# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

---

## APPELLANTS' EXCERPTS OF RECORD (VOL. I OF VII)

---

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

---

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

# INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
| | | *Exhibit B – July 12, 2012 Kline-Toberoff e-mail* | II | 56 |
| | | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
| | | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
| | | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
| | | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
| | | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
| | | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
| | | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
| | | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
| | | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
| | | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
| | | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
| | | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy | IV | 701 |
| | | Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz | IV | 703 |
| | | Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy | IV | 704 |
| | | Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy | IV | 705 |
| | | Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy | IV | 706 |
| | | Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy | IV | 708 |
| | | Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy | IV | 709 |
| | | Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson. | IV | 710 |
| | | Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy | IV | 719 |
| | | Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy | IV | 720 |
| | | Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc. | IV | 721 |
| | | Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy | IV | 753 |
| | | Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy | IV | 754 |
| | | Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy | IV | 759 |
| | | Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc. | IV | 760 |
| | | Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles | IV | 855 |
| | | Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles | IV | 869 |
| | | Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary) | IV | 874 |
| | | Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation | IV | 878 |
| | | Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary) | IV | 894 |
| | | Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary | V | 895 |
| | | Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson | V | 902 |
| | | Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary | V | 907 |
| | | Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen | V | 929 |
| | | Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff | V | 930 |
| | | Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011 | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |

1                                                                                              **O**

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          CENTRAL DISTRICT OF CALIFORNIA

8                               WESTERN DIVISION

9

10   DC COMICS,                          )    CASE NO. CV 10-3633 ODW (RZx)
                                         )
11                    Plaintiff,         )
                                         )    ORDER   GRANTING   PLAINTIFF'S
12   vs.                                 )    MOTION  FOR  PARTIAL  SUMMARY
                                         )    JUDGMENT    [458]  AND  DENYING
13   PACIFIC PICTURES CORP., *et al.*     )    DEFENDANTS' CROSS-MOTION [478]
                                         )
14                    Defendants.        )
     _____     )
15

16

17   **I.    INTRODUCTION**

18          DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed

19   interest in the Superman copyrights after certain heirs of Joseph Shuster, the first illustrator

20   of Superman, served DC with a copyright termination notice purporting to recapture certain

21   early Superman works as of October 26, 2013.

22          DC now moves for partial summary judgment as to the First and Third Claims.

23   DC's First Claim contests the validity of the termination notice at issue here, and its Third

24   Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and

25   his entertainment companies and business partners engineered in alleged violation of DC's

26   rights under the Copyright Act.  (Mot. at 1 ("There is a pressing need to resolve these

27   claims now, given the imminence of the 2013 termination date.").)

28   / / /

## II.   FACTS

Semantic quibbles aside, the following facts are undisputed.  On March 1, 1938, Jerome Siegel and Joseph Shuster assigned to DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)  "Action Comics #1 ('AC#1'), published on April 18, 1938, with a cover date of June 1938, featured an adapted version of Siegel and Shuster's Superman story." (UF 4.)  Defendants purport to, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.)  All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements. Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone.  (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.").)  In 1947, Siegel and Shuster sued DC in New York to invalidate the 1938 assignment.  The court found that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster acknowledged that the 1938 assignment granted DC all rights in Superman.  (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. (UF 8.) Defendants argue DC does not disclose its financial assumptions for its calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500." (Id.)

/ / /

2

DC has voluntarily increased the annual payments; made periodic cost-of-living adjustments; given special bonuses; and paid to have Siegel, Shuster, and their families travel to Superman-related events. (UF 9.) All told, the Siegels and Shusters have been paid over $4 million under the 1975 agreement, not including medical benefits or bonuses. (UF 10.) Shuster passed away on July 30, 1992. (UF 12.)

Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. (UF 13.) Defendants dispute this, arguing the statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary in the event Jean predeceased him and omits that the will states: 'In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor.'" (Opp'n UF.) On August 17, 1992, Jean filed an affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that certain property "be paid, delivered or transferred to her." (UF 14.)

Four days after filing her affidavit in state court, Jean wrote to DC, identifying herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses." (UF 15.) Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." (Opp'n UF.) DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.)

On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. (UF 17.) Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. (Opp'n UF.)

/ / /

3

**ER-3**

Paul Levitz dealt with many authors and heirs during his decades as president of DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.) The parties executed an agreement on October 2, 1992 under which DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19; Petrocelli Decl. Exh. 24.)

