APPELLATE CASE NO. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――――

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

―――――――――

## APPELLANTS' EXCERPTS OF RECORD (VOL. II OF VII)
―――――――――

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

―――――――――

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

## <u>INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD</u>

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
| | | *Exhibit B – July 12, 2012 Kline-Toberoff e-mail* | II | 56 |
| | | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
| | | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
| | | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
| | | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
| | | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
| | | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
| | | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
| | | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
| | | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
| | | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
| | | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
| | | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy* | IV | 701 |
| | | *Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz* | IV | 703 |
| | | *Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy* | IV | 704 |
| | | *Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy* | IV | 705 |
| | | *Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy* | IV | 706 |
| | | *Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy* | IV | 708 |
| | | *Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy* | IV | 709 |
| | | *Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson.* | IV | 710 |
| | | *Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy* | IV | 719 |
| | | *Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy* | IV | 720 |
| | | *Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc.* | IV | 721 |
| | | *Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy* | IV | 753 |
| | | *Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy* | IV | 754 |
| | | *Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy* | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy* | IV | 759 |
| | | *Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc.* | IV | 760 |
| | | *Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles* | IV | 855 |
| | | *Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles* | IV | 869 |
| | | *Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary)* | IV | 874 |
| | | *Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation* | IV | 878 |
| | | *Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary)* | IV | 894 |
| | | *Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary* | V | 895 |
| | | *Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | V | 902 |
| | | *Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary* | V | 907 |
| | | *Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen* | V | 929 |
| | | *Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff* | V | 930 |
| | | *Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011* | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |

1   TOBEROFF & ASSOCIATES, P.C.
    Marc Toberoff (State Bar No. 188547)
2    *mtoberoff@ipwla.com*
    Keith G. Adams (State Bar No. 240497)
3    *kgadams@ipwla.com*
    Pablo D. Arredondo (State Bar No. 241142)
4    *parredondo@ipwla.com*
    David Harris (State Bar No. 255557)
5    *dharris@ipwla.com*
    22337 Pacific Coast Highway #348
6   Malibu, California 90265
    Telephone:  (310) 246-3333
7   Fax:        (310) 246-3101

8   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
9   Estate of Joseph Shuster, Jean Adele Peavy,
    and Laura Siegel Larson, individually and
10  as personal representative of the Estate of
    Joanne Siegel

11
                **UNITED STATES DISTRICT COURT**
12
        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
13

| | |
|---|---|
| 14  DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 15              Plaintiff, | |
|          vs. | Hon. Otis D. Wright II, U.S.D.J. |
| 16 | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; | **NOTICE OF APPEAL TO THE** |
| 17  IP WORLDWIDE, LLC; IPW, LLC; | **UNITED STATES COURT OF** |
|    MARC TOBEROFF, an individual; | **APPEALS FOR THE NINTH** |
| 18  MARK WARREN PEARY, as personal | **CIRCUIT** |
| 19  representative of the ESTATE OF | Complaint filed:   May 14, 2010 |
|    JOSEPH SHUSTER; JEAN ADELE | Discovery Cutoff:  None Set |
| 20  PEAVY, an individual; LAURA | Trial Date:        None Set |
| 21  SIEGEL LARSON, individually and as | |
|    personal representative of the ESTATE | |
| 22  OF JOANNE SIEGEL, | |
| 23  and DOES 1-10, inclusive, | |
| 24             Defendants. | |

25

26

27

28

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
 rkendall@kbkfirm.com
Laura W. Brill (195889)
 lbrill@kbkfirm.com
Nicholas F. Daum (236155)
 ndaum@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:  310.556.2700
Facsimile:   310.556.2705

Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP Worldwide,
LLC, and IPW, LLC

NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**ER-20**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Notice is hereby given that MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, and MARC TOBEROFF, defendants in the above-named case, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the final judgment of the district court, filed on December 11, 2012 and entered in this case on December 11, 2012 at Docket No. 540 by the Honorable Otis D. Wright, II in the United States District Court for the Central District of California, pursuant to Federal Rule of Civil Procedure 54(b), based on the district court's October 17, 2012 order (Docket No. 507) and December 5, 2012 order (Docket No. 533).

December 10, 2012          RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

/s/ Laura W. Brill
KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff, *et al.*

1 | DANIEL M. PETROCELLI (S.B. #097802)
dpetrocelli@omm.com
2 | MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
3 | CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
4 | O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
5 | Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
6 | Facsimile: (310) 246-6779

7 | Attorneys for Plaintiff DC Comics

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | DC COMICS,

11 |       Plaintiff,

12 |       v.

13 | PACIFIC PICTURES
CORPORATION, IP WORLDWIDE,
14 | LLC, IPW, LLC, MARC TOBEROFF,
an individual, MARK WARREN
15 | PEARY, as personal representative of
the ESTATE OF JOSEPH SHUSTER,
16 | JEAN ADELE PEAVY, an individual,
LAURA SIEGEL LARSON, an
17 | individual and as personal
representative of the ESTATE OF
18 | JOANNE SIEGEL, and DOES 1-10,
inclusive,

19 |

20 |       Defendants.

Case No. CV 10-3633- ODW (RZx)

**JUDGMENT PURSUANT TO FED. R. CIV. P. 54(B)**

Hon. Otis D. Wright II

Case 2:12-57245  02/05/2013  ID: 8253872  DktEntry: 10-2  Page 16 of 312

# JUDGMENT

The Court's October 17, 2012, summary judgment order (Docket No. 507) granted judgment in favor of plaintiff DC Comics ("DC") on the First and Third Claims for Relief set forth in DC's First Amended Complaint (Docket No. 49).  The Court concludes that judicial administrative interests, as well as the equities involved, favor entering final judgment on DC's First and Third Claims for Relief at this juncture.  Therefore,

IT IS ORDERED AND ADJUDGED that DC's First Claim for Relief is GRANTED as set forth in the Court's October 17, 2012, order, and the copyright termination notice served by the Estate of Joseph Shuster on November 10, 2003, is deemed invalid and ineffective.

IT IS FURTHER ORDERED AND ADJUDGED that DC's Third Claim for Relief is GRANTED as set forth in the Court's October 17, 2012, order, and defendants' rights-encumbering agreements—including the 2001 Pacific Pictures agreement, 2003 Pacific Pictures agreement, and 2008 consent agreement—are deemed invalid and unenforceable under section 304(c)(6)(D) of the Copyright Act. 17 U.S.C. § 304(c)(6)(D).

IT IS FURTHER ORDERED AND ADJUDGED that, finding no just reason for delay, the Court's October 17, 2012, summary judgment order (Docket No. 507) is hereby certified as final, and partial final judgment is hereby entered pursuant to Federal Rule of Civil Procedure 54(b) on DC's First and Third Claims for Relief.

IT IS SO ORDERED.

Dated:  December 11, 2012          _____

Honorable Otis D. Wright, II
Judge, United States District Court

[PROPOSED] RULE 54(B) JUDGMENT

- 1 -

**ER-23**

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>         Plaintiff,<br><br>vs.<br><br>PACIFIC PICTURES CORP., *et al.*<br><br>         Defendants.<br>_____ | CASE NO. CV 10-3633 ODW (RZx)<br><br>ORDER DENYING DC'S MOTION FOR EVIDENTIARY HEARING **[500]** AND FINDING MOOT MOTION FOR RECONSIDERATION **[501]** GRANTING DEFENDANTS' MOTION FOR ENTRY OF RULE 54(b) JUDGMENT **[513]** AND FINDING MOOT MOTION TO VACATE ORDER **[514]** |

On October 17, 2012, this Court granted DC Comics' motion for partial summary judgment on its interest in the Superman copyrights, and denied Defendants' cross-motion. The parties have now filed four additional outstanding motions.

The Court begins with DC's motion for an evidentiary hearing. [500] DC argues "Toberoff's misconduct warrants terminating sanctions on DC's Fifth Claim and perhaps others." (Mot at 22.) Along with others, however, DC's Fifth Claim is currently before the Ninth Circuit on review from this Court's denial of Defendants' Anti-SLAPP motion. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). Accordingly, the Court lacks the jurisdiction to pass on the merits of this claim and the motion is **DENIED WITHOUT PREJUDICE**.

**ER-24**

DC next moves for Reconsideration of the May 23, 2011 Order Denying Motion for Review Re: Production of Defendants' Consent Agreement. [51] As DC explains, "[t]he Consent Agreement relates to [the then] pending summary judgment motions, particularly as DC's unclean-hands claim alleges that the Consent Agreement contains an improper quid pro quo in which the Siegels will pay off the Shusters for falsely disclaiming any ownership interest in the Superboy character." (Mot. at 1; *see also* Mot. 13 ("The Superboy quid pro quo is at the heart of DC's First Claim.").) Not only has this discovery matter been repeatedly litigated and reviewed, but now that the Court has resolved DC's First claim in its favor, it follows that this motion is **MOOT**.

Not to be outdone, Defendants move to Vacate the Order on Motion for Partial Summary Judgment. [514] Defendants bring this motion "on the grounds that DC engaged in discovery misconduct that prevented Defendants from fully and fairly developing their case in discovery and thereafter presenting their case to the Court on summary judgment." (Notice of Mot. at 1.) Interestingly, Defendants never requested a Rule 56(d) continuance to obtain evidence or otherwise complete discovery. Nevertheless, this "motion is being filed in the alternative to a concurrent motion for entry of judgment pursuant to Fed. R. Civ. P. 54(b) on DC's First and Third Claims." (*Id.* ("If the Court enters a Rule 54(b) judgment on DC's First Claim, this motion need not be addressed at this time.").) The Court turns to Defendants' Motion For Entry of Rule 54(b) Judgment.

### *Entry of Rule 54(b) Judgment*

"When an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Thus, Rule 54(b) allows a district court to certify an order as final and immediately appealable when it constitutes "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7–8 (1980). In deciding whether to enter judgment, courts "must take into account judicial administrative interests as well as the equities involved." *Id.* at 9.

2

**ER-25**

In its First Claim, DC sought a declaration that the Shuster Termination (advanced by Mark Warren Peary on behalf of the Shuster estate) is ineffective. (First Amended Complaint "FAC" ¶¶ 106, 134 (seeking a "declaration by this Court regarding the validity of the Shuster Termination Notice.")). The Court granted this relief, finding that as Joseph Shuster's sole heir, Jean Peavy entered into the 1992 Agreement with DC which effectively signed away the Shuster estate's not-yet-extant termination rights. In 1992, after all, the estate did not yet have the right to terminate Shuster's prior grants (which right would be adopted in 1998). By 1998, however, Jean had already signed the 1992 Agreement, which, as a post-1978 grant, may not be terminated under 17 U.S.C. § 304(d).

Having thus disposed of this claim, the Court cannot but conclude that judicial administrative interests, as well as the equities involved, favor entering final judgment at this juncture. First, as Defendants explain, "four of DC's claims (Second, Fourth, Fifth, and Sixth Claims) are already either directly on appeal before the Ninth Circuit or precluded pending the Ninth Circuit's resolution of the related Siegel appeals, as this Court noted." (Mot. at 7 (citation omitted).) The Court's October 17, 2012 Order granted summary judgment on DC's two remaining claims (First and Third). As Defendants posit, "[e]ntering a 54(b) judgment on this Order will put this entire matter and all claims before the Ninth Circuit, effectively streamlining this case and helping to bring this long-running litigation to a close." (*Id.*) The Court agrees.

The resolution of DC's First Claim regarding the validity of the Shuster Termination is not only "of far greater economic importance to the parties than any of DC's peripheral state-law claims," but it is easily severable, as the prior appeals demonstrate. And, as that claim has been fully decided, and the remaining claims are already on appeal, there is no just reason to delay appellate review at this time. Absent timely review of this Court's decision, the parties not only face "a significant impediment to settlement," but they also face crippling incertitude in the face of the October 26, 2013 termination date. And, finally, little is left for this Court to do while the various claims remain on appeal.

3

**CONCLUSION**

DC's motion for an evidentiary hearing [500] is DENIED WITHOUT PREJUDICE and its motion for reconsideration [501] is MOOT. Defendants' motion for entry of Rule 54(b) judgment [513] is GRANTED and their motion to vacate [514] is MOOT.


**SO ORDERED**

December 5, 2012

OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

4

**ER-27**

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
     parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
     dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Facsimile:   (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10  as personal representative of the Estate of
   Joanne Siegel

11

12                **UNITED STATES DISTRICT COURT**

13      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

14  DC COMICS,                           | Case No: CV 10-03633 ODW (RZx)

15                  Plaintiff,           | Hon. Otis D. Wright II, U.S.D.J.
                                         | Hon. Ralph Zarefsky, U.S.M.J.
        vs.

16

17  PACIFIC PICTURES CORPORATION;   **DEFENDANTS' MOTION TO**
   IP WORLDWIDE, LLC; IPW, LLC;       **VACATE OCTOBER 17, 2012**
18  MARC TOBEROFF, an individual;      **ORDER GRANTING PLAINTIFF DC**
                                        **COMICS PARTIAL SUMMARY**
   MARK WARREN PEARY, as personal      **JUDGMENT ON ITS FIRST AND**
19  representative of the ESTATE OF    **THIRD CLAIMS, AND FOR AN**
   JOSEPH SHUSTER; JEAN ADELE          **EVIDENTIARY HEARING**
20  PEAVY, an individual; LAURA
21  SIEGEL LARSON, individually and as  *Declaration of Pablo Arredondo and*
   personal representative of the ESTATE  *[Proposed] Order filed concurrently*
22  OF JOANNE SIEGEL,
                                        Complaint filed:  May 14, 2010
23  and DOES 1-10, inclusive,          Trial Date:  None Set

24                  Defendants.         Date:   December 17, 2012
                                        Time:   1:30 p.m.
25                                      Place:  Courtroom 11

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 17, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Mark Warren Peary, as personal representative of the estate of Superman's co-creator Joseph Shuster (the "Shuster Executor"), Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, will and hereby do move to vacate the Court's October 17, 2012 order (Docket 507; "Order") granting plaintiff DC Comics' ("DC") Motion For Partial Summary Judgment On Its First And Third Claims.

This motion is made on the grounds that DC engaged in discovery misconduct that prevented Defendants from fully and fairly developing their case in discovery and thereafter presenting their case to the Court on summary judgment.  DC withheld responsive, highly-relevant, non-privileged documents, ignored key document custodians, and searched for and produced relevant documents only if and when DC decided to use those documents in its own briefs.  There is every reason to believe that DC continues to withhold other responsive documents and willfully ignores other key document custodians.  Under the relevant case law and the guiding principles of Fed. R. Civ. P. 60(b)(3), from which the applicable legal standard is borrowed, DC's misconduct warrants vacating the summary judgment Order in its favor.

This motion is being filed in the alternative to a concurrent motion for entry of judgment pursuant to Fed. R. Civ. P. 54(b) on DC's First and Third Claims.  If the Court enters a Rule 54(b) judgment on DC's First Claim, this motion need not be addressed at this time.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 25, 2012.  This motion is based on the attached memorandum of points and authorities, the pleadings and records on file in this action, such additional authority and argument as may be presented in any reply and

at the hearing on this motion, and such other matters of which this Court may take judicial notice.

Dated:  November 12, 2012          RESPECTFULLY SUBMITTED,

                                   /s/ Marc Toberoff
                                   Marc Toberoff

                                   TOBEROFF & ASSOCIATES, P.C.
                                   Attorneys for Defendants Mark Warren Peary,
                                   as personal representative of the Estate of
                                   Joseph Shuster, Jean Adele Peavy, and Laura
                                   Siegel Larson, individually and as personal
                                   representative of the Estate of Joanne Siegel

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

    A.    The 1992 Agreement.................................................................3

    B.    Defendants Serve Discovery Targeted At The 1992 Agreement..........3

    C.    DC Withholds Documents Related To The 1992 Agreement ..............4

ARGUMENT ..........................................................................................................8

I.    THE ORDER SHOULD BE VACATED DUE TO DC'S DISCOVERY MISCONDUCT.............................................................................................8

    A.    The Legal Standard ..............................................................8

    B.    DC Engaged In Discovery Misconduct ................................9

    C.    Defendants Were Prevented From Fully And Fairly Presenting Their Case ........................................................12

    D.    The Court May Order An Evidentiary Hearing To Determine The Full Extent Of DC's Misconduct ........................................15

CONCLUSION.....................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Abada v. Charles Schwab & Co., Inc.*,
  127 F. Supp. 2d 1101 (S.D. Cal. 2000) ................................................... 8

*Alexander v. California Dept. of Corr.*,
  2010 WL 4006362 (E.D. Cal. Oct. 12, 2010) .......................................... 8

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) ................................................................. 8

*Anderson v. Cryovac, Inc.*,
  862 F.2d 910 (1st Cir. 1988) .......................................................... 8,9,12

*Bunch v. United States*,
  680 F.2d 1271 (9th Cir. 1982) ............................................................... 12

*Carrillo v. Schneider Logistics, Inc.*,
  2012 WL 4791614 (C.D. Cal. 2012) ...................................................... 11

*Corcoran v. McCarthy*,
  2010 S.D. 7 (S.D. 2010). ....................................................................... 13

*In re Independent Serv. Orgs. Antitrust Litig.*,
  168 F.R.D. 651 (D.Kan. 1996) .............................................................. 11

*In re M/V Peacock on Complaint of Edwards*,
  809 F.2d 1403 (9th Cir. 1987) ........................................................... 8,12

*In re Staff Inv. Co.*,
  146 B.R. 256 (Bankr. E.D. Cal. 1992) ............................................... 8,9,11

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3791716 (C.D. Cal. 2012) ...................................................... 11

*In re Vioxx Products*,
  489 F. Supp. 2d 587 (E.D. La. 2007) ................................................... 13

*Jones v. Aero/Chem Corp.*,
921 F.2d 875 (9th Cir. 1990) .......................................................... 8,13,15

*MGA Entm't Inc. v. Nat'l Products Ltd.*,
2012 WL 182158 (C.D. Cal. 2012) ........................................................ 11

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) .......................................................... 12,14

*Schultz v. Butcher*,
24 F.3d 626 (4th Cir.1994) ................................................................... 9

*Seaboldt v. Pennsylvania R. Co.*,
290 F.2d 296 (3d Cir. 1961) ................................................................ 12

*Square Const. Co. v. Washington Metro. Area Transit Auth.*,
657 F.2d 68 (4th Cir. 1981) ................................................................. 13

*United States v. One Douglas A–26B Aircraft*,
662 F.2d 1372 (11th Cir.1981) .............................................................. 9

*Wachtel v. Health Net, Inc.*,
239 F.R.D. 81 (D.N.J. 2006) ................................................................ 11

*Williams v. New York City Transit Auth.*,
2011 WL 5024280 (E.D.N.Y. Oct. 19, 2011) ........................................... 11

*Wyle v. R.J. Reynolds*,
709 F.2d 585 (9th Cir. 1983) ................................................................ 15

## **Rules**

Fed. R. Civ. P. 54(b) ........................................................................ 2

Fed. R. Evid. 60(b)(3) ............................................................... *passim*

TABLE OF CONTENTS AND AUTHORITIES

**ER-33**

# **INTRODUCTION**

The Court's October 17, 2012 partial summary judgment order (Docket 507; "Order") should be vacated because DC's blatant discovery misconduct prevented Defendants from fully and fairly developing and presenting their case. The central allegation of DC's First Claim was that a 1992 agreement between DC and Joseph Shuster's ("Shuster") siblings (the "1992 Agreement") revoked and replaced Shuster's venerable pre-1978 Superman grants to DC, and that, accordingly, DC's chain-of-title to Superman rests on the 1992 Agreement. Defendants' very first set of discovery requests served in 2011 therefore included multiple targeted requests for documents related to (1) the 1992 Agreement and (2) DC's chain-of-title to Superman. In response to these document requests, DC repeatedly assured Defendants that it had produced all relevant and responsive documents.

Despite these assurances, DC engaged in a pattern of misconduct. DC's improper actions speak for themselves: DC withheld highly responsive documents concerning the 1992 Agreement at issue, disclosing such documents only when it wanted to rely on them in summary judgment briefing.

First, DC turned over two letters exchanged between Paul Levitz and Jean Peavy (the "Peavy-Levitz Letters"), both signatories to the 1992 Agreement, just days before filing its motion for partial summary judgment that included the letters as exhibits.

Next, *after* DC had referred to an unproduced document in its opposition to Defendants' summary judgment motion, DC turned over the document only at Defendants' insistence and just *two* business days before Defendants' reply was due. The withheld 2006 document, written by Warner's Senior V.P. of Legal and Business Affairs, Damon Bonesteel (the "Bonesteel Document"), mentioned the 1992 Agreement, and, for DC's chain-of-title to Superman, it expressly relied on the pre-1978 Superman grants that DC falsely argued had been revoked by the 1992 Agreement.

DEFENDANTS' MOTION TO VACATE OCTOBER 17, 2012 ORDER

Finally, after summary judgment briefing was completed and taken under submission by the Court, DC turned over another three pages written in 2007 by Warner's Associate General Counsel, Donna Josephson (the "Josephson Document"), just *one hour* before DC filed it as part of an improper sur-reply.  This document also referenced the 1992 Agreement, and, in describing DC's chain-of-title to Superman, heavily relied on the same pre-1978 copyright grants that DC claimed were extinguished by the 1992 Agreement.

The Peavy-Levitz Letters, Bonesteel Document, and Josephson Document all go to the heart of DC's First Claim.  DC's selective disclosure of these documents only if and when it chose to use them in its own summary judgment briefs is clear-cut misconduct.  This misconduct denied Defendants the documents in question until just before or after summary judgment briefing, shutting down potentially fruitful avenues of discovery prior to summary judgment.

Based on DC's tactical misconduct there is every reason to believe that DC continues to withhold other highly responsive documents.  DC was forced to admit that it systematically ignores key document custodians when it responds to Defendants' discovery requests, searching them only when it seeks evidence to rebut Defendants' arguments.  *See* Docket 498 at 2-3.  Given DC's improper self-serving search/production strategies, it is almost certain that there are other documents that should have been produced to Defendants.

As a result of DC's discovery misconduct, Defendants were denied key evidence, denied potentially fruitful avenues of additional discovery, and denied access to relevant witnesses and custodians.  Pursuant to Fed. R. Civ. P. 60(b)(3)'s guiding standards and applicable case law, the Court should vacate its Order to ensure that Defendants have a full and fair opportunity to present their case as to DC's First Claim with all the relevant evidence at hand.[1]

---

[1] This motion is being filed in the alternative to a concurrent motion for entry of judgment on the First and Third Claims pursuant to Fed. R. Civ. P. 54(b).  If the Court enters a Rule 54(b) judgment, this motion need not be addressed at this time.

DEFENDANTS' MOTION TO VACATE OCTOBER 17, 2012 ORDER

**ER-35**

# BACKGROUND

### A.    The 1992 Agreement

In 1992, DC entered into an agreement with Joseph Shuster's siblings. (Docket 460-1 at 31; the "1992 Agreement").  This one-page pension agreement, and its purported effect on DC's chain-of-title to Superman, represents the most significant issue in this case.  DC alleged that the 1992 Agreement revoked and re-granted Shuster's Superman copyrights, and that DC's title to Superman therefore rests on the 1992 Agreement, which is not subject to statutory termination.  Docket 49 ¶¶112-17.  Defendants maintain that the 1992 Agreement had no impact on Superman, to which DC already owned all rights, and merely served to raise a modest pension due Frank Shuster under a 1975 agreement.

The majority of the parties' cross-motions for partial summary judgment, and the entirety of oral argument, were devoted to this issue, as was the Court's recent Order granting DC partial summary judgment as to its First and Third Claims. *See* Dockets 458, 462, 468, 478, 491, 495, 507.

### B.    Defendants Serve Discovery Targeted At The 1992 Agreement

In 2011, Defendant Mark Warren Peary served his first set of discovery requests on DC.  Given the significance of the 1992 Agreement in this case, Mr. Peary's requests unsurprisingly included a number of requests squarely aimed at the 1992 Agreement and its effect on DC's chain-of-title to Superman:

Request No. 7: All DOCUMENTS that RELATE to the 1992 AGREEMENT.

Request No. 12: All COMMUNICATIONS with third parties that REFER to the 1992 AGREEMENT.

Request No. 14: All DOCUMENTS that describe OR explain YOUR chain-of-title to Superman.

Request No. 27: All DOCUMENTS that support YOUR contention that "[t]he 1992 Agreement thus operated to revoke, rescind, and replace Shuster's prior copyright grants and agreements," found in paragraph 55 of YOUR COMPLAINT.

Request No. 29: All DOCUMENTS that support YOUR contention that "the clear effect of the 1992 Agreement was to revoke and regrant any

3

prior copyright grants that could otherwise have been subject to termination," found in paragraph 56 of YOUR Complaint.

Docket 498-2 at 26-27, 31-34, 50-51, 53-54.

To each and every one of these requests, on February 17, 2012, DC responded that it had produced "all non-privileged, responsive documents." *Id.* Later, during a meet-and-confer on March 16, 2012, DC's counsel reconfirmed that all responsive documents related to the 1992 Agreement had been produced. Declaration of Pablo Arredondo ("AD"), ¶ 2.

### C. DC Withholds Documents Related To The 1992 Agreement

On June 21, 2012, DC informed Defendants that it was moving for partial summary judgment on DC's First and Third Claims. AD Ex. A. On July 6, 2012, five months after DC confirmed that it had produced "all non-privileged, responsive documents," and three months after DC's counsel had re-confirmed that all responsive documents relating to the 1992 Agreement had been turned over, DC produced, without explanation, two new relevant documents. AD Ex. B. Why? Because six business days later (on July 16), DC attached both documents to its motion for partial summary judgment. Docket 460-1 at 33; 460-2 at 227.

Both documents were letters between Paul Levitz and Jean Peavy (the "Peavy-Levitz Letters"), signatories to the 1992 Agreement. AD Ex. C. One letter, dated October 7, 1992 (five days after the 1992 Agreement was signed), expressly referenced the 1992 Agreement. AD Ex. C at 6. The October 7, 1992 letter showed Jean/Frank's lack of negotiating leverage when they signed it. *Id.* ("As the family of Joe Shuster, we know we deserve more."). This lack of leverage was because an author's siblings hold no termination rights, and after Shuster's death no one held his termination rights until passage of the 1998 Copyright Term Extension Act. 17 U.S.C. § 304(c)(2); Pub. L. 105-298 (1998).

The other letter, dated June 8, 1998, showed that the 1992 Agreement was viewed by both parties as an act of charity by DC, not as a negotiated grant of

valuable Superman copyrights (because DC already owned all such rights).  *Id.* at 7.
The June 8, 1998 letter also showed how Jean, far from receiving compensation
commensurate with the sale of Superman, struggled to pay rent.  *Id.*

Initially, DC offered no explanation for why these letters were not produced
earlier.  AD Ex. B.  When Defendants requested an explanation, DC's counsel stated
only that "[t]he two documents in question were found as we finalized the motion for
summary judgment DC will file Monday."  AD Ex. D.  Defendants reminded DC's
counsel that "DC cannot apply a more rigorous search in preparation for its own
filings than it does in complying with its discovery obligations."  AD Ex. E.
Defendants also asked for specifics about DC's search efforts, including which
custodians of records had been searched and what search terms had been used.  *Id.*

In response to Defendants' requests for assurances, DC's counsel stated both
that "I asked our team to conduct an ***exhaustive review*** to confirm there were no
other documents" and "I can confirm that we have conducted a good-faith,
***comprehensive search*** for responsive documents pursuant to Rule 34 and have found
no other responsive documents requested by defendants in this case."  AD Ex. F
(emphases added).  Based on these representations and assurances, Defendants did
not seek further relief at that time.  Incredibly, DC now faults Defendants for
accepting its unequivocal assurances.  Docket 498 at 3.

On August 20, 2012, Defendants filed their cross-motion for partial summary
judgment.  Docket 478.  On August 30, 2012, the Court issued a tentative order
granting DC's motion for partial summary judgment.  On September 5, 2012, the
Court heard oral argument regarding its tentative order.  As in Defendants' briefing
(Docket 462 at 15-16, 478 at 11; 495 at 8), Defendants argued at the hearing that, in
addition to the lack of unequivocal language in the 1992 Agreement revoking
Shuster's pre-1978 Superman grants, DC/Warner Bros. did not rely on the
perfunctory 1992 Agreement for their chain-of-title to the multi-billion dollar
Superman franchise.  Docket 489 at 24:15-24, 35:15-22, 39:18-40:4.

On September 21, 2012, DC filed its opposition to Defendants' cross-motion (Docket 491) and concurrently filed a declaration of Damon Bonesteel, Warner's Senior Vice President of Legal and Business Affairs.  Docket 491-1.  Mr. Bonesteel's declaration purported to rebut the point made by Defendants at oral argument by stating that "in 2006, in dealing with a foreign government, Warner Bros. directly relied on the 1992 agreement as a grant by the Shuster heirs to DC." *Id.* at ¶3.  DC conspicuously did not attach any documents to support Mr. Bonesteel's declaration, nor had it ever produced such documents.

On September 25, 2012, Defendants wrote to DC requesting all documents relating to the "dealing[s] with a foreign government" that "relied on the 1992 agreement."  AD Ex. G.  Defendants noted that such documents would have been directly responsive to many of Defendants' discovery requests, including their requests for communications with third-parties concerning the 1992 Agreement and documents concerning DC's chain-of-title to Superman.  *Id.*; Docket 498-2 at 26-27, 31-34, 50-51, 53-54.

On September 27, 2012, just two business days before Defendants' reply papers were due, DC finally produced for the first time, and without explanation, eleven pages of material dated June 2006 specifically referenced in, but conspicuously not attached to, Mr. Bonesteel's declaration (the "Bonesteel Document").  AD Ex. H.  The previously withheld Bonesteel Document was a communication with a third-party that mentioned the 1992 Agreement, but explicitly relied in 2006 on the pre-1978 Superman grants that DC claimed were supposedly extinguished by the 1992 Agreement.  AD Ex. I.

DC thus filed a misleading Bonesteel declaration stating that it relied on the 1992 Agreement, while failing to attach the actual communication referred to because it showed DC's continued reliance on the very pre-1978 grants DC argued had been cancelled by the 1992 Agreement.  The Bonesteel Document that DC had withheld was directly responsive to Defendants' initial requests for production.

Docket 498-2 at 31 ("Request No. 12: All COMMUNICATIONS with third parties that REFER to the 1992 AGREEMENT."). Indeed, it is difficult to imagine a more responsive document.

Defendants filed their reply papers on October 1, 2012, including evidentiary objections to Mr. Bonesteel's declaration. Docket 495, 495-2. Among these objections, Defendants stated that "the declaration is inadmissible because it purports to describe a communication with third parties that should have long ago been disclosed and turned over to Defendants in discovery." Docket 495-2 at 3. After Defendants filed their reply, the Court ordered the matter submitted. Docket 497.

Three days after the Court ordered the matter submitted, DC produced, on October 4, 2012, again without explanation, *yet another* highly responsive document: a September 10, 2007 communication from Warner's Associate General Counsel, Donna Josephson, to a third party foreign government, mentioning the 1992 Agreement in passing, but again relying on pre-1978 Superman grants (supposedly extinguished in 1992) to establish DC's chain-of-title to Superman (the "Josephson Document"). AD Exs. J, K. A mere *hour* after producing the Josephson Document to Defendants, DC filed an improper sur-reply under the guise of a "Response" to Defendants' evidentiary objections, attaching the Josephson Document and the Bonesteel Document. Docket 498-2. It also attempted to explain away DC's discovery misconduct with false argument that DC's reliance on the 1992 Agreement only arose at oral argument, when Defendants had raised it in October 2011. *See* Docket 338 ("It defies reason that DC/Warner Bros. would have relied on this [1992 Agreement] for its chain-of-title to the billion-dollar Superman franchise."). Defendants promptly objected both to DC's improper sur-reply and the attached documents. Docket 499.

Less than two weeks later, the Court issued its Order, granting DC's motion for partial summary judgment and denying Defendants' cross-motion. Docket 507.

DEFENDANTS' MOTION TO VACATE OCTOBER 17, 2012 ORDER

**ER-40**

# ARGUMENT

## I. THE ORDER SHOULD BE VACATED DUE TO DC'S DISCOVERY MISCONDUCT

### A. <u>The Legal Standard</u>

The Order granting DC's motion for partial summary judgment is interlocutory, not a final judgment. "The interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment." *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996). The Court possesses the inherent procedural power to rescind an interlocutory order for "any reason it deems sufficient, even in the absence of new evidence or an intervening change in [law]." *Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101, 1102 (S.D. Cal. 2000). Where the grounds for rescinding an interlocutory order turn on a party's discovery misconduct, "**[t]he test to be applied … must be borrowed from cases interpreting Rule 60(b)(3)**," applicable to judgments. *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) (emphasis added). *See also Alexander v. California Dept. of Corr.*, 2010 WL 4006362, at *1 (E.D. Cal. Oct. 12, 2010) (noting that, in vacating orders due to discovery misconduct, "courts look to the standards under … Rule 60(b) for guidance").

Under the standards borrowed from Rule 60(b)(3), an order should be vacated where there is "misconduct by an opposing party." "'Failure to disclose or produce material requested in discovery can constitute 'misconduct' within the purview of this subsection.'" *Jones*, 921 F.2d at 879 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988)). To prevail, "the moving party must demonstrate" by "clear and convincing evidence" that (1) the opposing party engaged in "misconduct," and (2) "the conduct complained of prevented the moving party from fully and fairly presenting the case." *In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1404-05 (9th Cir. 1987); *see also In re Staff Inv. Co.*, 146 B.R. 256, 264 (Bankr. E.D. Cal. 1992) (same).

Case 13-57245 02/05/2013 ID: 8508472 DktEntry: 19-2 Page 35 of 312

As both requirements are easily met here, the Order should be vacated.

### B. DC Engaged In Discovery Misconduct

To demonstrate discovery misconduct under Rule 60(b)(3)'s standards, the moving party need not prove that its litigation opponent intentionally withheld evidence; rather, proof of "a negligent misrepresentation will suffice." *In re Staff Inc. Co*, 146 B.R. at 264; *see also Anderson*, 862 F.2d at 923 ("[Rule 60(b)(3)] '[m]isconduct' does not demand proof of nefarious intent or purpose…."); *United States v. One Douglas A–26B Aircraft*, 662 F.2d 1372, 1374–75 n. 6 (11th Cir.1981) (same). A "party's failure, either inadvertent or unintentional, to produce [] obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)." *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir.1994). Similarly, "discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that they deny the opposing party a fair trial" also amount to "misconduct" under Rule 60(b)(3). *Anderson*, 862 F.2d at 923.

As detailed above, DC: (1) produced the Peavy-Levitz Letters only days before relying on those documents in its own motion for summary judgment; (2) produced the Bonesteel Document only *after* referring to that document in its opposition to Defendants' cross-motion, and only two business days before Defendants' reply was due; and (3) produced the Josephson Document *after* the parties' cross-motions were taken under submission and only *one hour* before DC filed an improper sur-reply to which it brazenly attached the never-before-produced document. Any one of these instances would suffice as clear and convincing evidence of discovery misconduct under Rule 60(b)(3)'s standard. Together, they suggest a calculated strategy of discovery abuse and the suppression of evidence.

Perhaps recognizing this, DC attempted in its improper sur-reply to explain its belated and self-serving productions of the Bonesteel and Josephson Documents. Docket 498 at 2-3. However, DC did not and could not suggest that the multiple last-minute productions were the result of some sort of one-time oversight or error.

Rather, DC argued that it "could only conduct a good-faith search and review of 'relevant custodians of DC and Warner'" in response to Defendants' discovery requests and that "[o]nly when Toberoff made his false attacks on DC [during oral argument] did DC search for and locate the [Bonesteel and Josephson Documents]." *Id* at 3. According to DC these documents were not produced earlier, because DC could not "anticipate" the argument defense counsel made. *Id.* However, as shown above, DC was on notice of such argument in October, 2011. *See* Docket 338 ("It defies reason that DC/Warner Bros. would have relied on this [1992 Agreement] for its chain-of-title to the billion-dollar Superman franchise.").

DC's "explanation" that it did not uncover and produce the Bonesteel and Josephson Documents earlier because they were not held by "'relevant custodians of DC and Warner'" is absurd. Docket 498-2. The Bonesteel Document came from Warner's Senior Vice President of Legal and Business Affairs; the Josephson Document came from Warner's Associate General Counsel. It simply is not credible for DC to maintain that it never occurred to it or its counsel that Warner's Legal and Business Affairs departments were potentially "relevant custodians" of documents related to DC's chain-of-tile to Superman.

Indeed, DC's explanation is self-contradictory. According to DC, once it decided that it wanted documents relating to the 1992 Agreement for use in its own filings, it knew where to go. DC knew these custodians were relevant, searched them, and found precisely what it was looking for. If DC knew to search these custodians in response to Defendants' argument that DC did not rely upon the 1992 Agreement as the basis for its Superman chain-of-title, it also should have known (and did know) to search these custodians in response to Defendants' discovery requests about the 1992 Agreement and its Superman chain-of-title.[2]

DC's calculated, last-minute productions and shifting unsatisfactory

---

[2] *See* Docket 498-2 at 26-27, 31-34 ("Request No. 12: All COMMUNICATIONS with third parties that REFER to the 1992 AGREEMENT"; "Request No. 14: All DOCUMENTS that describe OR explain YOUR chain-of-title to Superman.").

10

explanations all point towards bad faith.  *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 106 (D.N.J. 2006) (holding that a "repetitive pattern" of misconduct "supports the conclusion that this incident was … committed in bad faith").

Even absent bad faith, DC/Warner's failure to search their Legal and Business Affairs departments is still misconduct.  A plaintiff cannot satisfy its discovery obligations by "sticking its head in the sand and refusing to look for answers…."  *In re Independent Serv. Orgs. Antitrust Litig.,* 168 F.R.D. 651, 653 (D. Kan.1996).  Rather, parties are under an "an *affirmative obligation* to conduct a reasonable search of documents in the possession of their employees, agents, subsidiaries, and others who are subject to their control."  *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *12 (C.D. Cal. Mar. 12, 2012).  *See also MGA Entm't, Inc. v. Nat'l Products Ltd.*, 2012 WL 182158, at *10 (C.D. Cal. Jan. 23, 2012) (the "obligation to conduct a reasonable search … would have included demand for production … from all potential custodians").  In fulfilling this duty, the "failure to collect and preserve records from key players 'constitutes gross negligence.'"  *Williams v. New York City Transit Auth.*, 2011 WL 5024280, at *7 (E.D.N.Y. Oct. 19, 2011) (citation omitted).  *See Carrillo v. Schneider Logistics, Inc.*, 2012 WL 4791614, at *5 (C.D. Cal. Oct. 5, 2012) (sanctioning plaintiff for "haphazard search for records"); *MGA Entm't, Inc.*, 2012 WL 182158, at *11 (C.D. Cal. Jan. 23, 2012) (defendant "should have conducted a reasonable search for responsive documents from all custodians from whom it had the legal right to obtain documents").

In short, then, DC had an affirmative duty to make a reasonable search of its key departments and custodians, and its failure to do so until it wanted to find evidence to use in its own briefing was, at best, grossly negligent.  This more than justifies vacating the Court's Order.  *See In re Staff Inc. Co*, 146 B.R. at 264 (negligence is sufficient to prove misconduct under Rule 60(b)(3)).

*///*

*///*

DEFENDANTS' MOTION TO VACATE OCTOBER 17, 2012 ORDER

**ER-44**

**C.  Defendants Were Prevented From Fully And Fairly Presenting Their Case**

Under Rule 60(b)(3)'s standard, to show prejudice from "the withholding of information called for by discovery, the [moving] party need not establish that the result in the case would be altered" by such information.  *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982).  A party "need not prove that the concealed material would likely have turned the tide at trial."  *Anderson*, 862 F.2d at 925; *see also Seaboldt v. Pennsylvania R. Co.*, 290 F.2d 296, 299-300 (3d Cir. 1961) (affirming new trial where "it cannot be stated that all of this [withheld information] would have changed the result of the case"); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978) ("Rule 60(b)(3) … does not require that the information withheld be of such nature as to alter the result in the case."); *In re M/V Peacock*, 809 F.2d at 1405 (explaining Rule 60(b)(3) is "aimed at judgments which were unfairly obtained, not at those which are factually incorrect.").

Instead, the moving party need merely show that the discovery misconduct denied it "access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *Anderson*, 862 F.2d at 925 (describing this as proof of "substantial interference" with a party's ability to present its case).

 Therefore it is no defense to say, as DC undoubtedly will in its opposition, that the Court's ultimate decision on summary judgment rested on other grounds – *i.e.*, the 1992 Agreement itself.  By systematically withholding documents until DC wanted to use them in its own filings, DC "denied [Defendants] access to evidence that could well have been probative on an important issue," ultimately preventing Defendants from fully and fairly presenting their case. *Anderson*, 862 F.2d at 925.

The Peavy-Levitz Letters, Bonesteel Document, and Josephson Document, all go to the heart of DC's First Claim – the 1992 Agreement, its effect on DC's chain-of-title to Superman and the supposed revocation of all of Shuster's pre-1978

DEFENDANTS' MOTION TO VACATE OCTOBER 17, 2012 ORDER

**ER-45**

Superman grants.  This was not merely an "important issue," but *the* central issue, and DC's failure to properly produce multiple documents highly-relevant to this issue warrants vacating the Court's Order under Rule 60(b)(3)'s standards.  *See In re Vioxx Products*, 489 F.Supp.2d 587, 594 (E.D. La. 2007) (party prevented from "fully and fairly presenting case" where adverse party's discovery misconduct concerned "central issue in this entire litigation."); *Square Const. Co. v. Washington Metro. Area Transit Auth.*, 657 F.2d 68, 72 (4th Cir. 1981) (reversing denial of Rule 60(b)(3) motion where "failure to disclose [document] struck at the very heart of the fact finding process").

DC's willful failure to turn this evidence over earlier deprived Defendants of the fair opportunity to conduct follow-up discovery prior to summary judgment.[3]

Even if the withheld evidence was, by itself "cumulative" or "*de minimis*," (which it is not), vacating the Order would be appropriate because DC's late disclosure of evidence and witnesses "may have substantially interfered with [the party's] ability to fully and fairly present her case" by "'preclud[ing] inquiry into a plausible theory.'"  *Jones*, 921 F.2d at 879.  *See Corcoran v. McCarthy*, 2010 S.D. 7, 778 (S.D. 2010) (vacating order is appropriate where disclosure "could have led to the timely discovery of [other relevant, admissible evidence]" even if the withheld evidence is, "by itself, … irrelevant").  The Bonesteel and Josephson Documents were not only relevant and important; they also identified important, heretofore unknown witnesses, custodians, and additional sources of evidence.  Both Mr. Bonesteel and Ms. Josephson, whose job duties apparently included communicating with third parties about DC's Superman chain-of-title, could have provided "potentially fruitful avenue[s]" of additional evidence at deposition.

Indeed, the Bonesteel and Josephson Documents indicate that a substantial

---

[3] This prejudice as to clearly non-privileged documents stands in stark contrast to the prejudice DC alleges in its recently-filed motion for sanctions (Dkt. 500), where the documents were produced *months*, and in some cases, a year ago, affording DC ample opportunity to take discovery on them before summary judgment or trial.

1    volume of relevant evidence has been withheld.  The Bonesteel and Josephson

2    Documents were communications sent to *two* foreign countries in connection with

3    the release of the *Superman Returns* movie.  *Superman Returns* was released in over

4    58 countries.[4]  DC has produced numerous "Superman" television series (*e.g.,*

5    *Smallville*) that also received international distribution.  There is, literally and

6    figuratively, a whole world of evidence that DC concealed in withholding the

7    Bonesteel and Josephson Documents.

8        The full extent of DC's misconduct will only be known once DC finally

9    complies with its discovery obligations and *actually* conducts the "comprehensive

10    search" that its counsel falsely represented in July 2012 had already occurred.  There

11    is every reason to believe that additional highly responsive documents authored by

12    Mr. Bonesteel, Ms. Josephson, and many others are still being withheld.  DC admits

13    that it ignored Warner's key Legal and Business Affairs departments and custodians,

14    and only searched these obvious custodians when it wanted to find evidence it

15    thought could rebut Defendants' specific arguments.  Docket 498 at 2-3.  Given this

16    admission, there are likely other custodians and documents that DC has deliberately

17    or negligently ignored, such as post-1992 documents that still rely *exclusively* on

18    Shuster's pre-1978 Superman grants in direct contradiction to DC's main revocation

19    argument, embraced by the Court's Order.

20        Finally, it is worth repeating that it does not matter whether the evidence DC

21    withheld or the avenues of discovery it shut down would actually have changed the

22    outcome.  Pursuant to Rule 60(b)(3)'s standard, so long as DC engaged in discovery

23    "misconduct" (which it did) and the withheld documents were related to an

24    "important" issue (which they were), then the Order should be vacated in the

25    interests of justice.  *See Rozier*, 573 F.2d at 1342 (reversing denial of Rule 60(b)(3)

26    motion where discovery misconduct "influenced the decision as to which theories

27

28   
---
[4] A list of countries where *Superman Returns* was released can be found at
http://www.imdb.com/title/tt0348150/releaseinfo

would be emphasized" and "would have made a difference in the way plaintiff's
counsel approached the case or prepared for trial") (quotations omitted).

### D. The Court May Order An Evidentiary Hearing To Determine The Full Extent Of DC's Misconduct

The Court would be more than justified in vacating its Order based on the specific instances of discovery misconduct proven in this motion which, individually or collectively, more than meet the Rule 60(b)(3) standard. Because willfulness is not required under Rule 60(b)(3), and because the withheld evidence need not be outcome-determinative, the fact that DC withheld evidence related to an important issue, only to rely on such evidence in its own summary judgment briefing, is alone sufficient grounds to vacate the Order. However, if the Court is uncertain, it should conduct a focused evidentiary hearing to determine the full scope of DC's misconduct and the appropriate remedy to ensure that Defendants are provided a fair opportunity to present their case. *See Wyle v. R.J. Reynolds*, 709 F.2d 585, 592 (9th Cir. 1983); *see also Jones*, 921 F.2d at 879 (remanding to district court for evidentiary hearing on Rule 60(b)(3) misconduct).

### CONCLUSION

Defendants respectfully request the Court grant their motion, and vacate the October 17, 2012 Order.

Dated: November 12, 2012        RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of
Joseph Shuster, Jean Adele Peavy, and Laura
Siegel Larson, individually and as personal
representative of the Estate of Joanne Siegel

Marc Toberoff (State Bar No. 188547)
  mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
  kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
  parredondo@ipwla.com
David Harris (State Bar No. 255557)
  dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and as
personal representative of the Estate of
Joanne Siegel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>             Plaintiff,<br><br>     vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL, and DOES 1-10,<br>inclusive,<br><br>             Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' OBJECTION TO DC'S NEW EVIDENCE ON SUR-REPLY RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Declaration of Pablo Arredondo filed concurrently herewith*<br><br>Complaint filed:     May 14, 2010<br>Discovery Cutoff:   None Set<br>Trial Date:           None Set<br><br>Date:     October 15, 2012*<br>Time:     1:30 p.m.<br>Place:    Courtroom 11<br><br>* Taken under submission (Docket 497) |

DC has submitted an improper sur-reply, in the guise of an untimely "Response to Defendants' Objections" (Docket No. 498), that includes new argument and heretofore unproduced new evidence that DC chose not to include with its opposition, and which should be stricken in its entirety.  *See* Local Rule 7-10; Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial at 12:110 (2010).  Compounding its brazen violation of the rules, DC did this *after* the Court had expressly taken Defendants' Motion for Partial Summary Judgment under submission.  Docket No. 497.

If the Court is inclined to consider DC's filing, it necessitates this response:

In December 2011, Defendants propounded targeted discovery aimed at whether DC had used a 1992 agreement as the basis for its chain-of-title.  *See, e.g.,* Declaration of Pablo Arredondo, Ex. A at 3, 6 (requesting "[a]ll [communications] with third parties that [refer] to the 1992 Agreement" and "[a]ll [documents] that describe or explain [DC's] chain-of-title to Superman").  In response, DC confirmed that it had conducted a "comprehensive search for responsive documents" but produced ***none*** of the documents that it now attempts to use.  *Id.*, Ex. B.

At the September 5, 2012 hearing on DC's motion for summary judgment, Defendants demonstrated that the 1992 agreement between DC Comics and Frank Shuster/Jean Peavy relating to a pension (the "1992 Agreement") did not cancel and replace DC's foundational chain-of-title to Superman.  DC's chain-of-title was based on grants by Jerome Siegel and Joseph Shuster that dated back to 1938 and had been upheld in multiple court judgments.  Docket 493-1 at 49:22-50:3, 50:13-17.  Defendants pointed to the absurdity of DC's contention that it intended in 1992 to tear up these venerated grants and replace its chain-of-title to a billion-dollar franchise with a pension agreement with people who held no Superman rights.  The Court agreed.  *Id.* at 78:6-7.  Defendants also noted that, prior to this litigation, DC had not argued that the 1992 Agreement revoked its key pre-1978 Superman grants.  *Id.* at 74:3-13.

OBJECTION TO NEW EVIDENCE ON SUR-REPLY RE: DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-50**

On September 21, 2012, DC filed a declaration of its in-house counsel Damon Bonesteel (Docket No. 491-1; the "Bonesteel Declaration") in opposition to Defendants' cross-motion for partial summary judgment.  The declaration vaguely stated that "in dealing with a foreign government, Warner Bros. directly relied on the 1992 agreement as a grant by the Shuster heirs," but DC conspicuously chose not to attach the communication(s) it referred to.  *Id.* ¶3.  Defendants duly objected that this self-serving declaration should be excluded for violating the best evidence rule.  *See* Docket No. 495-2 at 2-3; F.R.E. 1002, 1004; *Groppi v. Barham*, 157 F. App'x 10, 11-12 (9th Cir. 2005) (proper to apply "best evidence rule to exclude … declaration because [party] failed to provide the records upon which the declaration was based.")

After the Court took Defendants' motion under submission (Docket No. 497), DC improperly attempted to introduce two new documents into evidence.  Docket No. 498-2 at 5-18.  The first new document, dated June 12, 2006 (*id.* at 5-15), was produced only *after* DC had filed its opposition, and Defendants demanded the communication referred to in the vague Bonesteel Declaration; and even then, DC waited until two business days before Defendants' reply was due to finally produce the document.  Arredondo Decl., Ex. C.  The second new document, dated September 10, 2007 (Docket 498-2 at 16-18), was produced to Defendants on October 4, *one hour* before DC filed the document with its sur-reply.  Arredondo Decl., Ex. D.

DC obviously could have included these two documents in its opposition papers, but chose not to; and DC just as obviously should have produced the documents in discovery, but secreted them.  DC's "Response" attempts to explain this away, but the impropriety of DC's belated production of these letters for tactical advantage speaks for itself.[1]

_____

[1] Similarly, ten days before DC filed its motion for partial summary judgment, DC suddenly produced additional letters about the 1992 Agreement, despite its earlier claims that all such documents had been produced (Arredondo Declaration Ex. E), and then relied on such letters in its motion.  Docket 460-1 at 33, 460-2 at 227.

DC argues that Defendants' "best evidence" objection to the Bonesteel Declaration is "not well taken" because Defendants did not attach the belatedly-produced June 12, 2006 document to their reply papers.  Docket 498 at 1.  It is not Defendants' responsibility to fix DC's evidentiary problems, particularly when DC itself chose not attach the document.  Nor could Defendants have authenticated DC's document – especially as DC itself has still not properly authenticated or laid a foundation for either new document.  Fed. R. Evid. 602, 901.

The reason DC withheld these two documents in discovery, excluded them from its opposition, and relied instead on the self-serving declaration of its in-house counsel is clear.  **Neither document stands for the proposition that the 1992 Agreement revoked and replaced DC's prior chain-of-title to Superman.**  The very first paragraph of <u>both</u> documents expressly relies on the 1938 grant that is the foundation of DC's real chain-of-title to Superman.  Docket 498-2 at 5 ¶1, 16 ¶1.

Furthermore, both documents list a May 21, 1948 consent judgment and a December 23, 1975 agreement as granting Superman "rights."  Docket 498-2 at 5-6 ¶¶1, 5; 16-17 ¶¶1, 5.  But this Court affirmed in a judgment that <u>neither</u> was a Superman grant, and DC did not appeal that ruling.  *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal. 2008); Docket 478-1 ¶¶68-69.  Both documents also list the failed 2001 settlement negotiations with the Siegels as a "transfer" of rights, even though this Court expressly held that such "settlement negotiations did not result in an enforceable agreement," much less a rights grant.  *Siegel*, 542 F. Supp. 2d at 1139.  It is therefore clear that both new documents simply list any Superman-related agreement with the Siegels or Shusters as a "grant."  Neither document states, or even suggests, that the 1992 Agreement silently revoked and replaced DC's chain-of-title to Superman, as DC now argues.

In short, the new evidence DC offers is improper and objectionable on virtually every level:  it was improperly withheld in discovery (Fed. R. Civ. P. 37); it was not timely filed with DC's opposition, but with an improper sur-reply (Local Rule 7-10);

it lacks foundation and authentication (Fed. R. Evid. 602, 901); and it does not even support DC's contentions.  DC may flout the rules of civil procedure, but they cannot change the facts of this case.  DC's newfound evidence should be excluded, and Defendants' motion granted.

Dated:  October 5, 2012          RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
_____
TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

OBJECTION TO NEW EVIDENCE ON SUR-REPLY RE: DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT

Marc Toberoff (State Bar No. 188547)
  mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
  kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
  parredondo@ipwla.com
David Harris (State Bar No. 255557)
  dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
Malibu, California, 90265
Telephone: (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>       vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; JOANNE SIEGEL, an individual; LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DECLARATION OF PABLO D. ARREDONDO IN SUPPORT OF DEFENDANTS' OBJECTION TO DC'S NEW EVIDENCE ON SUR-REPLY RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Defendants' Objection filed concurrently herewith*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:        None Set<br><br>Date:      October 15, 2012*<br>Time:      1:30 p.m..<br>Place:     Courtroom 11<br><br>* Taken under submission (Docket 497) |

<u>**DECLARATION OF PABLO D. ARREDONDO**</u>

I, Pablo D. Arredondo, declare as follows:

1.     I am an attorney at Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joseph Shuster.  I am a member in good standing of the State Bar of California and submit this declaration in support of Defendants' Objection to DC's New Evidence On Sur-Reply Re: Defendants' Motion For Partial Summary Judgment.

2.     Attached hereto as Exhibit A is a true and correct copy of relevant excerpts from Plaintiff DC Comics' Responses to Defendant Mark Warren Peary's First Set of Requests For Production, dated February 17, 2012.

3.     Attached hereto as Exhibit B is a true and correct copy of an email sent from Matthew Kline, counsel for plaintiff DC Comics ("DC"), to my colleague Marc Toberoff, dated July 12, 2012.

4.     Attached hereto as Exhibit C is a true and correct copy of an email from Jason Tokoro, counsel for DC, to me, dated September 27, 2012.

5.     Attached hereto as Exhibit D is a true and correct copy of an email sent from Jason Tokoro to Marc Toberoff, dated October 4, 2012.

6.     Attached hereto as Exhibit E is a true and correct copy of an email sent from Ashley Pearson to Marc Toberoff, dated July 6, 2012.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on October 5, 2012, in Malibu, California

_____
Pablo D. Arredondo

DECLARATION OF PABLO D. ARREDONDO IN SUPPORT OF OBJECTION TO NEW EVIDENCE ON SUR-REPLY RE: DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-55**

## Pablo Arredondo

| | |
|---|---|
| **From:** | Kline, Matthew [MKline@OMM.com] |
| **Sent:** | Thursday, July 12, 2012 10:57 AM |
| **To:** | Marc Toberoff (mtoberoff@ipwla.com) |
| **Cc:** | Petrocelli, Daniel; Seto, Cassandra; Pablo Arredondo (parredondo@ipwla.com); Richard Kendall; lbrill@kbkfirm.com; Nicholas Daum |
| **Subject:** | DC vs. Pacific Pictures:  Meet and Confer on MSJ and Document Issue |

Marc,

This is to confirm our discussion yesterday concerning DC's supplemental production of July 6, 2012, which was comprised of two short letters that Jean Peavy, your client and a defendant in this matter, sent to DC several years ago.

As discussed, we came across the two documents in the past couple weeks as I was preparing the summary judgment motion we intend to file Monday.  As I mentioned, while finalizing our summary judgment motion, I asked a member of our firm to run electronic searches for certain documents.  One document that was found was located in a database from prior counsel to which we only recently obtained access in electronic form.  The searches turned up a letter from Jean Peavy that I and others had not seen before and that was not Bates-stamped.  We confirmed the letter had not previously been produced, at least in Bates-stamp form.  I immediately asked our team to conduct an exhaustive review to confirm there were no other documents in this database responsive to defendants' December 13, 2011, discovery requests.  That search turned up the second letter that we produced along with the first letter.  I can confirm that we have conducted a good-faith, comprehensive search for responsive documents pursuant to Rule 34 and have found no other responsive documents requested by defendants in this case.  It is possible, though unlikely, that there are a few documents responsive to requests in the *Siegel* case, and we will confirm that shortly, but obviously discovery is closed in that matter and the matter is on appeal.

As for the claims about DC's productions made in Laura Brill's letter of yesterday or Pablo's letters or emails on the same subject, they are false and belied by the facts above.  So, too, are their false claims about DC's privilege logs and other matters, as we have many times shown, and defendants have chosen not to challenge for many months.  If you wish to discuss any of these matters further, we are happy to do so.

We do hope finalize with you today or tomorrow your intentions on the three depositions discussed, as well as an agreed-upon briefing schedule on the MSJs.  On the briefing, we think the July 16, July 30, August 10, August 17 schedule makes sense, but are willing to consider other proposals, or to just follow the applicable rules.  On Paul Levitz's deposition, we confirm he will be deposed in New York on July 26--and we offered our New York offices to do that.

All of DC's rights are reserved.

Thanks,

Matt

**********************************************
**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm*

## Pablo Arredondo

| | |
|---|---|
| **From:** | Tokoro, Jason [jtokoro@omm.com] |
| **Sent:** | Thursday, September 27, 2012 4:11 PM |
| **To:** | Pablo Arredondo |
| **Cc:** | Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris' |
| **Subject:** | RE: DC v. PPC |
| **Attachments:** | DC 00158-168.pdf |

Counsel,

Please see below correspondence sent on behalf of Daniel M. Petrocelli.

\*       \*       \*

Counsel:

Your assertions below are incorrect, as you know. We will address them in due course. Attached is the document Mr. Bonesteel mentioned.

Dan

---

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, September 25, 2012 1:46 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris'
**Subject:** DC v. PPC

Counsel:

On Friday, September 21, 2012, DC filed a declaration of Damon Bonesteel (Dkt. No. 491-1) that purports to describe "dealing[s] with a foreign government [in which] Warner Bros. directly relied on the 1992 agreement as a grant by the Shuster heirs to DC. . . " Id. ¶3. DC conspicuously did not attach any documents relating to such "dealings" to Mr. Bonesteel's declaration and no such documents have been produced though they would be responsive to defendants' requests for production, including Mark Warren Peary's Requests nos. 7, 12, 14, 18, 19, 27, 29, 45, 61, and 63 served on DC on December 13, 2011. Please produce any documents relating to the "dealings" referenced in Mr. Bonesteel's declaration.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

**Exhibit C**
**10**

**ER-57**

1  DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:  (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8                **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10  DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

11            Plaintiff,                 | **DC COMICS' RESPONSE TO**
                                         | **DEFENDANTS' OBJECTION TO**
12            v.                         | **THE DECLARATION OF DAMON**
                                         | **BONESTEEL SUBMITTED IN**
13  PACIFIC PICTURES                     | **SUPPORT OF DC COMICS'**
    CORPORATION, IP WORLDWIDE,           | **OPPOSITION TO DEFENDANTS'**
14  LLC, IPW, LLC, MARC TOBEROFF,        | **MOTION FOR PARTIAL**
    an individual, MARK WARREN           | **SUMMARY JUDGMENT**
15  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,        | DECLARATION OF JASON H.
16  JEAN ADELE PEAVY, an individual,     | TOKORO SUBMITTED
    LAURA SIEGEL LARSON, an              | CONCURRENTLY HEREWITH
17  individual and as personal
    representative of the ESTATE OF      | Hon. Otis D. Wright II
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
              Defendants.
20

21

22

23

24

25

26

27

28

1    Given that the Court took defendants' cross-motion for summary judgment

2    under submission before DC filed responses to defendants' objections, or filed any

3    objections of its own, Docket No. 497, DC will not respond to defendants' *118*

4    *pages* of reply filings, Docket Nos. 495-1-5, except to note for the record that DC

5    disagrees with and objects to defendants' filings, and to address briefly one

6    particularly egregious argument that defendants advance:

7        1.  DC submitted a declaration from Damon Bonesteel to refute defendants'

8    false claim that, before DC filed this case in 2010, DC never relied on its 1992

9    Agreement with Jean Peavy and Frank Shuster as a full grant of Joe Shuster's

10   Superman copyrights.  Docket No. 491 at 11.  The Bonesteel declaration was not

11   the only evidence DC submitted to refute this false charge, *id.*, and his declaration

12   made clear that he had, as early as *2006*, relied on the 1992 Agreement to prove to

13   foreign authorities that DC owned full rights in Shuster's Superman copyrights, *id.*

14       Defendants argue Bonesteel's declaration "runs afoul of the best evidence

15   rule" because, while it attests that DC relied on the 1992 Agreement in 2006, it does

16   not "provide a copy of the alleged communication" between DC and the foreign

17   authority.  Docket No. 495-2 ("Obj.") at 2.  This objection is not well taken.  At

18   their request, DC provided defendants with a copy of Bonesteel's 2006 affidavit to

19   the French authorities *before* defendants filed their reply brief.  Decl. of J. Tokoro

20   Ex. 1.  It is *defendants* who tactically chose not to attach or address Bonesteel's

21   affidavit—the asserted "best evidence," which they had in hand—in their reply.

22       2.  The reason defendants chose not to include the 2006 affidavit is plain:  It

23   refutes Toberoff's repeated representations to the Court that DC "contrived" or

24   "cooked up" in 2010 its arguments concerning the 1992 Agreement.  *E.g.*, Docket

25   No. 489 at 24:15-24, 34:15-22, 39:18-40:4, 44:2-15.  Bonesteel's June 12, 2006,

26   affidavit, filed with the Centre National de la Cinematographie in France, provides:

27       Pursuant to an Agreement dated as of August 1, 1992 between Frank
         Shuster and Jean Shuster Peavy (heirs of Joseph Shuster), on the one
28       hand, and DC, on the other hand, <u>Shuster and Peavy granted to DC</u> *in*

**ER-59**

*perpetuity <u>all rights in any copyrights</u>, trademarks or other property rights <u>in any and all work created in whole or in part by Joseph Shuster</u>, or any works based thereon, <u>including without limitation, the Superman Concept.</u>* Tokoro Decl. Ex. 1 at 6 (emphases added).

3. Defendants also call Bonesteel's declaration "suspect" because, they say, it "provides solely *one* trivial purported example" of DC's reliance on the 1992 Agreement as a copyright grant. Obj. at 2. Again, untrue. As another example, in September 2007, Warner Bros. Pictures Associate General Counsel Donna Josephson sent a letter to the Canadian Audio-Visual Certification Office concerning DC's and Warner's rights in *Superman Returns*, which attests:

Pursuant to an Agreement dated as of August 1, 1992 …, [Frank] Shuster and [Jean] Peavy *granted to DC in perpetuity all rights in any copyrights, trademarks or other property rights in any and all work created in whole or in part by Joseph Shuster*, or any works based thereon, including without limitation, the Superman Concept.

Tokoro Decl. Ex. 2 at 17 (emphasis added).

4. Defendants finally assert that Bonesteel's 2006 affidavit should have been produced in February 2012, along with DC's responses to defendant Peary's discovery. Obj. at 3. Not so. In DC's responses,[1] written correspondence,[2] and a

---

[1] *E.g.*, Tokoro Decl. Ex. 3 at 26-27 ("Request No. 7: All DOCUMENTS that RELATE to the 1992 AGREEMENT. [DC's ] Response: DC objects to this Request on the grounds that it is indefinite as to time and not reasonably limited in scope. DC objects to the extent the Request seeks production of "all DOCUMENTS" on the ground that such request is overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence…. As used in these Responses, the phrase, "all DOCUMENTS," or phrases of similar import, <u>should be understood to mean those documents DC and its counsel were able to locate using reasonable diligence and reasonable judgment concerning the whereabouts of such documents. Subject to and without waiving all foregoing objections, *DC has conducted a reasonably diligent search of the documents in the possession, custody, or control of relevant custodians* and produces herewith by designation or otherwise all non-privileged, responsive documents.</u>); *id.* at 27-31 (same); Ex. 4 at 127-28 ("Interrogatory No. 5: IDENTIFY all COMMUNICATIONS between YOU AND any third party that REFERRED TO the 1992 AGREEMENT. [DC's] Response: … <u>As used in these Responses, the phrase "all COMMUNICATIONS," or phrases of similar import, should be understood to mean those communications DC and its counsel were able to locate using reasonable diligence and reasonable judgment concerning the whereabouts of such communications. DC objects to the definition of "YOU" as vague and overbroad and will respond to this term *as limited*</u>

ER 60

1  March 16, 2012, meet-and-confer call,[3] DC repeatedly told defendants that, given

2  the breadth of defendants' document requests and size of DC and its affiliates, DC

3  could only conduct a good-faith search and review of "relevant custodians of DC

4  and Warner" and would produce all non-privileged, responsive documents that the

5  search yielded.  Defendants understood and objected to this search methodology

6  and threatened to move to compel, but in the *seven months that followed*, never did

7  so.[4]  Indeed, the only discovery motion they did file—concerning other aspects of

8  DC's responses—was denied.  Docket No. 467.  Only when Toberoff made his

9  false attacks on DC did DC search for and locate the Bonesteel affidavit and

10  Josephson letter.  DC cannot anticipate what false arguments defense counsel will

11  make, and it has every right to search for and produce evidence in response.

12       5.  Defendants' objections to Bonesteel's declaration should be overruled.

13  Dated:    October 4, 2012               Respectfully submitted,

14                                    By:   /s/ Daniel M. Petrocelli

15                                    Daniel M. Petrocelli

16

17

---

18  *to the relevant representatives of DC and Warner Bros. Entertainment Inc*. … Subject to
and without waiving the foregoing objections, DC is willing to meet and confer with

19  defendants to reasonably tailor this request.") (emphases added); *id*. at 131-38 (same).

20  [2] *E.g.*, Tokoro Decl. Ex. 5 at 148 ("DC conducted a reasonable and diligent search and
investigation in responding to Peary's interrogatories, and defendants have shown no

21  reason why DC's efforts did not comply with its discovery obligations.  DC is not
required by the federal rules to conduct a search of all documents in its possession to

22  adequately respond to Peary's interrogatories, including documents that have no relevance
to claims in this case or Superman. If you want to have a discussion about DC's search

23  efforts, we are prepared to have one this Friday, and if the specific further details you
request are appropriate and relevant, DC is willing to consider furnishing them, though we

24  note that defendants have consistently refused to provide a similar accounting.")

25  [3] Tokoro Decl. ¶¶ 8-9.

26  [4] *E.g.*, *id.* ¶¶ 8-9; Ex. 6 at 152 ("DC is not entitled to unilaterally pick and choose the
sources of information it reviews in response to an interrogatory; rather, DC must provide

27  a full response based on the information in its possession…. For the above stated reasons,
defendant Peary will move to compel supplemental responses to these discovery requests

28  in the event DC does not resolve these issues.").

DC'S RESP. TO DEFS.' OBJ. TO
BONESTEEL DECL.

ER 61

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 55 of 312

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:   (310) 553-6700
6  Facsimile:    (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8
                 **UNITED STATES DISTRICT COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10

11  DC COMICS,                          | Case No. CV 10-03633 ODW (RZx)

12              Plaintiff,              | **DECLARATION OF JASON H.
                                        | TOKORO IN SUPPORT OF DC
13       v.                            | COMICS' RESPONSE TO
                                        | DEFENDANTS' OBJECTION TO
14  PACIFIC PICTURES                   | THE DECLARATION OF DAMON
    CORPORATION, IP WORLDWIDE,         | BONESTEEL SUBMITTED IN
15  LLC, IPW, LLC, MARC TOBEROFF,      | SUPPORT OF DC COMICS'
    an individual, MARK WARREN         | OPPOSITION TO DEFENDANTS'
16  PEARY, as personal representative of | MOTION FOR PARTIAL
    the ESTATE OF JOSEPH SHUSTER,      | SUMMARY JUDGMENT
17  JEAN ADELE PEAVY, an individual,   |
    LAURA SIEGEL LARSON, an            | Hon. Otis D. Wright II
18  individual and as personal         |
    representative of the ESTATE OF    |
19  JOANNE SIEGEL, and DOES 1-10,      |
    inclusive,                         |
20                                     |
                Defendants.            |
21

22

23

24

25

26

27

28

                                    TOKORO DECL. ISO DC'S RESP. TO
                                      OBJ. TO BONESTEEL DECL.
                                    **ER-62**

## <u>TABLE OF CONTENTS</u>

| Exhibit | Description | Page |
|---------|-------------|------|
| 1 | Email from Jason Tokoro to Pablo Arredondo dated September 27, 2012, attaching DC's supplemental production of documents bates-labeled DC00158-DC00168 | 3 |
| 2 | Letter from Donna L. Josephson to the Canadian Audio-Visual Certification Office dated September 10, 2007, bates-labeled DC00169-DC00171. | 16 |
| 3 | Plaintiff DC Comics' Objections And Responses To Defendant Mark Warren Peary's First Set Of Requests For Production dated February 17, 2012. | 19 |
| 4 | Plaintiff DC Comics' Objections And Responses To Defendant Mark Warren Peary's First Set Of Interrogatories dated February 17, 2012. | 119 |
| 5 | Letter from Jason Tokoro to Marc Toberoff and Keith Adams dated March 15, 2012. | 147 |
| 6 | Letter from Mr. Adams to Matthew Kline dated March 8, 2012. | 151 |

i

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 57 of 312

## DECLARATION OF JASON H. TOKORO

I, Jason H. Tokoro, declare and state as follows:

1.     I am an attorney licensed to practice in the State of California and admitted to the Central District of California. I am an associate at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics in the above-entitled action. I make this declaration in support of DC Comics' Response To Defendants' Objection To The Declaration Of Damon Bonesteel Submitted In Support Of DC Comics' Opposition To Defendants' Motion For Partial Summary Judgment. I have personal knowledge of the matters set forth in this declaration.

2.     Attached hereto as Exhibit 1 is a true and correct copy of an email from me to Pablo Arredondo dated September 27, 2012, attaching DC's supplemental production of documents bates-labeled DC00158-DC00168.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a letter from Donna L. Josephson to the Canadian Audio-Visual Certification Office dated September 10, 2007, which has been bates-labeled DC00169-DC00171, and we produced to defendants today.

4.     Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff DC Comics' Objections And Responses To Defendant Mark Warren Peary's First Set Of Requests For Production dated February 17, 2012.

5.     Attached hereto as Exhibit 4 is a true and correct copy of Plaintiff DC Comics' Objections And Responses To Defendant Mark Warren Peary's First Set Of Interrogatories dated February 17, 2012.

6.     Attached hereto as Exhibit 5 is a true and correct copy of a letter from me to Marc Toberoff and Keith Adams dated March 15, 2012.

7.     Attached hereto as Exhibit 6 is a true and correct copy of a letter from Mr. Adams to Matthew Kline dated March 8, 2012.

8.     On March 16, 2012, I participated in a teleconference with Mr. Kline, Cassandra Seto, and Messrs. Adams and Arredondo to discuss various discovery

TOKORO DECL. ISO DC'S RESP. TO
OBJ. TO BONESTEEL DECL.

**ER-64**

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 58 of 312

1   issues in this case.  During the conference, Mr. Adams asked to DC describe its

2   search efforts in responding to defendant Mark Warren Peary's First Set of

3   Requests for Production of Documents and First Set of Interrogatories.  DC

4   responded that it conducted a reasonable and diligent search and investigation in

5   responding to Mr. Peary's discovery requests, including conducting a reasonably

6   diligent search of the documents in the possession, custody, or control of relevant

7   custodians at DC and Warner Bros. Entertainment Inc.  DC stated that this targeted

8   search methodology was proper given the breadth of defendants' document requests

9   and the size of DC and its affiliates.  DC advised Mr. Adams that if defendants

10  identified specific further details it wished to know regarding DC's efforts, and if

11  that information was appropriate to share, DC was willing to consider furnishing it

12  and might also be willing to conduct additional searches.

13          9.      Defendants never followed up on DC's offer or filed their once-

14  threatened motion to compel.  Indeed, in the almost seven months since this March

15  teleconference—and in the scores of communications we have had with defense

16  counsel since—defendants have not communicated with DC about its search

17  methodology protocol, except to complain about two additional documents DC

18  found and promptly produced to defendants months ago.  Defendants also have not

19  identified for DC any specific further details they wish to know regarding DC's

20  search efforts or additional searches they wish DC to run or why.

21          I declare under penalty of perjury under the laws of the United States that the

22  foregoing is true and correct and that this declaration is executed this 4th day of

23  October, 2012, at Los Angeles, California.

24

25  _____
    Jason H. Tokoro

26

27

28

TOKORO DECL. ISO DC'S RESP. TO
OBJ. TO BONESTEEL DECL.

**ER-65**

# EXHIBIT 1

**Attachments:**         DC 00158-168.pdf

**From:** Tokoro, Jason
**Sent:** Thursday, September 27, 2012 4:11 PM
**To:** 'Pablo Arredondo'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris'
**Subject:** RE: DC v. PPC

Counsel,

Please see below correspondence sent on behalf of Daniel M. Petrocelli.

\*       \*       \*

Counsel:

Your assertions below are incorrect, as you know.  We will address them in due course.  Attached is the document Mr. Bonesteel mentioned.

Dan

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, September 25, 2012 1:46 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; Pearson, Ashley; 'Marc Toberoff'; 'Keith Adams'; 'David Harris'
**Subject:** DC v. PPC

Counsel:

On Friday, September 21, 2012, DC filed a declaration of Damon Bonesteel (Dkt. No. 491-1) that purports to describe "dealing[s] with a foreign government [in which] Warner Bros. directly relied on the 1992 agreement as a grant by the Shuster heirs to DC. . . " Id. ¶3.  DC conspicuously did not attach any documents relating to such "dealings" to Mr. Bonesteel's declaration and no such documents have been produced though they would be responsive to defendants' requests for production, including Mark Warren Peary's Requests nos. 7, 12, 14, 18, 19, 27, 29, 45, 61, and 63 served on DC on December 13, 2011.  Please produce any documents relating to the "dealings" referenced in Mr. Bonesteel's declaration.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333

1

**EXHIBIT 1**
3

Case 12-57245 03/25/2013 ID: 8538472 DktEntry: 10-2 Page 61 of 312

(f) 310.246.3101

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read,
copy, distribute or use this information. If you have received this transmission in error, please notify the sender
immediately by reply e-mail and then delete this message.

2

**EXHIBIT 1
4**

UNITED STATES OF AMERICA)
STATE OF CALIFORNIA     ) ss:
COUNTY OF LOS ANGELES  )

On this 12th day of June, 2006, before me, the undersigned Notary Public, personally appeared Damon B. Bonesteel who appears in this act in the name and on behalf of WARNER BROS. PICTURES INTERNATIONAL, a division of Warner Bros Distributing Inc., and in the capacity of Vice President thereof, he certified to me that he was duly entitled to act as such.

The appearer has made to me the following statements to the best of his knowledge and belief:

1. Jerome Siegel, deceased, formerly a citizen and resident of the United States of America, and Joseph Shuster, deceased, formerly a citizen of Canada and resident of the United States of America ("Siegel and Shuster") wrote and illustrated original characters and stories for a comic strip property entitled "Superman" in or around 1938. Pursuant to the terms and conditions of an Agreement dated as of March 1, 1938, as amended and/or restated from time to time thereafter (including on September 22, 1938, December 19, 1939, May 19, 1948 and May 21, 1948), between Siegel and Shuster, on the one hand, and Detective Comics, Inc., 480 Lexington Ave., New York, New York ("Detective"), on the other hand, Siegel and Shuster sold and transferred to Detective all of their respective right, title and interest in and to said comic strip property entitled "Superman". Pursuant to said Agreement as amended and/or restated, Detective acquired, in relevant part, all right, title and interest in and to the exclusive motion picture rights, the characters, the artwork, and the storyline contained in said comic strip property (the "Superman Concept").

2. Pursuant to a merger among several publishing companies, including, in relevant part, Detective, in or around September 1946, National Comics Publications, Inc. located in New York City (actual address unknown) became the parent company of Detective. Pursuant to the terms and conditions of an Assignment dated February 24, 1947, Detective assigned to National Comics Publications, Inc. the rights in and to the Superman Concept. Pursuant to said Assignment, National Comics Publications, Inc. acquired all of Detective's right, title and interest in and to the Superman Concept.

3. Pursuant to an Assignment and Consolidation Agreement dated January 20, 1966, National Periodical Publications, Inc. became successor-in-interest to National Comics Publications, Inc. Pursuant to said Agreement, National Periodical Publications, Inc., became the owner of all right, title and interest in and to Detective and, in relevant part, the Superman Concept.

4. Pursuant to a merger of Kinney Parking Company and National Cleaning Company in 1966, Steve Ross, deceased, became head of a company known as Kinney National. Pursuant to an incorporation in New York State in November 1967, Kinney National changed its name to KNS Publishing Company, Inc. ("KNS"). Pursuant to a corporate merger in 1968 National Periodical Publications, Inc. merged with KNS and the resulting company retained the name National Periodical Publications, Inc. National Periodical Publications, Inc. acquired Warner Bros.-Seven Arts, a Delaware corporation, 666 Fifth Avenue, New York, New York in 1969. National Periodical Publications, Inc. divested its non-entertainment holdings and became part of the group Warner Communications Inc., a Delaware corporation, 75 Rockefeller Plaza, New York, New York 10019 ("WCI") in 1972. Pursuant to said successive acquisitions and mergers, WCI became the parent company of National Periodical Publications, Inc. in 1972.

5. Pursuant to the terms and conditions of an Agreement dated as of December 23, 1975 between Siegel and Shuster, c/o Edmund Preiss, Esq., Kane, Kessler, Proujansky, Priess & Permutt, on the one hand, and WCI and its subsidiaries, inclusive of National Periodical Publications, Inc., on the other hand, Siegel and Shuster agreed and acknowledged that WCI is the sole and exclusive owner of all of the right, title and interest in and to the Superman Concept, including, without

**EXHIBIT 1**
5

ER-69
DC 00158

limitation, the characters, artwork, and motion picture rights, throughout the world in perpetuity. Pursuant to said Agreement, WCI owns the motion picture production, distribution and ancillary rights in the Superman Concept throughout the world in perpetuity, inclusive of copyrights and trademarks therein.

6. In or around August 1976, National Periodical Publications, Inc. changed its name to DC Comics, Inc. Pursuant to an Assignment dated as of June 30, 1992, among Detective, DC Comics, Inc., successor-in-interest to National Periodical Publications Inc., 1700 Broadway, 3rd Floor, New York, New York 10019, DC Comics, A New York Partnership, 1700 Broadway, 3rd Floor, New York, New York 10019 ("DC") and Warner Bros. Inc., a Delaware corporation, 4000 Warner Boulevard, Burbank, CA 91522, a subsidiary of WCI ("Warner"), Detective assigned to Warner all of its right, title and interest in, among other properties, the Superman comic books and Warner, in turn, simultaneously assigned to DC all of its right, title and interest in said property, including, without limitation, all copyrights, and renewals, all rights under copyright, including the right to prepare derivative works, all versions of said property and all rights in any underlying properties.

7. Pursuant to an Agreement dated as of August 1, 1992 between Frank Shuster and Jean Shuster Peavy (heirs of Joseph Shuster), on the one hand, and DC, on the other hand, Shuster and Peavy granted to DC in perpetuity all rights in any copyrights, trademarks or other property rights in any and all work created in whole or in part by Joseph Shuster, or any works based thereon, including without limitation, the Superman Concept.

8. Pursuant to the terms and conditions of an Agreement dated as of November 6, 1999 between DC and Warner Bros., a division of Time Warner Entertainment Company, L.P., a Delaware limited partnership, 4000 Warner Boulevard, Burbank, CA 91522 ("WB"), successor-in-interest to Warner, DC assigned an exclusive license to WB through December 31, 2033, throughout the universe, in the motion picture production, distribution and ancillary rights in the Superman Concept, including, without limitation, sequels and remakes. Pursuant to said Agreement, Warner has an exclusive license to produce, distribute and exploit motion pictures, remakes and sequels based on the Superman Concept.

9. Pursuant to an Agreement dated October 19, 2001 between Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel), on the one hand, and DC, on the other hand, Siegel and Larson transferred to DC all of their rights in the Superman properties and the Superman Concept, in relevant part.

10. Pursuant to the terms and conditions of an Agreement dated as of June 1, 2004 between Red Sun Productions Pty Limited, an Australian corporation, Level 6, 116 Military Road, Neutral Bay, Australia ("RSP") and Warner Bros. Pictures Inc., a Delaware corporation, 4000 Warner Blvd., Burbank, CA 91522 ("WBPI"), successor-in-interest to Warner, WBPI engaged RSP to produce, on behalf of WBPI, one theatrical motion picture based on the Superman properties and the Superman Concept. Pursuant to said Agreement, RSP shall retain no rights in the proposed motion picture, all such rights being owned at all times during the production by WBPI.

11. Pursuant to the terms and conditions of an Agreement dated as of July 20, 2004, as amended, between WBPI and Danimal, Inc. f/s/o Dan Harris, a citizen and resident of the United States of America, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, Attn: Todd Feldman and Michael Dougherty, a citizen and resident of the United States of America, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212 , Attn: Danny Greenberg, (collectively "Writer"), Writer wrote a first draft Screenplay ("Screenplay No. 1"), a second draft Screenplay ("Screenplay No. 2") and several Polishes (collectively "Screenplay No. 3") entitled "Red Sun" based on the Superman properties and the Superman Concept. Pursuant to said Agreement, the Writers assigned all of their respective right, title and interest in and to Screenplay No. 1, Screenplay No. 2 and Screenplay No. 3 to WBPI exclusively in perpetuity throughout the universe.

**EXHIBIT 1**

6

ER-70
DC 00159

12.      WBPI produced a feature length motion picture entitled "Superman Returns" based on Screenplay Nos. 1 through 3 (the "Picture"). The Picture was recorded on tape in Australia by means of a Genesis Camera for transfer to film and the film was developed by Technicolor in Los Angeles, California.

13.      Pursuant to a general inter company agreement dated as of April 1, 2003, between WBPI, predecessor-in-interest to Warner Bros. Distributing Inc., a Delaware corporation, 4000 Warner Boulevard, CA 91522 ("WBDI") and Warner Bros. Entertainment Inc., a Delaware corporation, 4000 Warner Boulevard, Burbank, CA 91522 ("WBEI"), WBDI assigned to WBEI all of its distribution and exploitation rights in and to the Picture in perpetuity.

14.      Pursuant to a general inter company agreement dated as of April 1, 2003, between WBEI and Warner Bros. Pictures International, a division of Warner Bros. Distributing Inc., formerly a division of Warner Bros. Pictures Inc. ("International"), WBEI assigned to International the distribution and exploitation rights in the Picture throughout the universe in perpetuity.

15.      Under a general distribution agreement dated December 1, 2003 between International and Warner Bros. France S.A., a corporation organized under the laws of France, having an office at 115-123 avenue Charles De Gaulle, 92525 Neuilly sur Seine Cedex, France ("WBF"), the license to distribute the Picture for the territory of Metropolitan France (including Corsica), Andorra, Monaco, Algeria, Tunisia, Morocco, Mauritius, Madagascar, Haiti, Comores Island, Martinique, Guadeloupe, French Guiana, Reunion, French Polynesia, New Caledonia, Vanuatu (formerly New Hebrides), Wallis and Futuna Islands, and French Austral and Antarctic Lands and Djibouti; and ships and aircraft flying the French flag but not traveling to or from the United States as the political borders of each exist; and all diplomatic posts and camps, bases, installations and reservations of the military forces of France, for a period of one year from delivery of the positive print, was granted by International to WBF.

The foregoing statement has been read to the appearer; he ratified the contents thereof in my presence under oath.

WARNER BROS. PICTURES INTERNATIONAL, A DIVISION OF WARNER BROS. DISTRIBUTING INC.

Damon B. Bonesteel
Vice President

Subscribed and sworn to before me this 12th day of June 2006.

Notary Public

CAROL F. TILTON
Commission # 1448186
Notary Public - California
Los Angeles County
My Comm. Expires Oct 28, 2007

EXHIBIT 1
7

ER-71
DC 00160

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 65 of 312

REPUBLIQUE FRANCAISE

——————

**CENTRE NATIONAL DE LA CINEMATOGRAPHIE**

——————

CONSERVATION DU REGISTRE PUBLIC

——————

**Délivré à**

**WARNER BROS FRANCE**

**115/ 123 AVE CHARLES DE GAULLE**

**92525 NEUILLY SUR SEINE CEDEX**

Sur requête de WARNER BROS FRANCE

a été porté au registre des dépôts

le seize Juin 2006

l'acte n° 2006.7333 comportant 5 page(s) et

contenant les inscriptions :

**Numéro 2006.10600 sur l'oeuvre n°115721 dépôt n°12000**

RECU: La somme de **VINGT CINQ EUROS** réglée par :

Chèque n° 5905632 du 13/06/2006 sur BNP PARIBAS

N° 7221 du journal des perceptions

A Paris, le 16/06/2006

Le Conservateur du Registre Public de la Cinématographie et de l'Audiovisuel

Référence de l'acte : Titre SUPERMAN RETURNS
DISTRIBUTION
Bénéficiaire : WARNER BROS FRANCE Cédant : WARNER BROS PICTURES INTERNA

En date du 12/06/2006

> ROLE N°
> 000001
> CONSERVATION DES REGISTRES DE LA CINEMATOGRAPHIE ET DE L'AUDIOVISUEL

**EXHIBIT 1**
**8**

ER 72
DC 00161

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 66 of 312

ETATS-UNIS D'AMERIQUE )
ETAT DE CALIFORNIE ) ss :
COMTE DE LOS ANGELES )

Le 12 juin 2006, a comparu en personne par devant moi, Notaire Public soussigné, le nommé Damon B. BONESTEEL qui apparaît dans le présent acte au nom et pour le compte de WARNER BROS. PICTURES INTERNATIONAL, une division de Warner Bros. Distributing Inc., et en qualité de Vice-président Exécutif de ladite société, lequel a certifié par devant moi être dûment habilité à agir en tant que tel.

Le comparant a formulé par devant moi les déclarations suivantes en son âme et conscience :

1.      Jerome Siegel, décédé, anciennement ressortissant et résident américain, et Joseph Shuster, décédé, anciennement ressortissant canadien et résident américain (« Siegel et Shuster »), ont, vers l'année 1938, écrit et illustré des personnages et histoires originaux pour une bande dessinée intitulée « Superman ». Aux termes d'un Acte signé en date du 1$^{er}$ mars 1938, tel qu'il a été par la suite modifié et/ou reformulé (notamment le 22 septembre 1938, le 19 décembre 1939, le 19 mai 1948 et le 21 mai 1948), entre Siegel et Shuster, d'une part, et Detective Comics, Inc., 480 Lexington Avenue, New York, New York (« Detective »), d'autre part, Siegel et Shuster ont vendu et cédé à Detective l'ensemble de leurs droits, titres de propriété et intérêts respectifs afférents à ladite bande dessinée intitulée « Superman ». Par cet Acte, sous sa forme modifiée et/ou reformulée, Detective a acquis, pour l'essentiel, tous les droits, titres de propriété et intérêts afférents aux droits cinématographiques exclusifs, aux personnages, aux visuels et à l'intrigue de ladite bande dessinée (le « Concept Superman »).

2.      Suite à la fusion vers septembre 1946 de plusieurs sociétés d'édition, dont, pour l'essentiel, Detective, National Comics Publications, Inc., sise à New York (adresse réelle inconnue), est devenue la société mère de Detective. En vertu d'un Acte de cession en date du 24 février 1947, Detective a cédé à National Comics Publications, Inc. les droits sur le Concept Superman. Par cet Acte, National Comics Publications, Inc. a acquis tous les droits, titres de propriété et intérêts de Detective afférents au Concept Superman.

3.      Aux termes d'un Acte de cession et de consolidation en date du 20 janvier 1966, National Periodical Publications, Inc. est venue aux droits de National Comics Publications, Inc.. Par cet Acte, National Periodical Publications, Inc. est devenue le propriétaire de tous les droits, titres de propriété et intérêts afférents à Detective et, pour une partie essentielle, du Concept Superman.

4.      Suite à la fusion en 1966 de Kinney Parking Company et de National Cleaning Company, Steve Ross, décédé, a pris la direction d'une société connue sous le nom de Kinney National. Du fait de son établissement dans l'Etat de New York en novembre 1967, Kinney National est devenue KNS Publishing Company, Inc. (« KNS »). Suite à la fusion en 1968 de National Periodical Publications, Inc. et KNS, la société ainsi formée a conservé le nom de National Periodical Publications, Inc. National Periodical Publications, Inc. a acquis en 1969 Warner Bros. – Seven Arts, société de droit de l'Etat du Delaware, 666 Fifth Avenue, New York, New York. En 1972, National Periodical Publications, Inc. a cédé ses actifs ne relevant pas du monde du spectacle et est devenue membre du groupe Warner Communications Inc., société de droit de l'Etat du Delaware, 75 Rockefeller Plaza, New York, New York 10019

N° 2006-10.600

**EXHIBIT 1**
**9**

ROLE N°

000002

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE

ER-73
DC 00162

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 67 of 312

(« WCI »). Par ces acquisitions et fusions successives, WCI est devenue en 1972 la société mère de National Periodical Publications, Inc.

5.     Aux termes d'un Accord passé en date du 23 décembre 1975 entre Siegel et Shuster, c/o Edmund Preiss, chez Kane, Kessler, Proujansky, Priess & Permutt, d'une part, et WCI et ses filiales, dont National Periodical Publications, Inc., d'autre part, Siegel et Shuster ont reconnu et accepté que WCI était le propriétaire exclusif de tous les droits, titres de propriété et intérêts afférents au Concept Superman, y compris, notamment, les personnages, visuels et droits cinématographiques, dans le monde entier et à perpétuité. Par cet Accord, WCI possède les droits de production cinématographique, de distribution et annexes sur le Concept Superman, dans le monde entier et à perpétuité, y compris les copyrights et marques s'y rapportant.

6.     Vers août 1976, National Periodical Publications, Inc. est devenue DC Comics, Inc.. Aux termes d'un Acte de cession signé en date du 30 juin 1992 entre Detective, DC Comics, Inc., société venant aux droits de National Periodical Publications, Inc., 1700 Broadway, 3rd floor, New York, New York 10019, DC Comics étant une partnership de droit new-yorkais sise au 1700 Broadway, 3rd floor, New York, New York 10019 (« DC »), et Warner Bros. Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522, filiale de WCI (« Warner »), Detective a cédé à Warner l'ensemble de ses droits, titres de propriété et intérêts afférents, notamment, aux albums de bandes dessinées Superman, et Warner a, à son tour, cédé simultanément à DC l'ensemble de ses droits, titres de propriété et intérêts afférents auxdits biens, y compris, notamment tous les copyrights et reconductions, tous les droits dans le cadre de copyright, y compris le droit de préparer des oeuvres dérivées, toutes les versions desdits biens et tous les droits sur les biens sous-jacents.

7.     En vertu d'un Acte signé en date du 1er août 1992 entre Frank Shuster et Jean Shuster Peavy (héritiers de Joseph Shuster), d'une part, et DC, d'autre part, Shuster et Peavy ont cédé à perpétuité à DC tous les droits dans le cadre de tous copyrights, marques ou autres droits patrimoniaux sur toute oeuvre créée en tout ou partie par Joseph Shuster ou toute oeuvre tirée de celle-ci, y compris, notamment, le Concept Superman.

8.     Aux termes d'un Accord passé en date du 6 novembre 1999 entre DC et Warner Bros., une division de Time Warner Entertainment Company, L.P., société en commandite simple de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522 (« WB »), société venant aux droits de Warner, DC a consenti à WB, jusqu'au 31 décembre 2033 et dans le monde entier, une licence exclusive sur les droits de production cinématographique, de distribution et annexes sur le Concept Superman, y compris, notamment, les suites et remakes. Par cet Accord, Warner détient une licence exclusive de production, de distribution et d'exploitation de films, remakes et suites tirés du Concept Superman.

9.     En vertu d'un Acte signé en date du 19 octobre 2001 entre Joanne Siegel et Laura Siegel Larson (héritiers de Jerome Siegel), d'une part, et DC, d'autre part, Siegel et Larson ont cédé à DC l'ensemble de leurs droits sur les biens Superman et le Concept Superman pour l'essentiel.

10.     Aux termes d'un Acte signé en date du 1er juin 2004 entre Red Sun Productions Pty Limited, société australienne, Level 6, 116 Military Road, Neutral Bay, Australie (« RSP »), et Warner Bros. Pictures Inc., société de l'Etat du Delaware, 4000 Warner Boulevard,

ROLE N°

000063

CONSERVATION DES REGISTRES DE LA CINEMATOGRAPHIE

Monique
ROUZET LELIÈVRE
Expert - Traducteur
Agréé par la Cour
de Cassation
ANGLAIS

EXHIBIT 1
10

ER-74
DC 00163

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 68 of 312

Burbank, CA 91522 (« WBPI »), société venant aux droits de Warner, WBPI a engagé RSP pour produire, pour le compte de WBPI, un film cinématographique commercial tiré des biens Superman et du Concept Superman. Par cet Acte, RSP n'a conservé aucun droit sur le projet de film, l'ensemble de ces droits étant possédé, pendant toutes les phases de la production, par WBPI.

11.     En vertu d'un Acte signé en date du 20 juillet 2004, tel que modifié, entre WBPI et Danimal, Inc., intervenant pour les services de Dan Harris, ressortissant et résident américain, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, à l'attention de Todd Feldman, et Michael Dougherty, ressortissant et résident américain, c/o William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, à l'attention de Danny Greenberg (collectivement « les Auteurs »), les Auteurs ont écrit une première ébauche de scénario (le « Scénario N° 1 »), une seconde ébauche de scénario (le « Scénario N° 2 »), et plusieurs peaufinages (collectivement le « Scénario N° 3 ») intitulés « Red Sun » et tirés des biens Superman et du Concept Superman. Par cet Acte, les Auteurs ont cédés à WBPI l'ensemble de leurs droits, titres de propriété et intérêts afférents au Scénario N° 1, au Scénario N° 2 et au Scénario N° 3, en exclusivité, à perpétuité et dans le monde entier.

12.     WBPI a produit un long-métrage cinématographique intitulé « Superman Returns » et tiré des Scénarios N° 1 à 3 inclus (le « Film »). Le film a été enregistré sur bande en Australie au moyen d'une caméra Genesis à fins de transfert sur pellicule et la pellicule a été développée par Technicolor à Los Angeles en Californie.

13.     En vertu d'un accord général inter-sociétés signé en date du 1er avril 2003 entre WBPI, prédécesseur de Warner Bros. Distributing, Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, CA 91522 (« WBDI »), et Warner Bros. Entertainment Inc., société de droit de l'Etat du Delaware, 4000 Warner Boulevard, Burbank, CA 91522 (« WBEI »), WBDI a cédé à WBEI tous ses droits de distribution et d'exploitation sur le Film et ce, à perpétuité.

14.     Aux termes d'un accord général inter-sociétés signé en date du 1er avril 2003 entre WBEI et Warner Bros. Pictures International, une division de Warner Bros. Distributing Inc., ancienne division de Warner Bros. Pictures Inc. (« International »), WBEI a cédé à International les droits de distribution et d'exploitation du Film dans le monde entier et à perpétuité.

15.     Aux termes d'un accord général de distribution signé en date du 1er décembre 2003 entre International et Warner Bros. France S.A., société de droit français ayant ses bureaux au 115-123 avenue Charles de Gaulle, 92525 Neuilly sur Seine Cedex, France (« WBF »), une licence de distribution du Film sur le territoire de la France Métropolitaine (y compris la Corse), d'Andorre, de Monaco, de l'Algérie, de la Tunisie, du Maroc, de l'Ile Maurice, de Madagascar, de Haïti, des Comores, de la Martinique, de la Guadeloupe, de la Guyane Française, de la Réunion, de la Polynésie Française, de la Nouvelle Calédonie, de Vanuatu (anciennes Nouvelles Hébrides), de Wallis et Futuna, des Terres Australes et Antarctiques Françaises et Djibouti, et sur les navires et dans les avions battant pavillon français mais ne provenant pas ni n'étant à destination des Etats-Unis, en l'état de leurs frontières politiques actuelles, et dans tous les postes diplomatiques, camps, bases, installations et réserves des forces militaires de la France, a été accordée par International à WBF pour une durée d'un an à compter de la livraison de la copie positive.

ROLE N°

000004

CONSERVATION DES REGISTRES DE LA CINEMATOGRAPHIE

**EXHIBIT 1**

**11**

Monique
ROUZET LELIÈVRE
Expert - Traducteur
Agréé par la Cour
de Cassation
ANGLAIS

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 69 of 312

La déclaration ci-dessus a été lue au comparant qui en a ratifié le contenu en ma présence sous la foi du serment.

WARNER BROS. PICTURES INTERNATIONAL, UNE DIVISION DE WARNER BROS. DISTRIBUTING INC.

(signature manuscrite)
Damon B. Bonesteel
Vice-président

Signé et déclaré sous serment par devant moi ce 12 juin 2006.

(signé) Carol F. TILTON
Notaire Public

| Sceau rond : | CAROL F. TILTON |
| Grand Sceau de | Charge N° 1448186 |
| l'Etat de Californie | Notaire Public - Californie |
| Eurêka | Comté de Los Angeles |
| | Ma Charge Expire le 28 octobre 2007 |



Pour traduction Certifiée Conforme

à l'original en langue *anglaise*

visé ne variétur sub n° *2006/420*

SOISY, le *15 juin 2006*



**EXHIBIT 1**
**12**

ER-76

DC 00165

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 70 of 312



**WARNER BROS.**

**WARNER BROS. PICTURES FRANCE**

## DECLARATION

La société WARNER BROS. FRANCE, déclare que le film :

**SUPERMAN RETURNS**

sera exploité sous le titre français :

**SUPERMAN RETURNS**

Paris, le: 16/06/06

Lori Rault
Directrice Service Technique

*Céline Laborie*
*Service Technique*



ROLE N°

009006

CONSERVATION DES REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL

Une division de WARNER BROS. FRANCE
Société Anonyme au capital de 20.825.827 € - Siège Social : 115/123, Avenue Charles de Gaulle - 92525 NEUILLY SUR SEINE Cedex
RCS Nanterre B 320 623 846 - Siret 320 623 846 00070 - Code APE 921 C - N° TVA intracommunautaire : FR 53 320 623 846

**EXHIBIT 1**
**13**

ER-77
DC 00166

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 71 of 312

**REGISTRES
DE LA CINEMATOGRAPHIE
ET DE L'AUDIOVISUEL**
11, rue Galilée
75116 PARIS

## REQUETE D'INSCRIPTION

| Raison sociale du requérant Adresse de correspondance | WARNER BROS France 115/123, avenue Charles De Gaulle 92525 Neuilly sur Seine Cedex | |
|---|---|---|
| Personne à contacter | Céline LABORIE | Tél. : 01 72 25 10 93 Courriel : celine.laborie@warnerbros.com |

## Contrat signé le  12 / 06 / 2006

Entre :  WARNER BROS PICTURES INC. (USA)

Et :    WARNER BROS FRANCE

Contrat  en Anglais ☒    déposé en Version originale ☐      accompagné   d'une traduction jurée ☒
(affidavit)      en Espagnol ☐                                    d'un résumé        ☐

Objet : DISTRIBUTION

Valeurs :

## Œuvres ou Projets

| Numéro au R.P.C.A. ou au Registre des Options | Titre |
|---|---|
| | **SUPERMAN RETURNS** |

Emoluments à prélever sur le compte client n°.....☐

A...Neuilly sur Seine., le  14/06/06...................

Nom et qualité     Céline LABORIE
.....................Service technique

WARNER BROS PICTURES FRANCE
Une division de WARNER BROS. France
115/123, Avenue Charles de Gaulle
92525 NEUILLY-SUR-SEINE CEDEX
Tél. : 01 72 25 00 00
RCS Nanterre Service commercial
Siren 320 623 846

Celine LABORIE

**EXHIBIT 1**
**14**

DC 00167

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 72 of 312

**REGISTRE PUBLIC**
**DE LA CINEMATOGRAPHIE**
**ET DE L'AUDIOVISUEL**
11, rue Galilée
75116 PARIS

**REQUETE D'IMMATRICULATION**

**FILMS ETRANGERS**

| | |
|---|---|
| Raison sociale du requérant<br>Adresse de correspondance | WARNER BROS France<br>115/123, avenue Charles De Gaulle<br>92525 Neuilly sur Seine Cedex |
| Personne à contacter | Céline LABORIE          Tél. : 01 72 25 10 93<br>Courriel : celine.laborie@warnerbros.com |

| Titre<br>de l'œuvre<br>(Sous-titre éventuel) | **SUPERMAN RETURNS** |
|---|---|

Titre original        …SUPERMAN RETURNS…………………………………………………….

Titre international      …SUPERMAN RETURNS…………………………………………………….

Producteur de
l'œuvre étrangère     …WARNER BROS PICTURES INC (USA)……………………………

**Caractéristiques**

| |
|---|
| Durée :…2……h………34….m………s          Fiction  ☒     Documentaire ☐    Animation ☐ |

**CESSIONS DE DROITS D'AUTEUR A JOINDRE**

Si l'œuvre cinématographique est tirée d'une œuvre préexistante (roman, bande dessinée, pièce de théâtre), préciser le titre et le nom de l'auteur de cette œuvre :
……………………………………………………………………………………………………………………………………

| Auteurs | Qualité<br>(scénariste, dialoguiste, …) | Date de la cession<br>des droits d'auteur |
|---|---|---|
| Dan Harris | Scénariste | 20/07/2004 |
| Michael Dougherty | Scénariste | 20/07/2004 |
| | | |

Emoluments à prélever sur le compte client  n°…….☐        A…Neuilly sur Seine……., le …14 juin 2006…………………….

Nom et qualité       LABORIE Céline
du signataire       Service technique

**WARNER BROS. PICTURES FRANCE**
Une division de WARNER BROS. France
115/123, Avenue Charles de Gaulle
92525 NEUILLY-SUR-SEINE CEDEX
Tél. : 01 72 25 00 00
RCS Nanterre B 320 623 846
Siren 320 623 846
Cachet commercial

| |
|---|
| Réservé au service : Doublon : Lettre remise ☐     Lettre demandée ☐ |

**EXHIBIT 1**
15

ER-79
DC 00168

Case: 12-57245   03/25/2013   ID: 8558472   DktEntry: 10-2   Page: 73 of 312

# EXHIBIT 2

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 74 of 312



**WARNER BROS.
PICTURES INC.**

Donna Josephson
Associate General Counsel
September 10, 2007

Canadian Audio-Visual Certification Office
100 Sparks Street, 4th Floor
Ottawa, Ontario K1A 0M5
 Canada

Re:     **"SUPERMAN RETURNS"**

Gentlepersons:

The undersigned, Donna L. Josephson, is a practicing member of the California State Bar and Associate General Counsel at Warner Bros. Pictures, a division of WB Studio Enterprises Inc. ("WB"), with its principal offices at 4000 Warner Boulevard, Burbank, California 91522, United States of America.

The following sets forth the chain-of-title with respect to the motion picture entitled "SUPERMAN RETURNS" (the "Picture"):

1.     Jerome Siegel and Joseph Shuster, both of whom are now deceased (collectively, "Authors"), wrote and illustrated original character and stories for a comic strip property ("Underlying Material") entitled "Superman" in or around 1938.  Pursuant to an Agreement dated as of March 1, 1938 (as amended and/or restated from time to time thereafter, including on September 22, 1938; December 19, 1939; May 19, 1948; and May 21, 1948), between Authors and Detective Comics, Inc. ("Detective"), Authors sold and transferred to Detective all of their respective right in and to the comic strip, including exclusive motion picture rights, the character, the artwork and the storyline contained therein (collectively, the "Superman Concept").

2.     Pursuant to a merger among several publishing companies, including Detective, in or around September 1946, National Comics Publications, Inc. ("National Comics") became the parent company of Detective, and National Comics acquired all of Detective's rights in and to the Superman Concept pursuant to an Assignment dated February 24, 1947 from Detective to National Comics.

3.     Pursuant to an Assignment and Consolidation Agreement dated January 20, 1966, National Periodical Publications, Inc. ("NPP") became successor-in-interest to National Comics, and thereby became owner of the Superman Concept.

4.     NPP acquired Warner Bros.-Seven Arts corporation, in 1969, and then NPP divested its non-entertainment holdings and became part of the group Warner Communications Inc.

PCDocs #105436

A Warner Bros. Entertainment Company

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 75 of 312

Canadian Audio-Visual Certification Office
September 10, 2007
Page 2

("WCI"), a Delaware corporation, in 1972.  Pursuant to said successive acquisitions and mergers, WCI became the parent company of NPP in 1972.

5.      Pursuant to the terms and conditions of an Agreement dated as of December 23, 1975 between Authors and WCI and its subsidiaries, inclusive of NPP, Authors agreed and acknowledged that WCI is the sole and exclusive owner of all of the right, title and interest in and to the Superman Concept, including, without limitation, the characters, artwork, and motion picture rights, throughout the world in perpetuity.  Pursuant to said Agreement, WCI owns the motion picture production, distribution and ancillary rights in the Superman Concept throughout the world in perpetuity, inclusive of copyrights and trademarks therein.

6.      In or around August 1976, NPP changed its name to DC Comics, Inc.

7.      Pursuant to an Assignment dated as of June 30, 1992, among DC Comics, Inc. (successor-in-interest to NPP), DC Comics, a New York Partnership ("DC") and Warner Bros. Inc., a subsidiary of WCI ("Warner"), on the one hand, and Detective, on the other hand, Detective assigned to Warner all of its right, title and interest in, among other properties, the Superman Underlying Material and Warner, in turn, simultaneously assigned to DC all of its right, title and interest in said property.

7.      Pursuant to an Agreement dated as of August 1, 1992 between Frank Shuster and Jean Shuster Peavy (heirs of Joseph Shuster), on the one hand, and DC, on the other hand, Shuster and Peavy granted to DC in perpetuity all rights in any copyrights, trademarks or other property rights in any and all work created in whole or in part by Joseph Shuster, or any works based thereon, including without limitation, the Superman Concept.

8.      Pursuant to an Agreement dated as of November 6, 1999 between DC and Warner Bros., a division of Time Warner Entertainment Company, L.P. ("WB"), successor-in-interest to Warner,  DC assigned an exclusive license to WB through December 31, 2033, throughout the universe, in the motion picture production, distribution and ancillary rights in the Superman Concept, including, without limitation, sequels and remakes.  Pursuant to said Agreement, Warner has an exclusive license to produce, distribute and exploit motion pictures, remakes and sequels based on the Superman Concept.

9.      Pursuant to an Agreement dated October 19, 2001 between Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel), on the one hand, and DC, on the other hand, Siegel and Larson transferred to DC all of their rights in the Superman properties and the Superman Concept, in relevant part.

10.     Pursuant to the terms and conditions of an Agreement dated as of June 1, 2004 between Red Sun Productions Pty Limited, an Australian corporation ("Red Sun") and Warner Bros. Pictures Inc. ("WBPI"), successor-in-interest to WB, WBPI engaged Red Sun to produce, on behalf of WBPI, one theatrical motion picture based on the Superman properties

**EXHIBIT 2**
17

ER-82
DC 00170

Case: 12-57245, 03/05/2013, ID: 8538472, DktEntry: 10-2, Page 76 of 312

Canadian Audio-Visual Certification Office
September 10, 2007
Page 3


and the Superman Concept.  Pursuant to said Agreement, Red Sun shall retain no rights in the proposed motion picture, all such rights being owned at all times during the production by WBPI.

12.     The Screenplay for the Picture was written as a work for hire for WBPI by Dan Harris ("Harris") and Michael Dougherty ("Dougherty"), pursuant to a Writer Loanout/Employment Agreement dated as of July 20, 2004, as amended.

13.     Red Sun (on behalf of WBPI as provided in Paragraph 10 above) produced a feature length motion picture entitled "Superman Returns" based on screenplay written by Harris & Dougherty (the "Picture").

14.     Pursuant to 3 separate visual effects agreements dated January 26, 2005, April 4, 2005 and April 27, 2005, respectively, Red Sun engaged the following Frantic Film Entitles to perform visual effects services for the Picture:  Frantic Films Australia Pty Ltd (for work to be performed in Australia) and Frantic Films Pacific, Inc. (for work to be performed in Canada).


Very truly yours,

*Donna Josephson*

Donna L. Josephson


DLJ/tg

cc:     Karen Fouts
        Ken Zorniak


**EXHIBIT 2**
**18**

1  Marc Toberoff (State Bar No. 188547)
      mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
      kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
      parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
      dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:        (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

12                    **UNITED STATES DISTRICT COURT**

                 **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
13

14 | DC COMICS, | Case No: CV 10-03633 ODW (RZx) |

               Plaintiff,

15       vs.                          Hon. Otis D. Wright II, U.S.D.J.
                                      Hon. Ralph Zarefsky, U.S.M.J.
16 PACIFIC PICTURES CORPORATION;
   IP WORLDWIDE, LLC; IPW, LLC;       **DEFENDANTS' REPLY IN**
17 MARC TOBEROFF, an individual;      **SUPPORT OF MOTION FOR**
   MARK WARREN PEARY, as personal     **PARTIAL SUMMARY JUDGMENT**
18 representative of the ESTATE OF     **ON FIRST, SECOND AND THIRD**
   JOSEPH SHUSTER; JEAN ADELE         **CLAIMS FOR RELIEF**
19 PEAVY, an individual; LAURA
   SIEGEL LARSON, individually and as *Reply to Statement of Genuine Issues;*
20 personal representative of the ESTATE *Evidentiary Objections; Responses to*
   OF JOANNE SIEGEL, and DOES 1-10,   *Evidentiary Objections; Objection to*
21 inclusive,                          *Rule 56(d) Declaration; and Reply*
                                      *Declaration of Keith G. Adams filed*
22                                    *concurrently herewith*

               Defendants.            Complaint filed:  May 14, 2010
23                                    Discovery Cutoff: None Set
                                      Trial Date:       None Set
24
                                      Date:   October 15, 2012
25                                    Time:   1:30 p.m.
                                      Place:  Courtroom 11
26

27

28

---

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ...................................................................................1

II.   THE 1992 AGREEMENT DOES NOT SUPPORT DC'S
      ARGUMENTS ......................................................................................2

III.  DC'S "UNCLEAN HANDS" CLAIM LACKS MERIT ....................9

IV.   DC OFFERS NO REBUTTAL AS TO OTHER CLAIMS AND
      ISSUES ...............................................................................................11

V.    CONCLUSION ..................................................................................12

TABLES OF CONTENTS AND AUTHORITIES                    **ER-85**

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987) ........................................................................ 12

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ........................................................................ *passim*

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992) ................................................................................ 5

*Estate of Molino*,
  165 Cal. App. 4th 913 (2008) .............................................................................. 7

*FTC v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir.1997) .............................................................................. 8

*Gucci Am., Inc. v. Guess?, Inc.*,
  2012 WL 2304247 (S.D.N.Y. June 18, 2012) ................................................ 10

*In re Estate of McGee*,
  2008 WL 3856834 (Cal. Ct. App. Aug. 20, 2008) ..................................... 6, 7

*In re Kalt's Estate*,
  16 Cal.2d 807 (1940) ........................................................................................... 7

*Jones v. Trice*,
  202 A.D.2d 394 (N.Y. App. 1994) ..................................................................... 5

*Lamkin v. Vierra*,
  198 Cal. App. 2d 123 (1961) .............................................................................. 6

*Marvel v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ............................................................................... 3

*Mellen & Jayne, Inc. v. AIM Promotions, Inc.*,
  33 A.D.3d 676 (N.Y. App. 2006) ....................................................................... 5

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ......................................................... 10

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ................................................................ *passim*

*Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*,
  100 A.D.2d 865 (N.Y. App. 1984) ..................................................................... 5

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ........................................................ *passim*

*Russ Berrie & Co. v. Jerry Elener Co., Inc.*,
   482 F. Supp. 980 (S.D.N.Y. 1980) ........................................................ 11

*Shady Records, Inc. v. Source Ent., Inc.*,
   2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. January 2, 2005) .................................. 11

*Siegel v. Nat'l Periodical Publications, Inc.*,
   508 F.2d 909 (2d Cir. 1974) .................................................... 1, 9, 10

*Siegel v. Time Warner Inc.*,
   496 F. Supp. 2d 1111 (C.D. Cal. 2007) ........................................................ 9

*United States v. U.S. Currency, $30,060.00*
   39 F.3d 1039 (9th Cir. 1994) ........................................................ 4

## Statutes

17 U.S.C. § 304(c). ........................................................ 3, 10

17 U.S.C. § 304(c)(5) ........................................................ 2, 3

17 U.S.C. § 304(c)(6) ........................................................ 3

17 U.S.C. § 304(c)(6)(D) ........................................................ *passim*

17 U.S.C. § 304(d) ........................................................ 10, 11

Pub. L. 105-298 (1998) ........................................................ 1, 7

37 C.F.R. § 201.10 ........................................................ 11

## Other Authorities

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010)
   § 11.07[E][2][b][i] ........................................................ 3
   § 11.08[A] ........................................................ 12

3 W. Patry, *Patry on Copyright* (2010)
   §7:47 ........................................................ 12

6 W. Patry, *Patry on Copyright* (2010)
   § 21:18 ........................................................ 12

TABLES OF CONTENTS AND AUTHORITIES

**ER-87**

## I. INTRODUCTION

In 1992, DC already owned all of Joe Shuster's rights to Superman free and clear. Its pre-1978 copyright grants had been repeatedly upheld in court, and nobody – not Shuster's sister Jean, his brother Frank, or his estate – had any right to terminate those grants. *See Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974); Pub. L. 105-298 (1998).

DC's First Claim nonetheless asks this Court to believe that in 1992, for unknown reasons, DC decided, in raising a small pension, to tear up its venerated pre-1978 Superman grants and replace them with an "ephemeral" one-paragraph quitclaim. It further asks this Court to believe that this boilerplate silently worked to (i) revoke all of Shuster's copyright grants, (ii) give those copyrights to his siblings, and (iii) regrant those copyrights back to DC.

As this Court correctly observed, this argument is "lunacy." It defies all legal and common sense. Not a single word in the 1992 Agreement, drafted by DC's own counsel, attempts to do *any* of these things. Why would they? Even Paul Levitz, DC's President, who handled and signed the 1992 Agreement, could not bring himself to say in his declaration (Docket 460) that DC intended what it now argues.

At the hearing on this matter, this Court rejected DC's frivolous argument:

> Defendants' Counsel: And I submit that that is impossible that companies of this magnitude would have their lawyers draft something like this [if] their intention was to revoke all prior grants and regrant them the Superman copyrights. It is an impossibility.

> The Court: What you suggest is lunacy. So, okay, I am sure that is not their intent.

1

**ER-88**

1   *See* Declaration of Daniel Petrocelli (Docket 493-1; "PD"), Ex. 2 (9/5/2012 Tr.) at

2   78:2-7.  The Court was incredulous at DC's ludicrous, self-serving argument:

3       <u>The Court</u>:  Well, I can see why DC would basically want to tear up a
        clear, unequivocal grant of intellectual property in Superman from 1938.
4       I can understand why they would tear that up for this ephemeral thing.
        That makes a lot of sense to me.  *Id.* at 85:7-11.
5

6       DC's "unclean hands" argument is equally specious.  It frivolously accuses the

7   Shuster Estate of a conspiracy for (i) opting not to bring a Superboy claim *against*

8   *DC* (due to 1947 court findings that Siegel created Superboy) and (ii) not listing

9   irrelevant (and ineffective) transactions with the Copyright Office.

10      DC fails to address, and thereby implicitly concedes, numerous other issues as

11  to its First, Second and Third Claims.  DC has had ample discovery – *eight years*

12  between this and the closely-related *Siegel* cases (two years in this case alone) – and

13  no amount of additional discovery will salvage DC's meritless claims.  Nor do DC's

14  attacks on opposing counsel, empty speculation and prejudicial rhetoric about

15  "fraudulent schemes" rescue its deficient legal claims. The time has come to end this.

16  **II.    THE 1992 AGREEMENT DOES NOT SUPPORT DC'S ARGUMENTS**

17      DC's convoluted arguments do nothing to salvage its First Claim.

18      <u>**Inalienability**</u>:  As shown in Defendants' opening brief (Docket 478 ("Mot.")

19  2-3), the termination right is inalienable and unwaivable, may be effected

20  "notwithstanding any agreement to the contrary," and transfers of terminated rights

21  are valid only if signed after a termination notice is served.  17 U.S.C. §§ 304(c)(5),

22  304(c)(6)(D); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008)

23  (noting "the inalienability of termination rights provision in § 304(c)(5)").

24      <u>**Promises Not to Exercise Termination Rights**</u>:  DC's argument that "if Jean

25  Peavy held the right of termination in 1992" (which she did not) "and agreed with

26  DC not to pursue the right for $25,000 per year going forward," the contract would

27  be enforceable is 100% wrong.  Docket 491 ("Opp.") 5, 10 (referring to supposed

28  "promises" in Jean's informal letters).  This is *exactly* the sort of "agreement to the

1  contrary" barred by § 304(c)(5).  *See Marvel v. Simon*, 310 F.3d 280, 290 (2d Cir.

2  2002) (agreement reclassifying works as non-terminable "works-for-hire" was void

3  "agreement to the contrary"; "clear Congressional purpose behind § 304(c) was to

4  prevent authors from waiving their termination right by contract"); 3 *Nimmer* §

5  11.07[E][2][b][i] (agreements that "expressly abandon[] the termination right" or

6  promise "not to terminate at any point in the future" are void "agreement[s] to the

7  contrary").  If the 1992 Agreement was construed to anticipatorily transfer terminated

8  copyrights, it would also be void as a "[f]urther grant … of any right covered by a

9  terminated grant" prior to service of a termination notice. 17 U.S.C. § 304(c)(6).

10  **_Mewborn_, _Milne_ and _Steinbeck_**:  Defendants did <u>not</u> argue, as DC suggests

11  (Opp. 3, 9), that the Copyright Act forbids the type of "revocation and regrant"

12  upheld in *Milne*.  Defendants explained this limited exception to the "inalienability"

13  rule, which applies only where someone with current termination rights enters into a

14  post-1978 grant that expressly "revokes and replaces" all pre-1978 grants.  Mot. 12-

15  14; *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Mewborn*, 532

16  F.3d 978; *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008).

17  In *Milne*, the author's son, who had an immediate termination right, *expressly*

18  used that leverage to *expressly* revoke a pre-1978 copyright grant and replace it with

19  a post-1978 grant, gaining "hundreds of millions of dollars."  That agreement was

20  held not to be an "agreement to the contrary" because it "fulfilled the very purposes

21  for which Congress enacted the termination right."  430 F.3d at 1040-41, 1045-47.

22  In *Steinbeck*, which neither binds this Court nor supports DC's arguments*,* the

23  widow (1) had a present termination right, and (2) "wield[ed] the threat of

24  termination" to enter into a new contract with major financial concessions, which (3)

25  *expressly* stated that it "'cancel[led] and supersede[d] the previous [pre-1978]

26  agreements.'"  537 F.3d at 196-200, 202-04.  Unlike the 1992 Agreement here, there

27  was a "clear expression of intent to terminate all prior grants."  *Id.* at 201.

28  In *Mewborn,* the publisher argued, just like DC, that a post-1978 grant that did

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    not expressly revoke a pre-1978 grant, and purported to grant already-assigned rights,

2    barred termination as a "revocation and regrant" under *Milne*.  Like DC, the publisher

3    argued that even though the new grant had no language of revocation, it "effectively

4    superseded" the pre-1978 grant by dealing with the same subject matter.  Like this

5    Court at the hearing, the Ninth Circuit rejected this claim and emphasized that the

6    new grant (1) was a "nullity" because it purported to grant rights *already owned* by

7    the publisher, (2) did not "expressly revoke[]" the prior grant, unlike the "express[]"

8    revocation in *Milne*, and (3) unlike in *Milne*, financially did not reflect termination

9    leverage, since termination could not be done for years.  532 F.3d at 980-82, 986-89.

10        DC grossly mischaracterizes *Mewborn*, and *pretends* that Defendants argue it

11   "jettisoned" *Milne*.  Opp. 12-13.  *Mewborn* applied and explained *Milne*, but properly

12   refused to expand *Milne* beyond "its distinct factual scenario."  532 F.3d at 986.[1]

13        The common holding of these cases is clear:  when a party uses their ***current***

14   ***termination right as leverage*** to negotiate a much better post-1978 copyright grant

15   that ***expressly revokes and replaces*** pre-1978 copyright grants, it will be upheld.

16   This is not "defendants' test" (Opp. 12); it is specifically stated in the case law.

17        **The 1992 Agreement Is Not a "Revocation and Regrant"**:  DC argues that

18   the 1992 Agreement's phrase "fully settles all claims to any payments or other rights

19   or remedies ***you*** [*i.e.,* Frank and Jean] ***may have***" (*id.* at 7-8, emph. added) somehow

20   silently (i) revoked Joe's long-standing Superman grants to DC, (ii) granted those

21   copyrights back to Frank and Jean, and (iii) immediately re-granted them back to DC.

22   As this Court noted at the hearing, that is "lunacy."  The 1992 Agreement does not

23   meet *any* of the Ninth Circuit's requirements from *Milne* and *Mewborn*.

24        *First*, the 1992 Agreement nowhere purports to revoke Joe Shuster's key

25   Superman grants, on which DC long relied.  DC weakly argues that the 1992

26   Agreement "gave back to the heirs the rights their relatives [*i.e.,* Joe] held."  Opp. 7.

27   The 1992 Agreement says nothing of the sort.  DC's efforts to analogize this case to

28

---

[1] DC cites *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992), which held that an earlier circuit case controls if there is an "irreconcilable conflict," not present here.

Case: 12-57245  02/05/2013  ID: 8538473  DktEntry: 10-2  Page: 85 of 312

1   *Milne* and *Steinbeck* (Opp. 7), where the post-1978 contracts ***expressly*** revoked the

2   pre-1978 contracts, lack merit from the outset.

3          DC's prior motion strained to evade this fatal flaw by arguing that the 1992

4   Agreement was somehow a "novation" under New York law.  Docket 458 at 13-15.

5   Defendants demonstrated that New York law[2] ***requires*** that the intent to replace a

6   prior contract be "clearly expressed" (Mot. 16; *Citibank, N.A. v. Benedict*, 2000 WL

7   322785, at *8 (S.D.N.Y. Mar. 27, 2000)),  and that, at best, the 1992 Agreement

8   amended Frank's $5,000 pension in a 1975 agreement that did not grant DC any

9   copyrights.  Mot. 15-18.  DC does not even attempt to defend its erroneous argument,

10  or to refute that the 1992 Agreement solely amended the 1975 agreement, and instead

11  makes only false conclusory references to New York law.  Opp. 7, 8 n.4.

12         The parties need not "list every superseded agreement" or say "magic words."

13  Opp. 7-8 n.4.  But if parties want to revoke binding contracts, then federal copyright

14  law, New York law and common sense require "unequivocal" language stating this.

15  Mot. 12-18.  If DC had wanted the 1992 Agreement to revoke and supersede Joe

16  Shuster' prior grants, it would have simply said so.  DC cannot now ask "[t]he court

17  … under the guise of interpretation, to write a new contract … or supply the missing

18  terms."  *Mellen & Jayne, Inc. v. AIM Promotions, Inc.*, 33 A.D.3d 676, 678 (N.Y.

19  App. 2006).  A court "may … no[t] redraft a contract" for the parties.  *Cruden v.*

20  *Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

21         <u>*Second,*</u> Jean and Frank had nothing to grant.  DC claims that Jean "possessed

22  Joe's copyright interests."  Opp. 10.  However Joe, at his death, had no Superman

23  rights to leave Jean because, as DC was forced to concede, "DC owned all of the

24  underlying copyrights in Superman – based on then-existing copyright grants from

25

26  _____

    [2] *Steinbeck*, 537 F.3d at 200, notes that under New York law a novation is *express*
27  (citing *Jones v. Trice*, 202 A.D.2d 394, 395 (1994) (contract "expressly stated that
    '[a]ll… agreements…[are] superseded by this contract'"); *Northville Indus. Corp. v.*
28  *Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867 (1984) (agreement "clearly and
    unequivocally provided that [it] was … 'in lieu of' and would 'supersede' any other
    agreements" and parties stated "[w]e agree no other contract[s] … are in effect")).

Joe Shuster." Opp. 6.  Jean could not "grant" Joe's Superman copyrights, because DC
owned them and, absent a clear revocation of Joe's old grants that did not happen,
any purported regrant would be a "nullity," just as in *Mewborn*, 532 F.3d at 987.

At the hearing, the Court asked DC's counsel ***five times*** the simple threshold
question of what rights Frank/Jean had to convey (PD Ex. B at 51:7-8 ("[W]hat rights
did Jean Shuster have to convey to DC?"); 52:12-13 ("When Joe Shuster died, what
rights did he have to Superman?"); 52:22-23 ("But you know my question was, what
rights did he have in Superman?"); 54:8-10 ("When he died, what rights did Joe
Shuster have in Superman?"); 54:14-15 ("I want to know what rights passed to Jean
as a result of Joe's death.")) and *five times* DC could not give a straight answer.

With the plain language of the 1992 Agreement before the Court on an easel,
DC's counsel could not say with a straight face that this simple one-page pension
agreement revoked Joe Shuster's venerable Superman copyright grants to DC
(upheld in two court decisions) and returned these valuable Superman copyrights to
Frank and Jean, nor provide *any* reason why DC would have done this.

DC engages in double-talk, arguing that if Jean had no rights, she must have
granted Joe's.  Opp. 6.  The 1992 Agreement "settles all claims to ***any*** payments or
other rights or remedies that ***you*** [Jean/Frank] ***may*** have."  Reply Undisputed Facts
("RUF") ¶29.  It was a boilerplate quitclaim that nowhere states or implies that Jean
owned Joe's rights.  In fact, before signing the 1992 Agreement, DC told Jean that it
was DC's "firm conviction based on [] research and expert counsel, that you don't
have any legal rights or claims whatsoever."  Docket 479 ("AD"), Ex. Q at 161.[3]

DC's suggestion that "Jean had full right [*sic*] in 1992 to contract on behalf of
Joe's estate and dispose of any contracts he held, even if his will is not
probated" (Opp. 6) is also erroneous.  *See Lamkin v. Vierra*, 198 Cal. App. 2d 123,
125 (1961) (executrix cannot contract for estate prior to appointment); *In re Estate of*

---

[3] DC claims the 2001 Agreement shows Jean had Joe's rights (Opp. 10), but it calls
for "establishment of Joe[]'s estate and the estate's termination." AD Ex. Z, 210 ¶2.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT **ER-93**

1  *McGee*, 2008 WL 3856834 *17 (Cal. Ct. App. Aug. 20, 2008) (daughter's actions

2  "not on behalf of the estate" where prior to probate).[4]  And the cases DC cites (Opp.

3  6)[5] do not support its argument that Jean could somehow "dispose" of, or modify, Joe

4  Shuster's key contracts, which had been fully performed decades prior.

5      <u>*Third*, Frank and Jean had no termination rights to leverage, as DC well knew</u>.

6  In 1992 ***no one*** held Joe Shuster's termination rights, which extended only to

7  widows, children and grandchildren, not to siblings like Frank and Jean, and not to

8  executors until 1998.  Pub. L. 105-298 (1998).  DC tries to evade this with false

9  argument that in *Steinbeck*, "when Elaine made the 1994 Agreement, she had no

10 present right to terminate those grants."  Opp. 6; 14.  *Steinbeck* stressed that it

11 concerned "authors or their statutory heirs [widow, children] holding termination

12 rights."  537 F.3d at 204.  *Steinbeck* also stressed that the widow "wield[ed] the threat

13 of termination" to secure market value, during an open window for key works (*e.g.*,

14 "Of Mice and Men" (1938) and "The Grapes of Wrath" (1939)).  *Id.* at 202, 204.

15 While the widow in *Steinbeck* could not terminate "on her own," there was a

16 plausible "threat" of termination because if no agreement was reached with the

17 widow, she and the children could terminate the publisher's rights.  The widow had

18 already joined with the children on a new contract.  *Id.* at 196 n.1.  DC's misleading

19 references to Jean's supposed "threats" of termination (Opp. 8, 13) ignore that in

20 1992 neither Jean, nor anyone else, had termination rights, as DC told her.  RUF ¶31.

21      DC tries to buttress its position that Jean had "leverage" by analogizing the

22 1992 Agreement's increased compensation to that in *Milne*.  Opp. 8-9.  In *Milne*, 430

---

[4] DC tries to sow confusion about the Shuster Estate.  The Estate is "open" because its only asset is the Termination, and the Estate cannot "distribute" the recovered copyrights before the Termination is effective in 2013.  17 U.S.C. § 304(c)(6)(D); RUF ¶47.  Jean never told the "courts" that she was the "executor of [Joe's] estate" in 1992.  Opp. 16.  DC irresponsibly accuses Peary of some sinister plot for serving as executor (Opp. 16-17), when Shuster's will names Peary as an alternate.  Jean (82) left the legal details of the Estate/Termination to her son.  Docket 305-59 at 27-28.

[5] *In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940) ("[A]ssignment by a legatee of his legacy under a will during probate is a fraudulent conveyance….."); *In re Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008) (addressing "heir-hunting" agreements).

F.3d at 1040-41, the renegotiation was worth "hundreds of millions" – a far cry from the $25,000/year pension (split two ways) in the 1992 Agreement. DC's math, claiming $600,000, is extremely misleading. RUF ¶32. In the "revocation and regrant" context, courts consider whether the amount payable to an heir reflects the leverage of termination and the market value of the copyrights subject to termination. *Mewborn*, 532 F.3d at 987; *Milne*, 430 F.3d at 1040-46; *Steinbeck*, 537 F.3d at 196.

**1992 Agreement As DC's Chain-of-Title**: DC attacks another straw man – arguing that the 1992 Agreement is not "too 'short'" to transfer copyrights. Opp. 10-11. DC ignores, as it cannot rebut, Defendants' real argument that the 1992 Agreement, containing no language revoking and replacing Joe Shuster's critical Superman copyrights grants, is far too "ephemeral" to have been intended by DC as the basis for its chain-of-title to Superman, as confirmed by DC's own conduct.

*First*, before 2010, DC *never* argued that the 1992 Agreement prevented the Shuster Termination, served in 2003. RUF ¶¶ 39-42.

*Second*, DC *never* claimed that its Superman chain-of-title rested on the flimsy 1992 Agreement, and instead consistently relied on the 1938 Grant and other pre-1978 agreements DC now argues were supposedly "revoked." RUF ¶¶37-38. DC's newfound "evidence" on this point (Opp. 11) is wholly "insufficient" as it consists of in-house counsel's vague, conclusory affidavit as to unspecified "dealings" with a "foreign government," which attaches no proof. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Even if this were credited, it is a single reference in two decades to the 1992 Agreement, which according to DC's "revocation and regrant" argument is the rights foundation of its billion-dollar Superman franchise. None of this adds up.

*Third*, when *real* copyright assignments are involved, the industry employs explicit language in long-form agreements plus short-form assignments (for filing with the Copyright Office), and this is true even for far less valuable characters (*e.g.,*

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT   **ER-95**

AD Ex. J (DC/"Swamp Thing")). This is not counsel's "testimony" (Opp. 11), but a viable inference from the record evidence. RUF ¶35. In opposition, DC presents no evidence that its other chain-of-title agreements rely on the type of vague language found in the 1992 Agreement or the convoluted legal theories DC now advances.

## III. DC'S "UNCLEAN HANDS" CLAIM LACKS MERIT[6]

DC cannot present any theories or evidence to save its stale "unclean hands" claim, based on documents DC has had since 2003 and 2006. RUF ¶77.

**Superboy**: The first part of DC's "unclean hands" claim is based on the fiction that the Shuster Executor could have terminated "Superboy," but conspired to "falsely position[]" Siegel as Superboy's "sole creator." Opp. 21. DC presents no evidence for its speculation and conspiracy theory, while ignoring the key facts.

*First*, in a 1947 action filed by Siegel and Shuster ("1947 Action"), the Court held that Siegel was "the originator and sole owner of the comic strip feature SUPERBOY." AD Ex. C at 91, ¶25. The Second Circuit held in *Siegel,* 508 F.2d at 913-14, that these findings were "binding."[7] Thus, the Shuster Executor reasonably chose not to attempt to separately terminate Superboy. DC nevertheless argues that Siegel and Shuster "co-created" Superboy, citing random instances where a "boy Superman" appeared in early Superman works. Opp. 19-20. However, the 1947 Action specifically found that such Superman material "did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by … SIEGEL to [DC]." AD, Ex. C at 83 ¶¶164-66. Moreover, to the extent "Superman as a youth" was depicted in these early Superman works, such depictions were duly terminated by the Shuster Executor. AD Ex. FF.

Unlike the 1947 Action, the Superman/Superboy renewal notices DC cites

---

[6] DC has had **years** of discovery, distinguishing this case from *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982) (Opp. 19), where the opposing party had no "opportunity to proceed with discovery."

[7] DC wrongly argues that Judge Larson did not consider the 1947 ruling binding (Opp. 23) is wrong; like the Second Circuit, he held the findings had "preclusive effect." *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1121 (C.D. Cal. 2007).

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

(Opp. 20) were held invalid, and thus are not binding.  *Siegel,* 508 F.2d at 912-13.

 *Second*, Superboy was "not subject to a § 304(d) termination."  Mot. 21.  DC does not dispute this and argues only that it was terminable under § 304(c).  Opp. 23.  But the Shuster Executor had no powers under § 304(c).  AD Ex. DD at 327-28.

 *Third*, even if the Shuster Executor had tried to terminate Superboy, that would not prevent the Siegels from asserting that Siegel alone created Superboy in their termination and infringement claim.  In short, DC wants to invalidate the Shuster Termination because *the Siegels* filed a legal claim DC disagrees with, and the Shuster Executor chose not to pursue a tenuous opposing claim, given the 1947 Action.  Such legal or tactical choices do not constitute "unclean hands."  *See MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1240 (C.D. Cal. 2007) ("[A] legal position … cannot be the basis of [] unclean hands …."); *Gucci Am., Inc. v. Guess?, Inc.*, 2012 WL 2304247 (S.D.N.Y. June 18, 2012) ("unclean hands" is inapplicable to a legitimate "tactical choice" regarding the pursuit of claims).

 *Fourth*, DC's allegation of a "quid pro quo" (Opp. 22) for the Shuster Estate's non-pursuit of Superboy is nothing but wild speculation, supported by <u>no evidence</u> beyond DC's own pleadings.  DC conspicuously omits that Ms. Larson and Mr. Peary *both* testified that the Shusters have no interest whatsoever in the Siegels' Superboy termination or Superboy litigation.  RUF ¶63.

 Ultimately, termination is discretionary, and the Shuster Executor's informed legal decision not to terminate Superboy does not constitute "unclean hands."

 **Pacific Pictures Agreements**: DC willfully distorts the record as to the second part of its "unclean hands" claim.  The only party with a termination interest was the Shuster Estate (established in 2003), and the only agreement with that party – the 2003 PPC Agreement – did <u>not</u> transfer any rights,[8] and only engaged PPC as an "exclusive advisor."  AD Ex. EE at 329 ¶1.  The 2001 PPC Agreement could not, and

---

[8] DC knowingly misrepresents that "[t]en days before Peary filed the [2003] termination notice, the Shuster Estate purported to transfer 100% of Shuster's termination interest" to PPC.  Opp. 24.

did not attempt to, transfer the non-extant right to serve a termination notice and, as DC itself asserted (Docket 49 ¶170) it could not anticipatorily assign copyrights to be terminated.  17 U.S.C. § 304(c)(6)(D).  There was no deception of either the Copyright Office or DC – the basis of DC's "unclean hands" claim – because the ownership of the "termination interest" always remained with the Estate.  Docket 49, ¶¶129-30.  Defendants' voluntary production of the PPC Agreements in 2006, years before the 2013 termination date, further undercuts its "deception" theory.  RUF ¶77.

DC cannot cite any law that the listing of the PPC Agreements might have caused "a rejection of the application."  Opp. 25.  First, there was no "application": terminations are filed at the Copyright Office with a form Cover Sheet that requires limited information (AD Ex. FF); and neither 17 U.S.C. § 304(d) nor the Copyright Office regulations, 37 C.F.R. § 201.10, require the disclosure of any information as to third-party agreements.  Second, because the 2001 PPC agreement could not transfer termination rights or terminable copyrights, it could not be grounds for rejecting the termination.  *Shady Records, Inc. v. Source Ent., Inc.*, 2004 U.S. Dist. LEXIS 26143, at *28 (S.D.N.Y. January 2, 2005) (even "deliberate, but nonmaterial" misstatements insufficient).  DC's only case, *Russ Berrie & Co. v. Jerry Elener Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980) is inapposite; there a party tried to copyright a public-domain work, and even then the Court did not invalidate the registration.

## IV.  DC OFFERS NO REBUTTAL AS TO OTHER CLAIMS AND ISSUES

**Statutory/Regulatory Requirements**:  The Shuster Termination met all the applicable legal requirements.  Mot. 7-8.  DC does not refute and concedes this issue.

**First Claim, Sub-Part (1)** (Executor Rights):  DC offers no new arguments, as the Shuster Executor plainly holds § 304(d) termination rights.

**First Claim, Sub-Part (3)** (Majority Interest):  DC conceded this issue at the hearing (PD Ex. 2 at 38:10-12), and offers no new argument.

**First Claim, Sub-Part (4)** (1948 Judgment):  DC offered no arguments in its own motion or in opposition to Defendants' motion (at 18-19), conceding this issue.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT **ER-98**

**Second Claim**:  As shown (Mot. 22), this claim entirely overlaps with, and is largely precluded by, the judgment in *Siegel*.  DC concedes this.  Opp. 1 ("[T]he Second Claim presents several issues currently before the Ninth Circuit in the *Siegel* case…").  Defendants asked that this claim be decided consistently with *Siegel* and otherwise stayed (Mot. 22), and DC offers no reason why this Court should not do so.

**Third Claim**:  DC's Third Claim is premised on the fiction that DC has a "right" to a period of exclusive negotiations with the Shusters under § 304(c)(6)(D). This unambiguous statute provides ***no such "right"*** to DC, and both case law and the leading treatises confirm that none exists.  *See* Mot. 22-24; 17 U.S.C. § 304(c)(6)(D) (only states when rights *can* be transferred); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987) (rejecting theory that § 304(c)(6)(D) provides an "exclusive negotiation period"); 3 *Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this…as 'an exclusive period of negotiation.'"); 3 *Patry* §7:47 (2010) (same). Defendants did not violate DC's "rights" under § 304(c)(6)(D), because it has no such rights, and DC has "no basis for standing" on its Third Claim.  6 *Patry* § 21:18.

**Procedure**:  DC contends that Defendants' cross-motion for summary judgment is somehow improper because it covers some of the same issues as DC's cross-motion.  Opp. 1-2.  Such cross-motions are routine, and DC offers no legal support for its baseless contention.  Reply Decl. of Keith Adams, Ex. C.

**Judgment**:  DC suggests that Defendants' request (Mot. 24-25) that the Court enter a Rule 54(b) judgment is "premature," but offers no other argument and concedes that a judgment can be entered "once these motions are resolved."  Opp. 25.

**V.    CONCLUSION**

The Court should grant Defendants' motion and enter a Rule 54(b) judgment.

Dated:  October 1, 2012          RESPECTFULLY SUBMITTED,

                                /s/ Marc Toberoff
                                Marc Toberoff

                                TOBEROFF & ASSOCIATES, P.C.
                                Attorneys for Defendants Mark Warren Peary *et al.*

Marc Toberoff (State Bar No. 188547)
 mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
 kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
 parredondo@ipwla.com
David Harris (State Bar No. 255557)
 dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and as
personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>          Plaintiff,<br><br>     vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL, and DOES 1-10,<br>inclusive,<br><br>          Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' REPLY TO DC COMICS' STATEMENT OF GENUINE ISSUES RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Reply Brief; Evidentiary Objections; Responses to Evidentiary Objections; Objection to Rule 56(d) Declaration; and Reply Declaration of Keith G. Adams filed concurrently herewith*<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:        None Set<br><br>Date:    October 15, 2012<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |

## DEFENDANTS' REPLY TO DC'S STATEMENT OF GENUINE ISSUES

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
| | **Siegel and Shuster's Creation of Superman** | |
| **1.** | **Defendants' Fact:** Author Jerome Siegel and illustrator Joseph Shuster co-created Superman in high school in 1933-34. | **Defendants' Evidence:** *Siegel v. Warner Bros. Entertainment, Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1102 (C.D. Cal. 2008). |
| | **DC's Response:** Undisputed that Siegel and Shuster co-created a character called Superman in 1933-34.<br><br>DC addressed Defendants' Statement Of Uncontroverted Fact ("DSUF") 1 in responding to Defendants' Statement Of Additional Undisputed Facts In Opposition To DC's Motion For Partial Summary Judgment ("DSAUF") 46. Docket No. 471 at 41. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, DC does not and cannot dispute this.<br><br>DC's distinction between "a character called Superman" and "Superman" is meaningless.<br><br>DC's attempt to incorporate its response to a separate motion is improper. |
| **2.** | **Defendants' Fact:** On March 1, 1938, Siegel and Shuster signed an agreement with Detective Comics, defendant DC Comics' predecessor (the "1938 Grant"). | **Defendants' Evidence:** Declaration of Keith G. Adams ("AD"), Ex. A. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 2 in responding to DSAUF 48. Docket No. 471 at 43.<br><br>The Court rightly ruled in its tentative order on DC's pending motion for partial summary judgment that "[o]n March 1, 1938, Jerome Siegel and Joseph Shuster granted DC the 'exclusive | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | right to the use of the [Superman] characters and story."  Decl. of Daniel Petrocelli ("PD") Ex. 1 ("Tentative") at 2. | |
| 3. | **Defendants' Fact:**  Under the 1938 Grant, Siegel and Shuster were paid $130 for the original Superman character and story. | **Defendants' Evidence:**  AD Ex. A. |
|    | **DC's Response:  Undisputed** for purposes of this motion that on March 1, 1938, Siegel and Shuster signed an agreement drafted by DC based on the parties' discussions and negotiations providing, in relevant part:  "In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer [the Superman] work and strip, all goodwill attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever…."  PD Ex. 2 at 10.<br><br>DC addressed DSUF 3 in responding to DSAUF 48.  Docket No. 471 at 43.  And, of course, the Court rightly noted at the September 5, 2012, oral argument on DC's motion for partial summary judgment that Siegel and Shuster received far more than $130 for their contributions to Superman. PD Ex. 2 at 40:6-20; *see also* Tentative at 2-3. | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC does not dispute that Siegel and Shuster were paid only $130 for their **rights** in and to Superman.<br><br>Siegel and Shuster were later paid a page rate for additional illustrated Superman stories they submitted to DC as independent contractors (*i.e.,* what DC calls their "contributions"), contingent on DC's acceptance of such stories for publication.  *See Siegel v. Warner Bros. Entertainment Inc.,* 658 F. Supp. 2d 1036 (C.D. Cal. 2009).<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>**Objections to DC's Evidence:** DC's statement that the 1938 agreement was "drafted by DC based on the parties' discussions and negotiations" is unsupported by the evidence DC cites. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
| **4.** | **Defendants' Fact:** Superman became a cultural icon, and eventually spawned a multi-billion dollar franchise. | **Defendants' Evidence:** AD Ex. K. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 4 in responding to DSAUF 47. Docket No. 471 at 41.<br><br>DC does not dispute for purposes of this motion that Superman became a "cultural icon" or "spawned a multi- billion dollar franchise," but does dispute the suggestion that Siegel and Shuster were solely responsible for its success. Scores of DC artists, editors, and others (including Siegel and Shuster) were responsible. PD Exs. 17 ¶ 5, 18 at 551-52.<br><br>Objections to Defendants' Evidence: AD Ex. K is inadmissible hearsay. Fed. R. Evid. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005). Defendants offer this newspaper article solely for the truth of the matters contained therein. Defendants cannot and do not identify any hearsay exception or other basis that would justify the exhibit's admission. *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>Defendants did not argue or state that Siegel and Shuster were "solely" responsible for Superman's success.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>The testimony of DC's "expert" witnesses in *Siegel* is disputed. The *Siegel* court characterized Siegel and Shuster's original creation and contributions as being at the heart of the character, and Siegel and Shuster are widely recognized as Superman's co-creators. *Siegel I*, 542 F. Supp. 2d at 1104-1105 (noting Siegel and Shuster's creation of Superman's origins, appearance, powers, love triangle with Lois Lane, etc.) |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).<br><br>FED. R. CIV. P. 56(c)(1)-(2) requires that only admissible evidence be considered for purposes of summary judgment, thus AD Ex. K must be disregarded, *In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008).<br><br>Lack of foundation. Lack of personal knowledge. Fed. R. Evid. 602. | |
| | **Siegel and Shuster's Lawsuits With DC** | |
| **5.** | **Defendants' Fact:** In 1947, Siegel and Shuster filed suit against DC in Westchester N.Y. (the "1947 Action"). | **Defendants' Evidence:** AD Ex. B. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 5 in responding to DSAUF 51. Docket No. 471 at 46.<br><br>The Court rightly ruled in its tentative order that "[i]n 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 Assignment." Tentative at 2. | **Defendants' Reply:**<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant. |
| **6.** | **Defendants' Fact:** In the 1947 Action, Siegel individually claimed that DC had no right to publish Superboy and that Superboy belonged to him. | **Defendants' Evidence:** AD Ex. B at 13-18 ¶¶22-39. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | **DC's Response: Disputed.** | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |
| | Defendants mischaracterize the 1947 Action. Siegel and Shuster sought to recapture rights in Superman by challenging their 1938 agreements with DC, and also challenged DC's 1944 publication of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth. | DC's attempt to incorporate its response to a separate motion is improper.

DC disputes this indisputable fact to make improper arguments. |
| | DC does not dispute for purposes of this motion that in the 1947 Action Siegel alleged that from "January 1945 until October 1, 1946," DC published a "Superboy" comic strip without Siegel's consent. AD Ex. B at 15-16 ¶¶ 30-33. | DC's statement that "[u]ntil recently Siegel, Shuster and their families had always taken the position that Superboy was as joint creation of Siegel and Shuster" is false.

Despite DC's rhetoric, the complaint from the 1947 action makes it clear that **Jerry Siegel** was advancing an **independent** claim to Superboy: AD Ex. B at 13-18. |
| | DC disputes that Siegel claimed "that Superboy belonged to him." Siegel alleged in the 1947 Action that in 1938 he submitted for DC's consideration a synopsis for a "Superboy" comic strip. AD Ex. B at 15 ¶ 26-29. The synopsis stated that the by-line for the "Superboy" comic strip would read, "By Jerry Siegel *and* Joe Shuster." PD Ex. 10. (emphasis added). | Siegel originally intended when he sent his Superboy "script" to DC that it be illustrated by Shuster (hence the byline Siegel submitted included Shuster), however, because **Shuster never actually illustrated Siegels' Superboy script**, it is not and cannot be a joint work and remains Siegel's sole creation. AD Ex. C at 81-83 ¶¶157-64. |
| | Until recently, Siegel, Shuster, and their families had always taken the position that Superboy was a joint creation of Siegel and Shuster (to | It is also clear that Superboy is both derivative of Superman <u>and</u> gave rise to a separate Superboy superhero character/story in a separate line of DC comic books that DC separately |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | the extent it was not a pure derivative of Superman). *See infra* DC's Statement Of Genuine Issues ("SGI") 1-9 (detailing the Siegels' and Shusters' prior representations regarding Siegel and Shuster's joint authorship of Superboy); *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1155 (C.D. Cal. 2007) (Judge Larson ruling that to the extent there was "any original copyrightable material in Siegel's Superboy submissions"—and he left that question open—such material was part of "a joint work with Shuster's illustrations") (underlining added).<br><br>In a November 2001 agreement, Shuster's heirs—defendants Mark Warren Peary and Jean Peavy— formed a joint venture with defendant Marc Toberoff's company Pacific Pictures Corporation listing "Superboy" as among "Joe Shuster's creations." AD Ex. Z. At the time, Peary and Jean believed that Superboy was a "derivative" of Superman and was co-authored by Siegel and Shuster. *Id.* Ex. Z; PD Ex. 3 at 356:2-357:7; Docket No. 305-37 at 1326:16-1336:11. Toberoff later induced them fraudulently to disclaim any interest in Superboy. PD Ex. 3 at 335:15-338:15, 340:14-346:15. | copyrighted. *See Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1115-18, 11432-44 (C.D. Cal 2007).<br><br>These two notions are not mutually exclusive, as DC pretends.<br><br>**Objections to DC's Evidence:** DC's statement that "Peary and Jean believed that Superboy was a 'derivative' of Superman and was co-authored by Siegel and Shuster" is unsupported by the evidence DC cites. DC's statement that "Toberoff later induced them [Peary and Jean] fraudulently to disclaim any interest in Superboy" is also unsupported by the cited evidence, and is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
| 7. | **Defendants' Fact:** In the 1947 Action, the Court found that DC owned all rights to Superman pursuant to the 1938 Grant. | **Defendants' Evidence:** AD Ex. C at 87 ¶1. |
|    | **DC's Response: Disputed.**<br><br>DC addressed DSUF 7 in responding to DSAUF 52. Docket No. 471 at 46.<br><br>The Court rightly ruled in its tentative order that "[t]he court [in the 1947 Action] concluded that the 1938 assignment granted all Superman rights to DC. In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster acknowledged that the 1938 assignment granted DC all rights in Superman." Tentative at 2-3.<br><br>Defendants again mischaracterize the 1947 Action and its outcome. In 1947, a referee issued an opinion holding that the parties' 1938 agreements were valid and that Siegel and Shuster assigned "all" of their Superman rights to DC. DC filed a notice of appeal, but the parties ultimately entered into a stipulation and consent judgment in1948 ("1948 Consent Judgment") in which Siegel and Shuster (1) acknowledged that they transferred to DC all rights in Superman and (2) agreed that DC was the sole and exclusive owner of all rights in | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's argument that the stipulation and consent judgment in the 1947 Action was a transfer or "grant" of rights is irrelevant to Defendants' Undisputed Fact No. 7; the argument was specifically rejected by the *Siegel* Court, and DC did not appeal that ruling. SUF ¶69; *Siegel I*, 542 F. Supp. 2d at 1131-32; AD Ex. WW. |

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|-----|------|------|
| | Superman and Superboy.  In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.  *See Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1112 (C.D. Cal. 2008); CPI Inflation Calculator, Bureau of Labor Statistics (http://www.bls.gov/data/inflation_calculator.htm/). | |
| 8. | **Defendants' Fact:**  In the 1947 Action, the Court found that Siegel had developed Superboy on his own in 1938-40. | **Defendants' Evidence:**  AD Ex. C at 81-83 ¶¶155-165, 91-92 ¶¶25-27. |
| | **DC's Response:  Disputed.**<br><br>Defendants again mischaracterize the 1947 Action and its outcome.  The referee found that Siegel owned rights in "the comic strip feature SUPERBOY"—not that Siegel "developed Superboy on his own in 1938-40.  Though Siegel submitted an initial synopsis for a "Superboy" comic strip, Superboy was "developed" by scores of DC artists and editors—including Shuster, who the referee found provided artwork for the Superboy story in *More Fun Comics No. 101*.  PD Exs. 17 ¶ 5, 18 at 551-52; AD Ex. C at 85 (Finding 180); *supra* DC's Response to DSUF.<br><br>Moreover, in the 1948 Consent Judgment—reached after DC filed its notice of appeal of the referee's 1947 opinion—Siegel and Shuster | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>The Court in the 1947 Action clearly and expressly found that "Plaintiff Siegel" – not Shuster – "is the originator and sole owner of the comic strip feature SUPERBOY."  AD Ex. C at 91, ¶25.<br><br>The Second Circuit in *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974) just as clearly held that the "fact findings" in the 1947 Action were binding.<br><br>The 1948 Consent Judgment resulted from a settlement and assignment of Superboy to DC *after* the Court had found that "Siegel is the originator and |

8

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES

**ER-108**

| No. | Statement Of Undisputed Fact<br>DC's Response | Defendants' Evidence<br>Defendants' Reply |
|---|---|---|
| | agreed that DC was the sole and exclusive owner of all rights in Superman and Superboy. AD Ex. E. at 106-07. | sole owner of SUPERBOY." AD Ex. C at 91, ¶25; *Siegel I*, 542 F. Supp. 2d at 1111-12. |
| 9. | **Defendants' Fact:** In the 1947 Action, the Court found that Siegel had independently submitted his Superboy script to DC. | **Defendants' Evidence:** AD Ex. C at 81-83 ¶¶155-165, 91-92 ¶¶25-27. |
| | **DC's Response: Disputed.**<br><br>Defendants again mischaracterize the 1947 Action and its outcome. The referee found in his 1947 opinion that Siegel submitted a synopsis for a "Superboy" comic strip to DC "for its consideration and acceptance or rejection, for publication, *under the terms of the contract dated September 12, 1938*," AD Ex. C at 81 ¶ 156 (emphasis added)— not that Siegel "independently" submitted his "Superboy" synopsis. Moreover, the 1948 Consent Judgment vacated "in all respects" the referee's 1947 opinion. AD Ex. E at 105. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's argument boils down to a pedantic dispute over the meaning of the word "independently." DC does not dispute that Siegel developed the "Superboy" comic strip without input from DC, and that DC rejected his proposal.<br><br>The findings from the 1947 Action were found to be binding on the parties by both the Second Circuit <u>and</u> in the recent *Siegel* case. *Siegel*, 508 F.2d at 914; *Siegel I*, 542 F. Supp. 2d at 1127-31. |
| 10. | **Defendants' Fact:** In the 1947 Action, the Court found that DC had illegally published Superboy in *More Fun Comics, No. 101* and subsequent comics without Siegel's consent. | **Defendants' Evidence:** AD Ex. C at 83-86 ¶¶163-82. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 10 in | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| **No.** | **DC's Response** | **Defendants' Reply** |
| | responding to DSAUF 52. Docket No. 471 at 46.<br><br>Defendants again mischaracterize the 1947 Action and its outcome. The referee found in his 1947 opinion that DC had no right to publish Superboy—not "that DC had illegally published Superboy" comic features.  In the 1948 Consent Judgment—reached after DC filed its notice of appeal of the referee's 1947 opinion—Siegel and Shuster agreed that DC was the sole and exclusive owner of all rights in Superman and Superboy.  AD Ex. E at 106-07. | this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>The referee clearly found DC had acted illegally in publishing "Superboy" without Siegel's consent, as follows:<br><br>"Plaintiff Siegel is the originator and sole owner of the strip feature Superboy, and the defendants [DC], their agents, servants, and employees are perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material of the nature now and heretofore sold under the title Superboy…."  AD Ex. C at 91-92 ¶25. |
| **11.** | **Defendants' Fact:**  The parties thereafter settled the 1947 Action. | **Defendants' Evidence:**  AD Exs. D, E. |
| | **DC's Response:  Undisputed** for purposes of this motion that after the referee's opinion issued in 1947, DC filed a notice of appeal. The parties thereafter in 1948 entered into a stipulation and consent judgment which vacated "in all respects" the referee's 1947 opinion.  AD Ex. E at 105.  In addition, Siegel and Shuster (1) acknowledged that they transferred to DC all rights in Superman and (2) agreed that DC was the sole and exclusive owner of all rights in | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>DC's argument that the consent judgment in the 1947 Action was a |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES     **ER-110**

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | Superman and Superboy. In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars. *See Siegel*, 542 F. Supp. 2d at 1112; CPI Inflation Calculator, Bureau of Labor Statistics (http://www.bls.gov/data/ inflation_calculator.htm/).<br><br>DC addressed DSUF 11 in responding to DSAUF 52. Docket No. 471 at 46.<br><br>The Court rightly ruled in its tentative order that "[i]n 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster acknowledged that the 1938 assignment granted DC all rights in Superman." Tentative at 2-3. | transfer or "grant" of rights was rejected by the *Siegel* Court, <u>and DC did not appeal that ruling.</u> SUF ¶69; *Siegel I*, 542 F. Supp. 2d at 1131-32; AD Ex. WW.<br><br>The amount paid in 1948 in settlement of the 1947 Action is irrelevant, whether in "1948 dollars" or "today's dollars." Fed. R. Evid. 401,403. |
| 12. | **Defendants' Fact:** In 1969, Siegel and Shuster brought a federal suit over the ownership of the renewal copyright to Superman (the "1974 Action"). | **Defendants' Evidence:** Docket No. 49 ("FAC") at ¶46. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 12 in responding to DSAUF 55. Docket No. 471 at 48-49. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| 13. | **Defendants' Fact:** The 1974 Action resulted in the Second Circuit's decision in *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974). | **Defendants' Evidence:** *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974). |
| | | |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | DC's Response: Undisputed.<br><br>DC addressed DSUF 13 in responding to DSAUF 56. Docket No. 471 at 49. | Defendants' Reply: DC's attempt to incorporate its response to a separate motion is improper. |
| 14. | Defendants' Fact: *Siegel*, 508 F.2d 909, held that DC owned all rights to Superman, including the renewal copyright, pursuant to the 1938 Grant. | Defendants' Evidence: *Siegel*, 508 F.2d at 912-913. |
| | DC's Response: Undisputed.<br><br>DC addressed DSUF 14 in responding to DSAUF 56. Docket No. 471 at 49. | Defendants' Reply: DC's attempt to incorporate its response to a separate motion is improper. |
| 15. | Defendants' Fact: Consistent with the outcome of the 1947 Action and *Siegel*, 508 F.2d 909, DC for decades has based its chain-of-title to Superman on the 1938 Grant. | Defendants' Evidence: AD Exs. T, NN at 417-18 ¶38, OO at 439 ¶38, PP at 448 ¶12, 550 ¶17. |
| | DC's Response: Disputed.<br><br>Defendants offer no competent evidence to support this claim, and the documents they cite do not contain any evidence that DC "based its chain-of-title to Superman on the 1938 grant." Defendants cite an inadmissible "Copyright Research Report," which does not address DC's chain-of-title claims to Superman—the report contains only information concerning recorded documents in "the records of the Copyright Office." AD Ex. T. Defendants also cite | Defendants' Reply: Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC offers **no evidence** to the contrary.<br><br>In every piece of evidence cited by Defendants, DC based its chain-of-title to Superman on the 1938 Grant and subsequent agreements, and did **not** base its chain-of-title to Superman on the 1992 Agreement.<br><br>DC's evidentiary objections are not well-taken. DC's pleadings in other cases function as admissions. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | paragraph 38 to the Siegel's Third Amended Complaint in the *Siegel* action, which concerns the December 23, 1975, agreement Siegel and Shuster entered into with DC, and DC's answer to paragraph 38. *Id.* Exs. NN at 417-18 ¶ 38; OO at 439 ¶ 38. Defendants finally cite to DC's Second Amended Counterclaims in the *Siegel* action, which provide historical background relevant to the claims in that action. *Id.* Ex. PP at 448 ¶ 12, 550 ¶ 17.<br><br>Objections to Defendants' Evidence: AD Ex. T does not prove this asserted fact and is inadmissible hearsay. FED. R. EVID. 801, 802; *see supra* DC's Response to DSUF 4. DC also refers the Court to No. 15 in DC's concurrently filed Objections To Evidence In Defendants' Statement Of Uncontroverted Facts, Declaration, And Exhibits In Support Of Defendants' Motion For Partial Summary Judgment ("Objections"). | Exhibit T (a report by the highly regarded Thompson & Thompson firm which conducts copyright and chain-of-title research at the Copyright Office) is not hearsay because it is not offered for the truth of any matter asserted therein; but rather, for the fact that a diligent search by Thompson & Thompson of the Copyright Office uncovered **no reference whatsoever to the 1992 Agreement**.<br><br>*See also* ¶36, *infra* |
| | **The 1975 Agreement** | |
| 16. | **Defendants' Fact:** DC deleted Siegel and Shuster's Superman credit byline (from 1947-1975) and references to them from its publications. | **Defendants' Evidence:** AD Ex. I. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 16 in responding to DSAUF 53. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | Docket No. 471 at 47-48.<br><br>DC disputes the implication that DC did something improper in removing Siegel and Shuster's Superman credit byline from 1947 to 1975. After Siegel and Shuster left DC in 1947, there was no need to give "credit" to the pair for the work of other DC artists and writers.  In fact, Siegel *objected* to having his name associated with stories he had not written; in the Westchester Action, Siegel's complaint asserted that DC acted improperly by "affix[ing] to the individual releases of said comic strip the name of plaintiff, SIEGEL, as author of the said releases ... whereas in truth and in fact the plaintiff Siegel, was not the author of the individual releases."  AD Ex. B at 17. In any event, defendants offer no competent evidence to support this claim, as the one hearsay newspaper article they cite from 1979 merely purports to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives and notes— incorrectly—that Siegel and Shuster's "by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case."  AD Ex. I. | DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC does not dispute the underlying fact, but only a supposed "implication" found nowhere in the stated fact.<br><br>DC cites to an irrelevancy – that Siegel objected to being credited as a *writer* on stories he had not written; but DC does not and cannot dispute that for decades it vindictively deleted Siegel and Shuster's *creator* credits on Superman stories Siegel did write and Shuster illustrated. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | <u>Objections to Defendants' Evidence:</u> AD Ex. I is inadmissible hearsay. FED. R. EVID. 801, 802; *see supra* DC's Response to DSUF 4. <br><br> Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. | |
| 17. | **Defendants' Fact:**  Between 1947-1975, Siegel and Shuster slipped into obscurity and poverty. | **Defendants' Evidence:**  AD Exs. F, G, I, K. |
|     | **DC's Response:  Disputed.** <br><br> DC disputes the implication that DC was responsible for Siegel and Shuster purportedly "slipp[ing] into obscurity and poverty."  The pair left DC in 1947, and engaged in litigation with DC for several years thereafter.  *See Nat'l Periodical Pubs.*, 508 F.2d 909.  After the *National* litigation, in which the Second Circuit affirmed that DC owned all rights in Superman, *id.* at 914, Siegel and Shuster encountered financial hardship and approached DC for help, and DC provided Siegel, Shuster, and their families with the generous benefits described below.  *See* DC's Response to DSUF 32. <br><br> In any event, defendants offer no competent evidence to support this claim, as the newspaper articles they cite merely purport to describe the financial hardship Siegel and Shuster faced later in | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. <br><br> DC's attempt to incorporate its response to a separate motion is improper. <br><br> DC does not dispute the underlying fact, but only a supposed "implication" found nowhere in the stated fact. <br><br> DC cites to actions Warner Communications finally took in **1975** to avoid negative publicity that only support the stated fact that Siegel and Shuster faced substantial financial hardship from 1947-75.  *See Siegel I,* 542 F. Supp. 2d at 1112-13. <br><br> **Objections to DC's Evidence:** DC's statement that Shuster and Siegel "left DC in 1947" is unsupported by the cited evidence. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
|     | their lives.<br><br><u>Objections to Defendants' Evidence:</u> AD Exs. F, G, I, and K are inadmissible hearsay. FED. R. EVID. 801, 802; *supra* DC's Response to DSUF 4.<br><br>Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. | |
| 18. | **Defendants' Fact:** In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign protesting DC's treatment of Siegel and Shuster. | **Defendants' Evidence:** AD Ex. G. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 18 in responding to DSAUF 57. Docket No. 471 at 49.<br><br>DC does not dispute for purposes of this motion that in 1975, certain individuals who were also members of the National Cartoonists Society and Cartoonists Guild supported Siegel and Shuster in their effort to obtain financial assistance from DC and Warner Communications Inc.<br><br>DC disputes the suggestion that it engaged in mistreatment of Siegel and Shuster. Siegel and Shuster, and their heirs, after suing DC twice and losing, nonetheless | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not dispute the underlying fact, but only a supposed "implication" found nowhere in the stated fact.<br><br>Warner Communications agreed to give Siegel and Shuster a modest pension to avoid negative publicity. *See Siegel I,* 542 F. Supp. 2d at 1112-13. The 1975 Agreement provided that Siegel and Shuster would each receive a yearly |

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|---|---|---|
| | were given millions of dollars in recognition of Siegel's and Shuster's contributions to Superman and as a gesture of goodwill. PD Ex. 30 ¶ 3; AD Exs. P-S, U-V, X-Y, AA.<br><br>Objections to Defendants' Evidence: AD Ex. G is inadmissible hearsay. FED. R. EVID. 801, 802; *supra* DC's Response to DSUF 4.<br><br>Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. | pension of $20,000. AD Ex. H. They were <u>not</u> paid "millions of dollars."<br><br>Warner Communications' supposed "gesture of goodwill" in and after 1975 is not evidence that DC did not mistreat Siegel and Shuster prior to 1975.<br><br>**Objections to DC's Evidence:** DC's statement that "Siegel and Shuster, and their heirs, … were given millions of dollars in recognition of Siegel's and Shuster's contributions" is unsupported by the purported evidence DC cites. It is also ***irrelevant***. Fed. R. Evid. 401, 403. |
| 19. | **Defendants' Fact:** Thereafter, on December 23, 1975, Warner Communications, Inc. (DC's Parent), entered into an agreement with Siegel and Shuster (the "1975 Agreement"). | **Defendants' Evidence:** AD Ex. H. |
| | **DC's Response: Undisputed**<br><br>DC addressed DSUF 19 in responding to DSAUF 58. Docket No. 471 at 49-51. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| 20. | **Defendants' Fact:** The 1975 Agreement provided Siegel and Shuster with a modest pension. | **Defendants' Evidence:** AD Ex. H at 118. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 20 in responding to DSAUF 58. Docket No. 471 at 49-51.<br><br>The Court rightly ruled in its tentative order: | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as 'credits' on new Superman works. Siegel and Shuster acknowledged that DC owned all Superman-related copyrights…. | DC disputes this indisputable fact to make improper arguments.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>Furthermore, DC has never made "periodic cost-of-living" adjustments for the Shusters. Joseph Shuster was granted a pension of $20,000 per year in 1975; that amount was <u>never</u> increased despite considerable inflation in the two decades after the 1975 Agreement. |
|     | Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families travel to Superman-related events.  All told, the Siegels and Shusters have been paid over $4 million under the 1975 agreement, not including medical benefits or bonuses. | DC's remaining contention amounts to wordplay over whether pension benefits, which in Shuster's case was never adjusted for inflation, are "modest" benefits for the creators of Superman, a billion-dollar character/franchise. |
|     | Tentative at 3.<br><br>DC disputes the suggestion that the payments DC agreed to make to Siegel and Shuster under the 1975 Agreement were "modest." The 1975 Agreement provided Siegel and Shuster with, in today's dollars, lump sums of | |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  AD Ex. H. | |
| 21. | **Defendants' Fact:**  The 1975 Agreement did not purport to transfer or re-transfer copyrights from Siegel and Shuster to DC. | **Defendants' Evidence:**  AD Ex. H at 117 ¶2, 125 ¶7. |
|     | **DC's Response:  Undisputed** for purposes of this motion that the parties have litigated whether the 1975 Agreement "transfer[red] or re-transfer[red] copyrights from Siegel and Shuster to DC."  *Siegel I*, 542 F. Supp. 2d at 1132-33. DC addressed DSUF 21 in responding to DSAUF 58.  Docket No. 471 at 49-51. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC omits that the Court ruled *against* DC on the issue of whether the 1975 Agreement was a "grant" of rights to Superman, that it found the agreement was not a "grant," and that <u>DC did not appeal that ruling.</u>  SUF ¶69. |
| 22. | **Defendants' Fact:**  The 1975 Agreement provided Frank Shuster with a $5,000/year pension if he survived Joe Shuster. | **Defendants' Evidence:**  AD Ex. H at 119. |
|     | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 22 in responding to DSAUF 49.  Docket No. 471 at 51. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |
| | **The Death of Joseph Shuster and the 1992 Agreement** | |
| 23. | **Defendants' Fact:**  Joe Shuster died on July 30, 1992. | **Defendants' Evidence:**  AD Exs. K, L. |
|     | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 23 in responding to DSAUF 60. Docket No. 471 at 51. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's gratuitous citation to a "tentative" ruling is improper and irrelevant. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | The Court rightly ruled in its tentative order that "Shuster passed away on July 30, 1992." Tentative at 3. | |
| 24. | **Defendants' Fact:** Joe Shuster never served a notice of termination under 17 U.S.C. § 304(c). | **Defendants' Evidence:** FAC at ¶50. |
| | **DC's Response: Undisputed.** | **Defendants' Reply:** N/A. |
| 25. | **Defendants' Fact:** Joe Shuster left no widow, child, or grandchild. | **Defendants' Evidence:** AD Exs. L, SS at 489:4-9. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 25 in responding to DSAUF 60. Docket No. 471 at 51.<br><br>The Court rightly ruled in its tentative order that "Shuster had no wife or child [when he died], and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate." Tentative at 3. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's gratuitous citation to a "tentative" ruling is improper and irrelevant, and Shuster's will does not support the stated fact. |
| 26. | **Defendants' Fact:** Joe Shuster was survived by his siblings, Frank Shuster and Jean Peavy. | **Defendants' Evidence:** AD Ex. L; FAC at ¶51. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 25 in responding to DSAUF 60. Docket No. 471 at 51. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| 27. | **Defendants' Fact:** Joe Shuster's estate was not probated in 1992-93, as he died with few assets. | **Defendants' Evidence:** AD Ex. M. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 27 in responding to DSAUF 61. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | Docket No. 471 at 51.<br><br>The Court rightly ruled in its tentative order that "[o]n August 17,1992, Jean filed an affidavit in California state court identifying herself as Shuster's 'successor' and sole heir and requesting that certain property 'be paid, delivered or transferred to her.'" Tentative at 3.<br><br>DC disputes that Shuster had "few assets" when he died. Shuster had 768 shares of Time Warner stock worth approximately $80,000. Moreover, Jean Peavy filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." AD Ex. M. | DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>The evidence cited by DC shows **only** that Jean Adele Peavy simply requested that Joe Shuster's shares of Time-Warner stock be transferred to her. DC cites no evidence that any other property, right or interest of Joe Shuster was transferred to Jean Adele Peavy. |
| 28. | **Defendants' Fact:** On October 2, 1992, DC entered into a short agreement with Frank Shuster and Jean Peavy (the "1992 Agreement"). | **Defendants' Evidence:** AD Ex. O. |
| | **DC's Response: Undisputed** for purposes of this motion that DC entered into an agreement with Frank Shuster and Jean Peavy dated "as of August 1, 1992."<br><br>DC addressed DSUF 28 in responding to DSAUF 66. Docket No. 471 at 53-56. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
|     | The Court rightly ruled in its tentative order:<br><br>Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joseph Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses." Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated "[a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." In response, DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. On September 10, 1992, Frank sent a letter to DC's then Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." Frank asked if he and Jean could meet with Levitz in | |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response**            | **Defendants' Reply** |
|     | New York to discuss the issue.  Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. Paul Levitz dealt with many authors and heirs during his decades at DC.  When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC."  Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed.  The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.  In exchange, Jean and Frank re granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. Tentative at 3-4 (citations omitted) | |
| **29.** | **Defendants' Fact:**  The 1992 Agreement reads, in full, as follows: | **Defendants' Evidence:**  AD Ex. O. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing August 1, 1992, for as long as either one of you is alive. Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practice and shall be subject to all applicable withholding taxes. If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.

We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this | |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement. We also reserve all of our other rights, remedies and defenses in such an event.  If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated. | |
|     | **DC's Response:  Undisputed** that the 1992 Agreement contains the language quoted by defendants.<br><br>DC addressed DSUF 29 in responding to DSAUF 66.  Docket No. 471 at 53-56. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |
| 30. | **Defendants' Fact:**  On the same day, October 2, 1992, Frank Shuster sent a letter to DC that read as follows:<br><br>In consideration of the agreement dated as of August 1, 1992 between DC Comics, myself and Jean Shuster Peavy, I hereby waive any rights or remedies that I may have under the agreement dated December 23, 1975 between Warner Communications Inc., Jerome Siegel and Joseph Shuster. | **Defendants' Evidence:**  AD Ex. N. |
|     | **DC's Response:  Undisputed** that Frank Shuster sent a letter to DC dated October 2, 1992, which | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | contains the language quoted by defendants.<br><br>DC addressed DSUF 30 in responding to DSAUF 70. Docket No. 471 at 57-58. | |
| 31. | **Defendants' Fact:** Both before and after the 1992 Agreement, DC made it clear that Frank Shuster and Jean Peavy held no Superman rights under the Copyright Act. | **Defendants' Evidence:** AD Ex. Q. |
| | **DC's Response: Disputed.**<br><br>DC informed Jean and Frank that it believed they had no legal right to terminate under the Copyright Act, but Jean and Frank disputed DC's belief. In the 1992 Agreement, Jan and Frank "*grant[ed] to [DC]* any … copyrights, trademarks, or other property right in any and all work created in whole or in part by [Joe Shuster]…." AD Ex. O (emphasis added). Jean and Frank further agreed that the 1992 agreement "fully settles all claims to any payments or other rights or remedies… *whether now or hereafter existing* regarding any copyrights, trademarks, or other property right in any and all work [he] created…." *Id.* (emphasis added). Thus, the 1992 agreement operated to revoke and re-grant all prior grants of Shuster's rights. Opp. at 2-17; Docket Nos. 458 at 11-12; 468 at | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>The 1992 Agreement does not contain any reference to termination.<br><br>DC offers **no evidence** that puts the stated fact even slightly in dispute, and instead selectively and misleadingly quotes the 1992 Agreement. DC made it clear to Frank and Jean that they had no termination rights to leverage. Frank and Jean's alleged (erroneous) beliefs are entirely irrelevant.<br><br>**Objections to DC's Evidence:** DC's statement that "Jean and Frank disputed DC's belief" that they had no legal right to terminate is unsupported by the purported evidence DC cites. It is also irrelevant. Fed. R. Evid. 401. DC's statement that "the 1992 agreement operated to revoke and re-grant all prior |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
|     | 2-5; *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008); *Siegel* 364 F. Supp. at 1037. | grants of Shuster's rights" is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the evidence DC cites. |
| 32. | **Defendants' Fact:** DC denied periodic requests by Frank and Jean for increases in their pension. | **Defendants' Evidence:** AD Exs. P, Q, R. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 32 in responding to DSAUF 77. Docket No. 471 at 62.<br><br>The Court rightly ruled in its tentative order that "[i]n 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal right to make such requests, but would pay her a bonus anyway, which she thanked DC for doing." Tentative at 5 (citations omitted).<br><br>DC disputes that the Shuster heirs' requests for additional compensation were "denied." As Paul Levitz's declaration and the parties' correspondence make clear, Jean periodically requested bonuses in addition to her payments under the 1992 agreement, and DC paid her | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>DC offers no evidence to contradict the fact that Frank and Jean's requests for increases in their pension (as opposed to periodic "bonuses") were denied.<br><br>DC gave bonuses of $10,000 and twice gave a $25,000 bonus, in 1993 (Docket No. 460-1 at 47-48) and 2001 (Docket No. 460-2 at 250).<br><br>With the 1992 Agreement, Frank and Jean went from a $5,000/year pension to a $25,000/year pension, an increase of $20,000. Jean was 72 years old in |

27

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES

**ER-127**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | bonuses in 1993, 1994, 1995, 1996,1998, 1999, 2000 and 2001. AD Exs. P-S, U-V, X-Y, AA.  In total, DC has paid Jean over $610,000 under the 1992 agreement.  PD Ex. 30 ¶ 9; AD Exs. P-S, U-V, X-Y, AA | 1992, with a life expectancy of 14 years. *See* http://www.ssa.gov/oact/ NOTES/as116/as116_Tbl_6_1990.html #wp1085668.  Thus, for Frank and Jean *combined*, the net present value of the 1992 Agreement was approximately $165,000, not $610,000.  *See* http://netpresentvaluecalculator.com/ (with an 8% rate).  For Jean, who in 1992 was only entitled to half the pension, the net present value of the 1992 Agreement was $82,500. |
| 33. | **Defendants' Fact:**  DC granted certain requests by Frank and Jean for year-end "bonuses." | **Defendants' Evidence:**  AD Exs. R, S, U, V, X, Y, AA. |
|     | **DC's Response:  Disputed.**<br><br>DC addressed DSUF 33 in responding to DSAUF 77.  Docket No. 471 at 62.<br><br>The Court rightly ruled in its tentative order that "[i]n 1993, 1994,1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal right to make such requests, but would pay her a bonus anyway, which she thanked DC for doing." Tentative at 5 (citations omitted).<br><br>DC disputes that "certain" requests by Frank and Jean for "bonuses" were granted by DC. Defendants offer no competent | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC only granted bonuses when specifically requested by Jean.  *Id.* |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | evidence to support this claim, as the documents they cite do not show that DC only granted "certain" of Jean's requests. In fact, DC granted all of Jean's requests for bonuses; DC even paid Jean bonuses where she had not previously requested a bonus payment.  PD Ex. 30 ¶ 9; AD Exs. P- S, U-V, X-Y, AA. |  |
| 34. | **Defendants' Fact:** The declaration of Paul Levitz, relied on by DC, does not describe the 1992 Agreement as a revocation or re-grant of Joe Shuster's 1938 Grant or any later Superman grants or suggest that this was ever the parties' intent. | **Defendants' Evidence:**  AD Ex. YY. |
|     | **DC's Response:  Disputed.**<br><br>DC addressed DSUF 34 in responding to DSAUF 20, 71. Docket No. 471 at 58.<br><br>The Court rightly ruled in its tentative order: Paul Levitz dealt with many authors and heirs during his decades at DC.  When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>DC does not and cannot dispute the fact that Paul Levitz **nowhere** describes the 1992 Agreement as a revocation and regrant, and avoids this subject entirely. His "admonition" or legal conclusion – that of a non-lawyer to an adverse party |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | understood and agreed. Tentative at 4.<br><br>DC does not dispute that Levitz's declaration and correspondence do not use the words "revocation" or "re-grant." Levitz's declaration and the parties' contemporaneous conduct and correspondence makes clear, however, the "parties' intent" was for the 1992 Agreement to "represent [the Shuster heirs'] last and final deal with DC, and would resolve any past, present, or future claims against DC," PD Ex. 30 ¶ 8. As shown in DC's summary judgment briefing (both its own motion and its opposition to defendants' cross-motion), this was fully consistent with the New York law governing superseding agreements. Docket Nos. 458 at 13-14, 468 at 2-4; Opp. at 2-17.<br><br>And as is clear from this discussion, defendants improperly use their DSUF to make merits-based arguments, which needed to be made in their 25-page motion, and are baseless in any event. Opp. at 2-17; Docket Nos. 458 at 13-15; 468 at 2-4. | – is irrelevant to whether or not the 1992 Agreement was a "revocation and regrant" under *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005).<br><br>Unlike DC here, Defendants did not make a "merits" argument in their statement of facts. They simply set forth the fact (which was also in their brief, *see* Motion at 16) that Levitz's declaration conspicuously did not state that the 1992 Agreement was intended to revoke Joe Shuster's operative Superman grants nor regrant Joe Shuster's Superman copyrights to DC.<br><br>**Objections to DC's Evidence:** DC's statement that "Levitz's declaration and the parties' contemporaneous conduct and correspondence makes clear" the parties' intent about the 1992 Agreement is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the purported evidence DC cites. |
| 35. | **Defendants' Fact:** The 1992 Agreement does not remotely resemble DC or Warner's customary rights agreements. | **Defendants' Evidence:** AD Exs. O, J, W, BB. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 35 in | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |

|   |   |
|---|---|
| responding to DSAUF 76. Docket No. 471 at 61-62.

Other of DC's rights agreements are shorter, including the 1938 Superman grant, AD Ex. A, and defendants offer no facts, documents, or testimony to support this assertion. Defendants' legal arguments— improperly masquerading as factual ones—also run directly contrary to well- established copyright law.  "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; *a one-line pro forma statement will do*."  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (emphasis added).

Objections to Defendants' Evidence:

Defendants offer no competent evidence to support this claim, as shown in DC's concurrently filed Objections at pages 4-6.

The three contracts defendants cite can and should be stricken for lack of foundation or connection to the facts at issue in this case, FED. R. EVID. 602, and disregarded on relevance | this.

DC's attempt to incorporate its response to a separate motion is improper.

DC disputes this indisputable fact to make improper arguments.

The 1992 Agreement unambiguously contains no revocation or cancellation of Joseph Shuster's 1938 Grant to DC of his Superman copyrights nor any subsequent pre-1978 grants (AD Exs. A, D), without resort to extrinsic evidence.  However, as DC proffered extrinsic evidence (*e.g.*, the Levitz Declaration), Defendants have done so as well.

It is established above that Jean Peavy and Frank Shuster owned no Superman copyrights as these had long ago been assigned by Siegel and Shuster to DC, and that accordingly, the 1992 Agreement contained only a standard quitclaim.  AD Ex. O.  The evidence cited was offered to show that this perfunctory language is inconsistent with DC's and the entertainment industry's established "custom and practice" for clear copyright grants, and that DC/Warner Bros. would never have relied on this if their intention was to replace the 1938 Grant, as DC claimed for the first time in this lawsuit.

The 1938 Grant was upheld  in two |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
|     | grounds, FED. R. EVID. 401. The contracts in AD Exs. J, W, and BB involve different parties, different rights, and different properties than those at issue in this case, and were entered into almost a decade after the 1992 Agreement. AD Ex. J (DC Comics-Swampfilms, Inc.; Swamp Thing; 1980); W (Warner Bros.-Hasbro; option; G.I. Joe; 1998); BB (Warner Bros.-Edgar Rice Burroughs, Inc.; option; Tarzan; 2002). AD Exs. J, W, and BB are not habit evidence under FED. R. EVID. 406, because the documents do not show "a frequency of specific conduct sufficient to be considered semiautomatic." *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988); *see U.S. v. West*, 22 F.3d 586, 592 (5th Cir. 1994) (rejecting Rule 406 argument where evidence not numerous enough in relation to defendants' thousands of other dealings); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (explaining that experience of one contractor not sufficient evidence of routine practice in light of different experiences of thousands of other contractors who had dealt with same party).

AD Exs. J, W, and BB are also inadmissible character evidence. | Court judgments (*see Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 912 (2d Cir. 1974)) as providing DC with all rights to Siegel and Shuster's original Superman character/story, from which all other Superman works are derived. If this and any other pre-1978 Grants were replaced by the 1992 Agreement, that would make the 1992 Agreement the chain-of-title foundation for DC/Warner Bros. multi-billion dollar Superman franchise.

This *custom and practice* evidence, comprised of DC/Warner Bros.' copyright assignments both ***before and after*** the 1992 Agreement is offered to give the Court a glimpse of what a real copyright assignment agreements usually look like in the industry. It presents a strong inference that the 1992 Agreement was intended (as is apparent from the face of the document) to raise Frank and Jean's modest pension and to include a standard quitclaim of Frank and Jean's rights, if any, and that it was <u>never</u> intended to replace DC's longstanding chain-of-title to Superman, as DC now argues.

DC's evidentiary objections are addressed in Defendants' concurrently-filed Responses to Evidentiary Objections. |

| | | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|---|
| | No. | DC's Response | Defendants' Reply |

"Evidence of a[n] … other act is not admissible to prove … that on a particular occasion the person acted in accordance." FED. R. EVID. 404(b).  Defendants identify no exception for this rule "prohibit[ing] 'other acts' evidence for the purpose of showing action in conformity therewith." *U.S. v. Redlightning*, 624 F.3d 1090, 1120-21 (9th Cir. 2010).

---

**36.**

**Defendants' Fact:**  DC did not file the 1992 Agreement with the U.S. Copyright Office, even though it is DC's customary practice to record real copyright assignments.

**Defendants' Evidence:**  AD at ¶54, Ex. T.

---

**DC's Response:  Disputed**.

DC addressed DSUF 36 in responding to DSAUF 74. Docket No. 471 at 60-61.

Defendants omit that DC has not registered many of its other copyright grants with the Copyright Office, as registration is not required. Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).

DC recorded the 1948 Consent Judgment with the Copyright Office in June 1965, in response to Siegel and Shuster filing copyright renewal notices for

**Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.

DC's attempt to incorporate its response to a separate motion is improper.

DC disputes this indisputable fact to make improper arguments.

DC cannot dispute that it did not file the 1992 Agreement with the Copyright Office.

DC also offers no evidence to contradict the fact that, c. 1992, it was customary for DC to register its chain-of-title copyright assignments with the Copyright Office, so as to "give[] all persons constructive notice of the facts

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES    **ER-133**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | *Action Comics #1*. PD Ex. 24 at 615. DC never recorded the 1938 grant or 1975 agreement. *Id.*<br><br>Objections to Defendants' Evidence:<br>AD Ex. T is inadmissible hearsay. given the theory of relevance. FED. R. EVID. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005). Defendants offer this report solely for the truth of the matters contained therein to support their claim that unlike DC's purported customary practice concerning copyright assignments, DC did not record the 1992 Agreement. Defendants cannot and do not identify any hearsay exception or other basis that would justify admission of the hearsay report. *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275,1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).<br><br>It is also not remotely "custom" evidence, given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC. | stated in the recorded document…." 17 U.S.C. § 205(c). That DC was not "required" to do so is irrelevant.<br><br>The Thompson & Thompson report regarding Superman (Ex. T) shows that DC could and did record **many** of its Superman-related documents with the Copyright Office, particularly over the last two decades.<br><br>DC raises objections to the Thompson & Thompson report attached as AD Ex. T, but nevertheless attaches its own Thompson & Thompson report as PD Ex. 24. As set forth in Defendants' Responses to DC's Evidentiary Objections, Ex. T is admissible. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES        **ER-134**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements. Pub. L. No. 100-568, 102 Stat. 2853,2857, 2861 (1988); *R&R Recreation Prods.*, 1992 WL 88171, at *4.<br><br>The report is not habit evidence under FED. R. EVID. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic." *Simplex,* 847 F.2d at 1294; *see West*, 22 F.3d at 592; *G.M. Brod & Co.*, 759 F.2d at 1533.<br><br>It also is inadmissible character evidence.  FED. R. EVID. 404(b); *Redlightning*, 624 F.3d at 1120-21. |  |
| 37. | **Defendants' Fact:**  DC has consistently relied on the 1938 Grant for it chain-of-title to Superman, as the 1938 Grant was held in *both* the 1947 Action and the 1974 Action to have granted DC's predecessor all rights in Siegel and Shuster's Superman character and story. | **Defendants' Evidence:**  AD Exs. C at 87, T, NN at 417-18 ¶38, OO at 439 ¶38, PP 448 ¶12, 450 ¶17; *Siegel*, 508 F.2d at 912-913. |
|     | **DC's Response:  Disputed.**<br><br>DC does not dispute for purposes of this motion that the 1938 Grant was held in the 1974 Action "to have granted DC's predecessor all | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | rights in Siegel and Shuster's Superman character and story." | response to a separate motion is improper. |
| | Defendants again mischaracterize the 1947 Action and its outcome. In 1947, a referee issued an opinion holding that the parties' 1938 agreements were valid and that Siegel and Shuster assigned "all" of their Superman rights to DC. DC filed a notice of appeal, but the parties ultimately entered into a stipulation and consent judgment in 1948 in which Siegel and Shuster (1) acknowledged that they transferred to DC all rights in Superman and (2) agreed that DC was the sole and exclusive owner of all rights in Superman and Superboy. AD Ex. E. | DC disputes this indisputable fact to make improper arguments. Yet, DC admits that the 1938 Grant was held in the 1947 Action and the 1974 Action to have assigned all of Siegel and Shuster's Superman rights to DC.<br><br>DC also cannot dispute that it has always relied on the 1938 Grant as the foundation for its chain-of-title to Superman.<br><br>The evidence cited by Defendants includes pleadings where DC directly alleges that its chain-of-title to Superman rests on the 1938 Grant and other pre-1978 agreements, while DC makes no mention whatsoever of the 1992 Agreement. |
| | DC disputes the suggestion that DC has relied solely on the 1938 Grant for its "chain-of-title to Superman." Defendants offer no competent evidence to support this claim. Defendants cite the referee's opinion in the 1947 Action, which was vacated "in all respects" by the 1948 Consent Judgment. AD Ex. E at 105. Defendants also cite to that portion of the court's decision in the 1974 Action that describes the 1947 Action and 1948 Consent Judgment. Defendants cite an inadmissible "Copyright Research Report," which does not address DC's chain-of-title claims to | DC offers **no evidence** to support its knowingly false assertion that it has "long relied" on the 1992 Agreement for its chain-of-title to Superman. The sole supposed evidence cited by DC is the vague Bonesteel Declaration, referring to an unidentified, unspecified and unproduced communication "dealing with a foreign government."<br><br>Tellingly, even this is not attached to the declaration, rendering its vague statements entirely suspect. *See* Defendants' concurrently-filed Evidentiary Objections re: Undisputed Fact 37. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | Superman—the report contains only information concerning recorded documents in "the records of the Copyright Office." AD Ex. T.  Defendants also cite paragraph 38 of the Siegels' Third Amended Complaint in the *Siegel* action, which concerns the December 23, 1975, agreement Siegel and Shuster entered into with DC, and DC's answer to paragraph 38.  *Id.* Exs. NN at 417-18 ¶ 38; OO at 439 ¶ 38.  Defendants finally cite to DC's Second Amended Counterclaims in the *Siegel* action, which provide historical background relevant to the claims in that action.<br><br>Moreover, DC has long relied on the 1992 Agreement as establishing its ownership of Shuster's copyrights in Superman.  *See* Declaration of Damon Bonesteel ("BD") ¶ 3.<br><br>Objections to Defendants' Evidence:<br>AD Ex. T does not prove this asserted fact and is inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Response to DSUF 36. | That DC could come up with only this **one** suspect reference to the 1992 Agreement in two decades, (1) belies DC's claim that the 1992 Agreement replaced its operative pre-1978 Superman grants and supposedly constitutes DC's chain-of-title to Superman; and (2) supports Defendants' assertion that the 1992 Agreement was intended to raise Frank and Jean's pension and is largely irrelevant to Superman.<br><br>DC raises objections to the Thompson & Thompson report attached as AD Ex. T, but nevertheless attaches its own Thompson & Thompson report as PD Ex. 24.  As set forth in Defendants' Responses to DC's Evidentiary Objections, Ex. T is admissible.<br><br>**Objections to DC's Evidence:**  The Declaration of Damon Bonesteel is inadmissible under Fed. R. Evid 1002, 1004 (best evidence rule) Fed. R. Evid. 801, 802 (hearsay), and Fed. R. Civ. P. 37(c)(1) (failure to produce).  DC's statement that it "has long relied on the 1992 Agreement as establishing its ownership of Shuster's copyrights in Superman" is unsupported by the purported evidence DC cites. |
| 38. | **Defendants' Fact:**  The 1975 Agreement contained an express acknowledgment by Siegel and Shuster that DC already owned *all rights* to Superman. | **Defendants' Evidence:**  AD Ex. H at 117 ¶2, 125 ¶7. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | **DC's Response:  Undisputed** that the 1975Agreement states that DC "both immediately before and immediately after the signing of this agreement, is the sole and exclusive owner of all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any renewals and extensions of any such rights…."  AD Ex. H at 117 ¶ 2.<br><br>DC addressed DSUF 38 in responding to DSAUF 58.  Docket No. 471 at 49-51. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |
| 39. | **Defendants' Fact:**  Outside of and before filing this lawsuit in 2010, attacking the Shuster Termination (described below), DC has not claimed or suggested that the 1992 Agreement is the basis for its chain-of-title to Superman. | **Defendants' Evidence:**  AD Exs. T, NN at 417-18 ¶38, OO at 439 ¶38, PP at 448 ¶12, 450 ¶17, ZZ at 752-54. |
|     | **DC's Response:  Disputed.**<br><br>DC addressed DSUF 39 in responding to DSAUF 74.  Docket No. 471 at 60.<br><br>Defendants offer no competent evidence to support this claim, as the documents they cite do not contain any evidence that prior to "filing this lawsuit in 2010 … DC has not claimed or suggested that the 1992 Agreement is the basis | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>The cited evidence includes pleadings where DC directly alleges that its chain-of-title to Superman rests on agreements other than the 1992 |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES      **ER-138**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | for its chain- of-title to Superman." *See* DC's Response to DSUF 15.  Defendants also cite to DC's response and objections to defendant Mark Warren Peary's Interrogatory No. 5, which identified all communications that referred to the 1992 Agreement— not what served as the basis for DC's chain-of-title to Superman. AD Ex. ZZ at 752-54. Moreover, years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its ownership of Shuster's Superman copyrights.  BD ¶ 3.<br><br>Objections to Defendants' Evidence: AD Ex. T does not prove this asserted fact and is inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Response to DSUF 36. | Agreement, and where DC makes no mention of the 1992 Agreement.<br><br>DC, in response to Warren Peary's Interrogatory No. 5 (AD Ex. ZZ at 752-54) refused to identify **any** communication with a third-party where it even referred to the 1992 Agreement.  If DC cannot identify any such communications, it obviously did not rely on the 1992 Agreement to establish its chain-of-title in dealing with third-parties.<br><br>The only evidence cited by DC is the vague Bonesteel declaration, referring to an unproduced communication as to an unspecified "dealing with a foreign government," addressed in Paragraph 37, *supra*.  This thin, isolated offering does more to support Defendants' uncontroverted fact than to refute it.<br><br>DC raises objections to the Thompson & Thompson report attached as AD Ex. T, but nevertheless attaches its own Thompson & Thompson report as PD Ex. 24.  As set forth in Defendants' Responses to DC's Evidentiary Objections, Ex. T is admissible.<br><br>**Objections to DC's Evidence:** The Declaration of Damon Bonesteel is inadmissible under Fed. R. Evid 1002, 1004 (best evidence rule) Fed. R. Evid. 801, 802 (hearsay), and Fed. R. Civ. P. 37(c)(1) (failure to produce). |
| 40. | **Defendants' Fact:**  Outside of and before filing this lawsuit in 2010, | **Defendants' Evidence:**  AD Exs. T, NN at 417-18 ¶38, OO at 439  ¶38, PP |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
| --- | --- | --- |
| | DC's Response | Defendants' Reply |
| | attacking the 2003 Shuster Termination, DC has not claimed or suggested that the 1992 Agreement revoked or extinguished the 1938 Grant or any other Superman grants by Joseph Shuster. | at 448 ¶12, 450 ¶17, ZZ at 752-54. |
| | **DC's Response: Disputed.** <br><br> DC addressed DSUF 40 in responding to DSAUF 74. Docket No. 471 at 60. <br><br> Defendants offer no competent evidence to support this claim, as the documents they cite do not contain any evidence that prior to "filing this lawsuit in 2010 … DC has not claimed or suggested that the 1992 Agreement revoked or extinguished the 1938 Grant or any other Superman grants by Joseph Shuster." *See* DC's Response to DSUF 39. <br><br> Moreover, years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its ownership of Shuster's Superman copyrights. BD ¶ 3. <br><br> <u>Objections to Defendants' Evidence:</u> <br><br> AD Ex. T does not prove this asserted fact and is inadmissible hearsay.  FED. R. EVID. 801, 802; *see supra* DC's Response to 36. | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. <br><br> DC's attempt to incorporate its response to a separate motion is improper. <br><br> The cited evidence includes pleadings where DC directly alleges that its chain-of-title to Superman rests on agreements other than the 1992 Agreement, and where DC makes no mention of the 1992 Agreement. <br><br> DC, in response to Warren Peary's Interrogatory No. 5 (AD Ex. ZZ at 752-54) refused to identify **any** communication with a third-party where it even referred to the 1992 Agreement.  If DC cannot identify any such communications, it obviously did not rely on the 1992 Agreement to establish its chain-of-title in dealing with third-parties. <br><br> The only evidence cited by DC is the vague Bonesteel declaration, referring to an unproduced communication as to an unspecified "dealing with a foreign government," addressed in Paragraph |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. | 37, *supra*. This thin, isolated offering does more to support Defendants' uncontroverted fact than to refute it.<br><br>DC raises objections to the Thompson & Thompson report attached as AD Ex. T, but nevertheless attaches its own Thompson & Thompson report as PD Ex. 24. As set forth in Defendants' Responses to DC's Evidentiary Objections, Ex. T is admissible.<br><br>**Objections to DC's Evidence:** The Declaration of Damon Bonesteel is inadmissible under Fed. R. Evid 1002, 1004 (best evidence rule) Fed. R. Evid. 801, 802 (hearsay), and Fed. R. Civ. P. 37(c)(1) (failure to produce). |
| 41. | **Defendants' Fact:** Outside of and before filing this lawsuit in 2010, attacking the 2003 Shuster Termination, DC has not claimed or suggested that the 1992 Agreement re-granted it Joseph Shuster's Superman copyrights. | **Defendants' Evidence:** AD Exs. T, NN at 417-18 ¶38, OO at 439 ¶38, PP at 448 ¶12, 450 ¶17, ZZ at 752-54. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 41 in responding to DSAUF 74. Docket No. 471 at 60.<br><br>Defendants offer no competent evidence to support this claim, as the documents they cite do not contain any evidence that prior to "filing this lawsuit in 2010 … DC has not claimed or suggested that the 1992 Agreement re-granted it Joseph Shuster's Superman | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>The cited evidence includes pleadings where DC directly alleges that its chain-of-title to Superman rests on agreements other than the 1992 Agreement, and where DC makes no |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES   **ER-141**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response**            | **Defendants' Reply** |
|     | copyrights." *See* DC's Response to DSUF 39.<br><br>Moreover, years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its ownership of Shuster's Superman copyrights. BD ¶ 3.<br><br>Objections to Defendants' Evidence:<br><br>AD Ex. T does not prove this asserted fact and is inadmissible hearsay. FED. R. EVID. 801, 802; *see supra* DC's Response to DSUF 36.<br><br>Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. | mention of the 1992 Agreement.<br><br>DC, in response to Warren Peary's Interrogatory No. 5 (AD Ex. ZZ at 752-54) refused to identify **any** communication with a third-party where it even referred to the 1992 Agreement. If DC cannot identify any such communications, it obviously did not rely on the 1992 Agreement to establish its chain-of-title in dealing with third-parties.<br><br>The only evidence cited by DC is the vague Bonesteel declaration, referring to an unattached communication as to an unspecified "dealing with a foreign government," addressed in Paragraph 37, *supra*. This thin, isolated offering does more to support Defendants' uncontroverted fact than to refute it. *See* Defendants' concurrently-filed Evidentiary Objections re: Undisputed Fact 37.<br><br>DC raises objections to the Thompson & Thompson report attached as AD Ex. T, but nevertheless attaches its own Thompson & Thompson report as PD Ex. 24. As set forth in Defendants' Responses to DC's Evidentiary Objections, Ex. T is admissible.<br><br>**Objections to DC's Evidence:** The Declaration of Damon Bonesteel is inadmissible under Fed. R. Evid 1002, 1004 (best evidence rule) Fed. R. Evid. 801, 802 (hearsay), and Fed. R. Civ. P. 37(c)(1) (failure to produce). |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES  **ER-142**

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|-----|-----------------------------------------------|-------------------------------------------|
| | | |
| **42.** | **Defendants' Fact:** DC's 2005 letter to Mark Warren Peary and Jean Adele Peavy, which discussed and offered to settle the 2003 Shuster Termination does not even mention the 1992 Agreement. | **Defendants' Evidence:** AD Ex. HH. |
| | **DC's Response: Disputed.**<br><br>Defendants offer no competent evidence to support this claim. Defendants cite an inadmissible 2005 settlement communication sent by Paul Levitz to the Shuster heirs — in an effort to avoid litigation— which disputed the Shusters' termination claim.<br><br>Defendants erroneously describe the letter, which challenges the Shusters' termination notice, as Toberoff expressly acknowledged in a letter in response. Docket No. 463-3 at 275.<br><br><u>Objection to Defendants' Evidence:</u> AD Ex. HH does not prove this asserted fact, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it. FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *U.S. v. Whitney*, 180 Fed. Appx. 670, 673 (9th Cir. 2006); *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990). | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments. DC does not and cannot dispute that DC's 2005 letter to the Shuster Executor, Mark Warren Peary, does not even mention the 1992 Agreement.<br><br>As set forth in Defendants' Responses to DC's Evidentiary Objections, DC's 2005 letter is admissible because it is not offered to prove liability. Fed. R. Evid. 408. Moreover, DC should not be heard to complain because it previously put the Shuster Executor's response to DC's 2005 letter into evidence and used it as an exhibit to question witnesses at deposition. *E.g.,* Docket No. 93-4; Docket 305-59 at 2113:25-2114:2, 2115:1-2.<br><br>Defendants correctly described the 2005 letter and DC offers no evidence or argument to support its conclusory |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | | statement that Defendants did not do so. |
| **The Establishment of the Shuster Estate** | | |
| 43. | **Defendants' Fact:** Mark Warren Peary is Joe Shuster's nephew. | **Defendants' Evidence:** AD Ex. CC at 315. |
| | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 43 in responding to DSAUF 64. Docket No. 471 at 52-53. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| 44. | **Defendants' Fact:** On July 15, 2003, Mr. Peary petitioned the Los Angeles Superior Court to probate Joe Shuster's estate. | **Defendants' Evidence:** AD Ex. CC. |
| | **DC's Response: Undisputed** for purposes of this motion that in 2003, Shuster's nephew Mark Warren Peary initiated proceedings in Los Angeles Superior Court to probate Shuster's estate— even though in 1992, his mother Jean Peavy had already filed an affidavit in California probate court to obtain all of Shuster's assets. Adams Decl. Ex. M.<br><br>DC addressed DSUF 44 in responding to DSAUF 64. Docket No. 471 at 52-53. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC willfully mischaracterizes Jean Peavy's 1992 affidavit as "to obtain all of Shuster's assets." Jean Peavy's affidavit asked **only** that Joseph Shuster's shares of Time-Warner stock be transferred to her. It did not request the transfer of any other assets, rights or powers of Joseph Shuster. AD Ex. M. |
| 45. | **Defendants' Fact:** Joe Shuster's will nominated Jean Adele Peavy to be the executrix, and nominated Mr. Peary to be the executor of his estate in the event Jean declined to serve. | **Defendants' Evidence:** AD Ex. CC at 315. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 45 in responding to DSAUF 63. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES **ER-144**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | Docket No. 471 at 52.<br><br>The Court rightly ruled in its tentative order that "Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. … On August 17, 1992, Jean filed an affidavit in California state court identifying herself as Shuster's 'successor' and sole heir and requesting that certain property 'be paid, delivered or transferred to her.'" Tentative at 3.<br><br>Shuster's will uses the words "unable" or "unwilling"—*not* "declined," as defendants falsely state in DSUF 45. The will states: "I give, devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate …. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, Mark Warren Peary. I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will and Testament, to act without | DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC's citation to a "tentative" ruling is improper and irrelevant.<br><br>DC's response boils down to false wordplay that there is a meaningful difference between being "unwilling" to serve as executor and "declining" to serve as executor.<br><br>DC does not and cannot dispute that Jean Peavy, who was then 82 years old, declined to serve as executor in a Declination to Act as Personal Representative, duly filed with the Los Angeles Superior Court probating Joseph Shuster's will. AD Ex. CC at 320-21. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | bond. In the event that my sister is for any reason <u>unable or unwilling</u> to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor, also without bond." AD Ex. CC at 286 (underlining added). | |
| 46. | **Defendants' Fact:** Jean Adele Peavy, who was then 82 years old, declined to serve as executor of the estate of Joseph Shuster. | **Defendants' Evidence:** AD Ex. CC at 320-21. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 46 in responding to DSAUF 64. Docket No. 471 at 52-53.<br><br>The facts do not support that Jean declined to serve because she was 82 in 2003. Peary testified Jean was "competent" and "had the ability to serve as an executor" in 2003, and that Jean never said she was "unable or unwilling to serve." Docket No. 305-37 at 1286:1-3, 1374:17-1375:4. Peary also admitted: "I'm the one that has initiated the whole -- the whole project. I've been involved in it with Toberoff from the beginning and I'm active and knowledgeable on it." *Id.* at 1374:20-25. Peary did this without "any discussion" with Jean, and Jean confirmed in 2006: "I don't know what's going on" with Shuster's "estate." Docket | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>Jean expressly declined to serve as executor in a Declination to Act as Personal Representative, duly filed with the Los Angeles Superior Court probating Joseph Shuster's will, which stated the following: "I hereby decline to serve as personal representative of the decedent's estate, whether as Executor of decedent's Will or Administrator of his estate." AD Ex. CC at 320-21.<br><br>DC does not dispute that Jean Peavy was 82 at the time she understandably |

| No. | Statement Of Undisputed Fact<br>DC's Response | Defendants' Evidence<br>Defendants' Reply |
|-----|-----------------------------------------------|-------------------------------------------|
| | No. 305-59 at 2107:10-13. | declined to serve as executor. |
| **47.** | **Defendants' Fact:** On October 7, 2003, the Los Angeles Superior Court therefore appointed Mr. Peary as executor (the "Shuster Executor") of the estate of Joseph Shuster (the "Shuster Estate") in accordance with his will. | **Defendants' Evidence:** AD Ex. DD at 327. |
| | **DC's Response: Disputed**.<br><br>DC addressed DSUF 47 in responding to DSAUF 65.  Docket No. 471 at 53.<br><br>DC does not dispute for purposes of this motion that in 2003, a Los Angeles Superior Court appointed Peary to serve as executor of Shuster's estate.<br><br>DC disputes the suggestion that the probate court appointed Peary executor in accordance with Shuster's will or because Jean declined to act in that capacity. Peary asked the probate court to appoint him executor in place of his mother, AD Ex. CC—and has chosen not to close the probate matter or distribute the Estate's assets to Jean, as Shuster's will and California law require, because Peary and Toberoff wish to persist in making their improper shell-game argument that the Shuster "executor" never signed the 1992 Agreement, and | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>Contrary to DC's assertions, Jean never told the "California courts" that she was the "executor of [Shuster's] estate" in 1992.  Opp. 16.  DC irresponsibly accuses Peary of some sinister plot for serving as the executor (Opp. 16-17), when Shuster's will names him as the alternate executor.<br><br>Jean expressly declared in a Declination to Act as Personal Representative, duly filed with the Los Angeles Superior Court probating Joseph Shuster's will, as follows:  "I hereby decline to serve as personal representative of the decedent's estate, whether as Executor of decedent's Will |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response                | Defendants' Reply    |
|     | thus the Shuster executor is not bound by it.  Opp. at 2-17; Docket Nos. 186 at 13; 334 at 9-10, 12-13; 334 at 9-10; 458 at 8, 15; 459-3 at 289-90; 468 at 7-8. | or Administrator of his estate."  Ex. CC at 320-21.<br><br>Joseph Shuster's will clearly and explicitly stated that Mr. Peary was to act as executor, if Jean declined to serve, and the Los Angeles Superior Court duly appointed Mr. Peary as the executor in accordance with Joseph Shuster's will.  AD Ex. DD.<br><br>DC's frivolous accusation that this is an improper "shell game" is unsupported by any evidence.<br><br>There, again, is no basis for DC's frivolous assertion that the Shuster Executor, Mr. Peary "has chosen not to close the probate matter or distribute the Estate's assets to Jean, as Shuster's will and California law require."  The Joseph Shuster Estate has remained open, with the permission of the Los Angeles Superior Court, "to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d) of the United States Copyright Act … <u>and to maintain and defend on behalf of the decedent and the estate all proceedings necessary or appropriate ín connection with this action</u>." AD Ex. DD at 327 (emphasis added).<br><br>The Shuster termination does not take effect until October 26, 2013.  AD Ex. FF at 343.  In addition, the Estate must remain open because the copyrights to be recovered pursuant to termination cannot be transferred to the Estate's |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | | beneficiaries prior to the effective date of the Termination. 17 U.S.C. § 304(c)(6)(D).<br><br>**Objections to DC's Evidence:** DC's statement that Peary has "chosen not to close the probate matter or distribute the Estate's assets to Jean, as Shuster's will and California law require, because Peary and Toberoff wish to persist in making their improper shell-game argument that the Shuster 'executor' never signed the 1992 Agreement" lacks foundation, and amounts to inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the purported evidence cited by DC. |
| 48. | **Defendants' Fact:** The Shuster Executor's powers expressly included the "power … to terminate prior transfers of [Joseph Shuster's] copyrights pursuant to [17 U.S.C.] § 304(d)." | **Defendants' Evidence:** AD Ex. DD at 327. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 48 in responding to DSAUF 65. Docket No. 471 at 54.<br><br>DC disputes the claim that the Los Angeles Superior Court "expressly included the 'power … to terminate" under the Copyright Act. The probate court merely granted Peary's request to be appointed executor so he could serve copyright termination notices on behalf of the Shuster | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not and cannot dispute the **fact** that the Los Angeles Superior Court granted Mr. Peary the authority, |

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|---|---|---|
| | estate.  The state court did not resolve the threshold copyright issues at the center of DC's First Claim, nor did Peary ask it to.  *Cf. Orr v. Orr*, 440 U.S. 268, 277 n.7 (1979) ("a state court cannot confer standing before this Court on a party who would otherwise lack it"); *see also Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (state court action "cannot retroactively confer standing in federal court").  As explained in DC's motion, Peary has no "power" to terminate.  Docket Nos. 458 at 21-23; 468 at 9-10. | as the duly appointed Executor of the Shuster Estate, to serve its notice of termination pursuant to 17 U.S.C. § 304(d).  **Objections to DC's Evidence:**  DC's statement that "Peary has no 'power' to terminate" is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702.  It is also unsupported by the purported evidence cited by DC. |
| | **The Shuster Executor's Notice of Termination** | |
| 49. | **Defendants' Fact:**  On or about November 10, 2003, the Shuster Executor served a notice of termination under 17 U.S.C. § 304(d) on DC as to Joe Shuster's grants of Superman copyrights (the "Shuster Termination"). | **Defendants' Evidence:**  AD Ex. FF at 346-48. |
| | **DC's Response:  Disputed.**  DC addressed DSUF 49 in responding to DSAUF 84. Docket No. 471 at 66.  DC does not dispute for purposes of this motion that "[o]n or about November 10, 2003," a Notice of Termination of Transfer Covering Copyright Renewal Term of "Superman" was served on DC on behalf of the Estate of Joseph Shuster.  DC disputes the | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.  DC's attempt to incorporate its response to a separate motion is improper.  DC disputes this indisputable fact to make improper arguments.  DC's argument that the 1948 Consent Judgment in the 1947 Action was a |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | suggestion that the Shuster Termination seeks to terminate all of Shuster's grants of Superman copyrights. The Shuster Termination does not seek to terminate the grants contained in the 1948 Consent Judgment and the 1992 Agreement. AD Ex. FF at 346-48; *see* Docket No. 49 ¶¶ 125-28. | copyright transfer or "grant" was expressly *rejected* by the *Siegel* Court, which held that the 1948 Consent Judgment was not a grant and need not be included in a Superman termination notice, and DC did not appeal that ruling. SUF ¶69; *Siegel I*, 542 F. Supp. 2d at 1131-32; AD Ex. WW.<br><br>The 1992 Agreement was also not a copyright transfer.<br><br>**Objections to DC's Evidence:** To the extent that DC's statement that the "Shuster Termination does not seek to terminate the grants contained in the 1948 Consent Judgment and the 1992 Agreement" implies that the Judgment and Agreement were in fact copyright grants, it is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the purported evidence cited by DC. |
| 50. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(i), the Shuster Termination states that it is "pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d))." | **Defendants' Evidence:** AD Ex. FF at 338. |
| | **DC's Response: Undisputed** for purposes of this motion that the Shuster Termination contains the language quoted by defendants. Defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion." |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | "undisputed fact." | |
| **51.** | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(ii), the Shuster Termination lists the name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made. | **Defendants' Evidence:** AD Ex. FF at 338-40. |
| | **DC's Response: Undisputed** for purposes of this motion that the Shuster Termination lists the stated information. Defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion." |
| **52.** | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(iii), the Shuster Termination lists the following works, their authors (Siegel and Shuster), and their original copyright registration numbers: *Action Comics, No. 1* (B379787), *No. 2* (B379788), *No. 3* (B385466), *No. 4* (B387907), *No. 5* (B394784), *No. 6* (B394866), *No. 7* (B399214); the previously unpublished works underlying such material; and the material reprinted in *Superman No. 1* (A299871) and *No. 3* (B443035). | **Defendants' Evidence:** AD Ex. FF at 340-42. |
| | **DC's Response: Undisputed** for purposes of this motion that the Shuster Termination lists the stated information and that any works not listed were purposely omitted by defendants. Defendants' claim that | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's claim that works were "purposely |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|---------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." | omitted" is unsupported by any cited evidence.<br><br>The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion."<br><br>**Objections to DC's Evidence:** DC's statement that "any works not listed [in the Shuster Termination] were purposely omitted by defendants" is unsupported by the purported evidence cited by DC. |
| 53. | **Defendants' Fact:** The relevant published works listed in the Shuster Termination secured statutory copyright between April 18, 1938 and October 25, 1938. | **Defendants' Evidence:** AD Ex. FF at 340-42. |
|     | **DC's Response: Undisputed** for purposes of this motion that the Shuster Termination lists works published between April 18, 1938, and October 25, 1938. | **Defendants' Reply:** N/A. |
| 54. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(iv), the Shuster Termination lists the 1938 Grant and subsequent pre-1978 grants or potential grants to which it applies. | **Defendants' Evidence:** AD Ex. FF at 342-43. |
|     | **DC's Response: Disputed.**<br><br>DC does not dispute for purposes of this motion that the Shuster Termination lists the 1938 Grant and other pre-1978 grants of Shuster's Superman copyrights. Defendants' claim that the Shusters' termination notice was "per" a federal regulation is an | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion."<br><br>DC disputes this indisputable fact to |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|---------------------|
|     | **DC's Response** | **Defendants' Reply** |
|     | improper legal conclusion and not the proper subject of an "undisputed fact." <br><br> Moreover, DC disputes the implication that the Shuster Termination lists all pre-1978 grants of Shuster's Superman copyrights. The Shuster Termination does not seek to terminate the grant contained in the 1948 Consent Judgment.  AD Ex. FF at 342-43; *see* Docket No. 4 ¶¶ 125-28. | make improper arguments. <br><br> DC's argument that the 1948 Consent Judgment in the 1947 Action was a copyright transfer or "grant" was expressly *rejected* by the *Siegel* Court in holding that the 1948 Consent Judgment need not be included in a Superman termination notice, and DC did not appeal that ruling. SUF ¶69; *Siegel I*, 542 F. Supp. 2d at 1131-32; AD Ex. WW. <br><br> **Objections to DC's Evidence:**  To the extent that DC's statement that the "Shuster Termination does not seek to terminate the grant contained in the 1948 Consent Judgment" implies that the Judgment was a copyright grant, it is inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.  It is also unsupported by the purported evidence cited by DC. |
| 55. | **Defendants' Fact:**  Per 37 C.F.R. § 201.10(b)(1)(v), the Shuster Termination lists an effective termination date of October 26, 2013. | **Defendants' Evidence:**  AD Ex. FF at 343. |
|     | **DC's Response:  Undisputed.** Defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." <br><br> DC addressed DSUF 55 in responding to DSAUF 84.  Docket No. 471 at 66. | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.  The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion." <br><br> DC's attempt to incorporate its response to a separate motion is |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES      **ER-154**

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|---|---|---|
| | | improper. |
| 56. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(vi), the Shuster Termination accurately states the following: "No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c))." | **Defendants' Evidence:** AD Ex. FF at 344. |
| | **DC's Response: Disputed.**<br><br>DC does not dispute for purposes of this motion that the Shuster Termination contains the language quoted by defendants, but whether the statement is "accurate[]" is a hotly disputed legal question, at the center of DC's motion for partial summary judgment. Docket Nos. 458 at 10-25; 468 at 8-10. It is improper for defendants to treat such legal questions as undisputed facts.<br><br>And defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the language responds to and is not a "legal conclusion."<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not and cannot dispute that no prior termination pursuant to 17 U.S.C. § 304(c) was exercised by Joseph Shuster or his statutory heirs or representatives. DC admitted this elsewhere in its opposition. SUF ¶24. |
| 57. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(b)(1)(vii), the Shuster Termination lists Mark Warren Peary, the Shuster Executor, as the | **Defendants' Evidence:** AD Ex. FF at 344. |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | person executing the grant and the person entitled to exercise Joe Shuster's termination rights, and the basis for that entitlement. | |
| | **DC's Response: Disputed.** <br><br> DC addressed DSUF 57 in responding to DSAUF 84. Docket No. 471 at 66. <br><br> The Shuster Termination lists Peary as executor of the Estate of Joseph Shuster, as the person executing the grant, but whether Peary was "entitled to exercise Joe Shuster's termination rights" is a hotly disputed legal question, at the center of DC's motion for summary judgment. Docket Nos. 458 at 10-25; 468 at 8-10. It is improper for defendants to treat such legal questions—whether Peary is "entitled" to exercise the Shuster's putative termination rights—as undisputed facts. <br><br> And defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion, and not the proper subject of an "undisputed fact." | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the language conforms to and is not a "legal conclusion." <br><br> DC's attempt to incorporate its response to a separate motion is improper. <br><br> DC disputes this indisputable fact to make improper arguments. DC does not and cannot dispute that the Shuster Termination contains the relevant language identifying Mr. Peary as the person entitled to exercise Joe Shuster's termination right under the Copyright Act. |
| 58. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(c), the Shuster Termination was signed by Mark Warren Peary, the Shuster Executor, as owner of Joseph Shuster's entire termination interest, accompanied by his | **Defendants' Evidence:** AD Ex. FF at 344. |

56
DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES    **ER-156**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | typewritten address. | |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 58 in responding to DSAUF 84. Docket No. 471 at 66.<br><br>The Shuster Termination is signed by Peary, as executor of the Estate of Joseph Shuster, but whether the Estate is the "owner of Joseph Shuster's entire termination interest" is a hotly disputed legal question, at the center of DC's motion for summary judgment. Docket Nos.458 at 10-25; 468 at 8-10. It is improper for defendants to treat such legal questions— whether Shuster's Estate holds a termination interest— as undisputed facts.<br><br>And defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. The reference to federal regulations merely identifies the appropriate regulation that the Shuster Termination followed and is not a "legal conclusion."<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments. DC does not and cannot dispute that the Shuster Termination contains the relevant language identifying Mr. Peary as the person entitled to exercise Joe Shuster's termination right. |
| 59. | **Defendants' Fact:** Per 37 C.F.R. § 201.10(d), the Shuster Termination was served by first-class mail and sent to addresses which, after a reasonable investigation, were found to be the last known address of the grantee(s) or successor(s) in title. | **Defendants' Evidence:** AD Ex. FF at 345-48. |
| | **DC's Response: Undisputed** for purposes of this motion that the Shuster Termination makes this | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | **DC's Response**            | **Defendants' Reply** |
|     | representation. Defendants' claim that the Shusters' termination notice was "per" a federal regulation is an improper legal conclusion and not the proper subject of an "undisputed fact." | this. The reference to federal regulations merely identifies the appropriate regulation that the Shuster Termination followed and is not a "legal conclusion." |
| 60. | **Defendants' Fact:** The Shuster Termination was filed and recorded with the United States Copyright Office on December 8, 2003. | **Defendants' Evidence:** AD Ex. FF at 333-35. |
|     | **DC's Response: Undisputed.**<br><br>DC addressed DSUF 58 in responding to DSAUF 84. Docket No. 471 at 66. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| | **The Siegels' Notices of Termination** | |
| 61. | **Defendants' Fact:** In 1997, Joanne Siegel and Laura Siegel Larson served and filed notices of termination on DC as to Jerome Siegel's grants of Superman copyrights. | **Defendants' Evidence:** FAC at ¶67; AD Ex. II at 360. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 61 in responding to DSAUF 97. Docket No. 471 at 71.<br><br>DC admits that Joanne Siegel and Laura Siegel Larson served and filed notices of termination in 1997. Whether the notices were valid, whether DC and the Siegels reached a settlement agreement in 2001, and whether the notices of termination sought to terminate all of Siegel's grants of Superman copyrights, are issues presently | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not dispute the undisputed facts stated, and improperly attempts to interject purported legal issues. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES       **ER-158**

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| **No.** | **DC's Response** | **Defendants' Reply** |
| | being litigated before the Ninth Circuit in the *Siegel* case. Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49. These are not remotely undisputed facts | |
| **62.** | **Defendants' Fact:** On November 8, 2002, Joanne Siegel and Laura Siegel Larson served notices of termination on DC as to Jerome Siegel's Superboy copyrights. | **Defendants' Evidence:** FAC at ¶86. |
| | **DC's Response: Disputed.**<br><br>DC admits that Joanne Siegel and Laura Siegel Larson served and filed notices of termination in 2002. Whether the notices were valid, whether Superboy is copyrightable, and whether Superboy, if copyrightable, is a joint work by Siegel and Shuster are issues presently being litigated in the *Siegel* case. Case No. CV-04-8400, 04-8776 SGL (RZx), Docket No. 116 at 29-39; *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1155 (C.D. Cal. 2007); 9th Cir. Appeal Nos. 11-55863, 11-56034, Docket No. 31-1 at 72-77. These are not remotely undisputed facts. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not dispute the undisputed facts stated, and improperly attempts to interject purported legal issues.<br><br>DC's argument that Jerome Siegel's original Superboy script that Shuster did not write and did not illustrate is somehow a "joint work" is erroneous. AD Ex. C at 81-83 ¶¶157-64. |
| **63.** | **Defendants' Fact:** Neither Mr. Peary nor Ms. Peavy have any interest in these Superboy notices of termination. | **Defendants' Evidence:** AD Exs. SS at 502-507, TT at 513-518. |
| | **DC's Response: Disputed.**<br><br>Whether the Shusters have *any* interest in the Siegel's Superboy termination notices served in 2002 | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | is a hotly disputed factual and legal question in this case.  Docket No. 49 ¶¶86-91, 131-33; Opp. at 17-25; *see infra* DC's Statement of Genuine Issues 1-17.  It is improper to treat such legal questions as undisputed facts. | DC disputes this indisputable fact to make improper arguments.<br><br>Ms. Larson and Mr. Peary expressly testified in their 2011 depositions that the Shusters had no interest in the Siegels' Superboy notice of termination.<br><br>DC cites **no evidence whatsoever** that the Shusters have any sort of interest in the Siegels' Superboy termination.  After nearly eight years of litigation, DC cites only to its own arguments and speculation in its own pleadings and motion papers. |
|  | **The *Siegel* Litigation and Judgment** | |
| 64. | **Defendants' Fact:**  In November 2004, the Siegels, represented by Marc Toberoff, filed suit against DC as to Superman (C.D. Cal. Case No. 04-08400) and Superboy (C.D. Cal. Case No. 04-08776) (the "*Siegel* Litigation"). | |
|     | **DC's Response:  Undisputed** that in 2004, Joanne Siegel and Laura Siegel Larson filed lawsuits concerning copyright termination notices they filed, Case Nos. CV-04-8400, CV-04-8776, and that Toberoff was their counsel of record.<br><br>DC addressed DSUF 64 in responding to DSAUF 98.  Docket No. 471 at 72. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |
| 65. | **Defendants' Fact:**  In the *Siegel* Litigation, the Court held that the Siegels' notices of termination | **Defendants' Evidence:**  *Siegel I*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008). |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | concerning Superman were valid and effective as to Siegel and Shuster's original Superman story published in *Action Comics, No. 1*, and that the Siegels had thereby recovered Jerome Siegel's copyright interest in that Superman story published in *Action Comics, No. 1.* | |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 65 in responding to DSAUF 98. Docket No. 471 at 72.<br><br>Whether the Siegels' termination notices concerning Superman were valid and, if so, the scope of the termination notices, are issues presently being litigated before the Ninth Circuit in the *Siegel* case. Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49. These are not remotely undisputed facts. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC nowhere disputes that Judge Larson in *Siegel* made the stated rulings as affirmed in this Court's Rule 54(b) judgment in *Siegel*. AD, Ex. QQ. |
| 66. | **Defendants' Fact:** In 2009, the *Siegel* Court also decided whether Siegel and Shuster's Superman stories published in *Action Comics Nos. 2-7* were "works-for-hire." | **Defendants' Evidence:** *Siegel v. Warner Bros. Entertainment, Inc.* ("*Siegel II*"), 658 F. Supp. 2d 1036 (C.D. Cal. 2009). |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 66 in responding to DSAUF 98. Docket No. 471 at 72.<br><br>Whether the Superman stories published in *Action Comics Nos. 2-7* are "works-for-hire" are issues | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper. |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| **No.** | **DC's Response** | **Defendants' Reply** |
| | presently being litigated before the Ninth Circuit in the *Siegel* case. Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49. These are not remotely undisputed facts. | DC disputes this indisputable fact to make improper arguments.<br><br>DC nowhere disputes that Judge Larson in *Siegel* made the stated rulings as affirmed in this Court's Rule 54(b) judgment in *Siegel*. |
| **67.** | **Defendants' Fact:** On May 17, 2011, in the *Siegel* Litigation, this Court entered a Rule 54(b) judgment that incorporated *Siegel I* and *Siegel II*. | **Defendants' Evidence:** AD Ex. QQ. |
| | **DC's Response: Undisputed** for purposes of this motion that the *Siegel* court granted defendants' Renewed Motion for Entry of a Partial Judgment Under FED. R. CIV. P. 54(b) on May 17, 2011, and certified as final pursuant to Rule 54(b) "the First Claim of the Third Amended Complaint, and the First, Second, Third and Fourth Counterclaims of the Second Amended Counterclaims (as stricken in part by the Court's May 5, 2011 order), and the Court's March 26, 2008 order (Docket No. 293), August 12, 2009 order (Docket No. 560), and October 30, 2009 order (Docket No. 595)." AD Ex. QQ. This Rule 54(b) ruling is currently on appeal. Appeal Nos. 11-55863, 11-56034. | **Defendants' Reply:** N/A. |
| **68.** | **Defendants' Fact:** On appeal from the Rule 54(b) judgment in the *Siegel* Litigation, DC did not challenge the ruling in *Siegel I* that "the 1975 Agreement was not a | **Defendants' Evidence:** *Siegel I*, 542 F. Supp. 2d at 1133; AD Ex. WW. |

| No. | Statement Of Undisputed Fact<br>DC's Response | Defendants' Evidence<br>Defendants' Reply |
|---|---|---|
| | 'grant.''' | |
| | **DC's Response: Undisputed** for purposes of this motion that DC did not challenge the ruling in *Siegel* that the 1975 Agreement was not a "grant" of Siegel's Superman copyrights | **Defendants' Reply:** N/A. |
| 69. | **Defendants' Fact:** On appeal from the Rule 54(b) judgment in the *Siegel* Litigation, DC did not challenge the ruling in *Siegel I* that the May 21, 1948 "consent judgment" did not need to be listed on notices of termination. | **Defendants' Evidence:** *Siegel I*, 542 F. Supp. 2d at 1131-32; AD Ex. WW. |
| | **DC's Response: Undisputed** for purposes of this motion that DC did not challenge the ruling in *Siegel* that the 1948 Consent Judgment did not need to be listed on the Siegels' notices of termination. | **Defendants' Reply:** N/A. |
| | **Overlap Between This Litigation And The *Siegel* Litigation** | |
| 70. | **Defendants' Fact:** DC filed this lawsuit, against Joanne Siegel, Laura Siegel Larson, Mark Warren Peary and their counsel, Marc Toberoff, in May 2010. | **Defendants' Evidence:** Docket No. 1. |
| | **DC's Response: Disputed.**<br><br>DC filed its initial complaint on May 14, 2010, against Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, Marc Toberoff, Joanne Siegel, Laura Siegel Larson, and Mark Warren Peary, as personal representative of the Estate of Joseph Shuster. Docket No. 1.<br><br>DC further disputes the suggestion | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not dispute that, regardless of whether Mr. Toberoff was *sued* as counsel, Mr. Toberoff was and still is counsel for both Ms. Larson and Mr. Peary. |

| No. | Statement Of Undisputed Fact / DC's Response | Defendants' Evidence / Defendants' Reply |
|---|---|---|
| | that the complaint was filed against Toberoff as "counsel" for the Siegel and Shuster heirs. This Court rejected defendants' SLAPP motion and their erroneous—yet oft-repeated—assertions that Toberoff's alleged interference was "protected, litigation and settlement related conduct." Docket No. 337. | |
| 71. | **Defendants' Fact:** Sub-parts (a) and (c) of DC's Second Claim concern "work-for-hire" issues already decided in the *Siegel* Litigation, and which were incorporated in this Court's Rule 54(b) judgment. | **Defendants' Evidence:** FAC ¶¶153-54, 158-50; *Siegel I*, 542 F. Supp. 2d at 1126-1130; AD Ex. QQ. |
| | **DC's Response: Disputed.**<br><br>This is pure legal argument about the impact of an interlocutory court ruling in the *Siegel* action that is currently pending before the Ninth Circuit. Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1 at 41-87; 49 at 17-28; 65-1. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC nowhere disputes that Judge Larson in *Siegel* made the stated rulings as affirmed in this Court's Rule 54(b) judgment in *Siegel*. |
| 72. | **Defendants' Fact:** Sub-parts (b), (d) and (e) of DC's Second Claim were also part of DC's counterclaims in the previously filed *Siegel* Litigation. | **Defendants' Evidence:** *Compare* FAC at ¶¶155-56, 160-62, 163-64 *with* AD Ex. PP at ¶¶109-13, 118-20, 34. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | **DC's Response:  Disputed.**<br><br>This is pure legal argument about the impact of an interlocutory court ruling in the *Siegel* action that is currently pending before the Ninth Circuit.  Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1 at 41-87; 49 at 17-28; 65-1. | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC nowhere disputes that Judge Larson in *Siegel* made the stated rulings as affirmed in this Court's Rule 54(b) judgment in *Siegel*. |
| 73. | **Defendants' Fact:**  DC's Fourth, Fifth and Sixth Claim are before the Ninth Circuit as part of the anti-SLAPP appeal. | **Defendants' Evidence:**  AD Exs. WW, XX. |
| | **DC's Response:  Undisputed.**<br><br>However, a central question presented in the SLAPP appeal is whether the Ninth Circuit has jurisdiction to hear it.  Appeal No. 11-56934, Docket No. 37-1 at 26-27. | **Defendants' Reply:**  DC's response is pure legal argument to which no response is necessary.<br><br>The Ninth Circuit recently reaffirmed the logic of *Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003), which found immediate appellate jurisdiction over denials of anti-SLAPP motions under California law, in *Metabolic Research, Inc. v. Ferrell*, 2012 WL 2215834, at *3-5 (9th Cir. June 18, 2012). |
| | **The Parties' Agreements** | |
| 74. | **Defendants' Fact:**  In November 2001, Ms. Peavy and Mr. Peary, as an individual, entered into an agreement (the "2001 PPC Agreement") with Pacific Pictures | **Defendants' Evidence:**  AD Ex. Z. |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| No. | DC's Response | Defendants' Reply |
| | Corporation ("PPC"). | |
| | **DC's Response: Undisputed** for purposes of this motion that Jean and Peary entered into an agreement with Pacific Pictures signed by Jean, Peary, and Toberoff in November 2001. AD Ex. Z.<br><br>DC addressed DSUF 74 in responding to DSAUF 79. Docket No. 471 at 63. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| **75.** | **Defendants' Fact:** In October 2003, the Shuster Executor, and PPC entered into an agreement (the ("2003 PPC Agreement"). | **Defendants' Evidence:** AD Ex. EE. |
| | **DC's Response: Undisputed** for purposes of this motion that Peary, as executor for the Shuster Estate, entered into an agreement with Pacific Pictures signed by Jean, Peary, and Toberoff in October 2003. DC addressed DSUF 75 in responding to DSAUF 83. Docket No. 471 at 64-65. | **Defendants' Reply:** DC's attempt to incorporate its response to a separate motion is improper. |
| **76.** | **Defendants' Fact:** In 2004, Mr. Peary, Ms. Peavy and Mr. Toberoff confirmed the cancellation of the 2001 and 2003 PPC Agreements. | **Defendants' Evidence:** AD Ex. GG. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 76 in responding to DSAUF 85. Docket No. 471 at 66-67.<br><br>DC has addressed at length in its Rule 12 briefing, Docket No. 185 at 5-6, summary judgment briefing, Docket No. 468 at 12, and other | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to |

| | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| **No.** | **DC's Response** | **Defendants' Reply** |
| | briefing, *e.g.*, Docket No. 360 at 3-4, whether the Pacific Pictures agreements were ever properly terminated, and whether the Shusters' putative rights were ever assigned back to them.  The evidence supporting DC's position includes the plain terms of the 2001, 2003, 2004, and 2011 Pacific Pictures agreements, which do not support defendants' position. AD Exs. Z, EE, GG, UU.  These are not remotely undisputed facts. | make improper arguments.<br><br>DC cites only its prior briefs, but offers **no evidence whatsoever** that the 2001 and 2003 PPC Agreements were not cancelled in 2004.  AD Ex. GG. |
| **77.** | **Defendants' Fact:**  The 2001 and 2003 PPC Agreements, and the 2004 cancellation, were voluntarily produced to DC in 2006 in the *Siegel* Litigation. | **Defendants' Evidence:**  AD Ex. KK. |
| | **DC's Response:  Disputed.**<br><br>DC addressed DSUF 77 in responding to DSAUF 94. Docket No. 471 at 70.<br><br>Defendants offer no competent evidence to support this claim, as the sole document they cite is a November 15, 2006, cover letter sent by former Toberoff associate Alexander Merino in the *Siegel* case purporting to enclose productions from IPW, LLC and Pacific Pictures Corporation. | **Defendants' Reply:**  Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC frivolously disputes this indisputable fact.<br><br>It is incontrovertible that the 2001 and 2003 PPC Agreements and the 2004 written cancellation of these agreements were produced to DC in 2006 in the *Siegel* case.<br><br>Furthermore, those agreements, along |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES    **ER-167**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
| --- | --- | --- |
| | DC's Response | Defendants' Reply |
| | | with the 2003 Siegel "Superboy" termination, form the basis of the basis of DC's "unclean hands" claim, brought in 2010, leading to the decided inference that this stale claim was concocted solely for this lawsuit.<br><br>As DC admits in response to Undisputed Fact No. 77, below, DC took deposition testimony in 2006 regarding the 2001 and 2003 PPC Agreements.  AD Exs. LL at 385-402 , JJ at 369-381.<br><br>Defendants previously requested that the Court take judicial notice that these documents were produced to DC in *Siegel* in 2006 (Docket No. 331-1) and DC stated that it "does not oppose" this.  Docket No. 335.<br><br>DC also admitted on appeal that the documents were produced to DC in 2006.  Case No. 11-56934, Docket 37-1 at 55 (referring to "agreements and letters they [Defendants] produced in *Larson* [*Siegel*] in 2006.").<br><br>DC also cites **no evidence whatsoever** that the agreements were not *voluntarily* produced to DC. |
| 78. | **Defendants' Fact:**  In 2006 in the *Siegel* Litigation, DC took deposition testimony regarding the 2001 and 2003 PPC Agreements. | **Defendants' Evidence:**  AD Exs. LL at 385-402, JJ at 369-381. |
| | **DC's Response: Undisputed.** DC addressed DSUF 78 in responding to DSAUF 95.  Docket No. 471 at 71. | **Defendants' Reply:**  DC's attempt to incorporate its response to a separate motion is improper. |

Case 2:10-cv-03633-ODW-RZ Document 495-12, Filed 10/01/12, Page 162 of 312 Page ID
#:31228
Case 2:10-cv-03633-ODW-RZ Document 495-1, Filed 10/01/12, Page 70 of 88 Page ID
#:31228

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| 79. | **Defendants' Fact:** In a 2011 letter, Mr. Peary, Ms. Peavy and Mr. Toberoff confirmed their intent that PPC have no continuing interest whatsoever when they revoked the PPC Agreements in 2004. | **Defendants' Evidence:** AD Ex. UU. |
| | **DC's Response: Disputed.** | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this. |
| | DC has addressed at length in its Rule 12 briefing, Docket No. 185 at 5-6, summary judgment briefing, Docket No. 468 at 12, and other briefing, *e.g.*, Docket No. 360 at 3-4, whether the Pacific Pictures agreements were ever properly terminated, and whether the Shusters' putative rights were ever assigned back to them. The evidence supporting DC's position includes the plain terms of the 2001, 2003, 2004, and 2011 Pacific Pictures agreements, which do not support defendants' position. AD Exs. Z, EE, GG, UU. | DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC cites its arguments in prior briefs, but offers **no evidence whatsoever** that the 2001 and 2003 PPC Agreements were not properly and fully cancelled in 2004. |
| | Moreover, DC has disputed Jean's competency to enter into this 2011 agreement, whether defendants revoked the 2004 agreement, and the legal effect of that asserted revocation. Docket No. 322 at 1-2. These are not remotely undisputed facts. | Despite DC's rhetoric, the 2011 letter was not another "agreement;" it simply confirmed that when the parties expressly cancelled the 2001 and 2003 PPC Agreements and replaced them with a legal retainer agreement in 2004 they intended that PPC have *no continuing interest* whatsoever. AD Ex. UU. |
| 80. | **Defendants' Fact:** In 2008, during the *Siegel* Litigation, an agreement was entered into by Joanne Siegel, Laura Siegel | **Defendants' Evidence:** AD Exs. SS at 490-499, TT at 511-512. |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | **DC's Response** | **Defendants' Reply** |
| | Larson, Mark Warren Peary, and Jean Adele Peavy regarding settlement negotiations with DC (the "2008 Agreement"). | |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 80 in responding to DSAUF 90. Docket No. 471 at 69.<br><br>DC does not dispute that the 2008 Consent Agreement was entered into by Joanne Siegel, Laura Siegel Larson, Mark Warren Peary, and Jean Adele Peavy.<br><br>DC disputes that the 2008 Consent Agreement was entered into "regarding settlement negotiations." Peary testified that the agreement remains in effect to this day— separate and apart from any mediation discussion. Docket No. 305-37 at 1174:5-7.<br><br>Moreover, defendants have refused to produce the 2008 Consent Agreement, and cannot make self- serving assertions about its contents or who is bound by it, including whether Mr. Toberoff is a party to it. *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cie. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."). In any event, if this | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>DC does not and cannot dispute the 2008 Agreement was entered into shortly before a settlement mediation in *Siegel* and that it concerns the Siegels/Shusters settlement negotiations with DC, which naturally have been ongoing.<br><br>In both *Siegel*, and in this litigation, in a ruling affirmed by this Court, the 2008 Agreement was upheld as privileged.  *See* SUF ¶¶82-93; Docket Nos. 209, 249.  Defendants were forced to make assertions about the 2008 Agreement to defend against DC's false accusations and speculation.  As Magistrate Judge Zarefsky stated in the ruling regarding the 2008 Agreement, upheld by this Court:  "Defendants do not waive privilege by defending themselves."  Docket. No. 209 at 10; *see* SUF ¶¶82-93. |

70
DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES          **ER-170**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC | It is manifestly improper for DC to seek to re-litigate discovery issues on which it lost and which are "law of the case," under the guise of a "separate statement." |
| 81. | **Defendants' Fact:** As alleged by DC, the 2008 Agreement requires the consent of the parties thereto to any settlement of their recaptured copyrights with DC. | **Defendants' Evidence:** FAC at ¶188. |
|     | **DC's Response: Disputed.**<br><br>DC addressed DSUF 81 in responding to DSAUF 91. Docket No. 471 at 69-70.<br><br>Defendants have refused to produce the 2008 Consent Agreement, and cannot make self-serving assertions about its contents. *Bilzerian*, 926 F.2d at 1292. Indeed, their choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver. *Id.* at 1291-94. In any event, defendants' admissions about its contents prove its illegality, as shown in DC's briefs. Docket Nos. 458 at 23-25; 468 at 10-12. If this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper. DC disputes this indisputable fact to make improper arguments.<br><br>In both *Siegel*, and in this litigation, in a ruling affirmed by this Court, the 2008 Agreement was upheld as privileged. *See* SUF ¶¶82-93; Docket Nos. 209, 252. Defendants were forced to makes assertions about the 2008 Agreement to defend against DC's false accusations and speculation. As Magistrate Judge Zarefsky stated in the ruling regarding the 2008 Agreement, upheld by this Court: "Defendants do not waive privilege by defending themselves." Docket No. 209 at 10; *see* SUF ¶¶82-93.<br><br>It is manifestly improper for DC to seek to re-litigate discovery issues on which it lost and which are "law of the case," |

71
DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES

**ER-171**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | | under the guise of a "separate statement."<br><br>DC's rhetoric about "illegality" is unsupported. The Siegels' and Shusters' 2008 Agreement to collectively negotiate settlement with DC does not violate 17 U.S.C. § 304(c)(6)(D), as DC falsely asserts, or any other laws.<br><br>**Objections to DC's Evidence:** DC's statement that Defendants' "choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver" is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. |
| 82. | **Defendants' Fact:** Magistrate Judge Zarefsky rejected DC's arguments that the 2008 Agreement constitutes "an independent wrong [that] violates the Copyright Act," and found, instead, that it is a legitimate "Drysdale-Koufax collective approach to negotiation." | **Defendants' Evidence:** Docket No. 209 at 6-8. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 82 in responding to DSAUF 93. Docket No. 471 at 70.<br><br>This is pure legal argument about a court ruling. It also erroneously describes the court's ruling; Magistrate Judge Zarefsky said that defendants' | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES   **ER-172**

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|-----|------------------------------|----------------------|
|     | DC's Response | Defendants' Reply |
|     | 2008 Consent Agreement might not violate § 304(c)(6)(D) of the Copyright Act, but conceded that "[o]ne cannot know with certainty what the consent agreement means without seeing" it, Docket No. 209 at 8:1-2—and, without looking at the contract, accepted Toberoff's representations to Judge Larson in the *Siegel* case about its contents. Docket Nos. 160 at 6-44; 209 at 1-10.<br><br>Since Magistrate Judge Zarefsky ruled in May 2011, new facts have emerged that disprove Toberoff's false assertions to Judges Larson and Zarefsky, and defendants have selectively disclosed information about the agreement that reveal many of its contents. PD ¶13-17. DC will move shortly to compel the production of the consent agreement and further testimony concerning its contents. | This is not "legal argument" about a Court ruling, it is a quotation from that ruling.<br><br>In both *Siegel*, and in this litigation, in a ruling affirmed by this Court, the 2008 Agreement was upheld as privileged. *See* SUF ¶¶82-93; Docket Nos. 209, 252. Defendants were forced to makes assertions about the 2008 Agreement to defend against DC's false accusations and speculation. As Magistrate Judge Zarefsky stated in the ruling regarding the 2008 Agreement, upheld by this Court: "Defendants do not waive privilege by defending themselves." Docket. No. 209 at 10; *see* SUF ¶¶82-93.<br><br>It is manifestly improper for DC to seek to re-litigate discovery issues on which it lost and which are "law of the case," under the guise of a "separate statement." DC pretends there are "new facts." However, the only "evidence" DC cites to are conclusory allegations in a declaration by DC's own counsel.<br><br>**Objections to DC's Evidence:** DC's statement that "[s]ince Magistrate Judge Zarefsky ruled in May 2011, new facts have emerged that disprove Toberoff's false assertions to Judges Larson and Zarefsky, and defendants have selectively disclosed information about the agreement that reveal many of its contents" is inadmissible |

| No. | Statement Of Undisputed Fact | Defendants' Evidence |
|---|---|---|
| | DC's Response | Defendants' Reply |
| | | speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the purported evidence cited by DC. |
| 83. | **Defendants' Fact:** This Court upheld Magistrate Zarefsky's ruling as to the 2008 Agreement. | **Defendants' Evidence:** Docket No. 252. |
| | **DC's Response: Disputed.**<br><br>DC addressed DSUF 82 in responding to DSAUF 93. Docket No. 471 at 70.<br><br>This is pure legal argument about a court ruling. It also erroneously describes the court's ruling. *See supra* DC's Response to DSUF 82. | **Defendants' Reply:** Defendants' cited evidence fully supports the stated fact, and DC does not and cannot dispute this.<br><br>DC's attempt to incorporate its response to a separate motion is improper.<br><br>DC disputes this indisputable fact to make improper arguments.<br><br>This is not "legal argument" about a Court ruling, but a description of the ruling. |

## DEFENDANTS' RESPONSE TO DC'S

## STATEMENT OF ADDITIONAL FACTS

| No. | DC's Additional Fact | Defendants' Response |
|---|---|---|
| 1. | A 1940 script that defendants say features the first appearance of Superboy contains the joint byline: "By Jerry Siegel and Joe Shuster."<br><br>**DC's Evidence:** *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1146, 1155 (C.D. Cal. 2007); PD Ex. 10. | **Undisputed,** but misleading and irrelevant.<br><br>Siegel's 1940 Superboy story that he submitted to DC was *intended* to be illustrated by Joe Shuster, hence the byline on the story; however, Joe Shuster **never illustrated that story**. AD Ex. C at 81-83 ¶¶157-64; *Siegel,* 496 F. Supp. 2d at 1115. For this |

| No. | DC's Additional Fact | Defendants' Response |
|---|---|---|
| | | reason Siegel's 1940 Superman story is not a joint work. *See Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266, 268 (2d. Cir. 1957) (work was not a "joint work" where produced without "plaintiff's consent, which was not sought or obtained"). <br><br> **Objections to DC's Evidence:** To the extent DC attempts to rely upon the byline for the truth of the matter asserted, it is inadmissible hearsay. Fed. R. Evid. 801, 802. <br><br> **Defendants' Evidence:** AD Ex. C at 81-83 ¶¶157-64; *Siegel,* 496 F. Supp. 2d at 1115. |
| 2. | In *Action Comics #1*, which was published in 1938, Shuster drew Superman as a very young boy displaying astounding "feats of strength." <br><br> **DC's Evidence:** PD Ex. 28. | **Undisputed,** but misleading and irrelevant. <br><br> The Court in the 1947 Action found that SUPERBOY was based on Siegel's 1940 story, and that the Superman material in *Action Comics, No. 1*, later repurposed in *Superman, No. 1*, "did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to [DC]." AD Ex. C at 83 ¶¶164-66. The Second Circuit in *Siegel,* 508 F.2d at 914, held that the findings and conclusions in the 1947 Action are preclusive and binding on the parties. <br><br> **Defendants' Evidence:** AD Ex. C at 83 ¶¶164-66. |
| 3. | In *Superman #1*, which was published in 1939, Shuster drew Superman as a young boy with super-powers. | **Undisputed,** but misleading and irrelevant. <br><br> The Court in the 1947 Action found |

| No. | DC's Additional Fact | Defendants' Response |
|---|---|---|
| | **DC's Evidence:** PD Ex. 12. | that SUPERBOY was based on Siegel's script, and the Superman material in *Action Comics, No. 1*, later repurposed in *Superman, No. 1*, "did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to [DC]." AD Ex. C at 83 ¶¶164-66. The Second Circuit in *Siegel,* 508 F.2d at 914, held that the findings and conclusions in the 1947 Action are preclusive and binding on the parties.<br><br>**Defendants' Evidence:** AD Ex. C at 83 ¶¶165-66. |
| **4.** | In a Sunday comic strip, which was published in 1942, Shuster depicted Superman as a "youth" who could "outrun the express" train and had other "amazing powers."<br><br>**DC's Evidence:** PD Ex. 13. | **Undisputed,** but misleading and irrelevant.<br><br>The Court in the 1947 Action found that SUPERBOY was "based upon the idea, plan and conception contained in the plaintiffs, SIEGEL'S letter to [DC], dated November 30, 1938" and that the "release of the said comic strip SUPERBOY published in December of 1944 [*i.e., More Fun Comics, No. 101*] embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to [DC] in December of 1940." AD Ex. C at 83 ¶¶164-65. The Second Circuit in *Siegel,* 508 F.2d at 914, held that the findings and conclusions in the 1947 Action are preclusive and binding on the parties.<br><br>**Defendants' Evidence:** AD Ex. C at 83 ¶¶164-65. |
| **5.** | In 1948, a New York state court found that Shuster provided the | **Undisputed,** but misleading and irrelevant. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES      **ER-176**

| No. | DC's Additional Fact | Defendants' Response |
|-----|---------------------|---------------------|
| | artwork for the first stand-alone Superboy story, printed in *More Fun Comics #101*.<br><br>**DC's Evidence:** AD Ex. C at 85 (Finding 180: "All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC."); PD Ex. 11. | The Court in the 1947 Action noted that "Plaintiff SHUSTER was paid in full by [DC]" for this 1844 work (AD Ex. C at 86 ¶181) while "Plaintiff SIEGEL has received no payment" for his independent 1938-40 submissions, including his 1940 SUPERBOY story. AD Ex. C at 84 ¶174. The Second Circuit in *Siegel,* 508 F.2d at 914, held that the findings and conclusions in the 1947 Action are preclusive and binding on the parties. To the extent DC submits this Additional Fact No. 5 to create an inference that Siegel's 1940 Story was a joint work, that inference is false as set forth above in response to Fact No. 1.<br><br>**Defendants' Evidence:** AD Ex. C at 84-86 ¶¶174, 181. |
| 6. | In 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as their joint creation.<br><br>**DC's Evidence:** PD Ex. 25-27. | **Disputed**. Siegel and Shuster arranged for scores of renewal registrations to be filed regarding *published* Superman and Superboy comic books, which routinely listed themselves as authors. Such renewal notices did not "identify[] Superboy as their joint creation." PD Ex. 25-27. Moreover, no such notice was filed listing Siegel's original 1940 Superboy story at issue, and DC's purported evidence shows none.<br><br>Furthermore, Siegel and Shuster's renewal notices were rejected as invalid in *Siegel,* 508 F.2d at 909. Such renewal notices also cannot change the Court's findings in the 1947 Action, held by the Second Circuit in *Siegel,* 508 F.2d at 913, to be |

| No. | DC's Additional Fact | Defendants' Response |
|-----|----------------------|---------------------|
| | | preclusive and binding on the parties. |
| | | **Objections to DC's Evidence:** To the extent DC attempts to rely upon the notices for the truth of the matter asserted, it is inadmissible hearsay. Fed. R. Evid. 801, 802. |
| | | **Defendants' Evidence:** PD Ex. 25-27. |
| **7.** | In 1982, Siegel's widow Joanne sent a letter to DC stating: "It's no mystery who the creators were in Jerry and Joe's case. Not only of Superman, but Superboy and other comics." <br><br> **DC's Evidence:** PD Ex. 29. | **Undisputed,** but misleading and irrelevant. <br><br> The letter was in response to statements by Paul Levitz, which explained that, while DC had implemented a policy of paying royalties to its current artists/writers, DC would not provide royalties to older artists/writers/creators, because "[i]t's hard to find out who the creators were in most cases." PD Ex. 29. <br><br> This statement is not inconsistent with the Court's findings in the 1947 Action that Siegel created Superboy in his 1938 and 1940 materials. AD Ex. C at 83 ¶¶164-65. Furthermore, casual comments by Siegel's widow in a 1982 letter do not alter the Court's 1947 findings, held by the Second Circuit in *Siegel,* 508 F.2d at 913, to be preclusive and binding on the parties. <br><br> **Objections to DC's Evidence:** To the extent DC attempts to rely upon the letter for the truth of the matter asserted, it is inadmissible hearsay. Fed. R. Evid. 801, 802. <br><br> **Defendants' Evidence:** PD Ex. 29. |

| No. | DC's Additional Fact | Defendants' Response |
|---|---|---|
| 8. | In 1997, Siegel's heirs filed a copyright termination notice seeking to terminate Siegel's prior grants of Superman rights that listed Superboy-specific works and identified "Superboy" as among the "character[s], story element[s], or indicia reasonably associated with SUPERMAN."<br><br>**DC's Evidence:** PD Ex. 31. | **Undisputed,** but misleading and irrelevant. The termination notices listed virtually every element associated with Superman. As Superboy was thought to be derivative of Superman, such elements were naturally included in the list.<br><br>**Defendants' Evidence:** PD Ex. 31. |
| 9. | In a November 2001 "Joint Venture Agreement," Jean and Peary formed a joint venture with Toberoff's company Pacific Pictures Corporation listing "Superboy" as among "Joe Shuster's creations."<br><br>**DC's Evidence:** AD Ex. Z. | **Disputed.** The name "Superboy" was included in the 2001 PPC Agreement in a list of examples of Superman-related elements and/or derivative works. It was not listed as one of "Joe Shuster's creations," and the list includes other elements/works that are also clearly not Shuster's creation or co-creation but are simply Superman derivatives (*e.g.,* Lana Lang and Supergirl).<br><br>**Defendants' Evidence:** PD Ex. 3 at 335:15-337:2; AD Ex. Z. |
| 10. | In November 2001, Toberoff approached the Siegels seeking to buy out their putative Superman rights.<br><br>**DC's Evidence:** PD Ex. 3 at 212:8-222:13; 32; 33; Docket No. 305-14 at 358:4-360:20. | **Disputed**.<br><br>DC's cited evidence does not support DC's willfully misleading statement.<br><br>Mr. Toberoff did not approach the "Siegels" (*i.e.,* Joanne Siegel and Laura Siegel Larson) in November 2001 to buy-out their Superman rights.<br><br>Mr. Toberoff approached Michael Siegel in November 2001 in connection with legal representation, as found by Magistrate Judge Zarefksy after reviewing a November 2001 e-mail from Mr. Toberoff to Michael Siegel. Docket No. 451. |

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES **ER-179**

| No. | DC's Additional Fact | Defendants' Response |
|-----|---------------------|---------------------|
|     |                     | Michael Siegel (Jerry Siegel's son by an earlier marriage) was not a party to Joanne and Laura's Superman termination notices or Superboy termination notice, nor was Michael a party to the Siegels' settlement negotiations with DC at issue in this case. Under the Copyright Act, Michael simply held a passive 25% interest in any proceeds Joanne and Laura received from their terminations. **Defendants' Evidence:** Docket No. 451; PD Ex. 31. |
| 11. | In October 2002, the Siegels signed an agreement with Toberoff's company IP Worldwide to exploit their putative Superman rights. **DC's Evidence:** PD Ex. 34. | **Disputed.** DC's cited evidence does not support its statement. IP Worldwide was a partnership between attorney Marc Toberoff and Ari Emanuel, a founder of the Endeavor Talent Agency (now CEO of William Morris Endeavor). The IP Worldwide Agreement is clearly directed at the representation of the Siegels' rights by IP Worldwide, not the exploitation of such rights. Shortly after entering into the IP Worldwide Agreement, Mr. Toberoff contacted Warner Bros.' General Counsel, John Schulman, in 2003 on behalf of Laura and Joanne Siegel to resume legal settlement negotiations with DC/Warner Bros. and he conducted such settlement negotiations in 2003 and 2004 – before entering into a litigation retainer agreement with Laura and Joanne Siegel in 2004 and |

| No. | DC's Additional Fact | Defendants' Response |
|-----|----------------------|---------------------|
|     |                      | filing the *Siegel* action in 2004 to enforce their statutory terminations. Reply Declaration of Keith Adams, Ex. B.<br><br>**Defendants' Evidence:** PD Ex. 34. |
| 12. | In November 2002, the Siegels filed a copyright termination notice directed at Superboy, which listed the same Superboy-specific works identified in their 1997 copyright termination notice.<br><br>**DC's Evidence:** PD Ex. 31. | **Undisputed,** but misleading and irrelevant.<br><br>The Siegels' Superboy termination notice applied to many of the same Superboy-specific works identified in their earlier 1997 copyright termination notices, which listed virtually every Superman-related work. This is because Superboy is both a derivative work of Superman *and* a separately copyrightable superhero character and comic book line, as to which DC has filed separate copyright registrations. Despite the contrary inferences intended by DC's statement, the two are not mutually exclusive. Derivative works like Superboy are subject to separate copyright protection. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 2012 WL 3764704 (9th Cir. Aug. 31, 2012) ("[D]erivative work may be independently copyrightable….").<br><br>**Defendants' Evidence:** PD Ex. 31. |
| 13. | The Siegels' 2002 copyright termination notice stated that Superboy was a copyrightable work "separate and distinct" from Superman and that Superboy was "solely written and created" by Siegel.<br><br>**DC's Evidence:** PD Exs. 15, 31. | **Undisputed**; these statements in the Siegels' Superboy termination notice are entirely accurate**.** |

| No. | DC's Additional Fact | Defendants' Response |
|-----|---------------------|---------------------|
| 14. | Without receiving any independent legal advice, conducting any factual investigation, or consulting with Jean, Peary agreed to disclaim any interest in Superboy, and defendants amended the 2001 Pacific Pictures Agreement to delete all reference to "Superboy" and redefine the Shusters' putative rights as including only "Superman."<br><br>**DC's Evidence:** Docket No. 305-37 at 1270:6-1272:19, 1385:12-1386:5, 1391:5-1395:7; AD Exs. Z, EE; PD Ex. 3 at 335:15-345:4. | **Disputed.** DC's cited evidence does nothing to support its rhetoric.<br><br>Peary did not "agree[] to disclaim any interest in Superboy." Nor does the 2003 PPC Agreement "redefine the Shusters' putative rights as including only 'Superman.'" Insofar as Superboy is a derivative work based on Superman, the Shuster Estate continues to have an interest in future Superboy exploitations as the expected co-owner of the copyrights to original Superman copyrights subject to its termination notice.<br><br>"Superboy" not being listed in the 2003 PPC Agreement was not the result of any agreement by Peary "to disclaim any interest in Superboy." DC misleadingly omits that the 2003 Agreement contains none of the many Superman-related elements listed in the 2001 Agreement; and that this was not specific to Superboy, or anything else.<br><br>**Objections to DC's Evidence:** DC's statement is unsupported by the purported evidence DC cites.<br><br>**Defendants' Evidence:** AD Exs. Z, EE. |
| 15. | In November 2003, Peary filed a termination notice with the Copyright Office that omitted all reference to Superboy-specific works and elements.<br><br>**DC's Evidence:** AD Ex. FF; Docket No. 305-37 at 1270:6-1272:19, 1385:12-1386:5, | **Disputed.** The Shuster Termination filed by Peary as Executor of the Shuster Estate did not specifically "omit" all reference to Superboy; it properly listed the works subject to the termination notice under 17 U.S.C. § 304(d). Insofar as Superboy is a derivative work based on Superman, the Shuster Estate continues to have an |

| No. | DC's Additional Fact | Defendants' Response |
|-----|----------------------|---------------------|
|  | 1391:5-1395:7, 1400:5-1414:2. | interest in future Superboy exploitations as the expected co-owner of the copyrights to original Superman copyrights subject to its termination notice.<br><br>**Defendants' Evidence:** AD Ex. FF. |
| 16. | In 2008, defendants entered into a "consent agreement" —which remains in effect to this day— barring the Siegels or Shusters from entering into an agreement with DC without the other family's consent.<br><br>**DC's Evidence:** PD Ex. 3 at 359:4-361:12; Docket Nos. 160 at 50-64; 305-24 at 758:23-760:25; 305-37 at 1155:21-1156:25, 1158:19-1160:9, 11174:5-7, 1184:8-1185:11. | **Disputed.** The 2008 Agreement requires only the "consent of the parties thereto to any settlement of their recaptured copyrights with DC." *See* ¶81, *supra*. Neither Mr. Toberoff nor any other Toberoff "defendants" are parties to the 2008 Agreement, and settlement does not require his/their consent. SUF ¶81. Mr. Toberoff signed the 2008 Agreement as the parties' attorney to connote his "approval as to [the] form" of the agreement only.<br><br>**Defendants' Evidence:** PD Ex. 3 at 361:15-16; 366:2-4. |
| 17. | While the *quid pro quo* the Shusters received for forfeiting their interest in Superboy is the subject of ongoing discovery, it appears that the 2008 consent agreement requires the Siegels to pay a portion of their recovery from the *Siegel* action to the Shusters.<br><br>**DC's Evidence:** PD ¶ 15-17; Docket Nos. 305-24 at 817:23-818:1, 823:23-824:4; 305-37 at 1191:21-1192:13, 1277:5-11; Cross-Mot. 22. | **Disputed.** DC's cited evidence does nothing to support its rhetoric.<br><br>The Shusters did not "forfeit their interest in Superboy" and there was no "quid pro quo;" DC cites **no evidence** whatsoever to support this. Ms. Larson and Mr. Peary expressly testified at depositions in 2011 that the Shusters had no financial interest in the Siegels' Superboy termination or litigation.<br><br>**Defendants' Evidence:** AD Exs. SS at 502-507, TT at 513-518. |

Dated:  October 1, 2012      RESPECTFULLY SUBMITTED,
/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

DEFENDANTS' REPLY RE: STATEMENT OF GENUINE ISSUES   **ER-184**

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
     parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
     dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Fax:          (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

12                **UNITED STATES DISTRICT COURT**

13         **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 14 DC COMICS,<br>            Plaintiff,<br>15      vs. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J. |
| 16 PACIFIC PICTURES CORPORATION;<br>17 IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>18 MARK WARREN PEARY, as personal<br>19 representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>20 PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>21 personal representative of the ESTATE<br>22 OF JOANNE SIEGEL, and DOES 1-10,<br>inclusive,<br>23<br>24            Defendants. | **DEFENDANTS' EVIDENTIARY OBJECTIONS TO PLAINTIFF'S STATEMENT OF GENUINE ISSUES RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Reply Memorandum; Reply to Statement of Genuine Issues; Responses to Evidentiary Objections; Objection to Rule 56(d) Declaration; and Reply Declaration of Keith G. Adams filed concurrently herewith*<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:          None Set<br><br>Date:    October 15, 2012<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |

25

26

27

28

Defendants respectfully submit the following Evidentiary Objections to Plaintiff DC Comics' Statement of Genuine Issues of Material Fact:

**Objections to DC's Response to Uncontroverted Fact 3**:  DC's statement that the 1938 agreement was "drafted by DC based on the parties' discussions and negotiations" is unsupported by the evidence DC cited.  There is no evidence of "negotiations" or of any meaningful back-and-forth between the parties.

**Objections to DC's Response to Uncontroverted Fact 6**:  DC's alleged fact that "Peary and Jean believed that Superboy was a 'derivative' of Superman and was co-authored by Siegel and Shuster" is not supported by the cited materials.  DC's claim that "Toberoff later induced them [Peary and Jean] fraudulently to disclaim any interest in Superboy" is also not at all supported by DC's citations.  It is also inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.

**Objections to DC's Response to Uncontroverted Fact 17**:  DC's statement that Shuster and Siegel "left DC in 1947" is unsupported by the cited evidence.

**Objections to DC's Response to Uncontroverted Fact 18**:  DC's statement that "Siegel and Shuster, and their heirs, … were given millions of dollars in recognition of Siegel's and Shuster's contributions" is unsupported by the cited evidence.  It is also irrelevant since the termination right exists regardless of how much an author and/or heir received prior to termination. Fed. R. Evid. 401.

**Objections to DC's Response to Uncontroverted Fact 31**:  DC states that "DC informed Jean and Frank that it believed they had no legal right to terminate under the Copyright Act, but Jean and Frank disputed DC's belief."  However, DC provides no evidence to support its contention that "Jean and Frank disputed DC's belief."  This statement is also irrelevant.  Fed. R. Evid. 401.

DC also states that the "1992 agreement operated to revoke and re-grant all prior grants of Shuster's rights."  This, however, is inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.  Furthermore, it is

unsupported by the cited evidence, or any evidence whatsoever, as detailed in
Defendants' Motion for Partial Summary Judgment.

**Objections to DC's Response to Uncontroverted Fact 34**:  DC's statement
that "Levitz's declaration and the parties' contemporaneous conduct and
correspondence makes clear" the parties' intent regarding the 1992 Agreement is
inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701,
702.  It is also unsupported by the evidence DC cited.

**Objections to DC's Response to Uncontroverted Fact 37**:  For the first time,
DC contends that it "has long relied on the 1992 Agreement as establishing its
ownership of Shuster's copyrights in Superman," and cites in support of this factual
assertion the willfully vague Declaration of Damon Bonesteel.  The Bonesteel
Declaration, however, is inadmissible to prove this alleged fact for a host of reasons.

*First*, the Declaration runs afoul of the best evidence rule because it fails to
provide either a copy of the alleged communication with the "foreign government" or
an explanation as to why it is not attached.  Fed. R. Evid. 1002, 1004; *Groppi v.
Barham*, 157 F. App'x 10, 11-12 (9th Cir. 2005) (proper to apply "best evidence rule
to exclude … declaration because [party] failed to provide the records upon which
the declaration was based and failed otherwise to explain their absence"); *United
States v. Bennett*, 363 F.3d 947, 954 (9th Cir. 2004) (other evidence of a writing is
admissible only if "the original is shown to be lost, destroyed or otherwise
unobtainable").

*Second*, the Declaration is inadmissible hearsay because it purports to describe
the contents of an out-of-court communication with a "foreign government."  Fed. R.
Evid. 801, 802.  It is also inadmissible hearsay to the extent that it purports to
describe the contents of supposedly similar (albeit non-specified) communications
with other parties.  *Id.*; *see FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171
(9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any
supporting evidence, is insufficient to create a genuine issue of material fact.").

OBJECTIONS RE: PLAINTIFF'S STATEMENT OF GENUINE ISSUES   **ER-187**

*Third*, the Declaration is inadmissible because it purports to describe a communication with third parties that should have long ago been disclosed and turned over to Defendants in discovery.  On December 13, 2011, Defendant Mark Warren Peary served his First Request for Production to Plaintiff DC Comics, in which he specifically asked DC to produce: (1) "All DOCUMENTS that RELATE to the 1992 AGREEMENT (Request No. 7); (2) "All COMMUNICATIONS with third parties that REFER to the 1992 AGREEMENT" (Request No. 12); (3) "All DOCUMENTS that describe OR explain YOUR chain-of-title to Superman" (Request No. 14).  Reply Declaration of Keith Adams, Ex. A.  At the same time, Mr. Peary also served his First Set of Interrogatories to Plaintiff DC Comics, in which he specifically asked DC to "IDENTIFY all COMMUNICATIONS between YOU AND any third-party that REFFERED TO the 1992 AGREEMENT" (Interrogatory No. 5).  Declaration of Keith Adams re: Defendants' Motion for Partial Summary Judgment (Docket No.479; "KA"), Ex. ZZ.

DC did not even mention this until now – *nine months* after Mr. Peary first served his discovery requests, and then only in opposition to Defendants' motion for summary judgment.

Even though this vague Declaration is of little value, DC is precluded from relying upon it.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information …, the party is not allowed to use that information ... to supply evidence on a motion … unless the failure was substantially justified or is harmless…."); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (noting that Rule 37(c)(1) is a "self-executing", "automatic" sanction) (citations/quotations omitted); *Northwest Pipeline Corp. v. Ross*, 2008 WL 1744617, at *7, 10-11 (W.D. Wash. Apr. 1, 2008) (excluding evidence under Rule 37(c)(1) because "plaintiff failed to timely produce [the evidence] in response to defendants' request for production"); *White v. De La Osa*, 2011 U.S. Dist. LEXIS 134867 (S.D. Fla. Nov. 22, 2011) (noting that plaintiff would be precluded from using information if it was not included in his

responses to defendant's interrogatories).

The Declaration is also suspect, at best. After improperly *arguing* that "Warner Bros. relied on the 1992 Agreement as an all-encompassing grant of Superman copyrights long before retaining Mr. Petrocelli in 2010," the Declaration provides solely *one* trivial purported example. And this example is far from satisfactory, consisting merely of a vague reference to a supposed "dealing" with an unidentified "foreign government." This "dealing" is conspicuously not attached to the Declaration and no explanation is given by DC as to why it is not attached or of its supposed content, context, or scope.

DC had over a month (from August 20 to September 23, 2012) to prepare its opposition to Defendants' motion. The fact that no such communication was produced to Defendants prior to DC's opposition; that no documentation is attached to DC's Declaration; and that in two decades DC can only come up with this vague undefined example, gives rise to an unavoidable inference that DC does not, in fact, rely on the 1992 Agreement as the foundation of its chain-of-title to Superman.

Given all of the above, the Declaration is entirely unreliable and should not be considered.

**Objection to DC's Response to Uncontroverted Fact 39**: As detailed above, the Declaration of Damon Bonesteel is inadmissible to prove that "years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its ownership of Shuster's Superman copyrights."

**Objection to DC's Response to Uncontroverted Fact 40**: As detailed above, the Declaration of Damon Bonesteel is inadmissible to prove that "years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its ownership of Shuster's Superman copyrights."

**Objection to DC's Response to Uncontroverted Fact 41**: As detailed above, the Declaration of Damon Bonesteel is inadmissible to prove that "years before filing this lawsuit in 2010, Warner Bros. relied upon the 1992 Agreement to establish its

OBJECTIONS RE: PLAINTIFF'S STATEMENT OF GENUINE ISSUES **ER-189**

ownership of Shuster's Superman copyrights."

**Objection to DC's Response to Uncontroverted Fact 47**: DC responds that Peary has "chosen not to close the probate matter or distribute the Estate's assets to Jean, as Shuster's will and California law require, because Peary and Toberoff wish to persist in making their improper shell-game argument that the Shuster 'executor' never signed the 1992 Agreement." DC's claim that Mr. Peary could "close the probate matter or distribute the Estate's assets" amounts to inadmissible speculation and argument and is an improper legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the cited evidence, which shows that the Estate must remain open because the recovered copyrights cannot be transferred until after the Shuster Termination takes effect in October 26, 2013. *See* Declaration of Keith G. Adams, Ex. FF at 343; 17 U.S.C. § 304(c)(6)(D). DC's statement is therefore inadmissible to refute Defendants' uncontroverted fact.

**Objections to DC's Response to Uncontroverted Fact 48**: DC responds that "Peary has no 'power' to terminate." This response amounts to inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the cited evidence. It is therefore inadmissible to refute Defendants' uncontroverted fact.

**Objections to DC's Response to Uncontroverted Fact 49:** DC states that the "Shuster Termination does not seek to terminate the grants contained in the 1948 Judgment and the 1992 Agreement." To the extent that this statement implies that the Judgment and Agreement were in fact copyright grants, the statement is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the cited evidence. Indeed, in the closely-related *Siegel v. Warner Bros. Entertainment, Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal. 2008), the Court held that the 1948 Consent Judgment need not be included in a Superman termination notice, and DC did not appeal that ruling.

**Objections to DC's Response to Uncontroverted Fact 52**: DC claims that

"the Shuster Termination lists the stated information and that any works not listed were purposely omitted by defendants."  However, DC offers no evidence to support its factual claim that any works not listed were purposely omitted.

**Objections to DC's Response to Uncontroverted Fact 82**: DC responds that "[s]ince Magistrate Judge Zarefsky ruled in May 2011, new facts have emerged that disprove Toberoff's false assertions to Judges Larson and Zarefsky [about the 2008 Consent Agreement], and defendants have selectively disclosed information about the agreement that reveal many of its contents."  This response is both vague and false (as set forth in Defendants' concurrently-filed Objection to Daniel Petrocelli's Rule 56(d) Declaration), and amounts to inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.  It is therefore inadmissible to refute Defendants' uncontroverted fact.

**Objections to DC's Response to Uncontroverted Fact 54**:  DC states that the "Shuster Termination does not seek to terminate the grant contained in the 1948 Consent Judgment."  To the extent that this statement implies that the Judgment was a copyright grant, it is indadmissible speculation, argument and legal conclusion. Fed. R. Evid. 602, 701, 702.  It is also unsupported by the cited evidence.  As noted above, the Court held in *Siegel*, 542 F. Supp. 2d at 1131-32, that the 1948 Consent Judgment need not be included in a Superman termination notice, and DC did not appeal that ruling.

**Objections to DC's Response to Uncontroverted Fact 81**:  DC's claim that Defendants' "choice affirmatively to discuss the contents of the [2008 Consent Agreement] and use facts about it as a sword constitutes a waiver" is inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.  It is also unsupported by the cited evidence.

**Objections to DC's Response to Uncontroverted Fact 82**:  DC's statement that "[s]ince Magistrate Judge Zarefsky ruled in May 2011, new facts have emerged that disprove Toberoff's false assertions to Judges Larson and Zarefsky, and

OBJECTIONS RE: PLAINTIFF'S STATEMENT OF GENUINE ISSUES     **ER-191**

defendants have selectively disclosed information about the agreement that reveal many of its contents" is inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702. It is also unsupported by the cited evidence.

**Objections to DC's Statement of Genuine Issues 1**: DC claims "[a] 1940 script that defendants say features the first appearance of Superboy contains the joint byline: 'By Jerry Siegel and Joe Shuster.'" To the extent DC offers this out-of-court writing to argue that Siegel and Shuster actually "co-created" Superboy (contrary to the findings of fact in the 1947 action) it is inadmissible hearsay. Fed. R. Evid. 801, 802.

**Objections to DC's Statement of Genuine Issues 6**: DC claims "'[i]n 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as their joint creation.'" DC mischaracterizes the evidence, which did not "identify" "Superboy" as the joint creation of Siegel and Shuster. Furthermore, the the renewal notices DC cites were held to be invalid. *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974). To the extent DC offers this out-of-court writing to argue that Siegel and Shuster actually "co-created" Superboy (contrary to the findings of fact in the 1947 action) it is also inadmissible hearsay. Fed. R. Evid. 801, 802.

**Objections to DC's Statement of Genuine Issues 7**: DC claims that "[i]n 1982, Siegel's widow Joanne sent a letter to DC stating: 'It's no mystery who the creators were in Jerry and Joe's case. Not only of Superman, but Superboy and other comics.'" DC mischaracterizes this evidence, which is consistent with Siegel being the sole creator of Superboy. To the extent DC offers this out-of-court writing to argue that Siegel and Shuster actually "co-created" Superboy (contrary to the findings in the 1947 action) it is inadmissible hearsay. Fed. R. Evid. 801, 802.

**Objections to DC's Statement of Genuine Issues 14**: DC claims that "[w]ithout receiving any independent legal advice, conducting any factual investigation, or consulting with Jean, Peary agreed to disclaim any interest in

1   Superboy, and defendants amended the 2001 Pacific Pictures Agreement to delete all

2   reference to 'Superboy' and redefine the Shusters' putative rights as including only

3   'Superman.'"  This statement is unsupported by the evidence DC cites.

4

5   Dated:  October 1, 2012      RESPECTFULLY SUBMITTED,

6                              /s/ Marc Toberoff

7                            TOBEROFF & ASSOCIATES, P.C.
                           Attorneys for Defendants Mark Warren Peary *et al.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 Marc Toberoff (State Bar No. 188547)
   *mtoberoff@ipwla.com*
2 Keith G. Adams (State Bar No. 240497)
   *kgadams@ipwla.com*
3 Pablo D. Arredondo (State Bar No. 241142)
   *parredondo@ipwla.com*
4 David Harris (State Bar No. 255557)
   *dharris@ipwla.com*
5 TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
6 Malibu, California 90265
Telephone:  (310) 246-3333
7 Fax:         (310) 246-3101

8 Attorneys for Defendants Mark Warren
Peary, as personal representative of the
9 Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
Joanne Siegel

11

12 **UNITED STATES DISTRICT COURT**

13 **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 14 DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 15         Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
|     vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| 16 PACIFIC PICTURES CORPORATION; | **DEFENDANTS' RESPONSE TO DC COMICS' EVIDENTIARY OBJECTIONS RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF** |
| 17 IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; | |
| 18 MARK WARREN PEARY, as personal representative of the ESTATE OF | |
| 19 JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA | |
| 20 SIEGEL LARSON, individually and as personal representative of the ESTATE | *Reply Brief; Reply to Statement of Genuine Issues; Evidentiary Objections; Objection to Rule 56(d) Declaration; and Reply Declaration of Keith G. Adams filed concurrently herewith* |
| 21 OF JOANNE SIEGEL, and DOES 1-10, inclusive, | |
| 22 | |
| 23         Defendants. | Complaint filed:  May 14, 2010 Discovery Cutoff:  None Set Trial Date:  None Set |
| 24 | |
| 25 | Date:  October 15, 2012 Time:  1:30 p.m. Place:  Courtroom 11 |
| 26 | |
| 27 | |
| 28 | |

RESPONSE TO DC COMICS' EVIDENTIARY OBJECTIONS RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants respectfully submit the following Responses to DC Comics' Objections to Evidence in Defendants' Statement of Uncontroverted Facts, Declaration, and Exhibits (Docket No. 492; "Objections"):

**<u>Response to DC's Objections to Decl. of Keith Adams ("AD") Exs. F, G, I, K</u>**:  DC objects to these exhibits, all of which are articles from either *The New York Times* or *Los Angeles Times*, on the grounds of hearsay, lack of foundation, and lack of personal knowledge.  Objections ¶¶16-18.  DC does not actually dispute the factual contentions in these articles, but rather the supposed "suggestion[s]" and/or "implication[s]" of them.  *See* Reply to DC Comics' Statement of Genuine Issues of Material Fact ("RUF"), ¶¶3, 12-15.  Moreover, DC relied upon similar newspaper articles in its own motion for partial summary judgment.  *See* Docket No. 459, Ex. 7.

**<u>Response to DC's Objections to AD Exs. J, W, BB</u>**:  These three exhibits are (1) an October 10, 1980 Agreement between DC Comics, on the one hand, and Swampfilms, Inc., on the other (Exhibit J), (2) a December 18, 1998 Agreement between Warner Bros., on the one hand, and Hasbro, Inc. and Hasbro International, Inc., on the other (Exhibit W), and (3) a December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar Rice Burroughs, Inc., on the other. (Exhibit BB).

DC raises various arguments as to why these contracts are purportedly inadmissible to show that the 1992 Agreement (AD Ex. O) does not even remotely resemble customary industry copyright assignments, but each argument is flawed. *See* Objections ¶35; RUF ¶35.

DC's claim that the three contracts lack foundation or are otherwise inauthentic is without merit.  Objections ¶35.  In the closely-related *Siegel* litigation, it was DC, and its parent-company Warner Bros., that first produced these documents and thereafter introduced them as exhibits at trial, as evidenced by their Bates numbers preceded by "WB" or "DCC."  AD Exs. J, W, BB; *see Siegel,* C.D. Cal. Case No. 04-CV-0840 ODW (RZx), Docket No. 436 (Joint Pre-Trial Exhibit Stipulation) at 43

(DC Comics-Swampfilms, Inc.) 51 (Warner Bros.-Edgar Rice Burroughs, Inc.) 52 (Warner Bros.-Hasbro).  The exhibits have therefore been properly authenticated and may be admitted into evidence.  *See Orr v. Bank of Am.*, 285 F.3d 764, 777 n.20 (9th Cir. 2002) ("Authentication can also be accomplished through judicial admissions such as … production of items in response to … [a] discovery request" or "when offered by the party-opponent") (quotations/citations omitted); *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1020 (rejecting argument that "documents produced by [party] in another lawsuit were erroneously admitted because they were not properly authenticated").

Contrary to DC's Objections (¶35), the issue is not whether a short statement can ever transfer ownership of a copyright, but, whether the 1992 Agreement did so. Under New York law, such evidence of industry custom and practice would be admissible, *see Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 78 (2d Cir. 1995), and it gives rise to a legitimate inference that the 1992 Agreement did not transfer ownership of a copyright because if DC considered the 1992 Agreement to be its chain-of-title to the original Superman copyrights, then DC's counsel would *never* have drafted the document in this vague, perfunctory fashion.

DC's argument that the contracts are "irrelevant" is therefore wrong. Objections ¶35.  So too is DC's argument that the contracts are inadmissible habit or character evidence, since Defendants legitimately introduce them to show industry custom and practice.  *Id.*

**Response to DC's Objections to AD Ex. T**:  Exhibit T is a February 29, 1996 Thompson & Thompson Copyright Research Report.

At the outset, DC's Objections are largely moot because DC does not really dispute that it chose not to file the 1992 Agreement as a copyright assignment with the Copyright Office, and effectively admits by implication that it did not.

It should be noted that DC offers as evidence its own Thompson & Thompson Copyright Research Report regarding Superman.  Declaration of Daniel

2

1  Petrocelli (Docket No. 493), Ex. 24.

2      DC nevertheless repeatedly objects that this exhibit is inadmissible hearsay.

3  *See* Objections ¶¶15, 36-37, 39-41.  However, apart from one arguable instance (RUF

4  ¶36), Defendants do not rely upon the exhibit for the truth of the matter asserted.

5  Rather, Defendants rely upon the exhibit to show that a third-party company hired by

6  Defendants and specializing in Copyright Office research was unable to locate or find

7  any evidence of such recordation of the 1992 Agreement.

8      This fact is independently relevant because the recordation of a copyright

9  transfer or grant with the Copyright Office is meant to "give[] all persons

10  constructive notice of the facts stated in the recorded document…."  17 U.S.C. §

11  205(c).  That a company specializing in copyright research was unable to gain this

12  constructive notice about the 1992 Agreement supports Defendants' contention that

13  DC has never relied upon or treated the 1992 Agreement as its key assignment of

14  Shuster's valuable Superman copyrights, as DC now conveniently argues.

15      DC also repeatedly objects that this exhibit is inadmissible character evidence.

16  Objections ¶¶15, 36-37, 39-41.  Again, apart from one arguable instance (RUF ¶36),

17  Defendants do not rely upon this exhibit to show DC's practices.

18      **Response to DC's Objections to AD Ex. HH**:  Exhibit HH is a letter from

19  Paul Levitz to Jean Peavy and Mark Warren Peary, dated April 28, 2005.

20      DC objects that this is "a settlement offer, which is inadmissible for the use

21  defendants seek to make of it" under Fed. R. Evid. 408.  *See* Objections at 9-10.

22      "Rule 408 … has limits."  *Master-Halco, Inc. v. Scillia, Dowling & Natarelli,*

23  *LLC*, 739 F. Supp. 2d 125, 130 (D. Conn. 2010).  Evidence regarding settlement

24  negotiations is not admissible to prove liability, but it is admissible "for another

25  purpose."  Fed. R. Evid. 408; *Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d

26  506, 510 (2d Cir. 1989) ("Evidence of an offer to compromise though otherwise

27  barred by Rule 408, can fall outside the Rule if it is offered for 'another

28  purpose'….").

Here, Defendants cite to Levitz's letter not to prove liability or the absence of liability, but to show that in addressing the 2003 Shuster Termination in its April 28, 2005 letter to Jean Peavy and to Mark Warren Peary (the Shuster Executor), DC did not argue that the 1992 Agreement barred the Shuster Termination, or even mention the 1992 Agreement as relevant to the termination.

Moreover, DC should not be heard to complain because it used its 2005 letter as an exhibit at both Mark Warren Peary's and Jean Peavy's depositions and questioned them about it. Docket No. 305-51 at 1747:14-21; Docket No. 305-59 at 2113:25-2114:2, 2115:1-2. DC should also not be heard to complain because it previously put the Shuster Executor's settlement response to DC's 2005 letter into evidence arguing, as Defendants do here, that it was proper to do so under Rule 408 because the response letter was not offered to show liability. Docket No. 93-4.

Dated: October 1, 2012      RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

RESPONSE TO DC COMICS' EVIDENTIARY OBJECTIONS RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT     **ER-198**

1  Marc Toberoff (State Bar No. 188547)
    mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
    kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
    parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
    dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:   (310) 246-3333
7  Fax:           (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

12                 **UNITED STATES DISTRICT COURT**

13        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 14  DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
|     Plaintiff, | |
| 15     vs. | Hon. Otis D. Wright II, U.S.D.J. |
| | Hon. Ralph Zarefsky, U.S.M.J. |
| 16  PACIFIC PICTURES CORPORATION; | **DEFENDANTS' OBJECTION TO** |
| 17  IP WORLDWIDE, LLC; IPW, LLC; | **RULE 56(d) DECLARATION OF** |
|     MARC TOBEROFF, an individual; | **DANIEL PETROCELLI RE:** |
| 18  MARK WARREN PEARY, as personal | **DEFENDANTS' MOTION FOR** |
|     representative of the ESTATE OF | **PARTIAL SUMMARY JUDGMENT** |
| 19  JOSEPH SHUSTER; JEAN ADELE | **ON FIRST, SECOND AND THIRD** |
|     PEAVY, an individual; LAURA | **CLAIMS FOR RELIEF** |
| 20  SIEGEL LARSON, individually and as | *Reply Brief; Reply to Statement of* |
| 21  personal representative of the ESTATE | *Genuine Issues; Evidentiary Objections;* |
|     OF JOANNE SIEGEL, and DOES 1-10, | *Responses to Evidentiary Objections;* |
| 22  inclusive, | *and Reply Declaration of Keith G. Adams* |
|     | *filed concurrently herewith* |
| 23     Defendants. | Complaint filed:   May 14, 2010 |
| 24  | Discovery Cutoff:  None Set |
|     | Trial Date:         None Set |
| 25  | Date:    October 15, 2012 |
| 26  | Time:    1:30 p.m. |
|     | Place:   Courtroom 11 |

27

28

As acknowledged in the Declaration of Daniel M. Petrocelli (Docket No. 493; "Declaration" or "PD"), lead counsel for plaintiff DC Comics ("DC"), a party may only obtain a continuance under Fed. R. Civ. P. 56(d) (formerly 56(f)) if it has "diligently pursued its previous discovery opportunities." PD ¶4; *Byrd v. Guess*, 137 F.3d 1126, 1135 (9th Cir. 1998); *see also Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011). However, DC has neither met that requirement nor the second requirement for a Rule 56(d) continuance – namely, that the party "'show how allowing additional discovery would have precluded summary judgment.'" *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1133 (9th Cir. 1998) (citation omitted).

A Rule 56(d) affidavit must contain more than mere "conclusory statements" that "discovery is incomplete" or that further discovery is supposedly of "'critical importance.'" *International Surplus Lines Ins. Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 905 (10th Cir. 1995). Rather, ***"[it] must state with specificity why extra time is needed and how the additional time and material will rebut"*** the relevant motion for summary judgment. *Id*. (emphasis added). DC does not meet these requirements.

## A.    DC Misrepresents The Discovery Record

1.    The Declaration admits that DC has already "served hundreds of discovery requests, deposed a number of witnesses, and … file[d] well over 20 discovery motions." PD ¶5. In other words, DC has had ample opportunity to take discovery in this case *for over two years*, and has actively engaged in discovery, including the depositions of the three central defendants, Marc Toberoff, Laura Siegel Larson and Mark Warren Peary, as well as third-parties such as Dawn Peavy (Mr. Peary's sister) and Don Bulson (Michael Siegel's former attorney), as set forth below. *See* PD Ex. 3; Paragraph 2, *infra*; *Byrd*, 137 F.3d at 1135 (affirming denial of Rule 56(f) request where non-movant had "many months to complete discovery").

2.    The Declaration fails to mention that DC has also had the benefit of many years of discovery in the closely-related *Siegel* cases that were filed in **2004**

OBJECTION TO RULE 56(d) DECLARATION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-200**

(*Siegel v. Warner Bros. Entertainment, Inc.*, 04-CV-8400-ODW (RZx); 04-CV-08776 ODW (RZx)), including extensive depositions of the same witnesses Jean Peavy, Mark Warren Peary, Joanne Siegel (now deceased), Laura Siegel Larson, their current attorney, Marc Toberoff, their former attorney, Kevin Marks, on most of the subjects and issues in this case. In fact, Magistrate Judge Zarefsky noted "[f]rom a realistic standpoint, the present case is so closely related as to be considered properly part of the same case as *Siegel*." Docket No. 209 at 4. Between these three cases, Defendants have produced many thousands of pages of documents, and DC has deposed Marc Toberoff twice, Mark Warren Peary twice, Laura Siegel Larson thrice, Jean Peavy and Joanne Siegel once, Dawn Peavy twice, Kevin Marks and Ari Emanuel, in addition to numerous other witnesses. *See* PD Ex. 3; AD Ex. II, LL, JJ, SS, TT; Docket Nos. 47-9, 305/308-14, 305/308-17, 305/308-24, 305/308-37, 305/308-51, 305/308-52, 305/308-53, 305/308-59, 377.

3.     The Declaration falsely asserts that "discovery in this case was largely stalled while the parties litigated … privilege over the Toberoff Timeline documents." PD ¶8.

a.     Magistrate Zarefsky stayed only the production of the stolen Timeline documents pending appeal. Docket No. 262. DC complains that Defendants "delayed producing the [stolen] documents" (PD ¶10), when they simply exercised their right to appeal. And DC could well have requested the Ninth Circuit to expedite that appeal under Ninth Circuit Rule 27-12, but failed to do so.

b.     While this stay was in effect, DC took substantial discovery, as evidenced by the ***eleven discovery motions*** it filed, most containing multiple parts and concerning multiple purported issues. Docket Nos. 267, 296, 297, 298, 315, 329, 355, 360, 361, 362, 385.

c.     The Declaration argues that DC chose not "to take a number of depositions of defendants and third party witnesses" pending the ultimate outcome of the dispute over the Timeline documents because "defendants … argued that DC

would only have one chance to depose each witness…." PD ¶9. The Federal Rules mandate that, absent stipulation or leave of the court, a witness may only be deposed ***once*** in a case. Fed. R. Civ. P. 30(a)(2)(A)(ii). This was a tactical choice by DC.

       d.     DC chose to take the depositions of defendants Laura Siegel Larson and Mark Warren Peary, Dawn Peavy (Mark's sister), and Don Bulson (who represented Michael Siegel) ***before*** the Timeline documents were adjudicated. Docket Nos. 305/08-24, 305/08-37, 305/08-52, 308-53.

       e.     Moreover, DC has now been in possession of the Timeline documents since early May 2012 (PD ¶12), giving it ample time to depose and re-depose any witnesses, such as Ari Emanuel (a second time) or Kevin Marks (a second time), who DC now claims are essential to its case. PD ¶11. However, in the over four months since DC had the Timeline documents, it chose to take but a single deposition. PD Ex. 3.

       f.     DC made the strategic decision to move for summary judgment (Docket No. 458), rather than take additional discovery, which is difficult to reconcile with DC's sudden claims, after the September 5, 2012 hearing on its motion did not go its way (PD Ex. 2), that discovery is still incomplete after all this time.

       g.     DC's strategic decision to forego certain discovery precludes its use of Rule 56(d). *See Scosche Industries, Inc. v. Visor Grear, Inc.*, 121 F.3d 675 (Fed. Cir. 1997) (holding that a party who had time to take a deposition but did not do so could not forestall summary judgment).

       h.     The Declaration makes vague accusations that the Timeline documents "further evidence … defendants' misconduct" (PD ¶10) but does not, and cannot, cite any specifics to support that claim.

       4.     The Declaration also falsely claims that discovery was delayed by supposed "efforts to evade and obstruct the discovery process." PD ¶6. Defendants have not engaged in any "discovery misconduct," and no court has so held. In a footnote, DC hurls yet another set of false and inflammatory accusations (PD ¶10

OBJECTION TO RULE 56(d) DECLARATION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT    **ER-202**

n.1) to which Defendants briefly respond:

        a.     DC falsely states that Defendants "withheld" communications between defendant Laura Siegel Larson and her brother Michael Siegel.  PD at 3 n.1. Defendants asserted common interest privilege over those communications, which was ***upheld*** on multiple occasions, because both Laura and Michael shared any proceeds from Laura and Joanne Siegel's termination.  Docket Nos. 285, 309.  A good-faith discovery dispute over the application of privilege does not constitute the improper "withholding" of evidence.

        b.     DC falsely states that Defendants "manipulate[ed] privilege logs to conceal non-privileged documents."  PD at 3 n.1.  Defendants' privilege logs were also *repeatedly* upheld against DC's challenges.  Docket Nos. 164, 209, 248.

        c.     DC falsely states that Defendants "claim[ed] that responsive documents do not exist," but the only purported example DC cites is a November 2, 2002 letter from Laura to Michael.  PD at 3 n.1.  DC misquotes Defendants' brief; Defendants truthfully stated that this November letter had not been located in their files.  Docket No. 395-1 at 96-97.  Ironically demonstrating this, the November letter was not included in the documents stolen from Defendants' files in 2005 and illicitly sent to Warner Bros.  When this letter was subsequently discovered in the electronic archive of Michael Siegel's former law firm, it was promptly listed on a privilege log.  After a motion regarding the common interest privilege was resolved, the letter was promptly produced to DC.  Docket Nos. 394, 412, 427, 451.

        5.     In complete contravention of Rule 56(d)'s requirement that an applicant put forth "the facts and specific discovery that will create a genuine issue of material fact" (*Cline v. Indus. Maint. Eng'g & Contracting Co.* 200 F.3d 1223, 1229 (9th Cir. 2000)), DC makes only vague references to the "close to 10 third parties" it supposedly must depose.  PD ¶11.  ***First***, Fed. R. Civ. P. 30(a)(2)(i) limits a party to ten depositions, and DC has already taken five depositions.  ***Second,*** DC nowhere states who these parties are – much less what specific evidence is sought from them

and how that evidence would create an issue of material fact barring summary
judgment against DC. PD ¶11; *Krav Maga Ass'n of Am., Inc. v. Yanilov*, 464 F.
Supp. 2d 981, 991 (C.D. Cal. 2006) (denying Rule 56(f) motion where "plaintiffs
failed to make clear what facts they intend to elicit from the seven … declarants or
how such facts would help the plaintiffs survive summary judgment").

6.     The Declaration effectively admits that additional discovery is not
necessary in arguing that "the Court could grant summary judgment in DC's favor …
for the reasons discussed in DC's opposition to defendants' motion." PD ¶11.
Accordingly, DC's application should be denied because "to justify a continuance
under Rule 56(f), the discovery sought must be 'essential' to [DC's] opposition [and
DC] concedes that the additional discovery [sought] is not necessary to their
opposition on summary judgment." *Asia Econ. Inst. v. Xcentric Ventures, LLC*, 2010
WL 4977054, at *21 (C.D. Cal. July 19, 2010).

7.     The Declaration relies on inapposite cases where a party who did not
have a chance to obtain discovery made a targeted request for pivotal, non-privileged
information – the ***opposite*** of the situation here. PD ¶¶4, 7; *Burlington N. Santa Fe
R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773
(9th Cir. 2003) (continuance where summary judgment motion brought less than a
month after filing suit and targeted evidence was "dispositive of [the] pivotal
question"); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 847 (9th Cir. 2001)
(ordering limited discovery as to specific scientific issue that expert characterized as
"highly probative"); *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d
1472, 1475 (9th Cir. 1986) (allowing specific discovery of specific documents that
were the "most probative evidence" of central issue); *Harrods Ltd. v. Sixty Internet
Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002) (reversing summary judgment
where there had been "almost no discovery conducted").

**B.     DC's First Claim for Relief**

8.     The Declaration insists that there is a "pressing need" to obtain the 2008

OBJECTION TO RULE 56(d) DECLARATION RE: DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT                                          **ER-204**

1    Consent Agreement based solely on false *speculation* that it will show a *quid pro quo*

2    between the Shusters and the Siegels regarding Superboy.  PD ¶¶12-13, 15-17.

3            a.     As DC knows full well, there is no *quid pro quo* whatsoever

4    regarding Superboy.  Neither the Shusters, nor the Shuster Estate, have any interest in

5    the Siegels' Superboy termination or separate Superboy litigation (Case No. 04-8776

6    ODW (RZx)).  Mr. Peary and Ms. Larson both testified unequivocally to this.

7    Defendants' Statement of Undisputed Facts (Docket No. 478-1), ¶63; Declaration of

8    Keith Adams re: Defendants' Motion for Partial Summary Judgment, Ex. SS at 502-

9    507, Ex. TT at 513-518.  DC is not entitled to a continuance for further discovery.

10   *See SW Traders LLC v. United Specialty Ins. Co.*, 409 Fed. Appx. 96, 98 (9th Cir.

11   2010) (affirming denial of Rule 56(f) application where party "moved under Rule

12   56(f) in the hopes that [witnesses] would directly contradict [previous] statements");

13   *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 566 (N.D. Cal. 1999) (denying

14   Rule 56(f) application where applicant had already deposed witnesses on issues

15   which applicant sought to obtain additional discovery on).

16           b.     DC's *repeated* motions to compel discovery of the 2008

17   Agreement have all been denied.  PD ¶13.  The 2008 Agreement has been upheld as

18   *privileged* three separate times, first by Judge Larson, then by Magistrate Zarefsky,

19   and finally by this Court.  Docket Nos. 163-1 at 724:2-19, 209, 248.  DC cannot

20   claim under Rule 56(d) that it requires additional time to take discovery regarding a

21   ***privileged*** document.  *See Bushnell v. Vis Corp.*, 1996 WL 506914, at *9 (N.D. Cal.

22   Aug. 29, 1996) ("Because [plaintiff] may not discover the documents on defendants'

23   privilege log, the court declines to order a continuance of defendants' motion for

24   summary adjudication pursuant to Rule 56(f).").

25           c.     The Declaration further argues that DC needs more time to depose

26   witnesses because Defendants "shut down" questions concerning the privileged 2008

27   Agreement.  PD ¶¶13-14, 18.  DC is obviously not entitled to deposition testimony on

28   the "contents" of a privileged document.  *See Bushnell*, 1996 WL 506914, at *9.

Moreover, the depositions occurred in June-July 2011; DC has had over a year to bring a motion on this topic and has not done so.

        d.     The Declaration vaguely asserts that "new facts have emerged" that somehow overcome the privilege, but provides no details or information as to what those "facts" may be or how they could possibly change the outcome of three separate judicial decisions upholding privilege as to the 2008 Agreement.

        e.     DC's false speculation does not even support "unclean hands" as DC presents no legally cognizable "unclean hands" theory. *See* Mot. 19-22.

        f.     DC's supposed Superboy "scheme" was initiated in 2002 and "complete[d] … in 2004." Opp. 21-22. It is unclear how a 2008 agreement regarding settlement negotiations is even relevant.

      9.     The Declaration summarily states that DC also needs more time to "further depose Peary and Larson concerning … the Timeline documents", "conclude Toberoff's deposition", "depose representatives for [Toberoff's] three companies, and depose third-party witnesses like J. Todd Harris (Toberoff's former business partner), and Ari Emanuel (Toberoff's former business partner)." PD ¶18.

        a.     As stated above, DC is not entitled to ***two*** full-day depositions of Mr. Peary, Ms. Larson and Mr. Toberoff in this case (in addition to the lengthy depositions in took of these individuals in the closely-related *Siegel* litigations), nor is DC entitled to depose more than ten witnesses. Fed .R. Civ. P. 30(a)(2)(A)(i)-(ii).

        b.     DC has had ample time in the over ***four months*** since the release of the Timeline documents to depose or move to re-depose any witnesses.

        c.     In fact, just weeks ago, DC rescheduled the deposition of Mr. Harris from September 2012 to October 2012 – *i.e.,* from before to after the deadline for DC to file its opposition. Reply Declaration of Keith Adams, Ex. D.

        d.     The Declaration does not explain why this discovery is necessary, or how the resulting evidence that could rebut Defendants' motion. Indeed, the Declaration does not even state that this discovery would do so. With years of prior

OBJECTION TO RULE 56(d) DECLARATION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

discovery at its disposal DC should not be afforded more time for this sort of "fishing expedition." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968) (denial of 56(f) motion where "additional discovery would be merely a fishing expedition").

### C. DC's Second Claim for Relief

10. As Defendants explain in their motion (Mot. at 22), and as DC implicitly concedes in its opposition (Opp. 1; the claim "presents issues currently before the Ninth Circuit"), DC's arguments about the "scope of any rights to be recaptured by the Shusters' termination" (PD ¶19-20) are squarely precluded by the pending appeal in the closely related *Siegel* case. *Siegel v. Warner Bros. Entertainment, Inc.*, 9th Cir. Appellate Case Nos. 11-55863, 11-56034.

11. The Declaration nevertheless argues that there are "differences between Siegel's and Shuster's employment histories with DC" and that DC requires additional time for discovery on this topic. PD ¶¶21-22. However, DC can point to no material or relevant differences in Siegel's and Shuster's "histories with DC." Furthermore, any such purported "employment" information would already be in DC's possession as Joe Shuster's putative "employer." "A continuance is not justified when all the information and knowledge is already in Plaintiff's possession." *Precision Airmotive Corp. v. Rivera*, 288 F. Supp. 2d 1151, 1154 (W.D. Wash. 2003); *see SEC v. Antar*, 44 Fed. Appx. 548, 554 (3d Cir. 2002) (denial of a Rule 56(f) motion appropriate where party "could have easily obtained [the information] from her husband").

### D. Conclusion

12. As demonstrated above, DC has utterly failed to meet its burden under Rule 56(d). With years of prior discovery available to it, DC cannot be permitted to rely on vague allusions to potential discovery without any explanation of how that discovery might lead to facts sufficient to preclude summary judgment. As a matter of law, the Court should not grant DC's eleventh-hour application for a continuance on Defendants' Motion for Partial Summary Judgment.

Dated: October 1, 2012       RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
_____

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

OBJECTION TO RULE 56(d) DECLARATION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-208**

Marc Toberoff (State Bar No. 188547)
  mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
  kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
  parredondo@ipwla.com
David Harris (State Bar No. 255557)
  dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway, #348
Malibu, California, 90265
Telephone:  (310) 246-3333
Fax:          (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>            Plaintiff,<br><br>  vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; JOANNE<br>SIEGEL, an individual; LAURA<br>SIEGEL LARSON, an individual,<br>and DOES 1-10, inclusive,<br><br>          Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**REPLY DECLARATION OF KEITH G. ADAMS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF**<br><br>*Reply Brief; Reply to Statement of Genuine Issues; Evidentiary Objections; Responses to Evidentiary Objections; and Objection to Rule 56(d) Declaration filed concurrently herewith*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:          None Set<br><br>Date:      October 15, 2012<br>Time:      1:30 p.m..<br>Place:      Courtroom 11 |

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.      I am an attorney at Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joseph Shuster.  I am a member in good standing of the State Bar of California and submit this reply declaration in support of Defendants' Motion For Partial Summary Judgment On First, Second And Third Claims For Relief.

2.      Attached hereto as Exhibit "A" is a true and correct copy of relevant excerpts from Plaintiff DC Comics' Responses to Defendant Mark Warren Peary's First Set of Requests For Production, dated February 17, 2012.

3.      Attached hereto as Exhibit "B" is a true and correct copy of Defendant Marc Toberoff's Amended Response to Plaintiff DC Comics' Second Set of Interrogatories, served on DC on March 26, 2012.

4.      Attached hereto as Exhibit "C" is a true and correct copy of a letter from me to Mr. Petrocelli, dated August 22, 2012.

5.      Attached hereto as Exhibit D is a true and correct copy of an email sent from Jason Tokoro, counsel for DC Comics, to my colleague Pablo Arredondo, dated September 10, 2012

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on October 1, 2012, in Malibu, California

_____
Keith G. Adams

1 | TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (State Bar No. 188547)
2 | *mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
3 | *kgadams@ipwla.com*
Pablo D. Arredondo (State Bar No. 241142)
4 | *parredondo@ipwla.com*
22337 Pacific Coast Highway, #348
5 | Malibu, California, 90265
Telephone:   310.246.3333
6 | Facsimile:    310.246.3101

7

8 | Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP
Worldwide, LLC, and IPW, LLC

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

11

| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| vs. | **DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF DC COMICS' SECOND SET OF INTERROGATORIES** |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN Peary, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | Complaint Filed:  May 14, 2010<br>Trial Date:  None Set |
| Defendants. | |

Defendant Marc Toberoff ("Defendant") amends his response as follows to the Second Set of Interrogatories dated January 24, 2012 (the "Interrogatories") propounded by plaintiff DC Comics ("Plaintiff" or "DC").

## I.

## **PRELIMINARY STATEMENT**

Defendant will construe the terms "YOU" and "YOUR" to refer to Marc Toberoff.

No incidental or implied admissions are intended by Defendant's responses to the Interrogatories. The supplying of any fact does not constitute an admission by Defendant that such fact is relevant or admissible. The fact that Defendant has responded to any interrogatory is not intended to be and shall not be construed as a waiver by Defendant of all or any part of any objection to any interrogatory. Defendant reserves until the time of trial all objections as to the relevance or admissibility of any facts provided in its answers to the Interrogatories. The responses set forth herein are based on information now available to Defendant and Defendant reserves the right to revise, correct, add, clarify or supplement the general and specific objections and responses set forth herein.

## II.

## **RESPONSES TO INTERROGATORIES**

Subject to, and without waiving the qualifications above, Defendant responds to each individual Interrogatory as follows:

**Interrogatory No. 26**

DESCRIBE in detail all efforts YOU have made to MARKET any rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 26**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive. Defendant further objects to this request on the grounds that it is not reasonably limited in scope. Defendant objects to

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

In 2004, Ari Emanuel and Marc Toberoff engaged in negotiations with Warner Bros. Entertainment Inc. regarding the sale and/or license of Joanne Siegel and Laura Siegel Larson's (the "Siegels") rights in Superman and Superboy to Warner. However Warner Bros. proposed terms that were virtually identical to its settlement proposal to the Siegels in 2001-2002, which they had rejected. The Siegels once again rejected such proposal.

Subsequently, there have been settlement discussions with DC Comics/Warner Bros. in *DC Comics v. Pacific Pictures Corp.*, Case No. 10-CV-03633, *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx), and *Siegel v. Time Warner Inc. et al.*, Case No. 04-CV-08776 ODW (RZx). Mediation sessions were held with Hon. Daniel Weinstein (Ret.) of JAMS in May-June 2008, September 2009 and April 2010, and with Judge Weinstein and Kenneth Ziffren in December 2011. The mediation has yet to result in a settlement, however, discussions are ongoing.

On December 4, 2008, in an in-person meeting with Peter Schlessel, then President of Worldwide Affairs for Sony Pictures Entertainment, Marc Toberoff discussed the potential license to Sony Pictures Entertainment of the Superman rights recaptured by the Siegels. They had a follow-up telephone conversation several weeks later. The discussions did not result in an agreement.

In April-May 2010, Marc Toberoff discussed the potential license to Paramount Pictures of the Superman rights recaptured by the Siegels with Rob

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Moore, Vice Chairman of Paramount Pictures, and his support staff. There was an initial telephone call including John Fogelman, Marc Toberoff, and Rob Moore on April 21, 2010; a further call including John Fogelman, Marc Toberoff and Rob Moore on April 29, 2010; and an in-person meeting including John Fogelman, Marc Toberoff and Rob Moore on May 12, 2010 at the Paramount Pictures lot. In addition, there were various e-mails exchanged between April 21 and May 11, 2010. The discussions did not result in an agreement.

On November 19, 2010, in an in-person meeting with Tom Rothman, CEO of Fox Filmed Entertainment, and his support staff, Marc Toberoff discussed the potential license to Filmed Entertainment of the Superman rights recaptured by the Siegels. The discussions did not result in an agreement.

**Interrogatory No. 27**

IDENTIFY any PERSONS with whom YOU have COMMUNICATED in connection with efforts to MARKET any rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 27**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive. Defendant further objects to this request on the grounds that it is not reasonably limited in scope. Defendant objects to this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

Laura Siegel Larson, c/o Toberoff & Associates, P.C., 22337 Pacific Coast Highway, Suite #348, Malibu, California 90265.

1    Joanne Siegel, deceased.

2    Mark Warren Peary and Jean Adele Peavy, c/o Toberoff & Associates, P.C.,

3    22337 Pacific Coast Highway, Suite #348, Malibu, California 90265.

4    Warner Bros. Entertainment Inc./DC Comics, including John Schulman,

5    Wayne Smith, Paul Levitz, Dianne Nelson and John Rogovin, 4000 Warner

6    Boulevard, Burbank, California, 91522, as well as outside counsel for the same.

7    William Morris Endeavor, including Ari Emanuel and John Fogelman, 9601

8    Wilshire Boulevard, Beverly Hills, California 90212.

9    Sony Pictures Entertainment, including its then President of Worldwide Affairs

10   Peter Schlessel, 10202 West Washington Boulevard, Culver City, California 90232.

11   Paramount Pictures Corporation, including its then Vice-Chairman Robert

12   Moore, 5555 Melrose Avenue, Hollywood, CA, 90038.

13   Fox Filmed Entertainment Group, including its then Chief Executive Officer,

14   Thomas Rothman, 10201 W. Pico Blvd., Los Angeles, CA 90035.

15   **Interrogatory No. 28**

16   DESCRIBE in detail when any efforts YOU have made to MARKET any

17   rights involving SUPERMAN and/or SUPERBOY took place.

18   **Response to Interrogatory No. 28**

19   Defendant objects to this interrogatory on the grounds that it is vague and

20   ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this

21   request on the grounds that it is not reasonably limited in scope.  Defendant objects to

22   this request to the extent that it seeks information which is not reasonably calculated

23   to lead to the discovery of relevant and admissible evidence.  Defendant additionally

24   objects to this request to the extent that it seeks communications or items protected

25   by the attorney-client privilege, the attorney work product doctrine and any other

26   privilege or immunity available under law or arising from contractual obligation.

27   Subject to and without waiving the foregoing general and specific objections,

28   Defendant responds, without limitation, as follows:

4
DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES

Exhibit B
25

**ER-215**

1    As to discussions with Warner Bros. Entertainment, Inc. and DC Comics, from

2 2003 to the present.

3    As to discussions with Sony Pictures Entertainment, December 2008.

4    As to discussions with Paramount Pictures, April-May 2010.

5    As to discussions with Fox Filmed Entertainment Group, November 19, 2010.

6 **Interrogatory No. 29**

7    DESCRIBE in detail all COMMUNICATIONS YOU have had with actual or

8 potential INVESTORS concerning rights involving SUPERMAN and/or

9 SUPERBOY.

10 **Response to Interrogatory No. 29**

11    Defendant objects to this interrogatory on the grounds that it is vague and

12 ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this

13 request on the grounds that it is not reasonably limited in scope.  Defendant objects to

14 this request to the extent that it seeks information which is not reasonably calculated

15 to lead to the discovery of relevant and admissible evidence.  Defendant additionally

16 objects to this request to the extent that it seeks communications or items protected

17 by the attorney-client privilege, the attorney work product doctrine and any other

18 privilege or immunity available under law or arising from contractual obligation.

19 Subject to and without waiving the foregoing general and specific objections,

20 Defendant responds, without limitation, as follows:

21    In late July-August 2002, Mr. Toberoff held in-person and telephonic

22 discussions with Mr. Emanuel that concerned his potential purchase or license of the

23 Superman rights recaptured by the Siegels' well-publicized Notices of Termination.

24 In approximately January 2003, Summer 2003, and November 2004-January 2005,

25 Mr. Toberoff held in-person and telephonic discussions with Mr. Emanuel

26 concerning Mr. Emanuel's potential purchase of Michael Siegel's passive 25% share

27 of the Superman rights recaptured by the Siegels' Notices of Termination, and

28 concerning the negotiations conducted by Mr. Toberoff on Mr. Emanuel's behalf

1  with Michael Siegel's attorney, Don Bulson, regarding the proposed purchase of

2  Michael Siegel's interest.

3          On December 4, 2008, in an in-person meeting with Peter Schlessel, then

4  President of Worldwide Affairs for Sony Pictures Entertainment, Marc Toberoff

5  discussed the potential license to Sony Pictures Entertainment of the Superman rights

6  recaptured by the Siegels.  They had a follow-up telephone conversation several

7  weeks later.

8          In April-May 2010, Marc Toberoff discussed the potential sale and/or license

9  of the "Superman" rights recaptured by the Siegels with Rob Moore, Vice Chairman

10 of Paramount Pictures and his support staff.  There was an initial telephone call

11 including John Fogelman, Marc Toberoff, and Rob Moore on April 21, 2010; a

12 further call including John Fogelman, Marc Toberoff and Rob Moore on April 29,

13 2010; and an in-person meeting including John Fogelman, Marc Toberoff and Rob

14 Moore on May 12, 2010 at the Paramount lot.  In addition, there were various e-mails

15 exchanged between April 21 and May 11, 2010.

16         On November 19, 2010, in an in-person meeting with Tom Rothman, CEO of

17 Fox Filmed Entertainment, and his support staff, Marc Toberoff discussed the

18 potential license of the Superman rights recaptured by the Siegels.

19 **Interrogatory No. 30**

20         IDENTIFY any PERSON with whom YOU have COMMUNICATED

21 concerning actual or potential INVESTORS in rights involving SUPERMAN and/or

22 SUPERBOY.

23 **Response to Interrogatory No. 30**

24         Defendant objects to this interrogatory on the grounds that it is vague and

25 ambiguous, overbroad, burdensome and oppressive.  Defendant further objects to this

26 request on the grounds that it is not reasonably limited in scope.  Defendant objects to

27 this request to the extent that it seeks information which is not reasonably calculated

28 to lead to the discovery of relevant and admissible evidence.  Defendant additionally

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES

objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

William Morris Endeavor, including Ari Emanuel and John Fogelman, 9601 Wilshire Boulevard, Beverly Hills, California 90212.

Sony Pictures Entertainment, including its then President of Worldwide Affairs Peter Schlessel, 10202 West Washington Boulevard, Culver City, California 90232.

Paramount Pictures Corporation, including its then Vice-Chairman Robert Moore, 5555 Melrose Avenue, Hollywood, CA, 90038.

Fox Filmed Entertainment Group, including its then Chief Executive Officer, Thomas Rothman, 10201 W. Pico Blvd., Los Angeles, CA 90035.

**Interrogatory No. 31**

DESCRIBE in detail when YOU have COMMUNICATED with actual or potential INVESTORS concerning rights involving SUPERMAN and/or SUPERBOY.

**Response to Interrogatory No. 31**

Defendant objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome and oppressive. Defendant further objects to this request on the grounds that it is not reasonably limited in scope. Defendant objects to this request to the extent that it seeks information which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Defendant additionally objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendant responds, without limitation, as follows:

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

1       With Ari Emanuel, in July -August 2002, January 2003, Summer 2003,

2  November 2004-January 2005.

3       With Sony Pictures Entertainment, on December 4, 2008.

4       With Paramount Pictures, April-May 2010.

5       With Fox Filmed Entertainment Group, on November 19, 2010.

9  Dated:  March 26, 2012      TOBEROFF & ASSOCIATES

/s/ Keith G. Adams
_____
Keith G. Adams
Attorneys for Defendants

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Exhibit B
29

**ER-219**

1

**<u>VERIFICATION</u>**

2
        I declare under penalty of perjury that on information and belief the facts set

3
forth in the foregoing answers to the Interrogatories are true to the best of my present

4
knowledge and belief.

5

6
DATED:  March 26, 2012

7
 Marc Toberoff
Print Name of Signatory                 Signature

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MARC TOBEROFF'S AMENDED RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  DC COMICS,                              Case No. CV 10-3633 ODW (RZx)

12              Plaintiff,                   **DECLARATION OF DANIEL M.
                                             PETROCELLI IN SUPPORT OF**
13        v.                                 **REQUEST FOR CONTINUANCE
                                             OF SUMMARY JUDGMENT**
14  PACIFIC PICTURES                         **UNDER FED. R. CIV. P. 56(d),**
    CORPORATION, IP WORLDWIDE,               **AND IN SUPPORT OF DC'S**
15  LLC, IPW, LLC, MARC TOBEROFF,            **OPPOSITION TO DEFENDANTS'**
    an individual, MARK WARREN               **MOTION FOR PARTIAL**
16  PEARY, as personal representative of     **SUMMARY JUDGMENT**
    the ESTATE OF JOSEPH SHUSTER,
17  JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an                  Hon. Otis D. Wright II
18  individual and as personal
    representative of the ESTATE OF          **Hearing Date**:  Oct. 15, 2012
19  JOANNE SIEGEL, and DOES 1-10,            **Hearing Time**:  1:30 p.m.
    inclusive,                               **Courtroom**:      11
20
                Defendants.
21

22

23

24

25

26

27

28

## DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state:

1.     I am a partner at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics in this case.  I make this declaration in support of DC Comics' Request For Continuance Of Summary Judgment Under Fed. R. Civ. P. 56(d), and in support of DC's Opposition To Defendants' Motion For Partial Summary Judgment.  I have personal knowledge of the matters set forth in this declaration.

2.     Defendants have moved for summary judgment on DC's First, Second, and Third Claims for Relief.  DC moved for summary judgment on its Third Claim, and three of the five grounds underlying its First Claim.  *See* Docket No. 458.  The Court tentatively granted DC's motion, and heard oral argument on the motion on September 5, 2012.  (A true and correct copy of the Court's tentative opinion is attached hereto as Exhibit 1; a true and correct copy of the transcript of the September 5 oral argument is attached hereto as Exhibit 2.)

3.     As explained in the sections that follow, discovery is ongoing on the additional issues defendants alone challenge in their cross-motion for summary judgment—chief among them, the unclean-hands ground for relief underlying DC's First Claim, and DC's Second Claim.  Hence, DC asks the Court to defer ruling on these particular issues until discovery is complete.

4.     Under Federal Rule of Civil Procedure 56(d), a party may obtain a continuance on a motion for summary judgment if it appears that he "cannot for reasons stated present by affidavit facts essential to justify his opposition."  If a party making a Rule 56(d) request has "diligently pursued its previous discovery opportunities," *Byrd v. Guess*, 137 F.3d 1126, 1135 (9th Cir. 1998), and sets forth in affidavit form (1) the relevant information it seeks to elicit from further discovery, and (2) the basis for believing that the information sought actually exists, then the additional discovery must be granted.  *VISA Int'l Servs. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986) (reversing district court's

- 1 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

**ER-222**

1    denial of Rule 56(f) application where discovery was not complete); *Metabolife*

2    *Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("the Supreme Court has

3    restated the rule as <u>requiring</u>, rather than <u>merely permitting</u>, discovery 'where the

4    non-moving party has not had the opportunity to discover information that is

5    essential to its opposition'") (underlining added); *Burlington N. Santa Fe R.R. Co.*

6    *v. Assiniboine and Sioux Tribes for the Fort Peck Reservation*, 323 F.3d 767, 773

7    (9th Cir. 2003) (noting that where a summary judgment motion is filed "before a

8    party has had any realistic opportunity to pursue discovery … district court should

9    grant any Rule 56(f) motion fairly freely").

10    **I.    <u>DC Has Diligently Pursued Discovery</u>**

11      5.     Since DC filed this case in 2010, it has diligently pursued discovery in

12    aid of its claims, including its unclean-hands claim and its Second Claim, which

13    challenges the scope of the Shuster Termination Notice, assuming the Notice is

14    valid. DC served hundreds of discovery requests, deposed a number of witnesses,

15    and been forced by defendants' misconduct to file well over 20 discovery motions.

16      6.     Despite reasonable diligence on DC's part, discovery has been delayed

17    due to: (1) an almost two-year-long discovery dispute (and stay that was imposed)

18    concerning the Toberoff Timeline documents; and (2) defendants' efforts to evade

19    and obstruct the discovery process (which will be the subject of an omnibus

20    sanctions motion that DC will file shortly).

21      7.     Defendants' discovery misconduct has particularly prejudiced DC's

22    ability to litigate its unclean-hands claim, which, like any claim involving

23    allegations of fraud and bad faith on the part of defendants, relies on evidence that

24    is uniquely within the offending party's possession. *E.g., Harrods Ltd. v. Sixty*

25    *Internet Domain Names*, 302 F.3d 214, 245-46 (4th Cir. 2002) (reversing grant of

26    summary judgment on Rule 56(f) grounds where plaintiff argued such discovery on

27    bad-faith claim was "uniquely in the possession of defendants").

28      8.     For almost two years—until May 2012—discovery in this case was

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

**ER-223**

1   largely stalled while the parties litigated whether defendants waived privilege over

2   the Toberoff Timeline documents by disclosing them to the U.S. Attorney's office

3   in 2010.  The Timeline documents describe Toberoff's rampant business and ethical

4   misconduct.  *In re Pacific Pictures*, 679 F.3d 1121, 1124 (9th Cir. 2012); Docket

5   Nos. 163-12 at 735-40; 427-3-427-11.

6          9.     The discovery magistrate ordered defendants to produce the Timeline

7   documents to DC in May 2011, but stayed his ruling pending appellate review.

8   Docket No. 262 at 4.  While the case was stayed (and defendants' petition for writ

9   review was pending), DC sought to take a number of depositions of defendants and

10  third party witnesses, but defendants and the third parties argued that DC would

11  only have one chance to depose each witness, and even if the Timeline documents

12  were later produced, DC could not examine the witnesses a second time.

13         10.    In April 2012, the Ninth Circuit affirmed the district court's order

14  compelling defendants to produce the Timeline documents.  *Pacific Pictures*, 679

15  F.3d at 1131.  Defendants delayed producing the documents, filing a series of

16  emergency motions, which this Court and the Ninth Circuit rejected.  Docket Nos.

17  424, 429; 9th Cir. Appeal No. 11-71844 Docket No. 39.  The Timeline documents

18  were finally produced in May 2012, and have revealed not only further evidence of

19  defendants' misconduct, but that defendants have been withholding other

20  documents and important evidence, and misled DC and the Courts about what

21  documents they possessed and what documents were privileged or not.[1]

22  _____
[1] Defendants' obstruction of the discovery process, includes, but is not limited to:

23  •  withholding non-privileged communications between defendant Laura Siegel
       Larson and her brother, Michael Siegel, *e.g.*, Docket Nos. 160 at 37-38; 225-4;
24     316 at 21-24; 362-2 at 286-90; 394 at 14-17;
    •  manipulating privilege logs to conceal non-privileged documents, *e.g.*, Docket
25     Nos. 316 at 21-24; 362-2 at 286-90; and
    •  falsely claiming that responsive documents do not exist, *compare* Docket No.
26     395-1 at 96-97 (defendants' statement to the Court at the hearing on DC's
       motion to compel Laura's November 2, 2002, letter to Michael: "there's no
27     November 2nd letter as described"), *and* Docket No. 162-12 at 589 ("There are
       no documents related to an offer by a 'billionaire investor' to purchase the
28     Siegels' Superman rights"), *with* Docket No. 455-2 at 3-4 (November 2, 2002
       letter, from Larson to Michael Siegel produced after DC moved for

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

ER-224

11.     These discovery issues will be fully addressed in the sanctions motion DC intends to file.  Docket No. 477-2 at 120-21.  And these documents and issues bear directly on DC's unclean-hands claim against defendants.  Such documents include previously undisclosed legal memoranda from third-party attorneys to Toberoff documenting the ethical violations presented by his joint-venture business relationship with the Shuster heirs.  Docket No. 427-3 at 335-49.  DC needs to complete all document discovery—and motion practice related to it—before any summary judgment motion challenging its unclean-hands claim can be heard.  It also still needs to depose many witnesses about these documents, including each of the defendants, as well as close to 10 third parties.   While the Court could grant summary judgment in DC's favor on its unclean-hands claim for the reasons discussed in DC's opposition to defendants' motion, defendants cannot possibly obtain summary judgment on these issues, when discovery is still so incomplete.

### A.     DC's First Claim for Relief

12.     DC's First Claim alleges that Peary and Toberoff (working along with the Siegels) tried to rewrite history to assert that Joe Shuster was not the co-creator of the character Superboy.  It further alleges that Toberoff induced the Shusters to relinquish their Superboy rights to permit the Siegels to bring an infringement action against DC.  It also alleges that, as a *quid pro quo*, the Siegels promised to share their recovery in the *Siegel* case with the Shusters.  Docket No. 49 ("FAC") ¶¶ 86-91, 131-33.  In DC's concurrently filed opposition to defendants' cross-motion for summary judgment, DC cites and documents the evidence supporting this unclean-hands claim.  Opp. at 17-25.

13.     Defendants' cross-motion asserts that it is an "undisputed fact" that "[n]either Mr. Peary nor Ms. Peavy have any interest in [the Siegels'] Superboy

---

reconsideration), *and* Docket Nos. 394 at 14-17; 439 at 1-2 ("We learned that due to the delays and the misinformation Kevin [Marks] had given them that there was a deal with DC, the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere.").  *See* Docket No. 477-2 at 119-36.

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

ER-225

1  notices of termination." Cross-Mot. at 22; Defs.' Statement of Uncontroverted

2  Facts ("DSUF") 63. This is wrong, as the evidence cited in DC's opposition brief

3  shows. DC is still in the midst of document and deposition discovery to establish

4  defendants' full activities in carrying out the alleged Superboy fraud. This includes

5  the pressing need to obtain the illicit 2008 Consent Agreement between the Siegel

6  and Shuster heirs and Toberoff. Defendants refuse to produce the document or

7  testify concerning its contents fully, but have revealed in depositions that it is

8  signed by the Siegels and Shusters and by Toberoff; it remains in effect to this day;

9  and it prohibits the heirs from entering into an agreement with DC regarding their

10 respective Superman rights without each other's consent. *E.g.,* Docket Nos. 90 at

11 3-4; 160 at 12-13; 305-37 at 1155:21-1156:25, 1158:19-1159:4, 1184:8-1185:11.

12 DC moved to compel the Consent Agreement in February 2011, and Magistrate

13 Judge Zarefsky denied the motion based on Toberoff's representations to Judge

14 Larson in the *Siegel* case. Docket Nos. 160 at 6-44; 209 at 1-10. Since that time,

15 however, new facts have emerged that disprove Toberoff's assertions, and

16 defendants have selectively disclosed information about the agreement that reveal

17 many of its contents. DC will move shortly to compel the production of the

18 Consent Agreement and further testimony concerning its contents.

19       14. DC deposed both Mark Warren Peary and Laura Siegel Larson in

20 2011. When DC asked them about the contents of the Consent Agreement,

21 Toberoff impeded DC from getting meaningful testimony by only selectively

22 allowing the witnesses to testify when it was (in his view) advantageous to their

23 position, and making untenable privilege assertions where it was not. For instance,

24 in Peary's July 2011 deposition, Toberoff allowed him to testify that the Consent

25 Agreement provides that "any agreement with DC or settlement with DC requires

26 the consent of the Siegels," Docket No. 305-37 at 1184:8-1185:11, and that it is

27 "still in effect," *id.* at 11174:5-7, but shut down all questions concerning:

28     • Why Peary entered into the Consent Agreement, *see id.* at 1168:15-1170:17;

- 5 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

**ER-226**

- Why Peary believes the Consent Agreement benefits the Shuster heirs, *see id.* at 1187:14-23;

- Peary's understanding of the purpose of the Consent Agreement, *see id.* at 1168:15-22, 1171:4-13;

- Peary's understanding of the effect of the Consent Agreement, *see id.* at 1171:4-13;

- Why Peary referred to the document as a "Consent Agreement," *see id.* at 1168:2-14;

- Whether the Siegel heirs can enter into an agreement concerning their rights without the Shuster heirs' consent, *see id.* at 1171:16-1172:15;

- Whether the Shuster heirs are free to enter into an agreement concerning their rights without the consent of anyone else, *see id.* at 1172:24-1173:7, 1188:15-1190:7;

- Whether the Consent Agreement entitles the Shuster heirs to share a portion of any settlement proceeds the Siegel heirs receive, *see id.* at 1172:17-22, 1173:9-15;

- Whether the Consent Agreement entitles the Shuster heirs to share a portion of the Siegel heirs' profits from the accounting trial in the *Siegel* cases, *see id.* at 1277:5-13, 1278:7-12; and

- Peary's understanding that the Consent Agreement violates DC's rights, *see id.* at 1143:8-1146:17.

15.     Defendants' selective disclosures concerning the 2008 Consent Agreement strongly suggest a *quid pro quo* arrangement alleged by DC.  For example, Toberoff permitted Peary to testify that the agreement purportedly does not entitle the Shusters to share in any recoveries by the Siegels from their copyright infringement case against DC involving Superboy.  Docket No. 305-37 at 1191:13-19.  Yet, when DC asked Peary whether the Consent Agreement refers to Superboy at all or entitles the Shusters to a portion of the proceeds from the

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

ER-227

Siegels' *Superman* case, Case No. CV-04-8400, Toberoff objected, instructed Peary not to answer, and said any answer would reveal "the contents of the Consent Agreement."  Docket No. 305-37 at 1172:4-7, 1277:5-1276:12.

16.    During Larson's deposition, Toberoff revealed that his approach is to "assert[] privilege to what is in the [consent] agreement," but not assert privilege as to what is not in the agreement, as "what is not in the agreement would not be privileged."  Docket No. 305-24 at 817:19-818:1.  This statement, combined with Toberoff's selective objections during Peary's deposition, also suggests the Consent Agreement may include an arrangement to trade the proceeds from the Siegel Superman case for the Shusters' forfeiture of their Superboy rights.

17.    When DC recently deposed Toberoff, he asserted privilege frequently and broadly, and admitted that he spoke to the Siegels about whether the Shusters had an interest in Superboy, Ex. 3 at 344:17-345:4, and that the agreement requires the "mutual consent" of the heirs to settle and does not require his consent, *id.* at 360:10-361:12.

18.    In addition to moving to compel the production of the Consent Agreement and full, uninterrupted testimony concerning its contents, DC will be moving to further depose Peary and Larson concerning the Consent Agreement, the Timeline document, and other evidence defendants had suppressed when their prior depositions were taken.  DC also needs to conclude Toberoff's deposition—which should require one additional day—depose representatives for his three companies, and depose third-party witnesses like J. Todd Harris (Toberoff's former business partner), and Ari Emanuel (Toberoff's former business partner).

**B.    DC's Second Claim for Relief**

19.    DC's Second Claim is in the alternative and only needs to be addressed if the Court does not find the Shuster termination notice invalid for the reasons stated in its First Claim.  DC alleges that the scope of any rights to be recaptured by the Shusters' termination is limited and does not include, *inter alia*:

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

(a) unpublished Superman works; (b) promotional announcements published before *Action Comics #1*; (c) works for hire; (d) derivative works; or (e) certain elements of the Superman character and storyline that either do not appear in the specified works, or are not listed in the notice. Docket No. 49, FAC ¶¶ 135-64.

20. In a four-sentence paragraph added to their motion without any prior notice to DC—and in violation of the Court's meet-and-confer rules, C.D. Cal. L.R. 7-3; Ex. 4 at 409—defendants contend that DC's claim as to categories (a) and (c) above involves work-for-hire issues and is precluded by the interlocutory judgments in *Siegel*. Cross-Mot. at 22.

21. Defendants' perfunctory treatment of this claim skims over the differences between Siegel's and Shuster's employment histories with DC and ignores contested factual issues that have yet to be examined in discovery. Siegel and Shuster performed different types of work for DC, at different times, and had different arrangements for compensation. For instance, while Siegel largely wrote the Superman scripts himself, letters among Siegel and Shuster and DC indicate that they employed other artists besides Shuster to illustrate the stories, Exs. 5-9, and when Siegel left DC to write for military publications during World War II, Shuster remained in Ohio as a DC employee. Docket No. 469-1 at 7 ("Since [Siegel] has been in the Army . . . [h]is artist collaborator, Joe Schuster, is keeping the strip going . . . ."). As of 1939, Shuster only illustrated for Superman, while Siegel continued writing for Superman and several other comics, and they were paid differently. Docket No. 459-1 at 20.

22. In further discovery, DC will focus on factual issues specific to Shuster's work, including:
- the work he did for DC, and whether and to what extent he hired other illustrators to draw for Superman;
- the manner in which Shuster was compensated and supervised by DC;
- the extent of his contributions to early Superman works; and
- his involvement with the pre-*Action Comics #1* promotional announcements.

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

ER-229

## II.    ADDITIONAL MATERIALS CITED IN DC'S OPPOSITION PAPERS

23.    Attached hereto as Exhibit 4 is a true and correct copy of a letter from me to Marc Toberoff and Richard Kendall, dated August 21, 2012.

24.    Attached hereto as Exhibit 5 is a true and correct copy of a letter from J.S. Leibowitz to Jerome Siegel, dated January 23, 1940.

25.    Attached hereto as Exhibit 6 is a true and correct copy of a letter from Whitney Ellsworth to Mr. Siegel, dated January 22, 1940.

26.    Attached hereto as Exhibit 7 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated January 25, 1940.

27.    Attached hereto as Exhibit 8 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated February 8, 1940.

28.    Attached hereto as Exhibit 9 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated May 2, 1940.

29.    Attached hereto as Exhibit 10 is a true and correct copy of a script entitled "Superboy," written by Mr. Siegel.

30.    Attached hereto as Exhibit 11 is a true and correct copy of a comic book entitled *More Fun #101*.

31.    Attached hereto as Exhibit 12 is a true and correct copy of a comic book entitled *Superman #1*.

32.    Attached hereto as Exhibit 13 is a true and correct copy of a comic strip dated May 31, 1942.

33.    Attached hereto as Exhibit 14 is a true and correct copy of a letter from Jean Peavy to Marty Payson, dated August 21, 1992.

34.    Attached hereto as Exhibit 15 is a true and correct copy of a "Notice of Termination of Transfer Covering Extended Renewal Term for Superboy," dated November 8, 2002.

35.    Attached hereto as Exhibit 16 is a true and correct copy of an excerpt from the "Brief of Appellant" in *Classic Media, Inc. v. Mewborn*, Ninth Circuit

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

ER-230

1   Appeal No. 06-55385, dated June 30, 2006.

2         36.    Attached hereto as Exhibit 17 is a true and correct copy of an expert

3   report submitted by Jeff Rovin in Case No. CV 04-8400 (the "*Siegel* Action"),

4   dated January 11, 2007.

5         37.    Attached hereto as Exhibit 18 is a true and correct copy of an expert

6   report submitted by Mark Waid in the *Siegel* Action dated February 8, 2007.

7         38.    Attached hereto as Exhibit 19 is a true and correct copy of an article

8   titled "Up, Up And Awa-a-y! The Rise of Superman, Inc." from *The Saturday*

9   *Evening Post*, dated June 21, 1941.

10        39.    Attached hereto as Exhibit 20 is a true and correct copy of an

11  agreement signed by Mr. Siegel, Joseph Shuster, and Jay Emmett on behalf of

12  Warner Communications Inc. dated December 23, 1975.

13        40.    Attached hereto as Exhibit 21 is a true and correct copy of a letter from

14  Mr. Payson to Mr. Shuster, dated August 8, 1988.

15        41.    Attached hereto as Exhibit 22 is a true and correct copy of a letter from

16  Mr. Payson to Joanne Siegel, dated March 5, 1991.

17        42.    Attached hereto as Exhibit 23 is a true and correct copy of a letter from

18  Mr. Payson to Ms. Peavy, dated September 8, 1992.

19        43.    Attached hereto as Exhibit 24 is a true and correct copy of a

20  "Copyright Research Report," dated August 22, 1994.

21        44.    Attached hereto as Exhibit 25 is a true and correct copy of "Copyright

22  Renewal Registrations" for Superman and Superboy, dated 1972.

23        45.    Attached hereto as Exhibit 26 is a true and correct copy of a certificate

24  of renewal registration for Superboy, dated November 15, 1972.

25        46.    Attached hereto as Exhibit 27 is a true and correct copy of "Copyright

26  Renewal Registrations" for Superman and Superboy, dated 1973.

27        47.    Attached hereto as Exhibit 28 is a true and correct copy of the

28  Superman story from the comic book entitled *Action Comics #1*.

- 10 -

48.     Attached hereto as Exhibit 29 is a true and correct copy of a letter from
Ms. Siegel to Steven Ross, dated February 14, 1982.

49.     Attached hereto as Exhibit 30 is a true and correct copy of the
Declaration Of Paul Levitz In Support Of DC Comics' Motion For Partial
Summary Judgment On Its First And Third Claims For Relief, dated July 16, 2012.

50.     Attached hereto as Exhibit 31 is a true and correct copy of excerpts
from "Notices of Termination of Transfers," dated April 3, 1997.

51.     Attached hereto as Exhibit 32 is a true and correct copy of excerpts of
the call log of Kevin Marks, dated November 2001.

52.     Attached hereto as Exhibit 33 is a true and correct copy of an email
from Mr. Toberoff to Michael Siegel, dated November 17, 2001.

53.     Attached hereto as Exhibit 34 is a true and correct copy of an
agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide,
and Ms. Siegel and Laura Siegel Larson, dated as of October 3, 2002.

54.     Attached hereto as Exhibit 35 is a true and correct copy of a subpoena
to Mark Warren Peary dated April 12, 2006.

55.     Attached hereto as Exhibit 36 is a true and correct copy of a subpoena
issued to Ms. Peavy dated April 12, 2006.

56.     Attached hereto as Exhibit 37 is a true and correct copy of a subpoena
to Mr. Toberoff dated September 20, 2006.

57.     Attached hereto as Exhibit 38 is a true and correct copy of a subpoena
to Mr. Toberoff dated October 19, 2006.

58.     Attached hereto as Exhibit 39 is a true and correct copy of an excerpt
from the transcription of the November 11, 2006, deposition of Ms. Peavy.

I declare under penalty of perjury under the laws of the State of California
and the United States that the foregoing is true and correct.  Executed this 21st day
of September, 2012, at Los Angeles, California.

/s/ Daniel M. Petrocelli
Daniel M. Petrocelli

- 11 -

# TABLE OF CONTENTS

| Exhibit | Description | Page |
|---|---|---|
| 1. | Tentative "Order Granting Plaintiff's Motion For Partial Summary Judgment," dated August 30, 2012 | 12 |
| 2. | Transcript of September 5, 2012, oral argument | 31 |
| 3. | Transcript of September 18, 2012, deposition of Marc Toberoff | 92 |
| 4. | Letter from Daniel Petrocelli to Marc Toberoff and Richard Kendall, dated August 21, 2012 | 408 |
| 5. | Letter from J.S. Leibowitz to Jerome Siegel, dated January 23, 1940 | 410 |
| 6. | Letter from Whitney Ellsworth to Mr. Siegel, dated January 22, 1940 | 412 |
| 7. | Letter from Mr. Leibowitz to Mr. Siegel, dated January 25, 1940 | 414 |
| 8. | Letter from Mr. Leibowitz to Mr. Siegel, dated February 8, 1940 | 416 |
| 9. | Letter from Mr. Leibowitz to Mr. Siegel, dated May 2, 1940 | 417 |
| 10. | Script entitled "Superboy," written by Mr. Siegel | 419 |
| 11. | Comic book entitled *More Fun #101* | 432 |
| 12. | Comic book entitled *Superman #1* | 438 |
| 13. | Comic strip dated May 31, 1942 | 458 |
| 14. | Letter from Jean Peavy to Marty Payson, dated August 21, 1992 | 459 |
| 15. | "Notice of Termination of Transfer Covering Extended Renewal Term for Superboy," dated November 8, 2002 | 476 |
| 16. | Excerpt from the "Brief of Appellant" in *Classic Media, Inc. v.* | 534 |

| Exhibit | Description | Page |
|---|---|---|
| | *Mewborn*, Ninth Circuit Appeal No. 06-55385, dated June 30, 2006 | |
| 17. | Expert report submitted by Jeff Rovin in Case No. CV 04-8400 (the "*Siegel* Action"), dated January 11, 2007 | 538 |
| 18. | Expert report submitted by Mark Waid in the *Siegel* Action dated February 8, 2007 | 547 |
| 19. | Article titled "Up, Up And Awa-a-y! The Rise of Superman, Inc." from The Saturday Evening Post, dated June 21, 1941 | 554 |
| 20. | Agreement signed by Mr. Siegel, Joseph Shuster, and Jay Emmett on behalf of Warner Communications Inc. dated December 23, 1975 | 560 |
| 21. | Letter from Mr. Payson to Mr. Shuster, dated August 8, 1988 | 595 |
| 22. | Letter from Mr. Payson to Joanne Siegel, dated March 5, 1991 | 596 |
| 23. | Letter from Mr. Payson to Ms. Peavy dated September 8, 1992. | 597 |
| 24. | "Copyright Research Report," dated August 22, 1994 | 598 |
| 25. | "Copyright Renewal Registrations" for Superman and Superboy, dated 1972 | 694 |
| 26. | Certificate of renewal registration for Superboy, dated November 15, 1972. | 695 |
| 27. | "Copyright Renewal Registrations" for Superman and Superboy, dated 1973 | 698 |
| 28. | Comic book entitled *Action Comics #1* | 699 |
| 29. | Letter from Ms. Siegel to Steven Ross, dated February 14, 1982 | 713 |
| 30. | Declaration Of Paul Levitz In Support Of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief (excluding exhibits), dated July 16, 2012 | 717 |
| 31. | Excerpts of "Notice of Termination of Transfer Covering Extended Renewal Term," dated April 3, 1997 | 722 |
| 32. | Excerpts of the call log of Kevin Marks, dated November 2001 | 785 |
| 33. | Email from Mr. Toberoff to Michael Siegel, dated November 17, 2001 | 787 |

| Exhibit | Description | Page |
|---------|-------------|------|
| 34. | Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Ms. Siegel and Laura Siegel Larson, dated as of October 3, 2002 | 790 |
| 35. | Subpoena to Mark Warren Peary issued by the U.S. District Court for the District of New Mexico, dated April 12, 2006 | 794 |
| 36. | Subpoena issued to Ms. Peavy by the U.S. District Court for the District of New Mexico, dated April 12, 2006 | 800 |
| 37. | Subpoena to Mr. Toberoff, issued by this Court and dated September 20, 2006 | 806 |
| 38. | Subpoena to Mr. Toberoff, issued by this Court and dated October 19, 2006 | 819 |
| 39. | Excerpt from the transcription of the November 11, 2006, deposition of Ms. Peavy | 833 |

# EXHIBIT 1

ER-236

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

DC COMICS,

              Plaintiff,

vs.

PACIFIC PICTURES CORP., *et al.*

              Defendants.

CASE NO. CV 10-3633 ODW (RZx)

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [458]

## I.  INTRODUCTION

DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed interest in the Superman copyrights, after certain heirs of Joseph Shuster, the first illustrator of Superman, served DC with a copyright termination notice purporting to recapture certain early Superman works as of October 26, 2013.

DC now moves for partial summary judgment as to the First and Third Claims. DC's First Claim contests the validity of the termination notice at issue here, and its Third

EXHIBIT 1

12

ER-237

Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and his entertainment companies and business partners engineered in alleged violation of DC's rights under the Copyright Act. (Mot. at 1 ("There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.")).

## II.   FACTS

Semantic quibbles aside, the following facts are undisputed.  On March 1, 1938, Jerome Siegel and Joseph Shuster granted DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)   "Action Comics #1 ("AC#1"), published on April 18, 1938, with a cover date of June 1938, featured an adapted version of Siegel and Shuster's Superman story." (UF 4.)  Defendants purport, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.)   All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success. (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone. (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.")).  In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.  The court concluded that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster

2

**EXHIBIT 1**

**13**

ER-238

acknowledged that the 1938 assignment granted DC all rights in Superman. (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. (UF 8.)   Defendants argue DC does not disclose its financial assumptions for its supposed calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500 . . . ." (Id.)

Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families have to Superman-related events. (UF 9.)   All told, the Siegels and Shusters have been paid over $4 million under the 1975 agreement, not including medical benefits or bonuses. (UF 10.)   Shuster passed away on July 30, 1992. (UF 12.)

Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. (UF 13.)   Defendants dispute this, arguing the statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary in the event Jean predeceased him and omits that the will states: 'In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor.'" (Opp'n UF.)   On August 17, 1992, Jean filed an affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that certain property "be paid, delivered or transferred to her." (UF 14.)

Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay

3

**EXHIBIT 1**

**14**

**ER-239**

Shuster's "final debts and expenses." (UF 15.) Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." (Opp'n UF.) In response, DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.) On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. (UF 17.) Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. (Opp'n UF.)

Paul Levitz dealt with many authors and heirs during his decades at DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.) The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19.)

Over the next decade, DC maintained good relations with the Shusters, and Jean and Paul Levitz corresponded regularly. In the close-to-60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992

4

**EXHIBIT 1**

**15**

ER-240

agreement, and requested bonus payments in excess of those required. (UF 20.)
Defendants contend that, over this decade, Jean expressed displeasure at the amount and
form of her pension payments and requested changes. (Opp'n UF.)   In a 1993 letter, Jean
confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman
copyright," but asked for an increase in payments "plus a yearly increment to account for
inflation." (UF 21.)   Defendants contend "Jean stated that at the present time 'Frank and
I are not planning to reclaim the Superman copyright.' [And]: 'We believe we have a
right to expect that you will be fair with us as well and will grant our request for increased
payment.   We will stick to our bargain [which we signed, dated as of August 1, 1992]'"
(Opp'n UF.)

In 1999 – after Congress amended the copyright statute to grant additional
statutory heirs termination rights under 17 U.S.C. § 304(d) – and after learning that Jerry
Siegel's heirs had served Superman copyright termination notices on DC–Jean reiterated
her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for
> Superman. I want you to know that I intend to continue to honor our pension
> agreement. I would, however, appreciate a generous bonus for this year as you had
> done many times in the past.

(UF 22.)

In 1993, 1994, 1995, 1996, 1997, 1999, 2000, and 2001, DC provided additional
bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.)   In one instance when Jean
asked for a bonus, DC made clear its position that Jean had no legal right to make such
requests, but would pay her a bonus anyway, which she thanked DC for doing. (UF 24.)
Jean's 50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound
mind when she sent these letters to DC. (UF 26.)   Mark Peary, Jean's doctor, and Jean's
daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean
has aphasia, and has difficulty communicating and "understand[ing] what people are
saying." (UF 27.)   On November 7, 2003, Mark Warren Peary (as substitute executor of

the Shuster estate) served on DC a notice of termination of the prior grants of Shuster's
Superman copyrights. (*See* Petrocelli Decl. Exh. 37.) Other facts shall be discussed as
necessary.

## III.   DISCUSSION

As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice
[is] invalid." Docket No. 49 ¶¶ 106-34. DC argues it is entitled to summary judgment on
three grounds: (1) "The 1992 Agreement Bars the Shusters from Pursuing
Termination[;]" (2) "The Shusters Lack the Majority Interest Necessary to Terminate"
because they assigned 50% of their putative rights to Pacific Pictures; and (3) "There Is
No Statutory Basis for the Shusters to Terminate, given that Joe Shuster had no statutory
heir under the Copyright Act when he died." (Mot. at 9.) "DC's Third Claim, which is
pled in the alternative to its First Claim, alleges that the Pacific Pictures Agreements and
2008 consent agreement improperly restrict the Shuster heirs' ability to enter into
agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.).

### *1992 Agreement*

The Copyright Act provides a termination right for the grant of a copyright transfer
or license made by parties other than the author only if the grant was made prior to
January 1, 1978. 17 U.S.C. § 304(c). Our inquiry begins, then, with whether the 1992
Agreement superseded "Joseph Shuster's key 1938 Grant and subsequent Superman
grants[,]" as Defendants put it. (Opp'n at 12.)

DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank
Shuster –Joseph's siblings – bars the Shusters from exercising their statutory termination
rights. (Mot. at 10.) That agreement provides, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement fully
> settles all claims to any payments or other rights or remedies which you may have
> under any other agreement or otherwise, whether now or hereafter existing
> regarding any copyrights, trademarks, or other property right in any and all work
> created in whole or in part by your brother, Joseph Shuster, or any works based
> thereon. *In any event*, you now grant to us any such rights and release us, our

licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

(Mot. at 6) (quoting SUF 19; Petrocelli Decl. Exh. 24) (emphasis added).

Defendants contend "DC attempts to circumvent termination by trying to jam the 1992 Agreement into a narrow and inapplicable 'revocation and re-grant' exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005)" ("*Milne*"). (Opp'n at 9) (arguing DC ignores "the plain language of the 1992 Agreement").

As Defendants acknowledged earlier in this litigation, it is New York law, which governs the 1992 Agreement. (Docket No. 191 at 4, n.6; Docket No. 333 at 21; *see also* Reply at 2 ("'whether [an] Agreement terminated and superseded [an earlier agreement],' is determined by governing state law – in this case, as in *Steinbeck*, 'New York law'") (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008) ("*Steinbeck*") citing *Milne* with approval).

Under New York law, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (2d Dep't 1994); *see also Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (2d Dep't 1984) ("[W]here the parties have clearly expressed . . . their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.").

The question is thus "whether the subsequent agreement, . . . in whatever form it may be, is a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (emphasis added). With a broad release and all-encompassing language, it would here appear that the 1992 Agreement aims to supersede any and all

prior agreements between the parties. (*See* SUF 19 ("this agreement *fully settles all claims* to *any payments or other rights or remedies* which you *may have* under *any other agreement or otherwise, whether now or hereafter existing* regarding *any copyrights . . . in any and all work created in whole or in part by your brother, Joseph Shuster*")) (emphasis added).

Pointing to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ("*Mewborn*"), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike [that] in *Milne*, did not '*expressly* revoke the earlier ... assignments.'" (Opp'n at 11) (quoting *Id.* at 989) (emphasis added by Defendants). In *Mewborn*, the Ninth Circuit upheld a termination notice regarding the novel "Lassie Come Home," finding *Milne* inapplicable. In 1976, the author's daughter, Mewborn, assigned her share of Lassie film and television rights to the publisher. *Id.* at 980. In 1978, she signed a second contract which purported to assign additional copyrights to the publisher for $3,000. *Id.* at 981. In 1996, Mewborn served a termination notice as to her 1976 grant. The publisher sued Mewborn, claiming that the non-terminable 1978 grant "superseded" and implicitly "revoked and re-granted" her Lassie rights. *Id.* at 981-82. The Ninth Circuit disagreed, upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at 989.

Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its decision on the lack of an express revocation of earlier agreements. *See id.* at 989 ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer Mewborn's termination right as to the 1976 Assignment, and that the circumstances here are not even close to those in *Milne*, the district court improperly concluded that the 1978 Assignment included a grant of Mewborn's termination right.") (emphasis added).

Rather than revoke and supersede the prior agreement, the Ninth Circuit found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the additional

8

**EXHIBIT 1**

19

enumerated rights that Mewborn had not assigned in 1976." *Id.* (observing "[n]or is there any evidence in the record to support a finding that Mewborn or LTI, when entering into the 1978 Agreement, considered Mewborn's termination rights under § 304(c), or that Mewborn intended to waive or relinquish them. Rather, the evidence suggests that Mewborn did not intend to waive her termination rights. ").

Such is not the case here. The broad and all-encompassing language of the 1992 Agreement unmistakably operates to supersede all prior grants. (*See* Petrocelli Decl. Exh. 24.) Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to" those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and displacing "all claims . . .. under any agreement" related to "any and all" works "created in whole or in part by . . . Joseph Shuster." (UF 19.) Unlike the heirs in *Mewborn*, moreover, Jean and Frank were aware of the Copyright Act's termination rights when they bargained for and entered into the 1992 Agreement. (*See* UF 17, 21, 22.) As DC points out, "the fact that Jean and Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows that *Mewborn*'s concerns about [the heirs'] ignorance are inapt here." (Mot. at 17.)

Defendants insist "the 1992 Agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.) Surely Defendants recognize that "any and all work created in whole or in part by . . . Joseph Shuster" necessarily includes his most famous creation, Superman. And, just as clear, when once a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes. Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant *and subsequent Superman grants*" lends credence to the need for all-encompassing language.

**EXHIBIT 1**

And, unlike in *Mewborn*, the record here is rife with "evidence . . . to support a finding that [Jean Peavy], when entering into the [1992] Agreement, considered . . . termination rights . . . [and] that [Jean] intended to waive or relinquish them." *Mewborn*, 532 F.3d at 989; *see also Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. 1977) (considering extrinsic evidence).

In a 1993 letter, for example, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright." (UF 21.) And, in 1999–after Congress amended the Copyright Act to grant additional statutory heirs termination rights, and after learning that Jerome Siegel's heirs had served Superman copyright termination notices on DC–Jean again reiterated her commitment "to honor" the 1992 Agreement. (UF 22.) Such evidence is uncontroverted by Defendants, who merely allege in conclusory fashion that, by entering into the 1992 Agreement, they did not intend to discharge and supersede all prior grants of the Superman copyrights. Such a showing (or lack thereof) is decidedly insufficient at this stage in the litigation.

As one New York court put it, "while the question of whether a substituted agreement effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no evidence as to the parties' intent in making the agreement." *Callanan Industries, Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712 (N.Y.A.D. 3 Dept.,1986) (citations omitted). As in *Callanan*, although Defendants have alleged in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, they have offered absolutely no evidence in support of that conclusion. Nor, indeed, have Defendants even earnestly controverted the facts alleged in Plaintiff's moving papers with anything other than general denials, which is "patently insufficient." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

10
**EXHIBIT 1**
21

ER-246

(1986) (explicating the parties' relative burdens on summary judgment).

To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong. As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement (along with Frank) which renegotiated the terms of the parties' prior agreements to her and Frank's benefit. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Schuster's original grants of licenses to his copyrights. As in *Milne*, Defendants "present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights." *Milne*, 430 F.3d at 1046-47 ("Certainly, with regard to [*Milne*], [the heir's] concerns are unfounded. The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades.").

Similarly here, the 1992 Agreement came about some sixteen (16) years "after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act . . . ." *Id.* Joseph Shuster, who himself passed away in 1992, never did terminate his prior grants of the Superman copyrights to DC and, by entering into the 1992 Agreement – which increased Frank and Jean's payments – the heirs essentially

11

**EXHIBIT 1**

22

ER-247

Case: 13-57245, 03/05/2013, ID: 8538472, DktEntry: 110-2, Page 241 of 312

struck a deal that binds all other heirs. *See Steinbeck*, 537 F.3d at 202 (" Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise.").[1]

# TENTATIVE

# ORDER

---

[1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

**EXHIBIT 1**

**23**

**ER-248**

Defendants next argue that an author or his estate may exercise termination rights "notwithstanding any agreement to the contrary, including an agreement to make a will or to make a future grant. 17 U.S.C. § 304(c)(5)" (Opp'n at 8 ("Thus, any agreement that purports to waive, settle or limit the termination right is unenforceable.").  Such an argument has been previously considered and rejected.

> As the *Steinbeck* court noted:
> We do not read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right. To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights. . . . Moreover,

the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement.  In 1994 [as in 1992], only 17 U.S.C. § 304(c) provided a termination right; section 304(d) would not become effective for another four years.  It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.  As of 1994, then, the agreement entered into by Elaine Steinbeck did not deprive the Steinbeck Descendants of any right they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination right four years later.  Had Elaine Steinbeck not entered into the 1994 Agreement, the section 304(c) termination right would have expired, and Penguin would have been bound only by the 1938 Agreement for the duration of the copyright terms absent (as ultimately happened) Congressional action.  *We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.*

Steinbeck, 537 F.3d at 202-03 (emphasis added).

**EXHIBIT 1**

The same holds true here.   In 1992, when Joseph Shuster passed away and his heirs entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody else, held a termination right . . . ." (Opp'n at 16.)   As of 1992, then, "the agreement entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could have realized at that time." *Steinbeck*, 537 F.3d at 203.   Nor, of course, could the parties have contemplated that Congress would create a second termination right six years later.   In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist." *Id.*

Defendants contend "DC's motion is defective as it fails to address most of defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories." (Opp'n at 2.)   The Court disagrees.   It is not Plaintiff's duty to disprove Defendants' affirmative defenses, but rather it is Defendants who bear the burden of proving the applicability of their affirmative defenses. *See*, *e.g.*, *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir.2006) (noting that a defendant bears the burden of proof at summary judgment with respect to affirmative defenses); c.f. *Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F.Supp.2d 1019, 1023 -24 (W.D.Wash.,2003) ("Since the affirmative defense of obviousness is Defendant's burden, by failing to challenge the issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

Finally, the 1992 Agreement explains that "[i]f, despite the terms of this agreement, either of you [Jean or Frank] assert any [ ] claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement." (Petrocelli Decl. Exh. 24 ("We also reserve all of our other rights, remedies

**ER-250**

and defenses in such an event.")).   Suffice it to say, it does not appear from the record before this Court that the heirs refunded any such monies.

In sum, the Court finds that the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate their prior grants of copyrights, impliedly superseded all prior grants of the Superman copyrights.   The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 agreement, it is not subject to termination pursuant to 17 U.S.C. § 304(d).

///

///

///

# TENTATIVE

*Majority Interest*

Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who . . . own and are entitled to exercise a total of more than one-half of [an] author's termination interest" and "shall be signed by the [requisite] number and proportion of the owners" (Mot. at 18) (quoting 17 U.S.C. §§ 304(d)(1), (c)(1)-(4)); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).

"According to the Shuster heirs' written contracts and deposition admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate served the [Termination] Notice." (Mot. at 18)   In 2001, the Shusters "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc Toberoff. (UF 31.)   In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in

ER-251

'Superman' pursuant to Section 304(d) of the U.S. Copyright Law." (UF 32.)  Mark
Warren Peary even admitted under oath that he understood when he signed the Pacific
Pictures agreement, "that all of the Joe Shuster rights, termination rights, to the extent
they existed, were being transferred and assigned to the venture just as it says." (UF 33.)

Defendants argue "the copyrights recaptured pursuant to a termination notice
cannot be anticipatorily transferred to anyone prior to the service of a termination notice,
and can be transferred only to the grantee [i.e., DC] or its successor before 'the effective
date of the termination' – here, October 26, 2013. (Opp'n at 18) (quoting 17 U.S.C.
§304(c)(6)(D)).   Thus, argue Defendants, "as a pure matter of law, the 2001/2003
[Pacific Pictures Corporation] PPC Agreements –pre-dating both the effective date and
the service of the Shuster Executor's termination notice – could not and did not transfer
the prospective copyrights to be recovered by the Shuster Termination." (Opp'n at 18.)

DC argues Defendants must be held accountable for entering into these
agreements, notwithstanding their illegality. (Reply at 8) ("This illegality defense fails
for two reasons.").   First, although defendants say the Pacific Pictures contracts "did not
transfer the prospective copyrights to be recovered by the Shuster Termination," Peary
testified under oath, and without any objection, that the 2001 contract "transferr[ed] and
assign[ed] to the venture" "all of the Joe Shuster rights, termination rights, to the extent
they existed," (Reply at 8) (citations omitted).   "The 2003 agreement reaffirmed the
2001 Agreement [and] [t]hese admissions and facts are fatal to defendants' defense." *Id.*

While the Court finds problematic Defendants' conduct – especially their failure to
inform the copyright office of agreements which they themselves believed would affect
ownership of the subject copyrights – these agreements do not alter the fact that "the
inalienable right to serve the Shuster Termination could not have been transferred to

PPC." (Opp'n at 18) ("No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4)). Thus, although the Defendants believed their contracts transferred the Shuster heirs' termination rights, those agreements did not and, indeed, could not have done so.

Second, DC argues Defendants fail "to address the public-policy rule that they may not assert the illegality of their own contracts as a defense." Mot. 19-20 (citing cases)." (Reply at 8) ("Like a swindler who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal to avoid liabilities they create."). While that may be so, the Court does not believe that estoppel is applicable here. In fact, were the Court to hold Defendants to their contracts (and find they lacked the majority interest to terminate), it would essentially rewrite copyright law, allowing parties to traffic in future rights. *See Milne*, 430 F.3d at 1047 (clarifying that Congress intended to protect original grantees like DC by "prohibit[ing] a new grant of rights terminated by statute until after the effective date of termination—to avoid trafficking in future interests" by third parties).

### *Third Claim* ORDER

DC argues it is "entitled to summary judgment on its Third Claim, which is pled in the alternative. (Mot. at 23.) The gist of this claim is that "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (I) purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective termination date in 2013, and (ii) barring the Shusters from making any deal with DC without Toberoff's and the Siegels' consent." (Reply at 10.)

Section 304(c)(6)(D) provides:
A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further

grant may be made between the author or [his heirs] and the original grantee or [its successor], after the notice of termination has been served….

17 U.S.C. § 304(c)(6)(D).

As DC points out, "Congress described this right in the original grantee's favor as 'in the nature of a right of 'first refusal,''" (Mot at 23) (quoting H.R. REP. NO. 94-1476 at 127). In *Milne*, the Ninth Circuit cited the statutory text and legislative history, and confirmed that § 304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin to a "right of 'first refusal.'" 430 F.3d at 1047.

As discussed above, Defendants do not dispute that they entered into multiple agreements purporting to grant rights covered by a (to be) terminated grant. Defendants merely argue, as they do above, that those agreements are void. (*See* Opp'n at 18.) Given that DC brings this claim in the alternative to its first claim, on which it prevailed, it suffices to note that DC prevails on this claim as well. (*See* Mot at 23-25; Reply at 10-12.)[2]

# ORDER

---

[2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22) (citation omitted). For one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized agreements. That section, moreover, *does* in fact state that a third party grant agreement "is valid only if it is *made* after the effective date of termination." 304(c)(6)(D) (emphasis added). And, finally, it is beyond dispute that the subject agreements at issue here were made well *before* the termination date.

ER-254

## IV. CONCLUSION

As explained above, DC's motion for summary judgment is **GRANTED**.

**SO ORDERED**

August 30, 2012

_____
OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE

# TENTATIVE

# ORDER

19

**EXHIBIT 1**

**30**

MARC TOBEROFF - 9/18/2012

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DC COMICS,                          )
                                    )
             Plaintiff,             )No.
                                    )CV-10-3633 ODW (RZx)
        VS.                         )
                                    )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as      )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an         )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL  )
LARSON, an individual, and   )
DOES 1-10, inclusive,        )
                             )
             Defendants.      )
                             )
             _____)




VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012




Reported by: SHANDA GABRIEL

CSR No. 10094

EXHIBIT 3
93

ER-256

```
 1              Videotaped deposition of MARC TOBEROFF,

 2     taken on behalf of the Plaintiff, at 1999 Avenue of

 3     the Stars, Los Angeles, California, commencing at

 4     9:25 a.m., TUESDAY, SEPTEMBER 18, 2012, before

 5     SHANDA GABRIEL, CSR No. 10094.

 6

 7     APPEARANCES:

 8     FOR THE PLAINTIFF:

 9              O'MELVENY & MYERS LLP

10              BY:  DANIEL M. PETROCELLI, ESQ.

11                  JASON TOKORO, ESQ.

12              1999 Avenue of the Stars

13              7th Floor

14              Los Angeles, California  90067-6035

15              (310) 553-6700

16                                                        09:25:49

       FOR THE TOBEROFF ENTITY DEFENDANTS and MARC
17     TOBEROFF:                                          09:25:49

18
                KENDALL BRILL & KLIEGER LLP
19
                BY:  RICHARD B. KENDALL, ESQ.
20
                10100 Santa Monica Boulevard
21
                Suite 1725
22
                Los Angeles, California 90067
23
                (310) 556-2700
24

25     ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER
```

Case 2:10-cv-03633-ODW-RZ Document 493-1 Filed 09/21/12 Page 87 of 430 Page ID #:30292
Case 2:13-57245 03/25/2013 ID: 8558472 DktEntry: 10-2 Page: 251 of 312 Page ID

MARC TOBEROFF - 9/18/2012

Page 3

```
 1
                         I N D E X
 2

 3    WITNESS              EXAMINATION                 PAGE

 4    MARC TOBEROFF        (BY MR. PETROCELLI)           6

 5

 6

 7             E X H I B I T S

 8    NO.             PAGE        DESCRIPTION

 9    Exhibit 100     120         Incoming/Outgoing Call
                                  Register
10
      Exhibit 101     127         E-mail dated November 17,
11                                2001 to Michael from Marc
                                  Toberoff
12
      Exhibit 102     152         Renner, Otto Pre-bill
13                                worksheet

14    Exhibit 103     266         October 3, 2004 letter to
                                  Joanne and Laura Siegel
15                                re: Engagement for
                                  Professional Services
16
      Exhibit 104     287         Incoming/Outgoing Call
17                                Register

18    Exhibit 105     303         July 11, 2003 letter to
                                  Michael from Laura
19
      Exhibit 106     304         July 5, 2003 Fax
20                                Transmittal to Marc
                                  Toberoff from Laura Siegel
21                                Larson

22    Exhibit 107     304         July 8, 2003 Fax
                                  Transmittal to Marc
23                                Toberoff from Laura Siegel
                                  Larson
24

25
```

Case 2:10-cv-03633-ODW-RZ Document 493-12 Filed 09/21/12 Page 89 of 430 Page ID #:30293

```
 1                 I N D E X (CONTINUED)

 2

 3            PREVIOUSLY MARKED EXHIBITS

 4            EXHIBIT NUMBER      PAGE
                     9            99
 5                  10            97
                    11           246
 6                  13           225
                    20           262
 7                  21           262
                    60           281
 8                  61           285
                    75           209
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA;

 2              TUESDAY, SEPTEMBER 18, 2012

 3                    9:25 A.M.

 4

 5         THE REPORTER:  I am making the following

 6    statements pursuant to Rule 30(b)(5) of the Federal

 7    Rules of Civil Procedure:

 8         My name is Shanda Gabriel, C.S.R. 10094,

 9    the videographer is Fritz Sperberg, both contracted

10    by Merrill Corporation, 20750 Ventura Boulevard,

11    Suite 205, Woodland Hills, California.

12         Today's date is September 18, 2012, the

13    time is 9:25 a.m. and this deposition is being held

14    at 1999 Avenue of the Stars, Los Angeles,

15    California.

16         Would counsel please state your appearances

17    and whom you represent:                             09:25:39

18         MR. PETROCELLI:  Daniel Petrocelli for       09:25:39

19    plaintiff, DC Comics.                             09:25:40

20         MR. TOKORO:  Jason Tokoro for plaintiff, DC  09:25:42

21    Comics.                                           09:25:44

22         MR. KENDALL:  Richard Kendall on behalf of   09:25:44

23    the Toberoff entity defendants and Marc Toberoff. 09:25:47

24         THE REPORTER:  The witness is Marc

25    Toberoff.
```

MARC   TOBEROFF - 9/18/2012

```
 1              Would you please raise your right hand to

 2      be sworn in.

 3                      MARC TOBEROFF,

 4              having been first duly sworn, was

 5              examined and testified as follows:

 6

 7                      EXAMINATION

 8      BY MR. PETROCELLI:

 9         Q.  I will address you as Mr. Toberoff for the      09:26:02

10      purpose of the deposition, if that's all right with   09:26:06

11      you.                                                  09:26:08

12         A.  I won't be offended.                           09:26:08

13         Q.  Can you tell us what your educational          09:26:11

14      background is?                                        09:26:15

15         A.  I went to -- starting with what, college?      09:26:16

16         Q.  Yeah.                                          09:26:16

17         A.  I went to McGill University, and then in my    09:26:22

18      third year I transferred to Princeton, and then I    09:26:28

19      didn't -- I missed my girlfriend, essentially, and   09:26:37

20      transferred -- decided to go back to McGill and      09:26:41

21      graduated from McGill after being at Princeton, I    09:26:45

22      think, for -- between a half a year and a year.  I'm  09:26:47

23      not sure.                                             09:26:51

24         Q.  What year did you graduate?                    09:26:51

25         A.  In 1977.                                       09:26:53
```

**EXHIBIT 3**
98

**ER-261**

Case 2:10-cv-03633-ODW-RZ Document 493-17 Filed 09/21/12 Page 327 of 430 Page ID #:30532
Case 2:13-57245 03/25/2013 ID: 8558472 DktEntry: 10-2 Page 255 of 312

MARC TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | they worked. | 16:33:43 |
| 2 | Q. Were you aware that the earliest year in | 16:33:45 |
| 3 | which the termination notice could be served was in | 16:33:48 |
| 4 | 2003? | 16:33:51 |
| 5 | A. I don't have a specific recollection, but I | 16:33:53 |
| 6 | believe that I was aware of that. When I signed | 16:33:56 |
| 7 | Exhibit 10? | 16:34:00 |
| 8 | Q. Correct. | 16:34:01 |
| 9 | A. It's easier if you say 2001 agreement. | 16:34:01 |
| 10 | Q. Okay. When you signed the 2001 agreement, | 16:34:07 |
| 11 | which is Exhibit 10, you were generally aware that | 16:34:11 |
| 12 | the termination window for the Shusters opened up in | 16:34:14 |
| 13 | 2003? | 16:34:17 |
| 14 | A. I believe I was aware of that. | 16:34:17 |
| 15 | Q. I want to ask you about Superboy as it | 16:34:35 |
| 16 | relates to these agreements so we can focus your | 16:34:38 |
| 17 | attention on that, okay? | 16:34:44 |
| 18 | In the 2001 agreement, Exhibit 10, as | 16:34:49 |
| 19 | you'll see in the second paragraph, there's a | 16:34:52 |
| 20 | reference to Superboy in broadly describing what the | 16:34:53 |
| 21 | rights shall include. | 16:35:02 |
| 22 | Do you see that? | 16:35:08 |
| 23 | A. Yes. | 16:35:08 |
| 24 | Q. And then in the 2003 agreement, that's | 16:35:09 |
| 25 | Exhibit 13, there's no reference to Superboy, | 16:35:22 |

Case 2:10-cv-03633-ODW-RZ Document 493-2 Filed 09/21/12 Page 328 of 430 Page ID
#:30533
Case 2:13-57245 03/25/2013 ID: 8558472 DktEntry: 10-2 Page 256 of 312

MARC TOBEROFF - 9/18/2012

Page 244

```
 1    correct?                                              16:35:25

 2         A.   Nor any of those other things, correct.     16:35:30

 3         Q.   Right.                                       16:35:32

 4              Was -- was it your intention as of the time 16:35:33

 5    you executed Exhibit 13 that it not encompass         16:35:38

 6    Superboy as a separate copyrightable property.        16:35:48

 7              MR. KENDALL:  I'm just going to caution you  16:35:52

 8    as to your work product and -- at that time.          16:35:56

 9              If you consider that to be work product, we 16:36:02

10    may want to have a discussion outside -- off the      16:36:04

11    record about that.  But if you're comfortable         16:36:08

12    asking -- answering that question, feel free.         16:36:11

13              THE WITNESS:  I don't believe this --       16:36:15

14    that -- that implicates work product because I don't  16:36:17

15    believe that the conclusion you've drawn is correct.  16:36:25

16              In one you have a -- and I would need to    16:36:27

17    explain this.                                         16:36:33

18              In Exhibit 10, 2001 PPC agreement, you have 16:36:34

19    a -- an attempt to list, without limitation, some of  16:36:38

20    the elements of Superman.  In looking at that now,    16:36:42

21    particularly Mr. Mxyztplk, however you pronounce      16:36:46

22    that name, I don't even know that character, I        16:36:50

23    believe these characters came off of language in the  16:36:53

24    Siegel termination that -- that was available on the  16:36:58

25    Internet.  And that I -- in an effort to be           16:37:00
```

| | | |
|---|---|---|
| 1 | complete, that was thrown into the Exhibit 10 2001 | 16:37:07 |
| 2 | agreement. | 16:37:13 |
| 3 | In the 2003 agreement, I don't believe | 16:37:15 |
| 4 | there was an intent to exclude or include Superman. | 16:37:19 |
| 5 | I just believe -- | 16:37:29 |
| 6 | BY MR. PETROCELLI: | 16:37:30 |
| 7 | Q. You meant Superboy? | 16:37:30 |
| 8 | A. Superboy. I just believe there wasn't an | 16:37:31 |
| 9 | intent to list the elements that were listed in the | 16:37:34 |
| 10 | 2001 agreement. | 16:37:37 |
| 11 | Q. In 2000- -- | 16:37:40 |
| 12 | A. I believe too much is being read into that. | 16:37:42 |
| 13 | Q. In 2003, did you, in entering into Exhibit | 16:37:44 |
| 14 | 13, have the view that the Shusters had a right to | 16:37:50 |
| 15 | terminate with respect to Superboy, as well as | 16:37:54 |
| 16 | Superman? | 16:37:57 |
| 17 | MR. KENDALL: Calls for work product. | 16:38:00 |
| 18 | THE WITNESS: That would be work product | 16:38:08 |
| 19 | but it's -- it's moot because I can't pin down -- | 16:38:09 |
| 20 | well, maybe I could pin it down. | 16:38:27 |
| 21 | MR. KENDALL: I think you have to be | 16:38:36 |
| 22 | careful not to think aloud when you're talking about | 16:38:38 |
| 23 | privileged material. | 16:38:40 |
| 24 | THE WITNESS: Okay. Okay. It's true. So | 16:38:41 |
| 25 | what was the question? | 16:39:04 |

| | |
|---|---|
| 1 | Q. My question was the first time that a | 17:16:46 |
| 2 | requirement for the consent of another to consummate | 17:16:48 |
| 3 | a settlement was 2008, after the 2004 agreements? | 17:16:51 |
| 4 | A. With respect to the Siegels and Shusters? | 17:16:57 |
| 5 | Q. Yes. Correct. | 17:16:57 |
| 6 | A. Yes. | 17:16:57 |
| 7 | Q. Is the consent -- | 17:17:01 |
| 8 | A. But I would answer that more specifically, | 17:17:10 |
| 9 | it's not the consent of another. You're technically | 17:17:13 |
| 10 | correct, but it's basically mutual consent of the | 17:17:15 |
| 11 | Siegels and Shusters to a settlement of their | 17:17:19 |
| 12 | termination interests. | 17:17:21 |
| 13 | Q. Did they receive -- | 17:17:22 |
| 14 | A. Not my consent. | 17:17:25 |
| 15 | Q. Your consent is not required at all? | 17:17:28 |
| 16 | A. Absolutely not. | 17:17:30 |
| 17 | Q. And not any entity associated with you? | 17:17:31 |
| 18 | A. Correct. | 17:17:34 |
| 19 | Q. Okay. And no third party, it's just the | 17:17:34 |
| 20 | Siegels and the Shusters? | 17:17:39 |
| 21 | A. Correct. | 17:17:39 |
| 22 | Q. Okay. Is -- is it both Mark -- | 17:17:40 |
| 23 | A. And -- and -- | 17:17:51 |
| 24 | Q. -- Warren Peary and Jean? | 17:17:53 |
| 25 | A. I was just about to say that the -- the | 17:17:54 |

MARC TOBEROFF - 9/18/2012

Page 270

| | |
|---|---|
| 1 | consent, I believe, is the executor. | 17:17:58 |
| 2 | Q. On the Shuster side? | 17:18:04 |
| 3 | A. I believe so. | 17:18:05 |
| 4 | Q. And on the Siegel side? | 17:18:08 |
| 5 | A. I'm not 100 percent certain. | 17:18:09 |
| 6 | On the Siegel side it was Laura and Joanne. | 17:18:11 |
| 7 | Q. Now it's just Laura? | 17:18:14 |
| 8 | A. Correct. | 17:18:15 |
| 9 | Q. Did -- you said that there was a conflict | 17:18:19 |
| 10 | waiver signed by Peary in or about 2008, I believe? | 17:18:24 |
| 11 | A. Yes. | 17:18:34 |
| 12 | Q. What prompted that? | 17:18:35 |
| 13 | A. The consent agreement. | 17:18:35 |
| 14 | MR. KENDALL: Just a minute. I think we're | 17:18:37 |
| 15 | getting into a slightly different area. | 17:18:38 |
| 16 | So, again, I just want to caution you on | 17:18:40 |
| 17 | privilege. And I assume we have the same | 17:18:43 |
| 18 | understanding, that it will not be a waiver, so | 17:18:47 |
| 19 | you'll just have to make a determination whether | 17:18:49 |
| 20 | you -- you want to provide this information since it | 17:18:51 |
| 21 | may be privileged. | 17:18:55 |
| 22 | MR. PETROCELLI: I believe he answered the | 17:18:56 |
| 23 | question. He said "the consent agreement." | 17:18:58 |
| 24 | MR. KENDALL: So he did, but that's because | 17:19:06 |
| 25 | he didn't give me an opportunity to object first and | 17:19:07 |

Page 271

| | |
|---|---|
| 1   give him a caution first. | 17:19:10 |
| 2   BY MR. PETROCELLI: | 17:19:10 |
| 3       Q.  Do you know whether the Shusters received | 17:19:12 |
| 4   independent legal advice regarding the conflict | 17:19:16 |
| 5   waiver or the consent agreement? | 17:19:22 |
| 6       A.  I don't know whether they did or did not. | 17:19:23 |
| 7       Q.  And do you know whether the Siegels did? | 17:19:27 |
| 8       A.  I believe the Siegels did. | 17:19:32 |
| 9       Q.  Do you know the name of the attorney? | 17:19:34 |
| 10      A.  George Zadorozny. | 17:19:35 |
| 11      Q.  George Zadorozny? | 17:19:40 |
| 12      A.  And I don't -- they may have -- I know that | 17:19:42 |
| 13  whenever it came to something like that, they would | 17:19:46 |
| 14  run it by George Zadorozny and/or George Zadorozny | 17:19:48 |
| 15  and Arthur Levine or just George Zadorozny. | 17:19:54 |
| 16      Q.  Did you send copies of the consent | 17:19:58 |
| 17  agreement to George or Arthur? | 17:20:00 |
| 18      A.  No, that wasn't the practice. | 17:20:06 |
| 19      MR. KENDALL:  Marc, take your hand away | 17:20:08 |
| 20  from your face because it interferes with the | 17:20:09 |
| 21  projection of your voice. | 17:20:12 |
| 22      THE WITNESS:  Okay. | 17:20:13 |
| 23  BY MR. PETROCELLI: | 17:20:13 |
| 24      Q.  It also detracts from your -- your | 17:20:16 |
| 25  appearance. | 17:20:18 |

| | | |
|---|---|---|
| 1 | A.  Sophisticated demeanor. | 17:20:18 |
| 2 | Q.  I know you said that Zadorozny would be | 17:20:23 |
| 3 | involved in certain matters. | 17:20:28 |
| 4 | A.  "Zadorozny." | 17:20:30 |
| 5 | Q.  "Zadorozny." | 17:20:31 |
| 6 | A.  Yeah. | 17:20:31 |
| 7 | Q.  Do you know for certain if he was involved | 17:20:34 |
| 8 | in the -- for the Siegels with respect to the 2008 | 17:20:37 |
| 9 | consent agreement? | 17:20:45 |
| 10 | A.  Not 100 percent certain, but that's my | 17:20:46 |
| 11 | belief. | 17:20:50 |
| 12 | Q.  Did the Siegels -- | 17:20:53 |
| 13 | A.  Put it another way, I would be very | 17:20:53 |
| 14 | surprised if he was not. | 17:20:55 |
| 15 | Q.  Did the Siegels also sign a conflict waiver | 17:20:56 |
| 16 | in 2008? | 17:20:59 |
| 17 | A.  Yes. | 17:21:00 |
| 18 | Q.  Do you know if he was involved in that | 17:21:00 |
| 19 | document? | 17:21:01 |
| 20 | A.  I thought you just asked me that. | 17:21:05 |
| 21 | Q.  I asked you about the consent agreement. | 17:21:07 |
| 22 | A.  Oh, okay. | 17:21:09 |
| 23 | Q.  Did you -- | 17:21:10 |
| 24 | A.  Two separate documents, yeah. | 17:21:11 |
| 25 | So consent agreement, it would be the same | 17:21:12 |

| | |
|---|---|
| 1   answer for both. | 17:21:14 |
| 2       Q.  There are two documents that the Siegels | 17:21:16 |
| 3   signed in 2008? | 17:21:18 |
| 4       A.  Yes. | 17:21:19 |
| 5       Q.  Okay. | 17:21:19 |
| 6       A.  And -- and now that you ask it that way, I | 17:21:19 |
| 7   have even -- I -- I think it's even -- it's even | 17:21:23 |
| 8   more likely that Zadorozny was involved with the -- | 17:21:29 |
| 9   with respect to the consent agreement, yes, and | 17:21:35 |
| 10  since there were two agreements, including a | 17:21:39 |
| 11  conflict waiver -- a conflict waiver and a consent | 17:21:43 |
| 12  agreement, I believe he was involved in reviewing | 17:21:46 |
| 13  those. | 17:21:47 |
| 14      Q.  And Zadorozny was involved in reviewing the | 17:21:48 |
| 15  2004 retainer agreement with Joanne and Laura? | 17:21:51 |
| 16      A.  Yes. | 17:21:55 |
| 17      Q.  Why did you date the engagement for | 17:22:00 |
| 18  professional services that you signed with Warren in | 17:22:05 |
| 19  2004 as of November 23, 2001? | 17:22:08 |
| 20      A.  Two reasons.  One, I wanted to make it | 17:22:13 |
| 21  clear that this agreement was replacing the PPC | 17:22:15 |
| 22  agreements and two, I wanted -- it was -- it was | 17:22:19 |
| 23  like an assertion of privilege over our | 17:22:27 |
| 24  relationship, attorney-client relationship | 17:22:33 |
| 25  commencing at the latest on November 23rd, 2001 when | 17:22:37 |

MARC TOBEROFF - 9/18/2012

Page 274

| | | |
|---|---|---|
| 1 | we signed the PPC agreement. | 17:22:42 |
| 2 | Q.  When you signed the -- excuse me.  Are you | 17:22:45 |
| 3 | a signatory to the consent agreement? | 17:22:50 |
| 4 | A.  Only as to approval as to form. | 17:22:52 |
| 5 | Q.  Okay.  Did you receive independent legal | 17:22:59 |
| 6 | advice?  Did you receive legal advice regarding that | 17:23:03 |
| 7 | subject whether the Siegels and Shusters could sign | 17:23:06 |
| 8 | a consent agreement without violating some law, | 17:23:14 |
| 9 | including the copyright statute? | 17:23:19 |
| 10 | MR. KENDALL:  So that may call for | 17:23:21 |
| 11 | privileged information given the specificity of the | 17:23:23 |
| 12 | question.  I just caution you not to reveal any | 17:23:26 |
| 13 | attorney-client communications you may have had with | 17:23:31 |
| 14 | anyone who was acting as your counsel or providing | 17:23:34 |
| 15 | legal advice. | 17:23:37 |
| 16 | THE WITNESS:  But I can answer outside | 17:23:46 |
| 17 | of -- I can answer whether or not -- revealing | 17:23:53 |
| 18 | whether or not I did is not -- | 17:23:56 |
| 19 | MR. KENDALL:  If the answer is no, then | 17:23:57 |
| 20 | you're not revealing any attorney-client | 17:23:59 |
| 21 | communication.  If the answer is yes, then you might | 17:24:01 |
| 22 | be, and so then you have to make a judgment as to | 17:24:06 |
| 23 | whether you wish to reveal that. | 17:24:08 |
| 24 | THE WITNESS:  Not -- not any -- not outside | 17:24:12 |
| 25 | of my firm. | 17:24:15 |

```
 1                      DECLARATION

 2

 3

 4

 5

 6          I hereby declare I am the deponent in the

 7     within matter; that I have read the foregoing

 8     deposition and know the contents thereof, and I

 9     declare that the same is true of my knowledge except

10     as to the matters which are therein stated upon my

11     information or belief, and as to those matters, I

12     believe it to be true.

13          I declare under the penalties of perjury of

14     the State of California that the foregoing is true

15     and correct.

16          Executed on the _____ day of

17     _____ 2012, at

18     _____,

19     California.

20

21

22

23

24     _____

25                      MARC TOBEROFF
```

EXHIBIT 3
406

ER-271

```
 1   STATE OF CALIFORNIA     )
                             )  ss.
 2   COUNTY OF LOS ANGELES   )

 3

 4         I, Shanda Gabriel, Certified Shorthand

 5   Reporter, Certificate No. 10094, for the State of

 6   California, hereby certify:

 7         I am the deposition officer that

 8   stenographically recorded the testimony in the

 9   foregoing deposition;

10         Prior to being examined the witness was by

11   me first duly sworn;

12         The foregoing transcript is a true record

13   of the testimony given.

14         Before completion of the deposition, review

15   of the transcript [X] was [] was not requested.  If

16   requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   are appended hereto.

19

20   Dated _____.

21

22                   _____

                              Shanda Gabriel
23                            CSR 10094

24

25
```

# EXHIBIT 5



Publishers of
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW YORK COMICS

January 23, 1940

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

In looking over the daily releases by Boring, I must say that there is a decided improvement. If the quality is kept up, I'm inclined to believe that we will not have to worry about the art. Working together with Joe, I think, will produce the necessary quality.

Received the Sunday release and noticed one material mistake in the continuity. I note that you say that a hemophiliac is a person with lack of blood. If you will consult the dictionary, you will note the definition that "hemophilia is a tendency to profuse bleeding even from slight wounds". We have notified McClure to make the change.

I wish you would let me know how long the present continuity for the Sunday release will run. From what I've seen of this release it's not so hot. Has the next Sunday continuity been written? If so, please send me a copy immediately, so that we may be in a position to edit same.

I am enclosing a copy of a letter from the St. Louis Dispatch, which is self-explanatory. I must inform you that at the present time there seems to be a concerted drive against movies and comic books which parent-teachers groups and womens clubs claim are harmful for children. I know that there is definite objection to the Dick Tracy serial in the movies. We must point out our editorial policy with a view of obtaining the approval of parents, while still not sacrificing the adventure and the thrill Superman has always brought to children.

I am also enclosing a synopsis which we think is suitable for a Superman release. After reading it I am sure that you can elaborate in detail action where necessary. As soon as you have completed playing out or writing the detailed panel scripts for this story, we would like to have it before it goes into work. Let me know what you think of this synopsis.

I have just received the first Superman release which will be inserted in Action, May issue. I've got to get at least one more before the month is over, which is just two more days. From your promised five releases a month I'm down to one. For anyone to have fallen down that badly, you are certainly a Superman in reverse. Now get behind these magazine releases and by the end of next month I've got to have five in order not to be delayed on the Superman quarterly.

I'm returning the letter from Cassidy. Let me know as soon as he gets

000002143

- 20 -

LSL ER 448

EXHIBIT 5
410

Mr. Jerome Siegel          -2-          January 29, 1940

This last Saturday we signed with Becker Products for a radio program. The
first broadcast will be February 12th from 5:15 to 5:30. The New York station
is WOR and WBR in Buffalo. These stations are the nearest to Cleveland. This
is only a 10 station hookup covering the New England stations, and as I've
written you before, the cost of producing the program and the amount we get
from them show us a net loss of about $700.00 a week without overhead. However,
if the program is good, we may be able to sell other stations and sponsors.

We have shown you that we're a live organization and we will get you some place,
providing you cooperate by getting your stuff in on time and putting the best
possible quality in the releases.

Best regards to Joe and have him drop me a line.

                                 Very sincerely yours,

                                 J. S. LIEBOWITZ

JSL:MH

 

000002144

-21-

LSL ER 449

**EXHIBIT 5**
**411**

ER-275

# EXHIBIT 6



**DETECTIVE COMICS**
INCORPORATED

Published by
DETECTIVE COMICS
MORE FUN COMICS
New ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

480 LEXINGTON AVE
NEW YORK, N. Y.

January Twenty Second
1 9 4 0

Dear Jerry:

Returned herewith are Joe's sketches for the next [...] After we have marked [...] okay will be okay, except that we suggest the Thug be grabbing a string of gems from the cat's back instead of a number of [...] on [...] We're trying to get away a little from the excessive use of [...] and knives on the covers, at least. The other two sketches are too much of the same old routine, and also they take SUPERMAN away from the camera instead of toward.

We've been having considerable talk about the daily released on SUPERMAN, and I believe that in sending to you the [...] have you had all the material have before it goes to the syndicate for release. You'll note that a number of queries have been noted on the enclosed proof-sheet for the latest set of released. In my opinion, and in the opinion of the others most vitally interested, the drawing is not nearly as good as it must be if SUPERMAN is going to continue to be a success. In the first place, most of the figures are too small, giving the impression of detail rather than of largeness [...] and that includes Kent and his alter ego SUPERMAN. And in the picture in the second strip in which Kent asks the other guy to the top of the flagpole, the other guy is a dead ringer for Charlie McCarthy. In the third strip, the two running guards look more like western dude boys who have just got their walking papers, and in the third picture of that same strip, Kent's figure leaves a great deal to be desired artistically.

Now for the fourth strip. In the first panel, SUPERMAN'S physique is a bit on the lah-de-dah side; I like particularly his nice fat bottom. His pose in the second picture is reminiscent of certain FLIT ads done by a cartoonist who signs himself "Dr. Seuss."

There is nothing quite so explicit to criticize in the last two strips, so I'll have to speak more generally and simply say that the art work is not up to standard.

000002259

-18-

LSL ER 445

**EXHIBIT 6**
412

ER-277

Now I...

Now, Jerry, I don't write you a piece like this so
you can show it to the artist who's working on the stuff to
prove to him that he's no good. I do write it to you to impress
you with the fact that you must exercise close supervision over
the stuff so that what comes out in the papers will be as good
as anybody else's stuff. You know, we build a feature with
these drawings, and then try to hoodwink publishers with the
idea that what we now give him is just as good —— which it is right.

Between you, you and Joe ought to be able to tell
what's good and what isn't; and you ought to insist that you
get nothing but good stuff. If one particular man can't
deliver, then it's a case of trying to find one who can. Your
present and future, as you probably realize, are closely aligned
with the success of SUPERMAN. If you treat your feature well, it'll
probably take care of you for a long time; on the other hand,
kick him around and he'll let you down —— and you'll find that
you're up against a mighty tough proposition trying to sell some-
body on another idea. You'd find it tougher, I daresay, to sell
another idea under these conditions than if you'd never sold
another idea.

Believe me, Jerry, it's absolutely imperative that you
tighten up on the stuff from all angles. Watch it very closely,
and let's see a decided improvement on the next batch. The
improvement will have to be quick, for this is no time to experiment
when you've got a feature that's going good.

Best regards,

[signature]

000002260

—19—

LSL ER 446

EXHIBIT 6
413

ER-278

Case: 12-57245 02/25/2013 ID: 8528472 DktEntry: 10-2 Page: 272 of 312

# EXHIBIT 7

PLAZA 3-0741



**DETECTIVE COMICS**

*M. Ex. 24*

Publishers of
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

January 25, 1940

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

I received your last letter in which you enclosed the clipping from the Plain Dealer. I can imagine how proud you and Joe must have been to see yourself in print in your home town.

In this interview there seems to have been a lot of misstatements. One in particular relating to the manufacture of Superman sweaters and emblems. Also, a remark regarding movie and radio. On the radio proposition, we expect to sign any day with Hecker Flour Co. - we to pay the cost of producing the program and they pay so much per station. The net result of this transaction will show us a loss of $600, every week, so at the present time this is nothing to gloat over. Our job, in order to get out of this hole, will be to sell other radio stations from record transcriptions which we make from the original broadcast. This will not come for a long time, depending of course whether the present program is successful.

We also plan to go after various licenses. In connection with this we have set up a publicity department which is to issue all information regarding Superman. It is therefore important that you give no further interviews. You might have mentioned in your interview that the first ones who saw something in the Superman strip was Detective Comics, Inc., who bought all rights to it. You might have also said that you have a very satisfactory arrangement with Detective Comics, Inc. as compensation for the transfer of all your rights, so hereafter we forbid you to grant any interviews relating to Superman and its development. Please refer all inquiries to our office. You can readily see the harm that will be done if things are not handled from a central source and if statements are issued which decade conflict with one another.

I notice that you are quite enthusiastic about Mr. Dobingis work. When we received the proofs of the daily that he did, we certainly were shocked at the many shortcomings. These criticisms have already been conveyed to you by Whit. I cannot reiterate too strongly the need for painstaking work which is necessary on the Superman daily, Sunday and magazine pages. You can see from our manner of going about things now, such as criticizing and approving the scripts, that we will not tolerate or accept slipshod work. I know that you can do and that you can influence Joe to do a very good job on this strip.

Whit sent you an okayed cover design. This must be in by the end of this week. Tell Joe that when he sketches covers to bear in mind that Superman must always appear the largest figure and a front view.

It is now the 23rd of the month and I have yet to receive any releases on Superman which

000002141

LSL ER 434

-11-

EXHIBIT 7
414

ER-280

Mr. Jerome Siegel                                                    January 25, 1940

is needed for the May issue of Action. Let me know by return air mail just when this is coming in. The Syndicate has also called saying that they are right up to dead-line. Haven't you turned out any Sunday or daily strips since you left here? Please do not forget that all copy must clear through our office. How long does the present continuity on the dailies continue and are you working on any new scripts? You've got to give us plenty of time for okaying so get busy.

I have not received a copy of the detailed Superman continuity which has been recently okayed by us. We are going over this script with a fine tooth comb. Please type your synopsis double spaced and on one side of the paper, for leaving your work with zest and ambition to improve and forget about book rights, movie rights and all other dreams. I will let you know as soon as things happen. After all, you must realize that we have a bigger stake in it than you have and we will take care of things in the proper manner.

                                                    Very sincerely yours,

                                                    J. S. LIEBOWITZ

JSL:MR

P.S. We're sending you a couple of Superman #4 preview copies. Also enclosing a check for $104.00.

     We notice in the last daily release that Clark Kent is flying in the air not dressed in Superman costume. We think it's an unsafe policy to show him without the Superman costume when performing any of his feats.

000002142

-12-

LSL ER 435

EXHIBIT 7
415

ER-281

# EXHIBIT 8

# DETECTIVE COMICS
### INCORPORATED

Publishers of
S U P E R M A N
ACTION COMICS
DETECTIVE COMICS
ADVENTURE COMICS
MORE FUN COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

February 8, 1940

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

I hope that everything is now on an even keel with Cassidy and Boring at work. Also, that you have forgotten about our unpleasant episode of last week. From now on, I hope we will only have nice things to write to each other.

I am enclosing a copy of a letter which was received by McClure from the New York Post, which is self-explanatory. Many other people have had the same criticism lately. Just this morning Mr. Waldo called me about the same matter. It is very important that Joe do the entire Superman figure as there seems to be no one who is able to copy his style and the facial expression of Superman. I hope that you will see to it that this is done and that the quality of the rest of the strip will continually improve.

I like the present arrangement on the editing of the strip and I think you do too, as it gives us an opportunity to catch any mistakes. Waldo knows his business and is very anxious to cooperate with you. We are, however, encountering trouble and delay on your other continuities. For example, the man who draws the Spy strip has now been delayed an entire week. He is unusually slow as it is, to delay him another week holds up the production of our magazine. You should try and get ahead.

I have also received a letter from the syndicate in which they insist that you catch up with the daily and the Sunday strips, as it is causing them a lot of needless expense and delay. I think, however, from now on these conditions will be remedied.

With kindest regards to all, I am

Sincerely yours,

J. S. Liebowitz

JSL:MN

P.S.: The syndicate has just called up stating that they received a contract from a California paper. They want to start some time in May and the syndicate is therefore anxious to know how long the present daily continuity will run — also the Sunday. I have asked you once before to give me this information —
Will you please be good enough by return mail to let me know the

000002261

- 13 -

LSL ER 437

EXHIBIT 8
416

ER-283

# EXHIBIT 9

PLAZA 3-0741

# DETECTIVE COMICS

Publishers of
S U P E R M A N
ACTION COMICS
DETECTIVE COMICS
ADVENTURE COMICS
MORE FUN COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

May 2, 1940

Mr. J. Siegel,
Box 1808,
University Center Station,
Cleveland, Ohio.

Dear Jerry,:

I am enclosing a check for $520.00 for the two Superman releases lately received and a check to yourself for the Spectre release.

By this time you no doubt have received the Syndicate check. This is quite a substantial sum and I have every hope that these will continue to grow, provided however, you pay strict attention to the plotting and the art work on the Superman. Incidently, I must say that the last two releases were not at all to our liking. This may be altogether due to your method of working, which is on a piece work basis in factory style. We've got to have tailor made releases. The fact that you pay Cassidy on a piece work basis certainly does not allow the man to take the pains necessary to plan and draw. Naturally, if he is to earn a good living, he has to bat the stuff out no matter what results. I think your income at present is large enough to warrant your taking a little additional expense which will prove to be a very wise investment, if we are to perpetuate the Superman strip. Pay the man a little more so that he will be able to allow himself a little more time and give it better quality.

The new artist is still in the process of working on his first release. We have seen some of the work and feel assured that it will definitely be an improvement over what we have been getting. I cannot at the present time figure out the cost, but as soon as the releases are finished I will write you.

As to your continuities, there is no need to go into it in detail again after our long telephone conversation. While in your last letter you seem to be imbued with a new spirit to raise the standard of the material, I am afraid that you will in a few weeks lapse into your old way of doing things. I hope that you will see to it that this does not happen.

Incidently, the Syndicate thinks that the current daily releases are absolutely the worse that they have ever read. They criticize our editorial supervision and you know that we are not at fault in this respect. So put on your thinking cap and get us some real good stuff.

While we are in the process of negotiations with several

-14-

LSL ER 439

EXHIBIT 9
417

ER-285

Mr. J. Siegel         :-         May 2, 1940

licensees, none of them have materialized as yet. I believe I told
you that the picture rights have been sold to Republic for release
as a 13 part serial. The price we got was $8,000. and while this sum
may seem insignificant we have gone ahead feeling assured that all the
publicity we will receive as a result of this venture would aid us
materially in building up the radio end and promoting the sale of
licensed merchandise.

        Incidently, Macy's is building for their Thanksgiving
Day Parade a figure of Superman 4-1/2 stories high and it will cost
approximately $15,000. I think that this will induce you to come into
town for the parade.

        This morning we received the decision from the Court
of Appeals on the case which Fox took to a higher court. The verdict
was altogether in our favor and the decision in the lower court was sus-
tained. We are now in the process of examining competitive magazines
for any infringements of Superman, whether in costume or in deeds.

        We have received no synopsis from you lately. Better
hurry up so that we will have sufficient time for comment. Please let me
hear from you as to what you plan to do to improve the art work.

        Regards from everyone here to yourself, Joe and Mrs.
Siegel.

                Sincerely,

JSL:MN                 J. S. LIEBOWITZ

P.S. The St. Louis Post Dispatch would like you to do a scene such as is
described on the attached sheet. They plan to use this as part of a
promotion. When you have this ready send it on to me so that I can forward
it to them.

- 15 -

LSL ER 440

EXHIBIT 9
418

ER-286

Case 13-57245, 03/25/2013, ID: 8558472, DktEntry: 10-2, Page 280 of 312

# EXHIBIT 10

From:
Jerry Siegel,
3402 Glendon Road,
University Heights, Ohio.

Page One

SUPERBOY

I.

1. (Panel occupies full page. Contains the title, SUPERBOY, the by-line, By Jerry
   Siegel and Joe Shuster, a script box, and an illustration showing SUPERBOY leap-
   ing high over the city at great speed alongside SUPERMAN)

   Script Box:   It has to happen!   So many faithful followers of today's leading
                 adventure comic strip, SUPERMAN, wrote in demanding the adventures
                 of Clark Kent as a youth that the creation of this newest and
                 most promising magazine comic strip character was inevitable! And
                 so here he is at last...the answer to your requests...America's
                 outstanding boy hero:   SUPERBOY!!

   •••••••••••••••••••••••••••••••••••••

II.

1.  Caption:   You will recall that as the distant planet, Krypton, burst into frag-
               ments, superscientist Jor-L and his wife Lora, launched their infant
               son toward the planet Earth in a trial space-ship...!

    (SCENE:    Shows the space-ship hurtling up from the surface of Krypton into
               space as the planet blows to bits)

2.  Caption:   As the solitary vessel hurtled thru interplanetary space, it nar-
               rowly dodged oblivion in the form of comets, meteors, and other
               stellar obstacles....

    (SCENE: illustrates)

3.  Caption:   Alighting upon Earth, it burst into flames.  Its tiny passenger
               was saved from a fiery death by a passing motorist....

    Man(lifting child from flaming vessel in horror):  Why — it's a BABY!

4.  Caption:   He immediately turned it over to the officials of the Crestwood
               Orphanage....

    Man:   You'll see that it's — er — well taken care of?

    Stout Woman Attendant in Charge:   As well as can be expected!

EXHIBIT 10
419

000000478
ER-288

SUPERBOY (Release No. One)                                         Page Two

5.    Caption:   But the motorist — Charles Kent — finds he can't forget the infant....

      Charles(at home,in armchair,to wife):   I can't get that little rascal out of

                              my mind, Mary!

      Mary Kent(his wife):   Then why not adopt him, Charles?  You know we've always

                              wanted a son of our own!

6.    Caption:   Meanwhile — at the Crestwood Orphanage.....

      Woman Attendant(running from room into hall,screaming):   EEEEeeee!

      Doctor:    Tell me, Nurse!  What is it?

7.    Woman Attendant(pointing in terror at room):   In the nursery, Doctor!  IN THERE!

      Doctor:    What can be ailing you?

8.    Doctor(entering, pince-nes glasses falling from nose in amazement as sights

          baby lifting armchair overhead in one hand):   ULP!!

      Woman  Attendant(triumphantly):   NOW what do you say!

                ..............................................
                                  III.

1.    Doctor(advancing toward child):   This is amazing — incredible!  A child —

          possessed of such strength!  I still can't believe it!

      Nurse:   Don't go near him, Doctor!

2.    Doctor(as baby drops armchair on his foot):   OUCH!  My foot!

      Nurse:   See!  I warned you!

3.    Caption:   Puzzled at his surroundings, the infant lifts empty metal cribs,

          smashes them together in thoughtful contemplation.....

      Doctor:   He's wrecked the equipment!

      Nurse:    This is TOO MUCH!  I'm going to the Director of the Orphanage!

4.    Director(suspiciously):   A child — smashing up the contents of the nursery?

                        Nurse Jacobs — are you sure you — er — haven't

                        imbibed?

      Nurse(indignantly):   Come see for yourself!

5.    Sound from nursery):   CRASH!

      Director(as he and nurse hurry toward it):   What's THAT?

      Nurse(grimly):   You'll see!

EXHIBIT 10
420

000000479
ER-289

6. Director(amazed to see doctor up on chandalier): Doctor Calvin! What are you doing up there on that chandalier? Come down here at once!

   Doctor(up on chandalier,gasping): At once — right away — but keep that little savage away from me!

7. Director(as Doctor stands besides him): And now — your explanation, please!

   Doctor(pointing to baby playing on floor): That infant threw me up there!

8. Director(heatedly): Pardon my saying so, my dear Doctor Calvin, but I think you're a cockeyed liar! Surely, you don't expect me to BELIEVE that!

   Nurse(shouting): LOOK OUT!

   (SCENE: Baby is waddling toward the director)

   · · · · · · · · · · · · · · · · · · · · · · · · · · ·

   ### IV.

1. Director(as seized, lifted by baby): Hey! Wha —— ?

   Baby: Da!

2. (SCENE: Shows the Director being hurled up toward the chandalier)

3. Director(hanging from chandalier): HELP! Get me down from here!

   Doctor(triumphantly): Still think it's impossible?

4. Director(on floor again, gazing at baby astonished as it whirls crib overhead): Amazing — beyond all belief! This infant actually possesses the strength of many men!

   Nurse: But you've got to get rid of the little monster at once! He'll wreck the establishment! There'll be nothing left of the Orphanage, then where'll WE be!

   Doctor: There's a lot in what the nurse says!

5. Another nurse(coming into room): A Mr. and Mrs. Charles Kent to see you, Director.

   Director: Kent...Kent. Say, that's the fellow who wished this miniature hurricane on us! I'll see him at once.

   Doctor: Do you think he's come to....

   Nurse: If only he HAS!

EXHIBIT 10
421

000000480
ER-290

Page Four

6.  Director(rubbing hands delightedly):   And what can I do for you, please?

    Charles:   Err — we've come about the youngster I brought here.

    Mary:   You see — we'd like to....

7.  Director(holding out pen and form-sheet):   ...adopt the infant? Why, nothing
          could be simpler! Just sign this paper, and he's yours!

    Charles(reaching for pen, jubilantly):   You hear that, Mary?

    Mary:   Oh! — Oh! — OH-HH!!!!

8.  Caption:   Several minutes later, the Kents depart with the newly acquired
          member of their family.....

    Mary(holding child, as they walk toward their car):   Doesn't it seem strange
          that we secured custody of the child so quickly? I always thought
          there was a lot of red tape attached to adopting a child.

    Charles:   So did I. But let's not look a gift horse in the mouth!
          ..............................................

                                V.

1.  Mary(as they drive along, baby asleep in her arms):   Fast asleep! Isn't he
          adorable? I still can't believe our wonderful luck! He's all ours!

    Charles:   The car...we're not moving!

2.  Charles(out of car, looking at it in dismay, wheel is stuck in muddy ditch):   Talk
          about your bad luck! Here we are stuck in a ditch, and miles from a
          service station, or a telephone!

    Mary(out of car, baby left in car):   Here comes an auto. Maybe they'll help!

3.  Charles(as car speeds swiftly by):   They wouldn't stop!

    Mary:   Let's try to push it!

4.  Caption:   Together, husband and wife shove, and pant, and strain — but without
          any luck!

    Charles:   (Puff!) Can't budge it!

    Mary:   I'm exhausted!

5.  Caption:   Within the car...the tiny passenger awakens in the midst of a yawn...

    (SCENE:   Shows the baby awakening, sleepily)

000000481
ER-291

EXHIBIT 10
422

SUPERBOY   (Release No. One)                                              Page Five

6.   Caption:   ...then...clambers out and thoughtfully observes his foster-parents' labor....

     (SCENE: illustrates, baby is unnoticed)

7.   Caption:   The infant acts.  Stepping in, it calmly lifts the auto out of the ditch and sets it back on the road....

     Charles(not noting child):  It's moving!

     Mary(ditto):   We've done it!!

8.   Charles(abruptly noting child holding rear end of car off of road):  Mary — L-LOOK!

     Mary:   I am! — And I still don't believe my eyes!
                    .........................................
                                              VI.

1.   Charles(closeup of the two,gasping):  The baby — lifted the car off the road — with one hand....IMPOSSIBLE!

     Mary:   But — we can't be dreaming — because — we BOTH SAW IT!!

2.   Charles:   Careful, Mary!  Keep away from it!

     Mary(avoiding his restraining hands,approaching child):   Put it down!

     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3.   Caption:   In response to Mary's command, the child obediently lowers the car, then toddles toward her....
     Mary:   You see, it did as I said!
     Charles:   The strength of a dozen elephants — and yet, it still possesses the instincts of a normal child!

4.   Caption:   Shortly after....as they proceed on their way....
     Mary(holding sleeping baby):   See...he's fallen asleep again.
     Charles:   Mary! I'm just beginning to realise! We've a problem child on our hands! And in more ways than one!

5.   Mary:   I see what you mean.  Our boy's extraordinary strength may make him the object of everyone's envy and fear....cause him to become an outcast. We mustn't let THAT happen!
     Charles:   Only one way to safeguard against it.  No one must learn of his super-strength!

000000482

EXHIBIT 10
423
ER-292

6. **Mary:** But how came we train an infant, who doesn't understand a word of English, what to do and what not to do?

   **Charles:** That's up to us to figure out! And somehow, I've a feeling that we'll succeed!

7. **Caption:** That evening....

   **Mary(in home, before fireplace, watching infant playing on floor):** I wonder what his history is, Charles? Where he came from? Where he gets his tremendous strength?

   **Charles:** We may never know, Mary. But one thing we DO know. He's our son, now and forever!

8. **Mary:** Our son — and we haven't even named him!

   **Charles:** You know what name we'd always planned to give our boy — if we ever had one! — Clark!

9. **Mary:** Then —— "Clark" it is!

   **Charles(lifting infant):** You hear that, Clark? Clark Kent! How do you like the sound of your new name?

   **Clark:** Da! Da!

   ●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

   VII.

1. **Caption:** The task of teaching the infant Clark to conceal his tremendous strength proceeds....

   **Mary(working in kitchen, to Clark, as he tries to lift refrigerator):** No, Clark! You mustn't do that! — Or we won't have any nice ice cream for desert!

   (SCENE: Shows question marks over Clark's head)

2. **Charles(to Mary):** Well, how are the lessons in will-power coming along?

   **Mary(discouraged):** I'm very discouraged, Charles. It's hard — but — I think I'm making slight progress. — Answer the doorbell.

   (SCENE: Clark is playing on floor with electric train)

000000483

EXHIBIT 10
424

ER-293

SUPERBOY        (Release No. One)                                    Page Seven

3.   Mrs. Doyle(entering with Mickey, her brattish eight year old son): I've heard
            so much about your adopted child, I just HAD to come and see him. And I've
            brought Mickey along to play with him!

     Mickey:   Aw, who wants to play with a baby?

     Mary:   Mrs. Doyle! I haven't seen you in AGES!

4.   Mrs. Doyle(pinching Clark's cheek):   Cute little fellow! My, how hard his cheeks
            are!

     Charles(whispering to Mary):   Ps-st! Get her away from Clark before she dis-
            covers something!

     Mary(to Mrs. Doyle):   Would you care to come upstairs and see my new sewing-machine!

5.   Mrs. Doyle(as climbs upstairs, blustering back to Mickey as Charles and Mary
            accompany her): Play with Clark, Mickey dear!

     Mickey:   Me play with that infant? Not on your life!

6.   Mickey(when they are alone):   Toy trains! Phooey! I outgrew that long ago!

     (SCENE:   Mickey is kicking the train off the track. Clark grimaces in displeasure)

7.   Mickey(leaning down to Clark,smirking):   Well, diaper-pants! Wottaya say to THAT?

     (SCENE:   Clark's wrath is rising)

8.   (SCENE:   Shows Clark striking up at Mickey with terrific right that knocks him
            off his feet.)
                    ...........................
                            VIII.

1.   Shout:   MA-AAAaaaa!

     Mrs. Doyle(turning,startled,as hears shout):   That's Mickey!

     Mary:   What can be the matter?

2.   Mrs. Doyle(taking Mickey's arm,shaking him):   What happened?

     Mickey(bawling,pointing at black eye):   All I did was kick his train — an' —
            an' he HIT ME!

EXHIBIT 10
425
000000484
ER-294

SC. 1483    (Release No. 418)                              Page Eight

3. Mrs. Doyle(dragging Mickey out thru front door by ear):  Telling me such a
                  ridiculous story!  When we get home, your dad will warm the seat of
                  your trousers!

   Mickey:  But he DID hit me!!

   Mary(shouting anxiously after them):  Don't be too harsh on him, Mrs. Doyle!

4. Mary(lifting Clark):  Shame on you, Clark! Picking on a boy four years older
                  than yourself!

   Charles(chuckling,Clark is grinning):  Sorry, Mary — but I can't help being
                  proud of MY SON!  He sure gave that brat what he deserved!

5. Caption:  One day — the inevitable occurs....

   Mary:    Charles, I've been dreading this for a long time, but...I believe the
            time has come when we're obliged to place Clark in school!

   Charles:  We've tried to teach him to control his strength, but what happens
            from here on is in the hands of fate alone!

6. Mary(to teacher,as takes Clark to kindergarten):  You'll take good care of him,
                  won't you, Miss Lemon?

   Miss Lemon(sourpuss kindergarten teacher):  Have no fear, Mrs. Kent.  Clark's
                  personality will be developed in this class. You'll be surprised how
                  it blooms!

   Charles:  (*—You may be in for some surprised yourself, Old Gal!—*)

7. Caption:  No sooner does Clark seat himself in the kindergarten class, then....

   Brat(aiming spitball in rubber band at Clark from rear,to little girl seated
                  beside him):  WATCH THIS!

   Girl beside him:  Tee Hee!

8. Caption:  The serenity of Clark's features changes not one whit as the
                  spitball bounces, unnoticed, off the rear of his neck....

   (SCENE illustrates)

   Girl:  Tee Hee!  He didn't even feel it!

   Brat:  Yeah?  Well, he'll feel this TACK!

   (NOTE:  Brat raises tack meaningly)

000000485

EXHIBIT 10
426

ER-295

IX.                                                                 Page Nine

1. Caption:  Surreptitiously, the class brat slips the tack beneath Clark....

   Brat(to himself,as does so):  ("-Ho! Ha! - When he moves back in the chair, this will be FUNNY!-")

2. Caption:  But again, Clark's expression is maddeningly impassive!

   Girl:  Tee Hee!  It doesn't even bother him!

   Brat(face darkening):  It don't, eh?  Well, I'll fix him during recess!

3. Caption:  Recess time...

   Brat(stopping Clark):  Wait a minute, you!  I don't like your face!

   Clark:  Aw! - Let him alone!

4. Brat(socking Clark):  I'll show you!

5. Brat(dancing with pain,holding fist):  Ouch!  My fist!  My fist!

   Girl:  Let that be a lesson to you!

6. Caption:  After that, Clark is left alone. But when he reaches the fifth grade.. . the members of the Thick-and-Thin Club hold a conference in which he is vitally concerned....

   Tom:  This kid Clark Kent always keeps off by himself.  Let's pretend we want him to join the club an' give him th' works. It oughta be a lot of fun.

   Bob:  Sounds like a good idea!

   Dick:  All in favor, says aye!

   Others(meeting in garage):  AYE!

7. Tom(to Clark,in school):  Want to join the Thick-and-Thin Club?

   Clark(pleased):  Oh, yes!

   Dick:  Good!  Then come to the meeting tonight in Tom's father's garage!

8. Mary(as Clark leaves house):  Where are you going, Clark?

   Clark:  Just out to see some fellows.

   Charles(reading newspaper):  Be back early, scan.
   ..........................................

X.

1. Tom(to the others):  Here's the set-up! We get Clark to enter the old haunted house. Then we scare the dickens out of him. Good idea?

   Bob:  Swell!

   Dick:  This ought to be a riot!

EXHIBIT 10
427

000000486
ER-296

2. Tom(to Clark,as he enters): So you want to be a member of the <u>Thick-and-Thin</u> <u>Club</u>, eh? You realise that you can't join our club unless you've got the courage of a lion and always help your friends?

Clark: I realise that!

Bob: Then you're going to have a chance to prove if you qualify!

3. Tom: You're to beter the old haunted house on <u>Hudson</u> <u>Street</u> and stay there for a full hour.

Clark: Is that all? It'll be a cinch!

Bob: ("—HE thinks! But he doesn't know what we got planned for him!—")

4. Caption: Racing swiftly, the members of the club reach the house before Clark...

Tom(as they enter the rear door;they're carrying sheets, etc.): Got everything?

Bob: Yeah. Hurry. He'll be here any minute!

5. Caption: The boys hide, chuckling in anticipation of the fun that lies ahead...

Tom(on floor): Sh-hh! Lay low!

Bob: I hear someone coming!

Dick: Boy! Wait'll I put on my spook outfit!

6. Caption: The front door opens and closes with a slam. But instead of Clark, several hard-faced individuals enter....

Croy(thug in lead): Remember where you hid the stolen jewelry?

Jim: Naturally. In the cupboard. Think I'd be dumb enough to forget where I salted away fifty grand!

7. Tom(gasping,looking thru slightly ajar door): Gee! It ain't Clark!

Bob: It's some men!

Dick: And they look like DESPERATE CROOKS!

8. Jim(opening cupboard,taking out bag): Here they are!

Croy(whirling,snatching out gun): A noise — from the next room!
........................................
II.

1. Croy(throwing open door, sighting cowering boys): It's some kids!

Jim: They heard everything! Cover 'em!

Tom(quaking): D-don't sh-shoot us!

Bob: W-we won't squeal on you!

000000487

EXHIBIT 10
428

ER-297

SUPERBOY (Release No. One)

2. Jim(as Croy ties them up): Too bad for you kids, but you know what we look like and we can't risk a rap right now!

Croy: If we was turned in, it would mean life for us. — There! That fixes 'em! Shall I take them out to the car?

3. Caption: In the darkness outside the house, Clark pauses alert as his keen eyes penetrate the blackness to reveal his bound friends being placed in the rear....

Clark: The boys...in trouble...

4. Caption: As the car drives off, Clark takes a flying leap after it...

Clark: Maybe I can help them!

5. Caption: ...that lands him noiselessly atop the rear-tire!

Clark: Made it!

6. Caption: The thieves stop the car at the top of a steep incline. Clark leaps to hiding behind a nearby rock:....

Croy(standing beside): But the kids will be killed!

Jim(shoving at rear of car): It's either them or us!

7. Caption: Propelled by the criminals, the auto commences to speed down the mountainside with its helpless captives....

(SCENE: illustrates car speeding down mountain road haphazardly at terrific speed)

8. Clark(springing to top of rock): Got to act — now!

Croy(looking up,amazed): Hey! Lookit the kid!

Jim(firing at Clark): Get him!

........................................

XII.

1. Caption: Down springs Clark in the very face of the firing weapons. The bullets careen harmlessly off his super-tough skin, but due to the darkness the crooks believe they have missed....

Clark(cracking their heads together as he streaks down): Let's see how thick-skulled you are!

EXHIBIT 10
429

000000488
ER-298

Page Twelve

2. Caption: Leaving the unconscious thugs behind him, Clark races down the incline after the rocketing car....

Clark(running at terrific speed): Another few seconds, and they're done for!

3. Caption: ...overtaking it in a few moments! He leaps to the running board!

Clark: Now to get in!

4. Caption: Climbing in, Clark desperately applies the brakes....

Tom(shouting): It's Clark!

Clark: Pray, boys — pray!!

5. Caption: ....so that the auto skids to a stop x bare inches from a cliff's brink!

(SCENE illustrates)

6. Caption: Clark unties his friends....

Tom(emerging from car): Whew! That was a close call!

Bob(to Clark): How did you happen to show up in time?

Clark: I saw those crooks take you fellows into the car and hid on the running board! But let's drive back up the incline and tie up those crooks before they come to. I saw them lying unconscious!

7. Newspaper Headline: BOYS CAPTURE CRIMINALS!!

(SCENE: Pictures of boys on front page)

8. Caption: Clark is made a permanent member of the Thick-and-Thin Club....

Tom(at meeting): The crooks claimed a young kid jumped at them out of the darkness. But it was too dark to see who he was.

Bob: Probably a made-up story.

Dick: Wouldn't it be strange if there was young kid like us playing at being Robin Hood and helping people in trouble?

Clark: ("—That's an IDEA!—")

.........................

XIII.

1. Mary(to Clark): You're quite a hero, Clark, aren't you, since that writeup in the paper?

Clark: I didn't do much.

Charles: ("—I WONDER!—")

000000489

EXHIBIT 10
430

ER-299

2. **Caption:** That evening...

   Clark(on his bed in bedroom): A young kid — venturing out to help people in need
   ...gee...that sounds like a grand idea...I could put my hidden
   strength to work for a good purpose!

3. **Clark:** But I'd have to hide my true identity from everybody while I was out
   playing at being Robin Hood. — I get it! A masquerade costume!

4. **Caption:** Surreptitiously, the lad designs a strange costume of his own making...
   (SCENE: Shows Clark making costume)

5. **Caption:** As he tries it on for the first time, he feels a strange premonition —
   come over him....

   Clark(wearing costume): Strange — but I feel almost as tho I were MADE to wear
   this costume — always....!

6. **Caption:** That night he springs out into the darkness in search of adventure,
   and someone to help...
   (SCENE: Shows SUPERBOY streaking over city at night)

7. **Caption:** And so was launched the career of SUPERBOY, youthful Champion of
   Righteousness! In later years he was to become the might figure known
   as SUPERMAN! But the story of SUPERBOY's amazing and often humorous
   adventures is a series of astonishing narratives in itself...! Don't
   miss a single adventure of the comic page's newest sensation:
   SUPERBOY!!

   (SCENE: Shows portrait of SUPERBOY)

   Small script box in lower right hand corner of panel: The End.
   ..........................................

   From:
   Jerry Siegel,
   2402 Glendon Road,
   University Heights, Ohio.

Page Thirteen

000000490

**EXHIBIT 10**
431

ER-300

# EXHIBIT 14

316 Horton Ln. NW
Albuquerque, NM 87114
August 21, 1992

Marty Payson, Vice-President
Time Warner
75 Rockefeller Plaza
New York, NY 10019

Dear Mr. Payson,

This will be one of the most difficult letters I've ever written and one I wish I didn't have to write. As you know, your friend and my brother, Joe Shuster, died on July 30. Joe and I were very close. Every week we talked on the phone. Back in the late 1940's and 1950's when Joe was struggling, I helped support him by sending him a weekly check so he could go on creating new ideas and hopefully sell them. My brother Frank knows this because he took over supporting Joe after I married in 1955. I was happy to do this because I loved him. Joe always assured me that I would be taken care of after his demise.

I have just returned from Los Angeles where I spent a very stressful two weeks arranging for Joe's funeral, disposing of the belongings in his apartment and trying to get the financial affairs in order. In going through his papers I was shocked to learn that Joe did not only not have much money in the bank but that he had almost $20,000 in credit card debts and unpaid bills (copies of bills enclosed). He only had one active bank account at Security Pacific National Bank with $23,773 in it, in which he received his direct deposit checks from Time Warner. I do not have access to his account until the legal things are set-tled while the 20% interest continues to accrue on his credit card debt. I could not find any other assets except two dormant bank accounts with $167 and $11 in them. I thought Joe might have had a small life insurance policy through his pension to pay his final debts and expenses. Unfortunately, he did not.

As heir to his Will, I am responsible for paying off his credit card debts, along with any bills that will be coming in and forwarded to me--utilities, half month's rent, unknown credit debts, legal fees, etc. Today I received another bill from the County Coroner. Thankfully, Paul Levitz said Time Warner would cover it.

I find myself in a financial plight. How could Joe Shuster end up with an estate of almost nothing? And what if more debt and bills come in? His estate may not even be able to cover it. It's bad enough to lose a family member with whom you are close but it's devastating when they leave a burden of large unpaid debts and bills which the estate can barely cover. On top of this, my son and I had great expenses flying out to California, staying at a motel, renting a car, etc. My husband and I are of modest means. We live on my husband's modest pension and this was very expensive for us. In addition, we still don't know how much the legal fees will be. The estate may not cover it at all.

**EXHIBIT 14**
459

ER 302
Q06477

This is very embarrassing for me to have to write to you this way.
It's unbelievable to me that Joe could have so little considering the
generosity shown by Time Warner in raising the pension income of
Siegel and Shuster.  Through his 1991 tax return and 1992 pay memos,
I found out he was receiving $2,627 twice a month after withholding or
$63,000 a year after taxes.  I had my son itemize Joe's 1992 checks and
bank statements to see where his money went.  We've been able to account
for most of his checks.  From January of 1992 to the middle of July, we
found he wrote almost $31,000 in checks, plus there are other checks
still unaccounted for.  In a little over six months, he spent everything
he took in.

Almost $1,500 a month went for rent.  Almost $500 for utilities.  We
also found that over $1,200 a month was being paid to Joanne Siegel for
some kind of commission for including him in the pay raise.  It appears
that for quite a few years, she has been taking 20% of his income as
an agent's commission for getting pay raises for Siegel and Shuster.
All of this consumed about $3,200 a month.  The rest went for groceries (home
delivered), personal and health items, and lots of clothes and stereo
systems that filled his large apartment from floor to ceiling which he
gave to charity at the end.

Joe was very generous.  He liked to spend on himself and he liked to
give things away.  In Joe's interview by a reporter from the Toronto Star
who came to Joe's apartment, he wrote, "One corner of his apartment is
jammed with stereo components--three turntables, several tapedecks, and a
dozen high-power speakers--that will be donated to the visually impaired."
This must have cost thousands of dollars.  Yet, when I came to his
apartment, more equipment had been bought and every room was jamm-packed
from floor to ceiling full of stereo components and speakers.  This time
he promised this to the Music Department of the Los Angeles Valley College.
When they came to take the equipment, they showed me a letter authorizing
them to get it for this good cause.  This equipment must have cost thousands
and thousands of dollars.  He also had every closet stuffed full of jackets
and clothes piled everywhere.

Joe's ladyfriend admitted to me how generous he had been to her and
her son.  Her son is a psychology professor and I asked if he could tell
me why Joe spent so much money.  He said that Joe was a compulsive buyer
triggered by years of deprivation, so when he had a chance, he went on
shopping sprees.  He was also very generous and gave when he heard there
was a need.

I am glad Joe spent the last years of his life happy.  Joe Shuster was
a kind, generous, and creatively brilliant man.  He made great contributions
to this world.  Unfortunately, Joe left his family with a crushing burden
of unpaid debts and bills and only a tiny estate to cover it.  Joe did not
like to deal with business.  And now he has put a terrible burden on me which
I know he never intended.  The kindness and generosity of Warner Communications
and now Time Warner has been demonstrated in the past.  Any help that
Time Warner could give to the family of Joe Shuster to pay his final debts and
expenses would be warmly appreciated at this time of mourning.  The Shuster
family looks forward to seeing you at the memorial service on September 24.

-2-

**EXHIBIT 14**
**460**

006478

With warmest regards,

*Jean Shuster Peavy*

Jean Shuster Peavy


Enclosed:  The bill from the County Coroner.
A schedule of Joe's debts with copies of statements.
His latest bank statement from Security Pacific.
An itemization of the amounts of most of his checks written in 1992.
The agreement with Joeanne Seigel to take 20% of his income and copies
of the two latest checks to her.

**EXHIBIT 14**
**461**

ER-304

PCS00006479

## Schedule of Debts of Joe Shuster

| Due Date | Creditor | Amount |
|---|---|---|
| 8-24-92 | Sears Charge | $5,325.54 |
| 8-21-92 | First Select VISA | 5,280.76 |
| 8-21-92 | BankAmericard VISA | 2,742.75 |
| as of 8-19-92 | The Broadway | 2,415.15 |
| 8-13-92 | Circuit City Stores | 1,161.-- |
| 8-14-92 | Security Pacific Bank Card | 1,061.18 |
| 7-9-92 | JC Penney | 101.16 |
| 8-13-92 | Century Cable | 103.02 |
| July/August | Electric bill based on 1-7-92 bill | 200 |
| 8-7-92 | Telephone bill | 130 |
| 8-1 to 8-13 | assessment for ½ month rent | 750 |
| 1992 | Final Tax Returns-Tax Counsel Assc. | 300 |
| Total Debts and Final Obligations | | $19,570 |

LEGAL/PROBATE FEES STILL UNKNOWN                    ?

**EXHIBIT 14**
**462**

DC00006480

# SEARSCharge

P.O. BOX 5000
RCH CUCAMGA CA 91729

| | |
|---|---|
| Account Number: | ██████029 6 |
| Billing date: | July 25, 1992 |

## ACCOUNT SUMMARY

| | | |
|---|---|---|
| Previous balance | | $5,435.59 |
| Total payments | − | 200.00 |
| Total charges | + | 5.41 |
| Total credits | − | 0.00 |
| Finance charge | + | 84.54 |
| New balance | | $5,325.54 |
| | | |
| Minimum due: | | $156.00 |
| Due date: | | August 24, 1992 |

JOSEPH M SHUSTER
11944 MONTANA AVE
LOS ANGELES CA   90049-5033

## TRANSACTIONS

Jul 11   *PAYMENT - THANK YOU* . . . . . . . . . . . . . . . . . . . . . − $200.00
Jul 15   CATD7835431D, CATALOG SALE, 800-366-3000 . . . . . . . . 5.41

## SPECIAL ACCOUNT INFORMATION

The amount due shown above includes a past due amount. You
should send the entire amount due now. If payment has been
made recently, please disregard this request.

## HELPFUL INFORMATION

Available Credit: **$1,694**

If the amount of Available Credit is not
sufficient, or you have a question, call:
(800) 877-8498
M - F 9-9, SAT 9-6

Mail any billing error notices to:
P.O. BOX 5001
RCH CUCAMONGA CA 91729-0000

Please include your account
number with any correspondence.

## SEARSCHARGE BONUS CLUB

Great News! Now the SearsCharge
Bonus Club pays you back in
money-saving certificates every time
your SearsCharge purchases build up
to $200 or more. You need only
$140.48 more in charges to earn your
bonus. It pays to shop at Sears!

## FINANCE CHARGE RATES

| Date of charges | Average Daily Balance | ANNUAL PERCENTAGE RATE | Monthly Periodic Rate | Average Daily Balance | FINANCE CHARGE |
|---|---|---|---|---|---|
| All | over $0.00 | 19.2% | 1.6% | $5,283.89 | $84.54 |
| | | | | Total | $84.54 |

**NOTE:** See other side for important information



Tear off and mail this coupon with your payment in
the enclosed envelope. Your payment must arrive
by the due date to avoid additional finance charges.
Make check payable to *Sears, Roebuck and Co.* and
include your account number on the check.   8498

ի|իմ||մ||||մ||||մ||||մ||||մ||||մ
SEARS PAYMENT CENTER
P.O. BOX 860020
PASADENA CA  91186-0020

| | |
|---|---|
| JOSEPH M SHUSTER | |
| Account Number: | ██████329 6 |
| Billing date: | July 25, 1992 |
| | |
| **New balance:** | $5,325.54 |
| **Minimum due:** | $156.00 |
| **Due date:** | August 24, 1992 |

Address change? Check in box below and
write your new address on the back.

[ · ]

ER-306

**EXHIBIT 14**
463

PCC00006481



Will Freeze as of July 30

FIRST SELECT VISA
P.O. BOX 9560
MANCHESTER, NH 03108-9560

REMIT TO:

FIRST SELECT VISA
P.O. BOX 9560
MANCHESTER, NH 03108-9560

JOSEPH M SHUSTER
11944 MONTANA AVE
LOS ANGELES CA 90049-5033

YES, please protect my First Deposit VISA® account with the CREDIT PROTECTION PLAN described in the Plan Summary which I have read. I understand I can cancel at any time during the first 30 days of membership and receive a full refund with no further obligation.

X _____
SIGN HERE TO ENROLL (Primary Cardholder's Signature Required)

**ACCOUNT NUMBER** 4223

**PAYMENT DUE DATE** AUG 21,1992

**MINIMUM PAYMENT DUE** 126.12

**AMOUNT ENCLOSED**
PLEASE MAKE CHECK PAYABLE TO FIRST DEPOSIT

0760

**DETACH HERE**

| POSTING DATE | DESCRIPTION | TRANSACTION DATE | REFERENCE NUMBER | AMOUNT CR = CREDIT PY = PAYMENT |
|---|---|---|---|---|
| 07-27 | PAYMENT RECEIVED - THANK YOU | 07-27 | 74168512209000001410550 | 126.16PY |
| 07-27 | CREDIT PROTECTION | 07-27 | | 20.12 |

PROTECT YOUR GOOD CREDIT WITH JUST A STROKE OF A PEN! SIGN THE BOX AT THE TOP OF YOUR STATEMENT AND PROTECT YOUR ACCOUNT AGAINST UNEMPLOYMENT OR DISABILITY. SEE ENCLOSED BROCHURE FOR DETAILS.

FOR CUSTOMER SERVICE ON YOUR FIRST SELECT VISA,
CALL TOLL-FREE AT 1-800-964-6000.

| AVERAGE DAILY BALANCE | DAILY PERIODIC RATE | ANNUAL PERCENTAGE RATE |
|---|---|---|
| PURCHASES* .00 | .060000% | 21.90% |
| CASH ADVANCES 5,310.54 | .060000% | 21.90% |

The Cash Advance Check below is provided for your convenience. We will gladly honor this and any other cash advance check you use as long as you have credit available. You cannot use this check to pay your credit account with First Deposit National Credit Card Bank. Please save this stub for future reference.

Date: _____ Amount: $ _____
Payable To:

**ACCOUNT NUMBER** 4223

CREDIT LINE 6,200
CREDIT AVAILABLE 919

NUMBER OF DAYS IN BILLING CYCLE 32
CLOSING DATE JUL 27,1992
MINIMUM PAYMENT DUE 126.12

For Billing Errors, See Reverse Side.
PAYMENT DUE DATE AUG 21,1992

**ACCOUNT SUMMARY**
| | |
|---|---|
| PREVIOUS BALANCE | 5,284.84 |
| CREDITS | .00 |
| PAYMENTS | 126.16 |
| PURCHASES* / OTHER CHARGES | .00 |
| CASH ADVANCES | 20.12 |
| FINANCE CHARGE | .00 |
| LATE PAYMENT CHARGE | 101.96 |
| | .00 |
| NEW BALANCE | 5,280.76 |

* Only applicable for accounts with credit cards.

**DETACH HERE**

EXHIBIT 14
464

ER-307
PCS00006482

## Payment Coupon

**BankAmericard** VISA

| PAYMENT DUE DATE | BILLING DATE |
|---|---|
| 08-21-92 | 07-27-92 |

▼ ENTER AMOUNT ENCLOSED

NEW BALANCE: 2742.75

LEASE PRINT CHANGE OF ADDRESS OR TELEPHONE NUMBER HERE ▶

STREET
CITY   STATE   ZIP
HOME PHONE   BUSINESS PHONE

MINIMUM PAYMENT DUE: 109.00

TO AVOID ADDITIONAL PERIODIC CHARGES, PAYMENT OF THE NEW BALANCE MUST BE RECEIVED BY THE PAYMENT DUE DATE. THE MINIMUM PAYMENT WILL BE PAST DUE IF NOT RECEIVED BY THE PAYMENT DUE DATE.

7901

JOSEPH M SHUSTER
11944 MONTANA AV 305
W LOS ANGELES CA 90049-5026

BANK OF AMERICA
CARD CENTER
PASADENA, CA 91127

MAKE CHECK PAYABLE T
BANK OF AMERICA N18
WRITE YOUR ACCOUNT
NUMBER ON YOUR CHE

◀ MAIL PAYMENT TO:

0105

4024004699987901001090002742754024004699987901001090002742 75   *** 920038669

ıı"0004522644ıı" ı:524022250ı: 00000"00000ıı"

**RETURN PAYMENT COUPON WITH YOUR CHECK AND KEEP THE STATEMENT PORTION BELOW FOR YOUR RECO**

TO AVOID ADDITIONAL PERIODIC CHARGES, PAYMENT OF THE NEW BALANCE MUST BE RECEIVED BY PAYMENT DUE DATE. THE MINIMUM PAYMENT WILL BE PAST DUE IF NOT RECEIVED BY THE PAYMENT DUE DATE.

Account Number: 7901   Name: JOSEPH M SHUSTER   **BankAmericard Stateme**

| Account Type | Credit Line | Credit Available | Billing Date | Payment Due Dat |
|---|---|---|---|---|
| VISA | 4700 | 1957 | 07-27-92 | 08-21-9 |

| ACCOUNT ACTIVITY | BankCard sub-Account | ValueAmerica* sub-Account | Total Account |
|---|---|---|---|
| Previous Balance | 2831 75 | 00 | 2831 75 |
| New Activity (+) | | | |
| Cash Advances (+) | | | |
| Service Transactions (+) | | | |
| Payments (–) | 150 00 | | 150 00 |
| Credits (–) | | | |
| Sub-Account Credit Transfers (+)(–) | | | |
| FINANCE CHARGE (+) | 45 32 | | 45 32 |
| Late/Collection Charge Overlimit Fee | | 00 | |
| Credit Insurance Premium (+) | 15 68 | | 15 68 |
| NEW BALANCE (=) | 2742 75 | 00 | 2742 75 |

| FINANCE CHARGE CALCULATION | Amounts Subject to Charge | X's Rate (%) (or Periodic Rate) | = Corresponding Finance Charge | Corresponding Ann Percentage Rate (% |
|---|---|---|---|---|
| BankCard sub-Account Average Daily Balance | 2746 81 | 1.650 | 45 32 | 19.80 |
| Cash Advances | | 2.000 | | |
| Service Transactions | | 2.000 | | |
| ValueAmerica sub-Account | | | | |
| $ 1000 and under | | 1.500 | | 18.00 |
| over $ 1000 | | 1.000 | | 12.00 |

**ANNUAL PERCENTAGE RATE (%)**

| BankCard sub-Account | ValueAmerica sub-Account | Total Account |
|---|---|---|
| 19.80 | .00 | 19.80 |

| | |
|---|---|
| Current Amount Due ▶ | 109 |
| Amount Past Due ▶ | |
| Amount Over Credit Line ▶ | |
| Minimum Payment Due ▶ | 109 |

BANK CARD CENTER
P.O. BOX 7042
PASADENA, CA   91109

◀ SEND BILLING INQUIRIES TO

| POSTING MO DAY | REFERENCE NUMBERS | ACTIVITY SINCE LAST STATEMENT | TRANSACTION DATE IF AVAILABLE | CHARGES | PAYMENTS AND CREDITS |
|---|---|---|---|---|---|
| | | YOUR BANKAMERICARD ACCEPTED AT SECURITY PACIFIC ATMS IN 11 WESTERN STATES! | | | |
| 0720 | 53252478 | PAYMENT – THANK YOU | | | 150 |
| 0727 | | CRED INS PREM, CENTRAL STATES, OMAHA, NE | | 15 68 | |
| 0727 | | ***FINANCE CHARGE*** | | 45 32 | |

| | FOR CUSTOMER SERVICE, CALL: | PACIFIC TIME | FOR LOST OR STOLEN CARD, CALL: | 61 00 | 150 |
|---|---|---|---|---|---|
| 920038669 | 1-800-323-1753 | 6:30 AM - 4:30 PM | 1-800-423-3823 | | |
| STATEMENT NUMBER | | | 24-HOUR TELEPHONE NUMBER | TOTAL CHARGES | TOTAL PAYME AND CREDIT |
| PAGE 1 OF 1 | | | | | |

**EXHIBIT 14**
**465**

ER-300

006483

IF ADDRESS IS INCORRECT, ENTER NEW ADDRESS HERE

| ADDRESS | | |
|---|---|---|
| CITY | STATE | ZIP CODE |
| PHONE - HM | BUS | |

3009134

JOSEPH SHUSTER
APT 305
11944 MONTANA AVE
W LOS ANGELES, CA    90049-5026

**THE BROADWAY**

P.O. BOX 52094
PHOENIX, AZ. 85072-2094

**ACCOUNT NUMBER**

_____ 978 7

PAYMENT SHOULD BE
RECEIVED BY
**AUG 03 92**

PLEASE RETURN THIS COUPON WITH YOUR PAYMENT
WRITE YOUR ACCOUNT NUMBER ON YOUR CHECK

| TYPE OF ACCOUNT | NEW BALANCE | MINIMUM PAYMENT NOW DUE | PLEASE ENTER AMOUNT PAID |
|---|---|---|---|
| CHA | 99.99 | 15.00 | |
| HOM | 2276.32 | 110.00 | |
| TOTAL | 2376.31 | 125.00 | |

DO NOT WRITE IN THIS SPACE

003738319787  0012500023763120001500000999937

| DATE | STR NO. | REFERENCE NUMBER | DEPT. | DESCRIPTION | CHARGES | PAYMENTS & CREDITS |
|---|---|---|---|---|---|---|
| 0611 | 56 | 002075 | 7931 | YOUR CHARGE ACCOUNT ELECTRONIC SERVICES | 99.99 | |
| 0321 | 44 | 092031 | 7573 | YOUR HOMEMAKER ACCOUNT AUDIO SYSTMS & COMPNTS | 707.00 | |
| 0702 | 12 | 011668 | 7161 | MAIL PAYMENT-THANK YOU | | 210.00 |

TRAVELING THIS SUMMER? DON'T FORGET YOUR CARD - -
YOUR BROADWAY CARD IS ACCEPTED AT WEINSTOCKS, EMPORIUM AND
BROADWAY SOUTHWEST CONVENIENTLY LOCATED THROUGHOUT
CALIFORNIA, ARIZONA, NEVADA, NEW MEXICO, UTAH AND COLORADO.

_balance as of 8-19-92_     _#2,415_

| BILLING CYCLE ** CLOSING DATE | | ACCOUNT NUMBER | | PAYMENT SHOULD BE RECEIVED BY: | | |
|---|---|---|---|---|---|---|
| | JUL 09 92 | _____ 978 7 A | | | | AUG 03 92 |
| TYPE ACCT | PREVIOUS BALANCE | CHARGES | PAYMENTS & CREDITS | AVERAGE DAILY BALANCE | FINANCE CHARGE | NEW BALANCE | MINIMUM PAYMENT NOW DUE |
| CHA | .00 | 99.99 | .00 | .00 | .00 | 99.99 | 15.00 |
| HOM | 1743.31 | 707.00 | 210.00 | 2182.21 | 36.01 | 2276.32 | 110.00 |
| TOT | 1743.31 | 806.99 | 210.00 | 2182.21 | 36.01 | 2376.31 | 125.00 |

You are required to pay at least the minimum payment shown and you may at any time pay all or any additional portion of the
NEW BALANCE. If we receive payment of the full amount of the NEW BALANCE within 30 days (28 days for February) of the
Billing Cycle Closing Date shown above, you will avoid a FINANCE CHARGE next month. The FINANCE CHARGE is computed
by applying to the AVERAGE DAILY BALANCE monthly periodic rate of **1.65%** on amounts up to **ALL**
and **N/A** , on amounts in excess of **N/A** , which are annual percentage rates of **19.80%** and
**N/A** respectively. Subject to a minimum charge of 50¢ per _____ with where permitted by law.
NOTICE: See reverse side for import ant information.

**EXHIBIT 14**
466

ER-309

DC000006484

SECURITY PACIFIC BANK, N.A.
BANKCARD SERVICES
PO BOX 2930
PHOENIX, ARIZONA 85038

*Finance charges accruing* 4100

400 RRB   7 13 3

| Account Number | | New Balance | Payment Due Date | Current Minimum Amount Due | Past Due + Overlimit Amounts | = | Minimum Payment Due | Amount Enclosed |
|---|---|---|---|---|---|---|---|---|
| 4100 | | $1061.18 | 08/14/92 | $0.00 | $0.00 | | $0.00 | $ |

BANKCARD SERVICES
BANKCARD PROCESSING
PASADENA CA 91052-0002

JOSEPH SHUSTER
11944 MONTANA AVE APT 305
LOS ANGELES CA 90049-5026

⑈060412⑈ ⑆524022250⑆ 00000⑈00000⑈

Telephone No                    310-247-2800

| Account Number | | Credit Line | Available Credit | Days in Billing Cycle | Billing Date | Payment Due Date | Minimum Payment Due |
|---|---|---|---|---|---|---|---|
| 4100 | | $2500 | $1438 | 32 | 07/20/92 | 08/14/92 | $0.00 |

| Date of Trans | Post | Reference Number | Activity Since Last Statement | Amount |
|---|---|---|---|---|
| 0709 | 0709 | 7407000JG00Z9BYW3 | PAYMENT - THANK YOU | 100.00- |
| | | *FINANCE CHARGE* | | 16.95 |

*will not freeze add finance charges until paid*

| Previous Balance | — | Total Payments/Credits | = | Subtotal | + | Automatic Advances | + | Fees | + | Finance Charge | = | New Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $1144.23 | | $100.00 | | $1044.23 | | $0.00 | | $0.00 | | $16.95 | | $1061.18 |

An amount followed by a minus sign (—) is a credit or a credit balance.

TO OBTAIN THE MOST CURRENT BALANCE, CREDIT LIMIT OR LAST
PAYMENT, CALL THE LOCAL PHONE NUMBER ABOVE.  USE YOUR ACCOUNT
NUMBER AND THE LAST 4 DIGITS OF THE PRIMARY SOCIAL SECURITY
NUMBER.  PRESS 1 AND THEN 4.  IT'S EASY TO USE!

Send inquiries to:    BANKCARD CUSTOMER SERVICE, PO BOX 52327, PHOENIX AZ, 85072

| | Automatic Advances | AMOUNT SUBJECT TO PERIODIC RATE | |
|---|---|---|---|
| | | Average Daily Balance Previous Cycle | Average Daily Balance Current Cycle |
| MONTHLY PERIODIC RATE (%) | 01.567 | | |
| NOMINAL ANNUAL PERCENTAGE RATE (%) | 018.80 | | |
| ANNUAL PERCENTAGE RATE (%) | 018.80 | 0.00 | 1081.74 |

P P P                    READY RESERVE ACCOUNT

**EXHIBIT 14**
**467**

ER-310
CC-00006485



| POSTING DATE | DESCRIPTION | TRANSACTION DATE | REFERENCE NUMBER | AMOUNT CR-CREDIT PY-PAYMENT |
|---|---|---|---|---|
| 01-08 LATE PAYMENT CHARGE | | 01-08 | | 12.00 |

A FRIENDLY REMINDER...WE HAVE NOT YET RECEIVED YOUR PAYMENT. PLEASE PAY THE AMOUNT DUE TODAY.

CATCH THE SUPER BOWL ON A BIG SCREEN TV!

*1st North Am. Natul. Bank issues credit for circuitcity*

*Balance as of 8-13-92 ($1,161)*

| | AVERAGE DAILY BALANCE | MONTHLY PERIODIC RATE | ANNUAL PERCENTAGE RATE | FINANCE CHARGE | | ACCOUNT NUMBER | | | ACCOUNT SUMMARY | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 1,070.23 | 1.6500% | 19.80% | $ 17.65 | | | 880 | | | 1,070.23 |
| B | .00 | 1.6500% | 19.80% | $ .00 | | CREDIT LINE | PAST DUE PREVIOUS STATEMENT | | | .00 |
| C | .00 | .0000% | 0.00% | $ .00 | $ 1,600 | | 67.00 | | | 12.00 |
| | | | | | AVAILABLE CREDIT | MINIMUM DUE THIS CYCLE | | | .00 |
| SEND INQUIRIES TO: | | | | | $ 500 | 67.00 | | | .00 |
| | CIRCUIT CITY STORES, INC. | | | | NUMBER OF DAYS IN BILLING CYCLE | MINIMUM PAYMENT DUE | | FINANCE CHARGE | 17.65 |
| | P.O. BOX 11768 | | | | 31 | $ 134.00 | | | |
| | RICHMOND, VA 23230 | | | | CLOSING DATE | PAYMENT DUE DATE | | | |
| CUSTOMER SERVICE TELEPHONE: 1-800-477-6761 | | | | | JAN 08,1992 | FEB 02,1992 | NEW BALANCE | | 1,099.88 |

NOTICE: See Reverse Side for Important Information

To avoid an additional Finance Charge pay entire New Balance by Payment Due Date.

* SEE EXPLANATION OF CODES ON REVERSE SIDE

**EXHIBIT 14**
**468**

ER-31
DC000006486

# JCPenney

## Account Statement

Customer Service
is Our Number One Priority

Billing Error
Notice Address ▶
See Reverse
Side For Details

P.O. BOX 4444
BUENA PARK CA 90624
(714) 228-1200

| ACCOUNT NUMBER | ████ 737-8 |
|---|---|
| CURRENT BILLING DATE | 06-13-92 |

PAGE 01 OF 01

To Avoid Additional Finance Charge, Pay New Balance By ▶ **07-09-92**

| Date | Store/Reference Number | | Balance Type | Item Description | Charges | Payments and Credits |
|---|---|---|---|---|---|---|
| 06-13 | | M | LATE CHARGE | | .80 | |

YOUR ACCOUNT IS PAST DUE. PLEASE PAY THE AMOUNT DUE OF $48.80 TODAY.

| BALANCE SUMMARY | PREVIOUS BALANCE | - PAYMENTS AND CREDITS | + FINANCE CHARGE | + CHARGES | = NEW BALANCE | MINIMUM PAYMENT |
|---|---|---|---|---|---|---|
| MAJOR | 98.79 | .00 | 1.57 | .00 | 100.36 | 48.80 |
| OTHER | .00 | .00 | .00 | .80 | .00 | .00 |
| TOTAL | 98.79 | .00 | 1.57 | .80 | 101.16 | 48.80 |

Your finance charge rates are: (See reverse side for important information and explanation of your finance charge method)

| BAL. TYPE | | ON BALANCE OF | AS OF | ON BALANCE THRU $ | MONTHLY PERIODIC RATE(S) % | ANNUAL PERCENTAGE RATE(S) % | ON BALANCE OVER $ | MONTHLY PERIODIC RATE(S) % | ANNUAL PERCENTAGE RATE(S) % |
|---|---|---|---|---|---|---|---|---|---|
| M | B | 95.44 | 06-92 | ALL | 1.65 | 19.8 | | | |

△ Your Finance Charge Method is (see reverse)

------------------------------------------------

PLEASE DETACH AND RETURN THIS STUB WITH YOUR PAYMENT

ACCOUNT NUMBER: ████ 37-81

PAYMENT SHOULD REACH US BY: **07-09-92**

Indicate Address/Telephone Changes Here

Address
City, State, Zip Code
Telephone
Area Code (    )

| BALANCE TYPE | NEW BALANCE | MINIMUM PAYMENT | WRITE AMOUNT PAID |
|---|---|---|---|
| MAJOR | 101.16 | 48.80 | |
| TOTAL | 101.16 | 48.80 | |

ZIP + 4 PRESORT
JOSEPH SHUSTER
11944 MONTANA AV 305
LOS ANGELES CA 90049-5026

4580 PARADISE BLV NW
ALBUQUERQUE NM 87201            66

0004562            198            6741347378 30 00048800010116

**EXHIBIT 14**
**469**
**ER-312**

PC 600906487

# YOUR PHONE SERVICE WILL BE TEMPORARILY DISCONNECTED

UNLESS WE RECEIVE PAYMENT OF YOUR PAST DUE BILL BY          AUGUST 14, 1992

**(GTE) California**

| | |
|---|---|
| SERIAL CODE | 62 0625 00500 |
| DATE | 8-07-92 |
| ACCT NO | 020-2446 |
| AMT DUE | 130.00 |

01 1717 8202446 880309 03

IF THIS NOTICE WAS MAILED BY CREDITOR AFTER YOUR TELEPHONE SERVICE HAD NOT BEEN RECEIVED, IF PAYMENT HAS BEEN MADE, PLEASE DISREGARD THIS NOTICE.

IF YOUR SERVICE IS TEMPORARILY DISCONNECTED, YOU WILL BE REQUIRED TO PAY THE FOLLOWING CHARGES IN ADDITION TO THE FULL AMOUNT DUE BEFORE THE TELEPHONE WILL BE RECONNECTED:

RECONNECT CHARGE $ . . . . . . . . . . . . . . DEPOSIT $          23.00

TO AVOID THESE ADDITIONAL CHARGES, PLEASE MAKE YOUR PAYMENT TODAY. AN ENVELOPE IS ENCLOSED FOR YOUR CONVENIENCE. ALLOW 5 DAYS FOR RECEIPT OF MAIL OR CONTACT A COMPANY REPRESENTATIVE AT THE CUSTOMER BILLING CENTER TO OBTAIN THE NEAREST IN-PERSON PAYMENT LOCATION BY CALLING TOLL FREE TO: PLEASE BRING THE ENTIRE NOTICE WHEN PAYING IN PERSON.          1 800 223-6177

### PERMANENT DISCONNECTION

ACCOUNTS ARE TEMPORARILY DISCONNECTED FOR ONLY SEVEN CALENDAR DAYS, AFTER WHICH TIME THE SERVICE IS PERMANENTLY DISCONNECTED, UNLESS SPECIAL ARRANGEMENTS ARE INITIATED BY THE SUBSCRIBER AND AGREED TO BY THE COMPANY. IF THE SERVICE IS PERMANENTLY DISCONNECTED, AN APPLICATION FOR NEW SERVICE WILL BE REQUIRED, WHICH WILL REQUIRE PAYING NEW SERVICE CONNECTION CHARGES IN ADDITION TO THE DELINQUENT AMOUNT DUE AND THE DEPOSIT BEFORE SERVICE WILL BE INSTALLED.

72517 82002446 880309 702620 7 00013000 6 08 11

---

### RETURN THIS LOWER PORTION WITH YOUR PAYMENT

01 1717 8202446 880309 03          AMOUNT DUE $          130.00

GTE CALIFORNIA
PAYMENT PROCESSING

SHUSTER, JOS.          717
11944 MONTANA AV, APT 305
LOS ANGELES  CA  90049-5026

72517 82002446 880309 702620 7 00013000 6 08 11

SEE REVERSE SIDE
FORM 90003489 (4-91)

**EXHIBIT 14**
**470**

ER-315

DC000006488



DATE DUE
08/13/92
CENTURY CABLE
COMMITTED TO
COMMUNITY
SERVICE!

AMOUNT DUE
103.02

$

PLEASE RETURN THIS TOP PORTION ONLY, WITH REMITTANCE TO ➜ ... *Thank You!*

PLEASE INDICATE
AMOUNT ENCLOSED

000-07-92-A-C

J0
21
00
0
10
24
1

**1 ZP 7.26440.DS
JOE SHUSTER
11944 MONTANA AVE APT 305
LOS ANGELES CA
90049-5026

CENTURY CABLE
PO BOX 10201
VAN NUYS CA  91401-0201

08614 213457 01 5    8  010302

| | | | | | |
|---|---|---|---|---|---|
| CENTURY CABLE | ACCOUNT NUMBER | | BILLED FROM | BILLED TO | DATE DUE | INCLUDES PAYMENTS RECEIVED BY |

CENTURY CABLE          ACCOUNT NUMBER       BILLED FROM  BILLED TO   DATE DUE   INCLUDES PAYMENTS RECEIVED BY
2939 NEBRASKA AVE      08614-213457-01-5     8/01/92    8/31/92    08/13/92      7/27/92
SANTA MONICA, CA

FOR- 11944 MONTANA AVE APT 305          BILLING/REPAIR: 453-2233

6/30        PREVIOUS BALANCE   103.02     MON-FRI 7AM-9PM AND SAT 8AM-9PM
                                          LOBBY: MON-FRI 8AM-6PM, SAT 8AM-4:30PM
7/11        PAYMENT-THANK YOU  103.02-   **RATES MAY INCLUDE FRANCHISE FEES
8/01- 8/31  BASIC SERVICE       24.20    WHERE APPLICABLE**
8/01- 8/31  ADD'L OUTLET         4.75
8/01- 8/31  DISNEY TRAP       * FREE *
8/01- 8/31  CONVERTER RENTAL     2.75    OUR BUSIEST TIMES ARE MONDAYS
8/01- 8/31  CONVERTER RENTAL     2.75    AND THE DAY AFTER BILLS ARE
8/01- 8/31  VCR               * FREE *   DELIVERED. OUR LEAST BUSY DAYS
8/01- 8/31  ADD'L PREM. SVC      5.72    ARE WEDNESDAY AND THURSDAY. IF
8/01- 8/31  PREMIUM SERVICES    62.85    YOU HAVE A BILLING QUESTION,
            SHOWTIME,DISNEY              PLEASE TRY TO CALL DURING THESE
            CINEMAX                      LESS BUSY TIMES.
            HBO
            MOVIE CHANNEL

7/31        AMOUNT DUE          103.02

       AUG 01 THRU AUG 31, 1992

**EXHIBIT 14**
**471**

ER-314

RC 000206489

Los Angeles Department of Water and Power
P.O. Box 111, Los Angeles, California

JOSEPH M SHUSTER
11944 MONTANA AV 305                    ACCT# 4-04-61024-11944-00-0305-3-01

 BILL ISSUE DATE  01/09/92
 AMOUNT OF PREVIOUS BILL    $      112.54
 PAYMENTS SINCE   11/04/91   $      112.54-

ELECTRIC RESIDENTIAL   RATE R1A        SERVICE DATES
                                      10/31/91 TO 01/07/92

 SERVICE CHARGE              2 MONTHS X $  0.30/MO   $       0.60
 ENERGY USED                 1,850 KWH X $  0.06624        122.54
 ENERGY COST ADJUSTMENT      1,850 KWH X $  0.02520         46.62
 LOW INCOME SUBSIDY CHARGE   1,850 KWH X $  0.00083          1.54
          METER 01-ELECTRIC TOTAL $     171.30

          CHARGES IMPOSED BY NON-DWP AGENCIES
 CITY UTILITY TAX        $      171.30 X   10.0%     $      17.13
 STATE ENERGY SURCHARGE     1,850 KWH X $  0.00020           0.37
          PLEASE PAY THIS AMOUNT NOW DUE ►    $    (188.80)
                METER USAGE INFORMATION

| METER<br>01 | TYPE<br>E | METER NUMBER<br>6-596677 | READS CURRENT<br>78177 | PREVIOUS<br>76327 | CONSTANT<br>1 | USAGE<br>1850 |
|---|---|---|---|---|---|---|

| METER<br>01 | DAYS | | USAGE | | DAILY AVERAGE | |
|---|---|---|---|---|---|---|
| | THIS YR<br>68 | LAST YR<br>67 | THIS YR<br>1850 | LAST YR<br>2118 | THIS YR<br>27 | LAST YR<br>32 KWH |

**EXHIBIT 14**
**472**

ER-315 006490

*Security Pacific National Bank*

SAN VICENTE-BUNDY OFFICE
11980 SAN VICENTE BLVD
LOS ANGELES CA 90049

JOSEPH SHUSTER
11944 MONTANA AVE APT 305
LOS ANGELES CA    90049-5026

| | |
|---|---|
| ITEMS ENCLOSED | 010 |
| | 0¢ |
| PAGE NO | 16 |
| | 1 |

(310) 247-2800

*No Safe Deposit Box*

JUN 19 92 - JUL 21 92
AUG 19 92

ACCOUNT NUMBERS:

FOR CHECK
READ BALANCES                          6696
CHECK GUARANTEE

55 CHECKING

## ACTIVITY

| TYPE | DATE | AMOUNT | TYPE | DATE | AMOUNT | TYPE | DATE | AMOUNT |
|------|------|--------|------|------|--------|------|------|--------|
| 1154 | JUL06 | 150.48 | 1186 | JUL02 | 210.00 | 1202* | JUL13 | 200.00 |
| 1177* | JUN19 | 250.00 | 1188* | JUL01 | 100.00 | 1203 | JUL13 | 103.02 |
| 1181* | JUN25 | 1245.00 | 1190* | JUL09 | 100.00 | 1226* | JUL14 | 31.30 |
| 1183* | JUN29 | 250.00 | 1191 | JUL06 | 61.24 | 1227 | JUL16 | 59.32 |
| 1184 | JUN23 | 98.79 | 1192 | JUL06 | 1423.00 | 1228 | JUL20 | 137.44 |
| 1185 | JUN24 | 125.44 | 1193 | JUL20 | 1211.00 | 1229 | JUL20 | 150.00 |

## ELECTRONIC ACTIVITY

| COMPANY NAME | TRANSACTION DESCRIPTION | COMPANY DATE | IDENTIFICATION NUMBER | POST DATE | AMOUNT |
|--------------|------------------------|--------------|----------------------|-----------|--------|
| WARNER COMMUNICA | PAYROLL DD | 920619 | 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 | JUN19 | 2627.60 + |
| WARNER COMMUNICA | PAYROLL DD | 920703 | 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 | JUL03 | 2627.60 + |
| WARNER COMMUNICA | PAYROLL DD | 920717 | 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 | JUL17 | 2627.60 + |

## DAILY BALANCES

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|------|---------|
| JUN19 | 24173.84 | JUN29 | 22454.61 | JUL06 | 23137.49 | JUL16 | 22643.85 |
| JUN23 | 24075.05 | JUL01 | 22354.61 | JUL09 | 23037.49 | JUL17 | 25271.45 |
| JUN24 | 23949.61 | JUL02 | 22144.61 | JUL13 | 22734.47 | JUL20 | 23773.01 |
| JUN25 | 22704.61 | JUL03 | 24772.21 | JUL14 | 22703.17 | | |

## CHECKING ACCOUNT SUMMARY

| | | |
|---|---|---|
| BEGINNING BALANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ⊗ | | 21796.24 |
| TOTAL OF    3 DEPOSITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + | | 7882.80 |
| TOTAL OF    18 CHECKS/OTHER DEBITS . . . . . . . . . . . . . . . . . . . . . . . . - | | 5906.03 |
| SERVICE CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - | | .00 |
| ENDING BALANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ⊗ | | 23773.01 |

MORE ATHS FOR EASIER BANKING. NOW YOU CAN USE YOUR READYBANKING CARD TO GET
CASH AT BANK OF AMERCIA VERSATELLER ATHS WITH NO NETWORK CHARGE.

**EXHIBIT 14**
**473**

DCC00006491
**ER-316**

# 1992 CHECKS

| Jan | | Feb | | March | |
|---|---|---|---|---|---|
| 1423·00 | + | 51·90 | + | 1423·00 | + |
| 40·50 | + | 100·21 | + | 110·74 | + |
| 44·67 | + | 1423·00 | + | 1211·00 | + |
| 61·57 | + | 107·77 | + | 45·27 | + |
| 115·75 | + | 58·00 | + | 465·63 | + |
| 36·00 | + | 312·03 | + | 50·00 | + |
| 1500·00 | + | 144·00 | + | 200·00 | + |
| 75·25 | + | 1211·00 | + | 121·69 | + |
| 150·00 | + | Feb 3407·91 | * | 98·00 | + |
| 200·00 | + | | | 67·09 | + |
| 200·00 | + | | | 197·00 | + |
| 100·00 | + | | | 32·00 | + |
| 47·20 | + | | | 71·00 | + |
| 50·00 | + | 298·33 | + | 181·51 | + |
| 1211·00 | + | 1423·00 | + | March 4273·93 | * |
| Jan 5254·94 | * | 150·00 | + | | |
| | | 34·00 | + | | |
| | | 80·75 | + | | |
| | | 100·00 | + | | |
| 137·41 | + | 200·00 | + | | |
| 172·00 | + | 103·02 | + | | |
| 44·19 | + | 126·22 | + | 61·24 | + |
| 126·27 | + | 96·57 | + | 1423·00 | + |
| 51·42 | + | 214·00 | + | 1211·00 | + |
| 200·00 | + | 250·00 | + | 200·00 | + |
| 117·19 | + | 98·79 | + | 103·02 | + |
| 27·05 | + | 1211·00 | + | 31·30 | + |
| 27·06 | + | May 4385·68 | * | 59·32 | + |
| 154·21 | + | | | 137·44 | + |
| 41·75 | + | | | 150·00 | + |
| 145·24 | + | | | July 3376·32 | * |
| 200·00 | + | 1430·00 | + | | |
| 31·05 | + | 111·40 | + | 0· | * |
| 186·14 | + | 103·02 | + | | |
| 187·60 | + | 150·48 | + | 5254·94 | + |
| 200·00 | + | 126·21 | + | 3407·91 | + |
| 120·74 | + | 250·00 | + | 4273·93 | + |
| 50·00 | + | 55·83 | + | 5908·51 | + |
| 12·00 | + | 115·00 | + | 4385·68 | + |
| 59·66 | + | 73·45 | + | 4301·52 | + |
| 142·50 | + | 1245·00 | + | 3376·32 | + |
| 312·63 | + | 105·69 | + | Total 30908·81 | * |
| 1211·00 | + | 125·44 | + | | |
| 1423·00 | + | 210·00 | + | | |
| 103·02 | + | 100·00 | + | | |
| 121·00 | + | 100·00 | + | | |
| 304·38 | + | June 4301·52 | * | | |
| April 5908·51 | * | | | | |

DCC00006492

**EXHIBIT 14**
**474**

**ER-317**

11928 Darlington Ave
Apt. 102
Los Angeles, CA 90049
May 27, 1986

Joseph Shuster
11944 Montana Ave
Apt. 305
Los Angeles, CA 90049
May 27, 1986

Dear Joe,

Your commission check to me dated May 15, 1986, which we thought had gotten lost in the mail, finally arrived. As you have given me another check to replace this one, I am returning this one to you as you requested on the phone.

To avoid future confusion, please make a notation in your checkbook that this one was returned to you.

Enclosed also are 3 copies each of the two documents you requested as a favor to you,( I made a special trip to have these xeroxed for you). One document is dated April 21, 1979 and the other March 23,1983, covering your agreement to pay me 20% of all bonuses and /or increases in lifetime income from D.C. Comics and/or Warner Communications which I have secured (and shall in the future secure) on your behalf. I hope these copies will be helpful to you.

From now on, would you please mark your commission checks to me,"Re: percentage fee for income increase negotiation", or if applicable, "Re: percentage fee for bonus", rather than putting the inaccurate "manager's commission", or "agent's commission", as you have in the past?

This will accurately state that I only negotiate bonuses and income increases for you on your lifetime income, and do not seek employment for you.

Warmest regards.

As ever,

*Joanne*

Joanne Siegel

P.S. I will go to the W.L.A. postoffice to mail this with signed receipt requested to make sure your enclosed check and the documents reach you safely.

**EXHIBIT 14**
**475**

DCS00006493

# <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated: March 5, 2013      TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams