# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

———————————

## APPELLANTS' EXCERPTS OF RECORD (VOL. III OF VII)

———————————

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

———————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Defendants-Appellants*

# INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
| | | *Exhibit B – Ju1y 12, 2012 Kline-Toberoff e-mail* | II | 56 |
| | | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
| | | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
| | | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
|  |  | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
|  |  | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
|  |  | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
|  |  | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
|  |  | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
|  |  | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
|  |  | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
|  |  | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
|  |  | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy | IV | 701 |
| | | Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz | IV | 703 |
| | | Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy | IV | 704 |
| | | Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy | IV | 705 |
| | | Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy | IV | 706 |
| | | Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy | IV | 708 |
| | | Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy | IV | 709 |
| | | Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson. | IV | 710 |
| | | Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy | IV | 719 |
| | | Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy | IV | 720 |
| | | Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc. | IV | 721 |
| | | Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy | IV | 753 |
| | | Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy | IV | 754 |
| | | Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy | IV | 759 |
| | | Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc. | IV | 760 |
| | | Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles | IV | 855 |
| | | Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles | IV | 869 |
| | | Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary) | IV | 874 |
| | | Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation | IV | 878 |
| | | Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary) | IV | 894 |
| | | Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary | V | 895 |
| | | Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson | V | 902 |
| | | Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary | V | 907 |
| | | Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen | V | 929 |
| | | Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff | V | 930 |
| | | Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011 | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |

# EXHIBIT 15



Notice of Termination of Transfer
Covering Extended Renewal Term

*Superboy*

000000612

EXHIBIT 15
476

ER-320

## NOTICE OF TERMINATION OF TRANSFER
### COVERING EXTENDED RENEWAL TERM

To:  AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

000000613

**EXHIBIT 15**
477

ER-321

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

2

000000614

**EXHIBIT 15**
478

ER-322

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand, and the undersigned set forth in connection therewith the following:

1. The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: AOL Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020; AOL Time Warner Book Group, Inc., 1271 Avenue of the Americas, New York, NY 10020; Warner Books, Inc., 1271 Avenue of the Americas, New York, NY 10020; Little, Brown, and Company, 1271

3

000000615

**EXHIBIT 15**
479

ER-323

Avenue of the Americas, New York, NY 10020; DC Comics Inc., 1700 Broadway, 7th Floor, New York, NY 10019; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; Milton Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Wildstorm Productions, 888 Prospect Street, Suite 240, La Jolla, CA 92037; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Cantharus Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819; Hallmark Entertainment, Inc., 1325 Avenue of the Americas, 21st Floor, New York, NY 10019; Marvel Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016; Golden Books Publishing, 1540 Broadway, New York, NY 10036; Random House Golden Books for Young Readers, 1540 Broadway, New York, NY 10036; Inkworks, 4320 Delta Lake Drive, Raleigh, NC 27612; DK Publishing, Inc., 375 Hudson Street, New York, NY 10014; Scholastic, Inc., 557 Broadway, New York, NY 10012.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, and additionally, by certified mail, return receipt requested, to the above grantees or successors at the addresses shown.

2.     Each work to which this Notice of Termination applies is as follows: The title of the original copyrighted work to which this Notice of Termination applies is SUPERBOY, which was published and embodied in the illustrated comic book story in More Fun Comics, No. 101, January-February, 1945 issue, for which copyright was originally secured on November 23, 1944 under Copyright Registration No. B653651 and which was published in or about November 18, 1944. SUPERBOY and this work were previously adjudicated to have been based upon and embodied in the character,

000000616

EXHIBIT 15
480

ER-324

concept, script and scenario solely written and created by Jerome Siegel and to be a separate and distinct copyrighted work and character from the copyrighted work and character, SUPERMAN.[1] Renewal for the work was made July 17, 1972, in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under Copyright Renewal Registration No. R532582. SUPERBOY and the aforesaid work were based upon and embodied the following works to which this Notice of Termination also applies: (i) a three page summary or synopsis of the concept and plan for a new comic strip to be known as SUPERBOY solely originated, created, conceived and written by Jerome Siegel (c. 1938) and submitted by Jerome Siegel to Detective Comics, Inc. on or about November 30, 1938; and (ii) a complete thirteen page script containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip, SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, solely originated, created,

---

[1] In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., Supreme Court of the State of New York, Case No. 1099-1947(1948), the Court signed findings of fact and conclusions of law on April 12, 1948 (from which neither side perfected an appeal) including, without limitation, that on or about November 30, 1938, Jerome Siegel submitted to Detective Comics, Inc. for its consideration a synopsis or summary of the conception and plan for a new comic strip entitled SUPERBOY (attached as Exhibit 16 thereto); that during December, 1940 Jerome Siegel submitted to Detective Comics, Inc. for its further consideration a complete script (attached as Exhibit 35 thereto) containing the continuity, plan and dialogue for the first "release" or "releases" of SUPERBOY, the concept and character of SUPERBOY and the entire plan for the future publication of SUPERBOY, all set forth by Jerome Siegel with detail and particularity; that the comic strip, SUPERBOY, published by Detective Comics, Inc. embodied and was based upon the idea, plan, conception and direction contained in said original material solely created by Jerome Siegel; that SUPERMAN did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY and that SUPERBOY was a work different and distinct from SUPERMAN; that the publication of all such comic strip material entitled SUPERBOY by Detective Comics, Inc. was at all times without the permission of Jerome Siegel; and accordingly, that Jerome Siegel, was the originator and owner of the comic strip feature, SUPERBOY, and had the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY, of the type and nature theretofore published by Detective Comics, Inc. Subsequent to these court findings, the parties entered into the above referenced agreement dated May 19, 1948 wherein Jerome Siegel assigned rights in SUPERBOY to National Periodical Publications, Inc., to which assignment this Notice of Termination applies, without limitation. In Jerome Siegel and Joseph Shuster v. National Comic Publications, Inc. et al., 364 F. Supp. 1032, 1033 (S.D.N.Y. 1973), aff'd in part, 508 F.2d 909 (2nd Circuit 1974), the Court held that the aforementioned findings by the Supreme Court of the State of New York in 1948 are binding and that any dispute with respect thereto is barred by the doctrines of *res judicata* and *collateral estoppal*.

5

000000617

**EXHIBIT 15**

481

ER-325

conceived, and written by Jerome Siegel in detail and with particularity, and submitted by Jerome Siegel to Detective Comics, Inc. on or about December, 1940. The remaining works to which this Notice of Termination applies[2] are:

| Title | Name of Author[3] | Date Copyright Secured[4] | Copyright Reg. No. |
|---|---|---|---|
| **SUPERBOY IN[5]:** | | | |
| More Fun Comics#101 | Detective Comics, Inc. | Nov. 18, 1944 | B653651 |
| More Fun Comics#102 | " | Jan. 16, 1945 | B661073 |
| More Fun Comics#103 | " | Mar. 20, 1945 | B669959 |
| More Fun Comics#104 | " | May 28 1945 | B679484 |
| More Fun Comics#105 | " | July 23 1945 | B687306 |
| More Fun Comics#106 | " | Sept. 23, 1945 | B696308 |
| More Fun Comics#107 | " | Nov. 20, 1945 | B701661 |

---

[2] This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERBOY or the SUPERBOY stories, such as, without limitation, Superboy, Smallville, Lana Lang and Pete Ross. Every reasonable effort has been made to find and list herein every such SUPERBOY-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

[3] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a "work made for hire," nor is anything else herein to be construed as any such admission. Nothing contained in this Notice of Termination shall be construed to in any way limit or waive any right or remedy that the undersigned might have, at law or in equity, with respect to the subject matter hereof, all of which is hereby expressly reserved.

[4] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 published work whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 published work whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 unpublished work whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 unpublished work whose year of creation differs from its year of registration, the year of creation will be given (e.g. "DCRE: 1979"), followed by the specific registration date.

[5] "SUPERBOY IN:" means any and all works as described in footnote no. 2.

000000618

EXHIBIT 15
482

ER-326

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Dichotic (aka Smallville # 209) | Warner Bros. Television | 2002 | No record |
| Skinwalker (aka Smallville # 210) | | 2002 | No record |
| Visage (aka Smallville # 211) | | 2002 | No record |
| Smallville DVD (Episode #101: "Pilot" and Episode #102: "Metamorphosis") | | 2002 | No record |

**SMALLVILLE NOVELIZATIONS**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| Smallville #1: Arrival | D C Comics, Inc. and AOL Time Warner, Inc. | 2002 | In progress |
| Smallville #2: See No Evil | | Oct. 17, 2002 | In progress |
| Smallville #2: Dragon | | Oct., 2002 | In progress |
| Smallville: Strange Visitors | | Oct. 7, 2002 | In progress |
| Smallville #3: Flight | | Dec., 2002 | In progress |
| Smallville #3: Hauntings | | Dec., 2002 | In progress |
| Smallville #3: Pet Peeves | | Dec., 2002 | In progress |
| Smallville #4: Whodunnit | | Mar., 2003 | In progress |

3.    The grant(s) to which this Notice of Termination applies is(are) made in that certain Agreement dated May 19, 1948 between Jerome Siegel and Joe Shuster, on the one hand, and National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the other hand; and in that certain Agreement dated December 23, 1975 between Jerome Siegel and Joe Shuster, on the one hand, and Warner Communications, Inc., on the other hand.[7]

4.    The effective date of termination shall be November 17, 2004.

---

[7] To the extent the following agreements are found or claimed to contain a grant(s) of, pertaining to or affecting SUPERBOY, in whole or in part, this Notice of Termination shall apply to such agreements as well: Agreement dated December 4, 1937 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated March 1, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand; Agreement dated September 22, 1938 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc. and The McClure Newspaper Syndicate, on the other hand; and Agreement dated December 19, 1939 between Jerome Siegel and Joe Shuster, on the one hand, and Detective Comics, Inc., on the other hand.

52

000000664

**EXHIBIT 15**
**528**

**ER-327**

5.      Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: November 8, 2002

_Joanne Siegel_
Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA  90292

_Laura Siegel Larson_
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

000000665

**EXHIBIT 15**
529

ER-328

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable investigation to be made on our behalf as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct. Executed this _8th_ day of November, 2002, at Los Angeles, California.

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

54

000000666

**EXHIBIT 15**
530

ER-329

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM to be served this 8th day of November, 2002, by First Class Mail, postage prepaid, upon the following:

To: AOL Time Warner Inc.
c/o Richard D. Parsons
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
c/o Barry M. Meyer
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Barry M. Meyer
Chairman & C.E.O
4000 Warner Boulevard
Burbank, CA 91522

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Television
c/o Peter Roth
President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Roger Ames
Chairman & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Worldwide
Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Publisher Services, Inc.
c/o Rich Jacobsen
President
135 W. 50th Street, 7th Floor
New York, NY 10020

AOL Time Warner Book Group, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Warner Books, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

Little, Brown and Company, Inc.
c/o Laurence J. Kirshbaum, CEO
1271 Avenue of the Americas
New York, NY 10020

DC Comics, Inc.
c/o Paul Levitz
President & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

55

000000667

**EXHIBIT 15**
531

FR-330

DC Comics, a General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway, 7th Floor
New York, NY 10019

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

Milton Bradley Co.
Division of Hasbro Inc.
c/o David E. Wilson
President
433 Shaker Road
East Longmeadow, MA 01028

Hasbro, Inc.
c/o Alan Hassenfeld
Chief Executive Officer
1027 Newport Avenue
Pawtucket, RI 02861

Wildstorm Productions
c/o Jim Lee
Editor & Director
888 Prospect Street, Suite 240
La Jolla, CA 92037

Dark Horse Publications
c/o Michael Richardson
President
10956 S.E. Main St.
Milwaukie, OR 97222

Cantharus Productions, N.V.
c/o Ilya Salkind
8965 Bay Cove Ct.
Orlando, FL 32819

Hallmark Entertainment, Inc.
c/o Robert Halmi, Jr.
Chairman
1325 Avenue of the Americas
21st Floor
New York, NY 10019

Marvel Entertainment Group, Inc.
c/o F. Peter Cuneo
President & C.E.O.
10 East 40th Street, 9th Floor
New York, NY 10016

Golden Books Publishing
c/o Amy Jarashow
Associate Publisher
1540 Broadway
New York, NY 10036

Random House Golden Books for
Young Readers
c/o Kate Klimo
Vice President & Publisher
1540 Broadway
New York, NY 10036

Inkworks
c/o Allan Caplan
President & CEO
4320 Delta Lake Dr.
Raleigh, NC 27612

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014

Scholastic, Inc.
c/o Richard Robinson
Chairman & CEO
557 Broadway
New York, NY 10012

56

000000668

EXHIBIT 15
532

ER-331

We declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of November, 2002, at Los Angeles, California.

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

57

000000669

**EXHIBIT 15**
533

ER-332

# EXHIBIT 19

FILE
SIEGEL +
SHUSTER

*It has been 50 years since Superman, the creation of two kids from Cleveland, made his debut in the pages of Action Comics No. 1. In honor of this anniversary, we reprint this article from The Saturday Evening Post of June 21, 1941 (© 1941 The Curtis Publishing Co.) . On the next five pages, we are reprinting the actual pages from the 47-year-old magazine, so don't try to cash in on any of the nifty ads.*

14

# UP, UP AND AWA-A-Y!

## The Rise of Superman, Inc.

### By John Kobler



*At twenty-six, the genie they created has brought them super-success. Jerry Siegel, who does the writing, watches Joe Shuster at the drawing table.*

ONE afternoon last June, shortly after the owners moved into the new house on Cleveland's University Heights, a delegation of small boys rang the doorbell. At sight of the short, plump, heavily spectacled young man of twenty-six who answered it, their faces fell.

"Aw, I told you Superman doesn't live here," the oldest one fretted.

"Oh, yes, he does," insisted another. "My pop told me so."

"Hold on, boys," put in the plump twenty-six-year-old. "Just wait here a minute."

He bobbed back into the house, returning an instant later with an outfit familiar to millions of boys the country over: the red boots, blue tights and flowing red cape, embroidered with an enormous S, which Superman, America's No. 1 Comic Magazine hero, wears whenever he swings into action.

The boys' faces brightened again. Hopping up and down excitedly, they squealed, "Where is he? We wanna see him!"

"Well, right now," explained the plump youth, "he's engaged on one of his mysterious missions.





*"Home of the Shusters was quite grand when has happened to them." Joe (center left) is a bountiful provider for Brother Frank, Mamma, Papa, Sister Jeanette. Right—Siegel invented Superman in a less luxurious bed, likes to read biographies of factual supermen.*

But he's not far away. He ought to be landing on the roof any minute."

Until dusk fell, the boys kept circling the house, their eyes glued to the roof.

Superman failed to show up that day. But when their mothers called them for supper, the plump young man managed to send them home satisfied that Superman was hovering somewhere in the neighborhood.

In the three years that Jerry Siegel, the plump youth, has been writing the Superman saga, and Joe Shuster, his neighbor, partner and boyhood crony of the same age, has been illustrating it, they have assumed a solemn obligation to instill faith, wherever possible, in the physical reality of Superman. They have done this in the same spirit in which

old-fashioned parents encourage belief in Santa Claus. Indeed, Siegel and Shuster are suspected by many of their friends of believing in Superman themselves.

And to their deep satisfaction, material considerations aside, their Man of Steel, with his superhearing, super-sight and super-vitality, has become all things to all boys. He has shaken the pedestal of many a classic boyhood idol: Tarzan, whom he can outleap and outfight; Nick Carter, whom he can outsleuth; Galahad, whose purity is as tarnished brass compared to his. More than this, Superman accomplishes with casual ease feats that are common to every boy's daydreams. He kayoes eleven prize fighters in one second flat, leaps an eighth of a mile in any direction, runs faster than a

locomotive and swims faster than a fish. His eyes are so keen that they can see through the thickest walls, his ears so acute that he is, willy-nilly, an eavesdropper on any conversation within a hundred yards. His skin is so tough that nothing short of an exploding grenade can even tickle it. Bullets bounce off it like spitballs; cold steel crumples against it like matchwood. And to top it all, his motivating traits are "super-courage, super-goodness and super-justice"; his mission in life "to go to the rescue of persecuted people and deserving persons."

Perhaps the greatest of all Superman's achievements is that he is a miracle man in fact as well as in fancy. No other cartoon character ever has been such an all-around success at the age of three. No other cartoon character ever has carried his creators to such an accomplishment as Siegel and Shuster enjoy at the age of twenty-six.

Three times a week, millions of young spines tingle as Superman thunders hollowly over the air waves. "Up, up and awa-a-y!" then soars into space to wreck an enemy Zeppelin in full flight or extinguish a forest fire by huffing at it, as the crisis may demand. His noble profile confronts them in two magazines and 230 newspapers with a com-

**EXHIBIT 19**
**554**

ER-334

DCC00006849

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*



*Superman crashes the movies—a scene from his first animated cartoon, about to be released. Below—The businessmen who have made an even better thing of Superman than have his authors. Harry Donenfeld is the man in the center.*

bined circulation of nearly 25,000,000. That boy is growing rare who has no Superman dungarees in his wardrobe or no Superman Krypto-Raygun in his play chest.

When R. H. Macy & Co. staged a Superman exhibit in its New York store last Christmas, it took in $30,000 in thirty-cent admissions. Superman Day at the World's Fair cracked all attendance records for any single children's event, drawing 36,000 of them at ten cents a head. Certificates, code cards and buttons, setting them apart as members of the Superman Club of America, are proudly carried by some quarter of a million youngsters, including Mickey Rooney, Spanky McFarland, Farina, a du Pont, a La Follette, Mayor La Guardia's two children, and six Annapolis midshipmen. The 33rd Bombardment Squadron, Air Corps Reserve, has adopted Superman as its insignia.

### *Bomb-Shelter Divertissement*

AN AMERICAN newspaper correspondent, touring London's bomb shelters during a heavy raid, observed a cockney boy immersed in the pages of Superman. Neither the din of antiaircraft fire nor shells exploding near by could distract his attention, and in his rapture he began squirming and jostling his neighbors. After a particularly violent detonation, his mother snatched the magazine out of his hands. "Give over," she bawled, "and pay attention to the air raid."

Among the intellectuals, Superman has been acclaimed the first authentic culture hero since Paul Bunyan. The New Republic recently analyzed him in terms of Nietzschean philosophy, a concept neither Siegel nor Shuster could ever understand.

Although many a parent-teacher group has objected to Superman, Dr. Lauretta Bender, the psychiatrist, addressing the American Orthopsychiatric Association, declared that he provides an inexpensive form of therapy for unhappy children. She cited the case history of a boy, ignored by a flighty mother and an alcoholic father, who believed he would soon die. He found relief by identifying himself with the imperishable Superman. "(He) would seem to offer the same type of mental catharsis," Doctor Bender concluded, "that Aristotle claimed was an attribute of the drama."

Governments have taken official note of Superman. In a special strip drawn for a magazine, Siegel and Shuster had him demolish the Siegfried Line, seize both Hitler and Stalin by the napes of their necks and whisk them off for judgment before the League of Nations. Das Schwarze Korps, official newspaper of Hitler's Elite Guards, took note of their Jewish blood and counterblasted: "The clever creator of Superman is a Colorado beetle (sic). . . . He stinks."

Translations used to carry Superman all over Europe—yes, including Scandinavia. But, banned wherever the swastika waves, he is now confined to the British Empire, the

*(Continued on Page 70)*



**EXHIBIT 19**
555

ER-335
DCC00006850

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*



GOOEY PIPE SINKS MARINE
—but he's out of the dog house now!




SERGEANT FRANKLIN'S pipe was rankin' the bimbo in back of the boat. "Head for the shore," she gasped. "That briar of yours smells like burning celluloid! I'm getting dizzy!"

OUT SHE JUMPED and off she stalked. And there he stood. "Well," said the fisherman, "I see the Marines have landed, but don't have the situation well in hand. Get wise, Mister!"




"THAT HANDSOME UNIFORM will win no women till you clean your pipe and switch to a tobacco that smells good. Like this here Sir Walter blend of fine mild burleys. Try a load."

PUFF ENDS RUFF. The sergeant took that good advice—switched to Sir Walter Raleigh—and won her back in a sniff. Try this mildest tobacco yourself. It smells grand to everyone!



KEEP OUT OF THE DOG HOUSE WITH SIR WALTER

SIR WALTER RALEIGH

New! Cellophane top around lid seals flavor in, brings you tobacco 100% factory-fresh!

UNION MADE

Tune in... UNCLE WALTER'S DOG HOUSE
EVERY FRIDAY NIGHT ★ NBC ★ PRIZES FOR YOUR "DOG HOUSE" EXPERIENCE

# UP, UP AND AWA-A-Y!

(Continued from Page 15)

United States, Latin America (Super-hombre), Hawaii and the Philippines.

The young creators of the Man of Steel have been hailed by Doctor Freud as perfect clinical illustrations of psychological compensation. For here are two small, shy, nervous, myopic lads, who can barely cope with ordinary body-building contraptions, let alone tear the wings of a stratoliner in mid-air. As the puniest kids in school, picked on and bullied by their huskier classmates, they continually moped off into what Doctor Freud termed "infantile phantasies," wherein they became colossi of brute strength, capable of flattening whole regiments of class bullies by a flick of their pinkies.

Siegel's parents are old-time Clevelanders. His father, Michael, who died six years ago, ran a hole-in-the-wall men's furnishing shop and his mother helped behind the counter. There are three sisters, now all married, and two older brothers—Leo, a dentist, and Harry, a mailman.

Never a shining scholar, Siegel daydreamed through Oliver Wendell Holmes Public School, landing uneasily in Glenville High. Everybody in the struggling Siegel family had to pull his own weight. Between classes Jerry made deliveries for a printing plant, averaging four dollars a week. At all leisure moments, however, he nurtured his ingrown soul on an undiluted diet of dime novels and comic strips, especially the Man-From-Mars category.

"It inspired me to devote myself henceforth to writing science fiction literature," says Siegel, who often talks like that.

Presently he was devoting himself to it so wholeheartedly that it sometimes took two years to move him from one grade into the next.

## A Cosmic Meeting

It was in the corridors of Glenville High that a classmate pointed out to him a pale, pitcher-eared lad named Joe Shuster, whose head was also in the clouds above Mars. Siegel sought him out.

"I understand," he said, "that you draw science fiction stuff."

"Uh-huh," Shuster admitted, his eyes blinking behind double-thick lenses.

By the noon recess the boys had formed a partnership which has progressed, unmarred by a single dispute, to this day.

The Dutch-Russian-Jewish Shusters were harder up than even the Siegels. Julius Shuster, a work-worn little tailor, had started life in Toronto forty years earlier and emigrated to Cleveland when Joe was ten. The family, consisting, in addition, of Mamma Shuster, brother Frank who now works as a letterer on the Siegel-Shuster staff and sister Jeanetta, crowded into a twenty-dollar-a-month flat in a down-at-the-heels district. Some days they skipped a meal. One winter they had no coal and Joe had to work at his drawing board wearing cotton gloves.

By the time he entered Glenville High he was a wage earner of experience, having peddled newspapers, hawked ice-cream cones in summer, and worked as an apprentice in a sign painter's shop. He earned as much as five dollars a week, which he dutifully

handed over to his parents. He also found time to win a scholarship at the Cleveland School of Art and attend night classes at John Huntington Art School, where the tuition was ten cents a lesson.

Five minutes after Siegel and Shuster met they were breathlessly discussing Buck Rogers, Tarzan of the Apes, and other exemplars of the contemporary comic strip. As soon as school was out they repaired to Shuster's unheated workroom, barely twelve blocks from the Siegel home, and plunged into an editorial conference, resuming it every night and as much of the daytime as they could snatch from school for the next several years.

## The Birth of Superman

They were years of struggle and discouragement. The partners brewed many a strong potion—Doctor Occult, a sort of astral Nick Carter who kept tangling with zombis, werewolves and such; Henri Duval, a doughty musketeer in the image of D'Artagnan—but no editor hastened to press riches on them. What few continuities they did place were bought by Major Malcolm Wheeler-Nicholson, a grand-mannered, bespatted ex-Army officer, who in February of 1935 had published New Fun Comics, first original comic magazine and forerunner of some 108 which now festoon the newsstands. [For the record, the first Comic Magazine of any description—it contained reprints only—was published by M. Charles Gaines, a schoolteacher who became production manager of Mc-Clure Syndicate.] But the major couldn't see Superman for two pins.

How, one hot night in 1932, the Man of Steel had gone practically full-blown into Jerry Siegel's head is an experience he never tires of describing.

"I am lying in bed counting sheep when all of a sudden it hits me. I conceive a character like Samson, Hercules and all the strong men I ever heard tell of rolled into one. Only more so. I hop right out of bed and write this down, and then I go back and think some more for about two hours and get up again and write that down. This goes on all night at two-hour intervals, until in the morning I have a complete script."

As the dawn rose over Cleveland, Siegel, shirttail flying and script clutched in his fevered hands, raced through the empty streets to the Shuster home - one of the few violent exertions he has ever permitted himself and roused his partner. Shuster took fire at once. Without pausing for either food or rest, they spent the rest of the day polishing off the first twelve Superman strips. The story told therein is now as familiar to the average American boy as George Washington and the cherry tree.

How, split seconds before the planet Krypton, abode of a super-race, is destroyed by earthquakes, Jorl-l, the great Kryptonian scientist, pops his first-born into a rocket ship and launches him into interplanetary space. Some 3,000,000,000 light-years later the rocket ship lands safely on a roadside near Metropolis, U. S. A., where a passing motorist extricates tiny Jorl-l, Jr., and delivers him to an orphanage. Here, in an unforgettable

(Continued on Page 73)

EXHIBIT 19
556

ER-336
DCE00006851

Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)

THE SATURDAY EVENING POST                                    73

[Continued from Page 70]

panel, the diapered super-tot merrily balances a huge armchair on his hand while doctor and nurse look on, bug-eyed.

We next see him grown to super-manhood, a broad-shouldered, Greek-profiled titan. In the process he has acquired a dual personality. Part of the time the world knows him as Clark Kent, a distinctly prissy reporter for the Daily Planet, who tends to shy away from unpleasantness. But let evil show its fangs and he ducks into privacy, shucks his college-cut clothes and stands forth, bold as truth, in the gaudy working clothes of Superman. This Doctor-Jekyll-and-Mr.-Hyde arrangement enables Clark Kent to hand his paper some extraordinary scoops on Superman's latest coups.

Most of them are brought off in behalf of Lois Lane, the Planet's toothsome girl reporter, whose nose for news is constantly landing her in dire straits.

If Major Wheeler-Nicholson's judgment in passing up this Homeric figure was faulty, it was no worse than the judgment of practically every syndicate and comic-magazine editor in the country. During the next six years all of them rejected it, some not once but two or three times.

"Frankly," wrote the editor of the Ledger Syndicate, "we feel that the public have had their fill of super-human subjects." The Bell Syndicate explained that "we are in the market only for strips likely to have the most extraordinary appeal and we do not feel Superman gets into that category." United Feature thought that Superman was "a rather immature piece of work," and Esquire Features, Inc., suggested, "Pay a little more attention to actual drawing. . . . Yours seems crude and hurried."

To keep eating regularly, the partners had to turn their hands to comic valentines and cut-rate advertising layouts.

But 500 miles away, in a New York office building, blind chance suddenly staggered in the partners' direction. Here, on the ninth floor of 480 Lexington Avenue, Harry Donenfeld, owner of a printing plant, partner in a distributing company and an irrepressible prankster who once gave Jack Dempsey a hot foot, had taken over the major's interests, which now embraced three comic magazines. And on the well-known pulp-publishing theory that it is practically as cheap to run four as three, he had decided to bring out a new ten-cent monthly, Action Comics. But how to stock up on new material? Charlie Gaines figured that McClure Syndicate ought to have some stuff lying about. McClure did and Gaines sent over a batch of it, including the original Superman strips, which McClure had been on the verge of rejecting for the third time.

**Selling a Brain Child**

Without great enthusiasm Donenfeld asked Siegel and Shuster to paste up their original strips into a single thirteen-page story and offered them ten dollars a page. Before payment, however, his far-seeing general manager, Jack Liebowitz, mailed them a release form, explaining, "It is customary for all our contributors to release all rights to us. This is the businesslike way of doing things."

Meaning that for $130 the partners would be relinquishing their equity in all possible future profits from syndication, radio, movies, and so on, and

that Donenfeld, as sole owner of Superman, could even hire some other team to draw him.

The partners, who by this time had abandoned hope that Superman would ever amount to much, mulled this over gloomily. Then Siegel shrugged, "Well, at least this way we'll see him in print." They signed the form.

Superman appeared in the first issue of Action Comics, June, 1938. Nothing happened. Nor the second, for which the partners received another $130. Nor the third. But with the fourth, Action Comics spurted mysteriously ahead of its fellow publications. Donenfeld heard the rumble of distant drums. "We better have a newsstand survey," said he.

**The Golden Touch**

The survey quickened his brightest hopes. Children were clamoring, not for Action Comics, but for "that magazine with Superman in it." Quivering with excitement, Donenfeld ordered Superman splashed all over the cover of succeeding issues. They sold out.

In May of 1939 he tested a quarterly consisting of four thirteen-page Superman stories. It, too, was a sellout. The following July, Superman Magazine bowed in as a bimonthly. It has been sipping along ever since at a lively 1,300,000, while Action Comics, featuring only one Superman story, soared to 900,000. Today Superman leads all other comic-magazine characters, one of the few within even hailing distance being The Bat Man—800,000—a bimonthly also owned by Donenfeld. Last year the Superman magazine grossed $950,000.

From the fall of '38 on, it was all sail and no anchor. Amid the piteous sounds of syndicate editors kicking themselves, McClure negotiated with Donenfeld to handle the newspaper rights. Donenfeld to receive 40 per cent. Superman was eventually placed in 230 daily and Sunday newspapers scattered throughout the Western Hemisphere. Donenfeld's 1940 cut was $100,000.

The McClure negotiations were preceded by considerable unhappiness for the partners. They sensed—correctly—that syndicate editors, who had once turned Superman down, would soon come to them, hat in hand. They begged Donenfeld to give back the syndicate rights.

"We can't do that," he replied, "but if one of you will come to New York, I'm sure we can work something out."

Sitting up all-night in the coach for lack of sleeper fare, Siegel arrived, rumpled and yawning, to receive the proposition: If the partners would confine all their services to Donenfeld for ten years, he would permit them to do strips for McClure, himself retaining an agent's 10 per cent—of McClure's gross, however, not his own 40 per cent net. In the heat of discussion Siegel was frequently reminded that Donenfeld owned all rights and could freeze the partners out. The boys signed a contract, which for the first year brought them an increase of less than $100 a month.

Back in Cleveland, Siegel and Shuster rented a thirty-dollar-a-month office in a remote office building. "The idea was to work where nobody would be likely to interrupt us," says Shuster.

They had the telephone ripped out and kept the frosted-glass door blank, lest curiosity seekers swamp them. As it is, a few of the more persistent ones



You're among Friends—

When you come to

# Ontario

CANADA'S PLEASURE PROVINCE

• FISHING        • RIDING
• GOLFING       • BOATING
• SWIMMING    • LOAFING

—every facet of holiday fun awaits you!

WHETHER you want a rest or a lively vacation, you will find it at its best in Ontario. Marvelous highways will carry you to beauty spots where you can holiday with an enjoyment you have never experienced before. Your money will go further, too, in Ontario . . . there's a handsome premium on U.S. funds.

This year there is a prize contest for the best vacation snapshots, and a contest for the biggest fish caught in each of six different classes. Write for full information about these contests.

If you would like information about visiting the great Ontario goldfields, about canoe trips, or about the rental of Crown lands for cottage or camp sites, it will be furnished gladly on request.

Plan now to enjoy this year's vacation in Ontario. Let us send you full information about the kind of holiday you want. Write now, or use the coupon below.

● No passport is required by U.S. citizens, simple identification papers only. There is no fuss or formality when entering or leaving Canada. No taxes on meals, no amusement taxes, no local sales taxes, and no toll bridge charges to pay within Ontario. Travel in this lovely Province is absolutely unrestricted . . . go where you please, and enjoy yourself to the full . . . you will be very welcome.

Ontario Travel and Publicity Bureau
31 Parliament Buildings
Toronto, Ontario, Canada

Please send me your free 80-page book on Ontario, also official road map.

Name _____

Address _____

Town _____  State _____

# NO PASSPORT REQUIRED

page 66

EXHIBIT 19
557
ER-337
DCC00006852

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*

74 **THE SATURDAY EVENING POST** June 21, 1941



"My Sun Glasses are Better than Yours"

manage to break in. They invariably expect to see something pretty awesome. What they do see is five young artists, hired by Siegel and Shuster, jammed cheek-by-jowl into one of the world's tiniest rooms, furiously penciling and lettering Superman panels at the rate of one thirteen-page story, one Sunday page and six daily strips a week.

The staff reports for work five days a week at 9:30 and knocks off around 5:00. Their salaries range from $50 to $200 a week, which is more than Siegel and Shuster got during the early years of Superman's rise. Nobody but Shuster, however, is allowed to draw Superman's facial expressions, which run the gamut from sublime vacuity to steely determination, depending upon what expression Shuster has subconsciously screwed his own face into at the moment of creation. He also indicates the color scheme, though the actual water coloring is applied in New York.

Siegel's schedule is more irregular. He seldom visits the office, banging out his continuities, three or four at a crack, in his own glossy study at home, a Benny Goodman record swinging at his elbow to stimulate inspiration. He sends the first draft to New York for suggestions, corrections and general editing. A highly individual stylist, he is partial to phrases like "within the room," prefers "commences" to "begins" and has been known to split an infinitive three ways. To Whitney Ellsworth, one of the harassed Donenfeld editors, falls the delicate task of curbing these tendencies without diluting Superman's fruity mode of speech: "So Luthor is still alive and plotting the downfall and subjugation of present-day civilization! The world will never be safe until that fiend is destroyed—and somehow I've got to accomplish it."

Besides being the greatest soliloquizer since Hamlet, Superman is also a humorist full of whimsey and light banter. No matter how rough the action or how grim the crisis, he is always ready to toss off some blithe gaiety. "May I get in on this?" he inquires with elaborate mock courtesy, as he slams himself through brick and into Luthor's hide-out. Dangling from the underside of a speeding auto and bouncing his head against the curb at every turn, he observes airily, "Just a good scalp massage." When an artillery squad fires a Big Bertha at him, he catches the shell in his bare hands, chuckles, "Oh, wanna play, eh?" and hurls it right back at them.

**Pen-and-Ink Morals**

When Ellsworth returns his continuity, Siegel prepares a final draft and runs through it with the entire staff. Shuster then blueprints the main sequence of action and allots the drawing chores, each to its proper specialist.

Every two or three months Siegel flies to New York to sit in on a policy conference. With millions of parents ready to ban Superman from the house should ever his high moral sense falter, the company takes its civic responsibilities seriously.

Superman is never allowed, for example, to destroy property belonging to anybody except the villain, and then only when absolutely unavoidable. He will readily project himself through a building, rendering it utterly uninhabitable, but only when Lois Lane's predicament inside is so desperate that to use the conventional entrance might mean a fatal delay. Superman never kills anybody and

never uses a weapon other than his bare fists. He knocks evildoers silly at the drop of a hat, tosses them clear into the stratosphere and generally scares the daylights out of them. But those who get killed are always hoist by their own petards, as when a gangster whams Superman on the skull with a crowbar, only to have the crowbar rebound and shatter his own noggin.

Rarely by so much as a word or a glance is the tender passion suggested between Superman and Lois Lane. For one thing, Superman himself has shyly confessed that he would never embrace a girl, lest he inadvertently crack her ribs. It is a curious evidence of children's precocity that most of them sense how Superman and Lois feel about each other anyway.

**The Air Wave of Prosperity**

With Superman, Inc.'s many extra-literary enterprises neither Shuster nor Siegel has any direct connection. Radio, for instance. In 1939, Bob Maxwell, one of Donenfeld's braintrusters, sat down with a script writer to whip together a series of fifteen-minute recorded cliff-hangers. The project dragged along for six months. The toughest problem was sound effects. What sort of noise would Superman make taking off, anyway? They finally solved that one by mixing a newsreel recording of a bomb falling in the Spanish war, a fifty-mile gale and a hand-operated wind machine. The result was a gratifying "Who-o-o-sh."

They found a sponsor and on the evening of February 12, 1940, over ten scattered stations, was first heard: "Up in the sky! Look! It's a bird! It's a plane! It's Superman!"

Ten weeks later it had a Crossley rating of 5.6, establishing it as the most popular children's program wherever broadcast.

At this writing it is being broadcast three to five times a week on sixty-three stations, its sponsors including an Atlanta, Georgia, wet-wash laundry and a Hawaiian Swiss-watch firm, bringing the total annual radio income to $75,000. A nationally known sponsor, whose identity is still a closely guarded secret, has just bid double that for exclusive ownership and plans to release it in the fall over a coast-to-coast hookup.

Of the 250 people employed in Superman enterprises, the only one who approaches the physical and spiritual ideal is Superman's radio voice, Clayton (Bud) Collyer, an extravagantly handsome young Williams graduate, six feet tall, weighing 170 pounds, most of it in his chest and shoulders, who superintends his community church and neither smokes nor drinks.

When first offered the role of Superman, Collyer, a $300-a-week performer on such programs as Cavalcade of America and Battle of the Boroughs, thought it sounded pretty silly. Now he loves it. He gets twenty dollars a recording and usually records three episodes at a single session. He takes a lot of ribbing from his adult friends. The elevator starter in the recording studio building never fails to hoot, "Why don't you fly up?" But Collyer takes comfort from the hordes of kids who wait for him to get off the train nights in Jackson Heights, Long Island, and follow him about, shouting, "Hi-ya, Superman! Make like Superman, will ya?" (Collyer uses a tenor for Clark Kent, a basso profundo for Superman.)

*(Continued on Page 76)*

**IT MAY BE TRUE!** Awkward and ugly, of course. But the primitive Eskimo's slit fishbone is better, safer glare-protection than you'll get from some sun glasses. * * * How can you be sure the sun glasses you buy are scientifically safe and efficient? What makes the difference between correct and incorrect glare-protection? Scientists of American Optical Company give the answers in the vital truths presented here.

**FOR YOUR EYES' SAKE... KNOW THESE FACTS**

**LENS QUALITY** is the first consideration. Some sun glass lenses are bent or blown glass containing invisible, but eye-taxing defects. AO Sun Glass lenses are made only of fine quality *ophthalmic* glass, to high optical standards.

**ABSORPTIVE POWER** or ability to stop rays that cause strain and discomfort may be very low in inferior lenses. All AO Sun Glass lenses shut out excessive ultra-violet (sunburn) rays, and some also absorb excess infra-red (heat) rays.

**LENS COLOR** may be guesswork in poor sun glasses. AO scientifically determines

what color shades cut overbrilliant light, yet admit adequate "seeing" light...affect colors least, and blend with complexions.

**FRAMES** of inferior products may interfere with vision, chafe or bind. AO frames are optical quality, smart, finely finished, designed for efficient seeing.

**IF YOUR EYES BURN** or ache, have them examined. Even the finest sun glasses are not the answer for eye trouble. Personal sun glasses, with lenses ground to prescription, add to outdoor pleasures of wearers of eyeglasses... are available through the optical profession.

**SAY "AO"... AND BE SURE!**

Four Types, Many Styles . . . $1.00 and up. Choose sun glasses that carry the famous AO mark. It stands for more than 100 years of optical experience . . . pioneering in absorptive lenses . . . recognized service to the optical profession, Army, Navy and Industry.

**AO CALOBAR Sun Glass** lenses meet specifications of U. S. Army Air Corps. Considered by many optical experts the finest lens of its kind. Calobar absorbs excess ultra-violet and infra-red rays. $2.00 up.

**AO COSL-RAY Sun Glasses** afford complete protection. The exceptionally fine lenses meet U. S. Army Air Corps specifications for infra-red and ultra-violet absorption. $2.50 up.



**AO POLAROID Day Glasses** employ the sensational Polaroid light control that stops reflected glare. Also cuts over-brilliant light and absorbs excess ultra-violet rays. Adult and children's . . . $1.95 up.

**AO SUN-VUE Sun Glasses** have lenses made in the specifications of genuine Crookes glass, that absorb excess ultra-violet. Truly fine glare protection that anyone can afford . . . $1.00 up.



**American Optical Company**

Southbridge, Mass.—Branches in Principal Cities

WORLD'S LARGEST MAKERS OF OPHTHALMIC PRODUCTS

page 67

EXHIBIT 19
558

ER-338

DCC00006853

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*

76    THE SATURDAY EVENING POST    June 21, 1941



# QUIET REVOLUTION

**R**OARING guns, screaming planes and rumbling tanks have had no part in a revolution that has taken place all around you during the past ten years. Quietly, steadily, new types of machine tools have been developed and produced to meet modern manufacturing conditions, until now, in thousands of factories and shops throughout the world, hundreds of thousands of these new tools have displaced older, slower and much more expensive machines!

Behind this quiet revolution lies an unusual story of inventive ingenuity and manufacturing skill. More than ten years ago, Delta engineers set out to design and produce wood and metal-working machines that would be lighter, more flexible, handier and more efficient than any machines then on the market—*which would cost only one fourth to one third as much as older machines*—yet would accomplish the same work. Today, so low in cost are these Delta machines, produced by modern manufacturing methods, that they can be purchased by the very smallest of "one-man" shops!

Behind these Delta light machine tools—now used so successfully and economically by thousands of the finest of American shops—lie years of research and experiment, years of development and patient testing in the field.

As a result, practically every worth-while improvement in light wood and metal-working machinery, for the past fourteen years, has come from the drafting boards of Delta engineers. Today, from the largest airplane and armament plants to the smallest basement workshop, Delta machines are recognized as the standard of high quality and performance.

Let us tell you about Delta machines, and how they can serve your needs.

**The Delta Manufacturing Company**
763 E. Vienna Avenue · Milwaukee, Wisconsin



# DELTA MILWAUKEE

World's largest exclusive manufacturers of low-cost, high quality drill presses · grinders · abrasive finishing machines · tool-oil machines · circular saws · band saws · scroll saws · lathes · jointers and shapers

---

*(Continued from Page 74)*

In October, Paramount Pictures will release the first of a series of twelve Fleischer technicolor cartoons. Under a guaranty-and-percentage contract, Superman, Inc., will net an estimated $120,000. Another healthy source of profit, developed only within the last six months, is thirty-three licensed products, which have poured $100,000 more into the till, bringing the company's 1940-41 income to a jolly total of approximately $1,500,000—and this exclusive of the $1,100,000 from Donenfeld's other publications.

It was only after anguished appeals that Siegel and Shuster finally managed, in 1940, to wangle sizable profits for themselves: $75,000, of which $16,000 goes in staff salaries and overhead. At the end of the first year, when they were still making $130 on a purely salaried basis, they had asked Liebowitz for a five-dollar raise per page. He professed to be shocked, but, as Liebowitz later expressed it, "An artist must be happy," and he granted the raise. The following year, after learning that Superman profits were skyrocketing, the boys again complained, and won a brand-new contract, whereby they got another five-dollar raise, or twenty dollars a page, and 5 per cent of all other Superman revenues.

In the same year Superman was proclaimed by editors almost everywhere tops among comic magazines. This emboldened the boys to plead for still more money. They are now wangling thirty-five dollars a page.

Meantime, their syndicate profits have leaped to $600 a week. They will soon be doubling, then quadrupling their weekly output, with an eye to bringing out Superman monthly and, if possible, twice a month. Next year, with revenues from radio, movies and licenses coming in, they stand to make $150,000. Their ten-year term of service, however, is not reciprocal. Donenfeld remains free at any time to discharge them.

How much he personally pockets from Superman is a question much debated in New York publishing circles. In his various publishing corporations he owns 75 per cent of the stock; an old business associate, Paul Sampliner, owns the rest. Liebowitz cautiously admits that his boss last year paid an income tax on "more than $100,000." Donenfeld himself, in an expansive mood, once told a reporter that he netted $500,000 from Superman alone. The best available estimates come to about half that.

## Living Up to a Character

Siegel and Shuster sometimes fall to brooding about now nice it would have been had they held out for a fat percentage of all future profits. But in the end they always reach the same Pollyannaism: "Even if we were making three or four times as much, we wouldn't be doing anything very different than we're doing now. As it is, we have to keep pinching ourselves."

Money has not added their brains. They have read too many horror stories depicting the plight of improvident celebrities not to salt away a fair slice of their incomes. As good provider for his whole family, Shuster recently moved them into a better neighborhood and a ten-room, wooden-frame house at seventy-five dollars a month. One of his few extravagances has been filling it with shiny new furniture, including a sixteen-tube radio-phonograph console, so that he and Mamma Shuster can share their favorite pas-

---

time—listening to classical music. He has also bought a fancy automobile, shelves of detective stories and a camera. But Mamma Shuster still cooks and waits on table, the only concession to her improved status being a colored maid who comes in twice a week to house-clean. Joe wants his father to retire, but Papa Shuster insists on going downtown every day, where, for something to do, he operates an elevator. None of the Shusters can quite grasp what has happened to them.

To Joe Shuster the most important thing money has brought is the chance to build up his body. For years he tried Lionel Strongfort correspondence-school methods, dynamic tension and scores of physical-culture magazines—without result. Now he lifts weights three times a week in Barney Kofron's gym—he can handle 175 pounds—consumes a T-bone steak and two quarts of milk a day. This regimen has increased his weight from 112 to 128 pounds. To increase his height of five-feet-two, he wears built-up shoes. But he still looks like an undernourished, bewildered schoolboy of sixteen.

Last December in Miami Beach, where he liked to loiter, hatless and in shabby clothes, along uppity Lincoln Road, gawking at the expensive automobiles, a policeman approached Shuster, bristling with dark suspicions. Probably nothing would have happened had Shuster not protested that he was Superman's co-creator and flashed $147 in large bills to show he was no derelict. The policeman arrested him and a magistrate sentenced

him to thirty days in the pen for vagrancy. A local reporter had the wit to suggest that Shuster establish his identity by drawing Superman. Face crimson, the court let him go.

## Aladdin's Lamp

Jerry Siegel has spread himself economically a little bit more. With no dependents save the buxom, twenty-year-old sweetheart of high-school days, whom he married last year, he put $15,000 into an air-conditioned, rock-wool-insulated, weather-stripped house with so many laborsaving gadgets that Bella Siegel has little to do all day except flip switches. Their pride and joy is a paneled playroom in the basement, complete with dart game, ping-pong table and bar, though neither drinks or even knows how to mix a cocktail. Every room has a radio and gleams with silken drapes and chromium fixings. Jerry has bought Bella a mink coat and a diamond bracelet.

Four months younger than Shuster, Siegel is an incurable jitterer, who hums softly to himself during conversational lulls and rolls reams of paper into little pellets. Four inches taller than Shuster, he weighs forty-two pounds more. Up in his attic he keeps a lazy man's hip-reducing machine which shakes itself and him silly when he pushes the button. He doesn't use it much. He and Bella spend half their waking lives in the movies, Siegel's pockets always crammed with four or five candy bars. Next to movies, he likes best to stretch out on his outsize bed and read history or biography.

Shortly after Siegel received his last check from New York he telephoned Liebowitz for an advance of $500.

"But we just mailed you a check," exclaimed Liebowitz.

"I know," replied Siegel, "but I have nineteen thousand five hundred dollars in my bank account and I want to round it out to an even twenty."

He got the advance.

Messrs. Shuster and Siegel are now in the throes of creating another comic strip.

It will be called Superboy and will confine itself to Superman's adolescence, when his supermuscles—the mind recoils from the possibilities—were employed in practical jokes.

"It will be," Siegel explains, "about Superman before he developed a social conscience."

---

*page 68*

---

**EXHIBIT 19**
559

# EXHIBIT 21

WARNER COMMUNICATIONS INC.

MARTIN D. PAYSON
OFFICE OF THE PRESIDENT
AND GENERAL COUNSEL

August 8, 1988

Mr. Joseph Shuster
256 South Robertson
Beverly Hills, CA  90211

Dear Joe:

I know from Joanne Siegel that she has kept you up to date
as to the discussions and correspondence which have taken place
between she, Jerry and I, and the new compensation arrangements
which Warner Communications has agreed to for Jerry's and your
benefit.

Retroactive to January 1, 1988, we will be making payments
to each of you and Jerry at the rate of $80,000 per annum, plus
an annual cost of living increase of up to 10%, commencing 1989
based upon the U.S. Department of Labor statistics for the cost
of living applicable to the Los Angeles area.  In addition, we
will make a one-time payment of $15,000 (less withholding
taxes).  We have also agreed to reimburse Jerry and Joanne for
the reasonable moving expenses which they will incur on their
move to a new apartment.  At the time such expenses are paid,
we will make a similar payment to you, even though you will not
be incurring any such expenses.

I am pleased to enclose a check in the amount of $11,550
representing the 1988 special payment of $15,000 less
withholding taxes.

Steve Ross, Deane Johnson and William Sarnoff join me in
extending to you our best personal wishes.

Sincerely,

Martin D. Payson

Enclosure

cc:  Joanne Siegel

75 ROCKEFELLER PLAZA, NEW YORK, N.Y. 10019    212-484-6520

Confidential

**EXHIBIT 21**
**595**

WB0056033

**ER-341**

# EXHIBIT 22

ER-342

75 Rockefeller Plaza
New York, NY 10019
212 484 6520

Martin D. Payson
Vice Chairman

# TIME WARNER INC.

March 5, 1991

Mrs. Joanne Siegel
11928 Darlington Avenue, Apt. 102
Los Angeles, CA 90049

Dear Joanne:

Please be advised that the cost of living for the Los
Angeles area for 1990 increased by 5.45% over 1989.
Accordingly, I am instructing the payroll department
to make the 5.45% increase, to be applied to Jerry and
Joe's compensation retroactive to January 1, 1991.

With best wishes to you, Jerry and Joe.

Sincerely,

Martin D. Payson

cc:  Joe Shuster
     Elaine Klein

DCC00005669

**EXHIBIT 22
596**

**ER-343**

# EXHIBIT 23

*Martin D. Payson*
*Vice Chairman*

 **T I M E W A R N E R**

September 8, 1992

Mrs. Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque, NM 87114

Dear Mrs. Peavy:

I wish to acknowledge your letter of August 21, 1992 which arrived while I was away on vacation.  I understand how difficult it was for you to write such a letter, but I am pleased that you chose to do so.

We certainly are prepared to assist Joe's family by paying the final debts and expenses described in your letter.  I have forwarded a copy of your letter with the schedule of debts and expenses to Paul Levitz, Executive Vice President for DC Comics. Paul will arrange for direct payment of each of the outstanding bills.  If you receive any further inquiries from creditors, please forward them directly to Paul Levitz.  His address is as follows:

        DC Comics
        1325 Avenue of the Americas
        New York, NY 10019

I wish to take this opportunity to extend to you my personal condolences on Joe's passing, and I look forward to meeting you at the memorial service on September 24th.

                Sincerely,

                *Martin D Payson*

                Martin D. Payson

cc:  Paul Levitz

# EXHIBIT 25

ER-346

Homecoming. (In The New Yorker,
Aug. 18, 1945) © 16Aug45; B688639.
Karl Shapiro (A); 11Sep72; R536510.
Honeymoon. (In The New Yorker, June
23, 1945) © 21Jun45; B682050.
Karl Shapiro (A); 13Jul72; R533207.

SHAPLEY, HARLOW.
Amateur telescope making. See
INGALLS, ALBERT G., ed.

SHAW, IRWIN.
Part in a play. (In Collier's,
July 7, 1945) © 29Jun45; B682557.
Irwin Shaw (A); 1Dec72; R540979.
The priest. (In The New Yorker,
Apr. 7, 1945) © 5Apr45; B674398.
Irwin Shaw (A); 1Dec72; R540977.
Retreat. (In Collier's, Jan. 27,
1945) © 19Jan45; B661484. Irwin
Shaw (A); 1Dec72; R540976.

SHAWNEE PRESS, INC.
Clarinet sessions. See CASSEL, DON.

SHAY, EDITH.
The private adventure of Captain
Shaw, by Edith Shay & Katharine
Smith (Dos Passos) © 20Feb45;
A186197. Isabel F. Whelan (E of
E. Shay); 4Aug72; R535263.
The private adventure of Captain
Shaw, by Edith Shay & Katharine
Smith (Dos Passos) © 20Feb45;
A186197. Isabel F. Whelan (NK of
E. Shay); 4Aug72; R535262.

SHEEHY, MAURICE, SISTER.
Principles of psychology for the
basic course in nursing. See
RAUTH, J. EDWARD.
Teacher's manual for Principles of
psychology for the basic course
in nursing. See RAUTH, J. EDWARD.

SHENTON, BARBARA WEBSTER.
Mrs. Heriot's house, by Barbara
Webster. © 14May45; A187614.
Barbara Webster Shenton (A);
14Aug72; R534407.

SHEPARD, WILLARD C.
A manual of surgical anatomy. See
JONES, TOM.

SHERIDAN, MARTIN.
Comics and their creators. NM:
additions & revisions. © 28Dec44;
A185533. Martin Sheridan (A);
20Dec72; R541913.

SHERMAN, MARGARET M.
West Point today. See AZOY,
ANASTASIO C. M., ed.

SHERROD, ROBERT.
On to westward: war in the central
Pacific. © 21Nov45; A191826.
Robert Sherrod (A); 27Dec72;
R542022.

SHERWOOD, HARRIETT. See WEAVER,
HARRIETT SHERWOOD.

SHIELDS, ELIZABETH MCE.
As the day begins. © 7Dec44; A185159.
John Knox Press (PWH); 10Oct72;
R537312.

SHIVELY, WILLIAM B.
Real estate broker's closing state-
ment. Form no.669. © 15Aug44;
AA473888. Stevens-Ness Law Pub.
Co. (PWH); 14Aug72; R534186.
Real estate broker's commission
contract. © Stevens-Ness Law
Pub. Co. (PWH)
Form no.
672. Farm property exclusive
listing. © 15Aug44; AA473879.
14Aug72; R534180.
674. Residence property exclusive
listing. © 15Aug44; AA473881.
14Aug72; R534181.

676. Hotel, apartments, rooming
house exclusive listing. © 15Aug44;
AA473883. 14Aug72; R534182.
678. Apartments, hotels, rooming
houses exclusive listing.
© 15Aug44; AA473885. 14Aug72;
R534183.
679. Business opportunities
exclusive listing. © 15Aug44;
AA473886. 14Aug72; R534184.
681. Suburban real estate, vacant
lots exclusive listing. © 15Aug44;
AA473878. 14Aug72; R534179.
685. Business real estate
exclusive listing. © 15Aug44;
AA473874. 14Aug72; R534178.
Real estate broker's deal envelope.
Form no.670. © 15Aug44; AA473890.
Stevens-Ness Law Pub. Co. (PWH);
14Aug72; R534188.
Real estate broker's earnest money
receipt. Form no.84. © 15Aug44;
AA473887. Stevens-Ness Law Pub.
Co. (PWH); 14Aug72; R534185.
Real estate broker's earnest money
receipt. Form no.671. © 15Aug44;
AA473889. Stevens-Ness Law Pub.
Co. (PWH); 14Aug72; R534187.

SHORT, LUKE, pseud. See GLIDDEN,
FREDERICK D.

SHREVE, R. NORRIS.
The chemical process industries.
(McGraw-Hill chemical engineering
series) © 6Apr45; A187171.
R. Norris Shreve (A); 9Aug72;
R534375.

SHULMAN, MAX.
Bank night at the Bijou. (In
Good housekeeping, Aug. 1945)
© 20Jul45; B685467. Max Shulman
(A); 20Jul72; R533029.
Operation Whitefish. (In The
American Legion magazine, Aug. 1945)
© 16Jul45; B685739. Max Shulman
(A); 25Jul72; R532896.
Trouble with the railroad. (In Satur-
day evening post, June 9, 1945)
© 6Jun45; B680032. Max Shulman (A);
6Jul72; R532002.
When Asa comes marching home. (In
Mademoiselle, Aug. 1945) © 31Jul45;
B687204. Max Shulman (A); 7Aug72;
R534045.
When Asa comes marching home. (In
Mademoiselle, Aug. 1945) © 9Aug45;
B687204. Max Shulman (A); 10Oct72;
R537324.

SHUM, ALFONSO VILA. See VILA SHUM,
ALFONSO.

SHURTLEFF, BERTRAND.
Short leash. Illus. by Diana Thorne.
© 28May45; A187866. David B.
Shurtleff (C of B. Shurtleff);
5Oct72; R537334.

SHURTLEFF, DAVID B.
Short leash. See SHURTLEFF,
BERTRAND.

SHUSTER, JOE.
Superboy. See SIEGEL, JEROME.
Superman. See SIEGEL, JEROME.
SHUSTER, JOE. See
SUPERMAN.

SIEB, MAX.
Gottes Berichtigungsgesetz, und
andere Aufsätze. See CHRISTIAN
SCIENCE PUB. SOCIETY.

SIEGEL, JEROME.
Superboy, by Jerome Siegel & Joe
Shuster. (In More fun comics,
Jan.-Feb. 1945) © 18Nov44; B653651.
Jerome Siegel & Joe Shuster (A);
15Nov72; R539938.
Superman, by Jerome Siegel & Joe
Shuster. (In New York post)
© Jerome Siegel & Joe Shuster (A)
© 31Aug44; A5-133999. 28Jul72;
R533254.

© 14Nov44; A5-134891. 24Oct72;
R538333.
© 25Nov44; A5-134944. 24Oct72;
R538344.
© 16Dec44; A5-135227. 24Nov72;
R540262.
© 21Dec44; A5-135287. 24Nov72;
R540257.
Superman, by Jerome Siegel & Joe
Shuster. (In New York post)
© National Periodical Publications,
Inc. (PWH)
© 31Aug44; A5-133999. 22Aug72;
R534042.
© 14Nov44; A5-134891. 20Oct72;
R538098.
© 25Nov44; A5-134944. 20Oct72;
R538116.
© 16Dec44; A5-135227. 24Nov72;
R540258.
© 21Dec44; A5-135287. 24Nov72;
R541672.
Superman, by Jerome Siegel & Joe
Shuster. (In Sunday mirror, New
York) © Jerome Siegel & Joe Shuster
(A)
© 9Jul44; A5-133278. 5Jul72;
R531773.
© 16Jul44; A5-133359. 5Jul72;
R531780.
© 23Jul44; A5-133430. 5Jul72;
R531787.
© 30Jul44; A5-133473. 5Jul72;
R531794.
© 6Aug44; A5-133530. 28Jul72;
R533229.
© 13Aug44; A5-133599. 28Jul72;
R533236.
© 20Aug44; A5-133841. 28Jul72;
R533243.
© 27Aug44; A5-133921. 28Jul72;
R533250.
© 3Sep44; A5-134002. 21Aug72;
R534649.
© 10Sep44; A5-134060. 21Aug72;
R534656.
© 17Sep44; A5-134117. 21Aug72;
R534663.
© 24Sep44; A5-134165. 21Aug72;
R534670.
© 1Oct44; A5-134351. 25Sep72;
R536321.
© 8Oct44; A5-134263. 25Sep72;
R536314.
© 15Oct44; A5-134669. 25Sep72;
R536328.
© 22Oct44; A5-134635. 25Sep72;
R536335.
© 29Oct44; A5-134711. 25Sep72;
R536342.
© 5Nov44; A5-134763. 24Oct72;
R538324.
© 12Nov44; A5-134796. 24Oct72;
R538331.
© 19Nov44; A5-134896. 24Oct72;
R538338.
© 26Nov44; A5-134945. 24Oct72;
R538345.
© 3Dec44; A5-135016. 24Nov72;
R540246.
© 10Dec44; A5-135332. 24Nov72;
R540267.
© 17Dec44; A5-135228. 24Nov72;
R540253.
© 24Dec44; A5-135290. 24Nov72;
R540260.
© 31Dec44; A5-135341. 24Nov72;
R540274.
Superman, by Jerome Siegel & Joe
Shuster. (In Sunday mirror, New
York) © National Periodical
Publications, Inc. (PWH)
© 16Jul44; A5-133359. 11Jul72;
R532022.
© 23Jul44; A5-133430. 18Jul72;
R533176.
© 30Jul44; A5-133473. 25Jul72;
R533187.
© 6Aug44; A5-133530. 31Jul72;
R533388.
© 13Aug44; A5-133599. 7Aug72;
R533888.
© 20Aug44; A5-133841. 15Aug72;
R534061.
© 27Aug44; A5-133921. 22Aug72;
R534828.

EXHIBIT 25
694

ER-347

# EXHIBIT 26

ER-348

LIBRARY OF CONGRESS

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY**, that on November 15, 1972 a claim to copyright in a work identified as **"SUPERBOY"** and registered under number **R 539938.** This work was registered in accordance with provisions of the United States Copyright Law (Title 17 United States Code).

**THIS IS TO CERTIFY FURTHER**, that the attached is an additional certificate for this work; the original certificate was issued in 1972.

**IN WITNESS WHEREOF**, the seal of this Office is affixed hereto on February 29, 2008.

Marybeth Peters
Register of Copyrights

By:     Rosemary Kelly
        Head
        Records Research and
          Certification Section
        Information & Records
          Division

Use of this material is governed by U.S. Copyright Law 17 U.S.C. 101 et seq.

EXHIBIT
18
6-22-11

EXHIBIT 26
695

ER-349

Page 1

# FORM R

REGISTRATION NO.

R   539938

DO NOT WRITE HERE

# Application for Registration of a Claim to Renewal Copyright

**Instructions:** Make sure that all applicable spaces have been completed before you submit the form. The application must be **SIGNED** at line 8. For further information, see page 4.

Pages 1 and 2 should be typewritten or printed with pen and ink. Pages 3 and 4 should contain exactly the same information as pages 1 and 2, but may be carbon copies.

Mail all pages of the application to the Register of Copyrights, Library of Congress, Washington, D.C. 20540, together with the registration fee of $4. Make your remittance payable to the Register of Copyrights.

**1. Renewal Claimant(s), Address(es), and Statement of Claim:** Give the full name(s) and mailing address(es) of the claimant(s) of the renewal copyright. State the statutory category of each renewal claimant. It must be one of the categories described on Page 4.

(*a*) Name .... Jerome Siegel

Address .... 11711 Mayfield Avenue, West Los Angeles, California

Claiming as .... Author
(Use the appropriate statement appearing on page 4)

(*b*) Name .... Joe Shuster

Address .... 98-120 Queens Boulevard, Forest Hills, New York

Claiming as .... Author
(Use the appropriate statement appearing on page 4)

(*c*) Name ....

Address ....

Claiming as ....
(Use the appropriate statement appearing on page 4)

**2. (a) Title:** Give the full title of the work. In the case of music, give specific instrumentation.

"SUPERBOY"

**(b) Renewable Matter:** If the work was a new version of a previous work, renewal may be claimed only in the new matter. If this work was a new version, state in general the new matter (e.g., arrangement, editing, illustrations, translations, etc.) upon which copyright was claimed.

**(c) Contribution to Periodical or Other Composite Work:** If the work was a contribution, give the title of the periodical or composite work in which it was published. .... More Fun Comics

If a periodical, give: Vol. ....; No. 101 ....; Issue Date Jan.-Feb. 1945

**3. Authors of Renewable Matter:** Give the names of all authors who contributed copyrightable matter to this version, but not the names of authors of previous versions. .... Jerome Siegel and Joe Shuster

**4. Facts of Original Registration:** The facts given here must agree with the Copyright Office records of the original registration.

Original registration number: Class .... B ....; No. 653651 ....

If registered as published, give date of publication .... November 18, 1944
(Month) (Day) (Year)

If registered as unpublished, give date of registration ....
(Month) (Day) (Year)

Original copyright claimant On information & belief Detective Comics, Inc.
(Name of claimant in original registration) **Complete all applicable spaces on next page**

EXAMINER

**EXHIBIT 26**

**696**

**ER-350**

**6. Name and address of person or organization to whom correspondence or refund, if any, should be sent:**

Name ........ Coudert Brothers ........ Address ........ 200 Park Avenue, New York, N.Y. 10017

**7. Send certificate to:**

(Type or
print      Name
name and
address) Address

> COUDERT BROTHERS
>
> 200 Park Avenue
> (Number and street)
>
> New York, N. Y.          10017
> (City)          (State)          (ZIP Code)

**8. Certification:**

(Application not
acceptable
unless signed)

> I CERTIFY that the statements made by me in this application are correct to the best of my knowledge.
>
> ........ Gordon T. King, agent ........
> (Signature of renewal claimant or duly authorized agent)

## Application Forms

Copies of the following forms will be supplied by the Copyright Office without charge upon request.

Class A      Form A—Published book manufactured in the United States of America.

Class A      Form A–B Foreign—Book or periodical manufactured outside the United States of America (except works subject to
or B         the ad interim provisions of the copyright law).
             Form A–B Ad Interim—Book or periodical in the English language manufactured and first published outside the United
             States of America.

Class B      Form B—Periodical manufactured in the United States of America.
             Form BB—Contribution to a periodical manufactured in the United States of America.

Class C      Form C—Lecture or similar production prepared for oral delivery.

Class D      Form D—Dramatic or dramatico-musical composition.

Class E      Form E—Musical composition the author of which is a citizen or domiciliary of the United States of America or which
             was first published in the United States of America.
             Form E Foreign—Musical composition the author of which is not a citizen or domiciliary of the United States of
             America and which was not first published in the United States of America.

Class F      Form F—Map.

Class G      Form G—Work of art or a model or design for a work of art.

Class H      Form H—Reproduction of a work of art.

Class I      Form I—Drawing or plastic work of a scientific or technical character.

Class J      Form J—Photograph.

Class K      Form K—Print or pictorial illustration.
             Form KK—Print or label used for an article of merchandise.

Class L      Form L–M—Motion picture.
or M

Class N      Form N—Sound Recording.
             Form R—Renewal copyright.
             Form U—Notice of use of musical composition on mechanical instruments.

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| **Application received** | |
| **Fee received** | |
| | *Amended By Copyright Office (Cert.) |

GPO : 1972 O - 460-622

Page 2

**EXHIBIT 26**
697

ER-351

# EXHIBIT 27

ER-352

EXHIBIT 19  6-29-11

1812     **BOOKS**     Jan.-June

**SHOTWELL, JAMES T.**
Modern and contemporary European history (1815-1945) See SHAPIRO, J. SALWYN.

**SHULMAN, MAX.**
Vote for Henry Ladd. (In Good housekeeping, Jan. 1946) © 19Dec45; BTC2551. Max Shulman (A); 29Dec72; R543143.
The zebra derby. Illustrated by Bill Crawford. © 10Jan46; A459. Max Shulman (A); 27Apr73; R551583.

**SHUSTER, JOE.**
Superboy. See SIEGEL, JEROME.
Superman. See SIEGEL, JEROME.

**SHUTE, AGNES KELSEY.**
World service church school programs for primary groups. See BOWER, LILLIAN V.

**SHUTE, NEVIL.**
Most secret. © 14Aug45; AI-29109; 17Oct45; A190873. Heather Mayfield & Shirley Norway (C); 1Dec72; R5-5346.

**SIEGEL, JEROME.**
Superboy. By Jerome Siegel & Joe Shuster. (In More fun comics) © Jerome Siegel & Joe Shuster (A) Mar-Apr45. © 16Jan45; B661073. 25Jan73; R544412.

Superman. By Jerome Siegel & Joe Shuster. (In New York post) © Jerome Siegel & Joe Shuster (A) © 24Feb45; A5-135966. 24Jan73; R544704.

Superman, by Jerome Siegel & Joe Shuster. (In New York post) © National Periodical Publications, Inc. (PWH) © 19Feb45; A5-135867. 23Jan73; R545376.
© 24Feb45; A5-135966. 23Jan73; R545390.

Superman, by Jerome Siegel & Joe Shuster. (In Philadelphia inquirer) © Jerome Siegel & Joe Shuster (A)
© 1Jan45; A5-135411. 29Dec72; R542907.
© 2Jan45; A5-135412. 29Dec72; R542908.
© 3Jan45; A5-135413. 29Dec72; R542909.
© 4Jan45; A5-135414. 29Dec72; R542910.
© 5Jan45; A5-135415. 29Dec72; R542911.
© 6Jan45; A5-135471. 4Jan73; R542476.
© 8Jan45; A5-135471. 4Jan73; R542478.
© 9Jan45; A5-135472. 4Jan73; R542479.
© 10Jan45; A5-135473. 4Jan73; R542480.
© 11Jan45; A5-135474. 4Jan73; R542481.
© 12Jan45; A5-135475. 4Jan73; R542482.
© 13Jan45; A5-135476. 4Jan73; R542483.
© 15Jan45; A5-135615. 4Jan73; R542485.
© 16Jan45; A5-135616. 4Jan73; R542486.
© 17Jan45; A5-135617. 4Jan73; R542487.
© 18Jan45; A5-135618. 4Jan73; R542488.
© 19Jan45; A5-135619. 4Jan73; R542489.
© 20Jan45; A5-135620. 4Jan73; R542490.
© 22Jan45; A5-135652. 4Jan73; R542492.
© 23Jan45; A5-135653. 4Jan73; R542493.
© 24Jan45; A5-135654. 4Jan73; R542494.

© 25Jan45; A5-135655. 4Jan73; R542495.
© 26Jan45; A5-135656. 4Jan73; R542496.
© 27Jan45; A5-135657. 4Jan73; R542497.
© 29Jan45; A5-135754. 4Jan73; R542499.
© 30Jan45; A5-135755. 4Jan73; R542500.
© 31Jan45; A5-135756. 4Jan73; R542501.
© 1Feb45; A5-135757. 24Jan73; R544688.
© 2Feb45; A5-135758. 24Jan73; R544689.
© 3Feb45; A5-135759. 24Jan73; R544690.
© 5Feb45; A5-135862. 24Jan73; R544692.
© 6Feb45; A5-135863. 24Jan73; R544693.
© 7Feb45; A5-135864. 24Jan73; R544694.
© 8Feb45; A5-135865. 24Jan73; R544695.
© 9Feb45; A5-135866. 24Jan73; R544696.
© 10Feb45; A5-135867. 24Jan73; R544697.
© 12Feb45; A5-136038. 24Jan73; R544706.
© 13Feb45; A5-136039. 24Jan73; R544707.
© 14Feb45; A5-136040. 24Jan73; R544708.
© 15Feb45; A5-136041. 24Jan73; R544709.
© 16Feb45; A5-136042. 24Jan73; R544710.
© 17Feb45; A5-136043. 24Jan73; R544711.
© 19Feb45; A5-135961. 24Jan73; R544699.
© 20Feb45; A5-135962. 24Jan73; R544700.
© 21Feb45; A5-135963. 24Jan73; R544701.
© 22Feb45; A5-135964. 24Jan73; R544702.
© 23Feb45; A5-135965. 24Jan73; R544703.
© 26Feb45; A5-136094. 24Jan73; R544713.
© 27Feb45; A5-136095. 24Jan73; R544714.
© 28Feb45; A5-136096. 24Jan73; R544715.
© 1Mar45; A5-136097. 26Feb73; R546878.
© 2Mar45; A5-136098. 26Feb73; R546879.
© 3Mar45; A5-136099. 1Mar73; R546880.
© 5Mar45; A5-136505. 1Mar73; R546882.
© 6Mar45; A5-136506. 1Mar73; R5-6883.
© 7Mar45; A5-136507. 5Mar73; R547181.
© 8Mar45; A5-136508. 5Mar73; R547182.
© 9Mar45; A5-136509. 5Mar73; R547183.
© 10Mar45; A5-136510. 5Mar73; R547184.
© 12Mar45; A5-136512. 5Mar73; R547186.
© 13Mar45; A5-136513. 5Mar73; R547187.
© 14Mar45; A5-136514. 5Mar73; R547188.
© 15Mar45; A5-136515. 5Mar73; R547189.
© 16Mar45; A5-136516. 5Mar73; R547190.
© 17Mar45; A5-136517. 5Mar73; R547191.
© 18Mar45; A5-136518. 5Mar73; R547192.
© 19Mar45; A5-136596. 5Mar73; R547193.

© 20Mar45; A5-136597. 5Mar73; R547194.
© 21Mar45; A5-136598. 5Mar73; R547195.
© 22Mar45; A5-136599. 5Mar73; R547196.
© 23Mar45; A5-136600. 5Mar73; R547197.
© 24Mar45; A5-136601. 5Mar73; R547198.
© 26Mar45; A5-136666. 5Mar73; R547199.
© 27Mar45; A5-136667. 5Mar73; R547200.
© 28Mar45; A5-136668. 5Mar73; R547202.
© 29Mar45; A5-136669. 5Mar73; R547203.
© 30Mar45; A5-136670. 5Mar73; R547204.
© 31Mar45; A5-136671. 5Mar73; R547205.
© 2Apr45; A5-136809. 26Mar73; R548507.
© 3Apr45; A5-136810. 26Mar73; R548508.
© 4Apr45; A5-136811. 26Mar73; R548509.
© 5Apr45; A5-136812. 26Mar73; R548510.
© 6Apr45; A5-136813. 26Mar73; R548511.
© 7Apr45; A5-136814. 26Mar73; R548512.
© 9Apr45; A5-136914. 26Mar73; R548514.
© 10Apr45; A5-136915. 26Mar73; R548515.
© 11Apr45; A5-136916. 26Mar73; R548516.
© 12Apr45; A5-136917. 26Mar73; R548517.
© 13Apr45; A5-136918. 26Mar73; R548518.
© 14Apr45; A5-136919. 26Mar73; R548519.
© 16Apr45; A5-137006. 26Mar73; R548521.
© 17Apr45; A5-137007. 26Mar73; R548522.
© 18Apr45; A5-137008. 26Mar73; R548523.
© 19Apr45; A5-137009. 26Mar73; R548524.
© 20Apr45; A5-137010. 26Mar73; R548525.
© 21Apr45; A5-137011. 26Mar73; R548526.
© 23Apr45; A5-137152. 26Mar73; R548528.
© 24Apr45; A5-137153. 26Mar73; R548529.
© 25Apr45; A5-137154. 26Mar73; R548530.
© 26Apr45; A5-137155. 26Mar73; R548531.
© 27Apr45; A5-137156. 26Mar73; R548532.
© 28Apr45; A5-137157. 26Mar73; R548533.
© 30Apr45; A5-137263. 26Mar73; R548535.
© 1May45; A5-137264. 30Apr73; R551462.
© 2May45; A5-137265. 30Apr73; R551463.
© 3May45; A5-137266. 30Apr73; R551464.
© 4May45; A5-137267. 30Apr73; R551465.
© 5May45; A5-137268. 30Apr73; R551466.
© 7May45; A5-137308. 30Apr73; R551468.
© 8May45; A5-137309. 30Apr73; R551469.
© 9May45; A5-137310. 30Apr73; R551470.
© 10May45; A5-137311. 30Apr73; R551471.
© 11May45; A5-137312. 30Apr73; R551472.

**EXHIBIT 27**
**698**
ER-353

# EXHIBIT 29

ER-354

11928 Darlington Avenue
#102
Los Angeles, CA 90049
February 14, 1982
213-820-2492


Mr. Steven J. Ross
Chairman of the Board and
Chief Executive Officer
75 Rockefeller Plaza
New York, NY 10019

Dear Steve,

I hope you are well and happy.

I'm bringing the attached articles to your attention because you are a busy man and may not be aware of all that transpires at D.C. Comics.

In the enclosed xeroxed material, Paul Levitz says that Jerry Siegel and Joe Shuster would be excluded from royalties on comic books selling over 100,000 copies, but that everyone else, including inkers (and he) would have a share.

His reasons for exclusion of older creators were: 1) "It's hard to find out who the creators were in most cases."

It's no mystery who the creators were in Jerry and Joe's case. Not only of Superman, but Superboy and other comics. What they did is well known in the trade. Jerry and Joe were in great part responsible for the success of the comic book industry. There are numerous, lucrative imitations of their creation from which others have become very wealthy, enabling them to build up estates for their wives and children.

Paul Levitz also states: 2) "Jerry Siegel and Joe Shuster were on salary for their creation.

This is incorrect. Jerry and Joe were not on salary. Not when they created Superman, nor were they ever, but rather independent contractors. For ten years they sold their comics material for Superman and other comics on a per-page basis and paid very low rates. Later, from 1959 to 1966, Jerry again wrote for Superman and Superman related characters (an additional seven years) giving Jerry a total of seventeen years of writing Superman Stories.

Today, free lancers are very well paid for their work. Now, under the new policy free lancers will get a royalty-bonus on each issue of the comic books over 100,000 copies bringing them heavy, extra money.

Also, under the new policy, people who originate new comics for D.C. receive originators royalties on everything including merchandising, movies, the lot. This sounds similar to the paperback and book deals that authors receive.

That's fine. But all of Jerry and Joe's working and contributing lives at D.C. they begged for royalties but were denied and overlooked despite their wonderfully successful creation Superman, and the many avenues of profit it brought. **ER-355**

EXHIBIT 29
713

Jerry and Joe created that character born of love. They brought it to life with the origination story, set the formula or format, dreamed up the spectacular action scenes, the idealistic fight against evil. Superman was their baby. The character that they love.

The past discrimination at D.C. was a bitter pill for the two pioneers who even now, after 44 years and a new policy find Siegel and Shuster shut out from royalties.

You have been very good to us and you know I speak from my heart when I tell you I'm filled with gratitude.

Jerry and Joe have nobody to speak for them but me, so I feel moved to tell you of this.

I suppose our last year's bonus, increase in annual income and tax check was in part due to the movie's success. That's what I tell Jerry and Joe, who will be 70 years old in a couple of years.

While I'm telling you that, I might as well tell you all. You did say had I any problems to let you know.

I have a terrible worry. In 1975 when our settlement contract was set up, I asked for, but was denied, life insurance for Jerry and Joe. As a result, Jerry does not have adequate life insurance, while Joe tells me he has none.

Jerry and Joe look in fairly good health. But at times, Jerry has difficulty walking. A vascular problem related to his heart condition. As for Joe, he was recently on penicillin for an abcessed tooth. The reaction gave him dizzy spells and I feared he'd be hit by a car while crossing streets when grocery shopping. It's times like these that remind me of their frailty. I think you will agree that they should have adequate life insurance.

Should anything happen to Jerry, there is the problem of what's to become of me as his widow. I'll be 65 years old this year. And there is our daughter, Laura who would be left without any measure of security.

For many years after Jerry and Joe leave this earth, Superman in movies, TV, cassettes, comic books, merchandising, will continue to earn hundreds of millions of dollars from the domestic and foreign market. Superman's steady, increasing popularity since 1938 seems ever to grow with each new generation, while holding on with the older fans.

Yet, our contract states that after Jerry's demise, should it come before 1985, I would receive only $20,000 annually, about $16,000 after taxes, or $10,000 after 1985, about $7,000 annually after taxes. This would plunge me into an impossible financial situation without dignity nor security.

After 1985 according to the contract, our beloved daughter Laura, who Jerry and I worry about, would not even have contractual protection and may be struggling to survive while Superman continues to reap many millions.

As long as you are around I feel, (and I hope I am right) that I can count on you to continue the same income to me as Jerry would be receiving. You realize I'm sure, that they don't lower rent, food or other costs for widows. Giving a widow one-half of her husband's income is an old fashioned unrealistic practice that unfailingly causes hardship.

If, God forbid, anything happened to you, Steve, or you retired, I would be at the mercy of your successors and others who might not care if I'm thrown out into the street in my old age.

**EXHIBIT 29**

Without an amendment to the contract stating that the same income continue to me, my financial security is in jeopardy.

Jerry does not have an estate to leave me. To ask an aged widow who has just experienced a terrible trauma (with all kinds of unexpected expenses) to suddenly cut her standard of living by 50% is a terrible upheaval.

Provisions for Laura could also be worked out so that the daughter of the creator of Superman doesn't suffer in poverty, while Superman continues with multi-million dollar earnings.

We are so grateful to you for all you have done for us. But there still remains the additional problems I've mentioned in these two letters which I hope you will consider.

Hoping to hear from you soon. Fondest regards from Jerry, Joe, Laura and me. God bless you.

Joanne

Joanne Siegel

P.S. Your lovely letter with two complimentary tickets to see Chariots of Fire has just arrived. Thank you for including us on your list.

The third paragraph in your letter regarding Chariots of Fire especially warmed my heart. Notably, "At the core of the picture is a celebration of the human spirit" and, "The film embodies all of the principles we strive to achieve here at WCI in our business relationships and in our daily lives."

**EXHIBIT 29**
**715**

**ER-357**

11928 Darlington Avenue
#102
Los Angeles, CA  90049
February 14, 1982
213-820-2492

Mr. Steven J. Ross
Chairman of the Board and
Chief Executive Officer
75 Rockefeller Plaza
New York, N.Y.  10019

Dear Steve,

For the past two and a half years , our daughter Laura has been Anchor/Reporter at KESQ-TV in Palm Springs.

As Anchor, she does the 6 o'clock news.  As Reporter, she's covered mountain fires, desert floods, interviewed celebrities such as Betty and Gerald Ford, Frank Sinatra and Bob Hope.  A real live, Lois Lane.

She has hosted the Palm Springs "Weekend with the Stars Telethon for Cerebral Palsy" for two consecutive years.

She initiated and produced documentaties, won awards and raised KESQ-TV's ratings to an all time high.

A hard worker, she is well liked by co-workers.  Although she's gotten several pay raises, her annual salary in 1981 was $15,000.  As a result, she can barely make ends meet.

We loaned her five thousand dollars to pay some of her most pressing bills(some medical) gave her two additional thousand dollars toward a down payment on a car plus additional money for necessities, all from the bonus you sent us last year.

Her eight year old junky car needs replacing, but because she could not manage payments for a new car is stuck with one that continually breaks down.  The average car today costs between eleven and twelve thousand plus high bank interest rates.

She has diligently applied to various markets but the offers thus far do not warrent relocation.  What she needs is placement in a larger market such as the New York, or preferably the Los Angeles, San Diego area.

As an alternative to Anchor/Reporter, she could handle and would enjoy hosting either an interview or co-hosting a magazine show.

Steve, would it be possible, through your connections to recommend her for a good position?  The news business is so glutted with female reporters, and available jobs are so flooded with applications, that without an edge, or recommendation, the going is rough.

I hope you can help.

Professional nameis Laura Carter.
Home phone: 714-325-8044

Fondly,

Joanne

EXHIBIT 29
716

ER-358

# EXHIBIT 31

ER-359

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

1-December 4, 1937 Agreement

1

000000848

**EXHIBIT 31**
**722**

ER-360

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joe Shuster and Detective Comics, Inc. executed on or about December 4, 1937, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

1-December 4, 1937 Agreement

2

000000849

**EXHIBIT 31**
**723**

ER-361

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.      Each work to which this notice of termination applies is as follows:  The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work was based upon the following works to which this Notice of Termination also applies:  Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZPTLK (also known as Mr. MXYZTPLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet.  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

1-December 4, 1937 Agreement                    3

000000850

**EXHIBIT 31**
724

ER-362

| <u>Title</u> | <u>Name of Author</u>[2] | <u>Date Copyright Secured</u>[3] | <u>Copyright Reg. No.</u> |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

000000851

**EXHIBIT 31**
725

ER-363

3. The grant to which this Notice of Termination applies is a two page agreement between Detective Comics, Inc. and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: An Agreement of Employment executed on or about December 4, 1937, which states in part that "any new and additional features which the Employees [Siegel and Shuster] produce for use in a comic magazine are to be first submitted to the Employer [Detective Comics, Inc.], who reserves the right to accept or reject same within a period of Sixty days." Prior to the execution of this agreement, Jerome Siegel had written the following SUPERMAN works: SUPERMAN story in a form suitable for comic book publication, twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips, a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, an untitled paragraph previewing future SUPERMAN exploits, fifteen SUPERMAN daily comic strips (12 strips and 3 scripts), and a nine page synopsis covering an additional two months of daily (at 6 days per week) comic strips of SUPERMAN. Assuming for purposes of this notice that said agreement contains a provision affecting rights to SUPERMAN, which, when first exercised by Detective Comics, Inc. on March 1, 1938, constituted a grant of non-work-for-hire SUPERMAN works and a grant of a transfer of renewal copyright(s) in SUPERMAN, the said grant included all SUPERMAN works in existence up through said date (March 1, 1938) as listed in paragraph 2 above and the renewal rights therein, and also included rights in the future including the renewal rights in the remaining works set forth in paragraph 2 above.

4. The effective date of termination shall be April 16, 1999.

1-December 4, 1937 Agreement

551

000000852

**EXHIBIT 31**
**726**

ER-364

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

1-December 4, 1937 Agreement

552

000000853

**EXHIBIT 31**
727

ER-365

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3cʰ day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

1-December 4, 1937 Agreement

553

000000854

**EXHIBIT 31**
728

ER-366

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this ___ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

1-December 4, 1937 Agreement

554

000000855

**EXHIBIT 31**

729

ER-367

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

1-December 4, 1937 Agreement

555

000000856

EXHIBIT 31
730

ER-368

# NOTICE OF TERMINATION OF TRANSFER
# COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

2-March 1, 1938 Agreement

1

000000857

**EXHIBIT 31**
731

ER-369

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joe Shuster and Detective Comics, Inc. executed on or about March 1, 1938, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

2-March 1, 1938 Agreement

2

EXHIBIT 31
732

ER-370

Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.     Each work to which this notice of termination applies is as follows:  The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work was based upon the following works to which this Notice of Termination also applies: Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZPTLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet.  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

2-March 1, 1938 Agreement

3

000000859

**EXHIBIT 31**
733

ER-371

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"]  will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4] The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5] This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

2-March 1, 1938 Agreement

4

000000860

**EXHIBIT 31**
734

ER-372

3.     The grant to which this Notice of Termination applies is a one page agreement between Detective Comics, Inc. and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: An Agreement executed on or about March 1, 1938, which states in part that the co-authors are selling and transferring to Detective Comics, Inc., the comic strip SUPERMAN,

"all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you [Detective] and your assigns to have and hold forever and to be your exclusive property. . . "

The Agreement included at the time all SUPERMAN works in existence up through said date (March 1, 1938), which included the above described SUPERMAN story in a form suitable for comic book publication, the thirteen page SUPERMAN comic book story and its cover, the twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips from which the thirteen pages were derived, a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, an untitled paragraph previewing future SUPERMAN exploits, fifteen SUPERMAN daily comic strips (12 strips & 3 scripts), and a nine page synopsis covering an additional two months of daily (at 6 days per week) comic strips of SUPERMAN.  As affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), said Agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4.     The effective date of termination shall be April 16, 1999.

2-March 1, 1938 Agreement                           551

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

_Joanne Siegel_
_____
Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

_Laura Siegel Larson_
_____
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

000000862

**EXHIBIT 31**
736

ER-374

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

2-March 1, 1938 Agreement

553

000000863

**EXHIBIT 31**
**737**

ER-375

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this _____ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

2-March 1, 1938 Agreement

554

000000864

**EXHIBIT 31**
738

ER-376

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041


I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

000000865

**EXHIBIT 31**
**739**

ER-377

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

3-September 22, 1938 Agreement (1)                    1

000000866

**EXHIBIT 31**
740

ER-378

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Detective Comics, Inc. executed on or about September 22, 1938, and the undersigned set forth in connection therewith the following:

1.       The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

3-September 22, 1938 Agreement (1)                    2

000000867

**EXHIBIT 31**
741

ER-379

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041. Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.

2.    Each work to which this notice of termination applies is as follows:  The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet.  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

000000868

**EXHIBIT 31**
742

ER-380

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies.  The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire.  Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation,  rather than the day, month, and year of creation.  Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation.  For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date.  For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"]  will be given, and the year therein will constitute the year of creation.  For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them.  Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550.  Paragraph number 3 begins on page 551.

3.  The grant to which this Notice of Termination applies is a three page agreement between Detective Comics, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about September 22, 1938, which states in part that, "We, Detective Comics, Inc., are the exclusive owners of comic strips known by the title... 'Superman'... and to the rights to publish comics carrying said title... and characters contained therein and continuity thereof."  The foregoing agreement included at the time all SUPERMAN works in existence up through said date (September 22, 1938), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4.  The effective date of termination shall be April 16, 1999.

000000870

EXHIBIT 31
744

ER-382

5.     Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

_Joanne Siegel_
_____
Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

_Laura Siegel Larson_
_____
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

**EXHIBIT 31**
745

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to

37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of

Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of the

records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

3d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

3-September 22, 1938 Agreement (1)

553

000000872

**EXHIBIT 31**
746

ER-384

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this 29 day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

3-September 22, 1938 Agreement (1)

554

000000873

**EXHIBIT 31**
747

ER-385

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

3-September 22, 1938 Agreement (1)

555

000000874

**EXHIBIT 31**
748

ER-386

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

4-September 22, 1938 Agreement (2)

1

000000875

**EXHIBIT 31**
749

ER-387

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster, Detective Comics, Inc., and The McClure Newspaper Syndicate executed on or about September 22, 1938, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

4-September 22, 1938 Agreement (2)

2

000000876

**EXHIBIT 31**
**750**

ER-388

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.      Each work to which this notice of termination applies is as follows:  The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work was based upon the following works to which this Notice of Termination also applies:  Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet.  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

4-September 22, 1938 Agreement (2)

3

000000877

**EXHIBIT 31**
751

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

4-September 22, 1938 Agreement (2)

4

000000878

**EXHIBIT 31**
**752**

ER-390

3.   The grant to which this Notice of Termination applies is a three page agreement between Detective Comics, Inc., The McClure Newspaper Syndicate and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about September 22, 1938, which states in part that "Superman" is "owned by Detective" and copyright "reverts to Detective at the termination of this contract. The title 'Superman' shall always remain the property of Detective... Radio, motion picture, silent and talkie, book and all other rights are retained and owned by Detective." The foregoing agreement included at the time all SUPERMAN works in existence up through said date (September 22, 1938), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4.   The effective date of termination shall be April 16, 1999.

4-September 22, 1938 Agreement (2)

551

000000879

**EXHIBIT 31**
753

ER-391

5. Jerome Siegel died on January 28, 1996. Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel. Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

_Joanne Siegel_
Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

_Laura Siegel Larson_
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

4-September 22, 1938 Agreement (2)

552

000000880

**EXHIBIT 31**
**754**

ER-392

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to

37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of

Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of the

records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

3d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

4-September 22, 1938 Agreement (2)                     553                        000000881

**EXHIBIT 31**
755

ER-393

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this 3|st day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

4-September 22, 1938 Agreement (2)

554

000000882

**EXHIBIT 31**
**756**

ER-394

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041


I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

EXHIBIT 31
757

# NOTICE OF TERMINATION OF TRANSFER
# COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

5-December 19, 1939 Agreement

1

000000884

**EXHIBIT 31**
758

ER-396

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Detective Comics, Inc. executed on or about December 19, 1939, and the undersigned set forth in connection therewith the following:

1.    The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

5-December 19, 1939 Agreement

2

000000885

EXHIBIT 31
759

ER-397

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail to the above grantees or successors at the addresses shown.

2.        Each work to which this notice of termination applies is as follows:  The title of the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is also the date that copyright was originally secured in this work), Copyright Registration No. B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal for the work was made June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work was based upon the following works to which this Notice of Termination also applies:  Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster; and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZPTLK (also known as Mr. MXYZTPLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

5-December 19, 1939 Agreement                                    3

000000886

**EXHIBIT 31**
760

ER-398

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

5-December 19, 1939 Agreement                4                000000887

**EXHIBIT 31**
**761**

ER-399

3. The grant to which this Notice of Termination applies is a two page agreement between Detective Comics, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about December 19, 1939, modifying the September 22, 1938 Letter Agreement between Detective Comics, Inc., and Jerome Siegel and Joseph Shuster, and providing in part that: "we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled 'SUPERMAN' . . . and to [sic] all rights of reproduction of all said comic strips and the titles and characters contained therein and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other form of reproduction..." and all rights of copyright in said forms of reproduction. The foregoing agreement included at the time all SUPERMAN works in existence up through said date (December 19, 1939), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the agreement also granted Detective Comics, Inc. rights in the future, including renewal rights.

4. The effective date of termination shall be April 16, 1999.

5.     Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

EXHIBIT 31
763

ER-401

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

5-December 19, 1939 Agreement

553

000000890

**EXHIBIT 31**
**764**

ER-402

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this 3⁴ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

5-December 19, 1938 Agreement

554

000000891

**EXHIBIT 31**
765

ER-403

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

5-December 19, 1939 Agreement

555

000000892

**EXHIBIT 31**
**766**

ER-404

# NOTICE OF TERMINATION OF TRANSFER
# COVERING EXTENDED RENEWAL TERM

TO:  Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

6-May 19, 1948 Agreement

000000893

**EXHIBIT 31**
767

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and National Comics Publications, Inc. executed on or about May 19, 1948, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research
Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section
201.10(d), service of this notice is being made by first class mail to the above grantees or
successors at the addresses shown.

2.      Each work to which this notice of termination applies is as follows:  The title of
the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an
illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body
of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is
also the date that copyright was originally secured in this work), Copyright Registration No.
B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal
for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.
claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work
was based upon the following works to which this Notice of Termination also applies:
Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper
comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;
and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of
strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this
Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever
created) that includes or embodies any character, story element, or indicia reasonably associated with
SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane,
Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as
Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the
Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-
related work ever created.  Nevertheless, if any such work has been omitted, such omission is
unintentional and involuntary, and this Notice also applies to each and every such omitted work.

6-May 19, 1948 Agreement                                    3

000000895

**EXHIBIT 31**
769

**ER-407**

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|-------|-------------------|---------------------------|---------------------|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2]Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3]Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4]The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5]This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

3.   The grant to which this Notice of Termination applies is a seven page agreement between National Comics Publications, Inc. and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A stipulation executed on or about May 19, 1948, providing in part that by virtue of a March 1, 1938 agreement, the co-authors transferred to Detective Comics, Inc. their ". . . rights in and to the comic strip SUPERMAN" and that National Comics Publications, Inc. "is the... owner of and has the... right to the use of the title[s] SUPERMAN [and SUPERBOY and] to the conception, idea, continuity, pictorial representation and formula of the cartoon feature SUPERMAN as heretofore portrayed and published" and the right to exploit "the characters SUPERMAN (also known as 'Clark Kent'), LOIS LANE, PERRY WHITE and all other characters" appearing in the SUPERMAN or SUPERBOY cartoons or comic strip material; and that said rights included licensing, "book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentations, television, motion picture reproduction and all other forms of reproduction and presentation..."  (A copy of the stipulation is available on request.)  The foregoing stipulation included at the time all SUPERMAN works in existence up through said date (May 19, 1948), as listed in paragraph 2 above; and as affirmed in Siegel v. National Periodical Pub., Inc., 508 F.2d 909 (2d Cir. 1974), the stipulation also granted National Comics Publications, Inc. rights in the future, including renewal rights.

4.      The effective date of termination shall be April 16, 1999.

5-May 19, 1948 Agreement

551

000000897

**EXHIBIT 31**
771

**ER-409**

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow, Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's termination interest, are executing this notice and constitute a 75% majority interest of those persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the transfer described herein-above.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Section 304(c) of Title 17, United States Code.

Dated: March 30, 1997

Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

6-May 19, 1948 Stipulation

552

000000898

**EXHIBIT 31**
772

ER-410

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3d day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

6-May 19, 1948 Agreement

553

000000899

EXHIBIT 31
773

ER-411

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF

TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served

this 3rd day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

6-May 19, 1948 Agreement

554

000000900

**EXHIBIT 31**
774

ER-412

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

TO:   Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

7-December 23, 1975 Agreement

1

000000902

**EXHIBIT 31**
776

ER-414

PLEASE TAKE NOTICE that pursuant to Section 304(c) of the Copyright Law (Title 17, U.S.C.) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned Joanne Siegel and Laura Siegel Larson, being the persons who own an interest sufficient to terminate transfers pursuant to said statutory provisions, hereby terminate the grant of the transfer of renewal copyright(s) (to the extent of author Jerome Siegel's share in the ownership of the renewal copyright(s)) made in a certain agreement between Jerome Siegel and Joseph Shuster and Warner Communications Inc. executed on or about December 23, 1975, and the undersigned set forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019; Warner Communications Inc., 75 Rockefeller Plaza, New York, NY 10019; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; DC Comics Inc., 1700 Broadway, New York, NY 10019; DC Comics, a New York General Partnership, 1700 Broadway, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Worldwide Licensing, 4000 Warner Boulevard, Burbank, CA 91522; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019; Dark Horse Publications, 10956 S.E. Main St., Milwaukie, OR 97222; Marvel Entertainment Group, Inc., 387 Park Ave. South, New York, NY 10016; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI 02861; Fleer/Skybox International, 1120 Route 73, Mt. Laurel, NJ 08054; Golden Books

7-December 23, 1975 Agreement

2

Publishing, 1220 Mound Ave., Racine, WI 53404; and Inverse Ink, TAO Research

Corporation, 785A Castro Street, Mountain View, CA 94041.  Pursuant to 37 C.F.R. Section

201.10(d), service of this notice is being made by first class mail to the above grantees or

successors at the addresses shown.


    2.      Each work to which this notice of termination applies is as follows:  The title of

the original copyrighted work to which this Notice of Termination applies is SUPERMAN, an

illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body

of Action Comics, Vol. 1, No. 1, June, 1938 issue, publication date April 18, 1938 (which is

also the date that copyright was originally secured in this work), Copyright Registration No.

B379787.  This work was written by Jerome Siegel and illustrated by Joe Shuster.  Renewal

for the work was made June 1, 1965, in the name of National Periodical Publications, Inc.

claiming as proprietor of copyright, renewal registration No. R362188.  The aforesaid work

was based upon the following works to which this Notice of Termination also applies:

Twenty-four (24) days (i.e., four weeks) of previously unpublished SUPERMAN newspaper

comic strips (created c. 1934), also written by Jerome Siegel and illustrated by Joe Shuster;

and a seven page synopsis of the last 18 days (i.e., weeks 2, 3, & 4) of said 24 days of

strips, also created c. 1934 and written by Jerome Siegel.  The remaining works to which this

Notice of Termination applies[1] are:

---

[1]This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories, such as, without limitation, Superman, Clark Kent, Lois Lane, Perry White, Jimmy Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor, Mr. MXYZTPLK (also known as Mr. MXYZPTLK), Ma and Pa Kent, Steel, the planet Krypton, Kryptonite, Metropolis, Smallville, or the Daily Planet. Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nevertheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

000000904

EXHIBIT 31
778

| Title | Name of Author[2] | Date Copyright Secured[3] | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in Comic Book form | Jerome Siegel | Unpublished Work created c. 1933 | N/A[4] |
| Untitled paragraph previewing future SUPERMAN exploits | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 15 SUPERMAN daily comic strips (12 strips & 3 scripts) | Jerome Siegel | Unpublished Work created c. 1934 | N/A |
| 9 page synopsis covering an additional 2 months of daily (at 6 days per week) comic strips of SUPERMAN[5] | Jerome Siegel | Unpublished Work created c. 1934 | N/A |

---

[2] Pursuant to 37 C.F.R § 201.10(b)(1)(ii), this Notice includes the name of at least one author of each work to which this notice of termination applies. The listing of any corporation as author of any work is done per the practice shown in Copyright Office records, and is not to be construed as an admission that any given work is or was a work made for hire. Nor is anything else herein to be construed as any such admission.

[3] Regarding works governed by the 1976 Copyright Act as to "Date Copyright Secured," and commencing in 1978, the records of the U.S. Copyright Office list only the year of creation, rather than the day, month, and year of creation. Accordingly, for every registered post-1977 *published work* whose year of creation is the same as its year of publication, only the specific publication date (month, day, and year) will be given, and the year therein will constitute the year of creation. For every registered post-1977 *published work* whose year of creation differs from its year of publication, the year of creation will be given (e.g., "DCRE: 1979" [i.e., "Date Created: 1979"]), followed by the specific publication date. For every registered post-1977 *unpublished work* whose year of creation is the same as its year of registration, only the specific registration date (month, day, and year) followed by the designation "(DREG)" [i.e., "Date Registered"] will be given, and the year therein will constitute the year of creation. For every registered post-1977 *unpublished work* whose year of creation differs from its year of registration, the year of creation will be given (e.g., "DCRE: 1979"), followed by the specific registration date.

[4] The first four works listed in this table as well as the above-referred 24 days of previously unpublished SUPERMAN newspaper comic strips and seven page synopsis of the last 18 days of said strips were never published or registered, at least not in their original form, so there are no copyright registration numbers for them. Accordingly, under the 1909 Act, copyright in the said works was not (and could not have been) secured prior to April 18, 1938, the date of the first published and registered SUPERMAN work, namely, *Action Comics #1* (described above).

[5] This list of titles/works as part of paragraph number 2 continues through page 550. Paragraph number 3 begins on page 551.

7-December 23, 1975 Agreement

4

000000905

**EXHIBIT 31**

779

**ER-417**

3.  The grant to which this Notice of Termination applies is a twelve page agreement (with additional pages for exhibits)  between Warner Communications Inc. and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, identified as follows: A Letter Agreement executed on or about December 23, 1975, acknowledging that Warner Communications Inc.

> "is the sole and exclusive owner of all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of any such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised, together with the absolute right to transfer, license, sell or otherwise dispose of said rights."

The foregoing agreement included at the time all SUPERMAN works in existence up through said date (December 23, 1975), as listed in paragraph 2, above, and the renewal rights therein, and also included rights in the future including the renewal rights in the remaining works set forth in paragraph 2 above.

4.      The effective date of termination shall be April 16, 1999.

7-December 23, 1975 Agreement                   551                        000000906

EXHIBIT 31
780

ER-418

5.      Jerome Siegel died on January 28, 1996.  Mr. Siegel is survived by his widow,

Joanne Siegel, and two children: Jerome and Joanne Siegel's daughter Laura Siegel

Larson, and Mr. Siegel's son by a previous marriage, Michael Siegel.  Joanne Siegel and

Laura Siegel Larson, who own and constitute more than one-half of author Jerome Siegel's

termination interest, are executing this notice and constitute a 75% majority interest of those

persons entitled to exercise the termination interest of Jerome Siegel as to the grant of the

transfer described herein-above.  To the best knowledge and belief of the undersigned, this

notice has been signed by all persons whose signature is necessary to terminate said grant

under Section 304(c) of Title 17, United States Code.


Dated: March 30, 1997

_Joanne Siegel_
Joanne Siegel
13900 Panay Way, R-115
Marina del Rey, CA 90292


_Laura Siegel Larson_
Laura Siegel Larson
6400 Pacific Avenue, No. 106
Playa del Rey, CA 90293

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM, and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made on behalf of Joanne Siegel and Laura Siegel Larson as to the current ownership of the rights being terminated, by commissioning a search of U.S. copyright records, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of April, 1997, at Washington, DC.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

7-December 23, 1975 Agreement

553

000000908

**EXHIBIT 31**
782

ER-420

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM was served this 3ʳᵈ day of April, 1997, by First Class Mail, postage prepaid, upon the following:

Time Warner Inc.
c/o Gerald M. Levin
Chairman of the Board & C.E.O.
75 Rockefeller Plaza
New York, NY 10019

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019

Warner Communications Inc.
75 Rockefeller Plaza
New York, NY 10019

Warner Bros. Inc.
c/o Robert Daly and Terry Semel
Co-Chairmen of the Board & Co-C.E.O.
4000 Warner Boulevard
Burbank, CA 91522

DC Comics Inc.
c/o Jenette Kahn
President & Editor In Chief
1700 Broadway
New York, NY 10019

DC Comics,
a New York General Partnership
c/o Paul Levitz
Executive V.P. & Publisher
1700 Broadway
New York, NY 10019

Warner Bros. Television
c/o Tony Jonas, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Consumer Products
c/o Dan Romanelli, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Bros. Worldwide Licensing
c/o George Jones, President
4000 Warner Boulevard
Burbank, CA 91522

Warner Music Group
c/o Robert Daly and Terry Semel
Co-Chairmen
75 Rockefeller Plaza
New York, NY 10019

Dark Horse Publications
c/o Michael Richardson, President
10956 S.E. Main St.
Milwaukie, OR 97222

Marvel Entertainment Group, Inc.
c/o Scott Sassa, C.E.O.
387 Park Ave. South
New York, NY 10016

Hasbro, Inc.
c/o Alan Hassenfeld, C.E.O.
1027 Newport Ave.
Pawtucket, RI 02861

Fleer/Skybox International
c/o Ed Feeley, President & C.E.O.
1120 Route 73
Mt. Laurel, NJ 08054

Golden Books Publishing
1220 Mound Ave.
Racine, WI 53404

7-December 23, 1975 Agreement

554

000000909

**EXHIBIT 31**

783

ER-421

Inverse Ink
TAO Research Corporation
c/o Lingtao Wang, President
785A Castro Street
Mountain View, CA 94041

I declare under penalty of perjury that the foregoing is true and correct.

ARTHUR J. LEVINE, Esq.
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P.
1300 "I" Street, N.W.
Washington, DC 20005
(202) 408-4000
Counsel for Joanne Siegel
and Laura Siegel Larson

000000910

EXHIBIT 31
784

ER-422

# EXHIBIT 34

ER-423

Nov-15-06   10:36pm   From-

-01   08:18pm   From-

T-129   P.003/027   F-045

827  7227                      P.02
T-288   P.004/013   F=55

# **Ip** worldwide

As of October 3, 2002

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

**RECEIVED**

OCT 24

Marc Toberoff

Re: "*Superman*"

Dear Joanne and Laura:

This letter shall confirm the agreement and understanding between you ("Owner") and us ("IPW") regarding Owner's retention of IPW to exclusively represent Owner with respect to any and all of Owner's rights, claims, title and interest in and to the comic book property commonly known as "*Superman*," including, without limitation, all characters and copyright interests therein (jointly and individually, "Rights"):

    1.    In consideration for IPW's services set forth below, the mutual covenants contained herein and other good and valuable consideration, Owner hereby grants IPW the exclusive right to represent Owner and the Rights throughout the world in negotiating and assisting Owner to arrange and negotiate the sale, lease, license and all other dispositions or exploitations of the Rights, for the Term set forth below.

    2.    IPW will furnish and provide the legal services of Marc Toberoff, Esq., and the business services of Ariel Emanuel and IPW's support staff and employ its network of business relationships and resources to market and negotiate the sale, license, settlement and/or other disposition of the Rights on your behalf, and will advise you and consult with you with respect thereto. IPW will also provide Marc Toberoff's legal services with respect to all legal contracts in connection with all of the above. IPW will be solely responsible for Marc Toberoff's legal fees in connection herewith, if any.

    3.    The terms of any and all agreements regarding the Rights will require Owner's express written approval.

    4.    IPW will pay its own costs and expenses in connection with this Agreement, including without limitation, office overhead, photocopying, messenger fees, postage and overnight mail, long distance telephone and fax charges, travel and accommodation costs and any legal fees to Marc Toberoff, and such costs will not be recoupable from Proceeds hereunder. Notwithstanding this, in the event IPW advances or loans Owner moneys to pay costs in furtherance of the Rights (e.g., US Copyright Office fees and audit fees, if any) the terms and repayment of any such advances or loans will be set forth in a separate written agreement between the parties.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

IPW 00001

**EXHIBIT 34**
790

**ER-424**

Nov-15-06   10:36pm   From-                                          T-129  P.004/027  F-045
          -2002  04:56 PM      (                          1  (  1 82r r22r              r. 05
Oct-Z1-02   08:18ms   From-                                          T-288  P.005/013  F-766

# **Ip**worldwide

Page 2
Retainer Agreement/ *Superman*
As of October 3, 2002

5.      The term ("Term") of this Agreement is eighteen (18) months from the date this Agreement is executed by all parties. In the event the parties are actively negotiating an agreement regarding the Rights when the Term is due to expire, the Term will automatically be extended for three (3) additional months. In the event during the Term either Marc Toberoff or Ariel Emanuel are unable to render services in connection with this Agreement for a continuous period greater than three (3) months due to death, incapacity or otherwise, Owner may in its discretion terminate this Agreement prior to the expiration of the Term.

6.      In consideration of the services to be furnished by IPW hereunder you hereby agree to pay and authorize IPW to retain out of all gross compensation, moneys or other consideration that may be payable or recovered for or by reason of Owner's Rights whether by negotiation, dispute resolution, settlement or otherwise ("Proceeds"): a fee ("Fee") of ten percent (10%) of any and all gross compensation payable including , without limitation, option, quitclaim or licensing fees, purchase price, settlement amounts, advances, fixed and/or contingent compensation. In computing IPW's fee no deduction will be made from gross Proceeds, including, without limitation, no deduction for Owner's taxes, expenses and/or moneys payable to any and all third parties if any. IPW's Fee shall apply to any and all agreements regarding the Rights made during the Term or the material terms of which are substantially negotiated during the Term and/or to any agreements between Owner and an investor or buyer introduced by IPW to Owner during the Term. For the avoidance of doubt, in the event "*Superman*" and the Rights are sold, settled, licensed or otherwise exploited in conjunction with other characters or rights owned or controlled by Owner (e.g., "*Superboy*"); it is understood and agreed that IPW will not "double dip" and the above 10% IPW Fee will apply to gross Proceeds from any said joined transaction(s).

Notwithstanding the above, for purposes of computing IPW's Fee, Proceeds will not include Joanne Siegel's annual "pension" payments which commenced in 1996 (currently $ 126,148 annually, plus cost of living increases or bonuses, if any) and her full medical and dental coverage provided by AOL Time Warner which consideration and interests pre-date and are wholly separate from her copyright termination interests.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

IPW 00002

**EXHIBIT 34**
**791**

**ER-425**

Nov-15-06   10:37pm   From-

.–21-02   09:18pm   From-

T-129   P.005/027   F-045

T-286   P.008/013   P-786

# **Ip**worldwide

Page 3
Retainer Agreement/ *Superman*
As of October 3, 2002

7.     Owner hereby authorizes IPW to collect and receive all Proceeds due and payable; to endorse and deposit any checks or moneys payable into a client trust account on Owner's behalf; to deduct IPW's fee as set forth above; whereupon IPW will promptly pay the remainder directly to Owner as directed by Owner in writing. It is understood that the Rights may involve multiple rights and claims against multiple parties and accordingly IPW's above fee shall be applicable to each Rights payment or recovery from any party and same is not contingent on any other Rights payment.

8.     Owner hereby warrants and represents that Owner will not transfer, assign, license or in any manner encumber the Rights during the Term or extended Term other than through or as a result of IPW's exclusive representation hereunder, with the exception of by will, probate or pursuant to other Court order.

9.     All notices and/or payments hereunder shall be made to the parties at the addresses set forth on page 1 hereof unless and until either party gives the other prior written notice of a change of address.

10.     The parties understand and acknowledge that the scope of this Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services and advancing of such expenses, if requested and desired by Owner, will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and Owner.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by both parties. The parties acknowledge that they fully understand the terms and conditions of this Agreement and have agreed to such terms and conditions after negotiation, mature thought and deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. The terms of this Agreement shall be construed pursuant to their fair meaning, not for or against either party. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals. This Agreement shall be governed by the

IPW 00003

**EXHIBIT 34**
**792**

**ER-426**

Nov-15-06   10:37pm   From-

,-2002  04:57 PM

,c-18-02   01:18pm   From-

T-129   P.006/027   F-045

T-291  P.006/013  F-756

# Ip worldwide

Page 4
Retainer Agreement/ *Superman*
As of October 3, 2002

Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased and excited to work with you and will do our very best to handle this matter in a dedicated manner and to achieve results satisfactory to you.

Yours sincerely,

Marc Toberoff
Authorized signatory

Ariel Emanuel
Authorized signatory

Agreed, Understood and Accepted:

Joanne Siegel

Date: *October 23rd-2002*

Laura Siegel Larson

Date: *October 23, 2002*

IPW 00004

**EXHIBIT 34**
**793**

**ER-427**

# EXHIBIT 39

1

1          UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JOANNE SIEGEL,              )
     LAURA SIEGEL LARSON         )
5                                )
                    Plaintiffs, )
6                                )
        v.                       )  CASE NO. CV 04-8400
7                                )            CV 04-8776
     WARNER BROS, et al.         )
8                                )
                    Defendants.  )
9

10

11

12

13          DEPOSITION OF JEAN ADELE PEAVY
               November 11, 2006
14                 1:26 p.m.
               317 Paseo de Peralta
15             Santa Fe, New Mexico

16

17        PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

18   TAKEN BY:  MR. PATRICK PERKINS
               Attorney for the Defendants
19

20

21

22   REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                   Bean & Associates, Inc.
23                 Professional Court Reporting Service
                   500 Marquette, Northwest, Suite 280
24                 Albuquerque, New Mexico 87102

25   (3520B) MC



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

**EXHIBIT 39**
**833**

**ER-429**

25

1  payments were made to you instead of to your brother?

2      A.   Yes.

3      Q.   Were they, in fact, made to you?

4      A.   Uh-huh.

5           MR. TOBEROFF:  Wait a moment for me to

6  object.

7           THE WITNESS:  Okay.

8           MR. TOBEROFF:  Also, let him finish the

9  question before you answer --

10          THE WITNESS:  Okay.

11          MR. TOBEROFF:  -- even though you think you

12 know what he is asking --

13          THE WITNESS:  Okay.

14          MR. TOBEROFF:  -- let him finish the

15 question.

16          THE WITNESS:  Uh-huh.

17          MR. TOBEROFF:  You are doing fine.

18          THE WITNESS:  Uh-huh.

19          (Exhibit 16 marked.)

20          THE WITNESS:  Okay.

21     Q.   (By Mr. Perkins)  All right.  I have had the

22 court reporter mark as Exhibit 16 a two-page

23 document.  I have -- I have copied them together.

24 They really don't go together, I'm sorry about that.

25 Actually, you may even take off the back page.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**
834

ER-430

26

1          MR. TOBEROFF:  Just the page 1 we should
2  keep?

3          MR. PERKINS:  Yes.

4          MR. TOBEROFF:  I'll do it for you.

5          THE WITNESS:  All right.

6          MR. PERKINS:  The other one doesn't -- it's
7  not very --

8      Q.   (By Mr. Perkins)  Did you -- is this your
9  signature at the bottom of the page?

10     A.   Yes.  Uh-huh.

11     Q.   Did you review this document before you
12 signed it?

13     A.   I probably glanced at it, yes.

14     Q.   Now, in the agreement, the second full
15 paragraph, the last sentence says, quote, "In any
16 event, you now grant to us any such rights and release
17 us" -- let me try that again.

18          "In any event, you now grant to us any such
19 rights and release us, our licensees and all others
20 acting with our permission, and covenant not to assert
21 any claim of right, by suit or otherwise, with respect
22 to the above, now and forever."

23          In the following paragraph it states, and I
24 quote, "If, despite the terms of this agreement,
25 either of you assert any such claim of right, for any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**
835

ER-431

27

1    reason, you agree to refund to us, upon the making of

2    any such assertion, all amounts previously paid to you

3    hereunder, and we will have no obligation to make any

4    further payments under this agreement," period, closed

5    quote.  Do you see that?

6         A.    Yes.

7         Q.    Do you remember reading that when you signed

8    this document?

9         A.    I probably read it but I -- you know, I was

10   -- I was listening to my brother Frank at the time, so

11   I wasn't paying much attention.  I was depending upon

12   him to, you know, tell me if I should sign it.  So --

13        Q.    Do you have an understanding as to what this

14   second to last paragraph means?

15             MR. TOBEROFF:  Calls for a legal conclusion.

16   You can answer.

17        A.    Yes.  I -- I don't -- I don't have any claim

18   if that's what -- yes.

19        Q.    Well, the first sentence of the second to

20   the last paragraph says that if either of you assert

21   any such claim of right for any reason, you agree to

22   refund to us, upon the making of any such assertion,

23   all amounts previously paid to you hereunder.  Do you

24   see that?

25        A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**

**836**

**ER-432**

28

1       Q.    Now, to your knowledge, had you made any

2   claim to --

3       A.    Huh-uh.

4       Q.    -- own or to be able to recapture the

5   copyrights of your brother, Joseph Shuster?

6            MR. TOBEROFF:   Objection, calls for a legal

7   conclusion, vague and ambiguous.   You can answer the

8   question if you understand it.

9       A.    Yes.   No, I haven't made any claim.

10      Q.    Are you aware as to whether or not the

11  estate of your brother has made any claim?

12      A.    My son handles everything legal, so I

13  don't -- I don't know what's going on there.

14      Q.    Okay.

15           (Exhibit 17 marked.)

16      Q.    I have asked the court reporter to mark as

17  Exhibit 17 the document, one-page document appears to

18  be a letter that bears Bates number 53 on it.

19      A.    Uh-huh.   Um.   Okay.   I remember that.

20      Q.    Did you -- is this -- did you write this

21  letter?

22      A.    Uh-huh.

23      Q.    And this is your signature at the bottom?

24      A.    Yes.   Yes.

25      Q.    Do you have regular contact with Joanne

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**
837

ER-433

38

1                    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JOANNE SIEGEL,            )
     LAURA SIEGEL LARSON       )
5                              )
                     Plaintiffs, )
6                              )
        v.                     ) CASE NO. CV 04-8400
7                              )          CV 04-8776
     WARNER BROS, et al.       )
8                              )
                     Defendants. )
9

10       CERTIFICATE OF COMPLETION OF DEPOSITION

11     I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   JEAN ADELE PEAVY was taken before me at the request
     of, and sealed original thereof retained by:
13
              Attorney for the Defendants
14            PERKINS LAW OFFICE, P.C.
              1711 Route 9D
15            Cold Spring, New York 10516
              BY:  MR. PATRICK PERKINS
16
       I FURTHER CERTIFY that copies of this certificate
17   have been mailed or delivered on _____, with
     changes, if any, by the witness appended, to the
18   following counsel of record and parties not
     represented by counsel:
19
              Attorney for the Plaintiffs
20            MR. MARC TOBEROFF
              2049 Century Park East, #2720
21            Los Angeles, California 90067

22     I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were requested
23   by the witness and all parties present.

24     On _____, a letter was mailed or
     delivered to Mr. Toberoff regarding obtaining
25   signature of the witness.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**
838

ER-434

39

1      I FURTHER CERTIFY that the recoverable cost of the
original and one copy of the deposition, including
2  exhibits to Mr. Perkins is $_____.

3      I FURTHER CERTIFY that I did administer the oath
to the witness herein prior to the taking of this
4  deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
5  forth herein, and the foregoing is a true and correct
transcript of the proceeding had upon the taking of
6  this deposition to the best of my ability.

7      I FURTHER CERTIFY that I am neither employed by
nor related to nor contracted with (unless excepted by
8  the rules) any of the parties or attorneys in this
case, and that I have no interest whatsoever in the
9  final disposition of this case in any court.

10

11                    _____
                   MABEL JIN CHIN
12                 Certified Court Reporter #81
                   License expires:  12/31/2006
13

14

15

16

17

18

19

20  (3520B) MC
Date taken:  November 11, 2006
21  Proofread by: LR

22

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 39**
**839**

**ER-435**

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8

          **UNITED STATES DISTRICT COURT**
9
          **CENTRAL DISTRICT OF CALIFORNIA**
10

11
   DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)
12
            Plaintiff,                 | **DC COMICS' OBJECTIONS TO
13                                      | EVIDENCE IN DEFENDANTS'
       v.                              | STATEMENT OF
14                                      | UNCONTROVERTED FACTS,
   PACIFIC PICTURES                    | DECLARATION, AND EXHIBITS
15 CORPORATION, IP WORLDWIDE,          | IN SUPPORT OF DEFENDANTS'
   LLC, IPW, LLC, MARC TOBEROFF,       | MOTION FOR PARTIAL
16 an individual, MARK WARREN          | SUMMARY JUDGMENT ON
   PEARY, as personal representative of| FIRST, SECOND AND THIRD
17 the ESTATE OF JOSEPH SHUSTER,       | CLAIMS FOR RELIEF
   JEAN ADELE PEAVY, an individual,    |
18 LAURA SIEGEL LARSON, an             | Hon. Otis D. Wright II
   individual and as personal          |
19 representative of the ESTATE OF     |
   JOANNE SIEGEL, and DOES 1-10,       | **Hearing Date**:  Oct. 15, 2012
20 inclusive,                          | **Hearing Time**:  1:30 p.m.
                                        | **Courtroom**:       11
21          Defendants.

22

23

24

25

26

27

28

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J.

**ER-436**

1    Plaintiff DC Comics ("DC") objects to the evidence in defendants' Statement

2    Of Uncontroverted Facts, Declaration Of Keith G. Adams, and supporting exhibits

3    on the following grounds.  Much of the evidence defendants cite in this needless

4    and duplicative cross-motion was already cited and addressed at length in DC's

5    pending motion for summary judgment.  DC incorporates its prior objections and

6    responses to cited evidence defendants re-submit here.  *See* Docket Nos. 458, 458-

7    1, 459, 460, 468, 469, 470-1, 471, 473.

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| 4.    Superman became a cultural icon, and eventually spawned a multi-billion dollar franchise.<br><br>**Decl. of Keith Adams ("AD") Ex. K**<br><br>Described in AD as a "New York Times article, dated August 3, 1992." | AD Ex. K is inadmissible hearsay.  FED. R. EVID. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005).  Defendants offer this newspaper article solely for the truth of the matters contained therein to support their suggestion that Siegel and Shuster were responsible for the success of Superman.  Defendants cannot and do not identify any hearsay exception or other basis that would justify admission of the hearsay article.  *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).<br><br>FED. R. CIV. P. 56(c)(1)-(2) requires that only admissible evidence be considered for purposes of summary judgment, and thus AD Ex. K must be disregarded, *In re Slatkin*, 525 F.3d 805, |

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J.

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| | 811 (9th Cir. 2008).<br><br>Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |
| 15.    Consistent with the outcome of the 1947 Action and *Siegel*, 508 F.2d 909, DC for decades has based its chain-of-title to Superman on the 1938 Grant.<br><br>**AD Ex. T**<br><br>Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | AD Ex. T is inadmissible hearsay, given the theory of relevance.  FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4.<br><br>It is also not remotely "custom" evidence, given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements.  Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).<br><br>The report is not habit evidence under FED. R. EVID. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic."  *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988); *see U.S. v. West*, 22 F.3d 586, 592 (5th Cir. 1994) (rejecting Rule 406 argument where evidence not numerous enough in relation to defendants' thousands of other dealings); *G.M. Brod & Co. v.* |

DC'S OBJECTIONS TO EVIDENCE ISO DEFS.' MOT. FOR PARTIAL SUMM. J

**ER-438**

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| | *U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (explaining that experience of one contractor not sufficient evidence of routine practice in light of different experiences of thousands of other contractors who had dealt with same party). |
| | It also is inadmissible character evidence. "Evidence of a[n] … other act is not admissible to prove … that on a particular occasion the person acted in accordance." FED. R. EVID. 404(b). Defendants identify no exception for this rule "prohibit[ing] 'other acts' evidence for the purpose of showing action in conformity therewith." *U.S. v. Redlightning*, 624 F.3d 1090, 1120-21 (9th Cir. 2010). |
| 16.    DC deleted Siegel and Shuster's Superman credit byline (from 1947-1975) and references to them from its publications. **AD Ex. I**       Described in AD as a "Los Angeles Times article, dated February 25, 1979." | AD Ex. I is inadmissible hearsay. FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4, 15.       Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |
| 17.    Between 1947-1975, Siegel and Shuster slipped into obscurity and poverty. **AD Ex. F**       Described in AD as a "New York Times article, dated November 22, | AD Exs. F, G, I, and K are inadmissible hearsay.  FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4.       Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| 1975."<br><br>**AD Ex. G**<br><br>    Described in AD as a "New York Times article, dated December 10, 1975."<br><br>**AD Ex. I**<br><br>    Described in AD as a "Los Angeles Times article, dated February 25, 1979."<br><br>**AD Ex. K**<br><br>    Described in AD as a "New York Times article, dated August 3, 1992." | |
| 18.    In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign protesting DC's treatment of Siegel and Shuster.<br><br>**AD Ex. G**<br><br>    Described in AD as a "New York Times article, dated December 10, 1975." | AD Ex. G is inadmissible hearsay.  FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4.<br><br>    Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |
| 35.    The 1992 Agreement does not remotely resemble DC or Warner's customary rights agreements.<br><br>**AD Ex. O**<br><br>    Described in AD as an "agreement between DC Comics, Inc., on the one hand, and Frank Shuster and Jean Peavy, on the other hand, dated October 2, 1992." |     Unsupported by any testimony or evidence laying any foundation for three contracts out of hundreds that companies like Warner and DC enter into, or any testimony or evidence tying these three contracts to the issues in dispute in this case—much less the 1992 Agreement on which DC sues—defendants try to use these contracts to show that the 1992 Agreement, to be an effective copyright grant, had to be |

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J

**ER-440**

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| **AD Ex. J**<br><br>Described in AD as an "October 10, 1980 Agreement between DC Comics, Inc., on the one hand, and Swampfilms, Inc., on the other hand.<br><br>**AD Ex. W**<br><br>Described in AD as a "December 18, 1998, Agreement between Warner Bros., on the one hand, and Hasbro, Inc. and Hasbro International, Inc., on the other hand."<br><br>**AD Ex. BB**<br><br>Described in AD as a "December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar Rice Burroughs, Incl., on the other hand." | much longer.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that the Ninth Circuit handed down two years before the 1992 Agreement was made:  "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; *a one-line pro forma statement will do*."  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (emphasis added).<br><br>In any event, the three contracts defendants cite can and should be stricken for lack of foundation or connection to the facts at issue in this case, FED. R. EVID. 602, and disregarded on relevance grounds, FED. R. EVID. 401.  The contracts in AD Exs. J, W, and BB involve different parties, different rights, and different properties than those at issue in this case, and were entered into almost a decade after the 1992 Agreement.  AD Exs. J (DC Comics-Swampfilms, Inc.; Swamp Thing; 1980); W (Warner Bros.-Hasbro; option; G.I. Joe; 1998); BB (Warner Bros.-Edgar Rice Burroughs, Inc.; option; Tarzan; 2002).<br><br>AD Exs. J, W, and BB are not |

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J

**ER-441**

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| | habit evidence under FED. R. EVID. 406, because the documents do not show "a frequency of specific conduct sufficient to be considered semiautomatic." *See supra* DC's Objections to DSUF 15.<br><br>AD Exs. J, W, and BB are also inadmissible character evidence. *Id.* |
| 36.    DC did not file the 1992 Agreement with the U.S. Copyright Office, even though it is DC's customary practice to record real copyright assignments.<br><br>**AD Ex. T**<br><br>Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | AD Ex. T is inadmissible hearsay, given the theory of relevance. FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4, 15.<br><br>It is also not remotely "custom" evidence, given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements. *See supra* DC's Objections to DSUF 15.<br><br>The report is not habit evidence under FED. R. EVID. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic." *See supra* DC's Objections to DSUF 15.<br><br>It also is inadmissible character evidence. *Id.* |
| 37.    DC has consistently relied on the 1938 Grant for it chain-of-title to Superman, as the 1938 Grant was held in | AD Ex. T is inadmissible hearsay, given the theory of relevance. FED. R. EVID. 801, 802; *see supra* DC's |

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| both the 1947 Action and the 1974 Action to have granted DC's predecessor all rights in Siegel and Shuster's Superman character and story.<br><br>**AD Ex. T**<br><br>Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | Objections to DSUF 4, 15.<br><br>It is also not remotely "custom" evidence given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements. *See supra* DC's Objections to DSUF 15.<br><br>The report is not habit evidence under FED. R. EVID. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic." *See supra* DC's Objections to DSUF 15.<br><br>It also is inadmissible character evidence. *Id.* |
| 39.    Outside of and before filing this lawsuit in 2010, attacking the Shuster Termination (described below), DC has not claimed or suggested that the 1992 Agreement is the basis for its chain-of-title to Superman.<br><br>**AD Ex. T**<br><br>Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | AD Ex. T is inadmissible hearsay, given the theory of relevance.  FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4, 15.<br><br>It is also not remotely evidence of what DC has claimed or not claimed over the past 20 years, especially given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC.<br><br>This legal argument—improperly |

| Defendants' Statement of Uncontroverted Facts ("DSUF") | DC's Objections |
|---|---|
| | masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements. *See supra* DC's Objections to DSUF 15. |
| | The report is not habit evidence under Fed. R. Evid. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic." *See supra* DC's Objections to DSUF 15. |
| | It also is inadmissible character evidence. *Id.* |
| 40.     Outside of and before filing this lawsuit in 2010, attacking the 2003 Shuster Termination, DC has not claimed or suggested that the 1992 Agreement revoked or extinguished the 1938 Grant or any other Superman grants by Joseph Shuster.<br><br>**AD Ex. T**<br><br>Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | AD Ex. T is inadmissible hearsay, given the theory of relevance. Fed. R. Evid. 801, 802; *see supra* DC's Objections to DSUF 4, 15.<br><br>It is also not remotely evidence of what DC has claimed or not claimed over the past 20 years, especially given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements. *See supra* DC's Objections to DSUF 15.<br><br>The report is not habit evidence under Fed. R. Evid. 406, because it does not show "a frequency of specific |

DC'S OBJECTIONS TO EVIDENCE ISO
DEFS.' MOT. FOR PARTIAL SUMM. J

**ER-444**

| **DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF")** | **DC'S OBJECTIONS** |
|---|---|
|  | conduct sufficient to be considered semiautomatic."  *See supra* DC's Objections to DSUF 15. It also is inadmissible character evidence.  *Id.* |
| 41.     Outside of and before filing this lawsuit in 2010, attacking the 2003 Shuster Termination, DC has not claimed or suggested that the 1992 Agreement re-granted it Joseph Shuster's Superman copyrights. **AD Ex. T** Described in AD as a "February 29, 1996 Copyright Research Report generated by Thompson & Thompson." | AD Ex. T is inadmissible hearsay, given the theory of relevance. FED. R. EVID. 801, 802; *see supra* DC's Objections to DSUF 4, 15. It is also not remotely evidence of what DC has claimed or not claimed over the past 20 years, especially given that it is unsupported by any testimony or evidence laying foundation for the report, its relevance, or why and how it is germane to DC. This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that parties like DC need not record such agreements.  *See supra* DC's Objections to DSUF 15. The report is not habit evidence under FED. R. EVID. 406, because it does not show "a frequency of specific conduct sufficient to be considered semiautomatic."  *See supra* DC's Objections to DSUF 15. It also is inadmissible character evidence.  *Id.* |
| 42.     DC's 2005 letter to Mark Warren Peary and Jean Adele Peavy, which | AD Ex. HH is a settlement offer, which is inadmissible for the use |

**ER-445**

| DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS ("DSUF") | DC'S OBJECTIONS |
|---|---|
| discussed and offered to settle the 2003 Shuster Termination does not even mention the 1992 Agreement.<br><br>**AD Ex. HH**<br><br>    Described in AD as a "letter from Paul Levitz to Jean Peavy and Mark Warren Peary, dated April 28, 2005." | defendants seek to make of it. FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g., U.S. v. Whitney*, 180 Fed. Appx. 670, 673 (9th Cir. 2006); *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); Docket No. 468 at 7 n.3. Defendants also erroneously describe the letter. It challenges the Shusters' termination notice, as Toberoff expressly acknowledged in a letter in response. Docket No. 463-3 at 275. |

Dated:  September 21, 2012

Respectfully submitted,

By: /s/ Daniel M. Petrocelli
              Daniel M. Petrocelli

Attorneys for Plaintiff DC Comics

- 10 -

1 | DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2 | MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3 | CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4 | O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5 | Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6 | Facsimile:   (310) 246-6779

7 | Attorneys for Plaintiff DC Comics

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | DC COMICS,

11 |          Plaintiff,

12 |     v.

13 | PACIFIC PICTURES
    CORPORATION, IP WORLDWIDE,
14 | LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN
15 | PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
16 | JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an
17 | individual and as personal
    representative of the ESTATE OF
18 | JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19 |
           Defendants.
20 |
21 |
22 |
23 |

Case No. CV 10-3633 ODW (RZx)

**PLAINTIFF DC COMICS'
OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT ON
FIRST, SECOND AND THIRD
CLAIMS FOR RELIEF**

STATEMENT OF GENUINE
ISSUES; DECLARATION AND
FED. R. CIV. P. 56(D) AFFIDAVIT
OF DANIEL M. PETROCELLI;
DECLARATION OF DAMON
BONESTEEL; OBJECTIONS; AND
[PROPOSED] ORDER FILED
CONCURRENTLY HEREWITH

Hon. Otis D. Wright II

**Hearing Date**:    Oct. 15, 2012
**Hearing Time**:    1:30 p.m.
**Courtroom**:        11

24 |
25 |
26 |
27 |
28 |

1

# **TABLE OF CONTENTS**

2

3

I.      INTRODUCTION ........................................................................................... 1

II.     SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S FAVOR ON ITS FIRST CLAIM, BASED ON THE 1992 AGREEMENT. ................................................................................................ 2

III.    THE SHUSTERS' UNCLEAN HANDS ALSO BAR TERMINATION. .......................................................................................... 17

IV.     CONCLUSION ............................................................................................. 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*Am. Meat Inst. v. Leeman*,
180 Cal. App. 4th 728 (2009) .................................................................. 18

*Barry v. Donnelly*,
781 F.2d 1040 (4th Cir. 1986) .............................................................. 18

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*,
No. SACV 05-1083 (Oct. 13, 2006) ...................................................... 25

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ........................................................*passim*

*Connell v. City of N.Y.*,
230 F. Supp. 2d 432 (S.D.N.Y. 2002) .................................................. 24

*Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*,
543 F. Supp. 522 (D. Del. 1982) .......................................................... 18

*Eazypower v. Alden Corp.*,
2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) ...................................... 19

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990) ................................................................ 10

*Estate of Molino*,
165 Cal. App. 4th 913 (2008) ................................................................. 6

*Gucci Am, Inc. v. Guess?, Inc.*,
2012 WL 2304247 (S.D.N.Y. June 18, 2012) ...................................... 24

*Huthwaite, Inc. v Randstad Gen. Partner*,
2006 WL 3065470 (N.D. Ill. Oct. 24, 2006) ................................. 18, 22

*In re Kalt's Estate*,
16 Cal. 2d 807 (1940) ............................................................................. 6

*In re McKesson HBOC, Inc. ERISA Litig.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005) ................................................. 18

*Linzer Prods. Corp. v. Sekar*,
499 F. Supp. 2d 540 (S.D.N.Y. 2007) .................................................. 18

*Lucky's Detroit, LLC v. Double L Inc.*,
2012 WL 219418 (E.D. Mich. Jan. 25, 2012) ..................................... 24

*Makaeff v. Trump Univ., LLC*,
2011 WL 613571 (S.D. Cal. Feb. 11, 2011) ........................................ 25

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-449**

## <u>TABLE OF AUTHORITIES</u>

*Marvel Characters, Inc. v. Simon,*
     310 F.3d 280 (2d Cir. 2002) .................................................................4, 5, 16

*McCormick v. Cohn,*
     1992 WL 687291 (S.D. Cal. July 31, 1992)........................................... 18

*Metabolife Int'l, Inc. v. Wornick,*
     264 F.3d 832 (9th Cir. 2001) ............................................................2, 19

*Milne v. Stephen Slesinger, Inc.,*
     430 F.3d 1036 (9th Cir. 2005) ......................................................*passim*

*Mitchell Bros. Film Group v. Cinema Adult Theater,*
     604 F.2d 852 (5th Cir. 1979) .............................................................. 17

*New York Times Co., Inc. v. Tasini,*
     533 U.S. 483 (2001) ............................................................................ 3

*Pelich v. I.N.S.,*
     329 F.3d 1057 (9th Cir. 2003) ............................................................. 18

*Penguin Grp. (USA) Inc. v. Steinbeck,*
     537 F.3d 193 (2d Cir. 2008) .........................................................*passim*

*Perform. Unlimited, Inc., v. Questar Publishers, Inc.,*
     52 F.3d 1373 (6th Cir. 1995) ........................................................22, 23

*R&R Recreation Prods., Inc. v. Joan Cook Inc.,*
     1992 WL 88171 (S.D.N.Y. Apr. 14, 1992)........................................... 11

*Rupert v. Jones,*
     2011 WL 855849 (N.D. Cal. Mar. 9, 2011) ........................................... 1

*Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,*
     482 F. Supp. 980 (S.D.N.Y. 1980) ........................................17, 22, 25

*Shloss v. Sweeney,*
     515 F. Supp. 2d 1068 (N.D. Cal. 2007)................................................ 18

*Stewart v. Abend,*
     495 U.S. 207 (1990) ........................................................................3, 5

*Texas Partners v. Conrock Co.,*
     685 F.2d 1116 (9th Cir. 1982)............................................................. 19

*U.S. v. Hardesty,*
     977 F.2d 1347 (9th Cir. 1992) .........................................................5, 12

1

# TABLE OF AUTHORITIES

2

*Vogue Ring Creations, Inc. v. Hardman*,
   410 F. Supp. 609 (D.C.R.I. 1976) ...................................................... 18

*Walczyk v. Rio*,
   496 F.3d 139 (2d Cir. 2007) ............................................................... 24

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ........................................................................ 18-19

## STATUTES

17 U.S.C. § 304(c) ......................................................................... 4, 23

17 U.S.C. § 304(c)(5) ..................................................................... 3, 4

17 U.S.C. § 304(c)(6)(D) .................................................................. 24

17 U.S.C. § 304(d)(1) ................................................................ 24, 25

28 U.S.C. § 2201(a) .......................................................................... 18

## RULES AND REGULATIONS

37 C.F.R. 201.10(b)(1)(vii) .......................................................... 24, 25

FED. R. CIV. P. 54(b) ....................................................................... 25

FED. R. CIV. P. 56(d) .................................................................... 2, 19

## OTHER AUTHORITIES

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102
   Stat. 2853 (1988) ........................................................................... 11

3 NIMMER ON COPYRIGHT § 7.20[B] (2012) ......................................... 18

4 NIMMER ON COPYRIGHT § 13.09[B] (2012) ....................................... 18

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

## I.   INTRODUCTION

Defendants' cross-motion for summary judgment should be denied as procedurally improper and substantively without basis.  It is procedurally defective because it rehashes the same arguments the parties addressed on DC's pending summary judgment motion, Petrocelli Decl. ("PD") Ex. 4, and seeks to resolve issues—including DC's unclean-hands claim—that are not ripe for review.

As to DC's Third Claim, the Court ruled in DC's favor on the claim in its recent tentative, *id*. Ex. 1 ("Tentative") at 17-18, and defendants raised *no* argument concerning that ruling in their hour-long challenge to the Court's opinion, *id*. Ex. 2 ("Hr'g Tr.").  Summary judgment should enter in DC's favor on its Third Claim, and there is no need to re-brief that issue yet again.

DC's Second Claim, pled in the alternative to DC's First Claim, is not ripe for summary adjudication.  It alleges that, even if the Shusters' termination notice is valid (a premise that the First Claim contests), the Shusters may recapture only a limited sliver of rights (if any) because, *e.g.*, the works listed in their notice are non-terminable unpublished works, works-made-for-hire, and derivative works.  Docket No. 49 ¶¶ 152-64.  If the Court rules in DC's favor on DC's First Claim, there is no need to reach this Second Claim now.  *E.g.*, *Rupert v. Jones*, 2011 WL 855849, at *3 n.6 (N.D. Cal. Mar. 9, 2011).  Moreover, the Second Claim presents several issues currently before the Ninth Circuit in the *Siegel* case set to be heard November 5, 2012, Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1 at 41-87; 49 at 17-28; 65-1—only further reason not to address this Second Claim now.

That leaves DC's First Claim, large parts of which defendants improperly reargue in their cross-motion.  DC asserted five bases for this First Claim, two of which it will address in detail below.  The other three bases require no further briefing presently.  The first basis—DC's "expired" argument, Docket No. 49 ¶¶ 107-11—was fully briefed by the parties months ago, Docket Nos. 458 at 21-23; 468 at 9-10; Docket No. 186 at 14-17, and there is no reason to re-brief it yet again,

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-452**

1    especially given that defendants spent no time addressing the issue on September 5.

2    The second basis—DC's "majority interest" argument, Docket No. 49 ¶¶ 118-24—

3    was fully briefed, Docket Nos. 458 at 18-20; 468 at 8; Docket No. 186 at 20-21,

4    and the Court tentatively ruled against DC on it, Tentative at 15-17, although DC

5    respectfully disagrees with that conclusion.  The third basis—the Shusters' failure

6    to terminate 1992 and 1948 grants, Docket No. 49 ¶¶ 112-17—can and will be

7    mooted if the Court rules in DC's favor on its 1992 Agreement claim.

8        The two remaining bases for DC's First Claim—the 1992 Agreement, and

9    unclean-hands—merit discussion.  The Court tentatively ruled in DC's favor on the

10   1992 Agreement, and that tentative should stand.  Defendants materially misstated

11   the facts and law about the 1992 Agreement in their cross-motion and at the

12   September 5 hearing, and DC now corrects those misstatements.

13       Defendants also direct their motion at DC's unclean-hands claim, another

14   independent basis for its First Claim.  Defendants' motion fails to cite the case law

15   demonstrating that DC's unclean-hands claim, brought as a declaratory relief

16   action, is a fully proper way to challenge the Shuster termination notice.  Their

17   motion also ignores that discovery into this claim is ongoing, will take months to

18   complete (particularly given delays defendants have caused), and bars their motion.

19   *See* FED. R. CIV. P. 56(d); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th

20   Cir. 2001); PD ¶¶ 5-22 (detailing ongoing, needed discovery).

21       In short, no part of defendants' motion is well taken; it should be denied.

22   **II.    SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S FAVOR**

23   **ON ITS FIRST CLAIM, BASED ON THE 1992 AGREEMENT.**

24       As shown by its tentative opinion and the oral argument it held on September

25   5, the Court is well aware of DC's First Claim concerning the 1992 Agreement.

26   DC will not repeat its prior briefing or argument, but instead responds to significant

27   misrepresentations about the 1992 Agreement and its legal effect, made both in

28   defendants' cross-motion and argument at the September 5 hearing.

2

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-453**

1      *1. The Lead Premise of Defendants' Argument:  That The Termination Right*

2  *Is "Inalienable" And Congress "Abrogated" Contract Law.*  Defendants say Jean

3  Peavy is not bound by the $600,000-and-counting, lifetime contract she signed with

4  DC in 1992 because the "termination right is inalienable" and, in enacting the

5  termination and agreement-to-the-contrary laws in the Copyright Act, Congress

6  rewrote "everything that we are taught in law school" about contracts, including a

7  "deal is a deal."  Hr'g Tr. at 31:12-32:5; *id*. at 8:19-9:2; Cross-Mot. at 3, 12.

8      The Ninth Circuit rejected this position seven years ago in *Milne v. Stephen*

9  *Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005).  Below are the *Milne* court's

10  own words, refuting defendants' "inalienability" argument—which Clare Milne,

11  like defendants here, based on dicta in the *Stewart* case, *see* Hr'g Tr. at 32:6:

12          To support her theory that the 1983 agreement falls under the
           category of "an agreement to the contrary," Clare reads the Supreme
13          Court's decision in *Stewart v. Abend*, 495 U.S. 207, 110 S. Ct. 1750,
           109 L. Ed. 2d 184 (1990), <u>as holding that Congress intended to make</u>
14          <u>the termination right inalienable for authors and their families.</u>
           *Stewart*, however, <u>did not</u> interpret the "agreement to the contrary"
15          language of section 304(c)(5) or its counterpart under section
           203(a)(5).  In fact, the only discussion in *Stewart* pertaining to
16          inalienability is the Court's relatively brief portrayal of the evolution
           of copyright law, beginning with the Copyright Act of 1790 and
17          ending with the 1976 Copyright Act.  Accordingly, *Stewart* <u>does not</u>
           support the broad "plain meaning" that Clare attributes to section
18          304(c)(5) [the agreement-to-the-contrary provision in the Act].
19

20  *Milne*, 430 F.3d at 1043 (footnote and cites omitted; underlining added).[1]

21      *Milne* also rejected the argument made by defendants here—again, notably

22  unsupported by any case law, *see* Cross-Mot. at 3:15-26—that the Copyright Act

23  rewrote the copyright law to forbid all contracts that bar later termination claims:

24          Relying on legislative history, the district court [in *Milne* correctly]
           read the House Report for the 1976 Copyright Act as confirming the
25          rule that "[n]othing in the Copyright Acts has altered the power of

26  _____

27  [1] Defendants' cite to a *parenthetical* in a *footnote* in *New York Times Co., Inc. v.*
   *Tasini*, 533 U.S. 483, 496 n.3 (2001), Cross-Mot. at 3:4, is equally unavailing—and
28  no more a "holding" on this issue, *cf.* Hr'g Tr. at 32:8, than the dicta in *Stewart* that
   *Milne* openly discounted.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-454**

private parties to contract." H.R. REP. NO. 94-1476, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5743.

Clare [Milne] criticizes the district court's approach to statutory construction, arguing that section 304(c)'s meaning is clear on its face and that there was no need for the district court to consider legislative history. She maintains that the district court used legislative history to override the statute itself.

We disagree. Section 304(c)(5) states that "[t]ermination … may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 304(c)(5). As we have noted, the phrase "agreement to the contrary" is unclear…..

[A review of the legislative history shows] Congress specifically stated that it did not intend for the statute to "prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one[.]" H.R. REP. NO. 94-1476 at 127. Congress further stated that "nothing in this section or legislation is intended to change the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment." H.R. REP. NO. 94-1476 at 142. Congress therefore anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by replacing it with a new one. Indeed, Congress explicitly endorsed the continued right of "parties to a transfer or license" to "voluntarily agree[] at any time to terminate an existing grant and negotiate[e] a new one." H.R. REP. NO. 94-1476 at 127.

*Milne*, 430 F.3d at 1045-46 (footnote and cites omitted; underlining added).[2]

In *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 203 (2d Cir. 2008), the Second Circuit, relying on *Milne*, held the same as *Milne*—again rejecting defendants' arguments that Congress intended to "abrogate" contract law:

There is also no indication in the statutory text or the legislative history of the Copyright Act that elimination of a termination right through termination of a pre-1978 contractual grant was precluded or

---

[2] Defendants cite *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) to argue the termination right cannot be "contractually waived or circumvented," and that Congress "abrogated freedom of contract principles…." Cross-Mot. at 3:15-23. This ignores *Milne*, and disregards *Marvel*'s holding that the parties there could have settled their dispute and barred any termination claim had they just filed a proper "statement of settlement" that complied with the collateral-estoppel rules. 310 F.3d at 291-92. It also ignores that *Marvel* had *nothing* to do with a post-1978 copyright grant replacing all pre-1978 grants—as was the case in *Milne*, *Steinbeck*, and here. Rather, *Marvel* involved a *1969* settlement agreement, made years before the termination right was created in the late 1970s. 310 F.3d at 283-84, 287.

4

undesirable.  The House Report for the 1976 amendments noted, for example, that <u>"nothing in [the Copyright Act] is intended to change the existing state of the law of contracts concerning the circumstances in which an author may cancel or terminate a license, transfer, or assignment."</u>  H.R. Rep. No. 94-1476, at 128 (1976)….  So, provided that a post-1978 agreement effectively terminates a pre-1978 grant, <u>Congress did not manifest any intent for the earlier agreement to survive simply for purposes of exercising a termination right in the future.</u>  *See Milne…*, 430 F.3d [at] 1046 … (post-1978 agreement superseding pre-1978 agreement was of "the type expressly contemplated and endorsed by Congress" because it enabled an author's statutory heirs to renegotiate the terms of an original grant with full knowledge of the market value of the works at issue).  (Underlining added.)

Despite these holdings, defendants told the Court at the September 5 hearing that, if Jean Peavy held the right of termination in 1992 and agreed with DC not to pursue the right for $25,000 per year going forward, her 1992 contract with DC would be "totally void," because that right is "inalienable," and Congress barred all such agreements to the contrary.  Hr'g Tr. at 31:14-32:5.  *Milne* and *Steinbeck* expressly reject defendants' erroneous assertions.[3]

*2. Jean's Ability To Dispose Of Joe Shuster's Rights And What Those Rights Were In October 1992.*  Defendants sowed confusion—both in their cross-motion, and at the September 5 hearing, Docket No. 478 at 12, 15; Hr'g Tr. at 37:18-

---

[3] Defendants also rely on dicta in *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 985-86 (9th Cir. 2008), to make their "inalienability" arguments.  But the earlier-decided Ninth Circuit opinion—*i.e.*, *Milne*—"controls," *U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992), and the Second Circuit in *Steinbeck* overturned the district court opinion on which *Mewborn* mistakenly relied.  *Compare Mewborn*, 532 F.3d at 986, *with Steinbeck*, 537 F.3d at 199-200, 202-04.

At all events, the "alienability" issue that motivated Congress—that authors in *their first contracts with publishers* would assign their termination rights in works when they had no idea what the works would be worth decades later, *see Stewart*, 495 U.S. at 225-30; *Marvel*, 310 F.3d at 290-91; *Steinbeck*, 527 F.3d at 197-98; *Mewborn*, 532 F.3d at 983-84—is not present here.  Jean Peavy knew full well what Superman was worth in 1992; her son and co-defendant, Mark Peary, admits this.  *Infra* at 14.  And as in *Milne*, when Jean made her deal in 1992, she was not making a forbidden "'agreement to make a future will'" or "'future grant'" not knowing what Superman was worth.  *Milne*, 430 F.3d at 1043.  Instead, knowing Superman's full value in 1992, she freely granted to DC all copyrights, claims, or other rights in any and all of Joe's creations.  *Infra* at 13-14; Tentative at 3-4, 8-10.

43:25—about whether Jean Peavy (or Joe Shuster) had any Superman rights to grant to DC when Jean made the 1992 Agreement.  The Court asked several questions on this issue as well.  Hr'g Tr. at 51:7-54:19.  The case law and undisputed facts confirm the Court's tentative opinion was fully correct.

a.  As Joe Shuster's designated executrix and sole heir, Docket No. 459-3 at 182, 275-76, Jean had full right in 1992 to contract on behalf of Joe's estate and dispose of any copyrights or contracts he held, even if his will was not probated.  *In re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940); *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008).  California law is clear on this point, and defendants have never disputed it.  Docket Nos. 186 at 12-13; 334 at 9-10; 458 at 15; 468 at 7-8.  Indeed, it was only *Joe's rights* that Jean could have granted DC in 1992, because, unlike her brother Frank, Jean had no rights or contracts with DC to settle, other than those she received from Joe.  Docket No. 458 at 5-6; 468 at 7; *cf.* Hr'g Tr. at 19, 40:6-24.

In making the 1992 Agreement, Jean stood in the same shoes as did Christopher Milne and as Elaine Steinbeck—as an author's authorized successor making an agreement that would affect the rights of any heirs and statutory rights holders who followed.  *Steinbeck*, 537 F.3d at 200-01; *Milne*, 430 F.3d at 1044-46.

b.  As in *Steinbeck* and *Milne*, before DC made its agreement with Jean, DC owned all of the underlying copyrights in Superman—based on then-existing copyright grants from Joe Shuster to DC.  Docket Nos. 458 at 3-5; Tentative at 2-3. The same was true in *Steinbeck*:  Before Elaine made her 1994 Agreement with Penguin, Penguin held copyrights grants from the 1930s in John Steinbeck's books, 537 F.3d at 196, and when Elaine made the 1994 Agreement, she had no present right to terminate those grants, *id.* at 202-03 & n.5; *infra* 14-15.  In *Milne*, Christopher *potentially* could have filed a notice of copyright termination in 1983 in several of his father's Winnie the Pooh books, but he had *not* done so, and so when he made his 1983 Agreement with the Slesinger company, neither he nor his father owned the relevant Winnie the Pooh copyrights.  430 F.3d at 1040; *infra* n.10.

c.  In their respective 1992, 1994, and 1983 agreements, the parties here and in *Steinbeck* and *Milne* each engaged in a simultaneous, two-part transaction—*the first part of which gave back to the heirs the rights their relatives once held*.  In the first part of the 1992 Agreement, DC "fully settled" all of its agreements with Joe— thereby superseding its agreements with Shuster under New York contract law, Docket No. 458 at 6 ("this agreement <u>fully settles</u> all claims to any payments or *other rights or remedies which you may have under <u>any other agreement</u> or otherwise*, whether now or hereafter existing regarding any *<u>copyrights</u>*, trademarks, or other property right *in any and all work* created in whole or in part by [Joe Shuster]"); *id*. at 13-14; Docket No. 468 at 2-4.  Likewise, Penguin "cancel[led] and supersede[d]" its agreements with John Steinbeck, as the first step of its 1994 contract, *Steinbeck*, 537 F.3d at 196, and Slesinger "revoked" A.A. Milne's grants to it, as the first step in its 1983 agreement with Christopher.  430 F.3d at 1044.[4]

_____

[4] Defendants argued repeatedly there was "no language" in the 1992 Agreement or any extrinsic evidence that supported DC's position that the 1992 Agreement expressly and impliedly superseded all of Joe Shuster's pre-1978 grants.  Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5; Cross-Mot. at 11-12, 16; Docket No. 462 at 15-16.  But, as the Court's tentative ruling correctly held:

The broad and all-encompassing language of the 1992 Agreement <u>unmistakably operates to supersede all prior grants</u>.  (See Petrocelli Decl. Exh. 24.)  Unlike *Mewborn*, where the post 1978 agreement transferred rights "in addition to" those transferred in pre 1978 grants, <u>the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and displacing "all claims … under any agreement" related to "any and all" works "created in whole or in part by … Joseph Shuster."</u>  (UF 19.)….

Defendants insist "the [1992] agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.)  Surely Defendants recognize that "any and all work created in whole or in part by … Joseph Shuster" necessarily includes his most famous creation, Superman.  <u>And, just as clear, when … a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes.</u>  Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant and subsequent Superman grants" lends credence to the need for all-encompassing language.

DC'S OPP. TO DEFS.' MOT. FOR PARTIAL SUMM. J.

**ER-458**

1      d.  In the second part of each of the 1992, 1983, and 1994 contracts—and for

2  new and valuable consideration given to the heirs—Jean, Christopher, and Elaine

3  each then granted their relatives' copyrights back to the publisher in question:

- Jean Peavy expressly "grant[ed]" to DC "any copyrights" in "any and all
  work created in whole or in part by [her] brother, Joseph Shuster…."
  Adams Decl. Ex. O; Tentative at 9; Docket No. 468 at 4-5.  In
  consideration, while DC had owed Jean *nothing* before the 1992
  Agreement, it agreed to pay her $25,000 a year for the rest of her life.  *Id.*
  This new and valuable consideration—which Jean obtained only after
  expressly threatening to assert a termination claim, Docket No. 460-1 at
  28; Tentative at 10—netted Jean and her family over $600,000, and that
  sum is still growing today, Docket No. 468 at 6-7; Tentative at 4-5, 14.

- Christopher Milne likewise re-granted all of his father's copyrights to
  Slesinger in the second part of his contract.  *Milne*, 430 F.3d at 1040.  The
  Pooh Properties Trust was already entitled to tens of millions of dollars in
  royalties before Christopher made the 1983 agreement, but under the new
  contract—made after Christopher threatened termination—Christopher
  "doubled" the Trust's royalty share.  *Id.* at 1046.

Tentative at 9-10 (underlining added).

    Not only did the 1992 Agreement *expressly* "fully settle" "any other agreement"
Joe had with DC—embracing any and all grants he gave DC in the 1930s or after,
*id.* at 9—Paul Levitz told Jean and Frank that the 1992 Agreement would create
final and total peace between the parties, exactly what the New York law on
superseding prior contracts contemplates.  Docket No. 468 at 7.

    Defendants do not and cannot dispute this testimony.  Instead, they argue the
1992 Agreement (and Levitz) needed to use magic words like "revoke" or "cancel."
Cross-Mot. at 14; Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5.
But *none* of the cases defendants cite say these words are required, Docket No. 468
at 2-4; the cases they cite using these words post-date the 1992 Agreement by a
decade, *id.*; and the words "fully settle" "all other agreements" are the sort of words
DC needed to supersede its prior contracts under New York law.  Tentative at 9;
Docket No. 468 at 4-5.  New York law is the *very law defendants argued must
apply* until confronted with DC's summary judgment motion and the Court's
tentative.  *Compare* Tentative at 7; Docket No. 468 at 2, *with* Hr'g Tr. at 46:2-12.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

- In *Steinbeck*, Elaine was already receiving significant royalties from Penguin for her husband's books, but in exchange for replacing her husband's old agreements with Penguin, and making new post-1978 grants, she received "larger guaranteed advance payments" and royalties calculated based on retail, not wholesale prices.  537 F.3d at 200.

e.  What these cases recognize—and as the 1992 Agreement provides—is that there is significant value to a publisher like DC, Penguin, or Slesinger in getting an heir to enter into a post-1978 transaction that both (a) returns the creator's copyrights to the family and (b) re-grants those copyrights to the publisher.  The value exists because the post-1978 agreement that replaces the earlier ones—and fully settles all the parties' claims—is *not* subject to termination under § 304, and is *not* a forbidden agreement to the contrary.  *See Steinbeck*, 537 F.3d at 201-03; *Milne*, 430 F.3d at 1043-46.  As *Steinbeck* explained it:

> Contrary to the district court's observation that "[a]t no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement," *Steinbeck*, 433 F. Supp. 2d at 401-02, the 1994 Agreement obligated Penguin to pay larger guaranteed advance payments and royalties….

537 F.3d at 200.  And as *Steinbeck* made clear, post-1978 agreements may not be terminated under § 304—period—even if the party making the post-1978 agreement tried to preserve its termination claims for a later day.  *Id*. at 199-204.[5]

---

[5] *Id*. at 201 ("It is of … little relevance that the 1994 Agreement might have intended that earlier created termination rights survive it, for our central inquiry is not the parties' intent to preserve these rights—which are granted by statute, not contract—but rather their intent to terminate the 1938 Agreement.  The availability of termination rights under the Copyright Act is not dependent on the intent of the parties but on, among other things, the date that a grant of rights was executed and the relationship to the author of those seeking to exercise the termination right.  So, even if we accept that the 1994 Agreement 'explicitly carries forward possible future termination,' *Steinbeck*, 433 F. Supp. 2d at 401, it does not matter inasmuch as the pre-1978 grant of rights no longer existed.  To the extent that the 1994 Agreement might also have contemplated the potential preservation of termination rights, it does not abrogate the 1994 Agreement's clear expression of intent to terminate all prior grants of a transfer or license in the subject copyrights.").

DC'S OPP. TO DEFS.' MOT. FOR PARTIAL SUMM. J.

ER-460

1    Here, and as in *Milne*, the facts are even stronger for DC than in *Steinbeck*.

2  In inducing DC to sign the 1992 Agreement, Frank and Jean expressly told DC that

3  if Jean received the $25,000 per year for the rest of her life, Jean would not pursue a

4  termination claim, Docket No. 460-1 at 28, just as Christopher had done, *Milne*,

5  430 F.3d at 1046; Tentative at 9-10.  She reaffirmed this promise after the 1992

6  Agreement was made, including in 1999.  Docket No. 460-2 at 236; Tentative at 4-

7  5.  In fact, *Jean has never disavowed making any of these promises*, nor have

8  defendants submitted a shred of testimony from her.  Instead, they rely on lawyer

9  arguments masquerading as witness testimony.  *E.g.*, *supra* n.4; *infra* nn.5-6.

10    f.  Finally, defendants' claim that Jean never possessed Joe's copyright

11  interests, Hr'g Tr. at 41:4-9, 17:22-24, 19:6-11, is not only contrary to law, but

12  refuted by defendants' own conduct.  In 2001, on behalf of his company defendant

13  Pacific Pictures, Toberoff signed an agreement with Jean and Peary expressly

14  obtaining an assignment to Joe's copyrights in Superman.  Docket No. 468 at 8;

15  Adams Decl. Ex. Z; Tentative at 15-16; PD Ex. 3.  Toberoff's argument that Jean

16  never had any of Joe's rights to assign—meant only to stave off this Court's

17  tentative ruling—is precisely the opposite of what he said and did in his own

18  private, business contract with Jean in 2001.  *Id.*

19    *3.  Whether The 1992 Agreement Was A "Grant" And Whether DC Relied*

20  *On That Grant Before.*  Likewise without merit are defendants' attacks on the 1992

21  Agreement as too "short" and "flimsy" to constitute a valid copyright grant.  Cross-

22  Mot. at 1:21; Hr'g Tr. at 45:9-11.  In 1990, before the 1992 Agreement was made,

23  the Ninth Circuit held that a copyright agreement needed only to be *one-line long*:

24    [The] writing requirement [in section 204 of the Copyright Act] is not
     unduly burdensome; it necessitates neither protracted negotiations nor
25    substantial expense.  The rule is really quite simple:  If the copyright
     holder agrees to transfer ownership to another party, that party must
26    get the copyright holder to sign a piece of paper saying so.  It doesn't
     have to be the Magna Charta; a one-line pro forma statement will do.
27

28  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (Kozinski, J.).

1   The 1992 Agreement fully satisfies this test, and while defense counsel

2   attempted at the September 5 hearing to testify as a fact witness about what DC's

3   copyright contracts usually say, how long they are, and where it files them,[6] there is

4   no competent record evidence to support those assertions.  Defendants cite no

5   testimony from any DC witness; no opinion testimony from an expert; no testimony

6   from Jean; and no competent evidence to establish DC's protocols.  Docket No. 473

7   at 5-7 (DC's objections to alleged evidence of its practices).  And since 1989 the

8   law has been clear that DC need not publicly file its copyright agreements.  Pub. L.

9   No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v.*

10  *Joan Cook Inc.*, 1992 WL 88171, at \*4 (S.D.N.Y. Apr. 14, 1992).

11  Defendants also falsely argue that DC "contrived" its arguments concerning

12  the 1992 Agreement when it hired Daniel Petrocelli in 2010.[7]  Defendants provide

13  no evidence of this—for good reason.  Long before hiring Petrocelli, the 1992

14  Agreement was the subject of discovery and communications among the parties in

15  *Siegel*.  *E.g.*, PD Exs. 35-39; Docket No. 334-10 at 43-44.  And *years before* DC

16  hired Petrocelli, Warner Bros. relied upon the 1992 Agreement to establish its

17  ownership of Joe Shuster's Superman copyrights.  Bonesteel Decl. ¶¶ 2-3.[8]

---

18  [6] Hr'g Tr. at 47:5-48:5 ("I know Warner Brother … and DC agreements"; the

19  1992 Agreement is "flimsy"; DC and Warner Bros. "filed [the contracts] with the

20  copyright office to give the wor[l]d constructive notice of their copyrights").

21  [7] *See* Hr'g Tr. at 24:15-24 ("You know what the first time is [DC] mentioned the

    1992 agreement? After they replaced their lawyers and they hired new counsel, and

22  new counsel came up with this theory.  But, that is what I meant, your Honor, when

    I was talking about fancy.  I wasn't referring to your tentative.  I was referring to a

23  new argument that is being contrived by lawyers…."); *id.* at 34:15-22 ("DC has

    never acted as if this 1992 agreement is the basis of its chain of title"); *id.* at 39:18-

24  40:4 ("They came up with that argument when they hired Mr. Petrocelli in 2010.").

25  [8] Defendants' claim that the "billion" dollar Superman franchise hangs on this

    one agreement, and hence it should be longer, is also false.  *Cf*. Hr'g Tr. at 20:1-17;

26  34.  The 1938 grant is a few lines long, *id*. at 55; the *Cohen* case makes clear this is

    proper; and Joe's Superman contributions he seeks to terminate—*i.e.*, a few early

27  comic strips—represent a tiny fraction of the 70 years of Superman content that DC

    owns free and clear of any claims by Shuster.  *E.g.*, Docket Nos. 49 ¶¶ 34-39; Case

28  No. CV-04-8400, Docket Nos. 336 at 24-25; 623 at 4-6.

11

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1    *4.  DC Also Prevails Under Any "Waiver," "Fairness," Or Other Test*

2    *Defendants Assert.*  Defendants plainly lose under *Milne* and *Steinbeck*, which bar

3    termination where a post-1978 agreement—like the 1992 Agreement—replaces all

4    pre-1978 copyright grants that might otherwise be terminable.  *Supra* at 5-11.

5        a.  Defendants propose jettisoning the test established by *Milne* and *Steinbeck*

6    in favor of a multifactor test, asserting that, among other factors, an author or heir

7    can relinquish a termination right only by knowingly using the threat of termination

8    "as leverage to bargain a new deal" that "realize[s] the increased market value" of

9    the author's work.  Hr'g Tr. at 13:14-14:2; Docket Nos. 478 at 13-14, 462 at 11.

10       In the first place, no court has ever adopted defendants' test.  During oral

11   argument, defendants argued that *Mewborn* modified the test announced in *Milne*,

12   and they represented that in *Mewborn* (a) Classic Media called its 1978 agreement

13   with Winifred Mewborn "a revocation and a regrant," (b) "the district court bought

14   that argument and said [Winifred] had no termination right," and (c) the Ninth

15   Circuit reversed on the ground that there was no "express revocation" and, thus,

16   "limit[ed]" *Milne* and adopted defendants' test.  Hr'g Tr. at 14:9-24, 15:4-14.

17       Each of these contentions is demonstrably false.  First, *Mewborn* could not

18   "limit" *Milne*, as Ninth Circuit rules hold.  *Hardesty*, 977 F.2d at 1347.  Second, as

19   shown by his own brief in *Mewborn*, Toberoff's characterization of the facts of

20   *Mewborn* to this Court were untrue.  Contrary to Toberoff's claims here about what

21   arguments the district court in *Mewborn* "bought," Hr'g Tr. at 14:18-20, he told the

22   Ninth Circuit in *Mewborn* "[t]he district court … found that the 1978 Assignment

23   *did not revoke and replace the 1976 Assignment*," and, instead, only granted rights

24   "in addition to the rights granted" in 1976.  PD Ex. 16 at 536 (emphases added).

25   The Ninth Circuit in *Mewborn*, 532 F.3d at 982, noted exactly the same.

26       Thus, the focus of *Mewborn* was *not* whether the 1978 agreement superseded

27   and replaced all pre-1978 copyright grants—which is the issue here, and was the

28   issue in *Milne* and *Steinbeck*—but, rather, in the context of a non-superseded *pre-*

12

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-463**

1   *1978 grant*, whether in making an "additional" *post-1978* grant, Winifred

2   "intend[ed] to relinquish a known termination right." *Mewborn*, 532 F.3d at 989.

3   Because Winifred, unlike Jean—was totally unaware of the termination provisions,

4   did not know what rights she was supposedly relinquishing, "had nothing in hand

5   with which to bargain," and was paid a mere $3,000, *Mewborn* held that her 1978

6   deal with Classics did not meet the objectives of the termination laws and could not

7   be enforced. *Id*. at 979-81, 989. The undisputed facts here are the opposite: Jean

8   threatened a claimed right of termination—and used it to obtain lifetime, annual

9   payments, which she has never renounced and receives to this day, 20 years later.

10       b.  To the extent such an "intent to relinquish" test exists separate and apart

11   from the supersede-and-replace formulation in *Milne* and *Steinbeck*, DC meets it.

12   As *Steinbeck* and *Milne* both observed, "post-1978 agreement[s] superseding pre-

13   1978 agreement[s]"—like the 1992 Agreement—were "'expressly contemplated

14   and endorsed by Congress'" because they "enabled an author's statutory heirs to

15   renegotiate the terms of an original grant with full knowledge of the market value

16   of the works at issue." *Steinbeck*, 537 F.3d at 203 (quoting *Milne*, 430 F.3d at

17   1046). And as this Court held in its tentative, "[u]nlike the heirs in *Mewborn*":

18   >  Jean and Frank were aware of the Copyright Act's termination rights
    >  when they bargained for and entered into the 1992 Agreement. (*See* UF
19   >  17, 21, 22.) As DC points out, "the fact that Jean and Frank were able to
    >  obtain hundreds of thousands of dollars in benefits … shows that
20   >  Mewborn's concerns about [the heirs'] ignorance are inapt here." (Mot.
    >  at 17.)…. And, unlike in *Mewborn*, the record here is rife with "evidence
21   >  … to support a finding that [Jean Peavy], when entering into the [1992]
22   >  Agreement, considered … termination rights … [and] that [Jean]
    >  intended to waive or relinquish them." *Mewborn*, 532 F.3d at 989.[9]

23       As defendants concede, and cases like *Milne* hold, the goal of the termination

24   law was to allow authors or heirs to make a new deal with publishers decades after

25

26   [9] Tentative at 9-10; *see also* Hr'g Tr. at 30:9-15 ("THE COURT: … Now, with
    respect to the Shusters, they kept saying over and over again that they would not
27   seek to reclaim any rights in the future. They said that over and over again. They
    made their intent clear; right? And I guess in exchange for that, DC continued to
28   give them checks. MR. TOBEROFF: Correct, Your Honor.").

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-464**

1   their initial grants, when the authors or heirs "knew what the value of these

2   creations were," and when they had new leverage—a threatened termination

3   claim—to secure a new and better financial deal.  Hr'g Tr. at 9:10-18, 13:14-19;

4   *Milne*, 430 F.3d at 1044-45 & n.8, 1046-47; *Steinbeck*, 537 F.3d at 197-98.

5       That purpose was realized here when Jean, in 1992—after invoking the

6   termination provisions and expressly offering "not [to] pursue the termination of

7   the Superman copyright," Docket No. 460-1 at 28; Tentative at 10—made a deal

8   with DC for all of Joe's Superman rights.  To date, the deal has netted Jean over

9   half a million dollars, and lifetime security—neither of which DC ever owed her

10   before.  Jean (and all the world) knew Superman's value in 1992.  Peary testified he

11   and Jean believed, *in 1992*, Superman had generated "billions of dollars," they had

12   not received their full share, and—knowing this and being of "sound mind"—Jean

13   still signed the 1992 deal.  Docket No. 305-37 at 1253:23-1257:22.  That Peary

14   (and Toberoff) now wish that Jean had held out for more money does not undo the

15   1992 Agreement.  An heir's "current dissatisfaction" with a predecessor heir's post-

16   1978 agreement in no way "discredit[s] the validity of [that] agreement and the

17   rights conferred thereby."  *Milne*, 430 F.3d at 1045; *Steinbeck*, 537 F.3d at 204.

18       c.  Contrary to defendants' suggestions at oral argument, Hr'g Tr. at 15:25-

19   16:6, 25:4-15, 34:9-35:23, it is immaterial whether Jean had a then-existing

20   termination right when she entered into the 1992 Agreement—the salient point is

21   that she "wield[ed] the threat of termination," even if she had no present right, to

22   extract benefits from DC.  *Steinbeck*, 537 F.3d at 202.  Defendants run from

23   *Steinbeck*, asserting that Elaine's 1994 Agreement with Penguin was enforceable

24   only because she was "in the termination window" when she executed it.  Hr'g Tr.

25   at 35:9-14.  This is wrong.  As *Steinbeck*, 537 F.3d at 202, 203 n.5, stated:

26          It is undisputed that the Steinbeck Descendants could not have
27         exercised their termination rights in 1994 because they lacked more
            than one-half of the author's termination interest.…  [And t]here is
28         some question as to why Penguin agreed to terminate and renegotiate

the 1938 Agreement, for without a majority termination interest, <u>it appears that Elaine Steinbeck would have been *unable* to terminate the 1938 Agreement on her own</u>…. (Emphases added.)

The court nonetheless held that Elaine's 1994 contract with Penguin—which had the legal effect of barring future termination claims her stepsons would assert—was enforceable. *Id*. at 203-04. And this was so even though her 1994 contract with Penguin actually tried to preserve such future termination rights. *Supra* at 9.

*Steinbeck* said it was "immaterial" whether Elaine had a present right of termination in 1994, 537 F.3d at 203 n.5, and instead held that what mattered was that she "did renegotiate and cancel the 1938 Agreement while wielding the threat of termination. Indeed, this kind of renegotiation appears to be exactly what was intended by Congress." *Id*. at 202. *Steinbeck* also "reject[ed] the suggestion that, notwithstanding the plain language of the 1994 Agreement, there was no effective termination of the 1938 Agreement because the 1994 Agreement provided no opportunity—no 'moment of freedom'—for those holding the termination right to renegotiate the terms of the grant," once the termination occurred. *Id*. at 201.

The court summed up its reasoning, *id*. at 204, which equally applies here:

> It should be noted that under our view, authors or their statutory heirs holding termination rights are still left with an opportunity to threaten (or to make good on a threat) to exercise termination rights and extract more favorable terms from early grants of an author's copyright. But nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them…. In this case, Elaine Steinbeck had the opportunity in 1994 to renegotiate the terms of the 1938 Agreement to her benefit, for at least some of the works covered by the agreement were eligible, or about to be eligible, for termination. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to Steinbeck's statutory heirs to revisit the terms of her late husband's original grants of licenses to his copyrights. It is no violation of the Copyright Act to execute a renegotiated contract where the Act gives the original copyright owner's statutory heirs the opportunity and incentive to do so. *See Milne*, 430 F.3d at 1046; *cf. Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 989 (9th Cir. 2008) (termination right preserved, notwithstanding a March 1978—i.e. post-1978—grant of rights, where termination right could not have been

1    exercised until 1984 at the earliest, and where "[n]either party intended
2    to revoke and replace (or even modify)" a 1976 grant of rights).

3    Other cases recognize that contracts may serve as alternatives to termination,
4    regardless of whether the requirements to terminate (*e.g.*, a present termination
5    right, filing a termination notice, etc.) are met.[10]  As in *Milne* and *Steinbeck*, Jean
6    took her family's one opportunity decades after Joe created Superman to cash in on
7    any asserted termination claims.  The deal she bargained for must be enforced.

8    *5.  Defendants' Misstatements About Jean's Authority And Role.*  Defendants
9    deflect from the facts that (a) Jean is the beneficiary of the purported termination
10   right they claim Joe's Estate holds, and (b) that Joe's will named Jean not only as
11   his sole heir, but as executor of his Estate to enforce such rights.  Docket No. 459-3
12   at 275-76; Hr'g Tr. at 41:20-21, 25:19-27:4.  To do so, Toberoff and Peary induced
13   Jean to be replaced by Peary as executor of Shuster's Estate in 2003, Adams Decl.
14   Ex. CC, in an effort to avoid the dispositive effect of the 1992 Agreement, which
15   Jean knowingly signed in 1992, just weeks after Jean told the California courts and
16   DC she was Joe's sole heir and executor of his estate.  Docket Nos. 186 at 12-13;
17   334 at 9-10; 458 at 15; 468 at 7-8; 460-1 at 9; Adams Decl. Ex. M at 156, 182.
18   Peary and Toberoff also refuse to close the 2003 probate case or to distribute the
19   Estate's assets to Jean—as Joe's will and California law require—because Peary
20   and Toberoff wish to persist in their arguments that Jean never obtained the

---

21   [10] Defendants conceded at oral argument that *Milne* enforced Christopher's 1983
22   agreement "although [he] didn't follow the statutory formalities of termination" and
     "contractually terminated instead."  Hr'g Tr. at 13:20-21, 34:1-3; *see Milne*, 430
23   F.3d at 1045 ("[a]lthough Christopher <u>presumably</u> could have served a termination
     notice, he elected instead to use his leverage to obtain a better deal"); *id.* at 1040
24   ("faced with the <u>possibility</u> that Christopher <u>might</u> seek to terminate … Disney
     proposed that the parties renegotiate") (emphases added).  In *Marvel*, the court
25   recognized that parties could have barred a termination claim by drafting—*even
     before 1978*—a "stipulation of settlement, complete with sufficient factual findings
26   on authorship," defining a work as a non-terminable work-for-hire.  310 F.3d at
     291.  And, again, in *Steinbeck*, 537 F.3d at 200-03, the Second Circuit rejected the
27   district court's conclusion that "'[a]ny interpretation of the 1994 Agreement having
     the effect of disinheriting the statutory heirs to the termination interest … must be
28   set aside as contrary to the very purpose of the termination statute.'"

16                                          DC'S OPP. TO DEFS.'
                                            MOT. FOR PARTIAL SUMM. J.

1  termination rights, and thus she is not bound by her 1992 Agreement. *E.g.*, Docket

2  Nos. 186 at 13; 334 at 9-13; 458 at 8, 15; 468 at 7-8.

3      The Court pressed defendants on these issues at the September 5 hearing, and

4  once again Toberoff was not candid about the true facts. *E.g.*, Hr'g Tr. at 41:20-21,

5  25:19-27:4. He claimed Jean "declined to act [as executor in 2003] because she

6  was 82." *Id.* at 42:19. But Peary testified Jean was "competent" and "had the

7  ability to serve as an executor" in 2003, and that Jean *never* said she was "unable or

8  unwilling to serve." Docket No. 305-37 at 1286:1-3, 1374:17-1375:4. Peary also

9  admitted: "I'm the one that has initiated the whole -- the whole project. I've been

10  involved in it with Toberoff from the beginning and I'm active and knowledgeable

11  on it." *Id.* at 1374:20-25. Peary did this without "any discussion" with Jean, and

12  Jean confirmed in 2006: "I don't know what's going on" with Shuster's "estate."

13  Docket No. 305-59 at 2107:10-13. Defendants cannot and should not be rewarded

14  for such duplicitous efforts to manipulate the termination process or this Court.

15  **III.   THE SHUSTERS' UNCLEAN HANDS ALSO BAR TERMINATION.**

16      The Shusters Notice contains at least two material misrepresentations, either

17  of which suffices to invalidate it. First, it conceals defendants' fraudulent scheme

18  to manipulate the Siegel and Shuster heirs' Superboy rights. Second, it attests that

19  the Shuster Estate holds Shuster's putative termination interest, but omits that 10

20  days before the notice was served, the Estate purported to assign all of its

21  "termination interest" to the Pacific Pictures Joint Venture—a deception this Court

22  rightly found to be "problematic." Tentative at 16. Unclean hands bars copyright

23  enforcement where a putative owner engages in "wrongful acts … affecting the

24  equitable relations between the parties." *Mitchell Bros. Film Group v. Cinema*

25  *Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). The doctrine applies when, as

26  here, a party "fails to advise the Copyright Office of facts," *Russ Berrie & Co., Inc.*

27  *v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980), or "misrepresents

28  the scope of his copyright to the court or opposing party," *Huthwaite, Inc. v*

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1    *Randstad Gen. Partner*, 2006 WL 3065470, at *9 (N.D. Ill. Oct. 24, 2006)."[11]

2        A.  The Law.  Citing two cases that do not involve an unclean-hands claim

3    asserted as a declaratory-relief claim, defendants argue that because unclean hands

4    is an equitable defense, it cannot be asserted as an affirmative claim.  Mot. 19

5    (citing *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D.

6    Cal. 2005) (request for remediation); *Pelich v. I.N.S.*, 329 F.3d 1057, 1062 (9th Cir.

7    2003) (habeas petition)).  Neither case so holds, *id.*, and defendants identify *no* case

8    precluding an unclean-hands claim brought as a declaratory-relief action.

9        None exists, and as DC showed at the Rule 12 stage, courts allow declaratory

10   relief claims based on anticipated defenses like unclean hands.[12]  If the rule were

11   otherwise, parties would be confronted with "the rock-and-a-hard-place choice to

12   cease [their activity] or fac[e] an infringement suit" and only then assert unclean

13   hands as a defense.  *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 557 n.96

14   (S.D.N.Y. 2007).  "The Declaratory Judgment Act was designed to prevent such

15   situations," *id.*, empowering courts to "declare the rights and other legal relations of

16   any interested party … whether or not further relief is or could be sought," 28

17   U.S.C. § 2201(a).  The Declaratory Judgment Act gives "federal courts unique and

18   substantial discretion in deciding whether to declare the rights of litigants," *Wilton*

19

20       [11] *See Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 616 (D.C.R.I.
21   1976); *McCormick v. Cohn*, 1992 WL 687291, at *4 (S.D. Cal. July 31, 1992).
     Defendants attack a straw man, saying DC's unclean-hands claim fails because it
22   does not meet the test for a claim of "fraud on the Copyright Office."  Mot. 20.
     Unclean hands has long been recognized as a separate and distinct doctrine,
23   *compare* 4 NIMMER ON COPYRIGHT § 13.09[B] (unclean hands), *with* 3 *id.* § 7.20[B]
     (fraud on the Copyright Office)—the two standards cannot be conflated.

24       [12] *E.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1081-82 (N.D. Cal. 2007)
25   (unclean-hands claim was "properly before the Court" because "if Defendants had
     sued Plaintiff for copyright liability, she could have raised an unclean hands
26   defense"); *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522, 548,
     554 (D. Del. 1982) (granting "unenforceability" claim, which is "rooted in the
27   equitable concept of 'unclean hands'"); *Barry v. Donnelly*, 781 F.2d 1040, 1043 n.8
     (4th Cir. 1986) (affirmative claim based on statute-of-limitations defense); *Am.*
28   *Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 744 (2009) (same; preemption).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1  *v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), which is essential here.  If DC were

2  forced to wait until the Shusters brought a lawsuit after the 2013 termination date to

3  assert unclean hands, it would be unfairly impeded in conducting and planning its

4  business.  Such economic harm is grounds for an unclean-hands claim to proceed.

5  *Eazypower v. Alden Corp.*, 2003 WL 22859492, at *2-3 (N.D. Ill. Dec. 2, 2003).

6      B.  The Merits.  Defendants' challenges to the merits of DC's unclean-hands

7  claim turn on contested factual issues that are the subject of ongoing discovery, PD

8  ¶¶ 12-18—which is itself grounds to deny defendants' motion.  FED. R. CIV. P.

9  56(d); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982);

10  *Metabolife*, 264 F.3d at 846.  Defendants' merits arguments fail in any event.

11      *1.  Superboy Fraud.*  From 1940 to 2002, Siegel, Shuster, and their families

12  asserted that Superboy was a joint creation of Siegel and Shuster.  For example:

13  • A 1940 script that Toberoff says features the first appearance of Superboy

14      contains the joint byline:  "By Jerry Siegel and Joe Shuster."  Statement of

15      Genuine Issues ("SGI") 1.

16  • Before the 1940 script, Shuster illustrated works for DC featuring Superman

17      as a boy with super-powers.  In *Action Comics #1*, Shuster drew Superman

18      as a very young boy displaying astounding "feats of strength":



27  *Action Comics #1* (1938), SGI 2

28  Shuster also showed Superman as a boy with super-powers in *Superman #1*:



*Superman #1* (1939), SGI 3

- In a 1942 Sunday comic strip, Shuster depicted Superman as a "youth" who could "outrun the express" train and had other "amazing powers":

Superman Sunday Strip (1942), SGI 4

- In 1948, a New York court found that Shuster provided the artwork for the first stand-alone Superboy story, printed in *More Fun Comics #101*.  SGI 5.

- In 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as their *joint creation*.   SGI 6.

- In 1982, Siegel's widow Joanne sent a letter to DC stating:  "It's no mystery who the creators were in Jerry and Joe's case.  Not only of Superman, *but Superboy and other comics*."  SGI 7 (emphasis added).

- In 2001, Jean and Peary signed the Pacific Pictures Agreement, defining "Superboy" as among "Joe Shuster's creations."  SGI 9.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-471**

This all changed in 2002, when Toberoff orchestrated an illicit scheme to position Jerry Siegel as the sole creator of Superboy so the Siegels could assert a baseless Superboy-related copyright infringement claim against DC in one of the two *Siegel* cases.  In 1997, years before Toberoff interfered, Siegel's heirs filed a termination notice seeking to terminate Siegel's prior Superman grants.  SGI 8. The notice expressly included *Superboy* works and elements among the "character, story element, or indicia reasonably associated with SUPERMAN," in recognition of the fact that Superboy is a complete derivative of Superman.  *Id.*

In November 2001—right when he entered into the 2001 Pacific Pictures Agreement with the Shusters—Toberoff set out to acquire the Siegels' interests, hoping to obtain their putative Superman rights and secure for himself a majority interest in the Siegel and Shuster heirs' collective rights.  SGI 10.  He succeeded. In October 2002, the Siegels signed an agreement with Toberoff's company IP Worldwide to exploit their putative Superman rights.  SGI 11.  The next month, the Siegels filed another termination notice directed at Superboy, which listed the same Superboy works and elements identified in the 1997 notice (along with a handful of additional Superboy titles that had fallen into the termination window).  SGI 12.

The Siegels' 2002 notice contained two crucial falsehoods:  (1) it erroneously stated that Superboy was a copyrightable work "separate and distinct" from Superman—though their 1997 notice acknowledged that Superboy was purely a derivative of Superman, SGI 13; and (2) it falsely recited that Superboy was "solely written and created" by Siegel and sought to recapture 100% of Superboy rights— enabling the Siegels to bring an infringement claim against DC in *Siegel*.  *Id.*

While the Shusters believed that Joe Shuster had co-authored Superboy, to induce them to join his fraudulent scheme, Toberoff colluded with Peary to agree that Superboy was created by Siegel alone.  Without receiving any independent legal advice, without conducting any factual investigation, and without consulting with Jean, Peary agreed to disclaim any interest in Superboy, and defendants

21

1  amended the 2001 Pacific Pictures Agreement to delete all reference to "Superboy"

2  and redefine the Shusters' putative rights as including only "Superman."  SGI 14.

3     Peary then filed the termination notice, which deceived the Copyright Office,

4  courts, and DC by misrepresenting Shuster's copyright interests, omitting all

5  references to Superboy-specific works and elements, and concealing defendants'

6  plan to falsely position Siegel as the sole creator of Superboy.  SGI 15; *Russ Berrie*,

7  482 F. Supp. at 988 ("failure to advise the Copyright Office of facts" unclean

8  hands); *Huthwaite*, 2006 WL 3065470, at *9 ("misrepresenting the scope of [one's]

9  copyright" unclean hands); *Perform. Unlimited, Inc., v. Questar Publishers, Inc.*, 52

10  F.3d 1373, 1383 (6th Cir. 1995) ("conduct involving fraud, deceit" unclean hands).

11     To complete this fraudulent scheme, in 2004, the Siegels filed a copyright

12  claim against DC in *Siegel* and sought to enjoin the successful *Smallville* television

13  show.  The *Siegel* court rightly rejected this claim, holding that to the extent there

14  was "any original copyrightable material in Siegel's Superboy submissions," such

15  material was part of "a joint work with Shuster's illustrations."  Case No. CV-04-

16  8776 ODW, Docket No. 151 at 62 (underlining added).

17     Toberoff and defendants have blocked full inquiry into their financial deals,

18  including the *quid pro quo* the Shusters received for falsely forfeiting their interest

19  in Superboy.  PD ¶¶ 12-18.  What we do know at present is that defendants' 2008

20  consent agreement, which remains in effect, binds the Siegels and Shusters together

21  by barring either family from making an agreement with DC without the other's

22  consent.  SGI 16.  It is also clear from defendants' selective disclosures about the

23  agreement that it requires the Siegels to pay a portion of their recovery from *Siegel*

24  to the Shusters.  SGI 17.  Defendants' motion carefully asserts the Shusters have no

25  claim to "the Siegels' Superboy termination," Cross-Mot. 22, but *does not deny* the

26  consent agreement entitles them to share in the Siegels' *Superman* recovery.

27     Defendants' efforts to excuse their Superboy frauds all fail:

28     a.  Defendants say the Shusters were barred from claiming an interest in

22

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-473**

1   Superboy by a 1948 ruling by a Westchester County court.  *Id*. at 21.  Not so.  Judge

2   Larson held in *Siegel* the Westchester ruling did *not* establish that Superboy was a

3   sole creation of Siegel.  Case No. CV-04-8776 ODW, Docket No. 151 at 5-38.  To

4   the contrary, he held that to the extent Superboy was separately copyrightable from

5   Superman—and he left that question open—it was a "joint work" by Siegel and

6   Shuster.  *Id*. at 62.  Siegel and Shuster told the Copyright Office the same thing in

7   1972 and 1973—some 25 years *after* the Westchester case, and 30 years before

8   Toberoff and Peary engaged in unclean hands by rewriting history.  *Supra* at 20.

9        b.  Defendants also say the timing limitations of the termination laws barred

10   the Shusters from seeking to recapture Superboy.  Again, untrue.  Under 17 U.S.C.

11   § 304(c), the Shusters could have served a termination notice seeking to recapture

12   the rights in *More Fun Comics #101*, which was published on November 18, 1944,

13   at any point between November 18, 1990 and November 18, 2003—just as the

14   Siegels did.  17 U.S.C. § 304(c) (allowing termination 56-61 years after work's

15   publication provided notice is served 2-10 years in advance).  The Shusters served

16   their notice under § 304(d) on November 10, 2003, eight days before the cut-off.

17        The Shusters also could have attempted to recapture rights in Superboy by

18   claiming the character was purely derivative of Superman—the same approach the

19   Siegels took in their 1997 notice by listing dozens of Superboy-specific works and

20   including a broad "catch-all" footnote identifying "Superboy" as among the

21   universe of Superman elements.  SGI 8.  The Shusters' notice does not list *any*

22   Superboy-specific works, and its catch-all footnote—which mirrors the Siegels' in

23   many other respects—deliberately omits all reference to Superboy.  SGI 15.

24        c.  Defendants' attempt to cast their illegal dealings as a legitimate effort to

25   gain a "tactical advantage," which they argue "cannot constitute 'unclean hands,'"

26   Mot. 21-22, is both false and illogical.  Why would any party engage in "conduct

27   involving fraud, deceit,… or bad faith," *Questar*, 52 F.3d at 1383, except to gain

28   some perceived advantage?  Indeed, courts frequently apply the doctrine of unclean

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-474**

1  hands based on a party's "strategic choice."  *E.g.*, *Walczyk v. Rio*, 496 F.3d 139,

2  146 (2d Cir. 2007) (plaintiff "made the strategic choice" to "initiate[] and direct[]"

3  fraudulent lawsuit); *Connell v. City of N.Y.*, 230 F. Supp. 2d 432, 439 (S.D.N.Y.

4  2002) ("unclean hands comes to mind" where party acted for "strategic reason").[13]

5         *2.  Concealment of Pacific Pictures.*  A termination notice can only be filed

6  "by the person or persons who … own and are entitled to exercise a total of more

7  than one-half of [an] author's termination interest," 17 U.S.C. § 304(d)(1), and

8  "must include a clear identification of … the person or persons executing the notice

9  who constitute more than one-half of that author's termination interest."  37 C.F.R.

10  201.10(b)(1)(vii).  Ten days before Peary filed the termination notice, the Shuster

11  Estate purported to transfer *100%* of Shuster's termination interest to the Pacific

12  Pictures Joint Venture.  Defendants withheld this key fact from the Copyright

13  Office and DC.  Docket Nos. 458 at 7-9, 18-20; 468 at 8; Tentative at 16.

14         Defendants concede that the Pacific Pictures agreements are "not lawful" and

15  were "void *ab initio*" under § 304(c)(6)(D) of the Copyright Act, *e.g.*, Docket No.

16  191 at 8, and, on that basis, assert "there were no misrepresentations to the

17  Copyright Office."  Cross-Mot. 20.  But as Peary admitted at his depositions, he did

18  not know these agreements were illegal, until *after* he filed his termination notice in

19  2003.  Docket No. 305-37 at 1326:16-1336:11; *see* PD Ex. 3 at 356:2-357:7

20  (Toberoff says not sure when he knew).  In its Tentative, the Court rightly observed

21  that, whether the Pacific Pictures agreements could legally transfer the Shusters'

22

23  _____

    [13] Defendants' cases are inapposite and merely conclude that the specific facts in
24  those cases did not constitute unclean hands.  *Gucci Am, Inc. v. Guess?, Inc.*, 2012
    WL 2304247, at *34 (S.D.N.Y. June 18, 2012) (decision to delay filing suit was
25  motivated by legitimate budgeting decisions rather than bad faith); *Lucky's Detroit,
    LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012)
26  (privilege objection was insufficient to "arise to unclean hands in this case").
    Defendants erroneously describe *Sears* as holding that "unclean hands 'cannot [be]
27  based on ... litigation strategy,'" Mot. 22, when the court denied the unclean-hands
    claim because plaintiff's misconduct was unrelated to its infringement claim—not
28  because it was motivated by strategy, 744 F. Supp. 1297, 1310 (D. Del. 1990).

termination interest, "the Court finds problematic Defendants' conduct—especially their failure to inform the copyright office of agreements which they themselves believed would affect ownership of the subject copyrights…." Tentative at 16.

Such intentional deception constitutes unclean hands and bars enforcement. In *Russ Berrie*, 482 F. Supp. at 988, a designer copyrighted a toy design, but did not "disclose to the Copyright Office … pre-existing works on which his designs" were based.  The court refused to enforce the copyright, finding the "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application" was reason to deny "enforcement on the ground of unclean hands." *Id.* Likewise, Peary knew full well when he filed the Notice that, *one week earlier*, he had purported to transfer 100% of the Shusters' "termination interest" to the Joint Venture, and if he disclosed this key fact to the Copyright Office, the Notice could be challenged and rejected.  17 U.S.C. § 304(d)(1), 37 C.F.R. 201.10(b)(1)(vii).[14]

## IV.   CONCLUSION

This Court should deny defendants' motion, and enter judgment in favor of DC on its First and Third Claims as set forth in the Court's tentative order.[15]

Dated:  September 21, 2012

Respectfully submitted,

By:   /s/  Daniel M. Petrocelli
Daniel M. Petrocelli

---

[14] That defendants "produced the PPC agreements" years later, Cross-Mot. 20—rather than suppressing them, as they have many other harmful documents, Docket No. 477-2 at ¶19-45—does not absolve defendants of liability.  Defendants never withdrew the false statements in their Notice or filed a corrected one.

[15] Defendants' request for judgment under FED. R. CIV. P. 54(b), Cross-Mot. 25, is premature.  It will be ripe once these motions are resolved.  DC disputes the claim that its Fourth through Sixth Claims are "stayed" pending defendants' SLAPP appeal. *Id.*  A central question presented in the appeal is whether the Ninth Circuit has jurisdiction to hear it.  Appeal No. 11-56934, Docket No. 37-1 at 26-27; *and compare Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, No. SACV 05-1083, Docket No. 54 (Oct. 13, 2006) (no stay), *with Makaeff v. Trump Univ., LLC*, 2011 WL 613571, at *2 (S.D. Cal. Feb. 11, 2011) (stay).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

**ER-476**

1  DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10 DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11         Plaintiff,                  DECLARATION OF DAMON
                                       BONESTEEL IN SUPPORT OF
12     v.                              PLAINTIFF DC COMICS'
                                       OPPOSITION TO DEFENDANTS'
13 PACIFIC PICTURES                    MOTION FOR PARTIAL
   CORPORATION, IP WORLDWIDE,          SUMMARY JUDGMENT ON
14 LLC, IPW, LLC, MARC TOBEROFF,       FIRST, SECOND AND THIRD
   an individual, MARK WARREN          CLAIMS FOR RELIEF
15 PEARY, as personal representative of
   the ESTATE OF JOSEPH SHUSTER,       Hon. Otis D. Wright II
16 JEAN ADELE PEAVY, an individual,
   LAURA SIEGEL LARSON, an             Hearing Date:   Oct. 15, 2012
17 individual and as personal          Hearing Time:   1:30 p.m.
   representative of the ESTATE OF      Courtroom:      11
18 JOANNE SIEGEL, and DOES 1-10,
   inclusive,
19
           Defendants.
20

21

22

23

24

25

26

27

28
                                       BONESTEEL DECL. ISO DC'S OPP. TO
                                       DEFS.' MOT. FOR PARTIAL SUMM. J.

**ER-477**

## DECLARATION OF DAMON BONESTEEL

I, Damon Bonesteel, declare and state as follows:

1.     I am an attorney licensed to practice in the State of California and admitted to the Central District of California.  I am a Senior Vice President of Legal and Business Affairs at Warner Bros. Entertainment Inc. ("Warner Bros."), an affiliate of plaintiff DC Comics ("DC").  I submit this declaration in support of DC's Opposition To Defendants' Motion For Partial Summary Judgment.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently thereto.

2.     I have reviewed the publicly available transcript of an oral argument held before this Court on September 5, 2012, during which counsel for defendants Marc Toberoff asserted that DC had "contrived" and "cooked up" arguments concerning the impact of a 1992 agreement between DC and the heirs of Joseph Shuster, and that DC did so only after hiring attorney Daniel Petrocelli in 2010.  I have reproduced below Mr. Toberoff's statements to this effect (emphases mine):

> *You know what the first time is that [DC] mentioned the 1992 agreement? After they replaced their lawyers and they hired new counsel, and new counsel came up with this theory.* But, that is what I meant, your Honor, when I was talking about fancy.  I wasn't referring to your tentative.  I was referring to *a new argument that is being contrived by lawyers that bears no relation to the actual document that was signed by the parties.* That is what I meant by that comment. Docket No. 489 at 24:15-24.

> *DC has never acted as if this 1992 agreement is the basis of its chain of title,* and the reason, your Honor, why I wanted to put that agreement in front of you is because it really is not credible that Warner Brothers and DC is relying for $400 million movies in a billion dollar business on this half page resolution in an agreement with Jean Peavy and Frank Schuster [sic]. *Id.* at 34:15-22.

> *[DC] never came up with that argument ever before.  They came up with that argument when they hired Mr. Petrocelli in 2010.  That is when they first presented that argument* even though the termination notices were served in 2003. *Id.* at 39:18-40:4.

- 1 -

BONESTEEL DECL. ISO DC'S OPP. TO
DEFS.' MOT. FOR PARTIAL SUMM. J.

We served termination notices in 2003. *And from all this time from 2003 to 2010, no one said peep about you can't do this, the 1992 agreement.... This is cooked up now, and I'm sorry to say it is a side show. Id.* at 44:2-15.

3.     Mr. Toberoff's representations to the Court were untrue. Warner Bros. relied on the 1992 agreement as an all-encompassing grant of Superman copyrights long before retaining Mr. Petrocelli in 2010. For example, in 2006, in dealing with a foreign government, Warner Bros. directly relied on the 1992 agreement as a grant by the Shuster heirs to DC of all copyrights in any and all work created in whole or in part by Joseph Shuster, including Superman.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed this 21st day of September 2012 at _Madrid_, Spain.

Damon Bonesteel

BONESTEEL DECL. ISO DC'S OPP. TO DEFS.' MOT. FOR PARTIAL SUMM. J.

ER-479

1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE OTIS D. WRIGHT

4         UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
DC Comics,                           )
7                    PLAINTIFF,      )
                                     )
8  VS.                               )   NO. CV 10-3633 ODW
                                     )
9  Pacific Pictures Corporation, et  )
   al.,                              )
10                   DEFENDANT,      )
   _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              LOS ANGELES, CALIFORNIA

16           WEDNESDAY, SEPTEMBER 5, 2012

17

18

19    _____

20         KATIE E. THIBODEAUX, CSR 9858
           U.S. Official Court Reporter
21         312 North Spring Street, #436
           Los Angeles, California 90012

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

ER-480

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF:

4         O'MELVENY AND MYERS LLP
          BY:  DANIEL M. PETROCELLI
5         -and- DIMITRI D. PORTNOI
          -and- MATTHEW T. KLINE
6         -and- JASON TOKOROFF
          400 South Hope Street
7         Eighteenth Floor
          Los Angeles, CA  90067
8

9

10   FOR DEFENDANT:

11        TOBEROFF AND ASSOCIATES PC
          BY:  MARC TOBEROFF
12        -and- KEITH ADAMS
          -and- PABLO ARREDONDO
13        22337 Pacific Coast Highway
          Suite 348
14        Malibu, CA  90265

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 5, 2012

 2                          1:30 P.M.

 3                       - - - - -

 4

 5

 6        THE CLERK:  Calling Item 2, CV 10-3633, DC Comics

 7   versus Pacific Pictures Corporation, et al.

 8            Counsel, may I have your appearances please.

 9        MR. PETROCELLI:  Thank you.  Good afternoon, your

10   Honor.  Daniel Petrocelli with Matthew Kline, Dmitri

11   Portnoi and Jason Tokoro for plaintiff DC Comics.

12        MR. TOBEROFF:  Good afternoon, your Honor.  Mark

13   Toberoff for the defendants.  I am here with my

14   associates Keith Adams and Pablo Arredondo.

15        THE COURT:  Gentlemen, good afternoon.

16            All right.  We are here on plaintiff's motion

17   for partial summary judgment on the first and third

18   claims, and I believe everyone has gotten our tentative;

19   correct?

20        MR. PETROCELLI:  Yes, your Honor.

21        THE COURT:  All right.

22        MR. TOBEROFF:  Yes, your Honor.

23        THE COURT:  Beginning with the moving party.

24        MR. PETROCELLI:  Yes.  Do you prefer that we --

25        THE COURT:  Make yourself comfortable.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. PETROCELLI:  I am actually more comfortable

2   standing if that is okay with you.

3          Your Honor, the central dispositive issue with

4   respect to our first claim the termination notice of the

5   Schuster heirs is ineffective is that the 1992 agreement

6   replaced all prior agreements and grants and regranted

7   new grants in 1992, and that would govern the parties

8   fully and finally going forward.

9          The copyright termination statute in all the

10  cases, all of them, including Milne and Mewborn and

11  Steinbeck all agree, and I believe even the defendants

12  agree that if we are dealing with grants that were made

13  after January 1, 1978, then there is no right of

14  termination.

15          If we are dealing with grants that still are

16  in existence as of the time this notice of termination

17  was filed in 2003, that were made prior to January 1,

18  1978, then there may be a right of termination.  We have

19  to then go to our other arguments that we presented in

20  our brief.

21          I am going to focus mainly on what I think is

22  the lynchpin argument which is the 1992 agreement, and

23  the first case to really address the issue of what would

24  happen if the parties entered into a new agreement after

25  January 1, 1978 superseding and replacing the old

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     agreements, whether that would extinguish any right to

2     terminate was addressed in the Milne case by the first

3     the District Court, the late Florence Marie-Cooper and

4     then the Ninth Circuit.

5               In that case, the Milne case, I submit,

6     directly deals with the issue at hand, namely that if the

7     parties do enter into a new post 1978 agreement replacing

8     the old agreement, there is no right to terminate.  The

9     copyright statute itself says that because it only

10    applies, it only provides the right to terminate to the

11    pre 1978 agreements and grants.

12              So Milne went on to address another argument

13    made by Ms. Milne in that claim, Clair Milne, contesting

14    the termination -- or advancing the termination right.

15    Forgive me.  And Clair Milne argued in that case, well,

16    wait a second, there is another part of the copyright

17    statute in the termination sections that says you can't

18    have an agreement to the contrary.

19              So even though the parties enter into this new

20    agreement replacing the old with a new set of grants,

21    that is still an agreement to the contrary and that is

22    still forbidden and you can't wipe out a termination

23    right in that manner.

24              That issue was discussed at length in Milne,

25    and the Milne court concluded that if the parties in fact

1    have superseded their old agreement with a new agreement

2    and it is after 1978, that is the beginning and the end

3    of the analysis.  It is straightforward because the

4    copyright statute on its face only allows termination for

5    pre 1978 grants.  And all of the discussion on that case

6    is really focused on this threshold issue which was the

7    case of first impression there, of whether the other

8    section dealing with a forbidden agreement to the

9    contrary encompassed this type of agreement.

10          And the court, after a lengthy analysis of the

11   legislative history and the cases, concluded that you can

12   supersede, revoke and replace, and that wipes out any

13   right of termination.  And there is nothing wrong with

14   that.  In fact, the court goes on to cite very important

15   language in the congressional history whereby Congress

16   made clear that nothing in this section or legislation is

17   intended to change the existing state of the law of

18   contracts concerning the circumstances in which an author

19   may terminate a license, transfer or assignment.

20          Indeed, Congress explicitly endorsed the

21   continued right of parties to a transfer or license, to

22   voluntarily agree at any time to terminate an existing

23   grant and negotiate a new one.  And that is at Pages 1045

24   and 1046 of the opinion which is 430 F.3d.  And then the

25   court winds through additional points and concludes that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    superseding agreements are not subject to termination.

2         THE COURT:  Is this a long way of saying you agree

3    with the tentative?

4         MR. PETROCELLI:  Yes.  And I didn't want to be

5    presumptuous, but that would pretty much sum it up,

6    Judge.

7         THE COURT:  Thank you, Mr. Petrocelli.

8         MR. PETROCELLI:  So, unless the court has any

9    questions, I would be prepared to defer.  And, by the

10   way, I am going to submit on the tentative even with

11   respect to the majority interest issue which the court

12   tentatively ruled against us unless you have questions or

13   if I need to respond.

14        THE COURT:  No.  We will deal with that later.

15        MR. PETROCELLI:  Thank you.

16        THE COURT:  All right.  Mr. Toberoff.

17        MR. TOBEROFF:  Your Honor, since -- your Honor,

18   since this is all about a half page agreement called the

19   1992 agreement, and a lot of fancy arguments are being

20   made about that page, I would like to set up that

21   document for you.

22        THE COURT:  I am not certain that there are any

23   fancy arguments.  We have an agreement supported by quite

24   a bit of consideration, and isn't that kind of the end of

25   it?  Promises made that we will never again pursue any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   future interests in Superman, promises repeated over and
 2   over again.  Where is the fancy part?
 3        MR. TOBEROFF:  I intend to explain all of that to
 4   you.  First, I would just like permission to set that up.
 5        THE COURT:  Go ahead.
 6        (Pause in proceedings.)
 7        THE COURT:  We spent a good deal of tax payer
 8   money to upgrade this courtroom, and we are still using
 9   those things?
10        MR. TOBEROFF:  Well, I am using it so that we can
11   really focus on this 1992 agreement.
12             That is the agreement in question, your Honor.
13   First of all, I would like to tell you how much I
14   appreciate the fact that the order you sent out was
15   labeled a tentative order, and I am here to attempt to
16   change your opinion about this matter by focusing on both
17   the facts and the law.
18        THE COURT:  Okay.
19        MR. TOBEROFF:  The termination provisions were
20   entered into, were enacted by Congress.  They are very;
21   unusual provisions because they cut through everything we
22   are taught in law school that a deal is a deal, that you
23   make a contract, if there is consideration for a
24   contract, it is enforceable whether it is for $10 or
25   $10 million.  You stick by those contracts.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-487**

1        And Congress said with respect to authors and

2    the Copyright Act, no.  There is a tremendous imbalance

3    of power between publishers and authors, and that means

4    that when authors want to have their works published,

5    they are going to have no leverage and those works may go

6    on to become very, very valuable.  And they will not have

7    had the opportunity to have bargained for profits or for

8    sufficient remuneration because they had no bargaining

9    leverage.

10        So what we are going to do is give you authors

11   the ability after a very long waiting period, in the case

12   of the terminations, 56 years, in the case of the

13   Schusters under 304(d), 75 years, we are going to give

14   them an attempt to realize some of the increased market

15   value of their works because when they first made the

16   deal with the publisher, not only didn't they have any

17   leverage but no one really knew what the value of these

18   creations were.

19        And, understand, large companies use

20   copyrights for exclusivity and to profit, but the reason

21   for copyright law to begin with is to provide financial

22   incentives for people to create because by providing

23   authors financial incentives, it is thought to be good

24   for commerce and good for a culture.

25        Siegel and Schuster who created Superman

```
 1   before there were any superheros and signed a document

 2   with a small publisher, a release to have that publisher

 3   publish Superman and got paid $130 were later held in

 4   1947 and again in '74 to have sold all their rights for

 5   $130, the poster boys for the termination provisions.

 6           When people talk about the legislative intent

 7   to correct the imbalance of power between authors and

 8   publishers, they often refer to Siegel and Schuster

 9   selling Superman for $130.

10       THE COURT:  Is that your position is that they

11   sold Superman, and all they were compensated was $130?

12   Is that your argument?

13       MR. TOBEROFF:  That is what they were originally

14   compensated.

15       THE COURT:  No.  No. is that what you are trying

16   to tell me?

17       MR. TOBEROFF:  No.  That is the beginning of the

18   story.  That is the beginning of the story.

19       THE COURT:  Okay.  Pretend that we don't have a

20   jury here and be factually accurate.  All right.

21       MR. TOBEROFF:  All right.  Your Honor, the -- so

22   the purpose of the termination, so concerted was the

23   legislative intent to give you authors and their families

24   a termination right, that they put into the termination

25   provisions, a provision that said termination can be
```

```
 1   affected notwithstanding any agreement to the contrary.

 2              This is a statutory prohibition because they

 3   realized that as soon as they give this termination right

 4   to authors that publishers would use their bargaining

 5   leverage when they make deals with authors to assent away

 6   their termination rights, to circumvent termination

 7   rights, to encumber termination rights.

 8              And so in the first case that dealt with this

 9   language which is Marvel versus Simon which dealt with

10   Captain America, another superhero.  Simon had signed a

11   settlement agreement in a case where they were arguing

12   over who had the rights to Captain America, and they

13   resolved that case with a settlement agreement.  And that

14   settlement agreement said everything you did for us, we

15   own all rights to Captain America.  And everything you

16   did for us was work for hire.

17              Later on, Simon sought to exercise his

18   termination rights under the Copyright Act and the

19   District Court in New York, Southern District, said you

20   can't, you don't have any termination rights because you

21   signed something saying it is work for hire.  And if it

22   is work for hire, you don't have any termination rights.

23   And Simon argued that this is an agreement to the

24   contrary, reading it this way is an agreement to the

25   contrary, and the District Court said I don't think so.
```

ER-490

1    You are bound by your settlement agreement.  You are

2    done.

3            They went to the Second Circuit, and the

4    second circuit reversed saying to the extent you can't

5    after the fact nullify the termination right by calling

6    works works for hire.  That is an agreement to the

7    contrary because the way Marvel was reading the agreement

8    has the effect of extinguishing the termination right.

9    And that is prohibited by the Copyright Act.  It is void

10   to the extent it nullifies the termination right.  That

11   was the first major case dealing with this provision

12   notwithstanding any agreement to the contrary.

13           Now, we get to the Milne decision in the Ninth

14   Circuit which is a different situation.  In Milne, the

15   son, Christopher Milne, was in the termination window.

16   He had a termination right.  He was going to terminate,

17   and he went to the original grantee which was

18   Schlesinger, Inc., SSI, and said I am going to terminate

19   that 1930 grant and then I will get the rights back and I

20   might renegotiate a new deal with you or I might sell

21   them to somebody else.  And like Superman, the

22   Winnie-the-Pooh rights, it was a billion dollar

23   enterprise.

24           And SSI said, wait a minute, don't do that,

25   why don't we negotiate a new deal now.  So wielding the

 1   threat of termination, they said rather than statutorily

 2   terminate the 1930 grant and then enter into a new

 3   agreement, let's do it contractually.

 4          And so they entered into an agreement, a

 5   multi-page agreement that did a number of things.  One,

 6   it expressly revoked the old 1930 grant.  Two, it

 7   expressly said that we are doing this because of your

 8   termination right and we are doing it in lieu of

 9   termination.  Three, it expressly regranted the exact

10   same copyrights granted in the 1930 grant because the

11   whole purpose was to replace that grant.  All of it was

12   express.  And, as a result, Christopher Milne ended up

13   with an additional $300 million.

14          Now, the court said since the purpose of

15   termination is to allow authors and their families to

16   realize the increased market value of their works years

17   later, and that is exactly what Christopher Milne was

18   doing.  He was using the leverage of termination to do

19   that.

20          The court reasoned that, although they didn't

21   follow the statutory formalities of termination, we

22   achieved a congressional objective.  He used the

23   termination as leverage to bargain a new deal, and that

24   new deal corresponded to the value of the Winnie-the-Pooh

25   franchise in question.  And, then, thereby created a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    narrow exception to what, to the prohibition of you can

2    terminate notwithstanding any agreement to the contrary.

3            So you could be sure after the Milne case that

4    every time you exercise, an author or family exercised a

5    termination right with respect to something of value,

6    what is the publisher going to say?  Revocation and

7    regrant.  They are going to find a post '78 agreement and

8    call it a revocation and regrant.

9            And that is exactly what happened in the

10   Mewborn case that I litigated.  They found a '78

11   agreement that assigned the exact same thing as a '76

12   agreement, motion picture television and allied rights,

13   they both had the exact same, very similar language, and

14   they said the '78 agreement, by dealing with the same

15   subject matter, effectively supersedes the '76 agreement,

16   and therefore you have no agreement that you can

17   terminate.

18           And they read into the agreement a revocation

19   and a regrant, and the district court bought that

20   argument and said you have no termination right.  All you

21   have is this 1980 agreement because the 1975 agreement by

22   dealing with the same subject effectively superseded even

23   though, and we argue, there is no language of revocation

24   and regrant.  In Milne, it was express.  Here, there is

25   no language.  You can't reform an agreement for the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   parties.

2          It went up to the Ninth Circuit and in

3   Mewborn, and the Ninth Circuit agreed.  The Ninth Circuit

4   said we are going to limit our ruling in Milne to the

5   factual circumstances of Milne which is someone with a

6   current termination right uses that termination right as

7   leverage to bargain for a new deal for value relative to

8   the market value of the copyrights they are dealing with.

9          And the important point is the use of the

10  termination right by leverage because the court concluded

11  in Milne that is how you realize the congressional

12  objective, and as long as that is being realized in a

13  real way, we are okay with that.  But that is not what

14  happened in Mewborn.

15         The court said there is no express revocation.

16  Mewborn, she had termination rights, but they wouldn't

17  come up for another 16 years.  So it wasn't relevant to

18  the negotiation.  The amount of money involved was a few

19  thousand dollars, didn't reflect the value of Lassie.

20  And it said, therefore, because the factors in Milne were

21  not present here, we are not going to read a revocation

22  into that.  We are not going to take this termination

23  right away from this person given this concerted

24  legislative objective behind the right.

25         Steinbeck which is relied on heavily in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    tentative is not binding, but Steinbeck is not against

2    our position.  Steinbeck supports Milne.  In Steinbeck,

3    the court noted that Elaine Steinbeck wielded the

4    termination right to bargain for a substantially enhanced

5    deal.  And that substantially enhanced deal was major

6    advances, major royalties.

7            So Steinbeck does not contradict.  But I would

8    submit, your Honor, that the two Ninth Circuit cases in

9    Mewborn and Milne are what is most relevant and binding

10   here although Steinbeck can also be instructive.

11           So, now, let's go to, if I may, your Honor, to

12   the 1992 agreement, and I would like to talk about what

13   it is and it isn't.  And a bit of history about Siegel

14   and Schuster.  In 1938, there was -- the core grant of

15   Siegel and Schuster's Superman copyright which is really

16   their, the Superman character and the initial Superman

17   story from which everything else is derived, that was

18   granted in the 1938 grant.  That was -- it was then

19   litigated in 1947 where Siegel and Schuster litigated

20   whether they had rights to Superman from the 1938 grant,

21   and the court said they do, they have all rights under

22   the 1938 grant and they entered into a stipulated

23   judgment.

24           Then, in 1974, Siegel and Schuster were in

25   court again, and the court focused again on the 1938
```

1    grant, your Honor, and they said based on the 1947 case,

2    DC owns all rights to Superman based on the 1938 grant.

3    So you have two court decisions upholding this 1938

4    grant, and then, after that, there are various other

5    assignments from Siegel and Schuster that DC has relied

6    on for years for its chain of title to Superman.

7             In 1975, due to negative publicity regarding

8    DC's and Warner Brothers' treatment of Siegel and

9    Schuster, the cartoonist's guild and various other

10   parties objected.  Warner Brothers were coming out with a

11   big Christopher Reeve movie, they engineered the 1975

12   agreement.

13            The 1975 agreement restored their credit which

14   had been taken away for years because they had sued DC,

15   and it provided them a pension of $20,000 each which

16   they, after that, they raised that pension.  And it said

17   when Joe Schuster dies, we are going to give his brother

18   Frank Schuster a $5,000 survivor pension.  And it also

19   acknowledged that, as of 1975, Siegel and Schuster had

20   just lost the 1974 case, acknowledged that DC owns all

21   right, title and interest to Superman.

22            So, in 1992, when this document was entered

23   into, Jean Peavy and Frank Schuster didn't own any rights

24   to the Superman to grant.  Like Mewborn, in the Lassie

25   case, the court said a 1978 agreement assigning motion

1    picture and television rights to Lassie is a nullity

2    because you already signed it in 1976.

3           So, here, just to set the stage, Jean -- the

4    siblings of Joe Schuster, Frank Schuster and Jean Peavy

5    who signed this 1992 document, their rights -- they

6    didn't have any rights to Superman.  What they had was

7    the right to a $5,000 pension.

8           And that is what this document is about, your

9    Honor, and I can show you based on other evidence that

10   that is what this document is about.  So if you turn to

11   the first paragraph of this document, it is basically a

12   three paragraph agreement, it provides them with a

13   $25,000 pension.

14          There is another document that was signed on

15   the same date by Frank Schuster which I can put on on

16   this machine for you, but that document, I can read it to

17   you, it is Exhibit 9 to the Petrocelli declaration.  It

18   says, in consideration of the agreement dated as of

19   August 1, 1992, with DC Comics between DC Comics and

20   myself, I hereby waive any rights and remedies they may

21   have under the agreement dated December 23, 1975.  That

22   is the 1975 agreement that gave them a $5,000 pension.

23          In giving them a pension, they threw in a

24   quitclaim.  Now, and that is the language that the court

25   in its tentative focused on and found to be broad or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-497**

1    construed as superseding, but what is noteworthy and why

2    I call it a tentative is the transfer language says and

3    this is the key, this is the yellow highlighted portion

4    on the board that I put in front of you.  It says,

5    that -- excuse me, your Honor.  Just need a sip of water.

6            It says we ask you to confirm by your

7    signature below that this agreement fully settles all

8    claims to any payment or other rights or remedies which

9    you may have, meaning Frank Schuster and Jean Peavy.

10   They didn't have any rights at that time, but it said any

11   rights you have under any agreement.  And then it says

12   down below, whether now or hereafter existing, and then

13   it says down below, and they grant those rights which you

14   may have.  And it says it assigns such rights.

15           Do you see that, your Honor?  The focus is on

16   the rights that Frank Schuster and Jean Peavy had, not on

17   the original Superman copyrights of Siegel and Schuster

18   that were granted in 1938 and acknowledged in 1975.

19           And there is no basis, I respectfully submit,

20   your Honor, for -- to read into this document as a

21   revocation or regrant.

22           And I put to the court, why would DC who has a

23   1938 grant upheld in two court judgments to give them all

24   rights to Superman and in an acknowledgment by 1975 by

25   Siegel and Schuster that they already own all rights to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-498**

1    Superman, why would DC feel the need to revoke all of

2    that chain of title that it has relied on for years and

3    replace it with an ambiguous document like this?  If they

4    were really revoking these pre '78 copyright grants.

5            They have a multibillion dollar Superman

6    franchise.  It just, it defies credibility to suggest

7    that Warner Brothers and DC are going to be launching

8    movies that cost, those Superman movies cost about $250

9    million a pop with another 150 million in print and

10   advertising and marketing cost.  That is $400 million a

11   motion picture.  They have investment partners.  They

12   have insurance.

13           It defies credibility to suggest that they are

14   going to throw away the chain of title that they have

15   relied on for years that has been upheld by two court

16   judgments and replace it with this half-page ambiguous

17   scenario here.

18           And if DC which is an intellectual property

19   company with inside counsel and outside counsel and

20   Warner, in particular, if they intended to revoke those

21   prior agreements, it would have been easy enough to say

22   it in plain English, or as my father says in plain

23   Brooklyn English.  If that was their intention, they

24   would have put it in the contract.

25           They know how to say we hereby cancel the 1938

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

**ER-499**

1  grant or refer generally we hereby cancel all pre '78

2  grants.  They didn't do so.  Not only does it suggest

3  that wasn't DC's intent or the parties' intent, but if

4  they wanted a revocation, it was incumbent upon them to

5  say so because courts whether it is New York or

6  California, all courts say you are bound by the objective

7  manifestation of your intent.  I am not interested in

8  after the fact rationalizations and self-serving

9  declarations years later.  I am going to look at the

10  document that you signed.  So none of this is in there.

11          There is no language of rescission, there is

12  no language of revocation, and the -- the sweeping

13  language, your Honor, is language about their rights.

14  Jean Peavy, it says rights that, quote, you may have, and

15  the only rights that Jean, that Frank Schuster had was

16  rights to a $5,000 pension.  That is why the first

17  paragraph talks about the pension, and that is why a

18  letter he signed on the same date talks about he is

19  waiving his rights to that pension under the 1975

20  agreement.

21          Now, the court mentioned in its tentative that

22  we didn't come up with any evidence.  Well, first and

23  foremost, the evidence of no revocation, your Honor, is

24  the 1992 agreement itself.  Secondly, and that is why

25  this should end, but if we go outside that and start

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    looking at extrinsic evidence, the evidence is abundant.

2    And it all points to the fact that this agreement had

3    nothing do with termination and nothing to do with the

4    revocation and regrant.  And I would like to briefly take

5    you through that, your Honor.

6            Number one, Paul Levitz was the president,

7    long time president of DC.  Paul Levitz's name is on the

8    document, and Paul Levitz managed the relationship with

9    the Schuster heirs, the Schuster siblings, Jean Peavy and

10   Frank Schuster.  He submits a four or five page

11   declaration.  He talks about the generosity of DC.  He

12   talks about how they met in New York prior to signing

13   this agreement.  He talks about how the -- it was

14   expressed at their meeting that they were going to

15   increase the $5,000 pension and make it $25,000.

16           The silence is deafening.  He doesn't say a

17   word about revocation and regrant.  Now, he is the

18   president of DC.  He is not going to lie in a sworn

19   declaration.  That is why he says nothing about

20   revocation or regrant even though he is submitting the

21   declaration in support of their motion and not a word

22   about revocation or regrant.

23           When the Schusters served the termination in

24   2003, did DC or Warner Brothers hop up and say you can't

25   do that, you have no termination rights.  You have a

1    revocation and regrant, this 1992 agreement.  Not a word

2    about the 1992 agreement, your Honor.

3            In 2005, they send a multi-page letter to the

4    Schusters trying to get them to settle.  And in that

5    agreement, they take on the Schuster termination.  They

6    don't mention the 1992 agreement in 2005 either.

7            It bears mentioning, your Honor, when we are

8    talking about settlement and we are talking about

9    leverage and the termination right in that agreement

10   which they have made, in that letter which they have they

11   have made public, just for starters, they offered the

12   Schusters $2 million, a percentage of the profits which

13   starts to reflect the leverage of termination because

14   then they really exercised their termination and it was

15   exercised by the party with the termination rights which

16   was the Schuster executive.

17       THE COURT:  Couple of things.  I need you to slow

18   down a little bit.

19       MR. TOBEROFF:  I am sorry.

20       THE COURT:  And are you talking about negotiations

21   that were taking place between the parties in connection

22   with settlement?

23       MR. TOBEROFF:  Yes, your Honor.  But it is in a

24   letter that they put into evidence in this case.

25   Otherwise, I wouldn't be talking about it.  It is a

1    document that they have relied on, your Honor.  That is

2    why I am talking about it.

3              So in 19 -- 2008, in the Siegel case where the

4    Siegel termination was upheld, it was argued that even

5    though the Siegel termination was upheld, Warner can

6    continue as they could to exploit Superman because they

7    were successors to Joe Schuster's half of the copyright.

8    And they were successors to Joe Schuster's half of the

9    copyright that was granted in the 1938 grant which is the

10   key grant upheld in two court judgments.

11             So in 2008, after the termination was served

12   in 2003, they didn't say to the court that our chain of

13   title to Joe Schuster has been replaced by a 1992

14   agreement.  Again, they made no mention of the 1992

15   agreement.  You know what the first time is that they

16   mentioned the 1992 agreement?  After they replaced their

17   lawyers and they hired new counsel, and new counsel came

18   up with this theory.

19             But, that is what I meant, your Honor, when I

20   was talking about fancy.  I wasn't referring to your

21   tentative.  I was referring to a new argument that is

22   being contrived by lawyers that bears no relation to the

23   actual document that was signed by the parties.  That is

24   what I meant by that comment.

25             There is other evidence, your Honor, even the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    evidence that they point to, that actually runs in our

 2    favor, and I have to dial it back just a little bit, and

 3    I will try and slow down.  I'm sorry.

 4              The key factor in the Milne case was that the

 5    holder of a current termination right within the

 6    termination window is going to use the termination to

 7    bargain for a much better deal that bears some

 8    resemblance to the market, increased market value of what

 9    they are bargaining for.

10              Here, this never took place.  Frank Schuster

11    didn't have a termination right.  He is the brother of

12    Joe.  Jean Peavy didn't have a termination right despite

13    their mentioning things in letters about termination.

14    They are not lawyers.  They don't know what they are

15    talking about.  They don't have a termination right.

16         THE COURT:  Why not?  Jean?

17         MR. TOBEROFF:  Because siblings don't have

18    termination rights.

19         THE COURT:  What about as the executor?

20         MR. TOBEROFF:  She wasn't the executor.  The

21    estate was never probated.

22         THE COURT:  She was named as executrix in the

23    will; right?

24         MR. TOBEROFF:  That's right, but the estate was

25    never probated.  What happened was she was a beneficiary.
```

1    The estate was in probate because they didn't have any

2    money.  She sent -- when you have a pauper's estate, you

3    don't have a probate estate.  He had a few shares of

4    stock, and she sent in -- there is a regulatory

5    declaration you can send in saying these are his assets.

6    His assets are some shares, ironically, of Time Warner

7    stock and can you send me the stock.  And they did that.

8    It was never probated.

9           Then what happened was in 1992, nobody had --

10   even if she was an executrix in 1992, she didn't have a

11   termination right because executors of estates didn't get

12   termination rights until 1998 under the Copyright Term

13   Extension Act.  So in 1992 -- first of all, so Jean

14   Schuster, Jean and Frank had never had any termination

15   rights, ever.  In 1992, no one had termination rights

16   despite mentions in letters to termination rights.

17          So, interestingly, they point, they say, well,

18   termination was mentioned in letters from Jean Peavy,

19   and, therefore, she used it as leverage to bargain for a

20   new deal.  And what I submit, your Honor, is let's say

21   Jean thought she had termination rights, DC knows she

22   doesn't have termination rights.  Their lawyers know who

23   had termination rights and who don't.  And even if Jean

24   and Frank thought they were using termination rights,

25   they didn't have termination rights.  And if they don't

1   have them, how can it be used as leverage to negotiate a

2   better deal thereby fulfilling the congressional intent

3   of the termination provision?  It couldn't.  It never

4   happened.

5          And I submit that DC is reinventing history.

6   It is not in the agreement, and it is not in their

7   letters.  And I will give you another example.  Exhibit

8   43 is a letter dated July 10, 1993 from Jean Peavy to

9   Paul Levitz.  Because it is in 1993, it took place after

10  1992.  They claim that the intent of the parties in 1992

11  was to relinquish their termination rights.  The intent

12  of both DC and Jean Peavy was to relinquish their

13  termination rights.

14         So if she relinquishes the termination rights,

15  how come in 1993 she refers to termination rights in

16  trying to ask them for even another increase in their

17  pension?  She says, during the past year, Frank and I

18  have been able to review our rights as Joe's only

19  surviving next of kin.  We are aware of the fact that in

20  1994 after 56 years, Superman could revert to us.

21         She is talking about that in 1993 after she

22  signed that.  The 56 years is the window for the first

23  termination right.  She is talking about termination.

24  She doesn't know what she is talking about because Frank

25  and her don't have any termination rights, but it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-506**

1    certainly suggests that she didn't relinquish them in

2    1992 if she is talking about it in 1993.

3            Then, in response, and I can put this on the

4    elmo.  I don't know.  Would you like to look at it, your

5    Honor?

6        THE COURT:  Do you want me to look at it?

7        MR. TOBEROFF:  Well, I will show you another

8    document.  I'm sorry.  It is exhibit -- it is Exhibit 20

9    to Petrocelli's declaration, a letter dated July 10,

10   1993.  So then, in response, Paul Levitz, the same Paul

11   Levitz who sent in a declaration never mentioning

12   revocation or regrant, he writes a letter back.

13           And he says, as I hope you recall from our

14   meetings in New York, we have done extensive research

15   into the Copyright Act and any potential rights that you

16   and Frank may have as Joe's siblings and survivors.  It

17   is our firm conviction based on that research and expert

18   counsel that you don't have any legal rights or claims

19   whatsoever.

20           Now, he is telling them what we know, that

21   they didn't have any rights.  All they have for rights

22   was a $5,000 pension.  So he says -- but he starts out

23   the paragraph, I hope you recall from our meetings in New

24   York that we have done extensive research and that you

25   don't have any rights.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              Well, in his declaration, the meetings in New

2    York he is talking about are meetings that took place he

3    says in late September before they signed this in

4    October.  So what he is saying is before we signed this

5    thing, the reason we are only giving you $25,000 a year

6    split two ways and we are going to deduct taxes from that

7    as well is because you don't have any rights.  This is an

8    act of charity.  And that is why they did it.

9              Now, a key point -- so the things they point

10   to as being evidence -- and in the tentative, it says we

11   don't present any evidence -- all of this, the 1992

12   agreement, these letters are all evidence that it wasn't

13   the intent of the parties.

14        THE COURT:  That is not a complete sentence.

15        MR. TOBEROFF:  Sorry.  Did I miss something

16   grammatically?

17        THE COURT:  No I just missed something.  You said

18   it wasn't the intent of the parties.

19        MR. TOBEROFF:  Oh.  Excuse me.  That it wasn't the

20   intent of the parties to relinquish termination rights

21   which they didn't have, that it wasn't -- there was no

22   use of the termination right to achieve a congressional

23   purpose of being able to bargain a new deal that is

24   relative to the increased market value of the copyrights

25   in question.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Now, we understand that each party has

 2     different interests here with respect to termination

 3     rights.

 4             DC is not anxious for any of the heirs or

 5     putative heirs to terminate anything and reclaim any of

 6     their rights, is it?

 7          MR. TOBEROFF:  Correct.

 8          THE COURT:  All right.  They are sitting on the

 9     golden goose.  Now, with respect to the Schusters, they

10     kept saying over and over again that they would not seek

11     to reclaim any rights in the future.  They said that over

12     and over again.  They made their intent clear; right?

13     And I guess in exchange for that, DC continued to give

14     them checks.

15          MR. TOBEROFF:  Correct, your Honor.

16          THE COURT:  Okay.  Now, granted, DC acknowledges

17     and I think we all acknowledge DC was not under any legal

18     obligation to do so, was it?

19          MR. TOBEROFF:  Not at all.  It was charitable.

20          THE COURT:  It was, and it also was designed to

21     keep them happy and not make them start looking for

22     perhaps other rights, get them a nice deal, a sweet deal,

23     that goes on into perpetuity, and I don't know the extent

24     to which it took care of their needs.  But it seemingly

25     made them happy year in and year out, all through the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   '90's.  They kept getting checks, and I guess they were

2   happy with that.  And I guess that means they didn't go

3   out and find a lawyer to research their rights under the

4   Copyright Act; right?

5        MR. TOBEROFF:  No, your Honor.  They were very

6   unhappy with that, and the letters that are all attached

7   to the declaration, every year, essentially when it comes

8   Christmas time, they are begging for money.

9        THE COURT:  They may have been begging for money,

10  but then they would get money and then they would express

11  their gratitude.

12       MR. TOBEROFF:  That's correct, your Honor.  But I

13  am glad you are bringing that up because I think that

14  goes to the core of this.  This is a very unusual right.

15  It goes against everything that we are taught in law

16  school, like I said, at the beginning of this, that a

17  deal is a deal, that you have a contract.

18          Let's just say for hypothetical purposes that

19  Jean Schuster was the executrix and there was an estate

20  and she did have the power of termination and she signed

21  a document that said I hereby state that I will never,

22  ever in consideration for $25,000 a year exercise my

23  termination right.  That wouldn't -- that would be void.

24  That would be totally void.

25          Why?  Because of the provision in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    termination that says the termination right is

 2    inalienable.  You can't waive it, you can't encumber it,

 3    you can't circumvent it.  Why did the Congress make the

 4    termination inalienable?  And, by the way, your Honor, it

 5    was held in two supreme court cases to be inalienable.

 6              In Stewart v. Abend which is the famous

 7    copyright case dealing with Rear Window and a case called

 8    New York Times versus Tasini, they held the termination

 9    right to be inalienable.  Now, the question is why would

10    they take these rash measures which hamper freedom of

11    contract principles that we all learn in law school

12    govern parties' transactions.  Why would they do that?

13              The reason is because they knew that the first

14    thing publishers would do is go to authors or the heirs

15    that don't have any money -- to many people $25,000 a

16    year is a tremendous amount of money -- and they would go

17    to them and say we are going to give you $25,000 not to

18    exercise your termination rights and you have to promise

19    never to exercise your termination rights and you have to

20    waive your termination rights.  You have to agree never

21    to exercise those rights, or if you do exercise those

22    rights, we are going to penalize you and you have to pay

23    back all that money.

24              They knew that publishers would do that.  They

25    didn't want publishers to do that because that would
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    defeat the purposes of the termination, and that is why

2    they had the provision notwithstanding any agreement to

3    the contrary.  That is why they had the provision.

4               So there is a -- forgive me, your Honor, there

5    is a disconnect here, and that disconnect is totally

6    understandable.  And that is the same disconnect that we

7    experienced in the district court in the Lassie case and

8    that was experienced at the district court level in the

9    Captain America case.

10              And that is people look at this through the

11   glass of contract law not through the glass and

12   objectives of the Copyright Act.  This is a new area of

13   law because these cases are now coming into existence

14   because of the long waiting period, 56 years and 75

15   years.

16              And you have these leading cases, but, believe

17   me, the Ninth Circuit as it expressed in Mewborn and the

18   Supreme Court takes this termination right very

19   seriously, and the prohibition of notwithstanding any

20   agreement to the contrary is very serious.  They don't

21   want people waiving their termination rights.  And they

22   said, Milne said under these specific factors, since the

23   purpose of the termination right was really realized

24   here -- really realized, excuse me -- the objective was

25   realized, because the purpose was realized to the tune of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-512**

1    a $300 million increase, even though they didn't follow

2    the formalities, they contractually terminated instead of

3    statutorily terminated, we are going to let this go.  But

4    then in Mewborn, they are going to say we don't want

5    publishers to go crazy with this revocation or regrant

6    exception.  If you don't have a factual scenario that is

7    similar to Mewborn, it doesn't work and they struck it

8    down.

9            And in Steinbeck which is relied on in the

10   tentative, your Honor, the Steinbeck court says that

11   Elaine Steinbeck wielded the termination right to bargain

12   for a better deal.  Here, Jane Peavy and Frank Schuster

13   didn't wield anything.  What they wielded was a $5,000

14   pension, and DC wielded a little money.

15           And there was -- DC has never acted as if this

16   1992 agreement is the basis of its chain of title, and

17   the reason, your Honor, why I wanted to put that

18   agreement in front of you is because it really is not

19   credible that Warner Brothers and DC is relying for

20   $400 million movies in a billion dollar business on this

21   half page resolution in an agreement with Jean Peavy and

22   Frank Schuster.

23           And there is discussion about understanding

24   law in reviewing these contracts in the tentative, and I

25   just want to point out that these cases of Milne and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-513**

1   Mewborn which are Ninth Circuit cases are construing the

2   prohibition of notwithstanding any agreement to the

3   contrary in the Copyright Act.  And in construing

4   notwithstanding any agreement to the contrary, they are

5   saying that a revocation and regrant must be express, and

6   you must use the termination right which you must have as

7   leverage to bargain a better deal.

8           And you must be within the termination window

9   or near the termination window.  In Steinbeck, they argue

10  that they are not in the termination window.  That is

11  incorrect.  We checked it out.  Grapes of Wrath and other

12  leading Steinbeck works were in the termination window,

13  and there were a few Steinbeck works that were outside

14  but close to the termination window.  Therefore, they use

15  the termination in Steinbeck as leverage to achieve a

16  better deal thereby fulfilling the congressional

17  directive of the termination right.

18          Nothing even remotely like that happened here,

19  your Honor, because, number one, Jean Peavy and Frank

20  Schuster had no termination rights and never had any

21  termination rights.  Number two, your Honor, nobody had a

22  termination right in 1992.  So they couldn't have used it

23  as leverage.

24          And DC knew no one had any rights and they

25  said in their letter referring to 1992 meetings before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-514**

1   they signed this document that we analyzed this, and you

2   don't have any rights.  So no one could have used the

3   termination right as leverage to bargain for a better

4   deal, termination had nothing to do with this agreement.

5   It was about a 1992 pension increase of the only right

6   that Frank Schuster had which was a right to $5,000 on a

7   1975 agreement.

8          And the 1975 agreement acknowledged that DC

9   already owned all rights to Superman, and this came

10  through in a quitclaim.  And it therefore says you hereby

11  grant to us, you settle any claims or rights and you

12  grant to us all rights that you, meaning Frank Schuster

13  and Jean Peavy had, not you grant us, regrant to us Joe

14  Schuster's copyright grants and we revoke his prior

15  grants.

16          THE COURT:  Wait a minute.

17          There is really no dispute here then; right?

18          MR. TOBEROFF:  Excuse me, your Honor?

19          THE COURT:  What is the dispute?  DC says it owns

20  the rights.  You agree.  Why are we here?

21          MR. TOBEROFF:  The dispute, your Honor, is that DC

22  owns the rights by virtue of a 1938 grant and some other

23  grants.

24          THE COURT:  Okay.

25          MR. TOBEROFF:  The Copyright Act is, on an

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   author's estate, the executor of an author's estate, the

2   right to recover their copyrights after a very long

3   waiting period by terminating all grants.  They have to

4   follow certain formalities.

5       THE COURT:  Don't go through all that again.

6   There are no heirs, there is no spouse, there is no

7   issue.  There is no executrix.  You just said that the

8   Schusters had no rights.  Why are we here?

9       MR. TOBEROFF:  Your Honor, the Schusters --

10       THE COURT:  They have no rights to reclaim.

11       MR. TOBEROFF:  We are here because the chain of

12   title to the Schuster copyrights is based on pre '78

13   grants.

14       THE COURT:  The chain of title.  What chain of

15   title?  There was a works for hire back in 1938.  Nothing

16   has changed.

17       MR. TOBEROFF:  The original Superman story was not

18   a work for hire, and it was held in the Siegel case which

19   this court granted a judgment on which said that it is

20   not work for hire.

21       THE COURT:  Okay.  How did title to Superman,

22   then, change from DC?  And when?

23       MR. TOBEROFF:  It changed -- it hasn't changed

24   yet.

25       THE COURT:  Okay.

1          MR. TOBEROFF:  This is declaratory relief, to

2     declare that a termination notice that was filed in 2003

3     that becomes effective in 2013 is void, is ineffective.

4     So DC has Superman.  They continue to exploit Superman,

5     but in 2013, they will have certain Superman copyrights

6     but will not have the original Superman story that was

7     created by Siegel and Schuster independently and was not

8     work for hire.

9          THE COURT:  Who will have that?

10          MR. TOBEROFF:  That will be owned by the estate of

11     Joe Schuster, and by the Siegels and most probably they

12     will enter into a new agreement with the natural buyer

13     for those rights since the rights are split.  Other

14     people may be reluctant to buy those rights, but they can

15     sell them to somebody else.  But, probably, they will

16     enter into a negotiation with Warner Brothers to make a

17     new deal with Warner Brothers.  But it won't be a deal

18     for $25,000 annual pension split two ways with taxes

19     deducted first.  It will be a real deal that is relative

20     to the market value of Superman which is exactly what

21     Congress wanted.

22          And, your Honor, the Siegel termination has

23     been upheld.  There is no reason why the Schuster

24     termination shouldn't be upheld.  It is the mirror image.

25     You are dealing with works that were co-created by Siegel

1    and Schuster, and there is no reason why the Schuster

2    termination shouldn't be upheld as the Siegel termination

3    was upheld.

4            And you can't take away this important right

5    that Congress has given these people based on, you know,

6    after the fact rationalizations when DC is bound by their

7    own document.  They drafted that document.  If they

8    wanted to revoke pre '78 grants, the 1938 grant upheld in

9    two court judgments, why didn't they we hereby revoke

10   those grants?  Or why didn't they say we hereby revoke

11   all prior grants and replace it with this grant?

12           THE COURT:  That is not a grant of anything, is

13   it?

14           MR. TOBEROFF:  What?

15           THE COURT:  This August 1, 1992 letter isn't a

16   grant of anything.

17           MR. TOBEROFF:  I agree.  I agree, your Honor.

18   That is what we are saying.  They are saying that this

19   August, 1992 letter did the following:  Revoked Siegel

20   and Schuster's prior copyright grants which DC has always

21   relied and regranted Siegel and Schuster's copyrights to

22   DC.  And because it took place in 1992 and was signed by

23   Schuster heirs, it can't be terminated and now we are

24   bulletproof.  And they never came up with that argument

25   ever before.

```
 1          They came up with that argument when they
 2   hired Mr. Petrocelli in 2010.  That is when they first
 3   presented that argument even though the termination
 4   notices were served in 2003.
 5          THE COURT:  Okay.
 6          MR. TOBEROFF:  And looking -- the reason why I
 7   wanted to, you know, I know it is a little antiquated,
 8   your Honor, to do a big blowup like that on an easel.
 9   But the reason why I wanted to do that is because I
10   wanted to put in front of you that half page agreement
11   which all the fuss is about because it did not say any of
12   the things that DC says it says.  And with due respect, I
13   think the court was to some extent led astray by some of
14   these arguments which I call fancy arguments.
15          And the reason I call them fancy arguments is
16   there is no indication in that document of revocation or
17   regrant.  They say impliedly revoked by talking about the
18   same subject matter, your Honor, but it doesn't talk
19   about the same subject matter.  It doesn't talk about Joe
20   Schuster's original Superman copyrights.  It says
21   whatever rights you, Frank and Jean, have, and they
22   didn't have any rights.  And DC says in its letters you
23   didn't have any right and the 1975 agreement says we
24   already own all rights.
25          THE COURT:  All right.  Tell me specifically what
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-519**

```
 1    you mean when you say they don't have any rights,

 2    specifically, what are you saying?  They also don't have

 3    any future rights?

 4          MR. TOBEROFF:  Jean Peavy and Frank Schuster had

 5    no rights to Joe Schuster's copyrights because they were

 6    long ago -- in 1992 because they were long ago assigned

 7    to DC by Siegel and Schuster.  So in 1992, they didn't

 8    have any rights to give to DC.  They also didn't have

 9    termination rights.  That's what I mean.

10          THE COURT:  Are you saying they also had never

11    acquired termination rights?

12          MR. TOBEROFF:  No.  Siblings aren't entitled to

13    termination rights.  So what happened is the Siegels had

14    termination rights because before 1998 --

15          THE COURT:  No.  Stay with the Schusters.

16          MR. TOBEROFF:  Okay.

17          THE COURT:  All right.  And the Schuster estate

18    will never acquire any termination rights, or will the

19    executor be able to exercise those termination rights?

20          MR. TOBEROFF:  The executor has termination

21    rights.  In 1998, the law changed.  And, previously, only

22    authors and statutory heirs were charged.  By statutory,

23    I mean spouse, children or grandchildren.  That is it.

24    Not siblings.  Then in 1998, they said that is not really

25    fair.  What if you were never married or didn't have any
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    children.  We are going to give termination rights to the

2    executor administrator of estates if there is no spouse

3    or children.

4              And after 1998, that is the first time there

5    was any possibility of a Schuster termination.  Unlike

6    the Siegels who terminated long before that because they

7    had a spouse and a child that could terminate.  So what

8    do you do, then, when you terminate?  You go to a court

9    which they did, and you said he died, we didn't have

10   enough money to bury him when he died therefore we didn't

11   probate the will.

12             But, now, there is this new right.  So we want

13   to probate the estate for purposes of exercising this new

14   right in the Superior Court of California.  This was duly

15   processed, petition for probate.  They probated, and the

16   will said I nominate, if the estate is probated, I

17   nominate Jean Peavy as the executrix, but if she declines

18   to act, I nominate Warren Peary, my nephew, as executor.

19   And she declined to act because she was 82 at the time,

20   and Warren Peary was nominated the executor.  That is the

21   first time anybody has the rights.  And who has the

22   rights?  Warren Peary, the executor.  He then files

23   termination notices in 2003.

24        THE COURT:  Wait a minute.  Back up.  You see that

25   is the first time when Warren Peary was named the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-521**

1    alternative executor, that is the first time anyone had

2    any rights.

3         MR. TOBEROFF:  Termination rights.  Yes.  Or any

4    rights outside of a $5,000 pension of Frank Schuster.

5         THE COURT:  Well, didn't Jean have those rights

6    before when she was the primary executrix?

7         MR. TOBEROFF:  No, because you become -- you don't

8    become executor or executrix unless there is an estate

9    that is probated.  And I am not a trust and estates

10   lawyer, but my understanding is that when someone says in

11   a will that you will be the executrix, it means if the

12   estate is probated that you will be the executrix.  I

13   don't think she has legal power to sign things as the

14   executrix if there is no estate over which to be an

15   executrix.  It is hard to pronounce that word.

16        THE COURT:  Okay.  I understand.

17        MR. TOBEROFF:  So she didn't -- I don't believe in

18   1998, that is why before termination notice could be

19   served for the Schusters, they would have to probate the

20   will.  And they went to court and said we didn't probate

21   the will before because there were no assets to be really

22   concerned about that don't rise to the level of probating

23   and under a special section for pauper's will, you can

24   just distribute the few assets by sending in a piece of

25   paper in the probate court or Superior Court.

1          So once they had this right, they then

2   probated the estate.  We served termination notices in

3   2003.  And from all this time from 2003 to 2010, no

4   one said peep about you can't do this, the 1992

5   agreement.  If DC really believed that this was a bar to

6   termination, wouldn't that be the first thing out of

7   their mouths on getting this termination notice?

8          And when they send a letter to the Schusters

9   trying to settle and telling them if we settle with the

10  Siegels before you, we are not going to settle with you.

11  And we don't agree that this termination is valid.

12  Wouldn't they say remember the 1992 agreement you signed,

13  that bars termination.  They don't say anything about it.

14         This is cooked up now, and I'm sorry to say it

15  is a side show.  Because if you really look at that

16  agreement, your Honor, if a jury looked at that agreement

17  or, I mean, let me put it this way, we are all lawyers

18  here.

19         If you were a lawyer for DC and your intention

20  was to revoke all prior grants from Siegel and Schuster

21  or from Schuster to DC of an important billing or a

22  copyright like Superman, wouldn't you put in the

23  agreement I hereby revoke all prior grants from Joe

24  Schuster to Superman?  Wouldn't you say I cancel those

25  agreements?  Wouldn't you say I rescind those agreements?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              You would make it abundantly clear.  You would
 2    say we hereby revoke and rescind all prior grants by Joe
 3    Schuster of Superman copyrights and including without
 4    limitation, the 1938 grants.  And we are hereby
 5    regranting those rights.  And you would do it -- that is
 6    why they do it.  Not only didn't they do it which casts a
 7    great inference that that wasn't the intention of DC, but
 8    it was incumbent upon them to do that.
 9              And they are bound by the objective
10    manifestations that are intent in this flimsy one page
11    letter.  And I don't believe this is a sound basis to
12    deprive the second half of the copyright of their rights
13    under the copyright act.  And, your Honor, this is a --
14    many think about this case as the seminal case dealing in
15    this area.  First of all, it is dealing with Superman so
16    there is a tremendous amount of interest in the case.
17              And, secondly, it is dealing with a lot of the
18    nuances of a fairly complicated area of law.  There have
19    been law review articles about the Superman case.
20         THE COURT:  Hang on a second.
21              That doesn't matter.  None of that matters.
22    Let's stick with the issues of this tiny little case.
23    That is all I care about.  I don't care what it will do
24    to history.
25              All right.  Have you made your arguments?  You
```

1   have been talking for an hour.

2        MR. TOBEROFF:  And I greatly appreciate you

3   letting me heard, your Honor.  One last argument is that

4   there is talk about New York law, and like I said before,

5   the -- the Ninth Circuit cases that are binding, the

6   Milne case and the Mewborn case, are dealing with

7   copyright act and provision in the copyright act

8   notwithstanding any agreement to the contrary.

9        They don't make, in construing that language,

10  and in construing the narrow exception to that language

11  in the copyright act, they don't make reference to state

12  law.  But even if you do look at New York law, New York

13  law is not different than California law.  In fact, New

14  York law puts more emphasis on the objective

15  manifestation of the parties' intent and doesn't look at

16  extrinsic evidence and after-the-fact rationalizations.

17  They look at the document.  They say if it is not in the

18  document, it is not there.

19        Number two, to find any kind of rescission,

20  revocation or novation under New York law, the parties'

21  intent to cancel and replace a prior agreement has to be

22  unequivocal.  Has to be crystal clear.  Novation will

23  never be presumed, the cases say.

24        Now, there is one case, I believe, cited by DC

25  where they say novation can be express or implied, but in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-525**

1    those cases where they are implied, it is crystal clear

2    from all of the circumstances surrounding the agreement,

3    that the intention was to revoke and replace an old

4    agreement from all of the circumstances.

5          Here, it is the opposite.  It is not

6    unequivocal in this flimsy 1992 agreement, and all of the

7    surrounding circumstances don't show any intent to

8    revoke.  And Levitz's declaration on the subject never

9    mentions that the intent was to revoke, and he signed the

10   agreement.  And the letters show that there was no intent

11   to relinquish termination rights so it is the opposite.

12         One can't find under New York law, an

13   unequivalent intent of both parties to revoke these

14   copyright grants on which DC has long relied.  I submit,

15   your Honor, it is impossible for this document to be the

16   basis of Warner Brothers and DC's chain of title to a

17   billion dollar franchise.  Nobody would let that happen.

18         I know Warner Brother agreements and DC

19   agreements.  When they have somebody assign them

20   copyrights, they have an agreement this thick.  And they

21   attach to it a short form assignment, and that short form

22   assignment is filed with the copyright office to give the

23   word constructive notice of their copyrights.

24         If this revoked all prior Superman grants and

25   replaced it with this, that means this is the basis of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-526**

1    their Superman franchise.  And I submit that that is

2    impossible that companies of this magnitude would have

3    their lawyers draft something like this that their

4    intention was to revoke all prior grants and regrant them

5    the Superman copyrights.  It is an impossibility.

6          THE COURT:  What you suggest is lunacy.  So, okay,

7    I am sure that is not their intent.

8          MR. TOBEROFF:  Then if it is not their intention,

9    they still have the termination right.  I agree with you,

10    your Honor.  It is not their intention.

11          Thank you.

12          THE COURT:  Wrap up?

13          MR. PETROCELLI:  Because of time constraints, your

14    Honor, I am not going to try to respond to a lot of what

15    Mr. Toberoff said.  What I would like to do is just

16    recenter the issue.  When the Schusters served the notice

17    of termination in 2003 for the very first time as

18    Mr. Toberoff described, the Schusters relied solely on

19    Section 304(d) of the copyright statute claiming that

20    that section gave them the right to terminate

21    notwithstanding all the prior history.

22          That section, your Honor, 304(d) specifically

23    states that the right to terminate a copyright interest

24    is only available for copyright grants or agreements

25    before January 1, 1978.  There is no right to terminate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-527**

1  any grants after January 1, 1978.  Nobody disagrees with

2  that.  Not certainly in the statute, and all the cases

3  uniformly agree with it.

4          So, the issue in this case and that is the

5  subject of the briefing in the court's tentative is

6  whether in 2003, when the notice of termination was

7  served, there existed any agreements or grants prior to

8  January, 1978, or whether the only thing that existed was

9  after January 1, 1978.

10         So that takes us to 1992.  Because what

11  happened in 1992 is that the parties entered into an

12  agreement, the one you have in front of you which is

13  indisputably governed by New York law where it was made.

14  The defendants acknowledge that New York law applies in

15  prior briefing, and the cases apply state law to

16  interpreting a contract.

17         The issue in this case is not whether that

18  1992 agreement waives a termination right.  The issue is

19  whether that 1992 agreement was intended to and did

20  supersede and replace all prior agreements by the parties

21  and insert in place of those prior agreements a new

22  agreement going forward which we contend it plainly does.

23      THE COURT:  Wait a minute.  Do you say that this

24  1992 letter is in effect a grant of a intellectual

25  property interest?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. PETROCELLI:  Correct.  Correct.  And I will

2   walk you through that.  Okay.  And that has been the

3   position that we briefed, that this document does

4   two things.  Okay.  It, number one, replaces and

5   supersedes and gets rid of all the other prior agreements

6   so there can be no further claims whatsoever brought

7   under any prior agreements at all.  And, number two, it

8   establishes new grants going forward.

9           The sole subject matter of the operative

10  paragraph which is the second paragraph is the copyrights

11  of Joe Schuster.  That is the sole subject matter.  The

12  first -- and, again, this is subject to New York law, and

13  New York law says when you enter into an agreement -- and

14  your Honor cites it in the tentative, I won't repeat

15  it -- which supersedes prior agreements, those agreements

16  are gone.  And the second part of this is that there is a

17  new grant going forward which is specific in the second

18  sentence of that first paragraph.

19          That grant of these rights is not subject to

20  termination because it is after January 1, 1978.  And

21  this isn't the first case where this has come up, your

22  Honor.  Take the Steinbeck case.  Elaine Steinbeck

23  entered into a new agreement just like the Schusters in

24  1994 instead of 1992.  She, just like the Schusters, at

25  the time had no termination right.  She did not have any.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-529**

1          The reason she did not have any even though

2     she was the surviving spouse is because there were adult

3     children, and the law says you have to have more than

4     50 percent.  And her children did not want to join with

5     her.  She only had exactly 50 percent.  And the case

6     makes clear that she had no right to terminate.

7          THE COURT:  Well, what rights did Jean Schuster

8     have to convey to DC?

9          MR. PETROCELLI:  That is precisely the correct

10    question, your Honor.  And the rights that Jean Schuster

11    had was she stood as the executrix and the sole heir

12    under the will which, prior to this agreement, she had

13    filed papers with the California court.  And we have

14    attached them to -- it is Exhibit 33 to my declaration, a

15    will made out in 1988, June 28, six years, four years

16    earlier where she was named the sole beneficiary and she

17    was also the executrix.

18          And we also cited the law, and defendants

19    don't challenge it, that on the death of the decedent, in

20    this case, Joseph Schuster who died July 30, 1992, even

21    without probate, the rights vest immediately to the sole

22    beneficiary, in this case, Jean.

23          THE COURT:  What rights in Superman does Joe

24    Schuster have in his name?

25          MR. PETROCELLI:  Joe Schuster was a party to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-530**

1    numerous contracts.  Joe Schuster, whatever Joe Schuster

2    had the power to do the day before he died, let's say,

3    now Jean Schuster had the power to do it.

4            The reason why we have an agreement with Jean

5    Schuster is because she, as she had previously told DC in

6    correspondence that is before the court, she said she is

7    the heir.  That is why they are dealing with her.  The

8    only reason they are dealing with her is because she is

9    now Joe's representative.  She is not a party to any

10   pension agreements or any personal agreements.  There was

11   no financial obligation to her whatsoever.

12       THE COURT:  When Joe Schuster died, what rights

13   did he have to Superman?

14       MR. PETROCELLI:  Joe Schuster had copyrights that

15   he had granted, and he had the right to receive money

16   over the years.  And he received that money.  By the time

17   he died, his last contract he made said he wanted his

18   brother, Frank, to get money.

19            Okay.  That is this last agreement that he

20   signed that was in 1975, and that provided for $5,000 a

21   year to brother Frank and zero to anybody else.

22       THE COURT:  But you know my question was, what

23   rights did he have in Superman?

24       MR. PETROCELLI:  He had the right to enter into a

25   new agreement.  He could have entered into a new

1    agreement.  And so what this document is is his

2    representative standing in his shoes, made a new

3    agreement.  So if Joe had made this agreement the day

4    before, it would be -- we would be making the identical

5    argument that we are making now which is that his

6    representatives made this agreement.

7            This is not a personal agreement about

8    personal pension claims of Jean Schuster.  She had no

9    personal pension claims.  She had nothing.  This is an

10   agreement that purports to get rid of all prior

11   agreements that Joe Schuster had with DC from the very

12   beginning through the very end and say all that is being

13   superseded now by this.

14           Secondly, it said you now grant to us any such

15   rights.

16       THE COURT:  Okay.  As we have discussed, those

17   rights were the right to receive a few bucks in the

18   pension payment.

19       MR. PETROCELLI:  No.  Here, the rights that are

20   referred to are the rights -- because it says any such

21   rights.  So you have to look to the prior sentence to see

22   what any such rights means.  And the prior sentence, I

23   believe, I don't know exactly what he put in front of

24   you, but I presume it is the copy of this agreement.

25           And the rights are, your Honor, claims to any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-532**

```
 1   payments or other rights or remedies which you may have

 2   under any agreement or otherwise whether now or hereafter

 3   existing regarding any copyrights, trademarks or other

 4   property right in any or all work created in whole or in

 5   part by your brother, Joseph Schuster, or any works based

 6   thereon.  So, in any event, you now grant to us any such

 7   rights.  In other words --

 8        THE COURT:  Okay.  That is why I asked you.  When

 9   he died, what rights did Joseph Schuster have in

10   Superman?

11        MR. PETROCELLI:  He had the right, as I

12   indicated -- at the moment of his death?  Or prior to his

13   death?

14        THE COURT:  I want to know what rights passed to

15   Jean as a result of Joe Schuster's death.

16        MR. PETROCELLI:  All of Joe Schuster's powers and

17   rights and ability including to make a new agreement on

18   his behalf.

19        THE COURT:  Okay.

20        MR. PETROCELLI:  And that is what this document

21   is.  In other words, it is not our position, your Honor,

22   that this is a document whereby we were asking Jean to

23   convey her personal rights because she had no personal

24   rights.

25             This is a document that was entered into with
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    her to convey the rights of Joe Schuster in the

2    copyrights including the right to make a new grant of

3    those copyrights especially given, especially given, that

4    there had been the specific issue raised before this by

5    her and her brother that they might have the ability to

6    reclaim copyrights and terminate interest in the future.

7        THE COURT:  Okay.  Well, I can see why DC would

8    basically want to tear up a clear, unequivocal grant of

9    intellectual property in Superman from 1938.  I can

10   understand why they would tear that up for this ephemeral

11   thing.  That makes a lot of sense to me.

12       MR. PETROCELLI:  By the way, the 1938 agreement

13   itself that this replaces is a 1-page agreement.  It is a

14   simple 1-page grant.  I mean I think that is in the

15   record also.

16       THE COURT:  That is when lawyers could get to the

17   point.  Those were the days.

18       MR. PETROCELLI:  And, remember, they are not

19   dealing with lawyers here, your Honor.

20       THE COURT:  I know.

21       MR. PETROCELLI:  They are dealing with

22   individuals, and they are trying to obviously keep this

23   simplistic.  And the Steinbeck case, the Milne case, they

24   all say when you enter into an agreement -- let me ask

25   the same thing, your Honor, that you just asked me

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-534**

1    applied to in the John Steinbeck case.  Elaine Steinbeck

2    was his representative under his will, and she canceled

3    prior grants and made new grants.  In that case, the

4    language was more specific than it is in this case.

5            And that takes us now to the New York cases on

6    whether or not when the parties make a contract to

7    replace and supersede all prior agreements and replace

8    them with something new, how specific must that be in

9    order for that to be upheld.

10           And we set out those various cases from New

11   York which described that the ultimate test is not

12   whether it is specific or explicit but what the intention

13   of the parties is.  The language, of course, is the most

14   helpful guide to that, but the intention can be implied.

15           The intent we were talking about is the intent

16   to supersede prior agreements and replace them with a new

17   grant.  We are not talking about an intent to waive or

18   relinquish termination.  That is not the operative intent

19   here.  The operative intent which would make this

20   contract a new 1992 agreement going forward is when this

21   contract is over, what do the parties think they have?

22           What the parties think they have is no more

23   prior agreements that Joe entered into, Jean never

24   entered into any agreements with DC.  This wasn't

25   canceling any of Jean's agreements.  Frank never entered

1    into any agreements with DC.  All of this was about, and

2    if you look at the wording, in simple terms, without a

3    lot of legal verbosity, it is extremely all-encompassing

4    and broad.  Any and all rights.  Any and all claims.

5    Whether now or hereafter existing regarding any

6    copyrights, trademarks or other property right in any and

7    all work.  You now grant that to us.  You being the only

8    person who has the legal power to grant that to us.

9            So now we have an explicit grant that is after

10   1978, and when Congress came along in 1998 and passed

11   this amendment to the termination law, they did not

12   change this part.  They kept the part intact that says

13   your right to terminate only applies to grants and

14   agreements prior to January 1, 1978.

15           So Milne and Steinbeck, both specifically deal

16   with the question, and Steinbeck is most applicable here

17   because Elaine Steinbeck like the Schusters in 1994 had

18   no termination right.  But she nonetheless entered into a

19   new grant of rights on behalf of her deceased husband.

20           Milne, we have a new grant of rights in 1983.

21   And so those two are the lead cases, one from the Second

22   Circuit, one from the Ninth Circuit.  And they both dealt

23   with specifically the argument that Mr. Toberoff has been

24   advancing whether or not you can make new grants that get

25   rid of old agreements after 1978 and whether that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    extinguishes any new termination rights that might come

2    along.  And the court said, yes, it does because Congress

3    could have said something different in the statute if

4    they wanted.  They could have said the right of

5    termination applies to post-1978 grants in these

6    circumstances.  They did not.

7           And, bear in mind here, your Honor, that this

8    says, fully settles all claims and agreements in the past

9    which would include all of his copyright grants that he

10   made in the past.  So it is very clear that the intention

11   here, it is straightforward in the sense that, look, you

12   are coming back to us.  We are going to take care of this

13   once and for all, and, essentially, that is what Paul

14   Levitz testified in that affidavit which is not refuted.

15   Here is the deal, nothing more in the past, and here is

16   where it is going forward.

17          And I want to explain something, your Honor,

18   because it may not have been clear from our papers.

19   Mr. Toberoff says that this is only about the 1975

20   pension agreement.  That was the last document that Joe

21   Schuster signed.  That document said Joe is supposed to

22   get $20,000 a year for the rest of his life.  It turns

23   out they gave him a lot more than that, but on his death

24   it is supposed to go to his brother Frank for Frank's

25   life.  $5,000.  That is addressed in the first paragraph

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**ER-537**

1   here where they decided to increase Frank's lifetime

2   pension to give him more financial security from 5 to 25.

3          And they entered into a separate agreement

4   with Frank on the same day making clear, and that is

5   Exhibit 9 to my -- to Mr. Levitz's declaration making

6   clear that this waives any rights or remedies that he has

7   under the agreement dated December 23, '75 between

8   Warners and Mr. Schuster, Joseph Schuster.

9          So the purpose of Exhibit 9 was to directly

10  get rid of the '75 agreement because that was in an

11  agreement where Frank was named specifically as a third

12  party beneficiary and he could enforce.  So that is the

13  Frank Schuster agreement, Exhibit 9.

14          When you go to the 1992 agreement which is

15  Exhibit 8, this is not about a pension agreement for

16  Frank's benefit.  This is not about any other agreement

17  for Jean's benefit.  This is about Joe Schuster's

18  copyrights.  That is the sole subject matter of the

19  operative paragraph here.  And the reason --

20          THE COURT:  Okay.  Mr. Petrocelli.  All right.  I

21  understand.

22          MR. PETROCELLI:  You got it.

23          THE COURT:  You have made that.

24          All right.  The matter stands submitted.

25  Thank you, counsel.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. PETROCELLI:  Thank you.

2          MR. TOBEROFF:  Thank you.

3       (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4   I hereby certify that pursuant to Section 753, Title 28,

 5   United States Code, the foregoing is a true and correct

 6   transcript of the stenographically reported proceedings held

 7   in the above-entitled matter and that the transcript page

 8   format is in conformance with the regulations of the

 9   Judicial Conference of the United States.

10   Date:  September 10, 2012

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1 | Marc Toberoff (State Bar No. 188547)
    *mtoberoff@ipwla.com*
2 | Keith G. Adams (State Bar No. 240497)
    *kgadams@ipwla.com*
3 | Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@ipwla.com*
4 | David Harris (State Bar No. 255557)
    *dharris@ipwla.com*
5 | TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6 | Malibu, California 90265
   Telephone:   (310) 246-3333
7 | Fax:             (310) 246-3101

8 | Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9 | Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 | as personal representative of the Estate of
    Joanne Siegel

11

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>           Plaintiff,<br><br>   vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>          Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DECLARATION OF KEITH G. ADAMS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF**<br><br>*Motion; Statement of Uncontroverted Facts and Conclusions of Law; and [Proposed] Order filed concurrently herewith*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:  None Set<br><br>Date: Oct 15, 2012<br>Time:1:30 p.m.<br>Courtroom: 11 |

| Ex. | Title | Page |
|---|---|---|
| A | Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel, dated March 1, 1938 | 7 |
| B | Complaint in *Siegel v. National Comics Pubs., Inc.,* No. 1099-1947 (N.Y. Sup. Ct.) (the "1947 Action"), dated March 5, 1947 | 8 |
| C | Findings of Facts in the 1947 Action, dated April 12, 1948 | 51 |
| D | Stipulation of Settlement in the 1947 Action, dated May 19, 1948 | 97 |
| E | Final Consent Judgment in the 1947 Action, dated May 21, 1948 | 104 |
| F | "Superman's Creators, Nearly Destitute, Invoke His Spirit", New York Times, dated November 22, 1975 | 115 |
| G | "Mild-Manner Cartoonists Go To Aid of Superman's Creators", *New York Times*, December 10, 1975 | 116 |
| H | Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster, dated December 23, 1975 | 117 |
| I | "Man of Steel Splinters An American Dream", *Los Angeles Times*, dated February 25, 1979 | 129 |
| J | Agreement between DC Comics, Inc. and Swampfilms, Inc., dated October 10, 1980 | 130 |
| K | "Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78", *New York Times*, August 3, 1992 | 154 |
| L | State of California Certificate of Death for Joseph Shuster, dated August 10, 1992 | 155 |
| M | Affidavit signed by Jean Peavy dated August 17, 1992 | 156 |
| N | Letter from Frank Shuster to Paul Levitz dated October 2, 1992 | 158 |

| | | | |
|---|---|---|---|
| O | Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy, dated October 2, 1992 | 159 |
| P | Letter from Paul Levitz to Jean Peavy, dated November 5, 1992 | 160 |
| Q | Letter from Paul Levitz to Jean Peavy, dated September 7, 1993 | 161 |
| R | Letter from Paul Levitz to Frank Shuster and Jean Peavy, dated July 11, 1994 | 163 |
| S | Letter from Paul Levitz to Jean Peavy, dated June 7, 1995 | 164 |
| T | February 29, 1996 Copyright Research Report generated by Thompson & Thompson. | 165 |
| U | Letter from Paul Levitz to Jean Peavy, dated March 25, 1996 | 174 |
| V | Letter from Paul Levitz to Jean Peavy, dated July 9, 1998 | 175 |
| W | Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc., dated December 18, 1998 | 176 |
| X | Letter from Paul Levitz to Jean Peavy, dated October 18, 1999 | 208 |
| Y | Letter from Paul Levitz to Jean Peavy, dated November 20, 2000 | 209 |
| Z | Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy, dated November 28, 2001 | 210 |
| AA | Letter from Paul Levitz to Jean Peavy, dated December 11, 2001 | 214 |
| BB | Agreement between Warner Bros. and Edgar Rich Burroughs, Inc., dated December 2, 2002 | 215 |
| CC | Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles, dated July 23, 2003 | 310 |
| DD | Order issued by the Superior Court of California, County of Los Angeles on October 7, 2003 | 324 |

| | | | |
|---|---|---|---|
| 1 2 3 | EE | Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary), dated October 27, 2003 | 329 |
| 4 5 | FF | United States Copyright Office Certificate of Recordation, dated December 8, 2003 | 333 |
| 6 7 8 | GG | Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary) and Jean Peavy, dated September 10, 2004 | 349 |
| 9 10 | HH | Letter from Paul Levitz to Jean Peavy and Mark Warren Peary, dated April 28, 2005 | 350 |
| 11 12 | II | Excerpts from deposition of Laura Siegel Larson, dated August 1, 2006 | 357 |
| 13 14 | JJ | Excerpts from deposition of Mark Warren Peary, dated November 11, 2006 | 362 |
| 15 16 | KK | Letter from Alexander Merino to Adam Hagen dated, November 15, 2006 | 382 |
| 17 18 | LL | Excerpts from deposition of Marc Toberoff, dated November 17, 2006 | 383 |
| 19 20 21 22 | MM | Excerpts from Defendants' Motion for Partial Summary Judgment in *Siegel v. Warner Bros. Entertainment, Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), dated April 30, 2007 | 404 |
| 23 24 | NN | Third Amended Complaint filed in *Siegel*, dated February 3, 2011 | 407 |
| 25 26 | OO | Answer To Third Amended Complaint filed in *Siegel*, dated February 17, 2011 | 432 |
| 27 28 | PP | Second Amended Counterclaims filed in *Siegel*, dated February 17, 2011 | 445 |

| | QQ | Order Granting Renewed Motion for Entry of A Partial Judgment issued in *Siegel*, dated May 17, 2011 | 483 |
|---|---|---|---|
| | RR | Defendants' Notice of Cross-Appeal filed in *Siegel*, dated February 3, 2011 | 485 |
| | SS | Excerpts from deposition of Mark Warren Peary, dated June 29, 2011 | 487 |
| | TT | Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011 | 509 |
| | UU | Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy, dated August 2, 2011 | 520 |
| | VV | Defendants' Notice of Appeal filed on November 2, 2011. | 522 |
| | WW | Cross-Appellants and Appellees' Principal and Response Brief filed in Appeal No. 11-55863, dated March 23, 2012 | 534 |
| | XX | Appellants Opening Brief filed in Appeal No. 11-56934, dated April 24, 2012 | 651 |
| | YY | Declaration of Paul Levitz filed on July 16, 2012 | 739 |
| | ZZ | DC Comics' Amended Objections and Responses to Defendant Mark Warren Peary's First Set of Interrogatories, served on July 20, 2012 | 744 |

## **DECLARATION OF KEITH G. ADAMS**

I, Keith G. Adams, declare as follows:

1.     I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and submit this declaration in support of Defendants' Notice of Motion and Motion for Partial Summary Judgment On First, Second and Third Claims for Relief.

2.     Attached hereto as Exhibit "A" is a true and correct copy of an agreement between Detective Comics, Inc. on the one hand, and Joseph Shuster and Jerome Siegel on the other hand, dated March 1, 1938.

3.     Attached hereto as Exhibit "B" is a true and correct copy of the Complaint in *Siegel v. National Comics Pubs., Inc.,* No. 1099-1947 (N.Y. Sup. Ct.) (the "1947 Action"), dated March 5, 1947.

4.     Attached hereto as Exhibit "C" is a true and correct copy of the Findings of Facts in the 1947 Action, dated April 12, 1948.

5.     Attached hereto as Exhibit "D" is a true and correct copy of Stipulation of Settlement in the 1947 Action, dated May 19, 1948.

6.     Attached hereto as Exhibit "E" is a true and correct copy of the Final Consent Judgment in the 1947 Action, dated May 21, 1948.

7.     Attached hereto as Exhibit "F" is a true and correct copy of a New York Times article, dated November 22, 1975.

8.     Attached hereto as Exhibit "G" is a true and correct copy of a New York Times article, dated December 10, 1975.

9.     Attached hereto as Exhibit "H" is a true and correct copy of an agreement between Warner Communications, Inc. on the one hand, and Jerome Siegel and Joseph Shuster on the other hand, dated December 23, 1975.

10.     Attached hereto as Exhibit "I" is a true and correct copy of a Los

Angeles Times article, dated February 25, 1979.

11.     Attached hereto as Exhibit "J" is a true and correct copy of an October 10, 1980 Agreement between DC Comics, Inc., on the one hand, and Swampfilms, Inc., on the other hand.

12.     Attached hereto as Exhibit "K" is a true and correct copy of a New York Times article, dated August 3, 1992.

13.     Attached hereto as Exhibit "L" is a true and correct copy of the State of California Certificate of Death for Joseph Shuster dated August 10, 1992.

14.     Attached hereto as Exhibit "M" is a true and correct copy of an Affidavit signed by Jean Peavy dated August 17, 1992.

15.     Attached hereto as Exhibit "N" is a true and correct copy of letter from Frank Shuster to Paul Levitz dated October 2, 1992.

16.     Attached hereto as Exhibit "O" is a true and correct copy of an agreement between DC Comics, Inc., on the one hand, and Frank Shuster and Jean Peavy, on the other hand, dated October 2, 1992.

17.     Attached hereto as Exhibit "P" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated November 5, 1992.

18.     Attached hereto as Exhibit "Q" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated September 7, 1993.

19.     Attached hereto as Exhibit "R" is a true and correct copy of a letter from Paul Levitz to Frank Shuster and Jean Peavy, dated July 11 5, 1994.

20.     Attached hereto as Exhibit "S" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated June 7, 1995.

21.     Attached hereto as Exhibit "T" is a true and correct copy of a February 29, 1996 Copyright Research Report generated by Thompson & Thompson.

22.     Attached hereto as Exhibit "U" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated March 25, 1996.

23.     Attached hereto as Exhibit "V" is a true and correct copy of a letter from

Paul Levitz to Jean Peavy, dated July 9, 1998.

24.    Attached hereto as Exhibit "W" is a true and correct copy of a December 18, 1998 Agreement between Warner Bros., on the one hand, and Hasbro, Inc. and Hasbro International, Inc., on the other hand.

25.    Attached hereto as Exhibit "X" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated October 18, 1999

26.    Attached hereto as Exhibit "Y" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated November 20, 2000.

27.    Attached hereto as Exhibit "Z" is a true and correct copy of a 2001 Agreement between Pacific Pictures Corporation, on the one hand, and Mark Warren Peary and Jean Peavy, on the other hand.

28.    Attached hereto as Exhibit "AA" is a true and correct copy of a letter from Paul Levitz to Jean Peavy, dated December 11 2011.

29.    Attached hereto as Exhibit "BB" is a true and correct copy of a December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar Rich Burroughs, Incl., on the other hand.

30.    Attached hereto as Exhibit "CC" is a true and correct copy of a Petition filed by Mark Warren Peary in the Superior Court of California, County of LosAngeles, dated July 23, 2003.

31.    Attached hereto as Exhibit "DD" is a true and correct copy of an Order issued by the Superior Court of California, County of Los Angeles on October 7, 2003.

32.    Attached hereto as Exhibit "EE" is a true and correct copy of a 2003 Agreement between Pacific Pictures Corporation, on the one hand, and Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary), on the other hand.

33.    Attached hereto as Exhibit "FF" is a true and correct copy of a United States Copyright Office Certificate of Recordation dated December 8, 2003.

34.    Attached hereto as Exhibit "GG" is a true and correct copy of a letter

from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary) and Jean Peavy, dated September 10, 2004.

35.     Attached hereto as Exhibit "HH" is a true and correct copy of a letter from Paul Levitz to Jean Peavy and Mark Warren Peary, dated April 28, 2005.

36.     Attached hereto as Exhibit "II" is a true and correct copy of excerpts from the transcript of the August 1, 2006 deposition of Laura Siegel Larson in the matter of *Larson v. Warner Bros. Entertainment et al.*, No 04-8400 (RSWL) (RZx) ("*Siegel*").

37.     Attached hereto as Exhibit "JJ" is a true and correct copy of excerpts from the transcript of the November 11, 2006 deposition of Mark Warren Peary in the *Siegel*.

38.     Attached hereto as Exhibit "KK" is a true and correct copy of a letter from Alexander Merino, counsel for plaintiff Laura Siegel Larson in *Siegel*, to Adam Hagen counsel for defendants in *Siegel*, dated November 15, 2006.

39.     Attached hereto as Exhibit "LL" is a true and correct copy of excerpts from the transcript of the November 17, 2006 deposition of Marc Toberoff in *Siegel*.

40.     Attached hereto as Exhibit "MM" is a true and correct copy of excerpts from Defendants' Motion for Partial Summary Judgment in *Siegel*, dated April 30, 2007.

41.     Attached hereto as Exhibit "NN" is a true and correct copy of the Third Amended Complaint filed in *Siegel*, dated February 3, 2011.

42.     Attached hereto as Exhibit "OO" is a true and correct copy of the Answer To Third Amended Complaint filed in *Siegel*, dated February 17, 2011.

43.     Attached hereto as Exhibit "PP" is a true and correct copy of the Second Amended Counterclaims filed in *Siegel*, dated February 17, 2011.

44.     Attached hereto as Exhibit "QQ" is a true and correct copy of an Order Granting Renewed Motion for Entry of A Partial Judgment issued in *Siegel*, dated May 17, 2011.

45.    Attached hereto as Exhibit "RR" is a true and correct copy of Defendants' Notice of Cross-Appeal filed in *Siegel*, dated February 3, 2011.

46.    Attached hereto as Exhibit "SS" is a true and correct copy of excerpts from the transcript of the June 29, 2011 deposition of Mark Warren Peary.

47.    Attached hereto as Exhibit "TT" is a true and correct copy of excerpts from the July 22, 2011 transcript of the deposition of Laura Siegel Larson.

48.    Attached hereto as Exhibit "UU" is a true and correct copy of a letter from Marc Toberoff to Mark Warren Peary and Jean Peavy, dated August 2, 2011.

49.    Attached hereto as Exhibit "VV" is a true and correct copy of Defendants' Notice of Appeal filed on November 2, 2011.

50.    Attached hereto as Exhibit "WW" is a true and correct copy of Cross-Appellants and Appellees' Principal and Response Brief filed in Appeal No. 11-55863, dated March 23, 2012.

51.    Attached hereto as Exhibit "XX" is a true and correct copy of Appellants Opening Brief filed in Appeal No. 11-56934, dated April 24, 2012.

52.    Attached hereto as Exhibit "YY" is a true and correct copy of Declaration of Paul Levitz, filed on July 16, 2012.

53.    Attached hereto as Exhibit "ZZ" is a true and correct copy of Plaintiff DC Comics' Amended Objections and Responses to Defendant Mark Warren Peary's First Set of Interrogatories, served on July 20, 2012.

54.    On several occasions, most recently on August 17, 2012, I searched the public catalog of the United States Copyright Office through the electronic search function available at http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First, to ascertain whether the agreement between DC Comics and Jean Adele Peavy/Frank Shuster, dated as of August 1, 1992 and signed October 2, 1992, had been filed with the Copyright Office.  I searched for any document containing the names "Frank Shuster" and "Jean Peavy"/"Jean Adele Peavy".  No entries appeared.  Nor did any of the entries that

1  were generated when I performed searches under the keywords "Shuster" (582

2  entries) and "Peavy" (220 entries) appear to be the 1992 agreement.

3

4          I declare under penalty of perjury of the laws of the United States of America

5  that the foregoing is true and correct.

6

7          Executed on August 20, 2012, at Los Angeles, California.

8

9          _____

10                         Keith G. Adams

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 24
U. S. Dist. Court
S. D. of N. Y.
APR  6 1939

Detective Comics, Inc.
480 Lexington Avenue
New York, N. Y.

     I, the undersigned, am an artist or author and
have performed work for strip entitled "SUPERMAN"

     In consideration of $150.00 agreed to be paid me
by you, I hereby sell and transfer such work and strip, all
good will attached thereto and exclusive right to the use of
the characters and story, continuity and title of strip contained
therein, to you and your assigns to have and hold forever and to
be your exclusive property and I agree not to employ said
characters or said story in any other strips or sell any like
strip or story containing the same characters by their names
contained therein or under any other names at any time hereafter
to any other person, firm or corporation, or permit the use
thereof by said other parties without obtaining your written
consent therefor.  The intent hereof is to give you exclusive
right to use and acknowledge that you own said characters or
story and the use thereof, exclusively. I have received the
above sum of money.

Accepted:

DETECTIVE COMICS, INC.

By

Confidential

WB005794

SUPREME COURT : wESTCHESTER COUNTY

- - - - - - - - - - - - - - - - - - x

JEROME SIEGEL AND JOSEPH SHUSTER,

                Plaintiffs,

    - against -

NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC., THE MC
CLURE NEWSPAPER SYNDICATE, HARRY
DONENFELD, JACOB LIEBOWITZ, and
PAUL H. SAMPLINER, and wAYNE BORING,
                Defendants.

- - - - - - - - - - - - - - - - - - x

            Plaintiffs, by their attorneys, SLONIM, WEKSTN
& FRIEDMAN, for their complaint, respectfully show to the
court and allege:-

<u>FOR A FIRST CAUSE OF ACTION</u>

           FIRST:  That the defendant, NATIONAL COMICS
PUBLICATIONS, INC., was and still is a domestic corporatic
duly organized and existing under and by virtue of the lat
of the State of New York.

           SECOND:  That the defendant, INDEPENDENT NEWS
CO., INC., was and still is a domestic corporation duly or
ganized and existing under and by virtue of the laws of th
State of New York.

           THIRD:  That the defendant, THE MC CLURE NEWS-
PAPER SYNDICATE was and still is a domestic corporation du
organized and existing under and by virtue of the laws of
the State of New York.

           FOURTH:  That Detective Comics, Inc. was a cor
poration duly organized and existing under and by virtue o
the laws of the State of New York.

           FIFTH:  Upon information and belief Superman, I
was a corporation duly organized and existing under and by
virtue of the laws of the State of New York and that the
said corporation was organized by Detective Comics, Inc.
and the defendants, HARRY DONENFELD, JACOB LIEBOWITZ and
PAUL H. SAMPLINER, and at all the times hereinafter mentio

               (1)

the officers and directors of Superman, Inc. were the same persons who were the officers and directors of Detective Comics, Inc., and that all facts known to Detective Comics Inc., were known to Superman, Inc. and that at all times hereinafter mentioned Superman, Inc. was completely controled by Detective, Comics, Inc. and the defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER.

SIXTH: That on or about the 22nd day of September, 1938, for a valuable consideration Detective Comics, Inc., and the defendant, THE MC CLURE NEWSPAPER SYNDICATE, entered into a contract in writing with the plaintiffs, a true copy of which is hereto annexed and marked Exhibit "A" and made part of this complaint as if here incorporated at length.

SEVENTH: That on or about the 19th day of December, 1939, for a valuable consideration, Detective Comics Inc. entered into an agreement with the plaintiffs to modify the contract hereinabove set out in paragraph "SIXTH" and whereby the said contract was modified, and the said agreement was in writing and a true copy of the same is hereto annexed and marked Exhibit "B" and made part of this complaint as if here incorporated at length.

EIGHTH: That on or about August 30, 1943, Detective Comics, Inc. did notify each of the plaintiffs in writing of its election to extend the existence of the contract hereinabove set forth according to the terms thereof for an additional five year period from September 22, 1943, of which said notices in writing true copies are hereto annexed, marked Exhibit "C" and "D" and made part of this complaint as if here incorporated at length.

NINTH: Upon information and belief, that the defendant, THE MC CLURE NEWSPAPER SYNDICATE, did notify Detective Comics, Inc. of its election to extend for five years from June 1, 1944, its participation in the contract herein

(2)

000000192 **ER-554**

above set forth according to the terms thereof.

TENTH: That on or about June 21, 1943, Detecti Comics, Inc. for a valuable consideration did enter into agreement with the plaintiffs whereby the contract herein above set forth was modified, in that in place of the rs of compensation therein provided for material furnished by the plaintiffs and accepted by Detective Comics, Inc., fo magazine publication, as previously modified from time to time theretofore, the said Detective Comics, Inc. agreed pay to each of the plaintiffs five hundred ($500.00) doll for each group of cartoon strips and continuity, of the s and nature known in the comic magazine trade as a "releas

ELEVENTH: That heretofore and on or about June 21, 1943, Detective Comics, Inc., for a valuable consider: tion entered into an agreement with the plaintiffs wherebj the contract hereinabove set forth was modified so as to provide that in the event that the plaintiffs or either of them should for any reason be unable to supply continuity or cartoons or to supply sufficient continuity or cartoons for the requirements of Detective Comics, Inc., in magazine publication, and Detective Comics, Inc., should hire write or artists or both, for the above reason or any other reas to supply continuity or cartoons or both relating to certo features of which the plaintiffs are or were the originato the said Detective Comics, Inc. would pay to the plaintiff the current agreed compensation per release paid to the plaintiffs for material completely furnished by the plain- tiffs, less a fixed amount agreed upon to be applied as compensation for artists or writers hired by the said Detec tive Comics, Inc. to supply material as above, the said fi: sum being one hundred ($100.00) dollars per release for cor tinuity and one hundred fifty ($150.00) dollars per release for cartoons.

TWELFTH: That the plaintiffs have duly performe

(3)

000000194 **ER-555**

all the terms and conditions of the contract hereinabove
set forth and each and every obligation on their part to
performed.

THIRTEENTH: That the plaintiffs are the exclus
originators and authors of the cartoon character "Superma
and of the title Superman and first created cartoon mater
in which the said character and title first appeared in 1
and have created such cartoon material ever since, and th
the plaintiffs are the authors and originators of all of
other cartoon characters which have appeared in the carto
strip entitled Superman , chief among which are "Superman'
also known as "Clark Kent", "Lois Lane"and "Perry White" 
that the plaintiffs are universally and in the various na
tions of the world known to the public as the authors and
creators of all cartoon material in which the character
"Superman" appears and of the character "Superman" and of
all other cartoon characters which appear and have appeare
in cartoons entitled Superman.

FOURTEENTH:  That Detective Comics, Inc., Super
man, Inc. and the defendants have, since the execution and
delivery of the contract hereinabove set forth, published,
sold and distributed, and are now publishing, selling and
distributing to the public in large volume serially in mont
ly and bi-monthly magazines and in the daily press numerou
comic strips other than Superman in which the conception,
characters, idea, plot and action are deliberate imitation
of the character and conception of Superman and of the plo
and actionof comic or cartoon strips in which Superman ap-
pears and has appeared, and that the said comic strips pub
lished in imitation of Superman are entitled Batman, Super
boy, Lois Lane, Girl Reporter, Johnny Quick, The Flash,
Green Lantern, Aquaman, Airwaive, and there are many other
and that the defendants have not engaged the plaintiffs to
write the continuity or draw the cartoons for any of the s

(4)

46

000000195
ER-556

comic strips other than Superman, and have not paid plain-
tiffs anything on account of the sale of the said various
comic strips and have not permitted the plaintiffs to share
the profits thereof, except that the plaintiff, JOSEPH
SHUSTER, has created certain cartoon material for the comic
strip Superboy and has been paid therefor.

FIFTEENTH:  That the publication of the said
divers comic strips other than Superman is publication in
direct competition with Superman and the publication of the
said comic strips has lessened and will continue to lessen
the market for the plaintiffs' comic strip Superman.

SIXTEENTH:  That the said publication by Detective
Comics, Inc. and Superman, Inc. and the defendants of the
various comic strips in close and deliberate imitation of
Superman as herein set forth did divert and is now diverting
from the plaintiffs revenue and profits belonging to them as
the authors and originators of Superman and belonging to them
under the contract hereinabove set forth and that the said
diversion of profits was in violation of the duty of the de-
fendant, THE MC CLURE NEWSPAPER SYNDICATE, and of Detective
Comics, Inc. under the contract to sell and distribute the
comic strip Superman for the mutual benefit of the plaintiff
and the said defendant and the said Detective Comics, Inc.,
and is in violation of the relationship of trust existing
between the plaintiffs and the said defendant, THE MC CLURE
NEWSPAPER SYNDICATE, and the said Detective Comics, Inc.
arising out of the contract hereinabove set forth.

SEVENTEENTH:  That heretofore and on or about the
1st day of October, 1946, Detective Comics, Inc.,All Ameri-
can Comics, Inc., Superman, Inc., Jolaine Publications, Inc
wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc.
Gainlee Publishing Co., Inc., J. R. Publishing Co., Inc.,
Worlds Best Comics, Inc., Trafalgar Printing Co., Inc., dul
consolidated into a single corporation pursuant to the prov
sions of Sections 85 to 90 of the Stock Corporation Law of the

(5)

000000196
ER-557

State of New York, the same being the defendant, NATIONAL COMICS PUBLICATIONS, INC.

EIGHTEENTH: That the defendant, NATIONAL COMICS PUBLICATIONS, INC. from the 1st day of October, 1946, did continue the wrongful publication, sale and distribution theretofore carried on by Detective Comics, Inc. and Super man, Inc. of the various comic strips in violation of the rights of the plaintiffs as heretofore alleged, and is at present carrying on the said wrongful publication, sale and distribution and threatens to carry on the same in the future.

NINETEENTH: That the acts of Superman, Inc., De tective Comics, Inc., and the defendants as hereinabove se forth have caused, and are causing and will hereafter cont ue to cause the plaintiffs irreparable loss, injury and da mage for which the plaintiffs have no adequate remedy at l

### FOR A SECOND CAUSE OF ACTION

TWENTIETH: Plaintiffs repeat and reallege each every allegation contained in the paragraphs of this compla marked, "FIRST", "SECOND", "THIRD", "FOURTH", "FIFTH", "SI "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH "THIRTEENTH" and "SEVENTEENTH" as if they were herein full set forth, and incorporate the same in this second cause o action.

TWENTY-FIRST: That the defendants, HARRY DONENFI JACOB LIEBOWITZ, PAUL H. SAMPLINER and INDEPENDENT NEWS CO. INC., at all times herein mentioned had due notice andknowl edge of aforesaid agreement between the plaintiffs and the Detective Comics, Inc., and the defendant, THE MC CLURE NEW PAPER SYNDICATE, and of all modifications thereof, as the said contract and modifications are hereinabove set forth.

TWENTY-SECOND: That heretofore and after the tim of the execution of the contract hereinabove set forth, the defendants, HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAM- PLINER and INDEPENDENT NEWS CO.INC., conspired together wit

(6)

000000197
ER-558

each other and with Detective Comics, Inc., Superman, Inc. and THE MC CLURE NEWSPAPER SYNDICATE, and entered into an agreement wrongfully, corruptly and maliciously to injure the plaintiffs by depriving them of their rights under the contract as hereinabove set forth and to interfere with, hinder and impair the performance of the said contract by the said Detective Comics, Inc., and THE MC CLURE NEWSPAPER SYNDICATE.

TWENTY-THIRD:  That pursuant to the said wrongful corrupt and malicious conspiracy the said defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER did induce the said Detective Comics, Inc., Superman, Inc., and THE MC CLURE NEWSPAPER SYNDICATE wrongfully to publish, sell and distribute to the public the comic strips, Batman, Superboy, Lois Lane, Girl Reporter, Johnny Quick, The Flash, Green Lantern, Aquaman, Airwave and many others, as herein above set out, and did procure and induce the defendant, INDEPENDENT NEWS CO., INC., to market, advertise and distribute the said comic strips in violation of the rights of the plaintiffs, and that all of the said defendants did advertise and represent to the public that the said comic strips published in derogation of the plaintiffs' rights, were the same as the plaintiffs' comic strip Superman, and did deceive the public thereby, and did market the said comic strips in competition with the said comic strip Superman.

TWENTY-FOURTH:  That the acts of Detective Comics, Inc., Superman, Inc., and the defendants as aforesaid have caused and are causing, and will hereafter continue to cause the plaintiffs irreparable loss, injury and damage for which the plaintiffs have no adequate remedy at law.

FOR A THIRD CAUSE OF ACTION

TWENTY-FIFTH:  Plaintiffs repeat and reallege each and every allegation contained in the paragraphs of this co

(7)

000000198   ER-559

plaint marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVEN
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH" and SEVENTEENTH" with the same force and effect a
if they were herein fully set forth, and incorporate the
in this third cause of action.

TWENTY-SIXTH:  That during the year 1938 and afte
the execution and delivery of the contract hereinabove set
forth the plaintiff, SIEGEL, pursuant to the terms of the
said contract delivered to Detective Comics, Inc., for its
consideration a scenario or synopsis containing the con-
tinuity plan and dialogue for the first "release" of a new
comic strip known as Superboy.

TWENTY-SEVENTH:  That the said synopsis contained
within itself the entire plan for the future publication
the said comic strip Superboy, and the conception of the
character, Superboy, all set forth with detail and particu
larity.

TWENTY-EIGHTH:  That Detective Comics, Inc., did
not within six weeks indicate its election to publish the
said comic strip Superboy, as required by the contract her
inabove set forth.

TWENTY-NINTH:  That Detective Comics, Inc. on or
about December 2, 1938, by its letter in writing to the
plaintiffs did declare that it elected not to publish the
said comic strip Superboy under the terms of the contract
hereinabove set forth.

THIRTIETH:  That thereafter and during January, 19
Detective Comics, Inc., did publish without the consent of
the plaintiff, SIEGEL, a certain comic strip release entitl
Superboy, which release was based entirely upon the synops
submitted to the said Detective Comics, Inc., by the plain
tiff, SIEGEL, and contained in detail the same characters,
incidents and plot.

THIRTY-FIRST:  That from January, 1945, until Oc-
tober, 1st, 1946, the said Detective Comics, Inc., without
the consent of the plaintiff, SIEGEL, did publish serially

(8)

**Exhibit B**  50

000000199

**ER-560**

**15**

sell and distribute numerous releases of a comic strip en titled Superboy, which said serial comic strip appeared monthly in magazines until February, 1946, and monthly thereafter, which said comic strip did use and was based upon the conception and idea as submitted in writing and detail by the plaintiff, SIEGEL, and submitted as aforesa

THIRTY-SECOND:  That from October 1, 1946, until the present, the defendant, NATIONAL COMICS PUBLICATIONS, INC., did without the consent of the plaintiff, SIEGEL, publish serially in monthly magazines and sell and distri bute numerous releases of the said comic strip Superboy in violation of the rights of the plaintiff, SIEGEL, as afore said, and the defendant does propose to and will continue in the future to publish numerous releases of the said con strip Superboy.

THIRTY-THIRD:  That the plaintiff, SIEGEL, has never consented to the publication of the said comic strip Superboy, as aforesaid, and has never been paid, received accepted anything of value or consideration therefor.

THIRTY-FOURTH:  That the acts of Detective Comics Inc., and the defendants as aforesaid have caused, and are causing, and will hereafter continue to cause the plaintif SIEGEL, irreparable loss, injury and damage for which the plaintiffs have no adequate remedy at law.

FOR A FOURTH CAUSE OF ACTION

THIRTY-FIFTH:  Plaintiffs repeat and reallege eac and every allegation contained in the paragraphs of this complaint marked "FIRST, "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFT "THIRTEENTH", and "SEVENTEENTH", with the same force and e fect as if they were herein fully set forth, and incorpora the same in this fourth cause of action.

THIRTY-SIXTH: That Detective Comics, Inc. from January 1945 until October 1, 1946, did without the consen

(9)

000000200

Exhibit B   51
16

ER-561

the plaintiff, SIEGEL, publish serially, sell and distribu

numerous releases of a comic strip entitled Superboy, whic

said serial comic strip appeared bi-monthly in magazines u

til February,1946 and monthly thereafter and that the prin

pal character of the said comic strip was represented to t

Superman as a child, and whose plot, conception and incide

were based upon and copied from the plot, conception and i

cidents of the plaintiff's comic strip Superman and that t

said Detective Comics, Inc. did intend by the said publica

tion to deceive the public and did by the said publication

deceive the public in that the public was led to believe

that the plaintiff, SIEGEL, was the author of the continu

dialogue and action of each of the individual releases of

the said comic strip whereas in truth the plaintiff, SIEGE

was not the author of each of the individual releases and

not invited nor permitted by the said Detective Comics, In

to create the continuity for each of the individual releas

THIRTY-SEVENTH:  That Detective Comics, Inc. fro

May 1945 until October 1, 1946 did, without the consent of

the plaintiff, SIEGEL, as aforesaid, publish, sell and dis-

tribute the said comic strip Superboy and did affix to the

individual releases of the said comic strip the name of the

plaintiff, SIEGEL, as author of the said releases, and that

the said Detective Comics, Inc. did represent to the public

and advertise that the plaintiff, SIEGEL, was the author of

the individual releases of the said comic strip Superboy whe

as in truth and in fact the plaintiff, SIEGEL, was not the

author of the individual releases of the said comic strip a

was not invited nor permitted by the said Detective Comics,

Inc. to create the continuity for said individual releases.

THIRTY-EIGHTH:  That thereafter from October 1, 1

to the present the wrongful publication, sale and distribu-

tion of monthly magazine releases of the said comic strip

Superboy as aforesaid were continued by the defendant,

NATIONAL COMICS PUBLICATIONS, INC., in violation of the

(10)

000000201

plaintiff, SIEGEL, and with intent to injure the said plai
tiff; and that the said defendant, by its publication of t
said comic strip Superboy, which it represented to be
Superman as a child, and by its affixing to the said indiv
dual releases of the said comic strip the name of the plai
tiff, SIEGEL, as author, when in fact the said plaintiff w
not the author of the said releases, did deceive the publi
to the grave and irreparable injury of the plaintiff, SIEG
and that the said defendant is continuing and proposes to
continue in the future to so deceive the public to the inj
of the plaintiff, SIEGEL.

THIRTY-NINTH:  That the acts of Detective Comi
Inc. and the defendants as aforesaid have caused, and are
causing, and will hereafter continue to cause the plaintif
SIEGEL, irreparable loss, injury and damage, for which the
plaintiffs have no adequate remedy at law.

## FOR A FIFTH CAUSE OF ACTION

FORTIETH:  Plaintiffs repeat and reallege as
part of this cause of action each and every allegation con-
tained in paragraphs marked "FIRST", "THIRD", "FOURTH",
"FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH",
"ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of tl
complaint, and like effect as if herein fully realleged and
plaintiffs incorporate herein all the facts therein set for

FORTY-FIRST:  That Superman, Inc., Detective
Comics, Inc., and the defendants, THE MC CLURE NEWSPAPER
SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER, with full knowledge of the rights of the plainti
under the contract hereinabove set forth, and with malice a
intent to deprive the plaintiffs of their rights under the
said contract did from the latter part of 1943 until October
1, 1946, without the consent of the plaintiffs, publish
serially, sell and distribute in monthly and bi-monthly maga
zines and in the daily press numerous releases of a comic
strip entitled Lois Lane, Girl Reporter and that the princi

(11)

000000202

**Exhibit B**
**18**

**ER-563**

pal characters of the said cartoon were and are Clark Ken
also known as Superman, Lois Lane, and Perry White, all o
which characters are the chief characters in the plaintif
comic strip Superman as is hereinabove set forth, and tha
the plot, conception and incidents presented in the said
comic strip Lois Lane, Girl Reporter were and are based u
copied and taken from the comic strip originated and crea
by the plaintiffs, known as Superman, and that the said
Superman, Inc., Detective Comics, Inc., and the defendants
THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB
LIEBOWITZ and PAUL H. SAMPLINER did intend by the said pu-
blication to deceive the public and did by said publicatic
deceive the public in that the public was led to believe
that the plaintiffs were the authors and creators of the c
tinuity, dialogue and action of each of the individual re-
leases of the said comic strips, whereas in fact and in tr
the plaintiffs were not the authors of each of the individu
releases, and the plaintiffs were not invited nor permitte
by the said Superman, Inc. or the defendants, THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and
PAUL H. SAMPLINER to create the said individual releases.

FORTY-SECOND:  That Superman, Inc., Detective
Comics, Inc. and the defendants, THE MC CLURE NEWSPAPER
SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER from the latter part of 1943 until October 1, 194
did, without the consent of the plaintiffs, publish, sell
and distribute the said comic strip Lois Lane, Girl Reporte
and did affix to the individual releases thereof the names
of the plaintiffs as authors of the said releases, and the
said Superman, Inc., Detective Comics, Inc., and the defen-
dants, THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD,
JACOB LIEBOWITZ and PAUL H. SAMPLINER did represent to the
public and advertise that the plaintiffs were the authors
of the individual releases of the said Lois Lane, Girl Re-
porter, whereas in truth and in fact the plaintiffs were not

(12)

authors of the individual releases as heretofore set forth

FORTY-THIRD:  That thereafter and from October 1, 1946, to the present the wrongful publication, sale and distribution of further releases of the said Lois Lane, Girl Reporter, were continued by the defendants, NATIONAL COMIC PUBLICATIONS, INC., THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, in violation of the rights of the plaintiffs as aforesaid and with intent to injure the said plaintiffs; and that the said defendants, by their publication of the said releases of the said comic strip in close imitation of the plaintiffs' comic strip Superman, and by affixing to the said releases the names of the plaintiffs as authors thereof, when in fact the plaintiffs were not the authors thereof, did deceive the public to the grave and irreparable injury of the plaintiffs and that the said defendants are continuing and propose to continue in the future to so deceive the public to the injury of the plaintiffs.

FORTY-FOURTH:  That the acts of the said defendants and of Detective Comics, Inc., and Superman, Inc., have caused and are causing and will hereafter continue to cause the plaintiffs irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

### FOR A SIXTH CAUSE OF ACTION

FORTY-FIFTH:  Plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of the complaint, with like effect as if herein fully realleged, and plaintiff incorporate herein all the facts therein set forth.

FORTY-SIXTH:  From July 1, 1943, to the present Detective Comics, Inc., published in magazines 120 releases of the comic strip Superman for which the plaintiff, SIEGEL did not create the continuity.

(13)

000000204
ER-565

FORTY-SEVENTH: That the said Detective Comics, Inc., has paid to the plaintiff, SIEGEL, the sum of $200. per release although there was due and owing under the contract above set forth the sum of $400.00 per release.

FORTY-EIGHTH: That though the plaintiff, SIEG. has duly demanded payment of the said additional sums of $200.00 per release, the said Detective Comics, Inc., and the defendant, NATIONAL COMICS PUBLICATIONS, INC., have neglected to and refuse to pay any portion of the said sums.

## FOR A SEVENTH CAUSE OF ACTION

FORTY-NINTH: Plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH," "TENTH", "ELEVENTH" TWELFTH", THIRTEENTH", and "SEVENTEENTH" of the complaint, with like effect as if herein fully realleged, and plaintiffs incorporate herein all the facts therein set forth.

FIFTIETH: From July 1, 1943 to the present, De tective Comics, Inc., published in magazines 130 releases of the comic strip Superman for which the plaintiff, SHUSTER, did not create the "art work".

FIFTY-FIRST: That the said Detective Comics, Inc., has paid to the plaintiff, SHUSTER, the sum of $150.0 per release for 80 of the said releases and the sum of $200.00 for the remaining 50 of the said releases although there was due and owing under the contract hereinabove set forth the sum of $350.00 per release.

FIFTY-SECOND: That although the plaintiff, SHUSTER, has duly demanded payment of the additional sums due under the said contract, the said Detective Comics, Inc and the defendant, NATIONAL COMICS PUBLICATIONS, INC. have neglected to and refuse to pay any portion of the said sums

## FOR AN EIGHTH CAUSE OF ACTION

FIFTY-THIRD:  The plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH" "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of the complaint with like effect as if herein fully realleged and plaintiff incorporate herein all the facts therein set forth.

FIFTY-FOURTH:  That pursuant to the terms of the contract hereinabove set forth, Superman, Inc., Detective Comics, Inc., and the defendant, NATIONAL COMICS PUBLICATI INC , from the date of the said contract to the present, h acquired and received large sums of money by the productio of radio features and moving pictures entitled Superman, based upon the characters, conception, plot and incidents created by the plaintiffs, and by the sale of licenses to various persons engaged in commercial enterprises permitti the said persons to affix to their products and to use in furtherance of the said commercial enterprises, the name o pictorial representation of "Superman".

FIFTY-FIFTH:  That, upon information and belief Superman, Inc., Detective Comics, Inc. and the defendant, N. TIONAL COMICS PUBLICATIONS, INC. have derived large profit above all costs and expenses from the motion picture and radio production and from the sale of licenses as hereinabo set forth and that they have failed and refused to make any payments to the plaintiffs on account thereof though the same have been duly demanded.

FIFTY-SIXTH:  That Superman, Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATION INC., have had during the term of the contract hereinabove set forth and have at present control of all books, records and papers relating to the matters set forth in this cause of action, and have in the past and do now refuse to permit

(15)

000000206

ER-567

**Exhibit B**
**22**

the plaintiffs to examine the said books, records and paper and that the plaintiffs therefor have no access to the information contained in the said books, records and papers.

FIFTY-SEVENTH: That from the inception of the contract herein set forth, the plaintiffs repeatedly demanded Superman, Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC, an account of the income a expenditures relating to the matters set forth in this caus of action and that the said Superman, Inc., Detective Comic Inc., and the defendant, NATIONAL COMICS PUBLICATIONS, INC. did neglect and refuse to furnish such an account until on about July 8, 1946, at which time the said persons did furn what purported to be an account of the said matters for the years 1942, 1943, 1944, 1945, and that thereafter and durin January, 1947, the said persons furnished what purported to be an account for the said matters for 1946.

FIFTY-EIGHTH: Upon information and belief the sa purported statements of account furnished by the said Super Inc., Detective Comics, Inc. and NATIONAL COMICS PUBLICATIO INC. were false and fraudulent and contained numerous deliberate intentional and fraudulent mis-statements as to th income and expenditures relating to production of motion pic tures and radio features and the sale of licenses as hereinabove set forth.

FIFTY-NINTH: That although the same have been dul demanded the said Detective Comics, Inc., Superman, Inc. and the defendant NATIONAL COMICS PUBLICATIONS, INC., have neglected and refused and do now neglect and refuse to furnish to the plaintiffs an account of income and expenditures relating to production of motion pictures and radio features and the sale of licenses for the years 1940 and 1941.

SIXTIETH: That the acts of Superman, Inc., Detectiv Comics, Inc. and NATIONAL COMICS PUBLICATIONS, INC. as afore said have caused, and are causing and will hereafter continu to cause the plaintiffs irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

(16)

## FOR A NINTH CAUSE OF ACTION

SIXTY-FIRST: The plaintiffs repeat and realle as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH," SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH", "SEVENTEENTH" ~~XXXXXXXXXXXXXX~~ of the complaint, with like effect as if herein fully re-alleged, and plaintiffs incorporate herein all the facts therein set forth.

SIXTY-SECOND: Upon information and belief that Random House, Inc. is a domestic corporation organized and existing under and by virtue of the laws of the State of Ne York.

SIXTY-THIRD: Upon information and belief that during 1942, Superman, Inc. and Detective Comics, Inc. for valuable consideration entered into an agreement with Rando House, Inc., granting the said Random House, Inc. the right to publish, and whereby the said Superman, Inc., Detective Comics, Inc., and Random House, Inc. agreed mutually and in cooperation with each other to publish a work of fiction bearing the name <u>Superman</u> and based upon the character, con ception and incidents created and originated by the plainti

SIXTY-FOURTH: That upon information and belief pursuant to the said agreement, the said Superman, Inc., De-tective Comics, Inc. and Random House, Inc. did publish, se and distribute a work of fiction entitled <u>The Adventures of Superman</u>, which was based upon the character, conception an incidents created and originated by the plaintiffs, and whic said book bears upon the outside cover thereof the statement "Based on the famous character created by Joe Shuster and Jerry Siegel" and which said book bears upon the title page thereof the statements "Based on the cartoon character creat by Jerry Siegel and Joe Shuster" and "Illustrations by Joe Shuster".

SIXTY-FIFTH: That the said Superman, Inc., De-

(17)

000000208
**ER-569**

tective Comics, Inc. did not invite or permit the plaintiff
to work on or create any portions of the said book, and th
plaintiffs did not work on or create any portions of the s
book or any illustrations therein, except that the plainti
SHUSTER, was invited to and did create four color illustra
tions included therein.

SIXTY-SIXTH:  That upon information and belief
that Detective Comics, Inc., Superman, Inc., and the defen
NATIONAL COMICS PUBLICATIONS, INC. have received large sum
of money on account of the said agreement and on account o
the publication of the said work of fiction, no part of
which has been paid to the plaintiffs.

SIXTY-SEVENTH:  That Superman, Inc., Detective
Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIO
INC., have had during the term of the contract hereinabove
set forth and have at present control of all books, record
and papers relating to the matters set forth in this cause
of action, and have in the past and do now refuse to permi
the plaintiffs to examine the said books, records and pape
and that the plaintiffs therefor have no access to the info
mation contained in the said books, records and papers.

SIXTY-EIGHTH:  That although the same have been
duly demanded, the said Detective Comics, Inc., Superman,
Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC.
have neglected and refused and do now neglect and refuse to
furnish to the plaintiffs an account of income and expendi-
tures relating to the publication and sale of the said work
of fiction, The Adventures of Superman.

SIXTY-NINTH:  That the acts of the said Superma
Inc., Detective Comics, Inc. and the defendant, NATIONAL
COMICS PUBLICATIONS, INC., as aforesaid, have caused, and a
causing and will hereafter continue to cause the plaintiffs
irreparable loss, injury and damage, for which the plaintif
have no adequate remedy at law.

(18)

FOR A TENTH CAUSE OF ACTION

SEVENTIETH:  That the plaintiffs repeat and re-
allege as part of this cause of action each and every alle-
gation contained in paragraphs of the complaint marked,
"FIRST", "THIRD", "FOURTH", "FIFTH", "SIXTH", "SEVENTH",
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH" and "SEVENTEENTH" with like effect as if herein
fully realleged, and plaintiffs incorporate herein all the
facts therein set forth.

SEVENTY-FIRST:  That on or about the 1st day of
February, 1940, the plaintiff, SHUSTER, entered into a con-
tract with the defendant, WAYNE BORING, a copy of which is
hereto annexed marked Exhibit "E" and made a part of this
complaint as if here incorporated at length.

SEVENTY-SECOND:  That the plaintiff, SHUSTER, ha
duly performed all the conditions of the said contract on
his part to be performed.

SEVENTY-THIRD:  That the defendant, BORING, dur-
ing July of 1943, left the employ of the plaintiff, SHUSTE
and entered the employ of Detective Comics, Inc. and Super
man, Inc., on whose behalf he drew without the consent of
the plaintiff, SHUSTER, cartoons for comic strips entitled
Superman and Batman and many others based upon the concep-
tion, idea, plot, incidents and character of the plaintiff
comic strip Superman which said employment and furnishing
cartoons continued until October 1, 1946.

SEVENTY-FOURTH:  That on and after October 1, 19
the said defendant entered the employ of the defendant, NA-
TIONAL COMICS PUBLICATIONS, INC., and there continued to d
the cartoons for comic strips entitled Superman and Batman
and others in violation of the plaintiff, SHUSTER'S, rights
under the contract hereinabove set forth, and threatens to
continue in the future to draw the said cartoons in viola-
tion of the rights of the plaintiff, SHUSTER.

SEVENTY-FIFTH:  That the acts of the defendant,

(19)

000000210
**ER-571**

BORING, have caused and are causing and will hereafter co
tinue to cause to the plaintiff irreparable loss, injury
damage, in that the said wrongful furnishing of cartoons
in competition with the plaintiff's cartoons and uses up
and lessens the market therefor; and that the preparation
of cartoons by the defendant, BORING, which were and are
sold to the public as the cartoons of the plaintiff, SHUS
which said cartoons were and are prepared without any su-
pervision and control by the plaintiff, SHUSTER, has re-
sulted in inferior and unskillful work being passed off a
the work of the plaintiff, SHUSTER, and has injured and i
now injuring the reputation of the plaintiff, SHUSTER,

SEVENTY-SIXTH:  That the plaintiff, SHUSTER, h
no adequate remedy at law.

<u>FOR AN ELEVENTH CAUSE OF ACTION</u>

SEVENTY-SEVENTH:  That the plaintiffs repeat ar
reallege as part of this cause of action each and every al
legation contained in paragraphs of the complaint marked
"FIRST", "THIRD", "FOURTH", "FIFTH", "SIXTH", " SEVENTH",
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH", "SEVENTEENTH", "SEVENTY-FIRST" and "SEVENTY-SECON
with like effect as if herein fully realleged, and plainti
incorporate herein all the facts therein set forth.

SEVENTY-NINTH:  During June and July of 1943 the
defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER, Detective Comics, Inc. and Superman, Inc. con-
spired to and with each other to injure the plaintiff,
SHUSTER, by inducing the defendant, BORING, to break his a-
greement with the plaintiff, SHUSTER, and to interfere with
the performance of the said agreement.

EIGHTIETH:  That during June and July of 1943 the
said defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL
SAMPLINER, Detective Comics, Inc. and Superman, Inc. did in
duce the said defendant, BORING, to break and repudiate his
obligations under his agreement with the plaintiff, SHUSTER

(20)

and did interfere with and render impossible the performan
of the said agreement in that they induced the said defenc
BORING to leave the employ of the plaintiff, SHUSTER, and
enter the employ of Detective Comics, Inc. and Superman, I
in whose employ the said defendant, BORING, engaged in col
ing, composing, editing and drawing comic strips based on
themes similar to Superman, to wit; the preparation of car
toons for the comic strips, Superman, Batman and many othe
which are based upon the conception, idea, plot, incident:
and character of the plaintiff's comic strip, Superman.

EIGHTY-FIRST:  That the said interference with
the contractual rights of the plaintiffs' by the defendant
DONENFELD, LIEBOWITZ and SAMPLINER, Detective Comics, Inc.
and Superman, Inc. was continued until October 1, 1946, an
was thereafter continued in like manner thereafter by the
said defendants and the defendant, NATIONAL COMICS PUBLICA
TIONS, INC., by whom the defendant, BORING, is now employe
and is continued by them at the present time, and that the
threaten to continue the same in the future.

EIGHTY-SECOND:  That the aforementioned acts o
the part of Detective Comics, Inc., Superman, Inc., and the
defendants, NATIONAL COMICS PUBLICATIONS, INC., DONENFELD,
LIEBOWITZ and SAMPLINER were wrongful, corrupt and malicio
and were known so to be by them at the time they were com-
mitted, and were committed by them in pursuance of their
plan and conspiracy as aforementioned, and with full knowl
edge of the agreement between the plaintiff, SHUSTER, and
the defendant, BORING.

EIGHTY-THIRD:  That the said acts of Detective
Comics, Inc., Superman, Inc. and the said defendants have
caused and are causing and will continue to cause the plai
tiff, SHUSTER, irreparable loss, injury and damage, in tha
the said wrongful furnishing of cartoons is in competition
with the plaintiff's cartoons and uses up and lessens the
market therefor; and that the preparation of cartoons by tl

(21)

000000212
ER-573

defendant, BORING, which were and are sold to the public a

the cartoons of the plaintiff, SHUSTER, which said cartoon

were and are prepared without any supervision and control

the plaintiff, SHUSTER, has resulted in inferior and unski

ful work being passed off as the work of the plaintiff,

SHUSTER, and has injured and is now injuring the reputatio

of the plaintiff, SHUSTER.

EIGHTY-FOURTH:  That the plaintiff, SHUSTER, ha

no adequate remedy at law.

### FOR A TWELFTH CAUSE OF ACTION

EIGHTY-FIFTH:  The plaintiffs repeat and realle

as part of this cause of action each and every allegation

contained in paragraphs of the complaint marked "FIRST",

"FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",

"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEE

of the complaint with like effect as if herein fully real-

leged and plaintiff incorporates herein all the facts ther

set forth.

EIGHTY-SIXTH:  That Detective Comics, Inc.,

Superman, Inc., and the defendant, NATIONAL COMICS PUBLICA-

TIONS, INC. have wrongfully and unlawfully from the date o

the contract hereinbefore set forth to the present, publish

numerous releases of the comic strip Superman and numerous

releases of other comic strips created by the plaintiffs f

Detective Comics, Inc.,Superman, Inc. and the defendant,

NATIONAL COMICS PUBLICATIONS, INC., which said releases wer

created by the servants and employees of the said  Detectiv

Comics, Inc., Superman, Inc. and NATIONAL COMICS PUBLICATIO

INC., and were published by the said corporations secretly

and without any notice to the plaintiffs and without the pe

mission of the plaintiffs, and that the defendant, NATIONAL

COMICS PUBLICATIONS, INC., and Detective Comics, Inc. and

Superman, Inc., have not paid the plaintiffs any money

or thing of value on account of the publication of the said

releases.

(22)

000000213

ER-574

EIGHTY-SEVENTH:  That Superman, Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATION INC , have had during the term of the contract hereinabove set forth and have at present control of all books, records and papers relating to the matters set forth in this cause of action and have in the past and do now refuse to permit the plaintiffs to examine the said books, records and papers.

EIGHTY-EIGHTH:  That the plaintiffs know of their own knowledge of divers comic strip releases wrongfully and secretly published without any notification of the plaintiffs, but upon information and belief that there are many more of such releases so wrongfully and secretly published concerning which the plaintiffs have no definite information and concerning which they can acquire no such definite information since as has been alleged above the plaintiffs have no access to the above mentioned books, records and papers.

EIGHTY-NINTH: That the acts of the said Superman Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC., as aforesaid have caused, and are causing and will hereafter continue to cause the plaintiffs, irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

<u>FOR A THIRTEENTH CAUSE OF ACTION</u>

NINETIETH: Plaintiffs repeat and reallege each and every allegation contained in paragraphs of the complaint marked "FIRST", "FOURTH", "FIFTH","SIXTH", "SEVENTH "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-TEENTH" and "SEVENTEENTH" as part of this cause of action, with the same force and effect as if herein fully realleged and plaintiffs incorporate herein all the facts therein set forth.

NINETY-FIRST: That from November 1945 to the present, Detective Comics, Inc., Superman, Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC., have published 20 releases of comics strips for which the plaintiff, SHUSTER,

(23)

created and executed the art work, and for which the said

Detective Comics, Inc., Superman, Inc. and NATIONAL COMICS

PUBLICATIONS, INC. had paid the plaintiff, SHUSTER, the su

of $380.00 per release.

NINETY-SECOND:  That though the same have be

duly demanded payment of the additional sums due under the

contract has been refused by the said Detective Comics, In

Superman, Inc. and the defendant, NATIONAL COMICS PUBLICA-

TIONS, INC.     FOR A FOURTEENTH CAUSE OF ACTION

NINETY-THIRD:  That the plaintiffs repeat an

allege as part of this cause of action each and every alle

gation contained in paragraphs of the complaint marked

"FIRST", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",

"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVEN-

TEENTH" with the same force and effect as if herein fully

realleged and plaintiffs incorporate herein all the facts

therein set forth.

NINETY-FOURTH:  That during 1946 Detective

Comics, Inc. pursuant to the contract hereinabove set fort!

published four certain releases of the comic strip, Superma

upon which theplaintiff, SIEGEL, did not furnish the con-

tinuity and on account of which the said Detective Comics,

Inc. has made no payment whatsoever.

NINETY-FIFTH:  That though the plaintiff,

SIEGEL, has duly demanded the same the said Detective Comic

Inc. has failed, neglected and refused to pay the sum due

under the contract for the said four releases.

FOR A FIFTEENTH CAUSE OF ACTION

NINETY-SIXTH:  Plaintiffs repeat and realleg

as part of this cause of action each and every allegation

contained in paragraphs of the complaint marked "FIRST","SE

"THIRD"
"FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",

"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEEN

with like effect as if fully realleged, and plaintiffs in-

corporate herein all the facts therein set forth.

(24)

NINETY-SEVENTH:  Upon information and belief tha on or about March 1, 1938, Detective Comics, Inc. and the plaintiffs entered into an agreement which purported to grant to the said Detective Comics, Inc. certain rights of the plaintiffs with respect to the comic strip Superman, which agreement is not in the possession of the plaintiffs and whose exact terms are unknown to the plaintiffs.

NINETY-EIGHTH:  That previous to March 1, 1938, there was a due and owing by Detective Comics, Inc. to the plaintiffs the sum of One Hundred Thirty ($130.00) Dollars.

NINETY-NINTH:  That the agreement entered by the plaintiffs on or about March 1, 1938, as hereinabove allege was for the sole purpose of procuring the payment to the plaintiffs of the above mentioned sum of One Hundred Thirty ($130.00) Dollars and for no other consideration whatsoever

ONE-HUNDREDTH:  That on or about September 22, 193 the plaintiffs entered into an agreement in writing with De tective Comics, Inc. and the defendant, THE MC CLURE NEWS-PAPER SYNDICATE, as is hereinabove set forth, which agreement is hereto annexed and marked Exhibit "A".

ONE HUNDRED FIRST:  That thereafter from time to time the plaintiffs entered into numerous modifications of the said agreement as hereinabove set forth.

ONE HUNDRED SECOND:  That to induce the plaintiff to enter into the agreement of 1938 and the various modifi-cations thereof and to induce the plaintiffs to continue to perform the said agreement in the face of numerous vital breaches thereof by the said Detective Comics, Inc. and THE MC CLURE NEWSPAPER SYNDICATE, the said Detective Comics, Inc and the defendants, HARRY DONENFELD and JACOB LIEBOWITZ falsely and fraudulently stated and represented that under the agreement of March 1, 1938, the said Detective Comics, Inc. had the sole and exclusive right to publish cartoon material to be originated in the future entitled Superman and depicting the character Clark Kent, and that under said

(25)

000000216
ER-577

agreement the plaintiffs had lost all right to ever again create comic strips entitled <u>Superman</u> and depicting the character <u>Clark</u> <u>Kent</u>, except as specifically permitted by Detective Comics, Inc. and that the said Detective Comics, I could terminate the employment of the plaintiffs at any tim and continue to publish the said comic strip <u>Superman</u>, depicting the character <u>Clark Kent</u>, and that the plaintiffs would thereafter be unable to create or publish any cartoon material bearing said title and depicting said character.

ONE HUNDRED THIRD: That the said statements and representations so made were false and were known to Detective Comics, Inc., the defendants, HARRY DONENFELD and JACO LIEBOWITZ, to be false when made.

ONE HUNDRED FOURTH: That the said Detective Com Inc. did not acquire by the instrument of March 1, 1938, the sole and exclusive right as against the plaintiffs or as a-gainst the public at large to create and publish future com strip material entitled <u>Superman</u> and depicting the character <u>Clark</u> <u>Kent</u>, and the plaintiffs did not by the said instrumen lose the rights which they had heretofore had with respect such rights.

ONE HUNDRED FIFTH: That plaintiffs relied upon said statements and representations and believed them to be true, and as a result thereof were induced and did enter int the agreement aforesaid of September 22, 1938, and did enter divers modifications thereof and did continue to perform the same despite numerous vital breaches thereof by Detective Comics, Inc.

ONE HUNDRED SIXTH: That plaintiffs elect to re-scind the said contract and hereby offer to release and dis-charge the said Detective Comics, Inc., THE MC CLURE NEWS-PAPER SYNDICATE and the defendant, NATIONAL COMICS PUBLICA-TIONS, INC., from any further obligation to perform the same and to return to the said Detective Comics, Inc., THE MC CLU NEWSPAPER SYNDICATE and the defendant, NATIONAL COMICS PUBLI

(26)

000000217

**ER-578**

CATIONS, INC. rightfully become theirs upon such a rescissal

ONE HUNDRED SEVENTH:  Plaintiffs have no adequate remedy at law.

## FOR A SIXTEENTH CAUSE OF ACTION

ONE HUNDRED EIGHTH:  That the plaintiffs repeat ar reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "SECOND", "THIRD", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH", and "SEVENTEENTH" of this complaint with like effect as if here in fully realleged, and plaintiffs incorporate herein all t facts therein set forth.

ONE HUNDRED NINTH:  That the agreement of Septembe 22, 1938, as modified, provides that the same may be cancel led and terminated by Detective Comics, Inc. at its sole optio

ONE HUNDRED TENTH:  That the plaintiffs elect to rescind the said contract as illusory, and as a contract lacking mutuality, and offer to release and discharge the said Detective Comics, Inc. and THE MC CLURE NEWSPAPER SYN- DICATE from any further obligation to perform the same and to return to the said Detective Comics, Inc. and THE MC CLUI NEWSPAPER SYNDICATE all things which rightfully become their upon such a rescission.

ONE HUNDRED ELEVENTH:  Plaintiffs have no adequate remedy at law.

## FOR A SEVENTEENTH CAUSE OF ACTION

ONE HUNDRED TWELFTH:  That the plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked in the complaint, "FIRST" through "ONE HUNDRED ELEVENTH" inclusive, with like effect as if herein fully realleged, and plaintiff incor- porate herein all the facts therein set forth.

ONE HUNDRED THIRTEENTH:  That the defendant, NA- TIONAL COMICS PUBLICATIONS, INC. and Detective Comics, Inc.

(27)

000000218
ER-579

have further failed and refused to perform the conditions
of the aforementioned contract in that after the return of
the plaintiff, SIEGEL, from two and one half years in the
United States Army, they refused and do still refuse to pe
mit the plaintiffs to undertake and carry on the full pro-
duction of continuity and cartoon material for all the nee
of newspaper and magazine publishing of the cartoon featur
Superman as the plaintiffs had previously done.

ONE HUNDRED FOURTEENTH:  That the plaintiffs have
repeatedly demanded of the said Detective Comics, Inc. and
of the defendant, NATIONAL COMICS PUBLICATIONS, INC. that
the plaintiffs be permitted to carry on the entire produc-
tion of material for publication of Superman as aforesaid,
but the said defendant and the said Detective Comics, Inc.
have refused to permit the same.

ONE HUNDRED FIFTEENTH:  That Detective Comics, In
and the defendant, NATIONAL COMICS PUBLICATIONS, INC. have
without the consent of the plaintiffs hired their own ser-
vants and employees to create a major portion of the materi
published under the title Superman, despite the fact that
the plaintiffs are capable of producing sufficient material
for all the needs of magazine and newspaper publishing.

ONE HUNDRED SIXTEENTH:  That in furtherance of the
unlawful and corrupt scheme to prevent the plaintiffs from
producing all of the material necessary for publication und
the title Superman as aforesaid, as is their right under th
contract as aforesaid, and in order therefor to cause it to
falsely appear that the plaintiffs are unable to produce al
the necessary material, Detective Comics, Inc. and the de-
fendant, NATIONAL COMICS PUBLICATIONS, INC. have since the
return of the plaintiff, SIEGEL, from the Army adopted a
course of conduct whereby they have rejected under the guis
of editorial supervision the major portion of the material
created by the plaintiffs, and that the said rejections are
corruptly, falsely, and maliciously made without right or

(28)

000000219
ER-580

reason, and solely to injure the production of the said ma
terial by the plaintiffs and pursuant to the scheme as abo
set out to prevent the plaintiffs resuming full supervisio
and control of the production of the comic strip <u>Superman</u>.

ONE HUNDRED SEVENTEENTH:  That the continuity an
cartoons created by the servants and employees were and ar
inferior to continuity and cartoons created by the plainti
and that the publication of such inferior material with the
representation that the said material is the work of the
plaintiffs has injured and is injuring and will continue t
injure in the future the reputation of the plaintiffs in the
trade and with the general public, and has lessened and de-
preciated the sale of the comic <u>Superman</u> and will continue
in the future to do so.

ONE HUNDRED EIGHTEENTH:  That the plaintiffs ele
to rescind the said contract, because of the numerous vital
and material breaches thereof, failure of consideration
therein, and numerous frauds in the inducement, the inceptio
and performance thereof, as hereinabove set forth, and here
by offer to release and discharge the said Detective Comics
Inc., THE MC CLURE NEWSPAPER SYNDICATE, and the defendant
NATIONAL COMICS PUBLICATIONS, INC. from any further obliga-
tion to perform the same and to return to the said Detectiv
Comics, Inc., THE MC CLURE NEWSPAPER SYNDICATE, and the de-
fendant, NATIONAL COMICS PUBLICATIONS, INC., all things
which rightfully become theirs upon such a rescission.

ONE HUNDRED NINETEENTH:  Plaintiffs have no
adequate remedy at law.

WHEREFORE, plaintiffs demand judgment:-

1. That the defendants, their agents, servants an
employees be perpetually  enjoined and restrained from crea
ing, publishing, selling or distributing any comic strip ma-
terial of the nature now and heretofore sold under the
titles <u>Batman</u>, <u>Superboy</u>, <u>Lois Lane,Girl Reporter</u>, <u>Johnny
Quick</u>, <u>The Flash</u>, <u>Green Lantern</u>, <u>Aquaman</u>, <u>Airwave</u>, or any

(29)

other comic strip material made in imitation of the conception, character, nature, incidents, action or plot of the plaintiffs' comic strip Superman, or in competition with the said Superman, and from using any title so imitative of Superman as to be calculated to deceive the public so that it would believe the so entitled material to have been created by the plaintiffs.

2. That the plaintiffs have an accounting of income, expenditures and profits of the defendants, derived from the publication, sale and distribution of Batman, Superboy, Lois Lane, Girl Reporter, Johnny Quick, The Flash, Green Lantern, Aquaman, Airwave and any other comic strip material made in imitation of conception, character, nature, incidents, action or plot of the plaintiffs' comic strip Superman or in competition with the said Superman, and that the profits derived from the said publication, sale and distribution be divided according to law and that the plaintiffs have their just share thereof.

3. That the plaintiffs have an accounting of the income, expenditures and profits acquired by the defendants through the production of radio features and moving picture entitled Superman, and by the sale of commercial licenses of all kinds and the receipt of commercial royalties of all kinds, and that the profits derived from the said publication, sale and distribution be divided according to law, and that the plaintiffs have their just share thereof.

4. That the plaintiffs have an accounting of the income, expenditures, and profits acquired by the defendant as a result of the publication, sale and distribution by Random House, Inc., or the defendants, of the book The Adventures of Superman, and that the profits derived from the said publication, sale and distribution be divided according to law and that the plaintiffs have their just share thereof.

5. That the plaintiffs have an accounting of all cartoon or comic strip material published under the title of any comic strip feature created by the plaintiffs or furnish

(30)

000000221

ER-582

by the plaintiffs pursuant to contract, and of all material published in imitation of any of the said comic strip features, and of the income, profits and expenditures relating to such publication and that the profits thereof be divided according to law, and that the plaintiffs have their just share thereof.

6. That the Court declare the rights and other legal relations of the plaintiffs and the defendants by reason of the written instrument dated March 1, 1938; and that the Court declare the said instrument void; and that the Court declare the said instrument ineffectual to convey to the defendants any property in, or the future rights to publish, the comic strip feature <u>Superman</u>, or any property in the use of the title thereto or of the comic strip character "Clark Kent" also known as <u>Superman</u>.

7. That the Court declare the rights and other legal relations of the plaintiffs and the defendants by reason of the written instrument dated September 22, 1938 and the modifications thereof; that the Court declare that the plaintiffs have the right to rescind the said contract; and that the plaintiffs have the sole right hereafter to the use of the title <u>Superman</u>, and to create and cause to be published cartoon or comic strip material containing the character "Clark Kent" also known as "Superman", "Lois Lane", and "Perry White", and containing the conception and idea of the cartoon feature <u>Superman</u>.

8. That the defendants, their agents, servants and employees be perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material under the title <u>Superman</u>, or any material containing the idea, conception, plot or in any wise resembling the comic strip feature heretofore published as <u>Superman</u>, or containing any of the characters hereinbefore presented in the said feature <u>Superman</u> or resembling the said characters and from making, selling, licensing, or distributing any radio, or motion picture or talking picture features, or any

(31)

73

000000222

dramatic or stage features and from granting any commercial
licenses of any kind or nature whatsoever, and from accept-
ing hereafter any money or consideration on account of any
licenses heretofore granted, and from using the names of
_Superman_ or of the plaintiffs for any commercial purpose
whatsoever.

9. That the plaintiffs have judgment against th
defendants for all sums of money due to the plaintiffs pur-
suant to the terms of the contract of September 22, 1938,
as modified and otherwise due and owing.

10. That the plaintiffs may have such other and
further relief as to the court may seem just and proper.

SLONIM, WEKSTEIN & FRIEDMAN
Attorneys for Plaintiffs
Office & P. O. Address
20 South Broadway
Yonkers, New York (2)

(32)

000000223

ER-584

EXHIBIT "A"

Sept. 22, 193

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberly Avenue
Cleveland, Ohio

Gentlemen:-

This letter, when signed by you, will serve as our agreemen

We, Detective Comics, Inc., are the exclusive owners of com
strips known by the titles "Superman", "Slam Bradley", "Spy
"Radio Squad" and "Federal Men", and to the rights to publi
comics carrying said titles and characters contained therei
and continuity thereof.

You have been doing the art work and continuity for said
comics for us.  We wish you to continue to do said work and
hereby employ and retain you for said purposes for the peri
of this contract.

You agree that you will supply us each and every month here
after, in sufficient time for publication in our monthly
magazines,sufficient copy and art for each of said features
each month hereafter.

All of said comic features consist of approximately 46 page
per month.  The standard of the said comics shall be equal
to the present standards.

You shall also furnish in sufficient time to properly perfo
the terms of an agreement we are executing together with yo
with the McClure Newspaper Syndicate, all of the art and
continuity for the newspaper strip entitled "Superman" call
for by said agreement.

You agree that you will not hereafter at any place in the
United States or in any foreign country, furnish to any oth
person, firm, corporation, newspaper or magazines any art o
copy for any comics to be used in any strip or comic or new
paper or magazine containing the above titles or the charac
ters or continuity thereof or in any wise similar thereto,
but you shall furnish such material exclusively to us for t
duration of this agreement as such matter may be required b
us or as designated by us in writing.

In the event you shall do or make any other art work or con
tinuity suitable for use as comics or comic strips, you sha
first give us the right to first refusal thereof by submit-
ting said copy and continuity ideas to us.  We shall have t
right to exercise that option for six weeks after submissio
to us at a price no greater than offered to you by any othe
party.

We agree to pay you on publication, for any and all of said
comics published by us and supplied by you, the following
rates:

| | |
|---|---|
| Superman | $10.00 per page |
| Slam Bradley | $10.00 per page |
| Spy | $10.00 per page |
| Radio Squad | $ 9.00 per page |
| Federal Men | $ 9.00 per page |

You agree that the number of panels to each monthly feature
shall be approximately equal to the panels contained in pre-
vious publications of the comics.

(1)

000000224

ER-585

We further agree to pay you for the McClure Newspaper Syndi-
cate strips which you may hereafter furnish pursuant to the
abovementioned contract with McClure, on the following basis

When we receive payment from McClure
on the 40% basis mentioned in the con-
tract, we shall retain 7½% and pay you
32½% of the "net proceeds" as defined
in the McClure contract.
When we receive payment from McClure
on the 45% basis mentioned in the con-
tract, we shall retain 9% and pay you
36% of the "net proceeds" as defined
in the McClure contract.
When we receive payment from McClure
on the 50% basis mentioned in the con-
tract, we shall retain 10% and pay you
40% of the "net proceeds" as defined
in the McClure contract.

All material, art and copy shall be owned by us and at our
option, copyrighted or registered in our name or in the
names of the parties designated by us.

This agreement shall be for a period of five years from the
date hereof and shall thereafter be continued for an addi-
tional five years at our option. However, if at any time
the art and continuity of any feature shall not be up to th
standard required for the magazines, we at our option, then
may terminate this agreement as to and substitute other ar-
tists for the unsatisfactory feature or features but not
otherwise.

According to the above mentioned McClure contract, we shall
have the right to use the material furnished for syndicate
purposes without charge by McClure. However, in the event
we shall use any of said syndicate matter in our magazines,
you shall be compensated at the above mentioned page rate
less the percentage which McClure receives for said syndica-
tion. When using such syndicate matter we shall of course
not be required to use original copy as called for by this
contract.

At any time, if we believe any feature is economically un-
successful, we may discontinue the further publishing of
said feature.

We shall have the right to reasonably supervise the editoria
matter of all features.

Your signature to this agreement is one of the inducements :
us to execute the above mentioned McClure contract and we
agree to use our best efforts to continue the publishing of
magazines containing the above mentioned features.

                          Very truly yours,

                          DETECTIVE COMICS, INC.

                          BY:   ___Harry Donenfeld___
                                      Pres.

Jerome Siegel _____


Joseph Shuster _____



                          (2)

000000225

**ER-586**

EXHIBIT "A"

Sept. 22. 1938

Detective Comics, Inc.
480 Lexington Avenue
New York City

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberley Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by each of you, will serve as our
agreement.

Hereafter, Detective Comics, Inc., is called "Detective" and
Messers. Siegel and Shuster are called the "Artists".

In line with our discussions, we are prepared to go ahead
with newspaper syndication of a daily strip, six days a week
entitled "Superman" and owned by Detective Comics, on the
following terms and conditions:

We are to have an eight month option from Detective, dating
from October 1, 1938, to enable us to make a preliminary
survey of the newspaper field in relation to this specific
feature, which survey we agree to make at our own expense
and to furnish Detective with a report thereof.

If this preliminary canvass indicates the possibility for
successful newspaper syndication of this feature, as we an-
ticipate it will, and providing we give Detective notice in
writing by registered mail before June 1, 1939, of our ex-
ercise of said option, Detective agrees to permit the Artis
to supply "Superman" strip exclusively to us for syndication
in newspapers in the United States, Canda, and all other par
of the world, for a minimum period of five years from June 1
1939, in consideration of the payment to Detective of forty
(40%) per cent of the net proceeds from such syndication dur-
ing the first year, forty-five (45%) per cent during the
second year and fifty (50%) per cent thereafter.  "Net proce
is hereby defined to mean gross receipts for the feature fro
newspapers using the feature, less cost of cuts, mats, and
proofs.  All other expenses, including billing, promotion
and selling expenses, are ours and are not deductible in ar-
riving at net proceeds.

If during the third year and continuing to the end of the
above mentioned initial five year period, the weekly net
share of Detective from the proceeds reaches $100. or more,
per week, we shall have the option to renew this agreement
for a further period of five years beginning June 1, 1944,
on the same terms as procided above, for the final three
years of the 1939-1944 period, providing, however, we give
Detective notice in writing by registered mail before Februa
1, 1943, of our renewal.

We are to have reasonable editorial supervision of the fea-
ture which the Artists agree to maintain at the standard
shown in the sample submitted.  In turn, we agree to our
best efforts to sell this feature to as large a list of news-
papers as possible, and at the best prices obrainable in eac
case.

Detective and Artists agree to cooperate with us in our sale
efforts by supply on request, any information and assis-

(1)

000000226

ER-587

tance, without cost to you however, that we may require for
promotion purposes.

Statements will be made to Detective and a copy to Artists
tween the 25th and 30th of each month, covering sales of th
month previous and will be accompanied by check for its abo
mentioned share of the amount collected to the date of the
statement.  Detective and the Artists or their authorized r
presentatives may inspect our books of account in reference
to the feature, at any reasonable time.

The material contained in the feature which we syndicate wil
be copyrighted in our name, but copyright reverts to Detec:i
at the termination of this contract.  The title "Superman"
shall always remain the property of Detective and the featu
may be used by Detective for any other purpose except daily
or weekly newspaper publication. Our agreement covers news-
paper right only.  Radio, motion picture, silent and talkie
book and all other rights are retained and owned by Detecti

The Artists agree to supply the feature required for the ne
paper syndicate publications to us, on an advanced schedule
of at least six weeks, or such other reasonable period as m
be determined by us to insure amply time for distribution
prior to release dates.  In the event the Artists shall at
time fail to furnish the feature, and so breach this agree-
ment, in addition to any other remedies Detective may appo1
other artists to do the feature and strip.

It is agreed that should it be determined at any time durin;
the life of this contract, that it would be advisable to re
lease a Sunday feature of "Superman" strip, we are to have
exclusive rights to such a Sunday feature, on the same terms
as outlined herein for the daily strip.

The Artists are to be paid for their work solely by Detecti\

Detective agrees that during the life of this contract, be-
fore it shall submit any other comics for newspaper syndicate
purposes, it shall offer said comics to us for first refusal
for a six week period.

We agree to provide Detective with all the original drawing
of the "Superman" strip, so that said drawings may be used
by Detective in the publication "Action Comics" six months
after newspaper release, without charge or for any substi-
tuted magazines.

This agreement does not prohibit Detective from selling to
foreign country newspapers rights to use any material which
may appear in any magazines published by Detective containir
and including "Superman".

It is understood that in the event of an outbreak of a
European war, in which Great Britain should become involved
during the period of October 1, 1938 to February 1, 1939, tr
McClure Newspaper Syndicate has the right to cancel this
agreement.

                          Very truly yours,

                          THE MC CLURE NEWSPAPER SYNDICATE

                          By:    Richard H. Waldo, Pres.

DETECTIVE COMICS, INC.

By:    HARRY DONENFELD

JEROME Siegel

JOseph Shuster              (2)

000000227
ER-588

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

EXHIBIT "B"

December 19, 1939

Jerome Siegel and Joseph Shuster,
New York, N.Y.

Dear Sirs:

We have discussed with you certain changes of procedure and compensation which we feel it advisable to set forth in written modification so as to bring our agreement of September 22, 1938 down to date.

In the 1938 agreement we had agreed to pay both of you for the art work and continuity for the comic strips entitled "SUPERMAN", "SLAM BRADLEY", "SPY", "RADIO SQUAD" and "FEDERAL MEN" at certain rates per page. Since that time, however, while both of you have continued to furnish art work and continuity for "SUPERMAN", only Mr. Siegel has continued to furnish the continuity for the remaining comic strips. Mr. Shuster no longer furnishes the art work for "SLAM BRADLEY", "SPY", "RADIO SQUAD" and "FEDERAL MEN". Also, we have discussed with both of you a change of your page rate compensation with respect to "SUPERMAN".

Effective therefore, upon the signing of this modification, we agree to pay to both of you for all art work and continuity for "SUPERMAN" at the rate of $20. per page, and both of you agree that you will at such rate continue to furnish all art and continuity work for "SUPERMAN" to us in accordance with the agreement of September 22, 1938. As to the remaining comic strips, we shall be free to make other arrangements with Mr. Siegel personally as to the furnishing of continuity for them and also make other arrangements for the furnishing of art work for them in view of the fact that Mr. Shuster no longer furnishes the same.

We have also informed you of our activities in promoting the commercial exploitation of "SUPERMAN" in other fields in addition to magazine publication and newspaper syndication. Such other fields include radio, motion pictures, the toy and novelty field and others and we have indicated to you our willingness that both of you receive some portion of the proceeds which may be realized from these additional activities. We, therefore, hereby agree to pay to you 5% of all net proceeds which may be derived by us from all commercial exploitation of "SUPERMAN" outside of magazine and book publication and newspaper syndication. Such net proceeds shall be arrived at by deducting from the gross proceeds from any such additional sources (except magazine and book publication and newspaper syndication) all expenses incurred by us in the course of such promotion and exploitation.

By your signature below, you hereby confirm the following arrangements and you hereby further confirm the following

1. That we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled "SUPERMAN" and the other comic strips entitled as above mentioned, and to all rights of reproduction of all said comic strips and the title and characters contained therein and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other forms of reproduction. We have all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction either in our own name or others

(1)

000000228

ER-589

at our exclusive option.

2. That you have not done or permitted any act or thing which might impair any of our aforesaid rights ith respect to any of the aforesaid comic strips and that so far as you are concerned our full and complete ownership thereof and c all reproduction rights in connection therewith are vested in us free and clear of the rights of any other persons or parties whatsoever.

3. That we have the unrestricted right to adapt, arrang change, transpose, add to and otherwise deal with any or al said comic strips and the titles, characters and continuity thereof as we in our sole discretion may deem it necessary or advisable to do so.

4. That we have the unrestricted right to grant to othe upon such bases as we in our sole discretion shall determin any of the foregoing rights of reproduction with respect to any of the aforesaid comic strips and the titles, character and continuity thereof.

You hereby agree to execute any and all further instru- ments which may at any time be necessary or advisable in connection with any of the foregoing rights and property no vested in us and for that purpose and for all other purpose hereunder you hereby designate us and our successors and as signs your agents and attorneys in fact irrevocably.

This modification shall become effective immediately upon your signing the same below and continue in full force and effect throughout the life of the agreement dated Sep- tember 22, 1938 as the same has been modified hereby.  Both you and ourselves hereby ratify and confirm the foregoing agreement dated September 22, 1938 as the same has been mo- dified by this letter.

Very truly yours,

DETECTIVE COMICS, INC.

By:   Harry Donenfeld

Pres.

APPROVED AND ACCEPTED:

Jerome Siegel

Joseph Shuster

000000229

EXHIBIT "C"

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

August 30, 1943

Pvt. Jerome Siegel
39th Special Service Company
Fort George G. Meade, Md.

Dear Mr. Siegel:

As provided in our agreement of September 22,
1938, wherein we agree to employ and retain you for the pur
poses mentioned therein, we hereby advise you that we have
decided to and do hereby exercise our option mentioned in
said agreement to continue said agreement for an additional
five year period on all the terms and conditions mentioned
therein.

Very truly yours,

DETECTIVE COMICS, INC.

By:   J. S. Liebowitz

(Treasurer)

JSL*DS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT "D"

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

September 8, 1943
One day closer to Victory.

Mr. Joseph Shuster
98-120 Queens Boulevard
Forest Hills, N.Y.

Dear Mr. Shuster:

As provided in our agreement of September 22,
1938, wherein we agree to employ and retain you for the pur-
poses mentioned therein, we hereby advise you that we have
decided to and do hereby exercise our option mentioned in
said agreement to continue said agreement for an additional
five year period on all the terms and conditions mentioned
therein.

Very truly yours

DETECTIVE COMICS, INC.

By:   J. S. Liebowitz

(Treasurer)

JSL*DS

000000230

EXHIBIT "E"

A G R E E M E N T

This Agreement, made at Cleveland, Ohio this first day of February 1940 by and between Joseph Shuster hereinafter called the party of the first part and Wayne Boring, hereinafter called party of the second part.

WITNESSETH, for and in consideration of the mutual promises and mutual terms contained herein, the parti hereto do agree as follows:

1. Party of the first part agrees to employ party of the second part, and party of the second part agre to be employed by party of the first part as artist for a period of two (2) years and seven (7) months from the date of this contract. It is further understood and agreed tha said party of the first part shall and hereby does, have th option to renew this agreement for an additional period of five (5) years after the expiration of the two (2) year seven (7) month period and under the same terms and conditions as herein set forth. Said party of the first part shall notify said party of the second part of his intention to exercise said option and renew said contract by written notice to said party of the second part at least thirty (30 days prior to the expiration of the original term of this contract.

2. It is understood and agreed that said party of the second part shall devote all of his time to the work and business of said party of the first part; and said party of the second part, shall at all times, maintain a good sta dard of work; that during the term of this contract, or any renewal period, said party of the second part shall devote his entire time and skill to the work of the party of the first part and shall not engage in any other work of any ki or nature whatsoever without first obtaining the written co sent of said party of the first part.

3. It is understood and agreed that said party o the second part shall not in any way publicise or take com-

000000231

Exhibit B     82
47

ER-592

mercial advantage of his employment or connection with the comic strip work of said party of the first part and agrees that upon leaving the employment of the party of the first part, he will not engage in the copying, composing, editing or similar work in any comic strip, which is based on a theme or motive similar to "Superman" or any other comic strip produced by said party of the first part.

4. It is understood and agreed that all of the work as artist and assistant to said party of the first part shall be performed at the office of said party of the first part now located at 10609 Euclid Avenue or any other place designated by said party of the first part.

5. For and in consideration of the services rendered by said party of the second part, to said party of the first part, it is understood and agreed that the salary of said party of the second part shall be as follows: Fifty Dollars ($50.00) per week as long as the percentage of the Syndicate work paid to said party of the first part is less than Two Hundred Fifty Dollars ($250.00) per week. That when said percentage received by said party of the first part is Two Hundred Fifty Dollars ($250.00) per week, party of the second part shall receive Ninety Dollars ($90.00) per week; when said percentage reaches Three Hundred Fifty Dollars ($350.00) per week, then party of the second part shall receive One Hundred Ten Dollars ($110.00) per week; when said percentage reaches Four Hundred Fifty Dollars ($450.00) per week, then party of the second part shall receive One Hundred Thirty Dollars ($130.00) per week; when said percentage reaches Five Hundred Dollars ($500.00) per week, then party of the second part shall receive One Hundred Forty Dollars ($140.00) per week.

It is understood and agreed that the above salary arrangement has reference only to the amount received by party of the first part as his share or percentage of th

Syndicate work only; that it refers to original or first ap
pearances only as distinguished from reprints and that it
does not include, and is not intended to include, income fr
any other sources.

6. It is further understood and agreed that
party of the second part, as artist, shall produce not less
than six (6) daily and one (1) Sunday comic strip each week
and in addition, thereto, he shall produce two (2) thirteen
(13) page "Superman" magazine releases per month in time to
meet deadlines. It is understood and agreed that in addi-
tion to the salary provided in Section 5 of this Agreement,
party of the second part shall receive One Hundred Dollars
($100.00) per month for said magazine releases providing tw
(2) releases are produced each month and in the event only
one (1) release is produced in any month, then in that even
said party of the second part shall receive Forty Dollars
($40.00) for said one (1) release.

7. It is understood and agreed that upon the
violation of any of the terms of this agreement, or if at
any time during the term of this agreement, or any renewal
period, the work of said party of the second part shall, in
the judgment of said party of the first part, and Jerome
Siegel, continuity writer for said comic strip, "Superman",
become below the good standard of work necessary and requir
in the production of said comic strip, then in that event,
said party of the first part may terminate this agreement
upon thirty (30) days written notice to said party of the
second part. In the event of such termination, this contra
or any renewal thereof, shall become null and void and of no
effect whatsoever.

IN WITNESS WHEREOF, the parties hereto sign the
names the day and year first above written.

Witnesses:

Leo N. Ascherman
Jerome Siegel

JOE SHUSTER
Party of the first part

WAYNE BORING
Party of the second part

STATE OF NEW YORK        )
COUNTY OF WESTCHESTER     )    SS.

      JOSEPH SHUSTER, being duly sworn, deposes and says that he is one of the plaintiffs in the within action; that he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters he believe it to be true.

                                   JOSEPH SHUSTER

Sworn to before me this 5th day of March, 1947.

MORTON N. WEKSTEIN
Notary Public, State of New York
I Reside in Westchester County
My Commission Expires March 30, 1948

000000234

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated: March 5, 2013   TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams