APPELLATE CASE NO. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

————————————

## APPELLANTS' EXCERPTS OF RECORD (VOL. IV OF VII)
————————————

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

————————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Defendants-Appellants*

## INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
| | | *Exhibit B – July 12, 2012 Kline-Toberoff e-mail* | II | 56 |
| | | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
| | | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
| | | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
| | | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
| | | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
| | | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
| | | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
| | | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
| | | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
| | | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
| | | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
| | | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

iv

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy* | IV | 701 |
| | | *Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz* | IV | 703 |
| | | *Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy* | IV | 704 |
| | | *Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy* | IV | 705 |
| | | *Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy* | IV | 706 |
| | | *Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy* | IV | 708 |
| | | *Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy* | IV | 709 |
| | | *Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson.* | IV | 710 |
| | | *Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy* | IV | 719 |
| | | *Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy* | IV | 720 |
| | | *Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc.* | IV | 721 |
| | | *Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy* | IV | 753 |
| | | *Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy* | IV | 754 |
| | | *Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy* | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy* | IV | 759 |
| | | *Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc.* | IV | 760 |
| | | *Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles* | IV | 855 |
| | | *Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles* | IV | 869 |
| | | *Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary)* | IV | 874 |
| | | *Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation* | IV | 878 |
| | | *Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary)* | IV | 894 |
| | | *Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary* | V | 895 |
| | | *Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | V | 902 |
| | | *Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary* | V | 907 |
| | | *Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen* | V | 929 |
| | | *Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff* | V | 930 |
| | | *Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011* | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

1099-1947

- - - - - - - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

                       Plaintiffs,

           -against-

NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT
NEWS CO., INC., THE MC CLURE NEWSPAPER SYNDICATE,
HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

          The above-entitled action having been duly referred
to the undersigned, pursuant to stipulation of the parties
herein, as Referee to hear, try and determine with findings
of fact and conclusions of law, and the said matter having
duly come on to be heard before the undersigned, and the
plaintiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN,ESQS.,
their attorneys (MORTON WEKSTEIN, ESQ.,of counsel, and the de-
fendants NATIONAL COMICS PUBLICATIONS,INC., INDEPENDENT NEWS
CO.,INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.SAMPLINER,
having appeared by WEIL, GOTSHAL & MANGES, ESQS.,their attor-
neys (HORACE S. MANGES,ESQ., EDWARD C.WALLACE,ESQ., and
ABRAHAM I. MENIN,ESQ., of counsel), and the defendant THE
MC CLURE NEWSPAPER SYNDICATE, having appeared by JOHN L.
MC CORMICK,ESQ., its attorney (JAMES L.BROWN,ESQ., of counsel),
and the defendant WAYNE BORING having appeared by his attorney
SIDNEY H. REICH,ESQ., and the Referee's oath having first been
taken, and the proofs and allegations of the parties having
been heard, and due deliberation having been had, I do find
and decide as follows, stating my findings of fact and con-
clusions of law:

**Exhibit C**
51

**15
ER-596**

## FINDINGS OF FACT

1. Defendants NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC. and THE MC CLURE NEWSPAPER SYNDICATE
are corporations duly organized and existing under the laws
of the State of New York; DETECTIVE COMICS, INC. was a corpo-
ration duly organized and existing under the laws of the
State of New York, and was one of the constituent corporations
consolidated on September 30, 1946 into defendant NATIONAL
COMICS PUBLICATIONS, INC.

2. Defendant NATIONAL COMICS PUBLICATIONS, INC.,
at all times hereinafter mentioned, was and still is a domes-
tic corporation duly organized and existing under and by
virtue of the laws of the State of New York.

3. Defendant INDEPENDENT NEWS CO., INC., at all
times hereinafter mentioned, was and still is a domestic
corporation, duly organized and existing under and by virtue
of the laws of the State of New York.

4. Defendant THE MC CLURE NEWSPAPER SYNDICATE,
at all times hereinafter mentioned, was and still is a domes-
tic corporation, duly organized and existing under and by
virtue of the laws of the State of New York.

5. Previous to September 30, 1946, DETECTIVE
COMICS, INC. was a corporation duly organized and existing
under and by virtue of the laws of the State of New York.

6. Previous to October 1, 1946, SUPERMAN, INC.
was a corporation duly organized and existing under and by
virtue of the laws of the State of New York, and the said
corporation was organized by DETECTIVE COMICS, INC. and the
defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER, and at all times hereinafter mentioned the offic-
ers and directors of SUPERMAN, INC. were the same persons
who were the officers and directors of DETECTIVE COMICS, INC.

**Exhibit C**
52

and all facts known to DETECTIVE COMICS, INC. were known to
SUPERMAN, INC., and at all times hereinafter mentioned
SUPERMAN, INC. was completely controlled by DETECTIVE COMICS,
INC., and the defendants HARRY DONENFELD, JACOB LIEBOWITZ
and PAUL H. SAMPLINER.

7. On or about the 30th day of September, 1946,
Detective Comics, Inc., All American Comics, Inc., Superman,
Inc., Jolaine Publications, Inc., Wonderwoman Publishing Co.,
Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc.,
and Trafalgar Printing Co., Inc. consolidated into a single
corporation pursuant to the provisions of Sections 85 to 90
of the Stock Corporation Law of the State of New York, the
same being the defendant NATIONAL COMICS PUBLICATIONS, INC.

8. Plaintiffs are the originators and authors
of the cartoon character SUPERMAN and of the title SUPERMAN
and first created cartoon material in which the said character
and title first appeared in 1934 and continued to create such
cartoon material until the institution of the present action,
and the plaintiffs are the authors and originators of
other cartoon characters which have appeared in the cartoon
strip entitled SUPERMAN, chief among which are SUPERMAN,
also known as Clark Kent, Lois Lane and Perry White, and the
plaintiffs are known to the public as the authors and
creators of the cartoon material in which the character
SUPERMAN appears and of the character SUPERMAN and of other
cartoon characters which appear and have appeared in cartoons
entitled SUPERMAN.

9. Some time in 1933 plaintiff SIEGEL conceived
the idea of a cartoon strip, the feature character of which

Exhibit C
53
17
ER-598

would be a man of superhuman strength and power, who would perform feats of great magnitude for the public good.

10. Plaintiff SIEGEL, together with plaintiff SHUSTER, an artist, prepared a comic strip containing separate panels embodying SIEGEL'S idea which was submitted to numerous publishers and newspaper syndicates, but was uniformly rejected.

11. After the joint creation of the SUPERMAN strip panels in 1933, plaintiffs collaborated in creating other cartoon strips, some of which were purchased by Nicholson Publishing Company for resale to DETECTIVE COMICS, INC.

12. In the latter part of 1937, Nicholson Publishing Company went out of business and DETECTIVE COMICS, INC. acquired some of its magazine properties.

13. On December 4, 1937, defendant LIEBOWITZ, representing DETECTIVE COMICS, INC., met plaintiff SIEGEL in New York City.

14. At the said conference defendant LIEBOWITZ proposed to plaintiff SIEGEL that the $9. page rate which Nicholson Publishing Company had been paying plaintiffs for certain comic strips, be increased to $10.

15. At the said conference DETECTIVE COMICS, INC. entered into a written contract of employment (Def. Ex. C), with plaintiffs with reference to two comic features known as "Slam Bradley" and "The Spy", the material for which

Exhibit C
54

18

ER-599

plaintiffs had been furnishing Nicholson Publishing Company; said contract provided in part as follows:

> "2.  The Employees agree to give their exclusive services as artists in producing features known as "Slam Bradley" and "The Spy" during said period of employment, to the Employer, and agrees that all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creator thereof, the Employee acting entirely as the Employer's employee.

> "3.  In the event that the Employee leaves the service of the Employer prior to the termination date set forth in this Agreement or subsequent thereto, and for any reason whatsoever, the Employees agree that they will not, directly or indirectly, and through any means whatsoever, use, duplicate, simulate or bring into being any of the products or work or creations of characters or plots used, made or created by him while in the employ of the Employer.

> "4.  It is understood that any new and additional features which the Employees produce for use in a comic magazine are to be first submitted to the Employer, who reserves the right to accept or reject same within a period of Sixty days."

16.  At the said conference defendant LIEBOWITZ and plaintiff SIEGEL discussed the possibility of DETECTIVE COMICS, INC. publishing a new magazine and plaintiffs furnishing new comic strips for such magazine; defendant LIEBOWITZ told plaintiff SIEGEL that if DETECTIVE COMICS, INC. published such a magazine and accepted and published any comic features created by plaintiffs, they would be paid at the increased rate of $10. per page, but that DETECTIVE COMICS, INC. would have to own all rights to such comic features.

17.  Early in 1938, DETECTIVE COMICS, INC. decided to publish a new comic magazine to be called "Action Comics".

18.  Thereupon, DETECTIVE COMICS, INC. inquired of defendant THE MC CLURE NEWSPAPER SYNDICATE as to whether the

Exhibit C
55
19
ER-600

latter had any available material suitable for the proposed magazine "Action Comics".

19.  Defendant THE MC CLURE NEWSPAPER SYNDICATE, then submitted to DETECTIVE COMICS, INC. the SUPERMAN comic strip created by plaintiffs, which strip consisted of a few panels suitable for newspaper syndication (Pl. Ex. 2).

20.  The said SUPERMAN comic strip material had been rejected by defendant THE MC CLURE NEWSPAPER SYNDICATE, but had remained in its custody for a long time.

21.  DETECTIVE COMICS, INC. examined the said SUPERMAN material and returned it to plaintiffs for revision and expansion into a full length thirteen page comic strip release suitable for magazine publication.

22.  Plaintiffs revised and expanded the said SUPERMAN material in compliance with the said request of DETECTIVE COMICS, INC. and on or about February 22, 1938 resubmitted such revised and expanded material to DETECTIVE COMICS, INC.  Said material, consisting of ninety-nine separate panels, constituted the formula for the continuing SUPERMAN series to come.  It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance.

23. Previous to March 1, 1938, there was due and owing by DETECTIVE COMICS, INC. to the plaintiffs the sum of $130.00, and the $130.00 recited as consideration in Plaintiffs' Exhibit 11 is the same $130.00 which was previously due and owing by DETECTIVE COMICS, INC. to the plaintiffs on or about February 22, 1938.

24. On March 1, 1938, prior to the printing of the first issue of "Action Comics", DETECTIVE COMICS, INC. wrote to plaintiff SIEGEL at Cleveland, Ohio, where he and plaintiff SHUSTER both resided, enclosing a check in the sum of $412. which included $130. in payment of the first thirteen page SUPERMAN release at the agreed rate of $10. per page, and a written instrument for plaintiffs' signatures (Pl. Ex. 11).

25. Said instrument, dated March 1, 1938, read as follows:

"Detective Comics, Inc.
480 Lexington Avenue
New York, N.Y.

"I, the undersigned, am an artist or author and have performed work for strip entitled "SUPERMAN".

"In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer such work and strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever and to be your exclusive property and I agree not to employ said characters or said story in any other strips or sell any like strip or story containing the same characters by their names contained therein or under any other names at any time hereafter to any other person, firm or corporation, or permit the use thereof by said other parties without obtaining your written consent therefor. The intent hereof is to give you exclusive right to use and acknowledge

that you own said characters or story and the use thereof, exclusively.  I have received the above sum of money.

Sgd.  _Joe Shuster_

Sgd.  Jerome Siegel

Accepted:

DETECTIVE COMICS, INC.

By  Sgd.  J.S. Liebowitz"

26.  The instrument of March 1, 1938 (Pl. Ex. 11) was duly received by mail at Cleveland, Ohio, by plaintiffs, who thereupon executed it, and on March 3, 1938 returned it by mail to DETECTIVE COMICS, INC.

27.  On or about the 3rd day of March, 1938, the plaintiffs executed an instrument dated March 1, 1938, which granted to DETECTIVE COMICS, INC. certain rights with respect to the comic strip SUPERMAN, which instrument has been received in evidence and marked Plaintiffs' Exhibit 11.

28.  The instrument of March 1, 1938 (Pl. Ex. 11) was executed by plaintiffs by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE COMICS, INC.

29.  The instrument of March 1, 1938 (Pl. Ex. 11) represented the exercise by DETECTIVE COMICS, INC. of the option granted to it by the said agreement of December 4, 1937 (Def. Ex. C).

30.  Upon receipt by DETECTIVE COMICS, INC. of the instrument of March 1, 1938 (Pl. Ex. 11), it published the first SUPERMAN release in the June, 1938 issue of "Action Comics", which magazine was issued for sale on April 18, 1938.

**Exhibit C**
58

22

**ER-603**

31.   The first thirteen pages of SUPERMAN material were published on April 18, 1938, in the June, 1938 issue of "Action Comics" magazine.

32.   The first thirteen pages of SUPERMAN material mentioned in paragraph 31 hereof were in existence and were in the possession of DETECTIVE COMICS, INC. before the execution of the instrument of March 1, 1938, Plaintiffs' Exhibit 11.

33.   The said first thirteen pages of SUPERMAN material mentioned in paragraphs 31 and 32 hereof and the panels submitted in Plaintiffs' Exhibit 2 were the only SUPERMAN material which had been submitted by the plaintiffs to DETECTIVE COMICS, INC. and which had come into the possession of DETECTIVE COMICS, INC. previous to the execution and delivery of the instrument of March 1, 1938, Plaintiffs' Exhibit 11.

34.   Plaintiffs' desire to see SUPERMAN in print and the realization of that desire by DETECTIVE COMICS, INC.'s acceptance of the SUPERMAN strip for publication and actually publishing it, were vital elements of consideration supporting the instrument of March 1, 1938 (Pl. Ex. 11).

35.   Between March, 1938 and March, 1947 DETECTIVE COMICS, INC. expended large sums of money and devoted much time and effort in the promotion and popular- ization of the comic strip SUPERMAN and the names and characters appearing therein.

36.   The said June, 1938 issue of "Action Comics" was followed by further issues published at regular intervals, each succeeding issue having a SUPERMAN comic strip prepared by plaintiffs, who continue to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10. per page.

**Exhibit C**

23

**ER-604**

37.  During September of 1938, DETECTIVE COMICS,
INC. and the defendants HARRY DONENFELD and JACOB LIEBOWITZ
made oral representations to the plaintiffs that DETECTIVE
COMICS, INC. owned SUPERMAN and had the power to discharge
the plaintiffs at any time and to cease receiving at the
hands of the plaintiffs any comic strip material depicting
SUPERMAN, and to cease publishing any such material created
by the plaintiffs and could thereafter legally continue to
produce literary and artistic material depicting SUPERMAN,
and the plaintiffs would be powerless to thereafter create
and publish any material depicting SUPERMAN and powerless
to receive any revenue from SUPERMAN.

38.  In September, 1938 DETECTIVE COMICS, INC.
represented to plaintiffs that it owned all rights to
SUPERMAN.  Said representation was believed by DETECTIVE
COMICS, INC. to be true, and was, in fact, true.

39.  On September 22, 1938, two agreements were
simultaneously executed, one of which was between DETECTIVE
COMICS, INC. and plaintiffs, and the other was between
DETECTIVE COMICS, INC., plaintiffs and THE MC CLURE NEWSPAPER
SYNDICATE.

40.  Both of said agreements were forwarded by mail
by DETECTIVE COMICS, INC. to plaintiff SIEGEL at Cleveland,
Ohio, for signature by both plaintiffs; they were duly exe-
cuted by both plaintiffs and returned by plaintiff SIEGEL
by mail to DETECTIVE COMICS, INC. on September 30, 1938.  In
all negotiations leading to the execution of said agreements
of September 22, 1938, plaintiff SIEGEL acted for himself
and for plaintiff SHUSTER and was duly authorized so to do
by plaintiff SHUSTER.

24

Exhibit C
60

ER-605

41. On or about September 28, 1938, DETECTIVE COMICS, INC. mailed to the plaintiffs for the purpose of execution by the plaintiffs the documents herein received in evidence and marked Plaintiffs' Exhibits 14 and 15, and enclosed in the same wrapper was the letter herein received in evidence and marked Plaintiffs' Exhibit 12.

42. In the said letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. made in writing to the plaintiffs the representation that DETECTIVE COMICS, INC. owned SUPERMAN and that the said DETECTIVE COMICS, INC. had the right to any time replace the plaintiffs in the creation of material depicting SUPERMAN and to continue to publish such material without receiving the same at the hands of the plaintiffs, and that the plaintiffs would be "the loser in the entire transaction".

43. In the same letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. and the defendant JACOB LIEBOWITZ represented that in a certain popularity poll held immediately before September 28, 1938, 30% of the returns from the readers designated SUPERMAN as the favorite comic strip feature.

44. The agreement dated September 22, 1938 (Pl. Ex. 14), between plaintiffs and DETECTIVE COMICS, INC. provided for plaintiffs' employment for five years from September 22, 1938 with an option in favor of DETECTIVE COMICS, INC. for an additional five years.

45. By said agreement, plaintiffs expressly confirmed that DETECTIVE COMICS, INC. was the exclusive owner

25

Exhibit C
61

ER-606

of the comic strip known as SUPERMAN and of the right to publish said comic strip and the characters contained therein and the continuity thereof, and further provided that plaintiffs would not,

> "hereafter at any place in the United States or in any foreign country, furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing the above titles or the characters or continuity thereof or in any wise similar thereto, but you shall furnish such material exclusively to us for the duration of this agreement as such matter may be required by us or as designated by us in writing."

46. By the terms of said agreement, DETECTIVE COMICS, INC. agreed to pay plaintiffs for SUPERMAN magazine strips (referred to by the parties as "releases") at the rate of $10. per page and to pay them from 65% to 80% of any income received by DETECTIVE COMICS, INC. from defendant THE MC CLURE NEWSPAPER SYNDICATE, under the newspaper syndication agreement of the same date.

47. By the terms of said newspaper syndication agreement (Pl. Ex. 15), defendant THE MC CLURE NEWSPAPER SYNDICATE, was given an eight months option dating from October 1, 1938 for newspaper syndication of SUPERMAN.

48. Defendant THE MC CLURE NEWSPAPER SYNDICATE availed itself of said option.

49. By the terms of said newspaper syndication agreement, defendant THE MC CLURE NEWSPAPER SYNDICATE agreed to pay DETECTIVE COMICS, INC. 40% to 50% of the net proceeds from such syndication; this agreement was for a period of five years from June 1, 1939 with the right in defendant THE MC CLURE NEWSPAPER SYNDICATE to renew for a further period of five years.

26

Exhibit C
62

ER-607

50. Defendants HARRY DONENFELD, JACOB LEIBOWITZ
and PAUL H. SAMPLINER were the officers and directors of
DETECTIVE COMICS, INC. until October 1, 1946, and have been
since October 1, 1946, and are as of the date of the trial
herein, the officers and directors of NATIONAL COMICS
PUBLICATIONS, INC. and at all times mentioned in these find-
ings were and are the officers and directors of the defendant
INDEPENDENT NEWS CO., INC.

51. Defendants HARRY DONENFELD, JACOB LIEBOWITZ,
PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. at all times
mentioned in these findings knew the terms of the plaintiffs'
contracts with DETECTIVE COMICS, INC., Plaintiffs' Exhibit
14 and 15.

52. On December 19, 1939, a modification agreement
(Pl. Ex. 22), was entered into between plaintiffs and
DETECTIVE COMICS, INC. by which plaintiffs' compensation for
SUPERMAN magazine releases was increased to $20. per page,
and in addition DETECTIVE COMICS, INC. agreed to pay to
plaintiffs 5% of the net proceeds to be derived from com-
mercial exploitation of SUPERMAN other than from magazine
and book publication and newspaper syndication.

53. On or about the 19th day of December, 1939,
the plaintiffs and the defendant DETECTIVE COMICS, INC.
entered into an agreement to modify the contract dated Sep-
tember 22, 1938, and the said agreement to modify the said
contract was received in evidence and marked Plaintiffs'
Exhibit 22.

ER-608

54.  During December of 1939 and immediately pre-
vious to the execution of Plaintiffs' Exhibit 22, DETECTIVE
COMICS, INC. and the defendant JACOB LIEBOWITZ represented
to the plaintiffs that DETECTIVE COMICS, INC. owned the
character SUPERMAN and was therefore under no obligation to
pay the plaintiffs anything on account of commercial licensing.

55.  Commencing with the July, 1940 magazine
releases, DETECTIVE COMICS, INC. increased plaintiff's
compensation for SUPERMAN magazine releases to $35. per page,
which, for the usual thirteen page release, amounted to
$455. per release.

56.  In February, 1942, DETECTIVE COMICS, INC.
increased plaintiffs' compensation for SUPERMAN magazine
releases to $500. per release.

57.  In August, 1942, DETECTIVE COMICS, INC. in-
creased plaintiffs' compensation for SUPERMAN magazine
releases to $600. per release.

58.  In March, 1943, by reason of the fact that
plaintiffs were not always able to fulfill their commitments
for production of the art work and continuity for both
magazine use and newspaper syndication, DETECTIVE COMICS,INC.
agreed with plaintiff SIEGEL to pay him the sum of $200. per
release for each SUPERMAN magazine release for which he did
not furnish the continuity and agreed with plaintiff SHUSTER
to pay him the sum of $150. per release for each SUPERMAN
magazine release for which he did not furnish the art work.

28

ER-609

59.  In June, 1943, DETECTIVE COMICS, INC. increased
plaintiffs' compensation for SUPERMAN magazine releases to
$1,000. per release.

60.  In or about June, 1943, plaintiff SHUSTER
commenced to submit his art work for SUPERMAN magazine
releases in pencil instead of in ink as he had theretofore
done.

61.  The cost of having said releases inked was
$180.

62.  Plaintiff SHUSTER was paid for a time $500.
less the sum of $180., or the sum of $320., for each
SUPERMAN magazine release submitted in pencil.

63.  In July, 1943, plaintiff SIEGEL ceased to
submit any continuity to DETECTIVE COMICS, INC. by reason
of his induction into the Army of the United States.

64.  In December, 1944, DETECTIVE COMICS, INC.
increased the compensation of plaintiff SHUSTER for each
magazine release of SUPERMAN for which he did not furnish
the art work to the sum of $200.

65.  In March, 1946, DETECTIVE COMICS, INC.
increased the compensation of plaintiff SHUSTER for each
magazine release of SUPERMAN for which he furnished the art
work in pencil to $380.

66.  On December 12, 1946, defendant NATIONAL
COMICS PUBLICATIONS, INC. increased the compensation of
plaintiff SHUSTER for each magazine release of SUPERMAN
for which he furnished the art work in pencil to $500.

29

Exhibit C
65

ER-610

67.   Commencing in 1946, DETECTIVE COMICS, INC. turned over to plaintiffs all of the income received by it from THE MC CLURE NEWSPAPER SYNDICATE from newspaper syndication of SUPERMAN.

68.   In connection with outside commercial exploitation of SUPERMAN during the year 1941, DETECTIVE COMICS, INC. paid plaintiffs a bonus of $500. in lieu of 5% of the net income from that source.

69.   In connection with outside commercial exploitation of SUPERMAN during the year 1942, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $7,000.

70.   SUPERMAN, INC. paid to each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1942, the sum of $2,000.00

71.   In connection with outside commercial exploitation of SUPERMAN during the year 1943, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $6,000.

72.   SUPERMAN, INC. paid each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1943 the sum of $1,500.

73.   In connection with outside commercial exploitation of SUPERMAN during the year 1944, DETECTIVE COMICS, INC. and SUPERMAN, INC. on its behalf, paid plaintiffs a bonus of $6,000.

30

Exhibit C
66

ER-611

74. SUPERMAN, INC. paid to each of the plaintiffs
on account of royalties from commercial exploitation of
SUPERMAN for the year 1944 the sum of $1,500.

75. In connection with outside commercial exploi-
tation of SUPERMAN during the year 1945, DETECTIVE COMICS,
INC. paid plaintiffs a bonus of $10,000.

76. SUPERMAN, INC. paid the plaintiffs nothing
on account of royalties for commercial exploitation of
SUPERMAN, for the year 1945.

77. In connection with outside commercial exploi-
tation of SUPERMAN during the year 1946, defendant NATIONAL
COMICS PUBLICATIONS, INC. paid plaintiffs the sum of
$3,069.56.

78. During the period commencing in December,
1937 and ending March, 1947, plaintiffs received in excess of
$400,000. as compensation from DETECTIVE COMICS, INC.,
SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS,INC.

79. During the period commencing December 1,
1937 and ending March 1947, the plaintiffs received from
DETECTIVE COMICS, INC., SUPERMAN, INC. and the defendant
NATIONAL COMICS PUBLICATIONS, INC., in compensation for
magazine publication and all outside exploitation including
money received as bonuses the sum of $195,196.64.

80. During the period commencing December 19,1939
and ending March 1947, the plaintiffs received from the
defendants NATIONAL COMICS PUBLICATIONS, INC. and DETECTIVE
COMICS, INC. the sum of $205,998.21 as compensation for the
newspaper publication of SUPERMAN.

31

**Exhibit C**
67

**ER-612**

81. On or about August 30, 1943, DETECTIVE COMICS, INC. duly notified each of the plaintiffs in writing of its election to extend the term of the employment contract of September 22, 1938 for an additional five year period from September 22, 1943.

82. Defendant THE MC CLURE NEWSPAPER SYNDICATE duly notified DETECTIVE COMICS, INC. of its election to extend for five years from June 1, 1944, the term of the newspaper syndication agreement dated September 22, 1938.

83. Plaintiff SIEGEL upon his return to civilian life in January of 1946 was willing and able to supply the full complement of continuity for all of the needs of newspaper and magazine publication exactly as he had done before the war.

84. Plaintiff SHUSTER has not established that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. has rejected any SUPERMAN art work prepared by him, pursuant to any scheme to prevent him from producing SUPERMAN material.

85. Plaintiff SIEGEL has not established that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. has rejected any SUPERMAN continuity prepared by him, pursuant to any scheme to prevent him from producing SUPERMAN material.

86. Some of the continuity furnished by plaintiff SIEGEL after his return to civilian status was deemed by

DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-
TIONS, INC. to be unsuitable for publication in comic
magazines designed for juvenile readers and was rejected in
good faith.

87.  During the period commencing in June, 1943
down to January, 1946, plaintiff SHUSTER failed to furnish
art work for the SUPERMAN comic strip in sufficient quanti-
ties to meet the requirements of DETECTIVE COMICS, INC.

88.  Defendants HARRY DONENFELD, JACOB LIEBOWITZ,
PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. did not
agree with each other or with DETECTIVE COMICS, INC.,
SUPERMAN, INC. or THE MC CLURE NEWSPAPER SYNDICATE, to
injure plaintiffs by depriving them of their rights under
their employment contract, or to interfere with, hinder
or impair the performance of such contract by the said
DETECTIVE COMICS, INC., or THE MC CLURE NEWSPAPER SYNDICATE.

89.  Plaintiffs elected in their complaint to
rescind the contract dated September 22, 1938, and herein
marked in evidence as Plaintiffs' Exhibits 14 and 15, and
the various modifications thereof, and offered in their com-
plaint to release and discharge DETECTIVE COMICS, INC., THE
MC CLURE NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS
PUBLICATIONS, INC. from any further obligation to perform
the same and did offer in their complaint to return to the
said DETECTIVE COMICS, INC., the defendant THE MC CLURE
NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS PUBLICA-
TIONS, INC. all things which rightfully become theirs upon
such a rescission.

33

Exhibit C
69

ER-614

90. LOIS LANE is and at all times was a central character in the SUPERMAN comic strip and was and is depicted as a girl reporter.

91. The comic strip LOIS LANE, GIRL REPORTER, was supplied by DETECTIVE COMICS, INC. to defendant THE MC CLURE NEWSPAPER SYNDICATE, without charge for use as a filler by newspapers which carried the comic strip SUPERMAN in order to prevent said newspapers from terminating their syndication agreements with defendant THE MC CLURE NEWSPAPER SYNDICATE as to the comic strip SUPERMAN.

92. From June 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines, 120 releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not create the continuity.

93. DETECTIVE COMICS, INC. paid to plaintiff SIEGEL the sum of $200. per release for each of said 120 releases, which sum was accepted by plaintiff SIEGEL in full payment.

94. From July 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines 130 releases of the comic strip SUPERMAN for which plaintiff SHUSTER did not create the art work.

95. DETECTIVE COMICS, INC. paid to plaintiff SHUSTER the sum of $150. per release for 80 of said releases, and the sum of $200. per release for 50 of said releases, which sums were accepted by plaintiff SHUSTER in full payment.

34

Exhibit C
70

ER-615

96. On or about September 22, 1943, DETECTIVE COMICS, INC. entered into an agreement, Plaintiffs' Exhibit 56, with the defendant THE MC CLURE NEWSPAPER SYNDICATE, with reference to the comic strip entitled, LOIS LANE, GIRL REPORTER.

97. Thereafter DETECTIVE COMICS, INC. and the said defendant THE MC CLURE NEWSPAPER SYNDICATE did furnish to a newspaper "THE CLEVELAND PLAIN DEALER" various releases of the said comic strip LOIS LANE, GIRL REPORTER.

