## ALL-PURPOSE ACKNOWLEDGMENT

State of _____ )
                            )
County of _____ )

On _____ before me, _____, personally appeared _____

_____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_/S/ Sandra Marks_____
Signature of Notary

WB136213
CONFIDENTIAL
ER-745

EXHIBIT "B"
EXCLUDED RIGHTS

Notwithstanding anything to the contrary in the Agreement to which this Exhibit "B" is
attached and incorporated, the following items are excluded from the Property and the
rights granted pursuant to the Agreement:

1.    TRADEMARKS AND COPYRIGHTS

The Fridge
Fridge Fever
The Refrigerator
William Perry
Slaughter
Sgt. Slaughter
Slaughter's Marauder Vehicle
Slaughter's Marauders

2.    EXISTING OR COMMITTED PRODUCTIONS

G.I. Joe – The Movie (animated feature-length movie)
G.I. Joe – A Real American Hero (95 commercial half-hour animated episodes
      including live-action wraparounds; produced by Sunbow Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Sunbow
      Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Gunther-
      Wahl Productions, Inc.)
G.I. Joe – Animated programs (44 commercial half-hour episodes; produced by
      DIC Animation City, Inc.)
The above may be utilized by Owner, Owner's distributors and Owner and its
      distributors' licensees anywhere, without restrictions of any kind.

3.    LITERARY AND DRAMATIC MATERIAL

The literary or dramatic material or other characters or elements
originated in any of the productions referred to in Paragraph 2 above or
originated in any other animation television program or animated theatrical
motion picture, and also any literary or dramatic material or other
characters or elements originated in any comic books or strips (e.g., the
Marvel Comics comic book series) or originated in other literary
embodiments.

**Exhibit W**
Exhibit "B"
**201**

WB136214
CONFIDENTIAL

**ER-746**

To Owner:    Hasbro, Inc.
             1027 Newport Avenue
             Pawtucket, Rhode Island    02862
             Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this
Agreement as of the day and year first above written.

WARNER BROS., a division of Time
Warner Entertainment Company, L.P.

By: _____
Its:    UP

HASBRO, INC.

By: _____
Its:

HASBRO INTERNATIONAL, INC.

By: _____
Its:

88122304.DOC/EMH: 4/27/99

23

**Exhibit W**
Exhibit "B"
**202**

WB136215
CONFIDENTIAL

ER-747

### "G.I. JOE"

#### OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the under-signed, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement: April 8, 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.

By: _____
Its:

HASBRO INTERNATIONAL, INC.

By: _____
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Option Agreement

**Exhibit W**
Exhibit "B"
**203**

WB136216
CONFIDENTIAL
ER-748

ALL-PURPOSE ACKNOWLEDGMENT

State of RHODE ISLAND
County of PROVIDENCE

On 5/17/99 before me, Sandra Marks , personally
appeared Harold P. Gordon
, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_Sandra Marks_
Signature of Notary   _Notary Public_

981223D4.DOC/EMH; 4/27/99
Short Form Option Agreement

WB136217
CONFIDENTIAL
**ER-749**

"G.I. JOE"

ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the under-signed, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on _____, the date of exercise of the option.

HASBRO, INC.

By: _____
Its:

HASBRO INTERNATIONAL, INC.

By: _____
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

**Exhibit W**
Exhibit "B"
**205**

WB136218
CONFIDENTIAL ER-750

**ALL-PURPOSE ACKNOWLEDGMENT**

State of *Rhode Island*)
County of *Providence*)

On *5/10/99* before me, *Sandra Marks*, personally
appeared *Harold P Gordon*
_____, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

*Sandra Marks*
Signature of Notary *Notary Public*

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

WB136219
CONFIDENTIAL
**ER-751**

SEE PC DOC 10483 FOR EXHIBITS.

**Exhibit W**
Exhibit "B"
**207**

WB136220
CONFIDENTIAL
**ER-752**

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



October 18, 1999

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for your note. I've reviewed your request for a bonus for SUPERMAN for 1999 with my colleagues. We're pleased that you continue to honor our agreement and that your health enables you to enjoy some benefit from Joe's wonderful creativity. In that spirit we're pleased to accept your request. Enclosed you'll find a $10,000 check in appreciation of our several successful SUPERMAN programs this year. Please give Warren my best and perhaps we'll meet up at next year's San Diego show.

Best

Paul Levitz

:lf

Redacted

A division of Warner Bros.—A Time Warner Entertainment Company

DCC00006204

Exhibit X
208

ER-753



**DC COMICS**
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz/Executive Vice President & Publisher



November 20, 2000

Jean Shuster Peavy
51 Camino Cabo
Santa Fe, NM 87505

Dear Jean,

Thanks for the update and the kind words. Although this has been a fairly quiet year for the Man of Steel (no new television episodes or film for only the second year out of the past twenty-five or so), we're pleased to honor your request for a year 2000 bonus with the enclosed check for $10,000. All of us at DC join in wishing you and Warren a good holiday season, and a happy and healthy new year to come.

Best,

Paul Levitz

A division of Warner Bros.—A Time Warner Entertainment Company

DCC00006193

# JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001 by and between Pacific Pictures Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu, CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively, "Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505) 466-4551, regarding the formation of a joint venture for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights").

    1.    The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy," "Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

    2.    In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations. In consideration for PPC'S contributions to the Venture and the mutual covenants contained herein Claimants hereby transfer and assign to the Venture their rights, title and interests in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's office address shall be the California address set forth above.

    3.    PPC will pay any and all costs and expenses of the Venture, including the legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _MWP_ _JAP_ _HT_

PPC 00005
**ER-755**

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4.     The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.     Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6.     All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.     The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials

PPC 00006

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.  The term ("Term") of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.  To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10.  All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.  This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

PPC 00...ER-757

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

    11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation


By: Marc Toberoff, President                    Date: Nov. 28, 2001


Jean A. Peavy                                   Date: Nov. 28, 2001


Mark Warren Peary
(f/k/a Mark Warren Peavy)                       Date: Nov. 28, 2001

PPC 00008
**ER-758**

DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail:paul.levitz@dccomics.com

Paul Levitz - Executive Vice President & Publisher



December 11, 2001

Jean Shuster Peavy
51 Camino Cabo
Santa Fe NM 87508

Dear jean:

As you surmised, this has been a good year for Superman, with the successful launch of
SMALLVILLE and the JUSTICE LEAGUE cartoon series. In the spirit of that success,
and of our continuing respect for Joe's great contribution to our culture and our company,
enclosed please find a $25,000 bonus check.

Hoping this holiday finds you and Warren well, and that you have a great new year.

Best,

Paul Levitz

:lf

A division of Warner Bros - An AOL Time Warner Company

DCC00006188

# "TARZAN (2003)"
## OPTION PURCHASE AGREEMENT

DATE:   December 2, 2002

PURCHASER: Warner Bros., a division of
      Time Warner Entertainment Company, L.P.
      4000 Warner Boulevard
      Burbank, California 9l522

OWNER:   Edgar Rice Burroughs, Inc.
      a California corporation  Federal I.D. #95-0586620
      c/o Ziffren, Brittenham, Branca, Fischer et al
      1801 Century Park West
      Los Angeles, California  90067
      Attention:  David Nochimson

This confirms the agreement between WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser") and  EDGAR RICE BURROUGHS, INC. ("Owner") with respect to certain rights in the series of published novels and stories ("Stories") written by Edgar Rice Burroughs ("ERB") listed on Exhibit "A" attached hereto featuring the character created by ERB known as "TARZAN". Those works, and the titles, themes, stories and all other contents thereof, and the characters therein, and all translations, adaptations and other versions thereof now or hereafter owned by Owner, whether now existing or hereafter created, are herein referred to collectively as the "Property".  Purchaser's obligations hereunder are subject to its receipt, in form and pursuant to terms and conditions satisfactory to Purchaser, of copies of all chain-of-title documents with respect to the Property.

 1.  Option:  Owner hereby grants to Purchaser an exclusive and irrevocable option to purchase all rights in the Property as set forth in Paragraph 4 hereof (the "Rights") upon and subject to the following terms and conditions:

  (a)  Option Period:  The initial option period ("Initial Period") shall commence on the date hereof and shall continue for a period of 24 months following the date of receipt by Purchaser of this Agreement signed by Owner ("Execution Date") as indicated below and, if Purchaser has during the Initial Period hired a screenwriter to write a screenplay based on the Property, the Initial Period may be extended by Purchaser for an additional period of 12 months ("Extension Period") consecutive to the Initial Period by written notice and the payment to Owner of the sum provided in subparagraph 1(b)(ii) below at

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

**Exhibit BB**

WB136016
CONFIDENTIAL

ER-760

any time prior to expiration of the Initial Period. The Initial Period and Extension Period are hereafter referred to collectively as the "Option Period".

(b) Option Payments: Purchaser shall pay to Owner the following sums in consideration of the option herein granted:

(i) For the Initial Period, Two Hundred Fifty Thousand Dollars ($250,000) ("Initial Option Payment"), payable promptly upon delivery of this Agreement to Purchaser executed by Owner.

(ii) For the Extension Period, if applicable, One Hundred Twenty-Five Thousand Dollars ($125,000) ("Extension Option Payment").

(c) Development Activities: During the Option Period, Purchaser may engage in customary development and preproduction activities with respect to motion pictures and/or other productions based on the Property. If in connection with such development or preproduction activities Owner or another party is engaged by or on behalf of Purchaser to write revisions of the Property, all such revisions shall be and remain Purchaser's sole and exclusive property, whether or not Purchaser exercises the option hereunder; provided, however, that if Purchaser does not exercise said option, Purchaser's use (if any) of such revisions shall be subject to Owner's rights in the Property.

(d) Automatic Extensions: The Initial Period and/or Extension Period, as applicable, shall be extended without notice for periods equal to the length of time necessary to settle or otherwise resolve any third party claims arising during the Option Period which in Purchaser's reasonable good faith judgment would materially and adversely affect Purchaser's acquisition and/or exercise of the Rights and of industry-wide labor disputes and other force majeure events which substantially interfere with Purchaser's development and preproduction of the Property, but no such force majeure extension(s) of the Option Period hereunder shall exceed an aggregate of 6 months, and no such extension(s) of the Option Period due to third party claims shall exceed an aggregate of 6 months unless formal legal action has been initiated and is actively being pursued and/or defended. Purchaser shall promptly, as soon as practicable under the circumstances, confirm any such extension by written notice to Owner, provided that such notice shall be furnished as a courtesy only and shall not be deemed a condition subsequent to the effectiveness of any such extension. In the event that the Initial Period or Extension Period would otherwise expire on a Saturday, Sunday or national holiday, said period shall be extended without notice until the end of the next following business day.

2. Purchase Price/Exercise of Option: If Purchaser exercises its option, the Initial Option Payment will apply toward the purchase price of the Rights which shall be

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

Exhibit BB

216

WB136017
CONFIDENTIAL
ER-761

a total of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Purchase Price"). The balance of the Purchase Price shall be paid upon exercise of the option. The option, if exercised, shall be exercised by written notice or by commencement of principal photography of the first live action feature-length theatrical motion picture based on the Property produced pursuant to the Rights (the "Picture"). The first project produced hereunder shall be the Picture.

2A. Reversion:

(a) Reversion of Picture Rights: Notwithstanding the foregoing, the Rights granted hereunder shall automatically revert to Owner if Purchaser does not commence principal photography of the Picture within a period of four years following the date of exercise of the option; provided that, Purchaser may elect to extend such four year period for one additional year (to a total of five years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period. In the event of such reversion, Owner shall have no obligation to repay to Purchaser any sums paid to Owner hereunder.

(b) Reversion of Live Action Remake and Sequel Rights: If Purchaser produces the Picture, the rights granted hereunder to produce remakes and sequels shall revert to Owner if Purchaser does not theatrically release the Picture in the United States within four years after commencement of principal photography of the Picture. In connection with each remake or sequel Purchaser produces, the rights granted hereunder to produce additional remakes and sequels shall revert to Owner if Purchaser does not commence principal photography of the next remake or sequel prior to the date which is the earlier of either: (i) the last day of a period of four years after initial theatrical release of the immediately preceding remake or sequel; or (ii) the last day of a period of five years following delivery of the answer print of the immediately preceding sequel or remake. In the case of each such four or five year period (as the case may be), Purchaser shall have the right, at Purchaser's election, to extend such period for one additional year (to a total of five or six years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of the applicable four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six or seven years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period, and if Purchaser does extend such five year period then Purchaser

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

3

35493

Exhibit BB
217

WB136018
CONFIDENTIAL
ER4762

may subsequently elect to extend such six year period for one additional year (to a total of seven or eight years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars (250,000) no later than the end of said six year period. It is acknowledged that, thereafter, if Purchaser does not commence principal photography of the next remake or sequel before the end of such seven or eight years (as applicable), the rights granted hereunder to produce additional remakes and sequels shall revert to Owner, and Purchaser shall have no further right to extend the period.

3. Additional Payments/Participation: Owner shall be paid the following additional amounts subject to the conditions specified:

(a) Defined Gross Participation: If the Picture is produced and released, the following amounts (less an amount equal to the Purchase Price):

(i) an amount equal to 2½% of 100% of the Defined Gross of the Picture, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto. Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(a)(i) equals Two Million Dollars ($2,000,000).

(ii) thereafter, an amount equal to 2½% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources. Said participation shall be payable only until such time as the participation under subparagraph 3(a)(iii) below becomes payable.

(iii) thereafter, an amount equal to 5% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

(a)(a) Box Office Advances: As used in this Agreement the term "DBO" shall mean domestic (United States and Canada) box office receipts as reported from time-to-time in the motion picture industry trade newspaper known as "Daily Variety" (or, if "Daily Variety" ceases publication of such reports, then as reported from time-to-time by E.D.I.), and the term "WWBO" shall mean world-wide box office receipts as reported from time-to-time in "Daily Variety" (or E.D.I., as the case may be). If the Picture is produced and released, Purchaser shall pay

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

4

35493

Exhibit BB
218

WB136019
CONFIDENTIAL
ER-763

Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(a)(ii) and 3(a)(iii) above:

(i) Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the Picture reaches Three Hundred Million Dollars ($300,000,000); and

(ii) Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the Picture reaches Three Hundred Fifty Million Dollars ($350,000,000).

(b) Theatrical Sequels and Remakes: As to each live action feature-length theatrical sequel or remake motion picture based on the Property produced pursuant to the Rights, a non-refundable sum equal to the Purchase Price, payable within 10 days following the commencement of principal photography of each such sequel or remake; plus the following sums (less an amount equal to the Purchase Price):

(i) an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto. Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(b)(i) equals Two Million Dollars ($2,000,000).

(ii) thereafter, an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources. Said participation shall be payable only until such time as the participation under subparagraph 3(b)(iii) below becomes payable.

(iii) thereafter, an amount equal to 5% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

5

35493

Exhibit BB
219

WB136020
CONFIDENTIAL
ER 764

(b)(b)  <u>Box Office Advances</u>:  If the applicable sequel or remake is produced and released, Purchaser shall pay Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(b)(ii) and 3(b)(iii) above:

(i)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Million Dollars ($300,000,000); and

(ii)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Fifty Million Dollars ($350,000,000).

4.  <u>Grant of Rights</u>:  If the option is exercised, Purchaser shall own, and subject only to such exercise Owner assigns and sells to Purchaser, exclusively, in perpetuity (subject only to the reversion provisions in Paragraph 2A above) and throughout the universe, all live action theatrical motion picture rights and (subject to subparagraph 4A(c)(c)(c)(c) below) live action television series rights in the Property.  All rights not specifically granted hereunder, including without limitation Reserved Rights, Trademark Rights and Copyrights specified below, are reserved to Owner.  Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

(a)  <u>Live Action Theatrical Motion Pictures and Allied Rights</u>:  The right to produce all types of live action theatrical motion pictures and (subject only to the reversion provisions in Paragraph 2A above) sequels thereto and remakes thereof (except made for television programs and television motion pictures), intended for initial exploitation in motion picture theatres and secondary exploitation in any medium now or hereafter devised (including by way of illustration only, any form of theatrical, television, non-theatrical or homevideo exploitation) and all music and music publishing rights, soundtrack album and other soundtrack exploitation rights, and promotional and advertising rights.  Said rights shall be exclusive, subject to the right previously granted to the Walt Disney Company ("Disney") to produce one theatrical musical motion picture as set forth in paragraph 6 of Schedule 1 attached hereto.  Notwithstanding the foregoing grant of soundtrack exploitation rights, it is agreed that Purchaser shall not use more than 10 minutes of the talking (non-singing) soundtrack of the Picture (or any production produced pursuant to the Rights granted hereunder) on any soundtrack album derived therefrom; provided, however, there is no such length limit on Purchaser's use of any songs contained in the Picture (or any other production produced pursuant to the rights granted hereunder) even if the lyrics of such song(s) are taken in whole or in part from the text of the Property.

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

6

35493

WB136921
CONFIDENTIAL
ER-765

(b) Copyrights/Exploitation Rights:  With respect to works produced pursuant to the rights granted in subparagraph 4(a) above, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in such works (subject to Paragraph 7 below) now or hereafter recognized in any and all territories and jurisdictions (including by way of illustration only, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public) and the right to exploit such works in all media, markets and languages and in any manner now known or hereafter devised subject to Owner's Reserved Rights.

(c) Alteration Rights:  The right to change, add to, delete or take from, translate, or otherwise modify the Property in any manner Purchaser may in its discretion determine in connection with the Picture and other works that will embody all or part of the Property, but subject in each case to the Character Standards provisions below.  To the fullest extent allowable under any applicable law, Owner hereby irrevocably waives or assigns to Purchaser its so-called "moral rights" or "droit moral".  Owner expressly acknowledges that many parties will contribute to the Picture and other works that will embody all or part of the Property.  Accordingly, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(d) Name, Likeness and Biography:  The right to use, in a reasonable and customary manner, ERB's name, approved likeness and approved biography in and in connection with the Picture and any other works that will embody all or part of the Property; provided, however, that ERB's name, likeness and/or biography shall not be used to endorse any entity, product or service.  Owner shall exercise its approval right over likenesses and biographies reasonably and within 5 days after receipt of written request by Purchaser, or such approvals shall be deemed given.

(e) Rental Right:  Purchaser and Owner acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental right granted to Purchaser in subparagraph 4(b) hereof: an agreed allocation to the rental right of 3.8% of the Purchase Price and, if applicable, 3.8% of any contingent compensation provided for in this Agreement.  If under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Purchaser of the rental right shall nevertheless be fully effective, and Purchaser shall pay Owner such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    7

35493

Exhibit BB
221

WB132082766
CONFIDENTIAL

thereof in accordance with applicable law. Since Purchaser has already paid or agreed to pay Owner equitable remuneration for the rental right, Owner hereby assigns to Purchaser all compensation for the rental right payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise. Owner shall cooperate fully with Purchaser in the collection and payment to Purchaser of such compensation. Further, since under this Agreement Purchaser has already paid or agreed to pay Owner full consideration for all rights granted by Owner hereunder, Owner hereby assigns to Purchaser all other compensation payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise, under the applicable law of any territory or jurisdiction, including by way of illustration only, so-called blank tape and similar levies. Owner shall cooperate fully with Purchaser in connection with the collection and payment to Purchaser of all such compensation.

     (f) <u>Intentionally Omitted</u>.

     (g) <u>No Obligation To Proceed</u>: Nothing contained in this Agreement shall be construed as requiring Purchaser to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted.

    4A. <u>Reserved Rights</u>: Owner reserves all rights not expressly granted hereunder, including without limitation the following rights (the "Reserved Rights") in the Property, subject to the terms and conditions set forth below, it being expressly acknowledged and agreed that Owner shall have no right to utilize any elements from any work produced by Purchaser pursuant to the Rights or any new or changed material created by or for Purchaser in the exercise of the Reserved Rights or otherwise, provided that if Purchaser does not exercise the option hereunder, Purchaser's use (if any) of such new or changed material shall be subject to Owner's rights in the Property. In connection with the exercise by Owner of any of the Reserved Rights hereunder, Owner shall have the right (notwithstanding anything to the contrary contained in Paragraph 4 above) to advertise and publicize same in all media, including without limitation radio and television.

