APPELLATE CASE NO. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

————————

## APPELLANTS' EXCERPTS OF RECORD (VOL. V OF VII)
————————

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

## <u>INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD</u>

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
| | | *Exhibit B – Ju1y 12, 2012 Kline-Toberoff e-mail* | II | 56 |
| | | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
| | | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
| | | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
|  |  | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
|  |  | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
|  |  | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
|  |  | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
|  |  | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
|  |  | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
|  |  | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
|  |  | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
|  |  | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy* | IV | 701 |
| | | *Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz* | IV | 703 |
| | | *Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy* | IV | 704 |
| | | *Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy* | IV | 705 |
| | | *Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy* | IV | 706 |
| | | *Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy* | IV | 708 |
| | | *Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy* | IV | 709 |
| | | *Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson.* | IV | 710 |
| | | *Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy* | IV | 719 |
| | | *Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy* | IV | 720 |
| | | *Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc.* | IV | 721 |
| | | *Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy* | IV | 753 |
| | | *Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy* | IV | 754 |
| | | *Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy* | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy* | IV | 759 |
| | | *Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc.* | IV | 760 |
| | | *Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles* | IV | 855 |
| | | *Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles* | IV | 869 |
| | | *Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary)* | IV | 874 |
| | | *Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation* | IV | 878 |
| | | *Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary)* | IV | 894 |
| | | *Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary* | V | 895 |
| | | *Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | V | 902 |
| | | *Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary* | V | 907 |
| | | *Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen* | V | 929 |
| | | *Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff* | V | 930 |
| | | *Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011* | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |



DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail: paul.levitz@dccomics.com

Paul Levitz - President & Publisher

<u>By Federal Express</u>

April 28, 2005

Jean Adele Peavy
  (as sole heir to Joseph Shuster)
Mark Warren Peary
  (as personal representative of the Estate of Joseph Shuster)
51 Camino Cabo
Santa Fe, NM 87505-2277

Dear Jean and Warren:

I write to you today to offer to license from you the interest in Superman
which is the subject of your recent notice of termination. Without in any way
conceding that the notice of termination is valid, and though the interest you
claim in Superman cannot, under any circumstances, become yours until April
2013 – over eight years from now – DC Comics is proposing to enter into an
arrangement with you and begin paying you substantial payments starting *now*.
For the period covered by your termination notice, DC will only pay a premium to
*one* terminating party. Therefore, before proposing the terms of our offer I
believe it would be helpful to lay out some of the background and history that
brings us to where we are today.

As an initial matter, I want to reiterate to you the great respect that DC
Comics and I personally have for Joe Shuster's work, and for Superman's value
and contribution to American culture and to DC Comics. As you may know, I
have been working in the comic book field for over thirty years, and like Joe,
while still in high school started out as a freelancer for DC. It was my pleasure to
know Joe for almost the last two decades of his life. As a result of my long
association with DC, I can personally attest to DC's heavy investment in and
nurturing of the Superman property, which I believe has played a substantial part
in creating the lasting value and continued popular interest the character that Joe
and Jerry created has enjoyed. DC's efforts have included the distribution of
television programming and motion pictures featuring Superman, merchandising
of the Superman character, and continually creating new and interesting story
lines that have kept Superman alive in the public's imagination. I hope you agree
that DC has done its job well in its management and development of Superman.



DCC00057431

Jean Adele Peavy
Mark·Warren Peary
April 28, 2005
Page 2

Given DC's long history of stewardship, commitment and dedication of resources to Superman, I believe that there is no company better positioned than DC to continue Superman's success.

· As you are no doubt aware, aside from you and DC Comics, the heirs of Jerry Siegel also claim to have an interest in the Superman character, and as you probably know, in October 2004 those heirs commenced two lawsuits in federal court in Los Angeles against DC Comics and certain of its affiliated companies. In the first lawsuit they seek an accounting for profits derived from DC's exploitation of the Superman character following the Siegel heirs' purported termination of Jerry Siegel's original 1938 grant to DC. · They claim the termination was effective April 16, 1999. In the second lawsuit the Siegel heirs assert that Jerry Siegel – without any contribution from Joe Shuster – was the sole creator and owner of the character Superboy, that the Siegel heirs purported to terminate DC's interest in the Superboy character effective November 18, 2004, and that neither DC, you nor anyone other than the Siegel heirs is entitled to exploit the Superboy property.

The Siegel lawsuits are pending and in their early stages. Although it is too early to tell how these lawsuits will turn out (and we believe that DC has substantial defenses to the Siegel heirs' claims) I am advised that the Siegel heirs' counsel has communicated to our lawyers that it is their ultimate goal to settle all claims with DC relating to Superman. This would presumably include all claims relating to any interest in the copyright extension period that begins in 2013 – the same period in which you claim rights. Most lawsuits do, in fact, settle, and it continues to be our hope as well to reach some sort of amicable resolution with the Siegel heirs. In fact, one of the principal defenses we have raised in the Siegel heirs litigations is that DC did, in fact, reach a comprehensive settlement with the Siegel heirs in 2001, which covered all copyright extension periods, and which was confirmed by the Siegel heirs' lawyers in writing. The Siegel heirs now deny that there was such an agreement. This is one of the issues that the court will ultimately decide.

I want to be frank in telling you that if we are able to resolve matters with the Siegel heirs (whether by settlement or judgment) *before* we reach an agreement with you, so that we acquire or are adjudged to own rights to the Superman character during the copyright extension term that begins in 2013, there will not be any pressing need to reach an agreement with you in advance of that date. The reason that we are contacting you at this time is that we are interested in removing now any possible issues as to whether DC Comics has sufficient rights to continue to fully exploit the Superman character in new works during the extension term beginning in 2013. Once we have certainty that we

DCC00057432

Case 2:16-cv-03245-ODW-RZ Document 25-6 Filed 05/20/19 Page 14 of 312 Page ID
Case 2:10-cv-03633-ODW-RZ Document 479-6 Filed 08/20/12 Page 43 of 226 Page ID
#:29617    Apr 29 2005  15:25    P.06

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 3

have those rights from one of the joint holders; we are then assured of our right
to continue to exploit those rights to create new works, and the other joint holder
at best is entitled to a participation or has a claim for an accounting. Therefore, if
you are interested in receiving something *now* in exchange for rights that cannot
ripen until 2013, you should be aware that we are more motivated to make such
a deal now. The deal that we envision makes a payment to you as soon as it is
signed, but the opportunity to enter into such a deal exists only in the absence of
a similar arrangement with the Siegel heirs, or a judgment by the court that the
Siegel heirs have already settled the matter – as we contend they have.

In considering our proposal – which you should discuss with any advisors
to you – please keep in mind that even after 2013, if your termination notice is
valid, your interest will be limited to U.S. rights since the termination notice you
gave applies to rights under U.S. law only. In addition, you will still have to share
the copyright with either or both the Siegel heirs or DC, so at best you will only
have non-exclusive rights. Further, your interest will be limited to the 1930s
version of the Superman character and the triangular (as opposed to the current
5-sided) "S" shield which have extremely limited marketability by themselves.
These limitations are substantial and could make it virtually impossible for you to
enter into any sort of significant license deal with another company. So a deal
between you and DC really makes by far the most sense; it gives both parties
significant benefits.

So, with that background, I would like generally to outline for you our offer
in exchange for your exclusive license to DC of all rights arising out of Joe's
authorship or contributions to DC Comics, including any Shuster post-April 2013
rights in Superman and all related properties, including Superboy (the "Superman
Property"). Although there may be fine points to this offer that our
representatives will want to work out, the following is our basic proposal:

1.    Non-Refundable Cash Advance

Upon signing, you shall be paid:

> • A non-refundable advance against royalties (as
> described below) of two million dollars ($2,000,000.00)
> (This means that no matter what, you get to keep the
> money; It is applied against money DC may owe you
> commencing in 2013; it is not repayable by you)

DCC00057433

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 4

2.    **Royalty Payments**

Beyond the initial advance, you shall share in the success of the
Superman Property in connection with new works created after
April 18, 2013. Commencing with revenues received on account of
such works after April 18, 2013, DC shall pay you royalties, subject
to recoupment of the advance described above, but in no event
less than $100,000.00 per year, as follows:

- On merchandising and media licenses:

   o 6% of DC's receipts from all media and
     merchandising licenses for the domestic (U.S.)
     territory for use of the Superman Property where
     the property is not commingled with any other
     superhero or equivalent property

   o 3% of DC's receipts from all media and
     merchandising licenses for the domestic territory
     for use of the Superman Property where the
     property is commingled with one other superhero
     or equivalent property (e.g., Batman, Flash)

   o An allocable share of DC's receipts from all media
     and merchandising licenses for the domestic
     territory where the Superman Property is
     commingled with multiple other properties,
     provided that the 6% royalty shall not be reduced
     to less than 1%

   o 1% of DC's receipts from all media and
     merchandising licenses for the domestic territory
     for use of the Superman Property where the
     property is used in an extraordinarily mixed license
     with multiple other properties (e.g. Six Flags
     license with DC and Looney Tunes characters),
     except to the extent that receipts can be
     specifically attributed to the Superman property in
     which case the 6% royalty would apply to such
     receipts.

DCC00057434

**Exhibit HH**
353

**ER-898**

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 5

- On merchandise sold directly by DC

    o 6% of an allocable portion of domestically derived
      revenue from the Superman Property consistent
      with revenue reporting by third-party licensees,
      reducible by commingling or bundling as per the
      media and merchandising licenses above

- On publications sold directly by DC

    o 1% of the cover price of copies sold in the
      domestic territory of DC's own editions of
      publications ("Publications") based on the
      Superman Property where the Superman Property
      comprises the title of the publication (e.g.
      "Superman") or where the Superman Property
      comprises the entire subject matter of the
      publication (e.g. "Action Comics")

    o 1/2% of the cover price of Publications which are
      based on multiple properties which include the
      Superman Property

    o there shall be no royalties payable hereunder
      where the Superman Property appears in
      publications or stories based on other properties
      where neither the publication or story title contains
      the Superman Property

The royalties will be paid to you on a calendar year basis beginning
in 2014 (for the April – December, 2013 period) and thereafter
through 2033. During this period, you will receive a minimum
royalty of $100,000.00 per year regardless of whether DC has
recouped its advance. To the extent that the minimum royalty
exceeds the royalties earned under the above definitions, such
excess shall be treated as an advance against royalties to be
earned. Aside from the $100,000.00 minimum, all royalties earned
shall first be applied to any unrecouped advances. All sums
advanced shall bear interest at the prime interest rate – whatever it
may be – to the extent unrecouped.

DCC00057435

**Exhibit HH**

354

**ER-899**

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 6

3.    **Credit**

DC Comics shall accord credit along the lines of "Superman
created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel
and Joe Shuster" or "Based on the characters created by Jerry
Siegel and Joe Shuster" on comic books, television programs (main
titles), motion pictures (main titles on screen), all publications and
other works where credit to creators is customary. Credit must be
consistent with guild and other obligations.

4.    **Miscellaneous Terms**

You will make appropriate warranties and representations that you
have not transferred or licensed any of the Superman rights and
that DC may exploit the Superman Property without interference.
You and DC will also mutually release each other and provide
certain covenants and indemnities as to future claims. Finally, you
will acknowledge DC's right to use and publish Joe's biographical
facts, materials and photographs in connection with the Superman
Property, including in connection with publicity and exploitation of
Superman, which is something we want to do.

As mentioned above, there may be other details that would need to be
ironed out before an agreement is signed, but we've tried to set forth herein the
essential terms of the deal we are proposing.

We hope you feel there are compelling reasons for you to seriously
consider our offer. First, it gives you money now, eight years before you could
be entitled to it otherwise. Second, it provides you with an annual advance for
each year from 2014 through 2033 – as long as the term of copyright in Action
Comics no. 1. Third, it allows you to capitalize on the synergies created by the
combination of your rights – which, by themselves are at best extremely narrow
and likely unmarketable – with those of DC. This is a situation where the whole
is clearly greater than the sum of the parts and both you and DC can benefit from
their combination.

Finally, to be fully open and candid, there is an additional point which I
feel compelled to mention. I understand that you are represented by counsel in
this matter – Marc Toberoff – and so I will ask DC's representatives to send him
a copy of this letter. I assume that you know that Mr. Toberoff is also
representing the Siegel heirs in their lawsuits against DC. I feel compelled to
mention the dual role Mr. Toberoff is playing because the offer in this letter is

DCC00057436

**Exhibit HH**
355

**ER-900**

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 7

made only to you, on a confidential basis, in the hopes of making a deal that is mutually beneficial to your family and to DC. I hope that you will consider your own best interests and instruct your counsel accordingly; keeping in mind that what is best for you may well conflict with the interests of Mr. Toberoff's other client.

I am hopeful that you will find our proposal beneficial and fair. I very much look forward to your response and would welcome the opportunity to discuss any question you may have. Please call or write to me at your convenience, but I urge you to do so soon as given the current situation we can only keep this offer open for a short time. Thank you.

Sincerely,

Paul Levitz

DCC00057437

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

       Plaintiffs,

    vs.                 No. 04-8400 (RSWL)(RZx)
                          -and-
WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

       Defendants.
_____

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



**www.sarnoffcourtreporters.com**

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

**SARNOFF**
*Court Reporters and
Legal Technologies*

Exhibit II
357
ER-902

```
 1          Beverly Hills, California, Tuesday, August 1, 2006

 2                      10:05 AM - 8:50 PM

 3

 4                    LAURA SIEGEL LARSON,

 5   having been administered an oath, was examined and

 6   testified as follows:

 7

 8                       EXAMINATION

 9   BY MR. ZISSU:

10        Q    Could you tell us your name?

11        A    Laura Siegel Larson.

12        Q    And where do you live?

13        A    6400 Pacific Avenue, No. 106, in Playa Del Rey,

14   California 90293.

15             MR. ZISSU:  Now, we will have certain

16   stipulations, which I think are normal.  Objections

17   except as to form are reserved.

18             Okay?

19             MR. TOBEROFF:  That's fine.

20   BY MR. ZISSU:

21        Q    Should I call you Miss Larson or Miss Siegel

22   or...

23        A    Miss Siegel.

24        Q    What do you prefer?

25        A    Miss Siegel would be fine, thank you.
```

9

```
 1                (Defendants' Exhibit 7 marked.)

 2    BY MR. ZISSU:

 3        Q   My first question is have you seen a copy of

 4    that letter before?

 5        A   No.

 6        Q   Have you seen it, ever?

 7        A   No.

 8        Q   Did you ever hear from either of the Peavys that

 9    they received an offer --

10        A   No.

11        Q   -- from DC Comics?

12        A   No.

13            MR. TOBEROFF:  While the next question is

14    pending, before you answer, please give me time.  Count

15    to 5.

16    BY MR. ZISSU:

17        Q   When did your own involvement with the copyright

18    termination rights pertaining to your father's works

19    begin?

20            MR. TOBEROFF:  Objection.  Vague and ambiguous.

21    Lacks foundation.  Calls for a narrative.

22            THE WITNESS:  When my father died.

23    BY MR. ZISSU:

24        Q   Had you any involvement with these kinds of

25    rights before he died?
```

62

ER-904

1     A    He talked to me about what he was doing.

2     Q    And what's your recollection of what he told

3  you?

4     A    He was going to pursue his termination rights

5  that were given to him under the copyright law.

6     Q    Did he ever say why he had not already pursued

7  them?

8     A    No.

9     Q    Did you ever discuss with him why he didn't

10  serve a termination notice while he was alive?

11     A    No.

12     Q    Do you know whether your mother discussed that

13  with him?

14     A    I don't know.

15     Q    Did he ever discuss with you what he thought his

16  termination rights were worth?

17     A    No.

18     Q    Did you ever hear that he had ever done any

19  evaluation or assessment of the value of those rights?

20     A    No.

21     Q    To your knowledge is there any evaluation that

22  was done for him of those rights?

23     A    No.

24     Q    Have you ever had a deposition taken of you

25  before?

63

1

2

3

4

5

6

7

8          I, LAURA SIEGEL LARSON, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this _17th_ day of _September_ ,

15   20_06_ , at _Playa Del Rey,_____ , _California_ .
                        (City)                        (State)

16

17

18

19        _Laura Siegel Larson_____
          LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

1             UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

**ORIGINAL**

4   JOANNE SIEGEL,       )
      LAURA SIEGEL LARSON  )

5                 )

6          Plaintiffs, )
                 )

7      v.            ) CASE NO. CV 04-8400
                 )        CV 04-8776

8   WARNER BROS, et al.  )
                 )

9        Defendants. )

10

11

12

13      DEPOSITION OF MARK WARREN PEARY
           November 11, 2006

14             8:30 a.m.
          317 Paseo de Peralta

15         Santa Fe, New Mexico

16

17      PURSUANT TO THE FEDERAL RULES OF CIVIL
   PROCEDURE, this deposition was:

18   TAKEN BY:  MR. PATRICK PERKINS

19           Attorney for the Defendants

20

21

22   REPORTED BY:  MABEL JIN CHIN, NM CCR #81
             Bean & Associates, Inc.

23             Professional Court Reporting Service
             500 Marquette, Northwest, Suite 280

24             Albuquerque, New Mexico 87102

25   (3519B) MC


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@nmreport.com

Exhibit J
362

ER 607

1    8.  March 12, 2004 Register of Copyrights documents   57

2    9.  September 10, 2004 cancellation letter              59

3    10. April 26, 2005 letter, Levitz to Peavy, Peary       64

4    11. May 12, 2005 letter, Toberoff to Perkins            71

5                          *    *    *

6                    MARK WARREN PEARY,

7      after having been first duly sworn under

8      oath, was questioned and testified as follows:

9              MR. TOBEROFF:  Before we start, I would just

10     like to note at the outset of the deposition that we

11     have discussed timing, and that we have to leave at

12     4 o'clock sharp so that I can make a flight.

13             I would also just like to object that

14     plaintiffs were not -- I was not given notice as

15     attorney for Warren Peavy, the witness, that this

16     deposition was going to be videotaped as I believe is

17     required by the rules.

18             Oh, excuse me.  The Notice.  I'm seeing it's

19     not in the subpoena.  It may be required in the

20     subpoena, it's not in the subpoena but it is in the

21     Notice to me.

22                        EXAMINATION

23     BY MR. PERKINS:

24       Q.  Good morning, Mr. Peary.  My name is Patrick

25     Perkins.  I represent the defendants, DC Comics, and



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@beanandassoc.com

Exhibit J
363

1    Q.   Mr. Peary, what is Pacific Pictures
2  Corporation?
3    A.   It's -- it's one of Marc Toberoff's
4  businesses.
5    Q.   When did you first make the acquaintance of
6  Marc Toberoff?
7    A.   It would have been 2001, I believe.
8    Q.   Do you remember when in 2001?
9    A.   Not exactly.  I was doing research on
10  copyrights and I contacted him as a result.  So exact
11  month, I don't remember.
12    Q.   What exactly were you researching with
13  respect to copyright?
14    A.   Copyright law and rights.
15    Q.   And why did you contact Mr. Toberoff?
16    A.   I thought we might have some rights.
17    Q.   What was the basis for your belief that you
18  thought you might have some rights?
19    A.   What I read about copyright law.
20    Q.   And where did you -- where did you read
21  about copyright law?
22    A.   Various places -- the Internet, articles in
23  magazines.
24    Q.   And what rights did you believe that you
25  had?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@...com

Exhibit J
364

ER 909

21

1     A.   Rights connected to Superman.

2     Q.   What rights connected to Superman did you

3 believe you had?

4     A.   That's my understanding of it, that the law

5 grants certain rights, ownership rights.  That's my

6 understanding.

7     Q.   And that's why you contacted Mr. Toberoff?

8     A.   Yes.

9     Q.   Did you contact anyone else concerning those

10 rights?

11    A.   Yes, I have.  I have had done so in the

12 past, earlier.  I -- I talked to other people.

13    Q.   Whom did you speak to?

14    A.   I talked to an attorney in Albuquerque once.

15    Q.   Do you recall when that was?

16    A.   1990s sometime.  I don't know the exact

17 year.

18    Q.   Was your uncle still alive at the time?

19    A.   I don't think so.

20    Q.   Did you ever discuss the issue of copyright

21 rights in Superman with your uncle?

22    A.   No.  No.

23    Q.   Did he ever talk to you about any

24 unhappiness with respect to the arrangements that had

25 been made with respect to Superman, speak to you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit J
365

ER-9170

1  personally?

2          MR. TOBEROFF:  Vague and ambiguous.

3      A.   He didn't say much.  I don't think he wanted

4  to talk too much about it.  He really didn't say that

5  much.

6      Q.   So, going back to your testimony, you

7  contacted Mr. Toberoff sometime in 2001; correct?

8      A.   Yes.

9      Q.   And as you sit here today, you can't

10 remember when in 2001?

11     A.   Not the exact month, no.

12     Q.   Do you remember the season?

13     A.   It seems like it was mid year sometime.

14     Q.   Now, when you contacted Mr. Toberoff, had

15 you made any attempt to evaluate what, if anything,

16 the copyright rights in Superman were worth that you

17 were contacting Mr. Toberoff about?

18          MR. TOBEROFF:  Objection, vague and

19 ambiguous.

20     A.   I don't think I -- no, I don't think I went

21 that far.  I didn't.

22     Q.   Since then have you done anything to try to

23 evaluate the value of copyright rights in Superman?

24          MR. TOBEROFF:  Him personally?

25     Q.   (By Mr. Perkins)  You personally?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit J
366

ER 914

1      A.   Me personally?  Not really on my own, just

2  whatever has been discussed with my attorney.

3      Q.   Were there discussions with your attorney

4  concerning the value of Superman?  That's a yes or no

5  question.

6          MR. TOBEROFF:  Objection, calls for

7  attorney-client privileged information.  The substance

8  of his conversations are privileged, and you just

9  outlined the substance.  Instruct him not to answer.

10     Q.   Are you going to follow Mr. Toberoff's

11 instruction not to answer the question?

12         MR. TOBEROFF:  Of course he is going to

13 follow my instruction.

14     A.   Yes.  That's a privileged question.

15     Q.   So you are going to follow his instruction

16 not to answer?

17     A.   Yes.

18     Q.   Thank you.  At what point did Mr. Toberoff

19 become your attorney?

20     A.   It was fairly soon after I contacted him.

21     Q.   Well, you have another relationship with

22 Mr. Toberoff also, or did, other than as an attorney,

23 didn't you?

24         MR. TOBEROFF:  Vague and ambiguous.

25     A.   Well, the -- the first relationship was as

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

Exhibit J
367

ER 912

24

1    counsel, and then we had discussed possible uses of

2    rights, but we really -- I employed him as counsel

3    very soon after I contacted him.

4              MR. PERKINS:  Would you mark that, please?

5              (Exhibit 3 marked.)

6         Q.   (By Mr. Perkins)  I have asked the court

7    reporter to mark as Exhibit 3 a document that's

8    entitled Joint Venture Agreement.  Could you turn to

9    the last page of this document, please?

10             MR. TOBEROFF:  Before you ask him questions

11   about an isolated portion of the document, I think you

12   should look it over because the rest of the agreement

13   may provide context for whatever question Mr. Perkins

14   is asking.

15             MR. PERKINS:  Well, I didn't ask any

16   questions yet, but I was just --

17             MR. TOBEROFF:  I presume you were about to?

18             MR. PERKINS:  I was just going to ask him if

19   it was his signature on the last page, because if it's

20   not, then it's going to be a very different

21   examination.

22        Q.   (By Mr. Perkins)  Is this your signature on

23   the last page?

24        A.   Yes.

25        Q.   Okay.  Have you seen this agreement before



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit J
368

ER-913

1  counsel, and then we had discussed possible uses of

2  rights, but we really -- I employed him as counsel

3  very soon after I contacted him.

4        MR. PERKINS:  Would you mark that, please?

5        (Exhibit 3 marked.)

6    Q.   (By Mr. Perkins)  I have asked the court

7  reporter to mark as Exhibit 3 a document that's

8  entitled Joint Venture Agreement.  Could you turn to

9  the last page of this document, please?

10       MR. TOBEROFF:  Before you ask him questions

11  about an isolated portion of the document, I think you

12  should look it over because the rest of the agreement

13  may provide context for whatever question Mr. Perkins

14  is asking.

15       MR. PERKINS:  Well, I didn't ask any

16  questions yet, but I was just --

17       MR. TOBEROFF:  I presume you were about to?

18       MR. PERKINS:  I was just going to ask him if

19  it was his signature on the last page, because if it's

20  not, then it's going to be a very different

21  examination.

22    Q.   (By Mr. Perkins)  Is this your signature on

23  the last page?

24    A.   Yes.

25    Q.   Okay.  Have you seen this agreement before



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@

Exhibit J
369

ER-914

1   today?

2       A.   Yes.

3       Q.   Did you read it before you signed it?

4       A.   Yes.

5       Q.   Okay.  Why don't you go ahead and go through

6   the agreement, because I am going to ask you some

7   questions about it now.

8            Have you had occasion to read through the

9   document?

10      A.   Yes.

11      Q.   Now, this agreement is a Joint Venture

12  Agreement; correct?

13           MR. TOBEROFF:  Objection, calls for a legal

14  conclusion.  You can answer.

15      A.   Well, that's what it says here.

16      Q.   What did you understand you were doing when

17  you signed this agreement?

18      A.   We were employing Marc Toberoff, Esquire, as

19  our attorney to exploit any rights we may have in

20  connection with Superman.

21      Q.   And so what was Pacific Pictures

22  Corporation's role in this whole agreement, then, your

23  understanding?

24           MR. TOBEROFF:  Calls for speculation.

25      A.   Um -- I don't know how to characterize

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit J
370

ER-915

 1   exactly what Pacific Pictures' role is my.

 2   Understanding is that this is when we employed Marc

 3   Toberoff as our attorney, and this was a business name

 4   he was using.  That's my understanding.

 5       Q.   Did you -- did you get legal counsel to

 6   advise you on this agreement before entering into it?

 7       A.   No.

 8       Q.   Now, in the first paragraph -- in the

 9   paragraph that's named -- that listed number 1, do you

10   see that?

11       A.   Yes.

12       Q.   It lists a number of characters.  Do you see

13   that?

14       A.   Yes.

15       Q.   Now, I promised the court reporter that I

16   wouldn't reference one particular character because of

17   the difficulty in spelling it, so we won't go through

18   all of them.  But I want to draw your attention to two

19   specific characters.  Before I do, who decided which

20   names and characters would be included in paragraph

21   1?

22           MR. TOBEROFF:  Objection, attorney-client

23   privileged information.  Instruct you not to answer.

24           Also attorney work-product.

25       Q.   Are you going to follow your counsel's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Exhibit J
371

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

ER-916

1    instructions not to answer.

2            THE WITNESS:  Yes.

3            MR. TOBEROFF:  Mr. Perkins, for the

4    remainder of this deposition please assume that he is

5    going to follow his counsel and do not ask him after

6    each question whether he is going to follow the

7    instruction.  I find that improper.

8            MR. PERKINS:  It's actually not,

9    Mr. Toberoff.  I have to ask the question because if I

10   just leave it with your instruction and don't ask, I

11   open myself up to the possibility that at trial he

12   could answer the question saying I was never asked

13   whether I would follow the instruction.

14           MR. TOBEROFF:  Okay.  So let's say for the

15   remainder of the deposition when I instruct you not to

16   answer are you going to follow my instructions?

17           THE WITNESS:  Yes.

18           MR. PERKINS:  That's fine.  Thank you.

19           MR. TOBEROFF:  Okay.  Then you don't need to

20   keep asking him.

21           MR. PERKINS:  Thank you.

22       Q.   (By Mr. Perkins)  Do you have any

23   understanding as to why the character Superboy is

24   listed in paragraph one of this agreement?

25       A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Exhibit J
372

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

ER 617

28

 1      Q.   In the research that you did concerning
 2   copyright law relating to Superman, was it your belief
 3   that some of the rights that you may have held were
 4   rights relating to Superboy?
 5      A.   No.
 6      Q.   And I also note that paragraph one mentions
 7   Smallville.  Do you see that?
 8      A.   Yes.
 9      Q.   Do you have any understanding as to why that
10   was included in this paragraph?
11      A.   No, I don't.
12      Q.   Do you know what Smallville is?  What that's
13   referring to there?
14      A.   Yes.
15      Q.   What is it?
16      A.   It's -- it was a name that was created by --
17   in connection with the story in connection with
18   Superboy.
19      Q.   And based on the --
20      A.   Or actually, let me finish, because --
21         MR. TOBEROFF:  Wait.
22      A.   It was actually -- I'm recalling, it was
23   part of the whole story from the very beginning, if
24   I'm recalling the whole story, the whole Superman
25   story.  From the very beginning it was used in there,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@beanassoc.com

Exhibit J
373

ER-918

1    so that's all I know about it.

2        Q.   And based on the research that you did, was

3    it your belief that the copyright rights that you may

4    have had rights to would include rights in Smallville?

5        A.   When you say Smallville, are you talking

6    about, like, the TV show that's on or --

7        Q.   That -- I'm sorry -- yes.

8        A.   Oh.

9            MR. TOBEROFF:  Calls for a legal conclusion

10   as to rights he would have.

11       A.   That's -- that's not really my understanding

12   that that's part of our rights.

13       Q.   You testified earlier, if I'm not mistaken

14   and if I get it wrong please tell me, and I'm sure

15   Mr. Toberoff will jump in and say that I

16   mischaracterized it.  The joint -- the purpose of this

17   document was to hire Mr. Toberoff as your attorney.

18   Is that an accurate characterization of your belief.

19           MR. TOBEROFF:  Asked and answered.  Oh,

20   mischarac- -- okay.  Strike that.

21       A.   Yes.  My understanding was that, that this

22   is the document that we used to hire Mr. Toberoff as

23   our attorney.

24       Q.   If you could turn to the second page in

25   paragraph 5, do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@beanre.com

Exhibit J
374

ER-919

30

1    A.    Yes.

2    Q.    That paragraph provides for a division of

3  proceeds of 50 percent to you and your mother and 50

4  percent to Pacific Pictures, do you see that?

5    A.    Let's see.  Who are the claimants again?

6  Let's see.  Let's see.

7    Q.    In the top paragraph of the first page, it

8  identifies Jean A. Peavy and her son Mark Warren

9  Peary --

10    A.    Oh.

11    Q.    -- individually and collectively as

12  claimants.  Do you see that?

13    A.    Yes.

14    Q.    So, turning back to paragraph 5?

15    A.    Uh-huh.

16    Q.    There is a division of 50 percent to you and

17  your mother and 50 percent to Pacific Pictures.  Do

18  you see that?

19    A.    Yes.

20    Q.    And, do you recall how the parties to this

21  agreement came up with that division?

22        MR. TOBEROFF:  Vague and ambiguous.

23    A.    It's discussions, just discussions between

24  us and Mr. Toberoff.

25    Q.    And what was the basis for choosing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@beanassociates.com

Exhibit J
375

ER-920

31

1    particular division of proceeds?

2            MR. TOBEROFF:  Vague and ambiguous, asked

3    and answered.

4        A.   Yes, it was pretty much what I said before,

5    it was just based on just discussions over time.

6        Q.   Well, were there certain considerations that

7    went into determining this percentage?

8        A.   Perhaps the amount of work involved, the

9    amount of time, the commitment, like, it was the idea

10   it was not an immediate thing, it might take many

11   years.

12           Level of -- just, you know, that's it.

13       Q.   In entering into this Joint Venture

14   Agreement, what there any discussion as to how much

15   revenue was anticipated would come in, in exploiting

16   the rights here?

17       A.   Oh, I -- I don't recall discussing exact

18   figures, no.

19       Q.   Discuss -- do you recall general amounts?

20       A.   You know, that's -- that's not something we

21   really talked too much about.  It was more having to

22   do with what the exact copyright law states what our

23   rights might be.  We really didn't discuss figures

24   much.

25       Q.   Did you enter into a separate written

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@

Exhibit J
376

ER-821

32

1   agreement with Mr. Toberoff concerning his

2   representation of you as a lawyer?

3         A.    This is all I recall, right here.

4               MR. TOBEROFF:  I want to interject.  The

5   question was vague and ambiguous at the time.

6         Q.    If I could ask you to turn to page 3 of the

7   document and take a look at paragraph 8, which is the

8   first paragraph on the page?  Could you please read

9   that paragraph to yourself, and then I'm going to ask

10  you some questions about it.

11        A.    Oh, okay.

12              Okay.

13        Q.    The second sentence of this agreement

14  states, and I quote, "Upon the expiration of the term

15  and the winding up of the venture, or in the event of

16  termination of the venture for any reason, all rights,

17  property or assets of the venture will be held 50

18  percent by the claimants and 50 percent by PPC as

19  tenants in common, and claimants and PPC will each be

20  entitled to receive and continue to receive 50 percent

21  of all proceeds derived from the rights after

22  termination of the venture."

23              My question is, Mr. Peary, what was your

24  understanding as to what, if any relationship, would

25  continue to exist between you and Pacific Pictures in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@...

Exhibit J
377

ER-922

33

1    the event that this agreement was terminated?

2         MR. TOBEROFF:  Calls for a legal conclusion,

3    the document speaks for itself.

4    A.    My understanding of what that meant?

5    Probably death, if he died.

6    Q.    What -- what was your understanding of what

7    would happen to the rights that are at issue in this

8    agreement in the event that this agreement was

9    terminated?

10        MR. TOBEROFF:  Same objections, calls for a

11   legal conclusion.  The document speaks for itself.

12   A.    What would happen to the rights?

13   Q.    Well, who would own them?

14        MR. TOBEROFF:  Are you asking him to read

15   the document and tell you what it means?

16   Q.    I'm asking you, Mr. Peary, what your

17   understanding was of what would happen to the rights

18   if the agreement was terminated at the time that you

19   signed the agreement?

20   A.    Well, it was terminated at some later date.

21   Q.    Yes.

22   A.    The rights would be split 50 percent.

23   Q.    If I could have you go back to page -- to

24   the first page of Exhibit 3, in paragraph 3 there is

25   reference to PPC paying costs and expenses of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-684-3148
e-mail: info@litsupport.com

Exhibit 21
378

ER 9242

1  venture.  Do you see that?

2      A.    Yes.

3      Q.    And it refers to -- it lists a number of

4  costs and fees.  My question, Mr. Peary, is, were you

5  ever made aware as to whether any costs or fees were

6  incurred by the venture?

7          MR. TOBEROFF:  Vague and ambiguous.

8      A.    There were -- there was some fees associated

9  with the establishment of the Joe Shuster estate.

10  That's pretty much all I know.

11      Q.    Were you aware of any other attorneys' fees

12  that were incurred in connection with this venture?

13          MR. TOBEROFF:  Objection, vague and

14  ambiguous.

15      A.    The only fees I am aware of is fees

16  associated with the establishment of the Shuster

17  estate.

18      Q.    Now, you mentioned that under this agreement

19  you believe that you were hiring Mr. Toberoff as your

20  attorney.  What is your understanding of the fee

21  arrangement with Mr. Toberoff for his legal services?

22          MR. TOBEROFF:  Asked and answered.

23      A.    Yes.  My understanding is what it says in

24  paragraph 5 that we discussed.

25      Q.    All right.  Hold on to that document, and



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@

Exhibit
379

ER-824

35

1  I'm going to mark something else and we're going to go

2  back to it.

3          MR. TOBEROFF:  I'm getting a glass of

4  water.

5          THE VIDEOGRAPHER:  Your mike.

6          MR. TOBEROFF:  Oh, sorry.

7          (A discussion was held off the record.)

8      Q.  (By Mr. Perkins)  Before you look at Exhibit

9  4, I would like you to go back to Exhibit 3 for a

10 moment, Mr. Peary.  Is this document, this agreement

11 the first agreement between you and Mr. Toberoff that

12 you believe established him as your attorney?

13     A.  Yes.

14     Q.  And the date on the back page of this, it's

15 signed November 28, 2001; correct?

16     A.  Yes.

17     Q.  Did you have any discussions with

18 Mr. Toberoff prior to November 28, 2001?

19         MR. TOBEROFF:  Just a second.  I need to put

20 on my mike.

21         Objection, asked and answered.

22     A.  Yes.  I would refer you back to the prior

23 answer about when I first talked to him.

24     Q.  He wasn't your lawyer when you first talked

25 to him; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

Exhibit J
380

ER-925

40

1      Q.    Who initially came up with the name Michael

2  Catron as the administrator?

3         MR. TOBEROFF:  Came up with it?  Vague and

4  ambiguous.

5      A.    I'm not sure who first came up with it.  He

6  is a long-time friend.  That's all I can say.

7         MR. PERKINS:  Would you mark this for me?

8         (Exhibit 5 marked.)

9      Q.    (By Mr. Perkins)  I have asked the court

10 reporter to mark as Exhibit 5 a document that is dated

11 October 27, 2003.  It is addressed to Mark Warren

12 Peary, and it is from Pacific Pictures Corporation.

13 If I could invite your attention to the last page,

14 please?

15        Is that your signature?

16     A.    Yes.

17     Q.    And did you read this document before you

18 signed it?

19     A.    Yes.

20     Q.    Mr. Peary, what was the purpose of entering

21 into this agreement?

22     A.    As far as I understand, the purpose of this

23 was after I was appointed executor of the Shuster

24 estate.

25     Q.    And why did you need to enter this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@dapc.com

Exhibit 36

381

ER 826

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JOANNE SIEGEL,               )
      LAURA SIEGEL LARSON          )
 5                                 )
                    Plaintiffs,    )
 6                                 )
           v.                      ) CASE NO. CV 04-8400
 7                                 )          CV 04-8776
      WARNER BROS, et al.          )
 8                                 )
                    Defendants.    )
 9

10          CERTIFICATE OF COMPLETION OF DEPOSITION

11       I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
      CERTIFY that on November 11, 2006, the deposition of
12    MARK WARREN PEARY was taken before me at the request
      of, and sealed original thereof retained by:
13
          Attorney for the Defendants
14        PERKINS LAW OFFICE, P.C.
          1711 Route 9D
15        Cold Spring, New York 10516
          BY:  MR. PATRICK PERKINS
16
         I FURTHER CERTIFY that copies of this certificate
17    have been mailed or delivered on _____, with
      changes, if any, by the witness appended, to the
18    following counsel of record and parties not
      represented by counsel:
19
          Attorney for the Plaintiffs
20        MR. MARC TOBEROFF
          2049 Century Park East, #2720
21        Los Angeles, California 90067

22       I FURTHER CERTIFY that examination of this
      transcript and signature of the witness were requested
23    by the witness and all parties present.

24       On  November 21, 2006 , a letter was mailed or
      delivered to Mr. Toberoff regarding obtaining
25    signature of the witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@bean-usa.com

Exhibit J

ER 927

1    I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including

2    exhibits to Mr. Perkins is $_____508.68_____.

3    I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this

4    deposition; that I did thereafter report in stenographic shorthand the questions and answers set

5    forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of

6    this deposition to the best of my ability.

7    I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by

8    the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the

9    final disposition of this case in any court.

10

11    _____

12    MABEL JIN CHIN
Certified Court Reporter #81

13    License expires: 12/31/2006

14

15

16

17

18

19

20    (3519B) MC
Date taken: November 11, 2006

21    Proofread by: LR

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Exhibit J

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@...com

ER 928

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re:   *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
      USDC Central District of CA, Case No. 04-08400 SGL (RZx)
      *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
      USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-
00016. In addition, enclosed please find Pacific Pictures Corporation's production of
documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:   Patrick T. Perkins, Esq.
      James D. Weinberger, Esq.

Exhibit KK
ER-929

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )     No. 04-8400 (RSWL)(RZx)
                                 )
WARNER BROS. ENTERTAINMENT )           -and-
INC., et al.,                    )
                                 )     No. 04-8776 (RSWL)(RZx)
          Defendants.            )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED
ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

**Exhibit LL**      **ER-930**

*Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation*

383

1    Beverly Hills, California, Friday, November 17, 2006

2                          1:46 PM

3

4                     MARC TOBEROFF,

5         having been first administered an oath,

6         was examined and testified as follows:

7

8                       EXAMINATION

9    BY MR. BERGMAN:

01:46 10        Q    State your full name for the record, please.

01:46 11        A    Marc Toberoff.

01:46 12        Q    Have you had your deposition taken before,

01:46 13    Mr. Toberoff?

01:46 14        A    Once.

01:46 15        Q    And when was that?

01:47 16        A    I think about nine years ago.

01:47 17        Q    Here in California?

01:47 18        A    Yes.

01:47 19        Q    In what type of a case?

01:47 20        A    It was a commercial litigation.

01:47 21        MR. BERGMAN:  Mr. Williamson, is Mr. Toberoff

01:47 22    appearing for Pacific and IPW, LLC as well as his own

01:47 23    subpoena?

01:47 24        MR. WILLIAMSON:  Yes.

01:47 25        MR. BERGMAN:  Okay.

6

ER-931

03:44 1    A    The assertion of the attorney-client privilege

03:44 2    goes to matters where you start to ask questions that go

03:44 3    to the giving of legal advice or legal strategies, mental

03:44 4    impressions, things protected by the work product

03:44 5    doctrine.

03:44 6    Q    The record will speak for itself on that.

03:44 7    In paragraph 11 there is the sentence about four

03:44 8    lines up from the bottom of the page that begins, "The

03:44 9    parties have mutually participated in the negotiation and

03:4410    drafting of this Agreement..."

03:4511    Did either Peary or Peavy engage in the drafting

03:4512    of this agreement?

03:4513    A    Only to the extent -- remember I told you

03:4514    earlier that I believe it went through a few drafts in

03:4515    response to requests, revisions, comments by Warren?  So

03:4516    to that extent, yes.

03:4617    MR. BERGMAN:  Would you mark as Exhibit 14,

03:4618    please, a document on Pacific Pictures Corporation

03:4719    letterhead dated October 27, 2003?

03:4720    (Deposition Exhibit 14 marked.)

03:4721    BY MR. BERGMAN:

03:4722    Q    My first question is going to be whether that

03:4723    is your signature on the last page of Exhibit 14,

03:4724    Mr. Toberoff.

03:4725    A    Yes, it is.

68

03:47 1          Actually, looking at the date of this document,

03:47 2    I can narrow the other question you asked:  When we

03:47 3    entered into a legal or retainer agreement.  Still I

03:47 4    think it might be between the date of this and the date

03:47 5    of the cancellation of these two agreements.

03:47 6          Q    Okay.

03:47 7          A    I'm not positive, but that's...

03:48 8          Q    Am I correct that you drafted Exhibit 14?

03:48 9          MR. WILLIAMSON:  Objection.  Vague and

03:48 10   ambiguous.

03:48 11         THE WITNESS:  Yes, I did.

03:48 12   BY MR. BERGMAN:

03:48 13         Q    Were --

03:48 14         A    With input from Warren.

03:48 15         Q    What input did you receive from Mr. Peary?

03:48 16         A    I don't recall specific items, but we discussed

03:48 17   it.

03:48 18         Q    Okay.  So am I correct you formed the -- you

03:48 19   probated the estate of Joseph Shuster and then entered

03:48 20   into this agreement with the executor of his estate?

03:48 21         MR. WILLIAMSON:  Objection.  Assumes facts not

03:48 22   in evidence.  It's vague and ambiguous.

03:49 23         THE WITNESS:  What's the question?

03:49 24   BY MR. BERGMAN:

03:49 25         Q    The question is, were you involved in the

69

probate of Joseph Shuster's estate?

        MR. WILLIAMSON: Objection. Vague and ambiguous.

        THE WITNESS: Yes.

BY MR. BERGMAN:

    Q   What was your involvement?

    A   I arranged for a -- since trusts and estates is a specialty of the law, I arranged for an attorney who's a -- who does nothing but trusts and estates work to handle the probating of the estate.

    Q   And what was the purpose in entering into this October 27, 2003 agreement, Exhibit 14?

    A   I think this agreement -- I'd have to compare it line by line to Exhibit 13, but I think this agreement is very similar if not the same to Exhibit 13, but the purpose was to, since -- was to include the executor in the agreement.

    Q   Has Pacific Pictures Corporation advanced or loaned any money to either Peary or Peavy?

    A   You mean like a personal loan? I don't recall it loaning money to the Shusters.

    Q   Or advancing any money to the Shusters?

    A   I don't recall that, no.

    Q   To the best of your recollection, did you personally advance or loan any money to the Shuster

70

ER-934

heirs?

MR. WILLIAMSON: Objection. Asked and answered.

THE WITNESS: I don't think so, no.

BY MR. BERGMAN:

Q  Did any other entity of which you are a member or shareholder advance or loan any money to Peary or Peavy?

A  I don't believe so.

Q  Paragraph 3 reads in part that "PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate," close quote.

In addition to paying the legal fees and costs of setting up the Shuster estate, did PPC pay any other costs or expenses in connection with its agreement with Peary and Peavy?

A  They may have paid filing fees with the U.S. Copyright Office, things of that nature, document retrieval fees from the U.S. Copyright Office, things of that nature.

Q  Did you negotiate Exhibit 14 with any attorney representing either the executor of the estate or Miss Peavy?

MR. WILLIAMSON: Objection. Vague and

71

ambiguous.

      THE WITNESS:  No, I did not.

BY MR. BERGMAN:

    Q   When you discussed either the original Joint Venture Agreement or this Exhibit 14 with Peavy and Peary, was there any discussion regarding the ownership of the character Superboy?

      MR. WILLIAMSON:  Objection.  Misstates prior testimony.  Vague and ambiguous.

      THE WITNESS:  I don't know.  I don't recall a discussion of that.

BY MR. BERGMAN:

    Q   Have you ever discussed ownership of the character Superboy with either Peary or Peavy?

    A   That would be privileged.

      (Unanswered question.)

    Q   Prior to the time that you entered into the retainer agreement that you have testified to, did you have any discussion with either Peary or Peavy concerning the ownership of the character Superboy?

      MR. WILLIAMSON:  Objection.  Attorney-client.

      THE WITNESS:  That would also be privileged.

      (Unanswered question.)

BY MR. BERGMAN:

    Q   So is it your position --

72

ER-936

A    I can just tell you, as I sit here today, I don't recall, but to the extent I had discussed it, it would be privileged.

Q    And is it your position, Mr. Toberoff, that the attorney-client relationship between you and Peary and Peavy resulted from the Joint Venture Agreement, Exhibit 13?

A    Absolutely not.

Q    Did it result -- that relationship result from Exhibit 14?

A    No.  It didn't result from a document.  It resulted from them seeking legal advice from the very first call and my providing it, which established a confidential relationship.

Q    With the exception of exhibits 13 and 14, have you ever entered into a joint venture agreement with a client?

A    I think that's --

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I think you already asked that. What do you mean by that?

BY MR. BERGMAN:

Q    I think it speaks for itself.

A    I don't understand.  Not to me.  Clarify that.

73

ER-937

Case 2:10-cv-03633-ODW-RZ Document 473-6 Filed 08/20/12 Page 55 of 312 Page ID

01:55 1      Q   Exhibit 13 is a joint venture agreement which in

01:55 2  essence provides for a 50-50 split of proceeds between

01:55 3  your company, Pacific Pictures Corporation, and the

01:55 4  Shuster heirs.  Have you ever entered into a similar

01:56 5  joint venture agreement with any legal client?

01:56 6      MR. WILLIAMSON:  Objection.  The document speaks

01:56 7  for itself.  Vague and ambiguous.

01:56 8      THE WITNESS:  I don't know.  As I mentioned to

01:56 9  you before, there have been situations where I'm involved

01:56 10  with -- I'm trying to explain it to you.  If somebody

01:56 11  is -- normally, if someone is -- options a book and

01:56 12  simply -- and then seeks to set up a film or to monetize

01:56 13  that book by licensing film rights or producing a film,

01:56 14  it's a very simple, straightforward type of situation,

01:57 15  and when we spoke about BLUE MOVIE, for instance, you

01:57 16  asked me about that, and I said I had optioned that book.

01:57 17      But in some cases when you're dealing in rights

01:57 18  and copyrights, due to the intricasies of copyright law

01:57 19  and what's involved, there can be a business side, but

01:57 20  everything having to do with the rights and chain of

01:57 21  title and issues regarding the rights that may arise are

01:57 22  of a very legal nature, so it's very possible to have a

01:57 23  business agreement but to in fact be dealing with a lot

01:57 24  of legal issues and providing legal advice, and I believe

01:57 25  that -- I shouldn't say I believe -- I know that's the

74

"not particularly" is because the word "active" is

another one of these -- you know, it's a subjective, so I

say not particularly depending on how one defines

"active."

Q   Okay.  When to the best of your knowledge was

the Smashbox Entertainment, LLC formed?

A   I don't remember when it was formed.  I believe

it was about three years ago.

Q   And what activities, if any, has Smashbox

Entertainment engaged in since its formation?

A   I believe it was going to be the production

entity for a film project; I don't remember what it was,

and for purposes of the -- I believe one of the guilds --

I think the Writers Guild needed a signatory company.

And it may or may not have been a signatory to the

Writers Guild, but it was ultimately not used as the

production entity.

Q   Okay.

Would you mark as Exhibit 13 a document entitled

"Joint Venture Agreement" made as of November 23, 2001.

(Deposition Exhibit 13 marked.)

THE WITNESS:  If we are going to go into a more

detailed session, could I just use the restroom before we

do that?

MR. BERGMAN:  Of course.  Why don't we take a

49

ER-939

03:09 1   five-minute break.

03:09 2           (Recess.)

03:15 3   BY MR. BERGMAN:

03:15 4       Q   Referring to the last page of Exhibit 13,

03:15 5   Mr. Toberoff, I note that this copy does not bear your

03:15 6   signature.  It bears the Peary and Peavy signatures.

03:15 7           To your recollection did you ever sign a copy of

03:16 8   Exhibit 13?

03:16 9       A   I recall a joint venture agreement that was

03:16 10  signed, I believe -- I recall because I believe that

03:16 11  document was produced, but I don't know -- I would have

03:16 12  to compare this to that document to know whether there

03:16 13  were any changes between the two.

03:16 14      Q   I know that the parties to this agreement are

03:16 15  Ms. Peavy and Mr. Peary on the one hand and Pacific

03:16 16  Pictures Corporation on the other.

03:16 17          Am I correct that you've identified Pacific

03:16 18  Pictures Corporation as a loan-out company?

03:16 19      A   I said I believe as it was initially conceived

03:16 20  in whenever it was in the '80s, that's how I conceived

03:16 21  it:  As a loan-out company.

03:16 22      Q   Well, did the nature of Pacific Pictures'

03:17 23  business ever change from being a loan-out company to

03:17 24  being something else?

03:17 25      A   To determine that, I'd have to know what the

                                                          50

ER-940

03:17 1  legal definitions of a loan-out company. When I use the

03:17 2  term loan-out company," in the entertainment business

03:17 3  when you do -- for example, if you're serving as a

03:17 4  producer on a film or a writer, for instance, or a

03:17 5  director, most people have a company that they -- which

03:17 6  is a sole proprietorship that loans out their services,

03:17 7  and I believe that people who do that originally for tax

03:17 8  purposes. I'm not sure what the reasons are for that.

03:17 9  So I believe when it was initially incorporated, that was

03:17 10  the purpose, but then afterwards I would just use Pacific

03:18 11  Pictures a lot for anything.

03:18 12      Q  Anything that you personally were involved in?

03:18 13      A  I would -- yeah, I would tend to use it for most

03:18 14  things that I was involved in.

03:18 15      Q  Okay.

03:18 16      A  So I don't know if at that point it's a loan-out

03:18 17  company or just a company.

03:18 18      Q  And the address given here for Pacific Pictures

03:18 19  Corporation, 23852 Pacific Coast Highway, does that

03:18 20  continue to be the address of Pacific Pictures

03:18 21  Corporation?

03:18 22      A  You mean as registered with the California

03:18 23  Secretary of State?

03:18 24      Q  Well, as operating in actuality, does Pacific

03:18 25  Pictures maintain offices?

51

ER-941

03:18 1      A   It's not active since -- I think -- didn't you

03:18 2  ask me earlier about Pacific, and I said at the end of

03:19 3  2000 -- -- towards the end of 2003 I stopped using it?

03:19 4  So it doesn't -- you know, I guess there is a distinction

03:19 5  between a technical office for purposes of registration

03:19 6  with the Secretary of State and active offices.  I used

03:19 7  to work out of my home in Malibu, and this was the

03:19 8  mailing address used for myself and Pacific Pictures.

03:19 9      Q   When was your first communication with either

03:1910  Miss Peavy or Mr. Peary concerning the Joe Shuster

03:1911  interest, if any, in Superman?

03:1912          MR. WILLIAMSON:  Objection.  Assumes facts not

03:1913  in evidence.  Vague and ambiguous.

03:2014          THE WITNESS:  Sometime around mid 2001.

03:2015  BY MR. BERGMAN:

03:2016      Q   And how did that initial communication come

03:2017  about?

03:2018      A   Warren Peary -- the last name is P E A R Y --

03:2019  called me up and -- he called me up.

03:2020      Q   And what did he say?

03:2021      A   He said he wanted -- was interested in -- I

03:2022  think he said that he got my name off of some article he

03:2023  had read on the Internet and that he wanted a lawyer to

03:2024  help him to figure out what rights the Joe Shuster estate

03:2125  would have in Superman.

52

ER-942

03:21 1      Q   And what did you reply?

03:21 2         MR. WILLIAMSON:  Objection.  Attorney-client

03:21 3  privilege.  Instruct you not to answer.

03:21 4         (Instruction not to answer.)

03:21 5         MR. BERGMAN:  The Joint Venture Agreement

03:21 6  between Pacific Pictures, which Mr. Toberoff has

03:21 7  testified is owned wholly by him and is basically a

03:21 8  loan-out company, and the Peavy and Peary individuals is

03:21 9  a business arrangement.  It is not a legal representation

03:21 10  document.  It is on its face a joint venture agreement.

03:21 11  There is no privilege applicable to that.  Mr. Toberoff

03:21 12  was not retained as an attorney.  He was -- he entered

03:21 13  into a joint venture for the purpose of retrieving and

03:22 14  enforcing and exploiting all of Joe Shuster's and his

03:22 15  estate's rights, claims and copyrights.  Certainly at

03:22 16  this point in time that I'm asking Mr. Toberoff about, he

03:22 17  was an entrepreneur, not an attorney.

03:22 18         MR. WILLIAMSON:  Objection.  Mr. Bergman, you

03:22 19  are completely misstating his testimony, the documents

03:22 20  and the record before us.  Whether or not there was a

03:22 21  retainer agreement between Mr. Toberoff and Mr. Peary and

03:22 22  Miss Shuster is, frankly, irrelevant.  I instruct him not

03:22 23  to answer.

03:22 24  BY MR. BERGMAN:

03:22 25      Q  Mr. Toberoff, I'll assume that when

53

ER-943

Mr. Williamson instructs you not to answer, you will refuse to answer on that basis?

A Generally, yes. I -- without waiver -- again, let me say in any of these areas where we may have a difference of opinion as attorney-client -- obviously when you are taking a deposition of an attorney, you can surmise that there will be a lot of things that are protected by the attorney-client privilege and by work product. To the extent -- I'd like it to be understood that to the extent I am able to give you a general answer to certain questions without revealing the substance of attorney-client communications or work product, I don't want that to be misconstrued or claimed to be a waiver at any point in this deposition of attorney-client privilege or work product doctrine.

MR. BERGMAN: I will not assert such a waiver.

THE WITNESS: So I would just answer generally that Mr. Peary called me with respect to Superman rights, as I already mentioned, and my response was, because it was Superman, was that yes, I would be interested in representing him with respect to that.

BY MR. BERGMAN:

Q Did you tell him that you'd be interested in entering into a joint venture with Peary and Peavy in order to exploit their interest?

54

ER-944

03:24 1     MR. WILLIAMSON:  Objection.  Attorney-client

2  privilege --

3     THE WITNESS:  No, I did not, but other than

4  giving you the basic subject matter, which I've already

5  given you, and why he was calling me, the rest of our

6  communications would be privileged, and they're

7  privileged on the basis that he was obviously seeking

8  legal advice, and I was dispensing legal advice.

9  BY MR. BERGMAN:

10     Q   And at what point in time did your activities

11  change from that of rendering legal advice to entering

12  into a joint venture with the Peary and Peavy --

13     MR. WILLIAMSON:  Objection.  Assumes facts not

14  in evidence.

15  BY MR. BERGMAN:

16     Q   -- individuals?

17     A   It didn't change.

18     Q   You did enter into a joint venture with them,

19  did you not?

20     A   I entered into a joint venture agreement with

21  them, yes.

22     Q   How many communications did you have with either

23  Peary or Peavy from the time of that first conversation

24  until November 23, 2001, the as of date of this joint

25  venture agreement?

55

**ER-945**

Case 2:10-cv-03633-ODW-RZ Document 473-6 Filed 08/20/12 Page 92 of 226 Page ID #:29666

03:25 1      A   I don't recall.

03:25 2      Q   What is your best estimate?

03:26 3      A   I don't -- we had at least one, we probably had

03:26 4  more than one, but other than that I don't have a basis

03:26 5  for estimating.

03:26 6      Q   Did you have any face-to-face meetings with

03:26 7  either Peavy or Peary prior to November 23, 2001?

03:26 8      A   No.

03:26 9      Q   Prior to this joint venture agreement, had you

03:2610  ever entered into a joint venture agreement with a

03:2611  client?

03:2612      MR. WILLIAMSON:  Objection.  Vague and

03:2613  ambiguous.

03:2614      THE WITNESS:  I don't know what you mean by

03:2615  that.

03:2616  BY MR. BERGMAN:

03:2617      Q   Well, you've testified that you were contacted

03:2618  and served as a lawyer, and yet, as Exhibit 13

03:2619  demonstrates, you entered into a joint venture agreement

03:2620  with them under which you received 50 percent of whatever

03:2621  their recovery might have been.

03:2622      A   That misstates the document.

03:2623      Q   No, it doesn't misstate the document.

03:2724      Am I correct that paragraph 5 of the agreement

03:2725  states that any moneys received from enforcement,

56

ER-946

settlement or exploitation of any of the rights -- I'll skip something -- will be shared, divided and payable 50 percent to claimants and 50 percent to PPC?

A   You've -- the words you've read appear there. The document speaks for itself.  I'm playing both the role now of the witness and to a certain extent making objections to your question, but you would have to take -- read the whole paragraph in context to give a fair meaning as to what it says.

Q   Who drafted this agreement?

A   I drafted it.

Q   Okay.  Were the -- was Peary or Peavy represented by an attorney in connection with the negotiation of this agreement?

A   I don't -- I didn't deal with an attorney, but I don't know whether or not they were represented by an attorney, whether they sought outside legal advice regarding the agreement.

Q   Did you suggest to them that they do obtain independent legal advice before entering into the agreement?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  Yes, I did.

BY MR. BERGMAN:

Q   Had there been any prior drafts of this

57

ER-947

agreement?

    A    I believe so, yes.

    Q    And had Peavy or Peary requested any changes in the prior draft?

    A    I believe so, yes.

    Q    What changes had they requested?

    A    I don't recall the specific changes, but I believe there was more than one draft, and I believe the reason for that is because of comments or revisions by Warren.

    Q    And are you still in possession of those prior drafts?

    A    No.

    Q    What happened to them?

    A    I don't know.  I'm not in possession of them. Otherwise, we would have produced them.

    Q    Have you searched for them?

    A    I searched the files.  I searched Pacific Pictures's files for any documents regarding the Shusters, yes.

    Q    Have you asked the Peary --

    A    I did that in response --

    Q    -- Peary or Peavy individuals whether they had any prior drafts?

    A    Yes.

58

ER-948

Case 2:10-cv-03633-ODW-RZ Document 479-6 Filed 08/20/12 Page 66 of 312 Page ID #:29669

Q   And am I correct that they did not and that they did not produce any?

A   Yes.   They actually did not even have a copy of the fully signed agreement.   What you're looking at -- I believe they didn't.   To my recollection, I believe this was the only copy that they had still retained, what is Exhibit 13.   This didn't come from my files.   This came from Peavy's and Peary's production in response to the subpoena you served on them.

Q   I note that in paragraph 1 of the Joint Venture Agreement, there is a reference to Superboy.

Did you -- have you at any point in time discussed with the Shuster heirs the conflict between the Siegel position and the Shuster heirs' position regarding Superboy?

MR. WILLIAMSON:   Objection.   Assumes facts not in evidence.   Attorney-client.   Instruct you not to answer.

(Instruction not to answer.)

BY MR. BERGMAN:

Q   Did PPC in fact pay, as provided in paragraph 3, the legal fees and costs of setting up Joe Shuster's estate?

A   I believe so, yes.

Q   Did the Shuster heirs request that PPC receive a

59

STATE OF CALIFORNIA    )
                       ) ss
COUNTY OF LOS ANGELES  )

        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated: ___**NOV 3 0 2006**___


        _____
        DAVID S. COLEMAN
        CSR No. 4613

ER-950

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

DC COMICS,                          )
                                    )
            Plaintiff,              )  No. CV-10-3633 ODW (RZx)
                                    )
      VS.                           )
                                    )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as      )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an         )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL  )
LARSON, an individual, and   )
DOES 1-10, inclusive,        )
                             )
            Defendants.      )
                             )
      _____)

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

              CSR No. 10094

**Exhibit SS**
487

**ER-951**

| | | |
|---|---|---|
| 1 | MR. TOKORO:  Jason Tokoro for plaintiff DC | 10:29:57 |
| 2 | Comics. | 10:29:59 |
| 3 | MR. TOBEROFF:  Marc Toberoff for defendants | 10:30:00 |
| 4 | Laura Siegel Larson and Mark Warren Peary. | 10:30:03 |
| 5 | THE VIDEOGRAPHER:  Our court reporter today | 10:30:06 |
| 6 | is Shanda Gabriel of Merrill.  Would the reporter | 10:30:09 |
| 7 | please swear in the witness. | 10:30:11 |
| 8 | | 10:30:12 |
| 9 | MARK WARREN PEARY, | 10:30:12 |
| 10 | having been first duly sworn, was | 10:30:12 |
| 11 | examined and testified as follows: | 10:30:12 |
| 12 | | 10:30:19 |
| 13 | THE VIDEOGRAPHER:  Please begin. | 10:30:19 |
| 14 | | 10:30:19 |
| 15 | EXAMINATION | 10:30:19 |
| 16 | BY MR. PETROCELLI: | 10:30:19 |
| 17 | Q.  Good morning, Mr. Peary. | 10:30:21 |
| 18 | A.  Good morning. | 10:30:24 |
| 19 | Q.  We're starting at 10:30 rather than the | 10:30:25 |
| 20 | noticed time of 9:30 because Mr. Toberoff informed | 10:30:27 |
| 21 | me this morning of car problems.  So we'll probably | 10:30:33 |
| 22 | have to go later than anticipated but hopefully | 10:30:38 |
| 23 | we'll get through this today. | 10:30:42 |
| 24 | Marc, all the defendants' counsel were | 10:30:43 |
| 25 | noticed for the deposition.  The other counsel is | 10:30:50 |

Exhibit SS
488

ER-952

| | | |
|---|---|---|
| 1 | Q. And you had known him since you were a | 10:46:18 |
| 2 | small boy? | 10:46:21 |
| 3 | A. Yes. Not real closely, but I did know him. | 10:46:21 |
| 4 | Q. He had no children, right? | 10:46:28 |
| 5 | A. Correct. | 10:46:28 |
| 6 | Q. But he had been married once? | 10:46:30 |
| 7 | A. Briefly. | 10:46:31 |
| 8 | Q. What years was he married? | 10:46:36 |
| 9 | A. 1979, I believe. | 10:46:37 |
| 10 | Q. Did you attend his wedding? | 10:46:43 |
| 11 | A. No. | 10:46:45 |
| 12 | Q. Did he and his wife elope? | 10:46:46 |
| 13 | A. Excuse me? | 10:46:49 |
| 14 | Q. Did they elope, they went off on their own | 10:46:50 |
| 15 | and got married without a cere- -- you know, a | 10:46:53 |
| 16 | ceremony for the family? | 10:46:56 |
| 17 | A. I'm not aware of the circumstances of their | 10:46:57 |
| 18 | marriage. | 10:47:01 |
| 19 | Q. What was his wife's name? | 10:47:01 |
| 20 | A. I'm not sure I can recall. I never met | 10:47:02 |
| 21 | her. | 10:47:11 |
| 22 | Q. Never spoke with her? | 10:47:11 |
| 23 | A. No. | 10:47:12 |
| 24 | Q. Ever communicate at all with her in | 10:47:13 |
| 25 | writing? | 10:47:16 |

Merrill Corporation - Los Angeles
800-826-0277                      www.merrillcorp.com/law

**Exhibit SS**
**489**

**ER-953**

|   |   |   |
|---|---|---|
| 1 | A. There is -- there's only one. | 11:21:57 |
| 2 | Q. Which one is that? | 11:22:02 |
| 3 | A. That's the legal retainer. | 11:22:03 |
| 4 | Q. What's the date of it? | 11:22:07 |
| 5 | A. It is -- it is active as of 2001. | 11:22:08 |
| 6 | Q. But created after the fact? | 11:22:19 |
| 7 | A. Yes. | 11:22:20 |
| 8 | Q. When was it created? | 11:22:23 |
| 9 | A. 2004, I believe. | 11:22:24 |
| 10 | Q. And is that the last document you have | 11:22:32 |
| 11 | signed with Mr. Toberoff or any of his entities? | 11:22:39 |
| 12 | A. With Mr. Toberoff. | 11:22:44 |
| 13 | MR. TOBEROFF: You mean last agreement or | 11:22:45 |
| 14 | any document? | 11:22:47 |
| 15 | BY MR. PETROCELLI: | 11:22:47 |
| 16 | Q. Is that the last agreement, contract, that | 11:22:49 |
| 17 | you have signed with Mr. Toberoff or any of his | 11:22:54 |
| 18 | entities, the one in 2004 that you said goes back to | 11:22:56 |
| 19 | 2001? | 11:23:03 |
| 20 | A. Yes. | 11:23:05 |
| 21 | Q. Have you signed any other agreements at any | 11:23:07 |
| 22 | time since 2004 relating to legal representation | 11:23:13 |
| 23 | relating to this case in any way? | 11:23:20 |
| 24 | A. Yes. | 11:23:22 |
| 25 | Q. What have you signed? | 11:23:24 |

Merrill Corporation - Los Angeles

800-826-0277                    www.merrillcorp.com/law

| | |
|---|---|
| 1 | A. It's a -- | 11:23:25 |
| 2 | MR. TOBEROFF: Don't go into -- just -- | 11:23:28 |
| 3 | just give a very -- the title or -- don't go into | 11:23:36 |
| 4 | details of the document. | 11:23:40 |
| 5 | THE WITNESS: It's -- it's called a consent | 11:23:40 |
| 6 | agreement. | 11:23:42 |
| 7 | BY MR. PETROCELLI: | 11:23:42 |
| 8 | Q. Is that in your lock box? | 11:23:45 |
| 9 | A. Yes. | 11:23:46 |
| 10 | Q. Why didn't you mention it earlier when I | 11:23:50 |
| 11 | asked you about the agreements in your lock box? | 11:23:52 |
| 12 | MR. TOBEROFF: Argumentative. | 11:23:55 |
| 13 | THE WITNESS: I -- I mentioned what I had | 11:24:01 |
| 14 | recalled. | 11:24:07 |
| 15 | BY MR. PETROCELLI: | 11:24:07 |
| 16 | Q. So you're now recalling additional | 11:24:10 |
| 17 | documents that you signed? | 11:24:12 |
| 18 | A. I -- I recall -- I stated what -- the | 11:24:12 |
| 19 | documents I recalled. | 11:24:18 |
| 20 | Q. You now recall that you signed something | 11:24:20 |
| 21 | called a consent agreement and that's also in your | 11:24:22 |
| 22 | lock box? | 11:24:24 |
| 23 | A. Yes. | 11:24:25 |
| 24 | Q. Okay. When was that signed? | 11:24:26 |
| 25 | A. That was 2008, I believe. | 11:24:30 |

Exhibit SS
491                                          ER-955

1        Q.  When is the last time you saw it, or a copy    11:24:38

2    of it?    11:24:42

3        A.  Fairly recently I reviewed it last, I don't    11:24:46

4    know, maybe in the last month or so I might have    11:24:51

5    reviewed it.    11:24:53

6        Q.  Why?    11:24:54

7        A.  Because I was thinking about this case    11:24:54

8    because of this.    11:25:00

9        Q.  This deposition?    11:25:02

10        A.  Yes.    11:25:03

11        Q.  Besides the 2008 consent agreement, what    11:25:06

12    else did you review in connection with this    11:25:09

13    deposition?    11:25:13

14        A.  I reviewed my prior deposition for the    11:25:13

15    Siegel case and exhibits.  That's -- that's what    11:25:19

16    I've reviewed.    11:25:30

17        Q.  Did you have a copy of your prior    11:25:32

18    deposition?    11:25:34

19        A.  Yes.    11:25:36

20        Q.  And the exhibits?    11:25:37

21        A.  Yes.    11:25:38

22        Q.  Besides the 2008 consent agreement and your    11:25:42

23    deposition in the Siegel case together with the    11:25:45

24    exhibits of that deposition, what else did you    11:25:48

25    review in connection with this deposition?    11:25:51

Exhibit SS
492

ER-956

| | | |
|---|---|---|
| 1 | A. That's -- that's pretty much it. | 11:25:55 |
| 2 | Q. Where did you get the consent agreement to | 11:26:02 |
| 3 | review, from the lock box? | 11:26:04 |
| 4 | A. I -- I -- I -- yes or -- or it could have | 11:26:10 |
| 5 | been a copy. | 11:26:15 |
| 6 | Q. Where -- where was the copy? | 11:26:16 |
| 7 | A. The copy is -- it could be in a separate | 11:26:18 |
| 8 | folder. | 11:26:22 |
| 9 | Q. What -- what's the name of the folder? | 11:26:24 |
| 10 | A. The folder is "Legal." | 11:26:26 |
| 11 | Q. Where is the folder maintained? | 11:26:29 |
| 12 | A. The folder, there could be a copy in there, | 11:26:30 |
| 13 | in the -- in the filing cabinet. | 11:26:35 |
| 14 | Q. Is the 2008 consent agreement the last | 11:26:40 |
| 15 | agreement of any kind that you have signed in | 11:26:44 |
| 16 | connection with either this case or anything having | 11:26:49 |
| 17 | to do with the Joe Shuster termination issue? | 11:26:52 |
| 18 | A. Yes. | 11:26:55 |
| 19 | Q. Okay. Who else signed the 2008 consent | 11:26:57 |
| 20 | agreement? | 11:27:07 |
| 21 | A. Would have been the -- Laura, Joanne | 11:27:07 |
| 22 | Siegel. | 11:27:17 |
| 23 | Q. Laura Siegel and Joanne Siegel? | 11:27:17 |
| 24 | A. Yes. | 11:27:20 |
| 25 | Q. Anyone else? | 11:27:20 |

Exhibit SS
493

ER-957

|    |                                                             |          |
|----|-------------------------------------------------------------|----------|
| 1  | A.  I think there was -- and -- and my attorney             | 11:27:21 |
| 2  | signed it.                                                  | 11:27:28 |
| 3  | Q.  You mean Mr. Toberoff?                                   | 11:27:28 |
| 4  | A.  Yes.                                                     | 11:27:29 |
| 5  | Q.  And did your mother, Jean Peavy, sign it?               | 11:27:30 |
| 6  | A.  I don't recall if she did.  I just -- I                 | 11:27:33 |
| 7  | didn't read it.  I just scanned the -- the pages.  I        | 11:27:44 |
| 8  | didn't -- I don't recall the signature page.  She           | 11:27:48 |
| 9  | might have.                                                  | 11:27:51 |
| 10 | Q.  Do you know where you were when you signed              | 11:27:53 |
| 11 | the document in -- in 2008?                                  | 11:27:55 |
| 12 | A.  Yeah.  When -- when I signed it, I -- I was              | 11:27:57 |
| 13 | at home.                                                    | 11:28:01 |
| 14 | Q.  And what did you do after you signed it?                | 11:28:05 |
| 15 | What did you do with it?                                    | 11:28:08 |
| 16 | A.  Well, an original was FedExed to                        | 11:28:09 |
| 17 | Mr. Toberoff and I kept another original.                   | 11:28:14 |
| 18 | Q.  You signed two copies?                                  | 11:28:18 |
| 19 | A.  Yes.                                                     | 11:28:20 |
| 20 | Q.  And you put the other original in your lock             | 11:28:21 |
| 21 | box?                                                         | 11:28:25 |
| 22 | A.  Yes.                                                     | 11:28:25 |
| 23 | Q.  Did you ever get back from Mr. Toberoff a               | 11:28:26 |
| 24 | version that had more signatures on it?                     | 11:28:29 |
| 25 | A.  Well, yes, the version in the lock box                  | 11:28:30 |

Exhibit SS

494

ER-958

|   |   |   |
|---|---|---|
| 1 | would have all the original signatures. | 11:28:35 |
| 2 | Q. Why did you review -- why did you pick the | 11:28:48 |
| 3 | 2008 consent agreement to review? | 11:28:51 |
| 4 | A. Well, before I came I -- I brought out my | 11:28:53 |
| 5 | folder and it says "Legal, Shuster case" and I | 11:28:59 |
| 6 | flipped through documents, just looked at them and | 11:29:06 |
| 7 | said what do I want to bring, what don't I want to | 11:29:08 |
| 8 | bring and -- and that's all. It was just a cursory | 11:29:10 |
| 9 | review of what I had in there. And I left most of | 11:29:15 |
| 10 | it at home, so it was just a cursory review of what | 11:29:18 |
| 11 | I had. | 11:29:21 |
| 12 | Q. What did you bring with you? | 11:29:23 |
| 13 | A. I brought a copy of the legal retainer as | 11:29:25 |
| 14 | of 2001 and I brought a -- a copy of the first page | 11:29:28 |
| 15 | of the consent agreement and a -- with a cover | 11:29:41 |
| 16 | letter that was a communication between Mr. Toberoff | 11:29:43 |
| 17 | and another attorney, so it was just like the first | 11:29:48 |
| 18 | page of it, just to jog my memory. And -- | 11:29:53 |
| 19 | Q. Who was the other attorney? | 11:29:56 |
| 20 | A. It was -- can I say that? Just -- it was a | 11:29:57 |
| 21 | communication. I don't know if that's privileged. | 11:30:04 |
| 22 | MR. TOBEROFF: Well -- | 11:30:07 |
| 23 | THE WITNESS: Just -- | 11:30:07 |
| 24 | MR. TOBEROFF: I -- I think you can -- I | 11:30:08 |
| 25 | think you can give the name of the attorney. | 11:30:12 |

Exhibit SS
495                                                        ER-959

| | | |
|---|---|---|
| 1 | Q. Was that mediation session in April 2010 | 11:47:54 |
| | the last time you saw her? | 11:47:56 |
| 2 | | |
| 3 | A. In person, yes. | 11:48:00 |
| 4 | Q. You said you spoke with her daughter, | 11:48:02 |
| 5 | Laura? | 11:48:04 |
| 6 | A. Yes. | 11:48:05 |
| 7 | Q. When was that? | 11:48:07 |
| 8 | A. After she died. | 11:48:09 |
| 9 | Q. What was the purpose of that? Phone call? | 11:48:11 |
| 10 | A. Yes. | 11:48:14 |
| 11 | Q. To give your condolences? | 11:48:16 |
| 12 | A. Yes. | 11:48:17 |
| 13 | Q. And have you spoken to Laura since then? | 11:48:18 |
| 14 | A. No. | 11:48:25 |
| 15 | Q. You identified the document that the | 11:48:28 |
| 16 | Siegels and you signed as a consent agreement. | 11:48:30 |
| 17 | Is the word -- is that the title of the | 11:48:34 |
| 18 | document? | 11:48:37 |
| 19 | A. I believe the title, if I'm allowed to say | 11:48:43 |
| 20 | that -- | 11:48:45 |
| 21 | MR. TOBEROFF: Objection. Actually, you | 11:48:46 |
| 22 | can -- you can testify as to the title, but that's | 11:48:50 |
| 23 | it. Not to any contents of the document. | 11:48:53 |
| 24 | THE WITNESS: I recall the title says | 11:48:57 |
| 25 | "Superman Agreement." | 11:48:59 |

Exhibit SS
496

ER-960

```
 1              "QUESTION:  Did you tell your        12:08:40

 2       mother in your conversations over          12:08:41

 3       the years and in particular about          12:08:44

 4       the consent agreement that any             12:08:46

 5       agreement with DC or settlement            12:08:51

 6       with DC requires the consent of the        12:08:54

 7       Siegels?")                                 12:08:56

 8       THE WITNESS:  Yes.                          12:09:52

 9  BY MR. PETROCELLI:                              12:09:52

10       Q.  What did you say in that regard?       12:09:54

11       A.  Pretty much what -- what you said there. 12:09:59

12       Q.  Did you discuss with her what would happen 12:10:04

13  if, for example, you wanted to do a settlement or an 12:10:12

14  agreement with DC but the Siegels did not, how you  12:10:16

15  would deal with that circumstance?             12:10:19

16       A.  I don't recall going into that detail of 12:10:27

17  what-ifs.                                      12:10:30

18       Q.  Did your mom ask you, "Well, what if we 12:10:32

19  can't agree with the Siegels?  I mean, what happens 12:10:35

20  then?"  Did she put that --                    12:10:37

21       A.  No.                                    12:10:40

22       Q.  -- question to you in so many words?  12:10:41

23       A.  No.                                    12:10:42

24       Q.  Do you -- did -- if she had put that   12:10:46

25  question to you, could you have answered it?   12:10:48
```

Exhibit SS
497
ER-961

| | | |
|---|---|---|
| 1 | MR. TOBEROFF: Again, don't testify based | 12:10:53 |
| 2 | on knowledge and communications you received -- | 12:10:56 |
| 3 | don't testify based on knowledge you received | 12:11:00 |
| 4 | through your communications with your attorney. | 12:11:02 |
| 5 | THE WITNESS: I -- all 1 can -- | 12:11:07 |
| 6 | MR. TOBEROFF: And 1 also, when he asks you | 12:11:08 |
| 7 | about conversations, if you understand the substance | 12:11:11 |
| 8 | of the conversation you can give him that substance. | 12:11:14 |
| 9 | If you understand the exact words you used, you can | 12:11:17 |
| 10 | give him the exact words. But if you don't remember | 12:11:19 |
| 11 | the exact words you used, don't make up the words to | 12:11:21 |
| 12 | fill in the blanks. That would be speculating. | 12:11:25 |
| 13 | THE WITNESS: Uh-huh. The question again | 12:11:27 |
| 14 | being? | 12:11:33 |
| 15 | BY MR. PETROCELLI: | 12:11:33 |
| 16 | Q. Did you have an understanding in | 12:11:33 |
| 17 | discussions with your mom about the consent | 12:11:38 |
| 18 | agreement what would happen if the Siegels and you | 12:11:40 |
| 19 | could not agree? | 12:11:43 |
| 20 | MR. TOBEROFF: Asked and answered. | 12:11:45 |
| 21 | THE WITNESS: I didn't discuss that with | 12:11:49 |
| 22 | her. | 12:11:51 |
| 23 | BY MR. PETROCELLI: | 12:11:51 |
| 24 | Q. Did you have an awareness in your own mind | 12:11:52 |
| 25 | of what would happen? | 12:11:57 |

Exhibit SS
498

ER-962

MARK WARREN PEARY - 6/29/2011

Page 65

| | | |
|---|---|---|
| 1 | A.  I'm aware -- | 12:11:59 |
| 2 | Q.  Had she asked you the question, could you | 12:11:59 |
| 3 | have answered it? | 12:12:01 |
| 4 | A.  Oh. | 12:12:02 |
| 5 | MR. TOBEROFF:  You can only answer the next | 12:12:02 |
| 6 | question to the extent you have an understanding | 12:12:04 |
| 7 | that's separate and apart from your communications | 12:12:06 |
| 8 | with me. | 12:12:09 |
| 9 | THE WITNESS:  Just -- okay. | 12:12:10 |
| 10 | It's just we -- I thought the agreement was | 12:12:14 |
| 11 | good.  It was mutually beneficial.  That's -- that's | 12:12:17 |
| 12 | all I can say. | 12:12:24 |
| 13 | BY MR. PETROCELLI: | 12:12:24 |
| 14 | Q.  Why did you think it was good and mutually | 12:12:25 |
| 15 | beneficial? | 12:12:28 |
| 16 | MR. TOBEROFF:  I instruct you not to | 12:12:28 |
| 17 | answer. | 12:12:29 |
| 18 | (Unanswered question.) | 12:12:30 |
| 19 | THE WITNESS:  I follow -- | 12:12:32 |
| 20 | MR. TOBEROFF:  I instruct you not to | 12:12:34 |
| 21 | answer. | 12:12:35 |
| 22 | THE WITNESS:  I follow my attorney's | 12:12:35 |
| 23 | advice. | 12:12:36 |
| 24 | BY MR. PETROCELLI: | 12:12:36 |
| 25 | Q.  Can I get an answer to my prior question, | 12:12:47 |

Exhibit SS
499
ER-963

| | | |
|---|---|---|
| 1 | (The reporter read the record | 12:16:23 |
| 2 | as follows: | 12:16:23 |
| 3 | "QUESTION: Do you have any | 12:14:58 |
| 4 | current arrangement for the consent | 12:15:00 |
| 5 | agreement or otherwise whereby the | 12:15:06 |
| 6 | Shuster interest's share in any | 12:15:10 |
| 7 | proceeds or recovery attributable | 12:15:15 |
| 8 | to Superboy?") | 12:15:17 |
| 9 | MR. TOBEROFF: That was really fast. | 12:15:17 |
| 10 | THE REPORTER: I'm sorry. | 12:15:17 |
| 11 | (The reporter read the record as | 12:15:17 |
| 12 | follows: | 12:15:17 |
| 13 | "QUESTION: Do you have any | 12:14:58 |
| 14 | current arrangement for the consent | 12:15:00 |
| 15 | agreement or otherwise whereby the | 12:15:06 |
| 16 | Shuster interests share in any | 12:15:10 |
| 17 | proceeds or recovery attributable | 12:15:15 |
| 18 | to Superboy.") | 12:15:17 |
| 19 | THE WITNESS: No. | 12:16:24 |
| 20 | BY MR. PETROCELLI: | 12:16:24 |
| 21 | Q. Does the consent agreement -- under the | 12:16:31 |
| 22 | consent agreement as you understand it, would the | 12:16:33 |
| 23 | Shuster interest's share in any proceeds or recovery | 12:16:39 |
| 24 | attributable to Superboy? | 12:16:44 |
| 25 | MR. TOBEROFF: This is the same question. | 12:16:47 |

Exhibit SS
500
ER-964

| | | |
|---|---|---|
| 1 | Do we have the same agreement? | 12:16:49 |
| 2 | MR. PETROCELLI: We do. It's not the same | 12:16:50 |
| 3 | question because I limited it to the consent | 12:16:54 |
| 4 | agreement. | 12:16:54 |
| 5 | MR. TOBEROFF: Do we have the same | 12:16:54 |
| 6 | agreement that I will allow him to answer but that | 12:16:58 |
| 7 | will not be deemed -- | 12:16:58 |
| 8 | MR. PETROCELLI: Yes. | 12:16:58 |
| 9 | MR. TOBEROFF: -- a waiver of the privilege | 12:17:00 |
| 10 | as to any other questions or the document? | 12:17:00 |
| 11 | MR. PETROCELLI: Yes. | 12:17:02 |
| 12 | MR. TOBEROFF: You can answer. | 12:17:03 |
| 13 | THE WITNESS: Okay. No. | 12:17:03 |
| 14 | BY MR. PETROCELLI: | 12:17:03 |
| 15 | Q. Have the Shusters, by "the Shusters" I mean | 12:17:07 |
| 16 | you, your mom, the estate of Joe Shuster, the | 12:17:13 |
| 17 | Shuster interest, have the Shusters ever had any | 12:17:17 |
| 18 | agreement with the Siegels regarding Superboy? | 12:17:21 |
| 19 | A. No. | 12:17:28 |
| 20 | Q. Is it your understanding that if the | 12:17:34 |
| 21 | Siegels were to be paid or recover money associated | 12:17:42 |
| 22 | with Superboy, that it would belong solely to them | 12:17:47 |
| 23 | and not to the Shuster side? | 12:17:50 |
| 24 | Is that your understanding? | 12:17:55 |
| 25 | A. Yes. | 12:17:56 |

Exhibit SS
501

ER-965

| | | |
|---|---|---|
| 1 | Q. Have you ever had any discussions with any | 12:18:02 |
| 2 | member of the Siegel family about Superboy and | 12:18:08 |
| 3 | sharing or not sharing in recoveries associated with | 12:18:16 |
| 4 | Superboy? | 12:18:21 |
| 5 | A. No. | 12:18:21 |
| 6 | Q. Have you ever had a discussion with your | 12:18:24 |
| 7 | mother about whether the Shusters had an interest in | 12:18:24 |
| 8 | Superboy? | 12:18:33 |
| 9 | A. No. | 12:18:37 |
| 10 | Q. You never once raised that subject with | 12:18:37 |
| 11 | her? | 12:18:39 |
| 12 | A. No. | 12:18:41 |
| 13 | Q. Has she ever discussed it with you? | 12:18:42 |
| 14 | A. No. | 12:18:45 |
| 15 | Q. At any time, even going back to the time | 12:18:46 |
| 16 | when Joe Shuster was alive? | 12:18:49 |
| 17 | A. We never discussed that. | 12:18:51 |
| 18 | Q. Did you ever discuss it with Joe Shuster? | 12:18:53 |
| 19 | A. No. | 12:18:55 |
| 20 | MR. PETROCELLI: Okay. Okay. Would you | 12:19:07 |
| 21 | agree that I don't need to ask any more questions | 12:19:14 |
| 22 | about his knowledge about the consent agreement | 12:19:17 |
| 23 | because you're -- you're going to assert the same | 12:19:21 |
| 24 | objections? | 12:19:23 |
| 25 | MR. TOBEROFF: If you're asking as to the | 12:19:24 |

Page 293

1    Superboy.                                                        17:47:48

2        Q.  But you -- it was included in the first                 17:47:48

3    agreement that you signed in November, Exhibit 10 --            17:47:51

4        MR. TOBEROFF:  Here is the exhibit.                         17:47:54

5    BY MR. PETROCELLI:                                              17:47:54

6        Q.  -- paragraph 1.                                         17:47:56

7        A.  Yes.                                                    17:47:56

8        MR. TOBEROFF:  He's referring -- again,                     17:47:57

9    when he refers to Exhibit 10, paragraph 1 and the               17:47:58

10   inclusion of Superboy, I'd like you to read                     17:48:02

11   paragraph 1 to see the way Superboy is included.                17:48:04

12       MR. PETROCELLI:  You know, please don't.                    17:48:07

13       MR. TOBEROFF:  No.                                          17:48:07

14       MR. PETROCELLI:  It's not appropriate.                      17:48:09

15       MR. TOBEROFF:  It's only fair that when you                 17:48:10

16   talk about something, he looks at it.                           17:48:11

17       MR. PETROCELLI:  He doesn't need you to                     17:48:13

18   tell him how to read it, okay?                                  17:48:14

19       MR. TOBEROFF:  I'm not telling him --                       17:48:16

20       MR. PETROCELLI:  That's just inappropriate.                 17:48:16

21       MR. TOBEROFF:  I'm telling him to read it.                  17:48:17

22       MR. PETROCELLI:  No, you're telling him                     17:48:19

23   more than that.  Let's not get -- go down this path.            17:48:20

24       Q.  What did you as the executor on behalf of               17:48:22

25   the estate get as consideration for giving up any               17:48:26

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | claim to Superboy? | 17:48:30 |
| 2 | MR. TOBEROFF:  Assumes facts.  Lacks | 17:48:32 |
| 3 | foundation. | 17:48:33 |
| 4 | THE WITNESS:  My understanding is the | 17:48:36 |
| 5 | Shuster estate -- | 17:48:40 |
| 6 | BY MR. PETROCELLI: | 17:48:41 |
| 7 | Q.  Did you understand my question?  Let me ask | 17:48:41 |
| 8 | it again. | 17:48:44 |
| 9 | A.  Repeat it. | 17:48:48 |
| 10 | Q.  Yes. | 17:48:48 |
| 11 | As the executor of the Shuster estate, in | 17:48:48 |
| 12 | executing Exhibit 13, the October 27, 2003 amendment | 17:48:57 |
| 13 | to your joint venture agreement, what did the estate | 17:48:57 |
| 14 | get in return for giving up any and all claim to | 17:49:02 |
| 15 | Superboy? | 17:49:07 |
| 16 | MR. TOBEROFF:  Assumes facts and lacks | 17:49:07 |
| 17 | foundation. | 17:49:13 |
| 18 | THE WITNESS:  I think the question | 17:49:13 |
| 19 | mischaracterizes the situation. | 17:49:14 |
| 20 | BY MR. PETROCELLI: | 17:49:14 |
| 21 | Q.  Can you answer the question? | 17:49:18 |
| 22 | MR. TOBEROFF:  He's trying and you're | 17:49:19 |
| 23 | interrupting his answer. | 17:49:20 |
| 24 | MR. PETROCELLI:  No. He's -- | 17:49:21 |
| 25 | MR. TOBEROFF:  Excuse me. | 17:49:22 |

**Exhibit SS**
**504**

**ER-968**

MARK WARREN PEARY - 6/29/2011

Page 295

| | | |
|---|---|---|
| 1 | MR. PETROCELLI: -- he's arguing and he's | 17:49:22 |
| 2 | not answering my question. | 17:49:23 |
| 3 | MR. TOBEROFF: No, he's -- he's -- | 17:49:25 |
| 4 | BY MR. PETROCELLI: | 17:49:26 |
| 5 | Q. Do you understand the question, sir? | 17:49:26 |
| 6 | A. I -- I think it mischaracterizes the | 17:49:27 |
| 7 | situation. | 17:49:28 |
| 8 | Q. It's not up to you to make that decision. | 17:49:29 |
| 9 | That's for a judge to make. | 17:49:31 |
| 10 | MR. TOBEROFF: He can answer. | 17:49:33 |
| 11 | BY MR. PETROCELLI: | 17:49:33 |
| 12 | Q. Do you understand the question? | 17:49:34 |
| 13 | A. I don't know how to answer it because it | 17:49:35 |
| 14 | assumes certain things that are -- that I don't | 17:49:37 |
| 15 | believe are true. | 17:49:40 |
| 16 | Q. What, if anything, did the estate get for | 17:49:42 |
| 17 | removing the words "Superboy" and "Smallville" from | 17:49:44 |
| 18 | your joint venture agreement from the way they | 17:49:49 |
| 19 | appeared in Exhibit 10? | 17:49:52 |
| 20 | MR. TOBEROFF: Again, he's referring to | 17:49:55 |
| 21 | Exhibit 10. Please look at Exhibit 10 and the way | 17:49:57 |
| 22 | they appeared in Exhibit 10. Those are your words, | 17:49:59 |
| 23 | Mr. Petrocelli. So please look at the way Superboy | 17:50:02 |
| 24 | appeared in Exhibit 10. | 17:50:06 |
| 25 | MR. PETROCELLI: Marc, you don't need to | 17:50:07 |

**Exhibit SS**
505

**ER-969**

MARK WARREN PEARY - 6/29/2011

Page 296

| | | |
|---|---|---|
| 1 | repeat my question to him.  Now, really, you're -- | 17:50:08 |
| 2 | you're starting to get out -- out of hand here. | 17:50:10 |
| 3 | MR. TOBEROFF:  I've been pretty good.  I've | 17:50:12 |
| 4 | been a good boy. | 17:50:14 |
| 5 | MR. PETROCELLI:  Let's -- let's keep it | 17:50:15 |
| 6 | that way.  Okay? | 17:50:16 |
| 7 | MR. TOBEROFF:  Please look at Exhibit 10 | 17:50:18 |
| 8 | which he's referred to before you answer the | 17:50:20 |
| 9 | question. | 17:50:21 |
| 10 | BY MR. PETROCELLI: | 17:50:21 |
| 11 | Q.  So what did -- what's the answer? | 17:50:27 |
| 12 | A.  What did we get? | 17:50:29 |
| 13 | Q.  Yes.  What did you get in return for your | 17:50:31 |
| 14 | agreement to delete the references to Superboy and | 17:50:33 |
| 15 | Smallville? | 17:50:45 |
| 16 | A.  All I can say is I don't think we have | 17:50:45 |
| 17 | rights to it. | 17:50:48 |
| 18 | Q.  I didn't ask you whether you thought you | 17:50:48 |
| 19 | had rights.  I asked you what -- what, if anything, | 17:50:50 |
| 20 | did you get for agreeing to do this supplement? | 17:50:53 |
| 21 | A.  There was -- okay.  There was no | 17:50:56 |
| 22 | remuneration or compensation or anything. | 17:50:58 |
| 23 | Q.  None, right? | 17:51:01 |
| 24 | A.  Okay. | 17:51:02 |
| 25 | Q.  Is that correct? | 17:51:02 |

```
1            MR. TOBEROFF:  He just answered you.        17:51:05

2            THE WITNESS:  That's what I said.           17:51:06

3    BY MR. PETROCELLI:                                  17:51:06

4       Q.  Okay.  And the estate of which you were in   17:51:07

5    charge of administering did not seek a second       17:51:12

6    opinion from another lawyer on that subject.        17:51:15

7            Is that right?                              17:51:15

8       A.  That's correct.                              17:51:20

9       Q.  The sole advice that you accepted was the    17:51:20

10   lawyer who represented the Siegels who were         17:51:24

11   asserting 100 percent ownership.                    17:51:28

12           Is that correct?                            17:51:28

13      A.  Yes.                                         17:51:28

14      Q.  Did you disclose to the probate court that   17:51:41

15   you had executed this amendment deleting any        17:51:45

16   reference to Superboy and Smallville for no         17:51:48

17   remuneration or compensation based on the advice of 17:51:53

18   the lawyer for the Siegels who were claiming 100    17:51:56

19   percent rights to Superboy?  Did you make that      17:52:01

20   disclosure to the probate court?                    17:52:03

21      A.  I don't believe so.                          17:52:06

22      Q.  When you -- in connection with your          17:52:13

23   decision to accept the -- the advice of             17:52:17

24   Mr. Toberoff, were you made aware of any            17:52:26

25   copyright -- before I get there, turn to Exhibit 14. 17:52:39
```

ER-971

Page 363

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF LOS ANGELES )


        I, Shanda Gabriel, Certified Shorthand

Reporter, Certificate No. 10094, for the State of

California, hereby certify:

        I am the deposition officer that

stenographically recorded the testimony in the

foregoing deposition;

        Prior to being examined the witness was by

me first duly sworn;

        The foregoing transcript is a true record

of the testimony given.


Dated  July 14, 2011              .


                    _____
                          Shanda Gabriel
                          CSR 10094

Exhibit SS
508

ER-972

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

| | | |
|---|---|---|
| DC COMICS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| PACIFIC PICTURES CORPORATION, | ) | CV-10-3633 ODW (RZx) |
| IP WORLDWIDE, LLC, IPW, LLC, | ) | |
| MARC TOBEROFF, an individual, | ) | |
| MARK WARREN PEARY, as | ) | |
| personal representative of | ) | |
| the ESTATE OF JOSEPH SHUSTER, | ) | |
| JEAN ADELE PEAVY, an | ) | |
| individual, JOANNE SIEGEL, | ) | |
| an individual, LAURA SIEGEL | ) | |
| LARSON, an individual, and | ) | |
| DOES 1-10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF:

    LAURA SIEGEL LARSON

    FRIDAY, JULY 22, 2011

    9:45 A.M.


Reported by:

    Kathleen E. McCarthy

    CSR No. 4483

Exhibit TT
509

ER-973

| | | |
|---|---|---|
| 1 | and Matt Kline of O'Melveny here as well. | 09:46:36 |
| 2 | THE WITNESS:  Excuse me.  Which is Matt and | 09:46:41 |
| 3 | which is -- | 09:46:42 |
| 4 | MR. PETROCELLI:  Jason -- | 09:46:43 |
| 5 | THE WITNESS:  Jason, and Matt -- | 09:46:44 |
| 6 | MR. PETROCELLI:  -- is to my right -- | 09:46:45 |
| 7 | THE WITNESS:  Okay. | 09:46:45 |
| 8 | MR. PETROCELLI:  -- and then Matt is down at | 09:46:45 |
| 9 | the end there. | 09:46:48 |
| 10 | THE WITNESS:  All right.  Thank you. | 09:46:48 |
| 11 | THE VIDEOGRAPHER:  The court reporter today | 09:46:48 |
| 12 | is Kathy McCarthy of Merrill. | 09:46:50 |
| 13 | Would the reporter please swear in the | 09:46:50 |
| 14 | witness. | 09:46:52 |
| 15 | | 09:46:52 |
| 16 | LAURA SIEGEL LARSON, | |
| 17 | having been first duly sworn, was | |
| 18 | examined and testified as follows: | |
| 19 | | 09:47:02 |
| 20 | THE VIDEOGRAPHER:  You may begin. | 09:47:02 |
| 21 | | |
| 22 | EXAMINATION | 09:47:03 |
| 23 | BY MR. PETROCELLI: | |
| 24 | Q.  Could you please state your full name. | 09:47:04 |
| 25 | A.  Laura Siegel Larson. | 09:47:07 |

| 1 | MR. PETROCELLI: Okay. There you go. | 10:02:22 |
| 2 | THE WITNESS: Okay. | 10:02:24 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q. So after the litigation document that you and | 10:02:25 |
| 5 | your family entered into with Mr. Toberoff in 2004, | 10:02:27 |
| 6 | were there any other documents, to your knowledge, | 10:02:31 |
| 7 | that were sent to Mr. Zadrozny for his review related | 10:02:34 |
| 8 | to Superman? | 10:02:40 |
| 9 | A. I don't recall. | 10:02:41 |
| 10 | Q. You signed a document sometime in or about | 10:02:44 |
| 11 | 2008 that the Shusters also signed, some agreement; | 10:02:49 |
| 12 | correct? | 10:02:52 |
| 13 | A. Yes. | 10:02:53 |
| 14 | Q. And Mr. Toberoff also signed that; correct? | 10:02:54 |
| 15 | A. Yes. | 10:02:57 |
| 16 | Q. Did Mr. Zadrozny, to your knowledge, review | 10:02:59 |
| 17 | that document? | 10:03:05 |
| 18 | A. Yes. | 10:03:05 |
| 19 | Q. Did he review that document prior to the time | 10:03:07 |
| 20 | you signed it? | 10:03:10 |
| 21 | A. Yes. | 10:03:11 |
| 22 | Q. How do you know he reviewed it? | 10:03:14 |
| 23 | A. Because he and I spoke about it. | 10:03:20 |
| 24 | Q. How long before you signed it -- withdrawn. | 10:03:27 |
| 25 | Did you send him a copy of it before signing | 10:03:33 |

| | | |
|---|---|---|
| 1 | it? | 10:03:35 |
| 2 | A. Yes. | 10:03:36 |
| 3 | Q. Was he here in town with you or -- | 10:03:37 |
| 4 | A. No. | 10:03:40 |
| 5 | Q. He was living in Florida? | 10:03:40 |
| 6 | A. Yes. | 10:03:42 |
| 7 | Q. Has he lived in Florida the whole time you've | 10:03:42 |
| 8 | been dealing with him? | 10:03:45 |
| 9 | A. Yes. | 10:03:45 |
| 10 | Q. Okay. Did any other attorney besides | 10:03:51 |
| 11 | Mr. Zadrozny review that document, to your knowledge, | 10:03:53 |
| 12 | before you or your mother signed it? | 10:03:57 |
| 13 | A. Which document are you speaking of? | 10:03:58 |
| 14 | Q. This 2008 -- we've been calling it a consent | 10:04:00 |
| 15 | agreement. | 10:04:04 |
| 16 | A. Oh. The -- no. | 10:04:05 |
| 17 | Q. How many documents have you or your mother | 10:04:11 |
| 18 | signed that the Shusters also signed, one or more | 10:04:15 |
| 19 | Shuster people? | 10:04:19 |
| 20 | A. Only one. | 10:04:20 |
| 21 | Q. Was the 2008 consent agreement the last | 10:04:32 |
| 22 | document you asked or your mother asked, to your | 10:04:41 |
| 23 | knowledge, Mr. Zadrozny to review related to Superman? | 10:04:44 |
| 24 | A. I believe so. | 10:04:49 |
| 25 | Q. Have you signed any other documents related | 10:04:52 |

**Exhibit TT**
**512**

**ER-976**

| | | |
|---|---|---|
| 1 | any interest in Superboy. | 16:12:55 |
| 2 | A.   I don't know anything about his arrangements | 16:12:57 |
| 3 | with the Shusters. | 16:12:58 |
| 4 | Q.   Have you ever inquired of anybody why the | 16:13:00 |
| 5 | Shusters would give up their entire interest in | 16:13:04 |
| 6 | Superboy that they were asserting at one point in | 16:13:07 |
| 7 | time? | 16:13:10 |
| 8 | MR. TOBEROFF:  Assumes facts.  Lacks | 16:13:10 |
| 9 | foundation. | 16:13:12 |
| 10 | THE WITNESS:  I think they -- they found out | 16:13:12 |
| 11 | by reading more carefully the 1947 ruling. | 16:13:16 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   Well, that's an interesting point.  It's not | 16:13:21 |
| 14 | what I asked you.  That's your speculation; right? | 16:13:23 |
| 15 | A.   That's my speculation. | 16:13:28 |
| 16 | Q.   And you know there's a lot of documents after | 16:13:30 |
| 17 | 1947 that they could have read that would have | 16:13:32 |
| 18 | informed them that Joe Shuster was a co-creator of | 16:13:36 |
| 19 | Superboy; correct? | 16:13:41 |
| 20 | A.   I don't know that. | 16:13:41 |
| 21 | Q.   I know that you picked the 1947 ruling | 16:13:42 |
| 22 | because that's the one Mr. Toberoff likes to talk | 16:13:44 |
| 23 | about; right? | 16:13:46 |
| 24 | A.   No.  That's the one that my father told me | 16:13:48 |
| 25 | about my entire life. | 16:13:51 |

| | | |
|---|---|---|
| 1 | Q. But that's not the last word on the subject; | 16:13:52 |
| 2 | right? | 16:13:54 |
| 3 | A. I don't know that that's the last word on the | 16:13:54 |
| 4 | subject. | 16:13:56 |
| 5 | Q. And you're aware that there are documents | 16:13:57 |
| 6 | that both Joe Shuster and your dad caused to be filed | 16:13:58 |
| 7 | in which they claimed co-credit for Superboy; correct? | 16:14:03 |
| 8 | A. I do not know that. | 16:14:06 |
| 9 | Q. And you have seen those copyright | 16:14:07 |
| 10 | certifications. | 16:14:10 |
| 11 | A. I don't recall anything like that. | 16:14:10 |
| 12 | Q. Copyright registration documents; correct? | 16:14:11 |
| 13 | MR. TOBEROFF: Just slow it down. Let him | 16:14:15 |
| 14 | finish the question. What's your answer? | 16:14:18 |
| 15 | THE WITNESS: My answer is I have not seen | 16:14:20 |
| 16 | those. I have not seen what you're referring to. | 16:14:21 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q. But I had asked you not to surmise that the | 16:14:24 |
| 19 | Shusters must have read some opinion back in 1947. I | 16:14:29 |
| 20 | had asked you if you had ever discussed with anyone | 16:14:32 |
| 21 | why they would disavow on the interest in Superboy | 16:14:36 |
| 22 | that they previously had -- | 16:14:42 |
| 23 | A. Okay. | 16:14:43 |
| 24 | Q. -- claimed. | 16:14:44 |
| 25 | A. I didn't understand that that was your | 16:14:45 |

| | | |
|---|---|---|
| 1 | question. The answer to that is no. | 16:14:46 |
| 2 | Q. Okay. Do you have a copy of our Complaint | 16:15:06 |
| 3 | there just while we're on this subject? | 16:15:14 |
| 4 | A. No, I don't. | 16:15:18 |
| 5 | Q. You are aware that in Action Comics No. 1, | 16:15:34 |
| 6 | Mr. Shuster did the illustrations or worked on the | 16:15:39 |
| 7 | illustrations; correct? | 16:15:43 |
| 8 | A. Yes. | 16:15:44 |
| 9 | Q. And there's some depiction of Superman as a | 16:15:44 |
| 10 | youth with super powers; correct -- not in Action | 16:15:51 |
| 11 | Comics No. 1. Excuse me. In Superman No. 1. | 16:15:54 |
| 12 | A. I haven't seen it for a long time. | 16:15:58 |
| 13 | Q. Okay. Well, rather than put you through a | 16:16:01 |
| 14 | memory test, can you take a look at our Complaint | 16:16:03 |
| 15 | which has been marked as Exhibit 59. Turn to page 29, | 16:16:07 |
| 16 | paragraph 88. | 16:16:12 |
| 17 | (Whereupon, Plaintiff's Exhibit 59 | |
| 18 | was marked for identification.) | 16:16:16 |
| 19 | THE WITNESS: 29, paragraph 88, yes. | 16:16:17 |
| 20 | MR. PETROCELLI: Yes. | 16:16:18 |
| 21 | Q. When you read paragraph 88 and you saw the | 16:16:21 |
| 22 | first bullet under paragraph 88 which states that, in | 16:16:26 |
| 23 | part, "Toberoff had entered into the 2001 | 16:16:33 |
| 24 | joint-venture agreement with the Shuster Heirs, | 16:16:37 |
| 25 | specifying that the Shuster Heirs owned an interest in | 16:16:40 |

1      A.   No, I really don't.                    17:44:39

2      Q.   Do you know whether you were bumping up    17:44:42

3  against a deadline to send out the Superboy notice?  17:44:44

4      A.   I think we were getting close to a deadline,  17:44:48

5  I think more in terms of end date than beginning date.  17:44:50

6      Q.   Did you have any discussions with any member  17:44:55

7  of the Shuster family that you were going to be  17:45:03

8  sending out the Superboy notice --               17:45:06

9      A.   No.                              17:45:09

10      Q.   -- claiming a hundred percent termination  17:45:10

11  interest?                            17:45:12

12      A.   No, we did not.                17:45:12

13      Q.   Did you and your mother discuss whether you  17:45:14

14  should do so beforehand?              17:45:16

15      A.   Whether we should what?          17:45:18

16      Q.   Contact them beforehand and let them know.  17:45:19

17      A.   No.                       17:45:26

18      Q.   Did you have any idea what their view was  17:45:27

19  about Mr. Shuster's termination interest with respect  17:45:33

20  to Superboy?                      17:45:37

21      A.   We didn't talk to them about Superboy.  17:45:39

22      Q.   Well, were you not concerned that they might  17:45:43

23  protest or contest the assertion by the Siegel family  17:45:48

24  that Jerome Siegel was the sole creator and the sole  17:45:53

25  person entitled to claim a termination interest?  17:45:57

**Exhibit TT**
**516**

**ER-980**

| | | |
|---|---|---|
| 1 | A. | No. |

1    A.   No.            17:45:59

2    Q.   Why not?       17:46:02

3    A.   Because we were, you know, relying on the   17:46:05

4   Westchester decision.   17:46:08

5    Q.   In 1947?   17:46:10

6    A.   Yes, correct.   17:46:11

7    Q.   But --   17:46:12

8    A.   '47, '48, whenever it was.   17:46:13

9    Q.   How did you know they were aware of it?   17:46:15

10    A.   We weren't trying to get inside their minds.   17:46:17

11  We were doing what we thought, you know, we had rights   17:46:20

12  to.   17:46:25

13    Q.   But what if -- but did you discuss with your   17:46:26

14  mother the possibility that you may now be entering   17:46:30

15  into an area in which they might contest your   17:46:33

16  position?  Did that thought ever occur to you?   17:46:43

17    A.   We felt perfectly confident that we were   17:46:45

18  within our rights.   17:46:47

19    Q.   I understand that you made a judgment that   17:46:48

20  you were within your rights, but did you give some   17:46:49

21  consideration to the idea that the family of Joe   17:46:52

22  Shuster might have a different view and might dispute   17:46:58

23  this in some way?   17:47:01

24    A.   I don't recall that being a concern.   17:47:05

25    Q.   Never even occurred to you?   17:47:07

| | |
|---|---|
| 1 | A. Of course. | 17:51:23 |
| 2 | Q. And you knew your father felt that way also; | 17:51:25 |
| 3 | right? | 17:51:28 |
| 4 | A. Yes. | 17:51:28 17:51:29 |
| 5 | Q. And your mother felt that way; correct? | 17:51:29 |
| 6 | A. We all did. | 17:51:31 |
| 7 | Q. And do you think that -- did it occur to you | 17:51:32 |
| 8 | that Jean Peavy might have some feelings about her | 17:51:35 |
| 9 | brother's getting credit for Superboy when you now | 17:51:40 |
| 10 | were claiming sole credit? | 17:51:45 |
| 11 | A. To the best of my recollection, it wasn't -- | 17:51:46 |
| 12 | it wasn't anything that we were concerned about or | 17:51:51 |
| 13 | worried about. We thought that they shared the same | 17:51:54 |
| 14 | view that we had. | 17:51:58 |
| 15 | Q. You had no basis to think that. What was | 17:51:59 |
| 16 | your basis? | 17:52:02 |
| 17 | A. I'm -- | 17:52:03 |
| 18 | Q. Some opinion in 1947 that you don't even know | 17:52:04 |
| 19 | that they were aware of? | 17:52:07 |
| 20 | A. Just discussions that I had had with my | 17:52:08 |
| 21 | father during his lifetime. | 17:52:10 |
| 22 | Q. Did you ever at any time have a discussion | 17:52:14 |
| 23 | with someone in the Shuster family about whether they | 17:52:17 |
| 24 | agreed with that position? | 17:52:21 |
| 25 | A. I did not. | 17:52:22 |

1   STATE OF CALIFORNIA      )

2                            )   ss.

3   COUNTY OF LOS ANGELES    )

4        I, Kathleen E. McCarthy, Certified Shorthand Reporter

5   No. 4483 for the State of California, do hereby certify:

6        That prior to being examined, the witness named in the

7   foregoing deposition was duly sworn to testify the truth,

8   the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in shorthand

10  at the time and place therein named and thereafter reduced

11  by me to typewritten form and that the same is a true,

12  correct, and complete transcript of said proceedings.

13       Before completion of the deposition, review of

14  the transcript [ ] was [ ] was not requested.  If

15  requested, any changes made by the deponent (and provided

16  to the reporter) during the period allowed are appended

17  hereto.

18       I further certify that I am not interested in the

19  outcome of the action.

20  Witness my hand this 3rd day of August , 2011 .

21

22

23       Kathleen E. McCarthy, CSR No. 4483

24

25

**Exhibit TT**
519

**ER-983**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 2, 2011

<u>Via E-Mail</u>

Mark Warren Peary
Jean Adele Peavy
51 Camino Cabo
Santa Fe, New Mexico 87508

Re:     <u>Pacific Pictures Agreements</u>

Mark:

This is to confirm your and our understanding that the retainer agreement between Mark Warren
Peary, Jean Adele Peavy and the Law Offices of Marc Toberoff (now Toberoff & Associates,
P.C.), dated as of November 23, 2001 (the "Retainer Agreement"), completely replaced and
superseded the November 23, 2001 agreement between Pacific Pictures Corporation, Jean Adele
Peavy and Mark Warren Peary, as well as the October 27, 2003 agreement between Pacific
Pictures Corporation and Mark Warren Peary (the "PPC Agreement(s)"), and that no provisions
of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of
the 2003 PPC Agreement, survived or had any continuing force or effect after the Retainer
Agreement was executed.

This also serves to confirm your and our understanding that the September 10, 2004 letter
between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy totally
cancelled the PPC Agreements, and that no term of the PPC Agreements, including paragraph 8
of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, was intended to
survive such cancellation.

Pacific Pictures Corporation has been dissolved, and Marc Toberoff is its successor in interest.
For the avoidance of doubt, in the unlikely event that any right, title or interest of Pacific Pictures
Corporation under either of the PPC Agreements is deemed to have nonetheless survived your
and our mutual cancellation and replacement of the PPC Agreements, Mr. Toberoff hereby
quitclaims any such right, title or interest of Pacific Pictures Corporation to the Estate of Joseph
Shuster.

This letter, including the above quitclaim, shall have no affect on the parties' rights and
obligations under the Retainer Agreement, all of which are expressly preserved.

**Exhibit UU**
**ER-984**

**TOBEROFF & ASSOCIATES, P.C.**

August 2, 2011
Re:     Pacific Pictures Agreements
Page:  2 of 2


Very truly yours,


Marc Toberoff


AGREED:


The Estate of Joseph Shuster


Mark Warren Peary,
as Personal Representative


Mark Warren Peary


Jean Adele Peavy


Marc Toberoff,
as successor to Pacific Pictures Corporation

Exhibit UU
ER-985

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
     parredondo@ipwla.com
4  David Harris (State Bar No. 255557)
     dharris@ipwla.com
5  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
6  Malibu, California 90265
   Telephone:  (310) 246-3333
7  Facsimile:   (310) 246-3101

8  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
9  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
10 as personal representative of the Estate of
   Joanne Siegel

11

12                    **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | |
| vs. | Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL, and DOES 1-10,<br>inclusive, | **DEFENDANTS' NOTICE OF<br>MOTION AND MOTION FOR<br>PARTIAL SUMMARY<br>JUDGMENT ON FIRST,<br>SECOND AND THIRD CLAIMS<br>FOR RELIEF**<br><br>*Statement of Uncontroverted Facts<br>and Conclusions of Law;<br>Declaration of Keith G. Adams; and<br>[Proposed] Order filed concurrently<br>herewith* |
| Defendants. | Complaint filed:  May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:        None Set<br><br>Date:    October 15, 2012<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |

---

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 15, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Mark Warren Peary, as personal representative of the estate of Superman's co-creator Joseph Shuster (the "Shuster Executor"), Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, will and hereby do move for partial summary judgment as to the First, Second and Third Claims for Relief in plaintiff DC Comics' ("DC") first amended complaint (Docket No. 49; "FAC") pursuant to F.R.C.P. 56(a).

DC's First Claim (FAC ¶¶105-34) fails as a matter of law because the Shuster Executor duly served and filed notices of termination in accordance with section 304(d) of the Copyright Act (the "Termination"), and the regulations promulgated thereunder, 37 C.F.R. § 201.10. The First Claim seeks to invalidate this straightforward statutory Termination based on five clearly erroneous theories:

- Part (1) (FAC ¶¶107-11) relies on wordplay to argue that Joe Shuster's termination rights under section 304(c) ceased to exist but did not "expire," contradicting the plain language and structure of the statute. The Shuster Executor owns the "entire termination interest" under a plain reading of 17 U.S.C. § 304(c)(2)(D) because Joseph Shuster left no widow, child or grandchild, and his termination rights under section 304(c) had not been exercised and expired before October 27, 1998, the effective date of the Copyright Term Extension Act. Pub. L. 105-298; 17 U.S.C. § 304(d); 67 Fed. Reg. 69134, 69135; *Stewart v. Abend*, 495 U.S. 207, 212 (1990).

- Part (2) frivolously argues that a perfunctory 1992 pension agreement between DC and Joe Shuster's siblings (the "1992 Agreement") bars the Termination as a supposed "revocation and re-grant" of Joe Shuster's Superman copyright grants/copyrights, contrary to the plain language of the 1992 Agreement,

1

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

governing case law, and DC's own conduct.  DC owned Shuster's Superman copyrights through a 1938 Grant and subsequent grants that the 1992 Agreement did not even identify or purport to rescind and replace.  *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974).  The 1992 Agreement does not even mention "Superman."  Moreover, in 1992, no one held Joe Shuster's termination rights under the Copyright Act. 17 U.S.C. § 304(c)(2)(D).  The 1992 Agreement, therefore, does not even come close to qualifying as an express "revocation and re-grant" of Joe Shuster's Superman copyright grants/copyrights, in lieu of statutory termination, under binding Ninth Circuit precedent.  *See Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008).

- Part (3) alleges that the Shuster Executor did not own the termination right, when he plainly did as a matter of federal copyright law.  The Shuster Executor's termination right was not and could not be transferred to third parties.  *See* 17 U.S.C. § 304(c)(2)(A)-(D); 17 U.S.C. §304(c)(6)(D).

- Part (4) alleges that the Termination omitted alleged "grants" of Joe Shuster's Superman copyrights that were not grants at all.  One such purported "grant" was the 1992 Agreement, which did not and could not transfer Superman copyrights long ago assigned by Siegel and Shuster to DC and already in DC's possession.  The other, a May 1948 "consent judgment" has already been litigated and held not be a Superman grant in *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal. 2008), which is binding on DC.

- Part (5) frivolously alleges "unclean hands" because Mr. Peary chose not to serve a "Superboy" termination notice, even though this decision was consistent with the Copyright Act and preclusive factual findings in a 1947 case regarding "Superboy."  *See* 17 U.S.C § 304(d): *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990).

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-988**

DC's Second Claim (FAC ¶¶135-64) seeks to re-litigate, and overlaps with, issues in *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal. Much of this claim is barred by the doctrine of issue preclusion/collateral estoppel. *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.,* 819 F.2d 1519, 1525 (9th Cir. 1987); *Brown v. Dunbar,* 376 Fed. Appx. 786 (9th Cir. 2010).

DC's Third Claim (FAC ¶¶165-73) insists that DC has a non-existent exclusive "right" to negotiate the purchase of the recovered Superman copyrights. The statute provides no such "right," as case law and treatises confirm. *See* 17 U.S.C. § 304(c)(6)(D); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08[A], n.6 (2010). DC lacks standing to bring this claim (6 W. Patry, *Patry on Copyright* § 21:18), which is barred as well by the three-year statute of limitations, as DC was on clear notice of its purported claim in 2006. 17 U.S.C. § 507(b).

Defendants respectfully request a hearing and oral argument on the parties' cross-motions for partial summary judgment to meaningfully assist the Court, given the importance of this case and the unique issues of law raised by these claims. To conserve judicial resources, Defendants propose that a hearing on the parties' cross-motions be held on October 15, 2012, or another date, as convenient for the Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 11, 2012. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently-filed declarations, the concurrently-filed Statement of Uncontroverted Facts and Conclusions of law, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

///

///

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-989**

1 Dated: August 20, 2012  RESPECTFULLY SUBMITTED,

2         /s/ Marc Toberoff

3         Marc Toberoff

4         TOBEROFF & ASSOCIATES, P.C.

5         Attorneys for Defendants Mark Warren Peary, as
personal representative of the Estate of Joseph

6         Shuster, Jean Adele Peavy, and Laura Siegel

7         Larson, individually and as personal representative
of the Estate of Joanne Siegel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT **ER-990**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................2

      A.    The Termination Right Under The U.S. Copyright Act ........2

      B.    The Relationship Between Superman's Co-Creators And DC ....................................................................3

      C.    The 1992 Agreement To A Modest Pension Increase ..........4

      D.    The Executor Of Shuster's Estate Exercises His Termination Right ....................................................5

      E.    Enforcement Of The Siegel Termination, Triggering This Action ............................................................6

LEGAL STANDARD ..............................................................6

ARGUMENT ........................................................................7

   I.    THE TERMINATION MET THE STATUTORY REQUIREMENTS ..............................................................7

   II.    DC'S FIRST CLAIM IS BARRED AS A MATTER OF LAW ..............................................................................8

      A.    The Shuster Executor Possessed The § 304(d) Termination Right ....................................................8

           1.    If No Statutory Heirs, Executors Hold Termination Rights ..........................................8

           2.    Shuster's Section 304(c) Termination Rights Expired ............................................................10

      B.    The 1992 Agreement Does Not Affect The Shuster Termination ..........................................................11

           1.    "Revocation And Re-grant" Exception In *Milne* And *Mewborn* ....................................................12

           2.    The 1992 Agreement Is Not A "Revocation And Re-Grant" ........................................................14

           3.    There Is No Novation Under New York Law ..........15

      C.    The Shuster Executor Properly Signed The Shuster Termination ..........................................................18

      D.    The Shuster Termination Properly Listed All Copyright Grants ....................................................18

E.   There Are No "Unclean Hands" That Would Bar Termination .................................................... 19

   1.   PPC's Exclusion Is Proper, Not "Unclean Hands" ........................................................... 19

   2.   No "Unclean Hands" In Deciding To Not Terminate Superboy .............................................. 20

III.   DC'S SECOND CLAIM IS LARGELY PRECLUDED ............... 22

IV.   DC'S THIRD CLAIM FAILS AS A MATTER OF LAW ........... 22

A.   Section 304(c)(6)(D) Does Not Provide DC With Any Rights .............................................................. 22

B.   DC Lacks Standing To Bring Its Third Claim .................... 24

C.   DC's Third Claim Is Barred By The Statute Of Limitations ............................................................ 24

V.   THE COURT MAY ENTER JUDGMENT UNDER F.R.C.P. 54(b) ................................................................ 24

CONCLUSION ............................................................. 25

## **TABLE OF AUTHORITIES**

**Federal Cases**                                                              **Pages**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ........................................................................ 24

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .......................................................................... 6

*Artichoke Joe's Cal. Grand Casino v. Norton,*
  353 F.3d 712 (9th Cir. 2003) ............................................................ 9

*Bourne Co. v. MPL Commc'ns, Inc.,*
  675 F. Supp. 859 (S.D.N.Y. 1987) .................................................. 23

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.,*
  41 N.Y.2d 397 (1977) ..................................................................... 15

*Celotex Corporation v. Catrett,*
  477 U.S. 317 (1986) .......................................................................... 6

*Citibank, N.A. v. Benedict,*
  2000 WL 322785 (S.D.N.Y. Mar. 27, 2000) .................................. 16

*Classic Media, Inc. v. Mewborn,*
  532 F.3d 978 (9th Cir. 2008) .................................................... 13-15

*Clinton v. Jones,*
  520 U.S. 681 (1997) ........................................................................ 22

*Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.,*
  819 F.2d 1519 (9th Cir. 1987) ................................................. 19, 25

*Curtiss-Wright Corp. v. General Electric Co.,*
  446 U.S. 1 (1980) ............................................................................ 25

*Davimos v. Halle,*
  60 A.D.3d 576 (2009) ..................................................................... 17

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,*
  411 F.3d 384 (2d Cir. 2005) ........................................................... 16

*Frank Associates, Inc. v. John J. Ryan & Sons, Inc.,*
  117 N.Y.S.2d 406 (App. Div. 1952) ............................................... 16

*Gausvik v. Perez,*
  392 F.3d 1006 (9th Cir. 2004) ........................................................ 17

*Goldbard v. Empire State Mut. Ins. Co.,*
  5 A.D. 2d 230 (N.Y. App. Div. 1958) ............................................ 15

*Greenberg v. Nat'l Geographic Society,*
  533 F.3d 1244 (11th Cir. 2008) ........................................................ 2

*Groucho Marx Prods. V. Day & Night Co.*,
689 F.2d 317 (2d Cir. 1982) ........................................................................ 11

*Gucci Am., Inc. v. Guess?, Inc.*,
2012 WL 2304247 (S.D.N.Y. June 18, 2012) .......................................... 22

*Harris v. Emus Records Corp.*,
734 F.2d 1329 (9th Cir. 1983) ................................................................... 20

*International Klafter Co., Inc. v. Continental Cas. Co.*,
869 F.2d 96 (2d Cir. 1989) ......................................................................... 16

*Lennon v. Seaman*,
84 F.Supp.2d 522 (S.D.N.Y. 2000) ........................................................ 20

*Lucky's Detroit, LLC v. Double L Inc.*,
2012 WL 219418 (E.D. Mich. Jan. 25, 2012) ....................................... 22

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ........................................................................ 3

*McKesson HBOC, Inc. ERISA Litig.*,
391 F. Supp. 2d 812 (N.D. Cal. 2005) ..................................................... 19

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960) ...................................................................................... 10

*Milne v. Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ........................................................... 12-15

*Milton H. Greene Archives v. CMG Worldwide*,
568 F. Supp. 2d 1152 (C.D. Cal. 2008) ................................................... 11

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ...................................................... 10

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) ........................................................................................ 3

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ...................................................................... 25

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
166 Fed. Appx. 268 (9th Cir. 2006) ......................................................... 25

*Pelich v. INS*,
329 F.3d 1057 (9th Cir. 2003) .................................................................... 19

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ......................................................... 11, 13-14

*Rivers v. Walt Disney Co.*,
980 F. Supp. 1358 (C.D. Cal. 1997) ........................................................ 22

iv
TABLES OF CONTENTS AND AUTHORITIES

ER-994

*Rottlund Co.*,
  2004 U.S. Dist. LEXIS 16723 .................................................................. 20

*Sears, Roebuck & Co. v. Sears PLC*,
  744 F. Supp. 1297 (D. Del. 1990).......................................................... 22

*Shady Records, Inc. v. Source Ent., Inc.*,
  2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. January 2, 2005) ..................... 20

*Siegel v. Warner Bros. Ent. Inc.*,
  542 F. Supp. 2d 1098 (C.D. Cal. 2009) ........................................... *passim*

*Siegel v. Nat'l Periodical Publications, Inc.*,
  508 F.2d 909 (2d Cir. 1974) .................................................. 4, 11, 17, 21

*Siegel v. Warner Bros. Entertainment Inc.*,
  C.D. Cal. Case No. 04-08400 ODW (RZx) ................................................ 2

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) .................................................................. 10

*Stewart v. Abend*,
  495 U.S. 207, 212 (1990)................................................................... 2, 10

*Yahava v. Hua*
  1989 WL 214481 (S.D.N.Y. Nov.28, 1989)............................................. 16

**Statutes/Rules**

17 U.S.C. § 203 ............................................................................................ 2

17 U.S.C. § 304 ................................................................................... *passim*

37 C.F.R. § 201.10 ............................................................................. 7, 8, 19

F.R.C.P. 54(b) ............................................................................................ 25

F.R.C.P. 56 ................................................................................................... 6

L.R. 7-3 ........................................................................................................ 3

**Other Authorities**

2 M. Nimmer & D. Nimmer, *Nimmer On Copyright*
  § 7.20 ...................................................................................................... 20

3 M. Nimmer & D. Nimmer, *Nimmer On Copyright*
  § 9.02 ........................................................................................................ 2

  § 11.03 ........................................................................................................ 9

  § 11.08 ...................................................................................................... 24

3 W. Patry, *Patry on Copyright* (2010)
  § 7:47.................................................................................................. 23

6 W. Patry, *Patry on Copyright*
  § 21:18................................................................................................ 24

67 Fed. Reg. 69134 ............................................................................ 11, 21

67 Fed. Reg. 69135 ............................................................................ 11, 21

H.R. Rep. No. 105-452 (1998),
  105th Congress, 2d Sess. ................................................................ 3, 9

H.R. Rep. No. 94-1476 (1976)............................................................. 2

TABLES OF CONTENTS AND AUTHORITIES

ER-996

### INTRODUCTION

For nearly as long as Superman has fought for justice, Siegel and Shuster struggled to participate in the fruits of their creation, to no avail. Congress enacted the Copyright Act's termination provisions to remedy the harsh publisher/author imbalance, and to enable authors and their families to finally benefit from the increased value of their copyrights. If ever there were a case that fit squarely within Congress' concerted objectives, it is that of Siegel and Shuster. After the Court upheld the Siegels' statutory termination, DC Comics (including its predecessors, "DC") brought this action as to the Shuster estate's mirror image termination in a last-ditch effort to derail its long-awaited statutory recovery, with meritless claims.

Summary judgment in favor of Defendants is amply justified on DC's First, Second and Third Claims, and most of its Second Claim (Dkt. 49, First Amended Complaint ("FAC"), ¶¶105-173).

In 2003, Mark Warren Peary, the executor of Joseph Shuster's estate, duly served and filed notices of termination in accordance with section 304(d) of the Copyright Act (the "Termination"). DC's First Claim (FAC ¶¶105-34) seeks to invalidate this straightforward statutory termination based on five theories, each of which is clearly erroneous as a matter of law. Part (1) relies on wordplay to argue that Joe Shuster's termination rights under section 304(c) ceased to exist but did not "expire," contradicting the plain language and structure of the statute. Part (2) frivolously argues that a short 1992 pension agreement between DC and Shuster's siblings bars the Termination as a supposed "revocation and re-grant" of Shuster's Superman copyright grants, contrary to the language of the 1992 agreement, binding Ninth Circuit precedent, and DC's own actions. Part (3) alleges that the executor did not own the termination right, when he plainly did as a matter of federal copyright law. Part (4) alleges that the Termination omitted alleged "grants" of Joe Shuster's Superman copyrights that were not grants at all. Part (5) frivolously alleges "unclean hands" because Mr. Peary chose not to serve a Superboy termination notice,

consistent with the Copyright Act and preclusive factual findings in a Superboy suit.

DC's Second Claim seeks to re-litigate issues presented in the more-advanced, related case of *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal. Much of this claim is barred by issue preclusion; the remainder should be stayed until resolved in the *Siegel* case.

DC's Third Claim insists that DC has a non-existent exclusive "right" to negotiate the purchase of the recovered Superman copyrights. The statute provides DC no such "right," as both case law and treatises confirm. DC lacks standing under the statute to bring this claim, which is barred as well by the statute of limitations.

DC has proceeded with these meritless claims for well over two years. Despite nearly a decade of discovery between this case and the *Siegel* case, DC cannot present any evidence to support its erroneous legal theories. DC's claims should be rejected, and this Court should confirm, consistent with Congress' clear objectives, that the Shuster Termination is valid and effective, just like the Siegels' termination.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Termination Right Under The U.S. Copyright Act

For over two centuries, the Copyright Act has consistently provided authors and their families with the right to recover previously transferred copyrights to enable their participation in the increased value of such copyrights. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990), 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright* ("*Nimmer*"), § 9.02. These protections culminated in the 1976 Copyright Act's termination provisions. 17 U.S.C. §§ 203(a), 304(c)-(d).

"The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the [] Copyright Act." *Greenberg v. Nat'l Geographic Society*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008). When Congress extended the copyright term, it intended to benefit authors rather than grantees. *See* H.R. Rep. No. 94-1476 (1976) at 140. Congress thus coupled the extension with a new right of authors and "statutory heirs" (*i.e.*, spouse, children and grandchildren) to

terminate transfers of copyright signed before January 1, 1978.  17 U.S.C. § 304(c).

In recognizing the intent of the 1976 Act to "enhance the author's position," the Supreme Court has emphasized this "inalienable" right "to revoke a copyright transfer." *N.Y. Times v. Tasini*, 533 U.S. 483, 496 (2001); *see also Stewart,* 495 U.S. at 230 ("[The 1976 Act] provides an inalienable termination right").

When Congress further extended the copyright term in the 1998 Copyright Term Extension Act (Pub. L. 105-298; "CTEA"), it again coupled this extension with a second termination right in § 304(d), for situations where § 304(c)'s termination right had not been exercised by 1998.  17 U.S.C. §§ 304(b), (d).  *See* H.R. Rep. No. 105-452 (1998) ("H.R. Rep. 105-452") at 8 (intent of CTEA was for "the original authors of works and their beneficiaries to benefit from the extended [renewal] copyright protection").  Congress also, for the first time, provided the termination right to *the executor* of an author's estate, if the author was not survived by a spouse, child or grandchild.  17 U.S.C. § 304(c)(2)(D).

The Copyright Act's termination rights lie in stark contrast to ordinary contract principles, as they empower authors, their statutory heirs and estates to recover copyrights by terminating prior grants *without cause*.  *Id*., § 304(c)(5).  To ensure that termination rights are not contractually waived or circumvented, Congress further abrogated freedom of contract principles to make these rights inalienable. Hence, "[t]ermination … may be effected notwithstanding any agreement to the contrary." *Id.*, § 304(c)(5); *see Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (agreement that effectively bars termination by re-characterizing works is void as an "agreement to the contrary").  Moreover, "[a] further grant…of any right covered by a terminated grant is valid only if it is made after the effective date of termination … [or as to] the original grantee or such grantee's successor in title, after the notice of termination has been served…." 17 U.S.C. § 304(c)(6)(D).

## B.   The Relationship Between Superman's Co-Creators And DC

In 1933-34, writer Jerome Siegel and illustrator Joe Shuster, two high school

students, co-created Superman as the "champion of the oppressed" in the midst of the Great Depression. *See* Statement of Undisputed Facts ("SF") ¶1; *Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008). Their highly original character would become a cultural icon, spawn a multi-billion dollar franchise and bring fortune to many – but not to them. SF ¶4. On March 1, 1938, Siegel and Shuster signed an agreement (the "1938 Grant"), without the aid of counsel, that would later be held to have granted Superman to DC for $130. SF ¶¶2-3. Despite Superman's phenomenal success, and DC's promises to "look after" its creators, DC refused to allow them even a simple royalty. SF ¶17.

In 1947, Siegel and Shuster filed suit against DC in Westchester, N.Y. SUF ¶5. The court held that DC owned Superman pursuant to the 1938 Grant, but that DC had stolen Superboy from Siegel (*not* Shuster) while he was overseas fighting for his country in WWII. SF ¶¶6-10. Although the case settled, DC retaliated by cutting Siegel and Shuster off, and systematically erased their credit byline and references to them from its publications and histories. SF ¶¶11, 16. While Superman was ubiquitous, his creators slipped into obscurity and poverty. SF ¶17.

In 1969, Siegel and Shuster brought a federal action as to ownership of the Superman renewal copyright, resulting in *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974), which held that DC owned the Superman renewal copyright pursuant to the 1938 Grant. SF ¶¶12-14. In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign protesting DC's shabby treatment of the creators. SF ¶18. Worried about negative publicity, DC's parent, Warner, finally agreed to pay Siegel and Shuster a modest pension, and restored their credit after 26 years (the "1975 Agreement"). SF ¶¶19-20. The 1975 Agreement re-acknowledged that DC already owned all Superman rights (SF ¶38), and provided a $5,000 pension to Shuster's brother Frank. SF ¶22.

**C.  The 1992 Agreement To A Modest Pension Increase**

Shuster died on July 30, 1992 without widow or child, and was survived only

by his siblings, Frank Shuster (died in 1996) and Jean Peavy.  SF ¶¶23-26.  As Shuster's assets were extremely limited, his estate was not originally probated.  SF ¶27.  On October 2, 1992, DC entered into a short agreement with Frank and Jean ("1992 Agreement") to raise their pension to $25,000, which also stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which **_you_** [Frank and Jean] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, **_you_** now grant to us any such rights and release us … and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

SF ¶¶28-29 (emphasis added).  The 1992 Agreement made **_no_** mention of termination rights, Shuster's prior specific Superman grants to DC, or Superman.  *Id*.  DC made clear that Frank and Jean held no rights under the Copyright Act and that it had no obligation to raise the pension.  SF ¶31.  The same day, October 2, 1992, Frank signed a letter to DC stating that, in consideration for the 1992 Agreement, he was waiving his $5,000 pension under the 1975 Agreement.  SF ¶30.  In the years that followed, Frank and Jean struggled to get by.  SF ¶32-33.  Requests for increases in their pension were denied, but periodic bonuses were granted.  *Id*.

### D. The Executor Of Shuster's Estate Exercises His Termination Right

On July 15, 2003, after the 1998 CTEA gave termination rights to an author's estate, Joe Shuster's nephew, Mark Warren Peary, petitioned the Court to probate his estate.  SF ¶¶43-44.  Shuster's will nominated Jean as executrix and stated that, if she declined, Mr. Peary should be appointed as executor.  SF ¶45.  As Jean was 82, she declined to serve.  SF ¶46.  On October 7, 2003, the Court duly appointed Peary as executor (the "Shuster Executor") with the "power … to terminate prior transfers of the decedent's copyright(s) pursuant to [17 U.S.C.] § 304(d)."  SF ¶¶47-48.

In November 2003, in compliance with the Copyright Act, the Shuster Executor filed in the U.S. Copyright Office and served on DC a notice of termination under 17 U.S.C. § 304(d), terminating Shuster's 1938 Grant and subsequent actual or potential Superman grants – with an effective termination date of October 26, 2013

1  (the "Termination").  SF ¶¶49-60; *Siegel I*, 542 F. Supp. 2d at 1114, n.3.

2      **E.**    **Enforcement Of The Siegel Termination, Triggering This Action**

3        In 1997, Jerry Siegel's widow and daughter served notices of termination as to

4  Siegel's share of the original Superman copyrights.  *Siegel I*, 542 F. Supp. 2d at

5  1114-16; SF ¶61.  In 2004, after four years of grinding negotiations did not result in a

6  settlement, the Siegels, represented by Mr. Toberoff, filed suit to vindicate their

7  copyrights.  SF ¶64.  On April 28, 2005, DC sent a letter to the Shuster Executor,

8  offering to settle with the Shusters at the expense of the Siegels, which was declined.

9  SF ¶42.  In 2008-09, the Court held that the Siegels had successfully recovered their

10  Superman copyrights by valid statutory termination.  SF ¶65; *Siegel I*, 542 F. Supp.

11  2d 1098; 658 F. Supp. 2d 1036 (C.D. Cal. 2009).  In 2010, DC replaced its general

12  and outside counsel, and retaliated by suing herein the Siegels, the Shusters and their

13  long-time counsel, Mr. Toberoff.  SF ¶70.

14           **LEGAL STANDARD**

15        Summary judgment is appropriate where "the pleadings, depositions, answers

16  to interrogatories, and admissions on file, together with the affidavits, if any, show

17  that there is no genuine issue as to any material fact and that the moving party is

18  entitled to judgment as a matter of law."  F.R.C.P. 56(c).  The moving party bears

19  the initial burden of demonstrating the absence of a genuine issue of material fact.

20  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is material

21  only if it affects the outcome.  *Id.* at 248.  The moving party need not disprove the

22  other party's case.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

23        If the moving party meets its initial burden, the "adverse party may not rest …

24  [on its] pleadings," but instead must demonstrate, by "admissible" evidence, the

25  existence of a genuine issue of material fact for trial.  F.R.C.P. 56(c); *Celotex*, 477

26  U.S. at 323.  "[T]he mere existence of a scintilla of evidence" is insufficient.

27  *Anderson*, 477 U.S. at 252.  "Partial summary judgment" where the court disposes of

28  some but not all claims or issues within a claim, is also permitted.  F.R.C.P. 56(a).

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT **ER-1002**

## ARGUMENT

## I.   THE TERMINATION MET THE STATUTORY REQUIREMENTS

The Shuster Termination fully satisfied the statutory and regulatory requirements for termination under 17 U.S.C. §§ 304(c)-(d) and 37 C.F.R. § 201.10.

Section 304(c)(2)(D) provides that the executor of an author's estate owns the termination right if the author had no widow or children.  As Joe Shuster had no widow or children (SF ¶25), the Shuster Executor held the entire termination right.

Section 304(d) provides a second termination right for copyrights in their renewal term on CTEA's effective date (October 27, 1998), where § 304(c)'s termination right had not been exercised and expired by October 27, 1998.  The Superman copyrights listed in the Termination were secured in <u>1938</u>, and thus were in their renewal term on October 27, 1998.  SF ¶53.  The termination right can only be exercised in time "windows" defined in § 304(c)(3)-(4).  A § 304(c) termination must be served no later than 59 years after the copyright is secured.  *Id*.  Accordingly, 1997 was the latest a § 304(c) termination could have been served regarding the 1938 Superman works, but none was served.  SF ¶24.  As such, the § 304(c) termination right expired before October 27, 1998 without being exercised.  Section 304(d) therefore provided a termination right to the Shuster Executor.

Termination under §§ 304(c)-(d) applies only to grants "executed before January 1, 1978" by the author or his statutory heirs.  17 U.S.C. § 304(c).  The 1938 Grant and subsequent Shuster agreements listed in the Termination were all executed by Joe Shuster before January 1, 1978.  SF ¶53, 54.

The termination notice must "state the effective date of termination, which shall fall within the five-year period" (17 U.S.C. § 304(c)(4)(A)), and for § 304(d) that period "begin[s] at the end of 75 years from the date copyright was originally secured."  17 U.S.C. § 304(d)(2).  The notice must be served between two and ten years before the effective termination date.  17 U.S.C. § 304(c)(4)(A).  The relevant Superman copyrights were secured on April 18 – October 25, 1938.  SF ¶53.  The

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT   **ER-1003**

1    Termination noticed an effective date of October 26, 2013, and was served on

2    November 10, 2003, both within the proper time windows.  SF ¶¶49, 55, 59.

3         The termination notice must be "recorded in the Copyright Office before the

4    effective date," 17 U.S.C. § 304(c)(4)(A), and comply "with requirements that the

5    Register of Copyrights shall prescribe by regulation."  17 U.S.C. § 304(c)(4)(B).  The

6    Termination was duly recorded on December 8, 2003 (SF ¶60), well before the

7    effective date, and fully complied with the Copyright Office's regulations. *See* 37

8    C.F.R. § 201.10(a)-(d); SF ¶¶49-59.

9         Because the Termination met all of the statutory and regulatory requirements

10   for termination, it is effective, as of October 26, 2013, to recover Shuster's joint

11   copyright interest in the Superman works listed therein.

12   **II.    DC'S FIRST CLAIM IS BARRED AS A MATTER OF LAW**

13        DC's First Claim contrives five arguments for why the Shuster Termination is

14   supposedly ineffective.  None have any merit.

15        **A.    <u>The Shuster Executor Possessed The § 304(d) Termination Right</u>**

16        Part (1) of DC's First Claim (FAC ¶¶107-11) argues that the Shuster Executor

17   had no Section 304(d) termination right to exercise.  A simple examination of the

18   language, structure and intent of the statute shows otherwise.

19             **1.    If No Statutory Heirs, Executors Hold Termination Rights**

20        The Shuster Executor "own[s] the author's entire [§ 304(d)] termination

21   interest" under a plain reading of 17 U.S.C. § 304(c)(2)(D):  "if the author's widow

22   or widower, children, and grandchildren are not living, the author's executor … shall

23   own the author's entire termination interest."  *See Siegel I*, 542 F. Supp. 2d at 1114

24   n.3 ("As executor of the Shuster estate, [Mark Warren Peary] is entitled [by the

25   CTEA] … to make the same termination claims for the Superman copyright that

26   Shuster or his heirs would have been entitled to bring.").

27        DC erroneously argues that § 304(d) termination rights only pass to an

28   executor if an author's widow, children and grandchildren are "'not living,' but [] did

at some time live." FAC ¶111. This wordplay theory contradicts both the language and intent of the statute and the meaning of "not living" under the Copyright Act.

Courts interpret a federal statute by looking at the "the language of the statute," and "[w]hen the words of a statute are unambiguous, judicial inquiry is complete." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003). Congress established in § 304(c)(2) four classes who may exercise termination rights: (1) widow(er), (2) children, (3) grandchildren, and (4) if there is no surviving widow(er), child or grandchild, <u>the executor</u>. The inclusion of estates was deliberate:

> What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren? ***Under the 1976 Act at its passage, the result was that no one could exercise the right of termination***. That harsh result persisted for the current Act's first two decades. Then in the [CTEA], Congress ameliorated that result. Effective from October 27, 1998 onward, ***the termination right, instead of lapsing in these circumstances, belongs to "the author's executor, administrator, personal representative, or trustee***."

3 *Nimmer* § 11.03[A][2][a] (quoting 17 U.S.C. § 304(c)(2)(D)) (emphasis added).

Section 304(d) was designed to "correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously, whether through neglect or inability." *Id.*, § 11.05[B][2] at 11-40.12. Such "inability" could arise, as here, "because no one was alive to effectuate termination," and the CTEA "solves that latter situation" through § 304(c)(2)(D). *Id.* at 25.2. The only reasonable interpretation of the statute is that Congress gave § 304(d) termination rights to widows, children and grandchildren if they existed, and otherwise to the author's estate/executor. *See* H.R. Rep. No. 105-452 at 8 (the amendments "allow[] an author's executor to receive his entire termination interest [if] the author's widow, widower, children or grandchildren are not living"). DC has falsely argued that CTEA was not intended "to open the door to an entirely new class of persons." Dkt. 458 at 22. The CTEA was intended to do and expressly did exactly that.

Furthermore, DC's argument that "not living" under § 304(c)(2)(D) means "once living, now deceased" also contradicts the meaning of "not living" under the Copyright Act. The termination provisions provide a right to recapture the extended

"renewal" copyright. 17 U.S.C. § 304(c), (d). The related sub-section dealing with the renewal copyright, 17 U.S.C. § 304(a)(1)(C), uses identical language (*i.e.*, "if such author, widow, widower, or children are not living") as that in § 304(c)(2)(D).

Under DC's self-serving interpretation of "not living," a renewal copyright would not vest in the executor of an estate under § 304(a)(1)(C)(iii) unless the author was survived by a spouse or child, who then died. Yet the courts – including the Supreme Court – have *consistently* held that copyrights are owned by an author's estate, even if the author had no spouse or children. *See Stewart v. Abend*, 495 U.S. 207, 212 (1990) (renewal copyright vested in executor of an estate where author had no widow or children); *Miller Music Corp. v. Charles N. Daniels, Inc*., 362 U.S. 373, 374–75 (1960) (construing the phrase "not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased" and holding "not living" covers situations where the author had no spouse or child). "Not living" in the related renewal and termination contexts must be interpreted consistently. *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 900 (9th Cir. 2005) ("[C]ourts will not interpret a statute in a way that results in an absurd or unreasonable result….").

## 2. Shuster's Section 304(c) Termination Rights Expired

As noted above, Section 304(d) provides a second termination right with respect to any copyright "in its renewal term on the effective date of the [CTEA] [*i.e.*, October 27, 1998] for which the termination right provided in subsection [304](c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right." Joe Shuster's § 304(c) termination rights were not exercised and had therefore expired by October 27, 1998. SF ¶24.

DC again engages in wordplay to argue that because Joe Shuster died without a widow or children while he could theoretically have exercised the termination right, his rights did not "expire," but were "extinguished," and that there is supposedly no §

10

304(d) termination right, contrary to the plain language of the statute.  FAC ¶¶109-111.  This makes no sense.  The Copyright Office itself states, without preconditions or qualification, that under § 304(d) "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured," regardless of whether the author lived to that exact date.  67 Fed. Reg. 69134, 69135.

Courts also routinely use "expired" to describe rights lost upon death.  *See Groucho Marx Prods. V. Day & Night Co.*, 689 F.2d 317, 320 (2d Cir. 1982) ("[T]he right is not descendible and expires upon the death of the person so protected."); *Milton H. Greene Archives v. CMG Worldwide*, 568 F. Supp. 2d 1152, 1156 (C.D. Cal. 2008) ("[T]hat right expired on an individual's death.").  Indeed, *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008), plainly states that Section 304(d)'s "statutory termination rights expire upon [] death."

## B. The 1992 Agreement Does Not Affect The Shuster Termination

Sections 304(c)-(d) apply to pre-1978 copyright grants; a post-January 1, 1978 grant by an author's heir is not terminable.  DC thus pretends in part (2) of its First Claim (FAC ¶¶112-17) that the 1992 Agreement, between DC and siblings Frank Shuster and Jean Peavy, regarding a modest pension, is DC's operative grant of Joe Shuster's Superman copyrights.  This makes no sense.  Siegel and Shuster assigned all rights in their original Superman character and story to DC in the 1938 Grant, and thereafter granted additional Superman copyrights to DC.  *Siegel*, 508 F.2d at 911-914.  DC has *for decades* based its chain-of-title to Superman on these pre-1978 grants (SF ¶15) – all of which were duly listed in the Termination.  SF ¶54.

DC frivolously argues that the 1992 Agreement somehow silently "revoked" all of Shuster's prior grants and "re-granted" Shuster's Superman copyrights to DC.  FAC ¶¶112-117.  This is preposterous.  The 1992 Agreement, on its face, merely raised Frank and Jean's modest pension and contained a standard quitclaim of *their* rights, if any.  SF ¶29.  The 1992 Agreement contains no language whatsoever of revocation or rescission nor does it purport to replace or even to identify any prior

1   Superman grants.  *Id.*  It nowhere even mentions Superman, because the Superman

2   copyrights had long ago been assigned by Siegel and Shuster to DC.  SF ¶¶2, 7, 14,

3   29.  The 1992 Agreement is irrelevant, and cannot bar the Termination as a matter of

4   law.

5        The 1992 Agreement contains only three obligations of Frank and Jean:  they

6   settled any payment claim, covenanted not to assert and quitclaimed to DC *their*

7   rights, *if any,* in Joe Shuster's works.  SF ¶29.  The 1992 Agreement makes no

8   mention of termination, nor does it purport to limit or waive termination.  *Id.*  This is

9   unsurprising, as siblings like Frank/Jean have no termination rights, and estates did

10  not have termination rights until 1998 under the CTEA.  17 U.S.C. § 304(c)(2).  Nor

11  could the Agreement "settle" the inalienable termination right, which is exercisable

12  "notwithstanding any agreement to the contrary."  17 U.S.C. § 304(c)(5).  Nor could

13  it have pre-assigned terminated copyrights, as "[an] agreement to make a further

14  grant [] of any right covered by a terminated grant is valid only if it is made after the

15  effective date [i.e., October 26, 2013] of the termination."  17 U.S.C. § 304(c)(6)(D).

16       **1.    "Revocation And Re-grant" Exception In *Milne* And *Mewborn***

17       DC unsuccessfully tries to squeeze the 1992 Agreement into a narrow and

18  inapplicable "revocation and re-grant" exception recognized in *Milne v. Slesinger,*

19  *Inc.*, 430 F.3d 1036 (9th Cir. 2005).  In *Milne*, the author's son, in 1983, during the

20  termination window, expressly agreed to the contractual "revocation of [a pre-1978]

21  agreement[] in favor of the new [1983] agreement, followed by the re-granting (on

22  the same page) of the rights" instead of statutory termination.  *Id.* at 1040-41.  When

23  the author's granddaughter later sought to terminate, *Milne* held there was no pre-

24  1978 grant to terminate, because the 1983 contract had "specifically stated" that it

25  revoked and replaced the pre-1978 copyright grant.  *Id.* at 1040 n.4.  *Milne*

26  emphasized that the author's son "could have served a termination notice," but

27  instead used that "bargaining power" as "leverage to obtain a better deal," with "a net

28  gain of hundreds of millions of dollars."  *Id.* at 1041, 1045.  This was not "an

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT  **ER-1008**

1    agreement to the contrary," because the *express* revocation and re-negotiation of a

2    new grant on greatly enhanced terms, under the real threat of termination, achieved

3    "the very result envisioned by Congress [in] the termination provisions." *Id.* at 1047.

4       *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008),

5    although not binding here, followed *Milne*. In 1994, an author's widow, during a

6    largely open termination window, *expressly* revoked his 1938 grant and re-granted

7    his copyrights, "leaving in effect no pre-1978 grants" to terminate. *Id.* at 196-200

8    (contract expressly "stated that '… [it] will cancel and supersede the previous

9    agreements'"). In exchange, the publisher made major financial concessions. *Id.* at

10    196. Later attempts to terminate were barred, because the widow "wield[ed] the

11    threat of termination" to secure market value for the author's copyrights, and such

12    "renegotiation appears to be exactly what was intended by Congress." *Id.* at 202-04.

13       In *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978 (9th Cir. 2008),

14    the Ninth Circuit revisited these issues and firmly rejected a publisher's attempt to

15    extend *Milne*'s narrow holding. In 1976, an author's daughter assigned her rights to

16    a publisher. *Id.* at 980. In 1978, she signed a second contract, purporting to assign

17    the already-assigned rights. *Id.* at 981. After she served a termination notice as to

18    the still-operative 1976 grant, the publisher sued, claiming that the 1978 grant

19    "superseded" and "revoked and re-granted" the copyrights. *Id.* at 981-82. The Ninth

20    Circuit upheld the termination, refused to extend *Milne* beyond its "distinct factual

21    scenario," and distinguished *Mewborn* on two principal grounds. *Id.* at 987.

22       **First**, the Ninth Circuit emphasized that the 1978 agreement, unlike in *Milne*,

23    did not "*expressly* revoke the earlier … assignments." *Id.* at 989 (emphasis added).

24    The 1978 grant was therefore a "nullity" as it purported to grant copyrights already

25    assigned to the publisher and in its possession. *Id.* at 986.

26       **Second**, the Ninth Circuit noted that, while the *Milne* agreement "expressly

27    stated that it was made in exchange for non-exercise of the immediately investive

28    termination right," Mewborn's agreement "was silent on the issue." *Id.* at 986-89.

She had no active termination right and "nothing in hand with which to bargain." *Id.*

Together, these cases establish the narrow proposition that (1) statutory heirs can leverage their termination right during an open termination window, (2) by expressly revoking a prior copyright grant and re-granting their copyrights (3) on substantially better economic terms, thereby trading on their termination right. Only then is Congress' concerted objective fulfilled. *See Mewborn*, 532 F.3d at 987 (*Milne*'s express agreement "was tantamount to following the statutory formalities," and "achieved the exact policy objectives for which 304(c) was enacted").

### 2. The 1992 Agreement Is Not A "Revocation And Re-Grant"

The 1992 Agreement does not even remotely qualify under *Milne* and *Mewborn* for this "revocation and re-grant" exception. It merely "settles all claims to any payments or other rights or remedies which you [*Frank and Jean*] may have under any other agreement or otherwise … in any and all work created … by your brother [Joe Shuster]" and "grant[s] to [DC] any such rights." SF ¶29. This boilerplate quitclaim could not possibly transfer Joe Shuster's Superman copyrights, long-owned by DC via Shuster's 1938 Grant and subsequent grants. SF ¶¶2, 7, 14, 29. Any "grant" was a "nullity" because Frank and Jean "had nothing [] to transfer." *Mewborn*, 532 F.3d at 986. Nor can DC meet the other requirements of *Milne*.

The 1992 Agreement does *not* contain *any* language of revocation (SF ¶29), let alone the required *express* revocation of identified prior copyright grants. *See Milne*, 430 F.3d at 1040-41; *Mewborn*, 532 F.3d at 989. It include *no* terms like revoke, rescind, supersede, replace, or any other obvious synonyms. SF ¶29. The 1992 Agreement neither identifies Joe Shuster's key Superman grants nor mentions Superman. *Compare Milne*, 542 F.3d at 1041 (new agreement contained express "revocation of the [prior] agreements"); *Steinbeck*, 537 F.3d at 197 (contract *expressly* provided it would "cancel and supersede the previous agreements"). The contract also does *not* re-grant Joe Shuster's Superman copyrights. If the parties had intended a "revocation and re-grant," DC could easily have written this, but did not.

In 1992, neither Frank, Jean, nor anyone else, held a termination right under the Copyright Act. 17 U.S.C. § 304(c)(2) (1978); SF ¶25. The 1992 Agreement was thus *not* negotiated within or near the termination window such that the termination right could be meaningfully leveraged, and Congress' objective achieved. *Milne*, 430 F.3d at 1045 ("Although Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal….").

### 3. There Is No Novation Under New York Law

DC blindly argues that, under New York law, the 1992 Agreement supposedly constitutes a "novation" that somehow replaced Shuster's prior agreements. Dkt. 458 at 13-15, Dkt. 468 at 2-5. Every step of DC's argument is wrong.

First, DC argues that New York law applies to whether the 1992 Agreement is an "agreement to the contrary" under the Copyright Act. Dkt. 468 at 2. The Ninth Circuit in *Milne* and *Mewborn* held that "revocation and re-grant" must be *express* as a matter of federal copyright law, without any reference to state law.

Second, New York law emphasizes the primacy of a contract's language. *See Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977) (courts look not to "subjective intent," but "to the objective manifestations of the intent of the parties" in their contract); *Croman v. Wacholder*, 769 N.Y.S.2d 219, 223 (2003) ("[N]o basis to accept plaintiff's after-the-fact contention that the written agreement means something other than what it says."). Try as DC might to distort the language of the 1992 Agreement, its quitclaim concerns Frank and Jean's rights, *if any*, not Joseph Shuster's prior Superman copyright grants.

Third, contrary to New York's emphasis on contractual language, DC has argued that intent to replace a prior contract may be "express or implied," citing *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D. 2d 230, 233 (N.Y. App. Div. 1958). Dkt. 468 at 2. But *Goldbard* found a purported settlement agreement did ***not*** extinguish the parties' prior contract, and noted that "courts hasten to find an intention to have a substituted or superseding [settlement] agreement discharging the

1   old where the settlement has resulted in *formalized papers with <u>unequivocal</u>*

2   *language* [], or in *formalized or deliberate proceedings in court during the pendency*

3   *of an action*." *Id.* at 234 (emphasis added). Nothing remotely like that exists here.

4        Fourth, DC ignores clear New York decisions that likewise require

5   unequivocal evidence for a novation. *See Citibank, N.A. v. Benedict*, 2000 WL

6   322785, at *8 (S.D.N.Y. Mar. 27, 2000) ("[A]ll parties must have 'clearly expressed

7   their intention that a subsequent agreement … [be] substituted for an old

8   agreement'"); *Wang v. Chen*, 1992 WL 7840 at *6 (S.D.N.Y. Jan. 10, 1992) ("[A]

9   novation must never be presumed."); *Frank Associates, Inc. v. John J. Ryan & Sons,*

10  *Inc.*, 117 N.Y.S.2d 406, 407 (App. Div. 1952) ("It is also well settled that

11  cancellation of a contract must be clearly expressed."); *Yahaya v. Hua*, 1989 WL

12  214481 at *4 (S.D.N.Y. Nov.28, 1989) (there must be a "clear and definite intention

13  on the part of all concerned that [novation] is the purpose of the agreement"). The

14  1992 Agreement hardly constitutes this "clear and definite" evidence, as it contains

15  no language whatsoever of revocation and rescission, and does not even specify *any*

16  of the Superman grants it supposedly revokes and replaces.

17        Fifth, DC miscites extrinsic evidence, notably out-of-context statements from

18  Frank and Jean, to imply that the parties intended the 1992 Agreement to act in place

19  of Frank and Jean's *non-existent* termination right. This supposed extrinsic evidence

20  is inadmissible, because the 1992 Agreement's language is unambiguous. *See Duane*

21  *Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005)

22  (contractual ambiguity is a "threshold question of law for the court"); *International*

23  *Klafter Co., Inc. v. Continental Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) (where

24  contractual terms unambiguous, the "intent of the parties must be determined from

25  their final writing and no parol evidence or extrinsic evidence is admissible").

26        Sixth, even if such evidence were admissible, the declaration of DC's former

27  President, Paul Levitz, on which DC has relied, nowhere suggests that the 1992

28  Agreement was intended to be revocation or re-grant. SF ¶34. Furthermore, DC's

own actions severely undermine its claims. The perfunctory 1992 Agreement, which simply increased Frank's modest pension, bears no resemblance to the elaborate rights agreements customarily used by Warner/DC. SF ¶35. DC has no evidence that it ever registered the 1992 Agreement with the Copyright Office, as is common place for key copyright assignments. SF ¶36. DC has relied for decades on Siegel and Shuster's 1938 Grant *upheld in two Court judgments as granting DC all rights to Superman. See Siegel,* 508 F.2d at 912-913; SF ¶37. DC's 2005 letter to the Shuster Executor regarding the Termination thus nowhere even mentions the 1992 Agreement. SF ¶29. In 2008, DC admitted, and the *Siegel* Court agreed, that DC co-owns the original Superman copyrights based on Shuster's 1938 Grant, not the 1992 Agreement. *See Siegel I*, 542 F. Supp. 2d at 1142; *Siegel,* Dkt. 161 at 15. Finally, even though the Termination was served in 2003, DC did not say one word about the 1992 Agreement until filing this contrived suit in 2010. SF ¶¶39-42.

Lastly, even if, the 1992 Agreement was somehow intended as a "novation," it was not a novation of Joe Shuster's Superman copyright grants. The 1975 Agreement provided a $5,000 pension to Joe's brother, Frank. SF ¶22. On the day Frank signed the 1992 Agreement, he sent a letter to DC waiving his pension under the 1975 Agreement. SF ¶30. Under New York law, Frank's letter is incorporated into the 1992 Agreement. *Davimos v. Halle*, 60 A.D.3d 576, 577 (2009). To the extent the 1992 Agreement "novated" anything, it was only the 1975 Agreement.

The 1975 Agreement, however, did not transfer any Superman copyrights, which it expressly acknowledged were all already owned by DC. SF ¶¶21, 38. This Court held, in an opinion, later incorporated into a Rule 54(b) judgment (SF ¶67), that "the 1975 Agreement was not a 'grant.' The agreement's execution did not result in the transfer or assignment of the Superman copyright." *Siegel I*, 542 F. Supp. 2d at 1133. DC did not bother to appeal that aspect of the judgment, which is binding on DC. SF ¶68; *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004).

Thus, even if New York law applied, and even if it did not require that a

17

1    novation be clear and unequivocal, and even if extrinsic evidence were somehow

2    admissible, and even if the 1992 Agreement were a "novation," it novated the 1975

3    Agreement, without any effect on DC's long-held Superman copyrights.

4          **C.    The Shuster Executor Properly Signed The Shuster Termination**

5          Pursuant to 17 U.S.C. § 304(c)(4), termination notices must be signed "by the

6    number and proportion of the owners of [the author's] termination interest required"

7    to terminate.  Part (3) of DC's First Claim (FAC ¶¶118-24) disingenuously alleges

8    that "the Estate did not own the requisite majority interest," and that 50% of the

9    termination right was supposedly owned by defendant Pacific Pictures Corporation

10   ("PPC") pursuant to a 2001 agreement between PPC and Mark Warren Peary/Jean

11   Adele Peavy and a 2003 agreement between PPC and the Shuster Executor.

12         DC's argument fails.  Under § 304(c)(2)(D),  the Shuster termination right was

13   solely owned by the Shuster Executor, who duly signed his termination notice.  SF

14   ¶58.  The termination right is not transferrable; it can only be held by statutorily-

15   defined classes (statutory heirs and executors), and PPC was not a member of any

16   such class.  17 U.S.C. § 304(c)(2)(A)-(D).  Second, a termination notice must be

17   served before the copyrights to be recovered are transferable to anyone; and even

18   then, prior to the effective termination date (here October 26, 2013), such copyrights

19   can only be anticipatorily assigned to the former grantee or its successor (here, DC).

20   17 U.S.C. § 304(c)(6)(D).  Thus, the 2001/2003 PPC agreements, pre-dating both the

21   service *and* effective date of the Termination, could not and did not transfer any

22   termination right or interest to PPC.  **DC admits this elsewhere in its complaint**

23   **(FAC ¶¶167-68) <u>and</u> briefs (Dkt. 458 at 8:13-15), citing §304(c)(6)(D), just as**

24   **Defendants do.**  The Termination provided all of the required information, and was

25   entirely accurate, as only the Shuster Executor held the termination right.

26         **D.    The Shuster Termination Properly Listed All Copyright Grants**

27         Termination notices are to contain "[a] brief statement reasonably identifying

28   the grant to which the notice of termination applies."  37 C.F.R. § 201.10(b)(1)(iv).

The Termination listed the 1938 Grant and six other DC agreements, to the extent such are construed as grants. SF ¶54. Part (4) of DC's First Claim (FAC ¶¶ 125-28) erroneously alleges that the Termination is invalid because it failed to list (i) a May 21, 1948 consent judgment ("1948 Judgment") and (ii) the 1992 Agreement.

As shown above, the 1992 Agreement was ***not*** a Superman copyright "grant," as DC already owned Joe Shuster's Superman copyrights pursuant to the 1938 Grant and subsequent pre-1978 grants (or potential grants) listed in the Termination. DC's equally dubious argument that the 1948 Judgment was a grant was roundly rejected in *Siegel I*, 542 F. Supp. 2d at 1131-32 – an order entered as a Rule 54(b) judgment (SF ¶67) that binds DC as a matter of collateral estoppel. *See Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987). Significantly, DC did not even bother to appeal that ruling. SF ¶69.

### E.    There Are No "Unclean Hands" That Would Bar Termination

Knowing that its legal arguments fail, DC turns in Part (5) of its First Claim (FAC ¶¶129-33), to vague and baseless "unclean hands" arguments. As a preliminary matter "unclean hands is an equitable defense, not a cause of action." *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D. Cal. 2005) (dismissing "unclean hands" claim). "The doctrine of unclean hands does not obviously apply where it is [the plaintiff], not the [defendant], who seeks relief" based on this "defensive doctrine." *Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003). Moreover, DC's allegations simply do not hold up.

### 1.    PPC's Exclusion Is Proper, Not "Unclean Hands"

The first part of DC's "unclean hands" claim erroneously alleges that not listing "[PPC's] purported ownership interest in the rights … to be terminated" was a "material misrepresentation intended to mislead the courts, Copyright Office, and DC Comics." FAC ¶¶129-30. This makes no sense. As shown above and admitted by DC (FAC ¶¶167-68), the copyrights to be recovered could not be anticipatorily transferred to PPC per 17 U.S.C. §304(c)(6)(D), as a matter of law. And despite

1  DC's empty rhetoric, the Shusters voluntarily produced the PPC agreements to DC in

2  2006 in *Siegel* (SF ¶77), belying any intent to "mislead" DC or the courts. *See*

3  *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1983) (rejecting similar

4  argument as party "made no showing that they have been prejudiced in any way").

5        The closest analogy to DC's vague "unclean hands" claim is that of a "fraud on

6  the copyright office," where a defendant accused of infringement tries to invalidate a

7  plaintiff's copyright. However, the "party seeking to establish a fraud on the

8  Copyright Office … bears a heavy burden." *Lennon v. Seaman*, 84 F.Supp.2d 522,

9  525 (S.D.N.Y. 2000) citing 2 *Nimmer* § 7.20[B]. "The party … must establish that

10  the application … is factually inaccurate, that the inaccuracies were willful or

11  deliberate, and that the Copyright Office relied on those misrepresentations." *Shady*

12  *Records, Inc. v. Source Ent., Inc.*, 2004 U.S. Dist. LEXIS 26143, at *28 (S.D.N.Y.

13  January 2, 2005). "Neither innocent misstatements, nor deliberate, but nonmaterial

14  misstatements, will overcome the presumption of validity." *Id.*

15        DC's "unclean hands" claim thus fails as a matter of law. The PPC agreements

16  ***could not transfer*** the future termination interest. Thus, neither the Termination nor

17  its filing was "factually inaccurate;" there were no misrepresentations to the

18  Copyright Office, on which it relied or otherwise. *See Shady Records, Inc.*, 2004

19  U.S. Dist. LEXIS 26143, at *28–*32 (finding "no alleged omissions or misstatements

20  to evaluate for fraudulent intent" because the plaintiff "was indeed an owner of

21  copyright interests in [the song] at the time of the basic registration, by virtue of

22  Michael Ruby's assignment of his interests"); *Rottlund Co.*, 2004 U.S. Dist. LEXIS

23  16723, at *39–*46 (finding no fraud because the plaintiff owned the copyrights by

24  assignment; "[t]hus, the allegedly erroneous work for hire designation is immaterial

25  and caused no prejudice to Defendants").

26        **2.    No "Unclean Hands" In Deciding To Not Terminate Superboy**

27        Part two of DC's purported "unclean hands" claim is based on the proper

28  omission of Superboy from "the Shuster Termination Notice." FAC ¶¶131-33. The

1  Shuster Executor's legal decision not to terminate Superboy was correct and, in any
2  event, such a discretionary legal decision could not constitute "unclean hands."

3      <u>Superboy Could Not Have Been Terminated</u>:  DC's claim fails because
4  Superboy could not have been terminated by the § 304(d) Shuster Termination as a
5  matter of law.  Section 304(d) *only* applies to "works for which copyright was
6  secured between January 1, 1923, and October 26, 1939."  67 Fed. Reg. 69134,
7  69135 (Nov. 15, 2002), 17 U.S.C. § 304(d).  Copyright for the first Superboy story
8  was secured in **November 1944** when it was first published in *More Fun Comics*,
9  No. 101.  RJN, Ex. E, FF ¶163; FAC ¶¶41-42, 131.  Superboy was therefore ***not***
10  subject to a § 304(d) termination by the Shuster Executor.

11      <u>Siegel Was Held To Be The Original Superboy Author/Owner</u>:  DC's "unclean
12  hands" theory ignores prior binding decisions as to Superboy.  In 1938-1940, Jerome
13  Siegel, on his own, developed Superboy in a script he submitted to DC, which
14  rejected it.  SF ¶¶6, 8-10.  In 1944, while Siegel was abroad in World War II, DC
15  published Superboy as a new character in *More Fun Comics*, No. 101 and in later
16  comics, based on Siegel's material, but without his consent.  SF ¶10.

17      When Siegel and Shuster jointly sued DC in the 1947 Action, Siegel
18  ***individually*** claimed that Detective had no right to publish Superboy, and that
19  Superboy belonged to him.  SF ¶6.  The court agreed, finding Siegel was the ***sole***
20  creator/owner of Superboy, and enjoined DC from publishing Superboy.  SF ¶¶8-10.
21  The Second Circuit later found such findings preclusive as to DC, Siegel and Shuster.
22  *Siegel*, 508 F.2d at 913-14.  The Shuster Executor thus chose not to include Superboy
23  in his termination, as he was bound (as is DC) by the prior decision that Siegel was
24  the original author/owner of Superboy.

25      <u>Termination Is Discretionary</u>:  Termination is not mandatory, it is discretionary.
26  *See* 17 U.S.C. §§ 304(c)-(d).  The Shuster Executor's well-reasoned decision not to
27  file a Superboy termination notice was squarely based on the above, but even if he
28  had refrained for a tactical advantage as alleged by DC (FAC ¶¶10, 89), such cannot

21

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT    **ER-1017**

constitute "unclean hands" as a matter of law.  *See Gucci Am., Inc. v. Guess?, Inc.*, 2012 WL 2304247 (S.D.N.Y. June 18, 2012) (unclean hands inapplicable to "a tactical choice rather than an 'unconscionable act'"); *Lucky's Detroit, LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012) ("litigation tactics" do not constitute "unclean hands"); *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990) (unclean hands "cannot [be] based on … litigation strategy").  Furthermore, despite DC's insinuations (FAC ¶132), the Shusters have no right or interest in Superboy or the Siegels' Superboy termination.  SF ¶63.

## III.    DC'S SECOND CLAIM IS LARGELY PRECLUDED

DC's Second Claim (FAC ¶¶135-164) addresses the "scope" of the Shuster Termination.  Parts (a) and (c) concern "work for hire" issues *fully* litigated in *Siegel*. *Compare* FAC ¶¶153-54, 158-59 *with Siegel*, 542 F. Supp. 2d at 1126-30; 658 F. Supp. 2d 1036, 1061-68, 1083 (C.D. Cal. 2009) ("work for hire" and unpublished Superman works).  Since Siegel and Shuster co-authored the same Superman works and executed the same grants subject to statutory termination, parts (a) and (c) are clearly barred by the judgment in *Siegel* under the issue preclusion doctrine.  *See* SF ¶71.  The remaining parts ((b), (d) and (e)) should be stayed pending resolution of the more advanced *Siegel* litigation, where such issues first arose.  *See* SF ¶72; *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997) (staying action pending related litigation to "serve the interests of judicial economy"); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (a court "has broad discretion to stay proceedings").

## IV.    DC'S THIRD CLAIM FAILS AS A MATTER OF LAW

### A.    Section 304(c)(6)(D) Does Not Provide DC With Any Rights

DC's Third Claim (FAC ¶¶165-73) fails a matter of law because it is premised on a non-existent "statutory right" under 17 U.S.C. § 304(c)(6)(D) to exclusively negotiate the purchase of the copyrights recovered by the Siegels and the Shuster Executor.  DC claims that (1) the long-cancelled and ineffective PPC agreements and (2) the Siegels' and Shusters' 2008 agreement to collectively negotiate with DC (the

1    "2008 Agreement") somehow interfere with its non-existent "right."

2         The unambiguous statute provides DC no such "right," and both case law and

3    treatises confirm that none exists.  Section 304(c)(6)(D) simply provides that "a

4    further grant, or agreement to make a further grant, of any right covered by a

5    terminated grant is valid only if it is made after the effective date," except that an

6    "agreement for such a further grant may be made … [with] the original grantee …

7    after the notice of termination has been served."  This merely limits the terminator's

8    ability to make a grant; it does not create an affirmative "right" for the terminatee.

9         DC's slim theory was expressly rejected in *Bourne Co. v. MPL Commc'ns,*

10   *Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), where a terminated party claimed rights

11   to "an exclusive period of negotiation" and "first refusal" under section 304(c)(6)(D):

12        ***Nor does the statute [§ 304(c)(6)(D)] provide for an exclusive period of
          negotiation. The statute neither compels the terminating party to negotiate***

13        ***with the terminated grantee, nor forbids him from negotiating with anyone
          else.*** All it requires is that prior to the effective date of termination, the

14        terminated grantee is the only person with whom the author or his successor

15        can make an enforceable and effective agreement to transfer those rights.

16   *Id.* (citations omitted) (emphasis added).  *Bourne* thus rejected the notion of an

17   "exclusive negotiation period," finding nothing in the statute that says "a [third party]

18   grant is valid only if *negotiated* after the termination date."  675 F. Supp. at 861.

19   *Bourne* also rejected the argument that § 304(c)(6)(D) is "'in the nature of a right of

20   first refusal;'" for if Congress intended such a right, "it would have done so in clear

21   language."  *Id.* at 865; *see* 3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010)

22   ("[§ 304(c)(6)(D) is] sometimes erroneously described as a 'right of first refusal.'").

23        DC's alleged remedy – to "restore" an "exclusive period of negotiation" – thus

24   makes no sense as "[i]t is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an

25   exclusive period of negotiation.'" 3 *Nimmer* § 11.08[A], n.6 (2010).

26        Simply put, neither the statute nor the case law supports DC's Third Claim.

27        Finally, even if DC had such rights, the 2001/ 2003 PPC agreements were

28   cancelled in 2004, *nine years* before the 2013 Termination date.  Furthermore, the

2008 Agreement does not in any way violate DC's supposed "right." As DC admits, the 2008 Agreement simply "'requires … the consent of the Siegels and the Shuster Estate … to a settlement of their termination rights *with DC*.'" Dkt. 458 at 24. (emphasis added); SF ¶¶80-81. Indeed, after extensive briefing, Magistrate Zarefsky rejected DC's argument that the 2008 Agreement is "an independent wrong [that] violates the Copyright Act," finding it a legitimate "Drysdale-Koufax collective approach to negotiation." SF ¶82. This Court upheld that ruling. SF ¶83.

### B. <u>DC Lacks Standing To Bring Its Third Claim</u>

Because a terminated grantee, like DC, has "no rights under [§ 304(c)(6)(D)], [it] cannot sue for failure to comply, and the provision therefore does not provide a basis for standing." 6 *Patry* § 21:18. Unless Congress plainly showed "an intent to create not just a private right but also a private remedy," then "a cause of action does not exist and courts may not create one." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). DC points to nothing that gives it such a private remedy.

### C. <u>DC's Third Claim Is Barred By The Statute Of Limitations</u>

DC's Third Claim for declaratory relief under the Copyright Act is subject to 17 U.S.C. § 507(b)'s three-year statute of limitations. DC's Third Claim is expressly based on *the text* of the 2001/2003 PPC Agreements. Dkt. Nos. 49 ¶169; 458 at 23-25. DC's claim therefore accrued no later than November 2006, when the PPC Agreements were voluntarily produced to DC, and DC deposed witnesses regarding them in 2006. SF ¶¶77-78. DC's Third Claim thus expired in **November 2009**, six months before this suit was filed. DC's excuse that it was unaware of its claim until it read the anonymous "Timeline" in 2008 does not hold up because DC's claim is based on the PPC Agreements themselves. Furthermore, because the PPC agreements were cancelled (SF ¶76), the only potential "continuing harm" is from the Consent Agreement, which does not violate any of DC's purported "rights."

### V. THE COURT MAY ENTER JUDGMENT UNDER F.R.C.P. 54(b)

F.R.C.P. 54(b) allows a district court to enter a judgment on orders that resolve

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT **ER-1020**

1   individual claims "[w]hen more than one claim for relief is presented in an action."

2   To be eligible for entry of judgment under Rule 54(b), an order must constitute "an

3   ultimate disposition of an individual claim," and there must be "no just reason" to

4   delay appellate review. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-

5   8 (1980). "The Ninth Circuit embraces a 'pragmatic approach [to Rule 54(b))

6   focusing on severability [of claims] and efficient judicial administration.'" *Cont'l*

7   *Airlines, Inc.*, 819 F.2d at 1525.

8        This motion presents an excellent opportunity for this Court to enter a Rule

9   54(b) judgment, just like it did in *Siegel*. SF ¶67. A Rule 54(b) judgment is

10  especially appropriate where, as here, it would streamline the issues, conserve

11  judicial resources and promote settlement. *See Noel v. Hall*, 568 F.3d 743, 747 (9th

12  Cir. 2009); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 166 Fed. Appx. 268, 270–

13  71 (9th Cir. 2006). DC's First and Third Claims fail as a matter of law. DC's

14  Second Claim is largely precluded and the remainder should be stayed pending

15  resolution of its issues in *Siegel*. DC's Fourth, Fifth and Sixth Claims are stayed and

16  currently on appeal. SF ¶73. The parties agree that the First Claim (validity of the

17  Termination) is of paramount importance. Dkt. 458. If a Rule 54(b) judgment is

18  entered on the First Claim, at a minimum, the remaining claims could be stayed,

19  while the Ninth Circuit confirms the validity of the Shuster Termination once and for

20  all.

21                   **<u>CONCLUSION</u>**

22        For the foregoing reasons, summary judgment should be granted to Defendants

23  as to DC's First Claim, Second Claim (sub-parts (a) and(c)), and Third Claim.

24  Dated:  August 20, 2012      RESPECTFULLY SUBMITTED,

25                    /s/ Marc Toberoff

26                    Marc Toberoff

27                    TOBEROFF & ASSOCIATES, P.C.

28                    Attorneys for Defendants Mark Warren Peary *et al.*

1  Marc Toberoff (State Bar No. 188547)
     mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
     kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
     parredondo@ipwla.com
4  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
5  Malibu, California 90265
   Telephone:  (310) 246-3333
6  Fax:          (310) 246-3101

7  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
8  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and as
9  personal representative of the Estate of
   Joanne Siegel

10            **UNITED STATES DISTRICT COURT**

11   **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12 | DC COMICS,                          | Case No: CV 10-03633 ODW (RZx)
13 |              Plaintiff,             | Hon. Otis D. Wright II, U.S.D.J.
14 |     vs.                             | Hon. Ralph Zarefsky, U.S.M.J.
15 | PACIFIC PICTURES CORPORATION;       | **DEFENDANTS' FURTHER
16 | IP WORLDWIDE, LLC; IPW, LLC;        | STATEMENT OF GENUINE
     | MARC TOBEROFF, an individual;       | ISSUES IN OPPOSITION TO DC
17 | MARK WARREN PEARY, as personal      | COMICS' MOTION FOR
     | representative of the ESTATE OF     | PARTIAL SUMMARY
18 | JOSEPH SHUSTER; JEAN ADELE          | JUDGMENT ON ITS FIRST AND
     | PEAVY, an individual; LAURA         | THIRD CLAIMS FOR RELIEF**
19 | SIEGEL LARSON, individually and as  |
20 | personal representative of the ESTATE | Complaint filed:  May 14, 2010
     | OF JOANNE SIEGEL, and DOES 1-10,    | Discovery Cutoff:  None Set
21 | inclusive,                          | Trial Date:       None Set
22 |                                     | Date:     August 20, 2012*
     |              Defendants.            | Time:     1:30 p.m.
23 |                                     | Place:    Courtroom 11

24

25

26

27

28

---

| | 100. | Pacific Pictures assigned all of its Shuster rights to defendant IP Worldwide in 2002, which in turn assigned those rights to defendant IPW. | **Disputed**. Any Shuster claims were explicitly excluded from the 2002 IP Worldwide agreement in paragraph D and Appendix "1" to the agreement. IP Worldwide has never represented the Shusters or claimed to hold any Shuster right. IPW has never had nor claimed to have had any interest whatsoever in Superman. Pacific Pictures, in any event, owned no "Shuster rights" as a matter of law. 17 U.S.C. §§ 304(c)(5), (c)(6)(D). DC's Evidence: Docket Nos. 305-20 at 668 (February 12, 2002, agreement between Marc Toberoff, on behalf of Pacific Pictures Corporation, and Ari Emanuel in which Pacific Pictures contributed its "current IP business" to a "joint venture" created "to acquire and exploit intellectual property rights"); 305-17 at 464:18-465:5 (transcript from the 2006 deposition of Toberoff, where he testified that IP Worldwide was "presently inactive," and its rights "were assigned to IPW") |
|---|---|---|---|

DEFENDANTS' FURTHER STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT    **ER-1023**

| | | |
|---|---|---|
| | | <u>Objections to DC's Evidence:</u> Docket Nos. 305-20 and 305-17 do not prove the facts asserted.<br><br><u>Defendants' Evidence</u>:  Docket No 305-20 at 668 (February 12, 2002, agreement between Marc Toberoff, on behalf of Pacific Pictures Corporation, and Ari Emanuel, where Pacific Pictures contribution to the joint venture is expressly "subject to pre-existing commitments and exclusions per Appendix "1" and ¶ D below").  Docket No 305-20 at 673 (Appendix I listing "JS [Joseph Shuster] Claims" as an express exclusion); *see also* Docket No. 145-2 at 19:6-15; No. 145-6 at 368. |
| 101. | Neither IP Worldwide nor IPW is a party to the 2011 Pacific Pictures contract. | **Disputed.**  There is no 2011 Pacific Pictures contract.  Pacific Pictures Corp. was dissolved years ago.  What DC mischaracterizes as a new contract is a simple August 9, 2011 letter acknowledging that when the 2001 and 2003 Pacific Pictures agreements were cancelled and revoked in writing on September 10, 2004, and replaced by a |

|     |     |     | regular legal retainer agreement retroactive to 2001, it was understood and intended by all that Pacific Pictures would have no continuing interest whatsoever.  The August 9, 2011 letter was signed to once and for all put to rest DC's false assertions as to Pacific Pictures.<br><br>DC's Evidence:  AD Ex. 27<br><br>Objections to DC's Evidence: AD Ex. 27 does not prove the asserted fact.<br><br>Defendants' Evidence:  AD Ex. 13, 21, 27 |

Dated:  August 13, 2012

RESPECTFULLY SUBMITTED,
/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

DEFENDANTS' FURTHER STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

ER-1025

1   DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11

12  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

13              Plaintiff,              **DC COMICS' OBJECTIONS TO
                                        EVIDENCE IN DEFENDANTS'**
14         v.                           **STATEMENT OF ADDITIONAL
                                        UNDISPUTED FACTS,**
15  PACIFIC PICTURES CORPORATION,       **DECLARATION, AND EXHIBITS**
    IP WORLDWIDE, LLC, IPW, LLC,
16  MARC TOBEROFF, an individual,
    MARK WARREN PEARY, as personal      Hon. Otis D. Wright II
17  representative of the ESTATE OF
    JOSEPH SHUSTER, JEAN ADELE
18  PEAVY, an individual, LAURA         **Hearing Date:**   Aug. 20, 2012
    SIEGEL LARSON, an individual and as **Hearing Time:**   1:30 p.m.
19  personal representative of the ESTATE **Courtroom:**     11
    OF JOANNE SIEGEL, and DOES 1-10,
20  inclusive,

21              Defendant.

22

23

24

25

26

27

28

**ER-1026**

Plaintiff DC Comics ("DC") respectfully submits the following objections to the evidence in defendants' Statement Of Additional Undisputed Facts, Declaration of Keith G. Adams, and supporting exhibits:

| DEFS.' ADDITIONAL UNDISPUTED STATEMENT OF FACT ("DAUSF") | DC'S OBJECTIONS |
|---|---|
| 47.    Siegel and Shuster's highly original character became a cultural icon, spawned a multi-billion dollar franchise and brought fortune to many, but not to them.<br><br>**Decl. of Keith Adams ("AD") Ex. 1**<br><br>Described in AD as "article titled 'Superman's Creators, Nearly Destitute, Invoke His Spirit' from The New York Times, dated November 22, 1975."<br><br>**AD Ex. 2**<br><br>Described in AD as "article titled 'Mild-Mannered Cartoonists Go To Aid of Superman's Creators' from The New York Times, dated December 10, 1975."<br><br>**AD Ex. 3**<br><br>Described in AD as "article titled 'Man of Steel Splinters an American Dream' from the Los Angeles Times, dated February 25, 1979."<br><br>**AD Ex. 5**<br><br>Described in AD as "article titled 'Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78' from The New York Times, dated August 3, 1992." | AD Exs. 1-3, 5, and 6 are inadmissible hearsay. FED. R. EVID. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005). Defendants offer these newspaper articles solely for the truth of the matters contained therein to support their erroneous argument that Siegel and Shuster did not benefit from the exploitation of Superman. Defendants cannot and do not identify any hearsay exception or other basis that would justify the exhibits' admission. *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).<br><br>FED. R. CIV. P. 56(c)(1)-(2) requires that only admissible evidence be considered for purposes of summary judgment, and thus AD Exs. 1-3, 5, and 6 must be disregarded, *In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008).<br><br>Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. |

| **AD Ex. 6** | |
|---|---|
| Described in AD as "article titled 'Jerry Siegel, Superman's Creator, Dies at 81' from The New York Times, dated January 31, 1996." | |
| **DAUSF** | **DC'S OBJECTIONS** |
| 50.    Although Superman soon became a phenomenal financial success, DC kept its creators at a basic "page rate," and denied their requests for a simple royalty.<br><br>**AD Ex. 1**<br><br>Described in AD as "article titled 'Superman's Creators, Nearly Destitute, Invoke His Spirit' from The New York Times, dated November 22, 1975."<br><br>**AD Ex. 3**<br><br>Described in AD as "article titled 'Man of Steel Splinters an American Dream' from the Los Angeles Times, dated February 25, 1979." | AD Exs. 1 and 3 are inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Objections to DAUSF 47.<br><br>Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |
| **DAUSF** | **DC'S OBJECTIONS** |
| 53.    In retaliation for the 1947 Action, DC cut Siegel and Shuster off, and from 1949-1975, deleted their credit byline and any references to them from its publications and corporate histories.<br><br>**AD Ex. 3**<br><br>Described in AD as "article titled 'Man of Steel Splinters an American Dream' from the Los Angeles Times, dated February 25, 1979." | AD Ex. 3 is inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Objections to DAUSF 47.<br><br>Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |

| **DAUSF** | **DC's Objections** |
|---|---|
| 54.    Siegel's last job was as a mail clerk, and Shuster worked intermittently as a messenger boy.<br><br>**AD Ex. 2**<br><br>    Described in AD as "article titled 'Mild-Mannered Cartoonists Go To Aid of Superman's Creators' from The New York Times, dated December 10, 1975." | AD Ex. 2 is inadmissible hearsay. FED. R. EVID. 801, 802; *supra* DC's Objections to DAUSF 47.<br><br>    Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602. |

| **DAUSF** | **DC's Objections** |
|---|---|
| 74.    Prior to filing this lawsuit in 2010, DC never asserted that the 1992 Agreement was the basis for its chain-of-title to Superman; nor did it ever suggest that the 1992 Agreement prevented termination as a "revocation and re-grant" or otherwise.<br><br>**Decl. of Paul Levitz ("LD") Ex. 74**<br><br>    Letter from Paul Levitz (DC) to Jean Adele Peavy and Mark Warren Peary dated April 28, 2005. | LD Ex. 74 does not prove this asserted fact, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *U.S. v. Whitney*, 180 Fed. Appx. 670, 673 (9th Cir. 2006); *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); Pl. DC Comics' Reply ISO Mot. For Partial S.J. On Its First And Third Claims For Relief ("DC's MSJ Reply") at 7 n. 3. |

| **DAUSF** | **DC's Objections** |
|---|---|
| 75.    DC admitted, and the Court agreed, that it co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement).  Siegel, 542 F. Supp. 2d at 1142.<br><br>**LD Ex. 74**<br><br>    Letter from Paul Levitz (DC) to Jean Adele Peavy and Mark Warren | LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n. 3; *supra* DC's Objections to DAUSF 74. |

DC'S OBJS. TO EVIDENCE IN DEF.'S
ADDITIONAL SUF, DECL., & EXS.

**ER-1029**

| Peary dated April 28, 2005. | |
|---|---|
| **DAUSF** | **DC'S OBJECTIONS** |
| 76. Elaborate rights agreements (including short form assignments for filing with the Copyright Office) customarily are used by Warner/DC to create valid chains-of-title to copyrights.<br><br>**AD Ex. 8**<br><br>Described in AD as "December 18, 1998 Agreement between Warner Bros. on the one hand, and Hasbro, Inc. and Hasbro International, Inc., on the other hand, produced by Warner Bros. in the related Siegel case and designated as a trial exhibit without a confidentiality designation."<br><br>**AD Ex. 9**<br><br>Described in AD as "August 2, 2001 Agreement between Marvel Characters, Inc. on the one hand, and Katja Motion Picture Corp., on the other hand, produced by Warner Bros. in the related Siegel case and designated as a trial exhibit without a confidentiality designation."<br><br>**AD Ex. 11**<br><br>Described in AD as "December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar Rice Burroughs, Inc., on the other, produced by Warner Bros. in the related Siegel case and designated as a trial exhibit without a confidentiality designation." | Unsupported by any testimony or evidence laying any foundation for three contracts out of hundreds that companies like Warner and DC enter into, or any testimony or evidence tying these three contracts to the issues in dispute in this case—much less the 1992 Agreement on which DC sues—defendants try to use these contracts to show that the 1992 Agreement, to be an effective copyright grant, had to be much longer.<br><br>This legal argument—improperly masquerading as a factual one—runs directly contrary to well-established copyright law that the Ninth Circuit handed down two years before the 1992 Agreement was made: "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; *a one-line pro forma statement will do*." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (emphasis added).<br><br>In any event, the three contracts defendants cite can and should be stricken for lack of foundation or connection to the facts at issue in this case, FED. R. EVID. 602, and disregarded on relevance grounds, FED. R. EVID. 401. The contracts in AD Exs. |

DC'S OBJS. TO EVIDENCE IN DEF.'S
ADDITIONAL SUF, DECL., & EXS.

**ER-1030**

8, 9, and 11 involve different parties, different rights, and different properties than those at issue in this case, and were entered into almost a decade after the 1992 Agreement.  AD Exs. 8 (Warner Bros.-Hasbro; option; G.I. Joe; 1998); 9 (Katja Motion Picture Corp.-Marvel Characters, Inc.; license; Iron Man; 2001); 11 (Warner Bros.-Edgar Rice Burroughs, Inc.; option; Tarzan; 2002).

AD Exs. 8, 9, and 11 are not habit evidence under FED. R. EVID. 406, because the documents do not show "a frequency of specific conduct sufficient to be considered semiautomatic." *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988); *see U.S. v. West*, 22 F.3d 586, 592 (5th Cir. 1994) (rejecting Rule 406 argument where evidence not numerous enough in relation to defendants' thousands of other dealings); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (explaining that experience of one contractor not sufficient evidence of routine practice in light of different experiences of thousands of other contractors who had dealt with same party).

Defendants' use of a contract between two third-party corporations, AD Ex. 9—to which neither Warner Bros. nor DC is related—to imply the 1992 Agreement differed from DC's routine practice is especially improper *Alevromagiros v. Hechinger Co.*, 993

- 6 -

DC'S OBJS. TO EVIDENCE IN DEF.'S
ADDITIONAL SUF, DECL., & EXS.

**ER-1031**

| | |
|---|---|
| | F.2d 417, 422 (4th Cir. 1993) ("bringing in one particular competitor's ladder … and making that an industry standard, that is terribly misleading"); *Anderson v. Nat'l R.R. Passenger Corp.*, 866 F. Supp. 937, 944 (E.D. Va. 1994). |
| | Documents AD Exs. 8, 9, and 11 are also inadmissible character evidence. "Evidence of a[n] … other act is not admissible to prove … that on a particular occasion the person acted in accordance." FED. R. EVID. 404(b). Defendants identify no exception for this rule "prohibit[ing] 'other acts' evidence for the purpose of showing action in conformity therewith." *U.S. v. Redlightning*, 624 F.3d 1090, 1120-21 (9th Cir. 2010).[1] |

| **DAUSF** | **DC'S OBJECTIONS** |
|---|---|
| 86.    On April 28, 2005, DC sent a letter to the Shuster Executor that offered to settle with the Shusters at the expense of the Siegels. The Shuster Executor declined this offer.<br><br>**LD Ex. 74**<br><br>    Letter from Paul Levitz (DC) to Jean Adele Peavy and Mark Warren Peary dated April 28, 2005. | LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it. FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n. 3; *supra* DC's Objections to DAUSF 74. |

---

[1] The Adams Declaration also includes an Exhibit 4, which defendants never cite in their opposition brief or Statement of Undisputed facts briefing.  Adams describes Exhibit 4 as "an October 10, 1980 Agreement between DC Comics, Inc. on the one hand and Swampfilms, Inc."  Defendants have failed to make any argument about Exhibit 4, but for the reasons discussed above, to the extent they do rely on the exhibit, it can and should be stricken.

ER-1032

| **DAUSF** | **DC'S OBJECTIONS** |
|---|---|
| 88.    On August 2, 2011, Toberoff, Jean and Peary confirmed their intent that PPC would have no continuing interest whatsoever when they revoked the PPC Agreements in 2004.<br><br>**AD Ex. 28**<br><br>    Described in AD as "a Mediation Questionnaire filed on November 9, 2011 in *DC Comics v. Pacific Pictures Corp. et al.*, Ninth Circuit Appeal No. 11-56934. | AD Ex. 28 is not evidence.  It is a mediation questionnaire that defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case.  It should be stricken as:  hearsay, FED. R. EVID. 801-02, for lack of foundation and personal knowledge, FED. R. EVID. 602, and as improper opinion evidence.  FED. R. EVID. 701-02.  If defendants meant to cite to Exhibit 27, it is inadmissible to support their stated claim as well.  As made clear by defendants' own testimony and that of Jean's doctor, Jean was incompetent to sign the 2011 agreement.  Docket Nos. 322 at 1-2; 360 at 3-5, 11-12.  Defendants submit no evidence from Jean or any other witness laying the foundation for this agreement or her ability to understand or enter into it.  This improper evidence that defendants manufactured after the filing of this lawsuit is, at best, evidence of additional improper agreements defendants created well within the limitations period on DC's Third Claim.  *See* MSJ Reply at 12. |
| **DAUSF** | **DC'S OBJECTIONS** |
| 89.    On April 28, 2005, DC sent a letter to the Shuster Executor that alluded to DC's arguments against the terminations in the Siegel litigation, and offered to settle with the Shusters at the expense of the Siegels. The letter stated, | LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it. FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d |

DC'S OBJS. TO EVIDENCE IN DEF.'S
ADDITIONAL SUF, DECL., & EXS.

| | |
|---|---|
| "DC will only pay a premium to one termination party." It also noted, "[I]f we are able to resolve matters with the Siegel heirs ... before we reach an agreement with you … there will not be any pressing need to reach an agreement with you." The letter offered the Shuster Executor a cash advance of two million dollars and royalties. | at 1213-14; DC's MSJ Reply at 7 n. 3; *supra* DC's Objections to DAUSF 74. |

**LD Ex. 74**

Letter from Paul Levitz (DC) to Jean Adele Peavy and Mark Warren Peary dated April 28, 2005.

| **DAUSF** | **DC'S OBJECTIONS** |
|---|---|
| 99.    In 2010, DC fired its general counsel and outside counsel, and, after settlement talks with the Siegels were unsuccessful, sued Mr. Peary and Mr. Toberoff. <br><br> **AD Ex. 28** <br><br> Described in AD as "a Mediation Questionnaire filed on November 9, 2011 in *DC Comics v. Pacific Pictures Corp. et al.*, Ninth Circuit Appeal No. 11-56934. | AD Ex. 28 is not evidence. It is a mediation questionnaire that defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case. It should be stricken as: hearsay, FED. R. EVID. 801-02, for lack of foundation and personal knowledge, FED. R. EVID. 602, and as improper opinion evidence. FED. R. EVID. 701-02. *See supra* DC's Objections to DAUSF 88. |

Dated:  August 6, 2012

Respectfully submitted,

By:  /s/ Daniel M. Petrocelli
                Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

ER-1034

1    DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3    CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4    O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5    Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6    Facsimile:   (310) 246-6779

7    Attorneys for Plaintiff DC Comics

8

               **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11   DC COMICS,

12          Plaintiff,

13        v.

14   PACIFIC PICTURES
    CORPORATION, IP WORLDWIDE,
15   LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN
16   PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
17   JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an
18   individual and as personal
    representative of the ESTATE OF
19   JOANNE SIEGEL, and DOES 1-10,
    inclusive,
20
          Defendants.
21

22

23

24

25

26

27

28

Case No. CV 10-3633 ODW (RZx)

**PLAINTIFF DC COMICS'
RESPONSE TO DEFENDANTS'
OBJECTIONS TO EVIDENCE IN
PLAINTIFF'S STATEMENT OF
UNDISPUTED FACTS,
DECLARATIONS, AND
EXHIBITS**

Hon. Otis D. Wright II

**Hearing Date**:   Aug. 20, 2012
**Hearing Time**:   1:30 p.m.
**Courtroom**:     11

1   DC Comics ("DC") hereby responds to defendants' Objections To Evidence

2   In Plaintiff's Statements Of Undisputed Facts, Declarations, And Exhibits.

3   Defendants raise dozens of meritless objections to the relevance of matters in DC's

4   statement of undisputed facts.  Such objections are "considered an exceptional

5   remedy and [are] generally disfavored," *Larouche v. Dep't of the Treasury*, 2000

6   WL 805214, at *13 (D.D.C. Mar. 31, 2000), and defendants do not meet their

7   "'formidable burden'" of striking any of DC's cited evidence.  *U.S. ex rel. K&R*

8   *Ltd. P'ship v. Mass. Housing Fin. Agency*, 456 F. Supp. 2d 46, 53 (D.D.C. 2006).

9   Almost all of defendants' objections are to the relevance or to the admissibility of

10  evidence under Rules 401-403, but such objections are "a[t] the summary judgment

11  stage … a waste of the court's time." *Elwell v. Conair, Inc.*, 145 F. Supp. 2d 79, 84

12  (D. Me. 2001).  Most disturbingly, defendants use their objections to rehash and

13  expand legal arguments about the merits of DC's motion for summary judgment; in

14  so doing, defendants, yet again, evade the Court's page limitations briefs.  Docket

15  No. 328.  DC regrets the length of this submission, but defendants' spurious

16  objections necessitate it.  For the reasons set forth below, their objections should be

17  overruled.

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

5.   After *AC#1* was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  [Decl. of Daniel M. Petrocelli ("PD")]  Exs. 3-6, 10 at 88-91 ([Finding of Facts ("FOF")] 55-59, 64-77).]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims whether Siegel and Shuster were compensated in royalties and bonuses.  It is also irrelevant whether those royalties and bonuses | Defendants' objections are improper because they do not specify which evidence is objectionable or explain how any particular piece of evidence could possibly "prejudice" the District Court.

Defendants' relevance objection "a[t] the summary judgment stage … is itself a waste of |

ER-1036

| | |
|---|---|
| increased with Superman's success. The Copyright Act's termination rights, 17 U.S.C.§§ 304(c),(d), 203(a), do not depend upon how much money an author previously made as a result of his creation, and DC's only purpose in alleging these purported facts is to elicit prejudice. Fed. R. Evid. 401, 402, 403. | the court's time." *Elwell*, 145 F. Supp. 2d at 84. "[N]ormally the balancing process contemplated by [Rule 403] is best undertaken at the trial itself." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000). |
| | In any event, DC's cited evidence is relevant because it provides a history of DC's "long-lasting economic relationship" with Siegel and Shuster. Docket No. 337 at 4. For the Shuster heirs, that relationship culminated in the 1992 Agreement, which DC argues in its First Claim bars their termination. Courts recognize "[t]he entire historical background provides the context for the actions of the parties." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 2009 WL 5064049, at *4 n.13 (E.D. Wis. Dec. 16, 2009). |
| | A "motion to strike [matter attached to motion for summary judgment] is considered an exceptional remedy and is generally disfavored," *Larouche v. Dep't of the Treasury*, 2000 WL 805214, *13 (D.D.C. Mar. 31, 2000). Defendants do not meet their "formidable burden" for striking this evidence. *U.S. ex rel. K&R Ltd. P'ship*, 456 F. Supp. 2d at 53. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

6.      By 1941, the *Saturday Evening Post* reported that Siegel and Shuster stood to make over $2 million (in today's terms) in the next year alone. Fn. 2. All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/. [PD Ex. 7 at 27.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims how much Jerry Siegel and Joseph Shuster were purportedly paid by DC during | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to |

DC'S RESP. TO DEFS.' OBJS.

**ER-1037**

| | |
|---|---|
| their lifetimes. The Copyright Act's termination rights do not depend upon how much money an author previously made as a result of his creation, and DC's only purpose in alleging these purported facts is to elicit prejudice. Fed. R. Evid. 401, 402, 403.<br><br>DC's calculation of the present day value of purported payments using an "online inflation calculator" is improper lay opinion, lacks sufficient underlying facts and data, and foundation. Fed. R. Evid. 701, 702. | Objection 5.<br><br>"The entire historical background provides the context for the actions of the parties," *Appleton Papers*, 2009 WL 5064049, at \*4 n.13, and DC's cited evidence is relevant to show DC's "long-lasting economic relationship" with Siegel and Shuster. Docket No. 337 at 4. For the Shuster heirs, that relationship culminated in the 1992 Agreement, which DC argues in its partial summary judgment motion on its First Claim bars their termination claim.<br><br>Defendants' attack on DC's calculation of inflation is spurious. Courts regularly use statistics, including the consumer price index, as provided by the Bureau of Labor Statistics. *See Sorenson v. Mink*, 239 F.3d 1140, 1148 (9th Cir. 2001) (noting it is a regular practice for district courts to use the consumer price index, a statistic provided by the Bureau of Labor Statistics, and to make calculations therefrom). |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

8.     In a 1975 agreement, DC provided Siegel and Shuster with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works. Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. [PD Ex. 15.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims how much Siegel and Shuster were purportedly paid under the 1975 agreement. The termination right does not depend upon how much an author previously made as a result of his creation, and | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>"The entire historical background provides the context for the actions of the parties," *Appleton Papers*, 2009 WL 5064049, at \*4 n.13, and DC's |

DC'S RESP. TO DEFS.' OBJS.

**ER-1038**

| DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403. | cited evidence is relevant because it provides a history of DC's "long-lasting economic relationship" with Siegel and Shuster.  Docket No. 337 at 4; *supra* Responses to Objections 5, 6. |
|---|---|
| DC's calculation of the present day value of purported payments using an "online inflation calculator" is improper lay opinion, lacks sufficient underlying facts and data, and foundation.  Fed. R. Evid. 701, 702. | Defendants' attack on DC's calculation of inflation is spurious.  Courts regularly use such statistics.  *See Sorenson*, 239 F.3d at 1148. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|
| 9.     Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families travel to Superman-related events. [*E.g.,* PD Exs. 17-19; Decl. of Paul Levitz ("LD") Exs. 23, 27, 33, 39, 53, 54, 60, 67, 71, 75-78.] |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims whether DC increased the annual payments, made periodic cost-of-living adjustments, gave special bonuses, or paid to have Siegel, Shuster, and their families travel to Superman-related events.  The termination right does not depend upon any of these issues and DC raises them merely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| | "The entire historical background provides the context for the actions of the parties," *Appleton Papers*, 2009 WL 5064049, at *4 n.13, and DC's cited evidence is relevant because it provides a history of DC's "long-lasting economic relationship" with Siegel and Shuster.  Docket No. 337 at 4; *supra* Responses to Objections 5, 6. |
| | Defendants' attack on DC's calculation of inflation is spurious.  Courts regularly use statistics, including the consumer price index, as provided by the Bureau of Labor Statistics.  *See Sorenson*, 239 F.3d at 1148 . |

DC'S RESP. TO DEFS.' OBJS.

ER-1039

| STATEMENT OF UNCONTROVERTED FACTS | |
|---|---|
| 10.    All told, the Siegels and Shusters have been paid well over $4 million under the 1975 agreement, not including medical benefits or bonuses. [LD ¶ 4 & Exs. Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |
| **DEFENDANTS' OBJECTION** | **DC'S RESPONSE** |
| It is irrelevant to DC's claims how much the Siegels and Shusters have been paid under the 1975 agreement. The termination right does not depend upon how much an author or his heirs made as a result of the author's creation, and DC's only purpose in alleging these purported facts is to elicit prejudice. Fed. R. Evid. 401, 402, 403.<br><br>Again, DC's calculation of the present day value of purported payments to the Siegels and Shusters is improper lay opinion, lacks sufficient underlying facts and data, and lacks foundation. Fed. R. Evid. 701, 702. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>"The entire historical background provides the context for the actions of the parties," *Appleton Papers*, 2009 WL 5064049, at *4 n.13, and DC's cited evidence is relevant because it provides a history of DC's "long-lasting economic relationship" with Siegel and Shuster. Docket No. 337 at 4; *supra* Responses to Objections 5, 6.<br><br>Moreover, the amount the Shusters were paid under the 1975 Agreement is relevant to demonstrate the additional consideration they received for re-granting their rights to DC under the 1992 Agreement. *See Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 204 (2d Cir. 2008); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1046 (9th Cir. 2005); *e.g.*, Pl. DC Comics' Reply ISO Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ Reply") at 7.<br><br>Defendants' "present day value" objection is misplaced, as DC never asserted that the $4 million figure was adjusted to present day terms. Moreover, Paul Levitz attested to that figure, Docket No. 460 at 1 ¶ 4; his declaration establishes his personal knowledge to account for this fact, *id*. at 1 ¶ 1; and defendants have done |

DC'S RESP. TO DEFS.' OBJS.

**ER-1040**

| | nothing to dispute his testimony. |
|---|---|
| **STATEMENT OF UNCONTROVERTED FACTS** | |

11.     Neither Siegel nor Shuster ever attempted to exercise any purported termination right, although the windows for both to do so opened in 1984, while both were alive.  [*E.g.,* PD Exs. 25-31, 37.]

| **DEFENDANTS' OBJECTION** | **DC'S RESPONSE** |
|---|---|
| To the extent that DC implies that Siegel and Shuster did not exercise their termination rights because they did not want to get their Superman copyrights back, this is unsupported by the evidence cited, is speculative, lacks personal knowledge, and lacks foundation.  Fed. R. Evid. 602.<br><br>Moreover, it is irrelevant to DC's claims whether Siegel or Shuster wanted to get their Superman copyrights back, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Defendants' objection is also improper because it does not assert legal arguments regarding DC's evidence, but rather, disputes the "inferences" that may be drawn from it.  The court may draw inferences in favor of the moving party where they are the only reasonable inference to be drawn.  *See Avila v. Willits Envmt'l Remediation Trust*, 633 F.3d 828, 841 (9th Cir. 2011).  Defendants' argument, without factual support, does not defeat any inference, and the "entire historical background provides the context for the actions of the parties."  *Appleton Papers*, 2009 WL 5064049, at *4 n.13.<br><br>Finally, DC's factual statement is fully supported by the termination notices it cites, which show that they were executed and served after Siegel and Shuster's respective deaths.  Defendants cite no contrary evidence—they only make lawyer's arguments. |

| **STATEMENT OF UNCONTROVERTED FACTS** | |
|---|---|

14.     On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her."  [PD Ex. 21.]

DC'S RESP. TO DEFS.' OBJS.

**ER-1041**

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims that Jean Peavy purportedly filed an affidavit in California state court identifying herself as Shuster's heir and/or requesting that his minimal assets (shares of Time Warner stock) be transferred to her. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| As Joseph Shuster's sister, Jean Peavy did not have any termination rights and could not gain any such rights from this alleged transfer, otherwise. 17 U.S.C. §§ 304(c)(2), 304(d). Nor did anyone hold any Shuster termination rights until termination rights were extended for the first time to the executor of an author's estate by the 1998 Copyright Term Extension Act. *Id.* Nor did Jean Peavy hold any Superman copyright interest, as Siegel and Shuster's Superman copyrights had long ago been assigned to DC. *Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1107-10 (C.D. Cal. 2008). | Jean's affidavit is relevant to establish the circumstances leading to the negotiation and execution of the 1992 Agreement, which DC alleges bars the Shuster's termination. *See Appleton Papers*, 2009 WL 5064049, at *4 n.13. Shortly after Jean filed the affidavit, she contacted DC identifying herself as Joe Shuster's sole heir, and asked DC to cover his debts and expenses and other consideration. Pl. DC Comics' Statement Of Uncontroverted Fact ("SUF") 15. The affidavit shows Jean's understanding of her role in Joe Shuster's testamentary scheme, and her using that position to extract additional compensation from DC in the 1992 Agreement. Courts have considered such facts in determining whether a post-1978 agreement bars a copyright termination claim. *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1046. |
|  | Jean's actions in the probate court also show she had full right and authority to assign to DC any and all interests in Joe Shuster's copyrights, as DC shows in its motion papers. Pl. DC Comics' Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ") at 5, 8-9, 21-22; DC's MSJ Reply at 7-8. |
| STATEMENT OF UNCONTROVERTED FACTS | |
| 15.    Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joe Shuster's] Will" and asking DC to pay | |

**ER-1042**

Shuster's "final debts and expenses."  [LD Ex. 3.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is also not relevant to DC's claims that Jean Peavy purportedly wrote to DC, identifying herself as Shuster's heir, and asking for his final debts and expenses to be paid. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Jean's 1992 letter is relevant to establish the circumstances leading to the negotiation and execution of the 1992 Agreement, which DC alleges bars the Shuster's termination.  *See Appleton Papers*, 2009 WL 5064049, at *4 n.13. In the letter, Jean contacted DC, identified herself as Joe Shuster's sole heir of Shuster's estate, and asked DC to cover his debts and expenses and other consideration.  SUF 15.  The affidavit shows Jean's understanding of her role in Joe Shuster's testamentary scheme, and her using that position to extract additional compensation from DC in the 1992 Agreement.  Courts consider such facts in determining whether a post-1978 agreement bars a copyright termination claim. *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1046; *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 989-90 (9th Cir. 2008) .  Jean's actions also show she had full right and authority to assign to DC any and all interests in Joe Shuster's copyrights, as DC explains in its motion papers. DC's MSJ at 5, 8-9, 21-22;  DC's MSJ Reply at 7-8. |
| STATEMENT OF UNCONTROVERTED FACTS | |
| 16.     DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year.  [LD Ex. 5; PD Ex. 23.] | |
| DEFENDANTS' OBJECTION | DC'S RESPONSE |
| It is also not relevant to DC's | Defendants' relevance and 403 objections made at |

DC'S RESP. TO DEFS.' OBJS.

ER-1043

| claims that DC purportedly offered to cover Joe Shuster's debts, and DC only makes this factual claim to elicit prejudice.  Fed. R. Evid. 401, 402, 403. | the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| --- | --- |
| | DC's initial offer to Jean is relevant to establish the circumstances leading to the negotiation and execution of the 1992 Agreement, which DC alleges bars the Shuster's termination.  *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1046; *Mewborn* 532 F.3d at 989-90; *Appleton Papers*, 2009 WL 5064049, at *4 n.13. |
| | Defendants also falsely argue in the opposition brief that DC and Jean and Frank never negotiated the 1992 Agreement.  Defs. Opp. to DC Comics' Mot. For Partial S. J. On Its First And Third Claims For Relief ("Defs. MSJ Opp.") at 16. DC's initial offer to Jean—which it increased and modified a number of times at Jean's and Frank's request—is directly relevant to refute defendants' untrue factual claims.  DC's MSJ Reply at 7. |

| STATEMENT OF UNCONTROVERTED FACTS |
| --- |

17.    On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments, and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]."  Frank asked if he and Jean could meet with Levitz in New York to discuss the issue.  [LD Ex. 6.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
| --- | --- |
| It is also not relevant to DC's claims that Frank Shuster sent a letter to Paul Levitz stating he was pleased that DC increased his survivor payments, and asking that such payments be sent to his | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.

Frank's letter responding to DC's offer and expressing his pleasure with it is relevant to |

DC'S RESP. TO DEFS.' OBJS.

**ER-1044**

| | | |
|---|---|---|
| 1 | sister for tax purposes. | establishing the circumstances leading to the |
| 2 | Frank Shuster's pleasure | negotiation and execution of the 1992 Agreement, |
| 3 | and/or displeasure with the | which DC alleges bars the Shuster's termination. |
| 4 | payments has no bearing on | *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at |
| 5 | the inalienable termination | 1046; *Mewborn* 532 F.3d at 989-90. |
| 6 | right of the executor of Joe | Frank's letter demonstrates he understood and |

To the extent that DC seeks to rely upon the letter for the truth of the matter asserted, it is inadmissible hearsay. Fed. R. Evid. 801, 802. To the extent that DC seeks to characterize Frank Shuster's state of mind based upon the letter, it lacks personal knowledge and foundation. Fed. R. Evid. 602.

sister for tax purposes. Frank Shuster's pleasure and/or displeasure with the payments has no bearing on the inalienable termination right of the executor of Joe Shuster's estate. 17 U.S.C. §§ 304(c)(5), 203(a)(5), 304(d); *Stewart v. Abend*, 495 U.S. 207, 230 (1990); *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 984-8l; *Marvel Character, Inc. v. Simon* ("*Simon*"), 310 F.3d 280, 290. DC again includes these purported facts merely to elicit prejudice. Fed. R. Evid. 401, 402, 403.

establishing the circumstances leading to the negotiation and execution of the 1992 Agreement, which DC alleges bars the Shuster's termination. *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1046; *Mewborn* 532 F.3d at 989-90.

Frank's letter demonstrates he understood and acknowledged the additional consideration he and Jean were receiving in exchange for granting any claims they had in any Superman rights to DC.

Defendants improperly use their objections to make merits-based arguments about the alleged "inalienability" of termination rights, but such arguments needed to be made in their 25-page opposition brief, *cf.* Docket No. 328 (reprimanding defense counsel before for "slithering around" the Court's page limits), and are baseless in any event. DC's MSJ at 10-11; DC's MSJ Reply at 1-2.

Frank's letter is not hearsay because it is used to demonstrate his state of mind at the time he entered into the 1992 Agreement with DC. FED. R. EVID. 803(3); *Wagner v. Cnty. of* Maricopa, 673 F.3d 977, 980-81 (9th Cir. 2012). It also recounts party admissions by Jean and communicates an offer she made to DC—neither of which are hearsay. *E.g.*, FED. R. EVID. 801(d)(2) (party admission rule); *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 892 (7th Cir. 1995) (legal act such as offer not hearsay).

Defendants' personal knowledge and foundation claims are inapposite, as DC does not "seek to characterize" Frank's state of mind, as defendants assert. Rather, DC simply quoted Frank's words. He is the one who said he was "extremely pleased."

- 10 -

DC'S RESP. TO DEFS.' OBJS.

| STATEMENT OF UNCONTROVERTED FACTS | |
|---|---|
| 18.     Levitz dealt with scores of authors and heirs during his decades running DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them the same admonition:  this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC.  Levitz reiterated this condition to Frank and Jean in 1992, who confirmed they understood and agreed.  [LD ¶ 8.] | |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| DC's assertion that Paul Levitz gave the same admonition to every writer, artist, or family member is improper habit evidence. Fed. R. Evid. 406.  It is also irrelevant to DC's claims because the inalienable termination right cannot be overcome by an admonition and can be exercised "notwithstanding any agreement to the contrary." 17 U.S.C. §§ 304(c)(5), 203(a)(5), 304(d); *Stewart v. Abend*, 495 U.S. 207, 230 (1990); *Mewborn*, 532 F.3d 978, 984-81; *Simon*, 310 F.3d at 290. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.  Paul Levitz's discussion with Jean and Frank concerning the 1992 Agreement and that they were relinquishing all their rights to Superman could not be more relevant. *Steinbeck*, 537 F.3d at 200-04; *Milne*, 430 F.3d at 1045; DC's MSJ Reply at 2-4. Citing no evidence, defense counsel pretends Jean and Frank made the 1992 Agreement in a state of ignorance; Levitz's uncontroverted testimony refutes this false claim. *Id.*  Levitz's statement that he gave the "same admonition" to other writers or authors is neither rebutted nor impeached and is relevant evidence of habit or routine practice that is relevant to proving conformity on a specific occasion.  FED. R. EVID. 406;  *Perrin v. Anderson*, 784 F.2d 1040, 1046 (10th Cir. 1986) (defining "habit" as "a regular practice of meeting a particular kind of situation with a certain type of conduct").   Having chosen not to depose Levitz on this issue or his declaration generally, Docket Nos. 461 at 4-5, 10, 12-14, 17; 467 at 2, defendants do not and cannot dispute that Levitz's "regular practice of meeting a particular |

ER-1046

| | |
|---|---|
| 1 | kind of situation with a specific type of conduct," Fed. R. Evid. 406 advisory committee note, occurred here. |
| 2 | |
| 3 | |
| 4 | Again, defendants improperly use their objections to make merits-based arguments about "agreements to the contrary," but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 5-6; DC's MSJ Reply at 8; *supra* Response to Objection No. 17. |
| 5 | |
| 6 | |
| 7 | |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

19.    The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. In exchange, Jean and Frank re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights.

The 1992 agreement stated, in pertinent part:

> We [DC ]ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

[LD Ex. 8.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| DC's assertion that Jean and Frank "re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights" is wholly unsupported by the evidence cited, lacks foundation and | Defendants' relevance objection made at the summary judgment stage is "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.

Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page |

| | |
|---|---|
| amounts to inadmissible speculation, argument, and legal conclusion. Fed. R. Evid. 602, 701, 702.<br><br>DC's assertion is also irrelevant because the 1992 agreement, as a matter of copyright law, could not prevent or otherwise limit the executor of the Shuster Estate (which was not even a party to the agreement) from later exercising his inalienable termination right. 17 U.S.C. §§ 304(c)(5); 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, 310 F.3d at 290; Fed. R. Evid. 401, 402. | opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.<br><br>Defendants attack the second sentence in DC's Statement of Undisputed Fact No. 19, but the plain language of the 1992 Agreement fully supports DC's claim in that sentence that Jean and Frank "re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights." The contract itself, as quoted above, expressly says "you [Jean and Frank] now *grant to* us [DC] any such rights"—which were defined as "all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon." It also says: you now "release us [DC], our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever." |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

20.     Over the next decade, DC maintained good relations with the Shusters, and Jean and Levitz corresponded regularly. In the close to 60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required. [LD ¶ 9 & Exs. 3, 10, 11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 77-78.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims that it purportedly maintained good relations with the Shusters, by sending letters | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to |

ER-1048

back and forth. The Shuster executor's termination right does not depend upon the Shuster heirs having had poor relations with DC. Nor is it relevant whether Jean Peavy thanked DC, reaffirmed the 1992 Agreement, or requested Christmas bonuses. The termination right is inalienable and cannot be waived or limited by supposedly good relations with DC, the 1992 Agreement, or bonuses. 17 U.S.C. 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, 310 F.3d at 290. DC injects these irrelevant factual claims into its motion only to elicit prejudice. Fed. R. Evid. 401, 402, 403.

Objection 5.

Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.

The cited letters between Jean and Levitz show that the parties' conduct under the 1992 Agreement was consistent with a mutual understanding that the Agreement was intended to finally settle all claims and disputes regarding Superman, as DC argues on its motion on its First Claim. Such subsequent conduct evidence is fully appropriate and relevant, as defendants' own cases confirm. DC's MSJ Reply at 1-8; *Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992) ("consent to a novation 'may be implied from all the facts and circumstances'"); *Brown Bros. Contractors Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. 1977) ("objective manifestations" of intent shown through parties' "words and deeds," "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain") (cited in Defs.' MSJ Opp. at 13); *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 965 (9th Cir. 2011) ("subsequent conduct can be used in some instances to discern contractual intent"). Jean's letters thanking DC for its generosity are also relevant evidence that she acknowledged the additional consideration she received under the 1992 Agreement in exchange for granting her termination rights to DC, as she was free to do under the Copyright Act. H.R. REP. NO. 94-1476 at 142 (1976); *Steinbeck*, 537 F.3d at 200-04;

ER-1049

*Milne*, 430 F.3d at 1045.

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

21.    In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the SUPERMAN copyright," but asked for an increase in payments "plus a yearly increment to account for inflation."  [LD Ex. 20.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims that Jean Peavy purportedly stated she was not planning to reclaim the Superman copyright.  Nor is it relevant that she allegedly stated she would "stick to our bargain." Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act.  *See* 17 U.S.C. § 304(c)(2).  Moreover, neither the 1992 Agreement nor statements in a letter can waive or limit the inalienable termination right, as a matter of copyright law.  17 U.S.C. §§ 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, 310 F.3d at 290.  These irrelevant factual claims are meant only to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and Rule 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.<br><br>Jean's statement to DC that she would "stick to her bargain" by not seeking to recapture Shuster's copyrights demonstrates that Jean understood and acknowledged that she had granted her termination rights to DC in the 1992 Agreement, as she was free to do under the Copyright Act.  *Id.* |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

22.    In 1999—after Congress amended the copyright statute to grant additional statutory heirs termination rights, 17 U.S.C. § 304(d), and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC—Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a

DC'S RESP. TO DEFS.' OBJS.

ER-1050

bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus for this year as you had done many times in the past.

[LD Ex. 59.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims that Jean Peavy allegedly stated she would "honor" the 1992 agreement after learning that the Siegel heirs had served termination notices. Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act. *See* 17 U.S.C. § 304(c)(2). Moreover, such statements cannot waive or limit the inalienable termination right as a matter of copyright law. 17 U.S.C. 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290. The only purpose DC has in alleging such an irrelevant fact is to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.<br><br>Jean's statement to DC that she would "honor" the 1992 Agreement, read in conjunction with her comment about Joanne Siegel's recent termination notice, is evidence that Jean understood and acknowledged that the 1992 Agreement operated, as DC argues, to bar defendants' copyright termination claim. Such subsequent conduct evidence is fully relevant—especially in the face of defendants' factually unsupported claims to the contrary. DC's MSJ Reply at 1-8; *supra* Response to Objection No. 20. |
| STATEMENT OF UNCONTROVERTED FACTS | |
| 23. In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. [LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |

DC'S RESP. TO DEFS.' OBJS.

**ER-1051**

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims that DC provided Jean Peavy with Christmas bonuses; such bonuses have no effect on the Shuster executor's termination right. *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290 . DC alleges these irrelevant facts merely to elicit bias. Fed. R. Evid. 401, 402, 403. | Defendants' objection is improper because it does not identify which specific evidence is objectionable. Moreover, defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| | Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17. |
| | The cited letters between Jean and Levitz concerning bonuses paid to Jean show that the parties' conduct under the 1992 Agreement was consistent with a mutual understanding that the Agreement was intended to finally settle all claims and disputes regarding ownership of the Superman rights. Jean's letters thanking DC for its generosity are also relevant to show she acknowledged the additional consideration she received in exchange for granting any and all rights to DC, and that she believed and reaffirmed it was a fair bargain. DC's MSJ Reply at 1-8. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|
| 24.    In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal rights to make such requests, but would pay her a bonus anyway, which she thanked DC for doing. [LD Ex. 23.] |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is again irrelevant to DC's claims whether DC paid Jean Peavy a bonus; such bonuses have no effect on the Shuster | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to |

DC'S RESP. TO DEFS.' OBJS.

**ER-1052**

| | |
|---|---|
| executor's termination right. *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, 310 F.3d at 290. DC alleges these irrelevant facts merely to elicit bias. Fed. R. Evid. 401, 402, 403. | Objection 5.<br><br>Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.<br><br>The cited letter between Jean and Levitz show that the parties' conduct under the 1992 Agreement was consistent with a mutual understanding that the Agreement was intended to finally settle all claims and disputes regarding ownership of the Superman rights. Jean's letter thanking DC is also relevant to show she acknowledged the additional consideration she received in exchange for granting any and all rights to DC. DC's MSJ Reply at 1-8; Response to Objection No. 20. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

| 25.    DC has paid the Shusters over $610,000 under the 1992 agreement and as special bonuses, and DC continues to make payments to Jean to this day.  [LD ¶ 9 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.] |
|---|

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| How much Frank and Jean Shuster were paid under the 1992 agreement and any bonuses are irrelevant to DC's claims, and have no effect on the Shuster executor's termination right.  Fed. R. Evid. 401, 402.  *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, | Defendants' objection is improper because it does not identify which specific evidence is objectionable.  Moreover, defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; |

ER-1053

| | |
|---|---|
| 310 F.3d at 290. | Response to Objection No. 17.<br><br>Finally, defendants falsely suggest the consideration Jean received under the 1992 agreement was paltry.  These facts dispute that erroneous claim.  DC's MSJ Reply at 1-8. |

| STATEMENT OF UNCONTROVERTED FACTS | |
|---|---|

26.     Jean's 50-year-old son, Mark Peary (born Peavy), who lives with his mother and does not have a job, testified that Jean was of sound mind when she sent these letters to DC.  [PD Ex. 46 at 443:19-444:22.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| Mark Warren Peary's age, residence, and career are all irrelevant to DC's claims.  So too is whether Jean Peavy was of sound mind when she sent DC letters, as the letters are irrelevant as set forth above. DC makes these irrelevant factual claims merely to elicit prejudice.  Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Jean's mental capacity is relevant to establish the enforceability of the 1992 Agreement, her competence to enter into it, and her competence when corresponding with DC throughout the 1990s, when she repeatedly affirmed DC's understanding of the 1992 Agreement, as set forth in its First Claim in this case.  The background information about Peary is relevant to show his motivation to pursue this baseless termination claim, to improperly traffic in alleged termination rights and to engage in misconduct in the probate courts and elsewhere to frustrate DC's rights under the 1992 Agreement, as DC challenges in its First and Third Claims in this case.  DC's MSJ at 10-17; DC's MSJ Reply at 1-8, 10-12. |

| STATEMENT OF UNCONTROVERTED FACTS | |
|---|---|

27.     Mark Peary, Jean's doctor, and Jean's daughter testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying."  [PD Exs. 44, 46 at 447:18-448:3, 455:10-21, 48 at 517:17-22, 520:2-4, 523:4-13.]

ER-1054

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| Jean Peavy's physical and mental health is irrelevant to DC's claims. As the sister of Joseph Shuster, Jean has never held termination rights under the Copyright Act, 17 U.S.C. § 304(c)(2), or purported to exercise those rights. DC raises these issues merely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' objection is improper because it does not identify which specific evidence is objectionable. Moreover, defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| | Jean's recent mental capacity is relevant to show that documents that Toberoff engineered after the filing of this lawsuit and Jean's stroke—like the 2011 PPC Agreement, which defendants feature in their opposition brief—is a fraud. *E.g.*, DC's MSJ Reply at 8, 10-12. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|
| 28.    In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel" called "Dreamers," and asked Levitz to share it with Warner Bros. Peary's screenplay detailed how Shuster became estranged from DC, but toward the end of his life, he and DC made amends. [LD ¶ 10 & Ex. 44.] |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| Mark Warren Peary's screenplay, its contents, and that he sent it to Paul Levitz are all irrelevant to DC's claims. Fed. R. Evid. 401, 402, 403. Moreover, to the extent that DC attempts to rely on the screenplay to establish that Shuster and DC "made amends," the screenplay does not support the claimed fact and is inadmissible hearsay. Fed. R. Evid. 801, 802. The screenplay also lacks foundation and personal | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| | The fact that Peary sent his screenplay to Levitz in 1996 and made no mention of termination rights or any indication of an interest in recapturing Joe Shuster's copyright—to the contrary, he sought DC's help and collaboration—shows Peary understood his family had no termination rights in light of the 1992 Agreement. The screenplay is not hearsay, as it was written by Peary and is thus a party admission. FED. R. EVID. 801(d)(2). And the last |

**ER-1055**

| knowledge.  Fed. R. Evid. 602.  The irrelevant screenplay is mentioned only to elicit prejudice.  Fed. R. Evid. 403. | act of the screenplay, which Peary testified he based on historical research, Docket No. 305-37 at 1123:11-14, clearly shows that Joe Shuster did make amends with DC, Levitz Decl. Ex. 44 at 126-30—contrary to defendants' persistently false claims that DC mistreated him, *e.g.*, Defs.' MSJ Opp. at 4-5. |

| STATEMENT OF UNCONTROVERTED FACTS | |
| --- | --- |
| 29.     Warner Bros. declined to develop "Dreamers," and in 1999, Peary submitted a revised script and asked Levitz if the Siegel family's copyright termination effort would "interfere with [him] selling [his] screenplay."   [LD ¶ 10 & Ex. 46, 62.] | |
| DEFENDANTS' OBJECTION | DC'S RESPONSE |
| It is irrelevant to DC's claims that Mark Warren Peary submitted a revised copy of his screenplay after Warner Bros. rejected it.  It is likewise irrelevant that Mark Warren Peary asked Paul Levitz if the Siegel family's statutory termination would interfere with his efforts to sell the screenplay.  DC makes these irrelevant factual allegations to elicit prejudice.  Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.

The fact that Peary contacted Levitz again in 1999 and made no mention of termination rights or any indication of an interest in recapturing Joe Shuster's copyright—to the contrary, he once again sought DC's help and collaboration, even though he makes clear he was aware of the Siegels' termination notices—shows Peary understood his family had no termination rights in light of the 1992 Agreement. *See* FED. R. EVID. 803(3). |

| STATEMENT OF UNCONTROVERTED FACTS | |
| --- | --- |
| 30.     Before Peary met Marc Toberoff, he never told DC the Shusters had a right to terminate or challenged the 1992 Agreement.  Instead, from 1992 to 2001, he and Jean affirmed the Agreement and accepted payments under it.  [LD ¶ 10 & Exs. 20, 23, 24, 26, 27, 28, 33, 34, 39, 43, 53, 54, 59, 60, 61, 67, 68, 71, 72.] | |
| DEFENDANTS' OBJECTION | DC'S RESPONSE |
| There is no evidence to support the purported fact that | Defendants' objection is improper because it does not identify which specific evidence is |

| | |
|---|---|
| 1 | Mark Warren Peary affirmed the 1992 agreement. There is no evidence to support the purported fact that Mark Warren Peary accepted payments under the 1992 agreement. Moreover, that Jean Peavy, or even Mark Warren Peary, purportedly affirmed the 1992 agreement and/or accepted payments under it is not relevant to DC's claims. Fed. R. Evid. 401, 402. Jean Peavy (Joseph Shuster's sister) has never held any termination rights. Mark Warren Peary has also personally never held termination rights under the Copyright Act. After the Joseph Shuster's estate was probated in mid-2003, Mr. Peary was duly appointed the executor of Joseph Shuster's estate, and holds termination rights under the Copyright Act only in that capacity. 17 U.S.C. §§ 304(c)(2), 304(d). Moreover, the termination right is inalienable and cannot be waived, released, or limited by alleged statements, or otherwise. 17 U.S.C. §§ 304(c)(5), 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-81; *Simon*, | objectionable. Moreover, defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.<br><br>Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.<br><br>Of course, Peary accepted the benefits of the 1992 Agreement and never disputed it. He is mentioned in letters discussing it, *e.g.*, Levitz Decl. Ex. 43, 54, 60, 67, 68, 71; he helped his mother calculate Joe Shuster's debts, which DC agreed to pay under the 1992 Agreement, *Id.* Ex. 7; Docket No. 305-37 at 1224:17-23; and Jean said Peary handled "all things legal" for her, PD Ex. 38 at 310:14-312:13. Levitz also testified, without any rebuttal, that: "I also exchanged correspondence over the years with Jean's son, Mark Warren Peary…. Mark Peary never told me that he thought he or his family had any remaining termination claims to assert." Levitz Decl. ¶ 10. |

DC'S RESP. TO DEFS.' OBJS.

ER-1057

| 310 F.3d at 290. | |
|---|---|
| **STATEMENT OF UNCONTROVERTED FACTS** | |
| 33.     Peary admits that, in 2003, he understood "that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as [the contract] says."  [PD Ex. 46 at 482:8-23.] | |
| **DEFENDANTS' OBJECTION** | **DC'S RESPONSE** |
| Mark Warren Peary's purported statement that he understood that Joseph Shuster's termination rights were being transferred to the venture constitutes improper lay opinion.  Fed. R. Evid. 701.  It also represents improper legal opinion.  Fed. R. of Evid. 702; *see also Aguilar v. International Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992) (explaining that legal opinions and conclusions are "inappropriate subjects [even for expert testimony").  Moreover, the purported statement is irrelevant to DC's claims since termination interests cannot be transferred to a third party prior to the effective date of termination, regardless of the parties' understandings.  17 U.S.C. §304(c)(6)(D); Fed. R. Evid. 401, 402.  Finally, the right to serve a termination notice is held solely by a certain statutorily-defined class of | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time."  *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.

Peary's testimony is relevant to DC's majority-interest claim, which is that the Shuster termination notice is invalid because when Peary signed the Notice, he had already transferred the Shuster termination rights to a joint venture with Toberoff's company and, thus, did not possess a majority interest required by law.  17 U.S.C. § 304(d)(1), (c)(1)-(4).  DC's MSJ at 18-20; DC's MSJ Reply at 8.

Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 11-12; DC's MSJ Reply at 8; Response to Objection No. 17.

Defendants never made their legal opinion argument when Peary was deposed, PD Ex. 46 at 482:8-23, and, thus, the objection was waived, FED. R. CIV. P. 32(d); *Bridges v. Armour*, 46 U.S. (5 How.) 91, 93 (1847) ("plaintiffs in error waived the objection by failing to make it when the deposition was taken"); *Batelli v. Kagan & Gaines Co.*, 236 F.2d 167, 170 (9th Cir. 1956).  Moreover, DC does not use this testimony as |

| | |
|---|---|
| persons, and the joint venture was not and has never been a member of any such class. *See* 17 U.S.C. § 304(c)(2)(A)-(D). No private contract could create a new statutory class eligible or required to sign a termination notice. | "legal opinion," but rather, as evidence of Peary's intent and understanding in entering into the PPC Agreements. As a signatory to the agreement, he has personal knowledge of its contents and his testimony is relevant to its interpretation. FED. R. EVID. 602, 901(b)(1); *Wagner*, 673 F.3d at 981; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 n.8 (9th Cir. 2002). This intent and understanding also shows that the submissions he and Toberoff made to the Copyright Office were false, misleading, and improper. DC's MSJ at 18-20; DC's MSJ Reply at 8. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|
| 35. Peary negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel. [PD Ex. 39 at 319:9-320:14.] |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims whether Mark Warren Peary negotiated the Pacific Picture agreements directly with Marc Toberoff without receiving outside advice from counsel. DC raises this issue merely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. This evidence is relevant background evidence of Toberoff's and Peary's illicit scheme, which DC challenges under its First and Third Claims. *Id.* |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|
| 36. Peary only told his mother about the Pacific Pictures agreements "just before [they] were ready to sign." [PD Ex. 46 at 492:20-493:11.] |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims when Mark Warren Peary purportedly told his mother, Jean Peavy, about the Pacific Pictures agreements. Jean Peavy (Joseph Shuster's sister) | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. Peary's testimony establishes that he pursued the |

- 24 -                                    DC'S RESP. TO DEFS.' OBJS.

ER-1059

| | |
|---|---|
| has never held any termination rights under the Copyright Act or purported to exercise any such rights. *See* 17 U.S.C. § 304(c)(2). DC makes this unsupported and irrelevant factual claim solely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | termination of Joe Shuster's copyright grants unilaterally, without Jean's involvement, even though Jean had originally represented herself to DC as the "beneficiary" and "heir" to Joe Shuster's estate and signed the operative 1992 Agreement that effectively bars the termination claim that defendants assert. DC's MSJ at 10-18; DC's MSJ Reply at 1-8. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

37.     When asked years ago about the Pacific Pictures agreements, Jean testified her "son handles everything legal" and she did not "know what's going on." [PD Ex. 38 at 310:14-312:13.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims whether Mark Warren Peary's mother handled legal matters relating to the Pacific Pictures agreements. It is likewise irrelevant if she knew what was going on with these various legal matters. Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act nor has she purported to exercise any such rights. *See* 17 U.S.C. § 304(c)(2). DC raises this irrelevant issue only in an effort to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5.

Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 1-8; Response to Objection No. 17.

Peary's testimony establishes that he pursued the termination of Joe Shuster's copyright grants unilaterally, without Jean's involvement, and is relevant background evidence of Toberoff's and Peary's illicit scheme, which DC challenges under its First and Third Claims. DC's MSJ at 10-18; DC's MSJ Reply at 1-8; *supra* Response to Objections 35, 36. |

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

38.     In 2003, Peary initiated proceedings to probate Joe Shuster's estate—even

DC'S RESP. TO DEFS.' OBJS.

though, in 1992, his mother had already filed an affidavit in California probate court to obtain all of Shuster's assets. Peary asked the court to appoint him executor in place of his mother. [PD Exs. 21, 33-34.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| It is irrelevant to DC's claims whether Jean Peavy allegedly filed an affidavit in California court to obtain Joe Shuster's minimal assets (shares of Time Warner stock). It is also irrelevant whether it was Jean or Mark Warren Peary who later asked the court (when a petition was filed in 2003 to probate Shuster's estate according to his will) to duly appoint Peary as the executor of Joseph Shuster's estate, although it was, in fact, Jean (age 86) who declined to act as executrix. DC makes these purported factual claims merely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | Defendants' objection is improper because it does not identify which specific evidence is objectionable. Moreover, Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 15; DC's MSJ Reply at 1-8; Response to Objection No. 17. The ways in which Peary manipulated the probate process are directly relevant to refute defendants' erroneous arguments that Peary is not bound by the 1992 Agreement. DC's MSJ at 15; DC's MSJ Reply at 1-8. |

| STATEMENT OF UNCONTROVERTED FACTS | |
|---|---|
| 39.    Peary has kept this probate matter open for nine years—despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible."   [PD Ex. 35.] | |

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| The length of time Joseph Shuster's estate must be kept open is also irrelevant to DC's claims. Fed. R. Evid. 401, 402, 403. The estate was expressly probated to avail itself of the termination right | Defendants' objection is improper because it does not identify which specific evidence is objectionable. Moreover, Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at |

DC'S RESP. TO DEFS.' OBJS.

ER-1061

| | |
|---|---|
| (extended to estates by the 1998 CTEA) and is kept open at least until the effective 2013 termination date, because the copyright interests reverting under the termination cannot be transferred in advance. 17 U.S.C. §304(c)(6)(D). | 428; *supra* Response to Objection 5. <br><br> Again, defendants improperly use their objections to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 15; DC's MSJ Reply at 1-8; Response to Objection No. 17. <br><br> The ways in which Peary manipulated the probate process—including by refusing to close the Estate and distribute its assets to its sole beneficiary, Jean—are directly relevant to refute defendants' erroneous arguments that Peary is not bound by the 1992 Agreement. DC's MSJ at 15; DC's MSJ Reply at 7-8. |

### STATEMENT OF UNCONTROVERTED FACTS

44.     After this Court held in the related *Siegel* case that "promotional announcements" featuring the first appearance of Superman fell outside the termination window of § 304(c) of the Copyright Act, both the Siegel and Shuster heirs served new termination notices in 2012 purporting to terminate the announcements.  [PD Exs. 41 at 369-70, 49-50.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| Whether the Siegel heirs and the Shuster Estate served new termination notices in 2012 terminating certain "promotional announcements" is irrelevant to DC's claims. Fed. R. Evid. 401, 402. | Defendants' objection is improper because it does not identify which specific evidence is objectionable.  Moreover, Defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. <br><br> Defendants' refiling of their defective promotional announcement notices (and the new notices are defective as well) is directly relevant to relief that DC seeks on its majority-interest ground for relief under its First Claim for Relief. DC's MSJ at 18-21; DC's MSJ Reply at 8. |

DC'S RESP. TO DEFS.' OBJS.

ER-1062

| STATEMENT OF UNCONTROVERTED FACTS |
|---|

45.     Joe Shuster's original wish, as embodied in the 1975 agreement, was to take care of Frank Shuster because of the assistance Frank had rendered on the early Superman strips as a letterer, and because Frank had taken Joe in during the 1960s; he had never known or understood Joe to want to provide for Jean.  [LD ¶ 7.]

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| The purported fact that Joe Shuster 's original wish was to take care of his brother Frank Shuster and not his sister Jean is irrelevant to DC's claims. Fed. R. Evid. 401, 402. Furthermore, the only evidence DC cites in support of this claim is Paul Levitz's Declaration.  Levitz could not have independently known Joe Shuster's wishes, does not purport to have discussed the issue with him, and offers no other basis for this alleged fact.  It is therefore unsupported by the evidence cited and lacks foundation and personal knowledge.  Fed. R. Evid. 602.  It is also improper opinion testimony.  Fed. R. Evid. 701. DC makes this improper factual claim merely to elicit prejudice.  Fed. R. Evid. 403. | Defendants' objection is improper because it does not identify which specific evidence is objectionable.  Moreover, defendants' relevance and 403 objections made at the summary judgment stage are "a waste of the court's time." *Elwell*, 145 F. Supp. 2d at 84; *Adams*, 231 F.3d at 428; *supra* Response to Objection 5. |
| | The 1975 Agreement is relevant to show that Jean made out much better under the 1992 Agreement than under the 1975 Agreement, where she received nothing.  This helps show that the 1992 Agreement was a bargained-for exchange whereby Jean received considerable new consideration for the rights she assigned to DC. *E.g.*, DC's MSJ Reply at 7. |
| | As for defendants' foundational objections, the 1975 Agreement reflects Joe Shuster's wish that DC provide for Frank, and not Jean—Frank is Joe's *only family* member provided for in the 1975 Agreement, Levitz Decl. ¶ 7, and the document independently establishes that fact, *Barnes v. Calgon Corp.*, 872 F. Supp. 349, 352 (E.D. Tex. 1994) ("contract itself conclusively establishes" its contents for purposes of summary judgment).  Moreover, Levitz's declaration attests to these facts, Levitz Decl. ¶ 7, and defendants neither impeached Levitz or offered any contrary testimony. |

DC'S RESP. TO DEFS.' OBJS.

ER-1063

| PETROCELLI DECLARATION & STATEMENT OF UNCONTROVERTED FACTS |
|---|

| 27.    Mark Peary, Jean's doctor, and Jean's daughter testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying."  [PD 43.] |
|---|

| DEFENDANTS' OBJECTION | DC'S RESPONSE |
|---|---|
| Exhibit 43 is a copy of an anonymous document written by the thief who stole privileged documents from Mr. Toberoff's law firm – the so-called "Timeline."  This anonymous and wholly unreliable document is rife with inadmissible hearsay, if not, double and triple hearsay. Fed. R. Evid. 801, 802.  It lacks foundation and personal knowledge. Fed. R. Evid. 602. It includes numerous improper legal conclusions.  Fed. R. Evid. 701, 702; *see also Aguilar*, 966 F.2d at 447. Finally, it is wholly irrelevant to DC's Motion for Partial Summary Judgment and Fact 27 for which it is purportedly cited, and is thus introduced merely to elicit prejudice. Fed. R. Evid. 401, 402, 403. | DC did not include a copy of the Toberoff Timeline document as an Exhibit to support SUF 27 or otherwise.  Defendants' erroneous objection attacks a straw man.

In any event, the Toberoff Timeline has also proven quite reliable at describing Toberoff's misconduct and the underlying documents proving it.  *E.g.,* Docket Nos. 209 at 12; 225-4 at 3-4; 336 at 1; 357-4 at 272-76; 427-3 at 332-49; 427-4 at 383-402. |

Dated:  August 6, 2012

Respectfully submitted,

By:  /s/ Daniel M. Petrocelli

———————————————————
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

DC'S RESP. TO DEFS.' OBJS.

ER-1064

1  DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8

                    **UNITED STATES DISTRICT COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10

11
   DC COMICS,                          Case No. CV 10-3633 ODW (RZx)
12
                  Plaintiff,           **PLAINTIFF DC COMICS'**
13                                     **RESPONSE TO DEFENDANTS'**
            v.                         **STATEMENT OF GENUINE**
14                                     **ISSUES  IN OPPOSITION TO DC**
   PACIFIC PICTURES                    **COMICS' MOTION FOR**
15 CORPORATION, IP WORLDWIDE,          **PARTIAL SUMMARY**
   LLC, IPW, LLC, MARC TOBEROFF,       **JUDGMENT ON ITS FIRST AND**
16 an individual, MARK WARREN          **THIRD CLAIMS FOR RELIEF**
   PEARY, as personal representative of
17 the ESTATE OF JOSEPH SHUSTER,
   JEAN ADELE PEAVY, an individual,    Hon. Otis D. Wright II
18 LAURA SIEGEL LARSON, an
   individual and as personal
19 representative of the ESTATE OF      **Hearing Date**:    Aug. 20, 2012
   JOANNE SIEGEL, and DOES 1-10,       **Hearing Time**:    1:30 p.m.
20 inclusive,                          **Courtroom**:       11

21               Defendants.

22

23

24

25

26

27

28

DC Comics ("DC") submits this Response To Defendants' Statement of Genuine Issues In Opposition To DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief. Part I addresses defendants' responses to DC's Statement of Uncontroverted Facts. Part II addresses defendants' purported Statement of Additional Undisputed Facts.

Defendants identify no actual or material facts in dispute on DC's summary judgment motion, but instead try to create the false impression of such disputes through improper legal argument and a persistent effort to discuss other facts that defendants think advance their position. Such improper argument has no place in pleadings of this sort, Docket No. 18 at 6-7, and only overburdens the Court and DC with make-work. DC regrets the length of this submission, but defendants' voluminous submission, laced with false factual assertions and improper legal arguments—all in violation of this Court's rules, *id.*—necessitates it.

Defendants' evidentiary objections to DC's evidence are equally without merit, as shown in DC's concurrently-filed Response To Defendants' Objections To Evidence In Plaintiff's Statement Of Undisputed Facts, Declarations, And Exhibits. DC objects to certain aspects of defendants' new evidence in its concurrently-filed Objections To Evidence In Defendants' Statement Of Additional Undisputed Facts, Declaration, And Exhibits.

## I. REPLY TO DEFENDANTS' RESPONSES TO STATEMENT OF UNCONTROVERTED FACTS

| DC'S STATEMENT OF UNCONTROVERTED FACT ("SUF") |
|---|
| 2.  In 1938, DC—which had employed Siegel and Shuster to do other work—elected to include Superman in a new comic book titled *Action Comics*. [Declaration of Daniel. M. Petrocelli ("PD") Exs. 1, 8, 10 at 80 (Finding of Fact ("FOF")) 21, 13 at 133, 14 at 141, 40 at ¶ 5, 41 at 343-45 & 408-21.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** Siegel and Shuster were not employees of DC in | Defendants' response is improper because it does not identify which facts it admits. Docket No. 18 |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1066**

| | |
|---|---|
| 1938, or before. They worked as independent contractors and DC purchased certain material from them.<br><br>DC's Evidence: Declaration of Daniel Petrocelli ("PD") Exs. 1, 8, 10 at 80 (FOF 21), 13 at 133, 14 at 141, 40 at ¶ 5, 41 at 343-45 & 408-21.<br><br>Defendants' Evidence: PD Exs. 2, 3; *Siegel v. Warner Bros Entertainment, Inc.*, 658 F. Supp. 2d 1036, 1070 (C.D. Cal. 2009). | at 6-7. The facts it disputes are immaterial to DC's motion.<br><br>And as to the one fact it appears to dispute—whether Siegel and Shuster were "employed" or were "independent contractors"—DC's cited evidence shows that on December 4, 1937, Siegel and Shuster entered into a contract with DC titled "AGREEMENT OF <u>EMPLOYMENT</u>," in which DC agreed to "*employ* the *Employees* [Siegel and Shuster] as Artists, for a period of two years, commencing with December 4, 1937 and terminating December 3, 1939…." Decl. of Daniel Petrocelli ("PD") Ex. 1 at 8 (emphasis added).<br><br>Even if defendants were not wrong on the facts, their objection is legally irrelevant. The law is clear that both employees and independent contractors are "employed," exactly as DC's SUF 2 asserts. *E.g.*, *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999). |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 3. On March 1, 1938, Siegel and Shuster granted to DC the "exclusive right to the use of the [Superman] characters and story." [PD Ex. 2.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent DC purchased the rights to Superman in the March 1, 1938 Agreement for $130 (the "1938 Grant").<br><br>DC's Evidence: PD Ex. 2.<br><br>Defendants' Evidence: Same. *Siegel v. Warner Bros. Ent. Inc.* ("Siegel I"), 542 F. Supp. 2d 1098, 1107-10 (C.D. Cal. 2008). | Again, defendants' response is improper because it does not identify which facts it admits. Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present. The facts defendants dispute are immaterial to DC's pending motion. And DC's cited evidence fully supports SUF 3, and defendants cannot and do not dispute this. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1067

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 4.     *Action Comics #1* ("*AC#1*"), published on April 18, 1938, with a cover date of June, 1938, featured an adapted version of Siegel and Shuster's Superman story along with other stories.  [PD Exs. 8, 41 at 408-21.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that AC #1 did not feature an "adapted version of Siegel and Shuster's Superman story."  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format.<br><br>DC's Evidence:  PD Exs. 8, 41 at 408-21.<br><br>Defendant's Evidence:  PD Ex. 10 at 80, ¶21-22; *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 911 (2d Cir. 1974). | Again, defendants' response is improper because it does not identify which facts it admits.  Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present.<br><br>In any event, defendants do not explain the legal or factual difference between "adapted" and "reformatted" or how this is possibly material.  DC's evidence shows that Siegel and Shuster "*revised and expanded* the said SUPERMAN material in compliance with the said request of [DC]," PD Ex. 10 at 80 (FOF 22); *Siegel v. Nat'l Periodical Pubs., Inc.*, 508 F.2d 909, 911 (2d Cir. 1974) ("[DC] asked [Siegel and Shuster] to *revise and expand* the materials into a full-length production suitable for magazine publication, and this was done.") (emphasis added).  "Adapt" is defined as "to fit, change, or modify to suit a new or different purpose," which is fully consistent with DC's SUF 4.  http://dictionary.reference.com/browse/adapt?s=t. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 5.     After *AC#1* was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  [PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed.**  Siegel and Shuster did not work pursuant to "work- | Again, defendants' response "disputes" this undisputed fact to make improper arguments, |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1068

for-hire" agreements and were not compensated in royalties and bonuses for Superman comics. The comic book material produced in their Cleveland shop that DC chose to accept was purchased by DC by the page pursuant to page-rate. The term "work-for-hire" did not appear anywhere in the relevant contracts, as it was inapplicable to independent contractors, like Siegel and Shuster, until the mid-1960s.

DC's Evidence: PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

Objections to DC's Evidence: Relevancy, prejudicial. FED R. EVID. 401, 402, 403.

Defendants' Evidence: PD Ex. 10 at 74, ¶14; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 886 (9th Cir. 2005); *Siegel*, 542 F. Supp. 2d 1111-14.

Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present. The facts it disputes are immaterial to DC's pending motion.

DC's cited evidence fully supports SUF 5, and this Court in *Siegel* ruled that the large majority of works Siegel and Shuster created for DC, even in the early years, were "works for hire." *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1064-80 (C.D. Cal. 2009).

As to the form of Siegel's and Shuster's pay, DC's cited evidence shows Siegel and Shuster were compensated in royalties and bonuses, and how this pay increased, *e.g.*:

- Siegel and Shuster were initially paid a generous per-page rate for their work on Superman—substantially "more than anyone else [was] getting for any feature in any of" DC's other books, PD Ex. 5 at 17—which DC increased with the success of Superman. *Id.* Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

- Siegel and Shuster also received substantial royalties for many exploitations of Superman, including between "32½%" and "40% of the 'net proceeds'" received from newspaper syndication and "5% of all net proceeds which may be derived of commercial exploitation of SUPERMAN." *Id.* Ex. 3 at 12; Ex. 6 at 20.

- DC also paid Siegel and Shuster generous lump sums and "bonus[es]" throughout the years. *Id.* Ex. 10 at 88-91 (FOF 68 (paid $500 bonus for 1941); 69 (paid $7,000 bonus for 1942); 70 (paid $2,000 to

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | account for royalties for 1942); 71 (paid $6,000 bonus for 1943); 72 (paid $1,500 to account for royalties for 1943); 73 (paid $6,000 bonus for 1944); 74 (paid $1,500 to account for royalties for 1944); 75 (paid $10,000 bonus for 1945)). |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

6.    By 1941, the *Saturday Evening Post* reported that Siegel and Shuster stood to make over $2 million (in today's terms) in the next year alone.[2]  [PD Ex. 7 at 27.] FN 2:  All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**  The cited article states that Siegel and Shuster, combined, were purportedly being paid $35 a page plus $600 a week.  This statement erroneously implies that Siegel and/or Shuster made "over $2 million (in today's terms)" in 1942, while DC fails to specify its financial assumptions and calculations.<br><br>DC's Evidence:  PD Ex. 7 at 27.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403.  Lack of foundation.  FED R. EVID. 602.<br><br>Defendants' Evidence:  PD Ex. 7. | As set forth in SUF 6, it is undisputed that by 1941, the *Saturday Evening Post* reported that Siegel and Shuster "stood to make"—not "made"—"$2 million (in today's terms)" in 1942.  PD Ex. 7 at 27.  Defendants attack a straw man, saying DC "implied" other facts.<br><br>DC did not "fail[] to identify its financial assumptions and calculations."  In footnote 2—*which defendants tellingly deleted from their response*—DC identified the exact method it used:  a well-known and -respected Bureau of Labor Statistics methodology.  Defendants cannot and do not challenge the adequacy of that methodology or DC's use of it.  Courts regularly use statistics, including the consumer price index, as provided by the Bureau of Labor Statistics. *See Sorenson v. Mink*, 239 F.3d 1140, 1148 (9th Cir. 2001). |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

7.    In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.  The court concluded that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1070**

under which Siegel and Shuster acknowledged the 1938 assignment granted to DC
all rights in Superman.  [PD Exs. 9, 11-12.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it omits that the court found that DC misappropriated Jerry Siegel's Superboy while Siegel was overseas fighting for his country in World War II.<br><br>DC's Evidence:  PD Exs. 9, 11-12.<br><br>Defendants' Evidence:  PD Ex. 10 at 108-110. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>The new facts defendants assert are unsupported and immaterial to DC's motion.  For example, Siegel admitted he did not "fight" for his country in World War II, but rather as he told DC in January 1944, he had been placed on the "Detached Enlisted Men's List," a status reserved for celebrities:  "DEML is known throughout the Army [as] 'Damn Easy Military Life.'"  Decl. of Cassandra Seto ("SD") Ex. 2 at 5-6.  Siegel was assigned to the Library and Publications Branch of the Army Special Services Company in Honolulu, Hawaii, where he spent the war writing for publications like *Midpacifican*.  *Id.* Exs. 2, 3. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

8.     In a 1975 agreement, DC provided Siegel and Shuster with, in today's
dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per
year, survivor payments to their heirs, and insurance coverage, as well as "credits"
on new Superman works.  Siegel and Shuster acknowledged that DC owned all
Superman-related copyrights.  [PD Ex. 15.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent DC's purported in "today's dollars" are misleading, and incapable of verification as DC does not disclose its financial assumptions for its supposed | Again, defendants' response is improper because it does not identify which facts it admits.  Docket No. 18 at 6-7.  Defendants' response  does not dispute that the terms of the 1975 agreement provided Siegel and Shuster with the benefits set forth in SUF 8.  Instead, it "disputes" DC's |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1071

| | |
|---|---|
| calculations. The 1975 agreement called for monthly payments of $20,000, less withholding taxes, and a lump sum payment of $17,500, $7,500 of which was intended to apply to Siegel and Shuster's legal fees. Frank Shuster (Joe Shuster's brother) was to be paid $5,000 a year. | calculation of the present day value of those benefits. This dispute is immaterial to DC's pending motion, and DC did not "fail[] to disclose its financial assumptions for its calculations." In footnote 2—*which defendants tellingly deleted from their response*—DC identified the exact method it used: a well-known and -respected Bureau of Labor Statistics methodology. *See supra* DC's Reply to SUF 6. |
| DC's Evidence: PD Ex. 15. | |
| Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. Improper lay opinion, lack of sufficient facts and data, lack of foundation. Fed. R. of Evid. 701, 702. | |
| Defendants' Evidence: PD Ex. 15 at 143. | |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 9. Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families travel to Superman-related events. [*E.g.*, PD Exs. 17-19; Declaration of Paul Levitz ("LD") Exs. 23, 27, 33, 39, 53, 54, 60, 67, 71, 75-78.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that it implies DC made "cost- of-living" adjustments for Shuster or his family.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the facts defendants dispute—whether DC made "cost-of-living" adjustments for Shuster or his family—DC's cited evidence shows that DC regularly adjusted Shuster's compensation under |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1072**

| | the 1975 agreement according to cost of living statistics.  PD Ex. 17 ("Retroactive to January 1, 1988, we will be making payments to [Shuster] at the rate of $80,000 per annum, plus an annual cost of living increase of up to 10%, commencing 1989 based upon the U.S. Department of Labor statistics for the cost of living applicable to the Los Angeles Area."); Ex. 18 ("[T]he cost of living for the Los Angeles area for 1989 increased by 5.15% over 1988.  Accordingly, I am instructing the payroll department to make the 5.15% increase, to be applied to [Shuster's] compensation retroactive to January 1, 1990."); Ex. 19 (same; cost-of-living adjustment for Los Angeles in 1990 increased 5.45%). |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

10.    All told, the Siegels and Shusters have been paid well over $4 million under the 1975 agreement, not including medical benefits or bonuses.  [LD ¶ 4 & Exs. Exs. 23, 27, 33, 39, 53, 60, 67, 71.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**  DC does not provide the underlying data, evidence or financial assumptions it used to arrive at this purported figure. DC also appears to conflate the 1975 agreement, amendments thereto, and the 1992 agreement.<br><br>DC's Evidence: LD ¶ 4 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. Improper lay opinion, lack of sufficient facts and data, lack of | Levitz's sworn declaration—which attests to his personal knowledge of such facts, Decl. of Paul Levitz ("LD") ¶ 1—confirms "[a]s of 2011, Warner had paid the Shuster and Siegel families $4.3 million under the 1975 agreement, not including the medical benefits or special bonuses."  *Id.* ¶ 4.  Business executives are fully competent to provide such testimony.  *E.g.*, *Lockheed Martin Corp. v. U.S.*, 70 Fed. Cl. 745, 753-54 (Fed. Cl. 2006); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). Defendants offer no testimony from Laura Siegel Larson, Jean Peavy, or any other defendant to contest these amounts.<br><br>DC did not "conflate" the 1975 agreement, |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| foundation. Fed. R. of Evid. 701, 702.<br><br>Defendants' Evidence: Same. | amendments thereto, and the 1992 agreement. Levitz separately identified in his declaration payments made under the 1992 agreement: "In total, DC has paid Jean at least over $610,000 under the 1992 agreement, and continues to pay her under this agreement to this day, even though she went back on her word." LD ¶ 9. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

11.    Neither Siegel nor Shuster ever attempted to exercise any purported termination right, although the windows for both to do so opened in 1984, while both were alive. [*E.g.*, PD Exs. 25-31, 37.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it implies that Siegel or Shuster did not wish to exercise their termination rights. Both were elderly, infirm and insolvent by the time a notice of termination right could be served, and the earliest effective date of a Superman termination notice was April, 18, 1994. Shuster died on July 30, 1992, and Siegel died on January 28, 1996. It was Siegel's wish that his widow and daughter exercise the termination right and finally restore his copyrights to his family.<br><br>DC's Evidence: *E.g.*, PD Exs. 25-31, 37.<br><br>Objections to DC's Evidence: Speculative, lack of personal knowledge and foundation. FED R. EVID. 602. Relevancy | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>The new facts defendants assert are unsupported and immaterial. Siegel and Shuster lived for many years after their termination window opened (close to a decade and over a decade, respectively), and they were far from insolvent. DC paid the men (and then their families) millions of dollars under their 1975 agreement with DC. LD ¶ 4; PD Exs. 17-19.<br><br>Defendants cite no evidence that Joe Shuster "wish[ed]" for Jean to pursue his termination rights. Defendants' only evidence that Jerry Siegel wanted his wife and daughter to do so is nothing more than an inadmissible, after-the-fact, hearsay account made by his daughter in the context of this litigation. AD Ex. 18 at 279:2-5. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1074**

| | |
|---|---|
| and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence:<br>Declaration of Keith Adams ("AD") Ex. 18 at 279:2-5 | |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 13. Shuster had no wife, child, or grandchild, and his will named his sister, Jean Peavy, as sole beneficiary and "executrix" of his estate. [PD Exs. 33 at 275-76, 46 at 443:10-444:9.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it omits that Shuster's will named Mark Warren Peary as beneficiary in the event Jean Peavy predeceased him and omits that the will states: "In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor."<br><br>DC's Evidence: PD Exs. 33 at 275-76, 46 at 443:10-444:9.<br><br>Defendants' Evidence: PD Ex. 34 at 285-286. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the "facts" defendants dispute, in 1992, Jean Peavy told both the California courts (in a sworn affidavit) and DC (in letter that soon followed) that she was Joe Shuster's sole heir. She made no mention of Mark Warren Peary's alleged rights, and based on her representations to the courts and DC, she had all of Joe Shuster's assets "paid, delivered or transferred to her" in 1992, and then made her 1992 Agreement with DC. PD Ex. 21, 33 at 275-77; LD Exs. 3, 8. |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 14. On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." [PD Ex. 21.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it omits that Jean's affidavit stated that the only property to be transferred and delivered to her | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous facts defendants wish to argue—all in contravention of this |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1075**

| | |
|---|---|
| was "758 shares of Time Warner Common Stock." | Court's rules. Docket No. 18 at 6-7. |
| DC's Evidence: PD Ex. 21. | As to the "facts" defendants dispute, Jean represented to DC in 1992 that she was Joe Shuster's sole heir, LD Ex. 3, and she and her brother Frank asserted that Jean had rights to Joe's copyrights. *Id.* Exs. 3, 6, 8, 9. |
| Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. | |
| Defendants' Evidence: Same. PD Ex. 21 at 182. | Moreover, Jean's affidavit requested the transfer to her of "768 [not 758] shares of Time Warner Common Stock," pursuant to a § 13101 affidavit by Jean Adele Peavy." PD Ex. 21, 33 ¶ 5. Those 768 shares, which were trading at just over $100 a share, SD Ex. 6, and were worth over $76,800, PD Ex. 21 at 182, mean Jean made false representations in her affidavit, when she asserted Shuster's assets do "not exceed Sixty Thousand Dollars," PD Ex. 21. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 15. Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joe Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses." [LD Ex. 3.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent Jean stated that "Any help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. |
| DC's Evidence: LD Ex. 3. | |
| Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. | |
| Defendants' Evidence: LD Ex. 3 at 10. | |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1076

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 16.     DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. [LD Ex. 5; PD Ex. 23.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it implies that DC initiated an offer. DC's proposal came in response to Jean's letter.<br><br>DC's Evidence: LD Ex. 5; PD Ex. 23.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence: LD Ex. 3 at 9-11. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the "fact" defendants dispute—whether DC "initiated" an offer to Jean—the evidence shows that the 1992 agreement, and the compensation Jean and Frank received, was subject to the parties' discussions and negotiations. *E.g.*, LD Exs. 3-6, 8, 10, 16, 17. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 17.     On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments, and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. [LD Ex. 6.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it is misleading by omission of subsequent correspondence from Frank, which indicated displeasure with amount and form of pension payments, and insofar as DC purports to characterize Frank's state of mind.<br><br>DC's Evidence: LD Ex. 6<br><br>Objections to DC's Evidence: | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>The new facts defendants assert are unsupported. There is no evidence—and defendants cite to none—of correspondence from Frank after October 1992. LD Exs. 6, 9. And DC does not purport to "characterize Frank's state of mind"; it quotes Frank, who said he was "extremely |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1077

| | |
|---|---|
| Relevancy and prejudicial. Fᴇᴅ R. Eᴠɪᴅ. 401, 402, 403. Inadmissible hearsay. Fᴇᴅ R. Eᴠɪᴅ. 801, 802. Lack of personal knowledge and speculation. Fᴇᴅ R. Eᴠɪᴅ. 602. **Defendants' Evidence:** LD Exs. 20 at 43 ("[W]e are merely asking for a fair share."), 25. | pleased." |

| **DC'S STATEMENT OF UNCONTROVERTED FACT** |
|---|
| 18.    Levitz dealt with scores of authors and heirs during his decades running DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them the same admonition:  this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC.  Levitz reiterated this condition to Frank and Jean in 1992, who confirmed they understood and agreed.  [LD ¶ 8.] |

| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
|---|---|
| **Disputed,** as to "scores of authors and heirs."  Levitz states only that he dealt with former writers and artists "from time to time."<br><br>DC's Evidence:  LD at ¶ 8<br><br>Objections to DC's Evidence: Insufficient to establish "habit" evidence. Fᴇᴅ R. Eᴠɪᴅ. 406. Relevancy. Fᴇᴅ R. Eᴠɪᴅ. 401, 402.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the "fact" defendants dispute—whether Levitz dealt with "*scores* of authors and heirs"— DC's cited evidence shows Levitz worked for DC for over 38 years and was responsible for "maintain[ing] relationships with writers and authors who had worked for DC in the past, as well as their families."  LD ¶¶ 1, 3.  When Levitz stated authors and heirs, "from time to time," "asked DC for money" he did not say scores. *Id.* ¶ 8.  Defendants attack a straw man. |

| **DC'S STATEMENT OF UNCONTROVERTED FACT** |
|---|
| 19.    The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.  In |

- 13 -

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1078**

exchange, Jean and Frank re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights.

The 1992 agreement stated, in pertinent part:

> We [DC]ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

[LD Ex. 8.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** The 1992 Agreement did not "re-grant" "all of Joseph Shuster's rights (including any Superman copyrights) to DC." The 1992 Agreement is silent on Joe Shuster's rights; its short quitclaim concerned only the rights, if any, held by Frank and Jean. Since Joe Shuster's Superman copyrights were long ago assigned to DC in the 1938 Grant and subsequent Siegel and Shuster copyright grants, Frank and Jean could not in 1992 assign to DC Superman copyrights that were already long-owned by DC. The 1992 Agreement does not even mention Superman. Accordingly, Paul Levitz (DC's former President) nowhere | Again, defendants' response is improper because it does not identify which facts it admits. Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present. Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading. Docket No. 328 (admonishing defendants for "slithering" around Court's rules on page limits). As to defendants' legal and factual arguments, DC's cited evidence shows that in the 1992 agreement, Jean and Frank "*grant[ed] to [DC]* any … copyrights, trademarks, or other property right in any and all work created in whole or in part by [Joe Shuster]…." LD Ex. 8 (emphasis added). Jean and Frank further agreed that the 1992 agreement "fully settles all claims to any payments or other rights or remedies … *whether now or hereafter existing* regarding any copyrights, trademarks, or other property right in |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1079

| | |
|---|---|
| states in his declaration on that the 1992 Agreement involved a "re-grant" of Joe Shuster's Superman copyrights.<br><br>DC's Evidence: LD Ex. 8.<br><br>Objections to DC's Evidence: Speculative, improper argument, improper lay opinion, improper conclusions of law. FED R. EVID. 602, 701, 702. Relevancy. FED R. EVID. 401, 402.<br><br>Defendants' Evidence: Same. | any and all work [he] created…." *Id.* (emphasis added). Thus, the 1992 agreement operated to revoke and re-grant all prior grants of Shuster's rights. *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008); *Siegel*, 364 F. Supp. at 1037. The 1992 agreement reflects the parties' intent to supersede the prior grants by Shuster. *E.g., Blair & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958); RESTATEMENT (SECOND) OF CONTRACTS § 279 (1988). The 1992 agreement covers the same subject matter as Shuster's prior copyright grants—*i.e.*, assignment of "copyrights ... *in any and all work* created in whole or in part by … Joseph Shuster." LD Ex. 8. The 1992 agreement represents the Shuster heirs' sole and final agreement with DC, replacing all remedies they may otherwise claim. It states: "[This] *fully settles **all claims** to any payments or other rights or remedies* which you may have under *any **other agreement** or otherwise, whether now or hereafter existing* regarding" any and all copyrights in Joe Shuster's works. *Id.* (emphasis added). Levitz testified in his sworn declaration that he told Jean and Frank during their in-person meeting that the 1992 agreement "would represent their last and final deal with DC, and would resolve any past, present, or future claims against DC." LD ¶ 8; *see also* Pl. DC Comics' Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ") at 11-12; Pl. DC Comics' Reply ISO Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ Reply") at 2-5.<br><br>Jean—Shuster's sole heir, PD Ex. 33 at 275-76— |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | had complete authority to assign any copyright interest in his works to DC in the 1992 agreement. *In re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940); *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008). Jean was a party to the 1992 agreement and bound all other heirs. *Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1040. |
| | The 1992 agreement states that it applies to "*any and all work created in whole or in part by ... Joseph Shuster.*" LD Ex. 8. Shuster's best-known work was Superman, and defendants themselves say he created the character. *See infra* SUF 46. Finally, the 1992 agreement is not a "quitclaim," as DC's legal briefing explains. DC's MSJ Reply at 5. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 20. Over the next decade, DC maintained good relations with the Shusters, and Jean and Levitz corresponded regularly. In the close to 60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required. [LD ¶ 9 & Exs. 3, 10, 11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 77-78.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** In many of the letters DC points to (Exs. 10, 17, 20, 25, 26, 29, 32), Jean expresses displeasure at the amount and form of her pension payments and requests changes. In others letters DC points to (Ex. 23, 27), DC refuses to grant these requests, stating that DC is under no legal obligation on to do so. Jean had tremendous difficulty living on a pension of $25,000 (split two | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. As to those facts defendants dispute, DC's cited evidence shows that in her letters to DC, Jean expressed gratitude—not displeasure—for DC's generosity. *E.g.*, LD Exs. 17 ("let me express again Frank's and my gratitude for having picked up Joe's debts .... We also appreciate the fact that you offered $25,000 per year over the original agreement"); 25 at 51 ("Frank and I want you to |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1081**

| | |
|---|---|
| ways after withheld taxes) and was forced to beg DC for periodic Christmas bonuses.<br><br>DC's Evidence: LD ¶ 9 & Exs. 3, 10, 11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 77-78.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence: LD Exs. 10, 17, 20, 23, 25, 26, 27, 29, 32, 74. | know that we appreciate very much your past generosity."); 26 ("Thank you, Paul, for your kindness and understanding in the care of Joe Shuster's family."); 45 ("Joe would have been pleased that you still continue to honor him through his family."); 54 ("Thank you so much for the $10,000 bonus. It is highly appreciated.").<br><br>Frank and Jean requested extra bonus payments, and DC granted those requests. LD Exs. 52-53, 59-60, 66-67, 70-71.<br><br>Defendants cite no evidence that Jean had difficulty surviving on DC's payments under the 1992 agreement, including the bonuses. Moreover, there is no truth to defendants' claim that Jean had to "beg" DC for bonuses. DC paid bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001:<br><br><ul><li>LD Ex. 23 ($25,000 in 1993);</li><li>*Id.* Ex. 27 ($10,000 in 1994);</li><li>*Id.* Ex. 33 ($10,000 in 1995);</li><li>*Id.* Ex. 39 ($10,000 in 1996);</li><li>*Id.* Ex. 53($10,000 in 1998);</li><li>*Id.* Ex. 60 ($10,000 in 1999);</li><li>*Id.* Ex. 67 ($10,000 in 2000); and</li><li>*Id.* Ex. 71 ($25,000 in 2001).</li></ul><br>Several of these bonus payments were initiated by DC, and not the result of any request by Jean or Frank. *Id.* Exs. 23, 27, 33, 39. To the extent Jean requested bonus payments, DC granted the requests. LD Exs. 52-53, 59-60, 66-67, 70-71. |

### DC'S STATEMENT OF UNCONTROVERTED FACT

21.    In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the SUPERMAN copyright," but asked for an increase in

ER-1082

payments "plus a yearly increment to account for inflation." [LD Ex. 20.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** DC misleadingly combines Jean's statements in her letter. Jean stated that at the present time "Frank and I are not planning to reclaim the SUPERMAN copyright." Jean further stated: " We believe we have a right to expect that you will be fair with us as well and will grant our request for increased payment. We will stick to our bargain...." Moreover, as DC knew, neither Frank nor Jean had any "right to reclaim the SUPERMAN copyright," as siblings have never held a termination right under the Copyright Act, 17 U.S.C. 304(c)(2). <br><br> DC's Evidence: LD Ex. 20. <br><br> Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. <br><br> Defendants' Evidence: Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. <br><br> As to those facts defendants dispute—that DC "misleadingly" quotes from Jean's 1993 letter—DC's cited evidence shows Jean confirmed in a 1993 letter to DC that she and Frank "are not planning to reclaim the SUPERMAN copyright." PD Ex. 20 at 43. At the same time, Jean requested an increase in payments: "What Joe's income would have been today plus a yearly increment to account for inflation, is, we believe, a reasonable request .... We do believe that such an *increase* in payments would be appropriate." *Id.* (emphasis added). Jean concludes, "We will stick to our bargain which we signed, dated as of August 1, 1992." *Id.* at 44. Defendants attack a straw man, saying DC "misleadingly combines" Jean's statements. There is nothing misleading about this SUF, which accurately quotes from Jean's 1992 letter. <br><br> Finally, defendants improperly make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 5-6. |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** ||

22.    In 1999—after Congress amended the copyright statute to grant additional statutory heirs termination rights, 17 U.S.C. § 304(d), and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC—Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus for this year as you had done many times in the past.

[LD Ex. 59.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it falsely implies that Jean was ever a statutory heir (she was not) or ever held termination rights (she did not). 17 U.S.C. § 304(c)(2)(D) extends termination rights to the executor, personal representative or administrator of an author's estate in the event an author (like Joe Shuster) is not survived by a spouse, child or grandchild. Joe Shuster's siblings, Frank and Jean have never held termination rights under the Copyright Act, 17 U.S.C. § 304(c)(2), and the 1992 Agreement cannot waive, release or encumber the inalienable termination right of the executor of Joe Shuster's estate. 17 U.S.C. § 304(c)(5).<br><br>DC's Evidence: LD Ex. 59.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence: Same. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. Defendants improperly use their response to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 5-6. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1084

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 23. In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. [LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it is misleading as to amounts of bonuses. In all but two years (1993 and 2001), the bonus was $10,000.<br><br>DC's Evidence: LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence: Same. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>Nothing about SUF 23 is "misleading." DC's cited evidence shows DC paid Jean bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001—and that they "ranged" from $10,000 to $25,000, exactly as SUF 23 states:<br><br>• LD Ex. 23 ($25,000 in 1993);<br>• *Id.* Ex. 27 ($10,000 in 1994);<br>• *Id.* Ex. 33 ($10,000 in 1995);<br>• *Id.* Ex. 39 ($10,000 in 1996);<br>• *Id.* Ex. 53 ($10,000 in 1998);<br>• *Id.* Ex. 60 ($10,000 in 1999);<br>• *Id.* Ex. 67 ($10,000 in 2000); and<br>• *Id.* Ex. 71 ($25,000 in 2001). |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 24. In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal rights to make such requests, but would pay her a bonus anyway, which she thanked DC for doing. [LD Ex. 23.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Undisputed,** but irrelevant.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1085

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 25.    DC has paid the Shusters over $610,000 under the 1992 agreement and as special bonuses, and DC continues to make payments to Jean to this day.  [LD ¶ 9 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that there is no evidence that the Shusters were paid "over $610,000" in 1992-2012 under the 1992 Agreement and as bonuses.<br><br>DC's Evidence: LD ¶ 9 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Exhibits: Same. | Levitz's sworn declaration (which defendants do literally nothing to refute) establishes that:  "In total, DC has paid Jean at least … $610,000 under the 1992 agreement, and continues to pay her under the agreement to this day."  LD ¶ 9.  Business executives can provide such testimony, *e.g.*, *Lockheed Martin*, 70 Fed. Cl. at 753-54; *Barthelemy*, 897 F.2d at 1018, and Levitz not only establishes these facts through his unrebutted testimony, DC provided documentary evidence to support it, *e.g.*, LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.  Nor do defendants offer any testimony from Jean Peavy or any other defendant to contest these amounts. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 26.    Jean's 50-year-old son, Mark Peary (born Peavy), who lives with his mother and does not have a job, testified that Jean was of sound mind when she sent these letters to DC.  [PD Ex. 46 at 443:19-444:22.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that Mark Peary shares a house with his mother and his sister, Dawn Peavy, and is self-employed as an investor and published author.<br><br>DC's Evidence:  PD Ex. 46 at 443:19-444:22.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to those facts defendants dispute, Peary's sister moved into his mom's house with him years later, Docket No. 360-2 at 81:9-14; he published two books in 20 years, WARREN PEARY, THE 10 BIGGEST DIET MYTHS AND GREATEST HEALTH SECRETS REVEALED (2003) |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1086**

| | |
|---|---|
| Defendants' Evidence:  PD Ex. 46 at 444:9-444:22; AD Ex. 17 at 363:14-365. | (self-published by Peavy's mother); WILLIAM S. PEAVY & WARREN PEARY, SUPER NUTRITION GARDENING (1992); and defendants do not explain how investing one's own money is a "job." |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 27.     Mark Peary, Jean's doctor, and Jean's daughter testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying."  [PD Exs. 44, 46 at 447:18-448:3, 455:10-21, 48 at 517:17-22, 520:2-4, 523:4-13.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Undisputed**, but irrelevant. Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 28.     In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel" called "Dreamers," and asked Levitz to share it with Warner Bros. Peary's screenplay detailed how Shuster became estranged from DC, but toward the end of his life, he and DC made amends.  [LD ¶ 10 & Ex. 44.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** The screenplay "Dreamers" was a fictionalized account of Shuster's life and did not purport to portray his actual relationship with DC. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. |
| DC's Evidence:  LD ¶ 10 & Ex. 44. Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403. Inadmissible hearsay.  Fed. R. Evid. 801, 802.  Lack of foundation and personal | As to the one point defendants contest, DC's cited evidence shows that Peary described "Dreamers" to Levitz as the "inspiring life story of Joe Shuster and Jerry Siegel," LD Ex. 44 at 82; *id.* ¶ 10.  The screenplay—at pages 126-30 of LD Ex. 44—discusses how Joe Shuster made amends with DC late in his life, just as Levitz testified, LD ¶ 10. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1087

| knowledge. Fed. R. Evid. 602. Defendant's Evidence: LD Ex. 44; PD Ex. 46, 450:12-452:3. | |
|---|---|
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 29. Warner Bros. declined to develop "Dreamers," and in 1999, Peary submitted a revised script and asked Levitz if the Siegel family's copyright termination effort would "interfere with [him] selling [his] screenplay." [LD ¶ 10 & Ex. 46, 62.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Undisputed,** but irrelevant. Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 30. Before Peary met Marc Toberoff, he never told DC the Shusters had a right to terminate or challenged the 1992 Agreement. Instead, from 1992 to 2001, he and Jean affirmed the Agreement and accepted payments under it. [*E.g.*, LD ¶ 10 & Exs. 20, 23, 24, 26, 27, 28, 33, 34, 39, 43, 53, 54, 59, 60, 61, 67, 68, 71, 72.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed.** Peary never affirmed or even mentioned the 1992 Agreement in the letters DC cites. Peary was not a party to the 1992 Agreement and did not receive any payments under it. Jean raised concerns about the terms of the 1992 Agreement less than two months after signing it and thereafter repeatedly asked DC to increase her pension, which DC denied. Furthermore, this Court has clearly held that the acceptance of benefits under a pension | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. As to the facts defendants disputes, the evidence shows: <br>• Peary was involved in negotiation of the 1992 Agreement—"Jean asked [him] to forward all of the final debts and expenses for Joe Shuster on to [DC]" for payment, which he did, LD Ex. 7; <br>• Though he and his mother regularly corresponded with Levitz between 1992 and 2001, "Mark Peary never told [Levitz] that he thought he or his family had any remaining |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1088**

| | |
|---|---|
| agreement is not a bar to termination, in a ruling incorporated into a judgment that DC did not challenge on appeal. *Siegel I*, 542 F. Supp. 2d at 1132-34.<br><br>DC's Evidence: *E.g.*, LD ¶ 10 & Exs. 20, 23, 24, 26, 27, 28, 33, 34, 39, 43, 53, 54, 59, 60, 61, 67, 68, 71, 72.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence: Same; LD Exs. 10, 17, 45, 52, 66, 70. | termination claims to assert," LD ¶ 10, Exs. 3, 7, 10, 11, 16-20, 22-35, 37, 39, 41-44, 45-74, 77, 78;<br><br>• Jean sent DC letters requesting more money to help support Peary, LD Ex. 25; and Peary's sister testified that he "handle[s Jean's] financial issues," Docket No. 305-53 at 2019:2-5, 2056:13-21;<br><br>• Jean repeatedly affirmed the 1992 agreement, stating that she would "stick to our bargain," LD Ex. 20 at 43-44, and "continue to honor" the agreement, *id.* Ex. 59;<br><br>• DC granted *every one* of Jean's requests for a bonus—and in many instances, gave her a bonus even when she did not request one. LD Exs. 23, 27, 33, 39, 52-53, 59-60, 66-67, 70-71;<br><br>• And Peary submits no testimony—declaration or otherwise—contesting these facts.<br><br>Contrary to defendants' straw-man arguments, SUF 30 does not assert, *e.g.*, that "Peary was … a party to the 1992 Agreement." |

| DC's STATEMENT OF UNCONTROVERTED FACT |
|---|

31.    In a November 2001 "Joint Venture Agreement," Peary and Jean formed a joint venture with Toberoff's company Pacific Pictures Corporation "for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations." Jean and Peary "transfer[ed] and assign[ed]" the following "Rights" to the Joint Venture:

> The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books….

The agreement provided that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by [the Shusters] and fifty percent (50%) by [Pacific Pictures]." [PD Ex. 32; *see*

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1089**

*also* Docket No. 305-37.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that the 2001 agreement could not have transferred or assigned to the joint venture either the termination rights or the future copyright interests recovered as a result of exercising such termination, as a matter of copyright law. 17 U.S.C. §§ 304(c)(5)-(6)(B), 203(a)(1)—(5). The only person eligible for the termination right under the Copyright Act, 17 U.S.C. § 304(c)(2), is the executor, personal representative or administrator of the estate of Joseph Shuster, and the estate was not probated and Mr. Peary was not appointed as its executor until 2003.<br><br>In 2003, after the Shuster Estate was probated, a new agreement was made between PPC and the Shuster Executor (the "2003 PPC Agreement").<br><br> As such, the 2001 PPC Agreement is legally inapplicable. Furthermore, in 2004, both PPC Agreements were revoked in 2004 and replaced by a legal retainer agreement.<br><br><u>DC's Evidence</u>: PD Ex. 32. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading. Docket No. 328 (admonishing defendants for "slithering" around Court's rules on page limits). Defendants' improper and baseless legal arguments are addressed in DC's legal briefs. DC's MSJ at 11-12; DC's MSJ Reply at 5-6, 8. They are also refuted by the 2001 Pacific Pictures agreement, PD Ex. 37, which Peary admitted under oath—and without objection—operated to assign to Pacific Pictures "all of the Joe Shuster rights, termination rights, to the extent they existed …. [Those rights] were being transferred and assigned to the venture just as [the 2001 contract] says." PD Ex. 46 at 482:8-23. In the 2003 Pacific Pictures agreement, Peary "confirm[ed]" the 2001 agreement on behalf of the Shuster estate. *Id.* Ex. 36.<br><br>Finally, defendants' unsupported factual and legal assertion that their 2004 "legal retainer agreement" revoked and replaced the PPC Agreements is untrue and immaterial, in any event, as shown in DC's briefing. DC's MSJ Reply at 12. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1090

| Defendants' Evidence:  Same. AD Exs. 13, 27. | |
| --- | --- |

| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| --- | --- |
| 32.    Toberoff, Jean, Peary, and the Shuster Estate reaffirmed the terms of the Pacific Pictures Joint Venture in a 2003 amendment "confirm[ing]" that the joint venture held the Estate's "copyright termination interest in 'SUPERMAN' pursuant to Section 304(d) of the U.S. Copyright Law."  [PD Ex. 36.] | |

| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| --- | --- |
| **Disputed.**  Jean was not a party to the 2003 PPC Agreement, and had no rights or obligations under it.  The only parties to the 2003 PPC Agreement were PPC and the Executor of the Estate of Joseph Shuster.  The Shuster Executor, appointed in October of 2003, was party only to the 2003 PPC Agreement which did not purport to transfer any termination rights to PPC, but rather provided PPC with a contingent share of proceeds, if any, from recaptured copyright interests. The 2003 agreement could not have transferred or assigned to the joint venture the termination right or the future copyrights to be recovered by termination as a matter of copyright law, 17 U.S.C. §304(c)(5)-(6)(B), §203(a)(1)—(5), nor did it even purport to assign either. The 2003 agreement provided that future proceeds, if any, from | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading. Defendants' improper and baseless legal arguments are addressed in DC's legal briefs. DC's MSJ at 11-12; DC's MSJ Reply at 5-6, 8. They are also refuted by the 2003 Pacific Pictures agreement, PD Ex. 36, which "confirm[ed]" on behalf of the Shuster estate the 2001 agreement "transfer[ring] and assign[ing] to the Venture" the Shuster heirs' termination interest. *Id.* Ex. 32; *see also id.* Ex. 46 at 482:8-23 (Peary admitting under oath—and without objection—that this 2001 agreement operated to assign to Pacific Pictures "all of the Joe Shuster rights, termination rights, to the extent they existed"). |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1091

| | |
|---|---|
| recovered copyrights would be shared.<br><br>DC's Evidence:  PD Ex. 36.<br><br>Defendants' Evidence:  Same at ¶1, 10. | |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

33.    Peary admits that, in 2003, he understood "that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as [the contract] says."  [PD Ex. 46 at 482:8-23.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that Peary did not say the quoted language.  Also disputed to the extent that it omits that Peary later learned in discussions with Toberoff that the contract was invalid.<br><br>DC's Evidence: PD Ex. 46 482:8-23.<br><br>Objections to DC's Evidence: Improper lay opinion and legal conclusions.  Fed. R. of Evid. 701, 702.  Relevancy. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>And as to the fact it does dispute—that "Peary did not say the quoted language"—the evidence DC cited shows that Peary testified as follows:<br><br>Q:  Okay.  [The 2001 PPC Agreement] says: "In considerations for PPC's contributions to the Venture in the mutual covenants contained herein, claimants hereby transfer and assign to the Venture their rights, titles and – title and interests in the rights."  Do you see that?<br>A:  Yes.<br>*Q:  So you understood when you signed this that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says, correct?*<br>*A:  Yes.*<br>PD Ex. 46 at 482:8-23 (emphasis added).  In the 2003 Pacific Pictures agreement, Peary "confirmed the [2001] agreement" on behalf of |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

the Shuster estate—effectively retransferring the same rights on behalf of the estate. *Id.* Ex. 36. Peary is bound by his admissions above, which he made under oath and without any objection from counsel. Deponents who make such direct admissions, by answering an unqualified "Yes" to such questions, cannot "dispute" such testimony, by having their lawyer say the fact is "disputed" in opposing summary judgment. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 252, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

34.    Peary concedes, as did Toberoff, that these Pacific Pictures agreements are "not lawful," because, *inter alia*, the Shusters could only make such a rights deal with DC. Peary testified he was unaware that the agreements were unlawful when he signed them and filed the Notice. [PD Ex. 46 at 485:16-488:21; Docket No. 191 at 8.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** Peary did not testify that the PPC agreements are "not lawful" because the Shusters could only make such a rights deal with DC.<br><br>DC's Evidence: PD Ex. 46 at 485:16-488:21; Docket No. 191 | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the fact defendants dispute, in moving to dismiss DC's First and Second Claims, Toberoff and Peary asserted that the Pacific Pictures |

- 28 -

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| at 8. | agreements were "void *ab initio*" because |
| **Defendants' Evidence:** Same. | § 304(c)(6)(D) of the Copyright Act prevents the Shusters from entering into a rights deal with anyone but DC until "after the effective date of the termination." Docket No. 191 at 8. |
| | At his deposition, Peary admitted he was "[n]ot [aware] at the time" he signed the Pacific Pictures agreements that they were "not lawful," but became aware of that fact "[s]ometime [in] 2003" when Toberoff told him they were illegal. PD Ex. 46 at 485:16-488:21. That testimony is reproduced below: |

> Q:  Did you think -- did you think that it was proper for lawyer to impose that -- to have such a -- an agreement with a client that the client can't settle without the lawyer's consent no matter how much the client wants to settle?
> A:  At the time I didn't consider it.
> Q:  Did you think it was appropriate?  Did you have any knowledge on that subject whether the lawyers are even permitted under the law to have such arrangements?
> A:  No, I -- I was not aware.
> Q:  Did you do any research on that subject?
> A:  Not specifically this, no.
> Q:  Were you aware that it's not lawful for a lawyer to have such a -- an agreement with a client?
> A:  Not at the time.
> Q:  Have you since become aware of that?
> A:  Yes.
> Q:  When?
> A:  Sometime 2003.
> Q:  How?
> A:  Discussions with Marc Toberoff.

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1094

| | PD Ex. 46 at 485:16-488:21. |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

35.  Peary negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel.  [PD Ex. 39 at 319:9-320:14.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that it omits that Toberoff advised Peary to seek outside counsel.<br><br>DC's Evidence:  PD Ex. 39 at 319:9-320:14.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  AD Ex. 19 at 320:19-23. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the fact defendants assert—that Toberoff advised Peary to seek outside counsel—there is *no evidence* Toberoff disclosed in writing the conflict of interest arising from his business partnership with Peary or obtained a conflict waiver from the Shuster heirs, as the rules require.  CAL. R. OF PROF'L CONDUCT 3-300, 3-310.  Indeed, recently emerged evidence from the Toberoff Timeline files shows that another law firm openly questioned the legality and ethics of Toberoff's conduct, Docket No. 427-3 at 335-49—for the same reason the Ninth Circuit recently questioned Toberoff's "ethical and professional" conduct vis-à-vis the Shusters.  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012). |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

36.  Peary only told his mother about the Pacific Pictures agreements "just before [they] were ready to sign."  [PD Ex. 46 at 492:20-493:11.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed**, as the quoted language was used by DC's counsel, and not used or adopted by Peary.<br><br>DC's Evidence:  PD Ex. 46 at | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1095**

| | |
|---|---|
| 492:20-493:11.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Ex. 46 at 492:5-493:14. | As to the fact defendants do dispute—that Peary did not "use" or "adopt" the quoted language—defendants misstate and mischaracterize Peary's admissions, which are reproduced below:<br><br>Q:  At what point did you disclose to [Jean] what you were doing?<br>A:  Probably when I decided to work, retain Mr. Toberoff, it's probably when I really discussed it. …<br>*Q:  [W]hy did you decide not to share with your mother … your activities until just before you were ready to sign the document?*<br>*A:  I was doing research on my own and she … had no interest or knowledge of any … of the rights or anything.  It was something I did completely on my own because I wanted to be thorough, so that's the reason.*<br>Q:  And did you come to a point when you thought, like, you had sufficient, thorough information that you could then talk with her?<br>A:  Yes.<br>*Q:  [W]hen did you talk with her, was it in that conversation that you first identified to her that you had contacted Mr. Toberoff and you were recommending him?*<br>*A:  I believe so.*<br>PD Ex. 46 at 492:8-493:11 (emphasis added). Peary is bound by such admissions, which he made under oath and without any objection from counsel.  *See Kennedy*, 952 F.2d at 266; *supra* DC's Reply ISO SUF 33. |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** ||
| 37.    When asked years ago about the Pacific Pictures agreements, Jean testified her "son handles everything legal" and she did not "know what's going on."  [PD Ex. 38 at 310:14-312:13.] ||

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1096

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** Jean was not asked about the PPC agreements. She was asked about the 1992 Agreement and whether she knew if her brother's estate had made any claims to the Superman copyright.<br><br>DC omits parts of Jean's testimony; her answer was limited to the specific issue of whether the Estate had made claims, and she stated: "I don't know what's going on there."<br><br>DC's Evidence: PD Ex. 38 at 310:14-312:13.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence: PD Ex. 38 at 312:1-312:13. | Defendants' response is well taken in part, but immaterial, and misleading in another part. When Jean was asked at deposition about her awareness of the Shuster estate filing a copyright termination claim related to Superman, she responded that her "son handles everything legal" and she did not "know what's going on there." Of course, the termination notice was filed only after Toberoff, Peary, and Jean formed the Pacific Pictures Joint Venture. PD Exs. 32, 36, 37. As shown in SUF 36, Peary only showed his mother the original Pacific Pictures agreement just before it was ready to sign. PD Ex. 46 at 492:8-493:11. And while Peavy has signed later Pacific Pictures agreements, including one in 2011, her competency to do so is expressly in doubt, given the stroke she suffered in May 2009. Docket No. 64-4 at 1. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 38.     In 2003, Peary initiated proceedings to probate Joe Shuster's estate—even though, in 1992, his mother had already filed an affidavit in California probate court to obtain all of Shuster's assets. Peary asked the court to appoint him executor in place of his mother. [PD Exs. 21, 33-34.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it was the elderly Jean (86) not Mr. Peary, who asked that he be appointed in Jean's place. Disputed in that it misleads by omission of the following: In 2003 Joseph Shuster's estate was expressly | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. Defendants improperly use their response to make merits-based arguments, but such |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

probated in California Superior Court for the express purpose of availing itself of the termination right that for the first time had been extended to the executor of an author's estate by the 1998 Copyright Termination Extension Act ("CTEA"). The Court found this to be reasonable and acceptable and duly appointed Mark Warren Peary as the personal representative of Joseph Shuster's estate, including for the express special purpose of exercising and enforcing the termination right under 17 U.S.C. § 304(c)(2)(d). When Joseph Shuster died, no one held his termination rights, and because he died with minimal assets consisting of some shares of stock, his estate was not probated by Jean in 1992. Instead, per Cal. Prob. Code § 13101, Jean filed an affidavit requesting that such stock be transferred to her.

<u>DC's Evidence</u>: PD Exs. 21, 33-34.

<u>Evidentiary Objections</u>: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.

<u>Defendants' Evidence</u>: Same; PD Ex. 21 at 182.

arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 15; DC's MSJ Reply at 5-6.

As to the "new" facts defendants assert, all are disputed, and the evidence shows that though defendants claim "it was the elderly Jean (86) not Mr. Peary, who asked that he be appointed in Jean's place," Jean was 82 in 2003, PD Ex. 46 at 447:21-22, and it was *Peary*, not Jean, who petitioned the probate court to be appointed executor of the Shuster estate—even though Shuster's will named Jean the "executrix" and sole beneficiary of his estate, and in 1992, Jean had already filed an affidavit in California probate court to obtain all of Shuster's assets, PD Exs. 21, 33-34; LD 3 at 9.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1098

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 39.     Peary has kept this probate matter open for nine years—despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible."  [PD Ex. 35.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** in that DC erroneously implies that Mr. Peary has not fulfilled his responsibilities as executor of Joseph Shuster's estate.  The estate was specifically probated to avail itself of the termination right under the 1998 CTEA, 17 U.S.C. § 304(d).<br><br>Because a notice of termination as to the early Superman copyrights (e.g., AC#1) would not be effective until 2013 (i.e., 1938 + 75 years) at the earliest under 17 U.S.C. § 304(d)(2), and because the copyright interests cannot be transferred prior to the effective date of termination per 17 U.S.C. § 304(c)(5), the estate has properly been kept open until at least the termination takes effect in 2013.<br><br>DC's Evidence:  PD Ex. 35.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Exs. 33-34. | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the fact defendants dispute—that "Peary has not fulfilled his responsibilities as executor"—the evidence cited by DC shows that Peary initiated proceedings to probate Shuster's estate in 2003, PD Exs. 33, 34, and signed a form committing to "complet[e] the estate administration as promptly as possible," PD Ex. 35; but the probate remains open to this day. Cal. Super. Ct., Case No. BP 080635.  As for defendants' improper legal arguments, California case law shows that Peary should have closed the Estate years ago, but has kept it open so defendants can make their improper, wrong-party shell-game arguments.  *In re Kalt's Estate*, 16 Cal. 2d at 811; *Estate of Molino*, 165 Cal. App. 4th at 921; Docket Nos. 186 at 12-13; 334 at 9-10; *see also* DC's MSJ at 11-12, 15-17; DC's MSJ Reply at 8. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

40. Several weeks after initiating the probate matter and signing the 2003 Pacific Pictures Joint Venture contract, Peary, on behalf of the newly formed Shuster Estate, served a copyright termination notice on DC purporting to take effect on October 26, 2013 (the "Notice"). The Notice nowhere mentions the Joint Venture with Pacific Pictures, or the fact that the Shusters had transferred all their putative termination interests to the Venture. [PD Ex. 37.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that the Shuster Termination was served many months after the probate case was initiated and after Peary had been appointed as the Shuster Executor. Disputed in that neither Jean nor Peary, individually or as the executor of the Shuster estate, could have transferred or assigned to the joint venture the termination right or the future copyright interests to be recovered pursuant to statutory termination, as a matter of copyright law. 17 U.S.C. §§ 304(c)(5)-(6)(B).<br><br>DC's Evidence: PD Ex. 37.<br><br>Defendants' Evidence: Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the fact defendants do dispute—"many months" versus "several weeks"—the undisputed evidence shows that the termination notice was served 13 weeks after the probate case was filed. PD Ex. 33 at 270, Ex. 37 at 303.<br><br>Defendants also improperly make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12, 18-20; DC's MSJ Reply at 8. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

41. Attached to the Notice were sworn certifications by Toberoff and Peary that all information contained in the Notice was "true and correct" and "signed by all persons whose signature is necessary to terminate" Shuster's copyright grants. Toberoff also certified in the Notice that "that before serving the foregoing document …, I caused a reasonable investigation to be made as to the current ownership of the rights being terminated." [PD Ex. 37 at 303-304.]

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** As required by 37 C.F.R. §201.10 (d), Mr. Toberoff duly certified that he "caused a reasonable investigation to be made as to the current ownership of the rights being terminated, including a search of the records in the U.S. Copyright Office." Mr. Peary duly certified, but was not required to swear, that "[to the best [of his] knowledge and belief, this notice has been signed by all persons who signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code."<br><br>DC's Evidence: PD Ex. 37 at 303-304.<br><br>Defendants' Evidence: PD Ex. 37 at 303. | The language used by DC in SUF 41 could have been more precise, so to be clear: Peary certified that all information contained in the termination notice was "true and correct" and "signed by all persons whose signature is necessary to terminate" Shuster's copyright grants. PD Ex. 37 at 303. Defendants do not dispute this. Moreover, Toberoff provided a sworn certification in the Notice "that before serving the foregoing document …, I caused a reasonable investigation to be made as to the current ownership of the rights being terminated." *Id.* at 304. Defendants do not dispute this. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 42. In 2008, Peary and Jean signed a "consent agreement" with the Siegels that bars the families from entering into an agreement with DC without the consent of the other. [PD Exs. 46 at 458:21-459:25, 461:19-462:9, 465:25-469:1, 472:8-473:11, 47 at 500:10-501:24, 504:20-506:13, 509:15-511:8.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it implies that the agreement was titled or characterized itself as a "consent agreement," which DC's evidence does not | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. |

- 36 -

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| support. | As to the fact defendants dispute—that the agreement was not "titled or characterized … as a 'consent agreement'"—Peary testified as follows: |
| DC's Evidence: PD Exs. 46 at 458:21-459:25, 461:19-462:9, 465:25-469:1, 472:8-473:11, 47 at 500:10-501:24, 504:20-506:13, 509:15-511:8. | Q: Have you signed any other agreements at any time since 2004 relating to legal representation to this case in any way? |
| | A: Yes. |
| | Q: What have you signed? |
| | A: … *[I]t's called a consent agreement.* … |
| | Q: You now recall that *you signed something called a consent agreement* and that's also in your lock box? |
| | A: *Yes.* |
| | Q: Okay. When was that signed? |
| | A: That as 2008, I believe. … |
| | Q: Is the 2008 *consent agreement* the last agreement of any kind that you have signed in connection with either this case or anything having to do with the Joe Shuster termination issue? |
| | A: Yes. |
| | Q: Okay. Who else signed the 2008 *consent agreement*? |
| | A: Would have been the -- Laura, Joanne Siegel. … |
| | Q: Anyone else? |
| | A: I think there was -- and -- and my attorney [Toberoff] signed it. |
| | Q: And did your mother, Jean Peavy, sign it? |
| | A: I don't recall if she did. I just -- I didn't read it. I just scanned the -- the pages. I didn't -- I don't recall the signature page. She might have. |
| | PD Ex. 46 at 458:21-462:9 (emphasis added). |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1102

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 43. Peary conceded the "consent agreement" was signed by himself, "Laura [Larson], Joanne Siegel," and "Toberoff" in 2008; that it provides that "any agreement with DC or settlement with DC requires the consent of the Siegels"; and that it is "still in effect" today. [PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7, 47 at 509:15-511:8; *see also* Docket No. 160 at 63, 231 at 6.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it misleadingly implies that Mr. Toberoff signed the 2008 agreement as a party to the agreement. Mr. Toberoff was not a party to the 2008 agreement, and expressly signed it as the Siegels' and Shuster estate's attorney, to approve the form of the agreement only. Disputed in that DC cites to irrelevant testimony of Ms. Larson concerning Mr. Toberoff's contingency fee in an attempt to elicit bias (PD Ex. 47 at 509:15-511:8). Disputed in that DC falsely attributes the testimony of Ms. Larson to Mr. Peary, who nowhere states that "any agreement with DC or settlement with DC requires the consent of the Siegels." | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. |
| | As to the fact defendants dispute—whether Toberoff signed the consent agreement as a party—Peary testified as follows: |
| | Q: Okay. *Who else signed the 2008 consent agreement*? |
| | A: Would have been the -- Laura, Joanne Siegel. … |
| | Q: Anyone else? |
| | A: I think there was -- and -- and *my attorney [Toberoff] signed it*. … |
| | PD Ex. 46 at 461:19-462:2 (emphasis added). |
| **DC's Evidence:** PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7, 47 at 509:15-511:8; *see also* Docket No. 160 at 63, 231 at 6. | Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about its contents or who is bound by it. *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").In any event, if this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |
| <u>Defendants' Evidence:</u> AD Ex. | |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| 26 at 369:1-4. | Defendants' claim that "DC falsely attributes the testimony of Ms. Larson to Mr. Peary, who nowhere states" the language quoted by DC, is demonstrably false, as Peary testified—without objection—as follows: |
| | Q: Did you tell your mother in your conversations over the years and in particular about the consent agreement that *any agreement with DC or settlement with DC requires the consent of the Siegels*? |
| | A: *Yes.* |
| | PD Ex. 46 at 473:1-8 (emphasis added). |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

44.   After this Court held in the related *Siegel* case that "promotional announcements" featuring the first appearance of Superman fell outside the termination window of § 304(c) of the Copyright Act, both the Siegel and Shuster heirs served new termination notices in 2012 purporting to terminate the announcements.  [PD Exs. 41 at 369-70, 49-50.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that the Court was referring to certain identified "promotional announcements," not such announcements in general, and disputed as to the term "purporting."<br><br>DC's Evidence:  PD Exs. 41 at 369-70, 49-50.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Ex. 49, 50. | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>Defendants' immaterial quibbles are hard to follow, but they cannot dispute that the *Siegel* court held that the "promotional announcements" featuring the first appearance of Superman fell "outside the effective reach of the [Siegel] termination notices."  PD Ex. 41 at 369-70.  Or that after this ruling, the Siegel and Shuster heirs served new termination notices in 2012 purporting to the terminate the announcements. PD Exs. 49-50.  DC says "purport" because the law is clear—copyright termination notices are |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1104**

| | not self-executing and are not valid or enforceable just because they were served. *E.g.*, 37 C.F.R. § 201.10(f)(6) ("Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction."); *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 491 F. Supp. 1320, 1323 n.3 (S.D.N.Y. 1980). Defendants cite no law to the contrary. |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 45. Joe Shuster's original wish, as embodied in the 1975 agreement, was to take care of Frank Shuster because of the assistance Frank had rendered on the early Superman strips as a letterer, and because Frank had taken Joe in during the 1960s; he had never known or understood Joe to want to provide for Jean. [LD ¶ 7.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**<br><br>DC's Evidence: LD ¶ 7.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. Lack of foundation and personal knowledge. Fed. R. Evid. 602. Improper opinion testimony. Fed. R. Evid. 701. | Defendants fail to identify what fact, if any, they dispute. Levitz testified—and defendants do not refute—that he "understood Joe's original wish, as embodied in the 1975 agreement, to be to take care of Frank because of the assistance Frank had rendered on the early strips as a letterer, and because Frank had taken Joe in during the 1960s," and "had never known or understood Joe to want to provide for Jean." LD ¶ 7. This testimony is uncontradicted and not impeached. The 1975 agreement also very clearly only provides for any benefits for Frank, not Jean. LD Ex. 15 at 144. |

- 40 -

ER-1105

## II.   DC'S RESPONSES TO DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

| DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS | DC'S RESPONSE |
|---|---|
| 46.    Author Jerome Siegel and illustrator Joseph Shuster co-created Superman in high school in 1933-34.<br><br>Defendants' Evidence:  PD Ex. 10 at 77, ¶ 8. | **Undisputed** that Siegel and Shuster co-created a character called Superman in 1933-34, even though defendants offer no competent evidence to support this claim.  The evidence they cite—a 1947 finding of fact issued by the New York Supreme Court in Westchester County (the "Westchester Action")—states only that Siegel and Shuster "first created cartoon material in which [Superman] first appeared in 1934." |
| 47.    Siegel and Shuster's highly original character became a cultural icon, spawned a multi-billion dollar franchise and brought fortune to many, but not to them.<br><br>Defendants' Evidence:  AD Ex. 1-3, 5, 6. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>As expert witnesses showed in the related *Siegel* case, Shuster and Siegel's limited, original contributions to Superman were not "highly original" and did not "spawn" the Superman franchise—the work of scores of DC artists and editors (including, from time to time, Siegel and Shuster) did.  *E.g.*, SD Exs. 8 ¶ 5; 9 at 5-6.<br><br>DC does not dispute for purposes of this motion that Superman became a "cultural icon" or "spawned a multi-billion dollar franchise," but does dispute that Siegel and Shuster were solely responsible for its success.  Scores of DC artists, editors, and others (including Siegel and Shuster) were responsible.  *Id.*<br><br>DC disputes that Superman "brought fortune to many, but not to [Siegel and Shuster]."  Along with their families, Siegel and Shuster received millions of dollars in compensation for their contributions to Superman.  PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

**ER-1106**

4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78. In any event, defendants offer no competent evidence to support this claim, as the hearsay newspaper articles they cite—three articles from the 1970s and obituaries for Siegel and Shuster—merely purport to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives after two failed lawsuits against DC and do not address the millions of dollars the men and their families were paid by DC both before and after these hardships. *See id.*

Objections to Defendants' Evidence: AD Exs. 1-3, 5, and 6 are inadmissible hearsay. FED. R. EVID. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005). Defendants offer these newspaper articles solely for the truth of the matters contained therein to support their erroneous argument that Siegel and Shuster did not benefit from the exploitation of Superman. Defendants cannot and do not identify any hearsay exception or other basis that would justify the exhibits' admission. *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).

FED. R. CIV. P. 56(c)(1)-(2) requires that only admissible evidence be considered for purposes of summary judgment, thus AD Exs. 1-3, 5, and 6 must be disregarded, *In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008).

Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602.

- 42 -

| | | |
|---|---|---|
| 1 | 48. On March 1, 1938, Siegel and Shuster, without counsel, signed an agreement furnished by DC under which they were paid $130 ("1938 Grant") for the rights to their Superman story.<br><br>Defendants' Evidence:  PD Ex. 10 at 81, ¶ 24. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that on March 1, 1938, Siegel and Shuster signed an agreement drafted by DC based on the parties' discussions and negotiations providing, in relevant part:  "In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer [the Superman] work and strip, all goodwill attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever...."  PD Ex. 2 at 10.<br><br>DC disputes that Siegel and Shuster entered into the March 1, 1938, agreement "without counsel." Defendants offer no competent evidence to support this claim, as the evidence they do cite—a finding of fact from the Westchester Action—merely states that DC sent Siegel and Shuster a check for "$412, which included $130 in payment of the first thirteen page SUPERMAN release at the agreed rate of $10 per page, and a written instrument for [their] signatures." |
| 19–28 | 49. The 1938 exchange of the rights to Superman for $130 is often cited as the prime example of the type of unremunerative grant the termination right was enacted to remedy.<br><br>Defendants' Evidence: Edward E. Weiman, Andrew W. DeFrancis, Kenneth D. Kronstadt, "Copyright Termination for | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Two cites to recent law review articles do not establish this "fact," which is really only an improper legal argument masquerading as fact. |

ER-1108

| | |
|---|---|
| Noncopyright Majors: An Overview of Termination Rights and Procedures", 24 INTELL. PROP. & TECH. L.J. 3, 4 (2012) ("First, Congress sought to protect ...first-time authors who, when faced with no alternative, might assign their copyrights for little compensation. For example, when Jerry Siegel and Joe Shuster sold the rights to the Superman character to DC Comics for $130."); Timothy K. Armstrong, "Shrinking the Commons: Termination of Copyright Licenses and Transfers for the Benefit of the Public," 47 HARV. J. ON LEGIS. 359, 399-400 (2010) ("Siegel and Shuster's situation exemplified a pattern that, the legislative history suggests, occurred all too frequently..."). | |
| 50.    Although Superman soon became a phenomenal financial success, DC kept its creators at a basic "page rate," and denied their requests for a simple royalty.<br><br>Defendants' Evidence:  AD Exs. 1, 3. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Superman was a "financial success."<br><br>DC disputes that it "kept [Siegel and Shuster] at a basic 'page rate,' and denied their requests for a simple royalty."  Siegel and Shuster were initially paid a generous per-page rate for their work on Superman—substantially "more than anyone else [was] getting for any feature in any of" DC's other |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

books—which DC increased with the success of Superman. PD Exs. 3 at 12, 5 at 17, 6 at 20, 7 at 27, 10 at 88-89. Siegel and Shuster also received substantial royalties for many exploitations of Superman, including between "32½%" and "40% of the 'net proceeds'" received from newspaper syndication and "5% of all net proceeds which may be derived of commercial exploitation of SUPERMAN." PD Exs. 3, 4, 6, 10 at 85-87 (FOF 45-49, 52). DC also paid Siegel and Shuster generous lump sums and "bonus[es]" throughout the years. PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

In any event, defendants offer no competent evidence to support this claim, as the two hearsay newspaper articles they cite from 1975 and 1979 merely purport to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives and do not address the specific payment terms of DC's agreements with Siegel and Shuster, *cf. id.*, or the millions of dollars the men and their families were paid by DC. PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ 4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78. Moreover, one of these articles refutes defendants' assertion that Siegel and Shuster were not paid royalties, noting: "A revised contract during the '40s also gave [Siegel and Shuster] a small percentage from merchandising." AD Ex. 3 at 8.

Objections to Defendants' Evidence: AD Exs. 1 and 3 are inadmissible hearsay. FED. R. EVID. 801, 802; *supra* at DC's Response to Defendants' Statement of Additional Undisputed Fact ("DSAUF") 47.

Lack of foundation. Lack of personal knowledge.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1110

| | FED. R. EVID. 602. |
|---|---|
| 51.    In 1947, Siegel and Shuster filed suit against DC in Westchester N.Y. (the "1947 Action").<br><br>Defendants' Evidence: *Siegel v. National Periodical Publications*, 508 F.2d 909, 912 (2d Cir. 1974). | **Undisputed.** |
| 52.    The court in the 1947 Action ultimately held (a) that DC owned Superman pursuant to the 1938 Grant but (b) that DC had stolen Superboy from Siegel, while he was overseas fighting for his country in WWII. The parties thereafter settled the case.<br><br>Defendants' Evidence:  PD Ex. 10 at 108-110, 12 at 120. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Defendants mischaracterize the Westchester Action and its outcome.  Siegel and Shuster sought to recapture rights in Superman by challenging their 1938 agreements with DC, and also challenged DC's 1944 publication of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth.  In 1947, a referee issued an opinion holding that the parties' 1938 agreements were valid and that Siegel and Shuster assigned "all" of their Superman rights to DC.  The referee found that DC improperly published Superboy—not "that DC had stolen Superboy from Siegel."  DC filed a notice of appeal, but the parties ultimately entered into a stipulation and consent judgment in 1948 in which Siegel and Shuster (1) acknowledged that they transferred to DC all rights in Superman and (2) agreed that DC was the sole and exclusive owner of all rights in Superman and Superboy.  In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.  PD Ex. 10 at 108-110; *see Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1112 (C.D. Cal. 2008); CPI Inflation Calculator, Bureau of Labor Statistics |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1111

| | |
|---|---|
| | (http://www.bls.gov/data/inflation_calculator.htm/).<br><br>DC also disputes that Siegel was "overseas fighting for his country in WWII" when DC published Superboy. *See supra* SUF 7. |
| 53.    In retaliation for the 1947 Action, DC cut Siegel and Shuster off, and from 1949-1975, deleted their credit byline and any references to them from its publications and corporate histories.<br><br>Defendants' Evidence:  AD Ex. 3 at 8. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC did not "retaliate" against Siegel and Shuster following the Westchester Action—as discussed *supra* at SUF 52, after DC prevailed in large part, the parties entered into a stipulation and consent judgment whereby Siegel and Shuster were paid nearly $900,000 in today's dollars.<br><br>Siegel and Shuster left DC in 1947, so there was no work to "cut off" and no "credit byline" to be deleted.  Moreover, Siegel *objected* to having his name associated with stories he had not written; in the Westchester Action, Siegel's complaint asserted that DC acted improperly by "affix[ing] to the individual releases of said comic strip the name of plaintiff, SIEGEL, as author of the said releases ... whereas in truth and in fact the plaintiff Siegel, was not the author of the individual releases."  PD Ex. 9 at 42.  In any event, DC *did* continue to credit Siegel and Shuster on certain works, *see* SD Exs. 4, 5, and as a gesture of goodwill, in the 1975 agreement DC agreed to give "created by" credit to Siegel and Shuster on Superman works—this was not a "credit byline."  PD Ex. 15.  DC is not aware of any deletion of references to Siegel and Shuster from its "corporate histories."<br><br>Defendants omit that DC re-hired Siegel in the 1950s at Joanne Siegel's request—until, in late 1965, Siegel and Shuster filed false renewal registrations with the Copyright Office and filed a lawsuit seeking a declaration that they owned those |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | | |
|---|---|---|
| 1 | | renewal rights.  SD Ex. 7 at 18:16-19:23; *Siegel v. National Periodical Pubs., Inc.*, 508 F.2d 909, 914 (2d Cir. 1974). |
| 2 3 | | |
| 4 5 6 7 8 9 10 | | In any event, defendants offer no competent evidence to support this claim, as the one hearsay newspaper article they cite from 1979 merely purports to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives and notes—incorrectly—that Siegel and Shuster's "by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case." |
| 11 12 | | Objections to Defendants' Evidence:  AD Ex. 3 is inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Response to DSAUF 47. |
| 13 14 | | Lack of foundation.  Lack of personal knowledge. FED. R. EVID. 602. |
| 15 16 17 18 19 20 | 54.     Siegel's last job was as a mail clerk, and Shuster worked intermittently as a messenger boy.  Defendants' Evidence:  AD Ex. 2. | **Disputed**, but, in any event, this fact is not material to DC's motion.  Defendants offer no competent evidence to support this claim, as the one hearsay newspaper article they cite from 1975 merely states that Siegel worked "as a mail clerk in Los Angeles" and Shuster lived "with his younger brother, Frank, who supports him." |
| 21 22 23 | | Objections to Defendants' Evidence:  AD Ex. 2 is inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* DC's Response to DSAUF 47. |
| 24 | | Lack of foundation.  Lack of personal knowledge. FED. R. EVID. 602. |
| 25 26 27 28 | 55.     In 1969, Siegel and Shuster commenced a federal action seeking declaratory relief as to ownership of the | **Undisputed**. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1113

| | |
|---|---|
| Superman renewal copyrights.<br><br>Defendants' Evidence:<br>*Siegel*, 508 F.2d at 912-13. | |
| 56.    The 1969 lawsuit resulted in Second Circuit's decision in Siegel, 508 F.2d at 912-13, that DC owned the renewal copyright to Superman pursuant to the 1938 Grant.<br><br>Defendants' Evidence:<br>*Siegel*, 508 F.2d at 912-13. | **Undisputed.** |
| 57.    In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign against DC and its parent, Warner Communications, to protest DC's shabby treatment of Siegel and Shuster.<br><br>Defendants' Evidence:  AD Ex. 2. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that in 1975, certain individuals who were also members of the National Cartoonists Society and Cartoonists Guild supported Siegel and Shuster in their effort to obtain financial assistance from DC and Warner Communications Inc.<br><br>DC disputes the suggestion that it engaged in "shabby treatment" of Siegel and Shuster.  Siegel and Shuster, and their heirs, after suing DC twice and losing, nonetheless were given millions of dollars in recognition of Siegel's and Shuster's contributions to Superman and as a gesture of goodwill.  PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ 4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78. |
| 58.    In 1975, Warner finally agreed to pay Siegel and Shuster an annual pension of $20,000, and restored their creator credits after 26 years | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that in 1975, Warner Communications Inc. entered into an agreement with Siegel and Shuster |

- 49 -

ER-1114

| | |
|---|---|
| (the "1975 Agreement"). The agreement did not transfer the Superman copyrights and expressly acknowledged that such rights were already owned by DC.<br><br>**Defendants' Evidence:** PD Ex. 15. | providing the pair with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works. SUF 8, PD Ex. 15. Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. *Id.*<br><br>DC disputes the implication that DC delayed in entering into the 1975 agreement with Siegel and Shuster. The pair left DC in 1947, and engaged in litigation with DC for several years thereafter. *Nat'l Periodical Pubs.*, 508 F.2d 909. After the *National* litigation, in which the Second Circuit affirmed that DC owned all rights in Superman, *id.* at 914, Siegel and Shuster encountered financial hardship and approached DC for help, and DC provided Siegel, Shuster, and their families with the generous benefits described above. DC also disputes that it "restored … creator credits" to Siegel and Shuster in the 1975 agreement. After Siegel and Shuster left DC in 1947, there was no need to give "credits" to the pair for the work of other DC artists and writers. In fact, Siegel *objected* to having his name associated with stories he had not written; in the Westchester Action, Siegel's complaint asserted that DC acted improperly by "affix[ing] to the individual releases of said comic strip the name of plaintiff, SIEGEL, as author of the said releases ... whereas in truth and in fact the plaintiff Siegel, was not the author of the individual releases." PD Ex. 9 at 42. As a gesture of goodwill, in the 1975 agreement DC agreed to give "created by" credit to Siegel and Shuster on Superman works. PD Ex. 15 at 146-47. Finally, the parties have litigated whether the 1975 agreement "transfer[red] the Superman |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | copyrights." |
|---|---|
| 59.    The 1975 Agreement also provided that, after Shuster's death, Warner would pay his brother Frank an annual pension of $5,000.<br><br>Defendants' Evidence:  PD Ex. 15 at 144. | **Undisputed.** |
| 60.    Joseph Shuster died on July 30, 1992 without widow or child, but was survived by his siblings Frank Shuster and Jean Peavy.<br><br>Defendants' Evidence:  PD Ex. 20. | **Undisputed.** |
| 61.    As Shuster had minimal assets, comprised only of a few shares of stock, his estate was not probated. Per Cal. Prob. Code § 13101, Jean Peavy filed an affidavit requesting that the stock be transferred to her.<br><br>Defendants' Evidence:  PD Ex. 21. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Jean Peavy filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." SUF 14, PD Ex. 21.<br><br>DC disputes that "Shuster had minimal assets, comprised only of a few shares of stock."  Shuster had 768 shares of Time Warner stock worth approximately $80,000; moreover, Jean contradicted this account, telling DC in 1992 that she was Joe Shuster's sole heir and had rights in his copyrights.  *See supra* SUF 14. |
| 62.    Upon Joe Shuster's death in 1992, no person or entity had a right to terminate his copyright grants to DC | **Disputed**.<br><br>This is pure legal argument, as evidenced by the only "Evidence" defendants cite—two federal statutes. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| until the CTEA became effective in 1998 and extended the termination right to the executor of an author's estate.<br><br>Defendants' Evidence: 17 U.S.C § 304(c)(2) (1978); 17 U.S.C. §304(d). | |
| 63.  Shuster's will nominated Jean as executrix of his estate and stated that, in the event Jean declined to serve, Mr. Peary should be appointed as executor.<br><br>Defendants' Evidence:  PD Ex. 33 at 275. | **Disputed**, but, in any event, the point of dispute is not material to DC's motion.<br><br>Shuster's will uses the words "unable" or "unwilling," not "declined."  It states:  "I give, devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate …. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, Mark Warren Peary.  I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will and Testament, to act without bond.  In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor, also without bond."  PD Ex. 33 at 275. |
| 64.  On July 15, 2003, Joseph Shuster's nephew Mark Warren Peary petitioned the Superior Court of the State of California to probate Shuster's estate.  As Jean was 86, she declined to serve as executrix, and | **Disputed**.<br><br>DC does not dispute for purposes of this motion that in 2003, Shuster's nephew Mark Warren Peary initiated proceedings in Los Angeles Superior Court to probate Shuster's estate—even though in 1992, his mother Jean Peavy had already filed an affidavit in California probate court to obtain all of Shuster's assets.  SUF 38, PD Exs. 21, 33-34. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1117

| | |
|---|---|
| nominated Mr. Peary in her place.<br><br>Defendants' Evidence: PD Ex. 33 at 270, 280-281. | DC disputes that "[a]s Jean was 86, she declined to serve as executrix, and nominated Mr. Peary in her place." Jean was 82 in 2003. PD Ex. 46 at 447:21-22. Peary asked the probate court to appoint him executor in place of his mother, SUF 38, PD Exs. 21, 33-34—and has kept this probate matter open for nine years, despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible." SUF 39; Docket No. 186 at 12-13. |
| 65. On October 7, 2003, the Court duly appointed Peary as Executor of Shuster's estate in accordance with his will and granted him the "special power ... to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings ... in connection with this action."<br><br>Defendants' Evidence: PD Ex. 34. | **Disputed**.<br><br>DC does not dispute for purposes of this motion that in 2003, a Los Angeles Superior Court appointed Peary to serve as executor of Shuster's estate.<br><br>DC disputes the claim that the Los Angeles Superior Court "granted [Peary] the 'special power … to terminate" under the Copyright Act. The probate court merely granted Peary's request to be appointed executor so he could serve copyright termination notices on behalf of the Shuster estate. The state court did not resolve the threshold copyright issues at the center of DC's First Claim. *Cf. Orr v. Orr*, 440 U.S. 268, 277 n.7 (1979) ("a state court cannot confer standing before this Court on a party who would otherwise lack it"); *see also Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (state court action "cannot retroactively confer standing in federal court"). As explained in DC's motion, Peary has no "power" to terminate. DC's MSJ at 21-23, DC's MSJ Reply at 9-10. |
| 66. On August 1, 1992, DC entered into a short agreement with Frank Shuster and Jean Peavy to raise their pension to | **Disputed**.<br><br>DC does not dispute for purposes of this motion that DC entered into an agreement with Frank |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

$25,000. The full text of this agreement was as follows:

> This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing August 1, 1992, for as long as either one of you is alive. Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practice and shall be subject to all applicable withholding taxes. If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.
>
> We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in

Shuster and Jean Peavy dated August 1, 1992, that contains the language quoted by defendants.

DC disputes that the 1992 agreement was "to raise [Jean and Frank's] pension to $25,000." Under the 1975 agreement, Frank was entitled to $5,000 a year in survivor payments, and Jean was entitled to nothing. LD ¶ 5-7; Exs. 3-6, 15. Jean and Frank bargained for and received a five-fold increase in annual payments, which would be paid to Jean rather than Frank—and they have received, to date, more than $600,000. SUF 25, LD Exs. 23, 27, 33, 39, 53, 60, 67, 71. As Paul Levitz testified—and defendants do not dispute—by agreeing to the payment terms Jean and Frank demanded, DC was "far exceeding [its] promise to Joe and committing to a much larger sum" than was due Frank. SUF 45; LD ¶ 7, Ex. 23.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1119

whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement. We also reserve all of our other rights, remedies and defenses in such an event. If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

Defendants' Evidence:  PD

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| Ex. 24. | |
| 67. The 1992 Agreement contains only three obligations of Frank and Jean: they settled with DC any claim to payment that they had; and they quitclaimed to DC and covenanted not to assert any rights that they held relating to Joseph Shuster's works.<br><br>Defendants' Evidence: PD Ex. 24. | **Disputed**.<br><br>The word "quitclaim" never appears in the 1992 agreement, and this is pure legal argument. Such legal arguments needed to be made in defendants' 25-page opposition brief, and are baseless in any event. DC's MSJ at 10-18; DC's MSJ Reply at 5. |
| 68. The 1992 Agreement: does not mention termination rights, or purport to limit or waive the termination right; does not mention Superman or Joseph Shuster's key 1938 grant of copyright or subsequent Superman grants; and does not include the terms revoke, rescind, supersede, replace, extinguish, or any other synonyms. Nor was the Shuster Executor a party to the agreement.<br><br>Defendants' Evidence: PD Ex. 24. | **Disputed**.<br><br>Again, this is pure legal argument. Such legal arguments needed to be made in defendants' 25-page opposition brief, and are baseless in any event. DC's MSJ at 10-18; DC's MSJ Reply at 2-5.<br><br>Moreover, by its plain terms, the 1992 agreement "*fully settles <u>all</u> claims* to <u>*any*</u> *payments or other rights or remedies* which you may have *under <u>any</u> other agreement or otherwise*, whether *now or hereafter existing* regarding <u>*any*</u> *copyrights, trademarks, or other property right* in <u>*any and all work created in whole or in part by … Joseph Shuster*</u>." SUF 19, PD Ex. 24 (emphasis added). This clearly encompasses all of Joe Shuster's works, including Superman; all agreements, including the 1938 grant; and all rights, including termination. *See* DC's MSJ Reply at 4-5. |
| 69. The 1992 Agreement was not negotiated by statutory heirs within an open termination window during | **Disputed**.<br><br>Again, this is pure legal argument, as best evidenced by defendants' first citation to "Evidence"—*i.e.*, a federal statute. Such legal |

| | |
|---|---|
| which they could meaningfully leverage their termination rights. Furthermore, Jean and Frank negotiated the agreement without the assistance of counsel and there was no meaningful back and forth over its terms. <br><br> <u>Defendants' Evidence</u>: 17 U.S.C 304(c)(2); LD Ex. 3-8. | arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 10-18; DC's MSJ Reply at 5-7. <br><br> Moreover, DC disputes that "there was no meaningful back and forth over" the 1992 agreement—this assertion is belied by the record of several counter-offers back and forth and the meeting the parties had. LD ¶ 5-7; Exs. 3-7. <br><br> Finally, defendants offer no proof that they were not advised by counsel—just inadmissible assertions by their current counsel. |
| 70. On the same date as the 1992 Agreement, October 2, 1992, Frank signed a letter addressed to Paul Levitz, then-President of DC, stating that in consideration for the 1992 Agreement Frank was waiving his rights under the 1975 Agreement (to a $5,000 pension). The full text of the letter is as follows: <br><br> In consideration of the agreement dated as of August 1, 1992 between DC Comics, myself and Jean Shuster Peavy, I hereby waive any rights or remedies that I may have under the agreement dated December 23, 1975 between Warner Communications Inc., Jerome Siegel and Joseph Shuster. | **Undisputed**. <br><br> To be clear, DC's briefs address at length the significant other consideration the parties received as part of the 1992 Agreement. DC's MSJ at 5-6, 16-17; DC's MSJ Reply at 7. |

| Defendants' Evidence: LD Ex. 9. | |
|---|---|
| 71.  Neither Paul Levitz's Declaration nor his contemporaneous correspondence with Jean Peavy/Frank Shuster ever describes the 1992 Agreement as a revocation of Joseph Shuster's Superman copyright grants nor as a re-grant of his Superman copyrights, nor suggests that this was the parties' intent.<br><br>Defendants' Evidence: LD Ex. 5, 8, 9. | **Disputed.**<br><br>DC does not dispute that Levitz's declaration and correspondence do not use the words "revocation" or "re-grant."  Levitz's declaration and the parties' contemporaneous conduct and correspondence makes clear, however, the "parties' intent" was for the 1992 Agreement to "represent [the Shuster heirs'] last and final deal with DC, and would resolve any past, present, or future claims against DC," LD ¶ 8.<br><br>Defendants again improperly use their SUF to make merits-based arguments, which needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 13-15; DC's MSJ Reply at 2-4. |
| 72.  Paul Levitz, then-President of DC, characterized the 1992 Agreement as a small act of charity in the "spirit" of the 1975 agreement.<br><br>Defendants' Evidence: LD at 2; LD Ex. 5 at 27. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Levitz was not "President of DC" in 1992.  As the paragraph of his declaration cited by defendants makes clear, Levitz served as "President and Publisher" of DC between 2002 and 2010.  LD ¶ 2.<br><br>The September 8, 1992, letter from Levitz to Frank Shuster cited by defendants does not "characterize[] the 1992 Agreement as a small act of charity in the 'spirit' of the 1975 agreement."  That letter provides "that Time Warner has chosen to look to the spirit of Joe's wish to go on assisting you after his passing, and let that be your guide.  In that spirit, the company will begin making payments to you at an annual rate of $25,000…."  LD Ex. 5 at 27.  This letter was sent *before* Frank sent a letter to DC on September 10, 1992, offering that if DC increased the payments due to Frank |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

**ER-1123**

| | | |
|---|---|---|
| | | under the 1975 agreement and made those payments to Jean instead of Frank, she as Shuster's sole heir "would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act." LD Ex. 6 at 28. DC also disputes that its payments under the 1975 and 1992 agreements were a "small act of charity"—DC has paid the Siegel and Shuster heirs well over $4 million under the 1975 agreement, and separately paid the Shuster heirs more than $610,000 under the 1992 agreement. LD ¶¶ 4, 9 & Exs. 23; 27; 33; 39; 53; 60; 67; 71. |
| 73. On September 7, 1993, Levitz wrote to Jean: "As I hope you recall from our meetings in New York, we've done extensive research into the copyright act [sic] and any potential rights that you and Frank may have as Joe's siblings and survivors. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever." Levitz then went on to say: "After his [Joe Shuster's] death, we [DC] raised $5,000 to $25,000 a year without any legal obligation to do so in deference to Joe's memory and your role in his life." <br><br> Defendants' Evidence: LD Ex. 23 at 47. | **Undisputed**. | |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1124

| | |
|---|---|
| 74. Prior to filing this lawsuit in 2010, DC never asserted that the 1992 Agreement was the basis for its chain-of-title to Superman; nor did it ever suggest that the 1992 Agreement prevented termination as a "revocation and re-grant" or otherwise. | **Disputed**, but, in any event, this fact is not material to DC's motion. In any event, defendants offer no competent evidence to support this claim, as the sole document they cite is an inadmissible 2005 settlement communication sent by Levitz to the Shuster heirs—in an effort to avoid litigation—which does not address "chain-of-title to Superman" or the legal significance of the 1992 agreement. |
| Defendants' Evidence:  LD Ex. 74. | Objections to Defendants' Evidence:  LD Ex. 74 does not prove this asserted fact, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *U.S. v. Whitney*, 180 Fed. Appx. 670, 673 (9th Cir. 2006); *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); Reply at 7 n.3. |
| 75. DC admitted, and the Court agreed, that it co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement). *Siegel*, 542 F. Supp. 2d at 1142. | **Disputed**, but, in any event, this fact is not material to DC's motion. Defendants offer no competent evidence to support this claim, as the documents they cite do not contain any "admi[ssion]" that "DC co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement)." |
| Defendants' Evidence:  LD Ex. 74 at 256-257; AD Ex. 14 at ¶¶ 12, 17, 26, 37, 137(g). | Defendants cite an inadmissible 2005 settlement communication sent by Levitz to the Shuster heirs—in an effort to avoid litigation—which does not address the legal significance of the 1992 Agreement.  Defendants also cite DC's First Amended Counterclaims in the *Siegel* action, which provide historical background relevant to the claims in that action, and an order from the *Siegel* court concerning the *Siegel heirs*' ability to terminate Siegel and Shuster's 1938 copyright |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1125

| | | |
|---|---|---|
| 1 | | grant to DC. The *Siegel* case has *nothing* to do with the legal significance of the 1992 agreement or the Shuster heirs' ability to terminate. Indeed, the *Siegel* court made clear the *Siegel* case did not involve the Shusters' claims, and "[i]t is by no means a foregone conclusion that the Shuster estate will be successful in terminating." Case No. CV 04-8400, Docket No. 554 at 23. *See* DC's MSJ Reply at 10 n.4. |

Objections to Defendants' Evidence: LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it. FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74.

| 76. Elaborate rights agreements (including short form assignments for filing with the Copyright Office) customarily are used by Warner/DC to create valid chains-of-title to copyrights. | **Disputed**. |
|---|---|

Defendants' Evidence: AD Exs. 8, 9, 11.

Defendants' legal arguments—improperly masquerading as factual ones—run directly contrary to well-established copyright law. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; *a one-line pro forma statement will do*." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (emphasis added). Moreover, defendants omit that DC has not registered many of its other copyright grants with the Copyright Office, as registration is not required. Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).

Objections to Defendants' Evidence:

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | Defendants offer no competent evidence to support this claim, as shown in DC's concurrently filed Objections To Evidence In Defendants' Statement Of Additional Undisputed Facts, Declaration, and Exhibits at pages 5-8. The third-party contracts defendants cite should be stricken for lack of foundation, FED. R. EVID. 602, and disregarded on relevance grounds, FED. R. EVID. 401, and because they constitute improper habit evidence under FED. R. EVID. character evidence under FED. R. EVID. 404(b). |
| 77.    In the years following the 1992 Agreement, Frank Shuster and Jean Peavy struggled to get by. Requests for increases in their pension were denied, although periodic bonuses were granted.<br><br>Defendants' Evidence:  LD Exs. 10, 17, 20, 25, 26, 29, 32. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC disputes that the Shuster heirs' requests for additional compensation were "denied."  As Levitz's declaration and the parties' correspondence make clear, Jean periodically requested bonuses in addition to her payments under the 1992 agreement, and DC paid her bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001.  LD ¶ 9 & Exs. 23; 27; 33; 39; 52-53; 59-60; 66-67; 70-71.  In total, DC has paid Jean over $610,000 under the 1992 agreement.  LD ¶ 9. |
| 78.    In 2001, spurred by the well- publicized Siegel termination, Mr. Peary, sought the advice of an attorney, and contacted Mr. Toberoff.<br><br>Defendants' Evidence:  AD Ex. 26 at 372:3-373:25. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Peary testified:  "I remember I first contacted him [*i.e.*, Toberoff] in 2001."  Peary did not, however, testify that he was "spurred by the well-publicized Siegel termination."  Moreover, Peary's deposition testimony has proven to be false in several key respects.  *E.g.*, Docket Nos. 305-37 at 1178:7-22; 360-2 at 235-36.  Moreover, Peary's mother—Jean Peavy—despite knowing full well about the Siegel termination—affirmed her |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1127

| | |
|---|---|
| | commitment to honor the 1992 Agreement. *Supra* SUF 20. |
| 79.    In November 2001, Jean and Mr. Peary entered into an agreement with Pacific Pictures Corp. ("PPC"). Both signed the agreement in their individual capacities. Shuster's Estate had not yet been probated and there was no Executor. The Shuster Executor was thus not a party to the Agreement.<br><br>Defendants' Evidence:  PD Ex. 32 at 266. AD Ex. 19 at 313:17-314:11. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Jean and Peary entered into an agreement with Pacific Pictures signed by Jean, Peary, and Toberoff in November 2001.<br><br>DC disputes, however, that "Shuster's Estate had not yet been probated and there was no Executor. The Shuster Executor was thus not a party to the Agreement."  Jean, who was a party to the 2001 agreement, was the "executrix" and sole beneficiary of Shuster's estate.  On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." PD Ex. 21. |
| 80.    Peary did not mislead Jean about the PPC Agreements, as misrepresented by DC without any support for this.<br><br>Defendants' Evidence:  PD Ex. 38 at 312:1-312:13; Docket 305-37 (Peary's full testimony). | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC's briefing did not say Peary misled his mother about the PPC Agreements.  It said Peary testified that he negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel.  SUF 35, 39 at 319:9-320:14.  Peary further testified he only told his mother about the agreements just before they were ready to sign.  SUF 36; PD Ex. 46 at 492:20-493:2. Peary did "mislead" his sister about the contents of his mother's will. *See infra.* |
| 81.    Peary did not rewrite Jean's will to name himself her sole heir, as misleadingly stated by DC without any | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Both of Jean's children, Mark Warren Peary and Dawn Peavy, testified that Jean told them she |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| evidence of this.<br><br>Defendants' Evidence:<br>Docket 360-2 at 235-36. | wanted to provide for them equally under her will. Docket Nos. 305-37 at 1178:10-1179:4; 360-2 at 99:2-11, 103:3-7, 105:10-106:14. Jean testified in *Siegel* that "[m]y son handles everything legal," PD Ex. 38 at 310:14-312:13; Dawn reiterated that Peary "handle[s Jean's] financial issues," Docket No. 360-2 at 69:2-5, 106:20-22; and Peary admitted he talked with his mother about her alleged desire to modify the will with a trust, Docket No. 305-37 at 1178:7-11:79:22. Jean's will provides that "Mark Warren Peary … shall be sole beneficiary of my [Jean Peavy's] estate." Docket No. 360-2 at 235-36. These facts speak for themselves, and defendants offer no competent evidence to support their factual claims. The sole document they cite is Jean's will—without any testimony about how that will was created, and why, or how Peary lied to his sister about its contents. Docket Nos. 360 at 6-9; 377. |
| 82. As trusts and estates attorney probated the estate of Joseph Shuster, and Mr. Peary was appointed as its executor.<br><br>Defendants' Evidence: PD Exs. 33, 35, 39 at 318:8-13. | **Undisputed**. |
| 83. In October 2003, the Executor of the Shuster Estate (the "Shuster Executor") and PPC entered into the 2003 PPC Agreement. This agreement did not purport to transfer the termination interest to PPC, but provided PPC with a contingent share | **Disputed**.<br><br>In the 2001 Pacific Pictures agreement, Jean and Peary "transfer[red] and assign[ed] to the Venture" "all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations," PD Ex. 32, and Peary admitted under oath that he understood when he signed this agreement "that all of the Joe Shuster rights, termination rights, to the extent they existed, |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | | |
|---|---|---|
| 1 | of proceeds, if any, from any | were being transferred and assigned to the venture |
| 2 | recovered copyright interests. | just as it says," *id.* Ex. 46 at 482:8-23. By its plain |
| 3 | Defendants' Evidence: PD | terms, the 2003 Pacific Pictures agreement was |
| 4 | Ex. 36. | "intended to supplement" the 2001 agreement and |
| 5 | | "to confirm the agreement" on behalf of the Shuster |
| 6 | | estate, *id.* Ex. 36—effectively re-transferring the |
| | | same rights on behalf of the estate. |
| 7 | | Peary testified: |
| 8 | | Q: Okay. [The 2001 PPC Agreement] says: |
| 9 | | "In considerations for PPC's contributions to |
| 10 | | the Venture in the mutual covenants contained |
| 11 | | herein, claimants hereby transfer and assign to |
| | | the Venture their rights, titles and – title and |
| 12 | | interests in the rights." Do you see that? |
| 13 | | A: Yes. |
| 14 | | *Q: So you understood when you signed this* |
| 15 | | *that all of the Joe Shuster rights, termination* |
| 16 | | *rights, to the extent they existed, were being* |
| | | *transferred and assigned to the venture just as* |
| 17 | | *it says, correct?* |
| 18 | | A: *Yes.* |
| 19 | | PD Ex. 46 at 482:8-23 (emphasis added). Peary is |
| 20 | | bound by such admissions. *See Kennedy v. Allied* |
| 21 | | *Mut. Ins. Co.*, 952 F.2d 252, 266 (9th Cir. 1991) |
| 22 | | ("The general rule in the Ninth Circuit is that a |
| 23 | | party cannot create an issue of fact by an affidavit |
| 24 | | contradicting his prior deposition testimony."); |
| 25 | | *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th |
| 26 | | Cir. 1985) ("[I]f a party who has been examined at |
| 27 | | length on deposition could raise an issue of fact |
| | | simply by submitting an affidavit contradicting his |
| | | own prior testimony, this would greatly diminish |
| | | the utility of summary judgment as a procedure for |
| | | screening out sham issues of fact."). |

28

- 65 -

ER-1130

| | |
|---|---|
| 84.    In November-December 2003, the Shuster Executor filed in the U.S. Copyright Office and served on DC a formal notice of termination under 17 U.S.C. § 304(d), terminating Joseph Shuster's 1938 Grant and subsequent Superman copyright grants, with an effective termination date of October 26, 2013 (the "Shuster Termination"). The Shuster Termination was signed by Mark Warren Peary as executor of the Shuster Estate. The notice properly stated that it "has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code."<br><br>Defendants' Evidence:  PD Ex. 37. | **Disputed**.<br><br>The Shuster Executor made these filings, but whether the notice was "proper[]" is hotly disputed legal question, at the center of DC's motion.  DC's MSJ at 10-25; DC's MSJ Reply at 8-10.  It is improper for defendants to treat such legal questions—whether Peary acted "properly" as undisputed facts. |
| 85.    In 2004, the parties cancelled and revoked the PPC Agreements, replacing them with a legal retainer agreement, retroactive to 2001.<br><br>Defendants' Evidence:  AD Exs. 13, 27. | **Disputed**.<br><br>DC has briefed at length in its Rule 12 papers, Docket No. 185 at 5-6, this summary judgment briefing, DC's MSJ Reply at 12, and other briefs, *e.g.*, Docket No. 360 at 3-4, whether the Pacific Pictures agreements were ever properly terminated, and whether the Shusters' putative rights were ever assigned back to them, or are still held by Toberoff's companies.  The evidence supporting DC's position includes the plain terms of the 2001, 2003, 2004, and 2011 Pacific Pictures agreements, |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1131

| | |
|---|---|
| | which do not support defendants' position.  PD Exs. 32; 36; AD Ex. 13. |
| 86.    On April 28, 2005, DC sent a letter to the Shuster Executor that offered to settle with the Shusters at the expense of the Siegels. The Shuster Executor declined this offer.<br><br>Defendants' Evidence:  LD Ex. 74; AD Ex. 15. | **Disputed**, but, in any event, this fact is not material to DC's motion—and the evidence defendants cite violates FED. R. EVID. 408.<br><br>DC does not dispute for purposes of this motion that Levitz sent a settlement communication to the Shuster heirs on April 28, 2005, in an effort to avoid litigation.<br><br>DC disputes that this settlement offer was made "at the expense of the Siegels."  DC also disputes that "The Shuster Executor declined this offer"; Toberoff responded to Levitz—not any of the Shuster heirs—and declined the offer.  AD Ex. 15.<br><br>Objections to Defendants' Evidence:  LD Ex. 74 is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74. |
| 87.    PPC was dissolved in 2009.<br><br>Defendants' Evidence:  AD Ex. 21. | **Disputed**, and this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that the New York Department of State Website states that Pacific Pictures is currently "inactive" and was "dissolved by proclamation" in 2009.<br><br>DC disputes, however, that PPC is in fact "inactive"—defendants do not explain, for example, why a dissolved corporation would continue entering into agreements as recently as 2011.  AD Ex. 27 (noting that PPC is "dissolved" but entering into agreement as of August 2, 2011) |
| 88.    On August 2, 2011, Toberoff, Jean and Peary confirmed their intent that | **Disputed**.<br><br>Defendants offer no competent evidence to support |

- 67 -

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | | |
|---|---|---|
| 1 | PPC would have no continuing interest whatsoever when they revoked the PPC Agreements in 2004. | this claim. The sole "evidence" defendants cite is a mediation questionnaire they filed in the Ninth Circuit containing Toberoff's own legal argument about this action. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Defendants' Evidence: AD Ex. 28. | Moreover, DC has disputed Jean's competency to enter into this 2011 agreement, as well as whether defendants' revoked the 2004 agreement, as well as the legal effect of that asserted revocation. Docket No. 322 at 1-2; *supra* SUF 85. |
| 6 | | |
| 7 | | |
| 8 | | Objections to Defendants' Evidence: AD Ex. 28 is not evidence. It is a mediation questionnaire that defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case. It should be stricken as: hearsay, FED. R. EVID. 801-02, for lack of foundation and personal knowledge, FED. R. EVID. 602, and as improper opinion evidence. FED. R. EVID. 701-02. |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | 89. On April 28, 2005, DC sent a letter to the Shuster Executor that alluded to DC's arguments against the terminations in the Siegel litigation, and offered to settle with the Shusters at the expense of the Siegels. The letter stated, "DC will only pay a premium to one termination party." It also noted, "[I]f we are able to resolve matters with the Siegel heirs ... before we reach an agreement with you. . . there will not be any pressing need to reach an agreement with you." The letter offered the Shuster | **Disputed,** but, in any event, this fact is not material to DC's motion—and the evidence defendants cite violates FED. R. EVID. 408.. |
| 16 | | |
| 17 | | DC does not dispute for purposes of this motion that Levitz sent a settlement communication to the Shuster heirs on April 28, 2005, in an effort to avoid litigation or that the letter included the quoted text. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | DC disputes that this settlement offer was made "at the expense of the Siegels." |
| 22 | | |
| 23 | | Objections to Defendants' Evidence: LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it. FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74. |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1133

| | | |
|---|---|---|
| 1 | Executor a cash advance of two million dollars and royalties. | |
| 2 | | |
| 3 | | |
| 4 | Defendants' Evidence:  LD Ex. 74. | |
| 5 | 90.     The 2008 Consent Agreement was entered into by the Siegel heirs, the Shuster Executor and Jean. Mr. Toberoff was not a party to the 2008 Consent Agreement. | **Disputed**. |
| 6 | | DC does not dispute the 2008 Consent Agreement was entered into by the Siegel heirs, the Shuster Executor and Jean.  Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about whether Toberoff is a party to it.  *Bilzerian*, 926 F.2d 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").  Indeed, their choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver.  *Id.* at 1291-94.  In any event, defendants have admitted that Mr. Toberoff signed the 2008 consent agreement.  PD Ex. 46 at 461:19-462:2.  If this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | Defendants' Evidence:  AD Exs. 22 at 333-335, 25 at 352-53. | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | 91.     The 2008 Consent Agreement simply requires the consent of the parties thereto to any settlement of their recaptured copyrights with DC. | **Disputed**. |
| 21 | | Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about its contents.  *Bilzerian*, 926 F.2d at 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").  Indeed, their choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver.  *Id.* at 1291-94.  In any event, defendants' admissions |
| 22 | | |
| 23 | | |
| 24 | Defendants' Evidence:  AD Exs. 22 at 333-335, 25 at 352-53. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1134

| | | |
|---|---|---|
| 1 | | about its contents prove its illegality, as shown in DC's briefs. DC's MSJ at 23-25; DC's MSJ Reply at 10-12. If this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |
| 5 | 92. The Shuster Estate remains unable to grant its recaptured copyrights to anyone but DC until the effective date of its termination in October 2013 pursuant to 17 U.S.C. 304(d)(2).<br><br>Defendants' Evidence: 17 U.S.C. § 304(d)(2). | **Disputed.**<br><br>This is pure legal argument, as best evidenced by defendants' first citation to "Evidence"—*i.e.*, a federal statute. Such legal arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 18; DC's MSJ Reply at 8. |
| 13 | 93. Magistrate Judge Zarefsky rejected DC's arguments that the Consent Agreement constitutes "an independent wrong [that] violates the Copyright Act," and found, instead, that it is a legitimate "Drysdale-Koufax collective approach to negotiation." This Court duly upheld that ruling.<br><br>Defendants' Evidence: AD Exs. 22, 23, 26. | **Disputed.**<br><br>This is pure legal argument about a court ruling. It is also erroneously described the court's rulings, as DC shows in its brief. DC's MSJ Reply at 10 n.4. |
| 23 | 94. The 2001 and 2003 PPC Agreements were voluntarily produced to DC in the Siegel litigation by November 2006.<br><br>Defendants' Evidence: AD Ex. 18. | **Disputed.**<br><br>Defendants offer no competent evidence to support this claim, as the sole document they cite is a November 15, 2006, cover letter sent by former Toberoff associate Alexander Merino in the *Siegel* case purporting to enclose productions from IPW, LLC and Pacific Pictures Corporation. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1135

| 95.    DC also took deposition testimony regarding the PPC Agreements in 2006.<br><br>Defendants' Evidence:  PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7; AD Exs 17 at 289:11-290:4, 19 at 305:17-306:5. | **Undisputed**. |
|---|---|
| 96.    DC's in-house counsel admitted to reading the anonymous "Timeline" in 2006.<br><br>Defendants' Evidence:  AD Ex. 20 at 325-26 ¶3. | **Disputed**.<br><br>DC had no access to the Timeline.  Wayne Smith worked for Warner Bros.  AD 20 ¶ 2.  He also said, after conducting a cursory review of the Timeline, he concluded that certain parts involved privileged communications, so he immediately turned over the Timeline and attachments to a neutral escrow agent to hold while DC "sought to obtain them through ordinary discovery."  Docket No. 163-12; 163-13 at 759:16-760:7; *In re Pacific Pictures*, 679 F.3d at 1125.  Despite Toberoff's resistance, the district court ordered him to produce the Timeline, Docket No. 163-13 at 760:8-761:5, which he finally did in December 2008.  163-15.  Until then, neither Mr. Smith, nor anyone at DC, nor DC's counsel was able to "read" the Timeline. |
| 97.    In 1997, Jerry Siegel's widow and daughter served notices of termination, entitling them to a share of Superman profits from 1999.  DC refused to pay, and four years of grinding negotiations did not result in a settlement.<br><br>Defendants' Evidence:  *Siegel I*, 542 F. Supp. 2d at 1114-16. | **Disputed**.<br><br>DC admits that Siegel's widow and daughter filed termination notices in 1997.  Whether those notices were valid, and whether DC and the Siegels reached a settlement agreement in 2001, are issues presently being litigated before the Ninth Circuit in the *Siegel* case.  Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49.  These are not remotely undisputed facts. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

ER-1136

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13 | 98.  In 2004, the Siegels filed suit, represented by Mr. Toberoff, to vindicate their recaptured copyrights. In 2008-2009, Warner/DC suffered serious setbacks, as the Court held that the Siegels had successfully recaptured their original Superman copyrights by valid statutory termination.<br><br>Defendants' Evidence: *Siegel*, 542 F. Supp. 2d 1098, 658 F. Supp. 2d 1036 (C.D. Cal. 2009). | **Disputed**, and these "facts" are not remotely material to DC's motion.<br><br>DC agrees that in 2004, Joanne Siegel and Laura Siegel Larson filed a lawsuit concerning copyright termination notices they filed, Case No. CV-04-8400, Docket No. 1, and that Toberoff was their of record.<br><br>DC disputes that "In 2008-2009, Warner/DC suffered serious setbacks…." Such lawyer argument has no place in pleadings of this sort, and the argument is mistaken. In any event, the Siegels lost on the large majority of works they sought to recapture, *Siegel*, 658 F. Supp. 2d at 1064-80, and the narrow issues on which they prevailed are now pending before the Ninth Circuit, Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49. |
| 14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 99.  In 2010, DC fired its general counsel and outside counsel, and, after settlement talks with the Siegels were unsuccessful, sued Mr. Peary and Mr. Toberoff.<br><br>Defendants' Evidence:  AD Ex. 28. | **Disputed**, and these "facts" are not remotely material to DC's motion.<br><br>DC does not dispute that it filed a complaint on May 14, 2010, naming Mark Warren Peary, Jean Peavy, Laura Siegel Larson, Joanne Siegel, Marc Toberoff, and Toberoff's companies Pacific Pictures Corporation; IP Worldwide, LLC; and IPW, LLC as defendants.  Docket Nos. 1, 49.<br><br>DC does dispute defendants' suggestion that the impetus for that complaint was that "settlement talks with the Siegels were unsuccessful."  The allegations in DC's complaint speak for themselves, defendants abandoned all Rule 12 motions challenging DC's complaint, Docket No. 343, and this Court rejected defendants' SLAPP motion and their erroneous assertions that this lawsuit was retaliatory,  Docket No. 337 (rejecting "Defendants' attempt to cloak Toberoff's alleged interference with protected, litigation and |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1137

settlement related conduct").

DC also disputes that "In 2010, DC fired its general and outside counsel."  DC does not have a "general counsel."  Amy Genkins, DC's current Senior Vice President, Business and Legal Affairs, joined DC in 2008.  John Rogovin became General Counsel of Warner Bros. Entertainment Inc. on January 1, 2009.  Neither Ms. Genkins nor Mr. Rogovin was "fired" in 2010 or since.

<u>Objections to Defendants' Evidence</u>:  The sole "evidence" defendants cite for this claim is AD Ex. 28.  AD Ex. 28 is not evidence.  It is a mediation questionnaire defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case.  It should be stricken as:  hearsay,  FED. R. EVID. 801-02, for lack of foundation and personal knowledge,  FED. R. EVID. 602, and as improper opinion evidence.  FED. R. EVID. 701-02. *See supra* DC's Response to DSAUF 88.

Dated:  August 6, 2012

Respectfully submitted,

By:  /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

OMM_US:70811187

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ER-1138

DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>          v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No. CV 10-03633 ODW (RZx)<br><br>**DECLARATION OF CASSANDRA SETO IN SUPPORT OF PLAINTIFF DC COMICS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST AND THIRD CLAIMS FOR RELIEF**<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:     Aug. 20, 2012<br>**Hearing Time**:     1:30 p.m.<br>**Courtroom**:          11 |

SETO DECL. ISO DC COMICS' REPLY
ISO MOT. FOR PARTIAL SUMM. J.

ER-1139

# DECLARATION OF CASSANDRA SETO

I, Cassandra Seto, declare and state as follows:

1.    I am an attorney licensed to practice in the State of California and admitted to the Central District of California.  I am a counsel at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics ("DC") in the above-entitled action.  I make this declaration in support of DC Comics' Reply In Support Of Motion For Partial Summary Judgment On Its First And Third Claims For Relief.  I have personal knowledge of the matters set forth in this declaration.

2.    Between June 21, 2012, and the beginning of August 2012, the parties met-and-conferred extensively concerning DC's motion for partial summary judgment and defendants' threatened cross-motion for partial summary judgment. During this time, DC (through myself and my colleagues Daniel M. Petrocelli and Matthew Kline) exchanged 9 letters and 17 e-mails and participated in at least 5 telephone calls with defendants (through Marc Toberoff, Keith Adams, and Pablo Arredondo) concerning the substance of the parties' motions and scheduling issues. Not once in these many exchanges did defendants ever:

- mention their affirmative defenses of "estoppel, laches, preclusion, duress, or others," Docket No. 462 at 24;
- indicate that defendants would challenge DC's motion on the ground that DC did not move for summary judgment on those defenses;
- or suggest that defendants would cross-move for summary judgment on any of these boilerplate defenses asserted in their answer.

Instead, defendants represented that they would oppose DC's partial summary judgment motion, and possibly file a cross-motion, on the specific grounds identified in the parties' January 24, 2012, joint status report (Docket No. 364) and defendants' now-withdrawn Rule 12 briefing (Docket Nos. 80, 147 and 333).  *See, e.g.*, June 28, 2012, Letter from Mr. Toberoff to Mr. Petrocelli (a true and correct

- 1 -

SETO DECL. ISO DC COMICS' REPLY
ISO MOT. FOR PARTIAL SUMM. J.

**ER-1140**

copy of which us attached hereto as Exhibit 1).  The only affirmative defense identified in the defendants' joint status report and Rule 12 briefing, and raised by defendants during meet-and-confer exchanges, was defendants' statute-of-limitations defense on DC's Third Claim, which is addressed in DC's motion.  *See* Docket Nos.147-1 at 10, 364 at 12, 458 at 25.

3.    Attached hereto as Exhibit 2 is a true and correct copy of a letter from Jerome Siegel to Detective Comics, dated January 1, 1944.

4.    Attached hereto as Exhibit 3 is a true and correct copy of an article titled "Jerry Siegel Tells Why His Superman Won't End The War" from the *Midpacifican*, dated August 26, 1944.

5.    Attached hereto as Exhibit 4 is a true and correct copy of excerpts from *Famous First Edition Action Comics #1*, with a copyright date of January 3, 1974.

6.    Attached hereto as Exhibit 5 is a true and correct copy of the copyright entry for *Famous First Edition Action Comics #1* from the Copyright Office's Catalog of Copyright Entries for Periodicals during the period of January to December of 1974.

7.    Attached hereto as Exhibit 6 are true and correct copies of electronic media printouts of the stock index for weeks ending August 14, 1992, and August 21, 1992.

8.    Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the transcript of the August 2, 2006, deposition of Joanne Siegel in the related *Siegel* case, Case No. CV 04-8400.

9.    Attached hereto as Exhibit 8 is a true and correct copy of an expert report submitted by Jeff Rovin in *Siegel* dated January 11, 2007.

10.    Attached hereto as Exhibit 9 is a true and correct copy of an expert report submitted by Mark Waid in *Siegel* dated February 8, 2007.

SETO DECL. ISO DC COMICS' REPLY
ISO MOT. FOR PARTIAL SUMM. J.

ER-1141

1       I declare under penalty of perjury under the laws of the United States that the

2   foregoing is true and correct and that this declaration is executed this 6th day of

3   August 2012 at Los Angeles, California.

                                        /s/ Cassandra Seto

                                        Cassandra Seto

SETO DECL. ISO DC COMICS' REPLY
ISO MOT. FOR PARTIAL SUMM. J.

ER-1142

# EXHIBIT 2

DCC00045428

39th Special Service Co.,
% Postmaster,
Elkins, West Virginia,
January 1, 1944.

Mr. J. S. Liebowitz,
DETECTIVE COMICS, Inc.,
480 Lexington Ave.,
New York, N. Y.

Dear Jack:

Thanks a lot for the swell Xmas gifts. Two checks
totalling $3000.00 are very welcome, especially to a fellow
in the Army. I spoke to Bella on the telephone today and she
told me a $1400 check had arrived for 7 magazine releases.
And no doubt a syndicate check will soon reach her. All
in all you people have really helped usher in a swell New
Year for me. I hope this will be the beginning of a Happy
New Year.

Returned herewith, please find that copy of
IN FACT. I was very interested to read its contents, and
hope that McClure's subversive activities are a thing
of the past. Also returned herewith is that clipping refering
to the character, SUSIE. I'm glad you like the character
Susie, who was first referred to in that list of plots I
handed in. By the way, one of my plots on that list, referring
to a time-hoax (I believed I titled the plot "Trouble In
Utopia") was appropriated a few months ago by a recent release
of BATMAN.

In regard to the boatride, the company I'm with
is an entertainment unit whose eventual function is to supply
such entertainment in person to soldiers overseas. If I return
to Ft. Meade after leaving this Maneuver Area, there's a chance
of my transferring to the Post newspaper there, if my CO doesn't
refuse to give me permission. Soon after I entered the Army,
they wanted me on the Post newspaper -- it would have been
a pleasant duration-length assignment -- but my CO wouldn't
let me transfer, saying he wanted me to remain in the 39th to
do certain writing assignments. Those assignments are now a
thing of the past. He said, at the time, if any good connections
were to come my way in the future he wouldn't prevent me from
taking them. But, if I don't return to Meade, I don't sight
any such connections in view. And even if we do return to
Meade, which we probably won't, I don't know if the position
on the newspaper would still be open. --- Murray is certainly
lucky to have been transferred to a writing job in Washington.
That's the goal of every Army writer. I wonder how he did it,
and if there's any chance of a connection there for yours truly.
I'd appreciate it if you'd look into it.

**EXHIBIT 2**

5

ER-1144

.S.   SUPERMAN ain't bad lately, but I'm conceited enough to feel that I could
do better.

-- 2 --

I've a number of unusual plot-ideas jotted down
which I will soon assemble and mail to Whit.  I may have
a furlough coming up either at the end of this month or
sometime in February, and I hope to have a chance to do
some writing in the peaceful and clean environment of
my own home.

By the way, I write a weekly column (about 1500
words per release) for the local small town Elkins Inter-
Mountain newspaper, dealing with the activities of the
Special Service outfit with which I am connected.  About
5 releases have appeared to date. I also collaborated on
an article on the PX distribution set-up in this Maneuver
Area.

It's very rugged here...lots of oozy mud, tent-
latrines with running icycles, and we live in squad tents,
five to a tent.  --- I hope I'll be able to see you in
a few weeks.

By the way, here's something important. Our
company recently was ousted from the Infantry, tho we still
wear Infantry insignia, and we are in DEML -- Detached
Enlisted Men's List -- or, as "DEML" is known thruout the
Army -- "Damn Easy Military Life".  Only, since we entered
DEML, our existence has grown tougher, instead of
easier.  The guys in the company would, as a gag, like
to put some new insignia on. I've had stacks of requests
for SUPERMAN pins, so that the entire company can fall
out some morning with everyone wearing SUPERMAN pins as
insignia.  Enclosed herewith please find a copy of the
Company's roster.  Will you please have SUPERMAN pins,
memberships cards, secret codes, etc. sent to every
individual on the list % 39th Special Service Company,
% Postmaster, Elkins, West Virginia.  This should be
quite a stunt.  If you wish, you may defray the cost
by deducting the expense for this from one of my checks.
There are about 131 names on this list, and I believe
your costumary charge is ten cents per member. I'd appreciate
it very much if you'd have this done right away.

Best personal wishes to Harry, Bob, Duke, Herb,
Charlie, Whit, Miss Heath, Frank Armer and of course Joe
and yourself, from Bella and I. Tell Joe I appreciate the
gifts he sent me recently, and I'll write to him soon...

Cordially,

DCC00045429

EXHIBIT 2
6

ER-1145

# EXHIBIT 6



3 of 5 DOCUMENTS

Copyright 1992 Crain Communications, Inc.
Electronic Media

August 24, 1992

**SECTION:** FINANCE; Pg. 36

**LENGTH:** 261 words

**HEADLINE:** ELECTRONIC MEDIA stock index for week ending Aug. 14

**BODY:**

Winners

| | Aug. 14 | Change from Aug. 7 |
|---|---|---|
| CBS | $ 194.00 | +$ 7.75 |
| Washington Post | $ 220.75 | +$ 5.75 |
| Cap Cities/ABC | $ 448.25 | +$ 2.12 |
| Time Warner | $ 108.00 | +$ 2.00 |
| Tribune | $ 42.12 | +$ 1.62 |
| McGraw Hill | $ 58.62 | +$ 1.62 |
| Itel | $ 19.00 | +$ 1.50 |
| A. H. Belo | $ 45.75 | +$ 1.25 |
| Adelphia | $ 19.50 | +$ 1.00 |
| Scientific-Atlanta | $ 26.75 | +$ 1.00 |
| TCI | $ 18.88 | +$ 0.50 |
| Disney s | $ 36.25 | +$ 0.50 |
| Comcast | $ 16.75 | +$ 0.25 |
| Scripps Howard | $ 51.25 | 0.25 |
| General Electric | $ 75.75 | +$ 0.25 |
| Pinelands | $ 18.00 | +$ 0.12 |

s stock split within last 52 weeks

**EXHIBIT 6**
**13**

**ER-1147**

ELECTRONIC MEDIA stock index for week ending Aug. 14 Electronic Media August 24, 1992

Note: Closing figures are price per share.
Source: Nordby International

### Losers

| | Aug. 14 | Change from Aug. 7 |
|---|---|---|
| Gannett | $ 46.75 | -$ 0.12 |
| Playboy | $ 6.75 | -$ 0.25 |
| Zenith | $ 6.62 | -$ 0.38 |
| TBS | $ 18.88 | -$ 0.38 |
| News Corp. | $ 32.62 | -$ 0.38 |
| Century Comm. | $ 8.38 | -$ 0.50 |
| Media General | $ 18.62 | -$ 0.50 |
| Multimedia s | $ 25.75 | -$ 0.50 |
| Knight-Ridder | $ 61.00 | -$ 0.50 |
| Clear Channel | $ 16.25 | -$ 0.75 |
| Times-Mirror | $ 34.00 | -$ 0.75 |
| Cablevision | $ 27.00 | -$ 0.88 |
| King World | $ 26.12 | -$ 1.00 |
| Paramount | $ 43.25 | -$ 1.00 |
| Jones Intercable | $ 11.50 | -$ 1.50 |
| GM/Hughes | $ 23.75 | -$ 1.88 |
| Matsushita | $ 90.25 | -$ 4.75 |

s stock split within last 52 weeks
Note: Closing figures are price per share.
Source: Nordby International

### Unchanged

| | Aug. 14 |
|---|---|
| Carolco | $ 0.81 |
| Orion Pictures | $ 1.50 |
| Home Shopping | $ 5.50 |
| Viacom | $ 32.62 |

Note: Closing figures are price per share.
Source: Nordby International

**GRAPHIC:** Picture 1, EM Index 5342.88 Down 27.39 points; Picture 2, Dow Jones Avg. 3328.94 Down 3.24 points

**EXHIBIT 6**
**14**

Page 1



2 of 5 DOCUMENTS

Copyright 1992 Crain Communications, Inc.
Electronic Media

August 31, 1992

**SECTION:** FINANCE; Pg. 14

**LENGTH:** 257 words

**HEADLINE:** ELECTRONIC MEDIA stock index for week ended Aug. 21

**BODY:**

Winners

|  | Aug. 21 | Change from Aug. 14 |
|---|---|---|
| Matsushita | $ 96.38 | +$ 6.12 |
| Washington Post | $ 223.00 | +$ 2.25 |
| CBS | $ 195.25 | +$ 1.25 |
| Viacom | $ 33.50 | +$ 0.88 |
| GM/Hughes | $ 24.25 | +$ 0.50 |
| Scientific-Atlanta | $ 27.25 | +$ 0.50 |
| Adelphia | $ 19.75 | +$ 0.25 |
| Times-Mirror | $ 34.12 | +$ 0.12 |

Note: Closing figures are price per share.
Source: Nordby International

Losers

|  | Aug. 21 | Change from Aug. 14 |
|---|---|---|
| Carolco | $ 0.69 | $ 0.12 |
| Zenith | $ 6.50 | -$ 0.12 |
| Century Comm. | $ 8.25 | -$ 0.12 |
| Media General | $ 18.50 | -$ 0.12 |
| Orion Pictures | $ 1.25 | $ -$ 0.25 |
| Home Shopping | $ 5.25 | -$ 0.25 |

**EXHIBIT 6**
**15**

Page 2

ELECTRONIC MEDIA stock index for week ended Aug. 21 Electronic Media August 31, 1992

| | | |
|---|---|---|
| Jones Intercable | $ 11.25 | -$ 0.25 |
| Comcast | $ 16.50 | -$ 0.25 |
| TCI | $ 18.62 | -$ 0.25 |
| Playboy | $ 6.38 | -$ 0.38 |
| King World | $ 25.75 | -$ 0.38 |
| Cablevision | $ 26.62 | -$ 0.38 |
| A. H. Belo | $ 45.25 | -$ 0.50 |
| Clear Channel | $ 15.62 | -$ 0.62 |
| Itel | $ 18.38 | -$ 0.62 |
| News Corp. | $ 32.00 | -$ 0.62 |
| Knight-Ridder | $ 60.38 | -$ 0.62 |
| General Electric | $ 75.12 | -$ 0.62 |
| Gannett | $ 45.62 | -$ 1.12 |
| Tribune | $ 40.75 | -$ 1.38 |
| Time Warner | $ 106.50 | -$ 1.50 |
| Multimedia s | $ 24.12 | -$ 1.62 |
| Paramount | $ 41.62 | -$ 1.62 |
| McGraw Hill | $ 56.75 | -$ 1.88 |
| Disney s | $ 33.75 | -$ 2.60 |
| Cap Cities/ABC | $ 445.62 | -$ 2.62 |
| Scripps Howard | $ 46.00 | -$ 5.25 |

s stock split within last 52 weeks.
Note: Closing figures are price per share.
Source: Nordby International

Unchanged

| | Aug. 21 |
|---|---|
| Pinelands | $ 18.00 |
| TBS | $ 18.88 |

Note: Closing figures are price per share.
Source: Nordby International

**GRAPHIC:** Picture 1, EM Index 5216.82 Down 126.06 points; Picture 2, Dow Jones Avg. 3254.10 Down 74.84 points

EXHIBIT 6
16

ER-1150

1    DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3    CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4    O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
5    Los Angeles, CA 90067-6035
     Telephone: (310) 553-6700
6    Facsimile: (310) 246-6779

7    Attorneys for Plaintiff DC Comics

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10   DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,               **PLAINTIFF DC COMICS' REPLY
                                         IN SUPPORT OF MOTION FOR
12        v.                             PARTIAL SUMMARY
                                         JUDGMENT ON ITS FIRST AND
13   PACIFIC PICTURES                    THIRD CLAIMS FOR RELIEF
     CORPORATION, IP WORLDWIDE,
14   LLC, IPW, LLC, MARC TOBEROFF,
     an individual, MARK WARREN          Hon. Otis D. Wright II
15   PEARY, as personal representative of
     the ESTATE OF JOSEPH SHUSTER,       **Hearing Date**:   Aug. 20, 2012
16   JEAN ADELE PEAVY, an individual,    **Hearing Time**:   1:30 p.m.
     LAURA SIEGEL LARSON, an             **Courtroom**:      11
17   individual and as personal
     representative of the ESTATE OF
18   JOANNE SIEGEL, and DOES 1-10,
     inclusive,
19
                Defendants.
20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    DC IS ENTITLED TO JUDGMENT ON ITS FIRST CLAIM ...................... 1

    A.    The 1992 Agreement Eliminated Any Right Of Termination ............. 1

        1.    The 1992 Agreement Revoked And Replaced All Terminable Grants ....................................................... 2

        2.    The Scope Of The 1992 Agreement Is Clear ............................ 4

        3.    *Milne* And *Steinbeck* Control Here, Not *Mewborn* ................... 5

        4.    The 1992 Agreement Is Binding On The Shuster Heirs ........... 7

    B.    The Shusters Lacked The 51% Interest Necessary To Terminate ........ 8

    C.    The Shusters Cannot Terminate Under § 304(d) ................................ 9

II.    DC IS ENTITLED TO JUDGMENT ON ITS THIRD CLAIM ................. 10

III.    DEFENDANTS WAIVED THEIR AFFIRMATIVE DEFENSES............. 12

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

**ER-1152**

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abuelhija v. Chappelle,*
  2009 WL 1883787 (S.D.N.Y. June 29, 2009)........................................4

*Associated Food Stores, Inc. v. Siegel,*
  10 A.D.2d 1003 (N.Y. App. Div. 1960)................................................4

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991) ...........................................................................11

*Blair & Co. v. Otto V.,*
  5 A.D.2d 276 (N.Y. App. Div. 1958) ...................................................3

*Bourne Co. v. MPL Commc'ns, Inc.,*
  675 F. Supp. 859 (S.D.N.Y. 1987) ....................................................11

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,*
  41 N.Y.2d 397 (N.Y. 1977)...............................................................2, 4

*Citibank v. Benedict,*
  2000 WL 322785 (S.D.N.Y. Mar. 28, 2000). ......................................4

*Classic Media, Inc. v. Mewborn,*
  532 F.3d 978 (9th Cir. 2008) .................................................1, 5, 6, 7

*Croman v. Wacholder,*
  2 A.D.3d 140 (N.Y. App. Div. 2003) ...................................................4

*Diversey Lever, Inc. v. Ecolab, Inc.,*
  191 F.3d 1350 (Fed. Cir. 1999) .........................................................12

*Effects Assocs., Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990) ...............................................................5

*Endicott Trust Co. v. Milasi.,*
  175 A.D.2d 480 (N.Y. App. Div. 1991)................................................4

*Faulkner v. Nat'l Geographic Soc'y,*
  452 F. Supp. 2d 381 (S.D.N.Y. 2006) ..............................................4, 7

*Goldbard v. Empire State Mut. Ins. Co.,*
  5 A.D.2d 230 (N.Y. App. Div. 1958)....................................................2

*Goldome Corp. v. Wittig,*
  221 A.D.2d 931 (N.Y. App. Div. 1995)................................................3

*Groucho Marx Prods. v. Day & Night Co.,*
  689 F.2d 317 (2d Cir. 1982) ..............................................................10

ER-1153

*In re Digimarc Corp. Deriv. Litig.*,
   549 F.3d 1223 (9th Cir. 2008) ........................................................................ 11

*In re WorldCom, Inc.*,
   2007 WL 2049723 (S.D.N.Y. July 13, 2007) ............................................... 2, 3

*Indep. Energy Corp. v. Triger Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) ................................................................ 3

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985) ....................................................................................... 10

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ................................................................ *passim*

*Milton H. Greene Archives v. CMG Worldwide*,
   568 F. Supp. 2d 1152 (C.D. Cal. 2008) ........................................................ 10

*Nat'l Am. Corp. v. Fed. Rep. of Nigeria*,
   448 F. Supp. 622 (S.D.N.Y. 1978) ................................................................. 3

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d at 203 (2d Cir. 2008) ............................................................... *passim*

*Prudential Real Estate Affils., Inc. v. PPR Realty, Inc.*,
   204 F.3d 867 (9th Cir. 2000) ........................................................................ 11

*R&R Recreation Prods., Inc. v. Joan Cook Inc.*,
   1992 WL 88171 (S.D.N.Y. Apr. 14, 1992) .................................................... 5

*Siegel v. National Periodical Pub's*,
   364 F. Supp. 1032 (S.D.N.Y 1973), *aff'd* 508 F.2d 909 (2d Cir. 1974). ......... 5

*UMWA 1974 Pension v. Pittston Co.*,
   984 F.2d 469 (D.C. Cir. 1993) ...................................................................... 12

*Wang v. Chen*,
   1992 WL 7840 (S.D.N.Y. Jan. 10, 1992) .................................................. 2, 4

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ....................................................................................... 11

*Yahaya v. Hua*,
   1989 WL 214481 (S.D.N.Y. Nov. 28, 1989) ................................................. 4

**STATUTES**

17 U.S.C. 304(d) .................................................................................................. 9

17 U.S.C. § 304(c)(6)(D) ............................................................................. 10, 11

28 U.S.C. § 2201(a) ........................................................................................... 11

- iii -

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102
    Stat. 2853 (1988) .................................................................................. 5

**OTHER AUTHORITIES**

67 FED. REG. 69,134-35 (Nov. 15, 2002). ................................................ 9

1 GOLDSTEIN ON COPYRIGHT § 5.4.3.1 (2007)......................................... 10

3 NIMMER ON COPYRIGHT § 11.05[B][2] (2012) ..................................... 9

3 PATRY ON COPYRIGHT § 7.47 (2009) ................................................... 10

FED. R. EVID. 408.................................................................................. 7

H.R. REP. NO. 94-1476 (1976)......................................................... 1, 10

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

**ER-1155**

1  Defendants' opposition brief is unavailing, as it consistently offers no answer

2 to Ninth Circuit and other controlling precedent that rejects defendants' positions;

3 makes arguments belied by defendants' own prior briefs; and asserts factual claims

4 based only on lawyer arguments refuted by defendants' own sworn admissions.

**I.  DC IS ENTITLED TO JUDGMENT ON ITS FIRST CLAIM.**

  **A.  The 1992 Agreement Eliminated Any Right Of Termination.**

7  Defendants' repeated claim that the Copyright Act's termination provisions

8 "abrogated standard 'freedom of contract' principles to make the termination right

9 'inalienable,'" Opp. 8, is untrue.  Congress said: "nothing in [the Act] is intended to

10 change the existing state of the law of contracts concerning the circumstances in

11 which an author may terminate a license, transfer or assignment."  H.R. REP. NO.

12 94-1476, at 142 (1976).  This language reflects a careful "'compromise'" between

13 "'the interests of individual authors and their transferees,'" like DC, who spent

14 nearly 75 years developing Superman.  Mot. 10 (quoting further legislative history).

15  In *Milne*, 430 F.3d 1036, 1046 (9th Cir. 2005), the Ninth Circuit cited this

16 history in holding that a *contract* that supersedes all pre-1978 copyright grants *may*

17 eliminate any claimed *termination right*.  The *Steinbeck* case, 537 F.3d 193, 203

18 (2d Cir. 2008), held the same, and Toberoff—before this case—hailed the Second

19 Circuit and *Steinbeck* as "play[ing] a key role in articulating federal copyright law,"

20 *Classic Media, Inc. v. Mewborn*, 2006 WL 2984706, Opp. 25 (9th Cir. June 30,

21 2006) ("*Mewborn* Opp.") (citing and discussing district court opinion in *Steinbeck*).

22  Knowing the termination right can be forfeited by contract, defendants invent

23 a six-part test for when a termination right can be contracted away, Opp. 11, but the

24 circuit court authorities that address this issue establish a simple rule:  a post-1978

25 agreement that replaces all pre-1978 copyright grants eliminates any termination

26 right that may otherwise have existed.  *Milne*, 430 F.3d at 1042-45; *Steinbeck*, 537

27 F.3d at 200-04; *Mewborn*, 532 F.3d 978, 982, 989 (9th Cir. 2008).  The 1992

28 Agreement did just this:  in 1992, Jean Peavy replaced all pre-1978 grants of

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

Shuster's copyrights by "grant[ing] to [DC]" all rights in all of his works and releasing DC from "all claims whether now or hereafter existing," regarding his copyrights.  SUF 19.  Defendants' arguments to escape the 1992 Agreement fail.

1. The 1992 Agreement Revoked And Replaced All Terminable Grants.

Defendants say *Milne* and its progeny require language in agreements like the 1992 agreement "*expressly* revoking" all pre-1978 copyright grants—*i.e.*, "the term[s] revoke, rescind, supersede, [or] replace," Opp. 11-12.  But *none* of these cases says such "magic words" are required, nor could they have so held under the legal sources the cases applied.  As defendants themselves acknowledged at the Rule 12 stage, it is "New York law, which governs the 1992 Agreement" and whether it operates to revoke and regrant Shuster's copyrights.  Docket No. 191 at 4.  Now confronted with New York law fatal to their position, defendants reverse course and argue that any reading of the 1992 Agreement "is a matter of federal copyright law."  Opp. 12.  *Steinbeck* refutes this, making clear that "whether [an] Agreement terminated and superseded [an earlier] Agreement," is determined by governing state law—in this case, as in *Steinbeck*, "New York law."  537 F.3d at 200.

a. New York law has long recognized that intent to supersede a prior contract may be "expressed *or implied*."  *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (italics added).  Defendants' own cases confirm the settled principle that "consent to a novation 'may be implied from all the facts and circumstances'"—no magic words are required.  *Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992); *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. 1977) ("objective manifestations" of intent shown through parties' "words and deeds," "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain").

Intent to supersede—or "novate"—is established where, as here, a new contract addresses all of the parties' obligations and remedies on a subject matter.  *E.g.*, *Steinbeck*, 537 F.3d at 200-01; *In re WorldCom, Inc.*, 2007 WL 2049723, at

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

**ER-1157**

*2 (S.D.N.Y. July 13, 2007). The 1992 Agreement plainly covers the same subject matter as Joe Shuster's prior copyright grants—*i.e.*, it assigns "copyrights … in any and all" of his works and "fully settles all claims," "rights or remedies … under any other agreement or otherwise, whether now or hereafter existing." SUF 19.

b. Defendants mainly ignore the authorities DC cited on this key point of law. *Cf.* Mot. 13-14. Their few attempts to distinguish DC's cases fail:

• While *WorldCom* applied Delaware law, it said *New York* uses the same test. Citing a New York case (*Nat'l Am. Corp. v. Fed. Rep. of Nigeria*, 448 F. Supp. 622 (S.D.N.Y. 1978)), it stressed: "other jurisdictions support the view that *a new contract's release of parties' claims under an old contract proves that the parties intended to novate the old contract*." 2007 WL 2049723, at *3.

• Defendants say that, in *Blair*, the substitute contract expressly disavowed the earlier one, Opp. 14, but *Blair* stressed the "more important" factor was that it *released the parties from all* preexisting liabilities. 5 A.D.2d at 276, 282.

• Defendants say in *Goldome* the new contract "identified the first agreement, and evidenced a clear intent to replace it." Opp. 14. Not so—the new contract in *Goldome* "reaffirmed" a provision from an earlier contract and released the parties from any other liability. 221 A.D.2d at 932-33. *Goldome* held it was the "clear and unambiguous language in the release," like the release here, that "establishe[d] that it superseded" the prior contract. *Id.* And, to be clear, the 1992 Agreement *did* reference Joe's prior agreements; "settl[ing] all claims" to any payments, rights, or remedies "under *any other agreement*."

• Defendants say *Independent Energy* did not "even address" the salient issues, Opp. 14. It plainly did. It stated the rule that a new "contract regarding the same subject matter *supersedes the prior contract.*" And it held that a contract providing "consideration for the assignment [of a party's] interests" proved intent to novate. 944 F. Supp. at 1195-96. (All italics above added.)

c. Defendants cite *no case* holding that novation requires "express language"

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

ER-1158

1    of revocation.  None exists, and, indeed, they repeatedly claim that their Pacific

2    Pictures contracts were "revoked, and replaced with a legal retainer agreement,"

3    Opp. 7, 19, even though it never says "revoke" or "replace," Adams Decl. Ex. 13.

4         Defendants' cite to *Abuelhija*, 2009 WL 1883787 (S.D.N.Y. June 29, 2009),

5    provides them no help.  There, a third party failed to establish that a 2004 contract

6    "superseded and replaced" a 2002 contract where (i) the contracts concerned

7    distinct subjects (different TV-show seasons ); (ii) the 2004 contract suggested the

8    2002 contract "remains in force"; and (iii) the parties continued to make payments

9    under the 2002 contract.  *Id.* at *6-7.  None of these conditions is present here.

10   Defendants' eight other cases are unavailing; none involves a contract, as here, that

11   covered the same subject matter as a prior contract and had a sweeping release.[1]

12        d. Finally, the *undisputed* extrinsic evidence confirms novation.  Defendants

13   do not dispute Paul Levitz's sworn testimony that he told Jean and Frank the 1992

14   Agreement "would represent their last and final deal with DC, and would resolve

15   any past, present, or future claims," and that "Frank and Jean both confirmed that

16   they understood."  SUF 18; *infra* at 6-7.  Defendants' cases make clear courts can

17   consider such extrinsic evidence (along with the 1992 Agreement itself) to grant

18   DC summary judgment.  *E.g.*, *Yahaya*, 1989 WL 214481, at *4; *supra* at 2, 4 n.1.

19        2.  The Scope Of The 1992 Agreement Is Clear.  Defendants say the 1992

20   Agreement is not a bar to termination because it does not expressly cite Shuster's

21   prior copyright grants or mention termination.  Opp. 12.  This is irrelevant, since

22   none of *Milne* or its progeny requires such language.  *Supra* at 1.  It is also untrue.

23

24        [1] *Cf. Wang*, 1992 WL 7840, at *6 (no novation where performance still required
25   under original contract and payments made under it); *Yahaya*, 1989 WL 214481, at
     *4 (no "conversation or behavior" supporting substitute agreement); *Citibank*, 2000
26   WL 322785, at *8-9 (no novation; new notes involved different debts); *Endicott*,
     175 A.D.2d at 480-81 (no oral revocation where contract could be "terminated only
27   by a writing"; oral termination "equivocal"); *Croman*, 2 A.D.3d at 144 (ineffective
     oral termination); *Assoc. Food*, 10 A.D.2d at 1003 (same); *Faulkner*, 452 F. Supp.
28   2d at 381(not a novation case); *Brown Bros.*, 41 N.Y.2d at 398, 401 (same).

- 4 -

The 1992 Agreement covers the entire waterfront of any claim in Joe Shuster's copyrights: it "*fully settles all claims* to *any payments or other rights or remedies* which you may have *under any other agreement or otherwise*, whether *now or hereafter existing* regarding *any copyrights, trademarks, or other property right* in *any and all work created in whole or in part by … Joseph Shuster*." (Emphases added). This clearly encompasses *all* of Joe Shuster's works, *all* agreements, including the pre-1978 grants, and *all* rights, no matter the form.[2]

Last, defendants say the 1992 Agreement is a "boilerplate quitclaim"—citing no law or competent evidence in support. They also say it could not have been a grant because DC did not register it with the Copyright Office or use the similar language in two unrelated contracts. Opp. 12-16; SUF 76. But copyright grants— as the Ninth Circuit made clear in 1990—can be a "a one-line pro forma statement." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Registration has not been required since the Berne Convention was implemented in 1989. Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at \*4 (S.D.N.Y. Apr. 14, 1992). And the 1992 Agreement is not a "quitclaim"; it expressly says "you now *grant to us*" all rights.

3. *Milne* And *Steinbeck* Control Here, Not *Mewborn.* Defendants say the facts in this case "are similar only to *Mewborn*," and *Steinbeck* and *Milne* do not apply. They assert the critical distinction between *Steinbeck* and *Milne* and here is that Jean and Frank were unable to "leverage the imminent threat of termination to

---

[2] Defendants know that agreements conveying "all" rights do not need to delineate specific rights to be effective. In the *National* case they cite, Opp. 5, the court held that Shuster's 1938 grant of "all" Superman rights included copyright renewal rights, even though (a) those renewal rights did not yet exist; and (b) "none of the agreements ... expressly refer[red] to the transfer of the renewal rights." 364 F. Supp. 1032, 1037 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 913 (2d Cir. 1974).

Defendants' claim that the 1992 Agreement did not include Superman because it "does not even mention Superman," Opp. 12, is laughable. The Agreement applies to "any and all work" Shuster "created in whole or in part." Defendants' first Statement of Undisputed Fact says "Shuster co-created Superman." SUF 46.

DC'S REPLY IN SUPPORT OF MOT. FOR PARTIAL SUMM. J.

ER-1160

1  realize market value for a copyright" and that they did not "intentionally trade-in

2  their termination right."  Opp. 11.  Defendants are wrong for at least five reasons.

3      a. This is *not* the test for when a termination right may be contracted away.

4  *Supra* at 1; *Steinbeck*, 537 F.3d at 203.  Indeed, *Mewborn* held that Winifred *could*

5  terminate because her 1978 contract (unlike the 1992 Agreement, and those in

6  *Milne* and *Steinbeck*) did not "substitute" or "revoke" any pre-1978 copyright

7  grants, and instead only "affirm[ed]" her 1976 grant.  532 F.3d at 982, 989 & n.8.

8      b. In *Mewborn*, Toberoff argued and the Ninth Circuit held, "there was no

9  record evidence that Mewborn *was even aware* of her recapture rights" and no

10  evidence she "inten[ded] to waive" them.  *Mewborn* Opp. at 37; 532 F.3d at 989.

11  Here, Jean and Frank expressly told DC if it increased the annual payments due to

12  Frank, and made those lifetime payments to Jean instead, Jean "would not pursue

13  the termination of the Superman copyright as provided for to creators' heirs in the

14  1976 U.S. Copyright Act."  Levitz Decl. Ex. 6.  In 1993, Jean affirmed she had

15  "traded-in" her termination right, saying she would "stick to our bargain" and not

16  attempt "to reclaim the SUPERMAN copyright."  *Id*. Ex. 20.  In 1999, after noting

17  "Siegel has filed a copyright [termination] for SUPERMAN," Jean reiterated she

18  would "honor" the 1992 Agreement and not make such a claim.  *Id*. Ex. 59.

19      c. Whether Jean had a right to terminate in 1992, and whether DC disputed it,

20  is irrelevant.  Mot. 15-17, Opp. 16-17.  Elaine Steinbeck was "unable to terminate"

21  when she made her 1994 contract.  *Steinbeck*, 537 F.3d at 203 n.5.  A contract that

22  eliminates a termination right does *not* become unenforceable "because it had the

23  effect of eliminating termination rights that did not yet exist," *id*. at 203—including

24  new alleged termination rights first created by Congress in 1998 in the CTEA, *id*.

25      d. Defendants' claim that there was no "back and forth" over the terms of the

26  1992 Agreement, Opp. 17, is belied by the undisputed record.  Levitz Decl. ¶¶ 5-7;

27  Exs. 3-6, 10.  DC initially offered no more than to pay Joe Shuster's debts.  Jean

28  successfully pushed for Frank's annual payments to be increased five-fold, for

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

1    those payments not to cease when he died, and for benefits herself—*i.e.*, a lifetime

2    pension that has provided her $600,000 and the financial security she sought. *Id.*

3    Levitz confirmed this would fully resolve any claim the Shusters had in Joe's

4    copyrights, and Jean and Frank said "they understood." SUF 18. After-the-fact

5    assertions by their counsel that Jean and Frank did not intend to relinquish rights

6    are meaningless, as defendants' own cases hold. *Faulkner*, 452 F. Supp. 2d at 381.

7        e. Defendants say the deal Jean accepted in 1992 was too paltry to count as a

8    revocation and regrant. Again, this is not the test, and is untrue. As Toberoff said

9    in *Mewborn*, Mewborn received only a "one-time," "miniscule" payment of $3,000,

10   whereas in "*Milne*, the author's trust *expressly* used the statutory termination right

11   to *double* its royalty." *Mewborn* Opp. 34, 36; *Mewborn* Reply at 17, 2006 WL

12   3225721. When they approached DC in 1992, Frank was owed $5,000 a year, and

13   Jean was owed *nothing*. Levitz Decl. ¶¶ 4-7; Exs. 3-5, 15. Jean and Frank obtained

14   a *five-fold* increase in annual payments, paid to Jean rather than Frank, *id.* Ex. 6,

15   and they have received, to date, more than *$600,000*, SUF 25. As Levitz testified,

16   by agreeing to the payment terms Jean and Frank demanded, DC "far exceed[ed]

17   [its] promise to Joe and commit[ted] to a much larger sum" than would have been

18   due Frank, SUF 24, or $50,000 total. Jean's current alleged dissatisfaction with the

19   1992 Agreement, which she continues to be paid under, does not "discredit the

20   validity of [the] agreement and the rights [it] conferred." *Milne*, 430 F.3d at 1045.[3]

21       4. The 1992 Agreement Is Binding On The Shuster Heirs. Defendants do

22   not and cannot dispute that under clear probate law Jean had full authority to enter

23   into the 1992 Agreement as the "sole beneficiary" and "executrix" of Joe Shuster's

24   estate. Mot. 15. Defendants' contention that the 1992 Agreement could not have

25   disposed of the Shusters' termination right, because Peary—who had himself

26   _____

27   [3] Violating FED. R. EVID. 408, defendants argue a $2 million settlement offer DC
     made Jean and Peary in 2005—to avoid litigation—shows the 1992 agreement was
28   not rich enough, Opp. 17. The 2005 offer shows no such thing, as Rule 408 plainly
     proscribes.

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

ER-1162

1    appointed "executor" of Joe Shuster's estate 11 years later—"was not a party,"

2    Opp. 8, is specious. *Milne* and *Steinbeck* make clear that when one heir executes an

3    agreement that supersedes all pre-1978 copyright grants, *all other heirs* are barred

4    from terminating—period. *Milne*, 430 F.3d at 1040; *Steinbeck*, 537 F.3d at 204.

5          **B.     The Shusters Lacked The 51% Interest Necessary To Terminate.**

6          Defendants claim their termination notice did not violate the Copyright Act's

7    majority-interest requirement—despite omitting the *100% owner* of the termination

8    right from their notice (the Pacific Pictures Joint Venture)—because their contracts

9    assigning all termination rights to the Venture were *illegal*. This *illegality* defense

10    fails for two reasons. First, while defendants say the Pacific Pictures contracts "did

11    not transfer the prospective copyrights to be recovered by the Shuster Termination,"

12    Opp. 18, Peary testified under oath, and without any objection, that the 2001

13    contract "transferr[ed] and assign[ed] to the venture" "*all of the Joe Shuster rights,*

14    *termination rights*, to the extent they existed," Petrocelli Decl. Ex. 46 at 482:18-23

15    (emphases added). The 2003 agreement reaffirmed the 2001 Agreement. *Id*. Ex.

16    36 at 291. These admissions and facts are fatal to defendants' defense.

17          Second, and equally fatal, is defendants' failure to address the public-policy

18    rule that they *may not* assert the illegality of their *own* contracts as a defense. Mot.

19    19-20 (citing cases). Like a swindler who induces a minor to sign a contract, *id.*

20    defendants cannot claim their contracts are illegal to avoid liabilities they create.

21          As to remedies, defendants abandon any "harmless error" defense, Opp. 19,

22    and do not dispute that a termination notice signed by a party with less than a

23    majority interest is void, *id*. 17. Nor do they dispute that, if they violated the

24    majority-interest rule, their notice must be declared judicially void—and, at best,

25    they can try to file a new one. Defendants *do* contest this Court's power to bar

26    them from refiling a notice, arguing it would be "inequitable." *Id*. 19. But they can

27    hardly argue equity when they provide no reasons why they created their web of

28    illegal agreements and hid them for years from DC and the Copyright Office.

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

ER-1163

## C.     The Shusters Cannot Terminate Under § 304(d).

Under the plain language of § 304(d), an author's statutory heir can terminate *only* where the "[t]ermination rights provided in subsection (c) … have expired on or before the effective date of the [CTEA]"—*i.e.*, where, unlike here, the window for terminating under the 1976 Copyright Act opened, ran its full 59-year course, and closed by October 27, 1998. Mot. 21-22.  Defendants say "[t]here is nothing in the CTEA" reading "expired" this way, Opp. 20—ignoring that (i) the same term is used in the copyright renewal provisions to mean exactly this, Mot. 22, and (ii) in their Rule 12 brief, defendants argued Copyright Act's termination provisions *must be read* consistent with the renewal provisions, Docket No. 148-1 at 6.

Rather than address the renewal provisions, defendants cite three other sources.  The first is a reference to the word "expired" in 67 FED. REG. 69,134-35:

> [A]n author or an author's successor must serve a notice of termination 'not less than two years before' the effective date, i.e., up to 59 years … after copyright was secured …. Therefore, the termination right will have 'expired,' *see* 17 U.S.C. 304(d), 59 years after copyright was secured.

This misses DC's point; had Shuster not terminated for 59 years, his right would have "expired."  But Shuster died during the 53rd year and he left no statutory heir.  Thus, Shuster's termination right never "expired," because the 59 years never ran.  The right simply ceased to exist upon his death.  Mot. 21-22.

Second, defendants say Shuster's termination right "expired" when he died, citing *Steinbeck*'s dictum that Elaine's "termination rights expired upon her death." 537 F.3d at 197.  But this dicta is contradicted six pages later, when the court said her termination right did *not* expire.  *Id.* at 203 ("Had Elaine Steinbeck not entered into the 1994 Agreement, the [§] 304(c) termination right *would have* expired…").

Third, defendants misquote Nimmer as "stating that § 304(d) was designed to 'correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously.'"  Opp. 20.  The treatise says the opposite, as DC showed in its Rule 12 brief.  Docket No. 186 at 16 (3 NIMMER § 11.05[B][2] (2012) ("addition

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

1    of twenty more years [to the copyright term] will serve as an additional windfall to

2    the transferee, thereby only exacerbating the imbalance arising from the fact that

3    the author (or his successors) failed to terminate previously"); *infra* at 10:19-20.[4]

4    **II.    DC IS ENTITLED TO JUDGMENT ON ITS THIRD CLAIM.**

5           Defendants' consent agreements violate § 304(c)(6)(D) of the Copyright Act

6    by (i) purporting to assign the Shusters' copyright interests to Pacific Pictures

7    before the effective termination date in 2013, and (ii) barring the Shusters from

8    making any deal with DC without Toberoff's and the Siegels' consent.  Mot. 23-25.

9    Citing Nimmer and a New York district court case from 1987, defendants say that

10   § 304(c)(6)(D) created a right without a remedy, Opp. 21-24.  They are mistaken.

11          1. *Milne*, 430 F.3d at 1047, makes clear Congress intended § 304(c)(6)(D) to

12   protect original grantees like DC by "prohibit[ing] a new grant of rights terminated

13   by statute *until after the effective date of termination*—to avoid trafficking in future

14   interests" by third parties, here from 2003 to 2013, Mot. 23.  Congress described

15   the rule it crafted in § 304(c)(6)(D) as is "*in the nature of a <u>right</u> of 'first refusal*,'"

16   running in favor of DC, and against "traffick[ers]" like Toberoff.  *Milne*, 430 F.3d

17   at 1047 (citing H.R. REP. NO. 94-1476 at 127) (emphases added).  Defendants say

18   Congress' words can be ignored, Opp. 23, but *Milne* and others cite them as sound

19   evidence of Congress' intent, *see Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173

20   n.40 (1985).  Defendants also fail to mention that *Milne* rejected Nimmer's reading

21   of § 304, *see* 430 F.3d at 1047; other treatise writers contradict him, 1 GOLDSTEIN

22   ON COPYRIGHT § 5.4.3.1, at 5:127 (2007); and Congress expressed "hostility"

23   toward those like Toberoff, 3 PATRY ON COPYRIGHT § 7.47, at 7-104 n.2 (2009).

24

25          [4] Defendants also falsely say this Court "acknowledged" Peary is "entitled" to
     terminate, Opp. 19, when the *Siegel* Court, in fact, said: "the present case only
26   concerns the Siegel heirs' efforts to terminate," Case No. CV 04-8400, Docket No.
     293 at 19 n.3, and, "[i]t is by no means a foregone conclusion that the Shuster estate
27   will be successful in terminating," *id*. Docket No. 554 at 23.  Defendants also cite
     *Groucho* and *Milton Greene*, two California "right of publicity" cases, but *neither*
28   involves copyright termination or interprets the meaning of the word "expired."

                                                        - 10 -                    DC'S REPLY IN SUPPORT OF
                                                                                  MOT. FOR PARTIAL SUMM. J.

ER-1165

2. *Bourne*, 675 F. Supp. 859 (S.D.N.Y. 1987), neither helps defendants nor supplants *Milne*. While Bourne sought a declaration that a copyright grant like Toberoff's was invalid, the district court never ruled on the claim. Rather, it found that, while the assignment was "invalid" under § 304(c)(6)(D), *id.* at 861, there was no basis for the grantee to pursue *monetary* damages, *id.* at 865-66. Even assuming this non-binding decision were correct (and it is not), *Bourne* never addressed whether the grantee could sue for declaratory relief and have his negotiation period restored. The Declaratory Judgment Act makes clear courts "may declare the rights and other legal relations of any interested party … whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act gives "federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)—as is plainly needed here.

3. Defendants' next argument is that even if § 304(c)(6)(D) gives DC a right, no remedy exists for defendants' violating it. A private right of action exists when:

> (a) plaintiff is "one of the class for whose especial benefit the statute was enacted"; (b) there is "any indication of legislative intent, explicit or implicit … to create such a remedy"; (c) the cause of action is "consistent with the underlying purposes of the legislative scheme"; and/or (d) the cause of action is not one "traditionally relegated to state law." *In re Digimarc Corp. Deriv. Litig.*, 549 F.3d 1223, 1231 (9th Cir. 2008).

Each factor is present here. The text and legislative history of the Copyright Act—like *Milne*—confirm that § 304(c)(6)(D) was meant to protect DC. Congress knew courts routinely enforce negotiation rights. *E.g.*, *Prudential Real Estate Affils., Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 875 (9th Cir. 2000) (rights of first refusal are "ordinarily enforceable"); Mot. at 24-25 (collecting cases); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law"). And permitting DC to protect its right promotes this statutory scheme—how else can traffickers be policed?[5]

---

[5] Defendants suggest Magistrate Zarefsky held otherwise. He did not. In a 2011 *discovery* dispute, he said defendants' 2008 consent agreement *might* not violate § 304(c)(6)(D). He conceded, however, the agreement's illegality was not before

- 11 -

ER-1166

5. Without disputing any of the case law on which DC relies, defendants say DC's Third Claim is time-barred. But, in so doing, they concede that, if the claim is properly based on the 2008 consent agreement (and it is), *or* if the continuing-harm or delayed-discovery doctrines apply (and they do), the claim was timely filed. Opp. 24. As for defendants' claims that the illegal Pacific Pictures contracts were cancelled, those irrelevant, fact-bound contentions, (SUF 85, 88, 31 & DC's Responses), ignore that defendants signed another Pacific Pictures contract in *2011*, well within the statutory period. While Pacific Pictures purported to quitclaim its Shuster copyrights in this 2011 contract, this ignores that Pacific Pictures assigned all of its Shuster rights to defendant IP Worldwide in 2002, which in turn assigned those rights to defendant IPW. Neither IP Worldwide nor IPW is a party to the 2011 Pacific Pictures contract. SUF 100-01. These illegal agreements remain, and defendants engaged in continuing misconduct well within the limitations period.

## III.   DEFENDANTS WAIVED THEIR AFFIRMATIVE DEFENSES.

Although defendants' answer asserts a series of affirmative defenses to DC's First and Third Claims, their opposition does not move on or prove them. Circuit authority, contrary to defendants' two district court cases, Opp. 25, holds that their "failure to raise [their] affirmative defense[s] … in opposition to … [DC's] motion constitute[s] an abandonment of the defense[s]." *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999); *UMWA 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993); Decl. of C. Seto ¶ 2 (meet-and-confer record).

Dated:  August 6, 2012          Respectfully submitted,

By: /s/ Daniel M. Petrocelli
          Daniel M. Petrocelli

---

him, "[o]ne cannot know with certainty what the consent agreement means without seeing" it, Docket No. 209 at 8:1-2, and, without looking at the contract, accepted Toberoff's representations about it contents. Since that ruling, defendants were deposed, and their admissions about the 2008 contract show it unlawfully impedes DC's negotiation rights. SUF 42-43. The Court should review the contract itself.

DC'S REPLY IN SUPPORT OF
MOT. FOR PARTIAL SUMM. J.

ER-1167

1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
    *kgadams@ipwla.com*
3  Pablo D. Arredondo (State Bar No. 241142)
    *parredondo@ipwla.com*
4  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
5  Malibu, California 90265
   Telephone:  (310) 246-3333
6  Fax:        (310) 246-3101

7  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
8  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
9  as personal representative of the Estate of
   Joanne Siegel

10                  **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12  | | |
|---|---|
| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | **DEFENDANTS' OBJECTIONS TO EVIDENCE IN PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS, DECLARATIONS, AND EXHIBITS** |
| | *Opposition; Declaration of Keith G. Adams; Statement of Genuine Issues; and [Proposed] Order filed concurrently herewith* |
| | Complaint filed:  May 14, 2010 |
| | Discovery Cutoff:  None Set |
| | Trial Date:        None Set |
| Defendants. | Date:   August 20, 2012* |
| | Time:   1:30 p.m. |
| | Place:  Courtroom 11 |

Defendants respectfully submit the following Objections to Evidence in Plaintiff's Statement of Undisputed Facts, Declarations, and Attached Exhibits:

<u>Objection to Uncontroverted Fact 5:</u>  It is irrelevant to DC's claims whether Siegel and Shuster were compensated in royalties and bonuses.  It is also irrelevant whether those royalties and bonuses increased with Superman's success.  The Copyright Act's termination rights, 17 U.S.C.§§ 304(c),(d), 203(a), do not depend upon how much money an author previously made as a result of his creation, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

<u>Objection to Uncontroverted Fact 6:</u>  It is irrelevant to DC's claims how much Jerry Siegel and Joseph Shuster were purportedly paid by DC during their lifetimes. The Copyright Act's termination rights do not depend upon how much money an author previously made as a result of his creation, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

DC's calculation of the present day value of purported payments using an "online inflation calculator" is improper lay opinion, lacks sufficient underlying facts and data, and foundation.  Fed. R. Evid. 701, 702.

<u>Objection to Uncontroverted Fact 8:</u>  It is irrelevant to DC's claims how much Siegel and Shuster were purportedly paid under the 1975 agreement.  The termination right does not depend upon how much an author previously made as a result of his creation, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

DC's calculation of the present day value of purported payments using an "online inflation calculator" is improper lay opinion, lacks sufficient underlying facts and data, and foundation.  Fed. R. Evid. 701, 702.

<u>Objections to Uncontroverted Fact 9:</u>  It is irrelevant to DC's claims whether DC increased the annual payments, made periodic cost-of-living adjustments, gave special bonuses, or paid to have Siegel, Shuster, and their families travel to

Superman-related events.  The termination right does not depend upon any of these issues and DC raises them merely to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 10:  It is irrelevant to DC's claims how much the Siegels and Shusters have been paid under the 1975 agreement.  The termination right does not depend upon how much an author or his heirs made as a result of the author's creation, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Again, DC's calculation of the present day value of purported payments to the Siegels and Shusters is improper lay opinion, lacks sufficient underlying facts and data, and lacks foundation.  Fed. R. Evid. 701, 702.

Objections to Uncontroverted Fact 11:  To the extent that DC implies that Siegel and Shuster did not exercise their termination rights because they did not want to get their Superman copyrights back, this is unsupported by the evidence cited, is speculative, lacks personal knowledge, and lacks foundation.  Fed. R. Evid. 602.

Moreover, it is irrelevant to DC's claims whether Siegel or Shuster wanted to get their Superman copyrights back, and DC's only purpose in alleging these purported facts is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 14:  It is irrelevant to DC's claims that Jean Peavy purportedly filed an affidavit in California state court identifying herself as Shuster's heir and/or requesting that his minimal assets (shares of Time Warner stock) be transferred to her.  Fed. R. Evid. 401, 402, 403.

As Joseph Shuster's sister, Jean Peavy did not have any termination rights and could not gain any such rights from this alleged transfer, otherwise.  17 U.S.C. §§ 304(c)(2), 304(d).  Nor did anyone hold any Shuster termination rights until termination rights were extended for the first time to the executor of an author's estate by the 1998 Copyright Term Extension Act.  *Id*.  Nor did Jean Peavy hold any Superman copyright interest, as Siegel and Shuster's Superman copyrights had long

ago been assigned to DC.  *Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1107-10 (C.D. Cal. 2008).

Objections to Uncontroverted Fact 15:  It is also not relevant to DC's claims that Jean Peavy purportedly wrote to DC, identifying herself as Shuster's heir, and asking for his final debts and expenses to be paid.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 16:  It is also not relevant to DC's claims that DC purportedly offered to cover Joe Shuster's debts, and DC only makes this factual claim to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 17:  It is also not relevant to DC's claims that Frank Shuster sent a letter to Paul Levitz stating he was pleased that DC increased his survivor payments, and asking that such payments be sent to his sister for tax purposes.  Frank Shuster's pleasure and/or displeasure with the payments has no bearing on the inalienable termination right of the executor of Joe Shuster's estate. 17 U.S.C. §§ 304(c)(5), 203(a)(5), 304(d); *Stewart v. Abend*, 495 U.S. 207, 230 (1990); *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 984-8l; *Marvel Character, Inc. v. Simon* ("*Simon*"), 310 F.3d 280, 290.  DC again includes these purported facts merely to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

To the extent that DC seeks to rely upon the letter for the truth of the matter asserted, it is inadmissible hearsay.  Fed. R. Evid. 801, 802.  To the extent that DC seeks to characterize Frank Shuster's state of mind based upon the letter, it lacks personal knowledge and foundation.  Fed. R. Evid. 602.

Objections to Uncontroverted Fact 18:   DC's assertion that Paul Levitz gave the same admonition to every writer, artist, or family member is improper habit evidence.  Fed. R. Evid. 406.  It is also irrelevant to DC's claims because the inalienable termination right cannot be overcome by an admonition and can be exercised "notwithstanding any agreement to the contrary."  17 U.S.C. §§ 304(c)(5), 203(a)(5), 304(d); *Stewart v. Abend*, 495 U.S. 207, 230 (1990); *Mewborn*, 532 F.3d 978, 984-8l; *Simon*, 310 F.3d at 290.

Objections to Uncontroverted Fact 19:  DC's assertion that Jean and Frank "re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights" is wholly unsupported by the evidence cited, lacks foundation and amounts to inadmissible speculation, argument, and legal conclusion.  Fed. R. Evid. 602, 701, 702.

DC's assertion is also irrelevant because the 1992 agreement, as a matter of copyright law, could not prevent or otherwise limit the executor of the Shuster Estate (which was not even a party to the agreement) from later exercising his inalienable termination right.  17 U.S.C. §§ 304(c)(5); 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290;Fed. R. Evid. 401, 402.

Objections to Uncontroverted Fact 20:  It is irrelevant to DC's claims that it purportedly maintained good relations with the Shusters, by sending letters back and forth.  The Shuster executor's termination right does not depend upon the Shuster heirs having had poor relations with DC.  Nor is it relevant whether Jean Peavy thanked DC, reaffirmed the 1992 Agreement, or requested Christmas bonuses.  The termination right is inalienable and cannot be waived or limited by supposedly good relations with DC, the 1992 Agreement, or bonuses. 17 U.S.C. 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.  DC injects these irrelevant factual claims into its motion only to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 21:  It is irrelevant to DC's claims that Jean Peavy purportedly stated she was not planning to reclaim the Superman copyright.  Nor is it relevant that she allegedly stated she would "stick to our bargain."   Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act.  *See* 17 U.S.C. § 304(c)(2).  Moreover, neither the 1992 Agreement nor statements in a letter can waive or limit the inalienable termination right, as a matter of copyright law. 17 U.S.C. §§ 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230;

**ER 1172**

*Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.  These irrelevant factual claims are meant only to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 22:  It is irrelevant to DC's claims that Jean Peavy allegedly stated she would "honor" the 1992 agreement after learning that the Siegel heirs had served termination notices.  Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act.  *See* 17 U.S.C. § 304(c)(2).  Moreover, such statements cannot waive or limit the inalienable termination right as a matter of copyright law. 17 U.S.C. 304(c)(5); 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.  The only purpose DC has in alleging such an irrelevant fact is to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 23:  It is irrelevant to DC's claims that DC provided Jean Peavy with Christmas bonuses; such bonuses have no effect on the Shuster executor's termination right.  *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290 .  DC alleges these irrelevant facts merely to elicit bias. Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 24:  It is again irrelevant to DC's claims whether DC paid Jean Peavy a bonus; such bonuses have no effect on the Shuster executor's termination right.  *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.  DC alleges these irrelevant facts merely to elicit bias.  Fed. R. Evid. 401, 402, 403.

Objection to Uncontroverted Fact 25:  How much Frank and Jean Shuster were paid under the 1992 agreement and any bonuses are irrelevant to DC's claims, and have no effect on the Shuster executor's termination right.  Fed. R. Evid. 401, 402. *See* 17 U.S.C. §§ 304(c)(2), 304(c)(5), 203(a)(5), 304(d); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.

**ER-1173**

Objection to Uncontroverted Fact 26:  Mark Warren Peary's age, residence, and career are all irrelevant to DC's claims.  So too is whether Jean Peavy was of sound mind when she sent DC letters, as the letters are irrelevant as set forth above. DC makes these irrelevant factual claims merely to elicit prejudice. Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 27:  Jean Peavy's physical and mental health is irrelevant to DC's claims.  As the sister of Joseph Shuster, Jean has never held termination rights under the Copyright Act, 17 U.S.C. § 304(c)(2),  or purported to exercise those rights.  DC raises these issues merely to elicit prejudice. Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 28:  Mark Warren Peary's screenplay, its contents, and that he sent it to Paul Levitz are all irrelevant to DC's claims. Fed. R. Evid. 401, 402, 403.  Moreover, to the extent that DC attempts to rely on the screenplay to establish that Shuster and DC "made amends," the screenplay does not support the claimed fact and is inadmissible hearsay. Fed. R. Evid. 801, 802.  The screenplay also lacks foundation and personal knowledge.   Fed. R. Evid. 602.  The irrelevant screenplay is mentioned only to elicit prejudice.  Fed. R. Evid. 403.

Objections to Uncontroverted Fact 29:  It is irrelevant to DC's claims that Mark Warren Peary submitted a revised copy of his screenplay after Warner Bros. rejected it.  It is likewise irrelevant that Mark Warren Peary asked Paul Levitz if the Siegel family's statutory termination would interfere with his efforts to sell the screenplay.  DC makes these irrelevant factual allegations to elicit prejudice. Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 30:  There is no evidence to support the purported fact that Mark Warren Peary affirmed the 1992 agreement.  There is no evidence to support the purported fact that Mark Warren Peary accepted payments under the 1992 agreement.  Moreover, that Jean Peavy, or even Mark Warren Peary, purportedly affirmed the 1992 agreement and/or accepted  payments under it is not

relevant to DC's claims.  Fed. R. Evid. 401, 402.  Jean Peavy (Joseph Shuster's sister) has never held any termination rights.  Mark Warren Peary has also personally never held termination rights under the Copyright Act.  After the Joseph Shuster's estate was probated in mid-2003, Mr. Peary was duly appointed the executor of Joseph Shuster's estate, and holds termination rights under the Copyright Act only in that capacity.  17 U.S.C. §§ 304(c)(2), 304(d).  Moreover, the termination right is inalienable and cannot be waived, released, or limited by alleged statements, or otherwise.  17 U.S.C. §§ 304(c)(5), 203(a)(5); *Stewart*, 495 U.S. at 230; *Mewborn*, 532 F.3d at 984-8l; *Simon*, 310 F.3d at 290.

Objections to Uncontroverted Fact 33:  Mark Warren Peary's purported statement that he understood that Joseph Shuster's termination rights were being transferred to the venture constitutes improper lay opinion.  Fed. R. Evid. 701.  It also represents improper legal opinion.  Fed. R. of Evid. 702; *see also Aguilar v. International Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992) (explaining that legal opinions and conclusions are "inappropriate subjects [even] for expert testimony").  Moreover, the purported statement is irrelevant to DC's claims since termination interests cannot be transferred to a third party prior to the effective date of termination, regardless of the parties' understandings.  17 U.S.C. §304(c)(6)(D); Fed. R. Evid. 401, 402.  Finally, the right to serve a termination notice is held solely by a certain statutorily-defined class of persons, and the joint venture was not and has never been a member of any such class.  *See* 17 U.S.C. § 304(c)(2)(A)-(D).  No private contract could create a new statutory class eligible or required to sign a termination notice.

Objections to Uncontroverted Fact 35:  It is irrelevant to DC's claims whether Mark Warren Peary negotiated the Pacific Picture agreements directly with Marc Toberoff without receiving outside advice from counsel.  DC raises this issue merely to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 36:  It is irrelevant to DC's claims when Mark Warren Peary purportedly told his mother, Jean Peavy, about the Pacific Pictures agreements.  Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act or purported to exercise any such rights.  *See* 17 U.S.C. § 304(c)(2).  DC makes this unsupported and irrelevant factual claim solely to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 37:  It is irrelevant to DC's claims whether Mark Warren Peary's mother handled legal matters relating to the Pacific Pictures agreements.  It is likewise irrelevant if she knew what was going on with these various legal matters.  Jean Peavy (Joseph Shuster's sister) has never held any termination rights under the Copyright Act nor has she purported to exercise any such rights.  *See* 17 U.S.C. § 304(c)(2).  DC raises this irrelevant issue only in an effort to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 38:  It is irrelevant to DC's claims whether Jean Peavy allegedly filed an affidavit in California court to obtain Joe Shuster's minimal assets (shares of Time Warner stock).  It is also irrelevant whether it was Jean or Mark Warren Peary who later asked the court (when a petition was filed in 2003 to probate Shuster's estate according to his will) to duly appoint Peary as the executor of Joseph Shuster's estate, although it was, in fact, Jean (age 86) who declined to act as executrix.  DC makes these purported factual claims merely to elicit prejudice.  Fed. R. Evid. 401, 402, 403.

Objections to Uncontroverted Fact 39:  The length of time Joseph Shuster's estate must be kept open is also irrelevant to DC's claims.  Fed. R. Evid. 401, 402, 403.  The estate was expressly probated to avail itself of the termination right (extended to estates by the 1998 CTEA) and is kept open at least until the effective 2013 termination date, because the copyright interests reverting under the termination cannot be transferred in advance.  17 U.S.C. §304(c)(6)(D).

OBJECTIONS TO EVIDENCE IN PLAINTIFF'S STATEMENT OF UNDISPUTED... **ER 1176**

Objections to Uncontroverted Fact 44:  Whether the Siegel heirs and the
Shuster Estate served new termination notices in 2012 terminating certain
"promotional announcements" is irrelevant to DC's claims.   Fed. R. Evid. 401, 402.

Objections to Uncontroverted Fact 45:  The purported fact that Joe Shuster 's
original wish was to take care of his brother Frank Shuster and not his sister Jean is
irrelevant to DC's claims.  Fed. R. Evid. 401, 402.  Furthermore, the only evidence
DC cites in support of this claim is Paul Levitz's Declaration.  Levitz could not have
independently known Joe Shuster's wishes, does not purport to have discussed the
issue with him, and offers no other basis for this alleged fact.  It is therefore
unsupported by the evidence cited and lacks foundation and personal knowledge.
Fed. R. Evid. 602.  It is also improper opinion testimony.  Fed. R. Evid. 701.  DC
makes this improper factual claim merely to elicit prejudice.  Fed. R. Evid. 403.

Objections to Decl. of Daniel Petrocelli ("PD") Ex. Ex. 43 (Fact 27):  Exhibit
43 is a copy of an anonymous document written by the thief who stole privileged
documents from Mr. Toberoff's law firm – the so-called "Timeline."  This
anonymous and wholly unreliable document is rife with inadmissible hearsay, if not,
double and triple hearsay.  Fed. R. Evid. 801, 802.  It lacks foundation and personal
knowledge.  Fed. R. Evid. 602.   It includes numerous improper legal conclusions.
Fed. R. Evid. 701, 702; see also Aguilar, 966 F.2d at 447.  Finally, it is wholly
irrelevant to DC's Motion for Partial Summary Judgment and Fact 27 for which it is
purportedly cited, and is thus introduced merely to elicit prejudice.  Fed. R. Evid.
401, 402, 403.

Dated:  July 30, 2012          RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary et al.

Marc Toberoff (State Bar No. 188547)
 mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
 kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
 parredondo@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Fax:        (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>            Plaintiff,<br><br>   vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL,<br>and DOES 1-10, inclusive,<br><br>            Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DECLARATION OF KEITH G.<br>ADAMS IN SUPPORT OF<br>DEFENDANTS' OPPOSITION<br>TO DC'S MOTION FOR<br>PARTIAL SUMMARY<br>JUDGMENT ON ITS FIRST<br>AND THIRD CLAIMS FOR<br>RELIEF**<br><br>*Opposition, Statement of Genuine<br>Issues, Evidentiary Objections, and<br>[Proposed] Order filed concurrently<br>herewith*<br><br>Complaint filed:  May 14, 2010<br>Trial Date:  None Set<br><br>Date:    Aug. 20, 2012*<br>Time:    1:30 p.m<br>Place:   Courtroom 11 |

| Exh. | Title | Page |
|------|-------|------|
| 1 | "Superman's Creators, Nearly Destitute, Invoke His Spirit", New York Times, dated November 22, 1975. | 5 |
| 2 | "Mild-Mannered Cartoonists Go To Aid of Superman's Creators", New York Times, dated December 10, 1975 | 6 |
| 3 | "Man of Steel Splinters and American Dream", New York Times, dated February 25, 1979 | 7-8 |
| 4 | Agreement between DC Comics, Inc. and Swampfilms, Inc., dated October 10, 1980 | 9-32 |
| 5 | "Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78", New York Times, dated August 3, 1992 | 33 |
| 6 | "Jerry Siegel, Superman's Creator, Dies at 81" dated January 31, 1996 | 34 |
| 7 | Thompson & Thompson Copyright Report, dated February 29, 1996 | 35-43 |
| 8 | Agreement between Warner Bros. and Hasbro, Inc. dated December 18, 1998 | 44-75 |
| 9 | Agreement between Marvel Characters, Inc. and Katja Motion Picture Corp., dated August 2, 2001 | 76-130 |
| 10 | Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy, dated November 28, 2001 | 131-134 |
| 11 | Agreement between Warner Bros. and Edgar Rice Burroughs, Inc., dated December 2, 2002 | 135-229 |
| 12 | Agreement between Pacific Pictures Corporation, Jean Peavy and Mark Warren Peary (as Executor of Joseph Shuster's Estate), dated October 27, 2003. | 230-233 |
| 13 | Letter from Marc Toberoff to Mark Warren Peary (as | 234 |

DECLARATION OF KEITH G. ADAMS

ER-1179

| | | |
|---|---|---|
| | Executor of the Estate of Joseph Shuster) and Jean Peavy, dated September 10, 2004 | |
| 14 | DC Comics' First Amended Counterclaims, filed in *Siegel* | 235-274 |
| 15 | Letter from Marc Toberoff to Patrick Perkins, dated May 12, 2005 | 275 |
| 16 | Excerpts from deposition of Laura Siegel Larson, dated August 1, 2006 | 276-280 |
| 17 | Excerpts from deposition of Mark Warren Peary, dated November 11, 2006 | 281-301 |
| 18 | Letter from Alexander Merino to Adam Hagen, dated November 15, 2006 | 302 |
| 19 | Excerpts from deposition of Marc Toberoff, dated November 17, 2006 | 303-323 |
| 20 | Declaration of Wayne Smith, dated March 26, 2007 | 324-329 |
| 21 | N.Y. State Division of Corporations Entity Information entry for Pacific Pictures Corporation, dated 2010 | 330-331 |
| 22 | Excerpts from Joint Stipulation, dated February 8, 2011 | 332-336 |
| 23 | Order issued by Magistrate Judge Zarefsky, dated April 11, 2011 | 337-350 |
| 24 | Excerpts from Defendants' Opposition to DC Comics' Motion for Review, dated May 2, 2011 | 351-356 |
| 25 | Order issued on May 23, 2011 | 347-359 |
| 26 | Excerpts from deposition of Mark Warren Peary, dated June 29, 2011 | 360-373 |
| 27 | Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy dated August 2, 2011 | 374-375 |
| 28 | Mediation Questionnaire, dated November 9, 2011 | 376-378 |

DECLARATION OF KEITH G. ADAMS

**ER-1180**

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.    I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and for plaintiff Laura Siegel Larson in the related case of *Siegel v. Warner Bros. Entertainment Inc., et al.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), and submit this declaration in support of Defendants' Opposition to plaintiff DC Comics' ("DC") Motion for Partial Summary Judgment On Its First and Third Claim for Relief.

2.    Attached hereto as Exhibit "1" is a true and correct copy of an article titled "Superman's Creators, Nearly Destitute, Invoke His Spirit" from *The New York Times*, dated November 22, 1975.

3.    Attached hereto as Exhibit "2" is a true and correct copy of an article titled "Mild-Mannered Cartoonists Go To Aid of Superman's Creators" from *The New York Times*, dated December 10, 1975.

4.    Attached hereto as Exhibit "3" is a true and correct copy of an article titled "Man of Steel Splinters an American Dream" from the *Los Angeles Times*, dated February 25, 1979.

5.    Attached hereto as Exhibit "4" is a true and correct copy of an October 10, 1980 Agreement between DC Comics, Inc. on the one hand and Swampfilms, Inc. on the other hand, produced by DC in the related *Siegel* case and designated as a trial exhibit without a confidentiality designation.

6.    Attached hereto as Exhibit "5" is a true and correct copy of an article titled "Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78" from *The New York Times*, dated August 3, 1992.

7.    Attached hereto as Exhibit "6" is a true and correct copy of an article

titled "Jerry Siegel, Superman's Creator, Dies at 81" from *The New York Times*, dated January 31, 1996.

8.     Attached hereto as Exhibit "7" is a true and correct copy of a February 29, 1996 Copyright Research Report generated by Thompson & Thompson, which was produced by plaintiff in the related *Siegel* case.

9.     Attached hereto as Exhibit "8" is a true and correct copy of a December 18, 1998 Agreement between Warner Bros. on the one hand, and Hasbro, Inc. and Hasbro International, Inc., on the other hand, produced by Warner Bros. in the related *Siegel* case and designated as a trial exhibit without a confidentiality designation.

10.     Attached hereto as Exhibit "9" is a true and correct copy of an August 2, 2001 Agreement between Marvel Characters, Inc. on the one hand, and Katja Motion Picture Corp., on the other hand, produced by Warner Bros. in the related *Siegel* case and designated as a trial exhibit without a confidentiality designation.

11.     Attached hereto as Exhibit "10" is a true and correct copy of a November 28, 2001 Agreement between Pacific Pictures Corporation, on the one hand, and Mark Warren Peary and Jean Peavy, on the other hand.

12.     Attached hereto as Exhibit "11" is a true and correct copy of a December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar Rice Burroughs, Inc., on the other, produced by Warner Bros. in the related *Siegel* case and designated as a trial exhibit without a confidentiality designation.

13.     Attached hereto as Exhibit "12" is a true and correct copy of a October 27, 2003 Agreement between Pacific Pictures Corporation, on the one hand, and Jean Peavy and Mark Warren Peary (as Executor of Joseph Shuster's Estate), on the other hand.

14.     Attached hereto as Exhibit "13" is a true and correct copy of a letter dated September 10, 2004 from Marc Toberoff to Mark Warren Peary (as Executor of the Estate of Joseph Shuster) and Jean Peavy.

15.     Attached hereto as Exhibit "14" is a true and correct copy of DC

**ER-1182**

Comics' First Amended Counterclaims filed in the related *Siegel* case.

16.    Attached hereto as "Exhibit 15" is a true and correct copy of a letter dated May 12, 2005 from Marc Toberoff to Patrick Perkins.

17.    Attached hereto as Exhibit "16" is a true and correct copy of excerpts from the transcript of the August 1, 2006 deposition of Laura Siegel Larson in the related *Siegel* case.

18.    Attached hereto as Exhibit "17" is a true and correct copy of excerpts from the transcript of the November 11, 2006 deposition of Mark Warren Peary in the related *Siegel* case.

19.    Attached hereto as Exhibit "18" is a true and correct copy of a letter dated November 15, 2006 from Alexander Merino, former counsel for plaintiff Laura Siegel Larson in *Siegel*, to Adam Hagen, former counsel for DC/Warner in *Siegel*.

20.    Attached hereto as Exhibit "19" is a true and correct copy of excerpts from the transcript of the November 17, 2006 deposition of Marc Toberoff in *Siegel*.

21.    Attached hereto as Exhibit "20" is a true and correct copy of a declaration of Wayne Smith dated March 26, 2007 and filed in the related *Siegel* case.

22.    Attached hereto as Exhibit "21" is a true and correct copy of a 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation.

23.    Attached hereto as Exhibit "22" is a true and correct copy of excerpts from a Joint Stipulation Regarding DC Comics' Motion To Compel filed in this case on February 8, 2011.

24.    Attached hereto as Exhibit "23" is a true and correct copy of an order issued by Magistrate Judge Zarefsky on April 11, 2011.

25.    Attached hereto as Exhibit "24" is a true and correct copy of excerpts from Defendants' Opposition to DC Comics' Motion for Review of Magistrate Zarefsky's April 11, 2001 Order On Plaintiff's Motion to Compel, filed on May 2,

2011.

26.     Attached hereto as Exhibit "25" is a true and correct copy of an order issued by this Court on May 23, 2011.

27.     Attached hereto as Exhibit "26" is a true and correct copy of excerpts from the transcript of the June 29, 2011 deposition of Mark Warren Peary.

28.     Attached hereto as Exhibit "27" is a true and correct copy of a letter dated August 2, 2011 from Marc Toberoff to Mark Warren Peary and Jean Peavy.

29.     Attached hereto as Exhibit "28" is a true and correct copy of a Mediation Questionnaire filed on November 9, 2011 in *DC Comics v. Pacific Pictures Corp. et al.,* Ninth Circuit Appeal No. 11-56934.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on July 30, 2012, at Malibu, California.

_____

Keith G. Adams

DECLARATION OF KEITH G. ADAMS                     **ER-1184**

# A Debate Over 2 Boys In Prison

Continued From Page A1

legislator who helped push through a package of tougher Illinois juvenile justice laws in 1994, shortly after the two boys were arrested, said in an interview that such youngsters were more like "predators" and "hardened criminals" than children.

Before Eric Morse was killed, children under 13 in Illinois could not be sent to a juvenile prison. Afterwards, the law was quickly changed to make children as young as 10 eligible to be locked up. Juvenile prisons are similar to adult ones, but they hold far fewer inmates and provide for mandatory schooling.

"I think all of us agree that hardened criminals should be punished," Mr. Hoffman said. "If you do an adult crime, you should be treated like an adult criminal. That's my sense of what the public very much wants."

Dr. Bruce Perry, a psychiatrist at the Baylor College of Medicine in Houston who studies violence in children, agreed that juvenile criminals should be punished. But at the same time, he said, they must receive intensive psychiatric care and oldfashioned nurturing that most have never found in their homes.

Dr. Perry said the best place for such deeply troubled and violent children is in a well-secured residential treatment center, where there are fewer inmates, where more intensive rehabilitation therapy is available and where the staff generally is trained in counseling.

"There are places that have shown good success rates," he said. "It's not easy, and it's expensive. And because of that, much of the public considers such placements a waste of time and emotion. But do you want a child who was capable of terrible violence at a young age to be put into a cell, receive little or no intervention, and then simply be sent home five years later? I know I don't want to meet that child then."

The Illinois Department of Children and Family Services said it could not find an appropriate residential center to take the boys, whom a spokeswoman described as "very disruptive" and involved in several fights while in a detention center since their arrest. The boy's lawyers said they found an out-of-state program willing to take them.

"He's not a monster," said David Hirschboeck, a public defender representing the 13-year-old. "I suppose some people will say he is. But one thing is certain now, we are barreling down the road to making him one."

Jack O'Malley, the Cook County State's Attorney, whose office prosecuted the boys, said he was confident the boys would receive adequate counseling at either a juvenile prison or a residential center. "But what particularly concerns me is that these kids are going to get out," he said. "They're going to be very young men at that time. There is a tremendous responsibility to go to whatever lengths necessary to rehabilitate them. These two kids are as risky as they get."

In sentencing the boys to prison on Monday, the judge in the case, Carol Kelly of Cook County Juvenile Court, tried to balance treatment and punishment but tipped the scales toward punishment because, "these two held a 5-year-old out a window and then dropped him to a terrifying death."

Corrections officials scoured the court that the necessary psychiatric services were available for the boys in juvenile prison. Still, Judge Kelly was taking no chances.

As part of the sentence, she said, the department must provide her within the next two months with a detailed treatment plan and full psychiatric evaluation of the boys. Eventually, she said, if they do well, they could be transferred to a residential treatment center.

But Michael Mahoney, executive director of the John Howard Association, which monitors the Cook County justice system, said he was worried that the boys would not receive the kind of treatment they need because the programs at juvenile prisons are limited, if they exist at all.

Both boys have been preyed on for most of their lives. They grew up in one of the city's roughest housing development, Ida B. Wells, where gangs, guns and death at an early age are part of everyday life.

Michelle Kaplan, the lawyer for the 13-year-old, said her client would probably end up in a medium-security prison with 263 inmates and one psychiatrist who only works a few hours a week.

"You cannot compare that with what he could get at a residential treatment facility," she said.

Ms. Kaplan said the boy had been ignored and failed by almost every adult in his life. He was passed through school even though he could barely read or write. He was picked up by the police several times for theft and disorderly conduct but never saw a social worker. His neighborhood was infested with violence.

"There's this history leading up to this child being in crisis, and no one has ever intervened," Ms. Kaplan said. "Now the system has finally intervened, and they want to throw him away. They're children. They're not animals."



**Army to Seek Death Penalty in Shooting**

Prosecutors will seek the death penalty in the court-martial of Sgt. William Kreutzer, 26, who is accused of killing one soldier and wounding 18 in a sniper attack on an exercise field at Fort Bragg, N.C., on Oct. 27. Sergeant Kreutzer arrived for arraignment yesterday.

## Judge Voids an Alabama Law Against Gay Campus Groups

**By DAVID W. DUNLAP**

An Alabama law barring gay and lesbian groups on college campuses from receiving public money or other official support has been declared unconstitutional by a Federal judge.

The judge, Myron H. Thompson of Federal District Court in Montgomery, Ala., ruled on Monday that the law violated the guarantees of free speech and association and reflected "an open effort by the State Legislature to limit the sexuality discussion in institutions of higher learning to only one viewpoint: that of heterosexual people."

The Gay Lesbian Bisexual Alliance at the University of South Alabama, in Mobile, brought the case after it was denied financing from the university administration. Alan Clampett, the group's president, said

*Overturning limits on the discussion of sexuality.*

yesterday that the outcome was a victory for gay and lesbian students and more broadly for the exercise of First Amendment rights by any student in Alabama.

There are no other such statewide prohibitions in the nation, said Ruth E. Harlow, associate director of the lesbian and gay rights project at the American Civil Liberties Union in New York, which represented the alliance. But, Ms. Harlow said, many local governments and school boards are considering restrictions on gay and lesbian groups and programs. She said the ruling by Judge Thompson would be "quite useful everywhere."

Judge Thompson's decision comes as Attorney General Jeff Sessions of Alabama is trying to cancel a conference of gay, lesbian and bisexual students that is scheduled for next

month at the University of Alabama, in Tuscaloosa.

Mr. Sessions, a Republican, is considering a run for the United States Senate. Before Judge Thompson's ruling, on Jan. 25, Mr. Sessions told the president of the university that the conference "would appear to violate the express mandate of the legislature" and had no place on a taxpayer-financed campus because it promoted values contrary to those held by most Alabamians.

A spokeswoman for Mr. Sessions, Claire Austin, said yesterday that he was likely to appeal Judge Thompson's ruling to the United States Court of Appeals for the 11th Circuit, in Atlanta.

As for the conference, it is "very much a go," said F. Keith Ayers, a spokesman for the University of Alabama. The organizers followed appropriate procedures, Mr. Ayers said, and the "university was inclined to respect their constitutional rights and not intervene."

"It looks like the court has concurred with that point of view," he added.

Judge Thompson relied heavily on an opinion by the United States Supreme Court, which ruled last year that the University of Virginia was required to subsidize the publication of a Christian student newspaper. "The university may not silence the expression of selected viewpoints," the Court declared.

The Alabama law was enacted in 1992 after officials at Auburn University, over the objection of the student government association, granted recognition to the Gay and Lesbian Association, of which Mr. Clampett was president. (He later transferred to the University of South Alabama.)

The law declares that no public money or facilities may be used by any college or university to "sanction, recognize or support the activities or existence of any organization or group that fosters or promotes a life style or actions prohibited by the sodomy and sexual misconduct laws."

## Subjects in Radiation Experiment Were Not Informed, Panel Says

**By WARREN E. LEARY**

The Air Force failed to properly inform the human subjects of experiments carried out in Alaska in the 1950's that they were being exposed to small amounts of radiation, a committee of the National Research Council said yesterday.

The expert panel said that the thyroid research, which was done on 102 Alaska native men, women and teenagers and 19 servicemen, did not involve enough radioactivity to pose health risks.

"Even so, we believe that the informed consent process was flawed," the five-member committee said in a report.

Dr. Kenneth L. Mossman of Arizona State University in Tempe, a member of the panel, said that many subjects were not aware the research involved radioactive material and that few of the Alaska native subjects even understood they were participating in research rather than receiving medical treatment.

The committee acknowledged that the researchers were conducting legitimate research, believed the radiation doses they were using were harmless and followed common

rules of the day for experimentation. However, the panel said, the principles of the 1947 Nuremberg Code, which defined morally and legally permissible human experimentation, should have been applied.

The research, carried out from 1955 to 1957 by the now-defunct Arctic Aeromedical Laboratory in Fairbanks, involved giving people low doses of radioactive iodine-131, a common medical tracer of the day, to determine whether the thyroid gland helped people adapt to Arctic climates. At the time, many American troops were stationed in frigid climates near the Soviet Union.

The scientists found no evidence of increased thyroid stimulation as a result of exposure to cold, and no ethnic difference in the thyroid uptake and excretion of the tracer.

Dr. Mossman said in a telephone interview that the researchers were good people who did what seemed to be appropriate for the times.

The Air Force, in a statement, disagreed with the conclusion that the experiments were conducted without informed consent according to the standards of the time.

## Jerry Siegel, Superman's Creator, Dies at 81

**By ROBERT McG. THOMAS Jr.**

Jerry Siegel, whose teen-age yearning for girls gave the world Superman, died in Los Angeles on Sunday. He was 81 but was remembered less as the Cleveland visionary who dreamed up the greatest superhero of all time than as the naive young man who sold the rights to a billion-dollar cultural and commercial juggernaut for $130.

It was Mr. Siegel's partner, Joe Shuster, who eventually gave Superman his familiar skin-tight costume and accompanying cape, but it was Mr. Siegel who had imagined Superman whole, from his birth on the doomed planet Krypton and his rocket arrival on Earth to his superhuman powers and his mild-mannered alter ego, Clark Kent.

The vision, as he later told it, came to him in a jumble all at once, during a sleepless summer night in Cleveland in 1934 after his graduation from Glenville High School, where he and Mr. Shuster had already teamed up to produce a stream of comic strip characters, including an earlier Superman, whom Mr. Siegel had imagined as a bald mad scientist.

But for all of the instant-imagined detail of the second Superman's extraterrestrial origins, his upbringing by doting foster parents and his decision to dedicate his awesome powers "to assist humanity," Mr. Siegel made no secret that the focus of his creative vision, the real creature of his dreams, was Lois Lane, Kent's fellow reporter on The Daily Planet.

She was the woman who would yearn for Superman even as the shameeol Kent, not knowing that beneath that mild-mannered exterior was in fact the very man of steel, not to mention the longing heart of Jerry Siegel.

Even discussing Superman's origins 40 years later, Mr. Siegel, who said he had thought of becoming a reporter, seemed still to feel the stings he had suffered as a scrawny, bespectacled high school student:

"I had crushes on several attractive girls who either didn't know I existed or didn't care I existed," he said. "It occurred to me: what if I had something going for me, like jumping over buildings or throwing cars around or something like that?"

Even after Mr. Shuster had rendered Mr. Siegel's fantasy in ink, it took the partners several years to find a publisher willing to accept their creation.

And when they did, in New York, where they had been hired to produce other comic book characters, their dream of cashing in was quickly shattered.

In March 1938, in exchange for $130 in cash, they signed away all rights to Superman to DC Comics, the company that brought Superman




Jerry Siegel and the first Superman cover from 1938.

to commercial life that June.

When the character proved an immediate sensation and the partners sought a share of the profits, they were dismissed and lived the rest of their lives near the poverty line. After a series of lawsuits to recover their creative property failed, Mr. Shuster was eventually reduced to becoming a messenger in Manhattan and Mr. Siegel worked as a clerk typist in Los Angeles for $7,000 a year.

In 1978, after the first Superman movie made more than $80 million, DC, which over the years has received more than $250 million of the more than $1 billion that Superman has earned from movies, television and an incredible array of commercial products, bowed to public opinion, restored their bylines and gave each man a $20,000-a-year annuity, later raised to $30,000.

In their final years, the two men lived within a few blocks of each other in Los Angeles, where Mr. Shuster, blind in the last years of his life, died in 1992.

Mr. Siegel may have been the man who created Superman, but his failure to safeguard his rights soured him on the man from another planet.

"I can't stand to look at a Superman comic book," he said in 1975. "It makes my physically ill. I love Superman, and yet to me he has become an alien thing."

He is survived by his wife, Joanne, their daughter; Laura Carter Larson of Los Angeles; a son, Michael, by a previous marriage, and two grandchildren.

## Julius Posener, 91, an Architect And Critic of Modern Movement

**By PAUL GOLDBERGER**

Julius Posener, an architectural critic and teacher who was an active figure in the European Modernist movement for much of the 20th century, died on Monday at his home in Berlin. He was 91.

Mr. Posener studied architecture at the Technische Hochschule Berlin in the 1920's but designed relatively few buildings himself. Uncomfortable with the narrow focus of so many modern architects, he came quickly to see his primary role as one of interpreter and teacher of the developing modern movement. His focus was more open-minded and humanistic than that of many Modernists, and in his writings and teaching he sought to connect architecture to the quality of life by looking as deeply into political, economic and social concerns as into purely esthetic ones.

He was a protégé and later a biographer of Hans Poelzig, the great German Expressionist architect, though he was never associated entirely with that school, or even solely with German architecture. He lived and worked in Paris, Jerusalem, London, Berlin and Kuala Lumpur, Malaysia at various points in his career, which continued actively un-

til the end of his life. Last year he won the Heinrich Mann Literary Prize in Germany for his final book, "What Architecture Can Be — Newer Essays," published by Birkhauser.

Julius Posener was born in Berlin on Nov. 4, 1904, into a wealthy and cultivated Jewish family. He moved to Paris in 1929 and became the first paid employee of L'Architecture d'Aujourd'hui (Architecture Today), the celebrated French journal, when it began publication in 1930. Later he returned briefly to Germany but, uncomfortable with growing anti-Semitism, began a 28-year exile that took him the city's own city and his two sons in Palestine, then named Palestine in 1935. In 1961 Mr. Posener, on the verge of moving permanently to Haifa, instead returned to Berlin, where he took the city's own architectural history as a subject, writing through the rise and fall of the Berlin wall and writing numerous essays and books on the city's development and becoming a prominent civic advocate of historic preservation.

He is survived by his second wife, Margarete, and by his three children, Alan and Ben, of Berlin, and Jill, of San Francisco.

## San Yu, 74, Former Leader Of Myanmar

U San Yu, who was President of Myanmar — formerly Burma — from 1981 to 1988, died on Sunday in a military hospital in Yangon. He was 78 and lived near the capital.

The cause of death was not certain but Reuters reported that he had a heart ailment.

Mr. San Yu was a longtime army officer and a faithful co-worker of U Ne Win, who commanded Mr. San Yu's old army unit and went on to rule Myanmar, under various titles, for more than two decades after he seized power in a coup in 1962.

Mr. Ne Win ruled democracy in Myanmar and set the country's extreme economy and fostered the country's international isolation.

He was President and in ill health in 1981, when Mr. San Yu succeeded him, assuming the ceremonial duties of the presidency. Mr. San Yu was thought to have little power until 1985, when Mr. Ne Win, in his key post of chairman of the ruling Burma Socialist Program Party, named him deputy chairman and in effect his heir apparent.

As President, Mr. San Yu presided over a repressive military Government that imposed its opponents and outlawed trade unions.

Early in 1988, despite violent countermeasures by the police, anti-Government environment rioting extended to the heart of Yangon, the Burmese capital formerly known as Rangoon. In July, Mr. Ne Win, Mr. San Yu and other leaders resigned from state and party posts but were believed to have remained in control. But economic problems worsened, demonstrations for democracy continued and the Government's grip on power began to slip.

Late that year, the military resumed absolute order in a violent crackdown and imposed martial law. Mr. San Yu was largely removed from the world stage after his political power base and he became an inactive member of the subsequent military Government. Gen Saw Maung led the new junta in the 1981 meeting in Las Vegas, between Sugar Ray Leonard and Thomas Hearns.

By then, Duva had left the practice of law to return to the sport he had been raised in by his father, who is 73 years old and still training such champions as Pernell Whitaker, who holds a welterweight title.

In 1984, Dan Duva saw a new

## Dan Duva, 44, Boxing Promoter Who Guided Many Champions

**By GERALD ESKENAZI**

Dan Duva, who was raised in boxing's backroom environment but left it to become a lawyer and then returned to one of its major promoters, died yesterday at Columbia-Presbyterian Medical Center. He was 44.

Duva had undergone surgery for brain cancer in 1994, but the illness recurred last November.

Duva, whose father, Lou, is a trainer who has been part of the sport's fabric for 60 years, enjoyed the irreverence, illogic and just plain muttiness associated with boxing. He often described himself as "incorrigibly optimistic," observing, "I'm a Jets fan, too."

His company, Main Events, successfully competed with other major promoters in the sport like Don King and Bob Arum. Typically, negotiations often included screaming and posturing and broken promises.

Among the 12 heavyweight title fights Duva promoted was the 1994 meeting of Evander Holyfield and Michael Moorer. To wring some added excitement out of it, Duva arranged for Moorer, the challenger, to smash the podium at one of the prefight rituals. Television networks, not knowing it was a set-up, showed the angry Moorer that night, which helped to hype the fight.

Duva, a graduate of Rutgers and the Seton Hall School of Law, promoted more than 100 world title bouts. His first mega-fight was the 1981 meeting in Las Vegas, Nev., between Sugar Ray Leonard and Thomas Hearns.

breed of fighter emerging, from the Olympics, and that year he signed Holyfield, Whitaker, Mark Breland, Tyrell Biggs and Meldrick Taylor, all of whom had won Olympic medals. All but Biggs went on to win professional championships.

"Dan was a man who gave me an opportunity, and I'll never forget him for that," Holyfield, who has earned more than $110 million in the ring, said yesterday.

Besides his father, Duva is survived by his wife, Kathryn; two daughters, Lisa and Nicole; a son, Bryan; a brother, Dino, and three sisters, Donna Brooks, Denise MacPhail and Deanne Boorman.

## Joseph De Rugeriis

Opera Conductor, 48

Joseph De Rugeriis, an opera conductor and administrator, died on Jan. 23 at St. Vincent's Hospital in Manhattan. He was 48 and lived in San Francisco.

The cause was AIDS, said William Purvis, a friend.

Mr. De Rugeriis, who was a native of Philadelphia and a graduate of Columbia University, performed a variety of administrative roles in the course of his career at opera houses in Baltimore, Pittsburgh, San Antonio, San Francisco and San Diego. In 1971 he was assistant chorus master at the composer Gian Carlo Menotti.

He also conducted operas in the United States and abroad, including productions at the Washington Opera and at the Festival of Two Worlds in Spoleto, Italy.

He is survived by his stepmother, Virginia, of Philadelphia, and two half-brothers, Mark and James, both of New York City.

*Do you have The Times delivered?*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Exhibit-6
ER-1185

Case 2:04-cv-08776-SGL-RZ Document 234-7 Filed 03/24/09 Page 303 of 312 Page ID #:28698
May-12-05  07:24pm  From-                                                    T-070  P.002/002  F-020

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF·
NICHOLAS C. WILLIAMSON

· ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY

May 12, 2005

Via Facsimile and US Mail

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

**Re: Superman / Estate of Joseph Shuster / Mark Warren Peary**

Dear Patrick:

On behalf of our clients, Warren Peary, the personal representative of the Estate of Joseph Shuster ("Estate") and Jean Adele Peavy, this is to respond to the buy-out proposal dated April 28, 2005 which DC Comics ("DC") sent directly to them.

While our clients certainly do appreciate DC's efforts, they are passing on DC's offer. It is believed that the offer is extremely low and bears no relation to the net present value of the Estate's 50% interest in *Superman* profits for the duration of copyright, commencing 2013. Nor does DC's offer reflect the considerable strategic value of the Estate's 50% copyright interest in tandem with the Siegel's 50% copyright interest in *Superman.*

One need only to look at DC/Warner Bros.' full-blown plans to reinvigorate *Superman* as a billion dollar film, television and merchandising franchise and to Marvel's $2.2 billion market capitalization to understand how DC's $2 million proposal bears little or no relation to the marketplace and the economic realities of this world famous property.

Given your firm's prior letter on DC's behalf denying our clients' termination interests without legal grounds, my clients have requested that any further communications to them be made through our law firm and not to them directly.

The foregoing is without prejudice to any of our clients' rights, remedies, claims or positions at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

Marc Toberoff

cc: Warren Peary and Jean Peavy

Exhibit-15  CC00057438

275
ER-1186

1  WEISSMANN WOLFF BERGMAN
       COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10 PERKINS LAW OFFICE, P.C.
   Patrick T. Perkins (Admitted *pro hac vice*)
11 1711 Route 9D
   Cold Spring, New York 10516
12 Telephone: (845) 265-2820
   Fax: (845) 265-2819

13

14 Attorneys for Defendants and Counterclaimant

15           **UNITED STATES DISTRICT COURT**

16          **CENTRAL DISTRICT OF CALIFORNIA**

17 JOANNE SIEGEL and LAURA          Case Nos. [Consolidated for Discovery]:
   SIEGEL LARSON,                        CV 04-8400 SGL (RZx)
18                                        CV 04-8776 SGL (RZx)
           Plaintiffs,
19                                   Hon. Steven G. Larson, U.S.D.J.
       vs.                           Hon. Ralph Zarefsky, U.S.M.J.
20 WARNER BROS. ENTERTAINMENT
   INC.; TIME WARNER INC.; DC       **DECLARATION OF WAYNE M.**
21 COMICS; and DOES 1-10,           **SMITH IN SUPPORT OF**
           Defendants.              **DEFENDANTS'**
22 JOANNE SIEGEL and LAURA          **MOTION TO COMPEL**
   SIEGEL LARSON,                   **PRODUCTION OF WHISTLE-**
23                                  **BLOWER DOCUMENTS**
           Plaintiffs,
24     vs.                          **DISCOVERY MATTER**
   TIME WARNER INC.; WARNER         **LOCAL RULE 37**
25 COMMUNICATIONS INC.; WARNER
   BROS. ENTERTAINMENT INC.;        Time: 10:00 a.m.
26 WARNER BROS. TELEVISION          Date: April 16, 2007
   PRODUCTION INC.; DC COMICS;      Courtroom: 540
27 and DOES 1-10,                   Mag. Judge Ralph Zarefsky
           Defendants.              Discovery Cutoff: Nov. 17, 2006
28 AND RELATED COUNTERCLAIMS

{T00106723}

1      I, Wayne M. Smith, declare and state as follows:

2      1.    I am an attorney, admitted to practice before the Supreme Court of the

3 State of California and before this Court, and am employed by defendant Warner

4 Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and

5 Chief Patent Counsel. I submit this declaration in support of Defendants' Motion to

6 Compel Production of Whistle-blower Documents. I have personal knowledge of

7 the facts contained within this declaration, and, if called upon as a witness, I could

8 and would testify competently thereto.

9      2.    During the afternoon of June 28, 2006, I received a telephone call from

10 John A. Schulman, General Counsel of Warner Bros., who asked that I come to his

11 office. Upon arriving at his office, Mr. Schulman advised me that a set of

12 documents (the "Superman Documents") addressed to him and apparently relating

13 to the Siegel litigation had arrived from an anonymous source at his office that day.

14 Mr. Schulman informed me that the cover letter contained with the documents

15 indicated that other executives at Warner Bros. may have received the same set of

16 documents, and that he had called the offices of those executives to see if they had

17 received anything. He further advised me that he had asked those executives to send

18 the documents to his office without reviewing them, and that one set of documents

19 had already been delivered to him. Mr. Schulman handed me the stack

20 (approximately an inch high) of Superman Documents that he had received and

21 asked me to wait outside his office while he completed a meeting, after which we

22 would discuss them. The stack did not include any envelope or packaging in which

23 the documents may have arrived. This was not unusual as it has been my experience

24 that the practice of Mr. Schulman's office staff is to dispose of envelopes and

25 packaging upon opening mail.

26      3.    While I was waiting, I looked at what might be characterized as the

27 "cover letter" that came with the Superman Documents. The cover letter, which

28

{F0010672.3 }

Exhibit-20

325
ER-1188

1   was not signed, alleged various types of ethical misconduct on the part of the
2   Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also
3   asserted ethical misconduct – violating the terms of a confidentiality agreement by
4   leaking settlement information to the press – in connection with another litigated
5   matter where Plaintiffs' counsel had also represented a party adverse to Warner
6   Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's
7   misconduct. The letter also referenced the documents enclosed, providing an
8   overview of their contents and their connection to Plaintiffs' counsel's alleged
9   wrongdoing. I also thumbed through the Superman Documents contained with the
10  letter, but did not read any of them in detail. Meanwhile, an assistant for another
11  Warner Bros. executive delivered what appeared to be another set of Superman
12  Documents to Mr. Schulman's office. I did not observe that any of the three sets of
13  Superman Documents – (i) the set Mr. Schulman handed to me; (ii) the other set in
14  his office; or (iii) the set that was delivered while I was waiting outside his office –
15  was contained in an envelope or other packaging.

16      4.      I then met with Mr. Schulman. I told Mr. Schulman that based on the
17  contents of the cover letter and my brief thumbing through the documents, it
18  appeared that certain of the documents in the package were privileged. I said that
19  before I looked at the documents I wanted to review the case law in the area to
20  determine what level of review, if any, of the Superman Documents was
21  appropriate. Mr. Schulman agreed with this approach, gave me one set of the
22  documents, retained the other two sets that he had received, and advised me that he
23  had only looked at the cover letter that came with the documents and would not
24  review the documents at all.

25      5.      I returned to my office with the set of documents. I initially went on
26  the internet and performed a Google search relating to the issue of what obligations,
27  if any, governed the handling of the Superman Documents we had received. My
28  initial search located an article from the June 2006 Los Angeles Lawyer magazine

1  entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of
2  which is attached as Exhibit "A" hereto) which was posted on the Los Angeles
3  County Bar Association web site. The article concerns the obligations of lawyers
4  who unwittingly receive privileged documents from opposing counsel's files and
5  discusses various California cases that have dealt with the issue, including the *Rico*
6  *v. Mitsubishi Motors Corporation* case pending before the California Supreme
7  Court.

8      6.    I read the Schmalz article and then downloaded and studied the three
9  principal California cases it identifies: *Aerojet-General Corporation v. Transport*
10  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*
11  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal
12  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116
13  Cal.App.4th 51 (2004) (*review granted* June 9, 2004). Based on my review of the
14  relevant California authorities, it appeared that a conservative approach to handling
15  the Superman Documents was to follow the procedure laid out by the Court in *State*
16  *Fund*, specifically: (i) to review each document but to cease the review once it
17  became apparent that the document was privileged; (ii) to contact opposing counsel
18  and advise that the documents have been received; and (iii) to refrain from using any
19  information in the documents until there was either an agreement with opposing
20  counsel, or the court had determined the documents' disposition.

21      7.    Following my review of the law, I called Mr. Schulman and advised
22  him of the results of my research. I said that I intended to review the Superman
23  Documents in accordance with *State Fund*. At Mr. Schulman's request I also sent
24  copies of the three key cases and the article to Mr. Schulman's office.

25      8.    That evening, I took the Superman Documents home with me and spent
26  approximately a half hour reviewing them. Certain of the documents – such as
27  executed agreements relating to Superman and correspondence between the
28  Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

{F0010672 1}

EXHIBIT A
Page 6

**Exhibit-20**

327

**ER-1190**

1 │ privilege. As I was going through the documents I placed them into three piles: (i)

2 │ "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell

3 │ whether it was privileged or I believed the document covered subject matter where

4 │ privilege may have been waived in the case, as explained below). In reviewing each

5 │ document, where it first appeared to me that it was entirely privileged, I ceased

6 │ reading it, placed the document in the "privileged" pile and did not look at it further.

7 │ After going through the documents, I placed a post-it note on the top of each pile

8 │ (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.

9 │ I did not look at the documents further. Because I did not conduct a detailed review

10 │ of the Superman Documents, and because of the passage of time, I do not recall

11 │ their specific contents. I do, however, recall generally the subject matter of certain

12 │ of the documents.

13 │   9.   The non-privileged pile was the second largest of the three. It

14 │ contained what appeared to be agreements between, *inter alia*, the Siegels and/or

15 │ Shusters and various entities, as well as correspondence concerning the interest in

16 │ Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

17 │ Michael Siegel. To my knowledge, this last category of documents has never been

18 │ produced in the litigation.

19 │   10.   The "?" pile was the smallest. I believe that one or two of the

20 │ documents in this category potentially fall within the scope of a privilege waiver

21 │ based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

22 │ did not have authority to accept a settlement proposal made by Defendants.

23 │ Defendants position on this privilege waiver is the subject of a separate Motion to

24 │ Compel filed concurrently herewith.

25 │   11.   The pile of documents I labeled "privileged" was the largest.

26 │   12.   Even from the brief review made, it appeared to me that, with the

27 │ exception of the cover letter (which also addressed the other litigation involving

28 │ Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

{P00106723}

EXHIBIT A
Page 7

**Exhibit-20**

328
**ER-1191**

1   the instant litigation and were responsive to document requests the Defendants had

2   previously served on Plaintiffs. However, it did not appear to me at the time that

3   any of the "non-privileged" documents had been produced in the litigation.

4   Moreover, at least some (and perhaps virtually all) of the privileged documents, as

5   well as those in the "?" pile, were, to the best of my knowledge, never identified in

6   any privilege log served by the Plaintiffs.

7         13.   The next morning, June 29, 2006, I returned with the Superman

8   Documents to see Mr. Schulman in his office. Mr. Schulman and I discussed having

9   a neutral third party hold the documents pending either the parties' agreement as to

10   their disposition or order of the Court. We decided to ask John Quinn, then with

11   Arnold & Porter, and former president of the Los Angeles County Bar Association,

12   to act as the neutral based on his reputation and legal ethics experience. He agreed

13   and the following morning, June 30, 2006, the three sets of the Superman

14   Documents, including the set that I had categorized, were handed over to Mr. Quinn.

15   Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not

16   just those that were clearly or potentially privileged. Further, we have not shared

17   the contents of the Superman Documents with any of the outside counsel

18   representing the Defendants in this action, nor have we used the contents of the

19   documents in the litigation.

20         I declare under penalty of perjury of the laws of the United States of America

21   that the foregoing is true and correct.

22         Dated this 26th day of March 2007 at Burbank, California.

23

24

25                        Wayne M. Smith

26

27

28

Exhibit-20

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 12, 2010.

---

Selected Entity Name: PACIFIC PICTURES CORPORATION
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Jan 28, 2009) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.state.ny.us keyword TR-194.1 or by writing to NYS Department of Taxation and Finance, Reinstatement Unit/Bldg-8, Rm #958, W.A. Harriman Campus, Albany, NY 12227 or by telephone at 1-800-972-1233

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate

**Exhibit-21**

of incorporation, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

\*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| AUG 26, 1988 | Actual | PACIFIC PICTURES CORPORATION |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us   |   Web Feedback

**Exhibit-21**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated: March 5, 2013    TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams