APPELLATE CASE NO. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

————————————

## APPELLANTS' EXCERPTS OF RECORD (VOL. VI OF VII)
————————————

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

————————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
  *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
  *kgadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
  *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

## INDEX TO APPELLANTS' ELECTRONIC EXCERPTS OF RECORD

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/17/2012 | 507 | Order on Cross-Motions for Summary Judgment | I | 1 |
| 12/11/2012 | 541 | Notice of Appeal of Rule 54(b) Judgment | II | 19 |
| 12/11/2012 | 540 | Rule 54(b) Judgment | II | 22 |
| 12/5/2012 | 533 | Order re: Motions for Evidentiary Hearing, for Reconsideration, to vacate, and for entry of Rule 54(b) Judgment | II | 24 |
| 11/12/2012 | 514 | Defendants' Motion to Vacate October 17, 2012 Order | II | 28 |
| 10/5/2012 | 499 | Defendants' Objection re: DC's New Evidence on Sur-Reply re: Defendants' Motion for Summary Judgment | II | 49 |
| 10/5/2012 | 499-1 | Declaration of Pablo D. Arredondo re: Objection | II | 54 |
|  |  | *Exhibit B – Ju1y 12, 2012 Kline-Toberoff e-mail* | II | 56 |
|  |  | *Exhibit C – September 25-27, 2012 e-mail chain* | II | 57 |
| 10/4/2012 | 498 | DC's Response re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 58 |
| 10/4/2012 | 498-1 | Declaration of Jason Tokoro re: Defendants' Objection to Bonesteel Declaration re: Defendants' Motion for Summary Judgment | II | 62 |
|  |  | *Exhibit 1 – June 12, 2006 Affidavit of Damon Bonesteel* | II | 66 |
|  |  | *Exhibit 2 – September 10, 2007 filing with Canadian Audio-Visual Certification Office* | II | 80 |
| 10/1/2012 | 495 | Defendants' Reply re: Defendants' Motion for Summary Judgment | II | 84 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/1/2012 | 495-1 | Defendants' Reply re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 100 |
| 10/1/2012 | 495-2 | Defendants' Objections re: DC's Statement of Genuine Issues re: Defendants' Motion for Summary Judgment | II | 185 |
| 10/1/2012 | 495-3 | Defendants' Response re: DC's Evidentiary Objections re: Defendants' Motion for Summary Judgment | II | 194 |
| 10/1/2012 | 495-4 | Defendants' Response re: Rule 56(d) Declaration re: Defendants' Motion for Summary Judgment | II | 199 |
| 10/1/2012 | 495-5 | Reply Declaration of Keith G. Adams re: Defendants' Motion for Summary Judgment | II | 209 |
| | | *Exhibit B – March 16, 2012 Interrogatory Responses* | II | 211 |
| 9/21/2012 | 493 | Declaration of Dan Petrocelli re: Defendants' Motion for Summary Judgment | II | 221 |
| | | *Exhibit 1 – August 30, 2012 Tentative Order re: Motions for Summary Judgment* | II | 236 |
| | | *Excerpts from Exhibit 3 – September 18, 2012 Deposition of Marc Toberoff* | II | 256 |
| | | *Exhibit 5 – January 23, 1940 Letter from Leibowitz to Siegel* | II | 273 |
| | | Exhibit 6 – January 22, 1940 letter from Ellsworth to Siegel | II | 276 |
| | | Exhibit 7 – January 25, 1940 letter from Ellsworth to Siegel | II | 279 |
| | | *Exhibit 8 – February 8, 1940 Letter from Leibowitz to Siegel* | II | 282 |
| | | *Exhibit 9 – May 2, 1940 letter from Leibowitz to Siegel* | II | 284 |
| | | *Exhibit 10 – "Superboy" script by Siegel* | II | 287 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 14 – August 21, 1992 Letter from Peavy to Payson* | II | 301 |
| | | *Excerpts from Exhibit 15 – November 8, 2002 Superboy Notice of Termination* | III | 319 |
| | | *Exhibit 19 – June 21, 1941 Saturday Morning Post Article* | III | 333 |
| | | *Exhibit 21 – August 8, 1988 Letter from Payson to Shuster* | III | 340 |
| | | *Exhibit 22 – March 5, 1991 Letter from Payson to Joanne Siegel* | III | 342 |
| | | *Exhibit 23 – "Copyright Research Report" dated August 22, 1992* | III | 344 |
| | | *Exhibit 25 – "Copyright Renewal Registrations" dated 1972* | III | 346 |
| | | *Exhibit 26 – "Copyright Renewal Registrations" dated November 15, 1972* | III | 348 |
| | | *Exhibit 27 – "Copyright Renewal Registrations" dated 1973* | III | 352 |
| | | *Exhibit 29 – February 14, 1982 letter from Joanne Siegel to Ross* | III | 354 |
| | | *Exhibit 31 – Excerpts of April 3, 1997 termination notices* | III | 359 |
| | | *Exhibit 34 – October 3, 2002 Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Joanne Siegel and Laura Siegel Larson* | III | 423 |
| | | *Exhibit 39 – Excerpts of November 11, 2006 deposition of Peavy* | III | 428 |
| 9/21/2012 | 492 | DC's Objections re: Defendants' Motion for Summary Judgment | III | 436 |
| 9/21/2012 | 491 | DC's Opposition re: Defendants' Motion for Summary Judgment | III | 447 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 9/21/2012 | 491-1 | Declaration of Damon Bonesteel re: Defendants' Motion for Summary Judgment | III | 477 |
| 9/11/2012 | 489 | Transcript for September 5, 2012 Proceeding | III | 480 |
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | III | 541 |
| | | *Exhibit A – March 1, 1938 Agreement between Detective Comics, Inc., Joseph Shuster and Jerome Siegel* | III | 552 |
| | | *Exhibit B – March 5, 1947 Complaint in the 1947 Action* | III | 553 |
| | | *Exhibit C – April 12, 1948 Findings of Facts in the 1947 Action* | IV | 596 |
| | | *Exhibit D – May 19, 1948 Stipulation of Settlement in the 1947 Action* | IV | 642 |
| | | *Exhibit E – May 21, 1948 Final Consent Judgment in the 1947 Action* | IV | 649 |
| | | *Exhibit F – November 22, 1975 New York Times Article* | IV | 660 |
| | | *Exhibit G – December 10, 1975 New York Times Article* | IV | 661 |
| | | *Exhibit H – December 23, 1975 Agreement between Warner Communications, Inc., Jerome Siegel, and Joseph Shuster* | IV | 662 |
| | | *Exhibit I – February 25, 1979 Los Angeles Times Article* | IV | 674 |
| | | *Exhibit J – October 10, 1980 Agreement between DC Comics, Inc. and Swampfilms, Inc.* | IV | 675 |
| | | *Exhibit K – August 3, 1992 New York Times Article* | IV | 699 |
| | | *Exhibit L – August 10, 1992 State of California Certificate of Death for Joseph Shuster* | IV | 700 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit M – August 17, 1992 Affidavit signed by Jean Peavy* | IV | 701 |
| | | *Exhibit N – October 2, 1992 Letter from Frank Shuster to Paul Levitz* | IV | 703 |
| | | *Exhibit O – October 2, 1992 Agreement between DC Comics, Inc., Frank Shuster and Jean Peavy* | IV | 704 |
| | | *Exhibit P – November 5, 1992 Letter from Paul Levitz to Jean Peavy* | IV | 705 |
| | | *Exhibit Q – September 7, 1993 Letter from Paul Levitz to Jean Peavy* | IV | 706 |
| | | *Exhibit R – July 11, 1994 Letter from Paul Levitz to Frank Shuster and Jean Peavy* | IV | 708 |
| | | *Exhibit S – June 7, 1995 Letter from Paul Levitz to Jean Peavy* | IV | 709 |
| | | *Exhibit T – February 29, 1996 Copyright Research Report generated by Thompson & Thompson.* | IV | 710 |
| | | *Exhibit U – March 25, 1996 Letter from Paul Levitz to Jean Peavy* | IV | 719 |
| | | *Exhibit V – July 9, 1998 Letter from Paul Levitz to Jean Peavy* | IV | 720 |
| | | *Exhibit W – December 18, 1998 Agreement between Warner Bros., Hasbro, Inc. and Hasbro International, Inc.* | IV | 721 |
| | | *Exhibit X – October 18, 1999 Letter from Paul Levitz to Jean Peavy* | IV | 753 |
| | | *Exhibit Y – November 20, 2000 Letter from Paul Levitz to Jean Peavy* | IV | 754 |
| | | *Exhibit Z – November 28, 2001 Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy* | IV | 755 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit AA – December 11, 2001 Letter from Paul Levitz to Jean Peavy* | IV | 759 |
| | | *Exhibit BB – December 2, 2002 Agreement between Warner Bros. and Edgar Rich Burroughs, Inc.* | IV | 760 |
| | | *Exhibit CC – July 23, 2003 Petition filed by Mark Warren Peary in the Superior Court of California, County of Los Angeles* | IV | 855 |
| | | *Exhibit DD – October 7, 2003 Order issued by the Superior Court of California, County of Los Angeles* | IV | 869 |
| | | *Exhibit EE – October 27, 2003 Agreement between Pacific Pictures Corporation, Jean Peavy and the Executor of Joseph Shuster's Estate (Mark Warren Peary)* | IV | 874 |
| | | *Exhibit FF – December 8, 2003 United States Copyright Office Certificate of Recordation* | IV | 878 |
| | | *Exhibit GG – September 10, 2004 Letter from Marc Toberoff to the Executor of the Estate of Joseph Shuster (Mark Warren Peary)* | IV | 894 |
| | | *Exhibit HH – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary* | V | 895 |
| | | *Exhibit II – Excerpts from August 1, 2006 deposition of Laura Siegel Larson* | V | 902 |
| | | *Exhibit JJ – Excerpts from November 11, 2006 deposition of Mark Warren Peary* | V | 907 |
| | | *Exhibit KK – November 15, 2006 Letter from Alexander Merino to Adam Hagen* | V | 929 |
| | | *Exhibit LL – Excerpts from November 17, 2006 deposition of Marc Toberoff* | V | 930 |
| | | *Exhibit SS – Excerpts from deposition of Mark Warren Peary, dated June 29, 2011* | V | 951 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit TT – Excerpts from deposition of Laura Siegel Larson, dated July 22, 2011* | V | 973 |
| | | *Exhibit UU – August 2, 2011 Letter from Marc Toberoff to Mark Warren Peary and Jean Peavy* | V | 984 |
| 8/20/2012 | 478 | Defendants' Notice of Motion and Motion for Partial Summary Judgment | V | 986 |
| 8/13/2012 | 474 | Defendants' Statement of Further Genuine Issues re: DC's Motion for Summary Judgment | V | 1022 |
| 8/6/2012 | 473 | DC's Objections re: Defendants' Evidence in Statement of Additional Undisputed Facts re: DC's Motion for Summary Judgment | V | 1026 |
| 8/6/2012 | 472 | DC's Response re: Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1035 |
| 8/6/2012 | 471 | DC's Response re: Defendants' Statement of Genuine Issues re: DC's Motion for Summary Judgment | V | 1065 |
| 8/6/2012 | 469 | Declaration of Cassandra Seto re: DC's Motion for Summary Judgment | V | 1139 |
| | | *Exhibit 2 – January 1, 1944 Letter from Siegel to DC* | V | 1143 |
| | | *Exhibit 6 – Stock Printouts for the week of August 14, 1992* | V | 1146 |
| 8/6/2012 | 468 | DC's Reply re: DC's Motion for Summary Judgment | V | 1151 |
| 7/30/2012 | 464 | Defendants' Evidentiary Objections re: DC's Motion for Summary Judgment | V | 1168 |
| 7/30/2012 | 463 | Declaration of Keith Adams re: DC's Motion for Summary Judgment | V | 1178 |
| | | *Exhibit 6 – January 31, 1996 New York Times Article* | V | 1185 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 15 – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | V | 1186 |
| | | *Exhibit 20 – March 26, 2007 Declaration of Wayne Smith* | V | 1187 |
| | | *Exhibit 21 – 2010 New York State Division of Corporations Entity Information entry for Pacific Pictures Corporation* | V | 1193 |
| | | *Exhibit 28 – November 9, 2011 Mediation Questionnaire* | VI | 1195 |
| 7/30/2012 | 462 | Defendants' Opposition re: DC's Motion for Summary Judgment | VI | 1198 |
| 7/16/2012 | 460 | Declaration of Paul Levitz re: DC's Motion for Summary Judgment | VI | 1229 |
| | | *Exhibit 1 – July 9, 1990 Letter from Levitz to Joe Shuster* | VI | 1234 |
| | | *Exhibit 3 – August 21, 1992 Letter from Peavy to Levitz* | VI | 1236 |
| | | *Exhibit 4 – August 21, 1992 Letter from Levitz to Frank Shuster* | VI | 1237 |
| | | *Exhibit 5 – September 8, 1992 Letter from Levitz to Frank Shuster* | VI | 1239 |
| | | *Exhibit 6 – September 10, 1992 Letter from Peavy to Levitz* | VI | 1241 |
| | | *Exhibit 7 – September 15, 1992 Letter from Peary to Levitz* | VI | 1244 |
| 7/16/2012 | 459 | Declaration of Dan Petrocelli re: DC's Motion for Summary Judgment | VI | 1246 |
| | | *Exhibit 1 – December 4, 1937 Agreement between Siegel, Shuster and DC* | VI | 1254 |
| | | *Exhibit 3 – September 22, 1938 Agreement between Siegel, Shuster and DC* | VI | 1257 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| | | *Exhibit 4 – September 22, 1938 Agreement between DC, the McClure Newspaper Syndicate, Siegel and Shuster* | VI | 1261 |
| | | *Exhibit 5 – September 28, 1938 Letter from Leibowitz to Siegel* | VI | 1265 |
| | | *Exhibit 6 – December 19, 1939 Agreement between DC, Siegel and Shuster* | VI | 1269 |
| | | *Exhibit 8 – Renewal Certificate for Action Comics No. 1* | VI | 1272 |
| | | *Exhibit 13 – March 1, 1973 Affidavit of Jerome Siegel* | VI | 1277 |
| | | *Exhibit 14 – March 7, 1973 Affidavit of Joe Shuster* | VI | 1289 |
| | | *Exhibit 16 – November 12, 1978 Letter by Joe Shuster* | VI | 1292 |
| | | *Exhibit 18 – March 12, 1991 Letter from Payson to Joanne Siegel* | VI | 1294 |
| | | *Exhibit 23 – September 8, 1992 Letter from Payson to Peavy* | VI | 1296 |
| 7/16/2012 | 458 | DC's Motion for Summary Judgment | VI | 1298 |
| 6/21/2012 | 451 | Order re: Documents Reviewed *en camera* | VI | 1331 |
| 11/25/2011 | 349 | Shuster Defendants' Answer to First Amended Complaint | VI | 1337 |
| 11/25/2011 | 348 | Siegel Defendants' Answer to First Amended Complaint | VI | 1378 |
| 11/25/2011 | 347 | Toberoff Defendants' Answer to First Amended Complaint | VI | 1416 |
| 10/24/2011 | 335 | DC's Response to Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1454 |
| 10/14/2011 | 333-1 | Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | VI | 1456 |

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 10/14/2011 | 333 | Excerpts from Defendants' October 14, 2011 Consolidated Motion to Dismiss | VII | 1466 |
| 5/23/2011 | 252 | Order denying Motion for Review | VII | 1512 |
| 5/2/2011 | 231 | Excerpts from Defendants' Opposition to DC's Motion for Review | VII | 1515 |
| 4/11/2011 | 209 | Order on Motion to Compel | VII | 1521 |
| 2/8/2011 | 160 | Excerpts from Joint Stipulation re: Motion to Compel | VII | 1535 |
| 9/3/2011 | 49 | First Amended Complaint | VII | 1540 |
| 2/26/2013 | N/A | Docket for Central District of California Case No. 10-CV-03633 ODW (RZx) as of February 26, 2013 | VII | 1616 |

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Circuit Mediation Office

Phone (415) 355-7900 Fax (415) 355-8566

http://www.ca9.uscourts.gov/mediation

# MEDIATION QUESTIONNAIRE

The purpose of this questionnaire is to help the court's mediators  provide the best possible mediation service in this case; it serves no other function.  Responses to this questionnaire are **not** confidential. Appellants/Petitioners must electronically file this document within 7 days of the docketing of the case. 9th Cir. R. 3-4 and 15-2. Appellees/Respondents may file the questionnaire, but are not required to do so.

9th Circuit Case Number(s): 11-56934

District Court/Agency Case Number(s): CV-10-3633

District Court/Agency Location: Central District of California, Western Division

Case Name: DC Comics  v.  Pacific Pictures Corporation, et al.

If District Court, docket entry number(s) of order(s) appealed from: 337

Name of party/parties submitting this form: Defendants, Pacific Pictures Corp. et al.

## Please briefly describe the dispute that gave rise to this lawsuit.

Attorney Marc Toberoff represents the heirs of Superman's co-creators, Siegel and Shuster, in long-standing copyright litigation with DC Comics ("DC") and its parent, Warner Bros. Entertainment Inc. ("Warner"), which commenced in 2004.  After years of litigation, Mr. Toberoff won key victories on behalf of his clients in Siegel v. Warner Bros. Entertainment Inc., C.D. Cal. Case No. 04-CV-08400, 542 F. Supp. 2d 1098 (C.D. Cal. 2008) (the "Siegel Case"), vindicating the heirs' right pursuant to 17 U.S.C. § 304(c) to terminate Siegel and Shuster's old Superman copyright grants to DC.  DC retaliated by filing baseless state-law claims for tortious interference against Mr. Toberoff and entities with which he has been affiliated to obtain economic leverage over Mr. Toberoff and his long-time clients.  Mr. Toberoff contends that the claims arise from protected activity, including his efforts to assist the heirs in vindicating their rights under federal copyright law.

## Briefly describe the result below and the main issues on appeal.

On August 13, 2010, defendants moved to strike DC's Fourth, Fifth, and Sixth Claims pursuant to California's Anti-SLAPP statute; that motion was vacated on September 7, 2010, when DC filed an amended complaint.  On September 20, 2010, defendants filed a new Anti-SLAPP motion as to DC's amended complaint; that motion was vacated on October 14, 2010 after full briefing.  On January 14, 2011, defendants refiled their Anti-SLAPP motion, and the parties then re-submitted their briefing in January 2011.  On March 9, 2011, the District Court ordered the parties to once again re-submit their briefing, which the parties did in March 2011.  On June 1, 2011, at DC's request, the District Court ordered the parties to file new opposition and reply briefs, which the parties did in August 2011.  On October 25, 2011, the District Court denied the Anti-SLAPP motion on the grounds that DC's Fourth, Fifth and Sixth Claims were not subject to the Anti-SLAPP statute.  That order is immediately appealable pursuant to Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003).

**Exhibit-28**

**376**

**ER-1195**

| Describe any proceedings remaining below or any related proceedings in other tribunals. |
|---|

The statutory termination rights of Siegel's heirs regarding Superman were litigated in the closely related Siegel Case. The District Court held that the Siegels' termination was valid as to the first Superman story published in Action Comics, No. 1 and other original Superman works. The case was then transferred to Judge Otis Wright on November 20, 2009. Thereafter, a F.R.C.P. 54(b) judgment was entered, and the remainder of the case was stayed pending an appeal by both sides of the Rule 54(b) judgment, currently before the Ninth Circuit, Case No. 11-55863.

In this action, C.D. Cal. Case No. 10-CV-3633, the District Court found that defendants had waived privilege on numerous attorney-client communications that had been stolen from Mr. Toberoff's law firm and delivered to Warner because Mr. Toberoff had produced the documents to the U.S. Attorney's Office, pursuant to a grand jury subpoena and confidentiality agreement, as a condition of their investigation/prosecution of this crime. That order is currently before this Circuit on a writ proceeding, Case No. 11-71844.

DC has taken the position that while this appeal is pending, it is entitled to pursue discovery on claims at issue in this appeal, as well as interrelated federal claims asserted in its complaint.

| Provide any other thoughts you would like to bring to the attention of the mediator. |
|---|

The parties engaged in formal mediation sessions before the Hon. Daniel Weinstein (Ret.) in May-June 2008, September 2009 and April 2010. The parties' efforts were unsuccessful. DC thereafter filed this action in May 2010. The parties have scheduled a further mediation for December 1, 2011.

Any party may provide additional information *in confidence* directly to the Circuit Mediation Office at ca09_mediation@ca9.uscourts.gov. Please provide the case name and Ninth Circuit case number in your message. Additional information might include interest in including this case in the mediation program, the case's settlement history, issues beyond the litigation that the parties might address in a settlement context, or future events that might affect the parties' willingness or ability to mediate the case.

## CERTIFICATION OF COUNSEL

I certify that:

a current service list with telephone and fax numbers and email addresses is attached
☒ (see 9th Circuit Rule 3-2).

I understand that failure to provide the Court with a completed form and service list
☒ may result in sanctions, including dismissal of the appeal.

| Signature | /s/ Marc Toberoff |
|---|---|

("s/" plus attorney name may be used in lieu of a manual signature on electronically-filed documents.)

| Counsel for | Laura Siegel Larson, Jean Adele Peavy and Mark Warren Peary |
|---|---|

**Note:** Use of the Appellate ECF system is mandatory for all attorneys filing in this Court, unless they are granted an exemption from using the system. **To file this form electronically** in Appellate ECF, complete the form, and then print the filled-in form to PDF (File > Print > PDF Printer/Creator). Then log into Appellate ECF and choose Forms/Notices/Disclosure > File a Mediation Questionnaire.

**Exhibit-28**

377
**ER-1196**

1

## SERVICE LIST

2 | O'MELVENY & MYERS LLP          PERKINS LAW OFFICE, P.C.
3 | Daniel M. Petrocelli           Patrick T. Perkins
  |  *dpetrocelli@omm.com*          *pperkins@ptplaw.com*
4 | Matthew T. Kline               1711 Route 9D
  |  *mkline@omm.com*              Cold Spring, NY 10516
5 | Cassandra L. Seto             Telephone:  (845) 265-2820
  |  *cseto@omm.com*              Facsimile:   (845) 265-2819
6 | 1999 Avenue of the Stars, 7th Floor
7 | Los Angeles, CA  90067-6035
  | Telephone:  (310) 553-6700     Attorneys for Plaintiff-Appellee,
  | Facsimile:   (310) 246-6779    DC Comics
8 |

9 | Attorneys for Plaintiff-Appellee,
  | DC Comics
10

11 | TOBEROFF & ASSOCIATES, P.C.    KENDALL BRILL & KLIEGER LLP
   | Marc Toberoff                  Richard B. Kendall (State Bar No. 90072)
12 |  *mtoberoff@ipwla.com*          *rkendall@kbkfirm.com*
   | Keith G. Adams                 Laura W. Brill (State Bar No. 195889)
13 |  *kgadams@ipwla.com*            *lbrill@kbkfirm.com*
   | 2049 Century Park East, Suite 3630   Nicholas F. Daum (State Bar No. 236155)
14 | Los Angeles, California 90067    *ndaum@kbkfirm.com*
   | Telephone:  (310) 246-3333     10100 Santa Monica Blvd., Suite 1725
15 | Facsimile:   (310) 246-3101    Los Angeles, California  90067
   |                                Telephone:  (310) 556-2700
16 |                                Facsimile:   (310)556-2705
17 | Attorneys for Defendants-Appellants,
   | Mark Warren Peary, as personal
18 | representative of the Estate of Joseph   Attorneys for Defendants-Appellants,
   | Shuster, Jean Adele Peavy, and Laura   Marc Toberoff, Pacific Pictures
19 | Siegel Larson, individually and as   Corporation, IP Worldwide, LLC, and
   | personal representative of the Estate of   IPW, LLC
20 | Joanne Siegel

21

22

23

24

25

26

27

28

**Exhibit-28**

**378**

**ER-1197**

1  Marc Toberoff (State Bar No. 188547)
   mtoberoff@ipwla.com
2  Keith G. Adams (State Bar No. 240497)
   kgadams@ipwla.com
3  Pablo D. Arredondo (State Bar No. 241142)
   parredondo@ipwla.com
4  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
5  Malibu, California 90265
   Telephone:  (310) 246-3333
6  Fax:          (310) 246-3101

7  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
8  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
9  as personal representative of the Estate of
   Joanne Siegel

10                **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12 | DC COMICS,                              | Case No: CV 10-03633 ODW (RZx)

13 |              Plaintiff,                 | Hon. Otis D. Wright II, U.S.D.J.
14 |        vs.                              | Hon. Ralph Zarefsky, U.S.M.J.

15 | PACIFIC PICTURES CORPORATION;           | **DEFENDANTS' OPPOSITION
16 | IP WORLDWIDE, LLC; IPW, LLC;            | TO DC COMICS' MOTION FOR
     MARC TOBEROFF, an individual;          | PARTIAL SUMMARY
17 | MARK WARREN PEARY, as personal          | JUDGMENT ON ITS FIRST
     representative of the ESTATE OF         | AND THIRD CLAIMS FOR
18 | JOSEPH SHUSTER; JEAN ADELE              | RELIEF**
19 | PEAVY, an individual; LAURA             | *Declaration of Keith G. Adams;
     SIEGEL LARSON, individually and as     | Statement of Genuine Issues;
20 | personal representative of the ESTATE   | Evidentiary Objections; and
     OF JOANNE SIEGEL, and DOES 1-10,       | [Proposed] Order filed concurrently
21 | inclusive,                              | herewith*
22 |                                         | Complaint filed:   May 14, 2010
     |                                         | Discovery Cutoff:  None Set
23 |              Defendants.                | Trial Date:         None Set
24 |                                         | Date:    August 20, 2012*
     |                                         | Time:    1:30 p.m.
25 |                                         | Place:   Courtroom 11

26

27

28

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    The Termination Right Under The U.S. Copyright Act ................................. 2

    The Relationship Between Superman's Co-Creators And DC ...................... 4

    The 1992 Agreement To A Modest Pension Increase ................................... 5

    The Executor Of Shuster's Estate Exercises His Termination Right ............ 6

    The 2001 And 2003 PPC Agreements, Cancelled In 2004 ........................... 6

    Enforcement Of The Siegel Termination, Triggering This Action ............... 7

LEGAL STANDARD ........................................................................................... 7

ARGUMENT ........................................................................................................ 8

I.    DC'S FIRST CLAIM IS MERITLESS ...................................................... 8

    A.    The 1992 Agreement Cannot Bar The Shuster Termination ............. 8

        1.    The Termination Right Is Inalienable ...................................... 8

        2.    The 1992 Agreement Is Not A "Revocation and Re-Grant" ...................................................................................... 9

            a.    There Is No Express Revocation Or Re-Grant .............. 11

            b.    There Is No Rescission Or Novation Under New York Law ...................................................................... 12

            c.    DC's Extrinsic Evidence Does Not Show Otherwise ..................................................................... 15

            d.    The 1992 Agreement Did Not Achieve Congress' Purpose ...................................................................... 16

    B.    The Shuster Executor Possessed The Majority Interest Needed To Terminate And Properly Signed The Termination Notices .......... 17

    C.    The Shuster Executor Has A Statutory Right To Terminate ............. 19

II.    DC'S THIRD CLAIM FAILS AS A MATTER OF LAW .......................... 21

    A.    Section 304(c)(6)(D) Does Not Provide DC With Any Rights ......... 21

    B.    DC Lacks Standing To Bring Its Third Claim ................................... 23

    C.    The Third Claim Is Barred By The Statute Of Limitations ............... 24

III.    DC'S MOTION IS PROCEDURALLY DEFECTIVE .................................24

CONCLUSION ..........................................................................................................25

TABLES OF CONTENTS AND AUTHORITIES                        **ER-1200**

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Abuelhija v. Chappelle,*
    2009 U.S. Dist. LEXIS 55861, 2009 WL 1883787 (S.D.N.Y. June 29, 2009) ...... 13

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ......................................................................... 24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................... 7, 15

*Associated Food Stores, Inc. v. Siegel,*
    205 N.Y.S.2d 208 (1960) ...................................................................... 13

*Blaire & Co. v. Otto,*
    5 A.D.2d 276, (N.Y. App. Div. 1958) .............................................. 14, 15

*Bourne Co. v. MPL Commc'ns, Inc.,*
    675 F. Supp. 859 (S.D.N.Y. 1987) .......................................................... 22

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.,*
    41 N.Y.2d 397 (1977) .......................................................................... 12

*CBOCS West, Inc. v. Humphries,*
    553 U.S. 442 (2008) .......................................................................... 23

*Citibank, N.A. v. Benedict,*
    2000 WL 322785 (S.D.N.Y. Mar. 27, 2000) ............................................ 13

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
    532 F.3d 978 (9th Cir. 2008)......................................................... *passim*

*Croman v. Wacholder,*
    769 N.Y.S.2d 219 (2003) .................................................................. 12

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,*
    411 F.3d 384 (2d Cir. 2005) .............................................................. 15

*Endicott Trust Co. v. Milasi,*
    572 N.Y.S.2d 524 (1991) .................................................................. 13

*Faulkner v. Nat'l Geographic Soc.,*
    452 F. Supp. 2d 369 (S.D.N.Y. 2006) .................................................. 12

*Goldome Corp. v. Wittig,*
    221 A.D.2d 931 (N.Y. App. Div. 1995).............................................. 14

*Greenberg v. Nat'l Geographic Soc'y,*
    533 F.3d 1244 (11th Cir. 2008)........................................................... 3

*Groucho Marx Prods. V. Day & Night Co.,*
    689 F.2d 317 (2d Cir. 1982) ............................................................... 20

*In re WorldCom, Inc.*,
2007 WL 2049723 (S.D.N.Y. July 13, 2007) ........................................ 14

*Indep. Energy Corp. v. Trigen Energy Corp.*,
944 F. Supp. 1184 (S.D.N.Y. 1996) ...................................................... 14

*International Klafter Co., Inc. v. Continental Cas. Co.*,
869 F.2d 96, 100 (2d Cir. 1989) ............................................................ 15

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002) ............................................................. 4, 8

*Meridian Project Sys., Inc. v. Hardin Constr. Co.*,
426 F. Supp. 2d 1101 (E.D. Cal. 2006) .................................................. 25

*Milne v. Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ........................................................ *passim*

*Milton H. Greene Archives v. CMG Worldwide*,
568 F. Supp. 2d 1152 (C.D. Cal. 2008) .................................................. 20

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) ............................................................................... 4

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ........................................................... *passim*

*Portsmouth Square Inc. v. Shareholders Protective Committee*,
770 F.2d 866 (9th Cir. 1985) ............................................................ 7, 8

*Siegel v. Nat'l Periodical Publications, Inc.*,
508 F.2d 909 (2d Cir. 1974) .................................................................. 5

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................. 4, 6, 7, 16, 19

*Siegel v. Warner Bros. Entertainment Inc.*,
Case No. 04-CV-08400 ODW (RZx) ................................................. 1, 16

*Stewart v. Abend*,
495 U.S. 207 (1990) ..................................................................... 2, 4, 8

*United States v. Bellecci*,
2008 WL 802367 (E.D. Cal. Mar. 26, 2008) .......................................... 25

*United States v. Granderson*,
511 U.S. 39 (1994) .............................................................................. 23

*Wang v. Chen*,
1992 WL 7840 (S.D.N.Y. Jan.10, 1992) ................................................ 13

*Yahaya v. Hua*, 87 Civ. 7309,
1989 WL 214481 (S.D.N.Y. Nov.28, 1989) ........................................... 13

**Statutes and Regulations**

17 U.S.C. § 101 *et seq.* (1978) .......................................................... *passim*

17 U.S.C. § 203(a) ........................................................................ 3

17 U.S.C. § 304(c) ................................................................... *passim*

17 U.S.C. § 304(c)(2) .............................................................. *passim*

17 U.S.C. § 304(c)(6)(D) ......................................................... *passim*

17 U.S.C. § 304(d) ................................................................. *passim*

17 U.S.C. § 507(b) ...................................................................... 24

Fed. R. Civ. P. 56(c) .................................................................... 7

67 Fed. Reg. 69134 ..................................................................... 20

67 Fed. Reg. 69135 ..................................................................... 20

**Legislative History**

H.R. Rep. No. 94-1476 .................................................................. 3
   94th Congress, 2d. Sess. (1976)

H.R. Rep. No. 105-452,
   105th Congress, 2d Sess. (1998) ............................................... 21

**Secondary Sources**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 9 .................................. *passim*

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11 ................................. *passim*

3 W. Patry, *Patry on Copyright* § 7:47 ............................................. 22

6 W. Patry, *Patry on Copyright* § 21:18 ............................................ 23

Case: 12-57245 02/05/2013 ID: 8503872 DktEntry: 10-7 Page: 21 of 283

**INTRODUCTION**

Plaintiff DC Comics' ("DC") motion for summary judgment (Docket No. 458; "MSJ") presents little more than erroneous, half-hearted arguments that are willfully blind to the purpose, plain language and effect of the Copyright Act and contracts.

The Copyright Act's "termination" provisions, which expressly preempt contracts and empower authors and their estates to terminate old copyright grants without cause, were enacted by Congress to remedy the "unequal bargaining position of authors" and to enable them to secure "the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success." *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 983-84 (9th Cir. 2008). Both here and in *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), DC has repeatedly tried to evade the termination rights of the estates of Superman's creators, Jerry Siegel ("Siegel") and Joe Shuster ("Shuster").

DC's First Claim attempts to invalidate the notice of termination (the "Shuster Termination") served by Mark Warren Peary (the "Shuster Executor"), executor of the Estate of Joseph Shuster (the "Shuster Estate"), on three dubious grounds. *First*, DC erroneously argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings, Frank Shuster and Jean Peavy, waived the Shuster Executor's termination right, even though: (i) siblings have never held termination rights, 17 U.S.C. § 304(c)(2); (ii) the 1992 Agreement nowhere mentions termination; (iii) the Shuster Executor was not a party to the 1992 Agreement; (iv) *no one* held termination rights in 1992, as Shuster left no widow, child or grandchild; (v) there was no possibility of termination until the 1998 Copyright Term Extension Act ("CTEA") extended the right to an author's estate, *id.* at §§ 304(c)(2)(D), 304(d); and (vi) even if the Shuster Executor had been a party to the 1992 Agreement, the termination interest cannot be assigned or waived, and remains exercisable "notwithstanding any agreement to the contrary," *id.* at §§ 304(c)(5), 304(c)(6)(D).

To circumvent this, DC falsely asserts that the 1992 Agreement "revoked and

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

re-granted" Siegel and Shuster's Superman copyright grants (on which DC has always relied), even though the plain language of the 1992 Agreement says no such thing. Whereas revocation of prior contracts must be express and unequivocal, the short 1992 Agreement does not mention Shuster's prior Superman grants, or even Superman, and has no language revoking such grants; rather, it simply raised Frank and Jean's pension and included a standard quitclaim of their rights, if any.

*Second*, DC erroneously argues that the Shuster Executor improperly signed his termination notice, because Pacific Pictures Corporation ("PPC") held the right to terminate. This is a legal impossibility – PPC cannot possess any termination rights under the statute and, as DC admits (MSJ 8:14-15), the terminated copyrights cannot be transferred to third parties before 2013. 17 U.S.C. §§ 304(c)(2), (c)(6)(D).

*Third*, DC relies on wordplay to falsely argue that, because Shuster died prior to the 1998 CTEA, Shuster's termination rights disappeared, but did not "expire." This ignores the clear language and intent of the CTEA, the common-sense meaning of "expire," and well-established law that rights "expire" upon death.

DC's Third Claim accrued in 2006 and is barred by the three-year statute of limitations. This claim also fails because it is based on a non-existent right, found nowhere in the Copyright Act, and rejected by both case law and copyright treatises.

Lastly, DC's motion is defective as it fails to address most of defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Termination Right Under The U.S. Copyright Act

For over two centuries, the United States Copyright Act has consistently provided authors and their families with the right to recover previously transferred copyrights to enable their participation in the increased value of such copyrights. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990), 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright* ("*Nimmer*"), § 9.02. These protections culminated in the current

Copyright Act's termination provisions.  17 U.S.C. §§ 203(a), 304(c)-(d).

"The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the [] Copyright Act."  *Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008).  On January 1, 1978, it went into effect, and with it major changes to U.S. copyright law that significantly enhanced the rights of authors and their families.  17 U.S.C. § 101 *et seq.* (1978).

When Congress extended the copyright term in the 1976 Act, it intended to benefit authors rather than grantees, for whom the automatic grant of the extended term would be an unjustified windfall.  *See* H.R. Rep. No. 94-1476 (1976) at 140. Congress therefore coupled the term extension with a new right of authors and their *statutory* heirs (*i.e.*, spouse, children and grandchildren) to terminate transfers of copyright executed before January 1, 1978.  17 U.S.C. § 304(c).

When Congress further extended the copyright term in the 1998 CTEA, it again coupled this extension with another termination right in § 304(d), for situations where § 304(c)'s termination right had not been exercised by 1998.  *Id.*, § 304(b), (d). The 1998 CTEA also created a new class of persons eligible to terminate an author's prior copyright grants, if the author is not survived by a spouse, child or grandchild: the executor of the author's estate.  17 U.S.C. § 304(c)(2)(D).

These statutory termination rights lie in stark contrast to ordinary contract principles, as they empower authors, their statutory heirs and estates to terminate prior copyright grants *without cause*, and regardless of the contracting parties' promises, intent or expectations.  *Id.*, § 304(c)(5).  Indeed, in enacting the termination provisions, Congress abrogated standard "freedom of contract" principles and ensured that the termination right cannot be contractually waived or circumvented: "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary;" and "[a] further grant…of any right covered by a terminated grant is valid only if it is made after the effective date of termination … [or as to] the original grantee or such grantee's successor in title, after the notice of termination has been

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
**ER 1206**

1    served…."  17 U.S.C. § 304(c)(5)-(6)(B).

2          In recognizing the intent of the 1976 Act to "enhance the author's position," by

3    adjusting "the author/publisher balance," the Supreme Court has emphasized the

4    "inalienable" right of authors and their estates "to revoke a copyright transfer."  *N.Y.*

5    *Times v. Tasini*, 533 U.S. 483, 496 (2001); *see also Stewart,* 495 U.S. at 230 ("[the

6    1976 Act] provides an inalienable termination right"); *Marvel Characters, Inc. v.*

7    *Simon* ("*Simon*"), 310 F.3d 280 (2d Cir. 2002) (publisher cannot bar termination by

8    re-characterizing works as "works for hire" in a settlement agreement).

9                **The Relationship Between Superman's Co-Creators And DC**

10         In 1933-34, writer Siegel and illustrator Shuster, two high school students, co-

11   created Superman as the champion of the oppressed in the midst of the Great

12   Depression.  *See* Statement of Genuine Issues ("SGI") ¶ 46; *Siegel v. Warner Bros.*

13   *Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008).  Siegel and

14   Shuster's original character would become a cultural icon, spawn a multi-billion

15   dollar franchise and bring fortune to many – but not to them.  SGI ¶47.  On March 1,

16   1938, Siegel and Shuster signed an agreement (the "1938 Grant"), without the aid of

17   counsel, that granted Superman to DC.  SGI ¶48.  In exchange, DC paid them $130,

18   and assured them they would be looked after.  *Id.*  But despite Superman's

19   phenomenal success, DC refused to pay them a royalty.  SGI ¶50.

20         Thus, in 1947, Siegel and Shuster filed suit against DC in Westchester, N.Y.

21   SGI ¶51.  The court held that DC owned Superman pursuant to the 1938 Grant, but

22   that DC had stolen Superboy from Siegel while he was overseas fighting for his

23   country in WWII.  SGI ¶52.  Although the case was settled, DC retaliated by cutting

24   Siegel and Shuster off, and from 1949-1975, systematically erased their credit byline

25   and any references to them from its publications and corporate histories.  SGI ¶53.

26   While Superman appeared *everywhere*, from comics to radio, TV, films, and

27   merchandise, his creators slipped into obscurity and poverty:  Siegel's last job was as

28   a mail clerk, and Shuster worked intermittently as a messenger boy.  SGI ¶54.

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU

In 1969, Siegel and Shuster brought a federal action as to ownership of the Superman renewal copyright, resulting in *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974), which held that DC owned the Superman renewal copyright pursuant to the 1938 Grant. SGI ¶¶55-56.

In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign to protest DC's shabby treatment of Superman's then elderly creators. SGI ¶57. Worried negative publicity would affect the box office of its planned Superman film, DC's parent, Warner, finally agreed to pay Siegel and Shuster a pension of $20,000 a year, and restored their credit after 26 years (the "1975 Agreement"). SGI ¶58. The 1975 Agreement also provided that, after Shuster's death, Warner would pay his brother Frank a $5,000 pension. SGI ¶59.

### The 1992 Agreement To A Modest Pension Increase

Shuster died on July 30, 1992 without widow or child, and was survived only by his siblings, Frank Shuster (died in 1996) and Jean Peavy. SGI ¶60. Upon his death, no one had any termination rights to Shuster's copyrights, and Shuster's assets were limited to a few shares of stock. SGI ¶¶61-62; 17 U.S.C. § 304(c)(2). As such, Shuster's estate was not probated. SGI ¶61. Instead, per Cal. Prob. Code § 13101, Jean requested by affidavit that his stock be transferred to her. *Id.*

On October 2, 1992, DC entered into a short agreement with Frank and Jean ("1992 Agreement") to raise their pension to $25,000, which stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which ***you*** [Frank and Jean] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, ***you*** now grant to us any such rights and release us… and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

SGI ¶66 (emphasis added). The 1992 Agreement made no mention of termination rights, Shuster's prior Superman grants to DC, or Superman. SGI ¶68.

The same day, October 2, 1992, Frank signed a letter to Paul Levitz, DC's then-President, stating that, in consideration for the 1992 Agreement, Frank was

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT    ER 1208

waiving his $5,000 pension under the 1975 Agreement.  SGI ¶70.  Levitz characterized the 1992 Agreement as a small act of charity in the spirit of the 1975 Agreement.  SGI ¶72.  Levitz also made clear that Frank and Jean never held any rights under the Copyright Act and that DC was under no legal obligation to raise the Shusters' pension.  SGI ¶73.  In the years following the 1992 Agreement, Frank and Jean struggled to get by.  SGI ¶77.  Requests for increases in their pension were denied, but periodic bonuses were granted.  *Id*.

### The Executor Of Shuster's Estate Exercises His Termination Right

Years later, in 1998, Congress passed the CTEA which, for the first time, extended termination rights to the executor of an author's estate.  Pub. L. 105-298.  Accordingly, on July 15, 2003, Joseph Shuster's nephew, Mark Warren Peary, petitioned the Superior Court of the State of California to probate Shuster's estate.  SGI ¶64.  Shuster's will nominated Jean as executrix of his estate and stated that, in the event Jean declined to serve, Mr. Peary should be appointed as executor.  SGI ¶63.  As Jean was 86, she declined to serve.  SGI ¶64.  On October  7, 2003, the Court duly appointed Peary as executor and granted him the "special power … to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings … in connection with this action."  SGI ¶65.  In November 2003, the Shuster Executor filed in the U.S. Copyright Office and served on DC a notice of termination under 17 U.S.C. § 304(d), terminating Shuster's 1938 Grant and subsequent Superman grants.  SGI ¶84; *Siegel I*, 542 F. Supp. 2d at 1114, n.3.

### The 2001 And 2003 PPC Agreements, Cancelled In 2004

In 2001, spurred by the well-publicized Siegel termination, Mr. Peary, a writer and investor, had sought the advice of an attorney, and contacted Mr. Toberoff.  SGI ¶78.  In November 2001, they entered into an agreement (the "2001 PPC Agreement") to enforce Shuster's termination rights.  SGI ¶79.  In 2003, after the

Shuster Estate was probated, a new agreement was made between PPC and the Shuster Executor (the "2003 PPC Agreement"). SGI ¶83. In 2004, both PPC Agreements were cancelled and revoked, and replaced with a legal retainer agreement, retroactive to 2001. SGI ¶85. On August 2, 2011, the parties confirmed their intent that PPC have no continuing interest whatsoever when they revoked the PPC Agreements in 2004. SGI ¶88.

### Enforcement Of The Siegel Termination, Triggering This Action

In 1997, Jerry Siegel's widow and daughter served notices of termination, entitling them to a share of Superman profits from 1999. *Siegel I*, 542 F. Supp. 2d at 1114-16; SGI ¶97. DC refused to pay, and four years of grinding negotiations did not result in a settlement. *Id.* In 2004, the Siegels filed suit to vindicate their copyrights. SGI ¶98. On April 28, 2005, DC sent a letter to the Shuster Executor that offered to settle with the Shusters at the expense of the Siegels, which the Executor declined. SGI ¶86. In 2008-09, Warner/DC suffered serious setbacks, as the Court held that the Siegels, represented by Mr. Toberoff, had successfully recovered their original Superman copyrights by valid statutory termination. SGI ¶98; *Siegel I*, 542 F. Supp. 2d 1098; 658 F. Supp. 2d 1036 (C.D. Cal. 2009). In 2010, DC replaced its general and outside counsel, and retaliated by suing herein the Siegels, the Shusters and their long-time counsel, Mr. Toberoff. SGI ¶99.

### LEGAL STANDARD

A motion for summary judgment may only be granted if the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party bears the burden of identifying credible "admissible evidence" that demonstrates the absence of a genuine issue of material fact for trial. *Id.* at 256. The court must resolve all ambiguities and draw all reasonable inferences *against* the moving party. *Id.* at 255. Courts can, and routinely do, order summary judgment *against* the moving party, as

it had "a full and fair opportunity to develop and present facts and legal arguments in support of its position" and knew the "sufficiency of his or her claim will be in issue." *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866, 869 (9th Cir. 1985).

## ARGUMENT

## I.    DC'S FIRST CLAIM IS MERITLESS

### A.    <u>The 1992 Agreement Cannot Bar The Shuster Termination</u>

#### 1.    **The Termination Right Is Inalienable**

As a matter of law, the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights.  The termination provisions specifically abrogated standard freedom of contract principles to make the termination right "inalienable." *Stewart*, 495 U.S. at 230.  An author or his estate may exercise termination rights "***notwithstanding any agreement to the contrary***, including an agreement to make a will or to make a future grant." 17 U.S.C. § 304(c)(5) (emphasis added).  Thus, any agreement that purports to waive, settle or limit the termination right is unenforceable.  DC's refrain that a "deal is a deal" (MSJ 2, 17-18) is inapplicable to the Copyright Act's termination provisions.

The 1992 Agreement contains only three obligations of Frank and Jean:  they settled any claim to payment, quitclaimed to DC, and covenanted not to assert any rights that *they* held relating to Joe Shuster's works.  SGI ¶¶66-67.  Of course, the 1992 Agreement makes no mention of termination rights.  SGI ¶68.  Nor does it purport to limit or waive those rights, let alone the rights of the Shuster Executor, who was not a party to the Agreement.  *Id*.  This is unsurprising, because an author's siblings, like Frank and Jean, have never held termination rights, and an estate did not have termination rights until passage in 1998 of the CTEA.  17 U.S.C. § 304(c)(2).

Even if the Shuster Executor had been a party to the 1992 Agreement and had *expressly* agreed to settle the termination right, the 1992 Agreement would be an unenforceable "agreement to the contrary." *Simon*, 370 F.3d at 290.  Nor could

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

anyone have anticipatorily assigned the estate's future Superman copyrights to DC in 1992.  "[A]n agreement to grant right covered by a terminated grant is not valid if entered before notice of termination," 17 U.S.C. § 304(c)(6)(D), and notice of termination was not served here until November 2003.  SGI ¶84.

### 2.  The 1992 Agreement Is Not A "Revocation and Re-Grant"

DC attempts to circumvent termination by trying to jam the 1992 Agreement into a narrow and inapplicable "revocation and re-grant" exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005).  DC glosses over *Milne's* different facts and holding, while ignoring the plain language of the 1992 Agreement.

*Milne* concerned the "Winnie the Pooh" copyrights.  In 1930, Pooh's author assigned his copyrights to the predecessor of SSI.  *Id.* at 1039-40.  In 1983, SSI was "faced with the possibility that [the author's son] Christopher might seek to terminate the rights," which were within the statutory termination window.  *Id.*  In lieu of statutory termination, Christopher agreed to the contractual "revocation of the [1930] agreement[] in favor of the new agreement, followed by the re-granting (on the same page) of the rights in the Pooh works to SSI."  As a result of his termination leverage, the Pooh heir received a "net gain of hundreds of millions of dollars."  *Id.* at 1040-41.

In 2002, Christopher's daughter, Claire Milne, sought to recapture the Pooh copyrights by terminating the 1930 grant.  *Id.* at 1041.  *Milne* held there was no longer a 1930 grant to terminate, because the 1983 contract had expressly *revoked* it and expressly *re-granted* the copyrights to SSI.  *Id.* at 1043.  The court emphasized that Christopher held the termination right, was within the termination window, and "could have served a termination notice," but instead used the "bargaining power" of the immediate threat of termination as "leverage to obtain a better deal" and "considerably more money."  *Id.* at 1045.  This was not "an agreement to the contrary," because the contractual termination and negotiation of a new grant on greatly enhanced terms achieved "the very result envisioned by Congress [in] the termination provisions."  *Id.* at 1047.

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU...

*Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008), although not binding here, followed *Milne*'s reasoning.  In 1938, John Steinbeck granted many of his copyrights to his publisher.  In 1994, his widow, Elaine, entered into a new contract that, like Christopher Milne's, <u>expressly</u> revoked the 1938 grant and re-granted the copyrights.  *Id.* at 197.  In exchange, the publisher made major financial concessions.  *Id.* at 196.  Steinbeck's sons thereafter attempted to terminate the 1938 grant.  The court held that Elaine's 1994 contract revoked the 1938 grant, because it expressly "stated that 'when signed by Author and Publisher, [it] will cancel and supersede the previous agreements'" (*id.* at 196) and thus "terminated and superseded the 1938 Agreement. … leaving in effect no pre-1978 grants to which the termination rights … applied."  *Id.* at 200.  *Steinbeck*, like *Milne*, stressed that Elaine "wield[ed] the threat of termination," during an open window for major works (*e.g.*, "Of Mice and Men" (1938) and "The Grapes of Wrath" (1939)), to secure market value.  *Id.* at 202, 204.  The court reasoned that "this kind of renegotiation appears to be exactly what was intended by Congress."  *Id.* at 202.

In *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), the Ninth Circuit revisited these issues, upheld a termination notice regarding the novel "Lassie Come Home," and firmly rejected the publisher's attempt, like DC's here, to extend *Milne*'s narrow holding.  In 1976, the author's daughter, Mewborn, assigned her share of Lassie film, television and allied rights to the publisher.  *Id.* at 980.  In 1978, she signed a second contract, which purported to assign the already-assigned rights to the publisher for an additional $3,000.  *Id.* at 981.  In 1996, Mewborn served a termination notice as to her operative 1976 grant.  The publisher sued Mewborn, claiming that the non-terminable 1978 grant "superseded" and implicitly "revoked and re-granted" her Lassie rights.  *Id.* at 981-82.  The Ninth Circuit upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant."  In so doing, it refused to extend *Milne* beyond its "distinct factual scenario," and distinguished *Mewborn* on two principal grounds.  *Id.* at 987.

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU**ER 1213**

***First***, the Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike in *Milne*, did not "*expressly* revoke the earlier … assignments." *Id.* at 989 (emphasis added). The 1978 grant was therefore a "nullity" as it purported to grant copyrights previously assigned to the publisher and already in its possession. *Id.* at 986.

***Second***, the Ninth Circuit noted that, whereas Christopher's agreement "expressly stated that it was made in exchange for non-exercise of the immediately investive termination right," Mewborn's 1978 agreement "was silent on the issue." *Id.* at 986-89. Moreover, while Christopher "had the present right to serve an advance notice of termination" and "could [have] exercise[d] [his termination] right at any moment," Mewborn could not, because the termination window was not open, and thus, "unlike Milne, … [she] had nothing in hand with which to bargain." *Id.*

Taken together, *Milne, Steinbeck*, and *Mewborn*, stand for the narrow proposition that (1) an author's statutory heir who holds a termination right, and (2) is within or close to the termination window, (3) may leverage the imminent threat of termination to realize market value for a copyright(s) by (4) *expressly* revoking a terminable pre-1978 copyright grant, (5) expressly re-granting such copyright(s) in a non-terminable post-1978 grant, and (6) thereby intentionally trade-in their termination right. It is only in such narrow circumstances that the Congressional objective in enacting the termination right is fulfilled, albeit by express contractual, instead of statutory, termination. *See Mewborn*, 532 F.3d at 987 (noting *Milne*'s express agreement "was tantamount to following the statutory formalities," and "achieved the exact policy objectives for which 304(c) was enacted").

Despite DC's efforts, the facts here are similar only to *Mewborn*, and none of *Milne's* requirements are met.

### a. There Is No Express Revocation Or Re-Grant

The 1992 Agreement does not contain *any* language of revocation (SGI ¶68), let alone the express revocation of prior copyright grants required by *Milne*, *Mewborn*, and *Steinbeck*. It does not include the term revoke, rescind, supersede,

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

replace, or any other synonyms.  SGI ¶68.  Indeed, the agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants.  *Id.*; *compare Milne*, 542 F.3d at 1041 (new agreement *expressly* "provided for the revocation of the [prior] agreements"); *Steinbeck*, 537 F.3d at 197 (contract *expressly* provided it would "cancel and supersede the previous agreements").

Nor does the 1992 Agreement contain any re-grant of Shuster's Superman copyrights.  The 1992 Agreement merely "settles all claims to any payments or other rights or remedies which you [*Frank and Jean*] may have under any other agreement or otherwise … in any and all work created in whole or in part by your brother [*Joe Shuster*]" and "grant[s] to [DC] any such rights."  SGI ¶66.  This is a boilerplate quitclaim that did not and could not transfer Shuster's Superman copyrights, long-owned by DC under Siegel and Shuster's 1938 Grant and subsequent grants.  SGI ¶¶74-75.  Just like in *Mewborn*, any Superman grant in the 1992 Agreement was a "nullity" because Frank and Jean "had nothing [] to transfer."  532 F.3d at 986.

In sum, the 1992 Agreement fails the Ninth Circuit's requirement that a "revocation and re-grant" be *expressly* stated by the holder of the termination right.  *Milne*, 430 F.3d at 1040-41; *Mewborn*, 532 F.3d at 989.

        b.    <u>There Is No Rescission Or Novation Under New York Law</u>

In fashioning this narrow exception to the termination right, the Ninth Circuit in *Milne* and *Mewborn* held that "revocation and re-grants" must be ***express*** as a matter of federal copyright law, and did not look to state contract law.  Nevertheless, the 1992 Agreement fares no better under New York law, which looks not to "subjective intent" but, "rather, to the objective manifestations of the intent of the parties" in their agreement.  *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977).  *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("post hoc conclusions of contracting parties" are irrelevant); *Croman v. Wacholder*, 769 N.Y.S.2d 219, 223 (2003) ("[N]o basis to accept plaintiff's after-the-fact contention that the written agreement means

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU**ER1215**

1  something other than what it says.").

2      The 1992 Agreement does not cancel or rescind the 1938 Grant or any

3  subsequent Superman grants. New York law requires that "cancellation or rescission

4  of a contract must be clearly expressed … unqualified and positive, express and

5  absolute." *Associated Food Stores, Inc. v. Siegel*, 205 N.Y.S.2d 208, 210 (1960)

6  (internal quotations omitted); *Endicott Trust Co. v. Milasi*, 572 N.Y.S.2d 524, 525

7  (1991) (same). The 1992 Agreement does not contain any mention of Joseph

8  Shuster's key 1938 Grant or subsequent Superman grants, or even of Superman, and

9  does not even hint that those agreements were being rescinded. SGI ¶68.

10      Nor is the 1992 Agreement a "novation," as DC erroneously argues. MSJ 13.

11  A novation occurs when the parties "extinguish[] … the old contract" and replace it

12  with "a new contract." *Wang v. Chen*, 1992 WL 7840 at *6 (S.D.N.Y. Jan. 10,

13  1992). Like the Ninth Circuit's requirement that a "revocation and re-grant" be

14  express, "New York courts have set a stringent standard for novation." *Abuelhija v.*

15  *Chappelle*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009).

16      "[A] novation must never be presumed." *Wang*, 1992 WL 7840 at *6. Rather,

17  there must be a "clear and definite intention on the part of all concerned that such is

18  the purpose of the agreement." *Yahaya v. Hua*, 1989 WL 214481 at *4 (S.D.N.Y.

19  Nov.28, 1989); *see Citibank, N.A. v. Benedict*, 2000 WL 322785, at *8 (S.D.N.Y.

20  Mar. 27, 2000) ("[A]ll parties must have 'clearly expressed their intention that a

21  subsequent agreement … [be] substituted for an old agreement'").

22      The 1992 Agreement falls far short of this "stringent standard" – it includes no

23  mention that Shuster's prior Superman grants are being extinguished, and its

24  boilerplate quitclaim is wholly insufficient to establish any mutual intent to novate.

25  SGI ¶¶66-68; *Abuelhija*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)

26  (standard merger clause that a new agreement "supersedes all understandings of the

27  parties hereto" insufficient to prove an intent to extinguish the old agreement).

28      The issue here is not that the 1992 Agreement fails to include "magic words"

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU...

(MSJ 13); rather, it fails to provide *any* indication that the parties intended either a rescission or novation. DC tries to evade the strict standards of New York law by systematically misrepresenting case law:

• *Blaire & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958) did not hold, as DC falsely claims, that a provision that payments would "constitute complete satisfaction for services rendered" showed "clear and unmistakable intent" to supersede prior agreements. MSJ 13-14. The court actually stated that, if the quoted language was the only evidence, it might find no novation. *Id.* at 282. A "[c]lear and unmistakable" novation was based on a different document that *expressly* stated that the parties "'no longer have any interest in [the prior Agreement].'" *Id.* at 272.

• In *Goldome Corp. v. Wittig*, 221 A.D.2d 931 (N.Y. App. Div. 1995), the superseding contract did not merely contain a broad release "discharging defendant from 'all cause and causes of action,'" as DC falsely implies. MSJ 14. The contract identified the first agreement, and evidenced a clear intent to replace it. *Id.* at 931.

• *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1196 (S.D.N.Y. 1996) did not even address these issues; rather, it addressed whether a prior oral agreement had merged into a later written contract and whether the parol evidence rule barred evidence of the oral agreement.

• *In re WorldCom, Inc.*, 2007 WL 2049723 at *3 (S.D.N.Y. July 13, 2007) applied *Delaware*, not New York, law. The court did not hold that novation required a mere generalized statement waiving the parties' claims, as DC falsely suggests. MSJ 14. The superseding agreement very specifically identified the prior agreement, and then expressly stated that it was "'the entire agreement … [and] supersedes any and all prior communications, negotiations and agreements between or among the parties pertaining to the subject matter hereof.'" *Id.* at *2.

These cases actually undermine DC's claims. The 1992 Agreement did not identify Shuster's prior grants nor state it superseded them (*In re WorldCom, Inc.*, 2007 WL 204973 at *2), nor attempt to replace such grants (*Goldome*, 221 A.D.2d at

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

931), nor was it accompanied by documents expressly stating that the parties were no longer bound by Shuster's prior agreements (*Blaire*, 5 A.D.2d at 282).

            c.      DC's Extrinsic Evidence Does Not Show Otherwise

The language of the 1992 Agreement clearly demonstrates that it was not a revocation or re-grant of Joe Shuster's prior Superman copyright grants and ends the analysis. Under New York law, whether a contract is ambiguous is a threshold question of law … [for] the court." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005). Where, as here, a contract's terms are unambiguous, the "intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *International Klafter Co., Inc. v. Continental Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989).

However, even if one looked beyond the 1992 Agreement's language, DC has provided no extrinsic evidence that would let it survive, much less win, summary judgment. *Anderson,* 477 U.S. at 256-57. Tellingly, neither the declaration of Paul Levitz (DC's then-President) nor DC's correspondence describe the 1992 Agreement as a revocation or re-grant, or remotely suggest that this was the parties' intent. SGI ¶¶71-73. Rather, this material, like the agreement itself, points to one thing – a simple raise of Frank and Jean's pension by a few thousand dollars. SGI ¶66.

To the extent that the 1992 Agreement could be read to even relate to any prior agreements, it would implicate only the 1975 Agreement that originally gave Frank his annual pension. SGI ¶59. Indeed, on the day the 1992 Agreement was signed, Frank sent a letter to DC waiving his pension under the 1975 Agreement. SGI ¶70. The 1975 Agreement, however, did not transfer Superman copyrights and expressly acknowledged that all such rights were already owned by DC. SGI ¶58.

DC's conduct over 18 years demonstrates that it ***never*** viewed the 1992 Agreement as the basis for its chain-of-title to Superman. SGI ¶74. The perfunctory 1992 Agreement bears no resemblance to the elaborate rights agreements (including short form assignments for filing with the Copyright Office) customarily used by

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Warner/DC. SGI ¶76. DC has offered **no** evidence that it ever registered the 1992 Agreement with the Copyright Office as it would have done for key assignments. Moreover, in *Siegel*, DC admitted, and the Court agreed, that it co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement). *Siegel I*, 542 F. Supp. 2d at 1142; SGI ¶75. Levtiz's 2005 letter to the Shusters says this also. SGI ¶86. Even after DC was served with the Shuster Termination in 2003, DC never claimed anything about the 1992 Agreement until 2010, in this lawsuit.

DC's newfound claim that 1992 Agreement revoked Siegel and Shuster's 1938 Grant – meaning its chain-of-title to its multi-billion dollar franchise is based on a short document that never even mentions Superman – is not credible. Nor is it credible that DC would have exchanged its core 1938 Grant, twice adjudicated to have given it *all rights* to Superman, for the 1992 Agreement, raising a pension.

### d. The 1992 Agreement Did Not Achieve Congress' Purpose

Unlike in *Milne*, the 1992 Agreement was not negotiated within an open or imminent termination window, when the termination right could be meaningfully leveraged. *Milne*, 430 F.3d at 1045 ("Although Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal…."). Indeed, neither the parties to the 1992 Agreement, nor anybody else, held a termination right in 1992, as siblings like Frank and Jean have never had any termination rights and the 1998 CTEA had not yet extended those rights to an estate's executor. 17 U.S.C. § 304(c)(2). The facts here are therefore even weaker than in *Mewborn*, where the author's daughter was at least eligible for termination rights, but could not exercise those rights for many years. 532 F.3d at 987.

DC attempts to obfuscate this fatal fact by stating that "[l]ike Christopher Milne and Elaine Steinbeck, Jean and Frank expressly adverted to the [termination] regime in their 1992 dealings with DC." MSJ 16. DC omits, however, that it always knew they had no termination rights. As Levitz wrote, "[i]t is our firm conviction … that you [Jean and Frank] don't have any legal rights or claims whatsoever." SGI

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ER-1219

¶73. Frank and Jean's stray uninformed references to termination were therefore meaningless. Without the actual threat of termination, they, unlike Christopher Milne, "had nothing in hand with which to bargain." *Mewborn*, 532 F.3d at 989.

Frank and Jean's total lack of bargaining power is evident from the terms of the 1992 Agreement, which merely increased their pension from $5,000 to $25,000, split two ways. SGI ¶66. This small sum bears no relation to the value of Superman, and lies in stark contrast to the $2,000,000 offered the Shuster Executor once the termination was served. SGI ¶86. Frank and Jean were not represented by counsel; nor was there any back and forth over the 1992 Agreement's terms. *See Mewborn*, 532 F.3d at 989 (noting that Mewborn "signed the contract 'as is' without the advice of counsel and without negotiating any of its terms" and received just $3,000). By contrast, the leverage of termination secured Milne "a net gain of hundreds of millions of dollars" (*Milne*, 430 F.3d at 1040-41) and Steinbeck "a far larger annual guaranteed advance, and royalties." *Steinbeck*, 537 F.3d at 196.

Ultimately this case bears no resemblance to *Milne* and *Steinbeck*; and is comparable to *Mewborn*. Frank and Jean had no rights to assign, and no termination leverage. The 1992 Agreement, which raised their modest pension, reflects this, just like the small transaction in *Mewborn*, and did not achieve the "result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1047.

## B. The Shuster Executor Possessed The Majority Interest Needed To Terminate And Properly Signed The Termination Notices

The Shuster Termination was served on November 10, 2003, with an effective date of October 26, 2013 and was duly signed by Mark Warren Peary, as Executor of the Shuster Estate. SGI ¶84. Pursuant to 17 U.S.C. § 304(c)(4), termination notices must be signed "by the number and proportion of the owners of [the author's] termination interest required" to terminate. Pursuant to 17 U.S.C. § 304(c)(2)(D), if an "author's widow or widower, children, and grandchildren are not living, the author's executor … shall own the author's entire termination interest." Because Joe

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER 1220**

Shuster had no widow or children (SGI ¶60), Mr. Peary, the Executor, held the entire termination interest when the Shuster Termination was executed and served in 2003. The notice properly stated that it "ha[d] been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code." SGI ¶84. DC contends that the termination is invalid because "the Estate did not own the requisite majority interest," erroneously arguing that 50% of the termination right was owned by PPC, under the PPC Agreements. MSJ 18. This argument is meritless and contradicts DC's own argument in both its complaint (Dkt. No. 49, ¶¶ 167-68) and its motion (MSJ 8:14-15) that the termination interest is not transferable before the effective termination date, per 17 U.S.C. §304(c)(6)(D).

The termination right is held only by statutorily-defined classes, and PPC was not and has never been a member of any such class. 17 U.S.C. § 304(c)(2)(A)-(D). Thus, the inalienable right to serve the Shuster Termination could not have been transferred to PPC. No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4).

Moreover, the copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to *anyone* prior to the service of a termination notice, and can be transferred only to the grantee or its successor before "the effective date of the termination" – here, October 26, 2013. 17 U.S.C. §304(c)(6)(D); 3 *Nimmer* § 11.08[A] at 11-49. Thus, as a pure matter of law, the 2001/2003 PPC Agreements – pre-dating both the effective date *and* the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster Termination.

Furthermore, the Shuster Executor was a party only to the 2003 PPC Agreement, which did not purport to transfer the termination interest to PPC, but provided PPC with a contingent share of proceeds, if any, from any recaptured copyright interests. SGI ¶¶ 79, 83. Indeed, the Shuster Estate was not probated and

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU **ER1221**

the Shuster Executor not even appointed until October 7, 2003, well after the 2001 PPC Agreement. SGI ¶65. As such, the 2001 PPC Agreement is legally inapplicable. SGI ¶79. Finally, both PPC Agreements were revoked in 2004 and replaced by a legal retainer agreement. SGI ¶85.

DC mischaracterizes defendants' argument and attacks a straw man argument of "harmless error" that defendants never made. MSJ 19, *citing* Docket No. 191 at 8 (nowhere mentioning "harmless error"). The Shuster Termination had **no** error as shown above, and a parties' contracts are not information that the Copyright Act, or the regulations promulgated thereunder, require in a termination notice, or otherwise.

Based on the totally erroneous premise that PPC had to sign the Shuster Executor's termination notice, DC constructs a false dilemma to argue that someone "defrauded" the Copyright Office. MSJ 20. This makes no sense, as neither the PPC Agreements, nor any other, could transform PPC into a required signatory.

DC blithely suggests – without any citation or basis – that the Court should "hold that the Shusters are barred from terminating." MSJ 20. This is unsupported by any provision of the Copyright Act and is entirely inequitable. The Shuster Termination provided DC with all of the information it was entitled to, and was entirely accurate as solely the Shuster Executor held the termination right.

### C. The Shuster Executor Has A Statutory Right To Terminate

As set forth above, under 17 U.S.C. § 304(c)(2), if an author dies without a widow, child or grandchild, termination rights vest in the executor of the his estate. As Joe Shuster was unmarried and had no children, the Shuster Executor holds the termination right. SGI ¶60. This Court has already acknowledged that "[a]s executor of the Shuster estate, [Mark Warren Peary] is entitled [by the CTEA] … to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring." *Siegel I*, 542 F. Supp. 2d at 1114 n.3.

The CTEA allows an executor to terminate when the "[t]ermination rights provided for in subsection [304](c) have expired on or before the effective date

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU**ER 1222**

1    [October 27, 1998] of the [CTEA]" and the author "has not previously exercised such

2    termination right." 17 U.S.C. § 304(d). DC even admits that, due to the time

3    windows applicable to § 304(c)'s termination right, it could not have been exercised

4    after 1997, and, in any event, expired when Shuster died in 1992. MSJ 21; 17 U.S.C.

5    §§ 304(c)(3)-(4). Since the §304(c) termination right expired before the CTEA's

6    effective date, the Shuster Executor has the clear right to terminate under § 304(d).

7         To circumvent § 304(d), DC uses wordplay to argue that, on Shuster's death

8    the termination right was "lost," as opposed to having "expired" – the word used in §

9    304(d). MSJ 21. Without any legal support, DC argues that to have "expired," the

10   termination window must have "opened and closed" while an author or his heirs were

11   alive. *Id.* at 22. This is nonsense. There is nothing in the CTEA, its legislative

12   history or case law requiring an author to live until the end of the § 304(c)

13   termination window for the author's executor to hold the termination right. *Nimmer*

14   agrees, stating that § 304(d) was designed to "correct the imbalance arising from the

15   fact that the author (or his heirs) failed to terminate previously, whether through

16   neglect or inability." 3 *Nimmer* § 11.05[B][2] at 11-40.12. As *Nimmer* points out,

17   such "inability" could arise "because no one was alive to effectuate termination" and

18   that CTEA "solves that latter situation" through § 304(c)(2)(D). *Id.* at n.25.2.

19        The Copyright Office itself states, without qualification, that "the termination

20   right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was

21   secured." 67 Fed. Reg. 69134, 69135.

22        Courts also routinely use "expired" to describe rights lost upon death. Indeed,

23   in *Steinbeck,* 537 F.3d at 197, a § 304(d) case repeatedly cited by DC, the Second

24   Circuit plainly states that "statutory termination rights expire upon [] death." *See*

25   *Groucho Marx Prods. V. Day & Night Co.*, 689 F.2d 317, 320 (2d Cir. 1982) ("[T]he

26   right is not descendible and expires upon the death of the person so protected.")

27   (citations omitted); *Milton H. Greene Archives v. CMG Worldwide*, 568 F. Supp. 2d

28   1152, 1156 (C.D. Cal. 2008) ("[T]hat right expired on an individual's death.").

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JU[...]

**ER 1223**

DC argues that CTEA was not intended "to open the door to an entirely new class of persons … who never before had the right to terminate." MSJ. at 22. The CTEA was intended to do and expressly did exactly that. *See* H.R. Rep. No. 105-452, 105th Congress, 2d Sess. at 8 (1998) (the amendments "allow[] an author's executor to receive his entire termination interest in the event that the author's widow, widower, children or grandchildren are not living"). Prior to CTEA's passage, only an author's widow or widower, children or grandchildren were given termination rights. The CTEA explicitly expanded these categories to include the "executor … of the author's estate" (17 U.S.C. § 304(c)(2)) to remedy Congress' prior refusal under the 1976 Act – misleadingly referenced by DC (MSJ. at 21:6) – to grant termination rights to estates. As explained by *Nimmer*:

> What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren? Under the 1976 Act at its passage, the result was that no one could exercise the right of termination. That harsh result persisted for the current Act's first two decades. Then in the [1998] Copyright Term Extension Act, Congress ameliorated that result. Effective from October 27, 1998 onward, ***the termination right, instead of lapsing in these circumstances, belongs to "the author's executor, administrator, personal representative, or trustee***." [quoting 17 U.S.C. § 304(c)(2)(D)].

*Nimmer* § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added). DC's tortured interpretation violates the clear legislative intent of CTEA and leads to the exact "harsh result" that § 304(c)(2)(D) was meant to and did avoid. *Id.*

## II. DC'S THIRD CLAIM FAILS AS A MATTER OF LAW

### A. <u>Section 304(c)(6)(D) Does Not Provide DC With Any Rights</u>

DC's Third Claim is premised on the erroneous legal position that DC has a "statutory right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the recaptured Superman copyrights, and that the (1) cancelled and ineffective PPC Agreements and (2) 2008 Consent Agreement interfere with DC's "right." MSJ 23.

The unambiguous statute provides no such "right," and case law recognizes that none exists. Section 304(c)(6)(D) simply provides that:

> "[A] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

date of the termination," but that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served."

The section merely limits the terminating party's ability to make a grant; it creates no affirmative "right(s)" for the terminated party, DC.

DC misrepresents and expands § 304(c)(6)(D) to argue that it applies to any type of agreement and gives DC an exclusive "right" to negotiate to buy terminated copyrights. MSJ 23. *See 3 Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation.'").

DC's theory was expressly addressed and rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), where an author's widow was induced by a third party to serve a termination notice, and later granted her rights to another third party before the termination date. The terminated party sued both third parties, claiming rights to "an exclusive period of negotiation" and "first refusal" under section 304(c)(6)(D), which were rejected as contrary to the statute:

> ***Nor does the statute [§ 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights. The provision does give the terminated grantee a preferred competitive position but "[i]f the author can afford to wait for competitive offers until after the effective date of termination, he can overcome any advantage the grantee or successor may seek to gain from the preferential position."

*Id.* (citations omitted) (emphasis added). Contrary to DC's claim that the statute gives it a 10-year "exclusive negotiation period" (MSJ 24), *Bourne* also found that the statute does ***not*** state that "a [third party] grant is valid only if *negotiated* after the termination date." 675 F. Supp. at 861 (emphasis in original).

*Bourne* also rejected the plaintiff's legislative history argument, parroted by DC (MSJ 23), that § 304(c)(6)(D) is "'in the nature of a right of first refusal;'" for if Congress intended such a right, "it would have done so in clear language." 675 F. Supp. at 865; *see 3 Patry* § 7:47 (2010) ("[§304(c)(6)(D) is] sometimes erroneously

described as a 'right of first refusal'); *Milne*, 430 F.3d at 1048 ( "if Congress intended [a requirement] it would have clearly said so"). "[W]here the language of a statute is clear, that language, rather than 'isolated excerpts from the legislative history,' should be followed." *United States v. Granderson*, 511 U.S. 39, 74 n. 7 (1994).

Even if DC was correct that it somehow had a right of exclusive negotiation or first refusal, the 2008 Consent Agreement does not violate it because, as DC admits, the agreement does not grant copyrights but only "'requires … the consent of the Siegels and the Shuster Estate … to a settlement of their termination rights with DC.'"  MSJ 24; SGI ¶91.  The Shuster Estate is also unable to grant recovered copyrights to anyone but DC until after the effective 2013 termination date.

Moreover, the 2008 Consent Agreement has already been addressed here. After extensive briefing, Magistrate Judge Zarefsky rejected DC's arguments that the Consent Agreement is "an independent wrong [that] violates the Copyright Act" and found that it is a legitimate "Drysdale-Koufax collective approach to negotiation," and this Court duly upheld that ruling.  SGI ¶93.

Indeed, the decision to negotiate collectively with DC was in *direct* response to DC's hard-ball tactic of trying to get the Siegels and Shuster Estate to turn against and underbid one another.  SGI ¶89 ("[I]f we are able to resolve matters with the Siegel heirs … *before* we reach an agreement with you. . . there will not be any pressing need to reach an agreement with you.").  The heirs didn't fall for it, and understood that *united*, they were in a stronger bargaining position.  Nothing in § 304(c)(6)(D) prevents them from joining forces.

## B.   DC Lacks Standing To Bring Its Third Claim

DC's entire argument that it has standing is erroneously premised on the fiction that it has a statutory "right" (MSJ 24-25); but, because a terminated grantee, like DC, has "no rights under [§ 304(c)(6)(D)], [it] cannot sue for failure to comply, and the provision therefore does not provide a basis for standing."  6 *Patry on Copyright* § 21:18.  DC can point to nothing in the statute that creates a right, much

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER 1226**

1  less a remedy.  And unless Congress plainly showed "an intent to create not just a
2  private right but also a private remedy," then "a cause of action does not exist and
3  courts may not create one."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

4      DC's citations (MSJ at 24) do not contradict this.  *See CBOCS West, Inc. v.*
5  *Humphries,* 553 U.S. 442, 450 (2008) (right to retaliation claims where Congress
6  specifically added statutory subsection to create right); H.R. Rep. 94-1476 at 127
7  (noting only that 17 U.S.C. §203 "*permit[s]* the original grantee … to negotiate a
8  new agreement with the persons effecting the termination") (emphasis added).

9      ## C.    The Third Claim Is Barred By The Statute Of Limitations

10     DC's Third Claim for declaratory relief under the Copyright Act is subject to
11  17 U.S.C. § 507(b)'s three-year statute of limitations.  DC's Third Claim as to the
12  2001/2003 PPC Agreements is expressly based on *their text*.  *See* Dkt. No. 49 ¶169;
13  MSJ 23-25.  DC is not saved by the "discovery rule" because the PPC Agreements
14  were voluntarily produced to DC in **November 2006**, and DC took depositions on
15  these agreements in 2006.  SGI ¶¶94-95.  DC's Third Claim thus expired in
16  **November 2009**, six months before this suit was filed.  DC's excuse that it was
17  unaware until it read the anonymous "Timeline" in 2008 does not hold up because
18  DC's claim is based on the PPC Agreements themselves and, in any event, DC's in-
19  house counsel admitted to reading the "Timeline" in 2006, as well.  SGI ¶96.

20     DC effectively concedes that its Third Claim is time-barred, unless saved by
21  the "continuing harm" doctrine.  MSJ 25.  DC has no continuing harm because the
22  PPC Agreements were expressly revoked in 2004 and have no continuing effect (SGI
23  ¶85) and, as shown above, the 2008 Consent Agreement does not violate anything.

24  ## III.    DC'S MOTION IS PROCEDURALLY DEFECTIVE

25     Defendants have asserted numerous affirmative defenses, including the statute
26  of limitations, estoppel, laches, preclusion, duress, and others, as to DC's First and
27  Third Claims. With the exception of a few affirmative defenses to the First Claim,
28  and the statute of limitations and lack of standing defenses to the Third Claim, DC

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

has neglected to move for summary adjudication on many affirmative defenses, which are left for trial. Therefore, DC's motion for summary judgment is procedurally defective. *See United States v. Bellecci*, 2008 WL 802367, at *4 (E.D. Cal. Mar. 26, 2008) ("Since plaintiff has addressed none of [defendants'] affirmative defenses, the merit of these claims remains for determination at trial."); *Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 426 F. Supp. 2d 1101, 1110 (E.D. Cal. 2006) ("Because defendant's affirmative defenses were not raised in plaintiff's initial summary judgment motion, the court will not address the issues raised by the affirmative defenses; those defenses remain viable…").

## CONCLUSION

For the foregoing reasons, DC's motion for summary judgment should be denied, and summary adjudication granted in defendants' favor as to sub-parts (1), (2) and (3) of DC's First Claim, at issue in its motion, and as to DC's Third Claim.

Dated: July 30, 2012          RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
_____

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

1  DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10 DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11          Plaintiff,                 **DECLARATION OF PAUL
                                       LEVITZ IN SUPPORT OF DC
12      v.                             COMICS' MOTION FOR
                                       PARTIAL SUMMARY
13 PACIFIC PICTURES                    JUDGMENT ON ITS FIRST AND
   CORPORATION, IP WORLDWIDE,          THIRD CLAIMS FOR RELIEF
14 LLC, IPW, LLC, MARC TOBEROFF,
   an individual, MARK WARREN          Hon. Otis D. Wright II
15 PEARY, as personal representative of
   the ESTATE OF JOSEPH SHUSTER,
16 JEAN ADELE PEAVY, an individual,    **Hearing Date**:   Aug. 20, 2012
   LAURA SIEGEL LARSON, an             **Hearing Time**:   1:30 p.m.
17 individual and as personal          **Courtroom**:      11
   representative of the ESTATE OF
18 JOANNE SIEGEL, and DOES 1-10,
   inclusive,
19
            Defendants.
20

21

22

23

24

25

26

27

28
                                       LEVITZ DECL. RE: DC'S
                                       MOT. FOR PARTIAL SUMM. J.

**ER-1229**

## DECLARATION OF PAUL LEVITZ

1.    I worked at DC Comics ("DC") for 38 years, and continue to serve as Senior Advisor, Consulting Editor, and as a writer for DC. I have personal knowledge of the matters set forth in this declaration or conducted due diligence to gather them, and if called to testify to the facts stated herein, I could and would do so competently.

2.    In 1972, I began working as a freelance writer for DC. In 1973, I became an assistant editor. Throughout the 1970s, I became progressively more involved in management of DC's general business activities, and in 1980, I was promoted to Manager of Business Affairs. By 1985, I had become predominantly responsible for DC's business operations, and I was promoted to Executive Vice President. In 1989, I became Executive Vice President and Publisher. From 2002 to 2010, I served as DC's President and Publisher. Since then, I have served as Senior Advisor, Consulting Editor, and as a writer for DC.

3.    During my many years as a business executive at DC, part of my role was to maintain relationships with writers and artists who had worked for DC in the past, as well as their families. I had many interactions with Joseph Shuster, his brother Frank Shuster, his sister Jean Peavy, and his nephew Mark Warren Peary. Attached hereto as Exhibits 1-78 are true and correct copies of my correspondence with the Shuster family that DC and I could locate.

4.    In a 1975 agreement, DC affiliate Warner Communications Inc. agreed to provide Joe Shuster and Jerome Siegel with lump sum payments, lifetime annual payments, survivor payments to their heirs, insurance coverage, and other benefits. As of 2011, Warner had paid the Shuster and Siegel families $4.3 million under the 1975 agreement, not including medical benefits or special bonuses.

5.    After Joe Shuster passed away in 1992, Frank and Jean wrote letters to me and Martin Payson at Time Warner asking for financial assistance. (Exhibits 3, 6 and 7.) Jean told us she was Joe's sole heir. (Exhibit 3.) I took the lead in

- 1 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

1   negotiations with Frank and Jean.  On September 8, 1992, I sent Frank a letter
2   offering that DC would increase the survivor payments due to Frank under the 1975
3   agreement from $5,000 to $25,000 per year.  (Exhibit 5.)
4        6.       On September 10, 1992, Frank sent me a letter stating that he was
5   "extremely pleased" with DC's offer, and saying that, after "discuss[ing] this good
6   news with [his] sister Jean," she and Frank wished that payments be made directly
7   to Jean, who would "send [Frank] whatever money [he] wanted as a gift which
8   would not be taxable to [him]."  (Exhibit 6.)
9        7.       Frank (who lived in New York) said that Jean would be visiting New
10  York soon, and asked if he and Jean could meet with me in New York to discuss
11  these issues further.  (Exhibit 6.)  I agreed, and we met in my office at DC in late
12  September or early October 1992.  Jean basically spoke for the two of them, as
13  Frank was frail and considerably older.  It was clear that by changing the agreement
14  to pay the annual stipend for Jean's lifetime rather than Frank's, DC would both be
15  far exceeding our promise to Joe and committing to a much larger sum.  I
16  understood Joe's original wish, as embodied in the 1975 agreement, to be to take
17  care of Frank because of the assistance Frank had rendered on the early Superman
18  strips as a letterer, and because Frank had taken Joe in during the 1960s; I had never
19  known or understood Joe to want to provide for Jean.  Nonetheless, on DC's behalf,
20  I conditionally agreed to Jean and Frank's request.
21       8.       Given DC's financial success, former writers and artists, or their
22  families, would from time to time, ask DC for money, much as Frank and Jean had
23  done.  Every time DC agreed to grant such a request, I would make clear to the
24  writer, artist, or family member that the payment would represent their last and final
25  deal with DC, and would resolve any past, present, or future claims against DC.  I
26  recall having this same discussion with Frank and Jean during our in-person
27  meeting in 1992.  Frank and Jean both confirmed that they understood.  Following
28  this discussion, DC (through me) and Frank and Jean signed an agreement on

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1231

October 2, 1992, dated as of August 1, 1992. A true and correct copy of that agreement is attached hereto as Exhibit 8. In key part, and consistent with the above, it states:

> We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

9.    DC maintained a good relationship with the Shuster family until 2001. In particular, Jean and I exchanged many letters, notes, and holiday cards. In many of Jean's letters, she would request special bonuses in excess of the payments due under the 1992 agreement based on some particular new success DC had achieved, like a television series. When Jean made such a request—including in 1999—DC agreed to honor Joe's memory and provide an additional bonus ranging from $10,000 to $25,000. DC paid Jean bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001. (Exhibits 23, 27, 33, 39, 53, 60, 67, 71.) In total, DC has paid Jean at least over $610,000 under the 1992 agreement, and continues to pay her under the agreement to this day, even though she went back on her word.

10.    I also exchanged correspondence over the years with Jean's son, Mark Warren Peary. On May 29, 1996, Mark sent me a screenplay called "DREAMERS," which he described as "an inspiring life story of Joe Shuster and Jerry Siegel." (Exhibit 44.) The screenplay discusses how Joe Shuster made amends with DC late in his life. Mark asked me to pass along the screenplay to Warner Bros., which I did. On November 6, 1999, Mark asked whether I would be willing to submit a revised screenplay to Warner Bros. (which I later did) and asked whether Joanne Siegel's termination claim concerning her husband's rights would "interfere with us selling our screenplay." (Exhibit 62.) Mark Peary never told me that he thought he or his family had any remaining termination claims to assert. To

- 3 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

1   the contrary, in 1999, Jean told me she planned to honor our 1992 agreement and

2   would assert no termination claim.  (Exhibit 59.)  I was disappointed when I learned

3   that the Shuster family filed their termination claim.

4       I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct and that this declaration is executed this 16th day of

6   July 2012 in New York, New York.

7

8                                               _____
                                                        Paul Levitz
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1233

# EXHIBIT 1



DC COMICS INC
666 Fifth Avenue
New York, New York 10103
(212) 484-2810
FAX (212) 484-2849



Paul Levitz  Executive Vice President & Publisher

July 9, 1990

Joe Shuster
11944 Montana Avenue
#305
West Los Angeles, CA 90049

Dear Joe:

We've just concluded a project with the Boys Clubs of America
(which in these modern days are totally co-ed) to use SUPERMAN
and WONDER WOMAN to encourage kids to get off the streets and
into the clubs.  Time Warner corporately underwrote the creation
and production of an animated public service announcement, and
the Boys Clubs have just reported it made over 384 million viewer
'impressions'.  It's hard to know the ultimate effect, but I
thought you'd be pleased to hear that your hero is reaching out to
help young people again.

Best,

Paul Levitz

:lf

A Warner Communications Company

DCC00004132

**EXHIBIT 1**

**5**

**ER-1235**

Aug. 21, 1992

Dear Paul,

I felt that I should share the enclosed letter to Marty Payson with you. I have found myself in an embarrassing situation. I do appreciate that the conservative funeral expenses were picked up.

I will call you when I get into N.Y. on Sept 21 to find out the exact time of the Sept. 24th memorial service. I will look forward to seeing you & Jerette again.

Jean Shuster Peavy

EXHIBIT 3
8

DCC00006476

ER-1236

# EXHIBIT 4

ER-1237



DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz·Executive Vice President & Publisher

August 21, 1992

Frank Shuster
98-40 Queens Boulevard
Apartment 4K
Rego Park NY 11374

Dear Frank:

Just a note to let you know that we're still checking on the details of Joe's financial consideration from Time Warner and our future arrangements for you. I've been on the road (and will have to head out again Monday to Wednesday), but I hope to have more detail for you by the end of next week.

I did have the opportunity to mention your sumpathies to Jerry Siegel, Bob Kane and Neal Adams, each of whom send their condolences. While at the San Diego Comic Convention I also made a brief memorial statement about Joe to their "Inkpot Awards" dinner ( a gathering of several hundred professionals and fans), and have been asked by them, and by many, many individuals to send you their sympathy on your loss.

Thanks for your patience, and I hope to see you next week.

Sincerely,

Paul Levitz

:lf

A division of Warner Bros. Inc.–A Time Warner Company

**EXHIBIT 4**
**26**

DCC00006462

**ER-1238**

Case 12-57245, 03/25/2013, ID: 8538472, DktEntry: 10-7, Page 56 of 283

# EXHIBIT 5



DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz·Executive Vice President & Publisher

September 8, 1992

Frank Shuster
98-120 Queens Boulevard
Apartment 4K
Rego Park NY 11374

Dear Frank:

I've had an opportunity to discuss your situation with Martin Payson, Vice Chairman of Time Warner, who as you know has been Joe's corporate "guardian angel" in recent years. It is my pleasure to tell you that Time Warner has chosen to look to the spirit of Joe's wish to go on assisting you after his passing, and let that be your guide. In that spirit, the company will begin making payments to you at an annual rate of $25,000 effective with the month after our last payment to Joe. This is instead of the $5,000 amount called for in Joe's settlement agreement with Warner Communications in 1975, and we hope will replace any direct assistance Joe had been providing in enabling you to have some comfort in retirement.

There's naturally some tax-related forms required to put you on the payroll, and I believe you were interested in arranging for direct deposit, which would require some additional paperwork (including your provision of a blank voided check from your checkbook). I've asked our human resources staff to arrange all the paperwork to be available any time from Monday, September 14th, that would be convenient to you, and if you call and let me know when you'd like to come in, we can get this started. I'm not sure how quickly the first check or deposit would be made, but we will certainly do our best to expedite matters.

I look forward to hearing from you, and to seeing you shortly.

Sincerely,

Paul Levitz

:lf

cc: Martin Payson
    Carolyn McCandless



A division of Warner Bros. Inc.–A Time Warner Company

DCC00006495

**EXHIBIT 5**

**27**

**ER-1240**

# EXHIBIT 6

Sept. 10, 1992

Dear Paul —

Thank you for your letter of Sept. 8.
I was extremely pleased to be informed
of Mr. Payson's decision to raise the
amount of pension payment, and I am
most grateful for the new amount Time
Warner will be providing.
I had the opportunity to discuss this
good news with my sister Jean and told
her I would help her out because of her
financial problems.
She pointed out that my income tax
as a single individual would be higher
than hers as a married person. She made
the suggestion that if payments were made
in her name, she would not pursue the
termination of the Superman copyright as
provided for to creators' heirs in the 1976
U.S. Copyright Act, and that she could send
me whatever money I wanted as a gift
which would not be taxable to me.
This arrangement is agreeable with me.
Hence, we agreed to suggest that perhaps
your accounting department could arrang

**EXHIBIT 6**
28

ER-1242
DC 00006

to have payments signed over to my sister Jean, so that all future payments be sent in her name instead of mine. I know this arrangement is different from the one provided in the Agreement and you may need to discuss this arrangement further with Mr. Payson as well as with Jean herself. She will be arriving in New York on September 20th, and will remain through the week. We plan to call you on Monday Sept. 21st to arrange an appointment.

Another matter I'd like to mention is Joe memorial service which we set for Thursday Sept. 24th. Some of Joe's relatives have said they would like to attend and need to know the exact time, address, and floor at which the service will be held. Also, I wonder if there is a piano in the room, or whether one can be rented.

Thank you for your condolence card and your thoughtfulness to me during my visit at the new DC offices.

Sincerely,
Frank Shuster

**EXHIBIT 6**
29

ER-1243
DC 00007

Case 12-57245 03/25/2013 ID: 8558472 DktEntry: 10-7 Page 61 of 283

# EXHIBIT 7

ER-1244

September 15, 1992

TO:  Paul Levitz
     DC Comics
     1325 Avenue of the Americas
     New York, NY  10019

FROM:  Warren, Jean Shuster Peavy's son.

RE:  Jean asked me to forward all of the final debts and expenses for
Joe Shuster on to you which are enclosed.  The only thing that we know
of that's not included is a bill for Joe's final tax returns which
will be sent at the end of the year.

     We are deeply grateful for your help.  I hope to meet you when I fly
in for Joe's memorial service.

P.S.  Sears should send a final bill after repossessing a few items.
      Wait on paying the BankAmericard debt.  Insurance might cover it if
      he paid his premiums.  Still waiting to find out.

**EXHIBIT 7**

**30**

DCC00006855

**ER-1245**

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8               **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,              **DECLARATION OF DANIEL M.**
                                        **PETROCELLI IN SUPPORT OF**
12          v.                          **DC COMICS' MOTION FOR**
                                        **PARTIAL SUMMARY**
13  PACIFIC PICTURES                    **JUDGMENT ON ITS FIRST AND**
    CORPORATION, IP WORLDWIDE,          **THIRD CLAIMS FOR RELIEF**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          Hon. Otis D. Wright II
15  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
16  JEAN ADELE PEAVY, an individual,    **Hearing Date**: Aug. 20, 2012
    LAURA SIEGEL LARSON, an             **Hearing Time**: 1:30 p.m.
17  individual and as personal          **Courtroom**:     11
    representative of the ESTATE OF
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
                Defendants.
20

21

22

23

24

25

26

27

28

                                        PETROCELLI DECL. RE: DC'S
                                        MOT. FOR PARTIAL SUMM. J.

                                                    **ER-1246**

# DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state:

1.      I am a partner at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics in the above-entitled action.  I make this declaration in support of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief.  I have personal knowledge of the matters set forth in this declaration, and if called to testify to the facts stated herein, I could and would do so competently.

2.      Attached hereto as Exhibit 1 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated December 4,1937.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC's predecessor in interest, dated March 1, 1938.  (When referring to DC's predecessors, I refer to "DC" throughout this declaration for simplicity.)

4.      Attached hereto as Exhibit 3 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated September 22, 1938.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an agreement signed by DC and the McClure Newspaper Syndicate dated September 22, 1938.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a letter from J.S. Liebowitz to Jerome Siegel, dated September 28, 1938.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated December 19, 1939.

8.      Attached hereto as Exhibit 7 is a true and correct copy of an article titled "Up, Up And Awa-a-y!  The Rise of Superman, Inc." from *The Saturday Evening Post*, dated June 21, 1941.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a Certificate of Registration for A Claim to Renewal Copyright for Action Comics No. 1.

10.      Attached hereto as Exhibit 9 is a true and correct copy of the

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**ER-1247**

Complaint in *Siegel v. National Comics Pubs., Inc.*, No. 1099-1947 (N.Y. Sup. Ct.) (the "Westchester Action").

11.    Attached hereto as Exhibit 10 is a true and correct copy of the referee's Findings of Fact and Conclusions of Law in the Westchester Action, dated April 12, 1948.

12.    Attached hereto as Exhibit 11 is a true and correct copy of the Stipulation filed in the Westchester Action, dated May 19, 1948.

13.    Attached hereto as Exhibit 12 is a true and correct copy of the Final Judgment issued in the Westchester Action, dated May 21, 1948.

14.    Attached hereto as Exhibit 13 is a true and correct copy of an affidavit signed by Jerome Siegel in in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973) ("National"), dated March 1, 1973.

15.    Attached hereto as Exhibit 14 is a true and correct copy of an affidavit signed by Joseph Shuster in National and dated March 7, 1973.

16.    Attached hereto as Exhibit 15 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster, and Jay Emmett on behalf of Warner Communications Inc. dated December 23, 1975.

17.    Attached hereto as Exhibit 16 is a true and correct copy of a letter signed by Joseph Shuster, dated November 12, 1978.

18.    Attached hereto as Exhibit 17 is a true and correct copy of a letter from Martin D. Payson to Joseph Shuster, dated August 8, 1988.

19.    Attached hereto as Exhibit 18 is a true and correct copy of a letter from Martin D. Payson to Joanne Siegel, dated March 12, 1990.

20.    Attached hereto as Exhibit 19 is a true and correct copy of a letter from Martin D. Payson to Joanne Siegel, dated March 5, 1991.

21.    Attached hereto as Exhibit 20 is a true and correct copy of a death certificate for Joseph Shuster, dated August 11, 1992.

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

22. Attached hereto as Exhibit 21 is a true and correct copy of the affidavit of Jean Peavy dated August 17, 1992.

23. Attached hereto as Exhibit 22 is a true and correct copy of a letter from Jean Peavy to Marty Payson dated August 21, 1992.

24. Attached hereto as Exhibit 23 is a true and correct copy of a letter from Marty Payson to Jean Peavy dated September 8, 1992.

25. Attached hereto as Exhibit 24 is a true and correct copy of an agreement signed by Frank Shuster, Jean Peavy, and Paul Levitz on behalf of DC Comics dated October 2, 1992.

26. Attached hereto as Exhibit 25 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997, regarding the March 31, 1938, grant.

27. Attached hereto as Exhibit 26 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997, regarding the December 4, 1937, agreement.

28. Attached hereto as Exhibit 27 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997, regarding the September 22, 1938, agreement with DC.

29. Attached hereto as Exhibit 28 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997, regarding the September 22, 1938, agreement with McClure Newspaper Syndicate.

30. Attached hereto as Exhibit 29 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for "Superman" dated April 3, 1997, regarding the 1948 Stipulation.

31. Attached hereto as Exhibit 30 is a true and correct copy of excerpts from a Notice of Termination of Transfer Covering Extended Renewal term for

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1249

1  "Superman" dated April 3, 1997, regarding the December 19, 1939, agreement.

2      32.    Attached hereto as Exhibit 31 is a true and correct copy of excerpts

3  from a Notice of Termination of Transfer Covering Extended Renewal term for

4  "Superman" dated April 3, 1997, regarding the December 23, 1975, agreement.

5      33.    Attached hereto as Exhibit 32 is a true and correct copy of a Joint

6  Venture Agreement signed by Mark Peary, Jean Peavy, and Marc Toberoff on

7  behalf of Pacific Pictures Corporation and dated November 23, 2001.

8      34.    Attached hereto as Exhibit 33 is a true and correct copy of the Petition

9  for Probate of Lost Will and for Letters Testamentary ("Petition") filed by Mark

10  Warren Peary on July 23, 2003, in *In re Estate of Joseph Shuster*, Case No. BP-

11  080635, in the Superior Court of the State of California for the County of Los

12  Angeles ("Probate Action").

13      35.    Attached hereto as Exhibit 34 is a true and correct copy of the Order

14  Admitting Will To Probate, Appointing Executor and Authorizing Independent

15  Administration of Estate with Limited Authority filed by Mark Warren Peary on

16  October 7, 2003, in the Probate Action

17      36.    Attached hereto as Exhibit 35 is a true and correct copy of the Duties

18  and Liabilities of Personal Representative filed by Mark Warren Peary on October

19  21, 2003, in the Probate Action.

20      37.    Attached hereto as Exhibit 36 is a true and correct of an agreement

21  signed by Peary on behalf of the Estate of Joseph Shuster, Jean Peavy, and Marc

22  Toberoff on behalf of Pacific Pictures Corporation, dated October 27, 2003.

23      38.    Attached hereto as Exhibit 37 is a true and correct copy of the Notice

24  Of Termination Of Transfer Covering Extended Copyright Renewal Term Of

25  "Superman" served by Mark Warren Peary, as Executor of the Estate of Joseph

26  Shuster, on November 10, 2003.

27      39.    Attached hereto as Exhibit 38 is a true and correct copy of excerpts

28  from the transcript of the November 11, 2006, deposition of Jean Peavy.

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1250

40.     Attached hereto as Exhibit 39 is a true and correct copy of excerpts from the transcript of the November 11, 2006, deposition of Mark Warren Peary.

41.     Attached hereto as Exhibit 40 is a true and correct copy of the Declaration of Paul Levitz in Support of Defendants' Motion for Partial Summary Judgment, filed with this Court on April 30, 2007, in the related *Siegel* cases, Case Nos. CV-04-8400 and CV-04-8776.

42.     Attached hereto as Exhibit 41 is a true and correct copy of an order issued by this Court on March 26, 2008, in the related *Siegel* case, Case No. CV-04-8400

43.     Attached hereto as Exhibit 42 is a true and correct copy of an order issued by this Court on September 26, 2008, in the related *Siegel* case, Case No. CV-04-8400.

44.     Attached hereto as Exhibit 43 is a true and correct copy of the "Toberoff Timeline."

45.     Attached hereto as Exhibit 44 is a true and correct copy of the Declaration of Adam Ronan, M.D., in Opposition to Plaintiff's Motion to Initiate Discovery of Two Elderly Witnesses filed in this case on September 13, 2010.

46.     Attached hereto as Exhibit 45 is a true and correct copy of excerpts from Plaintiff DC Comics' Renewed Opposition To Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC's Renewed Motion To Dismiss Plaintiff's First Amended Complaint Pursuant To Fed. R. Civ. P. 12(b)(6) (Docket No. 147) (RE: Third And Sixth Claims For Relief), filed in this case on March 21, 2011.

47.     Attached hereto as Exhibit 46 is a true and correct copy of excerpts from the transcript of the June 29, 2011, deposition of Mark Warren Peary.

48.     Attached hereto as Exhibit 47 is a true and correct copy of excerpts from the transcript of the July 22, 2011, deposition of Laura Siegel Larson.

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**ER-1251**

49.     Attached hereto as Exhibit 48 is a true and correct copy of excerpts from the transcript of the August 3, 2011, deposition of Dawn Peavy.

50.     Attached hereto as Exhibit 49 is a true and correct copy of the Notice Of Termination Of Transfer Covering Extended Copyright Renewal Term for the Superman promotional announcements served by Mark Warren Peary, as Personal Representative of the Estate of Joseph Shuster, on March 6, 2012.

51.     Attached hereto as Exhibit 50 is a true and correct copy of the Notice Of Termination Of Transfer Covering Extended Copyright Renewal Term for the Superman promotional announcements served by Larson on March 6, 2012.

52.     When Marc Toberoff raised issues concerning the scheduling of this motion, my partner Matt Kline proposed a briefing schedule by which DC would file its motion for partial summary judgment on July 16, 2012, defendants would file their opposition and cross-motion on July 30, DC would file its reply and opposition on August 10, and defendants would file their reply on August 17, allowing for a hearing date of September 10 or 17, 2012, if a hearing was needed. Although this would cut DC's time to file its opposition and reply short by three days, we offered it to Mr. Toberoff so that briefing could be complete on the parties' motions before he allegedly was set to leave for vacation. Mr. Toberoff declined Mr. Kline's proposal and proposed a schedule that would push the summary judgment hearing in this matter back by a month and afford him a month, rather than two weeks, to oppose DC's motion. On July 13, 2012, DC declined Mr. Toberoff's proposal and gave him notice that it would file its motion on July 16, 2012, as planned. A true and correct copy of the July 13, 2012, e-mail from Mr. Kline to Toberoff is attached hereto as Exhibit 51. A true and correct copy of DC's letter giving defendants notice of this motion is attached hereto as Exhibit 52.

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1252

1       I declare under penalty of perjury under the laws of the United States that the

2 foregoing is true and correct and that this declaration is executed this 16th day of

3 July 2012 at Los Angeles, California.

4

5                                 /s/ Daniel M. Petrocelli

                                    Daniel M. Petrocelli

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

ER-1253

Case: 12-57245 03/25/2013 ID: 8558472 DktEntry: 10-7 Page: 71 of 283

# EXHIBIT 1

AGREEMENT OF EMPLOYMENT entered into the Fourth
day of December, 1937, by and between DETECTIVE COMICS, INC.,
a domestic corporation having its offices at 480 Lexington
Avenue, New York City, hereinafter referred to as the Employer,
and Jerome Siegel and Joe Shuster residing at Cleveland, Ohio,
hereinafter referred to as the Employees.

1. The Employer hereby agrees to employ, and does hereby
employ the Employees as Artists, for a period of two years,
commencing with December 4, 1937 and terminating December 3, 1939,
and to pay them for such services and for all of the matters
hereinafter set forth, the sum of Ten Dollars ($10) per page.

2. The Employees agree to give their exclusive services
as artists in producing features known as "Slam Bradley " and
"The Spy " during said period of employment , to the Employer,
and agrees that all of these products and work done by said
Employee for said Employer during said period of employment,
shall be and become the sole and exclusive property of the
Employer, and the Employer shall be deemed the sole creator
thereof, the Employee acting entirely as the Employer's employee.

3. In the event that the Employee leaves the service of
the Employer prior to the termination date set forth in this
Agreement or subsequent thereto, and for any reason whatsoever,
the Employees agree that they will not, directly or indirectly,
and through any means whatsoever, use, duplicate, simulate or
bring into being any of the products or work or creations or
characters or plots used, made or created by him while in the
employ of the Employer.

EXHIBIT B

DCC00045543

**EXHIBIT 1**
**8**

**ER-1255**

--2--

4. It is understood that any new and additional features which the Employee produce for use in a comic magazine are to be first submitted to the Employer, who reserves the right to accept or reject same within a period of sixty days.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

In Presence of:                    DETECTIVE COMICS, INC.

_Herbert M. Siegel_                BY _J. Liebowitz_
         Witness                      Employer    L.S.

_Herbert M. Siegel_                _Jerome Siegel_ L.S.
         Witness                      Employee

_____              _____ L.S.
         Witness                      Employee

DCC00045544

EXHIBIT 1
9

ER-1256

# EXHIBIT 3

EXHIBIT 26

U. S. Dist. Court
S. D. of N. Y.
APR 6 1939

September 22, 1938

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberly Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by you, will serve as our agreement.

We, Detective Comics, Inc., are the exclusive owners of
comic strips known by the titles "Superman", "Slam Bradley",
"Spy", "Radio Squad" and "Federal Men", and to the rights
to publish comics carrying said titles and characters con-
tained therein and continuity thereof.

You have been doing the art work and continuity for said
comics for us. We wish you to continue to do said work and
hereby employ and retain you for said purposes for the
period of this contract.

You agree that you will supply us each and every month here-
after, in sufficient time for publication in our monthly
magazines, sufficient copy and art for each of said features
each month hereafter.

All of said comic features consist of approximately 46 pages
per month. The standard of the said comics shall be equal
to the present standards.

You shall also furnish in sufficient time to properly perform
the terms of an agreement we are executing together with
you with the McClure Newspaper Syndicate, all of the art
and continuity for the newspaper strip entitled "Superman"
called for by said agreement.

You agree that you will not hereafter at any place in the
United States or in any foreign country, furnish to any other
person, firm, corporation, newspaper or magazine any art or
copy for any comics to be used in any strip or comic or news-
paper or magazine containing the above titles or the characters
or continuity thereof or in any wise similar thereto, but you
shall furnish such matter exclusively to us for the duration
of this agreement as such matter may be required by us or as
designated by us in writing.

In the event you shall do or make any other art work or con-
tinuity suitable for use as comics or comic strips, you shall
first give us the right to first refusal thereof by submitting
said copy and continuity ideas to us. We shall have the right
to exercise that option for six weeks after submission to us
at a price no greater than offered to you by any other party.

WB008008

EXHIBIT 3
11

-2-                    9/22/38

We agree to pay you on publication, for any and all of said comics published by us and supplied by you, the following rates:

| | |
|---|---|
| Superman | $10.00 per page |
| Slam Bradley | 10.00 per page |
| Spy | 10.00 per page |
| Radio Squad | 9.00 per page |
| Federal Men | 9.00 per page |

You agree that the number of panels to each montly feature shall be approximately equal to the panels contained in previous publications of the comics.

We further agree to pay you for the McClure Newspaper Syndicate strips which you may hereafter furnish pursuant to the above-mentioned contract with McClure, on the following basis:

When we receive payment from McClure on the 40% basis mentioned in the contract, we shall retain 7½% and pay you 32½% of the "net proceeds" as defined in the McClure contract.
When we receive payment from McClure on the 45% basis mentioned in the contract, we shall retain 9% and pay you 36% of the "net proceeds" as defined in the McClure contract.
When we receive payment from McClure on the 50% basis mentioned in the contract, we shall retain 10% and pay you 40% of the "net proceeds" as defined in the McClure contract.

All material, art and copy shall be owned by us and at our option, copyrighted or registered in our name or in the names of the parties designated by us.

This agreement shall be for a period of five years from the date hereof and shall thereafter be continued for an additional five years at our option. However, if at any time the art and continuity of any feature shall not be up to the standard required for the magazines, we at our option, then may terminate this agreement and substitute other artists for the unsatisfactory feature or features but not otherwise.

According to the abovementioned McClure contract, we have the right to use the material furnished for syndicate purposes without charge by McClure. However, in the event we shall use any of said syndicate matter in our magazines, you shall be compensated at the abovementioned page rate less the percentage which McClure receives for said page or pages. When using such syndicate matter, we shall of course not be required to use original copy as called for by this contract.

WB008009

EXHIBIT 3
12

ER-1259

-3-                         9/22/38

At any time, if we believe any feature is economically un-
successful, we may discontinue the further publishing of
said feature.

We shall have the right to reasonably supervise the editorial
matter of all features.

Your signature to this agreement is one of the inducements
to us to execute the abovementioned McClure contract and we
agree to use our best efforts to continue the publishing of
magazines containing the abovementioned features.

                         Very truly yours,


                    DETECTIVE COMICS, INC.

                    By: _Harry Lehmfeld_
                                    P...


_Jerome Siegel_

_Joseph Shuster_


WB008010

**EXHIBIT 3**
13

ER-1260

# EXHIBIT 4

September 22, 1938

Detective Comics, Inc.
480 Lexington Avenue
New York City

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberley Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by each of you, will serve as our agreement.

Hereafter, Detective Comics, Inc., is called "Detective" and Messrs. Siegel and Shuster are called the "Artists".

In line with our discussions, we are prepared to go ahead with newspaper syndication of a daily strip, six days a week, entitled "Superman" and owned by Detective, on the following terms and conditions:

We are to have an eight month option from Detective, dating from October 1, 1938, to enable us to make a preliminary survey of the newspaper field in relation to this specific feature, which survey we agree to make at our own expense and to furnish Detective with a report thereof.

If this preliminary canvass indicates the possibility for successful newspaper syndication of this feature, as we anticipate it will, and providing we give Detective notice in writing by registered mail before June 1, 1939 of our exercise of said option, Detective agrees to permit the Artists to supply "Superman" strip exclusively to us for syndication in newspapers in the United States, Canada and all other parts of the world, for a minimum period of five years from June 1, 1939, in consideration of the payment to Detective of forty (40%) per cent of the net proceeds from such syndication during the first year, forty-five (45%) per cent during the second year and fifty (50%) per cent thereafter. "Net proceeds" is hereby defined to mean gross receipts for the feature from newspapers using the feature, less cost of cuts, mats, and proofs. All other expenses, including billing, promotion and selling expenses, are ours and are not deductible in arriving at net proceeds.

If during the third year and continuing to the end of the above mentioned initial five year period, the weekly net share of Detective from the proceeds reaches $100. or more, per week, we shall have the option to renew this agreement for a further period of five years beginning June 1, 1944, on the same terms as provided above, for the final three years of the 1939-1944 period, providing, however, we give Detective notice in writing by registered mail before February 1, 1943, of our renewal.

000000823

EXHIBIT 4
14

-2-                                          9/22/38

We are to have reasonable editorial supervision of the feature which
the Artists agree to maintain at the standard shown in the sample
submitted.  In turn, we agree to use our best efforts to sell this
feature to as large a list of newspapers as possible, and at the best
prices obtainable in each case.

Detective and Artists agree to cooperate with us in our sales efforts
by supplying on request, any information and assistance, without cost
to you however, that we may require for promotion purposes.

Statements will be made to Detective and a copy to Artists, between the
25th and 30th of each month, covering sales of the month previous and
will be accompanied by check for its abovementioned share of the amount
collected to the date of the statement.  Detective and the Artists or
their authorized representative may inspect our books of account in
reference to the feature, at any reasonable time.

The material contained in the feature which we syndicate will be copy-
righted in our name, but copyright reverts to Detective at the termina-
tion of this contract.  The title "Superman" shall always remain the
property of Detective and the feature may be used by Detective for any
other purpose except daily or weekly newspaper publication.  Our agree-
ment covers newspaper rights only.  Radio, motion picture, silent and
talkie, book and all other rights are retained and owned by Detective.

The Artists agree to supply the feature required for the newspaper
syndicate publications to us, on an advanced schedule of at least six
weeks, or such other reasonable period as may be determined by us to
insure ample time for distribution prior to release dates.  In the event
the Artists shall at any time fail to furnish the feature, and so breach
this agreement, in addition to any other remedies Detective may appoint
other artists to do the feature and strip.

It is agreed that should it be determined at any time during the life of
this contract, that it would be advisable to release a Sunday feature of
"Superman" strip, we are to have exclusive rights to such a Sunday feature,
on the same terms as outlined herein for the daily strip.

The Artists are to be paid for their work solely by Detective.

Detective agrees that during the life of this contract, before it shall
submit any other comics for newspaper syndicate purposes, it shall offer
said comics to us for first refusal for a six week period.

We agree to provide Detective with all the original drawings of the
"Superman" strip, so that said drawings may be used by Detective in the
publication "Action Comics", six months after newspaper release, without
charge or for any substituted magazines.

000000824

EXHIBIT 4
15

ER-1263

-3-                                    9/22/38

This agreement does not prohibit Detective from selling to foreign country newspapers rights to use any material which may appear in any magazines published by Detective containing and including "Superman".

It is understood that in the event of an outbreak of a European war, in which Great Britain should become involved during the period of October 1, 1958 to February 1, 1939, the McClure Syndicate has the right to cancel this agreement.

                                   Very truly yours,

                                   THE McCLURE NEWSPAPER SYNDICATE

                                   By: _____, Pres.

DETECTIVE COMICS, INC.

BY: _Harry Schuster_

_Jerome Siegel_

_Joseph Shuster_

000000825

EXHIBIT 4
16

ER-1264

# EXHIBIT 5

ER-1265



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

September 28, 1958

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

Your letter of the 26th reached me yesterday afternoon, just as Mr. Gaines and I were going over the syndicate contract and making the changes which you discussed with him the last day you were in New York, That is, an 8 months' option instead of 4 months, with the further provision that if a war should break out in Europe, in which England should be involved during the first 4 months of this 8 months option period, Mc Clure would have the right to cancel the agreement.

I am sending you herewith three copies of the contract with the corrections indicated thereon, as well as the contract between ourselves. Please note that you and Joe are to sign all three contracts between McClure, Detective Comics and yourselves and you are also to initial the changes where I have already put my initials on all three copies. Please return these three signed copies together with the two copies of our agreement signed by both of you by return mail, so that when Mr. Donenfeld comes back to New York in the next day or two, he can then sign them and I will then have Mr. Gaines get the McClure Syndicate signature on your copy and return your copy of each contract.

Now, in reply to your letter. Frankly, when I got through reading it, it took my breath away. I did not anticipate that when I asked you to come to New York to discuss this matter of newspaper syndication, that you would want to take advantage of this visit and try to boost up your price on "Superman". You must bear in mind, Jerry, that when we started Action Comics, we agreed to give you $10.00 a page, which is $4.00 a page more than anyone else is getting for any feature in any of our four books.

In addition, we're paying you $9.00 and $10.00 a page for the other four features you are drawing for us - again $5.00 and $4.00 a page more than we are paying any other artist. Where you got the idea that anyone was receiving $15.00 a page I'd like to know. As regard your mention that other features contain 6 panels, I beg you to be a little more observant. You will find that all contain 8, with the exception of where the action calls for a double spread. You, who have been the most flagrant violator in this particular respect, should have the least to say about such matters.

000000463

EXHIBIT 5
17

ER-1266



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

-2-

Also, take into consideration that when we decided to come out with Action Comics, we were taking a tremendous gamble involving many thousands of dollars. We have no assurance from anybody that Action Comics would not be a losing proposition - you took no such gamble.

As far as the rate of $25.00 for reprint material is concerned, when "Superman" reaches the same popularity as Dick Tracy, Orphan Annie, Skippy, Mutt & Jeff and dozens of other top-notch features, you will be in a position to ask for more money - and we will be more than happy to compensate you accordingly.

As far as the popularity poll is concerned, we have approximately 500 letters in reply to this contest. If you were so observant, you may have seen that the majority of these letters have not been opened as yet and I don't know whether "Superman" heads the list or "Zatara". If you base the popularity of your strip on the basis of 500 replies, you are grossly exaggerating the importance of "Superman". Don't forget that there are 64 pages in the magazine and that there isn't any magazine being published today that can sell on the basis of any one feature, whether that feature is Pop-Eye, Mickey Mouse, or any other top-notch strip and if I thought for a moment that our magazine depended on your strip, I would certainly make every effort to avoid any such situation.

As a matter of fact, we have today opened the other mail on the poll and we have found that about 25% indicate "Zatara" to be their favorite feature, 20% like "Pep Morgan", 15% like "Tex Thomson" and only 30% have designated "Superman" as their favorite, the balance being scattered among the other features in the magazine, so come off your high horse.

Is it possible that because we treated you like a human being - you suddenly got a swell head? It may also be that you are under the mistaken delusion that because you came into town to a large organization, which gave you time and showed you every courtesy which would be accorded to any big personage, you construed all these actions in the wrong light, that we were trying to get something from you. The case is distinctly the reverse. We were trying to give you, an inexperienced young man, the benefit of our experience and good will, in order that you get ahead in your ambition to become somebody in the comic field.

Don't get the idea that everyone in New York is a "gyp" and a highbinder and because you are treated as a gentleman and an equal, not only by ourselves but by Mr. Gaines and the McClure people, that we are seeking to take advantage of you.

As I have pointed out to you many times, our company has very little to gain in a monetary sense from the syndication of this material. Also

000000464

EXHIBIT 5
18



Publishers of
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

—5—

480 LEXINGTON AVE.
NEW YORK, N. Y.

bear in mind, that we own the feature "Superman" and that we can at any time replace you in the drawing of that feature and that without our consent this feature would not be syndicated and therefore you would be the loser in the entire transaction.

The amount of increase you demand does not hurt me as much as your attitude in the entire matter. I don't want to be too harsh about it, because I realize that because of your inexperience you have made an unfair request. In time, if our association continues, you will learn that you have been very fortunate in meeting up with people who are looking out for your interest as well as their own.

Don't forget Jerry, you and Joe are still young men. When we started to work with you, you were getting very little from Nicholson – when you got it, and not getting anywhere. We have more than doubled your revenue in the last six or seven months and only the future can tell how much farther you will go.

Please give the entire matter your serious thought. It is entirely up to you and Joe, whether you wish our pleasant relationship to continue and whether you wish the strip "Superman" to be syndicated.

Very truly yours,
DETECTIVE COMICS, INC.

JSL:MN

J. S. LIEBOWITZ

P.S. As there were too many changes in the contract, we decided to re-type it, therefore there will be nothing to initial.

000000465

**EXHIBIT 5**
19

ER-1268

Case 12-57245 03/25/2013 ID: 8538472 DktEntry: 10-7 Page 86 of 283

# EXHIBIT 6



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

December 19, 1939

480 LEXINGTON AVE.
NEW YORK, N. Y.

Jerome Siegel and Joseph Shuster,
New York, N. Y.

Dear Sirs:

          We have discussed with you certain changes of procedure and compensation
which we feel it advisable to set forth in a written modification so as to bring
our agreement of September 22, 1938 down to date.

          In the 1938 agreement we had agreed to pay both of you for the art work
and continuity for the comic strips entitled "SUPERMAN," "SLAM BRADLEY", "SPY",
"RADIO SQUAD" and "FEDERAL MEN" at certain rates per page.  Since that time, how-
ever, while both of you have continued to furnish art work and continuity for
"SUPERMAN", only Mr. Siegel has continued to furnish the continuity for the remain-
ing comic strips.  Mr. Shuster no longer furnishes the art work for "SLAM BRADLEY",
"SPY", "RADIO SQUAD" and "FEDERAL MEN".  Also, we have discussed with both of you
a change of your page rate compensation with respect to "SUPERMAN".

          Effective, therefore, upon the signing of this modification, we agree
to pay to both of you for all art work and continuity for "SUPERMAN" at the rate
of $20. per page, and both of you agree that you will at such rate continue to
furnish all art and continuity work for "SUPERMAN" to us in accordance with the
agreement of September 22, 1938.  As to the remaining comic strips, we shall be
free to make other arrangements with Mr. Siegel personally as to the furnishing
of continuity for them and also make other arrangements for the furnishing of art
work for them in view of the fact that Mr. Shuster no longer furnishes the same.

          We have also informed you of our activities in promoting the commercial
exploitation of "SUPERMAN" in other fields in addition to magazine publication and
newspaper syndication.  Such other fields include radio, motion pictures, the toy
and novelty field and others and we have indicated to you our willingness that both
of you receive some portion of the proceeds which may be realized from these addi-
tional activities.  We, therefore, hereby agree to pay to you 5% of all net
proceeds which may be derived by us from all commercial exploitation of "SUPERMAN"
outside of magazine and book publication and newspaper syndication.  Such net
proceeds shall be arrived at by deducting from the gross proceeds from any such
additional sources (except magazine and book publication and newspaper syndication)
all expenses incurred by us in the course of such promotion and exploitation.

          By your signatures below, you hereby confirm the foregoing arrangements
and you hereby further confirm the following:

          1. That we, Detective Comics, Inc., are the sole and exclusive owners
of the comic strip entitled "SUPERMAN" and the other comic strips entitled as above
mentioned, and to all rights of reproduction of all said comic strips and the titles

DCC00007181

**EXHIBIT 6**
20

ER-1270



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

Jerome Siegel & Joseph Shuster

December 19, 1939

-2-

and characters contained therein and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other form of reproduction. We have all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction either in our own names or others at our exclusive option.

2. That you have not done or permitted any act or thing which might impair any of our aforesaid rights with respect to any of the aforesaid comic strips and that so far as you are concerned our full and complete ownership thereof and of all reproduction rights in connection therewith are vested in us free and clear of the rights of any other persons or parties whatsoever.

3. That we have the unrestricted right to adapt, arrange, change, transpose, add to and otherwise deal with any or all said comic strips and the titles, characters and continuity thereof as we in our sole discretion may deem it necessary or advisable to do so.

4. That we have the unrestricted right to grant to others upon such bases as we in our sole discretion shall determine, any of the foregoing rights of reproduction with respect to any of the aforesaid comic strips and the titles, characters and continuity thereof.

You hereby agree to execute any and all further instruments which may at any time be necessary or advisable in connection with any of the foregoing rights and property now vested in us and for that purpose and for all other purposes hereunder you hereby designate us and our successors and assigns your agents and attorneys in fact irrevocably.

This modification shall become effective immediately upon your signing the same below and continue in full force and effect throughout the life of the agreement dated September 22, 1938 as the same has been modified hereby. Both you and ourselves hereby ratify and confirm the foregoing agreement dated September 22, 1938 as the same has been modified by this letter.

Very truly yours,
DETECTIVE COMICS, INC.

By *Harry Donenfeld*

*Pres.*

APPROVED AND ACCEPTED:

*Jerome Siegel*
Jerome Siegel

*Joseph Shuster*
Joseph Shuster

DCC00007182

EXHIBIT 6
21

ER-1271

Case 12-57245 03/25/2013 ID: 8558472 DktEntry: 10-7 Page 89 of 283

# EXHIBIT 8

Page 3

## Certificate of Registration of a Claim to Renewal Copyright

FORM R

REGISTRATION NO.

R 362187

DO NOT WRITE HERE

This Is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office. In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminski*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

(a) Name ...NATIONAL PERIODICAL PUBLICATIONS, INC.

Address ...575 Lexington Avenue, New York 22, New York

Claiming as ..Proprietor of copyright in a composite work

(b) Name ....................................................................

Address ....................................................................

Claiming as ....................................................................

(c) Name ....................................................................

Address ....................................................................

Claiming as ....................................................................

**2. (a) Title:**

.....ACTION COMICS, Vol. 1, No. 1

.....June 1938 Issue

(b) Renewable Matter: ....................................................................

(c) Contribution to Periodical or Other Composite Work: ....................................................................

....................................................................

(Title of periodical or composite work)

If a periodical, give: Vol. ............ ; No. ............ ; Date ............

**3. Authors of Renewable Matter:** ....................................................................

....................................................................

....................................................................

**4. Facts of Original Registration:**

Original registration number: Class ...C. I. B. ...; No. B. 379,787

If registered as published, give date of publication ...April 18, 1938

If registered as unpublished, give date of registration ....................................................................

Original copyright claimant ..DETECTIVE COMICS, INC.

EXAMINER

*Complete all applicable spaces on next page*

EXHIBIT H

DCC00045628

EXHIBIT 8
28

**5. Deposit account:**

**6. Send correspondence to:**

Name ..WILLIAM.K..FRIEDMAN.............................. Add..11.East.44th.St.,.New.York,N.Y..10017

**7. Send certificate to:**

(Type or print name and address)

Name .....WILLIAM.K..FRIEDMAN......................

Address ...11.East.44th.Street..........................
(Number and street)

....New.York.............New.York........10017...
(City)          (State)          (ZIP code)

### Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

NATIONAL MUSICAL PUBLICATIONS, INC

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15,

*Time limits.* 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received* in the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

### How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

### Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

**A.** The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* ....................... and/or *the child*
(Name of author)

*(children) of the deceased author* .......................
(Name of author)

3. The author's executor(s), if the author left a will and

if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*

.......................
(Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*

....................... *there being no will.*
(Name of author)

**B.** In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

*a corporate body otherwise than as assignee or licensee of the individual author.* (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received | |
| JUN - 1 1965 | |
| Fee received | |
| 97425 JUN-1'65 | |

U. S. GOVERNMENT PRINTING OFFICE : 1964 O - 721 - 480          (May 1964—50,000)          *Page 4*

DCC00045629

**EXHIBIT 8**
**29**

**ER-1274**

Page 3

## Certificate of Registration of a Claim to Renewal Copyright

FORM R

REGISTRATION NO.

R 362188

DO NOT WRITE HERE

This Is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office. In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

(a) Name ...... NATIONAL PERIODICAL PUBLICATIONS, INC.

Address ...... 575 Lexington Avenue, New York, N.Y. 10022

Claiming as Proprietor of copyright in a work made for hire

(b) Name

Address

Claiming as

(c) Name

Address

Claiming as

**2. (a) Title:**

"Superman" a comic strip constituting front cover and pages 1-13 inclusive in body of ACTION COMICS - Vol.1, No.1, June 1938 issue

(b) Renewable Matter:

(c) Contribution to Periodical or Other Composite Work:

(Title of periodical or composite work)

If a periodical, give: Vol. ...............; No. .............; Date

**3. Authors of Renewable Matter:**

**4. Facts of Original Registration:**

Original registration number: Class C.I.D.; No. B 379,787

If registered as published, give date of publication ...... April 18, 1938

If registered as unpublished, give date of registration ......

Original copyright claimant DETECTIVE COMICS, INC.

*Complete all applicable spaces on next page*

EXAMINER

EXHIBIT I

DCC00045630

EXHIBIT 8
30

ER-1275

5. **Deposit account:** ......

6. **Send correspondence to:**

Name WILLIAM K. FRIEDMAN ............... Address 11 East 44th St., New York, N.Y. 10017

7. **Send certificate to:**

(Type or print name and address)

Name WILLIAM K. FRIEDMAN

Address 11 East 44th Street
(Number and street)

New York _____ New York _____ 10017
(City) _____ (State) _____ (ZIP code)

## Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

NATIONAL PERIODICAL PUBLICATIONS, INC.

### Time limits

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15, 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received* in the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

### How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

### Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

A. The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* ....... *and/or the child*
(Name of author)

(children) of the deceased author ....................
(Name of author)

3. The author's executor(s), if the author left a will and

if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*
............
(Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*
............ *there being no will.*
(Name of author)

B. In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

a corporate body otherwise than as assignee or licensee of the individual author. (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received | |
| JUN - 1 '65 | |
| Fee received | |
| 97425 JUN-1 '65 | |

U. S. GOVERNMENT PRINTING OFFICE : 1964 O - 731 - 480 ............ (May 1964—50,000)

Page 4

DCC00045631

**EXHIBIT 8**
**31**

**ER-1276**

Case 13-57245, 03/05/2013, ID: 8538472, DktEntry: 18-7, Page 94 of 283

# EXHIBIT 13

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

JEROME SIEGEL and JOSEPH SHUSTER,   :

                          Plaintiffs,  :        69 Civ. 1429

          -against-         :

NATIONAL PERIODICAL PUBLICATIONS,   :      __AFFIDAVIT__
INC., JACOB S. LIEBOWITZ, IRWIN
DONENFELD and PAUL H. SAMPLINER,    :

                    Defendants.  :

- - - - - - - - - - - - - - - - x

STATE OF CALIFORNIA   )
                  : ss.:
COUNTY OF LOS ANGELES )

        JEROME SIEGEL, being duly sworn, deposes and says:
I am one of the plaintiffs and submit this affidavit in opposition
to the defendants' motion for summary judgment.

Superman In Years Prior To Our Association With Detective Comics

        In 1933 Joe Shuster, my co-plaintiff, and I, put
Superman in form suitable for comic book publication.  In about
mid-1934 we directed our attention to the newspaper comic strip
market.  More particularly, we prepared one week of daily strips,
the art work for which was completely inked.  These strips, suf-
ficient for a six day newspaper run, were in all respects ready
for reproduction and ultimate publication.

        We also prepared three additional weeks of "Super-
man" newspaper comic strip material.  These differed from the
first week's material only in that the art work, dialogue and
the balloons in which the dialogue appeared had not been inked,

EXHIBIT 13
129

DCC00003479

a step essential for reproduction.  In all other respects the
additional three weeks of strips were ready for publication.  In
all material the characters were drawn and the story continuity
and dialogue were set.

In addition, I prepared a synopsis of the story
continuity appearing in the three weeks of penciled daily strips.
Because we did not want to risk the loss of all the art work we
had done, either through the mails or a failure to return it, the
synopsis was sent to prospective out-of-town newspaper syndicates
and publishers, in lieu of the three weeks of penciled strips,
together with the first week of inked strips.  The synopsis just
described is annexed as Exhibit A.

All of this had been done more than three years
before Joe Shuster and I had any contact with the defendant's
predecessor, Detective Comics, Inc.

The Superman material was taken by us to a number
of prospective purchasers.  It is not true as the defendants
state, that the property was uniformly rejected.  In 1935
Malcolm Wheeler-Nicholson, a publisher of comic books, expressed
interest in Superman and tried to persuade us that the property
would be more successful if published in comic book form where
it would be seen in color, than it would be in a black and white
daily strip.  Our experience with him had been such that we did
not consider him the publisher to entrust with the property and
his proposal was rejected.  A copy of his proposal is annexed
as Exhibit B.

<u>Our Association With Detective Comics</u>

In 1936 and 1937 Joe Shuster was doing the art
work and I was writing the continuity for several comic strips

-2-

**EXHIBIT 13**
**130**

two of which in 1937 appeared in Detective Comics. This arrange-
ment called for the strips upon which we collaborated to be sub-
mitted to the publisher of Detective Comics, Mr. Wheeler-Nicholson,
and we were paid by him. In 1937 Mr. Wheeler-Nicholson had an
interest in Detective Comics.

Toward the end of 1937 the publisher fell behind
in its payments for the strips we supplied. Early in December
of 1937 I received a letter from Mr. Liebowitz, who introduced
himself as the half owner and treasurer of Detective Comics. Mr.
Liebowitz proposed that Detective Comics assume the publisher's
obligation of paying the money due us for the strips we furnished
for publication in Detective Comics. In return he wanted us to
sign a contract which would assure him of receiving art work
and continuity for these specific features for a length of time
to be agreed upon.

In response I came to New York and executed the
agreement annexed to the defendants' answer as Exhibit "B". The
agreement related specifically to two features we were doing
which were published by Detective called "Slam Bradley" and "The
Spy". I was told to return to Cleveland, have Joe Shuster
execute the agreement, and then mail it to Mr. Liebowitz in New
York. With the agreement I enclosed a letter, a copy of which
has been annexed to Mr. Wallace's affidavit as Exhibit 1. Con-
trary to his suggestion, my letter does not indicate that we
regarded Detective as our employer whose direction we would
follow with respect to any new strip. I would have written and
had in the past written, the same type of letter to any publisher
I was trying to interest in my work. I considered Detective as a
potential market only.

-3-

**EXHIBIT 13**
131

Later on in December of 1937 I wrote to a Mr. Gaines at McClure Syndicate (McClure was a newspaper syndicate to whom I submitted properties, including Superman) and referred to two strips I was submitting for consideration by McClure: "Snoopy and Smiley" and "Reggie Van Twerp". In that same letter I asked Mr. Gaines to consider as well certain features I had submitted to Detective for possible use in Action Comics. I told Mr. Gaines that he should feel free to visit Detective's offices and examine this material himself. A copy of this letter is annexed as Exhibit "C".

Detective, I am sure, was aware of the foregoing but never expressed any reservation or took exception to it. Clearly, neither we nor Detective regarded our relationship as one of employer-employee.

Earlier in this affidavit I stated that "Superman" had been submitted to McClure. McClure did not, as Mr. Wallace states, reject Superman, rather it decided not to proceed at that time with its proposed syndicated newspaper.

Early in 1938 Mr. Gaines informed me that it might be a good idea to furnish Detective with the "Superman" material I left with him. This, to my best recollection, consisted of the one week's supply of inked daily strips and three weeks of penciled strips. Mr. Gaines sought my permission to furnish this Superman material to Detective and I gave that permission.

At no time did Detective direct or even request that this material be revised. In fact it was published as we submitted it. The Wallace affidavit makes much of the fact that the number of panels per page were of interest to editor

-4-

EXHIBIT 13
132

ER 1281
SI 00003482

Vin Sullivan. This was the most inconsequential of considera-
tions, his only concern being that there be enough panels per
page to make a thirteen page feature. Detective had its own
internal policy regarding the number of panels that were to
appear on each page and may have been concerned by the "Superman"
format we submitted. Some of our panels were narrow and others
rather large. But in any event the number of panels per page
assumed but minor importance.

It must be remembered, too, that we had no respon-
sibility to Detective regarding "Superman". We could well have
ignored its requests and placed the property elsewhere. Indeed,
we were under no obligation to submit it to Detective in the
first instance.

The Sullivan letters, to which Mr. Wallace makes
constant reference, merely reflect normal editorial correspondence
and this the defendants know. There simply can be no question
about that.

Upon receiving word from Detective that we could
proceed, Joe Shuster, under my supervision, inked the illustra-
tions, lettering and dialogue balloons in the three weeks of
daily strips that had been previously penciled. In addition,
he trimmed certain pictures to meet Detective's panel specifica-
tions and extended others. To assure ourselves of having the
proper number of panels we added several pictures to illustrate
the story continuity, I had already written. Added as well
for this reason was the scientific explanation on page 1 of the
release and the last panel at the foot of page 13. These minor
additions were done on our initiative without any assistance
or direction from Detective.

-5-

**EXHIBIT 13**
**133**

ER 1282
DC0000003483

Because we were under the pressure of an early deadline, Mr. Shuster had time only to retouch or cover the chemically produced Ben Day dots effect on Superman's costume with a fine line shading. These darker tones were clearly evident when "Superman" first appeared in Action Comics. This should be conclusive proof that "Superman" was published in the form it was submitted to Detective. How the defendants can say, as they do at pages 17 and 18 of their memorandum of law, that drawings of Superman made by plaintiffs before they became involved with Detective were never used or published is something I just cannot understand.

My attorneys advise me that to an affidavit prepared by them there will be annexed a copy of the thirteen page "Superman" release which appeared in the first issue of Action Comics. This can be compared with the first week of inked daily strips which was marked as an exhibit at my examination before trial and compared with the synopsis, Exhibit "A" to the affidavit, and it will readily be seen that Superman as rendered by Joe Shuster and I, years before our association with Detective, was in fact used in that first issue of Action Comics.

Following the inking, trimming, etc. Mr. Shuster cut the panels prepared for newspaper form and pasted them in a form suitable for a comic magazine. These were then returned to Detective.

The events just narrated have been previously reported in certain national media. For example, in "Up, Up and Awa-a-y!" an article by John Kobler published in the June 21, 1941 issue of the Saturday Evening Post, the author stated:

> Without great enthusiam Donenfeld asked Siegel and Shuster to paste up their original strips into a single thirteen-page story and offered them ten dollars a page.

-6-

**EXHIBIT 13**
134

ER 0280
0003484

Reference is made to this article lest it be thought that our version is of but recent vintage.

### The March 1, 1938 Release

       This document, Exhibit A to the defendants' answer, was sent to us for execution after "Superman" had been submitted to Detective for publication but prior to its actual publication. Accompanying the document was a letter dated March 1, 1938 from Mr. Liebowitz which in part read as follows: I am also enclosing a form of release for your feature entitled "Superman", which is scheduled for our new book ACTION COMICS. Will you please have same signed by yourself and Mr. Schuster and return to us. As soon as we can get ourselves adjusted, I will prepare releases for all your features now appearing in our magazines. I have no knowledge of what releases you may have signed for Major Nicholson and as long as we have taken over these magazines, we would like them conducted in a more business-like manner. Therefore, I think you will agree that releases are necessary.

I think these magazine properly managed can grow and the artists will be in a position to better themselves. I would therefore like you to give our work your best efforts."

A transcript of this letter was marked as an exhibit at my examination before trial.

       At the time I was twenty-three years old. Prior to that I had dealings with the Nicholson publishing firm, the principal of which, Mr. Wheeler-Nicholson, was associated with Mr. Liebowitz at Detective Comics. He had written to me that I should not be concerned with the effect of language of release included on the back of checks given me in payment for features

-7-

**EXHIBIT 13**
**135**

DCComics0003485

I wrote.  Indeed he assured me that such language did not divest
me of my rights in these features except for first serial rights.
Annexed as Exhibit "D" is a copy of such a letter dated May 13,
1936.

I believed that the March 1, 1938 agreement would
be given the same effect and never consulted an attorney or spoke
to anyone else, except Mr. Shuster, before signing it.  Mr.
Liebowitz at this time was constantly assuring us that we would
be fairly treated and Detective seemed to us to be a responsible
firm.  We signed for these reasons; not merely to see "Superman"
in print, an opportunity afforded us by Mr. Wheeler-Nicholson in
the past.

### The Westchester Action

The Westchester action was in no way concerned
with the ownership of the renewal copyright to "Superman".  It
resulted in a finding that a feature I had created and submitted
to Detective Comics, "Superboy" had been illegally appropriated
and published by the defendants.  The Court ruled that because
of that illegal appropriation the defendants were obligated to
pay such actual damages as were sustained, render an accounting
as to the income derived from the publication of "Superboy", and,
the Court enjoined the defendants from further publishing
Superboy.

In addition, the Court ruled that the defendants
were obligated to account to Joe Shuster and me for all moneys
received by them from the exploitation of "Superman" in radio
and motion pictures and from the licensing of "Superman" to
third parties for merchandising purposes.

-8-

**EXHIBIT 13**
**136**

ER 1285

Although I understand that a Notice of Appeal was served and filed, the matter was ultimately settled when the defendants paid $94,013.16 to Joe and I. According to exhibits filed in the Westchester action, prepared, I believe, by the defendants, the net profits derived from the use of Superman in radio and for licensing purposes only during the years 1942-1945 inclusive only was in excess of $94,000.

In addition "Superboy" was a very valuable property in its own right.

The settlement sum paid by the defendants in the Westchester action was solely referable to "Superboy" and the use of "Superman" in radio, motion pictures and for licensing purposes.

That we were enjoined from using "Superman" or seeking to exploit Superman is entirely consistent with the defendants' interest in the property for the initial term of copyright. But this has nothing to do with the renewal copyright, a subject that is not even raised in all of the papers annexed to the defendants' answer in this case.

Finally, Superman at the time was an overwhelming success, an established success, and surely, if the renewal copyright to the property were an element, the amount of the settlement would have been substantially higher and the words "renewal copyright" would have specifically been mentioned in the settlement documents.

### The Leo Rosen Letter

To his affidavit Mr. Wallace has appended Exhibit 7 a letter dated April 15, 1952 from Mr. Leo Rosen of the firm of

-9-

**EXHIBIT 13**

137

ER 1286

DC 0000003487

Greenbaum, Wolf and Ernst to Mr. Gabriel Kaslow of the firm of
Weil, Gotshal & Manges, attorneys for the defendants.

       Contrary to Mr. Wallace's statement in paragraph
22 of his affidavit, I did not retain the firm of Greenbaum, Wolf
and Ernst to represent me in any claim I might have against the
defendants. In 1952 I was, as the defendant well knows, literally
financially destitute. I wrote to National for assistance but was
turned down. I then wrote a veritable blitzkrieg of letters to
publishers, etc., openly informing them of my situation. Soon
I was contacted by a lawyer who had done some work for National
at one time, a Mr. Alterbaum. He told me to stop writing letters
and gave me enough money to last two weeks. He later told me
this money had come from National.

       When this was spent I called Mr. Liebowitz who told
me to call Mr. Kaslow. Mr. Kaslow suggested I work through an
intermediary and I approached the Greenbaum firm which had per-
formed some services at the conclusion of the Westchester action.

       Given my then financial situation and my inability
to provide even necessities for my family, I signed the letter.
However, I went to that firm not to prosecute any claim, nor to
seek their assistance or advice on any claim I might have. I
went there solely because it was an avenue that offered hope of
receiving some financial assistance.

### Income received from exploitation of Superman

       Although Joe Shuster and I did receive something
in the area of $400,000 from all sources on account of the ex-
ploitation of Superman, some $200,000 of this amount was derived
solely from the newspaper syndication of the property. Income
from Detective's employment of the character in its comic books

-10-

**EXHIBIT 13**

**138**

probably amounted to something like $200,000 over a nine year period, or an average of $11,000 a year for each of us. Out of his share Joe Shuster had to compensate his art staff.

Although Mr. Wallace seeks to make much of the fact that I was paid for releases, I did not write while I was away in the Army, it was while I was so engaged that the defendants appropriated "Superboy".

It may be that Joe Shuster after 1943 could not meet all the demands of his work but this was due to failing eyesight. Although he did receive compensation he had, in turn, to compensate artists working for him.

For all of the foregoing reasons, I respectfully request that the motion for summary judgment be in all respects denied.

_Jerome Siegel_
Jerome Siegel

Sworn to before me this
_1st_. day of _March_ , 19_13_.

_Siguant Molina_
Notary Public

-11-

**EXHIBIT 13**
**139**

ER1288    ER000348

# EXHIBIT 14

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

JEROME SIEGEL and JOSEPH SHUSTER, :

     Plaintiffs, :

   -against-  :  <u>69 Civ. 1429</u>

NATIONAL PERIODICAL PUBLICATIONS, :
INC., JACOB S. LIEBOWITZ, IRWIN   <u>AFFIDAVIT</u>
DONENFELD and PAUL H. SAMPLINER, :

     Defendants. :

- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK  )
       : ss.:
COUNTY OF NEW YORK )

   JOSEPH SHUSTER, being duly sworn, deposes and says:
I am a co-author of the Superamn comic strip. More particularly,
I drew the art work and lettering that appeared in the original
strip. I make this affidavit in opposition to the defendants'
motion for summary judgment.

   I have read the affidavit of Jerome Siegel sub-
mitted in opposition to the motion and confirm the accuracy of
its contents. There are, however, several points that I would
like to make independent of Mr. Siegel's affidavit.

   I signed the March 1, 1938 agreement because Jerry
Siegel impressed me when he said that Mr. Liebowitz would treat
us fairly and that the property would be successful if he was
handling it. Jerry, at this time, handled all business matters
such as this and I was largely guided by what he had to say.

   I am aware that the defendants on this motion have
taken the position that they directed Jerry and I to revise and

**EXHIBIT 14**
**140**

**ER 1290**
DCC00003477

expand the Superman material submitted to them. This contention is false. The only thing I had to do to prepare Superman for comic book publication was to ink the last three weeks of daily strips which I had previously completely penciled in detail. In addition, I inked the lettering and the dialogue and story continuity and inked in the balloons containing the dialogue. Certain panels I trimmed to conform to Detective's page size. I drew several additional pictures to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release. Finally, I drew the last panel appearing on the thirteenth page. We were given no instructions or directions by Detective as to what to do or what to include in Superman. Detective's only concern was that there would be panels sufficient for thirteen complete pages. Jerry told me that Detective preferred having eight panels per page but in our judgment this would hurt the property. I specifically refer to the very large panel appearing on what would be page 9 of the thirteen page release. We did not want to alter this because of its dramatic effect. Accordingly, on this page but six panels appeared.

For the foregoing reasons and for the reasons set forth in Mr. Siegel's affidavit, I request that the defendants' motion be denied.

_Joseph Shuster_
Joseph Shuster

Sworn to before me this
7ᵗʰ day of March, 1973.

_Ernest F. Barnes_
Notary Public

ERNEST F. BARNES
Notary Public, State of New York
No. 24-5194165  Qual. in Kings Co.
Certificate Filed in New York County
Term Expires March 30, 1974

-2-

EXHIBIT 14
141

ER 1291

# EXHIBIT 16

Sunday
Nov. 12/ 1978

Dear Sol—

I enjoyed seeing you in L.A.— I want to thank you for excellent lunch at the Beverly Hills Hotel.

Jerry & I are looking forward to our trip to Washington D.C. & N.Y. to attend the Premiers of the SUPERMAN movie.

You suggested that I write to you regarding extra tickets. I would be very grateful if you could arrange to send 3 extra tickets for the N.Y. matinee showing on Dec. 12th. My sister is flying in from Texas for a re-union with me & my brother. Also, would appreciate an extra ticket for myself & for a girl-friend who is anxious to see the movie with me. (I would enjoy seeing the movie again too.)

I send along all my best wishes to you and everyone at D.C. and WARNERS. Thanks for your kindness & co-operation. — Looking forward to seeing you & your wife at the SUPERMAN Premier in Washington, D.C.

Warmest regards to all,

Joe

JOE SHUSTER
1519 SIXTH ST. # 7
SANTA MONICA, CALIF. 90401

RECEIVED
NOV 16 1978

**EXHIBIT 16**
177

ER-1293

# EXHIBIT 18

ER-1294

75 Rockefeller Plaza
New York, NY 10019
212 484 6520

Martin D. Payson
Vice Chairman
and General Counsel

# TIME WARNER INC.

March 12, 1990

Mrs. Joanne Siegel
11928 Darlington Avenue, apt. 102
Los Angeles, CA  90049

Dear Joanne:

    This is to let you know that the cost of living for the Los Angeles area for 1989 increased by 5.15% over 1988. Accordingly, I am instructing the payroll department to make the 5.15% increase, to be applied to Jerry and Joe's compensation retroactive to January 1, 1990.

    With best wishes to you, Jerry and Joe.

Cordially,

Martin D. Payson

cc:  Joe Shuster
      Elaine Klein

**EXHIBIT 18**
179

DCC00004908
ER-1295

# EXHIBIT 23

*Martin D. Payson*
*Vice Chairman*

 **TIMEWARNER**

September 8, 1992

Mrs. Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque, NM 87114

Dear Mrs. Peavy:

I wish to acknowledge your letter of August 21, 1992 which arrived while I was away on vacation.  I understand how difficult it was for you to write such a letter, but I am pleased that you chose to do so.

We certainly are prepared to assist Joe's family by paying the final debts and expenses described in your letter.  I have forwarded a copy of your letter with the schedule of debts and expenses to Paul Levitz, Executive Vice President for DC Comics. Paul will arrange for direct payment of each of the outstanding bills.  If you receive any further inquiries from creditors, please forward them directly to Paul Levitz.  His address is as follows:

>    DC Comics
>    1325 Avenue of the Americas
>    New York, NY 10019

I wish to take this opportunity to extend to you my personal condolences on Joe's passing, and I look forward to meeting you at the memorial service on September 24th.

>    Sincerely,

>    *Martin D. Payson*

>    Martin D. Payson

cc:  Paul Levitz

*Time Warner Inc. 75 Rockefeller Plaza  New York NY 10019  Tel 212.484.6520*

DCC00006498

**EXHIBIT 23**
**201**

**ER-1297**

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10  DC COMICS,                              Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,                  **PLAINTIFF DC COMICS'**
                                            **NOTICE OF MOTION AND**
12        v.                                **MOTION FOR PARTIAL**
                                            **SUMMARY JUDGMENT ON ITS**
13  PACIFIC PICTURES                        **FIRST AND THIRD CLAIMS FOR**
    CORPORATION, IP WORLDWIDE,              **RELIEF**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN              DECLARATIONS OF DANIEL M.
15  PEARY, as personal representative of    PETROCELLI AND PAUL LEVITZ;
    the ESTATE OF JOSEPH SHUSTER,           STATEMENT OF
16  JEAN ADELE PEAVY, an individual,        UNCONTROVERTED FACTS AND
    LAURA SIEGEL LARSON, an                 CONCLUSIONS OF LAW; AND
17  individual and as personal              [PROPOSED] ORDER FILED
    representative of the ESTATE OF         CONCURRENTLY HEREWITH
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
                Defendants.                 Hon. Otis D. Wright II
20
21                                          **Hearing Date**:    Aug. 20, 2012
                                            **Hearing Time**:    1:30 p.m.
22                                          **Courtroom**:       11
23
24
25
26
27
28

                                            **ER-1298**

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 20, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled court, located in Courtroom 11 at 312 North Spring Street, Los Angeles, California 90012, plaintiff DC Comics ("DC") will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on its First and Third Claims for Relief.

DC's First Claim alleges five independent grounds for deeming invalid the copyright termination notice filed on November 10, 2003, by the heirs of Superman co-creator Joseph Shuster. First Amended Compl. ("FAC"), Docket No. 49 ¶¶ 105-34. There are no issues of material fact as to three of these grounds, warranting summary judgment in DC's favor:

(1) In exchange for more than $600,000 and other benefits, Jean Peavy—the sole beneficiary of Shuster's estate—entered into a 1992 agreement with DC that rescinded all of Shuster's prior copyright grants and re-granted to DC any copyright interests that Shuster or his heirs may have held. This agreement eliminated any pre-1978 copyright grant that might otherwise be subject to termination under the Copyright Act. *See* 17 U.S.C. §§ 304(c)-(d), 203(a); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-02 (2d Cir. 2008).

(2) In 2001 and 2003, Jean Peavy, her son Mark Peary, and the Estate of Joseph Shuster "assign[ed]" their putative "copyright termination interest in 'SUPERMAN'" and any "termination" rights they possessed to a joint venture with Pacific Pictures Corporation, defendant Marc Toberoff's film production company. When the Shuster Estate served its copyright termination notice weeks later in November 2003, none of Jean, Mark Peary, or the Shuster Estate possessed the majority (or greater than 50%) share of Joe Shuster's putative termination interest required to terminate under the

DC'S MOT. FOR PARTIAL SUMM. J.

Copyright Act and Copyright Office regulations. *See* 17 U.S.C. §§ 304(d), 304(c)(1); 37 C.F.R. §§ 201.10(b)(1)(vii), (c)(2); *Steinbeck*, 537 F.3d at 202. Defendants' undisputed failure to disclose the transfer of their purported termination interest to Pacific Pictures was not "harmless error"—both the notice and the sworn declarations filed with it concealed material facts about defendants' illicit agreements in violation of federal law.

(3)  The Shuster heirs' copyright termination notice is premised on § 304(d) of the Copyright Act, which allows termination only by certain individuals whose rights "expired" under § 304(c) of the Act.  17 U.S.C. §§ 304(c)-(d).  Because Joe Shuster passed away in 1992 without exercising any purported termination right or leaving a statutory heir to inherit it, his termination right did not "expire"—it simply ceased to exist.  As a result, there is no statutory basis for the Shuster heirs to terminate under § 304(d).

Summary judgment is also warranted in DC's favor on its Third Claim, which arises under § 304(c)(6)(D) of the Copyright Act.  FAC ¶¶ 165-73.  Section 304(c)(6)(D) establishes that during the 10-year notice period before the Shuster heirs' copyright termination notice purports to take effect (2003 to 2013), the Shusters were and are barred from entering into any agreement regarding the putative rights they hope to recapture with any party other than DC, the original "grantee" to those rights.  17 U.S.C. § 304(c)(6)(D).  It is *undisputed* that defendants have entered into various rights-tying agreements that improperly restrict the Shuster heirs' freedom to enter into agreements with DC during that 10-year notice period, including the Pacific Pictures agreements, as well as a 2008 "consent agreement" with the heirs of Superman co-creator Jerry Siegel, which remains in effect today.  Defendants admit the Pacific Pictures agreements are "not lawful" under § 304(c)(6)(D)—effectively conceding liability for part of DC's Third Claim.  Defendants dispute whether their 2008 consent agreement is unlawful, but their admissions in deposition establish its illegality.

DC'S MOT. FOR PARTIAL SUMM. J.

This motion is made pursuant to Federal Rule of Civil Procedure 56, Central District Local Rule 56, and this Court's Standing Order Regarding Newly Assigned Cases (Docket No. 18).  This motion is made following several conferences of counsel on June 27, 2012, and days subsequent, pursuant to Central District Local Rule 7-3.  Marc Toberoff, counsel for defendants Mark Warren Peary and Laura Siegel Larson, has said he is unavailable for a hearing on August 20, 2012, due to vacation plans he told us about last week.  Decl. of Daniel M. Petrocelli ¶ 51 & Ex. 50.  As we have told Mr. Toberoff, if he is truly unavailable on August 20, DC is amenable to setting a hearing date (on DC's motion for summary judgment and any cross-motion defendants might file) for a later hearing date in September 2012 that is convenient for the Court, and assuming a hearing is required.  *Id.*  However, as DC explained to Mr. Toberoff, DC is unwilling to permit him to use his unavailability on August 20 to alter his briefing obligations—and the normal briefing deadlines—under the rules.  *Id.*  DC offered Mr. Toberoff a briefing schedule and hearing date that would have avoided impacting his vacation in any way; he declined it.  *Id.*

This motion is based on this Notice of Motion and Motion and accompanying Memorandum of Points and Authorities; the concurrently filed Declarations of Daniel M. Petrocelli and Paul Levitz; the concurrently filed Statement of Uncontroverted Facts and Conclusions of Law; the concurrently filed Proposed Order; and all exhibits, files, and records on file in this action, matters of which judicial notice may be taken, and such additional submissions and argument as may be presented at or before the hearing on this motion.

Dated:  July 16, 2012                    Respectfully submitted,

By:  /s/ Daniel M. Petrocelli
        Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1301

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................... 3

        A.      Joe Shuster's Agreements And Relationship With DC ........................ 3

        B.      Jean Peavy's 1992 Agreement With DC ........................................ 5

        C.      Mark Peary Looks To Recapture The Superman Copyrights .............. 7

        D.      This Lawsuit ................................................................................ 9

III.    SUMMARY JUDGMENT IS WARRANTED ON DC'S FIRST
        CLAIM ................................................................................................... 10

        A.      The 1992 Agreement Bars The Shusters From Terminating ............. 10

        B.      The Estate Lacked The Majority Interest Necessary To
                Terminate ................................................................................. 18

        C.      The Shuster Heirs Have No Statutory Right To Terminate ............... 21

IV.     SUMMARY JUDGMENT IS WARRANTED ON DC'S THIRD
        CLAIM ................................................................................................... 23

V.      CONCLUSION ...................................................................................... 25

DC'S MOT. FOR PARTIAL SUMM. J.

# TABLE OF AUTHORITIES

## CASES

*Blair & Co. v. Otto*,
  5 A.D.2d 276 (N.Y. App. Div. 1958)........................................ 13, 14

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
  683 F.2d 610 (2d Cir. 1982) .................................................... 19, 20

*C3 Media & Mktg. Group v. Firstgate Internet, Inc.*,
  419 F. Supp. 2d 419 (S.D.N.Y. 2005) .......................................... 14

*CBOCS West, Inc. v. Humphries*,
  553 U.S. 442 (2008) ................................................................... 24

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ........................................... 15 , 16, 17

*Estate of Molino*,
  165 Cal. App. 4th 913 (2008) ...................................................... 15

*Flowers v. Carville*,
  310 F.3d 1118 (9th Cir. 2002) ..................................................... 25

*Goldbard v. Empire State Mut. Ins. Co.*,
  5 A.D.2d 230 (N.Y. App. Div. 1958) ........................................... 13

*Goldome Corp. v. Wittig*,
  221 A.D.2d 931 (N.Y. App. Div. 1995) ........................................ 14

*Groves v. Prickett*,
  420 F.2d 1119 (9th Cir. 1970) ..................................................... 24

*Hartzheim v. Valley Land & Cattle Co.*,
  153 Cal. App. 4th 383 (2007) ...................................................... 24

*In re Kalt's Estate*,
  16 Cal.2d 807, 811 (1940) ........................................................... 15

*In re Pacific Pictures Corp.*,
  679 F.3d 1121 (9th Cir. 2012) ................................................... 2, 7

*In re WorldCom, Inc.*,
  2007 WL 2049723 (S.D.N.Y. July 13, 2007) ............................... 14

*Indep. Energy Corp. v. Trigen Energy Corp.*,
  944 F. Supp. 1184 (S.D.N.Y. 1996) ............................................ 14

*Int'l Bank of Comm. v. Int'l Energy Dev. Corp.*,
  981 S.W.2d 38 (1998) ................................................................. 20

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) .............................................*passim*

*Nat'l Res. Def. Council v. E.P.A.*,
  437 F. Supp. 2d 1137 (C.D. Cal. 2006) ....................................... 10

DC'S MOT. FOR PARTIAL SUMM. J.

1   *Norgart v. Upjohn Co.*,
        21 Cal. 4th 383 (1999) ........................................................................ 25
2
    *Pearson v. Super. Ct.*,
3       202 Cal. App. 4th 1333 (2012) ........................................................... 20

4   *Penguin Grp. (USA) Inc. v. Steinbeck*,
        537 F.3d 193 (2d Cir. 2008) ........................................................*passim*
5
    *Polar Bear Prods., Inc. v. Timex Corp.*,
6       384 F.3d 700 (9th Cir. 2004) ............................................................... 25

7   *Sarkisian v. Sayre*,
        2007 WL 4427309 (Cal. Ct. App. 2007) ............................................ 24

8   *Siegel v. Nat'l Periodical Publ'ns*,
        364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d 909 (2d Cir.
9       1974) ...................................................................................................... 4

10  *Suh v. Yang*,
        987 F. Supp. 783 (N.D. Cal. 1997) ..................................................... 25
11
    *Sullivan v. Little Hunting Park, Inc.*,
12      396 U.S. 229 (1969) ............................................................................ 24

13  *Sylve v. Riley*,
        15 Cal. App. 4th 23 (1993) ................................................................. 25
14
    *Touche Ross & Co. v. Redington*,
15      442 U.S. 560 (1979) ............................................................................ 25

16  *TransOrient Marine Corp. v. Star Trading & Marine, Inc.*,
        736 F. Supp. 1281 (S.D.N.Y. 1990) ................................................... 13
17
    *U.S. v. Hardesty*,
18      977 F.2d 1347 (9th Cir. 1992) (en banc) ............................................ 16

19  *Wagner v. CT Cimarron, LLC*,
        320 Fed. Appx. 539 (9th Cir. 2009) .................................................... 24
20
    *Wyatt v. Union Mort. Co.*,
21      24 Cal. 3d 773 (1979) ......................................................................... 25

22                              **STATUTES AND REGULATIONS**

23  17 U.S.C. § 304 ................................................................................. *passim*

24  37 C.F.R. § 201.10(b)(1)(vii) ....................................................................... 18

25  37 C.F.R. § 201.10(e) .................................................................................. 19

26  FED. R. CIV. P. 56(a) ................................................................................... 10

27

28

ER-1304

# OTHER AUTHORITIES

H.R. Rep. No. 941476 (1976) .................................................................. 11, 23, 24

Restatement (Second) of Contracts § 279 (1988) ........................................ 13

S. Rep. No. 104-315 (1996) .................................................................... 22

Supp. Reg.'s Rep. on Gen. Rev'n of U.S. Copyright Law, 89th Cong. 72 (1965) ........................................................................ 10, 21

Second Supp. Ref.'s Rep. on Gen. Rev'n of U.S. Copyright Law, 94th Cong. 307 (1975) ...................................................................... 24

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1305

# I.  INTRODUCTION

DC filed this case in May 2010 to protect its rights in the Superman property it has owned and nurtured for 70 years.  Heirs of Joe Shuster, the first illustrator of Superman, served a copyright termination notice purporting to recapture certain early Superman works as of October 2013.  DC's First Claim contests the validity of that notice, and its Third Claim challenges the web of illicit agreements that Marc Toberoff and his entertainment companies and business partners engineered in violation of DC's rights under the Copyright Act.  Summary judgment is warranted in DC's favor on both claims.  There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.

DC's First Claim.  DC alleges five independent grounds for deeming the Shusters' termination notice invalid, three of which are ripe for summary judgment:

*a. The Shusters' 1992 Agreement with DC.*  The 1976 Copyright Act created a right to terminate certain pre-1978 copyright grants.  Leading copyright termination cases make clear that a post-1978 agreement that supersedes all prior copyright grants before 1978 eliminates any claimed termination right.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008).

Those cases apply with full force here.  In 1992, Shuster's heirs solicited and executed such an agreement, in exchange for valuable consideration from DC.  After Shuster died, his sister and sole heir, Jean Peavy, approached DC asking for financial security for the rest of her life, as well as survivor benefits for her brother Frank, and payment of Shuster's "large unpaid debts," which she and Frank could not pay.  DC agreed, on the condition that this additional compensation would buy complete peace with the Shusters.  DC, Jean, and Frank entered into a 1992 agreement that provided for these benefits and that rescinded all of Shuster's prior copyright grants, re-granted to DC all copyright interests "in any and all work created in whole or in part by … Shuster," and released DC from "all claims[,]

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1306

whether now or hereafter existing" regarding his copyrights.  DC has provided Jean and Frank, to date, more than $600,000 under the contract, and Jean continues to accept payments under it today.  For years, Jean repeatedly affirmed her satisfaction with the 1992 agreement and her intent to "honor" it by not serving a copyright termination notice.  This all changed in 2001, after Jean's adult and jobless son, Mark Peary, began looking for ways to claim an interest in Superman and Toberoff intervened to disrupt the family's longtime contract with DC.  Peary rewrote Jean's will to name himself her sole heir, appointed himself executor of Shuster's Estate in place of Jean, and, in 2003, filed a termination notice for the Estate.

This notice was legally invalid.  The copyright provision Peary invoked only allows termination of copyright grants executed *before* 1978.  17 U.S.C. § 304(d); *Steinbeck*, 537 F.3d at 200-04.  Because the 1992 agreement had the legal effect of extinguishing all pre-1978 copyright grants and replacing them with a new, all-encompassing 1992 grant, there was nothing left for Peary to terminate in 2003.  *Id.* A deal is a deal, and like the Shuster family's claims to the Superman copyrights rejected by the courts in the 1940s and 1970s, this new claim must, too, be rejected.

*b. Lack of Majority Interest.*  By defendants' own admissions, the Estate did not own the required "more than one-half" share, 17 U.S.C. § 304(d)(1), of Shuster's termination interest when it filed its termination notice in 2003.  In 2001, "Toberoff created a joint venture between the [Shusters] and" his company, Pacific Pictures.  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012).  Jean and Peary "assign[ed] to the Venture" all of their putative termination interests, promised not to enter into any agreement concerning those rights "without [Pacific Pictures'] express written consent," and agreed that if the venture were terminated "for any reason," Pacific Pictures would get 50% of the rights.  The Estate ratified in 2003 that the joint venture owned the Shusters' "copyright termination interest."

Two weeks after executing the 2003 Pacific Pictures agreement, Peary and the Estate served the copyright termination notice at issue here, in which Peary and

DC'S MOT. FOR PARTIAL SUMM. J.

1    Toberoff falsely attested that the Estate owned the right to terminate. The notice

2    made *no mention* of the Pacific Pictures Joint Venture, which at the time, by

3    contract, held 100% of the Shusters' putative termination rights. Worse still,

4    Toberoff swore under oath that he investigated "the current ownership of the rights

5    being terminated" and did not disclose his company's plain interest in the rights.

6    These material falsehoods to DC and the Copyright Office are alternative grounds

7    judicially to invalidate the Shusters' termination notice.

8            *c. Section 304(d) Does Not Apply to the Shusters.* The Estate is ineligible to

9    terminate under § 304(d), in any event. This section applies *only* when termination

10   rights under § 304(c) "expired." Under § 304(c), Shuster's window to terminate

11   opened in April 1984 and was set to "expire" in April 1997. Shuster's right to

12   terminate never "expired" because he died in 1992 choosing never to exercise it,

13   and leaving no wife, child, or grandchild to inherit it, as the statute requires.

14           <u>DC's Third Claim.</u> The Court need only reach this claim if it does not grant

15   DC judgment on its First Claim. During the 10-year notice period (2003 to 2013)

16   before the Estate's termination notice purports to take effect, the Shusters are barred

17   by the Copyright Act from entering into agreements regarding their putative

18   Superman copyrights with any party other than DC. *See* 17 U.S.C. § 304(c)(6)(D).

19   Defendants *admit* the Pacific Pictures contracts that Toberoff engineered are "not

20   lawful" under § 304(c)(6)(D)—thus conceding part of DC's Third Claim—and also

21   admit they entered into another rights-tying agreement in 2008 that continues to

22   exist to this day. The Copyright Act bars such "trafficking in future [copyright]

23   interests," *Milne*, 430 F.3d at 1047, and the Court should declare defendants'

24   consent agreements invalid and restore DC's exclusive 10-year bargaining right.

25   **II.    STATEMENT OF FACTS**

26           **A.    Joe Shuster's Agreements And Relationship With DC**

27           Jerry Siegel and Joe Shuster created the character "Superman" in the 1930s;

28   but for years, the pair was unable to find a publisher for their story. Statement of

Uncontroverted Facts ("SUF") 1. In 1938, DC—which had employed Siegel and Shuster to do other work—elected to include Superman in a new comic book titled *Action Comics*. SUF 2. On March 1, 1938, Siegel and Shuster granted to DC the "exclusive right to the use of the [Superman] characters and story." SUF 3. *Action Comics #1* ("*AC#1*"), published on April 18, 1938, featured an adapted version of Siegel and Shuster's Superman story along with several other stories. SUF 4.

After *AC#1* was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements. SUF 5. They were compensated for their work in royalties and bonuses, both of which increased with Superman's success. *Id.* By 1941, the *Saturday Evening Post* reported that the pair stood to make over $2 million (in today's terms) in the next year alone. SUF 6.

The pair's relationship with DC became contentious. In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment. The court concluded that the 1938 assignment granted "all" Superman rights to DC. In 1948, the parties entered into a stipulated judgment under which Siegel and Shuster acknowledged the 1938 assignment granted to DC all rights in Superman. SUF 7.

In 1969, Siegel and Shuster filed another action against DC in New York seeking to recapture the renewal copyright in *AC#1*. The courts again recognized that Siegel and Shuster assigned all of their Superman rights to DC in 1938— including renewal rights. *See Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 1038 (S.D.N.Y. 1973), *aff'd*, 508 F.2d 909, 913-14 (2d Cir. 1974).

Siegel and Shuster faced financial difficulties and, after their legal claims were rejected, turned to DC for help. In a 1975 agreement, DC provided Siegel and Shuster with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" as creators of Superman. SUF 8. Siegel and Shuster again acknowledged that DC owned all Superman-related copyrights. *Id.* Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-

DC'S MOT. FOR PARTIAL SUMM. J.

1   living adjustments, given special bonuses, and paid to have Siegel, Shuster, and

2   their families travel to Superman-related events. SUF 9. All told, the Siegels and

3   Shusters have been paid well over $4 million under the 1975 Agreement, not

4   including medical benefits or bonuses. SUF 10.

5          In 1976, Congress amended the Copyright Act to allow authors and certain

6   statutory heirs to terminate prior copyright grants and recapture the underlying

7   copyrights in certain limited circumstances. 17 U.S.C. § 304. Neither Siegel nor

8   Shuster ever attempted to exercise any purported termination right, although the

9   windows for both to do so opened in 1984, while both were still alive. SUF 11.

10         Shuster passed away on July 30, 1992. SUF 12. Shuster had no wife, child,

11  or grandchild, and his will named his sister, Jean Peavy, as sole beneficiary and

12  executrix of his estate. SUF 13. On August 17, 1992, Jean filed a sworn affidavit

13  in California state court identifying herself as Shuster's "successor" and sole heir

14  and requesting that his property "be paid, delivered or transferred to her." SUF 14.

15         **B.    Jean Peavy's 1992 Agreement With DC**

16         Four days after filing her affidavit in the California probate court, Jean wrote

17  to DC, identifying herself as "heir to [Joe Shuster's] Will" and asking DC to pay

18  Shuster's "final debts and expenses." SUF 15. DC offered to cover Joe's debts and

19  increase survivor payments to his brother Frank from $5,000 to $25,000 per year.

20  SUF 16. On September 10, 1992, Frank sent a letter to DC's then-Executive Vice

21  President, Paul Levitz, stating he was "extremely pleased" with the increased

22  payments, and asking, after "discuss[ing] this good news with [Jean]," that

23  payments be made directly to Jean, who would "send [Frank] whatever money [he]

24  wanted as a gift which would not be taxable to [him]." SUF 17. Frank asked if he

25  and Jean could meet with Levitz in New York to discuss the issue. *Id.*

26         Levitz dealt with scores of authors and heirs during his decades running DC.

27  SUF 18. When DC agreed to grant an author or heir's request for additional

28  money, Levitz would give them the same admonition: this agreement would

1   represent the author/heir's last and final deal with DC, and would fully resolve any

2   past, present, or future claims against DC. *Id.* Levitz reiterated this condition to

3   Frank and Jean in 1992, who confirmed they understood and agreed. *Id.*

4         Following this discussion, the parties executed an agreement on October 2,

5   1992. It confirmed that DC would cover Shuster's debts and pay Jean $25,000 a

6   year for the rest of her life. SUF 19. In exchange, Jean and Frank re-granted all of

7   Joe Shuster's rights (including any Superman copyrights) to DC and vowed never

8   to assert a claim to such rights. The 1992 Agreement stated, in pertinent part:

9         We [DC] ask you to confirm by your signatures below that this
         agreement fully settles all claims to any payments or *other rights or*

10        *remedies which you may have under any other agreement or*
         *otherwise*, whether now or hereafter existing regarding any copyrights,

11        trademarks, or other property right *in any and all work* created in
         whole or in part by your brother, Joseph Shuster, or any works based

12        thereon. In any event, *you now grant to us any such rights and release*
         *us, our licensees and all others acting with our permission, and*

13        *covenant not to assert any claim of right, by suit or otherwise, with*
         *respect to the above, now and forever.* SUF 19 (emphasis added).

14

15        Over the next decade, DC maintained good relations with the Shusters, and

16  Jean and Levitz corresponded regularly. SUF 20. In the close to 60 letters back

17  and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the

18  1992 Agreement, and requested bonus payments in excess of those required. *Id.* In

19  a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to

20  reclaim the SUPERMAN copyright," but asked for an increase in payments "plus a

21  yearly increment to account for inflation." SUF 21. In 1999—after Congress

22  amended the copyright statute to grant additional statutory heirs termination rights,

23  and after learning that Jerry Siegel's heirs had served Superman copyright

24  termination notices on DC—Jean reiterated her commitment "to honor" the 1992

25  Agreement, and again asked for a bonus:

26        I have learned from the Internet that Joanne Siegel has filed a copyright
         claim for SUPERMAN. *I want you to know that I intend to continue to*

27        *honor our pension agreement.* I would, however, appreciate a generous
         bonus for this year as you had done many times in the past. SUF 22.

28

In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. SUF 23. In one instance when Jean asked for more, DC made clear that Jean had no legal rights to make such requests, but would pay her a bonus anyway, which she thanked DC for doing. SUF 24. DC paid the Shusters over $600,000 under the 1992 Agreement and as special bonuses, and DC continues to make payments to Jean to this day, SUF 25—providing her the very security she and Frank requested in 1992.

Jean's 50-year-old son, Mark Peary (born Peavy), who lives with his mother, testified that Jean was of sound mind when she sent these letters to DC. SUF 26. However, he, Jean's doctor, and Jean's daughter have all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying." SUF 27.

DC enjoyed good relations with Peary as well for a time. In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel" called "Dreamers," and asked Levitz to share it with Warner Bros. SUF 28. It detailed how Shuster became estranged from DC, but toward the end of his life, he and DC made amends. *Id*. Warner Bros. declined to develop "Dreamers," and in 1999, Peary submitted a revised script and asked Levitz if the Siegel family's copyright termination effort would "interfere with [him] selling [his] screenplay." SUF 29.

Before he met Toberoff, Peary never told DC the Shusters had a right to terminate or challenged the 1992 Agreement. SUF 30. Instead, from 1992 to 2001, he and Jean affirmed the Agreement and accepted payments under it. *Id*.

### C. Mark Peary Looks To Recapture The Superman Copyrights

Without Jean's knowledge, Peary began looking in 2001 for ways to claim an interest in Superman. He spoke with Toberoff, who also wished "to capture Superman for himself." *Pacific Pictures*, 679 F.3d at 1124-25. Toberoff proposed "creat[ing] a joint venture between the [Shuster] Heirs and" Toberoff's company Pacific Pictures. *Id*. In a November 2001 "Joint Venture Agreement," Peary and

DC'S MOT. FOR PARTIAL SUMM. J.

Jean "transfer[ed] and assign[ed]" the following "Rights" to the Joint Venture:

> The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books….

SUF 31. The agreement provided that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by [the Shusters] and fifty percent (50%) by [Pacific Pictures]." *Id.*

Toberoff, Jean, Peary, and the Shuster Estate reaffirmed the terms of the joint venture in a 2003 amendment "confirm[ing]" that the *joint venture* held the Estate's "copyright termination interest in 'SUPERMAN.'" SUF 32. Peary admits that, in 2003, he understood "that all of the Joe Shuster rights, *termination rights, to the extent they existed*, were being transferred and assigned to the venture just as [the contract] says." SUF 33 (emphasis added). He also concedes, as did Toberoff, that these Pacific Pictures agreements are "not lawful," because, *inter alia*, the Shusters could only make such a rights deal with DC. SUF 34; Docket No. 191 at 8.

Peary negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel. SUF 35. He only told his mother about the agreements "just before [they] were ready to sign." SUF 36. When asked years ago about the Pacific Pictures agreements, Jean testified her "son handles everything legal" and she did not "know what's going on." SUF 37.

In 2003, Peary initiated proceedings to probate Joe Shuster's estate—even though, in 1992, his mother had already filed an affidavit in California probate court to obtain all of Shuster's assets. SUF 38. Peary asked the court to appoint him executor in place of his mother. *Id.* Peary has kept this probate matter open for *nine* years—despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible." SUF 39; Docket No. 186 at 12-13.

Several weeks after initiating the probate matter and signing the 2003 Pacific Pictures Joint Venture contract, Peary, on behalf of the newly formed Shuster

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1313

Estate, served a copyright termination notice on DC purporting to take effect on
October 26, 2013 (the "Notice"). SUF 40. The Notice *nowhere* mentions the Joint
Venture with Pacific Pictures or the fact that the Shusters had transferred all their
putative termination interests to the Venture. *Id.* Attached to the Notice were
sworn certifications by Toberoff and Peary that all information contained in the
Notice was "true and correct" and "signed by all persons whose signature is
necessary to terminate" Shuster's copyright grants. Toberoff also certified "that
before serving the foregoing document …, I caused a reasonable investigation to be
made as to the current ownership of the rights being terminated." SUF 41.

    In 2008, Peary and Jean signed a "consent agreement" with the Siegels that
bars the families from entering into an agreement with DC without the other's
consent. Defendants admit the 2008 agreement remains in force today. SUF 42-43.

### D.    This Lawsuit

    DC filed this action in May 2010. DC's First Claim seeks a declaration that
the "Shuster Termination Notice [is] invalid," on five independent grounds. Docket
No. 49 ¶¶ 106-34. DC is entitled to summary judgment on three of these grounds:

- "The 1992 Agreement Bars the Shusters from Pursuing Termination";
- "The Shusters Lack the Majority Interest Necessary to Terminate," because
  they assigned 50% of their putative rights to Pacific Pictures; and
- "There Is No Statutory Basis for the Shusters to Terminate," given that Joe
  Shuster had no statutory heir under the Copyright Act when he died. *Id.*

    DC's Third Claim, which is brought in the alternative to its First Claim,
alleges that the Pacific Pictures Agreements and 2008 consent agreement
improperly restrict the Shuster heirs' ability to enter into agreements with DC, in
violation of § 304(c)(6)(D) of the Copyright Act.

    Defendants moved to dismiss DC's First and Third Claims, but abandoned
their motion after this Court denied their SLAPP motion. Docket Nos. 333-34,
342-43. As the Court observed in denying that SLAPP motion, "the Pacific

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1314

Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff those rights which were already assigned to DC." Docket No. 337 at 3.

Discovery confirms there are no issues of material fact as to three of the grounds entitling DC to judgment on its First Claim and as to DC's Third Claim. These claims can and should be resolved now—and the cloud of uncertainty surrounding the future of the Superman property after 2013 should be lifted.

**III.  SUMMARY JUDGMENT IS WARRANTED ON DC'S FIRST CLAIM.**

Summary judgment is appropriate where there is "no genuine issue as to any material fact." FED. R. CIV. P. 56(a). Where, as here, the issue raised is a question of law, such as "a question of statutory interpretation, it is appropriate to decide the issue on summary judgment." *Nat'l Res. Def. Council v. E.P.A.*, 437 F. Supp. 2d 1137, 1157 (C.D. Cal. 2006); *see Steinbeck*, 537 F.3d at 196-97, 200-04.

**A.  The 1992 Agreement Bars The Shusters From Terminating.**

The 1976 Copyright Act created a right to terminate pre-1978 copyright grants in certain limited circumstances. Congress crafted the termination provisions as a "compromise" between the interests of copyright authors and their heirs, and grantees like DC, who spent decades developing properties like Superman. *E.g.*, SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH CONG. 72 (1965) ("SUPP. REP.") (termination provisions a "compromise" designed to provide a "benefit to authors … without being unfair to publishers, film producers, and other users"). In 1998, Congress passed the Copyright Term Extension Act ("CTEA"), which extended the term of copyright protection and allowed termination of pre-1978 copyright grants during the extended period.

1. The 1992 Agreement bars the Shusters from pursuing termination because it rescinded all pre-1978 copyright grants that might otherwise be terminable and replaced them with a new, all-encompassing grant. It is well-established that a post-1978 agreement that supersedes all prior copyright grants—like the 1992 Agreement—extinguishes any termination right that may otherwise have existed.

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1315

1    *Steinbeck*, 537 F.3d at 200-04; *Milne*, 430 F.3d at 1045. In writing the copyright

2    termination rules, Congress contemplated that such agreements could serve as an

3    alternative to termination, making clear: "'Nothing in the Copyright Act has altered

4    the power of private powers to contract,'" *Milne*, 430 F.3d at 1045 (quoting

5    legislative history), or "prevent[s] the parties to a transfer or license from

6    voluntarily agreeing ***at any time*** to terminate an existing grant and negotiating a

7    new one," H.R. REP. NO. 94-1476, at 127 (1976) (emphases added).

8        Defendants say the 1992 Agreement is unenforceable under § 304(c)(5) of

9    the Act, which allows termination "notwithstanding any agreement to the contrary,"

10   Docket No. 333 at 19, but Congress' words above, *Milne*, and *Steinbeck*, refute this:

11       a. *Milne* involved the rights to Winnie the Pooh. In 1930, Pooh's author,

12   A.A. Milne, granted copyright interests to SSI in exchange for a share of future

13   royalties. 430 F.3d at 1040. In 1983, A.A.'s son Christopher re-granted the same

14   rights to SSI and agreed not to pursue termination in exchange for increased

15   royalties. *Id.* Year later, Christopher's daughter Clare later attempted to terminate

16   A.A.'s 1930 grant to SSI, but the Ninth Circuit held that her father's 1983 contract

17   revoked all pre-1978 grants that might otherwise be terminable. *Id.* at 1043.

18       Clare argued the 1983 agreement was an unenforceable "agreement to the

19   contrary." *Id.* The Ninth Circuit disagreed, emphasizing that Christopher "freely

20   and intelligently" entered into the 1983 agreement, securing "a better deal" for

21   A.A.'s heirs. *Id.*at 1045. Clare's "current dissatisfaction provide[d] no reason to

22   discredit the validity of the 1983 agreement and the rights conferred thereby." *Id*.

23       b. In *Steinbeck*, the Second Circuit relied upon *Milne* and reached a similar

24   conclusion. In 1938, John Steinbeck granted copyrights in his most popular works

25   to his publisher. After John's death, his termination interest passed by statute to his

26   widow Elaine *and* his children. 537 F.3d at 196, 203. Though Elaine did not hold

27   the majority share of John's termination interest in 1994 necessary to terminate, as

28   successor by will to John's copyrights (and prior to any attempt to terminate by his

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1316

1    children), she entered into an agreement with the publisher superseding the 1938

2    agreement in exchange for increased royalties and other benefits.  *Id.*

3        John's children later served a notice purporting to terminate the 1938 grant.

4    *Id.* at 197.  They argued that Elaine's 1994 agreement was an "agreement to the

5    contrary" because it had the effect of depriving them of their termination rights.  As

6    in *Milne*, the claim was rejected.  *Id.* at 202-04.  The Second Circuit held that it was

7    not proper to read the prohibition of "'agreement[s] to the contrary' so broadly that

8    it would include any agreement that has the effect of eliminating a termination

9    right."  *Id.* at 202.  Authors and heirs can "threaten (or … make good on a threat) to

10   exercise termination rights and extract more favorable terms from early grants of an

11   author's copyright," but they do *not* have "more than one opportunity, between

12   them, to use termination rights to enhance their bargaining power or to exercise

13   them."  *Id.* at 204.  Because Elaine entered into the post-1978 agreement replacing

14   the original grant, no termination right remained.

15       c.  The 1992 Agreement operates the same way as the contracts in *Steinbeck*

16   and *Milne*.  It says the Shusters "*now grant to* [DC] any … copyrights, trademarks,

17   or other property right in any and all work created in whole or in part by [Joe

18   Shuster]…."  SUF 19 (italics added).  Jean and Frank further agreed—going farther

19   than Christopher Milne or Elaine Steinbeck—that their agreement "fully settles all

20   claims to any payments or other rights or remedies … *whether now or hereafter*

21   *existing* regarding the copyrights, trademarks, or other property right in any and all

22   work [he] created…."  *Id.* (emphases added).  As did the contracts in *Steinbeck* and

23   *Milne*, the 1992 Agreement operated to revoke and re-grant all prior grants of

24   Shuster's rights, thereby eliminating any possible termination right.  Indeed, Jean

25   acknowledged as much, affirming in letters to DC, as late as 1999, that the effect of

26   the 1992 Agreement was to prevent her from terminating.  *Supra* at 6-7.

27       2.  Defendants make three arguments why the 1992 Agreement should not

28   bar the Shusters from pursuing termination—each is mistaken:

- 12 -                DC'S MOT. FOR PARTIAL SUMM. J.

**ER-1317**

a.  They first claim the 1992 Agreement did not eliminate any prior copyright grants because it does not contain the words "rescind" or "revoke."  But neither *Steinbeck* nor *Milne* impose a "magic words" requirement, particularly with respect to a contract that was made 13 years before either case was decided.  Nor does New York law, which defendants concede applies, Docket No. 333 at 21, and which for decades has recognized that, if parties enter into a contract covering the same subject matter as a prior contract, the first contract is rescinded *even if* it does not expressly say so.  *E.g.*, *Blair & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958); RESTATEMENT (SECOND) OF CONTRACTS § 279 (1988).  "The question always is whether the subsequent agreement, … *in whatever form it may be*, is a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement."  *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (emphasis added); *accord Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1283 (S.D.N.Y. 1990).

Intent to supersede or "novate" a prior contract is established where, as here, a new contract encompasses all of the parties' obligations and remedies concerning a given subject matter.  The 1992 Agreement plainly covers the same subject matter as Joe Shuster's prior copyright grants—*i.e.*, assignment of "copyrights … *in any and all work* created in whole or in part by … Joseph Shuster."  It is also clear that the 1992 Agreement represents the Shuster heirs' sole and final agreement with DC, replacing all remedies they may otherwise claim.  It states:  "[This] *fully settles **all claims** to any payments or other rights or remedies* which you may have under *any other agreement or otherwise*, *whether now or hereafter existing* regarding" any and all copyrights in Joe Shuster's works.  SUF 19 (emphases added); *supra* at 6.

Similar language has repeatedly been held, *as a matter of law*, to constitute a novation—even in the absence of express language of "revocation."  For example:

- In *Blair*, 5 A.D.2d at 278-79, 282, the court held at the pleading stage that a contract providing that payments thereunder would "'constitute complete

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1318

satisfaction' for services rendered, past and future," evinced the parties' "clear and unmistakable intent" to supersede the prior contracts.

- *Goldome Corp. v. Wittig*, 221 A.D.2d 931 (N.Y. App. Div. 1995) (summary judgment), considered whether the parties' settlement agreement superseded their employment agreement. The settlement contained a release discharging defendant from "all cause and causes of action ... from the beginning of the world to" today. *Id.* at 932-33. This broad release "establish[ed] that [the settlement] superseded and extinguished the employment agreement." *Id.*

- *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184 (S.D.N.Y. 1996) (summary judgment), considered whether a written contract conveying a power plant superseded an earlier oral agreement. The written contract began: "In consideration for the assignment by … (IEC) of all its interests in and to the electrical generating plant …." *Id.* at 1196. These words alone "indicate[d] an intention to treat comprehensively the issue of reimbursement and to be bound only by the terms of the written agreement." *Id.*

- And *In re WorldCom, Inc.*, 2007 WL 2049723, at *2 (S.D.N.Y. July 13, 2007) (summary judgment), held that a settlement agreement superseded a marketing agreement between SkyTel and Beepwear. The settlement stated it represented a "full and final compromise," "release[d] and discharge[d] SkyTel … from any and all actual or potential claims [under] the Joint Marketing Agreement," and Beepwear promised "not hereafter [to] institute any suit" against SkyTel. "[A] new contract's release of parties' claims under an old contract proves that the parties intended to novate the old contract." *Id.* at *3; *accord C3 Media & Mktg. Group v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 435 (S.D.N.Y. 2005) (motion to dismiss).

The 1992 Agreement is also plainly a revocation and full re-grant of "any and all" of Shuster's Superman rights, and it includes a release that is the same or broader than the language in the contracts in the cases above. Jean Peavy made her

DC'S MOT. FOR PARTIAL SUMM. J.

full and final deal with DC in 1992, and that deal can and should be enforced.

b. Defendants next say the 1992 Agreement did not dispose of the Shusters' putative termination right, because Peary—who appointed himself executor of Shuster's Estate in 2003—was not a party to the 1992 contract. Docket No. 333 at 19. This is baseless, because Jean—Shuster's sole heir—clearly *was* a party to the contract and bound all other heirs. In both *Steinbeck*, 537 F.3d at 204, and *Milne*, 403 F.3d at 1040, one heir executed an agreement that superseded all pre-1978 copyright grants and thus prevented later heirs from terminating. Such agreements bind *all future heirs*, including the Estate and Peary. *See id.*

Defendants cannot and do not dispute that Jean had authority to enter into the 1992 Agreement. Shuster's will named her the sole beneficiary and "executrix" of his estate. SUF 13. As Shuster's sole heir, Jean had complete authority to assign any copyright interests in his works to DC in the 1992 Agreement. Title to property passing by will vests in the beneficiary at the time of the testator's death, *In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940)—or in July 1992, when Shuster died—and a transfer of such property prior to probate is as effective as if made after probate, *id.*; *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008). Peary cannot circumvent the 1992 Agreement by having himself appointed, *post hoc*, executor of a newly opened Shuster Estate, in place of his mother, who probated his estate years ago. As the sole beneficiary and executor of Shuster's estate, Jean successfully filed affidavits in California state court in 1992 requesting that all of Joe's property be transferred to her. She then entered into the 1992 Agreement a few months later, after telling DC she was his sole heir. SUF 14, 15, 19; *supra* at 5-6.

c. Defendants last claim that *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), "limited *Milne*" and establishes they should prevail on DC's claim. Docket No. 333 at 20. First of all, *Mewborn* does not purport to limit or undermine *Milne*—nor could it. There is no tension between the decisions and, if there were, the Ninth Circuit rule is clear: *Milne*, the court's earlier-decided opinion,

DC'S MOT. FOR PARTIAL SUMM. J.

**ER-1320**

1 "controls." *U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992) (en banc).

2       *Mewborn* also addressed an unusual set of facts not presented here—or in

3 *Milne* or *Steinbeck*. In *Mewborn*, Winifred Mewborn, daughter of Lassie creator

4 Eric Knight, granted Knight's copyrights to Classic in 1976. In 1978—after Classic

5 became aware of the new copyright termination regime, but before Winifred

6 learned of it—Classic convinced her to sign a new agreement in exchange for a

7 pittance: $3,000. 532 F.3d at 980-81. The contract did not "substitute[] or

8 revoke[]" any pre-1978 copyright grants; instead, it "affirm[ed]" the 1976 grant and

9 granted Classic "addition[al]," new rights. *Id.* at 982, 989. The fact that there had

10 been an insufficient revocation and regrant in *Mewborn* was highlighted, the court

11 reasoned, by fact that Winifred could have invoked the termination regime to

12 get more leverage and demand more money, but because she was unaware of the

13 termination regime, she did not do so. *Id.* at 989.

14       Thus, the facts here mirror *Steinbeck* and *Milne*, not *Mewborn*. First, unlike

15 *Mewborn*, where the post-1978 agreement transferred rights "in addition to" those

16 transferred in pre-1978 grants, the 1992 Agreement leaves no previous agreement

17 in place. It settles "all claims … under any agreement" related to "any and all"

18 works "created in whole or in part by … Joseph Shuster." *Supra* at 6, 12-15.

19       Second, Jean and Frank Shuster—unlike Winifred, who was apparently

20 duped by Classic—were aware of the Copyright Act's termination regime when

21 they bargained for and entered into the 1992 Agreement. Like Christopher Milne

22 and Elaine Steinbeck, Jean and Frank expressly adverted to the regime in their 1992

23 dealings with DC. *See* SUF 17, 21, 22.

24       Third, *Mewborn* relied on the fact that Winifred owned a statutory

25 termination right in reasoning that her failure to rely on her right prejudiced her in

26 negotiations with Classic. 532 F.3d at 989. Here, while Jean and Frank invoked

27 the termination regime in 1992 and said they might otherwise bring a claim if a deal

28 could not be reached, DC had strong arguments in 1992 (and now) that neither Jean

    DC'S MOT. FOR PARTIAL SUMM. J.

1   nor anyone in her family was a statutory heir and that any termination right was lost

2   when Joe died. *Infra* at 21-22; *see* Docket No. 333 at 18. Moreover, the fact that

3   Jean and Frank were able to obtain hundreds of thousands of dollars in benefits—

4   especially for Jean, whom Joe had not provided for in prior contracts with DC, SUF

5   45—shows that *Mewborn*'s concerns about Winifred's ignorance are inapt here.

6       Finally, *Steinbeck* expressly noted that when Elaine Steinbeck made her 1994

7   agreement that stripped herself and her stepchildren of any termination rights that

8   might exist then or in the future, Elaine, like Jean, was "unable to terminate,"

9   because Elaine lacked the necessary majority interest to terminate in 1994. 537

10  F.3d at 203 n.5. *Steinbeck* nonetheless held that contracts that have the effect of

11  eliminating termination rights that might come into existence in the future—either

12  by the creation of new legal rights or otherwise—can and must be enforced.

13  *Steinbeck* explained: "We cannot see how [Elaine's] 1994 Agreement could be

14  [unenforceable] solely because it had the effect of eliminating termination rights

15  [that her stepchildren would assert under § 304(d) of CTEA, which was enacted in

16  1998] that did not yet exist" when Elaine signed her contract in 1994. *Id.* at 203.

17      3. In sum, the 1992 Agreement satisfies all of the requirements needed to be

18  a post-1978 agreement under the Copyright Act. On its face, it settles all claims

19  between DC and the Shusters, and DC paid Frank and Jean every year for the last

20  20 years significant compensation as consideration for the final and complete peace

21  DC told the Shusters the 1992 contract required. *Supra* at 6-7. Before Toberoff

22  and Peary intervened, Jean conceded time and again, and as late as 1999, that she

23  could *not* pursue a termination claim, given the 1992 Agreement. *Id.*; SUF 21, 22.

24  Under clear New York contract law, and clear copyright law set forth in *Steinbeck*,

25  *Milne*, and *Mewborn*, the 1992 Agreement superseded all prior copyright grants the

26  Shusters had made prior to 1978, and left only the non-terminable 1992 agreement.

27  As with the New York courts in the 1940s and 1970s that bound Joe Shuster to

28  deals he made with DC, this Court should bind Jean and her heirs as well—and

ER-1322

**B.      The Estate Lacked The Majority Interest Necessary To Terminate.**

Even if the Estate was not barred from terminating, the Notice is invalid because—by the Shuster heirs' own admissions—the Estate did not own the requisite majority interest when the Notice was served.  Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who … *own* and *are entitled to exercise* a total of more than one-half of [an] author's termination interest" and "*shall* be signed by the [requisite] number and proportion of the owners."  17 U.S.C. §§ 304(d)(1), (c)(1)-(4) (emphasis added); *see Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).  Copyright Office regulations further provide that a notice "*must* include a clear identification of … the person or persons executing the notice who constitute more than one-half of that author's termination interest."  37 C.F.R. 201.10(b)(1)(vii) (emphasis added).

According to the Shuster heirs' written contracts and deposition admissions, the Estate owned *0%* of Shuster's putative termination interest when the Estate served the Notice.  In 2001, the Shusters "transfer[red] and assign[ed] … all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture.  SUF 31.  In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in 'SUPERMAN' pursuant to Section 304(d) of the U.S. Copyright Law."  SUF 32.  And Peary admitted under oath that he understood when he signed the Pacific Pictures agreement, "that all of the Joe Shuster rights, *termination rights, to the extent they existed*, were being transferred and assigned to the venture just as it says."  SUF 33 (emphasis added).

Despite these admissions, the Notice that Peary and Toberoff served is *not* signed by Pacific Pictures.  Indeed, it makes *no* mention whatsoever of the Pacific Pictures Venture or its ownership interests—even though just two weeks before

- 18 -                    DC'S MOT. FOR PARTIAL SUMM. J.

**ER-1323**

1  they filed the Notice, Peary and Toberoff affirmed in the 2003 Pacific Pictures

2  contract that the Venture owned the Estate's "termination interest."  SUF 32.

3  These material omissions invalidate the Notice.  The majority-interest

4  requirement set forth in the Copyright Act and Copyright Office regulations is

5  mandatory, 17 U.S.C §§ 304(c)(4)(B), 304(d)(1), 304(c)(1)-(4), and failure to

6  comply with these rules render a termination notice invalid, *see Burroughs v.*

7  *Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982) ("[t]o be effective, a

8  notice of termination" must comply with Copyright Office regulations); *Steinbeck*,

9  537 F.3d at 196 ("notice of termination is ineffective" for failure to satisfy 17

10  U.S.C. § 304(d)); *Milne*, 430 F.3d at 1048 (same); 37 C.F.R. 201.10(e)(1)

11  (narrowly defining errors that will *not* "render the notice invalid").  Defendants

12  know this rule well.  After this Court held in *Siegel* that "promotional

13  announcements" featuring the first appearance of Superman fell outside the

14  termination window of § 304(c), both the Siegel and Shuster heirs served new

15  termination notices in 2012 purporting to terminate the announcements.  SUF 44.

16  To salvage the Notice, defendants now assert "harmless error," claiming the

17  Pacific Pictures agreements were "not lawful" and "void *ab initio*" under

18  § 304(c)(6)(D)—so, no harm, no foul.  Docket No. 191 at 8.  This is nonsense.

19  Defendants did *not* take this position when they formed their joint venture in 2001.

20  Nor did they take the position in 2003 when they reaffirmed the Joint Venture and

21  its ownership of the termination rights *just days* before filing the Notice.  While

22  defendants' concessions about the illegality of their Pacific Pictures contracts

23  concedes liability on DC's *Third* Claim, *infra* at 23-24, these admissions do not

24  save their Notice from invalidation.  Nor do their recent admissions alter the fact

25  that they submitted fraudulent termination filings that said the Estate owned the

26  termination rights, when days earlier they signed a contract saying the Joint Venture

27  owned them.  Citing the need to protect "public policy," courts reject defendants'

28  claims that the "illegal[ity] and unenforceab[ility]" of agreements they made are "a

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1324

1   defense to liability for the injuries suffered by" plaintiffs.  *Int'l Bank of Comm. v.*

2   *Int'l Energy Dev. Corp.*, 981 S.W.2d 38, 51-52 (1998); *Pearson v. Super. Ct.*, 202

3   Cal. App. 4th 1333, 1338 (2012) (defendant who entered into agreement with minor

4   may not claim agreement unenforceable to avoid liability).  This Court should

5   likewise reject defendants' self-serving arguments.

6          "Harmless error," moreover, cannot be claimed under copyright law because

7   here the supposed "error" was a purposeful omission of material facts intended to

8   "deceive, mislead, or conceal relevant information" from DC.  37 C.F.R. 201.10(e).

9   Peary testified he was unaware that the Pacific Pictures agreements were unlawful

10  when he signed them and filed the Notice.  SUF 34.  This leaves two possible

11  factual scenarios, both of which negate any claim of "harmless error":  (1) at the

12  time the Notice was served, Toberoff and Peary did *not* know the Agreements

13  violated § 304(c)(6)(D)—in which case they intentionally deceived DC and the

14  Copyright Office as to the ownership of the Estate's rights; or (2) Toberoff knew

15  the Agreements were invalid, but hid that fact from Peary, in which case Toberoff

16  defrauded DC and the Shusters by inducing the Shusters to execute illegal

17  agreements, while Peary wrongly signed the Notice falsely asserting the Estate

18  owned rights he knew he had transferred to the Joint Venture just days earlier.

19         The Court should deem the Notice invalid, *Burroughs*, 683 F.2d at 622-23,

20  and given defendants' deceptions, it should hold that the Shusters are barred from

21  terminating.  At a minimum, the Estate must serve a new termination notice that

22  complies with Copyright Act and Copyright Office regulations, and that accurately

23  discloses the ownership of all putative rights.  As with any termination notice, the

24  Estate would have to serve this new notice *at least* two years before the purported

25  termination would take effect, and must be prohibited from making any deal with a

26  party other than DC concerning its putative rights before the termination date.

27

28

ER-1325

### C. The Shuster Heirs Have No Statutory Right To Terminate.

Section 304(c) of the 1976 Copyright Act limited the class of persons who could terminate to an author or, "[w]here an author is dead, … his widow or her widower and his or her children or grandchildren." Legislative history confirms the termination right was lost if an author died without exercising it or leaving a widow, child, or grandchild to inherit it. SUPP. REP. at 73 (rejecting proposal to pass "rights of a dead author to his 'legal representatives, legatees, or heirs'" given Congress' "desire to keep the right … out of the author's estate"). This means that to the extent Joe Shuster had a termination right, it could have been exercised *only* by him during his lifetime, or by a widow, child, or grandchild after his death.

Shuster could have exercised his putative termination right beginning in April 1984. Under § 304(c), a copyright grant could be terminated 56 to 61 years after the date copyright was first secured, provided that a termination notice was served 2 to 10 years before the effective termination date. 17 U.S.C. § 304(c)(3)-(4). In other words, the window for terminating opened 46 years after the date copyright was first secured (*i.e.*, 56 years minus the 10-year maximum notice period) and expired after 59 years (*i.e.*, 61 years minus the 2-year minimum notice period). *Id.* The window for terminating Shuster's grant to DC of rights in *AC#1*, which obtained copyright protection in April 1938, opened in April 1984 (46 years later) and was set to expire in April 1997 (59 years later).

Shuster *never* attempted to terminate during his lifetime, which is unsurprising since, with the 1975 Agreement, he made peace with DC and assured lifetime payments for himself and his family. *Supra* at 4-5. Shuster died in 1992 without a widow, child, or grandchild—five years before his termination right was set to expire in 1997. Any termination right Shuster had was lost when he died. And in 1992, Jean obtained all of Shuster's property through a quickly resolved California probate case, claiming to be his sole heir. *Id.*

1         The 1998 CTEA allows an "author's executor" to terminate when the

2 "[t]ermination rights provided for in subsection (c) *have expired* on or before the

3 effective date of the [CTEA]"—*i.e.*, October 27, 1998—and the author "has not

4 previously exercised such termination right." 17 U.S.C. § 304(d) (emphasis added).

5 The Shuster Estate—formed by Peary, as its executor, in 2003—relies on this

6 provision to terminate, but § 304(d) has no application here. By its plain language,

7 § 304(d) applies *only* where the window for exercising a termination right under the

8 1976 Copyright Act opened and closed—*i.e.*, "expired"—and an author or statutory

9 heir failed to terminate during that window. It does not apply where an author died

10 while the window was open without terminating, without leaving a statutory heir,

11 and when his sole heir, Jean, fully resolved his estate in 1992. CTEA's legislative

12 history confirms that its aim was to create "a *revived* power of termination for

13 individuals who did not previously exercise their *now-expired termination right*

14 under section 304(c)," S. REP. NO. 104-315, at 18 (1996) (emphasis added)—not to

15 open the door to an entirely new class of persons—like Peary—who never before

16 had the right to terminate, and only created the sham of a new probate proceeding

17 so he could be named executor. *Supra* at 8; Docket No. 186 at 12-13.

18         Moreover, "expired" should be read consistent with Congress's use of the

19 term in the copyright renewal provisions, §§ 304(a)(2)(A), (2)(B) and (3)(A)(i).

20 There, "expiration" clearly means that the initial copyright term has opened and

21 closed after running its full 28-year course. *E.g.*, 17 U.S.C. § 304(a)(2)(A) ("At the

22 expiration of the original term of copyright"), (a)(3)(A)(i) (renewal application may

23 be made "within 1 year before the expiration of the original term of copyright").

24 "Expired" has the same meaning in the context of § 304(d)—an author or statutory

25 heir has a second chance to terminate if the window for terminating under the 1976

26 Copyright Act opened, ran its full 59-year course, and closed. Had Congress' intent

27 been otherwise, § 304(d) would have provided for termination where "rights

28 provided for in subsection (c) *have not been exercised*," rather than limiting

DC'S MOT. FOR PARTIAL SUMM. J.

ER-1327

1    termination to instances where termination rights "have expired."

2    **IV.    SUMMARY JUDGMENT IS WARRANTED ON DC'S THIRD**

3    **CLAIM.**

4    DC is also entitled to summary judgment on its Third Claim, which is pled in

5    the alternative. The Copyright Act establishes an exclusive period of time between

6    the date a copyright termination notice is served and its effective date in which *only*

7    an original copyright grantee can make an agreement with the terminating party:

8    A further grant, or agreement to make a further grant, of any right
     covered by a terminated grant *is valid only if* it is made *after the effective*

9    *date of the termination.* As an exception, however, an agreement for
     such a further grant *may be made* between the author or [his heirs] and

10   *the original grantee* or [its successor], after the notice of termination has
     been served…. 17 U.S.C. § 304(c)(6)(D) (emphasis added).

11

12   In other words, between November 10, 2003 (when the Notice was served)

13   and October 26, 2013 (its effective date), DC was and is the *only* party that may

14   enter into an agreement with the Shuster heirs regarding the Superman rights sought

15   to be recaptured. Section 304(c)(6)(D) not only bars third parties like Toberoff

16   from "trafficking in future [copyright] interests," *Milne*, 430 F.3d at 1047, it

17   protects original grantees who, like DC, spent decades developing and promoting

18   the copyrighted property. Congress described this right in the original grantee's

19   favor as "in the nature of a right of 'first refusal,'" H.R. REP. NO. 94-1476 at 127,

20   and made clear this right "was one of the compromises on which the delicate

21   balance of [the termination provisions] rests." SECOND SUPP. REF.'S REP. ON GEN.

22   REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975). In *Milne*, 430 F.3d at

23   1047, the Ninth Circuit cited the statutory text and legislative history above, and

24   confirmed that § 304(c)(6)(D) "give[s] the original grantee a competitive advantage

25   over third parties" akin to a "right of 'first refusal.'"

26   Defendants' Pacific Pictures agreements and 2008 consent agreement all run

27   afoul of these prohibitions and deprived DC of its statutory rights. Indeed,

28   defendants have conceded in briefing and in depositions that the Pacific Pictures

**ER-1328**

1    agreements are unlawful. *Supra* at 19. While defendants refuse to produce a copy

2    of the consent agreement, they admit it "requires … the consent of the Siegels and

3    Shuster Estate … to a settlement of their termination rights with DC." Docket No.

4    160 at 63; *see* Docket No. 231 at 6 (agreement "'prohibit[s] either family from

5    entering into agreements conveying rights … without the express approval of *all*

6    *stakeholders* in the heirs' rights") (italics added). And Peary conceded the "consent

7    agreement" was signed by himself, "Laura [Larson], Joanne Siegel," and

8    "Toberoff" in 2008; that it provides that "any agreement with DC or settlement with

9    DC requires the consent of the Siegels"; and that it is "still in effect." SUF 43.

10       The Court can and should grant summary judgment for DC on its Third

11   Claim, declare all of defendants' agreements invalid, and restore to DC the 10-year

12   exclusive negotiation period it was, by right, entitled to enjoy with the Shusters,

13   absent Toberoff's entanglements. It is well settled that the appropriate remedy for

14   violation of exclusive negotiation rights, is specific performance and to restore the

15   exclusive negotiation right. *E.g.*, *Groves v. Prickett*, 420 F.2d 1119, 1122 (9th Cir.

16   1970); *Wagner v. CT Cimarron, LLC*, 320 Fed. Appx. 539, 541 (9th Cir. 2009);

17   *Sarkisian v. Sayre*, 2007 WL 4427309, at *3 (Cal. Ct. App. 2007).

18       Defendants raise two challenges to DC's Third Claim—neither has merit:

19       a. They argue DC lacks standing to sue under § 304(c)(6)(D), Docket No.

20   333 at 10, but this ignores that parties whose negotiation rights are aggrieved have

21   standing to vindicate those rights "against third persons" like Toberoff. *Hartzheim*

22   *v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007); *Sullivan v. Little*

23   *Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a statutory right

24   implies the existence of all necessary and appropriate remedies."). Where, as here,

25   Congress has demonstrated its intent to create such a right, *Milne*, 430 F.3d at 1047;

26   H.R. REP. NO. 94-1476 at 127; 2D SUPP. REP 307, the beneficiary has standing to

27   enforce it. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Congress'

28   intent to confer such a right can be inferred from "the language and focus of the

- 24 -                    DC'S MOT. FOR PARTIAL SUMM. J.

1     statute, its legislative history, and its purpose," *Touche Ross & Co. v. Redington*,

2     442 U.S. 560, 575-76 (1979)—*all* of which supports DC's Third Claim.

3         b. Defendants assert DC's Third Claim is time-barred because DC learned

4     about the Pacific Pictures Agreements in November 2006, but filed suit six months

5     after the three-year limitations period ended in November 2009. Docket No. 333 at

6     7-8. To begin, Toberoff's overall pattern of misconduct did not come to light until

7     2008, when Toberoff finally produced the Toberoff Timeline under court order.

8     *E.g.*, Docket No. 185 at 11-12. DC timely filed its complaint less than two years

9     later—well within the limitations period. *E.g.*, *Sylve v. Riley*, 15 Cal. App. 4th 23,

10     26 (1993). The discovery rule postpones accrual of a cause of action until the

11     plaintiff discovers the facts underlying its claims. *E.g.*, *Polar Bear Prods., Inc. v.*

12     *Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004); *Norgart v. Upjohn Co.*, 21 Cal. 4th

13     383, 397-98 (1999). Moreover, DC's Third Claim is premised on defendants'

14     *continuing* course of conduct, including the "consent agreement," which continues

15     to violate DC's rights under the Copyright Act to this day. FAC ¶¶ 3, 101, 169-70;

16     *supra* at 3, 9. The statute of limitation only commences when such a "continuing

17     wrong" ceases. *Suh v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal. 1997); *Flowers v.*

18     *Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002); *Wyatt v. Union Mort. Co.*, 24 Cal. 3d

19     773, 788 (1979). DC seeks a declaration bringing defendants' continuing course of

20     misconduct, including its newly formed offending agreements, to a halt. The Court

21     should declare that defendants' illicit consent agreements are unlawful and void.

22    **V.    CONCLUSION**

23         DC's motion should be granted, and judgment should be entered in its favor

24     on its First and Third Claims.

25        Dated: July 16, 2012         Respectfully submitted,

26

27                                By:    /s/  Daniel M. Petrocelli

                                      Daniel M. Petrocelli

28   OMM_US:70773889                Attorneys for Plaintiff DC Comics

ER-1330

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,                                                     )     CASE NO. CV 10-03633 ODW (RZx)
                                                              )
                           Plaintiff,                         )
                                                              )
              vs.                                             )     ORDER RE DOCUMENTS
                                                              )     REVIEWED *IN CAMERA*
PACIFIC PICTURES CORPORATION,                                 )
ET AL.                                                        )
                                                              )
                           Defendants.                        )
                                                              )

On May 25, 2012, the Court ordered Defendants to submit certain documents for *in camera* review. The Court has reviewed them, and makes the following rulings:

**1.     Printout of November 17, 2001 email from "Mtoberoff@aol.com" to "msiegel@core.com".**

This is a one-page document, with a one-page attachment. The subject line of the e-mail reads "Your Rights," and before any text appear the words "Privileged & Confidential." The subject matter of the e-mail concerns legal rights and potential representation of Michael Siegel.

The email is protected by the attorney-client privilege.

The Court sees no waiver of the privilege. The print-out comes from Mr. Siegel's files after those were sent to counsel for Defendants. The Court accepts the

representation that the email was from a discontinued email account and thus not readily available for production earlier.

The motion to compel is denied as to this document.

### 2.    Bulson calendar entries and billing statements.

Defendants state that they have no calendar entries. If they have no calendar entries, they cannot produce them.

Defendants produced redacted billing records to Plaintiff and submitted unredacted records to the Court, identified as Exhibit B-4 through B-35. The Court has reviewed them carefully. Plaintiff asked for (and only would be entitled to receive) non-privileged entries, and the Court understands the privileges to be those which were held by Mr. Bulson's client Michael Siegel, privileges that survived Mr. Siegel's death. *Swidler & Berlin v. United States*, 524 U.S. 399 (1998). Billing records may be discoverable if the references do not reveal the sorts of things protected by privilege, such as motivation for consulting, legal strategy, or the specific nature of work performed. Information such as the name of the client, the case name, the amount of the fee, and the general nature of services is not protected. *Clarke v. American Commerce National Bank*, 974 F.2d 127 (9th Cir. 1982). The cases are not completely helpful in determining what is a "general" as opposed to a "specific" listing of services. Reference to particular statutes researched is protected information, for example, *see Chaudry v. Gallirizzo*, 174 F.3d 394 (4th Cir. 1999), but descriptions that are more generic, such as "reviewed client correspondence" or "drafted client correspondence" are not. *Avgoustis v. Shinseki*, 639 F.3d 1340 (Fed. Cir. 2011). The Court assumes that specific listing of services, such as "drafted memo re [subject] for [client]" would, under these authorities, be protected information.

It appears to the Court that many entries here do deserve protection, and many do not. Thus, Defendant is entitled to do some redacting. Although Defendants' understanding that Plaintiff sought only the entries relating to meetings or communications with Mr. Toberoff is a plausible interpretation of some of the correspondence between

ER-1332

counsel, in fact Plaintiff sought a slightly more broad production, first in its subpoena to Mr. Bulson, then in requests at the deposition that were clarified through correspondence.

In an effort to shorten matters as much as possible, the Court has reviewed the unredacted documents and — in what the Court assures the parties will *not* be the usual course of business — has gone line-by-line in an effort to determine what is privileged and what is not, with the understanding that responsiveness extends to the non-privileged portions of the billing statements. Under that construct, the Court authorizes Defendants to make the following redactions:

| | | |
|---|---|---|
| B-4 | 10/24/2001 | Redact the words before "letter to Mike Siegel" |
| | 10/25/2001 | Redact the words after "Siegel" |
| | 11/21/2001 | Redact the entry |
| | 11/29/2001 | Redact the entry |
| | 1/23/2002 | Redact the entry |
| B-5: | 2/11/2002 | redact the words after "Toberoff" |
| | 2/23/2002 | redact the entry |
| | 3/12/2002 | redact the entry |
| | 3/14/2002 | redact the words after "Siegel" |
| B-6 | 7/15/2002 | redact the entry |
| | 7/19/2002 | redact the words before "tel. conf. with Mike Siegel" |
| B-7 | 10/1/2002 | redact the entry |
| | 11/11/2002 | redact the words before "place call to Toberoff" |
| B-8 | 11/25/2002 | redact the entry |
| | 1/22/2003 | redact the entry |

ER-1333

| | | |
|---|---|---|
| <u>B-9</u> | 4/14/2003 | redact the entry |
| | 5/7/2003 | redact the entry |
| | 5/12/2003 | redact the entry |
| | | |
| <u>B-10</u> | 6/10/2003 | redact the entry |
| | 6/17/2003 | redact the entry |
| | 6/18/2003 | redact the entry |
| | 6/19/2003 | redact the entry |
| | 7/14/2003 | redact the entry |
| | 8/11/2003 | redact the entry |
| | | |
| <u>B-11</u> | 4/9/2004 | redact the entry |
| | 4/12/2004 | redact the entry |
| | 4/15/2004 | redact the entry |
| | 4/16/2004 | redact the entry |
| | 4/19/2004 | redact the entry |
| | 4/20/2004 | redact the entry |
| | | |
| <u>B-12</u> | 10/13/2004 | redact the words before "tel. Confs. With Marc Toberoff" |
| | | |
| <u>B-13</u> | 11/4/2004 | Redact the entry |
| | 11/12/2004 | Redact the entry |
| | | |
| <u>B-14</u> | 8/2/2005 | Redact the entry |
| | 8/3/2005 | Redact the entry |
| | | |
| <u>B-15</u> | 11/21/2001 | Redact the entry |

ER-1334

|   |   |   |   |
|---|---|---|---|
|   |   | 11/29/2001 | Redact the entry |
| B-16 | 7/15/2002 | Redact the entry |
|   | 7/19/2002 | Redact the entry |
| B-17 | 11/26/2002 | Redact the entry |
| B-18 | 1/22/2003 | Redact the entry |
| B-20 | 4/14/2003 | Redact the entry |
| B-21 | 5/7/2003 | Redact the entry |
|   | 5/12/2003 | Redact the entry |
| B-22 | 6/10/2003 | Redact the entry |
|   | 6/17/2003 | Redact the entry |
|   | 6/18/2003 | Redact the entry |
| B-23 | 7/14/2003 | Redact the entry |
| B-24 | 2/11/2002 | Redact the words after "Toberoff" |
|   | 2/23/2002 | Redact the entry |
| B-28 | 10/13/2004 | Redact the words before "tel. confs. With Marc Toberoff" |
| B-29 | 11/4/2004 | Redact the entry |
|   | 11/12/2004 | Redact the entry |

ER-1335

<u>B-30</u>  3/12/2002    Redact the entry

3/14/2002    Redact the entry

Documents in redacted form shall be produced within seven days.

**3.      Letter of November 2, 2002 from Laura Siegel Larson to Michael Siegel.**

This letter does not fit within the attorney-client privilege, or the joint defense component of that privilege.  Accordingly, the motion to compel is granted as to this letter, and it shall be produced within seven days.

IT IS SO ORDERED.

DATED:   June 21, 2012

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE

ER-1336

1 | TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (State Bar No. 188547)
2 |  *mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
3 |  *kgadams@ipwla.com*
2049 Century Park East, Suite 3630
4 | Los Angeles, California, 90067
Telephone:  (310) 246-3333
5 | Fax:          (310) 246-3101

6 | Attorneys for Defendants Mark Warren
Peary, as personal representative of the
7 | Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
8 | as personal representative of the Estate of
Joanne Siegel

9

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>          vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS MARK WARREN PEARY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH SHUSTER, AND JEAN ADELE PEAVY'S ANSWER TO FIRST AMENDED COMPLAINT**<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:          None Set |

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster (the "Shuster Executor"), and Jean Adele Peavy ("Defendants") hereby answer the First Amended Complaint ("Complaint") of DC Comics ("Plaintiff" or "DC") as follows:

### I.      STATEMENT OF THE CASE

1.      Defendants admit only that Plaintiff has brought this civil action as set forth in the Complaint and that the Court has subject matter jurisdiction, but otherwise deny the allegations in Paragraph 1.

2.      Paragraph 2 contains conclusions of law as to which no responsive pleading is required.

3.      Paragraph 3 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 3 contains issues of fact, Defendants deny the allegations of Paragraph 3.

4.      Paragraph 4 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 4 contains issues of fact, Defendants admit that during their lifetimes Jerry Siegel and Joe Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c), admit that Siegel and Shuster had certain agreements with DC Comics ("DC"), admit that Frank Shuster and Jean Adele Peavy entered into an agreement with DC in 1992, and lack knowledge or information sufficient to form a belief as to the truth of the allegation that Siegel or Shuster were "well aware of the termination provisions in amendments to the Copyright Act," and on that basis deny the same.  Defendants otherwise deny the allegations of Paragraph 4.

5.      Defendants admit that Marc Toberoff learned of a 1992 Agreement between Frank Shuster, Jean Adele Peavy and DC Comics in 2001-2002.  Defendants otherwise deny the allegations of Paragraph 5.

6.      Defendants admit that Pacific Pictures Corporation was wholly owned

ER-1338

and controlled by Marc Toberoff, and that Mark Warren Peary caused to be served a notice of termination.  Defendants otherwise deny the allegations of Paragraph 6.

7.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7, and on that basis deny the same, except admit that Joanne Siegel and Laura Siegel Larson served termination notices in 1997.

8.    Defendants admit that Joanne Siegel and Laura Siegel Larson terminated their prior attorneys and thereafter retained Marc Toberoff.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8, and on that basis deny the same.

9.    Defendants admit that *Smallville* was a successful network television series.  Defendants otherwise deny the allegations of Paragraph 9.

10.    Defendants admit that Joanne Siegel and Laura Siegel Larson served and filed notices of copyright termination concerning Superboy in 2002, and that Marc Toberoff filed a notice of copyright termination on behalf of the Estate of Joseph Shuster in 2003.  Defendants otherwise deny the allegations of Paragraph 10.

11.    Paragraph 11 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 11 contains issues of fact, Defendants deny the allegations of Paragraph 11, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

12.    Paragraph 12 contains conclusions of law as to which no responsive pleading is required.  Defendants admit that this action seeks declaratory judgments and other reliefs.  To the extent Paragraph 12 contains issues of fact, Defendants otherwise deny the allegations of Paragraph 12.

## II.    PARTIES

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

ER-1339

13. Defendants admit that DC is a general partnership organized and existing under the laws of the State of New York. Defendants otherwise deny the allegations of Paragraph 13.

14. Defendants admit that Pacific Pictures Corporation ("PPC") was a New York corporation that was organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California and the County of Los Angeles. Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 14, and on that basis deny the same.

15. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15, and on that basis deny the same.

16. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16, and on that basis deny the same.

17. Defendants admit that Mr. Toberoff is an individual who resides in the County of Los Angeles in the State of California and is and has been a citizen of the United States. Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 17, and on that basis deny the same.

18. Defendants admit the allegations of Paragraph 18.

19. Defendants admit the allegations of Paragraph 19.

20. Defendants admit that Jean Adele Peavy ("Peavy") is an individual who resides in the State of New Mexico and is and has been a citizen of the United States and that Peavy was the sister of Joseph Shuster. Defendants otherwise deny the allegations of Paragraph 20, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

ER-1340

21.     Defendants admit the allegations of Paragraph 21, except to the extent that Joanne Siegel has since passed away on February 12, 2011.

22.     Defendants admit the allegations of Paragraph 22.

23.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23, and on that basis deny the same.

24.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24, and on that basis deny the same.

## III.    JURISDICTION AND VENUE

25.     Paragraph 25 alleges conclusions of law to which no responsive pleading is required.

26.     Paragraph 26 alleges conclusions of law to which no responsive pleading is required.

    a.   Paragraph 26(a) contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 26(a) contains issues of fact, Defendants deny the allegations of Paragraph 26(a), except admit that Peary, Peavy, and Pacific Pictures Corporation entered into an agreement dated November 23, 2001, and that Peary and Pacific Pictures Corporation entered into an agreement dated October 26, 2003.  The terms of these agreements speak for themselves, and Defendants respectfully refer the Court to such documents for evidence of the contents thereof..

    b.   Defendants admit that a California Court appointed Peary executor of the estate of Joseph Shuster, and that Peary caused to be served a notice of termination pursuant to the Copyright Act, but otherwise deny the allegations of Paragraph 26(b), except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the

Court to such documents for evidence of the contents thereof.

c. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26(c), and on that basis deny the same.

d. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26(d), and on that basis deny the same.

e. Defendants admit the allegations of Paragraph 26(e), except to the extent that Joanne Siegel passed away on February 12, 2011.

f. Defendants admit that Joanne Siegel and Laura Siegel Larson filed two related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx) and 04-CV-08776 ODW (RZx) that concerned, *inter alia,* Superman and Superboy, respectively. Defendants otherwise deny the allegations of Paragraph 26(f).

27. Paragraph 27 alleges conclusions of law to which no responsive pleading is required.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

28. Defendants admit on information and belief that, in or about 1934, Jerome Siegel (a writer) ("Siegel") and Joseph Shuster (an illustrator) ("Shuster") conceived of a fictional character called Superman, and independently co-authored fifteen daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six-day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years. Defendants otherwise deny the allegations of Paragraph 28, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29. Defendants admit on information and belief that Detective Comics, Inc.

("DCI") was provided with the 1934 Superman Comic Strip, that DCI expressed interest in publishing this work in a thirteen-page comic magazine format, and that this was published by DCI in a magazine called "Action Comics, No. 1." Defendants otherwise deny the allegations of Paragraph 29.

30.     Defendants admit on information and belief only that on or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with DCI (the "December 4, 1937 Agreement") to continue to produce the comic magazine features "Slam Bradley" and "The Spy" for a period of two years, which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to DCI, which reserved the right to accept or reject same within sixty days. Defendants admit that, on or about September 22, 1938, DCI, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate, and that on or about September 22, 1938, DCI and Siegel and Shuster entered into an agreement. Defendants otherwise deny the allegations of Paragraph 30, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31.     Paragraph 31 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 31 contains issues of fact, Defendants admit on information and belief that, in or about January–February 1938, when DCI expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster cut and pasted their 1934 Superman Comic Strip into more than ninety separate panels (the "Revised Superman Comic Strip"), so as to render their newspaper strip more suitable for a magazine layout. Defendants otherwise deny the allegations of Paragraph 31.

32.     Paragraph 32 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 32 contains issues of fact, Defendants admit on information and belief only that in an instrument prepared by DCI, dated

March 1, 1938 (the "March 1, 1938 Agreement"), concerning a strip entitled "Superman," Siegel and Shuster agreed to the publication of their Revised Superman Comic Strip by Detective Comics in consideration for the sum of $10 per page for this thirteen-page installment equal to a total of $130. Defendants further admit that, in addition to the Siegel and Shuster material published by DCI in "Action Comics No. 1," Siegel and Shuster created further original "Superman" material and stories. Defendants otherwise deny the allegations of Paragraph 32, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

33. Paragraph 33 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 33 contains issues of fact, Defendants admit that "Action Comics No. 1" depicts, without limitation, Superman's origin from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits, his mission as a champion of the oppressed to use his great powers to benefit humankind, his secret identity as newspaper reporter "Clark Kent," his relationship with other key characters such as the newspaper editor from whom he takes his assignments, and his romantic interest in Lois, who rebuffs Clark while pursuing a romantic interest in Superman. Defendants otherwise deny the allegations of Paragraph 33, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

34. Paragraph 34 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 34 contains issues of fact, Defendants deny the allegations of Paragraph 34, except admit that DC and its predecessors-in-interest have published Superman works in various forms since 1938.

35. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35, and on that basis deny the same, except admit that DC and its predecessors-in-interest have published Superman

works in various forms since 1938.

36.     Defendants deny the allegations of Paragraph 36, except admit that numerous Superman works derived from Siegel and Shuster's original Superman story published in "Action Comics, No. 1," have thereafter been produced.

37.     Defendants deny the allegations of Paragraph 37, except admit that Siegel and Shuster's co-creation Superman is one of the most famous, beloved and valuable fictional characters in the world.

38.     Defendants deny the allegations of Paragraph 38, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39.     Defendants deny the allegations of Paragraph 39, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40.     Paragraph 40 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 40 contains issues of fact, Defendants admit that the relationship between DC and its predecessors and Siegel and Shuster became contentious, and lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 40, and on that basis deny the same.

41.     Defendants admit that in or about 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester, against National Comics Publications, Inc. (hereinafter, the "1947 Action") to determine the validity of the contracts between National Comics Publications, Inc.'s predecessors-in-interest and Siegel and Shuster with respect to Superman, and to determine the origin and ownership of Superboy.  Defendants otherwise deny the allegations of Paragraph 41, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

ER-1345

42.     Defendants admit that pursuant to a stipulation of the parties, the 1947 Action was referred for decision to an Official Referee of the New York Supreme Court.  After trial of the action the Official Referee rendered an opinion dated November 1, 1947, which speaks for itself.  Defendants otherwise deny the allegations of Paragraph 42, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

43.     Defendants admit that on April 12, 1948, the Official Referee in the 1947 Action signed detailed findings of fact and conclusions of law and entered an interlocutory judgment upholding the challenged contracts in some respects, but also finding that Jerome Siegel was the originator and sole owner of the comic strip feature "Superboy," and that DCI acted illegally in publishing the "Superboy" feature.  Defendants otherwise deny the allegations of Paragraph 43, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

44.     Defendants admit on information and belief only that after the Official Referee entered his findings in the 1947 Action, settlement negotiations ensued, resulting in a stipulation of settlement between said parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (hereinafter, the "1948 Consent Judgment").  Defendants specifically deny the allegation that the 1948 Stipulation and the 1948 Consent Judgment were separate grants or "agreements."  Defendants otherwise deny the allegations of Paragraph 44, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

45.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45, and on that basis deny the same.

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1346**

46.     Defendants admit only that Siegel and Shuster filed an action against National Periodical Publications, Inc. in the United States District Court for the Southern District of New York for a declaration that Siegel and Shuster were entitled to the renewal copyright to "Superman," that the District Court's decision was published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973); and that on appeal the decision of the United States Court of Appeals for the Second Circuit was published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), which held, *inter alia*, that the District Court erred in finding that Superman was a "work for hire" under the Copyright Act, 17 U.S.C. § 26, and that "Superman" and his miraculous powers were created by Siegel and Shuster long before any employment relationship with DCI; and that no appeal was taken from this ruling. Defendants otherwise deny the allegations of Paragraph 46, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

47.     Defendants admit on information and belief that, in the early 1970s, Siegel publicized his dire financial circumstances and the fact that DC and its predecessors-in-interest had profited immensely from Superman while Siegel and Shuster, Superman's co-creators, had received little-to-no participation or credit, resulting in a public backlash against companies such as DC and its predecessors. Defendants admit that Siegel and Shuster entered into a December 23, 1973 Agreement with Warner Communications, Inc.  Defendants otherwise deny the allegations of Paragraph 47, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

48.     Defendants deny the allegations of Paragraph 48, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1347**

49.     Paragraph 49 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 49 contains issues of fact, Defendants deny that DC's predecessors-in-interest developed Superboy pursuant to the original grant of rights in Superman, as Superboy was created by Jerry Siegel and ultimately sold to DC's predecessor.  Defendants otherwise deny the allegations of Paragraph 49, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

50.     Paragraph 50 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 50 contains issues of fact, Defendants deny the allegations of Paragraph 50, except admit that during their lifetimes Jerome Siegel and Joseph Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c).

51.     Defendants admit that Shuster passed away on July 30, 1992, and was survived by Frank Shuster (his brother), Jean Peavy (his sister), and Mark Warren Peary and Dawn Peavy (his nephew/niece), that Shuster did not leave a widow or have children or grandchildren and, as to Joe Shuster's will, Defendants respectfully refer the Court to such document for evidence of the contents thereof.  Defendants otherwise deny the allegations of Paragraph 51.

52.     Defendants deny the allegations of Paragraph 52, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53, and on that basis deny the same, except admit that, at some point, Time Warner and/or DC agreed to pay certain of Joe Shuster's expenses and to increase Frank Shuster's modest pension.

54.     Defendants deny the allegations of Paragraph 54, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1348**

refer the Court to such documents for evidence of the contents thereof.

55. Paragraph 55 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 55 contains issues of fact, Defendants deny the allegations of Paragraph 55, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

56. Paragraph 56 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 56 contains issues of fact, Defendants deny the allegations of Paragraph 56, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

57. Defendants admit that DC paid Frank Shuster, and has paid Jean Peavy, a modest increased pension pursuant to the terms of the 1992 Agreement. Defendants otherwise deny the allegations of Paragraph 57, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

58. Defendants deny the allegations of Paragraph 58.

59. Defendants admit that Mr. Toberoff represents the authors of copyrighted works and their heirs with respect to their rights. Defendants otherwise deny the allegations of Paragraph 59.

60. Defendants deny the allegations of Paragraph 60, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

61. Defendants deny the allegations of Paragraph 61, except to the extent that the allegations, if any, accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

62. Defendants deny the allegations of Paragraph 62, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1349**

refer the Court to such documents for evidence of the contents thereof.

63. Defendants deny the allegations of Paragraph 63, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

64. Paragraph 64 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 64 contains issues of fact, Defendants deny the allegations of Paragraph 64, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof. Mr. Toberoff began acting as the attorney for Mark Warren Peary and Jean Adele Peavy shortly after he was contacted by Mr. Peary in late 2001.

65. Defendants admit only that the Estate of Joseph Shuster was established by a probate action in Los Angeles Superior Court, LASC Case No. BP-080635, that Mark Warren Peary was appointed as executor/personal representative of the Shuster Estate, and that Mr. Peary served a copyright termination notice on DC on behalf of the estate in November 2003 drafted and signed by Mr. Toberoff as "Counsel for the Estate of Joseph Shuster" (the "Shuster Termination Notice"). Defendants otherwise deny the allegations of Paragraph 65, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

66. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66, and on that basis deny the same.

67. Paragraph 67 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 67 contains issues of fact, Defendants admit that Joanne Siegel and Laura Siegel Larson (the "Siegel Heirs"), with the assistance of counsel, served copyright termination notices as to Superman on DC, among others, in 1997. Defendants lack knowledge or information sufficient to form

a belief as to the truth of the other allegations contained in Paragraph 67, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

68.     Defendants admit that the Joanne Siegel and Laura Siegel Larson negotiated with DC Comics regarding the original Superman copyright interests, recaptured by Joanne Siegel and Laura Siegel Larson pursuant to their Superman notices of termination under the Copyright Act.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 68, and on that basis deny the same.

69.     Paragraph 69 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 69 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 69, and on that basis deny the same.

70.     Defendants admit that, if the Siegel Heirs and Shuster Executor work together, they have significantly greater leverage in negotiations.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 70, and on that basis deny the same.

71.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71, and on that basis deny the same.

72.     Defendants admit that Mr. Toberoff contacted Mr. Marks regarding the status of the Siegel Heirs' rights at some point.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 72, and on that basis deny the same.

73.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73, and on that basis deny the same.

74.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74, and on that basis deny the same.

75.     Paragraph 75 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 75 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

76.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76, and on that basis deny the same.

77.     Defendants admit that Mr. Toberoff contacted the Siegel Heirs' attorney; and that Mr. Emanuel, with Mr. Toberoff present, conveyed an offer to the Siegel Heirs' attorney regarding the Siegel Heirs' Superman rights.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 77, and on that basis deny the same.

78.     Defendants admit that Mr. Emanuel made a proposal regarding the Siegel Heirs' Superman rights.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 78, and on that basis deny the same.

79.     Defendants admit that the Siegel Heirs terminated their employment of their attorney.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 79, and on that basis deny the same.

80.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents

ER-1352

of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

81.     Defendants admit that the Siegel Heirs and Marc Toberoff entered into an agreement.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 81, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

82.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

83.     Paragraph 83 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 83 contains issues of fact, Defendants admit that Mr. Toberoff began acting as counsel for the Siegel Heirs shortly after their initial meetings, and entered into a formal retainer agreement with the Siegel Heirs at some point.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 83, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

84.     Defendants deny the allegations of Paragraph 84.

85.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85, and on that basis deny the same.

86.     Paragraph 86 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 86 contains issues of fact, Defendants

admit that the Siegel Heirs served on DC a copyright termination notice related to the

character "Superboy," which properly listed Jerome Siegel as the sole author of

Superboy based on, *inter alia*, his independently written Superboy script, consistent

with the November 21, 1947 opinion and April 12, 1948 findings of fact and

conclusions of law in a 1947 Action in the New York Supreme Court in Westchester

County.  Defendants otherwise deny the allegations of Paragraph 86.

87.     Defendants deny the allegations of Paragraph 87.

88.     Defendants deny the allegations of Paragraph 88, except to the extent, if

any, that the allegations accurately reflect the contents of documents, and respectfully

refer the Court to such documents for evidence of the contents thereof.

89.     Defendants admit that the Siegel Heirs served and filed notices of

termination regarding Superboy.  Defendants otherwise lack knowledge or

information sufficient to form a belief as to the truth of the allegations contained in

Paragraph 89, and on that basis deny the same.

90.     Defendants deny the allegations of Paragraph 90.

91.     Defendants admit that Joanne Siegel and Laura Siegel Larson filed two

related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx)

and 04-CV-08776 ODW (RZx) that concerned, *inter alia*, Superman and Superboy,

respectively.  Defendants otherwise deny the allegations of Paragraph 91.

92.     Defendants admit that Mark Warren Peary caused to be served the

Shuster Termination Notice one week after the November 3, 2003 date of the Pacific

Pictures Agreement.  Defendants otherwise deny the allegations of Paragraph 92.

93.     Defendants deny the allegations of Paragraph 93, which omits that the

Shuster Termination Notice was signed by "Marc Toberoff, Esq., Counsel for the

Estate of Joseph Shuster," except to the extent, if any, that the allegations accurately

reflect the contents of documents, and respectfully refer the Court to such documents

for evidence of the contents thereof.

94.     Defendants admit that the Shuster Termination Notice, pursuant to 17

ER-1354

U.S.C. § 304(d), effective October 26, 2013, terminated (a) the December 4, 1937
Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938
Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19,
1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975
Agreement, to the extent that such constituted copyright grants.

95.     Paragraph 95 contains conclusions of law as to which no responsive
pleading is required.  To the extent Paragraph 95 contains issues of fact, Defendants
admit that the Shuster Termination does not mention the May 21, 1948 Consent
Agreement and the 1992 Agreement because neither constitutes a Superman
copyright grant, and Defendants otherwise deny the allegations of Paragraph 95.

96.     Defendants admit that the Shuster Termination Notice applies to the
following works:  certain unpublished material created before Action Comics No. 1;
Action Comics Nos. 1-7; reprinted material in Superman No. 1; and reprinted
material in Superman No. 3.

97.     Paragraph 97 contains conclusions of law as to which no responsive
pleading is required.  To the extent Paragraph 97 contains issues of fact, Defendants
deny the allegations of Paragraph 97.

98.     Defendants deny the allegations of Paragraph 98, as the Shuster
Executor's termination interest could not have been transferred to PPC as a matter of
law pursuant to 17 U.S.C. § 304, except to the extent, if any, that the allegations
accurately reflect the contents of documents, and respectfully refer the Court to such
documents for evidence of the contents thereof.

99.     Paragraph 99 contains conclusions of law as to which no responsive
pleading is required.  To the extent Paragraph 99 contains issues of fact, Defendants
admit that a September 10, 2004 letter between Pacific Pictures Corporation, Mr.
Peary and Ms. Peavy completely cancelled the 2001 Pacific Pictures Agreement and
the 2003 Pacific Pictures Agreement and cancelled any joint venture between them.
Defendants otherwise deny the allegations of Paragraph 99.

ER-1355

100.   Paragraph 100 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 100 contains issues of fact, Defendants deny the allegations of Paragraph 100.

101.   Paragraph 101 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 101 contains issues of fact, Defendants deny the allegations of Paragraph 101, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

102.   Defendants deny the allegations of Paragraph 102, except admit that Judge Larson issued orders on September 26, 2008 and December 4, 2008 in the related *Siegel v. Warner Bros. Entertainment Inc.* case that resulted in the disclosure of the "Toberoff Timeline," which DC has admitted that it read in 2006.

103.   Defendants deny the allegations of Paragraph 103, except to the extent, if any, that the allegations accurately reflect the contents of the so-called "Toberoff Timeline," a false, ranting and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

104.   Defendants deny the allegations of Paragraph 104, as DC read the Toberoff Timeline in 2006, except to the extent, if any, that the allegations accurately reflect the contents of the so-called "Toberoff Timeline," a false and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

### V.      CLAIMS FOR RELIEF

### A.      First Claim for Relief

105.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-104, inclusive.

106.   Paragraph 106 contains conclusions of law as to which no responsive

pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants deny the allegations in Paragraph 106.

107.    Paragraph 107 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 107 contains issues of fact, Defendants deny the allegations in Paragraph 107.

108.    Paragraph 108 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 108 contains issues of fact, Defendants deny the allegations in Paragraph 108.

109.    Paragraph 109 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 109 contains issues of fact, Defendants admit that Action Comics, No.  1 was published in April 1938.  Defendants otherwise deny the allegations in Paragraph 109.

110.    Paragraph 110 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 110 contains issues of fact, Defendants admit that Joseph Shuster did not exercise his termination rights during his lifetime, that he died in 1992 and that he did not leave a widow, child or grandchild. Defendants otherwise deny the allegations in Paragraph 110.

111.    Paragraph 111 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 111 contains issues of fact, Defendants admit that Shuster did not have a widow, child or grandchild.  Defendants otherwise deny the allegations in Paragraph 111.

112.    Paragraph 112 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 112 contains issues of fact, Defendants deny the allegations in Paragraph 112.

113.    Paragraph 113 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 113 contains issues of fact, Defendants deny the allegations in Paragraph 113, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such

ER-1357

documents for evidence of the contents thereof.

114.   Paragraph 114 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 114 contains issues of fact, Defendants deny the allegations in Paragraph 114.

115.   Defendants admit that Jean Peavy was aware that Superman was a valuable property and that, after Joe Shuster's death, Frank Shuster and Jean Peavy entered into an October 2, 1992 agreement with DC.  Defendants deny the other allegations in Paragraph 115, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

116.   Paragraph 116 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 116 contains issues of fact, Defendants deny the allegations in Paragraph 116, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

117.   Paragraph 117 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 117 contains issues of fact, Defendants deny the allegations in Paragraph 117.

118.   Paragraph 118 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 118 contains issues of fact, Defendants deny the allegations in Paragraph 118.

119.   Paragraph 119 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 119 contains issues of fact, Defendants deny the allegations in Paragraph 119.

120.   Paragraph 120 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 120 contains issues of fact, Defendants deny the allegations in Paragraph 120, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1358**

documents for evidence of the contents thereof.

121.  Paragraph 121 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 121 contains issues of fact, Defendants admit that the Shuster Termination Notice was served on November 10, 2003, and Defendants otherwise deny the allegations in Paragraph 121.

122.  Paragraph 122 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 122 contains issues of fact, Defendants deny the allegations in Paragraph 122, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

123.  Paragraph 123 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 123 contains issues of fact, Defendants deny the allegations in Paragraph 123.

124.  Paragraph 124 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 124 contains issues of fact, Defendants deny the allegations in Paragraph 124.

125.  Paragraph 125 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 125 contains issues of fact, Defendants deny the allegations in Paragraph 125, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

126.  Paragraph 126 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 126 contains issues of fact, Defendants deny the allegations in Paragraph 126.

127.  Defendants deny the allegations in Paragraph 127, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

ER-1359

128.   Paragraph 128 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 128 contains issues of fact, Defendants deny the allegations in Paragraph 128.

129.   Paragraph 129 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 129 contains issues of fact, Defendants deny the allegations in Paragraph 129.

130.   Paragraph 130 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 130 contains issues of fact, Defendants admit that Mark Warren Peary signed the 2003 Pacific Pictures Agreement. Defendants otherwise deny the allegations in Paragraph 130, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

131.   Defendants deny the allegations in Paragraph 131, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

132.   Defendants deny the allegations in Paragraph 132, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

133.   Paragraph 133 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 133 contains issues of fact, Defendants admit that they filed a copyright infringement action against DC regarding Superboy, Case No. 04-CV-08776 ODW (RZx), and Defendants otherwise deny the allegations in Paragraph 133.

134.   Defendants admit that a declaration by this Court regarding the validity of the Shuster Termination Notice is warranted under 28 U.S.C. §§ 2201 *et seq.*, to establish the parties' respective rights and obligations.  Defendants otherwise deny the allegations in Paragraph 134.

ER-1360

## B. Second Claim for Relief

135. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-134, inclusive.

136. Defendants admit that DC's Second Claim for Relief is pleaded in the alternative.

137. Defendants admit that, in or around 1933, Siegel and Shuster co-created various Superman materials for a comic strip character named "Superman," including twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine-page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week). These works, though originally unpublished, were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 (the "Initially Unpublished Works"). Defendants otherwise deny the allegations in Paragraph 137.

138. Defendants admit that Siegel and Shuster submitted the Initially Unpublished Works to a number of prospective publishers. Defendants otherwise deny the allegations in Paragraph 138.

139. Defendants deny the allegations in Paragraph 139, except admit that Siegel and Shuster entered into a December 4, 1937 Agreement with DCI, which speaks for itself, and respectfully refer the Court to such document for evidence of the contents thereof.

140. Paragraph 140 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 140 contains issues of fact, Defendants admit that, in the 1930s, Siegel and Shuster independently co-created Superman comic strips which they pitched to prospective publishers, including newspaper syndicates, and that DCI eventually published Siegel and Shuster's independently created Superman comic strips in a magazine entitled "Action Comics, No. 1."

1    Defendants otherwise deny the allegations in Paragraph 140.

2        141.  Paragraph 141 contains conclusions of law as to which no responsive

3    pleading is required.  To the extent Paragraph 141 contains issues of fact, Defendants

4    deny the allegations in Paragraph 141, except to the extent, if any, that the allegations

5    accurately reflect the contents of documents, and respectfully refer the Court to such

6    documents for evidence of the contents thereof.

7        142.  Defendants deny the allegations in Paragraph 142.

8        143.  Paragraph 143 contains conclusions of law as to which no responsive

9    pleading is required.  To the extent Paragraph 143 contains issues of fact, Defendants

10   deny the allegations in Paragraph 143.

11       144.  Paragraph 144 contains conclusions of law as to which no responsive

12   pleading is required.  To the extent Paragraph 144 contains issues of fact, Defendants

13   admit that Siegel and Shuster continued to submit additional Superman stories to DCI

14   for publication after the publication of "Action Comics No. 1," and that Siegel and

15   Shuster entered into an agreement dated September 22, 1938 with DCI.  Defendants

16   otherwise deny the allegations in Paragraph 144, except to the extent, if any, that the

17   allegations accurately reflect the contents of documents, and respectfully refer the

18   Court to such documents for evidence of the contents thereof.

19       145.  Defendants admit that Siegel and Shuster entered into a September 22,

20   1938 agreement with The McClure Newspaper Syndicate.  Defendants otherwise

21   deny the allegations in Paragraph 145, except to the extent, if any, that the allegations

22   accurately reflect the contents of documents, and respectfully refer the Court to such

23   documents for evidence of the contents thereof.

24       146.  Paragraph 146 contains conclusions of law as to which no responsive

25   pleading is required.  To the extent Paragraph 146 contains issues of fact, Defendants

26   admit that Siegel worked for DC at times when Siegel did not.  Defendants otherwise

27   deny the allegations in Paragraph 144.

28       147.  Defendants admit only that on or about November 30, 1938, Siegel

wrote to DCI expressing his conception of a new comic "strip named SUPERBOY, which would relate the adventures of Superman as a youth … [which] would be very much different from the SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of adventures very much different …" (the "Superboy Summary"), and that DCI did not publish a "Superboy" comic at that time. Defendants otherwise deny the allegations in Paragraph 147, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

148. Defendants admit only that on or about December 19, 1939, Siegel and Shuster entered into an agreement with DCI (the "December 19, 1939 Agreement"), which speaks for itself. Defendants otherwise deny the allegations in Paragraph 148, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

149. Paragraph 149 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 149 contains issues of fact, Defendants admit only that on or about December, 1940, Siegel solely authored a complete, thirteen-page, original "Superboy" story ("Superboy Story"); and that in the event his story was licensed by DCI and thereafter published as a comic book, Siegel suggested a promotional prologue to the story. Defendants otherwise deny the allegations in Paragraph 149, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

150. Paragraph 150 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 150 contains issues of fact, Defendants admit only that on November 18, 1944 DCI issued for sale "More Fun Comics No. 101" with a cover date of January-February 1945, which wrongfully published the first Superboy comic story based on Jerome Siegel's 1940 Superboy Story, without

1  first obtaining a requisite license from Siegel, and without any credit to Siegel.

2  Defendants otherwise deny the allegations in Paragraph 150.

3      151.   Defendants admit that DC and its predecessors-in-interest have

4  published Superman in various forms since 1938, and that numerous Superman

5  works derived from Siegel and Shuster's original Superman story published in

6  "Action Comics, No. 1," have thereafter been produced.  Defendants otherwise deny

7  the allegations in Paragraph 151, except to the extent, if any, that the allegations

8  accurately reflect the contents of documents, and respectfully refer the Court to such

9  documents for evidence of the contents thereof.

10      152.   Defendants admit that DC seeks declaratory relief.  Defendants

11  otherwise deny the allegations in Paragraph 152.

12      153.   Defendants deny the allegations in Paragraph 153, except to the extent,

13  if any, that the allegations accurately reflect the contents of the Shuster Termination

14  Notice, and respectfully refer the Court to such document for evidence of the contents

15  thereof.

16      154.   Paragraph 154 contains conclusions of law as to which no responsive

17  pleading is required.  To the extent Paragraph 154 contains issues of fact, Defendants

18  deny the allegations in Paragraph 154.

19      155.   Paragraph 155 contains conclusions of law as to which no responsive

20  pleading is required.  To the extent Paragraph 155 contains issues of fact, Defendants

21  deny the allegations in Paragraph 155.

22      156.   Paragraph 156 contains conclusions of law as to which no responsive

23  pleading is required.  To the extent Paragraph 156 contains issues of fact, Defendants

24  deny the allegations in Paragraph 156.

25      157.   Paragraph 157 contains conclusions of law as to which no responsive

26  pleading is required.  To the extent Paragraph 157 contains issues of fact, Defendants

27  deny the allegations in Paragraph 157.

28      158.   Paragraph 158 contains conclusions of law as to which no responsive

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

pleading is required.  To the extent Paragraph 158 contains issues of fact, Defendants deny the allegations in Paragraph 158, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

159.   Paragraph 159, and footnote 4 included therein, contain conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 159 contains issues of fact, Defendants deny the allegations in Paragraph 159.

160.   Paragraph 160 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 160 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 160, and on that basis deny the same.

161.   Paragraph 161 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 161 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 161, and on that basis deny the same.

162.   Paragraph 162 contains conclusions of law as to which no responsive pleading is required.

163.   Paragraph 163 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 163 contains issues of fact, Defendants admit that there is a dispute between the parties as to which Superman "elements" appear in the works listed in the Shuster Termination Notice.  Defendants otherwise deny the allegations in Paragraph 163.

164.   Defendants admit that DC seeks declaratory relief.  Defendants otherwise deny the allegations in Paragraph 164.

### C.   Third Claim for Relief

165.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-164, inclusive.

166.   Defendants admit that DC's Third Claim for Relief is pled in the

alternative.

167. Paragraph 167 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 167 contains issues of fact, Defendants deny the allegations in Paragraph 167.

168. Paragraph 168 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 168 contains issues of fact, Defendants deny the allegations in Paragraph 168.

169. Paragraph 169 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 169 contains issues of fact, Defendants deny the allegations in Paragraph 169.

170. Paragraph 170 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 170 contains issues of fact, Defendants deny the allegations of Paragraph 170, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

171. Paragraph 171 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 171 contains issues of fact, Defendants deny the allegations of Paragraph 171.

172. Paragraph 172 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 172 contains issues of fact, Defendants deny the allegations of Paragraph 172.

173. Defendants admit that DC seeks an injunction. Defendants otherwise deny the allegations of Paragraph 173.

### D. Fourth Claim for Relief

174. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-173,

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1366**

175.   inclusive.

176.   Paragraph 175 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 175 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

177.   Paragraph 176 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 176 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

178.   Paragraph 177 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 177 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

179.   Paragraph 178 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 178 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

180.   Paragraph 179 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 179 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

### E.      Fifth Claim for Relief

181.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-179, inclusive.

182.   Paragraph 181 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 181 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1367**

183.   Paragraph 182 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 182 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

184.   Paragraph 183 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 183 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

185.   Paragraph 184 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 184 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

186.   Paragraph 185 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 185 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

187.   Paragraph 186 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 186 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

**F.     Sixth Claim for Relief**

188.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-186, inclusive.

189.   Paragraph 188 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 188 contains issues of fact, Defendants deny the allegations of Paragraph 188.

190.   Defendants deny the allegations of Paragraph 189.

**<u>AFFIRMATIVE DEFENSES</u>**

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT     ER-1368

In addition to the grounds set out in the Answer to the Complaint herein, Defendants hereby additionally allege as follows:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

191.   The Complaint and each purported claim therein fails to state a claim upon which the relief sought or any relief could be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Statute of Limitations)

192.   The Complaint and each purported claim therein is barred, in whole or in part, by Plaintiff's failure to bring such claims within the governing statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

### (Litigation Privilege)

193.   The Complaint and each purported state-law claim therein is barred, in whole or in part, by the litigation privilege of California Civil Code § 47.

## FOURTH AFFIRMATIVE DEFENSE

### (Waiver/Acquiescence/Estoppel)

194.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of waiver, acquiescence and/or estoppel.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

195.   The Complaint and each purported state-law claim therein is barred, in whole or in part, by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

196.   The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

ER-1369

**(Unjust Enrichment)**

197.   The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## EIGHTH AFFIRMATIVE DEFENSE

### (Illegality)

198.   The Complaint and each purported claim therein is barred, in whole or in part, to the extent of any illegality of any matters set forth in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

### (Claim Preclusion)

199.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of *res judicata* (claim preclusion).

## TENTH AFFIRMATIVE DEFENSE

### (Collateral Estoppel/Issue Preclusion)

200.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of collateral estoppel and/or  issue preclusion.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Duress)

201.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of duress.

## TWELFTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

202.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the Statute of Frauds.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

ER-1370

203. The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because the contract(s) lacked consideration.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Misrepresentation)

204. The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the misrepresentations of Plaintiff and/or its predecessors-in-interest.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

205. The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest which is contrary to public policy is unenforceable, and any relief requested in the Complaint which is contrary to public policy should not be granted.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Bad Faith)

206. The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff has acted in bad faith for improper purposes with respect to the subject matter of the claims.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Preemption)

207. The Complaint and each purported state-law claim therein is barred, in whole or in part, because they are preempted by federal law.

## EIGHTTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1371**

208.   The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff lacks standing to pursue its claims.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Full Performance)

209.   The Complaint and each purported claim therein is barred, in whole or in part, because as to any alleged contract between the parties or their respective predecessors-in-interest, Defendants have fully performed all of the conditions, covenants and promises on their part to be performed under the purported contracts, except those which have been excused or prevented by the conduct and actions of Plaintiff.

## TWENTIETH AFFIRMATIVE DEFENSE
### (Law of the Case)

210.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of law of the case.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Prior Action Pending)

211.   The Complaint and each purported claim therein is barred, in whole or in part, by prior actions pending before this Court and/or the United States Court of Appeals for the Ninth Circuit, which involve the same transactions, issues, parties, and property that are the subject of the complaint, including without limitation *Siegel v. Warner Bros. Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx) and *Siegel v. Time Warner Inc.*, Case No. 04-CV-08776 ODW (RZx).

## TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Termination Notices Are Valid and In Compliance with 17 U.S.C. §§ 304(c)-(d))

212.   The Complaint and the First and Second Claims for Relief are barred because the Shuster Termination Notice is valid and effective, and in full compliance with 17 U.S.C. § 304(c)-(d) and 37 C.F.R. § 201.10.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

SHUSTER DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT ER-1372

**(Termination Notices Not Invalidated By Technical Errors)**

213.   The Complaint and the First and Second Claims for Relief are barred, in whole or in part, because under 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the Shuster Termination Notice is not invalidated or curtailed due to technical errors or omissions, if any, since the intent to terminate all prior grants by Joseph Shuster of his copyright interests in all works listed in the Notice was made clear to Plaintiff in the Notice timely served on Plaintiff.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Termination Interests Under 17 U.S.C. §§ 304(c)-(d) Cannot Be Waived)

214.   The Complaint and each purported claim therein is barred, in whole or in part, because Defendants could not have waived or effectively waived, directly or indirectly, any of their termination rights or interests under 17 U.S.C. §§ 304(c)-(d) because such termination rights or interests are inalienable and persist "notwithstanding any agreement to the contrary," and cannot be waived.

.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Not "Works-Made–For-Hire")

215.   The Complaint and the First and Second Claims for Relief are barred, in whole or in part, because the works created or co-created by Joseph Shuster, referred to in the Complaint and/or in the Shuster Termination Notice, do not constitute "works-made-for-hire," and the Shuster Termination Notice cannot be invalidated or limited on that basis.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (1948 Consent Judgment Not A Copyright Grant)

216.   The Complaint and the First Claim for Relief is barred, in whole or in part, because the "Consent Judgment" dated May 21, 1948 need not have been terminated by Defendants pursuant to 17 U.S.C. § 304(d) to regain Shuster's copyright interests because the Consent Judgment does not constitute a grant or

assignment of a copyright interest in "Superman" or any other work authored by

Shuster. The Consent Judgment is not an operative agreement or grant of any

copyright interest(s) and merely recites which parties own which copyrights pursuant

to a prior grant(s), namely a May 19, 1948 stipulation, the operative grant which was

duly terminated by the Shuster Termination Notice pursuant to 17 U.S.C. § 304(d).

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE
### (Failure to List Ad Does Not Affect Superman Termination)

217. The Complaint and the First and Second Claims for Relief are barred, in

whole or in part, because the Shuster Termination Notice is not invalidated or

curtailed by any alleged failure to list an advertisement(s), allegedly depicting the

cover of "Action Comics No. 1," if any, since Defendants properly gave notice of

their termination of the underlying grant(s) of the original "Superman" copyright

pursuant to 17 U.S.C. § 304(c) and the Shuster Termination Notices identified

"Action Comics No. 1."

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE
### (Counterclaimant Cannot Exploit New Derivative Works)

218. The Complaint and the First and Second Claims for Relief are barred, in

whole or in part, because, after the Shuster Termination Notice becomes effective,

Plaintiff cannot exploit new derivative works based on copyrights that Defendants

have recovered pursuant to 17 U.S.C. §304(c) and/or based on works derived from

such recovered copyrights.

### TWENTY-NINTH AFFIRMATIVE DEFENSE
### (Joseph Shuster's Termination Rights Did Not Expire)

219. The Complaint and the First Claim for Relief is barred, in whole or in

part, because the termination rights of Joseph Shuster did not "expire" upon his death

and are properly held by the Shuster Executor pursuant to 17 U.S.C. §§ 304(c)(2),

(d).

### THIRTIETH AFFIRMATIVE DEFENSE

**(The 1992 Agreement Has No Effect on Termination)**

220.   The Complaint and the First and Fourth Claims for Relief are barred, in whole or in part, because the 1992 agreement between DC and Frank Shuster/Jean Peavy (the "1992 Agreement") does not bar the Shuster Termination because, *inter alia*, Frank Shuster and Jean Peavy never held any termination rights under the Copyright Act, nor did the 1992 Agreement revoke or regrant Siegel and Shuster's prior Superman grants on which DC has long relied prior to and after the 1992 Agreement .

### THIRTY-FIRST AFFIRMATIVE DEFENSE
### (The Shuster Executor Held Termination Rights)

221.   The Complaint and the First Claim for Relief is barred, in whole or in part, because the Shuster Executor held the entirety of Shuster's termination rights pursuant to 17 U.S.C. §§ 304(c)-(d), such interests could not be and were not transferred, and the Shuster Executor properly signed the Shuster Termination Notice.

### THIRTY-SECOND AFFIRMATIVE DEFENSE
### (No Failure to List Copyright Grants)

222.   The Complaint and the First Claim for Relief is barred, in whole or in part, because any alleged failure to list either the 1992 Agreement or the May 21, 1948 Consent Judgment in the Shuster Termination Notice has no effect on the validity of the notice.

### THIRTY-THIRD AFFIRMATIVE DEFENSE
### (No Unclean Hands)

223.   The Complaint and the First Claim for Relief is barred, in whole or in part, because Defendants did not have "unclean hands" with respect to the Shuster Termination Notice and because unclean hands cannot be used to invalidate the Shuster Termination Notice.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (Failure to Comply With F.R.C.P.)

224.   Defendants are not required to separately admit or deny each averment contained in each Paragraph of the Complaint due to Plaintiff's failure to comply with Rules 8(a) and 8(e) of the Federal Rules of Civil Procedure.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Unknown Defenses)

225.   Defendants believe, and based upon such information and belief allege that the Defendants may have additional affirmative defenses available to them, which are not now fully known and of which these answering Defendants are not fully aware.  The Defendants accordingly reserve the right to assert any additional affirmative defenses after the same have been ascertained.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Reservation of Right to Amend)

226.   The Complaint and each purported claim therein fails to state the claims for relief with sufficient particularity to permit Defendants to discern and raise all appropriate defenses, and Defendants therefore reserve their rights to amend or supplement this answer with additional defenses.

FOR THESE REASONS, Defendants pray that the Court dismiss all of Plaintiff's claims and find for Defendants on all counts, and that Defendants be awarded costs, including reasonable attorneys' fees under Section 505 of the United States Copyright Act and California Code of Civil Procedure Section 425.16, and pray for such other and further relief as this Court deems just and proper.

Dated: November 25, 2011     RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff

Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of
Joseph Shuster, Jean Adele Peavy, and Laura
Siegel Larson, individually and as personal
representative of the Estate of Joanne Siegel

ER-1377

1  TOBEROFF & ASSOCIATES, P.C.
   Marc Toberoff (State Bar No. 188547)
2    *mtoberoff@ipwla.com*
   Keith G. Adams (State Bar No. 240497)
3    *kgadams@ipwla.com*
   2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel

9

10                **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12  DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

13              Plaintiff,              Hon. Otis D. Wright II, U.S.D.J.
                                        Hon. Ralph Zarefsky, U.S.M.J.
14       vs.
                                        **DEFENDANTS LAURA SIEGEL**
15  PACIFIC PICTURES CORPORATION;       **LARSON'S, INDIVIDUALLY AND**
    IP WORLDWIDE, LLC; IPW, LLC;        **AS PERSONAL REPRESENTATIVE**
16  MARC TOBEROFF, an individual;       **OF THE ESTATE OF JOANNE**
    MARK WARREN PEARY, as personal      **SIEGEL, ANSWER TO FIRST**
17  representative of the ESTATE OF     **AMENDED COMPLAINT**
    JOSEPH SHUSTER; JEAN ADELE
18  PEAVY, an individual; LAURA         Complaint filed:   May 14, 2010
    SIEGEL LARSON, individually and as  Discovery Cutoff:  None Set
19  personal representative of the ESTATE OF  Trial Date:        None Set
    OF JOANNE SIEGEL, and DOES 1-10,
20  inclusive,

21              Defendants.

22

23

24

25

26

27

28

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel ("Defendants") hereby answer the First Amended Complaint ("Complaint") of DC Comics ("Plaintiff" or "DC") as follows:

### I.    STATEMENT OF THE CASE

1.    Defendants admit only that Plaintiff has brought this civil action as set forth in the Complaint and that the Court has subject matter jurisdiction, but otherwise deny the allegations in Paragraph 1.

2.    Paragraph 2 contains conclusions of law as to which no responsive pleading is required.

3.    Paragraph 3 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 3 contains issues of fact, Defendants deny the allegations of Paragraph 3.

4.    Paragraph 4 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 4 contains issues of fact, Defendants admit that during their lifetimes Jerry Siegel and Joe Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c), admit that Siegel and Shuster had certain agreements with DC Comics ("DC"), admit that Siegel knew of the "termination provisions in amendments to the Copyright Act," admit that Frank Shuster and Jean Adele Peavy entered into an agreement with DC in 1992, and lack knowledge or information sufficient to form a belief as to the truth of the allegation that Shuster was "well aware of the termination provisions in amendments to the Copyright Act," and on that basis deny the same.  Defendants otherwise deny the allegations of Paragraph 4.

5.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5, and on that basis deny the same.

6.    Defendants admit that Mark Warren Peary caused to be served a notice

of termination.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6, and on that basis deny the same.

7.  Defendants deny the allegations of Paragraph 7, except admit that Joanne Siegel and Laura Siegel Larson served termination notices in 1997.

8.  Defendants admit that Joanne Siegel and Laura Siegel Larson terminated their employment of Gang, Tyre, Ramer & Brown and thereafter entered into an agreement with Marc Toberoff and IP Worldwide, LLC.  Defendants otherwise deny the allegations of Paragraph 8.

9.  Defendants admit that *Smallville* was a successful network television series.  Defendants otherwise deny the allegations of Paragraph 9.

10.  Defendants admit that Joanne Siegel and Laura Siegel Larson served and filed notices of copyright termination concerning Superboy in 2002, and that Marc Toberoff filed a notice of copyright termination on behalf of the Estate of Joseph Shuster in 2003.  Defendants otherwise deny the allegations of Paragraph 10.

11.  Paragraph 11 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 11 contains issues of fact, Defendants deny the allegations of Paragraph 11, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

12.  Paragraph 12 contains conclusions of law as to which no responsive pleading is required.  Defendants admit that this action seeks declaratory judgments and other reliefs.  To the extent Paragraph 12 contains issues of fact, Defendants otherwise deny the allegations of Paragraph 12.

## II.  PARTIES

13.  Defendants admit that DC is a general partnership organized and

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1380**

existing under the laws of the State of New York. Defendants otherwise deny the allegations of Paragraph 13.

14. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14, and on that basis deny the same.

15. Defendants admit the allegations of Paragraph 15, except that Defendants deny that "Toberoff is the managing and controlling member of IP Worldwide, LLC ["IP Worldwide"] and owns the controlling interest therein."

16. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16, and on that basis deny the same.

17. Defendants admit that Mr. Toberoff is an individual who resides in the County of Los Angeles in the State of California and is and has been a citizen of the United States. Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 17, and on that basis deny the same.

18. Defendants admit the allegations of Paragraph 18.

19. Defendants admit the allegations of Paragraph 19.

20. Defendants admit that Jean Adele Peavy ("Peavy") is an individual who resides in the State of New Mexico and is and has been a citizen of the United States and that Peavy was the sister of Joseph Shuster. Defendants otherwise deny the allegations of Paragraph 20, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

21. Defendants admit the allegations of Paragraph 21, except to the extent that Joanne Siegel has since passed away on February 12, 2011.

22. Defendants admit the allegations of Paragraph 22.

23. Defendants lack knowledge or information sufficient to form a belief as

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1381**

to the truth of the allegations contained in Paragraph 23, and on that basis deny the same.

24. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24, and on that basis deny the same.

### III. JURISDICTION AND VENUE

25. Paragraph 25 alleges conclusions of law to which no responsive pleading is required.

26. Paragraph 26 alleges conclusions of law to which no responsive pleading is required.

    a. Paragraph 26(a) contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 26(a) contains issues of fact, Defendants deny the allegations of Paragraph 26(a), except admit that Peary, Peavy, and Pacific Pictures Corporation entered into an agreement dated November 23, 2001, and that Peary and Pacific Pictures Corporation entered into an agreement dated October 26, 2003. The terms of these agreements speak for themselves, and Defendants respectfully refer the Court to such documents for evidence of the contents thereof.

    b. Defendants admit that a California Court appointed Peary executor of the estate of Joseph Shuster, and that Peary caused to be served a notice of termination pursuant to the Copyright Act, but otherwise deny the allegations of Paragraph 26(b), except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

    c. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26(c), and on that basis deny the same.

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1382**

d. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26(d), and on that basis deny the same.

e. Defendants admit the allegations of Paragraph 26(e), except to the extent that Joanne Siegel passed away on February 12, 2011.

f. Defendants admit that Joanne Siegel and Laura Siegel Larson filed two related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx) and 04-CV-08776 ODW (RZx) that concerned, *inter alia*, Superman and Superboy, respectively. Defendants otherwise deny allegations of Paragraph 26(f).

27. Paragraph 27 alleges conclusions of law to which no responsive pleading is required.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

28. Defendants admit on information and belief that, in or about 1934, Jerome Siegel (a writer) ("Siegel") and Joseph Shuster (an illustrator) ("Shuster") conceived of a fictional character called Superman, and independently co-authored fifteen daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six-day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years. Defendants otherwise deny the allegations of Paragraph 28, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29. Defendants admit on information and belief that Detective Comics, Inc. (""DCI") was provided with the 1934 Superman Comic Strip, that DCI expressed interest in publishing this work in a thirteen-page comic magazine format, and that this was published by DCI in a magazine called "Action Comics, No. 1." Defendants otherwise deny the allegations of Paragraph 29.

ER-1383

30.     Defendants admit on information and belief only that on or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with DCI (the "December 4, 1937 Agreement") to continue to produce the comic magazine features "Slam Bradley" and "The Spy" for a period of two years, which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to DCI which reserved the right to accept or reject same within sixty days.  Defendants admit that, on or about September 22, 1938, DCI, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate, and that on or about September 22, 1938, DCI and Siegel and Shuster entered into an agreement.  Defendants otherwise deny the allegations of Paragraph 30, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31.     Paragraph 31 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 31 contains issues of fact, Defendants admit on information and belief that, in or about January–February 1938, when DCI expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster cut and pasted their 1934 Superman Comic Strip into more than ninety separate panels (the "Revised Superman Comic Strip"), so as to render their newspaper strip more suitable for a magazine layout.  Defendants otherwise deny the allegations of Paragraph 31.

32.     Paragraph 32 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 32 contains issues of fact, Defendants admit on information and belief only that in an instrument prepared by DCI, dated March 1, 1938 (the "March 1, 1938 Agreement"), concerning a strip entitled "Superman," Siegel and Shuster agreed to the publication of their Revised Superman Comic Strip by Detective Comics in consideration for the sum of $10 per page for this thirteen-page installment equal to a total of $130.  Defendants further admit that,

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1384**

in addition to the Siegel and Shuster material published by DCI in "Action Comics
No. 1," Siegel and Shuster created further original "Superman" material and stories.
Defendants otherwise deny the allegations of Paragraph 32, except to the extent that
the allegations accurately reflect the contents of documents, and respectfully refer the
Court to such documents for evidence of the contents thereof.

33.     Paragraph 33 contains conclusions of law as to which no responsive
pleading is required.  To the extent Paragraph 33 contains issues of fact, Defendants
admit that "Action Comics No. 1" depicts, without limitation, Superman's origin
from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by
his scientist father), his core physical and mental traits, his mission as a champion of
the oppressed to use his great powers to benefit humankind, his secret identity as
newspaper reporter "Clark Kent," his relationship with other key characters such as
the newspaper editor from whom he takes his assignments and his romantic interest
in Lois, who rebuffs Clark while pursuing a romantic interest in Superman.
Defendants otherwise deny the allegations of Paragraph 33, except to the extent that
the allegations accurately reflect the contents of documents, and respectfully refer the
Court to such documents for evidence of the contents thereof.

34.     Paragraph 34 contains conclusions of law as to which no responsive
pleading is required.  To the extent Paragraph 34 contains issues of fact, Defendants
deny the allegations of Paragraph 34, except admit that DC and its predecessors-in-
interest have published Superman works in various forms since 1938.

35.     Defendants lack knowledge or information sufficient to form a belief as
to the truth of the allegations contained in Paragraph 35, and on that basis deny the
same, except admit that DC and its predecessors-in-interest have published Superman
works in various forms since 1938.

36.     Defendants deny the allegations of Paragraph 36, except admit that
numerous Superman works derived from Siegel and Shuster's original Superman
story published in "Action Comics, No. 1," have thereafter been produced.

37. Defendants deny the allegations of Paragraph 37, except admit that Siegel and Shuster's co-creation Superman is one of the most famous, beloved and valuable fictional characters in the world.

38. Defendants deny the allegations of Paragraph 38, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39. Defendants deny the allegations of Paragraph 39, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40. Paragraph 40 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 40 contains issues of fact, Defendants admit that the relationship between DC and its predecessors and Siegel and Shuster became contentious, and lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 40, and on that basis deny the same

41. Defendants admit that in or about 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester, against National Comics Publications, Inc. (hereinafter, the "1947 Action") to determine the validity of the contracts between National Comics Publications, Inc.'s predecessors-in-interest and Siegel and Shuster with respect to Superman, and to determine the origin and ownership of Superboy. Defendants otherwise deny the allegations of Paragraph 41, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

42. Defendants admit that pursuant to a stipulation of the parties, the 1947 Action was referred for decision to an Official Referee of the New York Supreme Court. After trial of the action the Official Referee rendered an opinion dated November 1, 1947, which speaks for itself. Defendants otherwise deny the

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1386**

allegations of Paragraph 42, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

43.    Defendants admit that on April 12, 1948, the Official Referee in the 1947 Action signed detailed findings of fact and conclusions of law and entered an interlocutory judgment upholding the challenged contracts in some respects, but also finding that Jerome Siegel was the originator and sole owner of the comic strip feature, "Superboy," and that DCI acted illegally in publishing the "Superboy" feature.  Defendants otherwise deny the allegations of Paragraph 43, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

44.    Defendants admit on information and belief only that after the Official Referee entered his findings in the 1947 Action, settlement negotiations ensued, resulting in a stipulation of settlement between said parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (hereinafter, the "1948 Consent Judgment").  Defendants specifically deny the allegation that the 1948 Stipulation and the 1948 Consent Judgment were separate grants or "agreements."  Defendants otherwise deny the allegations of Paragraph 44, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

45.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45, and on that basis deny the same, except admit that Siegel created a new comic book and syndicated comic strip called "Funnyman," and that Siegel submitted material to DC for publication from the late 1950s to mid-1960s.

46.    Defendants admit only that Siegel and Shuster filed an action against National Periodical Publications, Inc. in the United States District Court for the

ER-1387

Southern District of New York for a declaration that Siegel and Shuster were entitled to the renewal copyright to "Superman," that the District Court's decision was published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973); and that on appeal the decision of the United States Court of Appeals for the Second Circuit was published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), which held, *inter alia*, that the District Court erred in finding that Superman was a "work for hire" under the Copyright Act, 17 U.S.C. § 26, and that "Superman" and his miraculous powers were created by Siegel and Shuster long before any employment relationship with DCI; and that no appeal was taken from this ruling. Defendants otherwise deny the allegations of Paragraph 46, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

47. Defendants admit on information and belief that, in the early 1970s, Siegel publicized his dire financial circumstances and the fact that DC and its predecessors-in-interest had profited immensely from Superman while Siegel and Shuster, Superman's co-creators, had received little-to-no participation or credit, resulting in a public backlash against companies such as DC and its predecessors. Defendants admit that Siegel and Shuster entered into a December 23, 1973 Agreement with Warner Communications, Inc. Defendants otherwise deny the allegations of Paragraph 47, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

48. Defendants deny the allegations of Paragraph 48, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

49. Paragraph 49 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 49 contains issues of fact, Defendants

ER-1388

deny that DC's predecessor-in-interest developed Superboy pursuant to its original grant of rights in Superman as Superboy was created by Jerry Siegel and ultimately sold to DC's predecessor.  Defendants otherwise deny the allegations of Paragraph 49, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

50.     Paragraph 50 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 50 contains issues of fact, Defendants deny the allegations of Paragraph 50, except admit that during their lifetimes Jerome Siegel and Joseph Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c).

51.     Defendants admit that Shuster passed away on July 30, 1992, and was survived by Frank Shuster (his brother), Jean Peavy (his sister), and Mark Warren Peary and Dawn Peavy (his nephew/niece), and that Shuster did not leave a widow or have children or grandchildren.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 51, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

52.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the

**ER-1389**

1  contents thereof.

2      54.   Defendants lack knowledge or information sufficient to form a belief as

3  to the truth of the allegations contained in Paragraph 54, and on that basis deny the

4  same, except to the extent, if any, that the allegations accurately reflect the contents

5  of documents, and respectfully refer the Court to such documents for evidence of the

6  contents thereof.

7      55.   Paragraph 55 contains conclusions of law as to which no responsive

8  pleading is required.  To the extent Paragraph 55 contains issues of fact, Defendants

9  lack knowledge or information sufficient to form a belief as to the truth of the

10  allegations contained in Paragraph 55, and on that basis deny the same, except to the

11  extent, if any, that the allegations accurately reflect the contents of documents, and

12  respectfully refer the Court to such documents for evidence of the contents thereof.

13      56.   Paragraph 56 contains conclusions of law as to which no responsive

14  pleading is required.  To the extent Paragraph 56 contains issues of fact, Defendants

15  lack knowledge or information sufficient to form a belief as to the truth of the

16  allegations contained in Paragraph 56, and on that basis deny the same, except to the

17  extent, if any, that the allegations accurately reflect the contents of documents, and

18  respectfully refer the Court to such documents for evidence of the contents thereof.

19      57.   Defendants lack knowledge or information sufficient to form a belief as

20  to the truth of the allegations contained in Paragraph 57, and on that basis deny the

21  same, except to the extent, if any, that the allegations accurately reflect the contents

22  of documents, and respectfully refer the Court to such documents for evidence of the

23  contents thereof.

24      58.   Defendants deny the allegations of Paragraph 58.

25      59.   Defendants admit that Mr. Toberoff represents the authors of

26  copyrighted works and their heirs with respect to their rights.  Defendants otherwise

27  deny the allegations of Paragraph 59.

28      60.   Defendants lack knowledge or information sufficient to form a belief as

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

**ER-1390**

to the truth of the allegations contained in Paragraph 60, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

61. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

62. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 62, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

63. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 63, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

64. Paragraph 64 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 64 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 64, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof. Defendants admit that Mr. Toberoff began acting as the attorney for Mark Warren Peary and Jean Adele Peavy at some point.

65. Defendants admit only that the Estate of Joseph Shuster was established

by a probate action in Los Angeles Superior Court, LASC Case No. BP-080635, that
Mark Warren Peary was appointed as executor/personal representative of the Shuster
Estate, and that Mr. Peary served a copyright termination notice on DC on behalf of
the estate in November 2003 drafted and signed by Mr. Toberoff as "Counsel for the
Estate of Joseph Shuster" (the "Shuster Termination Notice"). Defendants lack
knowledge or information sufficient to form a belief as to the truth of the other
allegations contained in Paragraph 65, and on that basis deny the same, except to the
extent, if any, that the allegations accurately reflect the contents of documents, and
respectfully refer the Court to such documents for evidence of the contents thereof.

66. Defendants deny the allegations of Paragraph 66.

67. Paragraph 67 contains conclusions of law as to which no responsive
pleading is required. To the extent Paragraph 67 contains issues of fact, Defendants
admit that Joanne Siegel and Laura Siegel Larson (the "Siegel Heirs"), with the
assistance of counsel, served copyright termination notices as to Superman on DC,
among others, in 1997. Defendants otherwise deny the allegations of Paragraph 67,
except to the extent, if any, that the allegations accurately reflect the contents of
documents, and respectfully refer the Court to such documents for evidence of the
contents thereof.

68. Defendants admit that DC provided $228,172.65 to the Siegel Heirs.
Defendants otherwise deny the allegations of Paragraph 68.

69. Paragraph 69 contains conclusions of law as to which no responsive
pleading is required. To the extent Paragraph 69 contains issues of fact, Defendants
admit that on October 16, 2001, DC made a proposal to Kevin Marks, counsel for the
Siegel Heirs; on October 19, 2001, Mr. Marks wrote a letter to DC's counsel
outlining initial terms of a proposed agreement for which many other material terms
had not yet been agreed upon; and that DC's counsel wrote a letter dated October 26,
2001 to the Siegel Heirs' counsel and that on or about February 1, 2002 DC's counsel
sent to the Siegel Heirs' counsel a proposed written agreement, both of which

contained many new material terms not contained in DC's original October 16, 2001 proposal or in the October 19, 2001 letter from the Siegel Heirs' counsel, including without limitation terms that materially differed from and/or substantially diluted the terms in the October 19, 2001 letter. Defendants otherwise deny the allegations of Paragraph 69.

70.     Defendants admit that, if the Siegel Heirs and Shuster Executor work together, they have significantly greater leverage in negotiations. Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 70, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

71.     Defendants deny the allegations of Paragraph 71.

72.     Defendants admit that Mr. Toberoff contacted Mr. Marks regarding the status of the Siegel Heirs' rights on or around February 6, 2002. Defendants otherwise deny the allegations of Paragraph 72.

73.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73, and on that basis deny the same.

74.     Defendants admit that Mr. Toberoff formed IP Worldwide with Ari Emanuel, the current head of the William Morris Endeavor talent agency.

75.     Paragraph 75 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 75 contains issues of fact, Defendants admit that, on May 9, 2002, Joanne Siegel sent a letter to the Richard Parsons, CEO of Time Warner Inc., DC's parent company, stating that DC's new proposals contained "new, outrageous demands that were not in the[ir] proposal," comparing DC to the "Gestapo" and stating that "[a]fter four years we have no deal and this contract makes an agreement impossible." Defendants otherwise deny the allegations of Paragraph 75.

76.     Defendants deny the allegations of Paragraph 76, except admit that, upon information and belief, Mr. Marks had a conversation with John Schulman on or around May 16, 2002, and can neither admit nor deny the other allegations of Paragraph 76 due to the attorney-client privilege.

77.     Defendants admit that Mr. Toberoff contacted Mr. Marks in or around August 2002; that Mr. Marks did not disclose the specific parameters of DC's various proposals and counter-proposals during those conversations; and that in a conference call on or around August 8, 2002, Mr. Emanuel, with Mr. Toberoff present, conveyed an offer to Mr. Marks regarding the Siegel Heirs' Superman rights.  Defendants otherwise deny the allegations of Paragraph 77.

78.     Defendants admit that Mr. Emanuel's August 8, 2002 proposal was for $15 million and a contingent "back-end" participation to be negotiated.  Defendants otherwise deny the allegations of Paragraph 78.

79.     Defendants admit that by letter dated September 21, 2002 the Siegel Heirs terminated Mr. Marks as their attorney.  Defendants otherwise deny the allegations of Paragraph 79, except to the extent that they can neither admit nor deny the allegations of Paragraph 79, as such involve communications protected by the attorney-client privilege.

80.     Defendants deny the allegations of Paragraph 80, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

81.     Defendants admit that the Siegel Heirs and IP Worldwide entered into an agreement dated October 23, 2002.  Defendants otherwise deny the allegations of Paragraph 81, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

82.     Defendants deny the allegations of Paragraph 82, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully

ER-1394

refer the Court to such documents for evidence of the contents thereof.

83.     Paragraph 83 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 83 contains issues of fact, Defendants admit that Mr. Toberoff began acting as counsel for the Siegel Heirs shortly after their initial meetings, and entered into a formal retainer agreement with the Siegel Heirs on or about October 3, 2004.  Defendants otherwise deny the allegations of Paragraph 83, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

84.     Defendants deny the allegations of Paragraph 84.

85.     Defendants deny the allegations of Paragraph 85.

86.     Paragraph 86 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 86 contains issues of fact, Defendants admit that on November 8, 2002, the Siegel Heirs served on DC a copyright termination notice related to the character "Superboy," which properly listed Jerome Siegel as the sole author of Superboy based on, *inter alia*, his independently-written Superboy "script," consistent with the November 21, 1947 opinion and April 12, 1948 findings of fact and conclusions of law in a 1947 Action in the New York Supreme Court in Westchester County.  Defendants otherwise deny the allegations of Paragraph 86.

87.     Defendants deny the allegations of Paragraph 87.

88.     Defendants deny the allegations of Paragraph 88, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

89.     Defendants admit that on or about June 17, 2004, Mr. Emanuel, a talent agent and founder of the Endeavor Talent Agency, sent a letter to Warner Bros. confirming that since "Smallville" is derived from "Superboy," DC and Warner Bros. would be prohibited after November 17, 2004, the effective date of the Superboy

notice of termination, from producing and exploiting new derivative "Smallville" episodes; and that by letter dated August 4, 2004, Mr. Toberoff, the Siegel Heirs' attorney, reiterated that since "Smallville" is derived from "Superboy," DC and Warner Bros. would be prohibited after November 17, 2004, the effective date of the Superboy Notice, from producing and exploiting new derivative "Smallville" episodes. Defendants otherwise deny the allegations of Paragraph 89.

90. Defendants deny the allegations of Paragraph 90.

91. Defendants admit that Joanne Siegel and Laura Siegel Larson filed two related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx) and 04-CV-08776 ODW (RZx) that concerned, *inter alia*, Superman and Superboy, respectively. Defendants otherwise deny the allegations of Paragraph 91.

92. Defendants admit that Mark Warren Peary caused to be served the Shuster Termination Notice. Defendants otherwise deny the allegations of Paragraph 92.

93. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

94. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

95. Paragraph 95 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 95 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95, and on that basis deny the same, except to the

extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

96.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

97.     Paragraph 97 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 97 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

98.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

99.     Paragraph 99 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 99 contains issues of fact, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99, and on that basis deny the same, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

100.    Paragraph 100 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 100 contains issues of fact, Defendants deny the allegations of Paragraph 100.

101.    Paragraph 101 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1397**

pleading is required.  To the extent Paragraph 101 contains issues of fact, Defendants deny the allegations of Paragraph 101, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

102.  Defendants deny the allegations of Paragraph 102, except admit that Judge Larson issued orders on September 26, 2008 and December 4, 2008 in the related *Siegel v. Warner Bros. Entertainment Inc.* case that resulted in the disclosure of the "Toberoff Timeline," which DC has admitted that it read in 2006.

103.  Defendants deny the allegations of Paragraph 103, except to the extent, if any, that the allegations accurately reflect the contents of the so-called "Toberoff Timeline," a false and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

104.  Defendants deny the allegations of Paragraph 104, as DC read the Toberoff Timeline in 2006, except to the extent, if any, that the allegations accurately reflect the contents of the so-called "Toberoff Timeline," a false and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

## V.   CLAIMS FOR RELIEF

### A.   First Claim for Relief

105.  Defendants re-allege and incorporate by reference their responses to Paragraphs 1-104, inclusive.

106.  Paragraph 106 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

107.  Paragraph 107 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT ER-1398

pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

108.   Paragraph 108 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

109.   Paragraph 108 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

110.   Paragraph 110 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 110 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

111.   Paragraph 111 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 110 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

112.   Paragraph 112 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 112 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

113.   Paragraph 113 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 113 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

114.   Paragraph 114 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1399**

1  pleading is required.  To the extent Paragraph 114 contains issues of fact, Defendants
2  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
3  Warren Peary, to whom this claim for relief is applicable.

4       115.   Paragraph 115 contains conclusions of law as to which no responsive
5  pleading is required.  To the extent Paragraph 115 contains issues of fact, Defendants
6  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
7  Warren Peary, to whom this claim for relief is applicable.

8       116.   Paragraph 116 contains conclusions of law as to which no responsive
9  pleading is required.  To the extent Paragraph 116 contains issues of fact, Defendants
10  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
11  Warren Peary, to whom this claim for relief is applicable.

12       117.   Paragraph 117 contains conclusions of law as to which no responsive
13  pleading is required.  To the extent Paragraph 117 contains issues of fact, Defendants
14  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
15  Warren Peary, to whom this claim for relief is applicable.

16       118.   Paragraph 118 contains conclusions of law as to which no responsive
17  pleading is required.  To the extent Paragraph 118 contains issues of fact, Defendants
18  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
19  Warren Peary, to whom this claim for relief is applicable.

20       119.   Paragraph 119 contains conclusions of law as to which no responsive
21  pleading is required.  To the extent Paragraph 119 contains issues of fact, Defendants
22  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
23  Warren Peary, to whom this claim for relief is applicable.

24       120.   Paragraph 120 contains conclusions of law as to which no responsive
25  pleading is required.  To the extent Paragraph 120 contains issues of fact, Defendants
26  incorporate by reference the answers of the defendants Jean Adele Peavy and Mark
27  Warren Peary, to whom this claim for relief is applicable.

28       121.   Paragraph 121 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1400**

pleading is required. To the extent Paragraph 121 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

122. Paragraph 122 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 122 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

123. Paragraph 123 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 123 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

124. Paragraph 124 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 124 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

125. Paragraph 125 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 125 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

126. Paragraph 126 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 126 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

127. Paragraph 127 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 127 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

128. Paragraph 128 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1401**

pleading is required. To the extent Paragraph 128 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

129. Paragraph 129 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 129 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

130. Paragraph 130 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 130 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

131. Paragraph 131 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 131 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

132. Paragraph 132 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 132 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

133. Paragraph 133 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 133 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

134. Paragraph 134 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 134 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

## B. Second Claim for Relief

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT
ER-1402

135.    Defendants re-allege and incorporate by reference their responses to Paragraphs 1-134, inclusive.

136.    Defendants admit that DC's Second Claim for Relief is pleaded in the alternative.

137.    Defendants admit that, in or around 1933, Siegel and Shuster co-created various Superman materials for a comic strip character named "Superman," including twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine-page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week). These works, though originally unpublished, were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 (the "Initially Unpublished Works"). Defendants otherwise deny the allegations in Paragraph 137.

138.    Defendants admit that Siegel and Shuster submitted the Initially Unpublished Works to a number of prospective publishers. Defendants otherwise deny the allegations in Paragraph 138.

139.    Defendants deny the allegations in Paragraph 139, except admit that Siegel and Shuster entered into a December 4, 1937 Agreement with DCI, which speaks for itself, and respectfully refer the Court to such document for evidence of the contents thereof.

140.    Paragraph 140 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 140 contains issues of fact, Defendants admit that, in the 1930s, Siegel and Shuster independently co-created Superman comic strips which they pitched to prospective publishers, including newspaper syndicates, and that DCI eventually published Siegel and Shuster's independently-created Superman comic strips in a magazine entitled "Action Comics, No. 1." Defendants otherwise deny the allegations in Paragraph 140.

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1403**

141.   Paragraph 141 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 141 contains issues of fact, Defendants deny the allegations in Paragraph 141, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

142.   Defendants deny the allegations in Paragraph 142.

143.   Paragraph 143 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 143 contains issues of fact, Defendants deny the allegations in Paragraph 143.

144.   Paragraph 144 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 144 contains issues of fact, Defendants admit that Siegel and Shuster continued to submit additional Superman stories to DCI for publication after the publication of "Action Comics No. 1," and that Siegel and Shuster entered into an agreement dated September 22, 1938 with DCI.  Defendants otherwise deny the allegations in Paragraph 144, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

145.   Defendants admit that Siegel and Shuster entered into a September 22, 1938 agreement with The McClure Newspaper Syndicate.  Defendants otherwise deny the allegations in Paragraph 145, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

146.   Paragraph 146 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 146 contains issues of fact, Defendants admit that Siegel worked for DC at times when Siegel did not.  Defendants otherwise deny the allegations in Paragraph 146.

147.   Defendants admit only that on or about November 30, 1938, Siegel wrote to DCI expressing his conception of a new comic "strip named SUPERBOY,

which would relate the adventures of Superman as a youth … [which] would be very much different from the SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of adventures very much different …" (the "Superboy Summary"), and that DCI did not publish a "Superboy" comic at that time. Defendants otherwise deny the allegations in Paragraph 147, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

148. Defendants admit only that on or about December 19, 1939, Siegel and Shuster entered into an agreement with DCI (the "December 19, 1939 Agreement"), which speaks for itself. Defendants otherwise deny the allegations in Paragraph 148, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

149. Paragraph 149 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 149 contains issues of fact, Defendants admit only that on or about December, 1940, Siegel solely authored a complete, thirteen-page, original "Superboy" story ("Superboy Story"); and that in the event his story was licensed by DCI and thereafter published as a comic book, Siegel suggested a promotional prologue to the story. Defendants otherwise deny the allegations in Paragraph 149, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

150. Paragraph 150 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 150 contains issues of fact, Defendants admit only that on November 18, 1944 DCI issued for sale "More Fun Comics No. 101" with a cover date of January-February 1945, which wrongfully published the first Superboy comic story based on Jerome Siegel's 1940 Superboy Story, without first obtaining a requisite license from Siegel, and without any credit to Siegel.

Defendants otherwise deny the allegations in Paragraph 150.

151.   Defendants admit that DC and its predecessors-in-interest have published Superman works in various forms since 1938, and that numerous Superman works derived from Siegel and Shuster's original Superman story published in "Action Comics, No. 1," have thereafter been produced.  Defendants otherwise deny the allegations in Paragraph 151, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

152.   Paragraph 152 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 152 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

153.   Paragraph 153 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 153 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

154.   Paragraph 154 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 154 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

155.   Paragraph 155 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 155 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

156.   Paragraph 156 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 156 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

ER-1406

157.   Paragraph 157 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 157 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

158.   Paragraph 158 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 158 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

159.   Paragraph 159 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 159 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

160.   Paragraph 160 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 160 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

161.   Paragraph 161 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 161 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

162.   Paragraph 162 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 162 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

163.   Paragraph 163 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 163 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**ER-1407**

164. Paragraph 164 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 164 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

### C. Third Claim for Relief

165. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-164, inclusive.

166. Defendants admit that DC's Third Claim for Relief is pled in the alternative.

167. Paragraph 167 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 167 contains issues of fact, Defendants deny the allegations in Paragraph 167.

168. Paragraph 168 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 168 contains issues of fact, Defendants deny the allegations in Paragraph 168.

169. Paragraph 169 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 169 contains issues of fact, Defendants deny the allegations in Paragraph 169.

170. Paragraph 170 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 170 contains issues of fact, Defendants deny the allegations of Paragraph 170, except admit that in April 2008, in connection with Court-ordered settlement mediation in the related case, *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)), Joanne Siegel, Laura Siegel Larson and Mark Warren Peary entered into a confidential agreement regarding settlement strategy, the existence and contents of which are protected, without limitation, by a JAMS Confidentiality Agreement with DC, dated May 1, 2008, which DC willfully breached by its allegations

171. Paragraph 171 contains conclusions of law as to which no responsive

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1408**

pleading is required.  To the extent Paragraph 171 contains issues of fact, Defendants deny the allegations of Paragraph 171.

172.   Paragraph 172 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 172 contains issues of fact, Defendants deny the allegations of Paragraph 172.

173.   Defendants admit that DC seeks an injunction.  Defendants otherwise deny the allegations of Paragraph 173.

### D.      Fourth Claim for Relief

174.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-173, inclusive.

175.   Paragraph 175 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 175 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

176.   Paragraph 176 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 176 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

177.   Paragraph 177 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 177 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

178.   Paragraph 178 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 178 contains issues of fact, Defendants incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

179.   Paragraph 179 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 179 contains issues of fact, Defendants

incorporate by reference the answers of the defendants Marc Toberoff and Pacific Pictures Corporation, to whom this claim for relief is applicable.

### E. Fifth Claim for Relief

180. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-179, inclusive.

181. Paragraph 181 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 181 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

182. Paragraph 182 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 182 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

183. Paragraph 183 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 183 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

184. Paragraph 184 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 184 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

185. Paragraph 185 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 185 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this claim for relief is applicable.

186. Paragraph 186 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 186 contains issues of fact, Defendants incorporate by reference the answers of the defendant Marc Toberoff, to whom this

SIEGEL DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT **ER-1410**

1    claim for relief is applicable.

2                    **F.      Sixth Claim for Relief**

3          187.   Defendants re-allege and incorporate by reference their responses to

4    Paragraphs 1-186, inclusive.

5          188.   Paragraph 188 contains conclusions of law as to which no responsive

6    pleading is required.  To the extent Paragraph 188 contains issues of fact, Defendants

7    deny the allegations of Paragraph 188.

8          189.   Defendants deny the allegations of Paragraph 189.

9                    <u>**AFFIRMATIVE DEFENSES**</u>

10         In addition to the grounds set out in the Answer to the Complaint herein,

11   Defendants hereby additionally allege as follows:

12                   **FIRST AFFIRMATIVE DEFENSE**

13                      **(Failure to State a Claim)**

14         190.   The Complaint and each purported claim therein fails to state a claim

15   upon which the relief sought or any relief could be granted.

16                   **SECOND AFFIRMATIVE DEFENSE**

17                      **(Statute of Limitations)**

18         191.   The Complaint and each purported claim therein is barred, in whole or

19   in part, by Plaintiff's failure to bring such claims within the governing statute of

20   limitations.

21                   **THIRD AFFIRMATIVE DEFENSE**

22                      **(Litigation Privilege)**

23         192.   The Complaint and each purported state-law claim therein is barred, in

24   whole or in part, by the litigation privilege of California Civil Code § 47.

25                   **FOURTH AFFIRMATIVE DEFENSE**

26                 **(Waiver/Acquiescence/Estoppel)**

27         193.   The Complaint and each purported claim therein is barred, in whole or

28   in part, by the doctrines of waiver, acquiescence and/or estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

194.    The Complaint and each purported state-law claim therein is barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

195.    The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unclean hands.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Unjust Enrichment)**

196.    The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Illegality)**

197.    The Complaint and each purported claim therein is barred, in whole or in part, to the extent of any illegality of any matters set forth in the Complaint.

**NINTH AFFIRMATIVE DEFENSE**

**(Claim Preclusion)**

198.    The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of *res judicata* (claim preclusion).

**TENTH AFFIRMATIVE DEFENSE**

**(Collateral Estoppel/Issue Preclusion)**

199.    The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of collateral estoppel and/or issue preclusion.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Against Public Policy)**

200.    The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective

predecessors-in-interest which is contrary to public policy is unenforceable, and any relief requested in the Complaint which is contrary to public policy should not be granted.

### TWELFTH AFFIRMATIVE DEFENSE

### (Bad Faith)

201.  The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff has acted in bad faith for improper purposes with respect to the subject matter of the claims.

### THIRTEENTH AFFIRMATIVE DEFENSE

### (Preemption)

202.  The Complaint and each purported state-law claim therein is barred, in whole or in part, because they are preempted by federal law.

### FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

203.  The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff lacks standing to pursue its claims.

### FIFTEENTH AFFIRMATIVE DEFENSE

### (Law of the Case)

204.  The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of law of the case.

### SIXTEENTH AFFIRMATIVE DEFENSE

### (Prior Action Pending)

205.  The Complaint and each purported claim therein is barred, in whole or in part, by prior actions pending before this Court and/or the United States Court of Appeals for the Ninth Circuit, which involve the same transactions, issues, parties, and property that are the subject of the complaint, including without limitation *Siegel v. Warner Bros. Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx) and *Siegel v. Time Warner Inc.*, Case No. 04-CV-08776 ODW (RZx).

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Comply With F.R.C.P.)**

206. Defendants are not required to separately admit or deny each averment contained in each Paragraph of the Complaint due to Plaintiff's failure to comply with Rules 8(a) and 8(e) of the Federal Rules of Civil Procedure.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(Unknown Defenses)**

207. Defendants believe, and based upon such information and belief allege that the Defendants may have additional affirmative defenses available to them, which are not now fully known and which these answering Defendants are not fully aware. The Defendants accordingly reserve the right to assert any additional affirmative defenses after the same have been ascertained.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(Reservation of Right to Amend)**

208. The Complaint and each purported claim therein fails to state the claims for relief with sufficient particularity to permit Defendants to discern and raise all appropriate defenses, and Defendants therefore reserve their rights to amend or supplement this answer with additional defenses.

FOR THESE REASONS, Defendants pray that the Court dismiss all of Plaintiff's claims and find for Defendants on all counts, and that Defendants be awarded costs, including reasonable attorneys' fees under Section 505 of the United States Copyright Act, and pray for such other and further relief as this Court deems just and proper.

ER-1414

Dated: November 25, 2011        RESPECTFULLY SUBMITTED,

                                /s/ Marc Toberoff
                                _____
                                Marc Toberoff

                                TOBEROFF & ASSOCIATES, P.C.
                                Attorneys for Defendants Mark Warren Peary,
                                as personal representative of the Estate of
                                Joseph Shuster, Jean Adele Peavy, and Laura
                                Siegel Larson, individually and as personal
                                representative of the Estate of Joanne Siegel

ER-1415

1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (State Bar No. 90072)
2    *rkendall@kbkfirm.com*
   Laura W. Brill (State Bar No. 195889)
3    *lbrill@kbkfirm.com*
   Nicholas F. Daum (State Bar No. 236155)
4    *ndaum@kbkfirm.com*
   10100 Santa Monica Blvd., Suite 1725
5  Los Angeles, California 90067
   Telephone: (310) 556-2700
6  Facsimile: (310)556-2705

7              **UNITED STATES DISTRICT COURT**

8       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| 9  DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 10            Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
|   vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| 11 | |
| 12  PACIFIC PICTURES CORPORATION; | **DEFENDANTS MARC TOBEROFF, PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC AND IPW, LLC'S ANSWER TO FIRST AMENDED COMPLAINT** |
|   IP WORLDWIDE, LLC; IPW, LLC; | |
| 13  MARC TOBEROFF, an individual; | |
|   MARK WARREN PEARY, as personal | |
| 14  representative of the ESTATE OF | |
| 15  JOSEPH SHUSTER; JEAN ADELE | Complaint filed: May 14, 2010 |
|   PEAVY, an individual; LAURA | Discovery Cutoff: None Set |
| 16  SIEGEL LARSON, individually and as | Trial Date: None Set |
|   personal representative of the ESTATE | |
| 17  OF JOANNE SIEGEL, and DOES 1-10, | |
| 18  inclusive, | |
| 19 | |
| 20            Defendants. | |

21

22

23

24

25

26

27

28

TOBEROFF DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT
                                                              **ER-1416**

# ANSWER TO FIRST AMENDED COMPLAINT

Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC ("Defendants") hereby answer the First Amended Complaint ("Complaint") of DC Comics ("Plaintiff" or "DC") as set forth below. To the extent the allegations of the complaint call for responses based on privileged information or attorney work product, Defendants object. The responses provided below are made subject to and without waiver of the attorney client privilege and attorney work product protection, and Defendants' answers herein are provided exclusively upon the basis of nonprivileged information.

## I. STATEMENT OF THE CASE

1. Defendants admit only that Plaintiff has brought this civil action as set forth in the Complaint and that the Court has subject matter jurisdiction, but otherwise deny the allegations in Paragraph 1.

2. Paragraph 2 contains conclusions of law as to which no responsive pleading is required.

3. Paragraph 3 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 3 contains issues of fact, Defendants deny the allegations of Paragraph 3.

4. Paragraph 4 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 3 contains issues of fact, Defendants admit that during their lifetimes Jerry Siegel and Joe Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c), admit that Siegel and Shuster had certain agreements with DC Comics ("DC"), admit that Siegel knew generally of certain "termination provisions in amendments to the Copyright Act," admit that Frank Shuster and Jean Adele Peavy entered into an agreement with DC in 1992, and lack knowledge or information sufficient to form a belief as to the truth of the allegation that Shuster was "well aware of the termination provisions in amendments to the Copyright Act," and on that basis deny the same. Defendants otherwise deny

ER-1417

the allegations of Paragraph 4.

5. Defendants admit that Marc Toberoff learned of a 1992 Agreement between Frank Shuster, Jean Adele Peavy and DC Comics in 2001-2002. Defendants otherwise deny the allegations of Paragraph 5.

6. Defendants admit that Pacific Pictures Corporation was wholly owned by Marc Toberoff, and that Mark Warren Peary caused to be served a notice of termination. Defendants otherwise deny the allegations of Paragraph 6.

7. Defendants deny the allegations of Paragraph 7, except admit that Joanne Siegel and Laura Siegel Larson served termination notices in 1997.

8. Defendants admit that Joanne Siegel and Laura Siegel Larson terminated their employment of Gang, Tyre, Ramer & Brown and thereafter entered into an agreement with Marc Toberoff and IP Worldwide, LLC. Defendants otherwise deny the allegations of Paragraph 8.

9. Defendants admit that *Smallville* was a successful network television series. Defendants otherwise deny the allegations of Paragraph 9.

10. Defendants admit that Joanne Siegel and Laura Siegel Larson served and filed notices of copyright termination concerning Superboy in 2002, and that Marc Toberoff filed a notice of copyright termination on behalf of the Estate of Joseph Shuster in 2003. Defendants otherwise deny the allegations of Paragraph 10.

11. Paragraph 11 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 11 contains issues of fact, Defendants deny the allegations of Paragraph 11, except to the extent that they can neither admit nor deny the allegations of Paragraph 11, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

12. Paragraph 12 contains conclusions of law as to which no responsive pleading is required. Defendants admit that this action seeks declaratory judgments

and other reliefs.  To the extent Paragraph 12 otherwise contains issues of fact, Defendants deny the allegations of Paragraph 12.

## II. PARTIES

13.     Defendants admit that DC is a general partnership organized and existing under the laws of the State of New York.  Defendants otherwise deny the allegations of Paragraph 13.

14.     Defendants admit that Pacific Pictures Corporation ("PPC") (dissolved in January 2009) was a New York corporation that was organized under the laws of the State of New York, and was registered as a foreign corporation doing business in the State of California and the County of Los Angeles.  Defendants otherwise deny the allegations of Paragraph 14.

15.     Defendants admit the allegations of Paragraph 15, except that Defendants deny that "Toberoff is the managing and controlling member of IP Worldwide, LLC ["IP Worldwide"] and owns the controlling interest therein."

16.     Defendants admit the allegations of Paragraph 16, except that Defendants deny that IPW, LLC ("IPW") is a successor-in-interest to all or part of IP Worldwide's interests that are relevant to this case.

17.     Defendants admit the allegations of Paragraph 17, except that Defendants deny that Toberoff is a shareholder and member of Pacific Pictures Corporation and that Toberoff is a member of IP Worldwide, LLC and IPW, LLC.

18.     Defendants admit the allegations of Paragraph 18.

19.     Defendants admit the allegations of Paragraph 19.

20.     Defendants admit that Jean Adele Peavy ("Peavy") is an individual who resides in the State of New Mexico and is and has been a citizen of the United States and that Peavy was the sister of Joseph Shuster.  Defendants otherwise deny the allegations of Paragraph 20, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

21. Defendants admit the allegations of Paragraph 21, except to the extent that Joanne Siegel has since passed away on February 12, 2011.

22. Defendants admit the allegations of Paragraph 22.

23. Defendants admit that Marc Toberoff was the sole shareholder and principal of Pacific Pictures Corporation, which was dissolved in 2009, and is a shareholder of both IP Worldwide, LLC and IPW, LLC. Defendants otherwise deny the allegations of Paragraph 23.

24. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24, and on that basis deny the same.

### III.    JURISDICTION AND VENUE

25. Paragraph 25 alleges conclusions of law to which no responsive pleading is required.

26. Paragraph 26, and each of its subparagraphs, alleges conclusions of law to which no responsive pleading is required.

    a. Paragraph 26(a) contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 26(a) contains issues of fact, Defendants deny the allegations of Paragraph 26(a), except admit that Peary, Peavy, and Pacific Pictures Corporation entered into an agreement dated November 23, 2001, and that Peary and Pacific Pictures Corporation entered into an agreement dated October 26, 2003. The terms of these agreements speak for themselves, and Defendants respectfully refer the Court to such documents for evidence of the contents thereof.

    b. Defendants admit that a California Court appointed Peary executor of the estate of Joseph Shuster, and that Peary caused to be served a notice of termination pursuant to the Copyright Act, but otherwise deny the allegations of Paragraph 26(b), except to the extent that the allegations

accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

    c. Defendants deny the allegations in Paragraph 26(c), except admit that IP Worldwide is a Delaware entity registered as doing business in the State of California and has its principal place of business in the State of California and county of Los Angeles.

    d. Defendants admit the allegations of Paragraph 26(d).

    e. Defendants admit the allegations of Paragraph 26(e), except to the extent that Joanne Siegel passed away on February 12, 2011.

    f. Defendants admit that Joanne Siegel and Laura Siegel Larson filed two related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx) and 04-CV-08776 ODW (RZx) that concerned, *inter alia,* Superman and Superboy, respectively.  Defendants otherwise deny allegations of Paragraph 26(f).

27. Paragraph 27 alleges conclusions of law to which no responsive pleading is required.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

28. Defendants admit on information and belief that, in or about 1934, Jerome Siegel (a writer) ("Siegel") and Joseph Shuster (an illustrator) ("Shuster") conceived of a fictional character called Superman, and independently co-authored fifteen daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years. Defendants otherwise deny the allegations of Paragraph 28, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29. Defendants admit on information and belief that DCI was provided with

the 1934 Superman Comic Strip, that DCI expressed interest in publishing this work in a thirteen page comic magazine format, and that this was published by DCI in a magazine called "Action Comics, No. 1." Defendants otherwise deny the allegations of Paragraph 29.

30. Defendants admit on information and belief only that on or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with Detective Comics, Inc. ("DCI") (the "December 4, 1937 Agreement") to continue to produce the comic magazine features "Slam Bradley" and "The Spy" for a period of two years which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to DCI which reserved the right to accept or reject same within sixty days. Defendants admit that, on or about September 22, 1938, DCI, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate, and that on or about September 22, 1938, DCI and Siegel and Shuster entered into an agreement. Defendants otherwise deny the allegations of Paragraph 30, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31. Paragraph 31 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 31 contains issues of fact, Defendants admit on information and belief that, in or about January–February 1938, when DCI expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster cut and pasted their 1934 Superman comic strip into more than ninety separate panels (the "Revised Superman Comic Strip"), so as to render their newspaper strip more suitable for a magazine layout. Defendants otherwise deny the allegations of Paragraph 31.

32. Paragraph 32 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 32 contains issues of fact, Defendants

Case 2:10-cv-03938-ODW-RZ Document 347-2 Filed 11/25/17 Page 8 of 38 Page ID
Case 1:13-cv-00345-JD Document 85-7 Entry 240-7 Page 240 of 283
#:22170

admit on information and belief only that in an instrument prepared by DCI, dated

March 1, 1938 (the "March 1, 1938 Agreement"), concerning a strip entitled

"Superman," Siegel and Shuster agreed to the publication of their Revised 1934

Superman Comic Strip by Detective Comics in consideration for the sum of $10 per

page for this thirteen page installment equal to a total of $130. Defendants further

admit that, in addition to the Siegel and Shuster material published by DCI in "Action

Comics No. 1," Siegel and Shuster created further original "Superman" material and

stories. Defendants otherwise deny the allegations of Paragraph 32, except to the

extent that the allegations accurately reflect the contents of documents, and

respectfully refer the Court to such documents for evidence of the contents thereof.

33. Paragraph 33 contains conclusions of law as to which no responsive

pleading is required. To the extent Paragraph 33 contains issues of fact, Defendants

admit that "Action Comics No. 1" depicts, without limitation, Superman's origin

from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by

his scientist father), his core physical and mental traits, his mission as a champion of

the oppressed to use his great powers to benefit humankind, his secret identity as

newspaper reporter, "Clark Kent," his relationship with other key characters such as

the newspaper editor from whom he takes his assignments and his romantic interest

in Lois, who rebuffs Clark, while she is romantically inclined towards Superman.

Defendants otherwise deny the allegations of Paragraph 33, except to the extent that

the allegations accurately reflect the contents of documents, and respectfully refer the

Court to such documents for evidence of the contents thereof.

34. Paragraph 34 contains conclusions of law as to which no responsive

pleading is required. To the extent Paragraph 34 contains issues of fact, Defendants

deny the allegations of Paragraph 34, except admit that DC and its predecessors-in-

interest have published Superman in various forms since 1938.

35. Defendants lack knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 35, and on that basis deny the

same, except admit that DC and its predecessors-in-interest have published Superman in various forms since 1938.

36.    Defendants deny the allegations of Paragraph 36, except admit that numerous Superman works derived from Siegel and Shuster's original Superman story published in "Action Comics, No. 1, have thereafter been produced.

37.    Defendants deny the allegations of Paragraph 37, except admit that Siegel and Shuster's co-creation, Superman is one of the most famous, beloved and valuable fictional characters in the world.

38.    Defendants deny the allegations of Paragraph 38, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39.    Defendants deny the allegations of Paragraph 39, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40.    Paragraph 40 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 40 contains issues of fact, Defendants admit on information and belief that the relationship between DC Comics' and its predecessors and Siegel and Shuster became contentious, and lack knowledge or information sufficient to form a belief as to the truth of the other allegations contained in Paragraph 40, and on that basis deny the same

41.    Defendants admit that in or about 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester against National Comics Publications, Inc. (hereinafter, the "1947 Action") to determine the validity of the contracts between National Comics Publications, Inc.'s predecessors – in–interest and Siegel and Shuster with respect to Superman, and to determine the origin and ownership of Superboy.  Defendants otherwise deny the allegations of Paragraph 41, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the

contents thereof.

42.     Defendants admit that pursuant to a stipulation of the parties, the 1947 Action was referred for decision to an Official Referee of the New York Supreme Court.  After trial of the action the Official Referee rendered an opinion dated November 1, 1947, which speaks for itself.  Defendants otherwise deny the allegations of Paragraph 42, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

43.     Defendants admit that on April 12, 1948, the Official Referee in the 1947 Action signed detailed findings of fact and conclusions of law and entered an interlocutory judgment upholding the challenged contracts in some respects, but also finding that Jerome Siegel was the originator and sole owner of the comic strip feature, "Superboy," and that DCI acted illegally in publishing Superboy. Defendants otherwise deny the allegations of Paragraph 43, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

44.     Defendants admit on information and belief only that after the Official Referee entered his findings in the 1947 Action, settlement negotiations ensued, resulting in a stipulation of settlement between said parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (hereinafter, the "1948 Consent Judgment").  Defendants specifically deny the allegation that the 1948 Stipulation and the 1948 Consent Judgment were separate grants or "agreements." Defendants otherwise deny the allegations of Paragraph 43, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

45.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45, and on that basis deny the

9

**ER-1425**

same, except admit on information and belief that Siegel created a new comic book and syndicated comic strip called "Funnyman," and that Siegel submitted material to DC for publication from the late 1950s to mid 1960s.

46.     Defendants admit only that Siegel and Shuster filed an action against National Periodical Publications, Inc. in the United States District Court for the Southern District of New York for a declaration that Siegel and Shuster were entitled to the renewal copyright to "Superman," that the District Court's decision was published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973); and that on appeal the decision of the United States Court of Appeals for the Second Circuit was published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), which held, *inter alia*, that the District Court erred in finding that Superman was a "work for hire" under the Copyright Act, 17 U.S.C. § 26, and that "Superman" and his miraculous powers were created by Siegel and Shuster long before any employment relationship with DCI; and that no appeal was taken from this ruling.  Defendants otherwise deny the allegations of Paragraph 46, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

47.     Defendants admit on information and belief that, in the early 1970s, Siegel publicized his dire financial circumstances and the fact that DC and its predecessors-in-interests had profited immensely from Superman while Siegel and Shuster, Superman's co-creators, had received little-to-no participation or credit, resulting in a public backlash against companies such as DC and its predecessors. Defendants admit that Siegel and Shuster entered into a December 23, 1973 Agreement with Warner Communications, Inc.   Defendants otherwise deny the allegations of Paragraph 47, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

48.     Defendants deny the allegations of Paragraph 48, except to the extent that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

49.     Paragraph 49 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 49 contains issues of fact, Defendants deny that DC's predecessor-in-interest developed Superboy pursuant to its original grant of rights in Superman as Superboy was created by Jerry Siegel and ultimately sold to DC's predecessor.  Paragraph 49 otherwise alleges conclusions of law to which no responsive pleading is required.

50.     Paragraph 50 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 50 contains issues of fact, Defendants deny the allegations of Paragraph 50, except admit that during their lifetimes Jerome Siegel and Joseph Shuster did not serve or file notices of termination pursuant to 17 U.S.C. § 304(c).

51.     Defendants admit that Shuster passed away on July 30, 1992, and was survived by Frank Shuster (his brother), Jean Peavy (his sister), and Mark Warren Peary and Dawn Peavy (his nephew/niece), that Shuster did not leave a widow or have children or grandchildren and, as to Joe Shuster's will, Defendants respectfully refer the Court to such document for evidence of the contents thereof.  Defendants otherwise deny the allegations of Paragraph 51.

52.     Defendants deny the allegations of Paragraph 52, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53, and on that basis deny the same, except admit that, at some point, Time Warner and/or DC agreed to pay certain of Joe Shuster's expenses and to increase Frank Shuster's modest pension.

54.     Defendants deny the allegations of Paragraph 54,  except to the extent, if

11

**ER-1427**

any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

55.     Paragraph 55 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 55 contains issues of fact, Defendants deny the allegations of Paragraph 55, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

56.     Paragraph 56 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 56 contains issues of fact, Defendants deny the allegations of Paragraph 56, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

57.     Defendants admit that DC paid Frank Shuster, and has paid Jean Peavy, a modest increased pension pursuant to the terms of the 1992 Agreement. Defendants otherwise deny the allegations of Paragraph 57, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

58.     Defendants deny the allegations of Paragraph 58.

59.     Defendants admit that Mr. Toberoff represents the authors of copyrighted works and their heirs with respect to their rights.  Defendants otherwise deny the allegations of Paragraph 59.

60.     Defendants deny the allegations of Paragraph 60, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

61.     Defendants deny the allegations of Paragraph 61, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

62.     Defendants deny the allegations of Paragraph 62, except to the extent, if

any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

63.     Defendants deny the allegations of Paragraph 63, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

64.     Paragraph 64 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 64 contains issues of fact, Defendants deny the allegations of Paragraph 64, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.  Mr. Toberoff began acting as the attorney for Mark Warren Peary and Jean Adele Peavy shortly after he was contacted by Mr. Peary in late 2001.

65.     Defendants admit only that the Estate of Joseph Shuster was established by a probate action in Los Angeles Superior Court, LASC Case No. BP-080635, that Mark Warren Peary was appointed as executor/personal representative of the Shuster Estate, and that Mr. Peary served a copyright termination notice on DC on behalf of the estate in November 2003 drafted and signed by Mr. Toberoff as "Counsel for the Estate of Joseph Shuster" (the "Shuster Termination Notice").  Defendants otherwise deny the allegations of Paragraph 65, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

66.     Defendants deny the allegations of Paragraph 66.

67.     Paragraph 70 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 70 contains issues of fact, Defendants admit that Joanne Siegel and Laura Siegel Larson (the "Siegel Heirs"), with the assistance of counsel, served copyright termination notices as to Superman on DC, among others, in 1997.  Defendants otherwise deny the allegations of Paragraph 67, except to the extent, if any, that the allegations accurately reflect the contents of

documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

68.     Defendants admit that DC provided $228,172.65 to the Siegel Heirs. Defendants otherwise deny the allegations of Paragraph 68.

69.     Paragraph 69 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 69 contains issues of fact, Defendants admit that on October 16, 2001, DC made a proposal to Kevin Marks, counsel for the Siegel Heirs; on October 19, 2001, Mr. Marks wrote a letter to DC's counsel outlining initial terms of a proposed agreement for which many other material terms had not yet been agreed upon; and that DC's counsel wrote a letter dated October 26, 2001 to the Siegel Heirs' counsel and that on or about February 1, 2002 DC's counsel sent to the Siegel Heirs' counsel a proposed written agreement, both of which contained many new material terms not contained in DC's original October 16, 2001 proposal or in the October 19, 2001 letter from the Siegel Heirs' counsel, including without limitation terms that materially differed from and/or substantially diluted the terms in the October 19, 2001 letter.  Defendants otherwise deny the allegations of Paragraph 69.

70.     Defendants admit that, if the Siegel Heirs and Shuster Executor work together, they have significantly greater leverage in negotiations.  Defendants otherwise deny the allegations of Paragraph 70.

71.     Defendants deny the allegations of Paragraph 71.

72.     Defendants admit that Mr. Toberoff contacted Mr. Marks regarding the status of the Siegel Heirs' rights on or around February 6, 2002.  Defendants otherwise deny the allegations of Paragraph 72.

73.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73, and on that basis deny the same

74.     Defendants admit that, on or around February 12, 2002, Mr. Toberoff

formed IP Worldwide with Ari Emanuel, the current head of the William Morris Endeavor talent agency.

75.     Paragraph 75 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 75 contains issues of fact, Defendants admit that, on May 9, 2002, Joanne Siegel sent a letter to the Richard Parsons, CEO of Time Warner Inc., DC's parent company, stating that DC's new proposals contained "new, outrageous demands that were not in the[ir] proposal," comparing DC to the "Gestapo" and stating that "[a]fter four years we have no deal and this contract makes an agreement impossible."  Defendants otherwise deny the allegations of Paragraph 75.

76.     Defendants admit that, upon information and belief, Mr. Marks had a conversation with John Schulman on or around May 16, 2002, and Defendants otherwise deny the allegations of Paragraph 76, except to the extent that they can neither admit nor deny the allegations of Paragraph 76, as such involve communications protected by the attorney-client privilege.

77.     Defendants admit that Mr. Toberoff contacted Mr. Marks in or around August 2002; that Mr. Marks did not disclose the specific parameters of DC's various proposals and counter-proposals during those conversations; and that in a conference call on or around August 8, 2002, Mr. Emanuel, with Mr. Toberoff present, conveyed an offer to Mr. Marks regarding the Siegel Heirs' Superman rights.  Defendants otherwise deny the allegations of Paragraph 77.

78.     Defendants admit that Mr. Emanuel's August 8, 2002 proposal was for $15 million and a contingent "back-end" participation to be negotiated.  Defendants otherwise deny the allegations of Paragraph 78.

79.     Defendants admit that by letter dated September 21, 2002 the Siegel Heirs terminated Mr. Marks as their attorney.  Defendants otherwise deny the allegations of Paragraph 79, except to the extent that they can neither admit nor deny the allegations of Paragraph 79, as such involve communications protected by the

1   attorney-client privilege.

2       80.     Defendants deny the allegations of Paragraph 80, except to the extent, if

3   any, that the allegations accurately reflect the contents of documents, and respectfully

4   refer the Court to such documents for evidence of the contents thereof.

5       81.     Defendants admit that the Siegel Heirs and IP Worldwide entered into

6   an agreement dated October 23, 2002 (the "IP Worldwide Agreement").  Defendants

7   otherwise deny the allegations of Paragraph 81, except to the extent, if any, that the

8   allegations accurately reflect the contents of documents, and respectfully refer the

9   Court to such documents for evidence of the contents thereof.

10      82.     Defendants deny the allegations of Paragraph 82, except to the extent, if

11  any, that the allegations accurately reflect the contents of documents, and respectfully

12  refer the Court to such documents for evidence of the contents thereof.

13      83.     Paragraph 83 contains conclusions of law as to which no responsive

14  pleading is required.  To the extent Paragraph 83 contains issues of fact, Defendants

15  admit that Mr. Toberoff began acting as counsel for the Siegel Heirs shortly after

16  their initial meetings, and entered into a formal retainer agreement with the Siegel

17  Heirs on or about October 3, 2004.  Defendants otherwise deny the allegations of

18  Paragraph 83, except to the extent, if any, that the allegations accurately reflect the

19  contents of documents, and respectfully refer the Court to such documents for

20  evidence of the contents thereof.

21      84.     Defendants deny the allegations of Paragraph 84.

22      85.     Defendants deny the allegations of Paragraph 85.

23      86.     Paragraph 86 contains conclusions of law as to which no responsive

24  pleading is required.  To the extent Paragraph 86 contains issues of fact, Defendants

25  admit that on November 8, 2002, the Siegel Heirs served on DC a copyright

26  termination notice related to the character "Superboy," which properly listed Jerome

27  Siegel as the sole author of Superboy based on, *inter alia*, his independently-written

28  Superboy "script," consistent with the November 21, 1947 opinion and April 12,

1948 findings of fact and conclusions of law in a 1947 Action in the New York

Supreme Court in Westchester County. Defendants otherwise deny the allegations of

Paragraph 86.

87. Defendants deny the allegations of Paragraph 87.

88. Defendants deny the allegations of Paragraph 88, except to the extent, if

any, that the allegations accurately reflect the contents of documents, and respectfully

refer the Court to such documents for evidence of the contents thereof.

89. Defendants admit that on or about June 17, 2004, Mr. Emanuel, a talent

agent and founder of the Endeavor Talent Agency, sent a letter to Warner Bros.

confirming that since "Smallville" is derived from "Superboy," DC and Warner Bros.

would be prohibited after November 17, 2004, the effective date of the Superboy

notice of termination, from producing and exploiting new derivative "Smallville"

episodes; and that by letter dated August 4, 2004, Mr. Toberoff, the Siegel Heirs'

attorney, reiterated that since "Smallville" is derived from "Superboy," DC and

Warner Bros. would be prohibited after November 17, 2004, the effective date of the

Superboy Notice, from producing and exploiting new derivative "Smallville"

episodes. Defendants otherwise deny the allegations of Paragraph 89.

90. Defendants deny the allegations of Paragraph 90.

91. Defendants admit that Joanne Siegel and Laura Siegel Larson filed two

related actions against, *inter alia,* DC Comics, Case Nos. 04-CV-08400 ODW (RZx)

and 04-CV-08776 ODW (RZx) that concerned, *inter alia*, Superman and Superboy,

respectively. Defendants otherwise deny the allegations of Paragraph 91.

92. Defendants admit that Mark Warren Peary caused to be served the

Shuster Termination Notice one week after the November 3, 2003 date of Pacific

Pictures Agreement. Defendants otherwise deny the allegations of Paragraph 92.

93. Defendants deny the allegations of Paragraph 93, which omits that the

Shuster Termination Notice was signed by "Marc Toberoff, Esq., Counsel for the

Estate of Joseph Shuster," except to the extent, if any, that the allegations accurately

1  reflect the contents of documents, and respectfully refer the Court to such documents

2  for evidence of the contents thereof.

3        94.    Defendants admit that the Shuster Termination Notice, pursuant to 17

4  U.S.C. § 304(d), effective October 26, 2013, terminated (a) the December 4, 1937

5  Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938

6  Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19,

7  1939 Agreement; (f) the May 19, 1948 Stipulation; and (g) the December 23, 1975

8  Agreement, to the extent that such constituted copyright grants.

9        95.    Paragraph 95 contains conclusions of law as to which no responsive

10  pleading is required.  To the extent Paragraph 95 contains issues of fact, Defendants

11  admit that the Shuster Termination does not mention the May 21, 1948 Consent

12  Agreement and the 1992 Agreement because neither constitute Superman copyright

13  grants, and Defendants otherwise deny the allegations of Paragraph 95.

14        96.    Defendants admit that the Shuster Termination Notice applies to the

15  following works:  certain unpublished material created before Action Comics No. 1;

16  Action Comics Nos. 1-7; reprinted material in Superman No. 1; and reprinted

17  material in Superman No. 3.

18        97.    Paragraph 97 contains conclusions of law as to which no responsive

19  pleading is required.  To the extent Paragraph 97 contains issues of fact, Defendants

20  deny the allegations of Paragraph 97.

21        98.    Defendants deny the allegations of Paragraph 98, as the Shuster

22  Executor's termination interest could not have been transferred to PPC as a matter of

23  law pursuant to 17 U.S.C. § 304, except to the extent, if any,  that the allegations

24  accurately reflect the contents of documents, and respectfully refer the Court to such

25  documents for evidence of the contents thereof.

26        99.    Paragraph 99 contains conclusions of law as to which no responsive

27  pleading is required.  To the extent Paragraph 99 contains issues of fact, Defendants

28  admit that a September 10, 2004 letter between Pacific Pictures Corporation, Mr.

Peary and Ms. Peavy completely cancelled the 2001 Pacific Pictures Agreement and the 2003 Pacific Pictures Agreement and cancelled any joint venture between them. Defendants otherwise deny the allegations of Paragraph 99.

100.   Paragraph 100 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 100 contains issues of fact, Defendants deny the allegations of Paragraph 100.

101.   Paragraph 101 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 101 contains issues of fact, Defendants deny the allegations of Paragraph 101, except to the extent that they can neither admit nor deny the allegations of Paragraph 101, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

102.   Defendants deny the allegations of Paragraph 102, except admit that Judge Larson issued orders on September 26, 2008 and December 4, 2008 in the related *Siegel v. Warner Bros. Entertainment Inc.* case that resulted in the disclosure of the "Toberoff Timeline," which DC has admitted that it read in 2006.

103.   Defendants deny the allegations of Paragraph 103, except to the extent, if any, that the allegations accurately describe the contents of the so-called "Toberoff Timeline," a false, ranting and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

104.   Defendants deny the allegations of Paragraph 104, as DC read the Toberoff Timeline in 2006, except to the extent, if any, that the allegations accurately describe the contents of the so-called "Toberoff Timeline," a false and inadmissible document written by an attorney who violated his duties of loyalty and confidentiality.

## V.   CLAIMS FOR RELIEF

### A.   First Claim for Relief

105.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-104, inclusive.

106.   Paragraph 106 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

107.   Paragraph 107 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

108.   Paragraph 108 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

109.   Paragraph 108 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 106 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

110.   Paragraph 110 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 110 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

111.   Paragraph 111 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 110 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

112.   Paragraph 112 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 112 contains issues of fact, Defendants

incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

113. Paragraph 113 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 113 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

114. Paragraph 114 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 114 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

115. Paragraph 115 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 115 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

116. Paragraph 116 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 116 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

117. Paragraph 117 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 117 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

118. Paragraph 118 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 118 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

119. Paragraph 119 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 119 contains issues of fact, Defendants

incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

120.   Paragraph 120 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 120 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

121.   Paragraph 121 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 121 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

122.   Paragraph 122 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 122 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

123.   Paragraph 123 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 123 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

124.   Paragraph 124 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 124 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

125.   Paragraph 125 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 125 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

126.   Paragraph 126 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 126 contains issues of fact, Defendants

incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

127.   Paragraph 127 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 127 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

128.   Paragraph 128 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 128 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

129.   Paragraph 129 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 129 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

130.   Paragraph 130 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 130 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

131.   Paragraph 131 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 131 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

132.   Paragraph 132 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 132 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

133.   Paragraph 133 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 133 contains issues of fact, Defendants

incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

134. Paragraph 134 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 134 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

## B. Second Claim for Relief

135. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-134, inclusive.

136. Defendants admit that DC's Second Claim for Relief is pleaded in the alternative.

137. Defendants admit that, in or around 1933, Siegel and Shuster co-created various Superman materials for a comic character named "Superman," including twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week). These works, though originally unpublished were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 (the "Initially Unpublished Works"). Defendants otherwise deny the allegations in Paragraph 137.

138. Defendants admit that Siegel and Shuster submitted the Initially Unpublished Works to a number of prospective publishers. Defendants otherwise deny the allegations in Paragraph 138.

139. Defendants deny the allegations in Paragraph 139, except admit that Siegel and Shuster entered into a December 4, 1937 Agreement with DCI, which speaks for itself, and respectfully refer the Court to such document for evidence of the contents thereof.

140.    Paragraph 140 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 140 contains issues of fact, Defendants admit that, in the 1930s, Siegel and Shuster independently co-created Superman comic strips which they pitched to prospective publishers, including newspaper syndicates, and that DCI eventually published Siegel and Shuster's independently-created Superman comic strips in a magazine entitled "Action Comics, No. 1," and Defendants otherwise deny the allegations in Paragraph 140.

141.    Paragraph 141 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 141 contains issues of fact, Defendants deny the allegations in Paragraph 141, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

142.    Defendants deny the allegations in Paragraph 142.

143.    Paragraph 143 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 143 contains issues of fact, Defendants deny the allegations in Paragraph 143.

144.    Paragraph 144 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 144 contains issues of fact, Defendants admit that Siegel and Shuster continued to submit additional Superman stories to DCI for publication after the publication of "Action Comics No. 1," and that Siegel and Shuster entered into an agreement dated September 22, 1938 with DCI, and Defendants otherwise deny the allegations in Paragraph 144, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

145.    Defendants admit that Siegel and Shuster entered into a September 22, 1938 agreement with The McClure Newspaper Syndicate.  Defendants otherwise deny the allegations in Paragraph 145, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such

**ER-1441**

documents for evidence of the contents thereof.

146. Paragraph 146 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 146 contains issues of fact, Defendants admit that Siegel worked for DC at times when Siegel did not, and Defendants otherwise deny the allegations in Paragraph 144.

147. Defendants admit only that on or about November 30, 1938, Siegel wrote to DCI expressing his conception of a new comic "strip named SUPERBOY, which would relate the adventures of Superman as a youth … [which] would be very much different from the SUPERMAN strip inasmuch as SUPERBOY would be a child and the type of adventures very much different …" (the "Superboy Summary"), and that DCI did not publish a "Superboy" comic at that time. Defendants otherwise deny the allegations in Paragraph 147, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

148. Defendants admit only that on or about December 19, 1939, Siegel and Shuster entered into an agreement with DCI (the "December 19, 1939 Agreement"), which speaks for itself. Defendants otherwise deny the allegations in Paragraph 148, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

149. Paragraph 149 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 149 contains issues of fact, Defendants admit only that on or about December, 1940, Siegel solely authored a complete, thirteen page, original "Superboy" story ("Superboy Story"); and that in the event his story was licensed by DCI and thereafter published as a comic book, Siegel suggested a promotional prologue to the story, and Defendants otherwise deny the allegations in Paragraph 149, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such

documents for evidence of the contents thereof.

150. Paragraph 150 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 150 contains issues of fact, Defendants admit only that on November 18, 1944 DCI issued for sale "More Fun Comics No. 101" with a cover date of January-February 1945, which wrongfully published the first Superboy comic story based on Jerome Siegel's 1940 Superboy Story, without first obtaining a requisite license from Siegel, and without any credit to Siegel, and Defendants otherwise deny the allegations in Paragraph 150.

151. Defendants admit that DC and its predecessors-in-interest have published Superman in various forms since 1938, and that numerous Superman works derived from Siegel and Shuster's original Superman story published in "Action Comics, No. 1," have thereafter been produced. Defendants otherwise deny the allegations in Paragraph 151, except to the extent, if any, that the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

152. Paragraph 152 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 152 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

153. Paragraph 153 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 153 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

154. Paragraph 154 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 154 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

155. Paragraph 155 contains conclusions of law as to which no responsive

pleading is required. To the extent Paragraph 155 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

156. Paragraph 156 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 156 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

157. Paragraph 157 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 157 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

158. Paragraph 158 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 158 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

159. Paragraph 159 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 159 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

160. Paragraph 160 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 160 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

161. Paragraph 161 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 161 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

162. Paragraph 162 contains conclusions of law as to which no responsive

pleading is required.  To the extent Paragraph 162 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

163.   Paragraph 163 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 163 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

164.   Paragraph 164 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 164 contains issues of fact, Defendants incorporate by reference the answers of the defendants Jean Adele Peavy and Mark Warren Peary, to whom this claim for relief is applicable.

## C.     Third Claim for Relief

165.   Defendants re-allege and incorporate by reference their responses to Paragraphs 1-164, inclusive.

166.   Defendants admit that DC's Third Claim for Relief is plead in the alternative.

167.   Paragraph 167 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 167 contains issues of fact, Defendants deny the allegations in Paragraph 167.

168.   Paragraph 168 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 168 contains issues of fact, Defendants deny the allegations in Paragraph 168.

169.   Paragraph 169 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 169 contains issues of fact, Defendants deny the allegations in Paragraph 169.

170.   Paragraph 170 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 170 contains issues of fact, Defendants deny the allegations of Paragraph 170, except to the extent that they can neither admit

nor deny the allegations of Paragraph 170, as such involve communications protected by the attorney-client privilege and a May 1, 2008 JAMS Confidentiality Agreement entered into by the parties in connection with court-ordered settlement mediation in *Siegel v. Warner Bros. Entertainment Inc.* (Case No. 04-CV-08400 ODW (RZx)).

171. Paragraph 171 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 171 contains issues of fact, Defendants deny the allegations of Paragraph 171.

172. Paragraph 172 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 172 contains issues of fact, Defendants deny the allegations of Paragraph 172.

173. Defendants admit that DC seeks an injunction. Defendants otherwise deny the allegations of Paragraph 173.

### D. Fourth Claim for Relief

174. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-173, inclusive.

175. Paragraph 175 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 175 contains issues of fact, Defendants admit that Frank Shuster and Jean Peavy entered into an agreement with DC Comics in 1992, and Defendants otherwise deny the allegations of Paragraph 175.

176. Paragraph 176 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 175 contains issues of fact, Defendants deny the allegations of Paragraph 176, and Defendants deny the allegations in footnote 5 included therein.

177. Paragraph 177 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 177 contains issues of fact, Defendants admit that Mr. Toberoff eventually became aware of the 1992 Agreement, and that the 2001 Pacific Pictures Agreement was designed to pursue "termination pursuant to [17 U.S.C. § 304] of any and all grant or transfers by Joe Shuster of any copyright

interest in his creations," and Defendants otherwise deny the allegations in Paragraph 177, except to the extent, if any, that the allegations accurately reflect the contents of the Shuster Termination Notice, and respectfully refer the Court to such document for evidence of the contents thereof.

178. Paragraph 178 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 178 contains issues of fact, Defendants deny the allegations of Paragraph 178.

179. Paragraph 179 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 179 contains issues of fact, Defendants deny the allegations of Paragraph 179.

### E. Fifth Claim for Relief

180. Defendants re-allege and incorporate by reference their responses to Paragraphs 1-179, inclusive above.

181. Paragraph 180 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 180 contains issues of fact, Defendants admit that after Joanne Siegel and Laura Siegel Larson served notices of termination regarding Superman on DC and Warner Bros. Entertainment, and that they negotiated with Warner Bros. Entertainment and DC over a very lengthy period of time, without reaching an agreement, and that letters were sent on October 19, 2001, October 26, 2001, and February 1, 2002, and Defendants otherwise deny the allegations of Paragraph 181, contentions expressly rejected in the related case, *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx).

182. Paragraph 182 contains conclusions of law as to which no responsive pleading is required. To the extent Paragraph 182 contains issues of fact, Defendants admit that Siegel submitted material to DC for publication during his career and was party to the 1975 Agreement, and that after Joanne Siegel and Laura Siegel Larson served notices of termination regarding Superman on DC Comics and Warner Bros. Entertainment, and that they negotiated with Warner Bros. Entertainment and DC

Comics over a very lengthy period of time, without reaching an agreement, and Defendants otherwise deny the allegations of Paragraph 182.

183.  Paragraph 183 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 183 contains issues of fact, Defendants deny the allegations of Paragraph 183.

184.  Defendants admit that Mr. Toberoff was aware of Joanne Siegel and Laura Siegel Larson's termination efforts.  Defendants otherwise deny the allegations of Paragraph 184.

185.  Defendants deny the allegations of Paragraph 185.

186.  Defendants deny the allegations of Paragraph 186.

### F.  Sixth Claim for Relief

187.  Defendants re-allege and incorporate by reference their responses to Paragraphs 1-186, inclusive.

188.  Paragraph 188 contains conclusions of law as to which no responsive pleading is required.  To the extent Paragraph 188 contains issues of fact, Defendants deny the allegations of Paragraph 188.

189.  Defendants deny the allegations of Paragraph 189.

### <u>AFFIRMATIVE DEFENSES</u>

In addition to the grounds set out in the Answer to the Complaint herein, Defendants hereby additionally allege as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

190.  The Complaint and each purported claim therein fails to state a claim upon which the relief sought or any relief could be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Statute of Limitations)

191.  The Complaint and each purported claim therein is barred, in whole or in part, by Plaintiff's failure to bring such claims within the governing statute of

limitations.

## THIRD AFFIRMATIVE DEFENSE

### (Litigation Privilege)

192. The Complaint and each purported state-law claim therein is barred, in whole or in part, by the litigation privilege of California Civil Code § 47.

## FOURTH AFFIRMATIVE DEFENSE

### (Waiver/Acquiescence/Estoppel)

193. The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of waiver, acquiescence and/or estoppel.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

194. The Complaint and each purported state-law claim therein is barred, in whole or in part, by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

195. The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

196. The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## EIGHTH AFFIRMATIVE DEFENSE

### (Illegality)

197. The Complaint and each purported claim therein is barred, in whole or in part, to the extent of any illegality of any matters set forth in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

### (Claim Preclusion)

198. The Complaint and each purported claim therein is barred, in whole or

in part, by the doctrines of *res judicata* (claim preclusion).

## TENTH AFFIRMATIVE DEFENSE

### (Issue Preclusion)

199.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrines of collateral estoppel / issue preclusion.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Duress)

200.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of duress.

## TWELFTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

201.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the Statute of Frauds.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

202.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because the contract(s) lacked consideration.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Misrepresentation)

203.   The Complaint and each purported claim therein is barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the misrepresentations of Plaintiff's and/or their predecessors-in-interest.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

204.   The Complaint and each purported claim therein is barred, in whole or in part, any alleged contract between the parties or their respective predecessors-in-interest which is contrary to public policy is unenforceable, and any relief requested in the Complaint which is contrary to public policy should not be granted.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Bad Faith)

205.   The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff has acted in bad faith for improper purposes with respect to the subject matter of the claims.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Preemption)

206.   The Complaint and each purported state-law claim therein is barred, in whole or in part, because they are preempted by federal law.

## EIGHTTEENTH AFFIRMATIVE DEFENSE

### (Superseding Intervening Cause)

207.   The Complaint and each purported claim therein is barred, in whole or in part, because any alleged damages suffered by Plaintiff were a direct and proximate result of a superseding intervening cause on the part of third parties and/or Plaintiff itself, such that the intervening superseding cause bars any recovery by Plaintiff against these answering Defendants.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

208.   The Complaint and each purported claim therein is barred, in whole or in part, because Plaintiff lacks standing to pursue its claims.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

209.   The Complaint and each purported claim therein is barred, in whole or in part, because of Plaintiff's failure to take reasonable steps to mitigate their alleged losses.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Full Performance)

210.   The Complaint and each purported claim therein is barred, in whole or in part, because as to any alleged contract between the parties or their respective predecessors-in-interest, Defendants have fully performed all of the conditions, covenants and promises on their part to be performed under the purported contracts, except those which have been excused or prevented by the conduct and actions of Plaintiff.

## TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Law of the Case)

211.   The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of law of the case.

## TWENTY-THIRD AFFIRMATIVE DEFENSE
### (Prior Action Pending)

212.   The Complaint and each purported claim therein is barred, in whole or in part, by prior actions pending before this Court and/or the United States Court of Appeals for the Ninth Circuit, which involve the same transactions, issues, parties, and property that are the subject of the complaint, including without limitation *Siegel v. Warner Bros. Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx) and *Siegel v. Time Warner Inc.*, Case No. 04-CV-08776 ODW (RZx).

## TWENTY-FOURTH AFFIRMATIVE DEFENSE
### (Failure to Comply With F.R.C.P.)

213.   Defendants are not required to separately admit or deny each averment contained in each Paragraph of the Complaint due to Plaintiff's failure to comply with Rules 8(a) and 8(e) of the Federal Rules of Civil Procedure.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**(Unknown Defenses)**

214. Defendants believe, and based upon such information and belief allege that the Defendants may have additional affirmative defenses available to them, which are not now fully known and which these answering Defendants are not fully aware. The Defendants accordingly reserve the right to assert any additional affirmative defenses after the same have been ascertained.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**(Reservation of Right to Amend)**

215. The Complaint and each purported claim therein fails to state the claims for relief with sufficient particularity to permit Defendants to discern and raise all appropriate defenses, and Defendants therefore reserve their rights to amend or supplement this answer with additional defenses.

FOR THESE REASONS, Defendants pray that the Court dismiss all of Plaintiff's claims and find for Defendants on all counts, and that Defendants be awarded costs, including reasonable attorneys' fees under Section 505 of the United States Copyright Act and California Code of Civil Procedure Section 425.16, and pray for such other and further relief as this Court deems just and proper.

Dated: November 25, 2011     RESPECTFULLY SUBMITTED,

/s/ Nicholas F. Daum
Nicholas F. Daum

KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff,
Pacific Pictures Corporation, IP Worldwide,
LLC, and IPW, LLC

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone: (845) 265-2820
10  Facsimile: (845) 265-2819

11  Attorneys for Plaintiff DC

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

15              Plaintiff,              **DC COMICS' RESPONSE TO**
                                        **DEFENDANTS' REQUEST FOR**
16          v.                          **JUDICIAL NOTICE IN SUPPORT**
                                        **ON CONSOLIDATED MOTION**
17  PACIFIC PICTURES                    **TO DISMISS PURSUANT TO FED.**
    CORPORATION, IP WORLDWIDE,          **R. CIV. P. 12(b)(6) (Docket No. 331-**
18  LLC, IPW, LLC, MARC TOBEROFF,       **1)**
    an individual, MARK WARREN
19  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,       Hon. Otis D. Wright II
20  JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an
21  individual and as personal          **Hearing Date**:  November 14, 2011
    representative of the ESTATE OF      **Hearing Time**:  1:30 p.m.
22  JOANNE SIEGEL, and DOES 1-10,       **Place**:         Courtroom 11
    inclusive,
23                                      Complaint Filed: May 14, 2010
              Defendants.               Discovery Cutoff: None Set
24                                      Trial Date:       None Set

25

26

27

28

1      Plaintiff DC Comics hereby responds to defendants' Request for Judicial

2 Notice In Support of Consolidated Motion To Dismiss Pursuant To Fed. R. Civ. P.

3 12(b)(6).  Docket No. 331-1.  DC does not oppose the Court taking judicial notice

4 of the evidence requested by defendants and would have told defendants as much

5 had they contacted DC before filing the request.  DC does object to defendants'

6 efforts, yet again, Docket No. 328, to evade the Court's page limitation on Rule 12

7 briefing by repeating and augmenting their Rule 12 arguments in the body of their

8 request for judicial notice.  *E.g.*, Docket No. 331-1 at 4-5.  Such additional

9 argument should be stricken and are further grounds to deny defendants' re-filed

10 Rule 12 motion.

11 Dated:  October 24, 2011          Respectfully Submitted,

12                            By:  /s/ Daniel M. Petrocelli

13                             Daniel M. Petrocelli

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC' RESPONSE TO DEF'S REQUEST FOR
JUDICIAL NOTICE ISO MOT. TO DISMISS

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel

9

## UNITED STATES DISTRICT COURT

10

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

11

| | |
|---|---|
| 12  DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| 13              Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
|          vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| 14  PACIFIC PICTURES CORPORATION; | **DEFENDANTS' REQUEST FOR** |
| 15  IP WORLDWIDE, LLC; IPW, LLC; | **JUDICIAL NOTICE IN** |
|     MARC TOBEROFF, an individual; | **SUPPORT OF CONSOLIDATED** |
| 16  MARK WARREN PEARY, as personal | **MOTION AND MOTION TO** |
|     representative of the ESTATE OF | **DISMISS PURSUANT TO FED.** |
| 17  JOSEPH SHUSTER; JEAN ADELE | **R. CIV. P. 12(b)(6)** |
|     PEAVY, an individual; LAURA | Complaint filed:  May 14, 2010 |
| 18  SIEGEL LARSON, individually and as | Trial Date:  None Set |
| 19  personal representative of the ESTATE | Date:     November 14, 2011 |
| 20  OF JOANNE SIEGEL, and DOES 1-10, | Time:    1:30 p.m. |
|     inclusive, | Place:    Courtroom 11 |
| 21 | |
| 22              Defendants. | |

23

24

25

26

27

28

1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (State Bar No. 90072)
2    rkendall@kbkfirm.com
   Laura W. Brill (State Bar No. 195889)
3    lbrill@kbkfirm.com
   Nicholas F. Daum (State Bar No. 236155)
4    ndaum@kbkfirm.com
   10100 Santa Monica Blvd., Suite 1725
5  Los Angeles, California 90067
   Telephone: (310) 556-2700
6  Facsimile: (310)556-2705

7  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
8  Worldwide, LLC, and IPW, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

| Exhibit | Document | Page |
|---|---|---|
| | Request for Judicial Notice | 1 |
| A | August 1, 1992 Agreement between DC Comics and Frank Shuster & Jean Peavy | 8 |
| B | November 23, 2001 Agreement between Pacific Pictures Corporation and Mark Warren Peary & Jean Adele Peavy | 9 |
| C | October 3, 2002 Agreement between IP Worldwide, Inc. and Joanne Siegel & Laura Siegel Larson | 13 |
| D | October 27, 2003 Agreement between Pacific Pictures Corporation and Mark Warren Peary | 17 |
| E | Notice of Termination re: Copyright Renewal Term of "Superman," served by the Estate of Joseph Shuster, recorded with the U.S. Copyright Office on December 3, 2003. | 21 |
| F | September 10, 2004 letter between Pacific Pictures Corporation and Mark Warren Peary & Jean Adele Peavy | 37 |
| G | November 15, 2006 letter from Marc Toberoff to DC Comics, in the related case *Siegel v. Warner Bros. Entertainment Inc., et al.*, USDC Case No. CV-04-8400-ODW (RZx) | 38 |
| H | Cover Pages, Exhibit Lists and Exhibits from the November 17, 2006 deposition of Marc Toberoff, in the related *Siegel* case | 41 |
| I | December 30, 2008 Declaration of DC Comics' Counsel, attaching May 2, 2008 Letter, in the related *Siegel* case | 58 |
| J | May 17, 2011 Judgment (Docket No. 669) in the related *Siegel* case | 62 |

1        Pursuant to Rule 201 of the Federal Rules of Evidence, defendants Mark

2   Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele

3   Peavy, Laura Siegel Larson, individually and as personal representative of the Estate

4   of Joanne Siegel, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC,

5   and IPW, LLC ("Defendants"), respectfully request that this Court take judicial

6   notice of the following documents, submitted in support of Defendants' Consolidated

7   Motion to Dismiss Plaintiff DC Comic's Complaint Pursuant to Fed. R. Civ. P.

8   12(b)(6).  In ruling on a motion to dismiss a complaint pursuant to Fed. R. Civ. P.

9   12(b)(6), a court may consider matters subject to judicial notice.  *See Neilson v.*

10  *Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1111-12 (C.D. Cal. 2003) ("In

11  deciding a motion to dismiss…a court may consider…matters that may be judicially

12  noticed pursuant to Federal Rule of Evidence 201."); *Haye v. United States*, 461

13  F.Supp. 1168, 1174 (C.D. Cal. 1978) ("Subsection (d) [of Rule 201] makes the taking

14  of judicial notice mandatory if the Court is so requested and supplied with the

15  necessary information.").[1]

16      1.    Defendants request that the Court take judicial notice of the agreement

17  between Plaintiff DC Comics ("DC"), on the one hand, and Frank Shuster and Jean

18  Peavy, on the other hand, dated as of August 1, 1992 (the "1992 Shuster

19  Agreement").  A true and correct copy of the 1992 Shuster Agreement is attached

20  hereto as **Exhibit A**.

21      On a motion to dismiss under Rule 12(b)(6), courts are permitted to consider

22  documents incorporated by reference in the complaint.  *United States v. Ritchie*, 342

23  F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it

24  may be incorporated by reference into a complaint if the plaintiff refers extensively to

---

25  [1]  *See generally In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal.

26  2003) ("[T]he Court may take judicial notice of documents on which allegations in the
    [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided
    the authenticity of those documents are not in dispute."); *Parrino v. FHP Healthcare, Inc.*,

27  146 F.3d 699, 706 (9th Cir. 1998) (stating judicial notice prevents "plaintiffs from surviving

28  a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their
    claims are based.").

the document or the document forms the basis of the plaintiff's claim."); *Von Koenig v. Snapple Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010) (where parties requested judicial notice of juice and tea bottle labels and labels formed the basis of the relevant causes of action, court considered labels for the purpose of defendant's motion to dismiss). *See generally Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir. 1997) (holding that "documents critical to plaintiff's claims, but not explicitly incorporated in his complaint" may be judicially noticed and considered by a district court on a motion to dismiss). As the 1992 Shuster Agreement is referred to throughout DC's first amended complaint (FAC) in this action (*see*, *e.g.*, FAC ¶¶ 3-4, 6, 51-55, 112-117, 125-128, 175-179) and is the basis in part of Plaintiff's First and Second Claims for Relief, it is proper for the Court to consider the 1992 Shuster Agreement on Defendants' motion to dismiss.

     2.    Defendants request that the Court take judicial notice of the agreement between Pacific Pictures Corporation ("PPC"), on the one hand, and Jean Peavy and Mark Warren Peary, on the other hand, made as of November 23, 2001 (the "2001 PPC Agreement"). The 2001 PPC Agreement is attached hereto as **Exhibit B**.

     On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2001 PPC Agreement is referred to throughout the Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 6, 11, 60-65, 90, 98-99, 120, 132, 169, 177-178, 192-193) and is an alleged basis for Plaintiff's First, Third, Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2001 PPC Agreement on Defendants' motion to dismiss.

     3.    Defendants request that the Court take judicial notice of the agreement between IP Worldwide, Inc., on the one hand, and Joanne Siegel and Laura Siegel Larson, on the other hand, dated as of October 3, 2002 ("the 2002 IPWW Agreement"). The 2002 IPWW Agreement is attached hereto as **Exhibit C**. On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by

reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2002 IPWW Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 8, 81-84, 188, 193) and is an alleged basis of Plaintiff's Third, Fifth and Sixth Claims for Relief, it is proper for the Court to consider the 2002 IPWW Agreement on Defendants' motion to dismiss.

4.      Defendants request that the Court take judicial notice of the agreement between PPC, on the one hand, and Jean Peavy and Mark Warren Peary, on the other hand, dated October 27, 2003 (the "2003 PPC Agreement"). The 2003 PPC Agreement is attached hereto as **Exhibit D**. On a motion to dismiss under Rule 12(b)(6), courts consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2003 PPC Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶ 3, 10-11, 90, 92, 98-99, 101, 120, 130, 132, 169, 177-178, 192-193) and is an alleged basis of Plaintiff's First, Third, Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2003 PPC Agreement on Defendants' motion to dismiss.

5.      Defendants request that the Court take judicial notice of the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of "Superman" (the "Shuster Termination") served by Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, on Plaintiff DC Comics, among others, on November 10, 2003 and recorded with the U.S. Copyright Office on December 3, 2003. A true and correct copy of the Notice of Termination and Certificate of Recordation with the U.S. Copyright Office is attached hereto as **Exhibit E**.

On a motion to dismiss under Rule 12(b)(6), courts are permitted to consider documents incorporated by reference in the complaint. *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the Notice of Termination is referred to throughout plaintiff's FAC in this action (*see*, *e.g.*, FAC ¶¶ 92-101, 105-164) and is an alleged basis of Plaintiff's First, Second and Fourth Claims for Relief, it is proper for the Court to consider the Notice of Termination on Defendants' motion to dismiss.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

1    Moreover, the Court may take judicial notice of such records from the U.S.

2    Copyright Office. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*,

3    413 F.3d 257, 261 (2d Cir. 2005) (taking judicial notice of copyright registrations);

4    *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (holding that on a

5    motion to dismiss a court may take judicial notice of matters of public record outside

6    the pleadings).

7         6.     Defendants request that the Court take judicial notice of the agreement

8    between PPC, on the one hand, and Jean Peavy and Mark Warren Peary, on the other

9    hand, dated September 10, 2004 (the "2004 PPC Agreement"). The 2004 PPC

10   Agreement is attached hereto as **Exhibit F**. On a motion to dismiss under Rule

11   12(b)(6), courts consider documents incorporated by reference in the complaint.

12   *Ritchie*, 342 F.3d at 908; *Von Koenig*, 2010 WL 1980208. As the 2004 PPC

13   Agreement is referred to throughout Plaintiff's FAC in this action (*see, e.g.*, FAC ¶¶

14   99, 121, 169, 171-172, 177-178) and an alleged basis of Plaintiff's First, Third,

15   Fourth and Sixth Claims for Relief, it is proper for the Court to consider the 2004

16   PPC Agreement on Defendants' motion to dismiss.

17        7.     Defendants request that the Court take judicial notice that DC Comics

18   was in possession of the 2001 and 2003 PPC Agreements, and the 2002 IPWW

19   Agreement on or before November 17, 2006.  Rule 201 of the Federal Rules of

20   Evidence permits a court to take judicial notice of a fact that is "not subject to

21   reasonable dispute in that it is … capable of accurate and ready determination by

22   resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

23   201(b).  "Subsection (d) [of Rule 201] makes the taking of judicial notice mandatory

24   if the Court is so requested and supplied with the necessary information." *Haye v.*

25   *United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978).  That the 2001 and 2003

26   PPC Agreements and 2002 IPWW Agreement were produced to DC in the closely-

27   related case *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-CV-

28   08400 ODW (RZx) ("*Siegel*") is not subject to reasonable dispute.  Such agreements,

attached hereto as Exhibits B, C and D, respectively, were Bates stamped as follows:

| | |
|---|---|
| 2001 PPC Agreement: | PPC 00005-00008 |
| 2003 PPC Agreement: | PPC 00001-00004 |
| 2002 IPWW Agreement: | IPW 00001-00004 |

*See also* November 15, 2006 letter from Marc Toberoff to counsel for DC, including facsimile cover sheet, attached hereto as **Exhibit G**, enclosing the document productions Bates-stamped IPW 00001-00016 and PPC 00001-00009; *Werner v. Werner*, 267 F.3d 288, 295-296 (3d Cir. 2001) (determination on a motion to dismiss of whether defendants produced corporate meeting minutes during discovery in related state court action "is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned by [defendants]").

Moreover, it cannot be disputed that DC Comics had possession of the 2001 and 2003 PPC Agreements, and the 2002 IPWW Agreement on or before November 17, 2006, as they were introduced as exhibits by DC Comics in its deposition of Marc Toberoff in *Siegel*, which took place on November 17, 2006. *See* cover pages and exhibits list of the transcript of the deposition of Marc Toberoff and documents stamped as Exhibits 13, 14, & 18 thereto, attached hereto as **Exhibit H**; *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (court takes judicial notice on a motion to dismiss of conference call transcripts for the fact that statements were made on the dates specified).

8.      Defendants request that the Court take judicial notice of a letter from attorney Marc Toberoff to DC's attorney Michael Bergman dated May 2, 2008, which was "Exhibit B" to the Declaration of Michael Bergman in Support of DC's Motion to Compel filed on December 30, 2008 (Docket Nos. 395-1, 395-2) in the related *Siegel* case. A true and correct copy of the December 30, 2008 Declaration of Michael Bergman and the May 2, 2008 Letter, as redacted by DC's counsel, is attached hereto as **Exhibit I**. It is proper for the Court to take judicial notice of proceedings and determinations of prior related litigation. 1-201 *Weinstein's Federal*

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

1  *Evidence* § 201.12[3] ("Courts have the power to judicially recognize their own

2  records of prior litigation closely related to the present case").  *See Stein v. State of*

3  *Arizona*, 2010 WL 2541136 (D. Ariz. June 18, 2010) (on motion to dismiss, taking

4  judicial notice of plaintiff's sentencing documents and release order in related

5  criminal case against plaintiff) (citing *Emrich v. Touche Ross & Co.,* 846 F.2d 1190,

6  1198 (9th Cir. 1988)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746

7  n.6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, of briefs,

8  pleadings, memoranda, expert reports from related litigation); *Kourtis v. Cameron*,

9  419 F.3d 989, 1001 (9th Cir. 2005) ("[C]ourt records from related proceedings can be

10 taken into account without converting a motion to dismiss into a summary judgment

11 motion"), *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008).

12       9.     Defendants request that the Court take judicial notice of the Judgment

13 dated May 17, 2011 (Docket No. 669), that this Court entered in the related *Siegel*

14 case.  A true and correct copy of the Judgment is attached hereto as **Exhibit J**.  It is

15 proper for the Court to take judicial notice of proceedings and determinations of prior

16 related litigation.  1-201 *Weinstein's Federal Evidence* § 201.12[3].  *See Stein*, 2010

17 WL 2541136 (citing *Emrich,* 846 F.2d at 1198); *Reyn's Pasta Bella, LLC,* 442 F.3d

18 at 746 n.6.

19       Pursuant to Federal Rules of Evidence 201, and for the reasons set forth above,

20 Defendants respectfully request that this Court take judicial notice of the documents

21 described above.

22  Dated:  October 14, 2011          RESPECTFULLY SUBMITTED,

23                                    /s/ Laura Brill

24                                    Laura Brill

25                                    KENDALL BRILL & KLIEGER LLP
                                      Attorneys for Defendants Marc Toberoff,  Pacific
26                                    Pictures Corporation, IP Worldwide, LLC, and
                                      IPW, LLC
27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION
TO DISMISS

1

/s/ Marc Toberoff

Marc Toberoff

2

3 TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary, as
4 personal representative of the Estate of Joseph
Shuster, Jean Adele Peavy, and Laura Siegel
5 Larson, individually and as personal representative
of the Estate of Joanne Siegel
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

ER-1465

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court.  Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred.  Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated:  March 5, 2013         TOBEROFF & ASSOCIATES, P.C.

                             /s/ Keith G. Adams

                             Keith G. Adams