APPELLATE CASE No. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

## APPELLANTS' OPENING BRIEF

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kadams@toberoffandassociates.com*
Pablo D. Arredondo (241142)
 *parredondo@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

## **F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellants make the following disclosure statements:

Defendant-Appellant IPW, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IPW, LLC.

Defendant-Appellant IP Worldwide, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IP Worldwide, LLC.

Defendant-Appellant Pacific Pictures Corporation does not have a parent corporation, nor does any publicly held corporation own 10% or more of Pacific Pictures Corporation.

Dated:  March 5, 2013       TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff

Marc Toberoff

Attorneys for Defendants-Appellants

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION.........................................................1

ISSUES PRESENTED.........................................................................1

STATEMENT OF THE CASE ..............................................................2

STATEMENT OF FACTS ....................................................................7

    A.    Siegel And Shuster's Creation Of Superman And Relationship With DC ...........................................................7

    B.    Joe Shuster's Death And The 1992 Agreement ...................8

    C.    The Shuster Termination ..................................................11

    D.    The Siegel Terminations ..................................................12

    E.    This Action .......................................................................13

STANDARD OF REVIEW ..................................................................15

SUMMARY OF ARGUMENT .............................................................16

ARGUMENT ......................................................................................20

I.    THE TERMINATION RIGHT UNDER THE U.S. COPYRIGHT ACT ...........................................................................20

II.    THE ORDER IMPROPERLY FOUND THAT THE 1992 PENSION AGREEMENT BARRED THE SHUSTER TERMINATION RIGHT ..........................................................23

    A.    The Circuits' "Revocation And Re-Grant" Decisions ......23

    B.    The 1992 Agreement Does Not Preclude Termination, But If It Did, It Would Be Void As An "Agreement To The Contrary" ................................................30

1.      Frank And Jean Did Not Have A Termination Right ............... 30

2.      The 1992 Agreement Does Not Reflect Superman's Value ..................................................................... 34

3.      Frank And Jean Did Not Expressly Revoke Joe Shuster's Copyright Grants Or Re-Grant His Superman Copyrights ............................................................. 36

C.      The Order Erred In Its Application Of New York Law ..................... 39

1.      New York Law Requires That A Novation Be Clear And Unequivocal ............................................... 39

2.      The 1992 Agreement Was Not A Clear And Unequivocal Novation ............................................ 41

D.      The Order Failed To Address The Evidence ........................................ 44

III.   DC'S OTHER ARGUMENTS FOR INVALIDATING THE TERMINATION FAIL AS A MATTER OF LAW ..................................... 46

A.      The Order Correctly Found That The Shuster Estate Possessed A Majority Interest ................................................. 46

B.      The Shuster Executor Possessed The Termination Right .................. 47

1.      Absent Statutory Heirs, Executors Hold Termination Rights ................................................. 47

2.      DC's "Not Living" Argument Fails ........................................ 48

3.      Shuster's Section 304(c) Termination Right "Expired" .......... 51

C.      The Termination Properly Listed All Copyright Grants ..................... 52

D.      There Are No "Unclean Hands" Barring Termination ........................ 53

1.      PPC's Exclusion Was Proper ................................................ 53

2. The Executor's Decision Not To Terminate Superboy Was Proper ................................................................55

III. DC'S THIRD CLAIM FAILS AS A MATTER OF LAW ...........................58

A. The Third Claim Was Moot ...............................................58

B. Section 304(c)(6)(D) Does Not Provide DC With Any Right ............59

C. DC Lacks Standing To Bring Its Third Claim ...................................60

D. The Third Claim Is Time-Barred .......................................61

CONCLUSION .......................................................62

STATEMENT OF RELATED CASES ...............................63

CERTIFICATE OF COMPLIANCE ..............................64

STATUTORY ADDENDUM ..................................65

CERTIFICATE OF SERVICE ...............................72

# TABLE OF AUTHORITIES

**Cases**

*Abuelhija v. Chappelle*,
2009 U.S. Dist. LEXIS 55861 (S.D.N.Y. June 29, 2009) ............................... 40, 42

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................61

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ................................................................................................15

*Artichoke Joe's Cal. Grand Casino v. Norton*,
353 F.3d 712 (9th Cir. 2003) ..................................................................................49

*Batjac Prods., Inc. v. Goodtimes Home Video Corp.*,
160 F.3d 1223 (9th Cir. 1998) ................................................................................51

*Beck v. Mfrs. Hanover Trust Co.*,
125 Misc. 2d 771 (N.Y. Sup. Ct. 1984) ........................................................... 40, 41

*Bourne Co. v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987) ..........................................................................60

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ........................................................................ passim

*Cuellar de Osorio v. Mayorkas*,
656 F.3d 954 (9th Cir. 2011) ..................................................................................15

*Davismos v. Halle*,
60 A.D.3d 576 (App. Div. 2009) .............................................................................43

*DHX, Inc. v. Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005) ................................................................................59

*Frank Associates, Inc. v. John J. Ryan & Sons, Inc.*,
177 N.Y.S.2d 406 (App. Div. 1952) .......................................................................40

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943)................................................................................21

*Gausvik v. Perez*,
392 F.3d 1006 (9th Cir. 2004) ...............................................................53

*Goldbard v. Empire State Mut. Ins. Co.*,
171 N.Y.S.2d 194 (App. Div. 1958).......................................................41

*Greenberg v. National Geographic Society*,
533 F.3d 1244 (11th Cir. 2008) .............................................................21

*Groucho Marx Prods. v. Day & Night Co.*,
689 F.2d 317 (2d Cir. 1982)...................................................................52

*Gucci Am., Inc. v. Guess?, Inc.*,
2012 WL 2304247 (S.D.N.Y. June 18, 2012) .......................................57

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)................................................................................51

*Harris v. Emus Records Corp.*,
734 F.2d 1329 (9th Cir. 1983) ...............................................................54

*Holland v. Fahnestock & Co., Inc.*,
210 F.R.D. 487 (S.D.N.Y. 2002) ...........................................................42

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) .................................................................53

*Jones v. Trice*,
608 N.Y.S.2d 688 (Sup. Ct. 1994).........................................................39

*Kittel v. Thomas*,
620 F.3d 949 (9th Cir. 2011) .................................................................59

*Koenig Iron Works, Inc. v. Sterling Factories, Inc.*,
1999 U.S. Dist. LEXIS 3973 (S.D.N.Y. Mar. 30, 1999)........................39

*Lennon v. Seaman*,
84 F. Supp. 2d 522 (S.D.N.Y. 2000) ...................................................................54

*Lucky's Detroit, LLC v. Double L Inc.*,
2012 WL 219418 (E.D. Mich. Jan. 25, 2012) ......................................................57

*Marvel Characters Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002)............................................................. 28, 33

*Mazer v. Stein*,
347 U.S. 201 (1954)..........................................................................20

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960)..........................................................................51

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)..........................................................................34

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) .................................................. passim

*Milton H. Greene Archives v. CMG Worldwide*,
568 F. Supp. 2d 1152 (C.D. Cal. 2008) ...............................................52

*Multimedia Patent Trust v. DirecTV, Inc.*,
2011 WL 3610098 (S.D. Cal. Aug. 16, 2011) ......................................42

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ...................................................51

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001)........................................................................2, 23

*Northville Indus. Corp. v. Fort Nexk Oil Term. Corp.*,
474 N.Y.S.2d 122 (App. Div. 1984).....................................................40

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008)..................................................... passim

*Schillitone v. Lewis Pub. Co.*,
171 N.Y.S. 262 (App. Term 1918) .......................................................42

*Shady Records, Inc. v. Source Enters., Inc.*,
2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. December 30, 2004) ............55

*Siegel v. National Periodical Publications, Inc.,*
508 F.2d 909 (2d Cir. 1974)........................................................ passim

*Siegel v. Warner Bros. Entertainment Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal 2008) ................................................53

*Stewart v. Abend*,
495 U.S. 207 (1990)........................................................... 20, 21, 50

*Toshiba Am. Info. Sys., Inc. v. Advantage Telecom, Inc.*,
19 F. App'x 646 (9th Cir. 2001) .........................................................53

*Williams Gold Refining Co. v. Semi-Alloys, Inc.*,
434 F. Supp. 453 (W.D.N.Y. 1977).....................................................57

**Statutes**

17 U.S.C. § 101 .................................................................................21

17 U.S.C. § 203(a) ............................................................................21

17 U.S.C. § 24 ...................................................................................20

17 U.S.C. § 304(a)(1)(C) ..................................................................50

17 U.S.C. § 304(c) ..................................................................... passim

17 U.S.C. § 304(d) ..................................................................... passim

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1338..................................................................................1

28 U.S.C. § 1367 ................................................................................................1

37 C.F.R. § 201.10(b)(1)(iv) .........................................................................52

Fed. R. Civ. P. 4(a)(1)(A) ..............................................................................1

Fed. R. Civ. P. 54(b) .....................................................................................1

Fed. R. Civ. P. 56(c) ....................................................................................15

Pub. L. 105-298 (1998) ...............................................................................22

**Other Authorities**

22A N.Y. Jur. Contracts § 473 .....................................................................43

M. & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*")
2 *Nimmer* § 7.20[B] ..................................................................................54

3 *Nimmer* § 11.03[A][2][a] .......................................................................49

3 *Nimmer* § 11.05[B][2] at 11-40.12 .......................................................49

W. Patry, *Patry on Copyright* (2010) ("*Patry*")
3 *Patry* § 7:47 ...........................................................................................60

6 *Patry on Copyright* § 21:18 ....................................................................61

67 Fed. Reg. 69134 ......................................................................................52

Black's Law Dictionary (8th ed. 2004) .......................................................38

H.R. Rep. No. 105-452, 105th Cong., 2d Sess. (1998) ....................... 22, 50

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) ..............................34

## STATEMENT OF JURISDICTION

Plaintiff DC Comics ("DC") brought declaratory relief claims under the Copyright Act and state-law claims against defendants Mark Warren Peary and Jean Adele Peavy (the "Shusters"); Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC; and Joanne Siegel and Laura Siegel Larson (the "Siegels"). The district court had subject matter jurisdiction. 28 U.S.C. §§ 1331, 1338, 1367. This timely appeal arises from a Fed. R. Civ. P. 54(b) judgment dated December 11, 2012. Excerpts of Record ("ER") 19-23; Fed. R. Civ. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Did the district court err in granting DC's First Claim and finding, contrary to 17 U.S.C. § 304(c)(5) and the requirements of *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) and *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), that a 1992 agreement between DC and Joseph Shuster's siblings barred a § 304(d) termination by Shuster's estate, and where DC's claim otherwise failed as a matter of law?

2.     Did the district court err in granting DC's Third Claim and finding that defendants had violated DC's purported "right" under 17 U.S.C. § 304(c)(6)(D), when DC had no right or standing under that section, and the claim was moot and time-barred?

1

## STATEMENT OF THE CASE

When Congress extended the copyright term in 1976, it sought to ensure that authors and their families obtained the benefits of this extension. To fulfill this purpose, Congress created the termination right, which allows authors and statutorily-defined heirs to recapture their copyrights by terminating old copyright grants. 17 U.S.C. §§ 203, 304(c).

