Appeal No. 12-57245
Oral Argument Scheduled for May 23, 2013
(Reinhardt, J.; Thomas, J.; Sedwick, D.J.)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

PACIFIC PICTURES CORPORATION ET AL.,
*Defendants and Appellants*,

*v.*

DC COMICS,
*Plaintiff and Appellee*.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-10-3633 ODW (RZx)

————————————

## ANSWERING BRIEF OF APPELLEE DC COMICS

————————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Plaintiff and Appellee DC Comics*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, plaintiff-appellee DC Comics ("DC"), by and through its counsel of record, hereby discloses that DC is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are indirect, wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation. Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC.

In the body of the brief that follows, "DC" refers to DC Comics as well as its predecessors and successors.

Dated: April 12, 2013

O'MELVENY & MYERS LLP

By:    /s/ Daniel M. Petrocelli
        Daniel M. Petrocelli
        Attorneys for DC

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..........................................................................1

INTRODUCTION ................................................................................................1

STATEMENT OF ISSUES PRESENTED.............................................................4

STATEMENT OF THE CASE..............................................................................4

STATEMENT OF FACTS ....................................................................................7

      A.    Joe Shuster's Agreements And Relationship With DC .......................7

      B.    Jean Peavy's 1992 Agreement With DC.............................................9

      C.    Jean's Son, Mark Peary ...................................................................12

      D.    Marc Toberoff And His Company Intervene .....................................13

      E.    The District Court's Summary Judgment Ruling ..............................16

STANDARD OF REVIEW .................................................................................17

SUMMARY OF ARGUMENT ...........................................................................18

ARGUMENT .....................................................................................................20

      I.    THE 1992 AGREEMENT INVALIDATES THE SHUSTERS'
            2003 TERMINATION NOTICE. .......................................................20

            A.    Statutory And Legal Background ...........................................20

            B.    As In *Milne* And *Steinbeck*, The 1992 Agreement
                Superseded All Of Joe Shuster's Pre-1978 Copyright
                Grants And Regranted Those Copyrights To DC...................24

                1.    The 1992 Agreement Operates Like The
                        Agreements In *Milne* And *Steinbeck*.............................24

## TABLE OF CONTENTS

2.    The 1992 Agreement Superseded—And Thereby Revoked And Replaced—Joe's Pre-1978 Grants As A Matter Of New York Law. ...................................27

3.    Appellants' Remaining Arguments That The 1992 Agreement Did Not Supersede Joe's Pre-1978 Grants Lack Merit. ........................................33

C.    As in *Milne* and *Steinbeck*, The 1992 Agreement Was Not A Prohibited "Agreement To The Contrary." ..................35

1.    Neither The Statute Nor Relevant Case Law Requires An Author Or Heir To Have Live Or Imminent Termination Rights Before Entering Into An Enforceable Agreement To Revoke And Replace Pre-1978 Grants. ...............................35

2.    The Value Of The 1992 Deal Is Immaterial To Its Enforceability. ..............................................44

3.    Appellants' "Alienability" Arguments ..........................46

D.    The Court Did Not Fail To Consider Any Material Evidence. ...................................................47

II.    IF THE COURT REVERSES THE RULING ON DC'S FIRST CLAIM, IT SHOULD REMAND FOR CONSIDERATION OF THE OTHER CHALLENGES DC RAISED TO THE TERMINATION NOTICE. ...........................................49

III.    TOBEROFF'S LOCK-UP AGREEMENTS ARE INVALID UNDER 17 U.S.C. § 304(c)(6)(D) ....................................50

CONCLUSION .....................................................54

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Abuelhija v. Chappelle*,
  2009 WL 1883787 (S.D.N.Y. June 29, 2009) ....................................................32

*ACLU of Nev. v. City of Las Vegas*,
  333 F.3d 1092 (9th Cir. 2003) ...........................................................................17

*Adelman v. Christy*,
  90 F. Supp. 2d 1034 (D. Ariz. 2000) ...................................................................32

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ...........................................................................................52

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) ...........................................................................................53

*Blair & Co. v. Otto*,
  5 A.D.2d 276 (N.Y. App. Div. 1958) ........................................................... 30-31

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987)............................................................... 53, 54

*Brandt-Erichsen v. U.S. Dep't of Interior*,
  999 F.2d 1376 (9th Cir. 1993) ...........................................................................50

*Cervantes v. Countrywide Home Loans, Inc.*,
  656 F.3d 1034 (9th Cir. 2011) ...........................................................................48

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008)..................................................................... *passim*

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003)..............................................................................34

*Cort v. Ash*,
  422 U.S. 66 (1975)..............................................................................................53

*DC Comics v. Pac. Pictures Corp.*,
  2013 WL 120807 (9th Cir. Jan. 10, 2013) ................................................... 15, 51

*DC Comics v. Pac. Pictures Corp.*,
706 F.3d 1009 (9th Cir. 2013) ................................................................7

*de Osorio v. Mayorkas*,
695 F.3d 1003 (9th Cir. 2012) ..............................................................17

*Effects Assocs., Inc. v. Cohen*,
908 F.2d 555 (9th Cir. 1990)................................................................34

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000) ..............................................................22

*First Pac. Bancorp, Inc. v. Helfer*,
224 F.3d 1117 (9th Cir. 2000) ..............................................................52

*Fletcher v. Peck*,
10 U.S. 87 (1810)..................................................................................34

*Frank Assocs., Inc. v. John J. Ryan & Sons*,
117 N.Y.S.2d 406 (App. Div. 1952) .....................................................32

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943)........................................................................ 23-24

*Goldbard v. Empire State Mut. Ins. Co.*,
5 A.D.2d 230 (N.Y. App. Div. 1958) ...................................................28

*Golden Gate Hotel Ass'n v. City & Cnty. of S.F.*,
18 F.3d 1482 (9th Cir. 1994)................................................................49

*Goldome Corp. v. Wittig*,
221 A.D.2d 931 (N.Y. App. Div. 1995) ...............................................30

*Harrison W. Corp. v. United States*,
792 F.2d 1391 (9th Cir. 1986) ..............................................................29

*Heller v. Pal*,
2003 Cal. App. Unpub. LEXIS 9059 (Cal. Ct. App. Sept. 23, 2003)...................31

*Holland v. Fahnestock & Co.*,
210 F.R.D. 487 (S.D.N.Y. 2002) ..................................................... 34-35

*In re Estate of Molino*,
165 Cal. App. 4th 913 (2008) ...............................................................28

*In re Fischer*,
116 F.3d 388 (9th Cir. 1997)................................................................34

*In re Kalt's Estate*,
16 Cal. 2d 807 (1940) .........................................................................28

*In re Pac. Pictures Corp.*,
679 F.3d 1121 (9th Cir. 2012) .............................................................14

*In re WorldCom, Inc.*,
2007 WL 2049723 (S.D.N.Y. July 13, 2007) .............................. 28, 31

*Indep. Energy Corp. v. Trigen Energy Corp.*,
944 F. Supp. 1184 (S.D.N.Y. 1996).....................................................31

*Koenig Iron Works, Inc. v. Sterling Factories, Inc.*,
1999 U.S. Dist. LEXIS 3973 (S.D.N.Y. Mar. 30, 1999) .....................32

*La France v. Georgetown Univ. Hosp.*,
1988 WL 135066 (D.D.C. Dec. 9, 1988)........................................ 31-32

*Liberal v. Estrada*,
632 F.3d 1064 (9th Cir. 2011) .............................................................54

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002).............................................. 24, 44, 46, 47

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ..................................................... *passim*

*Multimedia Patent Trust v. DirecTV, Inc.*,
2011 WL 3610098 (S.D. Cal. Aug. 16, 2011) .....................................32

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) .............................................................50

*N.Y. Times Co., Inc. v. Tasini*,
533 U.S. 483 (2001)............................................................................46

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*,
    597 F.2d 314 (2d Cir. 1979)................................................................30

*Nat'l Am. Ins. Co. v. Hogan*,
    173 F.3d 1097 (8th Cir. 1999) ..........................................................32

*Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*,
    100 A.D. 2d 865 (N.Y. App. Div. 1984) ............................................32

*OK Sales, Inc. v. Canadian Tool & Die, Ltd.*,
    2009 U.S. Dist. LEXIS 26403 (N.D. Okla. Mar. 31, 2009) ................31

*Orlando Orange Groves Co. v. Hale*,
    161 So. 284 (Fla. 1935).....................................................................32

*Palm Desert Art, Inc. v. Mohr*,
    2001 U.S. Dist. LEXIS 620 (N.D.N.Y. Jan. 26, 2001)................................. 30, 34

*Penguin Grp. (USA) Inc. v. Steinbeck*,
    537 F.3d 193 (2d Cir. 2008).......................................................... *passim*

*Pope v. Sav. Bank of Puget Sound*,
    850 F.2d 1345 (9th Cir. 1988) .................................................... 44-45

*Private One of N.Y., LLC v. JMRL Sales & Serv., Inc.*,
    471 F. Supp. 2d 216 (E.D.N.Y. 2007) ...............................................29

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*,
    204 F.3d 867 (9th Cir. 2000)............................................................53

*R&R Recreation Prods., Inc. v. Joan Cook Inc.*,
    1992 WL 88171 (S.D.N.Y. Apr. 14, 1992)........................................47

*Ray Charles Found. v. Robinson*,
    2013 WL 358174 (C.D. Cal. Jan. 25, 2013) ......................................53

*Ruttenberg v. Davidge Data Sys. Corp.*,
    215 A.D.2d 191 (N.Y. App. Div. 1995) ............................................29

*Schillitone v. Lewis Publ'g Co.*,
    171 N.Y.S. 262 (App. Term 1918) ...................................................32

*Siegel v. Nat'l Periodical Publ'ns, Inc.*,
508 F.2d 909 (2d Cir. 1974) ........................................................... 8, 33

*Siegel v. Nat'l Periodical Publ'ns, Inc.*,
364 F. Supp. 1032 (S.D.N.Y. 1973) .................................................... 33

*Simplex, Inc. v. Diversified Energy Sys., Inc.*,
847 F.2d 1290 (7th Cir. 1988) ........................................................... 34

*Singleton v. Wulff*,
428 U.S. 106 (1976) .................................................................. 19, 49

*Stewart v. Abend*,
495 U.S. 207 (1990) .................................................................. 44, 46

*Thomas v. Lewis*,
945 F.2d 1119 (9th Cir. 1991) ........................................................... 18

*Touche Ross & Co. v. Redington*,
442 U.S. 560 (1979) ...................................................................... 52

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) .................................................................. 52, 53

*Wang v. Chen*,
1992 WL 7840 (S.D.N.Y. Jan. 10, 1992) ............................................... 28

*Weiner v. McGraw-Hill*,
57 N.Y.2d 458 (1982) .................................................................... 45

*Willeke v. Bailey*,
189 S.W.2d 477 (Tex. 1945) ............................................................ 32

## **STATUTES**

17 U.S.C. § 24 (1909) .................................................................... 23

17 U.S.C. § 203 ...................................................................... 21, 41

17 U.S.C. § 304 .................................................................... *passim*

28 U.S.C. § 1291 .......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 1338 .......................................................................................1

Pub. L. No. 100-568, 102 Stat. 2853 (1988).........................................47

Pub. L. No. 105-298 (1998) ...................................................................23

## OTHER AUTHORITIES

W. PATRY, PATRY ON COPYRIGHT (2009) ................................................54

BLACK'S LAW DICTIONARY (6th ed. 1990) .............................................29

BLACK'S LAW DICTIONARY (9th ed. 2009) .............................................29

H.R. REP. NO. 94-1476 (1976)................................................... 22, 36, 52

SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH
    CONG. 72 (1965)...............................................................................21

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW,
    94TH CONG. 304 (1975).....................................................................21

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW,
    94TH CONG. 307 (1975).....................................................................52

## RULES

FED. R. CIV. P. 54(b) ............................................................................1, 7

FED. R. CIV. P. 56(d) ......................................................................... 48, 49

FED. R. EVID. 406 ...................................................................................34

FED. R. EVID. 408 ...................................................................................48

## STATEMENT OF JURISDICTION

The district court had jurisdiction over DC's First and Third Claims. *See* 28 U.S.C. §§ 1331, 1338. This Court has jurisdiction over the parts of those claims on which the district court ruled. *See id.* § 1291; FED. R. CIV. P. 54(b); *infra* 49-50.