Over the next decade, DC maintained good relations with the Shusters, and Jean and Paul Levitz corresponded regularly. In the close-to-60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required. (UF 20.) Defendants contend that, over this decade, Jean expressed displeasure at the amount and form of her payments and requested changes. (Opp'n UF.) In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright," but asked for an increase in payments "plus a yearly increment to account for inflation." (UF 21.) Defendants contend "Jean stated that at the present time 'Frank and I are not planning to reclaim the Superman copyright.' [And]: 'We believe we have a right to expect that you will be fair with us as well and will grant our request for increased payment. We will stick to our bargain which we signed, dated as of October 1, 1992'" (Opp'n UF.)

In 1999, Congress amended the copyright statute to grant additional statutory heirs termination rights under 17 U.S.C. § 304(d). Upon learning that Jerry Siegel's heirs had served a copyright termination notice on DC, Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for Superman. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus for this year as you had done many times in the past.

(UF 22.)

In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.) In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal right to make such requests, but would pay her a bonus anyway, for which she thanked DC. (UF 24.) Jean's 50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound mind when she sent these letters to DC. (UF 26.) Mark Peary, Jean's doctor, and Jean's daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying." (UF 27.) On November 7, 2003, Mark Warren Peary (as substitute executor of the Shuster estate) served on DC a notice of termination of the prior grants of Shuster's Superman copyrights. (*See* Petrocelli Decl. Exh. 37.) Other facts shall be discussed as necessary.

## III.   DISCUSSION

As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice [is] invalid." (First Amended Complaint "FAC", Docket No. 49 ¶¶ 106–34. DC argues it is entitled to summary judgment on three grounds: (1) "The 1992 Agreement Bars the Shusters from Pursuing Termination[;]" (2) "The Shusters Lack the Majority Interest Necessary to Terminate" because they assigned 50% of their putative rights to Pacific Pictures; and (3) "There Is No Statutory Basis for the Shusters to Terminate, given that Joe Shuster had no statutory heir under the Copyright Act when he died." (Mot. at 9.) "DC's Third Claim, pled in the alternative, alleges that the Pacific Pictures Agreements and 2008 consent agreement improperly restrict the Shuster heirs' ability to enter into agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.)

### *1992 Agreement*

The Copyright Act provides a termination right for the prior grant of a copyright transfer or license *only if* the grant was made *prior* to January 1, 1978. 17 U.S.C. § 304(d). Our inquiry begins, then, with whether the 1992 Agreement superseded "Joseph Shuster's key 1938 Grant and subsequent Superman grants[,]" as Defendants put it. (Opp'n at 12.)

DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank Shuster – Joseph's siblings – bars the Shusters from exercising their statutory termination rights. (Mot. at 10.)  That agreement provides, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement *fully settles all claims* to any payments *or* other rights *or* remedies which you may have under *any other agreement or otherwise*, whether now *or* hereafter existing *regarding any copyrights*, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. *In any event*, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

(SUF 19; Petrocelli Decl. Exh. 24 (emphasis added).)

As Defendants argued earlier in this litigation, New York law governs the 1992 Agreement.   (*See* Docket No. 191 at 4 n.6 (applying choice of law principles and concluding "New York law clearly applies"); Docket No. 333 at 21; *see also* Reply at 2 (Defendants agree, "'whether [an] Agreement terminated and superseded [another],' is determined by governing state law – in this case, as in *Steinbeck*, 'New York law'" (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008))).)

Under New York law, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (N.Y. App. Div. 1994); *see also Northville Indus. Corp. v. Fort Neck Oil Term. Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 1984) ("[W]here [ ] parties have clearly expressed . . . their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.").   The pertinent inquiry is thus "whether the subsequent agreement, . . . in whatever form it may be, is[, as] a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 171 N.Y.S.2d 194, 199 (N.Y. App. Div. 1958) (emphasis added).

Defendants argue "the language of the 1992 Agreement clearly demonstrates that it was not a revocation or re-grant of Joe Shuster's prior Superman copyright grants and ends

6

the analysis." (Opp'n at 15.) The Court does not share Defendants' view of clarity. With a broad release and all-encompassing language, it would here appear that the 1992 Agreement does indeed aim to supersede all prior agreements between the parties. (*See* SUF 19 ("[T]his agreement *fully settles all claims* to *any payments or other rights or remedies* which you *may have* under *any other agreement or otherwise*, *whether now or hereafter existing* regarding *any copyrights . . . in any and all work* created *in whole or in part by your brother, Joseph Shuster.*" (emphasis added)).) Just as it says, the 1992 Agreement "fully settles" all obligations under any and all agreements.