98. Affixed to the various individual releases of the said comic strip material LOIS LANE, GIRL REPORTER, which was furnished to a newspaper were the names of the plaintiffs as authors of the said individual releases of the said comic strip as published in the newspaper.

99. Plaintiffs were not the authors of the said individual releases of the comic strip LOIS LANE, GIRL REPORTER as published in the newspaper.

100. Plaintiffs did not give their permission for the use of their names as authors of the said releases of the said comic strip material LOIS LANE, GIRL REPORTER as published in the newspaper.

101. DETECTIVE COMICS, INC., the defendant THE MC CLURE NEWSPAPER SYNDICATE and the plaintiffs agreed in Plaintiffs' Exhibit 15 that "net proceeds" for the purposes of computing the plaintiffs' return from the newspaper publication of SUPERMAN should be the entire gross receipts, deducting therefrom only the cost of cuts, mats and proofs

35

Exhibit C
71
ER-616

and it was specifically provided that no other expenses what-
soever should be deductible from gross receipts in order to
arrive at "net proceeds".

102.  In the agreement, Plaintiffs' Exhibit 56,
DETECTIVE COMICS, INC. and the defendant THE MC CLURE NEWS-
PAPER SYNDICATE agreed to and with each other that the
compensation of the artists engaged by DETECTIVE COMICS, INC.
to draw the releases of LOIS LANE, GIRL REPORTER to be fur-
nished by DETECTIVE COMICS, INC. to the defendant THE MC CLURE
NEWSPAPER SYNDICATE for newspaper publication, was to be
deducted from the gross receipts of the SUPERMAN syndication
as "mechanical costs" in computing "net proceeds".

103.  Defendant THE MC CLURE NEWSPAPER SYNDICATE
and DETECTIVE COMICS, INC. did during the period of publica-
tion in said newspaper of LOIS LANE, GIRL REPORTER deduct
from the gross receipts from newspaper syndication of
SUPERMAN the compensation of the artists engaged by DETECTIVE
COMICS, INC. to draw LOIS LANE, GIRL REPORTER, in computing
"net proceeds".

104.  Plaintiffs were not parties to Plaintiffs'
Exhibit 56 and were given no notice by DETECTIVE COMICS, INC.
and the defendant THE MC CLURE NEWSPAPER SYNDICATE of the
existence thereof or the terms thereof.

105.  The existence of the provision in Plaintiffs'
Exhibit 56 for deducting the compensation of the artists en-
gaged by DETECTIVE COMICS, INC. to draw LOIS LANE, GIRL
REPORTER from gross receipts from publication of SUPERMAN

36

Exhibit C
72

ER-617

in newspapers in computing net proceeds was unknown to the
plaintiffs until May, 1947, when the plaintiffs received the
answer in this action of THE MC CLURE NEWSPAPER SYNDICATE,
with a true copy of Plaintiffs' Exhibit 56 attached thereto.

106.  Plaintiffs did not know until May of 1947,
at the time they received the answer of the defendant THE
MC CLURE NEWSPAPER SYNDICATE, that DETECTIVE COMICS, INC. and
the defendant THE MC CLURE NEWSPAPER SYNDICATE had deducted
from gross receipts in computing "net proceeds" from the
newspaper publication of SUPERMAN, the compensation of the
artists who drew the newspaper comic strips LOIS LANE, GIRL
REPORTER.

107.  DETECTIVE COMICS, INC. authorized Random
House, Inc., an independent book publisher, to publish a
book entitled "The Adventures of Superman", for which
plaintiffs did not supply the material, except for four il-
lustrations prepared by plaintiff SHUSTER.

108.  Random House, Inc. is a domestic corporation
duly organized and existing under and by virtue of the laws
of the State of New York.

109.  The book entitled "The Adventures of Superman"
is not a collection of SUPERMAN comic strips, but a work of
fiction in the form of a full length novel.

110.  The modification agreement dated December
19, 1939, expressly excludes book publication as an item
of income in which plaintiffs were entitled to participate.

ER-618

111. DETECTIVE COMICS, INC. received payments from Random House, Inc. which it included (without obligation so to do) in the gross receipts applicable to commercial exploitation of SUPERMAN.

112. "Superman-Tim" was a booklet printed by Diamond Sales Corporation pursuant to a license from DETECTIVE COMICS, INC., which contained SUPERMAN material.

113. "Superman-Tim" was sold to various department stores whose names were printed on said booklet and was distributed gratis to their customers.

114. "Pyco-Pay" was a booklet distributed to dentists by Pyco-Pay Company, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

115. The booklet "Pyco-Pay" was designed to teach children the proper care of their teeth and was distributed by dentists gratis to their young patients.

116. "The Christmas Book" was a booklet printed by Diamond Sales Corporation, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

117. "The Christmas Book" was sold to department stores, which printed their names thereon and distributed it gratis to their customers.

118. The booklets "Superman-Tim", "Pyco-Pay" and "The Christmas Book" were not sold to the public and were not SUPERMAN comic magazine releases.

38

Exhibit C
74

ER-619

119. The Kellogg Company, sponsor of the SUPERMAN radio program, printed SUPERMAN material upon cartons of its breakfast food, with the consent of DETECTIVE COMICS, INC.

120. The Kellogg Company made no payment for said SUPERMAN material.

121. R.H. Macy & Co., Inc. caused an advertisement containing SUPERMAN material to be printed in the New York Journal-American on one occasion, in connection with a Thanksgiving Day parade held by R.H. Macy & Co., Inc., which material was printed with the consent of DETECTIVE COMICS, INC.

122. R. H. Macy & Co., Inc. made no payment for said SUPERMAN material.

123. The two agreements of September 22, 1938 between plaintiffs and DETECTIVE COMICS, INC. (Pl. Ex. 14), and plaintiffs, DETECTIVE COMICS, INC. and THE MC CLURE NEWSPAPER SYNDICATE (Pl. Ex. 15), respectively, referred specifically to magazine releases and newspaper syndication, and made no reference to the publication of promotional material.

124. The commercial exploitation of SUPERMAN was first referred to in the modification agreement of December 19, 1939, which agreement expressly provided that DETECTIVE COMICS, INC. had the unrestricted right to grant to others, upon such basis as DETECTIVE COMICS, INC., in its sole discretion, should determine, any rights to repro-

39

Exhibit C
75

ER-620

duction with respect to the comic strip SUPERMAN, and the titles and characters and continuity thereof.

125. From November, 1945 to March, 1947, DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. published 20 releases of comic strips for which plaintiff SHUSTER created and executed the art work in pencil and for which he accepted the sum of $380. per release in full payment.

126. In the year 1946 DETECTIVE COMICS, INC. published four releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not furnish the continuity and for which DETECTIVE COMICS, INC. sent to him its check in full payment, at the rate of $200. per release.

127. Plaintiff SIEGEL has retained the said check.

128. During 1946 DETECTIVE COMICS, INC. published four certain releases of the comic strip SUPERMAN entitled "Malten World", "Mad Weather in Metropolis", "Superself" and "Mxyz and the Wonderful Lamp", for which the plaintiff SIEGEL did not furnish the continuity.

129. DETECTIVE COMICS, INC. delivered to the plaintiff SIEGEL a check in the amount of $1,000. Plaintiffs' Exhibit 59, which was given as payment for the four releases mentioned in paragraph 128 hereof and the additional release entitled "Old Gang of Superboy's".

40

ER-621

130. The said check, Plaintiff's Exhibit 59, was given on March 15, 1946.

131. Plaintiff SIEGEL advised DETECTIVE COMICS, INC. that he did not desire to cash the check, Plaintiffs' Exhibit 59, since it included a payment for a release of SUPERMAN bearing in its title the word "SUPERBOY" and that he could not do anything which would call into question in any way his rightful ownership of the comic strip SUPERBOY.

132. DETECTIVE COMICS, INC. on July 9, 1946, by letter, Plaintiffs' Exhibit 63, agreed to furnish a new check to plaintiff in place of Plaintiffs' Exhibit 59, which would cover the four releases other than "Old Gang of Superboy's".

133. Although the same has been duly demanded no other check has ever been given in payment for the four releases mentioned in paragraph 128 of these findings.

134. Since December 19, 1939 SUPERMAN, INC., DETECTIVE COMICS, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. received various sums of money from the production of radio programs and motion pictures entitled SUPERMAN, and by the sale of licenses to various persons engaged in commercial enterprises and incurred expenses in connection therewith.

135. SUPERMAN, INC., DETECTIVE COMICS, INC. and NATIONAL COMICS PUBLICATIONS, INC. from December 19, 1939 to date have acquired and received large sums of money by

41

Exhibit C
77

**ER-622**

the production of radio features and moving pictures entitled SUPERMAN, based upon the characters, conception, plot and incidents created by the plaintiffs, and by the sale of licenses to various persons engaged in commercial enterprises permitting the said persons to affix to their products and to use in the furtherance of the said commercial enterprises the name and pictorial representation of SUPERMAN.

136. From December 19, 1939 until the present time, SUPERMAN, INC., DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. have had complete control of all books, records and papers relating to the matters set forth in paragraph 135 of these findings and have at all times refused to permit the plaintiffs to examine said books, records and papers.

137. During the years 1940, 1941, 1942, 1943, 1944 and 1945 SUPERMAN, INC. and DETECTIVE COMICS, INC. failed to render any account of the income and expenditures relating to matters set forth in paragraph 135 hereof and did refuse to furnish such account during the years 1940, 1941, 1942, 1943, 1944 and 1945.

138. Plaintiffs during the years 1940, 1941, 1942, 1943, 1944 and 1945 did duly demand the rendering of an account of the matters set forth in paragraph 135 of these findings.

139. On July 8, 1946, SUPERMAN, INC. and DETECTIVE COMICS, INC. furnished what purported to be an account of the matters set forth in paragraph 135 hereof for the years 1942,

42

Exhibit C
78

ER-623

1943, 1944 and 1945 and that the said account was as claimed
by plaintiffs without substantial information and was insuf-
ficient to constitute an account of the matters dealt with
in paragraph 135 of these findings.

140.  DETECTIVE COMICS, INC. and SUPERMAN, INC.
and the defendants NATIONAL COMICS PUBLICATIONS, INC. have
failed and refused to furnish any account whatsoever of the
matters dealt with in paragraph 135 of these findings for
the years 1940 and 1941.

141.  Defendant NATIONAL COMICS PUBLICATIONS,INC.
during January, 1947 furnished a purported account of the
matters dealt with in paragraph 135 hereof for the year 1946.

142.  The said purported account described in
paragraph 141 was as claimed by plaintiffs incomplete and
furnished insufficient information to constitute an account
of the matters dealt with in paragraph 135 hereof.

143.  Plaintiffs have duly demanded that DETECTIVE
COMICS, INC., SUPERMAN, INC. and the defendant NATIONAL
COMICS PUBLICATIONS, INC. furnish a true and sufficient
account of the matters mentioned in paragraph 135 of these
findings for the years 1940, 1941, 1942, 1943, 1944, 1945
and 1946.

144.  Plaintiffs have duly performed all the
terms and conditions of the contract, Plaintiffs' Exhibits
14 and 15, as modified by Plaintiffs' Exhibit 22, on their
part to be performed up to the commencement of this action.

43

ER-624

145. Plaintiffs have not established any fraud or duress on the part of any of the defendants.

146. Defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and SUPERMAN, INC., did not induce or agree to induce defendant WAYNE BORING to breach an employment agreement with plaintiff SHUSTER.

147. Defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and SUPERMAN, INC., did not interfere with or render impossible the performance of any agreement between defendant WAYNE BORING and plaintiff SHUSTER or agree so to do.

148. Defendant WAYNE BORING did not breach his contract of employment with plaintiff SHUSTER.

149. Defendant WAYNE BORING did not violate any rights of plaintiff SHUSTER.

150. Defendant WAYNE BORING did not wrongfully furnish art work to any of defendants.

151. Defendant WAYNE BORING has not, in any way, injured or damaged plaintiff SHUSTER.

152. During the term of the agreement set forth in paragraph 153 of plaintiffs' proposed findings, the defendant BORING created cartoon material for DETECTIVE COMICS, INC. and SUPERMAN, INC. portraying the character SUPERMAN and entitled SUPERMAN, and the comic strip LOIS LANE, GIRL REPORTER, which comic strips were both based upon the

44

Exhibit C
80

ER-625

conception, idea, plot, incidents and characters of the comic strip SUPERMAN, as therefore created by the plaintiffs.

153. Since the expiration of the employment of WAYNE BORING by the plaintiff SHUSTER, the defendant BORING, in the employ of DETECTIVE COMICS, INC., SUPERMAN, INC. and NATIONAL COMICS PUBLICATIONS, INC., created cartoon material entitled SUPERMAN which presented the character SUPERMAN and was based upon the conception, idea, plot, incidents and character of the comic strip SUPERMAN as theretofore created by the plaintiffs.

154. Defendants DETECTIVE COMICS, INC. and SUPERMAN, INC. knew of the plaintiff SHUSTER'S contract with the defendant BORING, Plaintiffs' Exhibit 101, as subsequently modified.

155. On November 30, 1938, plaintiff SIEGEL wrote to DETECTIVE COMICS, INC. and suggested that the latter publish a comic strip under the title of SUPERBOY, which would narrate the adventures of SUPERMAN as a youth.

156. On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14, a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY, the said letter having been received in evidence and marked Plaintiffs' Exhibit 16.

157. On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time. (See Plffs. Ex. 17).

**Exhibit C**

45

**ER-626**

81

158.   DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159.   DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip SUPERBOY under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14.

160.   During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, Plaintiffs' Exhibit 36, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

161.   The officer and Director of DETECTIVE COMICS, INC. who received on behalf of DETECTIVE COMICS, INC. at the hands of the plaintiff SIEGEL the submission of the letter concerning SUPERBOY, Plaintiffs' Exhibit 16, and the scenario or script, Plaintiffs' Exhibit 36, was JACOB LIEBOWITZ.

162.   DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

**46**

Exhibit C
82

ER-627

163. Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics".

164. The said comic strip release entitled SUPERBOY embodied and was based upon the idea, plan and conception contained in the plaintiffs, SIEGEL'S letter to DETECTIVE COMICS, INC. dated November 30, 1938, Plaintiffs' Exhibit 16.

165. The said release of the said comic strip SUPERBOY published in December of 1944 embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in December of 1940, the said script being Plaintiffs' Exhibit 36.

166. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in Plaintiffs' Exhibit 16 and Plaintiffs' Exhibit 36.

167. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as published by DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. from December, 1944, until the date of the trial herein.

47

ER-628

168.  The said publication was without the permission of the plaintiff SIEGEL.

169.  Thereafter DETECTIVE COMICS, INC. did publish releases of the said comic strip entitled SUPERBOY in magazines bi-monthly until February of 1946, and monthly thereafter until on or about October 1, 1946.

170.  From the 1st day of October, 1946, until the date of the trial herein, the defendant NATIONAL COMICS PUBLICATIONS, INC. has published monthly in magazines a comic strip entitled SUPERBOY.

171.  All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the letter, Plaintiffs' Exhibit 16.

172.  All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the scenario or script, Plaintiff's Exhibit 36, submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC.

173.  The publication of all comic strip material entitled SUPERBOY was at all times without the permission of the plaintiff SIEGEL.

174.  Plaintiff SIEGEL has received no payment on account of the publication of any of the material entitled SUPERBOY.

175.  All publications of SUPERBOY by DETECTIVE COMICS, INC. from April, 1945 until the 1st day of October,

48

Exhibit C
84

ER-629

1946, and by the defendant NATIONAL COMICS PUBLICATIONS, INC.
from October 1, 1946, until the date of the trial herein,
contained affixed thereto the name of the plaintiffs SIEGEL
and SHUSTER.

176.  The use of the name of the plaintiff SIEGEL,
as alleged in paragraph 175 was without the consent of the
plaintiff SIEGEL.

177.  The officer and director of DETECTIVE COMICS,
INC., who on behalf of DETECTIVE COMICS, INC. caused the
material entitled SUPERBOY to be published as hereinbefore
set forth in these findings was JACOB LIEBOWITZ.

178.  The officer and director of NATIONAL COMICS
PUBLICATIONS, INC., who on behalf of NATIONAL COMICS
PUBLICATIONS, INC. caused the material entitled SUPERBOY
to be published as hereinbefore set forth in these findings,
was JACOB LIEBOWITZ.

179.  Defendant INDEPENDENT NEWS CO., INC. know-
ing of the rights of the plaintiff SIEGEL, under the con-
tracts, Plaintiffs' Exhibits 14 and 15, sold and distributed
to newsdealers for resale to the public throughout the
United States, magazines containing the material entitled
SUPERBOY as hereinabove described and set forth.

180.  All the art work for the SUPERBOY releases
was prepared by plaintiff SHUSTER under the direction of
DETECTIVE COMICS, INC.

49

Exhibit C
85

ER-630

181. Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182. At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183. Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184. No agreement was reached between DETECTIVE COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i. e., at the rate of $200. per release of standard length of thirteen pages.

185. That the defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC., have continued to publish, sell or distribute the said comic strip SUPERBOY and threaten to continue to so publish the same.

50

Exhibit C
86

ER-631

## CONCLUSIONS OF LAW

1.  By virtue of the instrument of March 1, 1938, plaintiffs transferred to DETECTIVE COMICS, INC. all of their rights in and to the comic strip SUPERMAN including the title, names, characters and concept as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine "Action Comics" and by virtue of said instrument DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN, including the title, names, characters and concept as the same were set forth in the said first release.

2.  The instrument of March 1, 1938 was supported by valid consideration.

3.  Any representations by DETECTIVE COMICS, INC. to plaintiffs that it owned SUPERMAN were neither false nor fraudulent.

4.  The two agreements of September 22, 1938, namely that between DETECTIVE COMICS, INC. and plaintiffs, and that between DETECTIVE COMICS, INC., plaintiffs and defendant THE MC CLURE NEWSPAPER SYNDICATE, as originally made and as thereafter modified, are valid.

5.  The said agreements of September 22, 1938 were not entered into by plaintiffs under duress nor were plaintiffs induced to execute the said agreements by any false or fraudulent representations.

6.  There have been no material breaches of the said agreements of September 22, 1938, or of any modifications

thereof, by DETECTIVE COMICS, INC., defendant NATIONAL COMICS PUBLICATIONS, INC. or defendant THE MC CLURE NEWSPAPER SYNDICATE.

7. The publication by DETECTIVE COMICS, INC. or SUPERMAN, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. of comic strips entitled Batman, Lois Lane, Girl Reporter, Johnny Quick, The Flash, Green Lantern, Aquaman, Air Wave, Hour-Man, Wonder Woman, Star-Man, Dr. Fate, Hawkman, Crimson Avenger, The Ultra-Man, TNT and Dan the Dyna-Mite, Manhunter, The Gay Ghost, Newsboy Legion starring The Guardian, Tarantula, Mr. Terrific, Sandman, The Atom, The Green Arrow, Dr. Mid-Nite, Genius Jones, Scribbly and The Red Tornado, Robin, The Boy Wonder and Liberty Belle did not violate any rights of plaintiffs in Superman nor are plaintiffs entitled to any moneys by reason of such publication.

8. Plaintiffs have failed to establish that defendants HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. or any of them conspired with DETECTIVE COMICS, INC., SUPERMAN, INC. or defendant THE MC CLURE NEWSPAPER SYNDICATE to injure plaintiffs by depriving them of any rights under either of said agreements of September 22, 1938, or any modification thereof.

9. Publication by DETECTIVE COMICS, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. of the comic strip entitled LOIS LANE, GIRL REPORTER, did not violate any rights of plaintiffs.

10. No moneys are due and owing by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. to

52

Exhibit C
88

ER-633

plaintiff SIEGEL for the 120 magazine releases of SUPERMAN
for which he did not furnish the continuity and for which
he received the sum of $200. per release.

11. No moneys are due and owing by DETECTIVE
COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC.
to plaintiff SHUSTER for the 80 magazine releases of SUPER-
MAN for which he did not furnish the art work and for which
he received the sum of $150. per release.

12. No moneys are due and owing by DETECTIVE
COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC.
to plaintiff SHUSTER for the 50 SUPERMAN magazine releases
for which he did not furnish the art work and for which he
received the sum of $200. per release.

13. Plaintiffs are not entitled to an accounting
of any profits received by SUPERMAN, INC. or DETECTIVE
COMICS, INC. from publication of the book entitled "The
Adventures of Superman".

14. The SUPERMAN material which appeared in the
booklets "Pyco-Pay", "Superman-Tim" and "The Christmas Book",
on the cartons of breakfast food of The Kellogg Company,
and in the advertisement of R. H. Macy & Co., Inc. appearing
in the New York Journal-American constituted outside com-
mercial exploitation of SUPERMAN as defined in the agreement
of December 19, 1939.

15. No moneys are due and owing by DETECTIVE
COMICS, INC., SUPERMAN, INC. or defendant NATIONAL COMICS
PUBLICATIONS, INC. to plaintiff SHUSTER for magazine releases
of the comic strip SUPERMAN for which plaintiff SHUSTER

furnished the art work in pencil and for which he received the sum of $380. per release, nor for any other art work furnished by plaintiff SHUSTER.

16. The agreements of September 22, 1938, as originally made and as thereafter modified, are not illusory and do not lack mutuality.

17. Plaintiffs have failed to establish that DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-TIONS, INC. schemed or conspired in any manner to prevent plaintiffs from furnishing the continuity or art work for the SUPERMAN comic strip.

18. Plaintiff SHUSTER has failed to establish that defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER and DETECTIVE COMICS, INC. and SUPERMAN, INC. or any combination including any of them, conspired to injure plaintiff SHUSTER by inducing defendant WAYNE BORING to breach his agreement with plaintiff SHUSTER or to interfere with the performance of said agreement.

19. Plaintiff SHUSTER has failed to establish that defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, or any of them, interfered in any manner with any contractual rights existing between plaintiffs and defendant WAYNE BORING.

20. The evidence fails to sustain the allegations of the complaint against defendants THE MC CLURE NEWSPAPER SYNDICATE and WAYNE BORING.

21. The complaint is dismissed on the merits as to each and every cause of action alleged therein, as to

54

Exhibit C
-4-
90

ER-635

defendants THE MC CLURE NEWSPAPER SYNDICATE and WAYNE BORING,
and judgment is directed to be entered accordingly.

22. Plaintiffs are entitled to an accounting of
all income and expenses of DETECTIVE COMICS, INC., SUPERMAN,
INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. in
connection with the outside commercial exploitation of
SUPERMAN as defined in the agreement of December 19, 1939.

23. Defendant NATIONAL COMICS PUBLICATIONS, INC.,
shall account to the plaintiffs for all income and profits ac-
quired by the defendants NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC. and by DETECTIVE COMICS, INC. and
SUPERMAN, INC. through the production of radio features and
moving pictures entitled SUPERMAN and by the sale of com-
mercial licenses of all kinds, and that the profits derived
therefrom be divided according to law, and that the plaintiffs
have their just share thereof.

24. Defendants shall be perpetually enjoined and
restrained from affixing the names of the plaintiffs to any
published material of any nature whatsoever and from affixing
the names of the plaintiffs to any advertising or from using
the names of the plaintiffs for any commercial purposes what-
soever.

25. Plaintiff Siegel is the originator and the
sole owner of the comic strip feature SUPERBOY, and the de-
fendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT
NEWS CO., INC., their agents, servants and employees are
perpetually enjoined and restrained from creating, publishing,
selling or distributing any comic strip material of the nature

Exhibit C
91

ER-636

now and heretofore sold under the title SUPERBOY, or any
other comic strip material made in imitation of the con-
ception, characters, nature, incidents, action or plot of
the plaintiffs' comic strip SUPERBOY or from using any title
so imitative of SUPERBOY as will be calculated to deceive
the public so that it would believe the so entitled material
to have been created by the plaintiffs.

26.  Plaintiff Siegel, as the originator and
owner of the comic strip feature SUPERBOY has the sole and
exclusive right to create, sell and distribute comic strip
material under the title SUPERBOY of the type and nature
heretofore published under that title and of the nature
described in plaintiffs' exhibits 16 and 36.

27.  Defendants NATIONAL COMICS PUBLICATIONS, INC.,
and INDEPENDENT NEWS CO., INC. shall account to plaintiff
Siegel for all profits derived from the publication, sale
and distribution of all comic strip material entitled SUPER-
BOY by either of them or by SUPERMAN, INC. or by DETECTIVE
COMICS, INC., and the said profits derived from the said sale,
publication and distribution be divided according to law and
that the plaintiff Siegel have his just share thereof.

Dated:  April 12, 1948.

                              _Addison Young_
                              OFFICIAL REFEREE,
                              Supreme Court, Westchester County

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.
I, TIMOTHY E. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF FILED IN MY OFFICE ON 4/13/48 AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
FEE PAID                              2-13-00

56

ER-637

Exhibit C
-5-
92

*Case reported in 364 F. Supp. 1032 (S.D.N.Y. 1973)
aff'd 508 F.2d 909 (2d cir. 1974).*

# 73-2844

## United States Court of Appeals

### For the Second Circuit

JEROME SIEGEL and JOSEPH SHUSTER,

*Plaintiffs-Appellants,*

*against*

NATIONAL PERIODICAL PUBLICATIONS, INC.,
JACOB S. LIEBOWITZ, IRWIN DONENFELD and
PAUL H. SAMPLINER,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## JOINT APPENDIX

COUDERT BROTHERS
*Attorneys for Plaintiffs-Appellants*
200 Park Avenue
New York, New York 10017
973-3300

WEIL, GOTSHAL & MANGES
*Attorneys for Defendants-Appellees*
767 Fifth Avenue
New York, New York 10022
758-7800

57

Exhibit C
93

0000ER0638

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Docket Entries | 1a |
| Complaint | 2a |
| Answer and Counterclaim | 10a |
| Exhibit A—Agreement of March 1, 1938 | 28a |
| Exhibit B—Agreement of December 4, 1937 | 29a |
| Exhibit C—Opinion of Referee J. Addison Young | 31a |
| Exhibit D—Findings of Fact | 43a |
| Conclusions of Law | 70a |
| Exhibit E—Interlocutory Judgment | 76a |
| Exhibit F—Stipulation | 80a |
| Exhibit G—Final Judgment | 87a |
| Affidavit of Edward C. Wallace Read in Support of Motion | 95a |
| Exhibit 1—Letter | 112a |
| Exhibit 2—Letter | 114a |
| Exhibit 3—Letter | 115a |
| Exhibit 4—Letter | 116a |
| Exhibit 5—Letter | 117a |
| Exhibit 6—Letter | 118a |
| Exhibit 7—Letter | 119a |

Exhibit C
94

000060002 ER-639

II

PAGE

Affidavit of Jerome Siegel Read in Opposition to
    Motion ............................................................ 121a

    Exhibit A—Superman (Synopsis) ...................... 132a

    Exhibit B—Letter .................................................. 139a

    Exhibit C—Letter .................................................. 141a

    Exhibit D—Letter .................................................. 142a

Affidavit of Joseph Shuster Read in Opposition to
    Motion ............................................................... 143a

Affidavit of Gordon T. King Read in Opposition
    to Motion ......................................................... 145a

    Exhibit A—First Week of Inked Strips ............... 147a

    Exhibit B—Three Weeks of Synopsized Strips 150a

    Exhibit C—Excerpts from Liebowitz Deposition 163a

    Exhibit D—Excerpts from Liebowitz Testimony
    in Westchester Action ...................................... 168a

Opinion of Judge Morris E. Lasker ............................... 171a

Exhibit C
95

1 a

## DOCKET ENTRIES

COMPLAINT Filed April 8, 1959

ANSWER Filed April 30, 1959

MOTION FOR SUMMARY JUDGMENT Filed December 21, 1972

PAPERS IN OPPOSITION TO THE MOTION Filed March 8, 1973

OPINION OF JUDGE LASKER Filed October 18, 1973

60

Exhibit C
96

00000004
ER-641

80 a

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

- - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

               Plaintiffs,

     -against-

NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC., THE MC
CLURE NEWSPAPER SYNDICATE, HARRY
DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,

              Defendants.

STIPULATION

- - - - - - - - - - - - - - - - - -x

      IT IS HEREBY STIPULATED AND AGREED between
the above named parties and their respective attorneys, as
follows:

      1.  The interlocutory judgment entered
herein on the 13th day of April, 1948, shall be in
all respects vacated.

      2.  The complaint herein shall be dis-
missed as to each and every cause of action alleged
therein as to all defendants.

      3.  The plaintiffs shall be paid by
the defendant NATIONAL COMICS PUBLICATIONS, INC.,
the sum of NINETY FOUR THOUSAND THIRTEEN DOLLARS
AND SIXTEEN CENTS ($94,013.16) as and for all sums
due and owing to them under and pursuant to the
terms of the following agreements, as modified:

      (a)  Agreement dated December 4, 1947
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

      (b)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

61

Exhibit B
97

000000083 ER 642

81 a

(c)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC., JEROME SIEGEL,
JOSEPH SHUSTER and THE MC CLURE NEWSPAPER
SYNDICATE.