     (a) <u>Publishing Rights</u>: All publishing rights in the Property, including but not limited to the publishing rights set forth in subdivisions 4A(a)(i), 4A(a)(ii) and 4A(a)(iii) below, except that Purchaser shall have the right to publish excerpts from and summaries of the Property, or any motion picture or other versions thereof based upon the Property, for advertising and/or publicizing purposes only (not for sale or resale) of any work produced pursuant to the Rights and the right to publish souvenir booklets (for release only at those theaters exhibiting the Picture or other productions produced pursuant to the Rights granted hereunder) and "making-of-the-movie" type books relating to the Picture (provided such souvenir booklets and "making of the movie" type books are for publicizing

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.    8

Exhibit BB
222

35493

WB13602 ER-767
CONFIDENTIAL

purposes, and not for sale or resale), provided that no such publication shall contain excerpts or summaries in excess of 7,500 words in the aggregate (not to be serialized) taken from the Property. The foregoing limitation on serializing is not intended to and shall not preclude Purchaser's publication of advertising and/or publicity materials in installments. With respect to any "making-of-the-movie" type books, such book(s) shall be titled differently than the Property (but such title may contain the title of the Property such as "The Making of the Film TARZAN"), and Owner's name will not appear on the cover, the title page or the spine thereof other than as part of the billing block or credit list, if any, for the underlying picture.

(i) <u>Print Editions</u>: The right to publish print editions of the Property in book form (including, without limitation, in comic book form), whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise.

(ii) <u>Recorded Readings</u>: The right to publish recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user.

(iii) <u>Electronically Read Editions</u>: The right to publish the text of published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically read devices individually purchased by the end-user. Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property but may not contain audio tracks of any kind.

As further set forth below, Purchaser shall take all steps necessary to protect the copyright in the Property as it may be contained in any publication by Purchaser. With respect to excerpts from the Property (if any) used by Purchaser as aforesaid, Purchaser shall identify ERB as the author of the Property from which the excerpts were taken, but any summaries of the Property (as distinguished from actual excerpts) shall not be attributable to ERB. Purchaser acknowledges that, due to the reservation of publishing rights hereunder, Purchaser shall have no right to, and shall not, publish any publications not specifically enumerated in this subparagraph (specifically but without limitation Purchaser shall not publish the screenplay of, or a novelization of, the Picture or any production produced pursuant to the Rights granted hereunder).

(b) <u>Stage Rights</u>: The right to perform the Property or adaptations thereof on the live stage with actors appearing in person in the immediate presence of the audience (including the right to record a cast album) provided no broadcast,

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

9

35493

**Exhibit BB**
223

WB136024
CONFIDENTIAL
**ER-768**

telecast, photography or reproduction of such performance is made, except for archival purposes and for the use of customary minor excerpts in award programs and for advertising and publicity purposes solely in connection with the exploitation of such stage rights. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted stage rights to Disney, the details of such grant of stage rights are listed on Schedule 1 and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control.

(c) <u>Theme Parks</u>: Theme park rights in the Property including, without limitation, the sole right to license 'TARZAN' trademarks and copyrights to theme parks.

(c)(c) <u>Merchandising</u>: The right to license, manufacture and/or sell merchandise and consumer products based on the 'TARZAN' character. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted certain merchandising rights to Disney, the details of which are listed on Schedule 1 attached hereto and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control. In the event that Disney's merchandising rights lapse, and provided Purchaser exercised the Option, Owner shall appoint Purchaser as Owner's merchandising agent on terms to be negotiated in good faith in connection with merchandising rights related to the theatrical motion pictures or direct to video motion pictures produced by Purchaser (but in no event shall such terms be less favorable to Purchaser than the terms of Disney's agreement with Owner for merchandising rights are to Disney). Purchaser shall not have the right to exploit generic merchandising rights.

(c)(c)(c) <u>Animation Rights</u>: All rights to produce animated motion pictures and series for movies and television. Notwithstanding the foregoing, Purchaser acknowledges that Owner previously granted theatrical and television animation rights to Disney.

(c)(c)(c)(c) <u>Television Rights</u>: The right to produce and telecast made-for-television motion pictures and television series. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted to Warner Bros. Television an exclusive option to acquire live action television series rights. Provided none of the Rights granted hereunder have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action long-form television rights pursuant to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement for live action long-form television rights with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

10

35493

**Exhibit BB**
**224**

WB136025
CONFIDENTIAL

**ER-769**

business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party. In connection with the foregoing, if and when Warner Bros. Television's rights terminate, Owner agrees not to option or otherwise grant said rights until Purchaser's rights under this Agreement terminate or revert. If Purchaser produces the Picture, Purchaser shall have the right to produce a live action television series based thereon (the "Series"), subject to the following terms:

(i) To keep the Series rights alive, Purchaser must start principal photography on the first episode of the Series by the date which is the earlier of either: (A) 4 years after release of the Picture, or (B) 5 years after delivery of the answer print of the Picture; provided, however, that Purchaser has the right to extend such reversion date by an additional year by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(ii) Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(i) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(iii) Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(ii) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

Notwithstanding the foregoing, in order to avoid a reversion at the reversion date described above, Purchaser must (prior to such reversion date) either: (i) receive a firm order of 13 episodes of the Series from a network, or (ii) commit to the production of 13 episodes of the Series, and must timely produce and continue to produce the Series. In connection with the Series, Owner will receive Thirty-Five Thousand Dollars ($35,000) per episode (with 5% cumulative annual increases), plus 7.5% of 100% of the modified adjusted gross computed according to the same definition of modified adjusted gross as set forth in Owner's agreement with Warner Bros. Television for said option of live action television series rights.

(c)(c)(c)(c)(c) Touring Rights: Touring rights in the Property for the purpose of putting on live action arena shows based on the Property.

(d) Live Action Made-For-Homevideo Rights: The right to produce and distribute live action motion pictures for direct-to-video distribution. Notwithstanding the foregoing, provided none of the Rights granted hereunder

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                          11

**Exhibit BB**
225

35493

WB136026
CONFIDENTIAL

ER-770

have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action made-for-homevideo rights pursuant to subparagraph 4A(f) without regard to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party.

(e) <u>First Negotiation</u>: If Owner at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, Owner shall give Purchaser notice thereof and an opportunity to so negotiate prior to Owner so negotiating with any third party. If Purchaser elects to so negotiate, Owner and Purchaser shall negotiate in good faith for a period of not less than 30 days from the commencement of such negotiations, and if Purchaser elects not to negotiate, Owner may enter into an agreement for the license, exercise or other disposition of such Reserved Rights with any third party with no further obligation to Purchaser with respect thereto. If Purchaser elects to negotiate and if an agreement does not result therefrom Owner may thereafter negotiate with any third party. If Owner is at any time prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved. In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice. If such notice sets forth a reason for a quicker response (e.g., imminent withdrawal of the offer by such third party upon which such third party agreement is to be based), Purchaser shall use best efforts to make such election within 5 business days.

5. <u>Representations and Warranties</u>: Owner hereby represents and warrants:

(a) That Owner has the right to enter into this Agreement and grant the Rights granted hereunder and that Owner has not heretofore assigned or encumbered any of the rights granted hereunder, except as otherwise set forth in this Agreement.

(b) That the Stories are original with ERB; that neither the Stories nor any part thereof are taken from or based upon any other material or any motion picture; that to the best of Owner's knowledge (including that which Owner in

FL206
021028MMS/blb Rev(3) 5-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

12

35493

**Exhibit BB**
**226**

WB136027
CONFIDENTIAL

ER-771

exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon the trademark, tradename, copyright or patent right of any person; and that to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon any other literary, dramatic, musical or artistic right, or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) any personal, private, civil or property right, right of privacy or any other right of any person or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) constitute a libel or slander of any person. Owner makes no warranty hereunder, however, with respect to any material added to any motion picture.

(c) That, except as otherwise set forth in this Agreement, Owner is the sole owner of all Rights herein granted and has full power and authority to grant said Rights to Purchaser, as more particularly set forth in Paragraph 4 hereof; that except as set forth in this Agreement, none of said rights have been granted, encumbered, or otherwise disposed of in any manner to any person; that no motion picture based in whole or in part on the Property has been produced or authorized by or with the knowledge or consent of Owner, except as set forth in subparagraph 5(f) below; that except as set forth in subparagraph 5(f) below, neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part have been published or presented or authorized on the spoken stage by or with the knowledge or consent of Owner, except pursuant to an agreement, dated April 18, 1920, between Owner and Arthur Gibbons (dealing with stage rights) and an agreement, dated 1973, between Owner and Michael White Limited (dealing with stage rights); that Owner has not by license, grant or otherwise done and will not by license, grant, or otherwise do any act or thing which will impair or encumber any of the Rights herein granted or materially interfere with the full enjoyment of said Rights; and that, so far as Owner is aware, there are no claims or litigation pending or threatened which will adversely affect any of the Rights herein granted to Purchaser.

(d) That the Stories set forth on page 1 of Exhibit "A" attached hereto enjoy copyright protection in the United States; and that the Stories set forth on pages 2 and 3 of Exhibit "A" attached hereto enjoy copyright protection in all countries outside of the United States which adhere to the Berne Copyright Convention (applying a copyright term of "life plus seventy [70] years").

(e) That ERB died on March 29, 1950, and accordingly, for purposes of the Berne Copyright Convention (as such Convention applies to countries

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    13

35493

Exhibit BB
227

WB136020
ER472
CONFIDENTIAL

outside of the United States which adhere to such Convention), the "life of said author (ERB) plus seventy (70) years" extends to December 31, 2020.

(f) That motion pictures and television programs set forth in Exhibit "D" attached hereto, all based in whole or in part on the Property, have been heretofore produced, in which productions Purchaser acknowledges there exists a continuing right to exploit, but aside from the productions specified in Exhibit "D", no other theatrical or television motion pictures or television programs have been produced or authorized by or with the knowledge or consent of Owner.

(g) That TARZAN is a registered trademark of Owner in the United States and certain other territories.

(h) That the Property is not based in whole or in part on the life of any real person except as approved in writing by Purchaser.

(i) That, without limiting Purchaser's rights to do so in the event Owner fails to do so, Owner will maintain copyright protection in the Reserved Rights.

(j) That, except as set forth in Exhibit "A", and except as set forth in subparagraph 5(k) below, to the best of Owner' knowledge, there are no other stories authorized by Owner or its predecessors in interest in which the TARZAN character appears. If there are any other Stories in which Owner has an interest, such stories shall be deemed Stories hereunder to the extent of Owner' rights therein, if any.

(k) That none of the publishers listed on Exhibit "A" has any present, continuing, or vested theatrical or homevideo live-action motion picture rights in the character of TARZAN or in any of the Stories.

(l) Owner has, over the years, licensed various comic book publishers to prepare, create and publish comic books based upon the Property. The current licensee with respect to comic book rights is Dark Horse. All of such licensees (including Dark Horse) have been authorized by Owner to prepare stories for use in connection with the exploitation of the licensed comic book rights. None of the comic book licensees, including Dark Horse, have the motion picture or television rights in the stories created for the comic books.

(m) If Owner authorizes the writing and publication of any new Stories based upon the Property, then so long as Purchaser has any production rights hereunder, Owner shall not authorize the exploitation of the motion picture and television rights therein and the Property shall be deemed to include any such new Stories.

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                                14

35493

**Exhibit BB**
**228**

WB136029
CONFIDENTIAL **ER-773**

The term "person" as used in this Agreement shall mean any person, firm, corporation or other entity.

     5A. <u>Indemnification</u>:  Owner shall indemnify Purchaser against any liability, damages, costs and expenses (including outside reasonable attorneys' fees) incurred by reason of any claim arising in connection with any breach of Owner's representations, warranties or agreements herein.  Purchaser will indemnify Owner against any liability, loss, damage, cost or expenses (including reasonable attorneys' fees) Owner may incur as a result of any claim or action respecting material incorporated into or added to the Property by Purchaser in the exercise of any of Purchaser's rights hereunder or otherwise in connection with Purchaser's exercise of any of the Rights granted hereunder (provided such claim or action does not arise on account of any breach of warranty or agreement made by Owner hereunder or any wrongful or negligent act of Owner).  The parties hereto, upon presentation of any such claim to either of the parties, or the institution of any such action naming either or both of the parties as defendants, shall promptly notify the other of the presentation of such claim or the institution of any such action giving such other party full details thereof.  In any such claim or action, Owner may have independent counsel, at Owner's sole cost and expense, and said counsel may participate on Owner's behalf, provided that Purchaser shall be entitled to maintain control of the conduct of the defense of any such claim or action.  Purchaser shall have the right to adjust or settle any such claim or action as it may determine in its sole discretion in good faith without affecting the foregoing indemnity; provided, however, that if Owner makes bonding arrangements reasonably satisfactory to Purchaser assuring Purchaser of reimbursements of all payments and expenses in connection with any such claim or action, Purchaser will not settle such claim or action without Owner's prior written consent (so long as Owner does not withhold its consent in bad faith); provided, further, that the preceding proviso shall not apply and Purchaser's right to settle any claim or action and Owner's indemnity obligation shall remain where Purchaser deems advisable a settlement of a lawsuit in which a claim or action for an injunction is made against the production, distribution and/or exploitation of the Picture or any other motion picture or television production which may be produced pursuant to the Rights granted hereunder.  To the extent any such settlement would affect Owner's Reserved Rights, same shall be made only with Owner's prior written consent (so long as Owner does not withhold its consent in bad faith).

     5B. <u>E&O Insurance</u>:  If Purchaser exercises its option hereunder, then commencing from the time Purchaser's errors and omissions insurance policy applicable to the Picture becomes effective, Purchaser agrees to cover Owner as an additional insured under such errors and omissions policy applicable to the Picture and any other production produced by Purchaser pursuant to the rights granted hereunder, but only with respect to claims or liabilities arising out of Purchaser's production, distribution or exploitation of the Picture (and not from a breach by Owner of any representation, warranty or agreement hereunder), subject to applicable deductibles

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.      15

35493

WB13**ER**0**0**774
CONFIDENTIAL

and exclusions. Purchaser shall not be obligated to maintain errors and omissions insurance for any particular period of time, it being expressly agreed that coverage of Owner hereunder shall continue only during the period of time provided herein and only during such time as Purchaser elects to carry such insurance.

    6. Additional Documents: At Purchaser's request, Owner will execute, acknowledge and deliver to Purchaser any and all additional documents consistent herewith which Purchaser may reasonably deem necessary to evidence and effectuate the purposes of this Agreement including, without limitation short-form options and assignments in the form attached hereto. Owner hereby irrevocably appoints Purchaser as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office and elsewhere any and all such documents which Owner fails to execute within 10 business days after Owner's receipt of Purchaser's written request therefor (unless a shorter period of time is reasonably required by Purchaser, but in any event at least 5 business days). Upon Owner's request, Purchaser shall furnish to Owner copies of all such documents which Purchaser so executes on behalf of Owner. The appointment shall be a power coupled with an interest. Concurrently with or promptly after execution by Owner of this Agreement, and as a condition to payment by Purchaser hereunder, Owner will deliver to Purchaser a Publisher's Release in the form attached hereto (or such other form as Purchaser has approved in writing), executed by an authorized signatory of each party to whom Owner has granted publishing rights in the Property.

    6A. Character Standards: The following shall apply with respect to motion pictures produced under this Agreement:

      (a) Purchaser agrees that it shall exercise a high degree of care so as to insure that the selection of themes and content for such motion pictures, the treatments, screenplays and presentations of such motion pictures, and the advertising and publicity thereof are made in good faith for the entertainment value thereof (taking into account their suitability for children as well as adults) rather than solely for the purposes of sensationalism or to appeal to prurient interests. In this connection, in the portrayal of the TARZAN and JANE characters in such motion pictures and advertising and publicity, Purchaser shall: (1) not portray the TARZAN and JANE characters as not being fundamentally good; (2) not be inconsistent with TARZAN'S and JANE'S basic characters and basic characteristics set forth in the Stories; (3) not depict TARZAN and JANE as unconcerned for the sanctity and well being of human and animal life; and (4) not depict TARZAN or JANE as being contemptuous of race, color, religion, creed or national origin.

      Without limiting the generality of the foregoing, Purchaser agrees that in no event shall TARZAN or JANE be portrayed in such motion pictures or advertising and publicity as:

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.    16

35493

**Exhibit BB**
230

WB130681
CONFIDENTIAL
ER-775

(i) losing life or limb or suffering any permanent physical or mental disability of any kind;

(ii) advocating or participating in any wanton killing of any human or animal other than for purposes of obtaining food, self-protection or the protection of other humans or animals, and in order to obtain knowledge;

(iii) advocating the use of, or intentionally and knowingly using for himself (except for medicinal or anthropologically accurate ceremonial purposes), alcohol, tobacco products or drugs; and

(iv) advocating or engaging in illicit sexual activity.

(b) No later than thirty (30) days prior to the scheduled commencement of principal photography of any motion picture, Purchaser shall furnish to Owner the screenplay therefor in order to ensure observance of the provisions of this Paragraph 6A, and if Owner has any comments thereon, they must be furnished to Purchaser in writing within five (5) business days after the screenplay is received by Owner, and if Owner fails to furnish its comments within such period, Owner shall be deemed to have accepted such screenplay and waived its right to claim that such screenplay failed to comply with the provisions of subparagraphs 6A(a) above and 6A(d) below; provided that the applicable motion picture is consistent with said screenplay.

(c) Purchaser shall not change the name of the characters TARZAN and JANE, but if Purchaser elects to change the name of any other character(s) in the Stories, it shall first consult with Owner (with Purchaser having the final say) and the fact that Purchaser changes the name of any character(s) shall not in any way alter or affect the status of such character(s) as still being part of the Property and not owned by Purchaser (other than with respect to Purchaser's rights to use the character in and in connection with the Picture and sequels to and remakes of the Picture), and Purchaser's right to exploit such character(s) shall be governed by the terms of this Agreement.

(d) Purchaser may not change the basic nature of any character in the Stories, it being understood that for purposes of this subparagraph 6A(d), the basic nature is deemed to mean whether a character is fundamentally "good" or "evil," and Purchaser shall not change a character in the Stories who is fundamentally "good" to fundamentally "evil" or vice-versa. Nothing herein shall limit Purchaser's ability to create and introduce new characters into motion pictures produced hereunder (i.e. characters which do not appear in the Stories).

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

17

**Exhibit BB**
231

WB1360**ER-776**
CONFIDENTIAL

(e) Without limiting the provisions of subparagraphs 6A(a), 6A(b), 6A(c) and 6A(d) above, Purchaser shall obtain an MPAA rating for each motion picture produced hereunder no more restrictive than "PG-13".

6B. <u>Credit, Trademark, Title</u>:

(a) <u>Credit</u>:  Purchaser shall accord credit to ERB on the positive prints of all motion pictures produced hereunder, on a separate card, in the main titles (meaning the credits, whether before or after the body of the Picture, where the "directed by" credit appears), in a size of type not less than fifty percent (50%) of the size of type used to display the title of the applicable motion picture and, subject to Purchaser's customary exclusions (set forth below), in all paid advertisements issued by or under Purchaser's control, in a size of type not less than that used to accord credit to the screenplay writer(s); provided that notwithstanding said exclusions, ERB will be accorded such credit in all paid advertisements issued by or under Purchaser's control (other than award, nomination, congratulatory advertisements and advertisements announcing personal appearances) in which the screenplay writer(s) for the applicable motion picture is accorded credit, in the following form, all subject to Purchaser's agreement with the Writer's Guild of America (the "WGA") and any other union requirements which may apply:

(i) "Based on the Story '[name of Story or Stories]' by Edgar Rice Burroughs", if the motion picture is based upon a Story or Stories; or

(ii) "Based on the 'TARZAN' stories created by Edgar Rice Burroughs", if the motion picture is not based upon a Story or Stories but is based upon the character TARZAN, subject to Purchaser not being precluded from according such credit by the WGA; and if the WGA so precludes said credit, then in the form "Based on the TARZAN character created by Edgar Rice Burroughs".