Recognizing publishers' superior bargaining power, and fearing they would use it to force authors to contract their rights away, Congress went to great lengths to ensure that the right to "revoke a copyright transfer" would be "inalienable." *N.Y. Times v. Tasini*, 533 U.S. 483, 496 (2001). Congress mandated that the termination right may be exercised "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5). Congress further mandated that assignments of the termination interest were only effective if made *after* service of a termination notice. 17 U.S.C. § 304(c)(6)(D). These protections were enacted to prevent contractual circumvention of the termination right and ensure that authors and their families actually obtained the benefits that Congress intended for them.

This case is about whether Joseph Shuster's estate lost its termination right as a result of a standard quitclaim and release in a one-page pension agreement.

Jerry Siegel and Joe Shuster co-created Superman in the 1930s. In 1938, to get Superman published, Joe and Jerry signed away their copyright for $130 to

DC's predecessor, Detective. Superman became a global sensation, spawning a multi-billion dollar enterprise. Joe and Jerry spent much of their lives in poverty.

Joe passed away in 1992. Although he had co-created an icon, he died nearly penniless. His siblings, Frank Shuster and Jean Peavy, struggled to cover his funeral expenses and pay off his debts. Desperate, Frank and Jean reached out to DC.

In 1992, DC owned Joe Shuster's Superman copyright free and clear. The courts had repeatedly upheld Siegel and Shuster's 1938 grant, finding that it fully and forever transferred Superman to DC. Moreover, at Joe's death, termination rights extended only to an author's widow, children, or grandchildren, and he had none.

Thus, as DC told Frank and Jean, the Shuster family had no legal right to Superman, and DC had no real legal obligation to them. Nevertheless, DC agreed to assist Frank and Jean. Frank and Jean, in no place to negotiate and without the advice of counsel, signed, on October 2, 1992, a one-page agreement that DC had drafted (the "1992 Agreement"). In lieu of a $5,000 pension DC owed Frank under a 1975 agreement, DC agreed to give them a modest combined pension of $25,000. And DC threw in a short release and quitclaim of Frank and Jean's rights, if any.

Six years later in 1998, Congress amended the Copyright Act to provide the

termination right to the executor of an author's estate.

In 2003, Joe's estate was probated and, per his will, his nephew, Mark Warren Peary, was appointed executor for the express purpose of effectuating the estate's new termination right. In November 2003, Peary served notices of termination on DC pursuant to 17 U.S.C. § 304(d), effective in 2013.

Seven years later, on May 14, 2010, DC sued, seeking to derail the termination. ER-1620. DC filed three federal claims attacking the termination, and three state-law claims attacking the Shuster family, the Siegel family, and their long-time attorney, Marc Toberoff. ER-1540-1615.

DC's First Claim sought to invalidate the termination. For its central argument, DC pulled out the 1992 Agreement. DC argued this one-page pension agreement (1) revoked Joe's prior Superman copyright grants, (2) re-granted his Superman copyright back to DC, and (3) left no pre-1978 grants to terminate.

In other words, DC argued that in 1992, for no apparent reason, it decided to rip up Joe's venerable copyright grants, upheld by the courts as giving it all rights to Superman, and to replace them with the 1992 Agreement, which nowhere identified Joe's grants or even mentioned Superman.

On October 17, 2012, on cross-motions for summary judgment, the district court granted DC's First Claim, adopting its position that the 1992 Agreement revoked Joe's pre-1978 Superman grants, and re-granted his Superman copyrights

4

back to DC, precluding the estate's Termination. ER-1-18 ("Order").

In so doing, the Order misconstrued this Circuit's decisions in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) and *Classic Media v. Mewborn*, 532 F.3d 978, 988 (9th Cir. 2008). *Milne* and *Mewborn* both maintained the Congressional mandate that the termination right may be exercised "notwithstanding any agreement to the contrary." They held, however, that where a statutory heir could serve a termination notice, but instead chooses "to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights … it [is] tantamount to following the statutory formalities, and achieve[s] the exact policy objectives for which [the termination right] was enacted." *Mewborn*, 532 F.3d at 987, citing *Milne*, 430 F.3d at 1044-45. By realizing Congress' objective, the new agreement, though it may preclude termination, is not "contrary" to the right and is enforceable.

The 1992 Agreement, by any measure, did not achieve the purposes of the termination provisions. DC already owned all rights to Superman, and Frank and Jean had no termination right with which to bargain. DC had no plausible reason to renegotiate Joe's Superman grants. Indeed, they barely negotiated at all: Frank and Jean asked for increased financial support and DC voluntarily provided some. The 1992 Agreement did not include any language of revocation, rescission or cancellation of Joe's Superman grants, and did not even identify such grants or

mention Superman.

In 1992, the non-existent termination right could not be used "as a valuable bargaining chip… to obtain an advantageous agreement," and, as such, the 1992 Agreement did not achieve "the very result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1046-47. The Order erroneously deprived the Shusters of the benefits that Congress intended, contrary to their inalienable termination right.

In misconstruing the 1992 Agreement, the Order not only ignored *Milne* and *Mewborn*'s requirement that a "revocation and re-grant" be "express," given Congress' concerted objective to protect the termination right, it misapplied New York law, which likewise requires clear and unequivocal language to supersede or replace (*i.e.*, "novate") a prior contract.

After granting DC's First Claim, the Order inexplicably also granted (ER-16-17) DC's Third Claim, expressly pled "in the alternative – *i.e.,* if the Court does not grant DC Comics' First Claim for Relief." ER-1594 ¶166. This claim was not only moot, but was time-barred and failed as a matter of law because DC did not have rights or standing under 17 U.S.C. § 304(c)(6)(D) as pled.

On December 11, 2012, the district court entered a Rule 54(b) judgment on its Order that defendants immediately appealed. ER-19-23. The Order should be reversed, and the case remanded with instructions to enter judgment in defendants'

favor on DC's First and Third Claims.

## STATEMENT OF FACTS

### A. Siegel And Shuster's Creation Of Superman And Relationship With DC

In 1933-34, high school students Jerry Siegel and Joe Shuster co-created Superman as the "champion of the oppressed" in the midst of the Great Depression.  ER-101 ¶1.  Their highly original character would become a cultural icon, spawn a multi-billion dollar franchise and bring fortune to many – but not them.  ER-103 ¶4.  On March 1, 1938, without counsel, they signed an agreement (the "1938 Grant") to grant rights to Superman to DC for $130.  ER-101-02 ¶¶2-3.  Despite Superman's phenomenal success, and DC's promises to look after its creators, DC refused to allow them even a simple royalty.  ER-115 ¶17, 1255-68.

In 1947, Siegel and Shuster filed suit (the "1947 Action").  ER-104 ¶5.  The court ultimately held that DC wholly owned Superman pursuant to the 1938 Grant, but that DC had stolen Superboy from Siegel (not Shuster) while he was overseas in WWII.  ER-104-10 ¶¶6-10, 1071.  Although the case settled, DC retaliated, cutting Siegel and Shuster off, and systematically erasing their credit and references to them from its publications.  ER-110-11 ¶11, 113 ¶16.  While Superman was ubiquitous, his creators slipped into obscurity and poverty.  *Id.*; ER-115 ¶17.

7

In 1969, Siegel and Shuster sought ownership of the Superman renewal copyright, resulting in *Siegel v. National Periodical Publications, Inc.* ("*National*")*,* 508 F.2d 909, 912-913 (2d Cir. 1974).  ER-111-12 ¶¶12-14.  In *National*, the Second Circuit confirmed that, pursuant to the 1938 Grant, DC owned all Superman rights, and that Siegel and Shuster owned none.  *Id.*

In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign protesting DC's treatment of Siegel and Shuster.  ER-116 ¶18.  Worried about negative publicity, DC's parent, Warner, agreed to pay Siegel and Shuster a modest pension of $25,000 each, and restored their credit after 26 years (the "1975 Agreement").  ER-117 ¶¶19-20.  The 1975 Agreement expressly re-acknowledged that DC already owned all Superman rights and that Siegel and Shuster owned none (ER-662-63 ¶2, 670-71 ¶7), and provided an annual survivor pension of $5,000 for Shuster's brother, Frank.  ER-119 ¶¶21-22.

### B.  Joe Shuster's Death And The 1992 Agreement

Joe Shuster died on July 30, 1992, without widow or child, survived only by his siblings, Frank (died in 1996) and Jean Peavy.  ER-119-20 ¶¶23-26.  After Joe's death, no one held his termination rights because, at that time, only surviving spouses, children and grandchildren held those rights.  17 U.S.C. § 304(c)(2) (1992).

8

As Shuster had few assets, his estate was originally not probated. ER-120 ¶27. Frank and Jean, who could not even cover the funeral expenses, begged DC for a pension increase. In September 1992, DC reminded Frank and Jean that they held no rights, and that DC had no obligation to them. ER-126 ¶31. On October 2, 1992, DC provided a short one-page agreement, dated August 1, 1992, which granted Frank and Jean a combined pension of $25,000 (in lieu of Frank's $5,000 pension in the 1975 Agreement), and included a short release and quitclaim of any rights that Frank and Jean might have. ER-121-26 ¶¶28-30; 703-04.

# The 1992 Agreement

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster                     Ms. Jean Shuster Peavy
98-120 Queens Blvd., Apt. 4K          316 Horton Lane, NW
Rego Park, NY  11374                  Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

    This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1, 1992, for as long as either one of you is alive.  Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practices and shall be subject to all applicable withholding taxes.  If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.

    We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

    If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement.  We also reserve all of our other rights, remedies and defenses in such an event.

    If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

                          Very truly yours,

                          DC Comics

                          By: _____
                              Paul Levitz

ACCEPTED AND AGREED TO:

_Frank Shuster_
Frank Shuster                         Dated: 10/2/92

_Jean Shuster Peavy_
Jean Shuster Peavy                    Dated: 10/2/92

                    Exhibit O                    8
                    159                          ER-704

10

Frank signed another letter, also dated October 2, 1992 (ER-125 ¶30), clarifying that, "[i]n consideration of the [1992] agreement," "I hereby waive any rights or remedies that I may have under the [1975] agreement" (ER-703) – *i.e.*, his $5,000 pension under the 1975 Agreement. Thereafter, Frank and Jean still struggled to get by. ER-127-29 ¶¶32-33. Their requests for pension increases were denied, but DC gave some Christmas "bonuses." *Id.*

## C.     <u>The Shuster Termination</u>

In 1998, Congress extended termination rights to an author's estate, if an author is not survived by a spouse, child, or grandchild. 17 U.S.C. § 304(c)(2)(D).

In 2001, Shuster's nephew, Mark Warren Peary, spurred by the well-publicized Siegel termination, sought the advice of Mr. Toberoff. ER-1127 ¶78. Peary and his mother, Jean, entered into a November 23, 2001 agreement with Mr. Toberoff's company (the "2001 PPC Agreement"). ER-165-66 ¶74, 755-58.