## INTRODUCTION

This is the fourth appeal related to the rights in Superman to come before this Court in the past year. *Infra* 56-57. And it is the second appeal involving the enforcement of a straightforward contract concerning the disposition of such rights.

The appeal concerns a "1992 Agreement" between Jean Peavy ("Jean"), the sister of Superman co-creator Joe Shuster ("Joe"), and DC Comics ("DC") concerning Joe's rights in Superman. In her capacity as named executrix and sole beneficiary of Joe's will, Jean entered a 1992 contract with DC superseding and thereby revoking all of Joe's prior Superman copyright grants to DC and regranting those rights to DC in exchange for lifelong annual payments to Jean.

In 2003, Jean's son purported to terminate Joe's copyright grants, citing § 304(d) of the Copyright Act, which allows authors and heirs to terminate certain copyright grants. But § 304(d) *only* permits the termination of grants made *before* January 1, 1978. Because the 1992 Agreement revoked all of Joe's pre-1978 grants and replaced them with a new, post-1978 grant, the district court correctly held that there were no grants for Joe's nephew to terminate in 2003.

This holding followed ineluctably from the plain language of § 304(d), the history of the Act, and *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005), and *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008). In *Milne*, the heir to the author of *Winnie the Pooh* similarly entered into a post-1978 agreement (1983) that revoked the author's 1930 grant of rights and regranted those same rights. Another heir later tried to terminate the 1930 grant, but this Court held that the 1930 grant "was terminated … upon the execution of the 1983 agreement." 430 F.3d at 1042. "[T]here was no pre-1978 grant … in existence" when the heir tried to terminate, and thus her termination notice was invalid. *Id.*

*Steinbeck* reached the same result. There, a post-1978 agreement by the beneficiary of an author's will "superseded" the author's pre-1978 grants of rights. 537 F.3d at 201-02. Because the pre-1978 grant "no longer existed" when later heirs tried to terminate it, their termination notice was held invalid. *Id*.

So too here. The 1992 Agreement terminated and superseded Joe's pre-1978 grants. Because there was no pre-1978 grant in existence when Joe's nephew served a termination notice in 2003, the notice is invalid. Appellants' objections to that result reduce to two propositions. The first is that the 1992 Agreement did not supersede Joe's pre-1978 grants. That argument is contrary to the plain language of the Agreement and an unbroken line of New York authority holding that such language operates to supersede prior agreements concerning the same subject.

Appellants' other argument is that even if the 1992 Agreement did supersede Joe's pre-1978 grants as a matter of state law, the Agreement is prohibited by the Copyright Act, because Jean did not have a termination right under the Act when she executed the 1992 Agreement. However, neither the Act nor its drafting history includes such a requirement, as *Steinbeck* rightly held. *Steinbeck* enforced a post-1978 revocation-and-regrant contract (made in 1994), even where the regranting party had no termination right in 1994, and even where the termination notice other heirs later sought to pursue, as here, was enabled by Congress in 1998, years after the post-1978 agreement. 537 F.3d at 200-04; ER-12.

Appellants rely heavily on *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 986-89 (9th Cir. 2008), but the whole point of *Mewborn* was that the post-1978 agreement there did *not* supersede any pre-1978 grants (which remained subject to termination)—all the new contract did there was grant new, additional post-1978 rights (which no one sought to terminate). Neither *Mewborn* nor any other case holds that a post-1978 agreement to revoke and replace a pre-1978 grant can be enforced only upon a showing that the author or heirs possessed present statutory termination rights. And for good reason: such a rule would be harmful to heirs and authors, who would be barred from obtaining remunerative copyright regrants until the limited statutory window to terminate opened. Unsurprisingly, Congress rejected the rule Appellants proffer, and made clear, as this Court held in *Milne*,

-3-

that "parties may contract, as an alternative to statutory termination"—and may do so "*at any time*." 430 F.3d at 1046 (italics added); *Steinbeck*, 537 F.3d at 203.

In short, the correct result here is the one compelled by *Milne* and *Steinbeck* and reached by the court below: the 1992 Agreement is a lawful supersession of Joe's pre-1978 grants, thereby eliminating the pre-1978 grants and precluding them from being terminated a second time now. The district court's other rulings are also either correct or not before this Court. Issues the district court did *not* reach should be left for any remand. But there should be no remand. The rights at issue here were lawfully granted to DC by contract in 1992, and nothing in the Copyright Act precludes its enforcement. The judgment should be affirmed.

## STATEMENT OF ISSUES PRESENTED

1. Whether the Shusters' 2003 copyright termination notice is invalid in light of the parties' 1992 Agreement.

2. Whether Marc Toberoff's "lock-up" agreements are invalid.

## STATEMENT OF THE CASE

This appeal involves two declaratory relief claims DC brought against the Shuster Heirs,[1] Toberoff, and Pacific Pictures (Toberoff's company) concerning DC's rights in Joe Shuster's Superman copyrights. In 2003, the Shuster Estate

---

[1] The "Shuster Heirs" are (1) <u>Jean</u>, Joe's sister; (2) <u>Mark Peary</u>, Jean's son; and (3) the <u>Estate of Joseph Shuster</u> (the "Shuster Estate"), for which Peary serves as personal representative.

-4-

(through Peary and Toberoff) filed a copyright termination notice purporting to recapture from DC certain of Joe's Superman copyrights, effective October 2013. ER-878-93. DC filed this lawsuit in 2010. In its First Claim, DC sought a declaration that the Shuster Estate's termination notice was invalid on five independent grounds, ER-1577-86:

- "(1) There Is No Statutory Basis for the Shusters to Terminate";
- "(2) The 1992 Agreement Bars the Shusters from Pursuing Termination";
- "(3) The Shusters Lack the Majority Interest Necessary to Terminate";
- "(4) The Shusters Do Not Attempt to Terminate Certain All-Encompassing Copyright Grants"; and
- "(5) The Doctrine of Unclean Hands Bars the Shusters from Terminating."

DC's Second Claim sought a declaration concerning its rights, if the termination was held valid. ER-1586-94. Its Third Claim alleged that lock-up agreements that Toberoff induced the heirs to sign violated the Copyright Act. ER-1594-96.[2]

Appellants moved to dismiss DC's claims under Rule 12, but withdrew their motions when their anti-SLAPP motion challenging DC's state-law claims was denied. SER-150-60. In their Rule 12 motions, Appellants conceded that New York contract law governed the question whether the 1992 Agreement superseded Joe's prior copyright grants. ER-6.

---

[2] DC's remaining claims—its Fourth to Sixth Claims, on which the district court recently granted Appellants summary judgment, in part, *see* Dist. Ct. Dkt. No. 613—are not before this Court.

-5-

In July 2012, DC moved for summary judgment on its First and Third Claims. DC pressed only *three* of the five foregoing grounds for judgment on its First Claim—*i.e.*, the 1992 Agreement barred the 2003 termination notice; the Shusters lacked the "majority interest" required to terminate; and that the Shusters had no statutory basis to terminate. ER-1306-08. Appellants opposed and cross-moved for judgment on the entirety of DC's First, Second, and Third Claims. ER-986-89, 1198-1228. DC opposed the cross-motion and showed how the arguments Appellants raised were wrong and premature. ER-447-76, 221-29.

The district court ruled on these cross-motions in October 2012, granting judgment in DC's favor on its First and Third Claims and denying Appellants' cross-motion. ER-1-18, 23. The court agreed with DC's lead argument on its First Claim and held that the parties' 1992 Agreement rendered the Shusters' 2003 termination notice invalid. ER-5-13. The court rejected DC's majority-interest ground for invalidating the notice. ER-13-15. It held that DC's Second Claim was moot in light of its ruling on the First Claim. ER-18 n.3. And it declined to reach the other grounds raised—noting, *e.g.*, that the parties' arguments on these grounds were moot and the briefing on them too "perfunctory" to resolve them. ER-15-16.

Appellants did not ask the district court to rule on these unresolved grounds. Rather, they moved to vacate the summary judgment order citing alleged discovery abuses by DC, about which they had complained in briefing summary judgment.

ER-28-48, 58-61; SER-7-22.  Alternatively, they moved the court to grant partial

judgment on DC's First and Third Claims under FED. R. CIV. P. 54(b).  ER-986-

1021.  The court denied Appellants' motion to vacate and granted their Rule 54(b)

motion.  ER-24-27.  Appellants timely appealed, ER-19-21, but did not appeal the

court's ruling denying their motion to vacate.  DC did not cross-appeal and does

not challenge here the court's ruling on its majority-interest argument.

## STATEMENT OF FACTS

As the court below noted, "the following facts are undisputed."  ER-2.  The

court recounted these facts in its opinion and citations to the underlying record and

explained how Appellants' objections to certain facts were not well-founded or

were forfeited.  ER-2-5, 12, 14.  In the fact section that follows, DC cites the

court's opinion concerning these facts (its "ER 1-18" cites), except when referring

to undisputed record facts not addressed in the court's opinion.

### A.     Joe Shuster's Agreements And Relationship With DC

Jerry Siegel and Joe Shuster created "Superman" in the 1930s, but could not

find a publisher for their story.  *DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009,

1011 (9th Cir. 2013).  In 1938, DC, which was employing Siegel and Shuster to

work on other features, decided to include a Superman story in the comic book

*Action Comics No. 1* ("*AC#1*").  ER-2, 1254-56.  In March 1938, Siegel and

Shuster assigned to DC, in a two-paragraph copyright grant, the "exclusive right to the use of the [Superman] characters and story" ("1938 Assignment").  ER-2, 552.

After *AC#1* was published in April 1938, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  ER-2.  They were compensated with royalties and bonuses, both of which increased with the success of Superman.  *Id*.  The *Saturday Evening Post* reported that, in 1942 alone, the pair stood to make over $2 million, in today's terms.  *Id*.

Despite their success, Siegel and Shuster's relationship with DC soured.  In 1947, they sued DC to invalidate the 1938 Assignment and challenge DC's publication of Superboy stories.  ER-2, 553-95.  A court ruled that the 1938 Assignment granted DC all rights to Superman, but not Superboy.  ER-632, 636-37.  This case settled while on appeal.  ER-2, 649-59.  In 1969, Siegel and Shuster again sued, contending that they owned renewal copyrights in *AC#1*.  The court rejected the claim, holding that the 1938 Assignment conveyed "all" of their rights to DC.  *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 913-14 (2d Cir. 1974).

Siegel and Shuster fell on hard times and asked DC for help.  ER-660-61.  "In a 1975 agreement, DC provided Siegel and Shuster with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as 'credits' on new Superman works."  ER-2.  Over time, DC "voluntarily increased the annual

-8-

payments; made periodic cost-of-living adjustments; g[ave them] special bonuses; and paid to have Siegel, Shuster, and their families travel to Superman-related events…. All told, the Siegels and Shusters [were] paid over $4 million [in cash] under the 1975 Agreement, not including medical benefits or bonuses." ER-3.