As Defendants themselves acknowledge, "[w]here, as here, a contract's terms are unambiguous, the 'intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible.'" (Opp'n at 15 (quoting *Int'l Klafter Co., Inc. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989))); *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) ("Whether a contract is ambiguous is a threshold question of law . . . [for] the court.").

Like Defendants, the Court finds no ambiguity in the parties' agreement. Unlike Defendants, however, the Court finds that the 1992 Agreement does in fact settle all prior agreements. As Black's Law Dictionary confirms, "full settlement" is "a settlement and release of all pending claims between the parties." Black's Law Dictionary 1497 (9th ed. 2009). The 1992 Agreement extends such release to "all claims to any payments or other rights or remedies which [the Shusters] may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . ." (SUF 19.) Accordingly, the 1992 Agreement not only settled and released all "claims . . . rights [and] remedies" concerning the Shuster copyrights under all prior agreements, but it also extended the release to such rights and remedies as might exist "otherwise." (Id.)

Immediately after so settling all rights, the 1992 Agreement expressly and unambiguously provides: "In any event, you [Shuster's heir] now grant to us any *such rights* and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, *with respect to the above*, now and

7

**ER-7**

forever." (SUF 19; Petrocelli Decl., Exh. 24 (emphasis added).)

Plainly, this subsequent grant deals with the same subject matter settled immediately above (DC's copyright interests). In other words, the 1992 Agreement first settled all claims, and then granted DC "such rights" as were just settled, essentially revoking and re-granting all copyright agreements and interest. As New York law recognizes, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (citation omitted); *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1046 (9th Cir. 2005) (1983 agreement superseding pre-1978 grant "is not subject to termination under section 304(d) because it was not 'executed before January 1, 1978,' as the statute expressly requires").

*Milne* involved the rights to Winnie the Pooh. In 1930, Pooh's author, A.A. Milne, granted his copyright interest in Winnie the Pooh to SSI in exchange for a share of future royalties. 430 F.3d at 1040. In 1983, A.A.'s son, Christopher, re-granted those same rights to SSI and agreed not to pursue termination in exchange for increased royalties. Subsequently, Christopher's daughter Clare attempted to terminate A.A.'s 1930 grant to SSI. The Ninth Circuit held that her father's 1983 contract revoked all pre-1978 grants which might otherwise have been terminable. *Id.* As Defendants note, "[i]n lieu of statutory termination, Christopher agreed to the contractual 'revocation of the [1930] agreement[] in favor of the new agreement, followed by the re-granting (on the same page) of the rights in the Pooh works to SSI.'" (Opp'n at 9 ("*Milne* held there was no longer a 1930 grant to terminate, because the 1983 contract had expressly *revoked* it and expressly *re-granted* the copyrights to SSI." (citation omitted)).)

Relying in part on *Milne*, *Steinbeck* reached a similar conclusion. In 1938, John Steinbeck granted the copyrights in his most popular works to his publisher. After John's death, his termination interest passed by statute to his widow Elaine and his children. *Steinbeck*, 537 F.3d at 196, 203. Though Elaine did not hold the majority share of John's termination interest in 1994 necessary to terminate, as successor by will to John's

8

copyrights, she entered into an agreement with the publisher superseding the 1938 agreement in exchange for increased royalties and other benefits.   John's children subsequently served a notice to terminate the 1938 grant, arguing Elaine's 1994 agreement was an "agreement to the contrary" because it had the effect of depriving them of their termination rights.  Finding against the children, the Second Circuit found it improper to read the prohibition on "'agreement[s] to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right." *Id.* at 202 (noting heirs can "threaten (or . . . make good on a threat) to exercise termination rights and extract more favorable terms from early grants of an author's copyright," but they do not have "more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them.").