(d)  Agreement dated December 19, 1939
between DETECTIVE COMICS, INC. and JEROME SIEGEL
and JOSEPH SHUSTER.

4.  All of the said agreements as
originally made and as modified, are valid.

5.  All of said agreements as originally
made and as modified, are terminated insofar as
plaintiffs may have any rights under and by virtue
of said agreements, or any of them.

6.  By virtue of the instrument of
March 1, 1938, plaintiffs validly transferred to
DETECTIVE COMICS, INC., one of the constituent corpora-
tions of defendant NATIONAL COMICS PUBLICATIONS, INC.,
all of their rights in and to the comic strip
SUPERMAN, including the title, names, characters,
concept and formula, as same were set forth in
the first release of said comic strip published in the
June, 1938 issue of the magazine "Action Comics"
and by virtue of said instrument, said DETECTIVE
COMICS, INC. became the absolute owner of the comic
strip SUPERMAN, including the title, names,
characters, concept and formula as the same were set
forth in the said first release.

7.  Defendant NATIONAL COMICS
PUBLICATIONS, INC. is the sole and exclusive owner
of and has the sole and exclusive right to the use
of the title SUPERMAN and to the conception, idea,

Exhibit D

62

continuity, pictorial representation and formula

00055064

82 a

of the cartoon feature SUPERMAN as heretofore
portrayed and published, and to create, publish,
sell and distribute and to cause to be created,
published, sold and distributed cartoon or other
comic strip material containing the characters
SUPERMAN (also known as "Clark Kent"), LOIS LANE,
PERRY WHITE and all other characters which have
heretofore appeared in said cartoon or other comic
strip material, and such sole and exclusive owner-
ship includes, but is not limited to, the fields of
book and magazine publications, newspaper syndica-
tion, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all
other forms of reproduction and presentation,
whether now in existence or that may hereafter be
created, together with the absolute right to
license, sell, transfer or otherwise dispose of
said rights.

8. Plaintiffs shall and do hereby
consent to a judgment enjoining and restraining them,
their agents, servants and employees, from creating,
publishing, selling or distributing, or permitting
or causing to be created, published, sold or distri-
buted any material of the nature heretofore created,
produced or published under the title SUPERMAN, or
any material created, produced or published in
imitation thereof, or from using, permitting or caus-
ing to be used in connection with any comic strip or
other material created by them the title SUPERMAN or
any title imitative of the title SUPERMAN, or which
shall contain as part thereof the word "SUPER".

EXHIBIT B
99

63

0005R 644

## 83 a

9. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights.

10. Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY.

## 84 a

9.  Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights.

10.  Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in  connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY.

65

00000ER0646

85 a

11. Plaintiffs shall and do hereby
consent to a judgment enjoining and restraining
them, their agents, servants and employees, from

(a) Representing their past
connection with the comic strips SUPERMAN
and/or SUPERBOY in such manner as may be
likely to induce the belief that such past
connection still exists;

(b) Making any representation
as to such past connection in conjunction with
any material, comic or otherwise, hereafter
issued by plaintiffs or either of them, or
with their consent or on their behalf, more
than half as conspicuous as to size, or more
conspicuous as to color, type of lettering or
style of print than the name or title of any
such hereafter issued material, or in any other
manner as may be likely to induce the belief
that defendant NATIONAL COMICS PUBLICATIONS,
INC. is or may be associated with such here-
after issued material; and

(c) Using any colors, lettering
and/or printing in referring to the words
SUPERMAN and/or SUPERBOY imitative of the
colors, lettering and/or printing now or here-
after used by defendant NATIONAL COMICS
PUBLICATIONS, INC. in portraying said words or
either of them.

12. Defendant NATIONAL COMICS PUBLICA-
TIONS, INC. is the sole and exclusive owner, with
all rights of absolute ownership thereto appertaining,

Exhibit D
102

00000ER8647

## 86 a

in and to the comic strips entitled Batman; Lois Lane, Girl Reporter; Slam Bradley; Johnny Quick; The Flash; Green Lantern, Aquaman; Air Wave; Hour-Man; Wonder Woman; Star-Man; Dr. Fate; Hawkman; Crimson Avenger; The Ultra-Man; TNT and Dan the Dyna-Mite; Manhunter; The Gay Ghost; Newsboy Legion starring the Guardian; Tarantula; Mr. Terrific; Sandman; The Atom; The Green Arrow; Dr. Mid-Nite; Genius Jones; Scribbly and The Red Tornado; Robin, the Boy Wonder; and Liberty Belle.

Dated:  New York, N.Y.
        May //, 1948.

Document Signed
By the Parties and
Their attorneys
and their signatures
were acknowledged
By a notary public

Jerome Siegel

Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By
Vice-President

INDEPENDENT NEWS CO., INC.

By
President

THE MC CLURE NEWSPAPER SYNDICATE

By
Treasurer

Harry Donenfeld

Jacob Liebowitz

Exhibit D

Paul Sampliner

67

103

000ER 648

At a Term of the Supreme Court
of the State of New York, held
in and for the County of
Westchester, at the Official
Referee's Chambers, 542 Main
Street, in the City of New
Rochelle and State of New York,
on the 21 day of May, 1948.

1099 - 1947

PRESENT:

HON. J. ADDISON YOUNG,

Official Referee.

- - - - - - - - - - - - - - - - - - - 203x/305

JEROME SIEGEL and JOSEPH SHUSTER,

Plaintiffs,                    :

-against-                                :

                                         :    FINAL JUDGMENT

NATIONAL COMICS PUBLICATIONS, INC.,      :
INDEPENDENT NEWS CO., INC., THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD,    :
JACOB LIEBOWITZ, PAUL H. SAMPLINER and
WAYNE BORING,                            :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - - - -x

          This action having been referred to HON. J.

ADDISON YOUNG, an Official Referee in and for the Ninth

Judicial District, by an order duly made and entered herein

the 19th day of May, 1947, to hear, try and determine the

issues in this matter, with the same force and effect as if

they were tried at a regular term of this Court, and plain-

tiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN, ESQS.,

their attorneys (MORTON WEKSTEIN, ESQ., of counsel), and

defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT

NEWS CO., INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL

H. SAMPLINER, having appeared by WEIL, GOTSHAL & MANGES,

ESQS., their attorneys (HORACE S. MANGES, ESQ., EDWARD C.

WALLACE, ESQ., and ABRAHAM I. MENIN, ESQ., of counsel),

and defendant THE MC CLURE NEWSPAPER SYNDICATE having

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES

Exhibit E
104

68

ER-649

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES
L. BROWN, ESQ., of counsel), and defendant WAYNE BORING
having appeared by SIDNEY H. REICH, ESQ., his attorney,
and after trial had, and said Official Referee having on
the 12th day of April, 1948 duly made and filed his decision
stating his findings of fact herein and conclusions of law
thereon, and directing interlocutory judgment, which said
interlocutory judgment was duly entered in the office of the
Clerk of this Court on the 13th day of April, 1948, and
defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT
NEWS CO., INC. having duly served and filed a notice of
appeal dated April 27, 1948 from certain parts of said inter-
locutory judgment and plaintiffs having duly served and filed
a notice of appeal dated May 10, 1948, from certain parts of
said interlocutory judgment, and said notices of appeal having
been withdrawn, and the parties hereto and their respective
attorneys having duly consented to the vacating of said
interlocutory judgment and to the entry of final judgment as
hereinafter set forth, it is

ORDERED AND ADJUDGED that the said inter-
locutory judgment entered herein on the 13th day of April,
1948, be and the same hereby is in all respects vacated; and
it is further

ORDERED AND ADJUDGED that the complaint be
and it hereby is dismissed as to each and every cause of
action alleged therein as to all defendants; and it is further

DECLARED AND ADJUDGED that the following
agreements as originally made and as modified, are valid;

69

Exhibit E
105

ER-650

(a)  Agreement dated December 4, 1937
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

(b)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

(c)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC., JEROME
SIEGEL, JOSEPH SHUSTER and THE MC CLURE
NEWSPAPER SYNDICATE.

(d)  Agreement dated December 19, 1939
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER;

and it is further

DECLARED AND ADJUDGED that all of said
agreements as originally made and as modified, be and they
hereby are terminated insofar as plaintiffs may have any
rights under and by virtue of the said agreements, or any of
them; and it is further

DECLARED AND ADJUDGED that by virtue of
the instrument of March 1, 1938, plaintiffs validly
transferred to DETECTIVE COMICS, INC., one of the constituent
corporations of defendant NATIONAL COMICS PUBLICATIONS, INC.,
all of their rights in and to the comic strip SUPERMAN,
including the title, names, characters, concept and formula,
as same were set forth in the first release of said comic
strip published in the June, 1938 issue of the magazine
"Action Comics" and that by virtue of said instrument, said
DETECTIVE COMICS, INC. became the absolute owner of the
comic strip SUPERMAN, including the title, names, characters,
concept and formula as  the same were set forth in the said
first release; and it is further

DECLARED AND ADJUDGED that defendant
NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive

owner of and has the sole and exclusive right to the use
of the title SUPERMAN and to the conception, idea, continuity,
pictorial representation and formula of the cartoon feature
SUPERMAN as heretofore portrayed and published, and to
create, publish, sell and distribute and to cause to be
created, published, sold and distributed cartoon or other
comic strip material containing the characters SUPERMAN
(also known as "Clark Kent"), LOIS LANE, PERRY WHITE and
all other characters which have heretofore appeared in said
cartoon or other comic strip material, and that such sole
and exclusive ownership includes, but is not limited to, the
fields of book and magazine publications, newspaper
syndication, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all other forms
of reproduction and presentation, whether now in existence
or that may hereafter be created, together with the
absolute right to license, sell, transfer, or otherwise
dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their
agents, servants and employees, be and they hereby are
enjoined and restrained from creating, publishing, selling
or distributing or permitting or causing to be created, pub-
lished, sold or distributed any material of the nature
heretofore created, produced or published under the title
SUPERMAN, or any material created, produced or published
in imitation thereof, or from using, permitting or causing
to be used in connection with any comic strip or other
material created by them the title SUPERMAN or any title
imitative of the title SUPERMAN or which shall contain as
part thereof the word "SUPER"; and it is further

DECLARED AND ADJUDGED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and that such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees be and they hereby are enjoined and restrained from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY or any material created, produced or published in imitation thereof or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY; and it is further

ORDERED AND ADJUDGED that the plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from

72

ER-653

(a)  Representing their past connection with the comic strips SUPERMAN and/or SUPERBOY in such manner as may be likely to induce the belief that such past connection still exists;

(b)  Making any representation as to such past connection in conjunction with any material, comic or otherwise, hereafter issued by plaintiffs or either of them, or with their consent or on their behalf, more than half as conspicuous as to size, or more conspicuous as to color, type of lettering or style of print than the name or title of any such hereafter issued material, or in any other manner as may be likely to induce the belief that defendant NATIONAL COMICS PUBLICATIONS, INC. is or may be associated  with such hereafter issued material; and

(c)  Using any colors, lettering and/or printing in referring to the words SUPERMAN and/or SUPERBOY imitative of the colors, lettering and/or printing now or hereafter used by defendant NATIONAL COMICS PUBLICATIONS, INC.  in portraying said words or either of them;

and it is further

ORDERED AND DECLARED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner, with all the rights of absolute ownership thereto appertaining, in and to the comic strips entitled Batman; Lois Lane, Girl Reporter; Slam Bradley; Johnny Quick; The Flash; Green Lantern; Aquaman; Air Wave; Hour-Man; Wonder

Woman; Star-Man; Dr. Fate; Hawkman; Crimson Avenger; The
Ultra-Man; TNT and Dan the Dyna-Mite; Manhunter; The Gay
Ghost; Newsboy Legion starring the Guardian; Tarantula;
Mr. Terrific; Sandman; The Atom; The Green Arrow; Dr. Mid-
Nite; Genius Jones; Scribbly and The Red Tornado; Robin,
the Boy Wonder; and Liberty Belle.

ENTER

Official Referee of the Supreme
Court of the State of New York.

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.,
I, TIMOTHY C. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF FILED IN MY OFFICE ON 5/21/18 AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
FEE PAID

74

Entry of the foregoing judgment is hereby consented to.

_Jerome Siegel_
Jerome Siegel

_Joseph Shuster_
Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By _____
Vice-President

INDEPENDENT NEWS CO., INC.

By _Paul H. Sampliner_
President

THE MC CLURE NEWSPAPER SYNDICATE

By _William O'Connell_
TREASURER

_Harry Donenfeld_
Harry Donenfeld

_Jacob Liebowitz_
Jacob Liebowitz

_Paul H. Sampliner_
Paul H. Sampliner

_Wayne Boring_
Wayne Boring

_____
Attorneys for Plaintiffs

_Weil, Gotshal & Manges_
Attorneys for Defendants National
Comics Publications, Inc., Inde-
pendent News Co., Inc., Harry
Donenfeld, Jacob Liebowitz and
Paul H. Sampliner

_John L. McCormick_
Attorney for Defendant The McClure
Newspaper Syndicate

75

_Sidney H. Reich_
Attorney for Defendant Wayne Boring

ER-656

STATE OF New York )
COUNTY OF New York ) SS.:

On the 19 day of May, 1948, before me
personally came JEROME SIEGEL, to me known, and known to
me to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executedthe same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co. Clk's No. 429, Reg. No. 1110-C-9
Commission Expires March 30, 1949

STATE OF NEW YORK )
COUNTY OF New York ) SS.:

On the 19 day of May, 1948, before me
personally came JOSEPH SHUSTER, to me known, and known to
me to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executed the same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co. Clk's No. 429, Reg. No. 1110-C-9
Commission Expires March 30, 1949

76

ER-657

STATE OF NEW YORK  )SS.:
COUNTY OF NEW YORK )

On the 𝜈𝜊 day of May, 1948, before me came JACOB S. LIEBOWITZ, to me known, who being by me duly sworn, did depose and say that he resides at Great Neck, New York; that he is the Vice-President of NATIONAL COMICS PUBLICATIONS, INC., the corporation described in, and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 2, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK  )
COUNTY OF NEW YORK )  SS.:

On the 𝜈𝜊 day of May, 1948, before me came PAUL H. SAMPLINER, to me known, who being by me duly sworn, did depose and say that he resides at 944 Fifth Avenue, New York, N.Y.; that he is the President of INDEPENDENT NEWS CO., INC., the corporation described in, and which executed, the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 6, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF New York )
COUNTY OF New York )  SS.:

On the 21st day of May, 1948, before me came William O'Connell, to me known, who being by me duly sworn, did depose and say that he resides at St. Albans, New York; that he is the Treasurer of THE MC CLURE NEWSPAPER SYNDICATE, the corporation described in, and which executed the foregoing instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

GEORGE J. McCARTIN, Jr.
Notary Public, State of New York
Residing in Queens County
Queens Co. Clks. No. 3801, Reg. No. 121-Mc-0
N. Y. Co. Clks. No. 304, Reg. No. 237-Mc-0
Kings Co. Clks. No. 72, Reg. No. 145-Mc
Bronx Co. Clks. No. 13, Reg. No. 13-Mc
Certificate filed in Westchester Co.

**EXHIBIT E**

77

**ER-658**

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:

On the ro day of May, 1948, before me personally came HARRY DONENFELD, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:

On the ro day of May, 1948, before me personally came JACOB LIEBOWITZ, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:

On the ro day of May, 1948, before me personally came PAUL H. SAMPLINER, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 5, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK )
COUNTY OF NEW YORK ) SS.:
Westchester

On the 21 day of May, 1948, before me personally came WAYNE BORING, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

ADELE JAMPOL
Notary Public in the State of New York
Appointed for Westchester County
Commission expires March 30, 1949

78

**Exhibit E**
**114**

**ER-659**

**Superman's Creators, Nearly Destitute, Invoke His Spirit**
By MARY BREASTED
*New York Times (1923-Current file);* Nov 22, 1975;
ProQuest Historical Newspapers: The New York Times (1851-2008)
pg. 62

## Superman's Creators, Nearly Destitute, Invoke His Spirit

By MARY BREASTED



The New York Times/David Strick
The New York Times/William R. Sears
Jerry Siegel, left, and Joseph Shuster invented Superman, but are now nearly destitute. Mr. Siegel is a clerk in California. Mr. Shuster, legally blind, lives in Queens.

Two 61-year-old men, nearly destitute and worried about how they will support themselves in their old age, are invoking the spirit of Superman for help.

Joseph Shuster, who sits amidst his threadbare furniture in Queens, and Jerry Siegel, who waits in his cramped apartment in Los Angeles, share the hope that they each will get pensions from the Man of Steel.

Mr. Shuster and Mr. Siegel invented the character of Superman 42 years ago, and although their invention has earned publishers and television producers tens of millions of dollars, the character's creators have gotten nothing from the Superman tales for almost 30 years.

They have survived by odd jobs and sometimes through the sale of valuable old comic books. They have tried to fight for rights to percentages of the Superman products in the courts, but always they have lost.

The last court case took 12 years to complete, and in that entire period Mr. Shuster and Mr. Siegel refused to discuss their problems with the press, on advice of their lawyers.

### Idea Born in 30's

Finally this year they lost in the Second Circuit Federal Court of Appeals here, and their law firm, Coudert Brothers, advised them not to take the case to the Supreme Court. National Periodical Publications, Inc., the company that published Superman Comics, might work out some financial settlement, their lawyer told them, if they dropped the case.

That was in April.

Nothing has happened in the intervening months, and Mr. Shuster and Mr. Siegel have tired of their silent waiting. They have decided to tell the public what happened to them.

In 1933, with the country in the gloom of the Depression, Mr. Siegel decided the public might take to a comic strip about an inspiring fictional character with super powers.

Douglas Fairbanks Sr., the silent film star who never let a stunt man stand in for him in the acrobatically dazzling scenes in which he played Robin Hood and other swashbuckling heroes, was an idol to both Mr. Siegel and Mr. Schuster, who were then high school students in Cleveland.

And one night, the actor's acrobatics gave Mr. Siegel an idea. A creature born on another planet, impervious to the laws of gravity and stronger than an Army tank, would come to earth as a baby, be reared in an orphanage and grow up into a Superman whose consuming passion would be to right the wrongs of the world.

The next day, Mr. Siegel rushed over to see his friend Mr. Shuster, who liked to draw, and together they began to work on a comic strip about the new character.

For five years, they tried to sell their comic strip to newspaper syndicates, but none would buy it.

### Copyright Signed Away

Then, in 1938, Detective Comics, Inc. bought the concept for inclusion in one of its comic strip magazines. The first Superman episode appeared in a new magazine called Action Comics in June 1938. (The first issue of that magazine is now a collector's item worth about $3,000.)

The two young men were paid $10 a page which they split between them, earning about $15 a week each.

They had sold the character of Superman to the company in an act that was, in effect, the signing away of the copyright for their invention.

As the years passed, and Superman comics proved ever more popular, Mr. Siegel and Mr. Schuster decided they should get more of the profits. They sued Detective Comics, Inc., and got some money but not the rights to Superman.

The company dropped them and used other writers and cartoonists to carry on the strip. Mr. Schuster, who was always afflicted with poor eyesight, could get only manual jobs. Now he is unemployed and being supported by his 57-year-old bachelor brother, Frank, who lives with him in Queens.

### The Irony of It

Mr. Siegel, who at one point six years ago was unemployed and so hopelessly in debt that he sold his treasured old comic books to survive, now works for the state of California as a clerk-typist, earning about $7,000 a year. On that salary he supports himself and his wife.

"For years I've been waiting for Superman to crash in and do something about it all," Mr. Siegel said the other day. "Perhaps he would reveal a new superpower. He might have a new ray which is capable of stimulating a corporation's conscience."

Jay Emmett, executive vice-president of Warner Communications, Inc., which now owns National, said recently that he had told the lawyers for Mr. Siegel and Mr. Shuster that the company intended to give them some kind of an annual stipend.

"There is no legal obligation," Mr. Emmett said, "but I sure feel that there is a moral obligation on our part."

Mr. Siegel and Mr. Shuster say they have not yet heard what they may be offered by the company.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

THE NEW YORK TIMES, WEDNESDAY, DECEMBER 10, 1975 L+ 81

# Larchmont Board Ends Creche Display

By JAMES FERON

# Lie Tests Are Postponed For Head of Slain Family

By JOSEPH P. SULLIVAN

## Metropolitan Briefs

### Gas Main Explodes on East Side

### Dutchess Jail Inmates Sue Sheriff

### City Upheld on Bullhorn Permits

### 13 Children Hurt in School-Bus Crash

### Carey Names an Appellate Justice

### Bearne Reappoints 2 Judges

### From the Police Blotter:



Superman, in a drawing by Neal Adams, holds Jerry Siegel, left, and Joseph Shuster, who invented the cartoon character. The two at the New York Press Club.

## Mild-Mannered Cartoonists Go To Aid of Superman's Creators

By DAVID VIDAL

## Theft of $200,000 Is Laid to a Lawyer in Westchester

### Police Treasury Fee Will Go Up to $65

### LOTTERY NUMBERS
Dec. 9, 1975
N. J. Daily—32790
N. J. Pick-It Lottery—711



WHAT WAS THE WEATHER LIKE HERE? Don't ask.

## Nassau County Enters Entente With Soviet

## 17 Women on Rikers I. Receive Certificates for Secretarial Skills

By EDITH EVANS ASBURY



Graduates of secretarial skills program holding roses at a ceremony yesterday in the Rikers Island detention center

Exhibit G
ER-661
116
Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

RECEIVED

FEB 1 5 1978

LAW OFFICES
ALLEN, EASMAN & JANGER

**WARNER COMMUNICATIONS INC.**

December 23, 1975

Mr. Jerome Siegel
Mr. Joseph Shuster
c/o Edmund Preiss, Esq.
Kane, Kessler, Proujansky, Preiss & Permutt
680 Fifth Avenue
New York, New York 10019

Dear Mr. Siegel and Mr. Shuster:

This letter, when countersigned by both of you, constitutes our agreement as follows:

1. You conceived of and created "Superman".

2. You acknowledge that Warner Communications Inc. ("Warner")*, both immediately before and immediately after the signing of this agreement, is the sole and exclusive owner of all right, title and interest in and to the "Superman" concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of any such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence

_____

* Such term, as used in this agreement, includes Warner Communications Inc., National Periodical Publications, Inc., Licensing Corporation of America, and all other Warner subsidiaries.

**Exhibit H**

12/18/75

75 Rockefeller Plaza   New York, New York 10019   212 484 8000

**ER-662**

2

or hereafter devised, together with the absolute right to transfer, license, sell or otherwise dispose of said rights.

3. You brought a proceeding in the United States District Court and in the United States Court of Appeals, asserting certain rights in Superman, and this case was determined against your claims. The Court of Appeals unanimously decided that "all rights in Superman, including the renewal copyright, have passed forever to [National Periodical Publications, Inc., a Warner subsidiary.]" You did not appeal this case to the Supreme Court of the United States. Your determination not to appeal was your own determination. Whatever your subjective reasons may have been, you acknowledge that the determination not to appeal was not made by reason of any promise or inducement by Warner or its representatives.

4. Warner does not have any legal obligation to pay you any sum of money whatsoever and does not acknowledge that any wrong has been done to you.

5. Warner has nevertheless determined, in consideration of your past services to Warner and in view of your present circumstances, to make the following voluntary payments:

a. Warner will make monthly payments to each of you at the annual rate of $20,000 for your respective lifetimes, less any applicable withholding taxes, commencing January 1, 1976.

ER-663

b. In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner will pay his wife, Joanne Siegel, if she survives him, monthly payments at the rate of $20,000 a year, commencing on the date of Jerry's death, and ending December 31, 1985, and thereafter monthly payments at the rate of $10,000 a year for the balance of her life. If Joanne does not live to December 31, 1985, Warner will pay Laura Siegel, Jerry's daughter, if she survives Joanne and Jerry, at the rate of $20,000 a year from the date of Jerry's death or Joanne's death, whichever is later, to December 31, 1985; all payments to Laura will cease on that date. All payments to be less any applicable withholding taxes.

c. In addition, Warner will pay Frank Shuster (Joe's brother), if he survives Joe, monthly payments at the rate of $10,000 a year commencing on the date of Joe's death and ending December 31, 1985, and thereafter at the rate of $5,000 a year for the balance of his life. All payments to be less any applicable withholding taxes.

d. In addition, Warner will include both of you in the Warner insured medical plan, covering employees generally, or any successor plan thereto. A copy of such plan as now in effect, together with cover memo dated December 17, 1975, is annexed hereto and incorporated by this reference as Schedule X.

e. In addition, as requested by you, Warner has paid you, simultaneous with the signing of this agreement, the sum of $7,500 each (not subject to withholding) which you have stated that you intend to apply to legal fees and disbursements incurred by you in connection with the lawsuit described

above.  Any such payment is to be made by you directly to your counsel in such action, in your discretion, and Warner does not recognize or have any obligation to such counsel. Warner does not recognize or have any obligation to your present counsel.

In addition, Warner has paid you, simul-taneous with the signing of this agreement, the sum of $10,000 each (not subject to withholding), which you have requested, to be applied to your debts.

f.  The obligation of Warner to make the periodic payments provided for above to you, to Jerry's wife (or daughter) and to Joe's brother, and the credit line obligation set forth in paragraph 6, will cease forthwith, if you, or either of you, or anyone acting on your behalf, or claiming through you, com-mences an action, suit or proceeding against Warner (including its subsidiaries), or against any licensee of Warner (1) assert-ing any right, title or interest in the "Superman" concept, idea, continuity, pictorial representation, formula, characters, car-toons and comic strips, title, logo, copyrights and trademarks; or (2) asserting any financial claims against Warner or any licensee, or claiming any credit line rights, other than as pro-vided for in this agreement.

6.  The following credit line provisions are agreed upon:

ER-665

a. The following "obligatory credit line" provisions apply only during the lifetime of the longer-lived of Jerry Siegel and Joe Shuster. They apply only to "Superman Books" whether new or reprints bearing a July 1976 cover date, or which are on the July 1976 production schedule or are published or licensed after such date. "Superman Books" means only the following: (i) Superman and Action Comics comic books; (ii) other comic books, comic strips and books in which both of the following conditions are met: (A) "Superman" is the sole title of the strip, alone or with other words, and the name of another cartoon character is not also used in the title or is not used instead in the title; and (B) Superman is the sole central character of the strip, the foregoing being intended to exclude comic books, comic strips and other books combining more than one central character, or featuring a different central character. The foregoing definition explicitly excludes "Justice League of America", "World's Finest" and "The Superman Family", but is not limited to such exclusions. In construing this provision, it is understood that the reason for such exclusions is that, while Warner wishes to give you credit for creating Superman, it cannot do so and does not agree to do so in any situation where confusion may result as to whether someone else's creation is yours, or where it would be necessary to use multiple credit lines.

As to "Superman Books" (July 1976 and after), the following "obligatory credit line" provisions will apply: The credit line "created by Jerry Siegel and Joe Shuster", or

"by Jerry Siegel and Joe Shuster", or "Superman created by
Jerry Siegel and Joe Shuster", or "Superman by Jerry Siegel
and Joe Shuster", any of such forms being satisfactory, will
be used on the first inside page in conjunction with the title
or logo "Superman". Such credit line will appear approximately
as in Exhibit A, but typeface and size can be changed in
Warner's sole discretion, as long as the credit line remains
legible.