With respect to each motion picture produced hereunder, Purchaser shall furnish Owner with a copy of the final main and end title screen credits schedule and the final advertising billing schedule prepared by Purchaser when the same are distributed to Purchaser's departmental personnel, but in no event later than five (5) days prior to the delivery of any answer print of any motion picture or publication of any advertisement, as the case may be, in order that Owner may insure that Purchaser has complied with the provisions of subparagraphs 6B(a) and 6B(b) hereof.  If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt thereof of any errors therein, then Owner shall be deemed to have approved said matters. Tentative credits may be substituted for final credits if the credit accorded ERB is not changed after Owner's approval thereof, or if changed, subject to furnishing

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

18

35493

**Exhibit BB**
232

WB136033
CONFIDENTIAL-777

Owner such changed credit in the form of another tentative or final credit in accordance with the foregoing procedure. In paid advertising, the following shall apply: any reference to the size of the title shall refer to the regular as opposed to the artwork title; the foregoing credit provisions shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Purchaser or under Purchaser's direct control relating to the Picture, and shall not apply at any time to teasers, trailers, billboards and other outdoor advertising, radio and television advertising, group, list or special advertisements, commercial tie-ins or by-products, any advertisements of 8 column inches or less, or any advertisements which would be excepted advertisements under the Directors Guild of America Basic Agreement. No casual or inadvertent failure to comply with credit requirements hereunder shall be deemed a breach of this Agreement, and the sole remedy for breach of any of the foregoing provisions shall be an action at law for damages, it being agreed that in no event shall Owner be entitled to injunctive or other equitable relief on account of any breach of any of the provisions of this subparagraph 6B(a); provided, however, that upon any notice by Owner to Purchaser of any inadvertent failure by Purchaser to comply with the provisions of this subparagraph 6B(a), Purchaser shall prospectively cure any such failure, but Purchaser shall not be required to recall prints or re-do advertisements which have been prepared and run. Purchaser shall require in Purchaser's contracts with the subdistributors of the Picture that ERB shall receive the credits required hereunder; provided, however, that any failure by a subdistributor to comply therewith shall not be a breach of this Agreement.

(b) Trademark:

(i) Purchaser shall insert the Trademark (of which Owner notifies Purchaser in writing of Owner' ownership thereof) together with the following legend, on the prints of each motion picture produced hereunder, in paid advertising relating to each motion picture produced hereunder, and (1) on the jacket or cover (or other wrapping) or label of any soundtrack recording relating to any motion picture produced hereunder, and (2) on any musical compositions relating to any motion picture produced hereunder:

TARZAN ®

"Trademark TARZAN owned by
Edgar Rice Burroughs, Inc. and used by Permission."

Such trademark symbol and legend shall be in legible size.

FL206
02102BMMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

19

35493

WB136034
CONFIDENTIAL
ER4778

(ii)  Purchaser acknowledges that Owner has advised Purchaser that TARZAN is a registered trademark of Owner in the United States and certain other territories, that any and all use of the Trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(iii)  Purchaser warrants and confirms that it will not obtain in its name or in the name of any agent or representative, any ownership interest in and to the Trademark and that it will not obtain any registration pertaining to such trademark nor will it file any application pertaining thereto.

(iv)  Purchaser agrees that it shall not attack the validity of the Trademark whether prior to or after any reversion to Owner of Purchaser's right to produce any motion pictures hereunder.

(v)  Subject to the other requirements of this subparagraph 6B(b), Purchaser shall be obligated to incorporate the Trademark as part of the title of any motion picture produced hereunder.

(vi)  Purchaser shall not utilize any other trademark, trade name or service mark in connection with the Trademark (it being understood that Purchaser may use its own corporate logo and/or trademark or any of its other applicable corporate logos and/or trademarks or the logos and/or trademarks of any third party manufacturer of soundtrack recordings or music publisher or contributor of production services or equipment) in connection with any motion picture, soundtrack recording or musical composition produced hereunder provided such use,  if it is on the same item as the Trademark, is distinct and separate from the Trademark and shall not vary, modify or change in any manner the Trademark whether by way of translation or otherwise, it being understood that Purchaser may translate the Trademark legends referred to in this Paragraph 6B into foreign languages in connection with the foreign exhibition of any motion picture produced hereunder as well as the foreign distribution or publication, as the case may be, of any soundtrack recording or musical composition produced hereunder.  Purchaser shall, upon Owner' request, execute and deliver any and all documents furnished to Purchaser by Owner which Owner may reasonably require to facilitate Owner' registration, renewal and protection of the Trademark, including, but not limited to recordation of Purchaser as a user of the Trademark. Purchaser furthermore undertakes upon the termination (if any) of Purchaser's right to use the Trademark hereunder, to execute all reasonable and necessary documents furnished to Purchaser by Owner for the purpose of effecting cancellation of the registered user entry or

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

20

35493

**Exhibit BB**

**234**

WB136035
ER 779
CONFIDENTIAL

other recordation. In connection with the foregoing, when Owner notifies Purchaser in which territories the Trademark is registered and requests Purchaser to advise Owner whether the Trademark is then being used in any territory, Purchaser shall comply with such request, and upon requests by Owner, Purchaser shall furnish Owner with an affidavit (in the form to be furnished to Purchaser by Owner) that it is using the Trademark in motion pictures in any specific territory.

(vii) Anything to the contrary notwithstanding, Owner acknowledges that Purchaser shall have the right to use the name TARZAN in conjunction with motion pictures based on the TARZAN character and in connection with the exercise of any other rights granted hereunder so long as Purchaser shall have the right under this Agreement to produce and/or distribute such motion pictures.

(viii) Purchaser hereby agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) arising out of any unauthorized use by Purchaser of the Trademark. Notwithstanding the foregoing, Owner shall have the right, but not the obligation, to assume the defense of any claim or action arising hereunder, subject to the provisions of subparagraph 7(d) below.

(c) Owner hereby grants Purchaser the exclusive right to use the word TARZAN and/or the title of any Story as the title of and in connection with any motion picture produced, and, subject to the following sentence, the nonexclusive right to use such words and/or title(s) in the exercise of any other right hereunder. Purchaser may use the title of the Story or the Stories solely for the following purposes: (i) as the title of such motion picture produced hereunder as may be based on such Story or the Stories; (ii) in the advertising and publicity relating to any motion picture produced hereunder, and (iii) as the title of any soundtrack recording and/or musical composition relating to any motion picture produced hereunder.

7. Copyright:

(a) As a condition of the grant of rights by Owner hereunder, Purchaser shall incorporate (and shall cause the respective record company and music publishing company to incorporate) the following form of copyright notice, which shall be in legible size, in the joint names of Owner and Purchaser (or its designee), among the credits on the negative and prints (and tapes if applicable) of motion pictures produced hereunder and on copies of all treatments, screenplays and all advertising or promotional materials issued by Purchaser or under its control in connection with any motion picture produced hereunder, as

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

21

**Exhibit BB**
235

35493

WB136036
CONFIDENTIAL ER-780

well as on the jacket or cover (or other packaging) or label of any soundtrack recording and on any treatment, screenplay and musical composition relating to any motion picture produced hereunder:

COPYRIGHT © [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee]. All Rights Reserved.

In addition, the following form of copyright notice shall appear on the jacket or cover (or other packaging) or label of any soundtrack recording in legible size:

P [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee].

The form of copyright notice shall be submitted to Owner no later than five (5) days prior to the preparation of the credits for the answer print of any motion picture produced hereunder (as well as prior to the manufacture of any soundtrack recording and publication of any musical composition produced hereunder) in order that Owner may insure that Purchaser has complied with the provisions of this Paragraph 7. If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt of such form of copyright notice, then Owner shall be deemed to have approved said form of copyright notice.

Notwithstanding anything to the contrary contained in this subparagraph 7(a), in the event Purchaser inadvertently omits to incorporate the requisite copyright notice as provided for herein, Purchaser shall not be deemed to be in breach of this subparagraph 7(a) if Purchaser complies with the provisions of Section 405(a)(2) of the United States Copyright Act.

(b) Purchaser shall apply, on behalf of Owner and Purchaser, for Registration of Claim of Copyright in the name of Owner and Purchaser for any motion picture produced hereunder, as well as any screenplay, teleplay, soundtrack recording and musical composition, within ninety (90) days after the date of initial release, exhibition, or publication, as the case may be, and shall concurrently therewith furnish Owner with a copy of the applicable Application to Register Claim of Copyright, and shall instruct the United States Copyright Office to mail a certificate of Registration of Claim of Copyright in respect of said Application to Owner. The Application for Registration of Claim of Copyright shall bear the inscription: "By Agreement Between Warner Bros., a division of Time Warner Entertainment Company, L.P. and Edgar Rice Burroughs, Inc." Purchaser further agrees that the release, exhibition or publication, as the case may be, of any motion picture produced hereunder, as well as any soundtrack recording and musical composition, shall be with such notice of copyright and in such a manner as shall afford to said motion picture copyright protection in the

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    22

35493

**Exhibit BB**
**236**

WB136893
**ER-781**
CONFIDENTIAL

United States of America and all countries adhering to the Berne Convention and the Universal Copyright Convention. References to motion pictures hereunder shall include, but not be limited to, the soundtrack thereof and any dubbed versions, subtitled versions, and any other version thereof.

(c) Purchaser shall have the right, but not the obligation, at Purchaser's expense, to bring, prosecute, defend and appear in suits, actions and proceedings concerning all copyrights in and to any motion pictures produced hereunder, or concerning any infringement of any such copyright, or any interference with any of the rights herein granted to Purchaser, and to take such action as Purchaser may deem advisable to enforce, protect and/or defend any of the rights, privileges and property herein granted to Purchaser under any and all such copyrights; and to litigate, collect and receive all damages arising from any infringement of any such rights. Any such action may be taken by Purchaser and Purchaser may, if required by law, join Owner as a party plaintiff or defendant in any such suit, action or proceeding, in which event, Purchaser agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) resulting from Purchaser joining Owner as a party plaintiff or defendant in any such suit, action or proceeding, except to the extent attributable to the fault of Owner or predecessor or successor in interest of Owner. If required by Purchaser, Owner shall execute a power of attorney in favor of Purchaser within five (5) business days of the request therefor by Purchaser, so as to enable Purchaser to proceed with any such suits, actions and proceedings. Notwithstanding anything to the contrary set forth in this subparagraph 7(c), if Owner shall notify Purchaser in writing of an infringement with respect to a soundtrack recording and request Purchaser to take action with respect to such infringement, and if Purchaser does not proceed in accordance with such request within five (5) business days of such notice, Owner shall have the right to proceed against the infringement involved at its own expense and shall indemnify and hold harmless Purchaser, its successors and assigns, from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from so proceeding.

(d) Nothing herein shall affect Owner's right to assert or otherwise use its copyright interest in any motion picture produced hereunder, in connection with any suit, action or proceeding of any nature in respect of any matters other than the enforcement, protection and/or defense of the copyright in any motion picture produced hereunder, or other product resulting from Purchaser's exercise of its rights hereunder, it being understood and agreed that no such assertion or use by Owner of its copyright interest shall in any way limit, impair, derogate from, or otherwise restrict Purchaser's sole and exclusive distribution rights in and to any motion picture produced hereunder. Owner may, if required by law, join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding,

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

23

Exhibit BB
237

WB136038
CONFIDENTIAL
ER-782

in which event Owner agrees to indemnify and hold Purchaser, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from Owner's joining Purchaser as a party plaintiff or defendant in any such suit, action or proceeding.

(e) Owner, as a condition of any grant of print publication rights to any third party, agrees to cause to be affixed to each copy of the Stories or any part thereof hereafter published or offered for sale by or with the authority of Owner notice of copyright in the same form as has been previously affixed to each copy of the Stories or any part thereof, and not to cause any publication of the Stories or any arrangement, revision or reissue thereof in any form without duly copyrighting the same in every country where such publication occurs.

(f) Wherever Purchaser is referred to in the last grammatical paragraph of subparagraph (a) of this subparagraph 7 or subparagraph (b) through (d) of this Paragraph 7, it shall be deemed to mean Purchaser, or, in the event Purchaser's designee is the co-copyright proprietor of the applicable motion picture, then it shall be deemed to mean Purchaser's designee.

8. Irrevocability and No Equitable Relief: Subject to any reversion rights and/or sequel reversion rights set forth herein, all rights granted and agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser in perpetuity, including without limitation, for the full term of copyright protection everywhere in the world and any and all renewals, extensions and revivals thereof. No breach by Purchaser of this Agreement shall entitle Owner to equitable relief, whether injunctive or otherwise, against or with respect to the Picture or any other works produced pursuant to the Rights granted hereunder or their exploitation, it being acknowledged and agreed that Owner's remedy of money damages in accordance with the dispute resolution provisions set forth below is adequate. If the rights granted to Purchaser hereunder should revert to Owner pursuant to the provisions of any copyright law or similar law, and if Owner is at any time thereafter prepared to enter into an agreement with a third party for the license, exercise or other disposition of all or any of such rights, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved. In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice.

9. Assignment: Purchaser shall have the right to assign any or all of its rights under this Agreement to any person, and upon such assignment Purchaser shall have no further obligations to Owner hereunder; provided, however, that unless such assignment is to a so-called major or so-called mini-major motion picture company or a United States television network (as those terms are commonly understood in the motion picture or television industries at the time) which assumes such obligations in

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

24

Exhibit BB
238

WB136039
CONFIDENTIAL
ER-783

writing, or unless Owner approves of such assignment, such assignment shall not relieve Purchaser of its payment obligations to Owner under this Agreement.

9A. <u>Videocassette/Videodisc Copy</u>: At such time, if at all, as videocassette and videodisc copies of the Picture and/or any sequel or remakes thereto produced by Purchaser shall be manufactured for distribution in the homevideo market, Purchaser shall furnish Owner, upon request, with 5 such videocassette copies and 5 such videodisc copies at no cost to Owner. Owner shall use said videocassette and videodisc copies solely for personal, library and reference purposes, and in no event shall said videocassette and videodisc copies be duplicated or used for any commercial purpose or for profit, including but not limited to the making of public exhibitions of the Picture or such sequel or remake (as applicable).

9B. <u>One-Sheets</u>: At such time as one-sheets advertising the Picture (and/or each sequel to or remake of the Picture) become available, Purchaser shall furnish Owner, upon Owner's timely request, with 5 copies of each such one-sheet at no cost to Owner. Owner shall use such copies solely for personal, library and reference purposes, and in no event shall said copies be duplicated or used for any commercial purpose or for profit.

10. <u>Miscellaneous</u>:

(a) <u>Entire Agreement</u>: Except as herein expressly provided, this Agreement cancels and supersedes all prior negotiations and undertakings relating to the Property and contains all terms and conditions, pertaining to the subject hereof. If there is any conflict between any provision of this Agreement and any present or future statute, law, ordinance, regulation or collective bargaining agreement the latter shall prevail; provided, that the provision hereof so affected shall be limited only to the extent necessary and no other provision shall be affected.

(b) <u>Notices</u>: All written notices which either party hereto is required or may desire to give to the other shall be given by delivering or mailing the same to the other at the address shown on the face hereof, or at such other address as may be designated in writing in a notice to the other given as aforesaid. Notices to Purchaser shall be addressed to the specific attention of Purchaser's Legal Department. Notices shall be sufficiently given when hand-delivered or when the same shall be deposited so addressed, postage prepaid, in the United States mail and/or when the same shall have been transmitted by facsimile or similar means and the date of said delivery, mailing or transmission shall be the date of the giving of such notice.

(c) <u>Governing Law/Dispute Resolution</u>: This Agreement shall be governed and construed in accordance with the laws of the State of California

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.          25

35493

**Exhibit BB**
239

WB136040
CONFIDENTIAL
ER 784

applicable to contracts entered into and fully performed therein. Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this agreement to arbitrate ("Dispute"), except as otherwise set forth below, shall be resolved according to the following procedures which shall constitute the sole dispute resolution mechanism hereunder: In the event that the parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration. The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules. The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute. The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.

The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award. Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry. If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County. The party seeking enforcement of any arbitration award shall be entitled to an award of all costs, fees and expenses, including reasonable outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County. Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a California court (state or federal) of competent jurisdiction in Los Angeles County. Any process in such proceeding may be served by, among other methods, delivering it or mailing it, by registered or certified mail, directed to, as applicable, Owner's

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                      26

**Exhibit BB**
240

35493

WB136041
CONFIDENTIAL

ER-785

or Purchaser's address as designated in this Agreement. Any such delivery or mail service shall have the same effect as personal service within the State of California.

      (d) <u>Relationship of the Parties</u>: This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other. This Agreement is not for the benefit of any third party, whether or not referred to herein. Captions and organization are for convenience only and shall not be used to construe meaning. A waiver of any breach shall not waive a prior or subsequent breach. All remedies shall be cumulative and pursuit of any one shall not waive any other. This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

                WARNER BROS., a division of Time Warner Entertainment Company, L.P.

                by WARNER BROS. PICTURES INC. (its successor-in-interest)

                                    ("Purchaser")

                By: <u>*/s/ MARSHALL M. SILVERMAN*</u>
                Its: Vice President

                Date signed by Warner Bros. Pictures Inc: <u>*7-17-03*</u>

EDGAR RICE BURROUGHS, INC.

*/s/ Illegible*

                ("Owner")

Execution Date: <u>as of March 1, 2003</u>

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

27

35493

Exhibit BB
241

WB136042
CONFIDENTIAL

ER-786

## SCHEDULE 1

### "TARZAN" – Merchandising/Television/Stage Rights

1. **General:**

    (a)   Disney merchandising rights are limited to the merchandising rights in the Disney pictures utilizing Disney-created materials. Disney does not have the right to exploit generic non-Disney picture related merchandising rights.

    (b)   For purposes of the following, a "picture" includes a theatrical motion picture or direct to video motion picture.

2. **Basic Structure:**

    (a)   Disney controls merchandising rights starting eighteen (18) months prior to release of a picture and ending two (2) years after the release date (but in the case of a television series, the term expires one (1) year after the date upon which the last original episode is broadcast), provided, however, that with respect to any category of merchandising goods (such category being defined in the applicable trademark regulations) in which Disney is actively exploiting merchandising rights at the end of such two (2) or one (1) year period, the term with respect to such category of goods shall be extended by one (1) additional year.

    (b)   If a Disney television series is a spin-off series and the term would have otherwise expired but for the production of such spin-off series, then Disney's merchandising rights for such spin-off series shall be on a non-exclusive basis.

    (c)   If Disney theatrically re-releases a picture after the term, then the merchandising license to Disney shall be reactivated for an additional term of three (3) years from the date of such theatrical re-release, provided that with respect to the second and third years of such three (3) year term, Disney's merchandising rights shall be on a non-exclusive basis.

3. **Extension Right:**

    (a)   Disney has the right (which it exercised with respect to the first picture) to extend the merchandising term until six (6) years after the release of the first picture (which, in the case of the first picture, would be June, 2005) with the sixth year being non-exclusive. If a television series is produced within such term, the term shall be extended until one (1) year after the date upon which the last original episode of the television series is first broadcast.

842.0
October 21, 2002

DN/sam
187003 3

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Ross Burroughs, Inc.

35493

1

Exhibit BB
242

WB136043
CONFIDENTIAL  ER-787

(b)    After the end of the extended term, Disney, on a non-exclusive basis, can exercise merchandising rights at Disney theme parks and Disney retail stores (and through Disney catalogue sales).

(c)    The extension right can be exercised (within six (6) months after release) for any additional picture produced after the term.

(d)    If any picture is theatrically re-released, then the term of Disney's merchandising rights shall be reactivated for a period of three (3) years after said re-release (with the last two (2) years being on a non-exclusive basis).

4.    Restrictions on Edgar Rice Burroughs' Exploitation of Generic Merchandising Rights:  During the period that Disney has exclusive rights, Burroughs cannot exploit generic merchandising rights, and during the period that it can exploit generic merchandising rights, it must limit the terms of its licenses (and any renewals thereof) to one (1) year.

5.    Warner Television Series Option:  Warner has an option to acquire the live-action television series rights in the "TARZAN" property, and if it does so, merchandising rights are reserved by Burroughs, provided, however, that upon expiration of the merchandising exclusivity held by Disney regarding the merchandising rights, Warner has a right of first negotiation to acquire the merchandising rights in its television series, provided that if Burroughs and Warner are unable to reach an agreement after good faith negotiations, Warner shall have no merchandising rights in the series.

6.    Stage Rights:  The stage rights in "TARZAN" are under option to Disney.  If the stage play is produced and runs for at least four (4) consecutive months, then Disney can produce one (1) live-action musical theatrical production and one (1) live-action musical television production based on the musical play.  In this connection, Disney has agreed not to release its film during the period commencing one (1) year before and ending one (1) year after the release of a third party (e.g., Warner) film, provided Burroughs gives Disney notice of the commencement of production, intended release date and actual release date of the third party film (updated as required).