On July 15, 2003, Peary petitioned the Los Angeles Superior Court to probate Shuster's estate. ER-144 ¶44. Shuster's will nominated Jean as executrix and stated that, if she declined, Peary should be appointed. ER-144 ¶45. Jean was 82, and declined to serve. ER-146 ¶46. On October 7, 2003, the court appointed Peary as executor ("Executor") with the "power … to terminate prior transfers of the decedent's copyright(s)." ER-147-49 ¶¶47-48, 869-73. In October 2003, the 2001 PPC Agreement was modified to add the Executor (the "2003 PPC

11

Agreement"). ER-166 ¶75,f 874-77.

On November 10, 2003, the Executor served a section 304(d) termination notice, terminating Joe's 1938 Grant and all subsequent pre-1978 grants, effective as of October 26, 2013, which he later filed with the Copyright Office. ER-150-58 ¶¶49-60.

In September 2004, Toberoff, Peary and Jean voluntarily cancelled and replaced the PPC Agreements with a legal retainer, effective as of November 23, 2001, the date of the 2001 PPC Agreement. ER-166 ¶76, 894, 1024-25 ¶101.

On April 28, 2005, DC sent directly to the Executor (not through counsel) a low-ball offer to buy out his termination interest. ER-895-901. The letter referenced DC's alleged defenses to termination, but made no mention of the 1992 Agreement. *Id*. The Executor rejected DC's offer. ER-1186.

Before filing this suit in 2010, DC never claimed or suggested anywhere that its Superman chain-of-title rested on the perfunctory 1992 Agreement, or that it had revoked Shuster's 1938 Grant (or any other grant) on which DC had long relied. ER-138-42 ¶¶39-41.

### D.    The Siegel Terminations

In 1997, Laura and Joanne Siegel, Jerry Siegel's widow and daughter, had served their own Superman termination notices (the "Siegel Termination"). ER-158 ¶61. In late 2002, the Siegels also served a Superboy termination notice. ER-

159 ¶62.  In 2004, the Siegels filed a still-ongoing suit to enforce their

terminations.  ER-160 ¶64.

### E.    This Action

On May 14, 2010, DC filed this suit with three federal claims attacking the

Shuster Termination.  ER-1620; ER-1577-1596.

DC's First Claim for declaratory relief (ER-1577-86 ¶¶105-34), against the

Shusters, sought to invalidate the Termination based on five erroneous theories:

(1) that under section 304(d) Shuster's termination rights "ceased to exist" but did

not "expire" at his death;  (2) that the 1992 Agreement barred the Termination as a

supposed "revocation and re-grant" of Shuster's pre-1978 copyright grants; (3) that

the Executor lacked a majority share of the termination right because he had

allegedly transferred it; (4) that the Termination omitted two supposed Superman

"grants"; and (5) that the Termination was barred by alleged "unclean hands."

DC's alternative Second Claim, against the Shusters, sought to limit the

Termination's scope, if upheld.  ER-1586-94 ¶¶135-64.

DC's alternative Third Claim, against all defendants, argued that DC had an

exclusive "right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the

Shuster termination interest.  ER-1594-96 ¶¶165-73.

The parties filed cross-motions for summary judgment on July 16, 2012 and

August 20, 2012.  ER-986-1021, 1298-1330.  DC moved on parts (1), (2) and (3)

of its First Claim and its Third Claim; defendants moved on DC's First and Third Claims, and to stay its Second Claim. *Id.*

On August 30, 2012, the Court issued a tentative order granting DC's motion. ER-237-55. At the September 5, 2012 hearing, however, the district court emphatically rejected DC's "revocation and re-grant" argument:

> Defendants' counsel: And I submit that that is impossible that companies of this magnitude would have their lawyers draft something like this [if] their intention was to revoke all prior grants and regrant them the Superman copyrights. It is an impossibility.
>
> Court: What you suggest is lunacy. So, okay, I am sure that is not their intent.

ER-527:1-7. In realizing that this was DC's argument, the court was incredulous:

> Court: Well, I can see why DC would basically want to tear up a clear, unequivocal grant of intellectual property in Superman from 1938. I can understand why they would tear that up for this ephemeral thing [the 1992 Agreement]. That makes a lot of sense to me.

ER-534:7-11. It asked DC's counsel five times the simple threshold question of what rights Shuster's siblings had to convey to DC in 1992. ER-530:7-8 ("[W]hat rights did Jean Shuster have to convey to DC?"), 531:12-13 ("When Joe Shuster died, what rights did he have to Superman?"), 531:22-23 ("But you know my question was, what rights did he have in Superman?"), 533:8-10 ("When he died, what rights did Joe Shuster have in Superman?"); 533:14-15 ("I want to know what rights passed to Jean as a result of Joe Shuster's death."). Five times, DC could not give a straight answer. ER-530-33.

14

Nonetheless, on October 17, 2012, the district court granted DC's motion, essentially adopting its tentative order six weeks later. The Court erroneously held that the 1992 Agreement "superseded and replaced all prior grants of the Superman copyrights" as a matter of law, and thereby "'had the effect of eliminating termination rights.'" ER-13. The court did not rule on Parts (1), (4) or (5) of DC's First Claim, but rejected part (3), finding the Executor could not have transferred his termination right. ER-13-15. The court also granted DC's Third Claim (ER-16-17), though DC had expressly pled it "in the alternative." ER-1594 ¶166. Judgment was thereafter entered, and this appeal followed. ER-19-27.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's grant of summary judgment." *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011). Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of identifying evidence demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986). In reaching its decision, the court must draw all reasonable inferences against the moving party. *Id.* at 249-250.

## SUMMARY OF ARGUMENT

The Order erroneously granted DC's First Claim (sub-part (2)), holding that the 1992 Agreement precluded the Shuster Termination.

This was error on two principal grounds.

First, to the extent the 1992 Agreement is read to bar the Executor's termination right, it is void under federal copyright law. Pursuant to section 304(c)(5), the right can be exercised "notwithstanding any agreement to the contrary." In *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (2005) (9th Cir. 2005) and *Classic Media v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), this Court confirmed that a post-1978 agreement cannot be used to preclude termination and is an "agreement to the contrary" unless it achieves "the very result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1047. This occurs when an author's heir, who could have terminated, chooses instead "to use the leverage of imminent vesting to [expressly] revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights." *Mewborn*, 532 F.3d at 987. Under these circumstances, the post-1978 agreement is "tantamount to following the statutory formalities," and "achieve[s] the exact policy objectives for which § 304(c) was enacted." *Id.*

The Order ignored or misconstrued this binding precedent. In 1992, no one (including Frank and Jean) held Shuster's termination rights. DC already owned

all of Shuster's Superman rights, and Frank and Jean had "nothing in hand with which to bargain." *Id.* at 989. Accordingly, the 1992 Agreement was not any sort of renegotiation over Shuster's Superman copyrights. Without the leverage of termination, its modest pension increase from $5,000 to $25,000, split two ways, did nothing to fulfill Congress' intent to "give an author and his heirs a second chance to benefit from the fruits of his labor" and the increased value of his creation. *Id.* at 983.

The Order erred in concluding that in the 1992 Agreement Frank and "Jean exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Shuster's original grants." ER-11. The agreement did not "fully honor[]" the termination right, as nobody had one in 1992. *Mewborn*, 532 F.3d at 988. Nor did the agreement contractually secure "the exact equivalent result" of termination. *Mewborn,* 532 F.3d at 988. From any angle, the 1992 Agreement did not fulfill Congress' objectives. Accordingly, to whatever extent it is now read to bar termination, it is void as an "agreement to the contrary" under § 304(c)(5).

Second, the 1992 Agreement did not even purport to revoke and re-grant Shuster's prior copyright grants. Its boilerplate release and quitclaim of <u>Frank and Jean's rights</u>, if any, contains no language revoking or replacing Shuster's Superman grants; indeed, it does not even identify them. Frank and Jean held no Superman rights to speak of. In 1992, DC had no reason to exchange Shuster's

17

1938 Grant, upheld in two court judgments as giving DC all rights to Superman, for the vague language in this pension agreement.

The Order ignored *Milne*'s and *Mewborn*'s requirement that a "revocation and re-grant" be "express," given Congress' concerted efforts to safeguard the termination right against contractual erosion. 17 U.S.C. §§ 304(c)(5), (c)(6)(D). The Order similarly misconstrued New York's stringent standards under which a novation or superseding agreement will only be found where there is a clear and definite expression of intent to cancel and replace a contract. Furthermore, fully-performed contracts like Shuster's pre-1978 grants cannot be novated.

The remaining portions of DC's First Claim fare no better.

Sub-part (1) used wordplay to argue that the Executor did not possess termination rights under section 304(d). DC first argued that executors only hold termination rights if an author had a widow or child who were "'not living,' but who did at some time live." ER-1578-79 ¶111. This tortured interpretation directly contradicts Supreme Court cases interpreting the meaning of "not living" under the Copyright Act. DC also argued that because Joe Shuster died during an open termination window, his rights did not "expire" (as is required by § 304(d)), but instead "ceased to exist." ER-1578-79 ¶110. This contradicts numerous court decisions as to the meaning of "expire," and the Copyright Office's clear definition of "expired" under § 304(d).

18

Sub-part (3) argued that the Shuster Executor did not hold the required majority termination interest because it had somehow been transferred in the PPC Agreements. The Order correctly held that was impossible because such rights cannot be transferred prior to service of a termination notice under section 304(c)(6)(D). The Shuster Executor held the termination right.

Sub-part (4) argued that the Termination did not terminate two copyright grants – a May 21, 1948 "consent judgment" and the 1992 Agreement. The consent judgment was not a "grant," and DC waived its right to argue the issue when it did not oppose defendants' motion or related appeal on the issue. The 1992 Agreement was not a grant either, as detailed above.

Sub-part (5) argued that the Executor had "unclean hands" on two unsupported grounds. The first was that the Executor did not list PPC when filing its termination notice with the Copyright Office. That is immaterial because (1) PPC did not own any termination interest, and (2) neither the Copyright Act nor Office require such disclosures.

The second was DC's unsupported speculation that the Shusters did not terminate Superboy so that the Siegels could pursue a Superboy termination and infringement claim against DC. DC presented no evidence of this, as there was no such arrangement. The Executor's choice not to terminate Superboy was squarely based on preclusive findings in the 1947 Action that Siegel alone created

19

Superboy.  Sound legal decisions are not unclean hands.  Moreover, even if the Executor had terminated, that would not have prevented the Siegels from filing their termination and infringement claim.

The Order improperly granted DC's Third Claim, which was moot as pled "in the alternative" to its granted First Claim.  DC erroneously premised its Third Claim on 17 U.S.C. § 304(c)(6)(D), even though the plain language of the statute, case law and leading commentators all agree that DC has no rights or standing under it.  The claim was also barred by the three-year statute of limitations, because DC was on notice since 2006.