In 1976, Congress amended the Copyright Act to allow authors and certain of their heirs to terminate prior copyright grants by authors. Neither Siegel nor Shuster ever attempted to exercise this putative right—although they could so starting in 1984, and each lived into the 1990s. ER-2-3, 359-422.

Joe died on July 30, 1992. ER-3. He "had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate." *Id.* On August 17, 1992, Jean filed an affidavit in California probate court identifying herself as Joe's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." ER-3.

## B.  Jean Peavy's 1992 Agreement With DC

On August 21, 1992—four days after filing her affidavit in probate court— Jean wrote to DC, identifying herself as "'heir to [Joe Shuster's] Will.'" ER-3. Paul Levitz, DC's then-publisher, had already offered to cover Joe's funeral expenses, ER-302, but Jean requested further help, explaining that Joe left "an estate of almost nothing" and "a burden of large unpaid debts." ER-3, 302-04. Jean asked DC to pay Joe's "final debts and expenses" and provide other help. *Id.*

-9-

DC agreed to cover Joe's debts, and also offered to quintuple the amount of the annual payments DC would make to Joe's brother Frank pursuant to the 1975 Agreement—which gave Frank, who had done work as an illustrator with Joe, the right to receive annual payments upon Joe's death. *Id.*; ER-662-73, 1238-40, 1245. On September 10, 1992, Frank wrote to Levitz, saying he was "extremely pleased" with DC's offer, but, after "discuss[ing] this good news with" Jean, asked that DC instead make the annual, lifetime payments to Jean, who had no rights under the 1975 Agreement. Jean would "'send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him].'" *Id.* ER-3, 1242. Frank wrote it was Jean's "'suggestion that if payments were made in her name, she would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act.'" ER-1242.

Jean and Frank met with Levitz in New York to discuss the proposed deal. ER-3, 1231 ¶ 7. During his decades running DC, "Levitz dealt with many authors and heirs." ER-4. He testified that when "DC agreed to grant an author or heir's request for additional money, [he] would give them this admonition: 'this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC.'" *Id.*; ER-1232. Levitz reiterated this condition to Frank and Jean during their 1992 meeting, and Frank and Jean confirmed they understood and agreed. ER-1231. Appellants

chose not to depose Levitz concerning this testimony, did not dispute its veracity, and offered no contrary testimony. ER-1046-47.

Following this meeting, the parties signed the agreement that is now at the center of this appeal. This October 2, 1992, contract confirmed that DC would "cover Shuster's debts and pay Jean $25,000 a year for the rest of her life." ER-4. "In exchange," as the court below held, the heirs "unmistakably … supersede[d]" all prior copyright grants Joe had made to DC and "re-granted all of Shuster's rights to DC." ER-4, 10. The 1992 Agreement states in pertinent part, ER-6:

> We [DC] ask you to confirm by your signatures below that this agreement *fully settles all claims* to any payments or other rights or remedies which you may have under *any other agreement or otherwise*, whether now or hereafter existing *regarding any copyrights*, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, *you now grant to us any such rights* and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

Frank executed a second agreement with DC on the same day, in which he "waived any rights" he had under the 1975 Agreement. ER-703. Appellants concede that when Jean entered the 1992 Agreement, she knew that Superman was a great commercial success. SER-61, 201-02.

"Over the next decade, DC maintained good relations with the Shusters." ER-4. Frank died in 1994, but Jean and Levitz corresponded often, trading some 60 letters between 1992 and 2003. *E.g.*, ER-4, 705-09, 719-20, 753-54, 759, 895-

904, 1232. In her letters, "Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required." ER-4.

For example, in a 1993 letter, Jean confirmed she would "'stick to our bargain'" and not attempt "'to reclaim the Superman copyright'"—although she did ask for an increase in payments "plus a yearly increment to account for inflation." *Id.* DC disagreed that she had any rights to pursue, but paid the bonus. ER-5. In 1999—after Congress amended the termination law, and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC—Jean reiterated her commitment "to honor" the 1992 Agreement:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus this year as you had done many times in the past. ER-4; SER-14.

Jean often asked for such bonuses, and every year between 1993 and 2001 (except 1997), DC paid them. ER-5. Peary testified his mother was of sound mind when she sent these letters. *Id.*; ER-465, 1054. DC paid Jean over $600,000 under the 1992 Agreement and related bonuses, and it continues to make payments to her today. ER-1232; SER-63-65, 67-68, 70-71, 73-74, 111-12, 116-17, 122, 124-25.

## C.    Jean's Son, Mark Peary

Jean and her 51-year-old son, Peary, live together in her New Mexico home. SER-175-76. Peary, who has pursued work as a musician, actor, investor, and

writer, admits his relationship with Joe was attenuated; he saw his uncle (who lived in New York and Los Angeles) only a few times in his entire life, and they never discussed Superman copyrights.  SER-76-77, 79, 82-107, 177-79, 184-85, 192-95.

Throughout the 1990s, DC enjoyed positive relations with Peary.  He helped his mother calculate Joe's debts in connection with the 1992 Agreement, ER-4, 1048-50, 1245, and at Jean's request, DC helped Peary with his writing career. ER-1232; SER-76-77, 79.  In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel"—which detailed how Shuster and DC became estranged, but then how Shuster and DC made amends and DC credited and compensated him for his creations.  ER-1232; SER-82-107.  In 1999—after the Copyright Act was amended, and after Siegel's family had filed its Superman termination notices—Peary wrote Levitz again.  He shared a revised draft of his script and asked Levitz whether the Siegels' termination effort "would interfere with us selling our screenplay?"  ER-1232; SER-119.  Peary neither challenged the 1992 Agreement nor said he believed his family retained rights to terminate.  *Id.*

### D.  Marc Toberoff And His Company Intervene

Warner Bros. (with whom Levitz had shared the script) never purchased Peary's screenplay, and without his mother's knowledge and with no warning to DC, Peary began looking for ways in 2001 to claim an interest in Superman.  ER-909-10, 1232; SER-109, 119, 198-99.  His mother's will was re-written to name

-13-

Peary (and not his sister, Dawn) as Jean's sole heir should Peary survive Jean. ER-1128-29; SER-148-49. Peary also contacted Toberoff, who, as this Court has noted, had by then "set his sights on Superman" and wished "to capture Superman for himself." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1124-25 (9th Cir. 2012).

After meetings with Peary, "Toberoff created a joint venture between the [Shuster] Heirs" and Toberoff's company, Pacific Pictures. *Id.* Jean played no role in negotiating the 2001 joint venture, and Peary sought no outside counsel to help him negotiate or assess its legality. SER-140-41, 199-200. This Court has previously noted the ethical concerns this raised. *Pac. Pictures*, 679 F.3d at 1124.

In their November 2001 "Joint Venture Agreement," Peary and Jean "assigned … all current and future rights" in Superman to the venture. ER-755. The agreement barred Peary and Jean from making any deals with DC concerning Superman without Pacific Pictures' consent. ER-756. It also provided that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%)" by the Shusters and 50% by Pacific Pictures. ER-757. Jean first saw and signed the 2001 agreement after Peary and Toberoff finalized it, SER-199-200, and she testified her "son handles everything legal" and she did not "know what's going on," ER-433.

In 2003, Peary initiated proceedings to probate Joe's estate—even though, in 1992, Jean had already petitioned the probate court. ER-855-57; SER-135-36.

-14-

Peary sought to replace Jean as executor.  *Id.*  On behalf of the newly created Estate, Peary and Jean reaffirmed the 2001 Pacific Pictures Joint Venture.  ER-874-77.  In this new 2003 contract, Peary, Jean, and the Estate again promised to make no deals with DC without Toberoff's consent.  ER-875.  As the district court noted, Peary also "admitted under oath that he understood when he signed the [2003 contract] 'that all of [the] Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture.'"  ER-14.  (Peary and Toberoff concede that Toberoff told Peary in 2004 that the Pacific Pictures contracts were "not lawful."  SER-210-13; ER-17; *see* SER-53-54).

Acting for the Estate, Peary then served a copyright termination notice on DC purporting to take effect on October 26, 2013 (the "Notice").  ER-878-93.  The Notice deceptively omitted any mention of the Joint Venture or Pacific Pictures.  ER-14-15.  DC disputed the Notice and tried unsuccessfully to settle the claims asserted.  ER-895-901.  The Shusters never sued to enforce the Notice, and DC, in the ensuing years, focused on lawsuits with the Siegel heirs.  In 2008, Toberoff had Peary, Jean, and the Siegels sign yet another lock-up agreement, prohibiting either family from entering into an agreement with DC without the other's consent.[3]

---

[3] While Appellants claims this lock-up was made in connection with a 2008 mediation, this Court noted the "agreement appears to bind the heirs long after the expiration of any settlement negotiations."  *DC Comics v. Pac. Pictures*, 2013 WL 120807, at *1 (9th Cir. Jan. 10, 2013); *see* SER-197 (Peary admitting same).

### E.     The District Court's Summary Judgment Ruling

DC filed this action in 2010.  Its First Claim sought a declaration that the Shuster Notice is invalid.  ER-1577-86.  The primary ground DC urged in support of this claim on summary judgment was that "The 1992 Agreement Bars the Shusters from Pursuing Termination," because it revoked all pre-1978 copyright grants Joe made to DC and replaced them with a post-1978 grant *not* subject to termination under the Copyright Act.  ER-1156-63, 1315-23.

The district court agreed.  Under New York law, the court explained, parties can revoke and replace a prior agreement by "'assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter.'"  ER-6.  The 1992 Agreement was such an agreement because its "broad and all-encompassing language … unmistakably operates to supersede all prior grants," in that it "deals squarely with the same subject matter as the parties' earlier agreements, settling and displacing 'all claims …. under any agreement' 'or otherwise' related to 'any and all' works 'created in whole or in part by … Joseph Shuster.'"  ER-10.  The 1992 Agreement "superseded and replaced all prior grants of the Superman copyrights" and, "as a post-1978 grant, it is not subject to termination under 17 U.S.C. § 304(d)."  ER-13.

Citing *Milne*, *Steinbeck*, and *Mewborn*, the court rejected Appellants' contention that the 1992 Agreement was an invalid "agreement to the contrary."

-16-

ER-9-13.  The 1992 Agreement, like the agreements in *Milne* and *Steinbeck*, was a fully permissible post-1978 revocation and regrant—and "[a]s in *Milne*, [Appellants] 'present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights.'"  ER-11.  Unlike in *Mewborn*—where no revocation-and-regrant agreement was ever made—here Appellants "offered no evidence," except "conclusory" denials that they "did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants."  *Id*.

The district court then denied one of the other four grounds DC had urged in support of its First Claim—*i.e.*, that the Estate lacked the majority-interest required to terminate, ER-13-15—and declined to address the other three grounds, ER-15-16, 18.  The court held that DC's Second Claim was moot, and granted DC judgment in part on its Third Claim, holding that Toberoff's lock-up agreements "run afoul of 17 U.S.C. § 304(c)(6)(D)."  ER-16-17, 23.

## STANDARD OF REVIEW

This Court reviews "de novo a district court's grant of summary judgment." *de Osorio v. Mayorkas*, 695 F.3d 1003, 1011 (9th Cir. 2012).  The district court's rulings that Appellants failed to dispute various fact issues by making conclusory denials are reviewed for abuse of discretion, *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003), as are Appellants' challenges concerning

-17-

DC's discovery conduct, *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991).