Pointing in opposition to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike [that] in *Milne*, did not '*expressly* revoke the earlier … assignments.'" (Opp'n at 11 (quoting *Mewborn*, 532 F3d at 989).)  In *Mewborn*, the Ninth Circuit upheld a termination notice regarding the novel "Lassie Come Home."  In 1976, the author's daughter, Mewborn, assigned her share of Lassie rights to the publisher. *Id.* at 980.  In 1978, she signed a second contract, which purported to assign additional copyrights. *Id.* at 981.  In 1996, Mewborn served a termination notice of her 1976 grant.  The publisher sued, claiming the 1978 grant "superseded" the 1976 grant and cannot be terminated.  Finding *Milne* inapplicable, the Ninth Circuit upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at 989.

Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its decision on the lack of an express revocation of earlier agreements. *See id.* at 989 ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer Mewborn's termination right as to the 1976 Assignment . . . , the district court improperly concluded that the 1978 Assignment included a grant of Mewborn's termination right."

(emphasis added)).  Rather than revoke and supersede prior agreements, the Ninth Circuit found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the additional enumerated rights that Mewborn had not assigned in 1976."  *Id.*

Such is not the case here.  The broad and all-encompassing language of the 1992 Agreement unmistakably operates to supersede all prior grants.  (*See* Petrocelli Decl. Exh. 24.)  Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to" those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and  displacing "all claims . . . . under any agreement" "or otherwise" related to "any and all" works "created in whole or in part by . . . Joseph Shuster."  (UF 19.)  Unlike the heirs in *Mewborn*, moreover, Jean and Frank were aware of the Copyright Act's termination rights when they bargained for and entered into the 1992 Agreement.  (*See* UF 17, 21, 22.)  As DC points out, "the fact that Jean and Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows that *Mewborn*'s concerns about [the heirs'] ignorance are inapt here."  (Mot. at 17.)

Defendants insist "the [1992] agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants."  (Opp'n at 12.)  Surely Defendants recognize that "any and all work created in whole or in part by . . . Joseph Shuster" necessarily includes his most famous creation, Superman.  And, just as clear, once a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes.  Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant *and subsequent Superman grants*" counsels in favor of all-encompassing language.

It bears noting here that, as one New York court put it, "while the question of whether a substituted agreement effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no evidence as to the parties' intent in making the agreement."  *Callanan Indus, Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712

10

(N.Y. App. Div. 1986) (citations omitted).

As in *Callanan*, although Defendants have alleged in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, they have offered no evidence in support of that conclusion. Nor, indeed, have Defendants even controverted the facts alleged in Plaintiff's moving papers with anything other than "patently insufficient" general denials. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (explicating the parties' relative burdens on summary judgment).

To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong. As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement (along with Frank) which renegotiated the terms of the parties' prior agreements to her and Frank's benefit. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Shuster's original grants of his copyrights. As in *Milne*, Defendants "present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights." *Milne*, 430 F.3d at 1046–47 ("Certainly with regard to [*Milne*], [the heir's] concerns are unfounded. The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades.").

Similarly here, the 1992 Agreement came about several years "after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act . . . ." *Id.* Joseph Shuster, who himself passed away in 1992, never terminated his prior grants of the Superman copyrights to DC. And, by entering into the 1992 Agreement – which increased Frank and Jean's payments – the heirs essentially struck a deal that binds

11

all other heirs. *See Steinbeck*, 537 F.3d at 202. ("Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise.").[1]

Defendants next argue that an author or his estate may exercise termination rights "notwithstanding any agreement to the contrary . . . . 17 U.S.C. § 304(c)(5)." (Opp'n at 8 ("Thus, any agreement that purports to waive, settle or limit the termination right is unenforceable.").) Such argument was previously considered and rejected in *Steinbeck*:

> We do not read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right. To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights. . . . Moreover, the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement.  In 1994, only 17 U.S.C. § 304(c) provided a termination right-section 304(d) would not become effective for another four years.  It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.  As of 1994, then, the agreement . . . did not deprive the Steinbeck Descendants of any rights they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination right four years later.  Had Elaine Steinbeck not entered into the 1994 Agreement, the section 304(c) termination right would have expired, and Penguin would have been bound only by the 1938 Agreement for the duration of the copyright terms absent (as ultimately happened) Congressional action. *We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.*

*Steinbeck*, 537 F.3d at 202–03 (emphasis added).