You waive your rights of privacy under the
New York Civil Rights Law and comparable or similar statutory
or case law of other jurisdictions to permit the "obligatory
credit line" uses, and to permit any other uses in any other
publications if Warner or its licensees elect in their sole
discretion to include a credit line in any of them. The agree-
ment to carry such credit line, and the carrying of such credit
line, does not constitute an admission by Warner or any licensee
of any proprietary ownership, right, title or interest of Siegel
and Shuster in Superman or in such comic books, strips or books,
there being none, and you agree that there is no such proprietary
ownership, right, title or interest. The omission of such credit
line shall not give rise to any right or remedy on the part of
Siegel and Shuster, including but not limited to injunctive re-
lief, unless such credit line shall have been omitted from an
issue or edition covered by the "obligatory credit line" use pro-
vision, and unless thereafter you shall give notice (in accord-
ance with the notice provisions hereof) to Warner of such omission

ER-667

6

and unless such credit line shall be omitted from an additional
issue or edition which goes to press after the receipt date
shown on such registered mail notice, in which case the remedy
shall be limited to an affirmative injunction requiring such
credit line to be carried in issues or editions going to press
after the date of the injunction; it is explicitly understood
and agreed that such injunction will not be an injunction to
restrain distribution of the issues or editions from which
credit has been omitted, and you hereby waive any such remedy.
The reasonable expenses of obtaining such injunction shall be
reimbursed to you by Warner, but you agree that you shall not
be entitled to any damages or other payments whatsoever, which
you hereby waive.

b. Warner has previously licensed to Film
Export A.G. the right to produce one or more Superman
motion pictures, not yet released, for theatrical, TV, and
other use. Warner agrees to write a letter request

**ER-668**

to the licensee to include a credit line ("Superman created
by Jerry Siegel and Joe Shuster") in the screen credits.
This is not a best efforts undertaking; Warner's sole obligation
will be discharged by sending the letter, which shall quote
this paragraph. Warner does not represent or warrant that the
licensee will honor the request; on the contrary, Warner has
stated that there is no basis for reopening the license agree-
ment. Any use by the movie licensee of the credit line will
explicitly not constitute an acknowledgment of any proprietary
ownership or right, title or interest of Siegel or Shuster in
Superman or in such movies, there being none, as you acknowledge,
nor will any royalties, remuneration or compensation be payable
to you by reason of any such use. You waive your rights of
privacy under the New York Civil Rights Law and similar or com-
parable statutory or case law of other jurisdictions if the movie
licensee elects to carry the credit line. There is no require-
ment as to typeface or size if the licensee elects to carry the
credit line. You acknowledge that the present agreement between
you and Warner is binding whether or not the movie licensee agrees
to carry the credit line.

c. As to any motion picture or TV license agree-
ments entered after the date hereof, Warner will require the
licensee to carry the credit line ("Superman created by Jerry
Siegel and Joe Shuster") in the screen credits. Any use by any
such future movie or TV licensee of the credit line will ex-
plicitly not constitute an acknowledgment of any proprietary

**ER-669**

ownership or right, title or interest of Siegel or Shuster
in Superman or in such movie or TV presentation, there being
none, as you acknowledge, nor will any royalties, remuneration
or compensation be payable to you by reason of any such use.
You waive your rights of privacy under the New York Civil Rights
Law and comparable or similar statutory or case law of other
jurisdictions to permit such credit line. There is no require-
ment as to typeface or size in movie or TV use.

d. No credit line will be carried on any use
licensed by Licensing Corporation of America (a Warner subsidi-
ary) including but not limited to clothing, toys, games, premiums,
or other merchandising rights, and no credit line request will
be made by Licensing Corporation of America to licensees.

7. You agree to accept the payments and the credit
line provision set forth above in full accord, satisfaction,
recognition and release of any and all claims by you, whether
legal, moral, equitable or otherwise; you acknowledge that the
agreed payments and the credit line provision are fair, generous,
equitable, satisfactory and sufficient, and that they meet the
objectives of your recent communications to us and to the press,
radio, TV, etc.; you acknowledge that you do not now have, and
will not in the future have, any rights to Superman; and you
agree that any statements you make to the press, radio, TV, etc.
will be consistent with the foregoing. You authorize Warner to
include the reference to you in the statement annexed hereto
as Exhibit B which Warner intends to release, at the signing of
this agreement. You intend to release the statement annexed

hereto as Exhibit C, and you authorize Warner to do so on your behalf, at the signing of this agreement. You further acknowledge that you have signed this agreement freely and without compulsion, and that this agreement has been reviewed by your present counsel, Edmund Preiss.

       8.   Any notice to Warner shall be given by registered mail, return receipt requested as follows:

> Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019
> Attention:  Jay Emmett
>                 Executive Vice President

with copy to:

> Martin D. Payson, Esq.
> Vice President and General Counsel
> Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019

with copy to:

> National Periodical Publications, Inc.
> c/o Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019
> Attention:  William Sarnoff

       Any notices to Mr. Siegel or Mr. Shuster shall be given by registered mail, return receipt requested as follows:

> Jerome Siegel
> 11711 Mayfield Ave., Apt. 14
> West Los Angeles, California 90049

> Joseph Shuster
> 98-120 Queens Boulevard  Apt 4-K
> Forest Hills, New York  11374

ER-671

with copy to:

> Edmund Preiss, Esq.
> Kane, Kessler, Proujansky, Preiss & Permutt
> 680 Fifth Avenue
> New York, New York 10019

Any party may furnish change of address by notice.

9. This agreement may be signed in counterpart. The counterparts taken together will constitute the original.

10. The payment provisions hereof will be binding upon any purchaser of substantially all of the assets of or any successor by merger to Warner Communications Inc. (the parent corporation). The credit line provisions (limited as set forth in paragraph 6) will be binding upon (a) any purchaser of the National Periodical Publications Inc. business, (b) any purchaser or licensee of the rights to publish the <u>Superman</u> and <u>Action Comics</u> series, or of any other comic book, comic strip or book in the "obligatory credit line use" category, and (c) any licensees of the future motion picture and TV rights to Superman, if any (excluding the existing movie licensee). Payment provisions and credit line provisions are personal to the named individuals and are not assignable, and do not benefit their heirs, executors or administrators.

11. This agreement shall be interpreted in accordance with the laws of New York applicable to contracts made and to be performed solely within New York.

Please sign below to signify that this sets forth

the entire understanding between us.

With our best wishes to you both.

WARNER COMMUNICATIONS INC.

By

Jay Emmett
Executive Vice President

Accepted and Agreed:

Jerry Siegel

Joseph Shuster

# CALENDAR



*Superman, the character created by Jerry Siegel, left, and Joe Shuster, symbolizes for them a shattered American dream.*

PHOTO BY ULI S. ALBERS

## MAN OF STEEL SPLINTERS AN AMERICAN DREAM

### BY EIRIK KNUTZEN

Superman's continual quest for "truth, justice and the American way" seems something of a cruel joke to the two men who created the Man of Steel.

As 19-year-old Cleveland boys with big dreams in 1934, writer Jerry Siegel and cartoonist Joe Shuster created what was to become the most successful superhero in history. At the time, during the Great Depression, Superman represented their one-way ticket to fame and fortune. Now they're battle-scarred and weary at 64 and their Man of Steel seems to symbolize a shattered American dream.

While remaining in virtual seclusion for 30 years, Siegel and Shuster have kept close tabs on the Man of Steel's incredible financial successes. Now they seem fearful that Warner Communications Inc., parent company of the Superman comic book publishers, may cut off their $20,000-a-year each "pension" for life—gained in late 1975—if they protest too loudly.

They went to court twice to test legal points with the comic book publishers, seeking to protect what they considered to be their rights as literary creators. They came out on top in the first case in 1947—splitting a $100,000 settlement—but it also was the beginning of financial ruin.

They lost the second in 1975, after a 12-year fight to obtain Superman copyright renewal rights. The court ruled that they had lost all rights to their character after signing the publishers' release form and endorsing a check for $130 in 1938.

The media publicized their dire economic straits, more or less prompting Warner Communications to offer some assistance.

Signing all copyrights over to the comic book publishers, according to Jack C. Harris, an editor and publicist at DC Comics, Inc., "was standard practice back then. It still is. Everyone who does art work for us signs a release saying we own the copyright, though we have a more open contract in that whoever creates a character for us now does get a percentage."

Siegel and Shuster live in quiet middle-class residential sections of Los Angeles'

West Side. Shuster, apparently embarrassed by his small, cluttered one-bedroom apartment, prefers to conduct his infrequent interviews at Siegel's place. A short, pudgy man with thinning gray hair, Shuster wears thick glasses. He is legally blind due to a progressive eye disease since childhood. Married late in life, he is going through divorce and has no children.

Siegel shares his sparsely furnished three-bedroom apartment with Joanne, his wife of 30 years, and his daughter, Laura, a newscaster and director in a local radio.

Plaid blankets cover the sofa and easy chairs as if to hide the wear and tear. Mass-reproduced art lines the walls. The apartment and most of the budget furniture was acquired after the deal with Warner Communications.

Siegel is of slighter build and sports a shock of longish gray hair. Intense blue eyes are set in a craggy, lined face. A recently developed heart condition is a source of chronic anxiety. Like Shuster, Siegel considers himself "semiretired"—meaning he writes comic book scripts and TV treatments while working on an autobiographical book.

They published one of the original Superman versions in their own mimeographed "fanzine." After nearly four unsuccessful years of trying to sell Superman as a comic strip, they went to work as independent artists in 1937 under a 10-year contract to Detective Comics, the first forerunner of DC Comics. After about a year, the publishers decided to take a chance on their superhero in Action Comics No. 1.

Siegel and Shuster deny that they were aware of selling the Superman character outright for $130 at the time. "We were

paid $10 a page for that 13-page story—a total of $130. Along with the check, we were sent a release form which was releasing all rights to the character. We did not receive any special amount for the character itself," Siegel explained.

When the McClure Syndicate decided to distribute Superman as a newspaper strip in 1939, the creators asked for their rights back. "We were told that we had parted with all our rights, that they owned the character, and if we wanted a syndicated strip, we could be associated with them in a pleasant manner," Siegel recalled.

A revised contract during the '40s also gave them a small percentage from merchandising. "But we were never given an accounting," Shuster said. "At the end of the year they would give us a Christmas bonus and say, 'That's the money due—just forget about everything else.' It was a lump sum to keep us quiet. I think it was something like a few thousand (dollars)."

Besides contractual salaries up to 1948, Siegel estimates that Superman in various forms generated approximately $420,000 for them. "It was mostly from newspapers, not from the comics where millions were made," he smiled. But take the $420,000, split it between us, and spread it over all those years . . . and Joe had to pay about half of that to his staff." After paying his staff, Shuster claims, he never took home more than $150 to $200 per week. And he needed a staff of artists because of the work load and due to his eye condition.

In 1947, toward the end of their 10-year contract period with the comic book publishers, they went to court over a spin-off character, Superboy. The litigation lasted a

**Calendar Movie Section, Page 36**

year, revolving around the fact that the creators of big-money-earner Superman were now ready to go into competition with Detective Comics with their own Superboy magazine. "There was a settlement out of court which is a little complicated, but they regained Superboy in exchange for $100,000. Part of the money was already due us for some work we had done over a period of years," Shuster explained.

"After that first lawsuit, we were completely broke. I went into debt because I didn't have an income (all ties with the publishers were severed once the suit was initiated)—and all the debts had to be repaid. And to pay our attorneys."

Severe times followed, especially after their efforts with a strip called "Funnyman" failed to amuse readers. "It got worse and worse for me free-lancing scripts for comic books—soon I found it impossible to make a living as a writer."

With Siegel's mental condition deteriorating, and a child to feed, his wife began to make appeals to the publishers: "We were without funds with only baby food in the house, the diaper service was cut off, along with the milk service, and we got an eviction notice from the landlord for our one-bedroom apartment.

Friends and neighbors in Great Neck, Long Island, extended credit for food and necessities while Mrs. Siegel repeatedly appealed to the president of the comic book publishers and Siegel wrote letters to the media concerning his plight. When he received some publicity in the New York area, he also went on a hunger strike. As a result of that, according to his wife, the publishing company sent one of their attorneys to their house with $50.

Somehow, after years of appeals, Mrs. Siegel persuaded the publisher to hire Siegel back on a free-lance basis and he began writing Superman stories again in 1959—without a by-line. (Their by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case.) Siegel wrote hundreds of stories "developing Superman's emotional life" at $10 per page (he said he received $50 a page) until the middle '60s, when again he severed the ties with the publishers and became involved in the 12-year litigation to gain Superman's copyright renewal.

His wife's physical condition dictated a move to the West Coast in 1966, where for the next three years he again had problems finding employment. "Then I got a job for the state of California's Public Utilities Commission as a clerk/typist. My salvation was that as a writer, I knew how to type."

Shuster, meanwhile, moved in with his invalid mother in Forest Hills a few years after the 1947 lawsuit had left him penniless in victory.

Unable to function as an artist, Shuster spent the next 15 years at menial labor as a stockroom clerk, sales clerk: "In 1965, I was the oldest messenger boy in New York City," he laughed. "And one day I had to deliver a message to an office located in the same building as the publisher of DC Comics. Someone from their office saw me in the hall, asked me what I was doing there, then told the publisher about it later. He called me that night—very upset—and asked me to come into his office so he could help me out a little. 'How does it look,' he said, 'for the artist/creator of Superman to be running around delivering messages—you're giving us a bad name!' " □

*Knutzen is a free-lance writer.*

SUNDAY, FEBRUARY 25, 1979 CALENDAR PAGE 7

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Exhibit I
129

ER-674

Dated: October *10*, 1980

DC Comics, Inc.
75 Rockefeller Plaza
New York, New York 10019

<div align="center">Re: "SWAMP THING"</div>

Gentlemen:

        This is to confirm the terms of the Agreement
between you (hereinafter referred to as the "Owner") and us
(hereinafter referred to as the "Purchaser") regarding that
certain comic book series entitled "SWAMP THING" solely owned
by Owner (said comic book series, together with the title
thereof and all characters, representations, situations,
translations, arrangements, and adaptations thereof, and all
literary, dramatic and photographic material relating to the
foregoing as created for the said comic magazines and the
themes, plots, situations, sequences, pictorial action,
dialogue, drawings and sketches contained in and depicted in
comic magazines published by Owner, and each and every part of
all the aforesaid, whether now or hereafter written, are herein
collectively referred to as the "Work").

        1. (a)  Owner hereby grants to Purchaser the sole
and exclusive option (hereinafter called the "Option") to
acquire, exclusively and forever, pursuant to the terms and
conditions hereof, all rights of whatsoever kind and nature,
under copyright and otherwise, throughout the universe in and
to the Work (except for those rights specifically reserved to
Owner pursuant to Paragraph 4 below) including, without
limitation, all motion picture and television and allied rights
(including all silent, sound, dialogue; musical, sequel, and
remake motion picture rights, and all television series,
special, movie-of-the-week rights); all rights pertaining to,
incident to, or deriving from the exercise of the rights
acquired by Purchaser pursuant to this Agreement and/or from
the advertising and/or exploitation and/or turning to account
of any productions, publications, sound recordings or other
products produced in the exercise of such rights and/or from
the exploitation and/or turning to account of any and all other
rights acquired by Purchaser pursuant to this Agreement; all
musical rights (including, without limitation, soundtrack album
and music publishing rights) pertaining to, incident to, or
deriving from the other rights granted to Purchaser pursuant to
this Agreement; the right to publish or cause to be published
books and publications (but not comic books) based upon or
relating to the motion picture based upon the Work (hereinafter

ii

DCC00147516
CONFIDENTIAL

**ER-675**

referred to as the "Picture") and/or to the Work; provided,
however, subject to Paragraph 3A below, Warner Books (here-
inafter referred to as "WB") shall have a right of first
refusal with respect to the publishing of said books, as more
particularly set forth in said Paragraph 3A below; the right,
in connection with or incident to Purchaser's exercise of its
other rights under this Agreement, to publish synopses,
excerpts and summaries of the Work or the productions based
thereon (but no such synopsis, excerpt, or summary shall
contain more than 7,500 words from the Work); but, although
Owner may be identified as the author of the Work, Owner shall
not be identified as the author of any such synopsis, excerpt
or summary unless Owner actually has caused the same to be
written; the right, for the purpose of advertising and
exploiting any motion pictures or other versions of the Work,
to broadcast and/or transmit by means of television or radio or
any process analogous thereto, whether now known or hereafter
invented or devised, excerpts from the Work or any adaptation
or versions thereof (such excerpts not to exceed ten [10]
minutes in length, nor shall such excerpts be broadcast in
serialized form), including any motion picture or other version
or versions thereof and announcements of or concerning said
motion picture or other version or versions, which broadcasts
or transmissions may be accomplished through the use of living
actors performing simultaneously with such broadcast or
transmission or by any other method or means including the use
of motion pictures (including trailers) reproduced on film or
by means of magnetic tape or wire or through the use of other
recordings or transcriptions, or by video cassettes, video
discs, or by any other means, whether now known or hereafter
invented or devised, together with all copyrights and exten-
sions and renewals of copyrights in and to each and all of the
foregoing; the right, insofar as Owner has the right to grant
same, to use for all purposes all titles by which the Work,
characters depicted therein, or any chapter, or part thereof is
now or hereafter known, including but not limited to the right
to sell, license and otherwise exploit motion pictures produced
hereunder in all forms of paid or cable television in conjunc-
tion with the exercise of rights acquired hereunder; the right
to distribute, exhibit and otherwise turn to account all motion
pictures and other products produced in the exercise of rights
acquired hereunder by any means, method, device or format,
whether now or hereafter known or invented; as well as all
rights now known or hereafter created which may be necessary to
effectuate any or all of said rights. The aforesaid rights are
hereinafter collectively called the "Optioned Rights". It is
hereby agreed that the first motion picture based upon the
Work, produced by Purchaser, shall be what is customarily
referred to in the motion picture industry generally as a
"feature-length theatrical" motion picture.

i

DCC00147517
CONFIDENTIAL
ER-676

(b) As full consideration for the Option, Purchaser agrees to pay or cause to be paid a sum of not less than Fifteen Thousand Dollars ($15,000.00) (hereinafter referred to as the "Development Sum") to a writer or writers for purposes of developing a treatment for a motion picture screenplay based upon the Work and/or for a motion picture screenplay based upon the Work. It is agreed that any such treatment shall be written and delivered to Purchaser within four (4) months from the date of this Agreement, and that any such motion picture screenplay shall be written and delivered to Purchaser within six (6) months from the date of this Agreement. Said six-month period shall hereinafter be referred to as the "Initial Option Period".

(c) Provided Purchaser has paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period and provided that either a treatment is delivered to Purchaser within four (4) months from the date of this Agreement or a screenplay is delivered to Purchaser within six (6) months from the date of this Agreement, the Initial Option Period shall be deemed automatically extended to the date which is one (1) year from the date of this Agreement.

(d) In the event Purchaser has not paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period, then provided Purchaser pays the sum of Fifteen Thousand Dollars ($15,000.00) to Owner by the end of the Initial Option Period, the Initial Option Period shall be automatically extended to the date which is one (1) year from the date of the Agreement.

(e) The extension of the Initial Option Period, pursuant to either subparagraphs (c) or (d) above, shall be hereinafter referred to as the "Extended Option Period".

(f) The Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Initial Option Period, unless the Initial Option Period has been extended pursuant to either subparagraphs (c) or (d) above. In such event, the Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Extended Option Period.

(g) If, prior to the giving to Owner of written notice of exercise of the Option, principal photography of the first motion picture to be produced hereunder in the exercise of the Optioned Rights is commenced, such commencement of principal photography shall constitute exercise of the Option.

-3-

DCC00147518
CONFIDENTIAL
ER-677

(h)  If Purchaser does not exercise the Option hereunder within the Initial Option Period, or the Extended Option Period, whichever is applicable, any rights granted revert to Owner, and Purchaser hereby agrees to execute such documents as are reasonably necessary to effect such reversion.

2.  Purchaser shall have the right to write or cause to be written screen treatments, scenarios and/or screenplay versions of the Work and to do all other things which it maydeem necessary for preparation of the Work as a motion picture.  Neither the writing thereof, nor the engagement of performers or other personnel in connection with the production of a motion picture based on the Work, nor the public announcement thereof, shall be deemed to constitute an exercise of the Option, which may be exercised only by written notice to Owner, as hereinabove provided, or by the sooner commencement of principal photography of the first motion picture (if any) produced hereunder in the exercise of the Optioned Rights.

3.  (a)  Owner hereby reserves all comic book publication rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above.

(b)  Owner hereby reserves all rights of production and use upon the regular spoken stage with living actors appearing and speaking in person solely in the actual and immediate presence of the audience; provided, however, that Owner shall not have the right to use or license any stage rights in favor of any party other than Purchaser prior to three (3) years after the date of the first general release of the first motion picture produced in the exercise of the Optioned Rights, or five (5) years from the date of the exercise of the Option by Purchaser, whichever first occurs, except that if, prior to the expiration of the said three (3) or five (5) year period, or thereafter but prior to Owner's use or licensing of such rights, Purchaser sells or causes the Picture to be sold to a U.S. television network for prime time exhibition, then at such time the holdback periods set forth herein and in subparagraph (c) below shall be extended to five (5) years after the date of such sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.  Any proposed sale, license, disposition or use by Owner of any such stage rights after such period shall be subject to the provisions of Paragraph 5(e) hereof.

(c)  Owner hereby reserves all radio rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above if the Option is exercised; provided, however, that Owner shall not have the right to use or license any such rights prior to three (3) years after the

DCC00147519 CONFIDENTIAL     ER-678

date of the first general release of the first motion picture
produced in the exercise of the Optioned Rights or five (5)
years from the exercise of the Option by Purchaser, whichever
first occurs.

(d)   Owner may enter into agreements regarding
the rights set forth in subparagraphs (b) and (c) above prior
to the expiration of the respective holdback periods; provided,
however, that such rights shall not be exercised by any party
until the dates of termination of said respective holdback
periods.

(e)   Owner hereby reserves all merchandising
rights in and to the Work, subject to the following terms and
conditions:

(i)   Licensing Corporation of America ("LCA")
shall be the licensing agent on behalf of Owner with respect to
merchandising;

(ii)   LCA shall be entitled to deduct a fee of
thirty-three and one-third percent (33-1/3%) of all gross
receipts from United States merchandising licenses, and, with
respect to foreign merchandising licenses, a fee of fifteen
percent (15%) of "net receipts" (i.e., gross receipts remaining
after deduction of foreign agents' commissions, if any, and of
taxes deducted by foreign governments), except that if the
deduction of LCA's fifteen percent (15%) fee, when combined
with the deduction of foreign taxes and foreign agents'
commissions, would reduce the remaining receipts below sixty
percent (60%) of the original amount prior to any such
deductions, then LCA's fee shall be reduced to such lower
percentage of net receipts as may be necessary to result in an
amount remaining after all such deductions equal to sixty
percent (60%) of such original gross receipts; provided,
however, that in no event shall LCA's fee on foreign
merchandising licenses be reduced below twelve and one-half
percent (12-1/2%) of net receipts.

(iii)   All amounts remaining after the
deductions permitted pursuant to subparagraph (e)(ii) above,
shall be shared fifty percent (50%) thereof to Owner and fifty
percent (50%) thereof to Purchaser (hereinafter referred to as
"Purchaser's Share").

(iv)   Owner shall provide to Purchaser
statements, indicating gross receipts from each territory or
country, deduction of LCA's fee, and other information
customarily included in same.  Such statements shall be sent to
Purchaser by Owner not less frequently than quarterly for  e
first two (2) years after the first general release of

DCC00147520
CONFIDENTIAL

ii

**ER-679**

Picture and any sequel, remake, television series, pilot, mini-series, or movie-of-the-week, and semiannually thereafter;

(v) Purchaser shall be paid the Purchaser's Share derived from all articles, items and commodities licensed by LCA in connection with the Work and/or the Picture, except, however, that Purchaser shall not be entitled to the Purchaser's Share derived from those certain articles, items, and commodities licensed by LCA pursuant to deals substantially negotiated by LCA and any licensees after the date which is eighteen (18) months from the first general release of the Picture in the United States (hereinafter referred to as the "Merchandise Date") (said certain articles, items and commodities hereinafter referred to as "Post Picture Merchandising"). Notwithstanding anything to the contrary contained herein, if Purchaser shall at any time (whether prior to or following the conclusion of such eighteen (18) month period) grant rights for any remake, sequel, television series, pilot, or movie-of-the-week, hereunder which is thereafter actually produced (hereinafter collectively referred to as the "Subsequent Pictures"), then Purchaser shall be paid the Purchaser's Share derived from merchandising licenses substantially negotiated within the period commencing upon the date of such grant and ending [except as may be extended pursuant to this subparagraph 3 (e)(v)] upon the date eighteen (18) months following general release or broadcast in the United States of any such Subsequent Picture. With respect to deals which are substantially negotiated by LCA and any licensee after the Merchandise Date and prior to any such grant, all net receipts remaining after the deduction by LCA of its fee pursuant to subparagraph (e)(ii) above, shall be paid one hundred percent (100%) to Owner.

The procedure outlined above shall be repeated with respect to each motion picture or television program produced and released pursuant to this Agreement.

3A.    Purchaser agrees to first offer to WB any book proposals based upon or relating to the Picture and/or to the Work (except for a "making of the Picture" type book which Purchaser may publish or cause to be published without offering such to WB). WB shall have ten (10) business days to accept such proposal(s). If WB rejects such proposal(s) or is silent, then all rights in and to such proposal(s) and the books, based upon such proposal(s), shall be exclusively owned free and clear by Purchaser, and Purchaser shall be free to offer and conclude deals for same with any third party for greater compensation than that offered by WB to Purchaser without any participation whatsoever by Owner or WB.

iii

DCC00147521
CONFIDENTIAL
ER-680

4.  (a)  If Purchaser exercises the Option, Purchaser
agrees to pay to Owner, concurrently with such exercise, a sum
equal to two and one-half percent (2-1/2%) of the cash pro-
duction budget of the Picture (said sum, as adjusted pursuant
to the provisions of Paragraph 4(b) below, shall hereinafter be
referred to as the "Cash Purchase Price"), less all sums paid
to Owner pursuant to Paragraph 1(d) above.  Upon the exercise
of the Option and payment to Owner of the Cash Purchase Price
by Purchaser, the Optioned Rights shall automatically vest in
Purchaser as Purchaser's sole and absolute property.

(b)  If after the receipt of the negative cost
statement by Owner pursuant to Paragraph 4(g) below, it appears
that the negative cost exceeds the cash production budget, then
in such event, the Purchaser shall promptly pay to Owner two
and one-half percent (2-1/2%) of said excess.  If on the other
hand, it appears that the cash production budget exceeds the
negative cost, the Owner shall promptly repay the Purchaser two
and one-half percent (2-1/2%) of such excess.

(c)  In respect to the first feature-length
motion picture, if any, based upon the Work and produced in the
exercise of the Optioned Rights hereunder, Owner shall be
entitled to receive the contingent compensation referred to in
Paragraph 4(e)(i) below.

(d)  (i)  In respect of each sequel and/or remake
motion picture (as such terms are hereinafter defined), if any,
produced in the exercise of the Optioned Rights hereunder,
Owner shall be entitled to receive a sum equal to one-half
(1/2) the Cash Purchase Price, payable to Owner upon commence-
ment of principal photography of each sequel and/or remake
motion picture, plus the contingent compensation referred to in
Paragraph 4(e)(ii) below, it being agreed that nothing in this
Agreement shall obligate Purchaser ever to produce a sequel or
remake motion picture.

(ii)  As used herein, the term "sequel motion
picture" means a motion picture other than a television motion
picture using one or more of the major characters of the Work
participating in different events from those found in the Work,
whether such events are prior to, concurrent with or subsequent
to the events of any prior motion picture(s) and whose plot is
substantially new, it being understood that the first motion
picture produced hereunder is not a sequel motion picture.
Purchaser's obligation to make the payment provided for in
Paragraph 4(d)(i) above shall only be in respect of sequel
motion pictures written by Purchaser, its successors,
assignees, or licensees, or written by persons engaged or
employed by Purchaser, its successors, assignees, or licensees,
to write such sequel motion pictures.

*[margin handwritten note:]* Production budget of said sequel and/or remake, as adjusted to the provisions of Paragraph 4(b) above.

iii

-7-

DCC00147522
CONFIDENTIAL
ER-681

(iii)  As used herein, the term "remake motion picture" means a motion picture other than a television motion picture and other than the first motion picture produced hereunder which is based upon the plot or story of the Work or of a prior motion picture produced hereunder.  The term "remake motion picture" does not include (a) a sequel motion picture, (b) versions (such as foreign language versions or shortened or expanded versions) of the first theatrical motion picture produced by Purchaser based on the Work or any sequel motion picture, or (c) a motion picture based upon some part of the plot or story of the Work which was not used for a prior motion picture.  Purchaser's obligation to make payments provided for in Paragraph 4(d)(i) above shall only be in respect of remake motion pictures written by Purchaser, its successors, assignees or licensees, or written by persons engaged or employed by Purchaser, its successors, assignees, or licensees, to write such remake motion pictures.

(e)  Owner shall be entitled to receive directly from the distributor(s):

(i)  contingent compensation of a sum equal to five percent (5%) of the gross receipts after "artificial breakeven", if any, derived from the first feature length motion picture, if any, produced in the exercise of the Optioned Rights.

For all purposes of this Paragraph 4(e)(i), the term "artificial breakeven" shall mean that point in time when the gross receipts derived by the Picture shall reach a sum equal to two and one-half (2-1/2) times the negative cost of the Picture (hereinafter referred to as the "Multiple"); however, in the event the negative cost of the Picture is Five Million Dollars ($5,000,000) or greater, the Multiple shall be reduced as follows:

| Negative Cost | Multiple |
|---|---|
| $5,000,000 - $6,250,000 | 2.4 times |
| $6,250,000 - $7,500,000 | 2.3 times |
| $7,500,000 - $8,750,000 | 2.2 times |
| $8,750,000 - $10,000,000 | 2.1 times |
| $10,000,000 and over | 2.0 times |

Notwithstanding the foregoing, in the event the distribution rights for the world are granted to two separate distributors (one with respect to the domestic

DCC00147523
CONFIDENTIAL
ER-682

[handwritten: for the purpose of the calculation by each such distributor of Owner's]
[handwritten: participation, if any, in such distributor's gross receipts,]
[handwritten: W?]

territory and one with respect to the foreign territory) then
~~in connection with the amounts due Owner from each such~~
~~distributor,~~ the term "artificial breakeven" shall mean that
point in time when the gross receipts derived by the Picture [handwritten: from each such]
shall reach a sum equal to the Multiple, as such may be reduced [handwritten: distributor]
as set forth above, times fifty percent (50%) of the negative
cost of the Picture.