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

Exhibit BB
243

WB136044
CONFIDENTIAL
ER-788

## EXHIBIT A

| | |
|---|---|
| AN EYE FOR AN EYE ) | |
| WHEN THE LION FED ) | |
| THE GOLDEN LOCKET ) | TARZAN THE UNTAMED |
| THE DEBT ) | |
| WHEN BLOOD TOLD ) | |
| THE BLACK FLYER ) | |

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AND THE IMMORTAL MEN )    TARZAN'S QUEST

THE RED STAR OF TARZAN )    TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN )    TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN )

TARZAN AND THE FOREIGN LEGION

TARZAN AND THE MADMAN

THE QUEST OF TARZAN )
TARZAN AND THE CHAMPION )    TARZAN AND THE CASTAWAYS
TARZAN AND THE JUNGLE MURDER )

TARZAN AND THE TARZAN TWINS WITH JAD-BAL-JA, THE GOLDEN LION

1

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

1

Exhibit BB
244

WB136045
CONFIDENTIAL-789

TARZAN OF THE APES

THE RETURN OF TARZAN

THE BEASTS OF TARZAN

THE SON OF TARZAN

TARZAN AND THE JEWELS OF OPAR

| | |
|---|---|
| TARZAN'S FIRST LOVE | ) |
| THE CAPTURE OF TARZAN | ) |
| THE FIGHT FOR THE BALU | ) |
| THE GOD OF TARZAN | ) |
| TARZAN AND THE BLACK BOY | ) |
| THE WITCH DOCTOR SEEKS VENGEANCE | )    JUNGLE TALES OF TARZAN |
| THE END OF BUKAWAI | ) |
| THE LION | ) |
| THE NIGHTMARE | ) |
| THE BATTLE FOR TEEKA | ) |
| A JUNGLE JOKE | ) |
| TARZAN RESCUES THE MOON | ) |

| | |
|---|---|
| AN EYE FOR AN EYE | ) |
| WHEN THE LION FED | ) |
| THE GOLDEN LOCKET | )    TARZAN THE UNTAMED |
| THE DEBT | ) |
| WHEN BLOOD TOLD | ) |
| THE BLACK FLYER | ) |

TARZAN THE TERRIBLE

TARZAN AND THE GOLDEN LION

TARZAN AND THE ANT MEN

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AT THE EARTH'S CORE

TARZAN THE INVINCIBLE

TARZAN TRIUMPHANT

2

FL206
02102BMMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

Exhibit BB
245

WB136046
CONFIDENTIAL
ER-790

TARZAN AND THE CITY OF GOLD

TARZAN AND THE LION MAN

TARZAN AND THE LEOPARD MEN

TARZAN AND THE IMMORTAL MEN )    TARZAN'S QUEST

THE RED STAR OF TARZAN )    TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN )    TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN )

3

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

3

35493

Exhibit BB
246

WB136047
CONFIDENTIAL
ER 1791

EXHIBIT "B"

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
## MOVING BASIS

### COMPUTATION AND PAYMENT

     1.    Definition of Parties: "Warner" means Warner Bros., a division of Time Warner Entertainment Company, L.P., and its subdivisions engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world. Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters; cable operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; phonograph record producers or distributors; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing are subdivisions of Warner.

     "Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture which exceeds the Contractual Start Point, computed on a moving basis (all as defined below), and the successors and permitted assigns of such party.

     2.    Contractual Start Point: As between Warner and Participant, the Picture shall be deemed to have reached the "Contractual Start Point" at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

     (a) Warner's distribution fees set forth in 4 hereof.

     (b) Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

     (c) The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture. Said interest and other costs shall be recouped before said cost of production.

     The Contractual Start Point shall be computed on a moving basis. "Moving basis" means that the Contractual Start Point shall be determined as of the close of each accounting period provided for in paragraph 10 hereof.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
1

35493

**Exhibit BB**
247

WB136048
CONFIDENTIAL

ER-792

3.     "Defined Gross" of the Picture means the aggregate of:

(a)     All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

(b)     Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either: (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

(c)     In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of (i) the gross wholesale rental income therefrom and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

(d)     All amounts actually received by Warner from the following:  (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d) (ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

(e)     All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any.  If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

(f)     The sums to be included in Defined Gross under Exhibits "1," "2" and "3" attached hereto.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses.  In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

4.     Distribution Fees:  Warner's distribution fees shall be as follows:

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"

2

Exhibit BB

248

35493

WB136049
CONFIDENTIAL
ER-493

     (a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

     (b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

     (c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

     (d)    Notwithstanding the foregoing; (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point and each accounting period thereafter, the distribution fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

     (1)    An amount equal to the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

     (2)    An amount equal to the distribution fees on Defined Gross necessary to recoup said deductible items plus the distribution fees.

For example: If for the accounting period in which the Picture first reaches the Contractual Start Point

     (i)    the total Defined Gross is $1,000,000; and

     (ii)    "X" represents the amount of Defined Gross on which distribution fees are to be charged for the purpose of calculating the Contractual Start Point; and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
249

35493

WB136050
CONFIDENTIAL ER-794

(iii) the average distribution fees for such accounting period are 35%; and

(iv) the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period are $500,000,

then said $500,000 would be .65X; X would be $769,230.76; the distribution fees for the purpose of calculating the Contractual Start Point would be $269,230.76 (i.e., 35% of $769,230.76) rather than $350,000 (i.e., 35% of $1,000,000); and the Defined Gross in excess of the Contractual Start Point would be $230,769.24 (i.e., $1,000,000 - $769,230.76).

5.    Distribution Expenses:  Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry. If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor. Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)    The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities.  Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)    All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition.  Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
4
Exhibit BB
250

35493

WB136051
CONFIDENTIAL
ER-795

exploitation of the Picture, shall be treated as costs hereunder to the extent
unrecouped by the record company. Where any Warner advertising or publicity
employee (other than an executive supervisory employee) or facility is used for
the Picture, the salary of such employee and the cost of such facility (while so
used for the Picture) shall be direct costs hereunder. Any costs and charges
referred to in this (b) (and not included in the cost of production of the Picture),
expended or incurred prior to delivery of the Picture, shall be included in direct
costs under this (b). There shall also be included as an item of cost a sum equal
to 10% of all direct costs referred to in this (b) to cover the indirect cost of
Warner's advertising and publicity departments, both domestic and foreign.

(c) All costs of preparing and delivering the Picture for distribution
(regardless of whether such costs are the salaries and expenses of Warner's
own employees or employees or parties not regularly employed by Warner),
including, without limitation, all costs incurred in connection with the production
of foreign language versions of the Picture, whether dubbed, superimposed or
otherwise, as well as any and all costs and expenses in connection with
changing the title of the Picture, recutting, re-editing or shortening or lengthening
the Picture for release in any territory or for exhibition on television or other
media, or in order to conform to the requirements of censorship authorities, or in
order to conform to the peculiar national or political prejudices likely to be
encountered in any territory, or for any other purpose or reason. The costs
referred to in this (c) shall include all studio charges for facilities, labor and
material, whether or not incurred at a studio owned or controlled by Warner.

(d)     All sums paid or accrued on account of sales, use, receipts,
income, excise, remittance and other taxes (however denominated) to any
governmental authority assessed upon the negatives, duplicate negatives, prints
or sound records of the Picture, or upon the use or distribution of the Picture, or
upon the revenues derived therefrom, or any part thereof, or upon the remittance
of such revenues, or any part thereof; any and all sums paid or accrued on
account of duties, customs and imposts, costs of acquiring permits,
"Kontingents", and any similar authority to secure the entry, licensing, exhibition,
performance, use or televising of the Picture in any country or part thereof,
regardless of whether such payments or accruals are assessed against the
Picture or the proceeds thereof or against a group of motion pictures in which the
Picture may be included or the proceeds thereof. In no event shall the
deductible amount of any such tax (however denominated) imposed upon
Warner, be decreased (nor the Defined Gross increased) because of the manner
in which such taxes are elected to be treated by Warner in filing net income,
corporate franchise, excess profits or similar tax returns. Subject to the
foregoing, (i) Warner's own United States federal and state income taxes and
franchise taxes based on Warner's net income; and (ii) income taxes payable to
any country or territory by Warner based on the net earnings of Warner in such
country or territory and which is computed and assessed solely by reason of the

retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)     Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)     All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws, ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)     Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)     In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof.  Warner shall have the right to settle and pay any such claim. After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
252

35493

**WB136053**
**CONFIDENTIAL**  ER-797

right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

 (i) All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

 (j) The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

 (k) If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this paragraph 5.

6. <u>Film Rentals</u>: "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise. Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals. No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals. Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
253

35493

WB136054
CONFIDENTIAL **ER-798**

joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses. Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

7.    Allocations:  Wherever Warner (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.  All costs described in 5 hereof shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

8.    Foreign Receipts:   No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export.  Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
8
**Exhibit BB**
254

35493

WB136055
CONFIDENTIAL
**ER-799**

other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country.

9. Cost of Production; Interest:

(a) The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge. The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as Warner customarily determines such matters. The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved. Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

(b) Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge. Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

(c) The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
Exhibit BB
255

35493

WB136056
CONFIDENTIAL
ER 800

customers. Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

     (d)    Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture. Participant shall have the right to audit such statement in accordance with 11 hereof.

     10.    <u>Earnings Statements</u>:  Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement. Statements shall be issued for each calendar quarter until the Picture has been in release for four (4) years from and including the quarter in which the Picture was first released, and thereafter annually. Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period". No statements need be rendered for any accounting period during which no receipts are received. Statements rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
10
**Exhibit BB**
256

35493

WB136057
CONFIDENTIAL **ER-801**

Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

      11.   <u>Accounting Records re Distribution; Audit Rights</u>: Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than twenty-four (24) months from the rendition of the earnings statement involved; nor shall any audit continue for longer than thirty (30) consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within twenty-four (24) months from rendition of the earnings statement, or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

      12.   <u>Ownership</u>: Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
257

35493

WB136**ER-802**
CONFIDENTIAL

purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary. Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.     Distribution: As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine. Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final. Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously. In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized. Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever. Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances. Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.     Sale of Picture: Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof. Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder. No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and participant shall have no rights in respect of any thereof.

15.     Assignments, etc.: Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
Exhibit BB
258

35493

WB136059
CONFIDENTIAL ER-803

the moneys payable to Participant hereunder.  Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder. In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner.  If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
13.
Exhibit BB
259

35493

WB136060
CONFIDENTIAL
ER-804

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "1"
**Exhibit BB**
260

35493

WB136061
CONFIDENTIAL

**ER-805**

## SOUND TRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of phonograph records derived from the sound track of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on sound track records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "sound track records" means and refers to phonograph records, tapes, or other sound recordings which contain either (i) portions of the sound track transferred directly to phonograph record masters from sound records which form a part of the sound track of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the sound track of the Picture; or (iii) a combination of (i) and (ii). Sound track records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

5% of 90% in respect of sound track records sold in the United States

2½% of 90% in respect of sound track records sold outside the United States

except that as to sound track records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any sound track records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the sound track compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such sound track records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
1
**Exhibit BB**
261

35493

WB136062
CONFIDENTIAL

ER-806

There shall be deducted from amounts included in Defined Gross hereunder a pro rata share of re-use fees and costs of recording and manufacturing masters advanced by Warner or the Record Company.  Sales shall be determined on the basis of the number of records sold and for which the Record Company has been paid in U.S. currency, after allowing for all returns, cancellations, exchanges, applicable discounts, etc. and reasonable reserves which may be established therefor.  No sums shall be included in Defined Gross with respect to records given away or sold at less than the Record Company's cost or for promotional purposes, or as sales inducements or otherwise.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
**Exhibit BB**
2
262

35493

WB136063
CONFIDENTIAL **ER-807**

## MERCHANDISING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in merchandising revenue, there shall be included in Defined Gross of the Picture:

(a) A sum equal to 50% of all license fees (in excess of all royalties and participations) received by Warner directly as a result of the exercise by Warner itself of merchandising license rights. If, however, Warner shall sublicense or sub-contract any of such merchandising license rights, Warner shall include in the Defined Gross hereunder, at its election, either a sum equal to (i) 85% of the net sums (in excess of all royalties and participations) received from such sub-licensee; or (ii) 50% of such sub-licensee's license fees from the exercise of such licensing rights (from which there shall be deducted all royalties and participations), and out of the remaining 50% thereof Warner shall pay and discharge the fees of its sub-licensee.

(b) If the publication rights to the underlying literary material were owned or controlled by the party entitled to share in Defined Gross of the Picture under the foregoing agreement (herein called "participant") prior to the execution of this agreement, and were acquired by Warner pursuant to or in connection with this agreement, then (i) all net sums received by Warner from nonaffiliated or nonsubsidiary publishers from the publication of such underlying literary material and of novelizations of the screenplay of the Picture, and (ii) a sum equal to 5% of the net receipts of Warner's subsidiary or affiliated publishers from the publication of such material and novelizations, less, in either case, royalties paid out of (i) or (ii) to the writers of such material and novelizations.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "3"
**Exhibit BB**
263

35493

WB136064
CONFIDENTIAL **ER-808**

## RIDER TO EXHIBIT "B"

### DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
### MOVING BASIS

### COMPUTATION AND PAYMENT

All paragraph references herein refer to paragraph numbers in the Exhibit to which this rider is attached. The provisions herein shall control to the extent they conflict with the provisions in the Exhibit to which this rider is attached.

Paragraph 2: The first sentence in paragraph 2(c) shall end after the words "in 9 hereof".

Paragraph 3: Warner shall elect paragraph 3(b)(i) during the initial theatrical release of the Picture in the following territories: United Kingdom, Canada, France, Germany, Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain, Switzerland, Taiwan and Japan.

Defined Gross shall include all sums actually received by Warner from recoveries of infringement, unfair competition, trademark and piracy actions with respect to the Picture. Recoveries by Warner from infringement, unfair competition, trademark and piracy actions with respect to the Picture representing penalties rather than actual or statutory damages shall be included in Defined Gross of the Picture without any distribution fee. Defined Gross shall also include all sums derived by Warner from distribution of the Picture on a four-wall basis as such term is commonly understood in the motion picture industry.

In subparagraph (d), the parenthetical in the second and third lines is deleted. Licenses to cable operators referred to in paragraph 3(d)(iii) specifically include all forms of pay, subscription, and other types of non-free television.

Paragraph 4: The distribution fee on Defined Gross of the Picture derived by Warner from prime time United States telecast of the Picture on free television on ABC, NBC or CBS or another national network (if any) shall be 25%. For a network other than ABC, NBC or CBS to be considered a national network, it must (i) own or be affiliated with over 200 television stations or a sufficient number to give national coverage comparable to ABC, NBC or CBS; (ii) offer Warner centralized purchasing of motion pictures for distribution to the owned or affiliated stations; (iii) offer a centralized clearing for distri-bution of the Picture over said television stations (i.e., the network clears telecast of the Picture over its stations -- not the distributor); (iv) handle itself or through affiliated stations the sale of advertising; and (v) pay a single pre-agreed sum for telecast of the Picture over all of its owned and affiliated stations.

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
**Exhibit BB**
264

35493

WB136065
CONFIDENTIAL  **ER-809**

Paragraph 5: If Warner sets up reserves, such reserves must be reasonable and appropriate, and shall be liquidated in no more than eighteen (18) months, except for reserves for taxes, which Warner may withhold longer. If Warner sets up a reserve for taxes which Warner later discovers are not payable, Warner shall credit such reserve back into Defined Gross. In addition, Warner shall reduce the interest on unrecouped production cost by an amount equal to the interest which accrued on an amount of production cost equal to the reserves so withheld. In paragraph 5(a), the cost of tapes and cassettes referred to therein shall not include any manufacturing costs of home video exhibition or distribution.

In 5(a) and 5(b), if Warner receives any discounts, rebates or credits (not including any cash discounts for accelerated payment), such discounts, rebates or credits shall be credited to the costs referred to in subdivision (a) and (b).

In 5(b), reuse fees and costs of recording and manufacturing masters for soundtrack phonograph records will only be charged as distribution expenses to the extent the record company does not pay same.

In 5(b), subdivision (i) is deleted.

In 5(b) and 5(c), the salaries and expenses of Warner's own employees will be charged to a Picture only if such employees substantially work on that Picture directly. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, then the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs under paragraph 5.

In 5(d), line 2, the word "gross" shall be inserted before the word "income". Change the words "Subject to" on line 17 to "Notwithstanding". The following shall be added at the end of subparagraph (d) : "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest received thereon shall be credited against sums deductible under this paragraph 5."

In 5(f), deductible costs and expenses will not include the salaries of Warner's regularly employed in-house legal or accounting staff. The allocable portion of checking and collection costs referred to therein shall be limited to 1% of the Defined Gross of the Picture.

In 5(g), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
2
**Exhibit BB**
265

35493

WB136066
CONFIDENTIAL
ER-810

In 5(h), the word "reasonably" shall be inserted in between the words "may deem" and "necessary" on line 5. The last sentence of subparagraph (h) shall be revised to read the following: "Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or waiver of any right or remedy at law or otherwise which may exist in favor of Warner against Participant, which rights may include the following: the right to require Participant to reimburse Warner on demand for any liability, cost, damage, or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses."

In 5(i) after "participations in the Picture" on line 10 add the following: "but excluding from this subdivision (i) any such participations in the Picture themselves." Delete the phrase in lines 14-15: "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 5(j), there shall be added at the end thereof the following: "Insurance recoveries relating to cost of production of the picture shall be credited first to recoupment of cost of production of the picture and then to recoupment of distribution expenses. All other insurance recoveries relating to distribution expenses as described in this paragraph 5 shall be credited against distribution expenses. Distribution expenses which are reimbursed by a third party and distribution expenses incurred but not ultimately paid by Warner shall be credited to distribution expenses under paragraph 5 (unless such reimbursements and/or payments of expenses are made by parties to financing arrangements with Warner)."

Paragraph 6: The words "all such costs" in line 12 mean allowances paid and granted on account of cooperative theater or joint advertising. At the end of paragraph 6 there shall be added the following: "provided, however, that the terms and conditions of the agreement between Warner and theaters, television stations or other facilities owned or controlled by Warner relating to film rentals shall be consistent with similar terms and conditions between such theaters and another studio relating to a comparable non-Warner picture. Nonrefundable advances received by Warner shall be included as Defined Gross hereunder when received, if such advances relate to licenses of the Picture as a single motion picture for national network or pay television."

Paragraph 7: In line 12, the words "and reasonably" shall be inserted before "apportioned", and the words "in good faith" shall be inserted after the word "apportioned".

Paragraph 8: Paragraph 8 shall be deleted in its entirety and the following shall be substituted: "Sums received by Warner which relate to the Picture shall not be included in Defined Gross hereunder unless and until such sums (i) have been received by

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
3
**Exhibit BB**
266

35493

WB136067
CONFIDENTIAL
ER-811

Warner in U.S. dollars in the United States; or (ii) are freely remittable to the United States; or (iii) are used by Warner for any purpose in the territory involved. In this event, the U.S. dollar equivalent of the currency utilized in a territory shall be included in Defined Gross hereunder for the accounting period during which such Defined Gross were so utilized, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect. As for expenses incurred in foreign territories, Warner will compute the U.S. dollar equivalent of the currency utilized in the Territory, such U.S. dollar equivalent to be computed on the same basis as used for Defined Gross for the accounting period involved. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually), advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, only such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. At Participant's written request, Warner will use its best efforts to convert such deposits or payments into U.S. dollars to the same extent and in the same proportion that Warner is able to convert its own blocked currencies in the country or countries involved. Warner makes no representations or warranties that any part of any such foreign currencies may be converted in U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country."

Paragraph 9: In 9(a) the cost of all items listed on Warner's standard delivery schedule shall be included in cost of production only for such items which are prepared for the Picture. The cost of Warner facilities shall be included in the cost of production only if actually used.

In 9(b) interest on the cost of production shall not be deemed part of the direct cost of production subject to said overhead charge.

Paragraph 10: In line 2, the words "in summary form" shall be substituted by "in reasonable detail".

The second and third sentences shall be deleted and the following substituted: "Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, semiannually for an additional period of two years, and thereafter annually. If the Picture is reissued theatrically in the U.S., quarterly statements shall be resumed until substantially all of the revenues contemplated from such reissue have been

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
**Exhibit BB**
267

35493

WB136068
CONFIDENTIAL ER-812

reported; and if the Picture is released to prime time U.S. network television and/or to a U.S. pay or cable network, statements shall be issued for quarterly accounting periods during which revenues from such sources are included in Defined Gross. Each such quarterly, semiannual or annual period, as the case may be, is herein referred to as an 'accounting period'."