## **ARGUMENT**

## I.    **THE TERMINATION RIGHT UNDER THE U.S. COPYRIGHT ACT**

"The economic philosophy behind the [Copyright] clause … [is] that encouragement of individual effort by personal gain is the best way to advance the public welfare through the talents of authors."  *Mazer v. Stein*, 347 U.S. 201, 219 (1954).  Since 1831, Congress has provided authors with rights to recover copyrights, and strengthened those rights over time to enable them to realize the value of their work.  *Stewart v. Abend*, 495 U.S. 207, 217-20 (1990).

The 1909 Copyright Act divided copyright into two separate 28-year terms: the "initial" and "renewal" terms.  17 U.S.C. § 24 (1974).  The renewal term was intended to be owned by authors, to protect authors who struck imprudent deals

and allow them to meaningfully participate in any increased value of their work. *Stewart,* 495 U.S. at 217-220; *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) ("[T]he renewal process was intended to give an author and his heirs a second chance to benefit from the fruits of his labors.").

This clear legislative purpose was gutted by *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 657-59 (1943), which held that the renewal interest could be anticipatorily assigned away. *Stewart*, 495 U.S. at 219. Thereafter, publishers insisted authors assign *both* terms up-front, negating the intended authorial benefits of the renewal term. *Id.*

Effective January 1, 1978, the Copyright Act of 1976 (17 U.S.C. § 101 *et seq.* (1978); the "1976 Act") significantly enhanced authors' rights and "was supposed to reverse two hundred years of publishers' exploitation of authors." *Greenberg v. National Geographic Society*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008).

"Congress's clear intent [was] to benefit authors and their heirs with additional years of copyright protection" rather than publishers (*Mewborn,* 532 F.3d at 982), so Congress coupled the extended renewal term with a *new* right of authors and certain heirs (widows/children/grandchildren) to terminate pre-1978 copyright transfers. 17 U.S.C. § 304(c). In addition, 17 U.S.C. § 203(a) allowed termination of <u>authors</u>' post-January 1, 1978 grants. The termination rights thus

21

covered both existing and future grants.

Congress' further extension of the copyright term in the 1998 Copyright Term Extension Act (Pub. L. 105-298 (1998); "CTEA") was coupled with a termination right in 17 U.S.C. § 304(d), for situations where section 304(c)'s right was not exercised by 1998. H.R. Rep. No. 105-452, 105th Congress, 2d Sess., at 8 (1998) (CTEA's intent was for "the original authors of works and their beneficiaries to benefit from the extended copyright protection"); *Mewborn,* 532 F.3d at 985 ("In 1998, Congress reaffirmed its objectives with respect to the 1976 Act's termination provisions."). For the first time, CTEA also provided termination rights to an author's estate, if the author left no spouse, child or grandchild. 17 U.S.C. § 304(c)(2)(D).

The termination right contrasts starkly with ordinary contract principles, empowering authors and heirs to terminate prior copyright grants *without cause,* regardless of the parties' intent when the grant was made. Congress carefully safeguarded the termination right to address the inequities caused by *Fred Fisher* and "assure that its new benefits would be for the authors and their heirs." *Mewborn,* 532 F.3d at 984. Thus, the right cannot be contractually waived or circumvented: termination "may be effected notwithstanding any agreement to the contrary," and grants of the reversionary termination interest are only effective if made after a termination notice has been served (if to the original grantee) or after

22

the effective termination date (if to third parties).  17 U.S.C. §§ 304(c)(5), (c)(6)(D).

The Supreme Court has recognized that these provisions reflect a concerted legislative effort to create an "inalienable authorial right to revoke a copyright transfer."  *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.3 (2001).

## II.   THE ORDER IMPROPERLY FOUND THAT THE 1992 PENSION AGREEMENT BARRED THE SHUSTER TERMINATION RIGHT

### A.   The Circuits' "Revocation And Re-Grant" Decisions

This Court has twice considered whether a post-1978 agreement purporting to revoke a pre-1978 grant and re-grant copyrights can legally prevent a subsequent statutory termination.  In *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005), the Court upheld such preclusion under the particular facts presented.  *Classic Media v. Mewborn*, 532 F.3d 978, 986 (9th Cir. 2008), applying *Milne*, reached the opposite result, finding an agreement "void as 'an agreement to the contrary'" under 17 U.S.C. § 304(c)(5).

Neither case questioned that the termination right cannot be waived or contractually circumvented, and both maintained Congress' mandate that the right can be exercised "notwithstanding any agreement to the contrary."  *Mewborn*, 532 F.3d at 988 (noting *Milne* never found "waiver or relinquishment of [the] right").

All that this Court found is that under certain circumstances some

23

agreements that effectively preclude termination are not "agreements to the contrary." Where an heir could have served a termination notice, but instead "use[s] the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, … it [is] tantamount to following the statutory formalities, and achieve[s] the exact policy objectives for which § 304(c) was enacted." *Mewborn*, 532 F.3d at 987. As such, the new post-1978 grant, even if it effectively precludes termination, is not "contrary" to the right because it achieves "the very result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1047. More simply, a post-1978 revocation and re-grant that achieves the "exact equivalent result" of a termination notice is not "an agreement to the contrary." *Mewborn,* 532 F.3d at 988.

Together, *Milne* and *Mewborn* map out when the negotiation of a new agreement is "tantamount to following the statutory formalities" of termination.

*Milne* dealt with the classic children's book *Winnie-The-Pooh*. In 1983, the author's son, Christopher Milne, held the termination right during an open termination window. 430 F.3d at 1046. "Faced with the possibility that Christopher might seek to terminate the rights," the publisher agreed to negotiate a new deal. *Id.* at 1040. The agreement ultimately reached expressly called for the "revocation of [the pre-1978] agreement[s] in favor of the new [1983] agreement, followed by the re-granting (on the same page) of the rights [back to the

24

publisher]," while the heirs received "a net gain of hundreds of millions of dollars." *Id.* at 1040-41.

Years later, the author's granddaughter sought to terminate, but Christopher's 1983 Agreement was not subject to termination. The Court held that the 1983 Agreement was not an "agreement to the contrary" because it achieved "the very result envisioned by Congress [in] the termination provisions." *Id.* at 1047. Christopher had used his termination right during an open termination window "as a valuable bargaining chip" to knowingly renegotiate a new grant and secure increased compensation based upon the highly-lucrative *Pooh* copyrights. *Id.* at 1046 (explaining the "1983 agreement exemplifies the increased bargaining power that Congress intended to bestow on authors and their heirs by creating the termination right").

*Milne* did not create a contractual "revocation and re-grant" loophole. As this Court explained in *Mewborn*:

> Our court in *Milne* did not find waiver or relinquishment of any right. What it did conclude was that the particular negotiated deal before it was not "any agreement to the contrary;" it was an agreement consistent with, and which fully honored Christopher's right of termination which could vest immediately if he served notice. As we noted, "[a]lthough Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal." [*Milne*, 430 F.3d] at 1045. The avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the congressional purpose underlying them.

532 F.3d at 988.

*Mewborn* revisited these issues with another classic, *Lassie Come Home*, and rejected the publisher's attempt to extend *Milne* beyond its "distinct factual scenario." *Id.* at 987. In 1976, the author's daughter, Winifred Mewborn, assigned her rights to a publisher. *Id.* at 980. In 1978, she signed a second contract, purporting to assign the same rights to the publisher in exchange for $3,000. *Id.* at 980-81 (the second contract "contained the identical transfer of … rights as the 1976 Assignment, but added language assigning ancillary rights"). Years later, Mewborn served a notice of termination of the 1976 grant, and the publisher sued, claiming that because the 1978 grant dealt with the same subject matter as the 1976 grant it was a "revocation and re-grant" under *Milne*. *Id.* at 981-82.

The Ninth Circuit rejected that argument and upheld Mewborn's termination on two principal grounds.

First, the 1978 grant was "void as an 'an agreement to the contrary' pursuant to [17 U.S.C.] § 304(c)(5)" (*id.* at 986) because Mewborn's agreement, unlike Christopher Milne's, did not fulfill the purposes of the termination right:

> Whereas Mewborn in 1978 did not even have the right to serve an advance notice of termination so as to vest her termination rights as to the Lassie Works, and could not have served advance notice for another six years as to the story and eight for the novel, the heir in *Milne* had the present right to serve an advance notice of termination, and could exercise it at any moment. Thus when the Milne heir chose to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the

26

same rights, ... it was tantamount to following the statutory
formalities, and achieved the exact policy objectives for which §
304(c) was enacted.

532 F.3d at 987. While Milne's agreement "expressly stated that it was made in

exchange for non-exercise of the immediately investive termination right,"

Mewborn's "was silent on the issue." *Id.* at 989. The earliest a termination could

take effect was 1994, and Mewborn had "nothing in hand with which to bargain."

*Id.* at 989. There was no evidence that the parties even "considered Mewborn's

termination rights," much less put them "on the bargaining table." *Id.* Nothing in

the 1978 agreement "reflect[ed] this intention or provid[ed] any consideration for

that right." *Id.* The Court also noted that Mewborn had signed the 1978 agreement

"'as is' without the advice of counsel and without negotiating any of its terms." *Id.*

As such, the agreement was not "tantamount to following the statutory formalities"

and did not "achieve[] the exact policy objectives for which § 304(c) was enacted."

*Id.* at 987. In short, the agreement, as construed by the publisher, was "contrary"

to the termination right.

Second, the 1978 grant could not have re-granted the copyrights because

Mewborn did not own them. *Id.* at 986. Unlike in *Milne*, the agreement did not

"expressly revoke[] the earlier … assignments." *Id.* at 989. "Because [the

publisher] owned the motion picture, television and radio rights to the Lassie

Works in 1978, Mewborn had nothing to transfer by virtue of the 1978

27

Assignment…. [T]he language in the 1978 Assignment purporting to assign the [same] rights is a nullity." *Id.* at 986.

The Second Circuit is the only other circuit to have considered these issues. Although not binding, its decisions accord with those of this Circuit.

In *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 283-84 (2d Cir. 2002), the publisher sought to preclude Captain America's co-creator, Joe Simon, from terminating a 1969 settlement agreement, citing a provision that characterized Simon's work as "for hire." A "work for hire" is not subject to termination. 17 U.S.C. §§ 304(c),(d). The Second Circuit held that, to the extent this provision was being used by the publisher to preclude termination, it "constitutes an 'agreement to the contrary' under § 304(c)(5)." *Id.* at 292. As *Mewborn* noted, *Simon* "affirmed that 'the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract,'" and "ruling otherwise would allow 'litigation-savvy publishers' to use their superior bargaining power to compel authors to similarly recharacterize their works, thus rendering § 304(c) a 'nullity.'" *Mewborn*, 532 F.3d at 985 (quoting *Simon*).

In *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), the Second Circuit confronted a situation like *Milne*. In 1994, John Steinbeck's widow, Elaine, "wielding the threat of termination" during an open window for key works (*e.g.*, "Of Mice and Men" (1938) and "The Grapes of Wrath" (1939)),

28

renegotiated her husband's prior grants with the publisher. *Id.* at 202. Like Christopher Milne, she entered into a new agreement that expressly revoked Steinbeck's pre-1978 copyright grants and re-granted his copyrights to the publisher: "when signed by Author and Publisher, [this agreement] will cancel and supersede the previous agreements." *Id.* at 196.