## SUMMARY OF ARGUMENT

I.  The district court correctly granted DC judgment on its First Claim, holding that the 1992 Agreement superseded Joe Shuster's pre-1978 copyright grants to DC and replaced them with a new 1992 grant.  Section 304(d) of the Copyright Act, on which Appellants rely, allows for termination of only *pre*-1978 copyright grants.  *See Milne*, 430 F.3d at 1043; *Steinbeck*, 537 F.3d at 200.  *Milne* and *Steinbeck* establish that where a post-1978 agreement supersedes and replaces a pre-1978 grant, there is no longer a pre-1978 grant to terminate under § 304.  That rule applies here.  Like the post-1978 agreements in *Milne* and *Steinbeck*, the 1992 Agreement superseded and replaced all of Joe's prior copyright grants with a new, post-1978 grant by: (1) "fully settl[ing]" all rights and claims the Shusters had under any agreement concerning Joe's copyrights; and (2) granting those same copyrights to DC.  ER-7.  Both New York contract law and copyright-termination precedents from this Court and others not only support, but compel this conclusion.

Over the life of this case, Appellants have advanced a number of competing arguments to avoid this outcome.  They asserted New York law applied, then recanted.  ER-6.  They argued this Court in *Mewborn* "limited" *Milne*, and *Steinbeck* could be ignored, SER-163, 166, but now say the cases are in harmony.  They argue copyright termination rights are "inalienable" until an heir both

possesses and asserts those rights, but the text of the Copyright Act and its legislative history, like *Milne* and *Steinbeck*, reject Appellants' reading of the Act as well as their arguments about the Act's impact on ordinary contract law. Appellants also assert that the 1992 Agreement lacks the necessary magic words, is too short, was not recorded, and lacked sufficient consideration. The undisputed record and established case law refute all such arguments.

Moreover, contrary to Appellants' suggestion, *Mewborn* does not prohibit enforcement of the 1992 Agreement as an "agreement to the contrary" under § 304(c)(5). Unlike in *Milne*, *Steinbeck*, and here, the post-1978 agreement in *Mewborn* did not supersede any pre-1978 grant, but, rather, expressly left the grant "intact" and hence still subject to termination. 532 F.3d at 986. *Mewborn* simply holds that an heir's post-1978 transfer of *additional* rights cannot defeat an heir's right to terminate a still-existing pre-1978 grant. That rule has no application here.

II. In addition to challenging the district court's ruling on the 1992 Agreement, Appellants challenge on appeal several rulings the court *never* made. Appellants challenged every ground DC asserted in support of its First Claim; DC argued two were not properly before the court; and the court declined to reach those two grounds and ruled that briefing on yet a third ground was too perfunctory to resolve. This Court normally "does not consider an issue not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), and it should not do so here.

-19-

III.  The district court granted DC summary judgment on its Third Claim, holding that Toberoff's "rights-encumbering agreements" violate § 304(c)(6)(D). ER-17, 23.  This Court need not reach this issue unless it reverses the court's ruling on DC's First Claim, but if the Court does reach it, the ruling should be affirmed. Congress described § 304(c)(6)(D) as "a right of 'first refusal'" running in favor of parties like DC, and protecting them from third parties like Toberoff who "traffic[] in future [copyright] interests."  *Milne*, 430 F.3d at 1047; ER-16.  Where, as here, Congress creates such a right, the intended beneficiary of the right may sue to enforce it.  While Appellants also argue, in passing, that DC's Third Claim is untimely, they concede that DC's challenge to their 2008 lock-up agreement is within the limitations period, thereby defeating this argument.

## ARGUMENT

## I.    THE 1992 AGREEMENT INVALIDATES THE SHUSTERS' 2003 TERMINATION NOTICE.

### A.    Statutory And Legal Background

The 1976 Copyright Act's termination provisions were the product of many years of deliberation and negotiation.  They were not designed simply to provide windfalls to authors or their heirs, as Appellants suggest.  Rather, Congress carefully crafted the provisions as a compromise between authors and heirs (who sought to capture the increased market values in their original creations) and copyright grantees like DC (who had spent decades developing the value in works

like Superman in reliance on their existing copyrights). *E.g.*, SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH CONG. 72 (1965) (termination rules a "compromise" designed to provide "benefit to authors … without being unfair to publishers, film producers, and other users"); SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975) (provisions "balance the interests of individual authors and their transferees"); *Milne*, 430 F.3d at 1045-56.

Congress struck this balance in a number of important ways:

• *First*, the termination rights created by § 304 apply only to copyright grants made *before* "January 1, 1978." 17 U.S.C. §§ 304(c), (d). Thus, grants made *after* the 1978 cut-off date are secure from termination under § 304. That provision contrasts with § 203, which authorizes the termination of certain grants made by authors *after* January 1, 1978. 17 U.S.C. § 203. Section 203 is not implicated here, but it underscores the limitation of § 304 to pre-1978 grants.

• *Second*, Congress made clear that, *after* 1978, authors and heirs may lawfully enter into new contracts superseding pre-1978 grants and replacing them with new, *post*-1978 grants *not* subject to § 304 termination. Such "post-1978 agreement[s] superseding pre-1978 agreement[s]" were "'expressly contemplated and endorsed by Congress,'" because they "enable[d] an author's statutory heirs to renegotiate the terms of an original grant *with full knowledge of the market value of the works at issue*." *Steinbeck*, 537 F.3d at 203 (following *Milne*; italics added).

As *Milne* explained, "Congress specifically stated that it did not intend for the statute to 'prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one[.]'" 430 F.3d at 1045 (quoting H.R. REP. NO. 94-1476 at 127). Congress "anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by replacing it with a new one." *Id*. at 1046 (same). "Nothing" in the Act "'change[s] the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment.'" *Id*. (same at 142).[4]

*Steinbeck*, 537 F.3d at 203, agreed with this Court in *Milne*, holding: "There is … no indication in the statutory text or the legislative history of the [Act] that elimination of a termination right through termination of a pre-1978 contractual grant was precluded or undesirable." To the contrary, so long as a "post-1978 agreement effectively terminates a pre-1978 grant" under ordinary state contract-law principles, "Congress did not manifest any intent for the earlier agreement to survive simply for purposes of exercising a termination right in the future." *Id.*

It is thus true only in the most limited sense that the "termination right contrasts starkly with ordinary contract principles." OB-22. The Act does permit authors and heirs to override certain *pre-1978* contracts during the termination

---

[4] The legislative history of the 1976 Copyright Act is considered particularly instructive given its 20-year drafting process. *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1079 (9th Cir. 2000).

window. But as *Milne* and *Steinbeck* make clear, after 1978, the Act and "ordinary contract principles" permit parties to revoke pre-1978 grants and replace them with new, post-1978 grants that are not subject to the § 304 termination regime.

• *Third*, Congress limited the authors and heirs who may terminate. Artists who created works-for-hire may *not* terminate under § 304, as they are not "authors" of those works. OB-28; 17 U.S.C. §§ 304(c), (d). Congress also limited the heirs who could terminate to authors' surviving spouses, children, or grandchildren. 17 U.S.C. § 304(c)(2) (1976). Congress expanded the list in 1998 to include authors' executors, administrators, personal representatives, or trustees, Pub. L. 105-298 (1998), but when it did so it left in place the critical 1978 cutoff, allowing this new class of heirs to terminate *only pre*-1978 grants made by authors, and *not* post-1978 revocation-and-regrants made by their heirs, 17 U.S.C. § 304.

• *Fourth*, Congress addressed a policy concern created by *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943). Under the 1909 Copyright Act—which governs pre-1978 works—an author owns a copyright for an initial 28-year term and a 28-year renewal period. 17 U.S.C. § 24 (1909). The renewal term was intended to allow authors a new opportunity, decades after a work's creation, to exploit its increased value. But *Fred Fisher*, 318 U.S. at 656-57, held that authors could agree, in their first contracts with publishers, to assign both the initial *and* renewal term—thereby precluding authors from benefitting from the renewal term.

Congress addressed that result in the 1976 Act by permitting authors and heirs to terminate authors' pre-1978 grants "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5). Thus, authors or heirs could terminate pre-1978 grants even if the author had—as in *Fred Fisher*—assigned "all" of his possible copyrights years ago. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) (§ 304(c)(5) enacted to avoid the "result wrought by [] *Fred Fisher*"). Section 304(c)(5) does not, however, bar an author or his heirs from, *at any time after 1978*, revoking pre-1978 grants and replacing them with new post-1978 grants. Congress made this clear, as *Milne* and *Steinbeck* both hold. *Supra* 21-23.

### B. As In *Milne* And *Steinbeck*, The 1992 Agreement Superseded All Of Joe Shuster's Pre-1978 Copyright Grants And Regranted Those Copyrights To DC.

1. *The 1992 Agreement Operates Like The Agreements In* Milne *And* Steinbeck.

The statutory termination right under § 304(d) applies *only* to grants made before 1978. When Appellants served their termination notice in 2003, *there were no pre-1978 grants in existence*—Joe's grants to DC had been revoked by the 1992 Agreement and replaced with a new grant. That 1992 grant may not be terminated under § 304(d), as *Milne* and *Steinbeck* held on materially the same facts.

a. *Milne* involved a termination claim by heirs of Winnie the Pooh creator A.A. Milne. In 1930, A.A. granted Pooh copyrights to SSI in exchange for a share of future royalties. 430 F.3d at 1039. In 1983, A.A.'s son, Christopher—before he

-24-

ever attempted to terminate his father's prior grants under the statute—approached SSI offering not to terminate in exchange for increased royalties. *Id.* at 1040. The parties entered into a 1983 agreement in which Christopher revoked A.A.'s prior copyright grants to SSI and assigned to SSI the same Pooh copyrights. *Id.* at 1040.

Years later, Christopher's daughter Clare attempted to terminate A.A.'s 1930 grant, but this Court held the 1983 agreement superseded all pre-1978 grants. *Id*. at 1043-44. Clare argued that Christopher's 1983 agreement was an improper "agreement to the contrary" because Christopher made it *before* he terminated A.A.'s copyrights and, further, because Christopher's 1983 agreement, if upheld, would forfeit Clare's rights to terminate. *Id*. This Court rejected those arguments: "Congress specifically stated that it did not intend for the statute to 'prevent the parties to a transfer or license from voluntarily agreeing *at any time* to terminate an existing grant and negotiating a new one[.]'" *Id*. at 1045-46 (italics added).

The Second Circuit followed *Milne* in *Steinbeck*. In 1938, John Steinbeck assigned the copyrights in many of his books to his publisher. 537 F.3d at 196. After his death, John's termination interest passed by statute to his widow Elaine and his children from another marriage. *Id*. at 196, 198. While Elaine did not hold the "majority" share of John's termination interest necessary to terminate, as his successor by will, she entered into an agreement with Penguin in 1994 that "supersede[d]" and replaced John's 1938 grant in exchange for increased royalties

and other benefits.  *Id.*  After Congress amended the Copyright Act in 1998, Elaine's stepchildren sought to terminate John's 1938 grant.  *Id.* at 199.