The same holds true here. In 1992, when Joseph Shuster passed away and his heirs entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody else, held a termination right . . . ." (Opp'n at 16.)  As of 1992, then, "the agreement entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could have realized at that time." *Steinbeck*, 537 F.3d at 203.  Nor, of course, could the parties

---

[1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

have contemplated that Congress would create a second termination right six years later. In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist." *Id.*

Defendants contend "DC's motion is defective [because] it fails to address most of Defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories." (Opp'n at 2.)  The Court disagrees.  It is not Plaintiff's duty to disprove Defendants' affirmative defenses, but rather, it is Defendants who bear the burden of proving the applicability of their affirmative defenses.  *See, e.g.*, *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a defendant bears the burden of proof at summary judgment with respect to affirmative defenses); *c.f. Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F. Supp. 2d 1019, 1023–24 (W.D. Wash. 2003) ("Since the affirmative defense of obviousness is Defendant's burden, by failing to challenge the issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

In sum, the Court finds that the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights, superseded and replaced all prior grants of the Superman copyrights.  The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 grant, it is not subject to termination under 17 U.S.C. § 304(d).

### *Majority Interest*

Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who . . . own and are entitled to exercise a total of more than one-half of [an] author's termination interest" and "shall be signed by the [requisite] number and proportion of the owners."  (Mot. at 18 (quoting 17 U.S.C. §§ 304(d)(1), (c)(1)–(4))); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).

DC contends "[a]ccording to the Shuster heirs' written contracts and deposition admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate served the [Termination] Notice." (Mot. at 18.) In 2001, after all, the Shusters had "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc Toberoff. (UF 31.) In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in 'Superman' pursuant to Section 304(d) of the U.S. Copyright Law." (UF 32.) Mark Warren Peary even admitted under oath that he understood when he signed the agreement "that all of [ ] Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says." (UF 33.)

Defendants contend "copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to anyone prior to the service of a termination notice, and can be transferred only to the grantee [i.e., DC] or its successor before 'the effective date of the termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. § 304(c)(6)(D)).) Thus, argue Defendants, "as a pure matter of law, the 2001/2003 [Pacific Pictures Corporation] PPC Agreements – pre-dating both the effective date and the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster Termination." (Opp'n at 18.)

DC argues Defendants must be held accountable for entering into these agreements, notwithstanding their illegality. (Reply at 8 ("This illegality defense fails for two reasons.").) First, although defendants say the Pacific Pictures contracts "did not transfer the prospective copyrights to be recovered by the Shuster Termination," Peary testified under oath, and without any objection, that the 2001 contract "transferr[ed] and assign[ed] to the venture" "all of the Joe Shuster rights, termination rights, to the extent they existed . . . ." (Reply at 8 (citations omitted).) "The 2003 agreement reaffirmed the 2001 Agreement [and] [t]hese admissions and facts are fatal to defendants' defense." (Id.)

While the Court finds problematic Defendants' conduct – especially their failure to inform the copyright office of agreements which they themselves believed would affect

ownership of the subject copyrights – these agreements do not alter the fact that the "right to serve the Shuster Termination could not have been transferred to PPC." (Opp'n at 18 ("No contract with PPC could create a new statutory class eligible or required to sign a termination notice.  Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute.  17 U.S.C. § 304(c)(4).").)  Thus, although Defendants may have believed that their contracts transferred the Shuster heirs' termination rights, those agreements did not and, indeed, could not have done so.

Second, DC argues Defendants fail "to address the public-policy rule that they may not assert the illegality of their own contracts as a defense."  (Reply at 8 ("Like a swindler who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal to avoid liabilities they create.").)  While that may be so, the Court does not believe that estoppel is applicable here.  In fact, were the Court to hold Defendants to their contracts (and find they lacked the majority interest necessary to terminate), it would essentially rewrite copyright law, allowing parties to traffic in future rights. *See Milne*, 430 F.3d at 1047 (law "prohibit[s] a new grant of rights terminated by statute until after the effective date of termination – to avoid trafficking in future interests" by third parties).  The Court thus finds the agreements did not transfer ownership of the subject copyrights, and that Defendants retained the requisite majority share.