The term "negative cost of the
Picture", as used herein, shall be defined as the aggregate
amount referred to in Exhibit "A" of this Agreement, attached
hereto and made a part hereof; and

(ii)   contingent compensation of a sum equal
to two and one-half percent (2-1/2%) of the gross receipts
after "artificial breakeven", if any, derived from each sequel
and each remake motion picture, if any, produced in the
exercise of the Optioned Rights.

(f)   The term "gross receipts" shall be defined
as either the standard definition(s) of the actual distri-
butor(s) of the respective motion picture(s) or, if Purchaser
obtains another definition which is more advantageous to ~~Owner~~, [handwritten: Purchaser]
then as such other definition. [handwritten: will be]

(g)   Purchaser shall provide Owner with its
itemized certified negative cost statement for the Picture
within ninety (90) days after Purchaser delivers the Picture to
the distributor(s).  Owner shall have the right to audit Pur-
chaser's certified negative cost statement at Owner's sole
expense.

(h)   With respect to a television program
produced by Purchaser and based upon the Work, Owner shall be
entitled to receive:

(i)   a royalty in the sum of One Thousand
Dollars ($1,000.00) for each program of thirty (30) minutes in
length or less;

(ii)   a royalty in the sum of One Thousand
Two Hundred Fifty Dollars ($1,250.00) for each program of not
more than sixty (60) minutes in length but greater than thirty
(30) minutes in length;

(iii)   a royalty in the sum of One Thousand
Five Hundred Dollars ($1,500.00) for each program of more than
sixty (60) minutes in length; and

(iv)   a rerun royalty equal to twenty percent
(20%) of the applicable royalty set forth in subsections (i),

ii

DCC00147524
CONFIDENTIAL
ER-683

(ii), and (iii) above, respectively, for the first, second, third, fourth, and fifth reruns, respectively, in the United States or Canada for each such program. For purposes hereof, the term "rerun" shall have the meaning customarily attributed to such term in the television industry in the United States.

The royalty payments, if any, set forth in subparagraphs (h) (i), (ii), and (iii) above, shall be auto-matically increased by twenty percent (20%) each on the date which is five (5) years from the first telecast of each such television program. Said royalty payments, if any, shall thereafter be increased by twenty percent (20%) every five years hence.

Purchaser agrees to make such royalty payments, if any, to Owner within ten (10) business days of Purchaser's receipt of such television monies.

(i) It is understood that Owner shall be furnished with settlement statements from the distributor(s) at the same time as such are furnished to Purchaser, and Owner shall be furnished with a copy of the audit provisions of Purchaser's agreement(s) with the distributor(s) of the Picture. Furthermore, Owner shall be accorded the right to join with Purchaser in the conduct of any such audit (and if Owner does so join with Purchaser, then the cost of the relative audit shall be shared equally by Purchaser and Owner) or, if Purchaser determines not to exercise its rights of audit in any ~~particular instance~~, to exercise such right of audit in Purchaser's place and stead (and if Owner does exercise such right, then the cost of the relative audit shall be borne by Owner). If as to any period within which an audit may be conducted, Purchaser intends to conduct such audit, then Purchaser shall notify Owner in writing of its intention, such notice to be in sufficient time to enable Owner to exercise its rights under this subparagraph (i). Purchaser agrees to respond promptly to any inquiry by Owner as to Purchaser's intention to conduct any such audit.

(j) With respect to television "movies-of-the-week", television "mini-series", or television pilots of ninety (90) minutes or more in length, as such terms are commonly understood in the motion picture industry generally, Owner shall be entitled to receive:

(i) a royalty in the sum of Twenty Thousand Dollars ($20,000.00) for the first television movie-of-the-week, television mini-series, or television pilot of ninety (90) minutes or more in length, if any, produced in the exercise of the Optioned Rights; or

ii
-10-

DCC00147525
CONFIDENTIAL


ER-684

(ii)  a royalty in the sum of Ten Thousand Dollars ($10,000.00) for each sequel or remake television movie-of-the-week, television mini-series, or television pilot of ninety (90) minutes or more in length, if any, produced in the exercise of the Optioned Rights, and a rerun royalty equal to twenty percent (20%) of such royalty payment for the first, second, third, fourth, and fifth reruns, respectively, in the United States and Canada for each such television program.  For purposes hereof, the term "rerun" shall have the meaning customarily attributed to such term in the television industry in the United States.  The said royalty payment of Ten Thousand Dollars ($10,000.00) shall be automatically increased by twenty percent (20%) on the date which is five (5) years from the first telecast of each such television program.  Said royalty payment shall thereafter be increased by twenty percent (20%) every five (5) years hence.

5. (a)  Nothing herein contained shall be construed to obligate Purchaser to exercise the Option or to produce, release, distribute, exhibit, advertise or exploit any motion picture or other production or authorize any other person, firm, or corporation to do so.  Purchaser has not made nor is the distributor(s) of any motion picture produced hereunder required to make any representation or warranty with respect to the amount of gross receipts or net profits which will or may be derived from any motion picture.

(b)  It is fully understood that Owner does not have nor shall Owner have any right, title, or interest of any kind in or to any gross receipts or net profits derived from any motion pictures or other productions produced in the exercise of the rights granted by Owner hereunder, it being agreed that the share of the gross receipts, if any, payable to Owner with respect to any motion picture produced hereunder shall be computed, determined, and paid in the manner herein provided, but shall not in any way constitute a lien or claim on or against the said motion picture or its gross receipts or net profits, or an assignment or transfer thereof or of any interest therein.  It is further fully understood that, insofar as Owner is concerned, Purchaser and/or the financier and/or the distributor of any motion picture or other production produced hereunder shall have the unrestricted right to sell or assign, and to pledge, mortgage or otherwise hypothecate such motion pictures and other productions and/or the gross receipts or net profits thereof, either in whole or in part, without obtaining Owner's consent.  Should Purchaser and/or the financier and/or the distributor sell or otherwise dispose of any motion picture produced hereunder or its gross receipts or net profits (as distinguished from a so-called outright or flat sale for a particular territory), then such sale or other disposition shall be made subject to the obligation on the part

DCC00147526
CONFIDENTIAL
ER-685

of the Purchaser or assignee to pay Owner's share of the gross receipts, if any, hereunder to the same extent and computed in the same manner and subject to the same limitations as though gross receipts and net profits, if any, were continued to be received by Purchaser and/or the financier and/or the distributor. Any assignment, pledge, mortgage, sale, disposition or hypothecation shall be subject to Owner's rights hereunder.

(c) Nothing herein contained shall be construed to create a partnership or joint venture by or between Owner and Purchaser or make either party the agent of the other. Each of the parties hereto agree not to hold themselves out as the partner or agent of the other or otherwise in any manner contrary to the terms of this Agreement, and neither of the parties hereto shall be or become liable or bound by any representation, act, omission or agreement whatsoever of the other which may be contrary to the provisions of this Agreement.

(d) Insofar as Owner is concerned, it is expressly agreed that Purchaser and/or the financier and/or the distributor of any motion picture or other production produced in the exercise of the rights granted by Owner hereunder shall have full and exclusive charge and control of the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use thereof and that said motion pictures and productions may be distributed, sold outright, exploited, marketed, advertised, or otherwise disposed of by Purchaser and/or the financier and/or the distributor throughout the world and universe in perpetuity, and Purchaser and/or the financier and/or the distributor may, in Purchaser's and/or said financier's and/or said distributor's sole discretion, withhold or withdraw such motion picture or other productions from distribution either entirely or with respect to any country or territory in the world or portion thereof. It is the intent and purpose hereof that absolute and sole control with reference to all matters involving the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use of said motin pictures and other productions shall be exercised by Purchaser and/or the financier and/or the distributor in such manner as Purchaser and/or the financier and/or the distributor in its sole and absolute discretion and judgment may deem proper and that Owner shall not have any voice or control whatsoever in connection therewith.

(e) If Owner desires to sell, license, or otherwise dispose of any of the rights referred to in Paragraphs 3(b) or 3(c) above at any time when any such sale, license or disposition would be permitted by such paragraphs, Owner shall first offer such right to Purchaser setting forth the terms and conditions on which the Owner is willing to sell,

ii

-12-

DCC00147527
CONFIDENTIAL
ER-686

license, or otherwise dispose of such rights, and Purchaser shall have twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt of said notice to accept said offer. Such offer shall not contain any non-monetary terms or conditions which by their nature cannot be met as easily by Purchaser as by any other party (e.g., the required employment or use of a certain director, writer, star, etc.). If Purchaser does not accept said offer within said twenty-one (21) day period, then Owner shall have the right to dispose of said rights to any third party; provided, however, that Owner shall not dispose of said rights on terms and conditions set forth in the offer submitted to Purchaser without first notifying Purchaser and giving Purchaser the opportunity within twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt to acquire such rights upon such less favorable terms and conditions.

Notwithstanding anything to the contrary contained herein, if prior to the expiration of such holdback period, Purchaser sells or causes the Picture to be sold to a U. S. television network for prime time exhibition, then at such time the holdback periods set forth herein shall be extended to five (5) years after the date of said sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.

(e) Purchaser agrees to affix or cause to be affixed on each motion picture produced hereunder, and on all advertising, promotional, and other such materials of any kind or nature created by or pursuant to the authority of Purchaser and containing the name or any graphic or pictorial representation of "SWAMP THING", a copyright and trademark notice in a form designated by Owner, designating Owner as the copyright and trademark owner and proprietor of such name and character.

6. The Owner represents and warrants that:

(a). The Owner is the sole author of and has sole, exclusive, unlimited and unencumbered motion picture rights throughout the world in the Work, and the full and sole authority to convey the rights herein granted as well as those rights which Purchaser may hereafter acquire under this Agreement; that each of the foregoing rights are and will be sole and exclusive to the Purchaser, and that no part of the Work is in the public domain, but all is or may be validly copyrighted and registered in the United States and likewise protected elsewhere as far as the laws of the United States and other countries provide for protection.

(b) The said title may be legally used by Purchaser for motion pictures and television programs based

DCC00147528
CONFIDENTIAL

ER-687

upon the Work and in the exercise of any other of Purchaser's rights hereunder; that Owner has not granted nor will Owner grant to any third party the rights granted to Purchaser pursuant to this Agreement in respect of the said title; that Owner has not copied the said title from any other work, and Owner further agrees not to grant the use of said title for motion pictures and television programs based on the Work or for any other purposes for which Purchaser has acquired rights hereunder.

(c) All the Work is wholly original with Owner and its full use, as herein granted, and the full exercise by Purchaser of all rights it acquires hereunder will not infringe upon or violate the copyright, right of privacy, right of publicity, personal, common law, or other rights of others or constitute a defamation, libel, or slander against any person, firm, or corporation.

(d) Owner has not granted nor will Owner grant to others any rights herein purported to be conveyed, or which may hereafter be conveyed, and such rights and the full exercise thereof have not been in any way encumbered, limited, or diminished by act or omission.

(e) There are no claims or litigation pending or threatened concerning or purporting to affect adversely Owner's rights or title as herein represented or conveyed.

(f) No motion picture or television program has ever been authorized by Owner nor to the best of Owner's knowledge has any motion picture or television program ever been made nor has any play been produced on the spoken stage nor has any other work been made based upon any part of the Work, and no right, license, or privilege to do so has heretofore been granted by Owner or under Owner's authority.

7. The Owner agrees to defend, indemnify, and hold the Purchaser and its assignees and licensees, and their respective officers, agents and associates, harmless from and against any charges, damages, costs, expenses (including reasonable counsel fees), judgments, penalties, liabilities, or losses of any other kind or nature whatsoever which may be sustained or suffered by or secured against or imposed upon the Purchaser, or its assignees or licensees, or their respective officers, agents or associates by reason of the breach or failure of any of the representations, warranties, covenants or agreements herein made by Owner. Purchaser agrees to defend, indemnify, and hold the Owner harmless from and against any charges, damages, costs (including reasonable counsel fees), judgments, penalties, liabilities, or losses of any kind or nature whatsoever which may be sustained or suffered by or secured against or imposed upon the Owner arising out of

ii                                    -14-

DCC00147529
CONFIDENTIAL
ER-688

material added by the Purchaser which infringes upon or violates the right of privacy of, or constitutes a libel against or violates any copyright, common law right or any other right of any party whatsoever.

8. Owner agrees to prevent the Work and any versions or part thereof from falling into the public domain anywhere in the world and will cause to be affixed to each published copy of the Work, or any version thereof, such notice and will do or cause to be done such other acts and deeds as may be required to obtain or maintain copyright in the work and all versions and parts thereof in each country in the world where such rights are capable of being obtained or maintained.

9. Owner hereby grants Purchaser the right to use Owner's name in or in connection with the advertising, publicity, and/or other turning to account of any of the rights herein granted or agreed to be granted to Purchaser, it being agreed that Purchaser shall not, without Owner's consent, authorize any advertiser to advertise or announce that Owner corporately endorses any product, commodity, or service.

10. (a) The Purchaser agrees to accord Owner credit on screen in the main titles of any theatrical motion picture or television program made by it and based on the Work, as follows:

"Based upon characters appearing in magazines published by DC Comics, Inc."

Said credit, upon the film itself of any theatrical motion picture or feature length television motion picture based upon the Property, shall appear on a separate card.

The said credit shall appear in a size of type which is not less than the size of type used for the credit accorded to the screenplay writer(s) for such motion picture.

(b) In addition, Owner shall be accorded the credit, provided for in Paragraph 10(a) above, in paid advertising issued, ordered, or placed by Purchaser or by the distributor, with respect to any theatrical motion picture or feature length television motion picture made by Purchaser hereunder and based upon the Work, except that Purchaser shall be under no obligation to accord Owner such credit in:

ii

DCC00147530
CONFIDENTIAL
ER-689

                    (i)   teaser or special advertising or
publicity;

                    (ii)  advertising or publicity relating to
members of the cast, the director, producers, writers, other
than Owner, and material written by them, or similar matters;

                    (iii) group, list, or institutional
advertising or publicity;

                    (iv)  any advertising or publicity written in
narrative form, or commercial or merchandising tie-ups,
merchandising by-products, phonograph records, phonograph
record album covers, advertising accessories, or products of
any kind;

                    (v)   advertising of eight (8) column inches
or less;

                    (vi)  trailers or advertising on the screen;

                    (vii) radio or television advertising or
publicity;

                    (viii) so-called 24 sheets, 6 sheets,
30 x 40's and 40 x 60's; and

                    (ix)  advertising of such a nature that
consent to the use of Owner's name in connection therewith has
not been granted.

                    (c)   No casual or inadvertent failure to comply
with the provisions of this Paragraph 10 shall constitute a
breach of this Agreement.  In the event of a failure or
omission by Purchaser constituting a breach of Publisher's
obligations under this Paragraph 10, Owner must give Purchaser
written notice thereof and afford Purchaser the opportunity to
remedy such breach within a reasonable time.  It is further
agreed that Owner's rights and remedies in the event of a
failure or omission by Purchaser constituting a breach of
Purchaser's obligations under this Paragraph 10 (which failure
or omission is not remedied within a reasonable time after
Purchaser's receipt of notice from Owner) shall be limited to
Owner's right, if any, to recover damages in an action at law,
and in no event shall Owner be entitled by reason of any such
breach to terminate this Agreement or to enjoin or restrain the
distribution or exhibition of any motion picture produced in
the exercising of rights granted hereunder or the advertising
or publicizing of any such motion picture.

Exhibit J
145

DCC00147531
CONFIDENTIAL

ER-690

11. (a) Any and all payments required to be made pursuant hereto shall be made payable to Owner at the address set forth above.

(b) All notices, which Purchaser is required to or may desire to serve upon Owner in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Owner at the address above, or at such other address as may be designated from time to time by Owner in writing by depositing the same, so addressed, by certified mail or registered mail, or at Purchaser's option, by telegraph, cable, or telex. If Purchaser elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Owner at the time of delivery thereof to the telegraph or cable office. If Purchaser elects to mail such notice, such notice shall be deemed to be served upon Owner forty-eight (48) hours after the mailing thereof by Purchaser. If Purchaser elects to send such notice by telex, such notice shall be deemed to be served upon Owner upon transmission by telex.

(c) All notices, which Owner is required or may desire to serve upon Purchaser in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Purchaser c/o Benjamin Melniker, Esq., Suite 1104, 1350 Avenue of the Americas, New York, New York 10019, or at such other address as may be designated from time to time by Purchaser in writing, by depositing the same, so addressed, by certified mail or registered mail or, at Owner's option, by telegraph, cable, or telex. If Owner elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Purchaser at the time of delivery thereof to the telegraph or cable office. If Owner elects to mail such notice, such notice shall be deemed to be served upon Purchaser forty-eight (48) hours after the mailing thereof by Owner. If Owner elects to send such notice by telex, such notice shall be deemed to be served upon Purchaser upon transmission by telex.

12. Owner hereby grants to Purchaser the right, at Purchaser's expense, to institute in the name and on behalf of Purchaser, or Owner and Purchaser jointly, any and all suits and proceedings in law or in equity to enjoin and restrain any infringements of any of the rights herein granted or agreed to be granted to Purchaser, and Owner hereby assigns to Purchaser any and all causes of action resulting from or based upon any such infringement, and the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be included in the gross receipts of the Picture. Owner will not compromise, settle, or in any manner interfere with any such action or litigation, if brought.

iii

DCC00147532
CONFIDENTIAL
ER 691

If, however, Purchaser fails or refuses to take any such actions described above, then Purchaser hereby appoints Owner or Owner's nominee, irrevocably, as Purchaser's attorney-in-fact with the right, but not the obligation to bring and prosecute suits, actions, and proceedings against third parties with respect to any infringement or alleged infringement by any third party of the copyright in any motion picture or television program produced hereunder, and to take such action as Owner may deem advisable to enforce, protect, and defend any such copyright, if Purchaser fails or refuses to do so. Any such action may be taken by Owner in the name of Purchaser or otherwise. Further, Owner, at its own cost and expense, may join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding. If, as a result of any suit, action, or proceeding taken or instituted by Owner, there is an award of damages to Purchaser and/or to Owner, then the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be added to the gross receipts of the Picture.

13. (a) Concurrently with Owner's execution hereof, Owner shall complete, execute and deliver to Purchaser the short form of option grant, set forth as Exhibit "B" attached hereto and by this reference made a part thereof, and Owner acknowledges that Purchaser shall have the right to detach the said Exhibit "B" and forward it to the United States Copyright Office for recording.

(b) Concurrently with Owner's execution hereof, Owner shall complete, execute, and deliver to Purchaser the short form of agreement, set forth as Exhibit "C" attached hereto and by this reference made a part hereof, and Owner understands and acknowledges that if Purchaser exercises the Option, Purchaser shall have the right to detach the said Exhibit "C" and forward it to the United States Copyright Office for recording.

(c) Purchaser shall have the right to fill in, on Exhibits "B" and "C", the date of registration of the Work in the United States Copyright Office, the name of the copyright proprietor, and the Entry Number of such registration.

(d) Owner agrees, upon Purchaser's request, to procure for Purchaser signed documents and other proof, if such is reasonably required and if such is available to Purchaser, to establish a clear chain of title in Purchaser in and to the rights acquired by Purchaser hereunder.

14. If Owner fails to do or cause to be done any act or thing required to be done or caused to be done by Owner hereunder in order to effectuate the transfer of the rights

-18-

**Exhibit J**

147

DCC00147533
CONFIDENTIAL
ER-692

herein contemplated within a reasonable time after notice from Purchaser, then, in such event, Owner hereby appoints Purchaser as its irrevocable attorney-in-fact for such limited purposes with the right, but not the obligation so to do in the name of and on Owner's behalf for the benefit of Purchaser, which appointment Owner acknowledges is coupled with an interest.

15. If the Work or any portion thereof shall ever be or become in the public domain, then nothing contained in this Agreement shall be construed to be prejudicial to or operate in derogation of any rights, licenses, privileges or properties which Purchaser may enjoy or be entitled to as a member of the public, and Purchaser may exercise such rights, privileges, or properties as if this Agreement were not in existence. If the Work or any portion thereof shall ever be or become in the public domain not due to any act or failure to act of Owner, its licensees and assigns hereunder, then Owner shall nevertheless be entitled to receive the payments under this Agreement Owner otherwise would be entitled to receive.

16. (a) No sums, other than those hereinabove specifically provided as being payable to Owner, shall accrue or be payable to Owner in respect of any use or exercise of the Optioned Rights.

(b) Purchaser intends to produce a motion picture or motion pictures, or television program or television programs, based upon the Work, but is not obligated to do so or to make any other use of the Work.

17. This Agreement may not be assigned by Purchaser without Owner's prior written consent, except only to: (i) any "major" motion picture company; (ii) any of the following independent production or financing companies: Avco-Embassy Pictures, Filmways, Orion Pictures, Lorimar Productions, The Ladd Company, Polygram Pictures, Melvin Simon Productions, Marble Arch Productions, EMI Films, Time-Life Films, ABC Films, or CBS Films; (iii) any other independent production or financing company having experience, financial responsibility, and a reputation comparable to any of the companies set forth in subparagraph (ii) above; (iv) a bank, or (v) any other person, firm, or corporation, with the prior written approval (such approval not to be unreasonably withheld or delayed) of Owner. Any assignments inconsistent with this paragraph shall be void.

18. Owner agrees that solely in connection with the exercise of the Optioned Rights, and any other rights which Purchaser may hereafter acquire hereunder, Purchaser shall have the unlimited right to revise, vary, change, alter, or modify the Work, add to and/or delete from the Work, and to arrange,

ii

-19-

DCC00147534
CONFIDER-693

rearrange, and/or transpose the Work, and change the sequence
thereof and the characters and descriptions of the characters
contained in the Work, and to use a portion or portions of the
Work or the characters, plots, or theme thereof in conjunction
with any other literary, dramatic, or other material of any
kind. Owner hereby waives any so-called "moral" rights of
author. It is agreed that the character of "Swamp Thing" shall
not be portrayed in the Picture in a manner that will degrade
said character in society or bring him into public hatred,
contempt, or that will shock, insult, and offend the community,
public morals, and decency.

19. No waiver by Purchaser or Owner of any breach
by Owner or Purchaser of any of the provisions of this Agree-
ment shall be construed to be a waiver of any preceding or
succeeding breach of the same or any other term or provision
hereof. Each of the rights and remedies granted to Purchaser
or Owner under this Agreement are cumulative, and the exercise
of one shall not limit, diminish, or otherwise affect Purcha-
ser's or Owner's right, concurrently or subsequently, to
exercise any other rights and remedies as Purchaser or Owner
may have, at law or in equity, under this Agreement or other-
wise.

20. This Agreement shall be governed by and
construed and enforced in accordance with the laws of the State
of New York, applicable to agreements executed and to be wholly
performed therein.

21. This Agreement contains the full and complete
understanding between Owner and Purchaser with reference to the
within subject matter, supersedes all prior agreements and
understandings (if any) between the parties, whether written or
oral, with respect to the within subject matter and cannot be
modified or amended except by a written instrument executed by
Owner and by Purchaser.

Our signature at the foot hereof, together with
yours underneath the words "Agreed to and Accepted", shall
constitute this a valid, binding, and enforceable agreement
between us.

Very truly yours,

SWAMPFILMS, INC.

By: _Michael Uslan_
       Its V-P

Agreed to and Accepted:

DC COMICS, INC.

By: _____
       Its

i

-20-

DCC00147535
CONFIDENTIAL
ER-694

Exhibit "A"

The term "negative cost of the Picture" shall, for all purposes of this Agreement, be defined as:

The aggregate of all out-of-pocket costs, charges, and expenses paid or incurred in connection with the development, preparation, production, completion and delivery of the Picture, calculated according to the Purchaser's method of accounting, but in accordance with customary motion picture accounting practices, and shall include, but shall not be limited to: (i) all amounts (other than contingent compensation) paid or payable for services of performers, writers, directors, producers and all other "above-the-line" personnel; (ii) all charges and expenses of production facilities, materials, equipment, personnel, insurance, taxes (other than net income taxes), legal and accounting charges and royalties attributable to the Picture, advertising and publicity incurred in connection with the production of the Picture, or any charges or expenses paid or incurred which are customarily included in the negative cost of the Picture; (iii) any fixed - items of cost, payment of which may be deferred; (iv) any sums heretofore paid to Owner in connection with the Picture; (v) the overhead charge, if any, to the Picture; and (vi) any interest [at a rate of two percent (2%) over the prime rate, except that if the prime rate is greater than eleven percent (11%), then the interest rate shall be equal to two and one-half percent (2-1/2%) over prime] on any moneys borrowed and used in financing the production thereof. In no event shall the overhead and interest charges set forth in subparagraphs (v) and (vi) above exceed the standard of such charges which iscustomarily included in calculating the negative cost of the Picture.

ii

DCC00147536
CONFIDENTIAL

ER 695

Exhibit "B"

## KNOW ALL MEN BY THESE PRESENTS

That for a good and valuable consideration, receipt of which is hereby acknowledged, the undersigned has granted to SWAMPFILMS INC., its successors and assigns, the picture, television, and allied rights in and to that certain work solely owned by the undersigned and entitled "SWAMP THING" and in and to the copyrights thereof throughout the world and all renewals and extensions of such copyrights. The said work was registered on _____ , 19____ in the name of _____

under Entry No.

The grant hereunder is upon and subject to the terms and provisions of a certain Option Agreement between SWAMP-FILMS, INC. and the undersigned dated October ____ , 1980.

Dated:

DC COMICS, INC.,

By: _____
            Its

STATE OF *New York* )
                                    : ss.:
COUNTY OF *New York* )

On this *10* day of *October* , 1980, before me came *William Sarnoff* to me known, who, being by me duly sworn, did depose that he did execute the foregoing instrument.

SHELDON J. KORN
Notary Public, State of New York
No. 31-7335380
Qualified in New York County
Commission Expires March 30, 1982

ii

DCC00147537
CONFIDENTIAL
ER-696

Exhibit "C"


## KNOW ALL MEN BY THESE PRESENTS


The undersigned, for One Dollar ($1.00) in hand paid
and for other valuable considerations now received, hereby
sells and assigns unto SWAMPFILMS, INC. (herein termed
"Purchaser"), its successors and assigns forever, all MOTION
PICTURE, TELEVISION AND ALLIED RIGHTS in and to the literary
and/or dramatic work entitled "SWAMP THING" written by the
undersigned and all MOTION PICTURE, TELEVISION AND ALLIED
RIGHTS in all copyrights thereof (and in any renewals or
extensions thereof) including copyrights registered in the
United States on                              , 1980, in the name of

under Entry No.                    , together with the sole and
exclusive right to use, adapt, change, translate, add to and
take from said work and the title in the making of motion
picture photoplays of every kind or character and to lease,
vend, exploit and exhibit the same throughout the world and to
copyright the same in Purchaser's name.

The undersigned agrees to cause renewals of all
copyrights in the work duly to be obtained, and the MOTION
PICTURE, TELEVISION AND ALLIED RIGHTS herein granted are now
assigned to Purchaser for the renewal term and during any
extensions of copyright and, after such renewals or extensions,
a further or like document of confirmation of assignment will
be given to Purchaser if requested. The undersigned hereby
appoints Purchaser its irrevocable attorney-in-fact with the
right, but not the obligation, to execute and file all such
documents and to do all acts necessary for the obtaining of
such extensions or renewals and evidencing the continuation of
the same rights in Purchaser for such renewed or extended terms
as are now vested in Purchaser.

AND the said Purchaser, its successors and assigns,
are hereby empowered to bring, prosecute, defend and appear in
suits, actions and proceedings of any nature under or con-
cerning said copyrights or their renewals, or concerning any
infringement thereof, and particularly infringement of or
interference with any of the MOTION PICTURE, TELEVISION AND
ALLIED RIGHTS now granted under said copyright or renewals in
the name of the copyright proprietor but at the sole cost and
expense of said Purchaser which will indemnify the undersigned
therein. The net amount of damages from infringement or
violation of any copyright or its renewal (i.e., after the
recoupment from such damages of Purchaser's and/or Owner's

ii

DCC00147538
CONFIDENTIAL
ER-697

costs and expenses) or costs from infringement or violation of
any copyright or its renewals, so far as it arises from any
violation of MOTION PICTURE, TELEVISION AND ALLIED RIGHTS hereby
assigned, is now assigned to and shall be paid to said
Purchaser, its successors and assigns.

　　　　The terms and conditions of this Assignment are
subject to that certain agreement between Purchaser and the
undersigned dated as of October　　, 1980.

　　　　　　　　　　　DC COMICS, INC.

　　　　　　　　　　　By: _____
　　　　　　　　　　　　　Its

STATE OF New York )
　　　　　　　　　　　ss.:
COUNTY OF New York )

　　　　On this 10 day of October , 1980, before me
came　　William Sarnoff
to me known, who, being by me duly sworn, did depose that he
did execute the foregoing instrument.

　　　　　　　　　　　　_____
　　　　　　　　　　　　SHELDON J. KORN
　　　　　　　　　　　　Notary Public, State of New York
　　　　　　　　　　　　No. 31-7992980
　　　　　　　　　　　　Qualified in New York County
　　　　　　　　　　　　Commission Expires March 30, 1982

ii

DCC00147539
CONFIDENTIAL
ER-698

## Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78

**By BRUCE LAMBERT**

Joseph Shuster, a co-creator of Superman who sold the rights to the character for $130, never dreaming it would become a legendary figure in popular culture reaping billions of dollars, died on Thursday at his home in Los Angeles. He was 78 years old.

He died of congestive heart failure, the Los Angeles County coroner's office said.

One night in 1934, Jerry Siegel conceived a superhuman hero, and the next day, he asked his buddy, Mr. Shuster, to draw it. Syndicators repeatedly rejected their comic strip until 1938, when Detective Comics bought the 13-page story for $10 a sheet.

"We were young kids," Mr. Shuster said later. "What did we know?"

Published as a booklet under the name Action Comics, Superman was an instant hit. His popularity helped establish comic books as a format and spawned a genre of bizarrely costumed superheroes, from Spiderman to Wonder Woman.

### Superman: The Industry

Superman reigned as king of the realm and an industry unto himself. Almost faster than a speeding bullet, the Man of Steel appeared in newspaper comics, a radio show, animated cartoons, movie-theater serials, a television series, a Broadway musical, a novel, feature films and a stream of franchised goods, from lunch boxes and toys to bubble gum. In the 1970's alone, Superman sales exceeded $1 billion.

Superman was the baby when from outer space, reared as a normal American boy and growing up to become Clark Kent, mild-mannered reporter. But when danger loomed, he transformed into the crusader for Truth, Justice and the American Way, dashing into the nearest phone booth, doffing his glasses and stripping to a blue bodysuit. Red cape flowing, he flew off, using X-ray vision and other powers to thwart the latest evil menace or global disaster. He leaped over tall buildings, gazlant kept the scheming and curious Lois Lane at arm's length and feared only kryptonite.

For several years, the Shuster-Siegel team earned a modest living as Superman's cartoonist and writer. But when they pressed for a share of the profits, they were dumped. They tried other



Joseph Shuster with a vintage Superman comic book in 1975.

jobs, including a character called Funnyman, which flopped.

### Poverty, Then a Pension

Protracted litigation seeking money from Superman's owners also failed. By the 1970's, both men were nearly destitute and even sold their old comic books as collectors' items worth thousands of dollars apiece. Mr. Shuster, partly blind and unemployed, lived in a threadbare Queens apartment.

Eventually, the aged Superman's co-creators won a pension, later raised to the court of public opinion. In 1975 Warner Communications, which then owned Superman, volunteered to give each a pension of $20,000 a year. In 1981 the figure was raised to $30,000, plus a $15,000 bonus after the first film in the "Superman" series grossed $275 million.

Mr. Shuster was born in Toronto. As a youngster, he moved with his family to Cleveland, where he met Mr. Siegel. No information on survivors was available.

---

## Judge Nils Boe, 78; S. Dakota Governor And Aide to Nixon

**By BRUCE LAMBERT**

Former Gov. Nils A. Boe of South Dakota, whose President Richard M. Nixon appointed as a White House aide and later as chief judge of the United States Customs Court, died Thursday at Sioux Valley Hospital in Sioux Falls, S.D. He was 78 years old and lived in Sioux Falls.

His family said he died of cancer.

While serving on the Customs Court, Judge Boe issued several notable decisions, including a sharply worded rebuke of Mr. Nixon in 1974. The President had ordered a 16 percent surcharge on all import duties to reduce the nation's trade deficit, a move that generated $506 million in four months. But a three-judge panel led by Judge Boe ruled that the power to impose such a surcharge rested with Congress and that Mr. Nixon had overstepped his



Nils A. Boe

education, advocated property-tax cuts, promoted industrial development and helped start the state's educational television system.

In 1969 President Nixon appointed him director of the new White House Office of Intergovernmental Relations and in 1971 named him to the Customs Court, in Manhattan. He retired from the court in 1984.

Surviving are two sisters, Borghild Boe of Sioux Falls and Lois Hyslop of State College, Pa.

---

## Frank Yatsu

Internment Survivor, 108

SEATTLE, Aug. 2 (AP) — Frank Yatsu, one of the oldest survivors of the internment of Japanese-Americans during World War II, died July 24 at a nursing home here. He was 108 years old. He was 108 years old.

Mr. Yatsu was among 120,000 Japanese-Americans who were sent to internment camps in 1942 after the Japanese attack on Pearl Harbor. In 1965 Congress passed a bill apologizing for the internment and authorizing payments of $20,000 to each of them. Mr. Yatsu was one of the first to receive his payment in 1988.

A Republican, he won election to the State House of Representatives for four two-year terms and became Speaker. He was elected Lieutenant Governor in 1967 and Governor in 1964 and was re-elected in 1966.

As Governor, he increased aid to

---

## Nicanor Costa Méndez, 69, Aide In Argentina in the Falkland War

BUENOS AIRES, Aug. 2 (AP) — Nicanor Costa Méndez, a former Argentine Foreign Minister and a leading figure in the war for the Falkland Islands in 1982, died today, his family said. He was 69 years old.

He died of lung cancer, his family said.

A lawyer linked to right-wing nationalist groups, Mr. Costa Méndez gained prominence 10 years ago as one of the planners of Argentina's invasion of the Falkland Islands in the South Atlantic, a British colony since 1833 that Argentina calls the Malvinas.

He was then appointed Foreign Minister and the principal civilian counselor to Gen. Leopoldo F. Galtieri, then the President.

The United Nations Security Council urged Argentina to withdraw its forces, but it refused. British forces sailed to the islands and an 11-week war ensued that ended in Argentina's surrender in June 1982.

The armed forces ousted President Galtieri immediately after the surrender, and Mr. Costa Méndez was dismissed as Foreign Minister.

"Regarding the Malvinas war," Mr. Costa Méndez said in 1983, "all I have to say is that I fought in defense of the Argentine national interest and of my country's sovereignty."

### From a Wealthy Family

A member of a wealthy, patrician Argentine family, Mr. Costa Méndez was born on Oct. 30, 1922, in Buenos Aires. He attended the University of Buenos Aires, graduating with a law degree in 1943. He went on to receive his doctorate in jurisprudence and taught a law practice here.

He served as Foreign Minister from 1966 through 1969 in another military Government, when Gen. Juan Carlos Onganía was President. An avowed anti-Communist, Mr. Costa Méndez believed close ties with the United States.

But when the United States and Western Europe sided with Britain during the Falkland war, he did not hesitate to seek the support of the Communist bloc. He flew to Cuba to attend a meeting of non-aligned nations and was received by President Fidel Castro.

In meetings of the United Nations Security Council and the Organization of American States, Mr. Costa Méndez

depicted United States support for Britain in the Falkland war as a "betrayal to the rest of the Americas."

In 1983, an official board of inquiry reported that Mr. Costa Méndez had counseled the junta that the United States would remain neutral in the war, despite an explicit message from the American Secretary of State, Alexander M. Haig Jr., as the ships were leaving for the islands.

The United States would support Britain. Information on survivors was not immediately available.

---

## Geoffrey W. Lewis, 82, Ambassador in Africa

Geoffrey W. Lewis, a retired career diplomat who served as the United States Ambassador to Mauritania and the Central African Republic, died Saturday at a hospital in Rockland, Me. He was 82 years old and lived in nearby Cushing.

He died of complications from heart and kidney disease, his family said.

Mr. Lewis was appointed to Mauritania in 1968 and the Central African Republic in 1967, where he stayed till his retirement in 1970. His other overseas posts included positions in Pakistan, the Far East, Italy and France and with the North Atlantic Treaty Organization.

Mr. Lewis was born in Brookline, Mass. After graduating from Harvard and studying at Trinity College in England, he became headmaster of the Browne and Nichols School in Cambridge, Mass., in 1937.

In World War II he was a United States Army colonel in London, working on post-war plans. He starred at the State Department in 1946 and soon became acting chief of its German affairs bureau, specializing in war reparations, and was also the coordinator for displaced persons.

His survivors include his wife of 55 years, the former Elizabeth Locke; a son, Geoffrey Jr. of Washington; a daughter, Margaret Herbert of Llano-Earth, Wales; a brother, David; and a sister, Edith Richards, both of Dover, Mass.; six grandchildren and one great-grandchild.

---

## Rae Dalven, 87, Former Professor And a Historian of Jews in Greece

**By BRUCE LAMBERT**

Rae Dalven, a translator of modern Greek poets and historian of Greek Jews, died on July 27 at Beth Israel Medical Center in Manhattan. She was 87 years old and lived in Manhattan.

Friends said she had been in declining health but they did not know the cause of death.

Dr. Dalven was retired as a professor of English literature and department chairwoman at Ladycliff College in Highland Falls, N.Y.

Born in Preveza, Greece, she immigrated to the United States with her family as a youngster. She graduated from Hunter College and earned a doctorate in English at New York University.

### Translated Greek Poetry

Among her translations was "Modern Greek Poetry" (Gaer, 1949). In a review, W. H. Auden wrote, "we should be very grateful to Miss Dalven for introducing us to a world of poetry which has been closed to us" by the language barrier. Mr. Auden later wrote the introduction to her "The Complete Poems of Cavafy" (Harcourt, Brace, 1961) and "The Fourth Dimension" (Doubleday, 1977), translating Yannis Ritsos.

Dr. Dalven also wrote two plays, the first of which, "A Season in Hell," about the French poets Rimbaud and Verlaine, was produced Off Broadway in 1950.

Last year she finished "Our Kind of People," an autobiographical play about a family of Greek Jewish immigrants. It was performed at a staged reading in Manhattan and is scheduled for presentation this fall at a Brooklyn theater and the Greek Orthodox Cathedral in Manhattan.

### Studied Greek Jewish Group

Dr. Dalven's special interest was the history of Jews in Greece, especially the community in Ioannina in northern Greece, most of whose members were



driven out during World War II. They were Romaniotes, who traced their ancestry to Palestinians and who migrated as early as 390 B.C. They maintained their customs and language, which differed from those of the more numerous Sephardic whose ancestors were expelled from Spain.

Dr. Dalven was the editor of "The Sephardic Scholar," a journal; a board member of the American Friends of the Jewish Museum of Greece and a past president of the American Society of Sephardic Studies and of the Sisterhood of Janina, a homeland group.

Her marriage to Jack Negrin ended in divorce. She is survived by several nieces and nephews.

**GET THE CROSSWORD ANSWER**
THAT'LL HELP YOU GET THROUGH TODAY'S PUZZLE.
JUST CALL
**1-900-884-CLUE.**

Get answers for up to three clues. Use a touch-tone telephone only. 75¢ for the first minute. 50¢ for each additional minute.

**The New York Times**

### Deaths
### Deaths
### Deaths
### Deaths
### Deaths
### Deaths

## At home or on the job... start each day with The New York Times.

**Call 1-800-631-2500 toll free.**

**Exhibit K**

**154**

**ER-699**

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
### USE BLACK INK ONLY

| STATE FILE NUMBER | | | | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|---|---|

**DECEDENT PERSONAL DATA**

| 1A. NAME OF DECEDENT—FIRST (Given) | 1B. MIDDLE | 1C. LAST (FAMILY) | 2A. DATE OF DEATH—MO, DAY, YR | 2B. HOUR | 3. SEX |
|---|---|---|---|---|---|
| JOSEPH | - | SHUSTER | Fnd July 30, 1992 | 1106 | MALE |

| 4. RACE | 5. HISPANIC—SPECIFY | 6. DATE OF BIRTH—MO. DAY, YR | 7. AGE IN YEARS | IF UNDER 1 YEAR MONTHS DAYS | IF UNDER 24 HOURS HOURS MINUTES |
|---|---|---|---|---|---|
| CAUCASIAN | ☐ YES ___ ☒ No | JULY 10, 1914 | 78 | | |

| 8. STATE OF BIRTH | 9. CITIZEN OF WHAT COUNTRY | 10A. FULL NAME OF FATHER | 10B. STATE OF BIRTH | 11A. FULL MAIDEN NAME OF MOTHER | 11B. STATE OF BIRTH |
|---|---|---|---|---|---|
| CANADA | USA | JULIUS SHUSTER | HOLLAND | IDA KAKLARSKY | RUSSIA |

| 12. MILITARY SERVICE? | 13. SOCIAL SECURITY NO. | 14. MARITAL STATUS | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) |
|---|---|---|---|
| 19 ___ TO 19 ___ ☒ NONE | 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 | NEVER MARRIED | NONE |

| 16A. USUAL OCCUPATION | 16B. USUAL KIND OF BUSINESS OR INDUSTRY | 16C. NAME OF EMPLOYER | 16D. YEARS IN OCCUPATION | 17. EDUCATION—YEARS COMPLETED |
|---|---|---|---|---|
| ARTIST | COMIC BOOKS | DC COMICS | 60 | 14 |

**USUAL RESIDENCE**

| 18A. RESIDENCE—STREET AND NUMBER OR LOCATION | 18B. CITY | 18C. ZIP CODE |
|---|---|---|
| 11944 MONTANA AVENUE #305 | W. LOS ANGELES | 90049 |

| 18D. COUNTY | 18E. NUMBER OF YEARS IN THIS COUNTY | 18F. STATE OR FOREIGN COUNTRY | 20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT |
|---|---|---|---|
| LOS ANGELES | 14 | CALIFORNIA | JEAN PEAVY-SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114 |

**PLACE OF DEATH**

| 19A. PLACE OF DEATH | 19B. IF HOSPITAL, SPECIFY ONE: IP, ER/OP, DOA | 19C. COUNTY |
|---|---|---|
| Residence | | Los Angeles |

| 19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION | 19E. CITY |
|---|---|
| 11944 Montana Avenue #305 | W. Los Angeles |

**CAUSE OF DEATH**

| | | | TIME INTERVAL BETWEEN ONSET AND DEATH | 22. WAS DEATH REPORTED TO CORONER? REFERRAL NUMBER |
|---|---|---|---|---|
| 21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C) | | | | ☒ 92-06897 ☐ NO |

| IMMEDIATE CAUSE (A) | Congestive Heart Failure | ► | Unk | 23. WAS BIOPSY PERFORMED? ☐ YES ☒ NO |
|---|---|---|---|---|
| DUE TO (B) | Arteriosclerotic Cardiovascular Disease | ► | Years | 24A. WAS AUTOPSY PERFORMED? ☐ YES ☒ NO |
| DUE TO (C) | | ► | | 24B. WAS IT USED IN DETERMINING CAUSE OF DEATH? ☐ YES ☒ NO |

| 25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 | 26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE. |
|---|---|
| Hypertension | No |

**PHYSICIAN'S CERTIFICATION**

| I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED |
|---|---|---|---|
| 27A. DECEDENT ATTENDED SINCE MONTH, DAY, YEAR / DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR | ► | | |
| | 27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS | | |

**CORONER'S USE ONLY**

| I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER | 28B. DATE SIGNED |
|---|---|---|
| | ► Deputy Coroner Mary T. Macri | 8-07-92 |

| 29. MANNER OF DEATH—specify one: natural, accident, suicide, homicide, pending investigation or could not be determined | 30A. PLACE OF INJURY | 30B. INJURY AT WORK? ☐ YES ☐ NO | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR |
|---|---|---|---|---|
| Natural | | | | |

| 32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) |
|---|---|

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

| 34A. DISPOSITION(S) | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS | 34C. DATE MO, DAY, YEAR | 35A. SIGNATURE OF EMBALMER | 35B. LICENSE NO. |
|---|---|---|---|---|
| CR/RES | RES: 11944 MONTANA AVE., #305 W.LOS ANGELES, CA 90049 | 8/14/92 | NOT EMBALMED | NONE |

| 36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING FOR HIM) | 36B. LICENSE NO. | 37. SIGNATURE OF LOCAL REGISTRAR | 38. REGISTRATION DATE |
|---|---|---|---|
| PIERCE BROS WESTWOOD VILLAGE | FD-951 | ► Robert C. Metz LH | AUG 1 0 1992 |

**STATE REGISTRAR**

| A. | B. | C. | D. | E. | F. | G. CENSUS TRACT |
|---|---|---|---|---|---|---|

VS-11 (REV. 3-91)

MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARTMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70

Director of Health Services and Registrar

Exhibit L
155

119
ER-700

**AFFIDAVIT OF JEAN PEAVY UNDER**
**CALIFORNIA PROBATE CODE SECTION 13101**

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.      The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.      The decedent died on July 30, 1992 in Los Angeles County, California.

3.      At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.      No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.      The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.      The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.      The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Timer Warner Inc. Common Stock

8.      No other person has a right to the interest of the decedent in the described property.

9.      The affiant requests that the described property be paid, delivered or transferred to her.

10.     The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:      August 17      , 1992

*Jean Peavy*
JEAN PEAVY

DCC00073013
**ER-701**

**STATE OF** NEW MEXICO )
                         ) ss.
**COUNTY OF** __BERNALILLO__ )

       On ___August 17_____, 1992, before me, a notary public for the State of __New Mexico_____, personally appeared JEAN PEAVY (___) known to me or ( _X_ ) proved to me based on satisfactory evidence to be the person whose name is subscribed to the above instrument, and she acknowledged to me that she executed the same.

       **IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal on the day and year first above written.

SEAL:

_Barbara Newson_
Notary Public for the
State of __New Mexico__

OFFICIAL SEAL
BARBARA NEWSON
NOTARY PUBLIC
STATE OF NEW MEXICO
Commission Expires 3-13-94

2.

**Exhibit M**
157

DCC00073014
**ER-702**

Case 12-57245 03/05/2013 ID: 8530472 DktEntry: 10-4 Page 119 of 160

<div align="right">
Mr. Frank Shuster<br>
98-120 Queens Blvd., Apt. 4K<br>
Rego Park, NY 11374<br>
October 2, 1992
</div>

Mr. Paul Levitz
Executive VP & Publisher
DC Comics
1325 Avenue of the Americas
New York, NY 10019

Dear Mr. Levitz:

In consideration of the agreement dated as of August 1, 1992
between DC Comics, myself and Jean Shuster Peavy, I hereby waive
any rights or remedies that I may have under the agreement dated
December 23, 1975 between Warner Communications Inc., Jerome Siegel
and Joseph Shuster.

Very truly yours,

*Frank Shuster*

Frank Shuster

Confidential

WB007972

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401



Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster                    Ms. Jean Shuster Peavy
98-120 Queens Blvd., Apt. 4K         316 Horton Lane, NW
Rego Park, NY  11374                 Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

     This is to confirm our agreement to pay you, collectively, a total of
$25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1,
1992, for as long as either one of you is alive.  Such amounts shall be
payable in accordance with Warner Communication Inc.'s customary payroll
practices and shall be subject to all applicable withholding taxes.  If Jean
Shuster Peavy shall predecease Frank Shuster, then the foregoing payments
shall be made to Frank Shuster for as long as he shall live.

     We ask you to confirm by your signatures below that this agreement fully
settles all claims to any payments or other rights or remedies which you may
have under any other agreement or otherwise, whether now or hereafter
existing regarding any copyrights, trademarks, or other property right in any
and all work created in whole or in part by your brother, Joseph Shuster, or
any works based thereon.  In any event, you now grant to us any such rights
and release us, our licensees and all others acting with our permission, and
covenant not to assert any claim of right, by suit or otherwise, with respect
to the above, now and forever.

     If, despite the terms of this agreement, either of you assert any such
claim of right, for any reason, you agree to refund to us, upon the making of
any such assertion, all amounts previously paid to you hereunder, and we will
have no obligation to make any further payments under this agreement.  We
also reserve all of our other rights, remedies and defenses in such an event.

     If after full consideration of the foregoing, you accept and agree to
all of the above, please so indicate by signing below where indicated.

                              Very truly yours,

                              DC Comics

                              By: _____
                                   Paul Levitz

ACCEPTED AND AGREED TO:

_Frank Shuster_____
Frank Shuster                          Dated: __10/2/92_____

_Jean Shuster Peavy_____
Jean Shuster Peavy                     Dated: __10/2/92_____



DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401



Paul Levitz/Executive Vice President & Publisher

November 5, 1992

Mrs. Jean S. Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

Thanks for the congratulations. Both Garret and his mom are doing fine, and I'm now back at work.

I appreciate your concerns about the impact of taxes on your income, but I confess the math seems illogical to me. If we were paying the income directly to Frank, who you said pays no income tax now, I believe even in New York's high tax environment on that modest an income he'd pay less than 25% in taxes. I don't know New Mexico's situation, or your finances, but I'd be surprised to find a 45% impact.

In any case, I've discussed your request with Martin Payson, and we feel that with the added $25,000 or more that we're paying out to help with Joe's final bills, and having set the income to you and Frank significantly above the level our settlement with Joe required, we've demonstrated Time Warner's good faith and consideration amply for now. We'd like to suggest that after the final bills are settled, and you have actually gone through a tax filing based on this income (presumably the 1993 tax year filing due in early 1994), we consider the matter again. You can then show us the actual tax impact, and we will then consider making an adjustment if there's an undue burden.

I hope the rest of your tour went well, and that you find all well on your return home.

Sincerely,

Paul Levitz

:lf
cc: Martin Payson



A division of Warner Bros. Inc.–A Time Warner Company

DCC00006439

ER-705



DC COMICS
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz, Executive Vice President & Publisher

September 7, 1993

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm sorry to have taken a few weeks to reply to your letter of July 10th, but as you may know, summer is comic convention time as well as vacation time, and our offices are both deserted and chaotic during this season.

As I hope you recall from our meetings in New York, we've done extensive research into the copyright act and any potential rights that you and Frank may have as Joe's siblings and survivors. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever.

Nonetheless, we do recognize the fact that Joe would want you to benefit from his great creativity and we have acted accordingly. As you know, Joe's agreement with Warner Communications (and thereby Time Warner and DC) only required us to pay $5,000 a year to Frank after Joe's death. During the 16 years that agreement was controlling, Joe did not ask us to increase that amount. After his death, we raised $5,000 to $25,000 a year without any legal obligation to do so, in deference to Joe's memory and your role in his life.

When you asked us to raise the amount to gross you up for what seemed to be an unlikely effect of taxes, I promised that we would review the effect of the taxes on you after you had experienced the IRS's effect on a year of the income. In the spring, when you and Frank have filed your taxes, I'll be happy to examine your situation in detail and we'll discuss the results of our examination with you.

In the meantime, we are not prepared to consider your request that you receive the same income that Jerry and Joanne Siegel are receiving. Perhaps Joe would have wanted that, but during his long relationship with us he gave no indication of that desire. And even if he had, in fairness, there is a vital difference between being the actual co-creator of Superman and being his surviving family. Jerry and Joe were, in every way, in a class by themselves.

We are, however, pleased that the launch on September 12th of the new Lois & Clark: The New Adventures of Superman television series will give a new generation a new chance to fall in love with Jerry's and Joe's wonderful creation. In celebration of that



Confidential

WB007959

occasion, we're pleased to enclose a bonus check for $25,000 for you and Frank to enjoy as you watch the premiere.

Best,

Paul Levitz

:lf

cc: Frank Shuster

Confidential

WB007960

DC COMICS
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz/Executive Vice President & Publisher

July 11, 1994

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Frank Shuster
98-120 Queens Boulevard
Apartment 4K
Rego Park NY 11374

Dear Jean and Frank:

It was nice to have you visit in May, and I'm pleased to see that you're both well. I've
finally had an opportunity to discuss your various requests with my colleagues, and
would like to share our feelings with you.

While we have a great deal of personal sympathy for your desire to take care of Joe's
nephew, niece and her family as you would have hoped (or expected) Joe to respond
had he lived, we can't accept that as our corporate responsibility. We have acted in
what we believe is a fair and decent, even generous, manner to you beyond our
contractual obligations to you both in the spirit of our agreement with Joe. While he
may have been willing to go even further, we can't act in his stead. We must,
therefore, decline to either raise your annual stipend by the eight or nine thousand
dollars you requested or to add an ongoing cost of living formula.

We are willing, however, to share the good fortune that Superman brings us with the
family of his creators. We're pleased to acknowledge our pick-up for a second season
of LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN (which happened
the day you came in) with the enclosed bonus check for $10,000. On behalf of the DC,
Warner Bros. and Time Warner team, we want you to feel Joe's genius is remembered
and honored.

I hope that other occasions will arise in future years which we will find suitable for
material acknowledgement that can assist your family, but we cannot promise to do
more than consider them as they may occur.

Wishing you both continued health and happiness,

Best,

Paul Levitz

:lf

Redacted



A division of Warner Bros.—A Time Warner Entertainment Company

DCC00006420



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



June 7, 1995

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

We've recently received official word of the pick up of LOIS & CLARK: THE NEW
ADVENTURES OF SUPERMAN for a third season, and wanted to share our success with
you and Frank. Enclosed please find a bonus check for $10,000, continued honor of Joe's
wonderful co-creation.

Hope all else is well with you and yours.

Best,

Paul Levitz

:lf

cc: Frank Schuster

A division of Warner Bros.—A Time Warner Entertainment Company

· DCC00006414

**ER-709**



# Copyright Research Report

Client Name: George Zadorozny, Esq.

Attention:

Date Received: 2/23/96

Date Mailed: 2/29/96

Property Searched: **SUPERMAN**

For: Comic Magazine

Analyst: Jerry L. Robb

Scope of Search: Full

Service: __X__ Reg. ____ Expedited

Acceptance and reliance upon this report by the client constitutes an acceptance of its terms, conditions and limitations. Any liability arising out of the preparation of this report is limited to a refund of the search fee paid.

We have taken all reasonable steps to ensure the completeness and accuracy of this report; however, due to the highly subjective nature of copyright and title searching we cannot otherwise guarantee these results. This search is valid only for the property or title noted above. If the property or title which was the subject of this search is changed, even slightly, a new search should be conducted. Please note that this report in no way constitutes a legal opinion.

Thomson & Thomson

COPYRIGHT RESEARCH GROUP, 1750 K St., N.W., Suite 200, Washington, DC 20006-2305
Telephone: (202) 835-0240 (800) 356-8630 FAX: (202) 728-0744

Redacted

Thomson & Thomson

February 29, 1996

VIA TELECOPIER
VIA OVERNIGHT DELIVERY

George Zadorozny, Esq.
Business Center
3780 Tampa Road
Oldsmar, Florida 34677

## Copyright Report - SUPERMAN

Dear Mr. Zadorozny:

A search of the records of the Copyright Office and the records and files of this office reveals that the character known as **SUPERMAN** created by Jerry Siegel and Joe Shuster, first appeared in <u>Action Comics</u>, No. 1, issue of June 1938, with copyright secured on the blanket copyright on this periodical in the name of Detective Comics, Inc. as of a publication date of April 18, 1938, under entry No. B: 379787. The copyright in the story entitled **SUPERMAN** was separately renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors, April 19, 1965, under entry No. R: 361642. It was also renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, June 1, 1965, under entry No. R: 362188.

The story as originally published in <u>Action Comics</u> was reportedly incomplete, but was later republished in its entirety in the summer of 1939 as the comic book **SUPERMAN**, Vol. 1, No. 1. Although we find no record of copyright registration or subsequent renewal of a work identified as Vol. 1, No. 1 of this periodical, the records do contain a registration for a work entitled **SUPERMAN (THE COMPLETE STORY OF THE DARING EXPLOITS OF THE ONE AND ONLY SUPERMAN)**, by Jerome Siegel and Joe Shuster, which was registered for copyright in the name of Detective Comics Inc., as of a publication date of May 18, 1939, under entry No. AA: 299871. This copyright was renewed in the name of National Periodical Publications, Inc., claiming as proprietor of copyright in a work made for hire, July 1, 1966, under entry No. R: 388937.

1750 K Street NW, Suite 200  Washington, D.C. 20006-2305  Telephone: 800-356-8630, 202-835-0240  Fax: 800-822-8823, 202-728-0744

Washington, D.C. • Boston • New York • Chicago • Los Angeles • Antwerp • London • Paris • Montreal • Toronto

**COPYRIGHT REPORT - SUPERMAN**

The character **SUPERMAN** made its debut as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5, 1939. It was distributed by and **registered for copyright in** the name of the McClure Newspaper Syndicate, through September 30, 1949. Beginning in October 1949, the strip was drawn by Wayne Boring, and **registered for copyright** in the name of National Comics Publications, Inc. Beginning in 1958, the strip was drawn by Curt Swann, and **registered for copyright in** the name of Superman, Inc. In 1961, the strip was **registered for copyright in the name of National Periodical Publications** Inc. It was discontinued in 1967. These copyrights were renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors. The copyrights in the comic strips originally published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietors of copyright in a work made for hire. Thereafter, renewals were made in the name of National Periodical Publications Inc., and later, beginning with the 1950 releases, in the name of DC Comics Inc.

<span style="float:right">Redacted</span>

The character **SUPERMAN** continued to be presented in <u>Action Comics</u>, issues of which were **registered for copyright** in the name of Detective Comics, Inc., with the story entitled **SUPERMAN** renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, through the 1943 issues.

The comic book **SUPERMAN** was published quarterly and **registered for copyright** in the name of Detective Comics Inc. through the issue of Spring 1940. Beginning in the summer of 1940, the comic book was published bimonthly, and **registered for copyright** in the name of Superman Inc. Beginning in February of 1946, the comic book was **registered for copyright** in the name of National Comics Publications Inc. through 1949, when it was again **registered for copyright** in the name of Superman Inc. Beginning in 1950, registrations began in the name of National Periodical Publications Inc.; beginning in 1976, issues were **registered for copyright** in the name of DC Comics Inc. In 1986, the title of the comic book was changed to **THE ADVENTURES OF SUPERMAN**. The copyrights in the issues published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications, claiming as proprietor of copyright in a work made for hire. Thereafter, renewals were made only in the name of National Periodical Publications Inc., and, beginning with issues published in 1950, in the name of DC Comics Inc, claiming as proprietor of copyright in a work made for hire. Renewal registrations continue to be made in the name of DC Comics, Inc., through the present.

2

## COPYRIGHT REPORT - SUPERMAN

A series of 14 prints by Jerry Siegel and Joe Shuster, with titles such as **SUPERMAN ATTACKING AN AEROPLANE IN MIDAIR, SUPERMAN CARRYING A MAN UNDER EACH ARM**, were **registered** for copyright in the name of Superman Inc. as of a publication date of July 26, 1940. We find no record of renewal for these copyright registrations.

A comic book entitled **SUPERMAN-TIM** commenced publication on August 1, 1942, and was **registered for copyright** in the name of Superman Inc. From 1947 through 1950, this periodical was **registered for copyright** in the name of National Comics Publications Inc. These copyrights were renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire.

In addition to the above-referenced comic books, several other comic books featuring the character have been published, including **SUPERMAN ANNUAL**, later **SUPERMAN - THE MAN OF STEEL ANNUAL** (1964 - present); **SUPERMAN'S GIRLFRIEND, LOIS LANE** (1958-1974); and **SUPERMAN'S PAL, JIMMY OLSEN** (1954 - 1974), retitled **THE SUPERMAN FAMILY** (1974 - until at least 1984), which were originally **registered for copyright** in the name of National Periodical Publications Inc., and later in the name of DC Comics Inc. Renewals are being made as they come due in the name of DC Comics Inc. A comic book entitled **SUPERMAN: THE MAN OF STEEL** commenced publication in 1991, with issues **registered for copyright** in the name of DC Comics Inc.

A novel entitled **SUPERMAN**, by George Lowther, based on the cartoon character, and illustrated by Joe Shuster, was **registered for copyright** in the name of Superman, Inc., as of a publication date of November 2, 1942, under entry No. A: 168596. We find no record of renewal for this copyright registration.

An anthology entitled **SUPERMAN - FROM THE THIRTIES TO THE SEVENTIES**, with an introduction by E. Nelson Bridwell, was published by Crown Publishers and **registered for copyright** in the name of National Periodical Publications Inc., as of a publication date of December 14, 1971, under entry No. A: 303583. The application authors are E. Nelson Bridwell and Carmine Infantino. Copyright is claimed on dedication, introduction and compilation.

A book entitled **THE DEATH OF SUPERMAN**, by Dan Jurgens, Jerry Ordway, Louise Simonson, and Roger Sterm, was created in 1992, published December 1, 1992, and **registered for copyright** in the name of DC Comics (employer for hire), February 22, 1993, under entry No. TX: 3-496-004. Copyright is claimed on selection and compilation.

3

ER-713

## COPYRIGHT REPORT - SUPERMAN

A novel entitled **THE DEATH AND LIFE OF SUPERMAN**, by Roger Stern, was created in 1992, published by Bantam Books, August 2, 1993, and registered for copyright in the name of DC Comics (employer for hire), September 28, 1993, under entry No. TX: 3-640-100.

A work entitled **SUPERMAN** (spine title: **SUPERMAN STYLE GUIDE**) was created in 1991, published November 11, 1991, and registered for copyright in the name of DC Comics, Inc., December 18, 1991, under entry No. TX: 3-221-758. Copyright is claimed on new graphics of old and new characters, new artwork and text.

Another work, entitled **SUPERMAN BETTER THAN EVER** (application title **SUPERMAN, BETTER THAN EVER STYLE GUIDE**), containing text and illustrations, was created in 1993 and registered for copyright as an unpublished work in the name of DC Comics, July 16, 1993, under entry No. TXU: 579-563. Copyright is claimed on new graphics of old and new characters, new art and new text.

Numerous other "Superman" works, including books, single-issue comic books, coloring books, cut-out books, puzzles, etc., have been published and registered for copyright over the years, generally in the name of Superman, Inc., National Comics Publications Inc., National Periodical Publications, Inc., and most recently in the name of DC Comics Inc.

The comic magazine entitled **SUPERMAN** is still being registered for copyright in the name of D.C. Comics, Inc.

## Derivative Works

The records disclose a radio program, several motion pictures and several television series featuring the character **SUPERMAN**.

## Recorded Instruments

By instrument dated **September 12, 1946**, recorded February 18, 1948, in Vol. 659, pages 48-77, it is recited that by an agreement dated August 15, 1940, Detective Comics Inc. had granted a license to Fleisher Studios to produce and release one-reel cartoons based on the comic strip **SUPERMAN**, but by a supplemental document, Paramount recites that it failed to exercise the option provided under an agreement dated April 22, 1941, relating to these cartoons and, accordingly, that

4

Superman, Inc. had the right to produce and release motion pictures of any kind, based on the "Superman" material. Paramount reserved from this declaration such rights as it originally had acquired in the seventeen one-reel cartoons produced under the earlier agreement. The 1946 instrument thereupon recites the terms of the agreement between Detective Comics Inc. and Columbia Pictures Corporation, whereby Columbia was granted the right to produce a serial photoplay of not more than fifteen episodes based on the "Superman" material, both present and future, and the right to produce a feature photoplay therefrom for release in Europe, the United Kingdom and certain other countries abroad with such rights to endure exclusively for a period of two and one-half years after the release of the first episode of the serial and for an additional three years thereafter.

By instrument dated **February 24, 1947**, recorded March 25, 1947, in Vol. 626, pages 5-10, Superman, Inc., Detective Comics Inc. and other publishing companies were merged into National Comics Publications, Inc. and all the copyrights in the cartoon strips published by such earlier companies were assigned to National Comics Publications, Inc.

There is of record a Final Judgment dated **May 21, 1948**, recorded June 1, 1965, in Vol. 1207, pages 1-12, wherein the New York court dismissed the complaint of Jerome Siegel and Joe Shuster, and adjudged that National Comics Publications, Inc. was the sole and exclusive owner of the **SUPERMAN** comic strip material and certain related rights. (See the "Litigation" section of this report for additional information.)

Redacted

By Assignment and Consolidation dated **January 20, 1966**, recorded February 4, 1966, in Vol. 1222, pages 348-369, National Periodical Publications Inc., successor in interest to Detective Comics Inc. and National Comics Publications, Inc., reciting that by an instrument (attached as "Exhibit A") dated July 3, 1944, McClure Newspaper Syndicate assigned to Detective Comics, Inc. all its right, title and interest in all copyrights in **SUPERMAN**, including the copyrights and all renewals and extensions thereof; that by an instrument (attached as "Exhibit B") dated September 30, 1946, Detective Comics, Inc., was consolidated with other corporations into National Comics Publications, Inc.; that by an instrument (attached as "Exhibit C") dated June 29, 1961, National Comics Publications Inc. was consolidated with another corporation into National Periodical Publications, Inc.; that National Periodical Publications, Inc., thereby became vested with all the properties of Detective Comic, Inc., and National Comics Publications, Inc.; thereby stated that it is the owner of and is vested with title to all of the copyrights (and renewals and extensions thereof) in the artistic and literary works

5

COPYRIGHT REPORT - SUPERMAN

Redacted

consisting of newspaper cartoon strips or continuities entitled
SUPERMAN which the McClure Newspaper Syndicate had from the
first day of publication to July 3, 1944.

by Mortgage and Assignment of Copyright dated **December 21,
1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages
201-214, Film Export A.G. mortgaged and assigned to N.V.
Slavenburg's Bank all its right, title and interest in the
copyrights and other property listed on an attached Schedule A,
and all renewals and extensions of such copyrights, as security
for a loan pursuant to the terms of a Loan agreement and
Security Assignment dated December 21, 1979 among Film Export
AG, International Film Production, Inc., Dovemead Limited, Mr.
Alexander Salkind, and N.V. Slavenburg's Bank, to which this
instrument is subject.  The document further states that the
assignor's rights derive from the Agreement between National
Periodical Publications, Inc., and Film Export AG dated
November 6, 1974, and that, pursuant to an agreement made
January 15, 1975, Film Export AG granted to Film Trust S.A. the
sole and exclusive right and license to exercise such rights of
Film Export AG under the License Agreement to produce two films
entitled **SUPERMAN** and **SUPERMAN II**; by an assignment dated
January 31, 1977, Film Trust S.A. assigned to International
Film Production Inc. all of its right, title, and interest
under the Film Trust Agreement; by agreement dated January 31,
1977, as subsequently modified, International Film Production
Inc. granted to Film Export AG the exploitation rights in the
two films; pursuant to an Agreement dated May 10, 1978 between
International Film Production Inc. and Dovemead Limited,
International Film Production Inc. engaged Dovemead Ltd. to
make the films, and Dovemead granted to International Film
Production Inc. the entire copyright and all rights therein.
Schedule A enumerates the collateral, including all right,
title and interest of Film Export A.B. in and to a license to
produce, exhibit and distribute any number of motion picture
based on the name, title, characterizations of **SUPERMAN** and
other characters as part of the "Superman family", on radio,
television and other entertainment media.  Attached to the
document is a list of Warner distribution agreements relating
to **SUPERMAN I** and **SUPERMAN II**.

By Mortgage and Assignment of Copyright dated **December 21,
1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages
215-228, International Film Production, Inc., executed a
similar document to N.V. Slavenburg's Bank.

By Mortgage and Assignment of Copyright dated **December 21,
1979**, and **May 1, 1980**, recorded May 6, 1980, in Vol. 1786,
pages 229-242, Dovemead, Ltd. executed a similar document to
N.V. Slavenburg's Bank.

6

COPYRIGHT REPORT - SUPERMAN

By Short-Form Collateral Assignment of Rights dated
December 31, 1985, recorded January 9, 1986, in Vol. 2159,
pages 293-295, Cantharus Productions, N.V. assigned to Tri-Star
Pictures, Inc., (1) all of its rights in and to that certain
Rights Agreement regarding film right to the character SUPERMAN
and other characters between Tri-Star's predecessor-in-
interest, Film Export A.G., and D.C. Comics, Inc. (formerly
known as National Periodical Publishing Inc.) dated November 6,
1974, and any motion pictures produced after November 5, 1985
under the authority of and based on the rights granted in that
Rights Agreement, but excluding all rights subject to options
in favor of Warner Bros, Inc. and any agreements between Warner
and Cantharus or its predecessors-in-interest previously
entered into and all rights and options in favor of The Cannon
Group Inc. or Cannon Productions N.V. under that memorandum
agreement dated May 21, 1985 between Alexander Salkind, on
behalf of Cantharus, and Yoram Globus and Menahem Golan, on
behalf of Cannon, and (2) all of its right, title and interest
in or to the Cannon Agreement and all benefits accruing
thereunder, all sums or other distributions paid or payable to
and rights and options reverting to or held by Cantharus
pursuant to the Cannon Agreement, and all motion pictures
produced pursuant to the Cannon Agreement to the extent that
Cantharus has any interests therein, all as more fully
described in that certain Indemnity Agreement dated as of July
1, 1985.

Redacted

There is recorded an undated statement recorded September
20, 1994 in Vol. 3029, page 75, from Warner Brothers, a
division of Time Warner Entertainment Company, L.P. (by Nils
Victor Montan, assistant secretary) declaring that it is the
sole and exclusive owner of all rights in and to the SUPERMAN
motion pictures, television programs, etc. and owns sole and
exclusive rights to any and all future SUPERMAN motion
pictures, television programs, animated cartoons, etc. whether
or not they are deemed sequels to the currently titled
SUPERMAN V motion picture.

No further document affecting any right, title or interest
in the comic magazine or the character entitled SUPERMAN is
found of record in the Copyright Office. However, the records
disclose numerous documents recorded in connection with the
various adaptations of the comic magazine.

## Biographical Information

Joseph Schuster died in August 1992 at the age of 78. We
have no information with regard to his heirs and the records of
the Copyright Office do not disclose an address for them.

7

ER-717

## COPYRIGHT REPORT - SUPERMAN

Jerome Siegel was born in Cleveland, Ohio on October 17, 1914 and died in Los Angeles, California on January 30, 1996. According to his obituary, he was married and had one son and one daughter. The records of the Copyright Office do not disclose an address for his heirs. In 1986 he was living at 11928 Darlington Avenue, Apartment 102, Los Angeles, CA 90049.

## Notes

If we may be of any further assistance to you, or if you have any questions regarding this report, please do not hesitate to contact me at 1-800-356-8630 (ext. 3312).

Sincerely yours,

Jerry L. Robb

JLR/kah/dms

8

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



March 25, 1996


Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm please to inform you that we;ve had an early pick-up for LOIS & CLARK: THE
NEW ADVENTURES OF SUPERMAN for the season beginning this fall. The
show's done very well in the ratings, and has made it up to the top 20 shows. In
continuing recognition of Joe's contribution to our success, we're enclosing a check
for $10,000 for you and Frank.

I hope all else is well with you and your family.

Sincerely,

Paul Levitz

:lf

cc: Frank Shuster

DCC00006375

ER-719



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

July 9, 1998

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for the offer of coming out to the San Diego Con. We're not planning any major events around Superman at the convention, so we'll decline the offer, but I have reopened the question of a raise or bonus with my colleagues, and I'm pleased to enclose a check for $10,000 based on the Superman animated series' success.

If you and Warren decide to come out to San Diego for the fun of it, please let me know and we'll roll out the hospitality wagon.

Best,

Paul Levitz

:lf
enclosure

A division of Warner Bros.—A Time Warner Entertainment Company

AGREEMENT


THIS AGREEMENT dated December 18, 1998 between WARNER BROS., a division of Time Warner Entertainment Company, L.P., a Delaware corporation (herein called "Purchaser") and HASBRO, INC., a Rhode Island corporation, and HASBRO INTERNATIONAL, INC., a Massachusetts corporation (herein collectively called "Owner"):

WITNESSETH:

1.    Option:

        (a)    In consideration of the sum of Fifty Thousand Dollars ($50,000) payable to Owner upon execution hereof, Owner hereby grants to Purchaser the sole, irrevocable and exclusive option (the "Option") for the period commencing on the date hereof and continuing until eighteen (18) months after the date of Purchaser's receipt of an executed copy of this Agreement (the "Initial Option Period") to acquire upon and pursuant to the terms and conditions of this Agreement, the rights specified in Paragraph 3 hereof in and to the "Property" (as such term is defined in Paragraph 2 below).  For purposes of calculating the Initial Option Period, the date of Purchaser's receipt of the executed copy of the Agreement shall be deemed to be the date which is six (6) weeks prior to the date of Purchaser's actual receipt.  The Initial Option Period may be extended by Purchaser for an additional twelve (12) months (the "Extended Option Period") by the payment to Owner of an additional $50,000 at any time prior to expiration of the Initial Option Period.  The Initial Option Period and the Extended Option Period (if applicable) shall be referred to herein collectively as the "Option Period."  The payment for the Initial Option Period shall be applicable against, and deducted from, the Purchase Price set forth in paragraph 9 below.

        (b)    Purchaser may exercise the Option at any time during the Option Period by giving Owner written notice accompanied by the payment specified in subparagraph 9(a) hereof.  Subject to Owner's consultation and approval rights hereunder, Purchaser shall have the right during the Option Period to cause screenplays, scenarios, treatments, scripts and other material based in whole or in part upon the Property to be written, developed and/or composed by such person or persons as Purchaser may in its sole discretion determine, and to conduct such other preproduction and development activity as Purchaser may desire.  If Purchaser does not exercise the Option, Purchaser shall not have the right for any purpose to use or authorize others to use any material so developed by or for Purchaser based in whole or in part upon the Property.

981223D4.DOC/EMH;  4/27/99

WB136189
CONFIDENTIAL
ER 721

1A.    Progress to Production:  Purchaser acknowledges that it has entered into that certain Producer Loanout Agreement (the "Producer Agreement") dated March 17, 1999 with Threshold Entertainment, Inc. (f/s/o Larry Kasanoff) ["Employer"].  Purchaser further acknowledges that subparagraph 1(c) of the Producer Agreement contains a progress to production whereby Employer may provide Purchaser with a written notice after any consecutive sixty (60) day period during which Purchaser is not in active development of Picture #1 (as such term is defined in subparagraph 2(b) below).  "Active development" is specifically defined in subparagraph 1(c) of the Producer Agreement.  If Purchaser fails to resume active development of Picture #1 within thirty (30) days of Employer's written notice, then Picture #1 shall be put into turnaround to Employer and Purchaser shall have no further rights in and to the Property.

2.    Definition of Certain Terms:

(a)    "Property" as used herein shall mean the following:

(i)    The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters comprising the line of toys known as "G.I. JOE" created or manufactured and exploited by Owner, its affiliates, licensees and agents before or during the "Production Period" (as such term is defined in Paragraph 5 below) as set forth in Exhibit "A" attached hereto and incorporated herein by reference.  In the event Purchaser wishes to use characters not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other characters may be used by Purchaser upon the same terms as provided herein.

(ii)    The names, titles, characterizations, literary descriptions, artwork and three dimensional representations of all fictional locations, fictional vehicles and other conveyances and devices depicted, contained and/or relating to the "G.I. JOE" line of toys referred to in (a) above, as set forth in Exhibit "A".  In the event Purchaser wishes to use locations, fictional vehicles and other conveyances and devices not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other locations, fictional vehicles and other conveyances and devices may be used by Purchaser upon the same terms as provided herein.

(iii)    Except for any elements originated in any animated series based on the Property, including, without limitation, the series produced by Gunther-Wahl, Sunbow and DIC, all literary, dramatic, photographic, artwork and physical replications, descriptions and other material relating to the foregoing, and the themes, plots, situations, sequences, pictorial action,

981223D4.DOC/EMH;  4/27/99

Exhibit W
177

WB136190
CONFIDENTIAL ER-722

dialogue lines, sketches, figurines, models and replicas contained in such line of toys and related materials and any future versions or adaptations thereof to the extent Owner or an affiliate of Owner owns or controls such future versions or adaptations (Owner being obligated to advise Purchaser of any restrictions).

(b)   "Picture" means any live action feature-length theatrical motion picture produced hereunder, whether based on the Property or a prior Picture or any element thereof.  The first Picture is referred to as "Picture #1" and subsequent motion pictures are referred to as "Picture #2," "Picture #3," etc.

(c)   "New Character" means a character, vehicle or accessory created by or for Purchaser.

(d)   "Sequel" means any Picture produced after Picture #1 which contains:

> (i)   one or more "G.I. JOE" characters, vehicles or accessories; and/or

> (ii)   A "New Character" which makes use of an identifying characteristic of a "G.I. JOE" character, vehicle or accessory;

whether or not such Picture has a substantially different story than that contained in Picture #1.

3.   <u>Rights Granted</u>:  Without limiting the generality hereof, Owner hereby grants the following rights to Purchaser, solely and exclusively, but subject to Purchaser's exercise of the Option and Purchaser's payment of the sum due under subparagraph 9(a) and subject further to the other terms, conditions and limitations of this Agreement, including the restrictions on the grant of rights to Purchaser and the exclusions from the grant hereunder and from the Property of those items and properties as set forth in Exhibit "B" attached hereto and incorporated herein by reference:

(a)   The right, but only during the Production Period, to produce first class, live action, theatrical motion pictures based upon, incorporating and/or adapted from the Property and recorded originally in the English language. Notwithstanding the foregoing, any Picture produced hereunder may contain animated titles, animated effects and other incidental animation.

(b)   The right in perpetuity to distribute and exploit Pictures produced hereunder in any and all media (whether now known or hereafter devised), in any and all languages throughout the universe.

981223D4.DOC/EMH;  4/27/99

WB136191
CONFIDENTIAL
ER-723

    (c)    Solely in connection with motion pictures based upon the Property produced hereunder and the advertising and exploitation thereof, the right to produce sound recordings of or based upon all or any part of the Property, including, without limitation, motion picture soundtrack albums; and the right in its sole discretion to synchronize original music (whether or not based upon the Property) with any Picture produced hereunder and to exploit such original music (whether or not in connection with motion pictures produced hereunder) in all media now known or hereafter devised, including, without limitation, motion picture soundtrack albums. Purchaser hereby grants to Owner at no cost, to the extent of Purchaser's rights in such music (Purchaser making no representation that it will be the exclusive owner thereof), a non-exclusive synchronization and master use license for any original music owned or controlled by Purchaser and used in any Picture (or soundtrack album therefor) to be used by Owner in connection with the advertising and/or promotion of Owner's (as opposed to Owner's licensees') line of products relating to the Property or in connection with Owner's merchandising rights in the Pictures set forth in subparagraph 4(b) below. (The parties acknowledge and agree that Owner does not generally control the right to use music from previous productions based on the Property and the rights to use such music are not included in the grant to Purchaser herein.)

    (d)    Solely in connection with Pictures based upon the Property produced hereunder and the advertising, publicity and exploitation thereof, the right to adapt, use, dramatize, arrange, change, vary, modify, alter, transpose and make musical or non-musical versions of the Property and any parts thereof; to add to, interpolate in and subtract or omit from the Property, characters, language, plot, theme, scenes, incidents, situations, action, titles, dialogue, songs, music and lyrics; to translate any of the foregoing into all languages; to include in Pictures, sound records and other items provided for in this Paragraph 3 such language, speech, songs, music, lyrics, dancing, choreography, sound effects, action, situations, scenes, plot, dialogue, incidents, characters, characterizations, and other material (whether or not based upon or taken from the Property) as Purchaser in its uncontrolled discretion may deem advisable, it being the intention hereof that, except as otherwise expressly stated herein, Purchaser shall have the exclusive, absolute and unlimited right to use the Property and each and every part thereof for live action, theatrical motion picture purposes and all other purposes granted hereunder in connection with such Pictures and the advertising and exploitation thereof as Purchaser in its uncontrolled discretion deems advisable, specifically including, without limitation, the right, subject to Paragraph 5 hereof, to produce live action, theatrical motion pictures which are remakes of or sequels to Pictures previously produced hereunder. Owner waives the benefits of any provision of law known as "droit moral" or any similar laws, and agrees not to institute, support, maintain or authorize any action or lawsuit on the ground that any motion pictures or sound records, or other items produced hereunder in any way constitute any of Owner's droit moral or a defamation or mutilation of any part

WB136192
CONFIDENTIAL **ER-724**

thereof, or (subject to Paragraph 8 below) contain unauthorized variations, alterations, modifications, changes or translations. Subject to subparagraphs 3(c), 4(b) and 4(e) hereof (and notwithstanding the expiration of the Production Period) and subject to all of the terms and conditions of this agreement, Owner shall not have any right, title or interest whatsoever in or to any plot, story, character, music, lyrics, dialogue, screenplay, logo or other material of any kind created by or for Purchaser in the exercise of its rights hereunder, or in or to any Picture produced hereunder.

(e)     Solely in connection with the advertising, publicity and exploitation of Pictures produced hereunder, the right to broadcast excerpts from the Property and all or any part of any motion picture or sound record produced hereunder by radio and television, or otherwise, whether by living actors, electrical transcription, film, tape or otherwise, in any language.

(f)     The right, solely for the purpose of advertising and promoting the Pictures produced hereunder, to produce and publish as serials or otherwise (with or without illustrations) stories, synopses, excerpts, summaries, fictionalizations and novelizations, not to exceed 7,500 words in length, of and from the Property; and, subject to all of the other terms and conditions of this agreement, the right to utilize drawings, pictorial actions or expressions and physical replications of any characters or other elements of the Property in connection with advertising, publicizing and exploiting Pictures produced hereunder.

(g)     Subject to Owner's consultation and approval rights hereunder, the right to write and prepare screenplays, teleplays, treatments, storyboards, plans specifications and designs for Pictures and sound records produced hereunder, and to cause musical compositions, including both original music and words and music utilizing or based upon or adapted from all or any part of the Property or any title or titles thereof (subject to subparagraph 3(c) above) to be written and composed and to include such musical compositions solely (except in the case of original music, which may be exploited by Purchaser in all media) in Pictures and sound records produced hereunder.

(h)     Subject to the terms and conditions of this agreement, including without limitation subparagraphs 4(b) and 4(e) hereof (and except for "G.I. JOE" characters, devices and accessories and New Characters), the right to copyright Pictures, sound records, musical compositions, screenplays, teleplays, and all other items created by or for Purchaser pursuant to this Paragraph 3, and to secure copyright and/or trademark registration and protection thereof in all countries and territories where such protection is available in Purchaser's own name, or otherwise, together with the right to manufacture copies thereof and to distribute, sell, lease, license, exhibit, transmit, broadcast, project, reproduce, publish, use, perform, advertise, publicize, market, exploit, turn to account and

WB136193
CONFIDENTIAL **ER-725**

derive revenue in any form or manner therefrom without any territorial restriction whatsoever by any and all media, methods, systems and processes now or hereafter known, invented, used or contemplated, and the right to import or export such copies into or out of any territory without restrictions. It is further expressly understood and agreed that Pictures, sound records and all other items produced hereunder shall constitute independent derivative works, and Purchaser and its successors, permitted assigns and licensees shall have the perpetual right to exercise the rights granted in this subparagraph (h) with respect to Pictures produced hereunder irrespective of the expiration, termination, transfer or renewal of any copyright owned or controlled by Owner or any assigns of Owner or the reversion of any rights in the Property to Owner hereunder; provided, however, that if the Property reverts to Owner pursuant to Paragraph 5 hereof, Purchaser shall have no right to exploit any material produced or created by it hereunder which is in any manner identifiable with the Property.

      (i)     The right to use the title, titles, names and/or logo (subject to Paragraph 10 hereof) by which the Property and the elements of the Property are now known or identified or hereafter may be known or identified as the title or titles and/or log of live action, Pictures produced hereunder based upon or adapted from the Property and the right to exploit and exhibit any such motion pictures produced hereunder under any other title or titles and/or log (subject to subparagraph 8(f) and Paragraph 10 hereof) that Purchaser may deem proper in its uncontrolled discretion.

Except as otherwise set forth in this Agreement, including subparagraph (a) above, all rights granted pursuant to this Paragraph 3 are in perpetuity. Subject to the terms and conditions of this Agreement, Purchaser shall have for use in connection with Pictures, all rights herein granted to it in all existing and future characters, devices, versions, translations, dramatizations, arrangements, revisions, continuations, supplements and reissues of the Property designed, manufactured, developed, written or published with the authority of Owner and owned or controlled by Owner or its parents, subsidiaries or affiliates, and their respective successors and assigns, as well as all prior material and other works owned or controlled by Owner upon which the Property is based and from which the Property is adapted. All rights granted Purchaser under this Agreement shall be cumulative, and Purchaser may exercise or refrain from exercising any one or more of said rights separately or simultaneously or in connection with any other rights granted to Purchaser hereby or obtained by Purchaser from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive. Notwithstanding anything to the contrary herein, Purchaser agrees that the initial exploitation of any Picture produced by it hereunder shall be as a live action, theatrical motion picture.

      4.    Reservation of Rights: All rights in the Property not specifically granted to Purchaser herein, including, without limitation, the following rights, are reserved to Owner

WB136194
CONFIDENTIAL

ER-726

for Owner's use and disposition, subject, however, to the other provisions of this Agreement:

(a) Subject to the exceptions set forth in Paragraphs 3 and 7 hereof, all rights to publish the Property and any Pictures produced hereunder as follows: (i) the right to publish print editions of the Property and/or the Picture(s) in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise; (ii) the right to publish recorded readings by a single narrator of the text of published print editions of the Property and/or the Picture(s) in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of published print editions of the Property and/or the Picture(s) in the form of CD-Rom, videocassette tape or similar electronically-read devices individually purchased by the end-user. Such electronically-read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property and/or Picture(s) but may not contain audio tracks of any kind.

(b) All merchandising rights. The term "merchandising rights" shall mean the exclusive right to produce, sell and license, or grant others the exclusive right to produce, sell and license, or enter into any agreements with respect to the manufacturing privileges under which a commodity, product or service is manufactured or distributed under the name of or using a representation of "G.I. Joe" or any other character or thing included in the Property or under the name of or using a representation thereof, including but not limited to accessories, mailing pieces, toys, games, figurines, video games or other items or devices. Included in merchandising rights shall be the exclusive right in Owner to use and/or license merchandisers of products and services to reproduce and/or use any New Character. Owner shall consult in good faith with Purchaser regarding any merchandising arrangements relating to New Characters, but Owner's decision shall be final. Owner agrees to advise Purchaser from time to time of the kind and nature of licensed products which have been licensed for production in the exercise by Owner of its merchandising rights hereunder. Further, upon Purchaser's request, Owner agrees to ask that its licensing agent meet with Purchaser to discuss such ideas as Purchaser may have for the exercise of merchandising rights hereunder. Any and all revenues from any such merchandising shall belong solely to Owner; Owner shall be free to exploit such New Characters without any obligation of any kind to Purchaser except with respect to Purchaser's consultation rights as set forth in this subparagraph (b). In addition thereto, any New Character shall be copyrighted in Owner's name. However, Purchaser shall have the right to use New Characters in Pictures produced hereunder. In the event that Owner wishes to produce, or license the right to produce, a video game based upon any Picture hereunder, Purchaser agrees to license to Owner a reasonable amount of footage from the applicable Picture at no charge to Owner.

WB136195
CONFIDENTIAL
ER-727

Notwithstanding the foregoing, Owner's merchandising rights hereunder shall be subject to all applicable third party approvals and all applicable third party royalties which are incorporated in any contracts negotiated by Purchaser in connection with any Picture hereunder; provided, however, that Purchaser shall not provide any third party with a merchandising royalty other than in connection with the use of a performer's likeness in Purchaser's standard 5%-2½% royalty (with Owner entitled to the 50% distribution fee) unless a higher royalty is approved in advance by Owner or if Owner separately negotiates a higher royalty for a third party and then requests that Purchaser include such higher royalty in the applicable contract; and further provided that Owner shall have no obligation to use any performer's likeness.

     (c)     All animated television rights in and to the Property.

     (d)     All live action television rights in and to the Property; provided, however, that if Owner desires to produce, or grant to third parties the right to produce, live action television motion pictures or live action episodic television shows based on the Property or based on any Hasbro New Character, Owner shall accord Purchaser a right of First Negotiation/First Refusal upon the same terms and conditions as set forth in Paragraph 6 below.

     (e)     The right to produce and distribute theatrical feature-length animated motion pictures based upon the Property; provided, however, that subject to Owner's licensee's right to continue to exploit "G.I. Joe - The Movie," an existing animated feature-length motion picture, Owner shall not exercise or authorize any other person to exercise the right of production and distribution of animated feature-length theatrical motion pictures prior to the end of the Production Period.

     (f)     Subject to all of the rights and licenses granted to Purchaser hereunder, Owner shall retain ownership of and shall be entitled to copyright and trademark in its name or the name of its designee all characters, vehicles, accessories, logos and designs which are presently a part of the Property or are hereafter created by or acquired by Owner in connection with the Property, or are created by Purchaser but are New Characters, and Owner shall be entitled to depict and use all such characters, vehicles, accessories, logos and designs in any of its animated productions based upon the Property and the advertising and exploitation thereof and to use the same for any other purpose not expressly prohibited under this Agreement.

     (g)     The parties acknowledge and agree that the property entitled "Action Man" is a separate property from the property entitled "G.I. Joe". Owner shall retain sole and exclusive ownership and all right, title and interest in and to the trademark and property "Action Man", and Owner's rights to exploit "Action Man"

981223D4.DOC/EMH; 4/27/99

WB136196
CONFIDENTIAL ER-728

shall not be restricted in any way by the terms of this Agreement, and Purchaser acknowledges that no rights in and to the "Action Man" property are being optioned, licensed or otherwise transferred to Purchaser pursuant to this Agreement.

5.    Production Period:  Purchaser shall not commence principal photography of any Picture hereunder after expiration of the Production Period.  The Production Period shall commence on the exercise of Purchaser's Option hereunder and shall continue thereafter until such time as any of the following shall occur:

(a)    Commencement of principal photography of Picture #1 has not commenced within three (3) years from execution of this Agreement; provided, however, that if Purchaser has engaged the principal cast member of Picture #1 on a "pay-or-play" basis, said three (3) year period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for Picture #1; or

(b)    Four (4) years shall have passed from the date of initial general theatrical release of any Picture in the Domestic Territory and Purchaser shall not have commenced principal photography of the next Picture; provided, however, that if Purchaser has engaged the principal cast member of the next Picture, said four (4) period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for the applicable Picture; or

(c)    Purchaser shall not have initially generally theatrically released any Picture in the Domestic Territory within twenty-four (24) months after commencement of principal photography thereof.

"Domestic Territory" as used in this Paragraph 5 and in Paragraph 6 below, shall mean the Continental United States of America.

Purchaser shall advise Owner in writing of the date of commencement of principal photography of any Picture hereunder immediately following such commencement, and shall advise Owner in writing of the date of the initial general domestic theatrical release of each such Picture immediately following such release.  However, Purchaser's inadvertent failure to do so shall not be a breach hereof.  If the Production Period shall expire, all rights granted Purchaser revert to Owner except that:  Purchaser shall continue to have in perpetuity with respect to all existing Pictures all of the exploitation rights set forth in subparagraphs 3(b) through (i); and Purchaser shall retain all rights in New Characters to the extent set forth in this Agreement without any restriction relating to the Production Period.

WB136197
CONFIDENTIAL

ER-729

6.     <u>First Negotiation; First Refusal</u>:  If the Production Period shall expire but Purchaser shall have completed and generally released Picture #1 for theatrical exhibition in the Domestic Territory, and if Owner shall thereafter desire to produce or grant to third parties the right to produce live action feature-length theatrical motion picture and/or feature-length animated theatrical motion pictures based on the Property or utilizing in any such motion picture any New Character (the "Rights"), Owner shall do so only in accordance with the following procedure:

(a)     At such time as Owner elects to exercise or dispose of any of such Rights, Owner shall offer in writing to negotiate in good faith with Purchaser regarding such Rights prior to any exercise of such Rights itself and prior to negotiating with any third party.  If Purchaser gives written notice that Purchaser does not wish to negotiate or if such good faith negotiations do not result in a written agreement between Purchaser and Owner within a period of thirty (30) calendar days from Purchaser's receipt of Owner's written offer to negotiate, then Owner may exercise such Rights itself or may negotiate elsewhere for the disposition of such Rights, subject to (b) and (c) below.

(b)     If Owner proposes to accept an offer in respect of the Rights which incorporates a material term which is less favorable to Owner (whether or not such offer in its entirety is less favorable to Owner) than Owner's last proposal to Purchaser, then Owner shall give Purchaser written notice of such offer specifying the particulars thereof, including the name of the Offeror, and Purchaser shall have a period of seven (7) business days from receipt of such notice within which to meet said offer; provided, however, that Purchaser shall not be required to meet any terms which cannot be met as easily by one party as another.  Purchaser's right to meet said offer shall be exercised by Purchaser, if at all, by giving Owner written notice of Purchaser's election to do so within the aforesaid seven (7) business day period.  In the event Purchaser exercises its right to meet such offer, then Purchaser and Owner shall promptly execute an agreement conveying to Purchaser the rights involved upon the terms and conditions of said offer.

(c)     In the event Purchaser does not acquire such Rights in accordance with the provisions of (b) above, then Owner shall have the right to sell or otherwise dispose of such Rights but only to the Offeror and upon the terms and conditions specified in such notice; otherwise the provisions of (b) above shall apply again.  If Owner enters into a written agreement with a third party whereby such third party acquires the theatrical motion picture rights, either live and/or animated, in and to the Property and/or the right to produce or cause the production of live action theatrical motion pictures and/or feature-length animated theatrical motion pictures based on the Property and/or the right to use a Hasbro New Character in any motion picture, then Purchaser's rights under this Paragraph 6 shall terminate.

981223D4.DOC/EMH;  4/27/99

WB136198
CONFIDENTIAL

ER-730

7.   Product Placement; Tie-ins:

(a)   All decisions, arrangements and agreements with respect to so-called "product placement" in connection with Pictures produced hereunder shall be at the sole discretion of Purchaser, subject only to good faith consultation with Owner; provided, however, that Purchaser agrees that no products which are directly competitive with the Property or with any product manufactured, distributed and/or sold by Owner, Milton Bradley, Playskool and/or Playskool Baby subsidiaries shall be placed in the Picture and that no product placement arrangements shall be made with competitors of those persons or entities with which Owner already has ongoing product placement, premium or similar arrangements ("Owner Licensees") unless the Owner Licensees are unwilling or unable to enter into a product placement arrangement with Purchaser on reasonable and customary terms.  Any and all revenues derived from any such product placement shall belong solely to Purchaser.

(b)   All decisions, arrangements and agreements relating to so-called premiums and commercial tie-ins in connection with any Picture produced hereunder shall be subject to the mutual approval of Owner and Purchaser. Revenues derived from any premium or tie-in arrangement shall be divided 50/50 between Owner and Purchaser without any deductions or offsets from the gross amount of such revenues.

8.   Standards; Consultations:  The following requirements and procedures apply to Picture #1 and any Sequels:

(a)   No Picture, or any advertising or publicity therefor, shall depict the Property in a manner substantially different from the way it is generally depicted by Owner.  The various characters, relationships to other characters, their reaction to any given set of circumstances, and their behavior and language shall in general be consistent with that of the Property.  Any new or additional character or element introduced in the Pictures which is not contained in the Property will, in general, be consistent with the nature, subject matter, quality and standards of the Property.

(b)   No Picture produced and released hereunder shall have a rating issued by the Motion Picture Rating Administration of the Motion Picture Association of America, Inc. which is more restrictive than a "PG-13" rating without the prior written consent of Owner.

(c)   All Pictures shall be consistent with the following:

(i)   All characters shall be heterosexual;

981223D4.DOC/EMH;  4/27/99

WB1361 ER-731
CONFIDENTIAL

(ii)    There shall be no war or other conflict utilizing nuclear weapons of any type;

(iii)    No war or conflict against a real country will be depicted; provided, however, that Owner agrees that new and imaginary fictional countries and/or villains may be created and depicted, but no such fictional country shall be given characteristics which suggest that a real country is being referred to;

(iv)    No "G.I. Joe" characters shall be depicted smoking or drinking alcoholic beverages;

(v)    No "G.I. Joe" characters shall be depicted engaging in sexual intercourse;

(vi)    At least some of the then existing characters and vehicles from the Property shall be depicted in Picture #1.

(d)    Purchaser shall consult in good faith with Owner with respect to the actors to be hired to portray the lead roles in each Picture and with respect to the director for each Picture.  Each lead actor for a Picture shall be credible to the public in his or her role.  Purchaser acknowledges that it has entered into a Producer Loanout Agreement with Larry Kasanoff in connection the first theatrical motion picture project based upon the Property.  Purchaser acknowledges that it has agreed to consult with Larry Kasanoff as to the selection of the writer for such screenplay.

(dd)    Purchaser agrees to consult with Owner regarding any names chosen by Purchaser for the characters, vehicles or devices if such name does not appear on Exhibit "A", or is not supplied by Owner pursuant to Paragraph 2(a)(i) or 2(a)(ii) above.  If Owner notifies Purchaser that the selection of any such name in Owner's good faith business judgment is likely to violate the trademark rights of a third party with respect to one or more of Owner's product categories, Purchaser agrees to select a substitute name for any such conflicting name and to resubmit such substitute name to Owner for consultation as set forth in this paragraph. Owner agrees that it must notify Purchaser of any such conflict within ten (10) business days (reducible to 5 in the event of production emergencies) from Owner's or Owner's representatives' receipt of Purchaser's request therefor or such name shall be deemed approved.

(e)    Purchaser may, but shall not be obligated to, commission a treatment for a particular Picture hereunder prior to commissioning a screenplay. If Purchaser does commission a treatment prior to the writing of a screenplay, Purchaser shall furnish Owner with such treatment and such treatment shall be

WB136200
CONFIDENTIAL
**ER-732**

subject to Owner's written approval, not to be unreasonably withheld. Disapproval of the treatment on any of the following grounds shall not be deemed unreasonable:

      (i)    Countries or villains described in the treatment are identifiable as actual existing countries, persons or organizations;

      (ii)    The number of characters and vehicles taken from the Property (as opposed to newly created characters and vehicles) is insufficient;

      (iii)    Excessive violence or foul language.

Owner's said approval rights shall be exercised in good faith and shall be deemed given if no written notice of disapproval is received by Purchaser within thirty (30) calendar days of receipt by Owner of said treatment. In the event Owner disapproves the treatment in writing within said thirty (30) calendar-day period, Owner shall in its notice expressing disapproval give specific reasons for such disapproval with Owner's detailed suggested changes, referring to specific scenes, language and characterizations for such treatment to meet Owner's approval.

Purchaser shall then revise the treatment, giving good faith consideration to Owner's requested changes, and shall submit such revised treatment to Owner for its approval, again not to be unreasonably withheld and to be exercised in good faith. The procedure for approval and/or disapproval outlined above shall apply to the revised treatment and shall continue to apply until Owner has approved a revised treatment submitted to it by Purchaser.

The procedure set forth for treatment approval in this subparagraph 8(e) shall apply to any Sequels produced hereunder. The script for the applicable Picture, and the Picture itself, will be consistent in all material respects with the approved treatment therefor.

Whether or not Purchaser has first commissioned a treatment for a particular Picture hereunder, Purchaser shall submit to Owner, prior to commencement of principal photography, the proposed screenplay for such Picture, which screenplay shall be subject to Owner's written approval, not to be unreasonably withheld. The procedure for approval of such screenplay shall be the same as outlined above for treatment approval; provided, however, that if Purchaser complies with the changes in the screenplay requested by Owner and Owner thereafter disapproves such screenplay, Owner's disapproval shall automatically be deemed unreasonable. Each Picture will be photographed and recorded in a manner consistent with the screenplay approved or deemed approved by Owner.

981223D4.DOC/EMH; 4/27/99

WB136201
CONFIDENTIAL

ER-733

Notwithstanding anything to the contrary contained herein, so long as Purchaser has complied with the provisions of this subparagraph 8(e), Owner may not exercise its approval right over the screenplay of any Picture hereunder in a manner which frustrates the production of such Picture.

(f) The title of all Pictures produced hereunder will contain the phrase "G.I. Joe," either in the main title or as a subtitle (but appearing in the main titles of the picture) in Purchaser's sole discretion. If "G.I. Joe" appears as a subtitle, it shall be no less than 50% of the size of the main title.

(g) The parties acknowledge that vehicles are integral to the "G.I. Joe" property and that it is Purchaser's intent that unique vehicles with unusual characteristics will be featured prominently in the Picture including, without limitation, in action sequences. Purchaser will consult fully and meaningfully with Owner with regard to the design of said vehicles and at Purchaser's request, Owner will provide at least two proposed designs for each vehicle.

9. Consideration: Purchaser agrees to pay, and Owner agrees to accept, as full consideration for all rights granted herein and for Owner's warranties and agreements herein contained, the following:

(a) The sum of Five Hundred Thousand Dollars ($500,000) (the "Purchase Price"), (less the amount paid to Purchaser for the Initial Option Period pursuant to Paragraph 1 hereof), payable upon exercise of the Option.

(b) For each Picture subsequent to Picture #1 including Spinoffs, Purchaser shall pay Owner the sum of Five hundred Thousand Dollars ($500,000) upon the commencement of principal photography of the applicable Picture.

In the event Purchaser shall fail to make payments under subparagraph 9(b) within the time and in the manner hereinabove set forth, Owner acknowledges and agrees that Owner's sole remedy shall be an action at law to recover such payments, and in no event shall any of said rights revert to Owner, nor shall Owner have or be deemed to have any lien, charge or other encumbrance upon said rights to secure payment of said sums; provided, however, that if Purchaser fails to timely make the payment required under subparagraph 9(a) hereof, Owner shall be entitled to seek equitable relief.

10. Credits, Trademark, Title:

(a) Subject to Owner's reasonable prior written approval, Purchaser shall have the right to publish, advertise, announce and use in any manner or medium the name of Owner in connection with any exercise by Purchaser of its rights hereunder; provided, however, that Purchaser may not use Owner's name in commercial tie-ins without Owner's prior written consent which Owner may

981223D4.DOC/EMH; 4/27/99

14
Exhibit W
189

WB136202
CONFIDENTIAL
ER-734

such trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(e)    (i)    Subject to subparagraph 10(e)(ii) below, Purchaser may create and use a new logo in connection with any Picture produced hereunder and all advertising and publicity in connection therewith so long as Purchaser uses such logo in a manner consistent with the protection of Owner's logo under applicable trademark laws. Any such new logo shall be trademarked in Owner's name and may be used by Owner and its licensees at no cost solely in connection with Owner's advertising and exploitation of the Property so long as such use is in a manner consistent with the protection of Owner's logo under applicable trademark laws.

(ii)    Any logo created hereunder by Purchaser shall be subject to the approval of Owner, but Owner shall not disapprove any such logo created by Purchaser unless Owner reasonably believes that the use of such logo will impair Owner's trademark rights with respect to any existing logo of Owner. Notwithstanding the foregoing, if any Picture produced hereunder and/or the advertising and publicity therefor has an artwork title which is composed of more than just the phrase "G.I. Joe," but which contains the phrase "G.I. Joe" in a manner and style of print which is the same as the manner and style of print of the rest of such artwork title, then the use of the phrase "G.I. Joe" in such artwork title shall not be considered a logo and shall not be subject to Owner's approval. Any such artwork shall belong to and be copyrighted in the name of Purchaser, but Purchaser acknowledges that Owner remains the sole and exclusive owner and proprietor of the name "G.I. Joe" and all logos, artwork, vehicles and accessories relating thereto.

(f)    Notwithstanding anything contained in this Paragraph 10, Owner acknowledges that Purchaser shall have the right to use the name "G.I. Joe" in connection with any Picture and the advertising and publicity therefor, so long as Purchaser shall have the right under this Agreement to produce and/or distribute any such Picture produced hereunder.

11.    Owner's Warranties and Indemnities: Owner hereby represents and warrants that:

(a)    It is the sole owner of or exclusively controls all rights herein granted; it has full power and authority to enter into and perform this Agreement; the Property does not constitute a libel or defamation of and does not infringe upon the copyright, right of privacy or any other right of any person or entity; the Property is copyrighted in the United States of America and to the best of its knowledge in all countries which are signatories to the Universal Copyright Convention; it knows of

WB136204
CONFIDENTIAL
**ER-736**

no claims made against it which if true would adversely affect its rights in and to the Property or the rights granted to Purchaser under this Agreement; and the names of the characters, devices and other elements contained in the Property and the title of the Property may be used by Purchaser in the exercise of all or any of its rights hereunder.

(b)    Owner has not heretofore assigned or encumbered any of the rights granted hereunder, or if Owner has so assigned or encumbered such rights, such assignment or encumbrance shall be terminated, relinquished or satisfied prior to the execution hereof and shall have no adverse effect on the rights granted hereunder.

(c)    Neither the Property nor any element thereof or the exercise by Purchaser pursuant to this Agreement of any of the rights granted to it herein will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, right of privacy or any other right of any person or constitute a libel or slander of any person.

(d)    "G.I. Joe" is a registered trademark of Owner in the United States and certain other territories. Owner shall at its own expense take any and all action reasonably necessary to maintain the continued existence and legal validity of the "G.I. Joe" trademark, including the registrations and pending applications set forth on Exhibit "C", attached hereto and incorporated herein by reference, and any new logo created by Purchaser and trademarked in the name of Owner (the parties acknowledging that Owner's obligation to register such marks is limited to Owner's product categories and Owner is not hereby agreeing to pay for registrations required solely by Purchaser). Owner represents and warrants that to the best of Owner's knowledge (including that which Owner should have known in the exercise of reasonable prudence) there are no adverse claims as of the date hereof that might jeopardize Purchaser's right to use such trademarks as are licensed hereunder. Owner shall notify Purchaser promptly in writing of any adverse claims which arise after the date hereof and agrees that it shall, at its own expense, take all steps necessary in its good faith judgment to enforce its rights in and to the trademarks of the Property and the New Characters and defend and/or prosecute any and all third party claims adverse thereto and conflicting with the rights granted to Purchaser hereunder. Notwithstanding anything contained in this Agreement to the contrary including this Paragraph 11, Owner makes no representations or warranties with respect to New Characters, and any trademarks relating thereto.

Owner will defend, indemnify, make good, save and hold harmless Purchaser, its successors and assigns, from and against any damages, costs, charges, reasonable attorneys' fees, recoveries, judgments, penalties and expense whatsoever which may be obtained against, imposed upon or suffered by Purchaser, its successors and assigns, by

981223D4.DOC/EMH; 4/27/99

WB136205
CONFIDENTIAL

ER-737

reason of the breach of any warranty, covenant, agreement or representation herein made by Owner.

11A.   Purchaser's Warranties:  Purchaser has full power and authority to enter into and perform this Agreement and has taken all corporate and other action necessary to do so.  Material contained in any Picture which is not in the Property or material which is added to the Property including New Characters does not and will not constitute a libel or defamation of and does not infringe upon the copyright, right or privacy or any other right of any person or entity; the aforementioned material will not violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, or any other right of any person or entity.

12.   Purchaser's Indemnities:  Purchaser will defend, indemnify, make good, save and hold harmless Owner, its successors and assigns, from and against any damages, costs, charges, reasonable attorneys' fees, recoveries, judgments, penalties and expenses whatsoever which may be obtained against, imposed upon or suffered by Owner, its successors and assigns, by reason of the breach of any warranty, covenant, agreement or representation herein made by Purchaser, or by reason of incorporation of any material including New Characters into any Picture produced hereunder other than material taken from the Property.

13.   Copyright:  Purchaser shall affix or cause to be affixed an appropriate copyright notice in the name of Purchaser on each of the Pictures produced hereunder in order to afford copyright protection for said Pictures and the Property in the United States of America and in all countries of the world which are member of the Universal Copyright Convention or any other copyright convention.  Purchaser shall cause each Picture to be registered for copyright in the U.S. Copyright Office.

Owner will, at the request of Purchaser, execute and deliver, or procure the execution and delivery of, any and all documents consistent herewith which are reasonably necessary or proper to license to Purchaser the rights herein licensed, and Owner agrees to execute and procure any other and further instruments consistent herewith which are necessary to grant, confirm and license the rights in the Property herein licensed to Purchaser in any country throughout the world.  If it shall be necessary by the laws of any country that copyright registration for any Picture produced hereunder or any version or adaptation thereof be made in the name of Owner, Purchaser is hereby authorized by Owner to apply for said copyright registration in the name of Owner and in such event, Owner shall and does hereby grant the same to Purchaser.  Owner further agrees, upon request, duly to execute, acknowledge, procure and deliver to Purchaser short form instruments consistent herewith for the purpose of recording in the United States and elsewhere.  Owner shall execute separate short-form assignments for each Picture.  Purchaser shall hold the executed short-form assignments in trust and shall not record such instrument with respect to Picture #1 unless and until Purchaser exercises its Option hereunder, and with respect to subsequent Pictures Purchaser shall record an

981223D4.DOC/EMH;  4/27/99

Exhibit W
193

WB136206
CONFIDENTIAL

ER-738

assignment only upon commencement of principal photography of the applicable Picture. If the Option lapses, Purchaser shall, upon request, return all signed copies of the assignments.

If the Owner shall undertake legal action to protect the rights, licenses and privileges hereby granted to Purchaser or for the recovery of damages and penalties for any infringement of such rights, licenses and privileges, Purchaser may join in any such action or proceeding at its own cost and expense. If Owner fails to prosecute or defend as aforesaid (Owner having no obligation to do so), Purchaser is hereby authorized to do so, and insofar as may be necessary, shall have the right to use the name of Owner for or in connection with such purpose; and Owner shall, in any such proceedings, afford Purchaser all reasonable assistance in proving and defending the rights, licenses and privileges held by Purchaser under this Agreement. Owner and Purchaser hereby agree to hold each other harmless from and against any costs, expenses or liability (including reasonable outside attorneys' fees and disbursements) incurred by either as a result of any action or proceeding instituted by the other pursuant to this Paragraph, unless and to the extent arising out of a matter which constitutes a breach of the applicable party's representations and warranties.

14. _Force Majeure:_ In the event that the preparation, commencement, production or completion of any of the Pictures hereunder is prevented, delayed, or interrupted by reason of any act or occurrence beyond the control of Purchaser, including without limitation by reason of any fire, flood, earthquake, explosion, epidemic, casualty, accident, war, civil disturbance, statutory enactment or order, local or national government decree, pestilence, national calamity, act of God, lockout, strike, labor disturbance or conditions, inability to obtain essential materials, power or transportation, or delay of a common carrier, or death, illness or incapacity of the director or principal member of the cast of each and any of the Pictures, Purchaser shall, by written notice given to Owner during the continuance of such prevention, delay or interruption, be entitled to suspend the term of this Agreement, including, without limitation, the Option Period (if the force majeure event affects development of Picture #1) and all dates otherwise applicable in the determination of the Production Period, but in any event, with respect to each Picture hereunder, no suspension (except with respect to subparagraph 5(a) as to which there shall be no time limit on the suspension) shall continue for a period of more than three months.

15. _Assignment:_ This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, heirs, administrators, successors and permitted assigns. Without the prior written approval of Purchaser, not to be unreasonably withheld, Owner may not assign its rights hereunder to any party other than a parent or subsidiary or affiliate or any entity into which Owner may merge or which acquires all or substantially all of its assets, which shall not require Purchaser's approval. Owner may also assign all or any part of the consideration it receives hereunder. Purchaser may not assign, transfer, license, delegate and/or grant any or all of its rights,

18

**Exhibit W**

194

WB136207
CONFIDENTIAL **ER-739**

obligations, privileges and property hereunder to any person or entity other than (i) in connection with any tax or other financing arrangements if Purchaser is still involved as the major distributor of the applicable Picture(s), and/or (ii) to any subsidiary or affiliate or any entity into which Purchaser may merge or which may acquire all or substantially all of its assets, without the prior written approval of Owner not to be unreasonably withheld. Any such assignment, delegation and/or grant by Purchaser shall be subject to all of the terms and conditions of this Agreement and Purchaser shall continue to remain liable for all of its obligations under this Agreement.

16. Miscellaneous: This instrument and instruments executed pursuant hereto includes the entire understanding between the parties and replaces all former agreements and representations with respect to the subject matter hereof. No modification, alteration or amendment of this Agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration or amendment. No officer, employee or representative of Purchaser or Owner has any authority to make any representation or promise not contained in this Agreement, and Owner and Purchaser acknowledge that neither Owner nor Purchaser has executed this Agreement in reliance on any such promise or representation not expressly set forth in this Agreement.

No waiver by either party of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof. Neither Purchaser nor Owner shall be liable for any breach of this Agreement unless it shall have received written notice from the other of such breach and shall not, within a reasonable time after receipt of such notice, have cured such breach.

Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.

Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order, or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this Agreement shall be affected thereby and such other provisions shall continue in full force and effect. .

17. Notices: All notices which either party hereto is required or may desire to give to the other shall be given by addressing the same to the other at the address

981223D4.DOC/EMH; 4/27/99

WB136208
CONFIDENTIAL-740

hereinafter in this paragraph set forth or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be sufficiently given when the same shall be received in the U.S. mail, personally delivered, telexed, telecopied and/or when the same shall have been delivered, so addressed, to a telegraph or cable company, toll prepaid. The addresses to which any such notices, accountings or statements shall be given are the following:

To Purchaser:    Warner Bros., a division of
Time Warner Entertainment Company, L.P.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Business and Legal Affairs Dept.

To Owner:    Hasbro, Inc.
1027 Newport Avenue
Pawtucket, Rhode Island  02862
Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

By: /S/ Pamela Kirsh
Its: Vice President

HASBRO, INC.

By: /S/ Harold P. Gordon
Its:

HASBRO INTERNATIONAL, INC.

By: /S/ Harold P. Gordon
Its:

981223D4.DOC/EMH; 4/27/99

Exhibit W
196

WB136209
CONFIDENTIAL
BR-741

## "G.I. JOE"

## OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement: __April 8__, 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.


By: __/S/ Harold P. Gordon__
    Its:

HASBRO INTERNATIONAL, INC.


By: __/S/ Harold P. Gordon__
    Its:

WB136210
CONFIDENTIAL
ER-742

## ALL-PURPOSE ACKNOWLEDGMENT

State of _____ )
                              )
County of _____ )


On _____ before me, _____,
personally appeared

_____

_____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.


___/S/   Sandra Marks_____
Signature of Notary

981223D4.DOC/EMH;  4/27/99
Short Form Option Agreement

**Exhibit W**
198

WB136211
CONFIDENTIAL
ER 443

## "G.I. JOE"

### ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on _____, the date of exercise of the option.

HASBRO, INC.

By: __/S/__ Harold P. Gordon__
Its:

HASBRO INTERNATIONAL, INC.

By: __/S/__ Harold P. Gordon__
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

**Exhibit W**
199

WB136212
CONFIDENTIAL ER-744