The second to the last sentence of paragraph 10 shall be deleted and the following sentence shall be substituted: "The obligation of Warner to account for but not Participant's right to receive any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statements issued thereafter shows a deficit under 2 hereof such that at least $1,000,000 of Defined Gross would be required before Participant would be entitled to receive any Defined Gross in excess of Contractual Start Point hereunder. Notwithstanding the foregoing, thereafter Employee may request a statement by written notice to Warner (but not more frequently than annually)."

The last sentence is deleted and the following substituted: "In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $1,000,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of Contractual Start Point, and thereafter Participant may request statements by written notice to Warner (but not more frequently than annually)."

Paragraph 11: The applicable records subject to audit shall include the records pertaining to the cost of production of the Picture. Change 24 to 36 in lines 11 and 18. Audits shall not continue for longer than sixty (60) consecutive business days. The words "or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit" in lines 18-20 are deleted and the following substituted: "provided however, that if an audit is completed at least one hundred twenty (120) days prior to the expiration of said thirty-six (36) month period, Warner may give written notice to Participant at any time after ninety (90) days from the completion of such audit requiring Participant to advise Warner in writing of any objections to the earnings statement involved, specifying the particulars of such objection, and if Participant does not make such written objections specifying the particulars thereof within sixty (60) days from receipt of such notice from Warner or, whether or not Warner gives such written notice to Participant, upon the expiration of said thirty-six (36) month period, whichever is earlier, Participant shall thereafter be barred from making any such objection or filing any suit, action or proceeding against Warner with respect to the earnings statement involved." Warner preapproves Sills & Adelmann; Gelfand, Rennert & Feldman; Breslauer, Jacobson, Rutman & Sherman; Nigro, Karlin & Segal; Phil Hacker & Company; and any of the so-called "big six" national accounting firms to conduct audits.

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
**Exhibit BB**
268

35493

WB136 **ER-813**
CONFIDENTIAL

In line 15, after the words "more than once," add "except Purchaser shall not be precluded from again examining such records if the earnings statement is later altered or amended by Warner."

Paragraph 13: The following shall be added at the end thereof: "If Warner licenses the exhibition of the Picture to any theater or television station or other facility owned or controlled by Warner or in which Warner has an interest directly or indirectly, Warner shall do so on an arms-length basis, consistent with the manner in which Warner licenses the exhibition of the Picture to facilities in which it does not have an interest."

Paragraph 14 The second sentence of paragraph 14 is deleted and the following substituted in its place: "Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming in writing the performance of this agreement instead of Warner, if the purchaser, transferee or assignee is at the time a parent, subsidiary or affiliated corporation of Warner, or a corporation with or into which Warner may merge or consolidate, or a person, firm or corporation succeeding to all or a substantial portion of Warner's assets, or another major motion picture distributor as such term is understood in the motion picture industry, Warner shall be released and discharged of and from any further liability or obligation hereunder."

The following shall be added at the end thereof: "Upon request, Participant may obtain from Warner a copy of the written assumption of the obligations to Participant by such purchaser, transferor or assignee."

Music Publishing Income Exhibit: The second paragraph is deleted and the following substituted: "A sum equal to 75% of the 'publisher's share' of mechanical reproduction, synchronization license and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The 'publisher's share' of mechanical reproduction and synchronization license fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof."

At the end of the third paragraph, the following is added: "If Warner's subsidiary or affiliated publisher is not entitled to 100% of the publisher's share of mechanical reproduction, synchronization license, and performing fees by reason of "split" publishing agreement with the composer or lyricist of the music and lyrics involved, or any corporation furnishing the services of such composer or lyricist, then only the pro rata share of Warner's subsidiary or affiliated publisher shall be included for the purpose of the foregoing computations."

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Rider to Exhibit "B"
6
**Exhibit BB**
269

WB136070
CONFIDENTIAL
ER-814

Soundtrack Record Income Exhibit: The following is added at the end thereof: "Notwithstanding anything herein contained, the royalty payable hereunder shall be the net royalty actually received and retainable by Warner for its own account from the Record Company, as such royalty may be reduced, calculated, computed and paid in the same manner as the soundtrack record royalty paid to Warner under the applicable agreement with the Record Company is reduced, calculated, accounted for and paid."

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
**Exhibit BB**
**270**

35493

WB136071
CONFIDENTIAL

**ER-815**

## EXHIBIT "C"

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
## INITIAL BASIS

### COMPUTATION AND PAYMENT

1.　__Definition of Parties__:　"Warner" means Warner Bros., a division of Time Warner Entertainment Company, L.P., and its subdivisions, subsidiaries and affiliates engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world. Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters or programming services; cable systems or operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; sound recording producers or distributors; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing excluded parties are subdivisions, subsidiaries or affiliates of Warner.

"Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture in excess of the Contractual Start Point, computed on an initial basis (all as defined below), and the successors and permitted assigns of such party.

2.　__Contractual Start Point__:　As between Warner and Participant, the Picture shall be deemed to have reached the Contractual Start Point at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

　　　　(a)　Warner's distribution fees set forth in 4 hereof.

　　　　(b)　Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

　　　　(c)　The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture. Said interest and other costs shall be recouped before said cost of production.

3.　__Defined Gross__:　As used herein, the term "Defined Gross" means the aggregate of:

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
1

**Exhibit BB**
271

35493

WB136072-816
CONFIDENTIAL

     (a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

     (b)    Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either: (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

     (c)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of: (i) the gross wholesale rental income therefrom; and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

     (d)    All amounts actually received by Warner from the following: (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d)(ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

     (e)    All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any. If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

     (f)    All amounts required to be included under Exhibits "1," "2" and "3" hereof.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses. In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

Notwithstanding anything herein contained, after the Picture shall be deemed to have reached the Contractual Start Point as defined in 2 above, Defined Gross shall be as defined and this Exhibit shall otherwise be modified as set forth in Schedule 1 attached hereto and incorporated herein by this reference.

    4.    <u>Distribution Fees</u>: Warner's distribution fees shall be as follows:

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
2

**Exhibit BB**
272

35493

WB136873
**ER-817**
CONFIDENTIAL

(a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

(b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

(c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

(d)    Notwithstanding the foregoing:  (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; and (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point, the distribution fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

(a)    An amount equal to the sums specified in subparagraphs (b) and (c) of Paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

(b)    An amount equal to the distribution fees on Defined Gross equal to the sum of said deductible items, plus the distribution fees on Defined Gross equal to such distribution fee.

5.    Distribution Expenses:  Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry.  If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement                    Exhibit "C"
Edgar Rice Burroughs, Inc.                                          3

                                                   35493

**Exhibit BB**
273

WB136074
CONFIDENTIAL    ER-818

Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)     The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities.  Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)     All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than:  (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition.  Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and exploitation of the Picture, shall be treated as costs hereunder to the extent unrecouped by the record company.  Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs hereunder.  Any costs and charges referred to in this (b) (and not included in the cost of production of the Picture), expended or incurred prior to delivery of the Picture, shall be included in direct costs under this (b).  There shall also be included as an item of cost a sum equal to 10% of all direct costs referred to in this (b) to cover the indirect cost of Warner's advertising and publicity departments, both domestic and foreign.

(c)     All costs of preparing and delivering the Picture for distribution (regardless of whether such costs are the salaries and expenses of Warner's own employees or employees or parties not regularly employed by Warner), including, without limitation, all costs incurred in connection with the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, as well as any and all costs and expenses in connection with chang-ing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or other media, or in order to conform to the requirements of censorship authorities, or in order to

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Exhibit "C"
4

**Exhibit BB**
274

WB156075

**ER 819**

conform to the peculiar national or political prejudices likely to be encountered in any territory, or for any other purpose or reason. The costs referred to in this (c) shall include all studio charges for facilities, labor and material, whether or not incurred at a studio owned or controlled by Warner.

(d)    All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing: (i) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (ii) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)    All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws,

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Exhibit "C"
5

**Exhibit BB**
275

WB136076
ER 820
CONFIDENTIAL

ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)     Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)     In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof. Warner shall have the right to settle and pay any such claim. After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

(i)     All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the

F1803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
6

35493

Exhibit BB
276

WB136077
CONFIDENTIAL

ER 821

amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

(j) The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

(k) If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this 5.

6. Film Rentals: "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise. Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals. No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals. Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses. Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

7. Allocations: Wherever Warner: (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied); or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters. All costs described in 5 hereof (and, after the Contractual Start Point, all

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
7

**Exhibit BB**
277

35493

WB ER 822
CONFIDENTIAL

deductible items set forth in Schedule 1 hereto) shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

8.  Foreign Receipts:  No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been: (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder.  Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor.  Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country.  In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture (or, after the Contractual Start Point, of any deductible items set forth in Schedule 1 hereto) in any other country.

9.   Cost of Production; Interest:

(a)   The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge. The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
8

35493

**Exhibit BB**
278

**ER-823**

Warner customarily determines such matters. The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved. Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

      (b)    Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge. Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

      (c)    The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred customers. Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

      (d)    Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture. Participant shall have the right to audit such statement in accordance with 11 hereof.

    10.   <u>Earnings Statements</u>: Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement. Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, and thereafter annually. Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period". No statements need be rendered for any accounting period during which no receipts are received. Statements

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
9

**Exhibit BB**
279

35493

WB1360 **ER-824**
CONFIDENTIAL

rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point, and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

11.    <u>Accounting Records re Distribution; Audit Rights</u>: Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Exhibit "C"
10

**Exhibit BB**
280

WB13ER0825
CONFIDENTIAL

during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than 24 months from the rendition of the earnings statement involved; nor shall any audit continue for longer than 30 consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within 24 months from rendition of the earnings statement, or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

12.  Ownership:  Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of the Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary. Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.  Distribution:  As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine. Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final. Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
11

35493

**Exhibit BB**
281

WB136081 **ER-826**
CONFIDENTIAL

any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously. In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized. Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever. Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances. Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.   Sale of Picture:  Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof. Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder. No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and Participant shall have no rights in respect of any thereof.

15.   Assignments, etc.:  Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive the moneys payable to Participant hereunder. Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder. In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner. If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
12
Exhibit BB
282

35493

WB136606
ER-827
CONFIDENTIAL

## SCHEDULE "1"

1.    Defined Gross: As used herein, the term "Defined Gross" means the aggregate of:

(a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors");

(b)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of:  (i) the gross wholesale rental income therefrom; and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns;

(c)    All sums actually received by Warner from grants or licenses of distribution rights in and to the Picture (in any and all gauges of film, tape and other material) from sources other than those referred to in (a) and (b) above;

(d)    All net earnings of Warner from trailers of the Picture (other than trailers advertising the television exhibition of the Picture); and the lease of positive prints, tapes and other material (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets;

(e)    All net sums derived by Warner from distribution of the Picture on a "road show", "reissue" and "four wall" basis, as such terms are commonly understood in the motion picture industry, whether on fixed or percentage engagements.  The term "net sums" means Warner's receipts less all advertising, publicity and other distribution costs incurred directly in connection therewith;

(f)    All amounts required to be included under Exhibits "1", "2" and "3" hereof.

less the aggregate of:

(i)    All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Schedule "1"
1

35493

**Exhibit BB**
283

WB136083
CONFIDENTIAL
ER-828

any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing: (A) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (B) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(ii)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(iii)    The cost of reducing or minimizing the matters referred to in (i) or (ii) above, which costs shall be fairly apportioned to the Picture if done on an industry basis or with respect to motion pictures distributed by Warner generally.

(iv)    All costs of cooperative or other advertising or promotion (excluding trade and institutional advertising or promotion) incurred in connection with exhibitions of the Picture in theaters (or other places where an admission is charged) where Warner pays, shares in or is charged with all or a portion of the promotional or advertising costs relating to any such exhibitions.

(v)    All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulations or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Schedule "1"
2

**Exhibit BB**
284

35493

WB136084
CONFIDER-829

rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's share of the Defined Gross hereunder, and conversely, any Defined Gross paid to Participant hereunder shall (to the extent permissible under applicable collective bargaining agreements) constitute an advance against such residuals payable to or for the benefit of Participant or any principal stockholder of Participant, or any such heirs, executors, administrators, successors or assigns.

(vi)    Dues and assessments of and contributions by Warner to AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences, and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection, including actions under the antitrust laws, and/or promotion of motion pictures.

In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross. If Warner reasonably anticipates taxes, residuals, uncollectible accounts, or any matters relating to the Picture, which, if and when determined, will be deductible hereunder, Warner may, for a reasonable time, set up appropriate reserves therefor.

2.    Film Rentals: In Paragraph 6 of the foregoing Exhibit for purposes of computing Defined Gross under this Schedule 1, the third and fourth sentences are deleted, and the following substituted: Where the film rental is computed on the basis of box-office receipts of the Picture, any expenses incurred in checking attendance and/or receipts of such engagements shall be deducted in determining film rentals hereunder. There shall be deducted from film rentals expenses incurred in the collection thereof.

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Schedule "1"
3
**Exhibit BB**
285

35493

WB13005-830
CONFIDENTIAL

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "1"

35493

**Exhibit BB**
**286**

WB136 **ER-831**
CONFIDENTIAL

# SOUNDTRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of sound recordings derived from the soundtrack of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on soundtrack records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "soundtrack records" means and refers to phonograph records, tapes, or other sound recordings which contain either: (i) portions of the soundtrack transferred directly to masters from sound records which form a part of the soundtrack of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the soundtrack of the Picture; or (iii) a combination of (i) and (ii). Soundtrack records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

    5% of 90% in respect of soundtrack records sold in the United States

    2 1/2% of 90% in respect of soundtrack records sold outside the United States

except that as to soundtrack records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any soundtrack records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the soundtrack compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such soundtrack records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
1

**Exhibit BB**
287

35493

WB136087
**ER-832**
CONFIDENTIAL

There shall be deducted from amounts included in Defined Gross hereunder a pro-rata share of re-use fees and costs of recording and manufacturing masters advanced by Warner or the Record Company. Sales shall be determined on the basis of the number of records sold and for which the Record Company has been paid in U.S. currency, after allowing for all returns, cancellations, exchanges, applicable discounts, etc. and reasonable reserves which may be established therefor. No sums shall be included in Defined Gross with respect to records given away or sold at less than the Record Company's cost or for promotional purposes, or as sales inducements or otherwise.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
2

**Exhibit BB**
**288**

35493

WB1360 **ER-833**
CONFIDENTIAL

## MERCHANDISING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in merchandising revenue, there shall be included in Defined Gross of the Picture:

(a)  A sum equal to 50% of all license fees (in excess of all royalties and participations) received by Warner directly as a result of the exercise by Warner itself of merchandising license rights.  If, however, Warner shall sublicense or sub-contract any of such merchandising license rights, Warner shall include in the Defined Gross hereunder, at its election, either a sum equal:  to (i) 85% of the net sums (in excess of all royalties and participations) received from such sub-licensee; or (ii) 50% of such sub-licensee's license fees from the exercise of such licensing rights (from which there shall be deducted all royalties and participations), and out of the remaining 50% thereof Warner shall pay and discharge the fees of its sub-licensee.

(b)  If the publication rights to the underlying literary material were owned or controlled by the party entitled to share in Defined Gross of the Picture under the foregoing agreement (herein called "participant") prior to the execution of this agreement, and were acquired by Warner pursuant to or in connection with this agreement, then:  (i) all net sums received by Warner from nonaffiliated or nonsubsidiary publishers from the publication of such underlying literary material and  of novelizations of the screenplay of the Picture; and (ii) a sum equal to 5% of the net receipts of Warner's subsidiary or affiliated publishers from the publication of such material and novelizations, less, in either case, royalties paid out of (i) or (ii) to the writers of such material and novelizations.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement          Exhibit "3"
Edgar Rice Burroughs, Inc.

35493

**Exhibit BB**
289

WB136999
**ER-834**
CONFIDENTIAL

## RIDER TO EXHIBIT "C"

### DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
### INITIAL BASIS

### COMPUTATION AND PAYMENT

All paragraph references herein refer to paragraph numbers in the Exhibit to which this Rider is attached. The provisions herein shall control to the extent they conflict with the provisions in the Exhibit to which this Rider is attached.

Paragraph 2: The first sentence in Paragraph 2(c) shall end after the words "in 9 hereof".

Paragraph 3: Warner shall elect Paragraph 3(b)(i) during the initial theatrical release of the Picture in the following territories: United Kingdom, Canada, France, Germany, Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain, Switzerland, Taiwan and Japan.

Defined Gross shall include all sums actually received by Warner from recoveries of infringements, unfair competition, trademark and piracy actions with respect to the Picture. Recoveries by Warner from infringement, unfair competition, trademark and piracy actions with respect to the Picture representing penalties rather than actual or statutory damages shall be included in Defined Gross of the Picture without any distribution fee. Defined Gross shall also include all sums derived by Warner from distribution of the Picture on a four-wall basis as such term is commonly understood in the motion picture industry.

In Paragraph 3(d), the parenthetical in the second line is deleted. Licenses to cable operators referred to in Paragraph 3(d)(iii) specifically include all forms of pay, subscription and other types of non-free television.

Paragraph 4: The distribution fee on Defined Gross of the Picture derived by Warner from prime time United States telecast of the Picture on free television on ABC, NBC or CBS or another national network (if any) shall be 25%. For a network other than ABC, NBC or CBS to be considered a national network, it must: (i) own or be affiliated with over 200 television stations or a sufficient number to give national coverage comparable to ABC, NBC or CBS; (ii) offer Warner centralized purchasing of motion pictures for distribution to the owned or affiliated stations; (iii) offer a centralized clearing for distribution of the Picture over said television stations (i.e., the network clears telecast of the Picture over its stations -- not the distributor); (iv) handle itself or through affiliated stations the sale of advertising; and (v) pay a single preagreed sum for telecast of the Picture over all of its owned and affiliated stations.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
1

35493

**Exhibit BB**
290

WB136090
CONFIDENTIAL

ER 885

Paragraph 5: If Warner sets up reserves, such reserves must be reasonable and appropriate, and shall be liquidated in no more than 18 months, except for reserves for taxes, which Warner may withhold longer. If Warner sets up a reserve for taxes which Warner later discovers are not payable, Warner shall credit such reserve back into Defined Gross. In addition, Warner shall reduce the interest on unrecouped production cost by an amount equal to the interest which accrued on an amount of production cost equal to the reserves so withheld.

In 5(a), the cost of tapes and cassettes referred to therein shall not include any manufacturing costs of home video exhibition or distribution.

In 5(a) and 5(b), if Warner receives any discounts, rebates or credits (not including any cash discounts for accelerated payment), such discounts, rebates or credits shall be credited to the costs referred to in subdivision (a) and (b).

In 5(b), reuse fees and costs of recording and manufacturing masters for soundtrack phonograph records will only be charged as distribution expenses to the extent the record company does not pay same.

In 5(b), subdivision (i) is deleted.

In 5(b) and 5(c), the salaries and expenses of Warner's own employees will be charged to a Picture only if such employees substantially work on that Picture directly. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, then the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs under Paragraph 5.

In 5(d), line 2, the word "gross" shall be inserted before the word "income". Change the words "Subject to" on line 17 to "Notwithstanding". The following shall be added at the end of subparagraph (d) : "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest received thereon shall be credited against sums deductible under this Paragraph 5."

In 5(f), deductible costs and expenses will not include the salaries of Warner's regularly employed in-house legal or accounting staff. The allocable portion of checking and collection costs referred to therein shall be limited to 1% of the Defined Gross of the Picture.

In 5(g), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
2

35493

WB136091
CONFIDENTIAL

ER 836

In 5(h), the word "reasonably" shall be inserted in between the words "may deem" and "necessary" on line 5. The last sentence of subparagraph (h) shall be revised to read the following: "Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or waiver of any right or remedy at law or otherwise which may exist in favor of Warner against Participant, which rights may include the following: the right to require Participant to reimburse Warner on demand for any liability, cost, damage, or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses."

In 5(i) after "participations in the Picture" on line 10 add the following: "but excluding from this subdivision (i) any such participations in the Picture themselves." Delete the phrase in lines 14-15 "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 5(j), there shall be added at the end thereof the following: "Insurance recoveries relating to cost of production of the picture shall be credited first to recoupment of cost of production of the picture and then to recoupment of distribution expenses. All other insurance recoveries relating to distribution expenses as described in this Paragraph 5 shall be credited against distribution expenses. Distribution expenses which are reimbursed by a third party and distribution expenses incurred but not ultimately paid by Warner shall be credited to distribution expenses under Paragraph 5 (unless such reimbursements and/or payments of expenses are made by parties to financing arrangements with Warner)."

Paragraph 6: The words "all such costs" in line 12 mean allowances paid and granted on account of cooperative theater or joint advertising. At the end of Paragraph 6 there shall be added the following: "provided, however, that the terms and conditions of the agreement between Warner and theaters, television stations or other facilities owned or controlled by Warner relating to film rentals shall be consistent with similar terms and conditions between such theaters and another studio relating to a comparable non-Warner picture. Nonrefundable advances received by Warner shall be included as Defined Gross hereunder when received, if such advances relate to licenses of the Picture as a single motion picture for national network or pay television."

Paragraph 7: In line 13, the words "and reasonably" shall be inserted before "apportioned", and the words "in good faith" shall be inserted after the word "apportioned".

Paragraph 8: Paragraph 8 shall be deleted in its entirety and the following shall be substituted: "Sums received by Warner which relate to the Picture shall not be included in Defined Gross hereunder unless and until such sums (i) have been received by

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
3
**Exhibit BB**
292

35493

WB136092
CONFIDENTIAL ER-837

Warner in U.S. dollars in the United States; or (ii) are freely remittable to the United States; or (iii) are used by Warner for any purpose in the territory involved. In this event, the U.S. dollar equivalent of the currency utilized in a territory shall be included in Defined Gross hereunder for the accounting period during which such Defined Gross were so utilized, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect. As for expenses incurred in foreign territories, Warner will compute the U.S. dollar equivalent of the currency utilized in the Territory, such U.S. dollar equivalent to be computed on the same basis as used for Defined Gross for the accounting period involved. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually), advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, only such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. At Participant's written request, Warner will use its best efforts to convert such deposits or payments into U.S. dollars to the same extent and in the same proportion that Warner is able to convert its own blocked currencies in the country or countries involved. Warner makes no representations or warranties that any part of any such foreign currencies may be converted in U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country."

Paragraph 9: In 9(a), the cost of all items listed on Warner's standard delivery schedule shall be included in cost of production only for such items which are prepared for the Picture. The cost of Warner facilities shall be included in the cost of production only if actually used.

In 9(b), interest on the cost of production shall not be deemed part of the direct cost of production subject to said overhead charge.

Paragraph 10: In line 2, the words "in summary form" shall be substituted by "in reasonable detail".

The second and third sentences shall be deleted and the following substituted:
"Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, semiannually for an additional period of two years, and thereafter annually. If the Picture is reissued theatrically in the U.S., quarterly statements shall be resumed until substantially all of the revenues contemplated from such reissue have been

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
4
**Exhibit BB**
293

35493

WB136093
CONFIDENTIAL ER-838

reported; and if the Picture is released to prime time U.S. network television and/or to a U.S. pay or cable network, statements shall be issued for quarterly accounting periods during which revenues from such sources are included in Defined Gross. Each such quarterly, semiannual or annual period, as the case may be, is herein referred to as an 'accounting period'."

The second to the last sentence of Paragraph 10 shall be deleted and the following sentence shall be substituted: "The obligation of Warner to account for but not Participant's right to receive any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statements issued thereafter shows a deficit under 2 hereof such that at least $1,000,000 of Defined Gross would be required before Participant would be entitled to receive any Defined Gross in excess of the Contractual Start Point hereunder. Notwithstanding the foregoing, thereafter Employee may request a statement by written notice to Warner (but not more frequently than annually)."

The last sentence is deleted and the following substituted: "In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $1,000,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point, and thereafter Participant may request statements by written notice to Warner (but not more frequently than annually)."

Paragraph 11: The applicable records subject to audit shall include the records pertaining to the cost of production of the Picture. Change 24 to 36 in lines 11 and 18. Audits shall not continue for longer than 60 consecutive business days. The words "or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit" in lines 18-19 are deleted and the following substituted: "provided however, that if an audit is completed at least 120 days prior to the expiration of said 36-month period, Warner may give written notice to Participant at any time after 90 days from the completion of such audit requiring Participant to advise Warner in writing of any objections to the earnings statement involved, specifying the particulars of such objection, and if Participant does not make such written objections specifying the particulars thereof within 60 days from receipt of such notice from Warner or, whether or not Warner gives such written notice to Participant, upon the expiration of said 36-month period, whichever is earlier, Participant shall thereafter be barred from making any such objection or filing any suit, action or proceeding against Warner with respect to the earnings statement involved." Warner preapproves Sills & Adelmann; Gelfand, Rennert & Feldman; Breslauer, Jacobson, Rutman & Sherman; Nigro, Karlin & Segal; Phil Hacker & Company; and any of the so-called "big six" national accounting firms to conduct audits. In line 15 after the words "more than once," add "except Purchaser

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
5
**Exhibit BB**
294

35493

WB13699
CONFIDENTIAL ER 839

shall not be precluded from again examining such records if the earnings statement is later altered or amended by Warner."

Paragraph 13:  The following shall be added at the end thereof:  "If Warner licenses the exhibition of the Picture to any theater or television station or other facility owned or controlled by Warner or in which Warner has an interest directly or indirectly, Warner shall do so on an arms-length basis, consistent with the manner in which Warner licenses the exhibition of the Picture to facilities in which it does not have an interest."

Paragraph 14:  The second sentence of Paragraph 14 is deleted and the following substituted in its place:  "Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming in writing the performance of this agreement instead of Warner, if the purchaser, transferee or assignee is at the time a parent, subsidiary or affiliated corporation of Warner, or a corporation with or into which Warner may merge or consolidate, or a person, firm or corporation succeeding to all or a substantial portion of Warner's assets, or another major motion picture distributor as such term is understood in the motion picture industry, Warner shall be released and discharged of and from any further liability or obligation hereunder."

The following shall be added at the end thereof:  "Upon request, Participant may obtain from Warner a copy of the written assumption of the obligations to Participant by such purchaser, transferor or assignee."

Paragraph 1 of Schedule 1:

Defined Gross shall include all film rentals actually received by Warner's subdistributors, if any, in the following territories:  U.K., Canada, France, Germany, Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain, Switzerland, Taiwan and Japan; provided, however, that Warner shall not use a subdistributor for the initial theatrical release of the English language version of the Picture in the United States or Canada.

Defined Gross shall include all sums actually received by Warner from recoveries of infringement, unfair competition, trademark and piracy actions with respect to the Picture.  Defined Gross shall also include all net sums derived by Warner from distribution of the Picture on a four-wall basis as such term is commonly understood in the motion picture industry.

Defined Gross further includes all net sums actually received by Warner on account of direct subsidies, aid or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any.  If local laws require use of such monies as a condition to the grant of such subsidy or aid, such monies shall not be included in Defined Gross until actually used.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
6
**Exhibit BB**
295

35493

WB136095
CONFIDENTIAL **ER-840**

In 1(d), the parenthetical in the first and second lines is deleted. Licenses of distribution rights referred to in 1(c) specifically include all licenses to cable operators, including pay, subscription, and other types of non-free television.

In 1(f)(i), line 2, the word "gross" shall be inserted before the word "income". Change the words "Subject to" on line 17 to "Notwithstanding". A subparagraph shall be added at the end of subparagraph (i) with the following: "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest previously received thereon shall be credited against sums deductible under this subparagraph (i)."

1(f) is deleted.

In 1(f), after "participations in the Picture" on lines 10-11, add the following: "but excluding from this subdivision (v) any participations in the Picture themselves." Delete the phrase in lines 15-16: "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 1(f), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

<u>Paragraph 2 of Schedule 1:</u>

The third and fourth sentences of Paragraph 6 of the Exhibit, which are deleted in Schedule 1, shall be deemed reinserted.

<u>Music Publishing Income Exhibit:</u> The second paragraph is deleted and the following substituted: "A sum equal to 75% of the 'publisher's share' of mechanical reproduction, synchronization license and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The 'publisher's share' of mechanical reproduction and synchronization license fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof."

At the end of the third paragraph, the following is added: "If Warner's subsidiary or affiliated publisher is not entitled to 100% of the publisher's share of mechanical reproduction, synchronization license, and performing fees by reason of a "split" publishing agreement with the composer or lyricist of the music and lyrics involved, or any corporation furnishing the services of such composer or lyricist, then only the pro

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
7
**Exhibit BB**
296

35493

WB136096
CONFIDENTIAL **ER-841**

rata share of Warner's subsidiary or affiliated publisher shall be included for the purpose of the foregoing computations."

Soundtrack Record Income Exhibit: The following is added at the end thereof: "Notwithstanding anything herein contained, the royalty payable hereunder shall be the net royalty actually received and retainable by Warner for its own account from the Record Company, as such royalty may be reduced, calculated, computed and paid in the same manner as the soundtrack record royalty paid to Warner under the applicable agreement with the Record Company is reduced, calculated, accounted for and paid."

FI803
02102BMMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
8
**Exhibit BB**
297

35493

WB136897
**ER-842**
CONFIDENTIAL

## EXHIBIT D

### I. FEATURE MOTION PICTURES

1.   TARZAN OF THE APES
2.   THE ROMANCE OF TARZAN
3.   THE RETURN OF TARZAN (THE REVENGE OF TARZAN)
4.   THE ADVENTURES OF TARZAN
5.   THE SON OF TARZAN
6.   TARZAN AND THE GOLDEN LION
7.   TARZAN THE MIGHTY
8.   TARZAN THE TIGER
9.   TARZAN THE APE-MAN
10.  TARZAN THE FEARLESS
11.  TARZAN AND HIS MATE
12.  THE NEW ADVENTURES OF TARZAN
13.  TARZAN AND THE GREEN GODDESS
14.  TARZAN ESCAPES
15.  TARZAN'S REVENGE
16.  TARZAN FINDS A SON
17.  TARZAN'S SECRET TREASURE
18.  TARZAN'S NEW YORK ADVENTURE
19.  TARZAN TRIUMPHS
20.  TARZAN'S DESERT MYSTERY
21.  TARZAN AND THE AMAZONS
22.  TARZAN AND THE LEOPARD WOMAN
23.  TARZAN AND THE HUNTRESS
24.  TARZAN AND THE MERMAIDS
25.  TARZAN'S MAGIC FOUNTAIN
26.  TARZAN AND THE SLAVE GIRL
27.  TARZAN'S PERIL
28.  TARZAN'S SAVAGE FURY
29.  TARZAN AND THE SHE DEVIL
30.  TARZAN'S HIDDEN JUNGLE
31.  TARZAN AND THE LOST SAFARI
32.  TARZAN'S FIGHT FOR LIFE
33.  TARZAN AND THE TRAPPERS
34.  TARZAN'S GREATEST ADVENTURE
35.  TARZAN THE APE-MAN
36.  TARZAN THE MAGNIFICENT
37.  TARZAN GOES TO INDIA
38.  TARZAN'S THREE CHALLENGES
39.  TARZAN AND THE VALLEY OF GOLD
40.  TARZAN'S DEADLY SILENCE
41.  TARZAN AND THE GREAT RIVER
42.  THE PERILS OF CHARITY JONES
43.  TARZAN'S JUNGLE REBELLION
44.  TARZAN AND THE JUNGLE BOY
45.  TARZAN THE APE-MAN
46.  GREYSTOKE, THE LEGEND OF TARZAN LORD OF THE APES

47.  TARZAN (Disney feature-length animated theatrical)

48.  TARZAN AND JANE (Disney feature-length animated direct-to-video)

Exhibit "D"

1

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
1

Exhibit BB
298

35493

WB136098 **ER-843**
CONFIDENTIAL

## II. LIVE ACTION TELEVISION MOTION PICTURES

1. ALEX THE GREAT
2. ALGIE B FOR BRAVE
3. BASIL OF THE BULGE
4. BLUE STONE OF HEAVEN, THE – PART I
5. BLUE STONE OF HEAVEN, THE – PART II
6. CAP'N JAI
7. CIRCUS, THE
8. CONVERT, THE
9. CREEPING GIANTS, THE
10. DAY OF THE GOLDEN LION, THE
11. DAY THE EARTH TREMBLED, THE
12. DEADLY SILENCE – PART I
13. DEADLY SILENCE – PART II
14. END OF A CHALLENGE
15. END OF THE RIVER
16. EYES OF THE LION
17. FACES OF DEATH, THE
18. FANATICS, THE
19. FIGUREHEAD, THE
20. FIRE PEOPLE, THE
21. FOUR O'CLOCK ARMY, THE – PART I
22. FOUR O'CLOCK ARMY, THE – PART II
23. GOLDEN RUNAWAY, THE
24. GUN FOR JAI, A
25. HOTEL HURRICANE
26. JAI'S AMNESIA
27. JUNGLE DRAGNET
28. JUNGLE RANSOM
29. KING OF THE DWASARI
30. LAST OF THE SUPERMEN, THE
31. LEOPARD ON THE LOOSE
32. LIFE FOR A LIFE, A
33. MAN KILLER
34. MASK OF BONA, THE
35. MOUNTAINS OF THE MOON – PART I
36. MOUNTAINS OF THE MOON – PART II
37. MUGUMA CURSE
38. PEARLS OF TANGA, THE
39. PERILS OF CHARITY JONES, THE – PART I
40. PERILS OF CHARITY JONES, THE – PART II
41. PRIDE OF A LIONESS, THE
42. PRIDE OF ASSASSINS
43. PRISONER, THE
44. PRODIGAL PUMA, THE
45. PROFESSIONAL, THE
46. RENDEVOUS FOR REVENGE
47. THIEF CATCHER
48. TIGER, TIGER

Exhibit "D"

2

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
2

**Exhibit BB**

299

35493

WER-844

## II. LIVE ACTION TELEVISION MOTION PICTURES (Continued)

49. TO STEAL THE RISING SUN
50. TRACK OF THE DINOSAUR
51. TREK TO TERROR
52. TRINA
53. ULTIMATE DUEL, THE
54. ULTIMATE WEAPON, THE
55. ULTIMATUM, THE
56. VILLAGE OF FIRE
57. VOICE OF THE ELEPHANT, THE
58. TARZAN IN MANHATTAN
59. TARZAN AND THE CAVES OF DARKNESS
60. TARZAN'S JOURNEY TO DANGER
61. TARZAN AND THE PICTURE OF DEATH
62. TARZAN AND THE PIRATE TREASURE
63. TARZAN IN THE LOST CITY
64. TARZAN AND THE KILLER LION
65. TARZAN THE HUNTED
66. TARZAN'S ELEVENTH HOUR
67. TARZAN AND THE SAVAGE STORM
68. TARZAN AND THE MYSTIC CAVERN
69. TARZAN AND THE SILENT CHILD
70. TARZAN AND THE GOLDEN EGG
71. TARZAN AND THE POISONED WATERS
72. TARZAN'S CHRISTMAS
73. TARZAN AND THE UNWELCOME GUEST
74. TARZAN AND THE RIVER OF DOOM
75. TARZAN AND THE EXTRA-TERRESTRIALS
76. TARZAN AND THE ORPHAN
77. TARZAN AND THE DEADLY GIFT
78. TARZAN AND THE TEST OF FRIENDSHIP
79. TARZAN TAMES THE BRONX
80. TARZAN AND THE WOMAN OF STEEL
81. TARZAN AND THE ENEMY WITHIN
82. TARZAN AND THE SONG OF THE JUNGLE
83. TARZAN IN THE EYE OF THE HURRICANE
84. TARZAN AND THE MISSILE OF DOOM
85. TARZAN AND THE FORBIDDEN JEWELS
86. TARZAN AND THE BROKEN PROMISE
87. TARZAN AND THE AMAZON WOMEN
88. TARZAN AND THE KARATE WARRIORS
89. TARZAN AND THE LION GIRL
90. TARZAN AND THE DEADLY DELUSIONS
91. TARZAN AND THE FATAL EPIDEMIC
92. TARZAN AND THE MYSTERIOUS SHEIK

Exhibit "D"

3

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Rider to Exhibit "C"
3

**Exhibit BB**

**300**

WB136100
CONFIDENTIAL

ER-845

## II. <u>LIVE ACTION TELEVISION MOTION PICTURES</u> (Continued)

93. TARZAN AND THE RUNAWAYS
94. TARZAN MEETS JANE
95. TARZAN AND THE WAYWARD BALLOON
96. TARZAN AND THE FUGITIVE'S REVENGE
97. TARZAN AND THE MUTANT CREATURE
98. TARZAN RESCUES THE SONGBIRD
99. TARZAN AND THE FIRE FIELD
100. TARZAN AND THE MOVIE STAR
101. TARZAN AND THE FOUNTAIN OF YOUTH
102. TARZAN AND THE LAW OF THE JUNGLE
103. TARZAN AND THE SHAFT OF DEATH
104. TARZAN AND THE POLLUTED RIVER
105. TARZAN'S DANGEROUS JOURNEY
106. TARZAN AND THE TOXIC TERROR
107. TARZAN AND THE SHOWDOWN
108. TARZAN AND THE KILLER FOG
109. TARZAN'S HOLLYWOOD ADVENTURE
110. TARZAN AND THE WITNESS FOR THE PROSECUTION
111. TARZAN AND THE ROCK STAR
112. TARZAN AND THE ODD COUPLE
113. TARZAN AND THE RETURN OF THE BRONX
114. TARZAN AND THE NEW COMMISSIONER
115. TARZAN AND THE STONEMAN
116. TARZAN AND THE DEADLY CARGO
117. TARZAN AND THE SAPPHIRE ELEPHANT
118. TARZAN AND THE FEAR OF BLINDNESS
119. TARZAN AND THE MATING SEASON
120. TARZAN AND THE GIFT OF LIVE
121. TARZAN AND THE DEATH SPIDERS
122. TARZAN AND THE RUSSIAN INVASION
123. TARZAN AND THE FIERY END
124. TARZAN AND THE CURSE OF DEATH
125. TARZAN AND THE KING OF THE APES
126. TARZAN AND THE EVIL TWIN
127. TARZAN AND THE DANGEROUS COMPETITION
128. TARZAN AND THE PIRATES REVENGE
129. TARZAN AND CHEETAH'S DESPERATE ADVENTURE
130. TARZAN AND THE SIXTH SENSE
131. TARZAN AND THE KING OF ROMANCE
132. TARZAN AND THE NIGHT HORRORS
133. TARZAN AND THE JEWELS OF JUSTICE

Exhibit "D"
4

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Rider to Exhibit "C"
4
Exhibit BB
301

WB136101
CONFIDENTIAL
ER 846

III. <u>ANIMATED THIRTY MINUTE TELEVISION EPISODES</u>

1.   TARZAN AND THE CITY OF GOLD
2.   TARZAN AND THE VIKINGS
3.   TARZAN AND THE GOLDEN LION
4.   TARZAN AND THE FORBIDDEN CITY
5.   TARZAN AND THE GRAVEYARD OF THE ELEPHANTS
6.   TARZAN'S RETURN TO THE CITY OF GOLD
7.   TARZAN AND THE STRANGE VISITORS
8.   TARZAN AND THE LAND OF THE GIANTS
9.   TARZAN AND THE KNIGHTS OF NIMMR
10.  TARZAN'S RIVAL
11.  TARZAN IN THE CITY OF SORCERY
12.  TARZAN AT THE EARTH'S CORE
13.  TARZAN AND THE ICE MONSTER
14.  TARZAN AND THE OLYMPIADS
15.  TARZAN'S TRIAL
16.  TARZAN THE HATED
17.  TARZAN AND THE BIRD PEOPLE
18.  TARZAN AND THE SUNKEN CITY OF ATLANTIS
19.  TARZAN AND THE COLOSSUS OF ZOME
20.  TARZAN AND THE BEAST IN THE IRON MASK
21.  TARZAN AND THE AMAZON PRINCESS
22.  TARZAN AND THE CONQUISTADORS
23.  TARZAN AND THE SPIDER PEOPLE
24.  TARZAN AND THE SPACE GOD
25.  TARZAN AND THE LOST WORLD
26.  TARZAN AND THE MONKEY GOD
27.  TARZAN AND THE HAUNTED FOREST
28.  TARZAN AND THE ISLAND OF DOCTOR MORPHOS
29.  TARZAN AND THE SIFU
30.  TARZAN AND JANE
31.  LAND BENEATH THE EARTH
32.  THE DROUGHT
33.  THE SOUL STEALER
34.  TARZAN AND THE FUTURE KING
35.  TARZAN AND THE HUNTRESS
36.  TARZAN AND THE WHITE ELEPHANT

Exhibit "D"

5

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
5
Exhibit BB
302

35493

WB136102
CONFIDENTIAL
ER-847

## PUBLISHER'S RELEASE

The undersigned publisher hereby acknowledges and agrees for the express benefit of WARNER BROS., a division of Time Warner Entertainment Company, L.P., 4000 Warner Boulevard, Burbank, CA 91522, and its successors and assigns forever ("Warner"), that except for the Publishing Rights defined below, the undersigned has no right, title or interest whatsoever in that certain series of novels written by Edgar Rice Burroughs, published by the undersigned, titled TARZAN (the "Property"). Notwithstanding and without limiting the foregoing, if and to the extent that the undersigned owns any right, title or interest in the Property other than Publishing Rights, the undersigned hereby quitclaims such right, title and interest other than Publishing Rights to Warner. The undersigned understands that Warner will be relying upon the foregoing acknowledgement and quitclaim in connection with the purchase of rights in the Property and the possible development, production and distribution of works based on the Property. As used herein, Publishing Rights means (i) the right to publish print editions of the Property in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise, it being acknowledged that unless the Property has heretofore been published in comic book or comic strip form, the right to publish comic books and/or comic strips shall be deemed included within the merchandising rights granted to Warner by said author; (ii) the right to publish recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically read devices individually purchased by the end-user. Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property but may not contain audio tracks of any kind.

Insofar as it is concerned, the undersigned hereby consents to the publication by the above-named author and/or by Warner, and/or their heirs, representatives, licensees and assigns, in any and all countries of the world, in the above-mentioned publishing media encompassed by the Publishing Rights, of the following: (a) excerpts from and summaries of the Property, or any motion picture or other versions thereof, for the purpose of advertising and/or publicizing any work produced pursuant to the rights owned by or licensed to Warner in the Property; and (b) souvenir booklets and "making-of-the-movie" and "coffee-table" type books relating to the Picture. No such publication shall contain excerpts or summaries taken from the Property in excess of 7,500 words in the aggregate.

FL206
021028MMS/blb Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

1

35493

**Exhibit BB**

303

WB136103
CONFIDENTIAL
ER-848

IN WITNESS WHEREOF, the undersigned has executed this instrument as of December 2, 2002.

_____

By: _____

Its: _____ ("Publisher")

Address:

_____

_____

_____

FL206
021028MMS/blb Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

2

Exhibit BB
304

35493

WB136104
CONFIDENTIAL
ER-649

### "TARZAN (2003)"
### ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, EDGAR RICE BURROUGHS, whose address is c/o Ziffren, Brittenham, Branca, Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised theatrical and made-for-homevideo live action motion pictures and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain series of novels described as follows:

    Titles: "TARZAN" (and related titles)
    Written By: Edgar Rice Burroughs
    Publisher: _____
    Date and Place of Initial Publication: _____
    Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters therein and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated December 2, 2002 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on _____, the date of exercise of the option.

                  EDGAR RICE BURROUGHS, INC.


                  */s/ Illegible*
                  Its: President

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

WB136105
CONFIDENTIAL
**ER-850**

## "TARZAN (2003)"
## OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, EDGAR RICE BURROUGHS, INC., whose address is c/o Ziffren, Brittenham, Branca, Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 2, 2002 and continuing for a period of at least 24 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised theatrical and made-for-homevideo live action motion pictures and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain series of novels described as follows:

> Titles:  "TARZAN" (and related titles)
> Written By:  Edgar Rice Burroughs
> Publisher:  _____
> Date and Place of Initial Publication:  _____
> Copyright Registration No.:  _____

including the title, themes, stories and all other contents thereof, and the characters therein and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated December 2, 2002 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Execution Date of the Option Purchase Agreement:  *as of March 1, 2003.*

EDGAR RICE BURROUGHS, INC.


*/s/ Illegible*
Its: President

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

WB136106
CONFIDENTIAL

**ER-851**

or Purchaser's address as designated in this Agreement. Any such delivery or mail service shall have the same effect as personal service within the State of California.

(d) Relationship of the Parties: This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other. This Agreement is not for the benefit of any third party, whether or not referred to herein. Captions and organization are for convenience only and shall not be used to construe meaning. A waiver of any breach shall not waive a prior or subsequent breach. All remedies shall be cumulative and pursuit of any one shall not waive any other. This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

WARNER BROS., a division of Time
Warner Entertainment Company, L.P.

by WARNER BROS. PICTURES INC.
(its successor-in-interest)

("Purchaser")

By: _____
Its: Vice President

Date signed by Warner Bros. Pictures Inc:

7-17-03

EDGAR RICE BURROUGHS, INC.

("Owner")

Execution Date: as of March 1, 2003

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

27

35493

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

**Exhibit BB**
**307**

WB136107
CONFIDENTIAL  ER-852

### "TARZAN (2003)"
### OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, EDGAR RICE BURROUGHS, INC., whose address is c/o Ziffren, Brittenham, Branca, Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 2, 2002 and continuing for a period of at least 24 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised theatrical and made-for-homevideo live action motion pictures and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain series of novels described as follows:

> Titles: "TARZAN" (and related titles)
> Written By: Edgar Rice Burroughs
> Publisher: _____
> Date and Place of Initial Publication: _____
> Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters therein and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated December 2, 2002 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Execution Date of the Option Purchase Agreement: _As of March 1, 2003._

EDGAR RICE BURROUGHS, INC.

Its: _President_

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

**Exhibit BB**
**308**

WB136108
CONFIDENTIAL
ER-853

SENT BY MESSENGER

June 11, 2003

P. J. Shapiro Esq.
c/o Ziffren, Brittenham, Branca & Fischer
1801 Century Park West
Los Angeles, California 90067

Re: "TARZAN" – Edgar Rice Burroughs, Inc. – Option Purchase Agreement

Dear P. J.:

I enclose herewith five (5) copies of the above captioned agreement, which you have now confirmed is ready for signature.

Please arrange to have all of the copies signed on behalf of Edgar Rice Burroughs, Inc. and return them to me. I will then have two (2) copies countersigned and sent to you for your files.

Note that this agreement will be countersigned on behalf of Warner Bros., a division of Time Warner Entertainment Company, L.P., by its successor-in-interest Warner Bros. Pictures Inc.

Yours truly,

*/s/ MARSHALL M. SILVERMAN*
Marshall M. Silverman

MMS/blb

enclosures

cc: David Nochimson Esq.
     Dan Furie
     Virginia Tweedy w/enc.
     Mike Edwards w/enc.
     Norma Fuss w/enc.

**Exhibit BB**
309

WB136109
CONFIDENTIAL

ER-854

DE-111

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | TELEPHONE AND FAX NOS. | FOR COURT USE ONLY |
|---|---|---|

(213) 895-4900    (213) 895-4921

JOHN D. PETTKER, Esq. (SBN 42346)
RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A Law Corporation
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901

ATTORNEY FOR (Name): MARK WARREN PEARY

**FILED**
LOS ANGELES SUPERIOR COURT

JUL 2 3 2003

JOHN A. CLARKE, CLERK
BY E. ALVAREZ, DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

ESTATE OF (Name): JOSEPH SHUSTER, also known as JOE SHUSTER
/lost                                    DECEDENT

| PETITION FOR | [X] Probate of Will and for Letters Testamentary |
| | [ ] Probate of Will and for Letters of Administration with Will Annexed |
| | [ ] Letters of Administration |
| | [ ] Letters of Special Administration |
| | [X] Authorization to Administer Under the Independent Administration of Estates Act [X] with limited authority |

CASE NUMBER: BP080635
HEARING DATE: 8/25/03
DEPT: 5    TIME: 9:15

1. Publication will be in (specify name of newspaper): DAILY JOURNAL
   a. [X] Publication requested.    b. [ ] Publication to be arranged.
2. Petitioner (name of each): MARK WARREN PEARY    requests
   a. [X] decedent's will and codicils, if any, be admitted to probate.
   b. [X] (name): MARK WARREN PEARY
        be appointed (1) [X] executor    (3) [ ] administrator
                     (2) [ ] administrator with will annexed    (4) [ ] special administrator
        and Letters issue upon qualification.
   c. [X] that [ ] full [X] limited authority be granted to administer under the Independent Administration of Estates Act.
   d. (1) [X] bond not be required for the reasons stated in item 3d.
      (2) [ ] $          bond be fixed. It will be furnished by an admitted surety insurer or as otherwise provided by law.
                   (Specify reasons in Attachment 2 if the amount is different than the maximum required by Probate Code section 8482.)
      (3) [ ] $          in deposits in a blocked account be allowed. Receipts will be filed. (Specify institution and location):

3. a. Decedent died on (date): July 30, 1992    at (place): West Los Angeles, California
      (1) [X] a resident of the county named above.
      (2) [ ] a nonresident of California and left an estate in the county named above located at (specify location permitting publication in the newspaper named in item 1):
   b. Street address, city, and county of decedent's residence at time of death (specify): 11944 Montana Avenue #305, West Los Angeles, County of Los Angeles, California 90049
   c. Character and estimated value of the property of the estate:
      (1) Personal property:          $    None
      (2) Annual gross income from
          (a) real property:          $    None
          (b) personal property:      $    None
                      Total:          $    None
      (3) Real property: $ None        (If full authority under the Independent Administration of Estates Act is requested, state the fair market value of the real property less encumbrances.)
   d. (1) [X] Will waives bond. [ ] Special administrator is the named executor and the will waives bond.
      (2) [X] All beneficiaries are adults and have waived bond, and the will does not require a bond. (Affix waiver as Attachment 3d(2).)
      (3) [X] All heirs at law are adults and have waived bond. (Affix waiver as Attachment 3d(3).)
      (4) [ ] Sole personal representative is a corporate fiduciary or an exempt government agency.
   e. (1) [ ] Decedent died intestate.
      (2) [X] Copy of decedent's will dated: 6/28/1988 [ ] codicils dated:    are affixed as Attachment 3e(2).
          [X] The will and all codicils are self-proving (Prob. Code, § 8220).
                         (Continued on reverse)

Form Approved by the Judicial Council of California
DE-111 (Rev. January 1, 1998)
Mandatory Use (1/1/2000)

**PETITION FOR PROBATE**

Legal Solutions Plus

Probate Code, §§ 8002, 10450

Exhibit CC
ER-855

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court – Central District

### ATTACHMENT 2c
### Requested Additional Power

Requested Additional Power

      Petitioner requests that the court grant him the following power in addition to the general powers conferred upon him by law and under the Independent Administration of Estates Act: *the power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings necessary or appropriate in connection with this action.*



261503_1.doc

Exhibit CC
ER-856

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

### ATTACHMENT 2d(1), 3(c) and 3(d)(1), (2) and (3)

No bond should be required of petitioner to act as Executor, or if a bond is required by the Court, it should be for a nominal amount, for the following reasons:

1. The first named Executor, Jean Adele Peavy, has signed and filed a Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peary as Personal Representative. Jean Adele Peavy, who is the sister of the decedent, is also the sole beneficiary under the decedent's Will and the sole heir at law of the decedent's estate under the laws of intestacy.

2. Petitioner is the alternate named Executor under the decedent's Will, and the decedent's Will waives bond.

3. Petitioner, who is the son of Jean Adele Peavy, is the nephew of the decedent.

4. A probate proceeding with respect to the decedent's estate would be unnecessary but for the fact that a personal representative of his estate needs to be appointed for the purpose of *terminating prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D)*. This right of the personal representative of the decedent's estate to terminate prior transfers of the decedent's copyright(s) was enacted into federal law as part of the Sonny Bono Copyright Act effective October 27, 1998. The purpose of such new law, enacted over six years after the decedent's death, is to give authors and their estates the power to recover previously assigned copyrights within time limits delineated in the statute.

5. All assets of the decedent, with the exception of the decedent's interest in and to *the copyrights*, which currently have an undetermined value, were of minimal value and transferred through a §13101 affidavit by Jean Adele Peavy shortly after the decedent's death on July 30, 1992.

Dated: ___July 15___, 2003

_Mark Warren Peary_
MARK WARREN PEARY

261503_1.doc

**Exhibit CC**
**ER-857**

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court – Central District

### ATTACHMENT 3e(2)
### *(Lost)* Last Will and Testament

Grounds for Admission of *Lost* Will

The decedent died more than 10 years ago on July 30, 1992. Petitioner and other family members have made a diligent and extensive search for the original Will executed by the decedent on June 28, 1988, but have been unable to find it. Petitioner has only found a copy of such Will, which he is submitting for probate as the decedent's lost Will. Petitioner believes that the original of such Will has been lost or inadvertently destroyed. There would be no reason for the decedent to have revoked such Will by destroying it, because the terms of the Will replicate the result if the decedent died intestate. Under both the Will and the laws on intestacy, petitioner's mother, Jean Adele Peavy, who is the decedent's sister and sole surviving heir at law, would be the sole beneficiary of the decedent's estate and, but for her declination to act, would be entitled to be appointed personal representative. Further, under both the decedent's Will and the laws of intestacy, by reason of the declinations to act that have been filed concurrently with this petition, petitioner is entitled to be appointed personal representative.

The decedent never married and never had any issue.

261503_1.doc

Exhibit CC
ER-858



Exhibit CC
ER-859

# Last Will and Testament of

KNOW ALL PERSONS BY THESE PRESENTS:

That, I ___JOSEPH SHUSTER_____

of _____W. Los Angeles, California_____

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I.

I hereby declare that I am the __brother_____ of JEAN ADELE PEAVY_____

at the time of the execution of this Will.

II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their

_____N/A_____ will provide for them.
(mother, or father)

III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execut_rix__ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV.

I give, devise and bequeath unto ____JEAN ADELE PEAVY_____ all of the rest, residue and

remainder of my estate, whether real or personal, and wheresoever situated. In the event that

___Jean Adele Peavy_____ shall predecease me, or in the event that both

___Jean Adele Peavy_____ and I shall die as a result of a common accident, illness or

disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew,

___MARK WARREN PEARY_____ .

V.

I hereby nominate and appoint my __sister_____, ___Jean Adele Peavy_____,

execut_rix_ of this my Last Will and Testament, to act without bond. In the event that my

___sister___, is for any reason unable or unwilling to act as execut_rix__ hereof, I nominate

and appoint ____Mark Warren Peary_____ to act as

execut_or___, also without bond.

Exhibit CC

ER-860

VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her___, and I hereby empower my executrix to mortgage, lease sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Exhibit CC
ER-861

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this _28_ day of _June_ , 19 _88_.

_Joseph Shuster_
Testator

STATE OF CALIFORNIA }
} ss.
County of _Los Angeles_ }

Each of the undersigned, being first duly sworn on oath, states that on this _28_ day of _June_ , 19 _88_:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of
_JOSEPH SHUSTER_ (the Testat_or_ );

(2) The Testat_or_, in my presence and in the presence of the other Witnesses whose signatures appear below:

   (a) Declared the foregoing instrument consisting of _one_ pages, of which this is the last to be _his_ Will;

   (b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

   (c) Signed such instrument;

(3) I believe the Testat_or_ to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testat_or_ and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_               _Robert E Williams_
Witness                       Witness
_3374 Overland Ave #1_        _3545 Mentone Ave #3_
Address                       Address
_L.A. Ca 90064_               _Los Angeles California 90034_

_____
Witness

_____
Address

SUBSCRIBED & SWORN to before me this _28_ day of _June_ , 19 _88_.

_F. Patrick Hagerty_
Notary Public in and for the State of _California_,
residing at _Santa Monica, Calif._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Exhibit CC
ER-862

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court – Central District

### ATTACHMENT 3g
### Nonresident of California and Permanent Address

    I, Mark Warren Peary, the proposed personal representative, am a non-resident of California. I reside in the State of New Mexico at the following residence address:

51 Camino Cabo
Santa Fe, NM 87508

    I hereby consent to act as the personal representative of the estate of my uncle, Joseph Shuster.

Dated: _____July 15_____, 2003

MARK WARREN PEARY

261503_1.doc

Exhibit CC
ER-863

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court – Central District

## **ATTACHMENT 8**

The following is a list of the names, relationships, ages, and addresses, so far as known to or reasonably ascertainable by petitioner, of (1) all persons named in decedent's will and codicils, whether living or deceased, (2) all persons named or checked in items 2, 5, 6, and 7, and (3) all beneficiaries of a devisee trust in which the trustee and personal representative are the same person:

| Name and Address | Relationship | Age |
|---|---|---|
| Mark Warren Peary<br>51 Camino Cabo<br>Santa Fe, NM 87508 | Petitioner/Nephew | Adult |
| Jean Adele Peavy<br>51 Camino Cabo<br>Santa Fe, NM 87508 | Sister | Adult |
| Dawn L. Peavy<br>11405 Lake Nemi<br>El Paso, Texas 79936 | Niece | Adult |

261503_1.doc

**Exhibit CC**
**ER-864**

RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
Telephone: (213) 895-4900
Facsimile: (213) 895-4921

Attorneys for MARK WARREN PEARY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL

| | |
|---|---|
| In re the Matter of the Estate of | CASE NO. BP080635 |
| JOSEPH SHUSTER, also known as JOE SHUSTER | DECLINATION TO ACT AS PERSONAL REPRESENTATIVE AND WAIVER OF BOND OF MARK WARREN PEARY AS PERSONAL REPRESENTATIVE |
| Decedent. | |

I, JEAN ADELE PEAVY, state as follows:

1.    I am the only sibling of the decedent, JOSEPH SHUSTER. The decedent's and my parents are both deceased, having predeceased the decedent. I have two children, both of whom survived the decedent. They are Mark Warren Peary and Dawn L. Peavy.

2.    I am the sole beneficiary under the decedent's Will dated June 28, 1988, and am nominated to act as Executor under such Will.

3.    I hereby decline to serve as personal representative of the decedent's estate, whether as Executor of the decedent's Will or Administrator of his estate.

4.    I hereby waive the requirement of a bond by Mark Warren Peary, whether acting as

Exhibit CC
ER-865



1 | Executor of the decedent's Will or Administrator of his estate.

2 | Dated: July 15, , 2003

3

4 | Jean Adele Peavy
  | JEAN ADELE PEAVY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 | 261504_1.doc

ROGI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

2

DECLINATION TO ACT AS PERSONAL REPRESENTATIVE AND WAIVER OF BOND OF MARK WARREN PEARY AS PERSONAL REPRESENTATIVE

Exhibit CC
ER-866

RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
Telephone: (213) 895-4900
Facsimile: (213) 895-4921

Attorneys for MARK WARREN PEARY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL

| | |
|---|---|
| In re the Matter of the Estate of | CASE NO. |
| JOSEPH SHUSTER, also known as JOE SHUSTER | NOMINATION OF PERSONAL REPRESENTATIVE, DECLINATION TO ACT, AND WAIVER OF BOND OF MARK WARREN PEARY |
| Decedent. | |

I, DAWN L. PEAVY, state and declare as follows:

1.      I am the niece of JOSEPH SHUSTER (the "decedent"), the decedent named herein, being the daughter of the decedent's sister, Jean Adele Peavy. My brother is Mark Warren Peary.

2.      If the decedent's Will is not admitted to probate and an Executor thereof is not appointed and if my mother, Jean Adele Peavy, declines to act as personal representative of the decedent's estate, I am a person entitled to equal priority for appointment as the personal representative of the decedent's estate with my brother, MARK WARREN PEARY.

3.      If for any reason MARK WARREN PEARY is not appointed by the Court as Executor of the decedent's Will, I hereby nominate MARK WARREN PEARY of Albuquerque, New Mexico, to serve as the personal representative of the decedent's estate without the

1
NOMINATION OF PERSONAL REPRESENTATIVE, DECLINATION TO ACT, AND WAIVER OF BOND OF MARK WARREN PEARY

Exhibit CC
ER-867

1  requirement of any bond, pursuant to the authority provided to me under Sections 8461 and 8465

2  of the California Probate Code, and I decline to act as such personal representative.

3      4.      My intent in making this nomination is to ensure the appointment of a person that I

4  trust to serve as the personal representative of my uncle's estate.

5      I declare under penalty of perjury under the laws of the State of California, that the

6  foregoing is true and correct.

7      Executed on _July 15_____, 2003, in El Paso, Texas.

8

9

10                                    DAWN L. PEAVY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  261505_1.doc

2

NOMINATION OF PERSONAL REPRESENTATIVE, DECLINATION TO ACT, AND WAIVER OF BOND OF MARK WARREN PEARY

Exhibit CC
ER-868

ORIGINAL

FILED
LOS ANGELES SUPERIOR COURT

OCT 0 7 2003

JOHN A. CLARKE, CLERK
M. Castelum
BY M. CASTELUM, DEPUTY

1   **RODI, POLLOCK, PETTKER, GALBRAITH**
    **& CAHILL, A Law Corporation**
2   **JOHN D. PETTKER (SBN 42346)**
    444 South Flower Street, Suite 1700
3   Los Angeles, CA 90071-2901
    Telephone: 213-895-4900
4   Facsimile: 213-895-4750

5   Attorneys for MARK WARREN PEARY,
    Petitioner

6

7

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         FOR THE COUNTY OF LOS ANGELES

10

11  In the Matter of the Estate of                **NO. BP-080635**

12  JOSEPH SHUSTER, also known as JOE            **ORDER ADMITTING WILL TO**
    SHUSTER,                                      **PROBATE, APPOINTING EXECUTOR**
13                                                **AND AUTHORIZING INDEPENDENT**
                        Deceased.                 **ADMINISTRATION OF ESTATE WITH**
14                                                **LIMITED AUTHORITY**

15                                                **Hearing Date: 8-25-03**
                                                  **Dept. 5 at 9:15 a.m.**
16

17

18        Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters

19  testamentary and for authorization to administer estate under the Independent Administration of

20  Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster,

21  deceased (the "decedent"), and such petition came on regularly for hearing and approval by the

22  Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the

23  Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding. JOHN D. PETTKER of Rodi,

24  Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner,

25  and no one appeared in opposition.

26        On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

27        1.      All notices required by law have been given.

28  / / /

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

2.    The decedent died on July 30, 1992, a resident of the County of Los Angeles, State of California.

3.    The decedent died testate, leaving a will dated June 28, 1988. This will has never been revoked but was lost or inadvertently destroyed. Such will is admitted to probate by Minute Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

## LAST WILL AND TESTAMENT OF

KNOW ALL PERSONS BY THESE PRESENTS:

I

That, I JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the execution of this Will.

II

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their _____N/A_____ will provide for them.

III

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV

I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

2

**Exhibit DD**
**325**

**ER-870**

1   result of a common accident, illness or disaster, then I give, devise and bequeath the residue and

2   remainder of my estate to my nephew, MARK WARREN PEARY.

3                                        V

4          I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will

5   and Testament, to act without bond. In the event that my sister is for any reason unable or

6   unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor,

7   also without bond.

8                                        VI

9          I further direct that my estate be settled without the intervention of any court, except to the

10  extent required by law, and that my executrix settle my estate in such a manner as shall seem best

11  and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell,

12  exchange and convey the personal and real property of my estate without an order of court for that

13  purpose and without notice, approval or confirmation and in all other respects to administer and

14  settle my estate without the intervention of court.

15                                       VII

16         I hereby revoke any and all former Wills and Codicils thereto made by me and declare this

17  my Last Will and Testament.

18         In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

19

20                                          JOSEPH SHUSTER
                                            Testator

21  STATE OF CALIFORNIA      )
                             ) ss.
22  COUNTY OF LOS ANGELES )

23         Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June,

24  1988:

25         (1)    I am over the age of eighteen (18) years and competent to be a Witness to the Will

26  of JOSEPH SHUSTER (the Testator);

27         (2)    The Testator, in my presence and in the presence of the other Witnesses whose

28  signatures appear below:

---

3

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

**Exhibit DD**
**326**

1          (a) Declared the foregoing instrument consisting of one pages, of which this is the

2  last to be his Will;

3          (b) Requested me and the other Witnesses to act as Witnesses to his Will and to

4  make this affidavit; and

5          (c) Signed such instrument;

6     (3)   I believe the Testator to be of sound mind, and that in so declaring and signing, he

7  was not acting under any duress, menace, fraud, or undue influence;

8     (4)   The other witnesses and I, in the presence of the Testator and of each other now

9  affix our signatures as Witnesses to the Will and make this affidavit.

10  Tom Fenaughty                       Robert Williams

11  3374 Overland Ave., #1             3545 Mentone Ave. #3

12  Los Angeles, CA 90064             Los Angeles, California 90034

13  SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

14                       F. PATRICK HAGERTY
          [NOTARIAL SEAL]        Notary Public in and for the State of California,

15                       residing at Santa Monica, Calif.

16  **THE COURT ORDERS:**

17     1.   MARK WARREN PEARY is appointed Executor of the decedent's Will recited

18  above, and letters testamentary shall issue on qualification.

19     2.   The Executor is granted limited authority to administer the estate under the

20  Independent Administration of Estates Act (there is no authority, without court supervision, to (1)

21  sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money

22  with the loan secured by an encumbrance upon real property).

23     3.   The Executor is also granted the following special power in addition to the general

24  powers conferred upon him by law and under the Independent Administration of Estates Act:

25  The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d)

26  of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C.

27  §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings

28  necessary or appropriate in connection with this action.

ROCO, POLLOCK, PETHGER, GALBRATH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2601
TELEPHONE (213) 895-4900

4



4.    Bond is fixed at $6,000.00.

Dated: _____

OCT 0 7 2010

_____
Judge Pro Tem of the Superior Court

H. RONALD HAUPTMAN,
JUDGE PRO TEM

204438_1.doc

ROOL, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

5
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1. Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2. In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3. PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _MT_, _MWP_

PPC 00001
ER-874

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.   The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.   Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.   All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.   The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

PPC 00002

ER-875

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

    8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

    9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

    10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

    11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

    If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MS_, _MNF_

PPC 00003
**ER-876**

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor                    Date: 10-30-03
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my
interests are concerned.

Jean A. Peavy                                       Date: 10-30-03

PPC 00004
ER-877



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

DATE OF RECORDATION

8Dec03

| VOLUME | DOC. NO. |
|--------|----------|
| 3505 | 773 |

| VOLUME | DOC. NO. |
|--------|----------|

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services



**RECORDED DOCUMENTS**     **FL-10A**

**DATE:** March 12, 2004

IP Worldwide
9595 Wilshire Blvd. Suite 811
Beverly Hills, CA  90212

ATTN:  MARC TOBEROFF

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| VOLUME | 3505 |
|---|---|
| DOC. NO. | 773-774 |

The recording fee has been handled as follows:

| RECEIVED | $ |
|---|---|
| APPLIED | $ |
| REFUNDED (under separate cover) | $ |
| CHARGED TO YOUR DEPOSIT ACCOUNT | $ |

Sincerely yours,

Register of Copyrights

ENCL(S):
DOC(S):   2

Library of Congress
U.S. Copyright Office
101 Independence Ave, SE
Washington, DC 20559-6000
www.copyright.gov

63

FL-10A  01/2004: 12,000

**ER-879**

Copyright Office fees are subject to change.
For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.

## DOCUMENT COVER SHEET
**For Recordation of Documents**
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION
(Assigned by Copyright Office)

**DEC 0 8 2003**

| Month | Day | Year |

Volume **3505** Page **773**

Volume _____ Page _____

FUNDS RECEIVED

Do not write above this line.

## To the Register of Copyrights:

*Please record the accompanying original document or copy thereof.*

FOR OFFICE USE ONLY

**1** Name of the party or parties to the document spelled as they appear in the document (List up to the first three)

Time Warner Inc.

Time Warner

Warner Bros. Entertainment Inc.

**2** Date of execution and/or effective date of the accompanying document Dec. 1, 2003
(month) (day) (year)

**3** Completeness of document
☒ Document is complete by its own terms.
☐ Document is not complete. Record "as is."

**4** Description of document
☐ Transfer of Copyright
☐ Security Interest
☐ Change of Name of Owner
☒ Termination of Transfer(s) (Section 304)
☐ Shareware
☐ Life, Identity, Death Statement [Section 302]
☐ Transfer of Mask Works
☐ Other _____

**5** Title of first work as given in the document
"Superman"

**6** Total number of titles in document  8

**7** Amount of fee calculated
$ 100

**8** Fee enclosed
☒ Check
☐ Money Order

☐ Fee authorized to be charged to :
Copyright Office
Deposit Account number _____

Account name _____

**9** Affirmation*: I hereby affirm to the Copyright Office that the information given on this form is a true and correct representation of the accompanying document. This affirmation will not suffice as a certification of a photocopy signature on the document.
(Affirmation *must* be signed even if you are also signing Space 10.)

Signature
Date 12/1/03
(310) 246-3100   (310) 246-3101
Phone Number          Fax Number

**10** Certification*: Complete this certification in addition to the Affirmation if a photocopy of the original signed document is substituted for a document bearing the actual signature.
NOTE: This space *may not* be used for an official certification.
I certify under penalty of perjury under the laws of the United States of America that the accompanying document is a true copy of the original document.

Signature
IP Worldwide/Estate of Joseph Shuste
Duly Authorized Agent of:
12/1/03
Date

Recordation will be mailed in window envelope to this address:

Name ▼
IP Worldwide/Marc Toberoff, Esq.

Number/Street/Apt ▼
9595 Wilshire Blvd., Suite 811

City/State/ZIP ▼
Beverly Hills, CA 90212

YOU MUST:
• Complete all necessary spaces
• Sign your Cover Sheet in Space 9
SEND ALL 3 ELEMENTS TOGETHER:
1. Two copies of the Document Cover Sheet
2. Check/money order payable to *Register of Copyrights*
3. Document
MAIL TO:
Library of Congress, Copyright Office
Documents Recordation Section, LM-462
101 Independence Avenue, S.E.
Washington, D.C. 20559-6

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

*Knowingly and willfully falsifying material facts on this form may result in criminal liability. 18 U.S.C. § 1001.

Rev: June 2002—20,000   Web Rev: June 2002   ⊛ Printed on recycled paper

U.S. Government Printing Office: 2000-461-113/20,021

V3505 D773

# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED COPYRIGHT RENEWAL TERM
## OF "SUPERMAN"

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappuccio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O.

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen, President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz, E.V.P. & Publisher

V3505 D773 Page 1

**66**

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co.

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr. Chairman

Marvel Entertainment Group, Inc.
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O.

Golden Books Publishing
1540 Broadway _____
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group, (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

**67**

**ER-882**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. §304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. §201.10, the undersigned Mark Warren Peary, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted work(s) entitled "SUPERMAN" made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Richard D. Parsons, Chief Executive Officer; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019, Attn: Barry M. Meyer, Chairman & C.E.O.; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Communications Inc., c/o Time Warner, Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Paul T. Cappucio, E.V.P. & General Counsel; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Peter Roth, President; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019, Attn: Roger Ames, Chairman & C.E.O.; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Dan Romanelli, President; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020, Attn: Rich Jacobsen, President; Time Warner Book Group, Inc., 1271 Avenue of

ER-883

the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Warner

Books, Inc., 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J.

Kirshbaum, C.E.O.; Little, Brown, and Company, 1271 Avenue of the Americas, New

York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; DC Comics Inc., 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. &

Publisher; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Direct, c/o DC Comics, 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levtiz, E.V.P. & Publisher; Milton

Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028,

Attn: David E. Wilson, President; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI

02861, Attn: Alan Hassenfeld, Chief Executive Officer; Wildstorm Productions, 888

Prospect Street, Suite 240, La Jolla, CA 92037, Attn: Jim Lee, Editor & Director;

Wildstorm Productions, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, President & Publisher; Dark Horse Publications, 10956 S.E.

Main St., Milwaukie, OR 97222, Attn: Michael Richardson, President; Cantharus

Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819, Attn: Ilya Salkind; Ilya

Salkind and Pierre Spengler, 12 Chiswick Lane, London W4 2JE, England, Attn: Albion

Gee, Esq., Albion Gee & Co.; Hallmark Entertainment, Inc., 1325 Avenue of the

Americas, 21st Floor, New York, NY 10019, Attn: Robert Halmi, Jr., Chairman; Marvel

Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016, Attn: F.

Peter Cuneo, President & C.E.O.; Golden Books Publishing, 1540 Broadway, New

York, NY 10036, Attn: Amy Jarashow, Associate Publisher; Random House Golden

Books for Young Readers, 1540 Broadway, New York, NY 10036, Attn: Kate Kilmo,

Vice President & Publisher; Random House, Inc., 1745 Broadway, New York, NY

V3505 D773 Page 4

10019, Attn: Katherine J. Trager, Senior V.P. & General Counsel; Inkworks, 4320 Delta

Lake Drive, Raleigh, NC 27612, Attn: Allan Caplan, President & C.E.O.; Penguin Group

(USA) Inc., 375 Hudson Street, New York, NY 10014, Attn: David Shanks, C.E.O.; DK

Publishing, Inc., 375 Hudson Street, New York, NY 10014, Attn: Christopher Davis,

Publisher; Scholastic, Inc., 557 Broadway, New York, NY 10012, Attn: Richard

Robinson, Chairman & C.E.O. Pursuant to 37 C.F.R. Section 201.10(d), service of this

notice is being made by first class mail, and additionally service of this notice is being

made by certified mail, return receipt requested, to the above grantees or successors at

the addresses shown.

      2.      The works (individually, "Work;" collectively, the "Works") to which this

Notice of Termination applies are as follows[1]: The title of the original copyrighted Work

to which this Notice of Termination applies is SUPERMAN, an illustrated comic book

story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics,

Vol. 1, No. 1, June, 1938 issue, which was published on April 18, 1938. This Work was

registered for copyright under registration No. B379787 and copyright was originally

---

[1] This Notice of Termination applies as well to each and every element of each Work, including
without limitation, the story or stories, character or characters, the interplay of such characters,
theme or themes, settings or locales, and includes, but is not limited to, Superman, his origins
and escape as an infant to Earth in a rocket ship, his super strength, his invulnerability (bullets
bounce off his chest and he's impervious to fire), his super speed, his ability to leap great
distances in a single bound, his telescopic vision, his super hearing and sense of smell, his
sense of humor, his clean-cut good looks, his high morals, ethics and compassion, his mission
as a crime fighter and as a champion of the underdog, his stylized costume and cape, the
diamond shaped "S" insignia on his chest, his secret identity / alter ego as the mild mannered
bespectacled newspaper reporter, Clark Kent, the feisty and attractive female reporter love
interest, Lois Lane, the love triangle between Superman, Lois Lane and Clark Kent, Clark Kent's
boss / newspaper Editor (a.k.a. Perry White), the Daily Planet newspaper (f.k.a. the Daily Star)
where Clark Kent, Lois Lane and the Editor work, the great skyscraper metropolis where these
characters live (a.k.a. Metropolis), Superman's scientist father (a.k.a. Jor L) and Superman's
birthplace --a highly advanced but doomed distant planet (a.k.a. Krypton).

V3505 D773 Page 5

secured in this Work as of its April 18, 1938 publication date. This Work was written by

Jerome Siegel and illustrated by Joseph Shuster.  Renewal of the copyright in and to

this Work was made on June 1, 1965, in the name of National Periodical Publications,

Inc. claiming as proprietor of copyright, under renewal registration No. R362188.  This

Work was based upon, incorporated, and constituted a slightly revised version of, the

following Works to which this Notice of Termination also applies: twenty-four days (i.e.,

four six day weeks) of previously unpublished SUPERMAN newspaper comic strips,

created c. 1934, written by Jerome Siegel and illustrated by Joseph Shuster.[2] The

remaining Works to which this Notice of Termination applies are:

| Title | Name of Author | Date Copyright Secured | Copyright  Reg. No. |
|---|---|---|---|
| SUPERMAN story in comic book form | Jerome Siegel Joseph Shuster | Work created c.1933 | N/A[3] |

---

[2]  In Siegel and Shuster v. National Comics Pub., Inc. et al., the court found that Jerome Siegel and Joseph Shuster were "the originators and authors of the cartoon character Superman and of the title Superman and first created cartoon material in which said character and title first appeared in 1934...," and further found that this material as incorporated in Action Comics No. 1 constituted:  "the formula for the continuing SUPERMAN series to come. It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance." Findings of Fact and Conclusions of Law by Referee J. Addison Young, ¶¶ 8, 22 (November 1, 1947); See also Siegel and Shuster v. National Comics Pub., Inc. et al., Opinion of Referee J. Addison Young, page 9 ("[the aforementioned material] certainly contained the full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did, I believe constitute a formula for the continuing series to come..."). In Siegel v. National Periodical Publications, Inc, the Second Circuit Court of Appeals reversed the District Court's determination that Action Comics No. 1 was a work-for-hire and held: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accomodate Superman to a magazine format." 508 F.2d 909, 914 (2nd Circuit 1974).

[3]  The second and third Works listed in this table as well as the above-referenced 24 days of previously unpublished SUPERMAN newspaper comic strips were first published in a somewhat revised form on April 18, 1938 as Action Comics, Vol. 1, No. 1, June, 1938, which was registered for copyright under registration No. B379787 and renewed under registration No. R362188.

V3505 D773  Page 6

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| 15 SUPERMAN daily comic strips (12 strips and 3 scripts) | Jerome Siegel Joseph Shuster | Work created c.1934 | N/A |
| Action Comics #2 [4] | Jerome Siegel Joseph Shuster | May 25, 1938 | B379788 |
| Action Comics #3 | Jerome Siegel Joseph Shuster | June 25, 1938 | B385466 |
| Action Comics #4 | Jerome Siegel Joseph Shuster | July 25, 1938 | B387907 |
| Action Comics #5 | Jerome Siegel Joseph Shuster | August 25, 1938 | B394784 |
| Action Comics # 6 | Jerome Siegel Joseph Shuster | September 26, 1938 | B394866 |
| Action Comics # 7 | Jerome Siegel Joseph Shuster | October 25, 1938 | B399214 |

3. This Notice of Termination applies to the following grants, assignments, transfers and/or agreements to the extent each grants, transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a) A one page agreement between Detective Comics, Inc., on the one hand and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about March 1, 1938;

_____

[4] Action Comics Nos. 2-6 were reprinted in Superman Nos. 1 and 3 (Copyright Reg. Nos. AA299871 and B443035, respectively) to which this Notice of Termination, therefore, also applies.

V3505 D773 Page 7

ER-887

(b)     A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 4, 1937;

(c)     A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(d)     A three page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(e)     A two page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 19, 1939;

(f)     A seven page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about May 19, 1948;

(g)     A twelve page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 23, 1975.

4.     The effective date of termination shall be October 26, 2013.

73
ER-888

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304 (c) of the United States Copyright Act (17 U.S.C. §304(c)).

6.    Joseph Shuster died on July 30, 1992.  There is no living widow, child or grandchild of Mr. Shuster. The undersigned, Mark Warren Peary is the Executor  of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304 (d), incorporating without limitation 17 U.S.C. § 304 (c)(2)(D), as to the grants of the transfers described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code.

Dated: November ⌐ , 2003

*Mark Warren Peary*

Mark Warren Peary
Executor of the Estate of Joseph Shuster
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

V3505 D773 , Page 9

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF "SUPERMAN", and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made as to the current ownership of the rights being terminated, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10TH day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3Ͻᴜ5 D773 Page 10

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM OF "SUPERMAN" to be served this _10th_ day of November, 2003, by First Class

Mail, postage prepaid, upon the following:

To:  Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappucio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group.
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen
President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

V3bv5 D773 Page 11

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
E.V.P. & Publisher

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson,
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler.
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr.
Chairman

Marvel Entertainment Group, Inc..
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

V3505 D773    Page 12

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773 Page 13

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

September 10, 2004

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor, Estate of Joseph Shuster
Jean Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren and Jean:

This is to confirm that (1) the joint venture agreement dated as of November 23, 2001 between you and Pacific Pictures Corp. and (2) the engagement agreement dated October 27, 2003 between the Estate of Joseph Shuster and Pacific Pictures Corp. have been cancelled.

Sincerely yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Mark Warren Peary

Jean A. Peavy

PPC 00009
**ER-894**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court.  Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred.  Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated:  March 5, 2013          TOBEROFF & ASSOCIATES, P.C.

                                            /s/ Keith G. Adams
                                            Keith G. Adams