Steinbeck's sons later attempted to terminate the pre-1978 grants expressly revoked in 1994. The Second Circuit emphasized that in light of Elaine's termination right, her 1994 agreement included a "clear expression of intent to terminate all prior grants" and replace them with a post-1978 grant. *Id.* at 201. The Second Circuit, citing *Milne*, found that Elaine's agreement was not "contrary" to the termination right because she had leveraged her right during an open termination window to secure a substantially better deal. *Id.* at 197, 200, 202; 204 ("[Elaine] had the opportunity in 1994 to renegotiate the terms … for at least some of the works covered by the agreement were eligible … for termination."). *Steinbeck* concluded that this "appears to be exactly what was intended by Congress." *Id.* at 202.

Taken together, these cases establish that statutory heirs must be given the "opportunity … to use [their] termination rights." *Id.* at 204. When that opportunity comes along, they can exercise their termination rights by either serving a termination notice or leveraging those rights to secure a new agreement.

*Id.*; *Milne,* 430 F.3d at 1046; *Mewborn*, 532 F.3d at 988-89. If the new agreement is "tantamount to following the statutory formalities" and "land[s] the [heir] in the same place [he would be in] had he followed the formalities," the new agreement will not be void as "an agreement to the contrary." *Id.*

In essence, an explicit contractual termination and re-grant "in exchange for non-exercise of the immediately investive termination right," is not "contrary" to termination as it clearly satisfies Congress' concerted objective. *Mewborn,* 532 F.3d at 989; *Milne*, 430 F.3d at 1046.

**B.    The 1992 Agreement Does Not Preclude Termination, But If It Did, It Would Be Void As An "Agreement To The Contrary"**

The Order wrongly concluded that the 1992 Agreement "bars termination" (ER-16), that Frank and Jean revoked Shuster's copyright grants and re-granted his copyrights and thereby "exhausted the single opportunity provided by statute to … revisit the terms of Shuster's original grants." ER-11; *see* ER-13 ("[T]he 1992 Agreement, which represented the Shuster heir's opportunity to renegotiate the prior grants of Joe Shuster's copyrights, superseded and replaced all prior grants….").

**1.    Frank And Jean Did Not Have A Termination Right**

The 1992 Agreement did not provide Frank and Jean an "'opportunity … to use termination rights to enhance their bargaining power'" because neither they nor

30

anyone else held Joe's termination rights at the time. ER- 11 (quoting *Steinbeck*, 537 F.3d at 204). Under the 1976 Act, only authors, widows, children and grandchildren held termination rights. 17 U.S.C. § 304(c)(2) (1992). Joe left no widow or child. ER-119-20 ¶¶23-26. Frank and Jean were his siblings, and the Act has never given siblings termination rights. 17 U.S.C. § 304(c)(2). It was not until 1998 that Shuster's estate gained a termination right under CTEA.

Like Mewborn's, Frank and Jean's situation, was "a far cry from Christopher Milne's. Milne had – and knew that he had – the right to vest copyright in himself at the very time he revoked the prior grants and leveraged his termination rights to secure the benefits" of a new deal. *Mewborn*, 532 F.3d at 989. It was also a far cry from Elaine Steinbeck's situation, where she "wield[ed] the threat of termination" during an open termination window for key works. *Steinbeck*, 537 F.3d at 202. Frank and Jean were even worse off than Mewborn, who had a right to serve termination notices "six years later." *Mewborn*, 532 F.3d at 989.

DC's contemporaneous letters to Frank and Jean clearly state "you don't have any legal rights or claims whatsoever" (ER-706), much less the powerful termination right, making plain that termination was not "on the bargaining table" and no "consideration for that right" was being paid. *Mewborn*, 532 F.3d at 989.

It is unclear whether the Order misapprehended that Jean and Frank never

held termination rights or misunderstood its significance. The Order largely suggests incorrectly that Frank and Jean held the right. ER-11 (noting "the 1992 Agreement came about several years 'after the copyright owner felt empowered to exercise his right of termination'") (quoting *Milne*); 11 (referring to Frank and Jean and quoting *Steinbeck* for the proposition that heirs only have "'one opportunity … to use termination rights'"); 11 ("By taking advantage of this opportunity, [Frank and Jean] exhausted the single opportunity provided by statute … to revisit the terms of Shuster's original grants...."); 13 (the 1992 Agreement used up "the Shuster heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights").

At other points, the Order reverses course, concluding the 1992 Agreement was not an "agreement to the contrary" because Frank and Jean had no termination rights. ER-12 ("'[T]he agreement entered into by Jean and Frank did not deprive the Shuster heirs of any rights they could have realized at that time.'") (quoting *Steinbeck*, 537 F.3d at 203), 12-13 ("Nor, of course, could the parties have contemplated that Congress would create a second termination right six years later.").

The Order concludes that it "agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not 'an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.'" ER-13 (quoting *Steinbeck*).

32

This misapprehends *Steinbeck* and § 304(c)(5), which contains no *scienter* element and does not require that an agreement intentionally eliminate termination rights to be an "agreement to the contrary." *Simon*, 310 F.3d at 290-92 (invalidating 1969 agreement as "contrary" to termination rights, years before the rights existed).

In *Steinbeck*, Elaine had already "wielded" her termination right to renegotiate a better deal. Steinbeck's sons argued that this was an "agreement to the contrary" because it blocked their later acquired 304(d) termination right. In rejecting this, the Second Circuit did not hold that an agreement is "to the contrary" only when it precludes an extant termination right, as this would contradict its holding in *Simon*. Rather, *Steinbeck* narrowly held that it would not invalidate Elaine's 1994 grant "solely" on that ground, since it otherwise achieved Congress's purpose with respect to Elaine's section 304(c) termination right. 537 F.3d at 203. In other words, as in section 304(d) itself, the sons had no termination right, because the widow had effectively exercised her right under section 304(c).

The Order also suggests it was somehow sufficient that Frank and Jean were "aware" of the right and made stray references to it. ER-4, 10 ("Unlike … Mewborn, Jean and Frank were aware of the Copyright Act's termination rights when they bargained for and entered into the 1992 Agreement.").

This suggestion is flawed. The legally relevant point is that Frank and Jean had no termination right to leverage. DC indisputably knew that no one could

33

terminate Shuster's prior copyright grants in 1992. ER-1321-22 (DC: "DC had strong arguments in 1992 … that neither Jean nor anyone in her family was a statutory heir"). DC told Frank and Jean as much before they signed. ER-706 (DC: "As I hope you [Jean] recall from our meetings in New York, we've done extensive research into the copyright act and any potential rights that you and Frank may have…. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever."). Without a credible termination threat, Frank and Jean were like Mewborn – they "had nothing in hand with which to bargain." *Mewborn*, 532 F.3d at 989.

### 2. The 1992 Agreement Does Not Reflect Superman's Value

"The rationale behind the [1976 Act] was to 'safeguard authors against unremunerative transfers' and improve the 'bargaining position of authors' by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.'" *Milne*, 430 F.3d at 1046 (quoting H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) at 124). "More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985).

Under the 1992 Agreement, DC increased Frank's $5,000 annual pension

under the 1975 agreement to a combined annual pension of $25,000. ER-121-25
¶¶28-29. This modest increase of $20,000, split two ways, did not reflect any
meaningful renegotiation over Joe's Superman copyrights. This is unsurprising as
Frank and Jean held no copyrights or termination right. The agreement was an act
of charity, as DC confirmed to Jean: "After [Joe's] death, we raised $5,000 to
$25,000 a year without any legal obligation to do so, in deference to Joe's memory
and your role in his life." ER-706.

The Order misunderstood and refused to consider this point. ER-12 n.1
("Defendants believe Jean and Frank struck a bad deal … it is not this Court's
place to renegotiate the parties' contracts, notwithstanding Defendants' objection
that 'this small sum bears no relation to the value of Superman.'")

In *Milne, Mewborn* and *Steinbeck*, however, both this Court and the Second
Circuit found the economic terms of the new agreements legally relevant – not to
determine if they were good or bad, but to see if the heirs had achieved Congress'
objectives by meaningfully leveraging their termination rights.

In *Milne*, "the court relied on the facts that the new grant was more lucrative
for the author's heirs … and that the beneficiaries of the Pooh Properties Trust
were able to obtain considerably more money as a result of [the termination]
bargaining power wielded by … Christopher." *Mewborn*, 532 F.3d at 988; *see
Milne*, 430 F.3d at 1040-41, 1048 (Christopher "parlayed [his termination] right

into a new agreement" "result[ing] … in a net gain of hundreds of millions of dollars"). Similarly, *Steinbeck* stressed that Elaine secured a "far larger annual guaranteed advance, and royalties of between ten and fifteen percent of retail (rather than wholesale) sales." 537 F.3d at 196. This Circuit also emphasized that Mewborn "signed the contract 'as is' without the advice of counsel and without negotiating any of its terms," in noting that the $3,000 payment did not reflect "any consideration for [her termination] right." *Mewborn*, 532 F.3d at 989. The same applied to Jean and Frank. ER-121-26 ¶¶28-30.

It is not even close – the 1992 Agreement bears no relation to Superman's increased value since 1938.

### 3. Frank And Jean Did Not Expressly Revoke Joe Shuster's Copyright Grants Or Re-Grant His Superman Copyrights

The 1992 Agreement did not contain any revocation language, let alone the express revocation required by the cases. The *Milne* agreement expressly "provided for the revocation of the 1930 and 1962 agreements." 430 F.3d at 1040 (emphasizing "undisputed fact[] that the 1930 grant was expressly revoked"). The *Steinbeck* agreement expressly stated that it would "cancel and supercede the previous agreements, as amended, for the Works." 537 F.3d at 200. *Mewborn* stressed that the daughter's 1978 assignment did not expressly revoke her pre-1978 assignment. 532 F.3d at 988 n.7 (contrasting 1978 assignment with the *Milne*

agreement that "expressly revoked" the author's pre-1978 grants).

Here, the 1992 Agreement contained a boilerplate release:  it "fully settle[d] all claims … which [Frank and Jean] may have … regarding … Joseph Shuster['s]" copyright.  ER-704.  It did not even identify Shuster's prior contracts. *Compare Steinbeck*, 537 F.3d at 200 (new agreement recognized the "previous agreements, as amended"); *Milne*, 430 F.3d at 1040 (the "new agreement acknowledged the 1930 grant and the 1961 assignment").  Nor did it purport to revoke those prior contracts.  Indeed, although DC drafted the agreement, the words "revoke," "rescind," "cancel," "supersede," "replace" or their synonyms appear nowhere.

The Order nonetheless found that the 1992 Agreement's phrase "fully settles" operated to revoke Joe's prior copyright grants as a matter of law.  ER-7. The Order reasoned that "full settlement" means "a settlement and release of all pending claims between the parties." *Id.*  This does not add up.

First, the 1992 Agreement only "settle[d]" any claims that Frank and Jean may have had, and they had no claims under Shuster's Superman copyright grants, executed and fully performed decades earlier, and twice held to have transferred *all* of Joe's Superman rights to DC.  ER-107 ¶7; *National*, 508 F.2d at 912-913.

Second, even if Frank and Jean had "pending claims" under Shuster's prior grants, settling and releasing their claims is not equivalent to revoking the grant

itself. A "revocation" is an "annulment, cancellation, or reversal." Black's Law Dictionary at 1346 (8th ed. 2004). The settlement of a claim under an agreement does not annul, cancel, or reverse the agreement.

Nor can the 1992 Agreement be read to grant Shuster's original Superman copyright to DC. The 1992 Agreement did not revoke Shuster's prior grants, so DC still owned his copyrights, as held in *National*. DC admitted in **2011** that the 1992 Agreement did not revoke Shuster's prior grants: "**All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect**, and all rights under copyright granted therein are still owned exclusively by DC Comics." Request for Judicial Notice ("RJN"), Ex. 1 ¶87 (emphasis added); *id.* at Ex. 2, p.17 (DC: "[T]he Superman Notices purport to terminate Siegel's – but not Shuster's – participation in the [pre-1978] copyright grants to Detective. Therefore, even if the Superman Notices are effective, DC remains (through Shuster's unterminated interests) a co-owner of the copyrights…."").

*Mewborn* addressed this very issue in holding that Mewborn's purported 1978 "assignment" was a "nullity" because the publisher already owned the rights under an earlier assignment. 532 F.3d at 986. This situation is identical. DC had long owned all of Joe's rights pursuant to his pre-1978 grants. Frank and Jean had nothing to grant. To whatever extent the 1992 Agreement is read to grant Joe's Superman copyright to DC, it is a "nullity."

38

## C.   The Order Erred In Its Application Of New York Law

*Milne* and *Mewborn* both required that a valid "revocation and re-grant" be "express," not as a matter of state contract law, but of federal copyright law, to protect the termination right as Congress intended.  430 F.3d at 1040-44; 532 F.3d at 986-87.  The requirement that this be "expressly stated" is necessary to ensure that terminations do not devolve into a free-for-all of contract interpretation.  *Id.* at 989.  Neither case even mentioned state law in its discussion.  *Milne*, 430 F.3d at 1045 n.8 (California contract; sole reference to California law made in passing); *Mewborn*, 542 F.3d at 979-991 (New York contract; no reference to state law).

The Order failed to apprehend this, and jumped to New York law to hold that the 1992 Agreement impliedly replaced and superseded Shuster's Superman copyright grants.  ER-6.  Its analysis erred even under New York law.

### 1.   New York Law Requires That A Novation Be Clear And Unequivocal

New York cases do not use the term "revocation and re-grant."  The closest analogy is a novation or superseding agreement, when parties enter into "a substitute contract that replace[s] the original contract."  *Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, 1999 U.S. Dist. LEXIS 3973, at *21 (S.D.N.Y. Mar. 30, 1999); *see Jones v. Trice*, 608 N.Y.S.2d 688, 688 (Sup. Ct. 1994) (explaining "parties … can mutually agree to terminate [a prior contract] by expressly

assenting to its rescission while simultaneously entering into a new agreement").

"New York courts have set a stringent standard for novation." *Abuelhija v. Chappelle*, 2009 U.S. Dist. LEXIS 55861, at *16 (S.D.N.Y. June 29, 2009) (quotations omitted). "[B]oth parties must have 'clearly expressed their intention that a subsequent agreement superseded or substituted for an old agreement.'" *Id.* (citations omitted); *see Beck v. Mfrs. Hanover Trust Co.*, 125 Misc. 2d 771, 779 (N.Y. Sup. Ct. 1984) ("[T]o prove a novation, there must be a 'clear and definite intention on the part of all concerned that such is the purpose of the agreement. Not only must the intention to effect a novation be clearly shown, but a novation must never be presumed.'") (citation omitted); *Northville Indus. Corp. v. Fort Nexk Oil Term. Corp.*, 474 N.Y.S.2d 122, 125 (App. Div. 1984) (subsequent agreement supersedes an old agreement where parties have "clearly expressed … their intention"); *Frank Associates, Inc. v. John J. Ryan & Sons, Inc.*, 177 N.Y.S.2d 406, 407 (App. Div. 1952) ("It is also well settled that cancellation of a contract must be clearly expressed.").

The Order purports to acknowledge this stringent standard: "'parties can mutually agree to terminate [a prior contract] by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter.'" ER-6 (quoting *Steinbeck*). It then pivots and quotes *Goldbard v. Empire State Mut. Ins. Co.*, 171 N.Y.S.2d 194, 199 (App. Div. 1958)

40

to hold that a novation may be "'*expressed or implied*.'" ER-6 (emphasis by district court). *Goldbard*, however, did not purport to relax the standard for novation, and specifically stated that courts only "hasten to find an intention to have a substituted or superseding agreement … where … [there are] formalized papers with unequivocal language." *Id.* at 235. *Goldbard* found that the settlement agreement in question did *not* supersede the prior agreement because there was none of the "finality," "deliberateness" or "formalization with which one associates substituted agreements." *Id.* at 236.

### 2. The 1992 Agreement Was Not A Clear And Unequivocal Novation

The Order failed to consider the mandate that a novation requires a "clear and definite" and unequivocal expression of intent. *Beck*, 125 Misc. 2d at 779. Instead, it stretched and misread the 1992 Agreement to find a silent novation.

The Order emphasized the following language: "[T]his [1992] agreement *fully settles all claims to any payments or other rights or remedies* which you [Frank and Jean] *may have* under *any other agreement … in any and all work* created in *whole or in part by your brother, Joseph Shuster*" and "in any event you [Frank and Jean] now grant us any *such rights*." ER-7-8 (emphasis in Order).

First, nothing in this emphasized language or the 1992 Agreement "expressly assent[s]" to a supersission of Shuster's Superman grants, attempts to

41

rescind them, or even identifies them. The language is a boilerplate release and quitclaim of whatever rights Frank and Jean may have had (*i.e.*, none), insufficient for a novation. *See Abuelhija*, 2009 U.S. Dist. Lexis 55861, at *18 (standard merger clause that new agreement "'supersedes all understandings of the parties hereto'" insufficient to extinguish old agreement); *Multimedia Patent Trust v. DirecTV, Inc.*, 2011 WL 3610098, at *3 (S.D. Cal. Aug. 16, 2011) (New York law; "boilerplate" language "does not evidence a 'clear expression' of intent to extinguish a separate and distinct written contract" where new document "never uses the word 'novation' or mentions [the earlier agreement]"); *Schillitone v. Lewis Pub. Co.*, 171 N.Y.S. 262, 264 (App. Term 1918) (general release of claims was not a novation); *compare* ER-10 (relying on the "broad and all-encompassing language of the 1992 Agreement").

Second, contrary to the Order, the 1992 Agreement did not "deal with the same subject matter" as Shuster's 1938 Grant (ER-8), but only with the "rights or remedies which *you* [Frank and Jean] may have." ER-704. Frank and Jean had no rights or remedies with regard to Joe's Superman copyrights, long owned by DC pursuant to the fully performed 1938 Grant and other early grants. A novation was not even possible. *See Holland v. Fahnestock & Co., Inc.*, 210 F.R.D. 487, 489-90 (S.D.N.Y. 2002) (no novation where contract no longer executory, and transaction completed); 22A N.Y. Jur. Contracts § 473 ("A novation requires an existing

executory contract, and there cannot be a novation of a contract under which all transactions have closed.").

To the extent that the 1992 Agreement, which provided a $25,000 pension to Frank and Jean, dealt with the "subject matter" of a prior agreement, it was the 1975 Agreement, which gave Frank a $5,000 survivor pension. ER-119 ¶22. In fact, the day Frank signed the 1992 Agreement, he sent a letter expressly waiving his pension under the 1975 Agreement. ER-703. *See Davismos v. Halle*, 60 A.D.3d 576, 577 (App. Div. 2009) (noting "well-established rule" that "contemporaneous instruments ... are to be read together") (quotations omitted).

At most, the 1992 Agreement superseded the 1975 Agreement as to Frank's pension. The 1975 Agreement did not transfer Superman copyrights to DC.[1] To the contrary, it emphasized that DC was already the "sole and exclusive owner" of Superman and that Shuster "do[es] not now have, and will not in the future have, any rights." ER-662 ¶2, 670 ¶7.

For all of these reasons, the Order's conclusion that the 1992 Agreement unambiguously revoked and replaced Shuster's Superman grants is incorrect.

---

[1] DC conceded this issue. Section III.C, *infra*

### D.    The Order Failed To Address The Evidence

The Order selectively cited evidence it thought favorable to DC (ER-3, 4, 10), but failed to consider significant evidence that overwhelmingly supported the conclusion that the 1992 Agreement did not replace Shuster's venerable Superman copyright grants on which DC has long relied and continues to rely:

- Nobody testified that the 1992 Agreement was meant to replace Shuster's grants.  DC's long-time former President, Paul Levitz, who handled and signed the 1992 Agreement for DC, submitted a declaration in support of DC's motion which nowhere described the agreement as intending to replace Shuster's Superman grants.  ER-1229-1233.

- The 1992 Agreement does not remotely resemble the elaborate lengthy rights agreements customarily used by Warner/DC, which clearly define the rights transferred and include a plethora of other protective provisions.  ER-130 ¶35, 675-698, 721-52, 760-854.

- DC never registered the 1992 Agreement with the Copyright Office, as is customary to provide constructive notice of operative copyright assignments.  ER-133 ¶36, 710-18.

- The only chain-of-title documents even mentioning the 1992 Agreement which DC produced were two random 2006 and 2007 filings with foreign governments – and those filings also listed the1938 Grant and other pre-

44

1978 grants that DC here claims were revoked.  ER-67-83, 138-42 ¶¶39-41.[2]

- In response to the 2003 Termination, DC sent a 2005 letter to the Shuster Executor that nowhere mentions or alludes to the 1992 Agreement.  ER-895-901.  DC was utterly silent about the 1992 Agreement until filing this lawsuit in 2010.

- As noted, DC admitted in 2011 that "[a]ll grants made by Siegel and Shuster or rights in Action Comics No. 1 [first Superman story] are still in effect" – contradicting DC's allegations that the 1992 Agreement replaced Shuster's grants.  RJN, Ex. 1 ¶87.

It defies credibility that DC's lawyers would have exchanged its longstanding chain-of-title to Superman, upheld in two court judgments, for the ephemeral language in the 1992 pension agreement, without any reason to do so, or that DC/Warner Bros. and their many media partners would ever accept such a document as the legal foundation for their multi-billion dollar Superman franchise.

* * *

Ultimately, this case and the 1992 Agreement do not resemble *Milne* or *Steinbeck*, but rather *Mewborn*.  Like Mewborn, Frank and Jean had no termination

---

[2] Despite defendants' clear discovery requests for "all communications with third parties that refer to the 1992 agreement," and DC's representations that it had conducted an "exhaustive review," DC withheld these documents until it chose to use them in briefing.  ER-34-40, 56.

right and no leverage to negotiate a new contract regarding the lucrative Superman copyrights. The 1992 Agreement did not "fully honor[]" or secure the "exact equivalent result" of a non-existent termination right, *Mewborn*, 532 F.3d at 988, nor did it achieve from any perspective "the very result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1047. Only the Termination represents the single "opportunity … to renegotiate the terms of [Joe's] 1938 [Grant] to [the Shusters'] benefit." *Steinbeck*, 537 F.3d at 204. This Court should allow them that opportunity.

## III. DC'S OTHER ARGUMENTS FOR INVALIDATING THE TERMINATION ALSO FAIL AS A MATTER OF LAW

### A. The Order Correctly Found That The Shuster Estate Possessed A Majority Interest

Pursuant to 17 U.S.C. § 304(c)(4), termination notices must be signed "by the number and proportion of the owners of [the author's] termination interest required" to terminate. Part (3) of DC's First Claim (ER-1581-83 ¶¶118-24) alleged that "the Estate did not own the requisite majority interest" because 50% of the right had supposedly been transferred to defendant PPC pursuant to the 2001 and 2003 PPC Agreements, cancelled in 2004. ER-894.

DC's argument fails. Under section 304(c)(2)(D), the termination right was solely owned by the Shuster Executor, who duly signed his termination notice.

ER-156-57 ¶58. The PPC Agreements could not have transferred any portion of the right to PPC, because it is not transferrable and held only by statutorily-defined classes (widows, children, grandchildren, and executors), of which PPC was not a member. 17 U.S.C. § 304(c)(2)(A)-(D).

Nor could the PPC Agreements have transferred Shuster's Superman copyrights to PPC. The PPC Agreements were entered into before the service and effective date of the Termination. Before a termination notice is served, the copyrights to be recaptured cannot be anticipatorily transferred; after service but prior to the effective termination date (here, October 26, 2013), that interest can only be assigned to the terminated grantee or its successor (here, DC). 17 U.S.C. § 304(c)(6)(D).

As the Order correctly held, the 2001/03 PPC Agreements, pre-dating both the service *and* effective date of the Termination, "do not alter the fact that the right to serve the Shuster Termination could not have been transferred to PPC'" and "those agreements did not and, indeed, could not have" transferred those rights. ER-15. DC itself admitted this elsewhere in its complaint and briefs. ER-1313:13-15, 1594-95 ¶¶167-68. Part (3) of DC's First Claim was properly denied.

### B. The Shuster Executor Possessed The Termination Right

#### 1. Absent Statutory Heirs, Executors Hold Termination Rights

Part (1) of DC's First Claim (ER-1577-79 ¶¶107-11) argues that the Shuster

47

Executor did not have a § 304(d) termination right.  The statute shows otherwise.

Section 304(d) provides a second termination right for copyrights in their renewal term on CTEA's effective date (October 27, 1998), where Section 304(c)'s termination right was not exercised and "expired" by October 27, 1998. The Superman copyrights in the Termination were from <u>1938</u>.  ER-153 ¶53.  The termination right can only be exercised in time "windows" defined in § 304(c)(3)-(4).  A § 304(c) termination must be served no later than 59 years after copyright is secured.  *Id*.  Accordingly, 1997 was the latest a § 304(c) termination notice could have been served regarding the 1938 works at issue – but none was.  ER-120 ¶24.  The § 304(c) termination right expired before October 27, 1998, without being exercised.

The Executor thus "own[s] the author's entire [§ 304(d)] termination interest" under a plain reading of 17 U.S.C. § 304(c)(2)(D):  "if the author's widow or widower, children, and grandchildren are not living, the author's executor … shall own the author's entire termination interest."

### 2. DC's "Not Living" Argument Fails

DC erroneously argued that § 304(d) termination rights only pass to an executor if an author's widow, children and grandchildren are "'not living,' but [] did at some time live."  ER-1578-79 ¶111.  According to DC, if an author died prior to 1998, without exercising his termination right and without a widow or

48

child, the right did not "expire" within the meaning of § 304(d) and does not pass to his estate.

This strained interpretation contradicts the plain language and intent of the statute. Courts interpret a statute by looking at the "the language," and "[w]hen the words of a statute are unambiguous, judicial inquiry is complete." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003) (quotations omitted). Section 304(c)(2) establishes four classes who may exercise termination rights: (1) widow(ers), (2) children, (3) grandchildren, and (4) if there are none, the executor. The inclusion of estates was deliberate:

> What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren? ***Under the 1976 Act at its passage, the result was that no one could exercise the right of termination***. That harsh result persisted for the current Act's first two decades. Then in the [CTEA], Congress ameliorated that result. Effective from October 27, 1998 onward, ***the termination right, instead of lapsing in these circumstances, belongs to "the author's executor, administrator, personal representative, or trustee***."

3 M. & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 11.03[A][2][a] (quoting § 304(c)(2)(D)) (emphasis added).

Section 304(d) was designed to "correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously, whether through neglect or inability." *Id.*, § 11.05[B][2] at 11-40.12. Such "inability" could arise, as here, "because no one was alive to effectuate termination," and CTEA "solves that latter situation" through § 304(c)(2)(D). *Id.* at 25.2.

49

The only reasonable interpretation is that Congress gave § 304(d) termination rights to the author's estate/executor if he had no widow, children or grandchildren. *See* H.R. Rep. No. 105-452 at 8 (CTEA "allows an author's executor to receive his entire termination interest"). DC argued that CTEA was not intended "to open the door to an entirely new class of persons" (ER-1327), but it was intended to do and did exactly that.

DC's argument that "not living" under § 304(c)(2)(D) means "once living, now deceased" (ER-1578-79 ¶111) also contradicts the meaning of "not living" under the Copyright Act. The Act's termination provisions provide a right to recapture the extended "renewal" copyright. 17 U.S.C. § 304(c), (d). A related sub-section regarding the renewal copyright, 17 U.S.C. § 304(a)(1)(C), uses identical language (*i.e.*, "if such author, widow, widower, or children are not living") as that in § 304(c)(2)(D).

Under DC's self-serving interpretation of "not living," a renewal copyright could not vest in an estate under § 304(a)(1)(C)(iii) unless the author was survived by a spouse or child, who then died. Yet the courts – including the Supreme Court – have *consistently* held that such renewal rights are owned by an estate, even if the author had no spouse or children. *See Stewart v. Abend*, 495 U.S. 207, 212 (1990) (renewal copyright vested in executor where author had no widow or children); *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 374–75

(1960) (construing "not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased" and holding "not living" covers situations where the author had no spouse or child).

"Not living" must be interpreted consistently in the related renewal and termination contexts, and DC's arguments rejected. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 562 (1995) (holding "'identical words used in different parts of the same act are intended to have the same meaning'" under the "'normal rule of statutory construction'") (citation omitted); *Batjac Prods., Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223, 1228 (9th Cir. 1998) (same).

### 3.    Shuster's Section 304(c) Termination Right "Expired"

DC's other argument was based on similar wordplay regarding "expired." Joe Shuster's § 304(c) termination right was not exercised and expired by October 27, 1998, making his estate eligible for the § 304(d) termination right. DC argued that the Executor held no § 304(d) termination right because Joe died without a widow or child and for that reason his rights purportedly did not "expire," but were "extinguished." ER-1578-79 ¶¶109-111.

DC's argument does not hold water. The Copyright Office states, without preconditions or qualification, that under § 304(d) "the termination right will have

'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured,"
regardless of whether the author lived to that date. 67 Fed. Reg. 69134, 69135.
Courts routinely use "expired" to describe rights lost upon death. *See Groucho
Marx Prods. v. Day & Night Co.*, 689 F.2d 317, 320 (2d Cir. 1982) ("[T]he right is
not descendible and expires upon the death of the person so protected.") (citation
omitted); *Milton H. Greene Archives v. CMG Worldwide*, 568 F. Supp. 2d 1152,
1156 n.6 (C.D. Cal. 2008) ("[T]hat right expired on an individual's death.").
Indeed, *Steinbeck*, 537 F.3d at 196, plainly states that § 304(d)'s "statutory
termination rights expire upon [] death." DC's erroneous interpretation of
"expired" must be rejected.

### C.    The Termination Properly Listed All Copyright Grants

Termination notices are to contain "[a] brief statement reasonably
identifying the grant to which the notice of termination applies." 37 C.F.R. §
201.10(b)(1)(iv). The Termination listed the 1938 Grant and six other DC
agreements, to the extent such are construed as grants. ER-153-54 ¶54. Part (4) of
DC's First Claim (ER-1583 ¶¶125-28) alleged that the Termination is invalid
because it failed to list (i) a May 21, 1948 consent judgment ("1948 Judgment")
and (ii) the 1992 Agreement.

The 1992 Agreement was not an operative Superman copyright grant, as
shown above.

DC's equally dubious argument that the 1948 Judgment was a grant, and that the failure to list it invalidated termination, was roundly rejected by the district court previously: "[the 1948 Judgment] did not effectuate any transfer of rights from Siegel and Shuster to [DC]" and "simply memorialized the transfer" that had already occurred, and need not be listed on termination notices. *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal 2008). DC conceded that it did not challenge that adjudication on appeal (ER-163 ¶69), also did not challenge that adjudication on summary judgment below (ER-453), and waived any right to argue the issue now. *See Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004).

## D. There Are No "Unclean Hands" Barring Termination

The last part of DC's First Claim (ER-1584-86 ¶¶129-33) consisted of vague and baseless "unclean hands" arguments. The Order did not reach this issue, but it may properly be decided as a matter of law because DC's allegations show that there were no "unclean hands." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (affirming denial of "unclean hands" on summary judgment); *Toshiba Am. Info. Sys., Inc. v. Advantage Telecom, Inc.*, 19 F. App'x 646, 648 (9th Cir. 2001) (same).

### 1. PPC's Exclusion Was Proper

The first part of DC's "unclean hands" claim erroneously alleges that not

listing "[PPC's] purported ownership interest in the rights … to be terminated" was a "material misrepresentation intended to mislead the courts, Copyright Office, and DC Comics." ER-1584 ¶¶129-30. This makes no sense.

As shown above, the termination interest could not be anticipatorily transferred to PPC as a matter of law under § 304(c)(6)(D).

Nor was there any intent to mislead, despite DC's rhetoric. The Shusters and PPC voluntarily cancelled the ineffective PPC Agreements in 2004. ER-894. The Shusters and PPC voluntarily produced the PPC Agreements and 2004 cancellation to DC in 2006 during discovery in *Siegel*. ER-167-68 ¶77; 1462-63 ¶¶6-7. These actions bely any intent to "mislead" and bar DC's unsupported "deception" theory. *See Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1983) (rejecting "unclean hands" theory where registrations listed wrong owner because "inaccuracies in copyright registrations do not bar actions for infringement. … [P]laintiffs did in fact effectuate the necessary correction through transfers of interest.").

The closest analogy to DC's vague "unclean hands" claim is that of a "fraud on the copyright office," where a defendant accused of infringement tries to invalidate a copyright. This carries "a heavy burden." *Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000), citing 2 *Nimmer* § 7.20[B]. A party must prove the application was "factually inaccurate, that the inaccuracies were willful

or deliberate, and that the Copyright Office relied on those misrepresentations."

*Shady Records, Inc. v. Source Enters., Inc.*, 2004 U.S. Dist. LEXIS 26143, at *28

(S.D.N.Y. December 30, 2004). "Neither innocent misstatements, nor deliberate,

but nonmaterial misstatements, will overcome the presumption of validity." *Id.*

The PPC Agreements could not transfer the termination interest, so neither the

Termination nor its filing were "factually inaccurate," and there were no

misrepresentations to the Copyright Office. *See id.* at *28–*32 (finding "no

alleged omissions or misstatements" because the plaintiff "was indeed an owner of

copyright interests in [the song] at the time of the basic registration;" noting even

"deliberate, but nonmaterial" misstatements were insufficient).

## 2. The Executor's Decision Not To Terminate Superboy Was Proper

The second part of DC's "unclean hands" claim was based on the proper

exclusion of "Superboy" from the Termination. ER-1584-86 ¶¶131-33. This also

fails as a matter of law.

First, DC's "unclean hands" claim regarding Superboy is premised on the

Shuster Executor not making a "Superboy" claim against DC, so the Siegels could

bring a Superboy infringement suit based on Jerry Siegel's sole authorship of

Superboy. ER-1573-74 ¶90. Essentially, DC sued the Shusters for not terminating

or suing DC regarding Superboy. Leaving aside the obvious legal shortcomings,

DC did not meet its burden of presenting credible evidence to support its claim, and every relevant witness denied DC's speculation. ER-183 ¶17.

Moreover, if the Shuster Executor had served a Superboy termination notice, that would not have prevented the Siegels from asserting that Siegel alone created Superboy in their infringement claim. DC cannot invalidate the Shuster Termination because the Siegels filed a legal claim DC disagrees with and that the Shusters could not prevent.

Second, the Executor's legal decision not to terminate Superboy was correct. In 1938-1940, Jerry Siegel independently developed Superboy in a script he submitted to DC, which rejected it. ER-104-10 ¶¶6, 8-10. In 1944, while Siegel was abroad in World War II, DC published Superboy as a new character in *More Fun Comics*, No. 101, and later comics, based on Siegel's material but without his consent. ER-109-10 ¶10. When Siegel and Shuster jointly sued DC in the 1947 Action, Siegel **individually** claimed DC had no Superboy rights, and that he owned Superboy. ER-104-06 ¶6; ER-559-63 ¶¶25-39 (1947 Action complaint; "Superboy" allegations repeatedly referring to "the plaintiff, SIEGEL" alone, not Shuster). The court agreed, and held that "Plaintiff Siegel" – not Shuster – "is the originator and sole owner of the comic strip feature SUPERBOY" (ER-636 ¶25), and enjoined DC from publishing Superboy. ER-108-09 ¶8. The Second Circuit later found the 1947 Action's findings preclusive. *National*, 508 F.2d at 913-14.

The Siegels' Superboy termination was <u>expressly based</u> on the "binding" 1947 Action, as affirmed in *National*. ER-325 n.1. The Shuster Executor thus properly chose not to include Superboy in his Termination.

Third, termination is discretionary, not mandatory. The Executor's well-reasoned decision not to file a Superboy termination notice was based on the above, but even if he had refrained as a litigation tactic that could not constitute "unclean hands" as a matter of law. *See Williams Gold Refining Co. v. Semi-Alloys, Inc.*, 434 F. Supp. 453, 457 (W.D.N.Y. 1977) (no unclean hands where there was "a justifiable reason" for litigation strategy); *Gucci Am., Inc. v. Guess?, Inc.*, 2012 WL 2304247 (S.D.N.Y. June 18, 2012) (unclean hands inapplicable to "a tactical choice rather than an 'unconscionable act'"); *Lucky's Detroit, LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012) ("litigation tactics" do not constitute "unclean hands").

Fourth**,** DC's attempts to supplement its infirm argument made no sense. DC argued that Siegel and Shuster "co-created" Superboy, citing random instances where a "boy Superman" appeared in early Superman works. ER-470. The 1947 Action specifically found that such Superman material "did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY" that Siegel created. ER-628 ¶¶164-66. Moreover, to the extent "Superman as a youth" was depicted in the early works listed in the Termination, such depictions were duly "terminated"

57

by the Executor. ER-885-87 ¶2. DC also cited renewal notices filed by Siegel and Shuster in the late 1960's as to Superman and Superboy works, but those renewal notices were held invalid, and are not binding. *National,* 508 F.2d at 912-13.

As DC's "unclean hands" allegations are insufficient as a matter of law to invalidate the Termination, part (5) of its First Claim should be rejected.

## IV. DC'S THIRD CLAIM FAILS AS A MATTER OF LAW

### A. <u>The Third Claim Was Moot</u>

DC's Third Claim was entirely pled "in the alternative – *i.e.,* if the Court does not grant DC's First Claim for Relief." ER-1594 ¶166. Because the district court granted the First Claim and invalidated the Termination (ER-15), the Third Claim was moot, per DC's complaint.

DC's Third Claim was also functionally moot, because it alleged violations of DC's purported "right" under § 304(c)(6)(D) to "exclusive negotiations" with the Executor to repurchase the Superman copyrights recaptured by the Termination. The Order held the Termination ineffective, and that the Shusters did *not* recover any Superman copyrights. ER-13, 16. DC could not have been denied a "right" regarding a purportedly non-existent interest.

Notwithstanding this, the claim was moot insofar as it sought to invalidate the PPC Agreements, which defendants voluntarily cancelled in 2004 and conceded were ineffective. ER-894.

"The Constitution limits the jurisdiction of the federal courts to live

controversies…." *Kittel v. Thomas*, 620 F.3d 949, 951 (9th Cir. 2011); *see also*

*DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1174 (9th Cir. 2005) ("[W]e

have no authority 'to give opinions upon moot questions … or to declare

principles or rules of law which cannot affect the matter in issue in the case before

[us].' The federal courts do not, and cannot, render advisory opinions.") (citations

omitted). DC's Third Claim should have been dismissed as moot.

### B.   Section 304(c)(6)(D) Does Not Provide DC With Any Right

DC's Third Claim also fails as a matter of law because it is premised on a

non-existent "right" under 17 U.S.C. § 304(c)(6)(D) to exclusively negotiate the

purchase of the Shuster termination interest. The unambiguous statute provides

DC with no such "right," and both case law and the leading treatises confirm that

none exists. Section 304(c)(6)(D) simply states:

> A further grant, or agreement to make a further grant, of any
> right covered by a terminated grant is valid only if it is made
> after the effective date of the termination. As an exception,
> however, an agreement for such a further grant may be made
> between the [author/heirs] … and the original grantee or such
> grantee's successor in title, after the notice of termination has
> been served ….

This plain language simply limits a terminating party's ability "to make a further

grant;" it does not give the terminated grantee an affirmative "right." In finding

such right, the Order ignored the statutory language. ER-16.

DC's theory was also expressly rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), where a terminated grantee claimed rights to "an exclusive period of negotiation" under § 304(c)(6)(D):

> ***Nor does the statute [§ 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights.

*Id.* (citations omitted) (emphasis added). *Bourne* thus rejected the notion of an "exclusive negotiation period," finding nothing that says "a [third party] grant is valid only if *negotiated* after the termination date." 675 F. Supp. at 865 n.11.

*Bourne* also rejected the argument that § 304(c)(6)(D) is "'in the nature of a right of first refusal;'" for if Congress intended such a right, "it would have done so in clear language." *Id.* at 865; *see also* 3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010) ("[§ 304(c)(6)(D) is] sometimes erroneously described as a 'right of first refusal.'"); *Milne,* 430 F.3d at 1048 (noting as to termination rights, "if Congress intended [a requirement] it would have clearly said so").

Simply put, neither the statute nor case law supports DC's Third Claim.

### C.    DC Lacks Standing To Bring Its Third Claim

The Order implicitly and erroneously found that DC had standing under § 304(c)(6)(D).  A terminated grantee has "no rights under [§ 304(c)(6)(D)], [it]

cannot sue for failure to comply, and the provision therefore does not provide a basis for standing." 6 *Patry on Copyright* § 21:18. Unless Congress plainly shows "an intent to create not just a private right but also a private remedy," then "a cause of action does not exist and courts may not create one." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Order pointed to nothing in § 304(c)(6)(D) that gives DC such a private remedy or standing.

### D. The Third Claim Is Time-Barred

DC's Third Claim is subject to the Copyright Act's three-year statute of limitations. 17 U.S.C. § 507(b). DC's claim is expressly based on *the text* of the 2001/2003 PPC Agreements (cancelled in 2004). ER-1328-30, 1595 ¶169. Those PPC Agreements were produced to DC and DC took deposition testimony about them by November 2006, placing DC on notice of its claim. ER-167-68 ¶¶77-78. DC's Third Claim thus expired in November 2009, six months before this suit was filed. ER-1620. The Order simply ignored the statute of limitations pled (ER-1369 ¶192, 1411 ¶191, 1448-49 ¶191) and argued by defendants (ER-1020, 1227), just as it ignored the fact that the Third Claim was pled in the alternative.

## **CONCLUSION**

The district court's Order should be reversed, and the case remanded with instructions to enter judgment in defendants' favor on the First and Third Claims.

Dated:  March 5, 2013          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____

Marc Toberoff

Attorneys for Defendants-Appellants

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Defendants identify the appeal in *DC Comics v. Pacific Pictures Corp., et al.*, 9th Circuit Case No. 11-56934, as related to this case as it arises out of the same district court case as the instant appeal.

Defendants further identify the appeal and cross-appeal in *Larson v. Warner Bros. Entertainment Inc., et al.*, 9th Circuit Case Nos. 11-55863, 11-56034, as related to this case as they arise out of the related district court case, *Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx). Oral argument was heard by the same panel in both appeals on November 5, 2012, and decisions were issued on January 10, 2013. No petitions for rehearing or rehearing *en banc* were filed from those decisions. This case has been assigned to that same panel.

Dated: March 5, 2013      TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff

Marc Toberoff

Attorneys for Defendants-Appellants

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that Defendants' attached opening brief is proportionately spaced, has a typeface of

14 points or more, and contains 13,688 words, as measured by the Microsoft Word

program used to generate the brief.

Dated: March 5, 2013      TOBEROFF & ASSOCIATES, P.C.

                                    /s/ Marc Toberoff

                                    Marc Toberoff

                                    Attorneys for Defendants-Appellants

## STATUTORY ADDENDUM

### 17 U.S.C. § 304

(c) Termination of Transfers and Licenses Covering Extended Renewal Term. – In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

> (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

> (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by

regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

68

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the

effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) Termination Rights Provided in Subsection (c) Which Have Expired on or before the Effective Date of the Sonny Bono Copyright Term Extension Act. — In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license

of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the excerpts of the record was deferred.

Dated: March 5, 2013          TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams
Keith G. Adams