The Second Circuit held their termination notice was invalid.  Because of Elaine's 1994 agreement, the court explained, John's 1938 grant "no longer existed" and John's children could not terminate it.  *Id.* at 201-02.  The court upheld Elaine's 1994 agreement, even though Elaine herself had no right to terminate when she made it in 1994 (she lacked the majority interest necessary to terminate), and even though the stepchildren's new window to terminate was not created by Congress until 1998.  *Id.* at 203-04 & n.5.  Nor did it matter that Elaine had tried to preserve termination rights in her 1994 agreement.  *Id*. at 203.  "The availability of termination rights under the Copyright Act is not dependent on the intent of the parties but on, among other things, the date that a grant of rights was executed," *id.*—in the Steinbecks' case, the operative, remaining, and existing grant was made in 1994, or 16 years *after* § 304's 1978 cut-off date.  *Id*. at 201.

b.  The district court here correctly held that the 1992 Agreement operates like the agreements in *Steinbeck* and *Milne*.  The 1992 Agreement "superseded and replaced all prior grants of the Superman copyrights" made by Joe.  ER-13.  Like the agreements in *Milne* and *Steinbeck*, the 1992 Agreement superseded all of Joe's prior copyright grants to DC:  It "'*fully settles* all claims to any payments or *other rights or remedies which you may have under any other agreement or otherwise*,

-26-

whether now or hereafter existing regarding any *copyrights*, trademarks, or other property right *in any and all work* created in whole or in part by your brother Joe Shuster.'" ER-6 (italics added). Next, it regranted to DC all of Joe's copyrights: "'[Y]ou *now grant to* [DC] any … copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.'" *Id.* The Agreement, thus, accomplished exactly what Congress contemplated and the *Milne* and *Steinbeck* agreements accomplished: it revoked pre-1978 grants and simultaneously replaced them with new, post-1978 grants outside the scope of § 304 termination. ER-7.

2.   *The 1992 Agreement Superseded—And Thereby Revoked And Replaced—Joe's Pre-1978 Grants As A Matter Of New York Law.*

Appellants' central argument is that the 1992 Agreement did not eliminate Joe's pre-1978 grants because it did not contain the words "rescind," "revoke," "or "supersede." OB-37. But no such magic words are required under New York law, which Appellants initially conceded governs the 1992 Agreement. ER-6; *supra* 5.[5]

As the district court detailed, ER-6, New York law has long held that if parties enter a contract covering the same subject matter as a prior one, the prior

---

[5] While Appellants now say "federal copyright law" governs, OB-39, *Steinbeck* held that "whether [an] Agreement terminated and superseded" an earlier one is determined by state law—there (and here), "New York law," 537 F.3d at 200. Appellants claim *Milne* and *Mewborn* hold that federal law governs, OB-39, but neither case ever says this. Rather, *Milne* held that Congress expressly intended for ordinary state-contract-law to continue to apply to post-1978 grants. *Supra* 22.

-27-

contract is superseded *even if* the second contract does not say so.  "The question always is whether the subsequent agreement, … in whatever form it may be, is a matter of intention, expressed or implied, a superseder of, or substitution for, the old agreement."  *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958); *Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992).

Intent to supersede, or "novate," is established where, as here, a new contract addresses all of the parties' obligations and remedies on a given subject. *See Steinbeck*, 537 F.3d at 200-01; *In re WorldCom, Inc.*, 2007 WL 2049723, at *2 (S.D.N.Y. July 13, 2007).  As the district court held, "the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements"—*i.e.*, "copyrights … in any and all" of Joe's works.  ER-10.  Appellants argue the 1992 Agreement "'did not deal with the same subject matter'" as Joe's prior copyright grants because "Jean and Frank had no rights" to grant.  OB-42.  They are wrong. As in *Milne* and *Steinbeck*, Jean—as the sole beneficiary to Joe's will and legal successor to his rights—had the right and authority to contract on his behalf and to revoke his prior grants and regrant Joe's rights to DC for new consideration.[6] Effecting a revocation and regrant, as in *Milne* and *Steinbeck*, is precisely what

---

[6] Title to property passing by will vests in the beneficiary at the time of the testator's death, *In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940)—here, July 1992, when Joe died—and a transfer of property prior to probate is as effective as if made after probate, *id.*; *In re Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008); ER-1313, 1320, 457.

Jean did here, as the court explained below. ER-6-9.[7]

The fact that the 1992 Agreement addressed the same subject as Joe's pre-1978 grants itself establishes that it supersedes those grants. ER-10 (agreement addressing same subject suffices "to supersede all prior agreements between the parties"); *Private One of N.Y., LLC v. JMRL Sales & Serv., Inc.*, 471 F. Supp. 2d 216, 223 (E.D.N.Y. 2007) (a "subsequent contract regarding the same subject matter supersedes the prior contract"); *Harrison W. Corp. v. U.S.*, 792 F.2d 1391, 1393 (9th Cir. 1986) (federal common law) (all claims "under the first contract were abandoned upon the signing of a second contract which was complete in itself, covered the same subject matter, and contained no reservation of rights").

The 1992 Agreement goes an extra step, however, and contains an "all-encompassing," "broad release": this "'fully settles all claims'" under contract or otherwise. ER-7. "[F]ull settlement" "[i]mplies an adjustment of *all pending matters*, the *mutual release of all prior obligations* existing between the parties." BLACK'S LAW DICTIONARY 672 (6th ed. 1990); ER-7 (citing same (9th ed. 2009)).

---

[7] The 1992 Agreement was not a mere "quitclaim," OB-42—it was a novation as a matter of law. It also did much more than simply "supersede[] the 1975 Agreement as to Frank's pension." OB-43. Frank entered into a *separate* agreement with DC addressing and terminating the 1975 Agreement. *Supra* at 11; ER-703. If Jean and Frank's 1992 Agreement with DC itself did nothing more than supersede that 1975 Agreement, then Frank's separate 1992 agreement with DC, *id.*, would be redundant. Such an interpretation that renders Frank's separate 1992 contract "mere surplusage" must be avoided. *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 195-96 (N.Y. App. Div. 1995).

Similar language has repeatedly been held, as a matter of New York law, to wipe out an earlier contract—even in the absence of express "revocation" language:

- In *Palm Desert Art, Inc. v. Mohr*, 2001 U.S. Dist. LEXIS 620 (N.D.N.Y Jan. 26, 2001), the parties entered into a contract seeking to undo an earlier merger agreement. The contract stated that it was executed "in settlement of various disputes that have arisen." *Id.* at *10. This language "constitut[ed] a novation of the merger agreement." *Id.* at *12.

- *Goldome Corp. v. Wittig*, 221 A.D.2d 931, 932-33 (N.Y. App. Div. 1995), considered whether the parties' settlement agreement superseded their prior employment agreement. The settlement agreement included a release from "all cause and causes of action ... from the beginning of the world to" today. *Id.* The "clear and unambiguous language in the release … establishe[d] that it superseded and extinguished the employment agreement." *Id.*

- *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 597 F.2d 314, 324 (2d Cir. 1979), held that the parties' settlement agreement substituted for a prior contract based on a broad release providing: "'[The parties] hereby releases and discharges the other from all ... claims and demands whatsoever which each of them now has or ... had or may have.'" (quoting district court).

- In *Blair & Co. v. Otto*, 5 A.D.2d 276, 278-82 (N.Y. App. Div. 1958), the court held a contract providing that payments thereunder would "'constitute

-30-

complete satisfaction' for services rendered, past and future," demonstrated the parties' "clear and unmistakable" intent to supersede all prior contracts.

- *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1196 (S.D.N.Y. 1996), involved a written contract conveying a power plant that superseded a prior oral deal. The written contract began: "In consideration for the assignment … of all [IEC's] interests in [the] plant .…" *Id.* This showed "an intention to treat comprehensively the issue of reimbursement and to be bound only by the terms of the written agreement." *Id.*

- And *WorldCom* held that a settlement agreement superseded a marketing agreement between SkyTel and Beepwear. The settlement stated it was a "full and final compromise" and "release[d] and discharge[d] SkyTel … from any and all actual or potential claims" under the marketing agreement. 2007 WL 2049723, at *2. "[O]ther jurisdictions support the view that a new contract's release of parties' claims under an old contract proves that the parties intended to novate the old contract." *Id.* at *3 (citing New York).[8]

---

[8] These lists go on. *E.g.*, *Heller v. Pal*, 2003 Cal. App. Unpub. LEXIS 9059, at *7-12 (Cal. Ct. App. Sept. 23, 2003) ("full and final settlement" of dispute over earlier partnership agreement "amount[ed] to the substitution of a new obligation between the same parties, with intent to extinguish the old obligation"); *OK Sales, Inc. v. Canadian Tool & Die, Ltd.*, 2009 U.S. Dist. LEXIS 26403, at *7 (N.D. Okla. Mar. 31, 2009) (second contract covering same subject as first "replace[s] and supersede[s]" first); *La France v. Georgetown Univ. Hosp.*, 1988 WL 135066, at *2 (D.D.C. Dec. 9, 1988) (contract covering same subject matter as existing

Appellants cite no case holding that a superseding agreement must use express language of revocation, and none exists. To the contrary, their own cited cases recognize that parties' intent to replace a prior contract may be express *or* implied. *E.g., Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D. 2d 865, 867 (N.Y. App. Div. 1984); *Abuelhija v. Chappelle*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009). And none of their cases involves a contract that, like the 1992 Agreement, covered the same *subject matter* as a prior contract, contained a *sweeping release*, and "*fully settles … any other agreement*."[9] ER-6.

As a matter of New York law, the 1992 Agreement supersedes Joe's prior grants, replacing them with a new 1992 grant.

---

contract "discharges the existing contract even though there is no express agreement that the new contract shall have that effect"); *Willeke v. Bailey*, 189 S.W.2d 477, 479 (Tex. 1945) (first contract "is conclusively presumed to have been superseded" by second contract covering same topic); *Nat'l Am. Ins. Co. v. Hogan*, 173 F.3d 1097, 1107 (8th Cir. 1999) (Arkansas) (finding novation even where "parties did not expressly declare their intent to" novate); *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1040 (D. Ariz. 2000) (novation "may be implied"); *Orlando Orange Groves Co. v. Hale*, 161 So. 284, 291 (Fla. 1935) (same).

[9] *Cf. Abuelhija*, 2009 WL 1883787, at *6-7 (second contract said first contract "remains in force"; contracts concerned different subjects; party continued making payments under first contract); *Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, 1999 U.S. Dist. LEXIS 3973, at *28-29 (S.D.N.Y. Mar. 30, 1999) (second contract "[did] not suggest an extinguishment of the old contract, but, instead, refer[red] to it"); *Multimedia Patent Trust v. DirecTV, Inc.*, 2011 WL 3610098, at *3 (S.D. Cal. Aug. 16, 2011) (second contract said it only superseded "'prior communications and understandings,'" *not* prior contract); *Schillitone v. Lewis Publ'g Co.*, 171 N.Y.S. 262, 264 (App. Term 1918) (no second contract, but "merely an offer"); *Frank Assocs., Inc. v. John J. Ryan & Sons*, 117 N.Y.S.2d 406, 407 (App. Div. 1952) (remanding for jury to consider factual issues concerning intent to novate).

-32-

3.    *Appellants' Remaining Arguments That The 1992 Agreement Did Not Supersede Joe's Pre-1978 Grants Lack Merit.*

Beyond their magic-words test, Appellants posit three other reasons the 1992 Agreement does not supersede Joe's pre-1978 grants.  None has merit.

a.  It is irrelevant that the 1992 Agreement did not list all of "Joe's grants" or expressly "mention[] Superman."  OB-4.  The agreement *did* expressly encompass "all claims … *under any other agreement* or otherwise … regarding *any copyrights … in any and all work created in whole or in part by … Joseph Shuster*."  ER-704 (italics added).  That broad language "necessarily includes [Joe's] most famous creation, Superman."  ER-10.  And a party is not required to "specifically list every superseded agreement, lest that party forget one such agreement."  *Id.*  "Any and all" means just that—*any and all* of Shuster's works, agreements, and rights.  *Id.*; *see Siegel v. Nat'l Periodical Publ'ns, Inc.*, 364 F. Supp. 1032, 1037 (S.D.N.Y. 1973) ("all" rights included renewal rights even though "none of the agreements ... expressly refer[red] to … renewal rights"), *aff'd* 508 F.2d 909, 913 (2d Cir. 1974).

b.  Appellants complain that the 1992 Agreement is less elaborate than other of DC's "rights agreements."  OB-44.  In fact, the 1938 Assignment they concede is valid, OB-3, and the courts upheld, *Nat'l Publ'ns*, 508 F.2d at 912, is a mere *four-sentences* long, ER-552.  Like the 1938 grant, the 1992 Agreement is binding and plainly provided that DC would own all of Joe's copyrights.  As this Court affirmed in 1990—two years before the 1992 Agreement was made—a copyright

assignment "doesn't have to be the Magna Charta," "a one-line pro forma … will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990).[10]

    c. Appellants last argue that "fully-performed contracts like Shuster's pre-1978 grants cannot be novated." OB-18. Appellants forfeited this argument by failing to press it below. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). It is incorrect in any event. Courts find novation where parties' obligations under the first contract were performed. *E.g.*, *In re Fischer*, 116 F.3d 388, 390 (9th Cir. 1997) (purchase completed); *Palm Desert*, 2001 U.S. Dist. LEXIS 620, at *9-11 (underlying merger deal closed). In any event, Joe's pre-1978 grants *did* impose a continuing duty on the Shusters "not to employ [Superman] characters or said story" without DC's written consent, as long as the Superman copyrights remained in effect—through, at least, 2033. ER-552. *Cf. Fletcher v. Peck*, 10 U.S. 87, 136 (1810) ("An executory contract is one in which a party binds himself to do, or not to do, a particular thing.").[11]

---

[10] Appellants cite three supposed examples of DC's agreements, all of which are untethered to the facts here, were unsupported by any testimony, and involve different parties, properties, rights, and time periods. ER-440-42; 675-98 (DC-Swampfilms Inc; Swamp Thing; 1980); 721-52 (Warner Bros.-Hasbro; option; G.I. Joe; 1998); 760-854 (Warner Bros.-Edgar Rice Burroughs, Inc.; option; Tarzan; 2002). None shows "a frequency of specific conduct sufficient to be considered semiautomatic," as the evidence rules require. *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988); FED. R. EVID. 406; ER-1030-32.

[11] Appellants' reliance on *Holland v. Fahnestock & Co.*, 210 F.R.D. 487(S.D.N.Y. 2002), is misplaced. There, a party assigned its "rights" under a

**C.    As in *Milne* and *Steinbeck*, The 1992 Agreement Was Not A Prohibited "Agreement To The Contrary."**

Having failed to establish that Joe's pre-1978 grants survived the 1992 Agreement under New York law, Appellants argue that the Agreement is an unenforceable "agreement to the contrary" under § 304(c)(5).  That provision applies, they assert, because:  (1) Jean did not have a termination right when she made the Agreement; (2) the Agreement did not reflect Superman's value; and (3) the Estate's termination rights were inalienable.  None of Appellants' purported requirements is present in the Copyright Act, and their arguments are incorrect.[12]

1.    *Neither The Statute Nor Relevant Case Law Requires An Author Or Heir To Have Live Or Imminent Termination Rights Before Entering An Enforceable Agreement To Revoke And Replace Pre-1978 Grants.*

The Copyright Act provides that the right to terminate a pre-1978 grant may be exercised "notwithstanding any agreement to the contrary."  *Supra* 23-24.  Appellants argue that this provision prohibits enforcement of a post-1978 contract revoking and replacing a pre-1978 grant unless the party who made the new

---

contract to a newly created entity.  *Id.* at 488 n.1.  This mere "delegation of duties" showed no intent to novate.  *Id.* at 499.  Here, Jean expressed the clear intent to "supersede all prior agreements," ER-7—in her words, actions, conversations and letters with Levitz, and 1992 Agreement, *e.g.*, *supra* 9-12.

[12] Appellants also contend that the 1992 Agreement was an "agreement to the contrary" because it was not sufficiently explicit about its revocation of Joe's pre-1978 grants.  OB-36.  Appellants do not explain why the specificity of a revocation bears on whether it is an "agreement to the contrary."  Appellants are wrong in any event:  the 1992 Agreement is more than adequately explicit to supersede Joe's pre-1978 grants under governing New York law.  *Supra* 27-35.

-35-

agreement possessed live or imminent termination rights that she "meaningfully leverag[ed]." OB-35. Appellants argue that, because the Shuster Estate did not have a right to terminate until after 1998, Jean's 1992 Agreement is invalid, even if it was a revocation and regrant. OB-33. Appellants are wrong for several reasons.

a. First, Appellants' proposed rule is directly contrary to express legislative intent. As this Court held in *Milne*, "Congress specifically stated that it did not intend for the statute to 'prevent the parties to a transfer or license from voluntarily agreeing *at any time* to terminate an existing grant and negotiating a new one[.]'" 430 F.3d at 1045 (quoting H.R. REP. NO. 94-1476 at 127) (italics added).

b. Second, *Steinbeck*, which followed *Milne*, rejected Appellants' proposed rule. Elaine, like Jean here, did not appear to have a termination right when she made her 1994 deal: "without a majority termination interest, it appears that Elaine Steinbeck would have been unable to terminate the 1938 Agreement on her own." 537 F.3d at 203 n.5; *id.* at 202 ("It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.").[13] The court held this was no impediment to enforcing Elaine's agreement: "We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the

_____

[13] Also contrary to Appellants' assertions, OB-28, the termination window for *The Grapes of Wrath* was not open in 1994. Under § 304(c), the termination window opened in *1995*—56 years after the book's 1939 publication. *Id.* at 199.

-36-

effect of eliminating termination rights that did not yet exist." 537 F.3d at 202.

Appellants quote the court's observation that Elaine "wielded the threat of termination" when she "cancel[ed] the 1938 Agreement," *id.* at 202, but the court held that "speculation[]" about Elaine's and Penguin's motivations for making the post-1978 agreement was "immaterial" to the enforceability of the 1994 agreement under § 304, *id.* at 201, 203 & n.5. Moreover, as the statements above make clear, the court was *not* holding that Elaine herself actually possessed any actual or imminent right to terminate. Her threat of termination was based instead on the theoretical, untested legal argument that she held a majority interest through a prior power of attorney—a theory the court openly doubted was "valid." *Id.* at 203 n.5.

What *did* matter was that, in the 1976 Act, Congress authorized parties to make—"at any time"—new agreements that replaced pre-1978 grants and left only post-1978 grants in their place that could not be terminated under § 304. *Id.* at 203. Elaine made such an agreement in 1994 and it left no pre-1978 grants intact. Her 1994 agreement was not an "agreement to the contrary"—it was a contract that Congress invited parties to make in response to the 1976 Act, and it was enforceable against Elaine or heirs who later tried to terminate. *Id.* In neither the 1976 Act nor the 1998 Act that gave her stepchildren a new window to terminate, did Congress bar intervening, post-1978 agreements of the sort Elaine and Penguin had made. *Id.* at 203-04. Congress could have done so by, *inter alia*, altering the

pre-January 1, 1978 cut-off in § 304, but notably it never did so. *Supra* 21-23.

The same analysis applies here—except Jean's 1992 Agreement with DC is on *stronger* legal footing. Jean specifically identified the possibility of her terminating as reason for DC to make a new deal; unlike Elaine, Jean never sought to reserve any rights (termination or otherwise); and while DC (like Penguin) disagreed whether Jean had any termination rights to exercise, her standing to assert such rights had not been adjudicated, and as in *Steinbeck*, Congress would only a few years later amend the Act to create new classes of heirs (including Jean) and windows to terminate. *Supra* 9-12, 23, 25-26; ER-1242.

Moreover, Jean, unlike Elaine, then reaffirmed her promises to DC—*after* Congress acted in 1998 to expand the Act and allow executrixes like her to terminate, and *after* the Siegels served their Superman termination notices. *Id.*; ER-4-5; SER-114. The new and valuable consideration DC agreed to pay Jean in 1992—which Jean obtained only after expressly threatening termination—has so far netted Jean and her family over $600,000. ER-1232, 1242; *supra* 11-12.

Because Jean and Elaine were in similar legal positions when they negotiated their post-1978 agreements, their agreements are equally enforceable.[14]

---

[14] If the 1992 Agreement were a mere "act of charity" or "pension agreement," OB-35, 45, it would not have included broad releases or express grants of rights, ER-704. Notably, the 1975 Agreement with Joe and Frank—which *was* a pension,

c.  Third, Appellants rely heavily on *Mewborn*, but that case does not support their theory.  In *Mewborn*, Winifred Mewborn, daughter of Lassie creator Eric Knight, granted Eric's copyrights to Classic in 1976.  532 F.3d at 980-81.  In 1978—after Classic became aware of the new copyright termination regime, but before Winifred learned of it—Classic convinced her to sign a new agreement in exchange for $3,000.  *Id.*  Critically, the 1976 grant "was *not substituted or revoked* by the [new] 1978 Assignment but *remained intact*."  *Id.* at 986 (italics added); *id.* at 989 ("There is also no evidence that either party intended to revoke and replace … the 1976 Assignment.").  Rather, the 1978 Assignment transferred only "additional ancillary rights," *i.e.*, certain "additional enumerated rights that Mewborn had not assigned in 1976."  *Id.* at 986, 989; *id.* at 981("'The rights granted herein to [Classic] *are in addition to* the rights granted by me to [Classic] under and pursuant to an assignment dated July 14, 1976….") (italics added).

The question in *Mewborn* was thus whether the *additional* rights transferred in 1978 included Winfred's right to terminate the pre-1978 grant, which would vest in six years.  The court held that Winifred's future termination right was not "expressly or impliedly" encompassed within the new grant.  *Id.* at 989; *id.* at 986-87 (explaining why "the 1978 Assignment does not purport to grant those [future

---

and which provided them "consideration" for their "past services" and "in view of [their] present circumstances," ER-663—includes *no* such copyright grants, *id.*

termination] rights"). The court observed that such an advance "waiver or relinquishment" of future termination rights, especially when Winifred had no idea they existed, would be a prohibited "agreement to the contrary." *Id.* at 986, 988.

*Mewborn*'s latter observation about agreements-to-the-contrary is not at issue here because Jean's 1992 Agreement did exactly what Winifred's 1978 agreement did not. The 1992 Agreement superseded and replaced all of Joe's pre-1978 grants, *supra* 26-32, whereas Winifred's 1978 agreement granted only additional rights, and left the pre-1978 grants intact. In other words, even if an agreement to relinquish future termination rights is an "agreement to the contrary" under *Mewborn*, an agreement to revoke and replace pre-1978 grants is not, as *Milne* and *Steinbeck* hold—and as *Mewborn* itself noted in distinguishing *Milne*.[15]

There is another important legal distinction between this case and *Mewborn*. *Mewborn* ultimately was about the legal effect of a post-1978 agreement on a then-

---

[15] Beyond the dispositive legal difference in the post-1978 agreements at issue here and in *Mewborn*, there are significant factual differences in the cases as well. "Unlike the heirs in *Mewborn* … Jean and Frank were aware of the Copyright Act's termination rights when they bargained for and entered into the 1992 Agreement." ER-10. Indeed, they *told* DC that if agreed to pay Jean, she "would not pursue the termination of the Superman copyright." ER-1242. Moreover, Jean and Frank confirmed to Levitz that the 1992 Agreement "would fully resolve any past, present, or future claims against DC," and the 1992 Agreement expressly states that it "fully settles all claims to any payments or other rights or remedies … whether now or hereafter existing." ER-704, 1231-32. Winifred never so agreed; she merely assigned new, additional rights, leaving prior grants intact. *Supra* 39. Finally, in the decade after signing the 1992 Agreement, Jean repeatedly affirmed that she would honor the 1992 Agreement and could not terminate. *Supra* 11-12.

existing, but not-yet-vested, right to terminate a pre-1978 grant. *Mewborn*'s
discussion of *Milne* viewed *Milne* through a similar lens, noting Christopher's
knowing possession of a "present right" to terminate when he negotiated his 1983
agreement. 532 F.3d at 987. In this case, by contrast, the termination right that
Peary seeks to enforce did not exist in 1992; Congress amended the Act in 1998 to
include representatives of estates, and then in 2003, Peary had himself appointed as
the Estate's representative in lieu of Jean. *Supra* 14-15, 23; ER-1313, 1320, 457.
Accordingly, whereas the question in *Mewborn* was whether the Copyright Act
precluded Winifred from entering an agreement waiving her not-yet-vested (or
known) termination right, here there is no question that Jean's 1992 Agreement did
not contravene the Act when it was made—the question is whether the 1998
amendment to the Act somehow *retroactively invalidated* Jean's 1992 Agreement.

The answer is no. Nothing in the 1998 amendment says or suggests that by
extending to executors the right to terminate pre-1978 grants, Congress *also*
intended to give executors the right to, in effect, terminate *post*-1978 copyright
grants. Congress certainly knew how to permit heirs to terminate post-1978 grants
when it wished: Congress did that in § 203. In the 1998 amendment, however,
Congress did not extend to executors a similar right to terminate post-1978 grants.
Rather, Congress left the "before January 1, 1978" cut-off in place and extended to
executors only such termination rights that existed *as of 1998*. 17 U.S.C. § 304(d).

-41-

If, by 1998, there were no remaining pre-1978 grants to terminate—as here—then the executor assumed no right to terminate them. On these same facts, *Steinbeck* held that "'the 1994 Agreement [there] did not divest the Steinbeck Descendants of any termination right.'" ER-12 (quoting *Steinbeck*, 537 F.3d at 202-03). As with the rights Peary now asserts here, the termination rights the Steinbeck Descendants asserted under § 304(d) "'would not become effective'" until years later, *i.e.*, after 1998, and, thus, no agreement-to-the-contrary waiving these rights was made. *Id.* "'We cannot see how the 1994 Agreement could be an "agreement to the contrary" solely because it had the effect of eliminating termination rights that did not yet exist.'" *Id.*

d. Fourth, the theory urged by Appellants makes little practical sense. Their rule would force authors and heirs to wait until the statutory termination window is open or imminent to negotiate revocation-and-regrants. But the window is often years away, and authors and heirs (especially older ones) may wish to capitalize and make a new deal sooner. For example, if Shuster wanted more compensation in 1978 right after enactment of the 1976 Act, he would have been unable to do so under Appellants' theory—he would have had to wait until 1984, when his termination window opened. Or imagine a 50-year-old screenwriter who sold his script in 1974 and watched it become a smash hit. His termination window would not open until 2030, so he might well want to negotiate a revocation-and-regrant of

-42-

rights long before then, to obtain some monetary value for himself to use during his lifetime. Appellants' theory would bar him from doing so.

These outcomes are directly at odds with the purpose of the termination right, which was to *supplement*—not override or undermine—authors' and heirs' contractual freedom to negotiate new post-1978 grants. *Supra* 20-24. Moreover, enforcing revocation-and-regrant agreements only upon a showing that authors or heirs "meaningfully leverage[d]" present or imminent termination rights, OB-35, would be a litigation nightmare. The parties would have to conduct extensive discovery (including experts) into all aspects of what rights the parties possessed and how their negotiations unfolded, in order to determine how much leverage was exercised. Courts would have to identify and apply standards for determining whether that leverage was sufficient to justify enforcing the agreement, as well as litigate whether the termination rights threatened were presently held or would be imminently held by the author or heir making the deal—often a thorny question itself. *Supra* 36. None of this side-show was contemplated in the Copyright Act.

What *was* contemplated was the application of ordinary contract-law rules to post-1978 agreements to revoke and replace pre-1978 grants. *Supra* 21-23. Those agreements may be executed "at any time," as *Milne* recognized, and they are not "contrary" to exercise of the termination right. *Id.* Indeed, they serve the same end, as this case illustrates. The purpose of the termination right was to address the

-43-

concern that authors in their first contracts with publishers would assign all their rights in works when they had no idea what the works would be worth decades later. *See Stewart v. Abend*, 495 U.S. 207, 225-30 (1990); *Marvel*, 310 F.3d at 290-91; *Steinbeck*, 537 F.3d at 197-98; *Mewborn*, 532 F.3d at 983-84. Section 304 allowed authors or heirs to renegotiate a new, post-1978 assignment now knowing the works' value. The 1992 Agreement worked that way: Jean knew Superman's market value full well in 1992, and asked for and made her 1992 Agreement. *Supra* 9-12. That agreement is enforceable under ordinary contract-law principles, and nothing in the 1976 or 1998 Copyright Acts invalidates it.

   2.  *The Value Of The 1992 Deal Is Immaterial To Its Enforceability*.

   Appellants contend the 1992 Agreement is unenforceable because Jean did not get paid enough. OB-34-35. The Copyright Act imposes no such requirement; to the contrary, its drafters said ordinary contract rules apply. *Supra* 21-23. Nor did *Milne* or *Steinbeck* impose some baseline amount an heir must be paid to make an enforceable post-1978 replacement contract. They, too, hold that ordinary contract law governs. *Id*. Under the law of contracts, adequacy of consideration is irrelevant to a contract's enforceability—so long as there is consideration, the contract is valid. *E.g.*, *Pope v. Sav. Bank of Puget Sound*, 850 F.2d 1345, 1356 (9th Cir. 1988); *Weiner v. McGraw-Hill*, 57 N.Y.2d 458, 464 (1982).

The rule Appellants urge—that courts should evaluate the "economic terms" of post-1978 agreements to check for "meaningful[] leverage[]," OB-35—defies these principles and would thrust courts into the complicated, unlegislated terrain of "rate-setting" the consideration exchanged in post-1978 replacement contracts. What is a "good" or a "bad" deal would by necessity be decided ad hoc, rather than based on any statute or rule, and each judge would have to decide if the agreement before him or her is "good enough." The subjective, indeterminate nature of this inquiry is the reason why courts have never considered it their role to evaluate the adequacy of consideration. *See Pope*, 850 F.2d at 1356 ("We recall the first lesson in contracts, the peppercorn theory—that courts will not inquire into the adequacy of consideration, so long as it was true and valuable."); *Weiner*, 57 N.Y.2d at 464. Congress did not supplant that age-old rule and did not make the courts regulatory rate-setters for post-1978 revocation-and-regrants. The ordinary rules of contract apply, and, as in any other case, adequacy of consideration is irrelevant to § 304.[16]

---

[16] Appellants provide no enforceable rule to measure consideration, nor can the "true and valuable" consideration exchanged here be doubted. *Pope*, 850 F.2d at 1356. Jean was entitled to *nothing* from DC before the 1992 deal; the deal netted her $600,000. *Supra* 9-12. While Christopher Milne made a richer deal in dollar terms, not so in terms of multiples. His trust was entitled to millions of dollars in royalties *before* he made the 1983 deal; under the new deal, the share "'doubled.'" ER-1162. In *Steinbeck*, Elaine already received significant royalties. Under her 1994 contract, she received larger guaranteed advances and royalties calculated based on retail, not wholesale prices. 537 F.3d at 196. In *Mewborn*, 532 F.3d at 986, 989, Winifred was paid a mere $3,000, but the court cited that as proof she

3. *Appellants' "Alienability" Arguments*

Citing *Stewart*, 495 U.S. 207, *N.Y. Times Co. v. Tasini*, 533 U.S. 483 (2001), and *Marvel*, Appellants suggest termination rights are "inalienable" and cannot be disposed of by contracts like the 1992 Agreement. OB-2, 6, 20-23. This Court rejected that argument in *Milne*:

> To support her theory that the 1983 agreement falls under the category of "an agreement to the contrary," Clare reads the Supreme Court's decision in *Stewart* [], as holding that Congress intended to make the termination right *inalienable* for authors and their families. *Stewart*, however, did not interpret the "agreement to the contrary" language of section 304(c)(5) or its counterpart under section 203(a)(5).

430 F.3d at 1043 (italics added). Appellants' cites to a parenthetical in a footnote in *Tasini*, 533 U.S. at 496 n.3, *see* OB-2, 23, is equally unavailing—and no more a holding on this issue than the dicta in *Stewart* that *Milne* expressly discounted.

Appellants' reliance on *Marvel* is also misplaced. *Marvel* held the parties there could not end-run the Copyright Act's termination provisions by recasting copyright works created in the 1930s as works-for-hire. 310 F.3d at 289-92. *Marvel* had nothing to do with a post-1978 copyright grant superseding all terminable pre-1978 grants—as was the case in *Milne*, *Steinbeck*, and here. Rather, *Marvel* involved a *1969* settlement agreement. *Id.* at 283. In addition, Appellants disregard *Marvel*'s observation that the parties there could have barred

did not intend to waive any rights—not to espouse a rule that courts must assess the adequacy of consideration under actual post-1978 replacement contracts.

-46-

any future termination claim had they just filed a proper "stipulation of settlement" in 1969 that complied with the collateral-estoppel rules. *Id*. at 291.

### D.  The Court Did Not Fail To Consider Any Material Evidence.

Appellants' final contention—that the district court "failed to consider significant evidence," OB-44—is incorrect.  Having reviewed the entire record, the court held that, "although [Appellants] allege[] in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, *they have offered no evidence in support of that conclusion*."  ER-11 (italics added).  This finding was not an abuse of discretion, *supra* 17, and, in any event, Appellants argued the parties' summary-judgment motions on the 1992 Agreement were ripe to resolve, without any further discovery.  ER-1008, 1021, 25.

As for the "evidence" Appellants now seek to argue:

• They argue that the 1992 Agreement was not intended to be a copyright grant because DC did not record it with the Copyright Office.  OB-44. Recordation has not been required for decades, and DC, for example, never recorded Joe's original 1938 grant.  ER-552; Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).

• They say "[n]obody testified that the 1992 Agreement was meant to replace Shuster's grants," OB-44, but Levitz said exactly that—he told Jean and Frank

-47-

the 1992 Agreement "would resolve any past, present, or future claims," and they "confirmed that they understood." ER-1231.

• They improperly cite a confidential settlement offer DC made to the Shusters, as supposed proof that DC did not believe in its rights under the 1992 Agreement. OB-45. DC made this offer *to avoid litigation*, not to set forth its all of its legal positions—which is exactly why FED. R. EVID. 408 prohibits reliance on such "evidence." ER-143, 445-46, 1029-33.

• Their claim that "DC was utterly silent about the 1992 Agreement until filing this lawsuit," OB-45, is untrue. To rebut this, DC produced examples of chain-of-title submissions it made to foreign authorities years before this lawsuit was filed that rely on the 1992 Agreement. ER-66-83, 477-79. Of course these submissions "listed the 1938 Grant and six other pre-1978 grants," *cf.* OB-44-45—chain-of-title documents, by definition, list *all* grants.[17]

• Finally, Appellants quote, out of context, two of DC's filings in *Larson*—from 2007 and 2011. OB-38, 45. The alleged statements they contain were not urged below and not subject to judicial notice. Docket No. 19; *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 n.1 (9th Cir. 2011). Appellants also misread the documents. In a lawsuit concerning the *Siegels'*

---

[17] Appellants' motion claiming "DC withheld these documents," OB-45, was denied. ER-25 (court noting: "Interestingly, [Appellants] never requested a Rule 56(d) continuance to obtain evidence or otherwise complete discovery.").

termination rights, DC made the unremarkable points that (i) the Siegels' notices "purport to terminate Siegel's—but not Shuster's" copyright grants, and (ii) "[a]ll grants made by Siegel and Shuster of rights in *Action Comics No. 1* are still in effect … because the Superman Notices served by the Siegels" were untimely.  Docket No. 12-1, Exs. 1-2; 19.  DC has *never* suggested the 1992 Agreement was invalid or that it did not bar Appellants' termination notice.

## II.  IF THE COURT REVERSES THE RULING ON DC'S FIRST CLAIM, IT SHOULD REMAND FOR CONSIDERATION OF THE OTHER CHALLENGES DC RAISED TO THE TERMINATION NOTICE.

DC's First Claim alleged five grounds for declaring the Shusters' Notice invalid.  The district court granted DC judgment on only one ground (the 1992 Agreement), while rejecting another (majority-interest), and declining to reach the remaining three (unclean hands, "expired," and the 1948/1992 grants).  The parties spent just a few pages below briefing the "expired" and 1948/1992 arguments, ER-452-53, 1006-07, 1164, 1327-28, 1222-24, and while they briefed the unclean-hands claim in more detail, ER-96-98, 468-76; 988, 1015-1018, DC showed, including in a FED. R. CIV. P. 56(d) declaration, how discovery on that claim was ongoing, ER-221-32, and how Appellants' motion turned on disputed fact issues.

A "federal appellate court does not consider an issue not passed upon below," *Singleton*, 428 U.S. at 120; *see Golden Gate Hotel Ass'n v. City & Cnty. of S.F.*, 18 F.3d 1482, 1487 (9th Cir. 1994)—particularly where, as here, the issue

-49-

was not fully developed and briefed below, *id*.; ER-16, 221-28. Never mentioning this rule, Appellants spend Part III of their brief arguing such issues.

If the Court affirms the district court's judgment on DC's First Claim based on the 1992 Agreement, it has no reason to reach these alternative grounds. *See Brandt-Erichsen v. U.S. Dep't of Interior*, 999 F.2d 1376, 1381 (9th Cir. 1993). If the Court reverses on the 1992 Agreement, it should remand for the district court to consider these grounds in the first instance on a full record. *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1092 n.1 (9th Cir. 2011).

## III. TOBEROFF'S LOCK-UP AGREEMENTS ARE INVALID UNDER 17 U.S.C. § 304(c)(6)(D).

The district court granted DC's Third Claim in part and held that Toberoff's lock-up agreements with the Shuster and Siegel heirs are unlawful under 17 U.S.C. § 304(c)(6)(D). If this Court affirms the lower court's ruling on DC's First Claim, it has no need to address this Third Claim. If this Court rules against DC on its First Claim, however, it should affirm the court's ruling on the Third Claim to secure DC's negotiation rights under § 304(c)(6)(D). The need to secure those rights is the reason why the court's ruling on the Third Claim below is not moot, contrary to Appellants' assertion. OB-58-59; *see* SER-1-6 (district court ruling denying DC's fees motion, but affirming that DC's successful prosecution of its Third Claim altered the parties' rights and duties).

1.  Section 304(c)(6)(D) creates an exclusive period of time—from when a copyright termination notice is served until its effective date, here 10 years—when *only* an original copyright grantee can obtain a grant from the terminating party:

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant *is valid only if it is made after the effective date of the termination*.  As an exception, however, an agreement for such a further grant *may be made* between the author or [his heirs] and *the original grantee* or [its successor], after the notice of termination has been served….  (Emphasis added).

Under this provision, "between November 10, 2003 (when the [Shuster] Notice was served) and October 26, 2013 (its effective date), DC was and is the only party that may enter into an agreement with the Shuster heirs regarding the Superman rights sought to be recaptured."  ER-16.  The district court rightly held that Toberoff's lock-up agreements "run afoul of [§] 304(c)(6)(D)" and are thus "invalid."  ER-17, 23.  The agreements assign the Shuster Heirs' putative terminated copyrights to Pacific Pictures, and bar the heirs from making deals with DC without Toberoff's consent. *Id.*; ER-755-58, 874-77, 961; *supra* 14-17.

Appellants admitted after DC filed this suit—in briefs and at deposition—that the Pacific Pictures agreements were "not lawful."  ER-17; SER-42-44, 208-10, 218, 222.  While they refuse to produce a copy of the 2008 lock-up agreement, they concede it "requires … the consent of the Siegels and Shuster Estate … to a settlement of their termination rights with DC" and remained in effect until 2012.  ER-961, 1329, 1518; 1537; *Pac. Pictures*, 2013 WL 120807, at *1; *supra* n.3.

-51-

2.  Appellants argue that DC lacked standing or a private right of action to challenge the lock-up agreements.  OB-61.  But where, as here, Congress creates a statutory right, the beneficiary of the right may sue to enforce it.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 18 (1979).  The "central inquiry [is] whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979).

Congress's intent to create a private cause of action can be inferred from "the language and focus of the statute, its legislative history, and its purpose." *Touche*, 442 U.S. at 575-76; *Sandoval*, 532 U.S. at 286; *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1124 (9th Cir. 2000).  All these indicia are met here.  The Act's plain text establishes an exclusive period during which DC may make an agreement with the Shuster Heirs and third parties may not.  Congress described this provision in its legislative history as "in the nature of a right of 'first refusal,'" H.R. REP. NO. 94-1476 at 127, and said that this right "was one of the compromises on which the delicate balance of [the termination provisions] rests," SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975).  In *Milne*, 430 F.3d at 1047, this Court noted that Congress intended § 304(c)(6)(D) to protect grantees like DC from "trafficking" in copyrights by parties like Toberoff.

-52-

"Congress is understood to legislate against a background of common-law." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Courts routinely enforce negotiation rights. *E.g.*, *Prudential Real Estate Affiliates., Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 875 (9th Cir. 2000). By establishing a negotiation right in favor of grantees, Congress "necessarily contemplate[d]" that grantees like DC could enforce this right in court, *TAMA*, 444 U.S. at 18-19. DC is "one of the class for whose especial benefit the statute was enacted," *Cort v. Ash*, 422 U.S. 66, 78 (1975), as Congress clearly enacted § 304(c)(6)(D) to give grantees like DC a "competitive advantage over third parties" like Toberoff, *Milne*, 430 F.3d at 1047. *See also Ray Charles Found. v. Robinson*, 2013 WL 358174, at *10 (C.D. Cal. Jan. 25, 2013) ("grantees of transfers [like DC] fall within the 'zone of interests' Congress contemplated" in enacting § 304(c)).

Appellants address none of these authorities, and instead cite *Bourne Co. v. MPL Communications, Inc.*, 675 F. Supp. 859 (S.D.N.Y. 1987). There, Ruby served a termination notice on Bourne, and before the effective termination date, Ruby entered into an agreement with MPL assigning her recaptured copyrights. Bourne sought (i) a declaration that this agreement was invalid, and (ii) damages. The court *never ruled on Bourne's declaratory relief claim*—though it recognized the agreement was "invalid." *Id.* at 861. The court denied Bourne's *damages* claim, ruling Bourne had submitted no evidence of damages and that

§ 304(c)(6)(D) makes no mention of a "statutory right of first refusal" on which a damages claim could be based. *Id.* at 865-66. This latter conclusion conflicts with *Milne*'s reading of the Act and the Act's text, history, and intent. *Supra* 50-52.[18]

3. Appellants argue the three-year statute of limitations ran on DC's Third Claim in November 2009—six months before DC filed suit—because DC received the 2001 and 2003 Pacific Pictures agreements in 2006. OB-61. But Appellants do not address their 2008 lock-up agreement, which DC challenged in the Third Claim. ER-23. Appellants thereby concede the timeliness of DC's claim.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP

Dated: April 12, 2013

---

[18] Appellants' cite to Patry is no help either. His treatise does not address *Milne*'s analysis of § 304(c)(6)(D), and Patry concedes Congress expressed a "hostility toward those who would attempt to offer the grantor a better deal" before the grantee. 3 W. PATRY, PATRY ON COPYRIGHT § 7:47, at 7-104 n.1 (2009).

Below, Appellants also relied on *Nimmer*'s treatise and statements he made as the undersigned's co-counsel in *Milne*. ER-99, 1019. Appellants forfeited these arguments by not pressing them in their opening brief. *See Liberal v. Estrada*, 632 F.3d 1064, 1072 n.6 (9th Cir. 2011). They also fail, in any event, as *Milne* expressly rejected Nimmer's views—both those expressed as an advocate and in his treatise, 430 F.3d at 1047. *See* ER-16-17, 1165-67, 1328-30.

## **CERTIFICATE OF COMPLIANCE**

1.  This Answering Brief Of Appellee DC Comics complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 13,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This Answering Brief Of Appellee DC Comics complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 Times New Roman size 14-point.

Dated:  April 12, 2013                    O'MELVENY & MYERS LLP

                                          By:   /s/  Matthew T. Kline
                                                Matthew T. Kline
                                                Attorneys for DC

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, DC identifies the following related cases decided by this Court:

1. *Pacific Pictures Corp. v. United States District Court*, Appeal No. 11-71844 (Kozinski, C.J.; O'Scannlain, J.; Smith, J.). Certain Appellants here filed a petition for a writ of mandamus, which this Court denied in a published opinion issued on April 17, 2012, and amended on May 10, 2012. *In re Pac. Pictures Corp.*, 2012 WL 1293534 (9th Cir. Apr. 17, 2012); *In re Pac. Pictures Corp.*, 679 F.3d 1121 (9th Cir. 2012) (amended). The panel and full court denied Appellants' petitions for rehearing. Appeal No. 11-71844, Docket No. 44.

2. *Pacific Pictures Corp. v. DC Comics*, Appeal No. 11-56934 (Reinhardt, J.; Thomas, J.; Sedwick, D.J.). Appellants here appealed the district court's denial of their motion to strike DC's state-law claims under California's anti-SLAPP statute. The Court denied the appeal in a memorandum opinion issued on January 10, 2013, Appeal No. 11-56934, Docket No. 66, and issued a published opinion on a threshold jurisdictional question, *DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009 (9th Cir. 2013). The Court issued its final mandate on February 4, 2013. Appeal No. 11-56934, Docket No. 68.

3. *Larson v. Warner Bros. Entm't Inc.*, Cross-Appeal Nos. 11-55863, 11-56034 (Reinhardt, J.; Thomas, J.; Sedwick, D.J.). DC and Laura Siegel Larson, an

Appellant here, filed cross-appeals in the related *Larson* case. In a memorandum opinion issued on January 10, 2013, the Court ruled in DC's favor on its settlement defense and remanded the case to the district court for further proceedings. Appeal No. 11-55863, Docket No. 70-1. The Court issued its final mandate on February 4, 2013. Appeal No. 11-55863, Docket No. 71.

4. Appellants filed two other interlocutory appeals in this *Pacific Pictures* case—one which this Court dismissed for lack of jurisdiction, Appeal No. 10-56594, Docket No. 15, and one which Appellants withdrew, Appeal No. 10-56980, Docket No. 9-2. They also filed an emergency petition for a writ of mandamus in this *Pacific Pictures* case that this Court denied. Appeal No. 10-73851, Docket Nos. 1-3; 13.

Dated: April 12, 2013                    O'MELVENY & MYERS LLP

                                         By:   /s/  Daniel M. Petrocelli
                                               Daniel M. Petrocelli
                                               Attorneys for DC

OMM_US:71467754

57

9th Circuit Case Number(s) | 12-57245

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) April 12, 2013 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Cassandra L. Seto

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)