### Statutory Right to Terminate

The 1998 Copyright Term Extension Act allows an "author's executor" to terminate when the "[t]ermination rights provided for in subsection (c) have expired on or before the effective date of the [CTEA]" – October 27, 1998 – and the author "has not previously exercised such termination right." (Mot. at 21 (quoting 17 U.S.C. § 304(d)) ("The Shuster Estate – formed by Peary, as its executor, in 2003 – relies on this provision to terminate, but § 304(d) has no application here.").)  DC argues "[b]y its plain language, § 304(d) applies only where the window for exercising a termination right under the 1976 Copyright Act opened and closed – i.e., 'expired' – and an author or statutory heir failed to terminate during that window.  It does not apply where [as here] an author died while the window

15

**ER-15**

1   was open without terminating, without leaving a statutory heir, and when his sole heir,

2   Jean, fully resolved his estate in 1992." (Id. at 22.)

3       Given the Court's finding that the 1992 Agreement bars termination, as well as the

4   perfunctory briefing of the issue, the Court will not explore the matter at this time.

5       ***Third Claim***

6       DC argues it is entitled to summary judgment on its Third Claim, contending

7   "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (i)

8   purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective

9   termination date in 2013, and (ii) barring the Shusters from making any deal with DC

10  without Toberoff's and the Siegels' consent." (Reply at 10.)

11       Section 304(c)(6)(D) provides:

12       A further grant, or agreement to make a further grant, of any right covered by
        a terminated grant is valid only if it is made after the effective date of the
13       termination. As an exception, however, an agreement for such a further grant
        may be made between the author or [his heirs] and the original grantee or [its
14       successor], after the notice of termination has been served . . . .

15  17 U.S.C. § 304(c)(6)(D).

16       As such, between November 10, 2003 (when the Notice was served) and October 26,

17  2013 (its effective date), DC was and is the only party that may enter into an agreement

18  with the Shuster heirs regarding the Superman rights sought to be recaptured. (Mot. at 23

19  ("Section 304(c)(6)(D) not only bars third parties like Toberoff from 'trafficking in future

20  [copyright] interests,' *Milne*, 430 F.3d at 1047, it protects original grantees who, like DC,

21  spent decades developing and promoting the copyrighted property.")). As DC points out,

22  "Congress described this right in the original grantee's favor as 'in the nature of a right of

23  'first refusal.'" (Mot. at 23 (quoting H.R. REP. NO. 94-1476 at 127).) In *Milne*, the Ninth

24  Circuit reviewed the statutory text and legislative history, and confirmed that Section

25  304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin

26  to a "right of 'first refusal.'" 430 F.3d at 1047.

27  / / /

28

16

Defendants concede that "copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to anyone prior to the service of the termination notice, and can be transferred only to the grantee or its successor before 'the effective date of the termination' – here, October 26, 2013." (Opp'n at 18 (quoting 17 U.S.C. §304(c)(6)(D)).)

The Court further agrees with Defendants that, "as a pure matter of law, the 2001/2003 PPC Agreements – pre-dating both the effective date and the service of the Shuster Executor's termination notice – *could not* and did not transfer the prospective copyrights to be recovered by the Shuster Termination." (Opp'n at 18 (emphasis added).) Such is the declaration DC seeks by this, its Third Claim.[2]

Defendants do not dispute that they entered into multiple agreements purporting to grant and otherwise encumber rights covered by a (to be) terminated grant; indeed, they agree that those agreements are void insofar as they aim to transfer the subject copyrights. (*See* Opp'n at 18.)  Those agreements run afoul of 17 U.S.C. § 304(c)(6)(D) as well and, accordingly, are hereby deemed invalid.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22 (citation omitted).) For one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized agreements.  That section, moreover, *does* in fact state that a third party grant agreement "is valid only if it is *made after* the effective date of termination." § 304(c)(6)(D) (emphasis added).  And, finally, it is beyond dispute that the subject agreements at issue here were *made* well *before* the termination date.

ER-17

IV.   **CONCLUSION**

As discussed above, DC's motion for summary judgment is **GRANTED**. [458]
Defendants' cross-motion for summary judgment is **DENIED**.[3] [478]

**SO ORDERED**

October 17, 2012

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

---

[3] Defendants' cross-motion also attacks DC's Second Claim concerning the scope of Defendants' termination notice.  As Defendants point out, however, "DC's Second Claim (FAC ¶¶135–64) seeks to re-litigate, and overlaps with, issues in *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal.  Much of this claim is barred by the doctrine of issue preclusion/collateral estoppel." (Defs' MSJ, Dkt No. 478 at 3 (citations omitted).)  As that claim is related to one currently on review before the Ninth Circuit, this Court declines to rule on that aspect of Defendants' motion.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated: March 5, 2013      TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams