Appeal No. 12-57245
Oral Argument Scheduled for May 23, 2013
(Reinhardt, J; Thomas, J; Sedwick, D.J.)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

PACIFIC PICTURES CORPORATION ET AL.,
*Defendants and Appellants,*

*v.*

DC COMICS,
*Plaintiff and Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-10-3633 ODW (RZx)

————————

## APPELLEE DC COMICS'
## SUPPLEMENTAL EXCERPTS OF RECORD

## VOLUME 1 OF 1

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Plaintiff and Appellee DC Comics*

## INDEX TO SUPPLEMENTAL EXCERPTS OF RECORD

| Docket No. | Filing Date | Document Title | Page |
|---|---|---|---|
| 612 | 04/04/13 | Excerpt from "Order Denying DC's Motion For Attorneys' Fees" | 1 |
| 522 | 11/15/12 | "DC Comics' Opposition To Defendants' Motion To Vacate October 17, 2012 Order Granting DC Comics Partial Summary Judgment On Its First And Third Claims, And For An Evidentiary Hearing" | 7 |
| 493 | 09/21/12 | "Declaration Of Daniel M. Petrocelli In Support Of Request For Continuance Of Summary Judgment Under Fed. R. Civ. P. 56(d), And In Support Of DC's Opposition To Defendants' Motion For Partial Summary Judgment" | 23 |
| 493-1 | 09/21/12 | *Excerpt from Exhibit 3: Transcript of the September 18, 2012 deposition of Marc Toberoff* | 38 |
| 463 | 07/30/12 | "Declaration of Keith G. Adams In Support Of Defendants' Opposition To DC's Motion For Partial Summary Judgment On Its First And Third Claims For Relief" | 46 |
| 463-4 | 07/30/12 | *Exhibit 27: Letter re: "Pacific Pictures Agreements," dated August 2, 2011* | 53 |
| 460 | 07/16/12 | "Declaration of Paul Levitz In Support Of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief" | 55 |
| 460-1 | 07/16/12 | *Exhibit 10: Letter from Jean Peavy to Paul Levitz, dated October 7, 1992* | 60 |
| 460-1 | 07/16/12 | *Exhibit 23: Letter from Paul Levitz to Jean Peavy, dated September 7, 1993* | 62 |

| 460-1 | 07/16/12 | *Exhibit 27: Letter from Paul Levitz to Jean Peavy and Frank Shuster, dated July 11, 1994* | 66 |
|---|---|---|---|
| 460-1 | 07/16/12 | *Exhibit 33: Letter from Paul Levitz to Jean Peavy, dated June 7, 1995* | 69 |
| 460-1 | 07/16/12 | *Exhibit 39: Letter from Paul Levitz to Jean Peavy, dated March 25, 1996* | 72 |
| 460-1 | 07/16/12 | *Exhibit 41: Letter from Jean Peavy to Paul Levitz to Jenette Kahn, dated March 29, 1996* | 75 |
| 460-1 | 07/16/12 | *Exhibit 42: Letter from Paul Levitz to Jean Peavy and Frank Shuster, dated March 30, 1996* | 78 |
| 460-2 | 07/16/12 | *Excerpt from Exhibit 44: "DREAMERS" screenplay, co-authored by Mark Warren Peary and sent by Peary to Paul Levitz on May 29, 1996* | 81 |
| 460-2 | 07/16/12 | *Exhibit 46: Letter from Paul Levitz to Jean Peavy, dated November 18, 1996* | 108 |
| 460-2 | 07/16/12 | *Exhibit 53: Letter from Paul Levitz to Jean Peavy, dated July 9, 1998* | 110 |
| 460-2 | 07/16/12 | *Exhibit 59: Letter from Jean Peavy to Paul Levitz, dated September 7, 1999* | 113 |
| 460-2 | 07/16/12 | *Exhibit 60: Letter from Paul Levitz to Jean Peavy, dated October 18, 1999* | 115 |
| 460-2 | 07/16/12 | *Exhibit 62: Letter from Mark Warren Peary and Jean Peavy to Paul Levitz, dated November 5, 1999* | 118 |
| 460-2 | 07/16/12 | *Exhibit 67: Letter from Paul Levitz to Jean Peavy, dated November 20, 2000* | 121 |
| 460-2 | 07/16/12 | *Exhibit 71: Letter from Paul Levitz to Jean* | 123 |

| | | *Peavy, dated December 11, 2001* | |
|---|---|---|---|
| 459 | 07/16/12 | "Declaration Of Daniel M. Petrocelli In Support Of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief" | 126 |
| 459-3 | 07/16/12 | *Exhibit 21: "Affidavit of Jean Peavy Under California Probate Code Section 13101," dated August 17, 1992* | 134 |
| 459-3 | 07/16/12 | *Excerpt from Exhibit 39: Excerpts from the transcript of the November 11, 2006 deposition of Mark Warren Peary* | 137 |
| 360-1 | 01/23/12 | "Declaration Of Cassandra Seto In Support Of DC Comics' Motion For Leave To Conduct Further Deposition Of Dawn Peavy" | 143 |
| 360-2 | 01/23/12 | *Exhibit Q: "The Last Will and Testament of Jean Peavy," produced by defendants on September 30, 2011* | 147 |
| 345 | 11/04/11 | "Order Vacating Defendants' Consolidated Motion To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" | 150 |
| 343 | 11/03/11 | "Notice of Withdrawal of Defendants' Consolidated Notice of Motion and Motion To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" | 151 |
| 337 | 10/25/11 | "Order Denying Defendants' Motion to Strike Pursuant to Anti-SLAPP Statute" | 154 |
| 334 | 10/24/11 | Excerpt from "DC Comics' Opposition to Defendants' Consolidated Motion To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" | 161 |
| 333 | 10/14/11 | Excerpt from "Defendants' Consolidated Notice of Motion and Motion To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" | 165 |

| 308 | 08/09/11 | Excerpt from "Declaration of Daniel M. Petrocelli In Support Of DC Comics' Updated Initial Opposition to Defendants' Motion To Strike Under California's Anti-SLAPP Statute" | 169 |
|---|---|---|---|
| 305-37 | 08/09/11 | *Excerpt from Exhibit 37: Transcript of the June 29, 2011 deposition of Mark Warren Peary* | 172 |
| 191 | 03/29/11 | Excerpt from "Defendants Mark Warren Peary, As Personal Representative Of The Estate of Joseph Shuster, And Jean Adele Peavy's Reply In Support Of Renewed Motion To Dismiss And/Or Stay Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)" | 217 |
| 147-1 | 01/14/11 | Excerpt from "Memorandum Of Points And Authorities In Support Of Defendants Joanne Siegel and Laura Siegel Larson's Renewed Motion and Motion To Dismiss And/Or Strike Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)" | 220 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 6 of 230

O

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11   DC COMICS,                            Case No. 2:10-cv-03633-ODW(RZx)
12              Plaintiffs,                 **ORDER DENYING DC'S MOTION
         v.                                 FOR ATTORNEYS' FEES [562]**
13
     PACIFIC PICTURES CORPORATION;
14   IP WORLDWIDE, LLC; IPW, LLC;
     MARC TOBEROFF; MARK WARREN
15   PEARY; JEAN ADELE PEAVY, LAURA
     SIEGEL LARSON; DOES 1–10,
16   inclusive,
17              Defendants.
18
19                   **I.    INTRODUCTION**
20        In 2010, DC Comics filed suit against (among others) the heirs of Superman co-
21   creator Joseph Shuster, alleging that the heirs' attempted copyright-grant termination
22   was ineffective.  DC also sought to invalidate three agreements between the heirs and
23   Defendants Marc Toberoff and Pacific Pictures Corporation under 17 U.S.C.
24   § 304(c)(6)(D).  After two years of acrimonious litigation, the Court granted partial
25   summary judgment on both claims in DC's favor.
26        DC now moves for $500,000 in attorneys' fees under the Copyright Act's fee-
27   shifting statute, 17 U.S.C. § 505.  But DC seeks fees only against Toberoff, and only
28   on its third claim concerning the heirs' 2001 and 2003 agreements with Pacific

Case: 12-57245, 04/12/2013, ID: 8558288, DktEntry: 24-2, Page 7 of 230

1   Pictures and the 2008 consent agreement between the Shuster and Siegel heirs.
2   Defendants oppose DC's fees request, arguing that DC succeeded only minimally and
3   that Defendants had not asserted any frivolous or unreasonable defenses during the
4   litigation.   After considering the various factors expounded by the United States
5   Supreme Court, as well as public-policy considerations, the Court **DENIES** DC's
6   Motion for Attorneys' Fees.[1]

7                   **II.    FACTUAL AND PROCEDURAL BACKGROUND**

8          In November 2001, Defendants Mark Warren Peary and Jean Adele Peavy
9   entered into a "Joint Venture Agreement" with Defendant Pacific Pictures
10  Corporation, purportedly assigning any interest the heirs would recapture from the
11  1992 Shuster termination notice to the venture.   The parties reaffirmed this agreement
12  in 2003.   But in 2004, the parties rescinded both agreements.   In 2008, the Shuster
13  heirs and the Siegel heirs entered into a consent agreement, which prohibited either
14  family from entering into an agreement with DC without the other's approval.

15         On August 20, 2012, DC moved for partial summary judgment on its first,
16  second, and third claims.   (ECF No. 458.)   DC's first claim sought a declaratory
17  judgment that the Shuster heirs' purported 2003 termination notice was ineffective
18  under the Copyright Act for five alternative reasons.   (FAC ¶¶ 105–34.)   Under its
19  third claim, DC sought a declaratory judgment that the 2001 and 2003 Pacific Pictures
20  agreements and a 2008 consent agreement all violated 17 U.S.C. § 304(c)(6)(D).   (*Id.*
21  ¶¶ 165–73.)   DC argued that, as the allegedly terminated grantee, it was the only party
22  with which the Shuster heirs could enter into an agreement regarding the Superman
23  rights expected to be recovered from the 2003 termination.   (ECF No. 458, at 31–33.)

24         Defendants filed a cross-motion for partial summary judgment on the same
25  claims.   (ECF No. 478.)   With respect to DC's first claim, Defendants argued that
26  Mark Warren Peary validly terminated the 1992 agreement in 2003 under 17 U.S.C.
27

28  _____
[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter
    appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

Case: 12-57245, 04/12/2013, ID: 8558288, DktEntry: 24-2, Page 8 of 230

1    The United States Supreme Court has expounded four nonexclusive factors a
2  district court should consider in determining whether to award attorneys' fees under
3  this section: (1) frivolousness; (2) motivation; (3) objective unreasonableness in both
4  the factual and legal components of the case; and (4) the need to advance
5  compensation and deterrence goals. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n.19
6  (1994).   The Ninth Circuit also considers the prevailing party's degree of success.
7  *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 787 (9th Cir. 2006).
8  Despite these vague factors, the Ninth Circuit has emphasized that an attorneys'-fees
9  award is "reposed in the sound discretion of the district courts." *Fantasy, Inc. v.*
10 *Fogerty*, 94 F.3d 553, 555 (9th Cir. 1996).

11                          **IV.   DISCUSSION**

12   DC moves for attorneys' fees solely against Toberoff and Pacific Pictures and
13 only based on DC's third claim.  DC argues that since Defendants have agreed that the
14 2001 and 2003 Pacific Pictures agreements were invalid, they should have stipulated
15 to judgment in DC's favor on the third claim and saved DC from having to spend
16 $500,000 prosecuting that claim.

17   Defendants respond that DC did not obtain any meaningful relief against
18 Toberoff or Pacific Pictures, because Defendants voluntarily rescinded the Pacific
19 Pictures agreements in 2004—six years before this litigation commenced.  Defendants
20 also assert that nothing they argued was frivolous or objectively unreasonable,
21 considering the scant authority interpreting § 304(c)(6)(D).  The Court considers each
22 party's arguments in turn.

23 **A.   Degree of success DC obtained**

24   The United States Supreme Court has interpreted that a party must have
25 obtained "a corresponding alteration in the legal relationship of the parties" to be
26 considered a "prevailing party" under a federal fee-shifting statute. *Buckhannon*, 532
27 U.S. at 602.  The Ninth Circuit has adopted this *Buckhannon* test in the Copyright Act
28 attorneys'-fees context. *Cadkin v. Loose*, 569 F.3d 1142, 1149 (9th Cir. 2009).

4

Case: 12-57245, 04/12/2013, ID: 8558288, DktEntry: 24-2, Page 9 of 230

1    DC argues that it obtained precisely the relief it sought through the Court's
2    partial-summary-judgment Order: a declaration that the 2001, 2003, and 2008
3    agreements violated § 304(c)(6)(D). (Mot. 2–3.) Even though Toberoff and Pacific
4    Pictures were not parties to the 2008 consent agreement, DC contends that its third
5    claim nevertheless targeted Toberoff's conduct in "orchestrating [the] lock-up
6    agreements." (Reply 4.)

7    Defendants disagree, arguing that since Defendants voluntarily canceled the
8    Pacific Pictures agreements in 2004 and never asserted that they were valid, DC did
9    not achieve any significant alteration in the parties' legal relationship. (Opp'n 1, 4, 6–
10   9.) Further, Toberoff contends that he is not personally liable for any of DC's
11   attorneys' fees, because he was not a party to the 2008 consent agreement and only
12   acted as the Shuster heirs' attorney. (*Id.* at 9–10.)

13   In its partial-summary-judgment Order, the Court reasoned that the "multiple
14   agreements purporting to grant or otherwise encumber" the alleged rights to be
15   recovered from the 2003 termination ran afoul of § 304(c)(6)(D) and were therefore
16   invalid. (ECF No. 507, at 17.) These agreements, as noted in the Court's partial
17   judgment, were the 2001 and 2003 Pacific Pictures agreements and the 2008 consent
18   agreement between the Shuster and Siegel heirs. (ECF No. 540.) So, even though
19   Defendants voluntarily terminated the 2001 and 2003 agreements, the 2008 consent
20   agreement remained in full force until the Court invalidated it. This nullification did
21   indeed alter the legal relationship between DC and the Shuster heirs: without it, DC is
22   now free to negotiate with either family without the other family's consent.

23   But DC achieved only limited success on its third claim. While DC's first
24   claim—under which it retained the rights to Superman—was worth millions of
25   dollars, its third claim stands in stark contrast. DC simply obtained the freedom to
26   unilaterally negotiate with one family (the Shusters) over rights the Shuster heirs do
27   not have. The Ninth Circuit's degree-of-success factor contemplates that a party's
28   favorable judgment falls on a continuum. DC's exiguous success on its third claim

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 10 of 230

1   ranks at the lower end of that spectrum, thus weighing against an attorneys'-fees
2   award. *See Park, ex rel. Park v. Anaheim Union High School Dist.*, 464 F.3d 1025,
3   1036 (noting that a court may deny attorneys' fees when "plaintiff's success on a legal
4   claim can be characterized as purely technical or de minimis").

5   **B.   Frivolousness and objective unreasonableness**

6       The Ninth Circuit recently held that "a losing party's claim can be a relevant
7   indicator of whether the [Copyright] Act's primary objective is being served by the
8   litigation." *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, No. 10-56535, 2013 WL
9   1004610, at *5 (9th Cir. Mar. 11, 2013) (slip op.) (internal quotation marks omitted);
10  *see also Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 883 (9th
11  Cir. 2005).   The Supreme Court has not defined objective unreasonableness in the
12  copyright context.   But in another area, the Court noted that an argument is "frivolous
13  where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S.
14  319, 325 (1989).

15      DC asserts that since Defendants declined to stipulate to judgment on DC's
16  third claim, DC was "forced" to, among other things, prosecute that claim, defend
17  against motions to dismiss, and prepare its partial-summary-judgment motion.
18  (Mot. 4.) DC also argues that Defendants' opposition to the third claim ran counter to
19  a "right" the Ninth Circuit allegedly recognized in favor of original grantees like DC.
20  (Reply 8); *see also Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th
21  Cir. 2005).   Since the Court approvingly cited *Milne* in its partial-summary-judgment
22  Order, DC asserts that Defendants "had no basis to oppose DC's Third Claim."
23  (Reply 8–9.)

24      Defendants respond that they always agreed that the 2001 and 2003 Pacific
25  Pictures agreements were invalid and never debated their legality during the litigation.
26  (Opp'n 4; *see also* ECF No. 191, at 8 (conceding that the agreements were void "*ab*
27  *initio*"); Peary Dep. 225:16–17, June 29, 2011 (ECF No. 305–37, at 227) (Toberoff
28  and the Shuster heirs agreed that the Pacific Pictures agreements were "not the best

**SER 5**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 11 of 230

1  supported defenses is wrong.  That is undoubtedly not a message this Court wants to
2  send to Toberoff or others.

### V.    CONCLUSION

4  For the reasons discussed above, DC's Motion for Attorneys' Fees is **DENIED**.

6  **IT IS SO ORDERED.**

8  April 4, 2013

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

12

**SER 6**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 12 of 230

1   DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
6   Facsimile: (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11  DC COMICS,                          Case No. CV 10-03633 ODW (RZx)

12              Plaintiff,              **DC COMICS' OPPOSITION TO
                                        DEFENDANTS' MOTION TO
13       v.                             VACATE OCTOBER 17, 2012
                                        ORDER GRANTING DC COMICS
14  PACIFIC PICTURES CORPORATION,       PARTIAL SUMMARY
    IP WORLDWIDE, LLC, IPW, LLC,        JUDGMENT ON ITS FIRST AND
15  MARC TOBEROFF, an individual,       THIRD CLAIMS, AND FOR AN
    MARK WARREN PEARY, as personal      EVIDENTIARY HEARING**
16  representative of the ESTATE OF
    JOSEPH SHUSTER, JEAN ADELE          DECLARATION OF ASHLEY
17  PEAVY, an individual, LAURA         PEARSON AND [PROPOSED]
    SIEGEL LARSON, an individual and as ORDER SUBMITTED
18  personal representative of the ESTATE CONCURRENTLY HEREWITH
    OF JOANNE SIEGEL, and DOES 1-10,
19  inclusive,                          Hon. Otis D. Wright II

20              Defendants.

21                                      **Hearing Date:** December 17, 2012
                                        **Hearing Time:** 1:30 p.m.
22                                      **Courtroom:** 11

23

24

25

26

27

28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 13 of 230

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................ 1

II.  FACTUAL BACKGROUND ............................................... 2

III. DEFENDANTS' MOTION TO VACATE SHOULD BE DENIED. ............ 6

    A.   Defendants' Motion Is An Improper Request For
       Reconsideration..................................................... 6

    B.   Defendants Cannot Satisfy Their Proposed Rule 60(b)(3)
       Standard................................................................ 9

IV.  DC SHOULD BE AWARDED ITS FEES AND COSTS. ........... 12

V.   CONCLUSION .............................................................. 12

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 14 of 230

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Cryovac,*
862 F.2d 910 (1st Cir. 1988) ........................................................ 10, 11

*Ashton–Tate Corp. v. Ross,*
916 F.2d 516 (9th Cir. 1990) .............................................................. 9

*Brown v. U.S.,*
2011 WL 333380 (C.D. Cal. Jan. 31, 2011) ......................................... 8

*Bunch v. U.S.,*
680 F.2d 1271 (9th Cir. 1982) .......................................................... 11

*Coastal Transfer Co. v. Toyota Motor Sales,*
833 F.2d 208 (9th Cir. 1987) ............................................................. 8

*Dukes v. City of Minneapolis,*
339 F. App'x 665 (8th Cir. 2009) ...................................................... 10

*Edwards v. Carey,*
2006 WL 3437901 (E.D. Cal. Nov. 29, 2006) ..................................... 3

*Figueroa v. Gates,*
2002 WL 31572968 (C.D. Cal. Nov. 15, 2002) ......................... 2, 7, 12

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.,*
2009 WL 7464165 (C.D. Cal. Feb. 18, 2009) ...................................... 8

*In re Impac Mortg. Holdings, Inc. Secs. Litig.,*
2006 WL 6886003 (C.D. Cal. June 9, 2006) .................................... 7, 8

*In re M/V Peacock on Complaint of Edwards,*
809 F.2d 1403 (9th Cir. 1987) ................................................. 9, 10, 11

*In re Staff Inv. Co.,*
146 B.R. 256 (Bankr. E.D. Cal. 1992) .............................................. 10

*In re Vioxx Prods.,*
489 F. Supp. 2d 587 (E.D. La. 2007) ............................................... 11

*Jones v. Aero/Chem Corp.,*
921 F.2d 875 (9th Cir. 1990) ........................................................... 11

*MGA Entm't, Inc. v. Nat'l Prods., Ltd.,*
2012 WL 182158 (C.D. Cal. Jan. 23, 2012) ..................................... 10

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 9**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 15 of 230

*Negrete v. Allianz Life Ins. Co. of N. Am.,*
   2010 WL 4536779 (C.D. Cal. Nov. 1, 2010) ................................................ 8

*Optional Capital, Inc. v. Kim,*
   2008 WL 2986660 (C.D. Cal. Aug. 1, 2008) ................................................ 8

*Price v. Household Int'l Grp. Ins. Plan,*
   2008 WL 4554161 (C.D. Cal. Oct. 7, 2008) ................................................ 9

*Rodriguez v. Cnty. of Stanislaus,*
   2010 WL 4513403 (E.D. Cal. Nov. 2, 2010) ................................................ 3

*Ross v. Corp. of Mercer Univ.,*
   2007 WL 1521605 (M.D. Ga. May 23, 2007) ........................................ 2, 10

*Rozier v. Ford Motor Co.,*
   573 F.2d 1332 (11th Cir. 1978) ............................................................. 11

*Shah v. Cnty. of Los Angeles,*
   2008 WL 4200603 (C.D. Cal. Sept. 4, 2008) ................................................ 8

*Square Constr. Co. v. WMATA,*
   657 F.2d 68 (4th Cir. 1981) ............................................................. 11

*Tatum v. City & Cty. of San Francisco,*
   441 F.3d 1090 (9th Cir. 2006) ............................................................. 9

*Treppel v. Biovail Corp.,*
   233 F.R.D. 363 (S.D.N.Y. 2006) ............................................................. 3

*Universal Dyeing & Printing, Inc. v. U.S. Textile Printing, Inc.,*
   2011 WL 5865567 (C.D. Cal. Nov. 21, 2011) ................................................ 8

*Zurich N. Am. v. Matrix Serv., Inc.,*
   426 F.3d 1281 (10th Cir. 2005) ........................................ 10, 11

**RULES**

FED. R. CIV. P. 37(a)(2) ................................................................. 10

FED. R. CIV. P. 54(b) ................................................................. 6

FED. R. CIV. P. 56(d) ......................................................... 1, 3, 9, 10

FED. R. CIV. P. 60(b)(3) ................................................................. *passim*

C.D. L.R. 7-18 ................................................................. *passim*

C.D. L.R. 83-7 ................................................................. 12

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 10**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 16 of 230

## I.    INTRODUCTION

Defendants' motion to vacate the Court's recent summary judgment ruling is frivolous and should be denied.  It presses meritless discovery arguments about four documents, but none is new.  Defendants raised the *very same arguments* during summary judgment, but the Court declined to credit them and issued its October 17, 2012, ruling in DC's favor.  Defendants' rehashing of the very same discovery disputes now is nothing more than a motion for reconsideration—based on *no new facts or law*, and all in violation of the Court's clear rules.  C.D. L.R. 7-18.

Defendants' motion also fails on the merits.  First, the Court's summary judgment order did not rely upon the four documents at issue.  There is no reason to vacate an order that did not rely on such evidence.  Second, even under defendants' incorrect Rule 60(b) test, they must show that DC's production prevented them from "fairly" presenting their case.  Mot. 8:25-26.  They come nowhere close to meeting this test, which demands that they acted diligently.  Over *seven* months ago, defendants knew that DC used targeted search protocols to locate responsive documents.  Defendants chose never to challenge the protocols—not in a motion to compel, and not in a Rule 56(d) affidavit seeking more discovery before summary judgment.  Similarly, while defendants now say they wish to take further discovery concerning the four documents at issue, they unilaterally cancelled Paul Levitz's deposition—at which they could have questioned him about two of the letters—and never noticed depositions of the authors of the other two documents.

Not only did defendants knowingly sit on their hands and not take the discovery they now seek, they repeatedly told the Court that it should rule on the parties' pending summary judgment motions based on the record before it.  Defendants chose this tactic (as they told the *L.A. Times*) because they thought they would win.  Only now that their prediction was proven incorrect, and only now that Marc Toberoff faces a terminating sanctions motion for violating court orders, do defendants accuse DC of misconduct.  Defendants' effort to go on the "offense" is

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 11**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 17 of 230

1  misguided and violates Local Rule 7-18 and Rule 60(b)(3). *See Ross v. Corp. of*

2  *Mercer Univ.*, 2007 WL 1521605, at *4 (M.D. Ga. May 23, 2007) ("A party who

3  fails to take advantage of discovery opportunities to determine relevant facts prior

4  to dispositive motions cannot cry foul afterwards in the form of a Rule 60(b)(3)

5  motion...."). Defendants' motion to vacate should be denied, and DC should be

6  awarded its fees for having to oppose this wasteful filing. *See Figueroa v. Gates*,

7  2002 WL 31572968, at *3 (C.D. Cal. Nov. 15, 2002).

8  **II.   FACTUAL BACKGROUND**

9      Defendants' motion omits one key record fact after another from the relevant

10  chronology—going so far as to exclude the lengthy meet-and-confer letter DC sent

11  them concerning this motion. Pearson Decl. ("PD") Ex. D. Here are the true facts:

12      1. DC's Search Protocol. Defendants failed to propound any discovery in

13  the case for 18 months. *Id.* ¶ 2. When they finally served discovery in December

14  2011, their requests were overbroad, and DC objected to them on these and other

15  grounds. *Id.* Ex. A. In its objections,[1] written correspondence,[2] and a March 2012

---

[1] *E.g.*, DN 498-2 at 26-27 ("Request No. 7: All DOCUMENTS that RELATE to the 1992 AGREEMENT. [DC's ] Response: DC objects to this Request on the grounds that it is indefinite as to time and not reasonably limited in scope. DC objects to the extent the Request seeks production of "all DOCUMENTS" on the ground that such request is overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.... As used in these Responses, the phrase, "all DOCUMENTS," or phrases of similar import, should be understood to mean those documents DC and its counsel were able to locate using reasonable diligence and reasonable judgment concerning the whereabouts of such documents. Subject to and without waiving all foregoing objections, *DC has conducted a reasonably diligent search of the documents in the possession, custody, or control of relevant custodians* and produces herewith by designation or otherwise all non-privileged, responsive documents.); *id.* at 27-31 (same); *id.* at 127-28 ("Interrogatory No. 5: IDENTIFY all COMMUNICATIONS between YOU AND any third party that REFERRED TO the 1992 AGREEMENT. [DC's] Response: ... As used in these Responses, the phrase "all COMMUNICATIONS," or phrases of similar import, should be understood to mean those communications DC and its counsel were able to locate using reasonable diligence and reasonable judgment concerning the whereabouts of such communications. DC objects to the definition of "YOU" as vague and overbroad and will respond to this term *as limited to the relevant representatives of DC and Warner Bros. Entertainment Inc*. ... Subject to and without waiving the foregoing objections, DC is willing to meet and confer with defendants to reasonably tailor this request.") (emphases added); *id.* at 131-38 (same).

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 18 of 230

1   meet-and-confer call,[3] DC repeatedly told defendants that, given the breadth of their

2   document requests and size of DC and its affiliates, DC could only conduct a good-

3   faith search and review of certain custodians and would produce all non-privileged,

4   responsive documents that the search yielded.

5        Defendants voiced objection to the search methodology and even threatened

6   to move to compel.[4] But in the *seven months that followed*, defendants never so

7   moved and never filed an application for further discovery under FED. R. CIV P.

8   56(d). PD ¶ 2. One of many reasons for their tactical choice was obvious: DC's

9   good-faith search for responsive documents met its obligations under the rules.[5]

10      Indeed, in the seven months after DC served its responses, defendants never

11   made a single proposal about new searches DC should run, despite DC's express

12   invitations to suggest any. *Supra* nn.2-3; PD Ex. D at 128. Only after DC filed its

13   pending sanctions motion, DN 500, and only after DC won on summary judgment,

14   did defendants act, PD Ex. D at 129. Even now, defendants fail to propose any new

15   searches DC should run, *id.*—as their true purpose in filing the present motion is

---

16     [2] *E.g.*, DN 498-2 at 148 ("DC conducted a reasonable and diligent search and
investigation in responding to Peary's interrogatories, and defendants have shown no
17   reason why DC's efforts did not comply with its discovery obligations. DC is not
required by the federal rules to conduct a search of *all* documents in its possession to
18   adequately respond to Peary's interrogatories, including documents that have no relevance
to claims in this case or Superman. If you want to have a discussion about DC's search
19   efforts, we are prepared to have one this Friday, and if the specific further details you
request are appropriate and relevant, DC is willing to consider furnishing them, though we
20   note that defendants have consistently refused to provide a similar accounting.")

21     [3] DN 498-1 ¶¶ 8-9.

22     [4] *E.g.*, DN 498-1 ¶¶ 8-9; 498-2 at 152-53 ("DC is not entitled to unilaterally pick and
choose the sources of information it reviews in response to an interrogatory; rather, DC
23   must provide a full response based on the information in its possession…. For the above
stated reasons, defendant Peary will move to compel supplemental responses to these
24   discovery requests in the event DC does not resolve these issues.")

25     [5] *E.g.*, *Rodriguez v. Cnty. of Stanislaus*, 2010 WL 4513403, at *3 (E.D. Cal. Nov. 2,
2010) (denying discovery motion where party "established that a good faith and
26   reasonably diligent search was conducted for the records Plaintiff seeks"); *Edwards v.
Carey*, 2006 WL 3437901, at *1 (E.D. Cal. Nov. 29, 2006) (denying motion to compel
27   where defendants conducted a "reasonable and diligent search"); *see also Treppel v.
Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006) (observing that discovery obligations
28   do not extend to "examin[ation of] every scrap of paper").

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 13**

1    not to obtain discovery, but to accuse DC of wrongdoing in the misguided hope of

2    misdirecting the Court from their own misdeeds. *Compare* DN 500, *with* 517 at 18.

3         2.  The Two Jean Peavy Letters.  In preparing its summary judgment papers,

4    DC located two letters from defendant Jean Peavy to former DC President Paul

5    Levitz that neither DC nor defendants had produced. *Id.* ¶ 4; Ex. C. DC produced

6    these two letters before moving for summary judgment, *id.*, invited defendants to

7    depose Levitz concerning the letters, *id.* ¶ 3, Ex. B, and cited the letters in its

8    summary judgment papers as part of DC's long chain of correspondence with the

9    Shuster family, DN 458-1 at 5 (Uncontroverted Fact No. 20).

10        Defendants chose not to depose Levitz, unilaterally cancelling his deposition

11   days before it was scheduled in July, and they have never attempted to reschedule it

12   in the four months since. PD ¶ 3; Ex. B at 115-19.  And despite angry letters to

13   DC, defendants' summary judgment papers made *no objection* to the two new

14   Peavy letters or DC's citation to them.  To the contrary, defendants affirmatively

15   relied on the letters themselves, (wrongly) arguing that the letters favored their

16   position, DN 465 at 12-13, 19, 41-42, as they again do now, Mot. at 4-5.

17        3.  The Bonesteel Declaration and Josephson Letter.  At the September 5 oral

18   argument on DC's summary judgment motion, defendants made a spectacle

19   claiming that DC never relied on its 1992 Agreement with the Shusters as

20   establishing its rights in Superman.[6] DC responded to this spurious and irrelevant

21   argument by conducting additional diligence and submitting a declaration from

22   Damon Bonesteel pointing out that, for example, many years earlier, in a French

23   public filing, Warner Bros. had in fact relied on the 1992 Agreement as a source of

24

25        [6] *See* DN 489, Hr'g Tr. at 24:15-24 ("You know what the first time is [DC] mentioned
     the 1992 agreement?  After they replaced their lawyers and they hired new counsel, and

26   new counsel came up with this theory.  But, that is what I meant, your Honor, when I was
     talking about fancy.  I wasn't referring to your tentative.  I was referring to a new

27   argument that is being contrived by lawyers...."); *id.* at 34:15-22 ("DC has never acted as
     if this 1992 agreement is the basis of its chain of title"); *id.* at 39:18-40:4 ("They came up

28   with that argument when they hired Mr. Petrocelli in 2010.").

DC'S OPP. TO DEF.'S MOT. TO
                                            VACATE OCT. 17, 2012 ORDER

**SER 14**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 20 of 230

1    its rights.  DN 491 at 11:11-17 & nn.7-8.  DC did not include a copy of the filing

2    with its opposition brief because it had not been among the targeted files it had

3    previously searched and thus had not been produced in discovery.  DC provided

4    defendants with a copy of the French filing when they asked for it, DN 498 at 1,

5    and rather than address its contents in their reply brief, defendants made a "best

6    evidence" objection to Bonesteel's declaration, DN 495-2 at 4.  To meet this

7    objection, DC submitted the underlying French filing to the Court.  DN 498 at 1-2;

8    498-2 at 5-15.  Defendants also argued DC's filing with the French authorities was

9    the only document of its kind.  DN 495-2 at 2.  So DC submitted another such

10   government submission—a letter from Donna Josephson to Canadian authorities

11   that DC's new search had also revealed.  DN 498 at 2; 498-2 at 16-18.

12        Defendants responded with a lengthy objection targeting *all four documents*

13   about which they now complain in their motion to vacate.  DN 499.  They argued

14   the Court should strike the Bonesteel and Josephson documents, and that DC had

15   "secreted" this evidence along with the two Peavy letters.  *Id.* at 1-4 & n.1.  In this

16   October 5, 2012, filing—much of which they now repeat verbatim in their motion

17   to vacate—defendants never argued that a summary judgment ruling could not issue

18   because of pending document discovery disputes.  To the contrary, they urged the

19   Court to rule and grant them judgment on DC's First Claim, *id.* at 3:26-4:4, and

20   they argued (as they do here) that DC's new documents helped prove their case, *id.*

21   at 3:8-25; Mot. 6.  Defendants pressed the Court for a ruling because they assumed

22   they would win summary judgment.  B. Fritz, *With Superman Decision Imminent,*

23   *Warner Goes After Attorney,* LOS ANGELES TIMES, Oct. 11, 2012 (Marc Toberoff:

24   "'The summary judgment hearing went very badly for DC and [its sanctions

25   motion] is a distraction tactic to muddy the waters in an attempt to elicit bias.'").

26        4. The Court's Summary Judgment Ruling.  After receiving defendants'

27   October 5 objections to all four documents at issue here, the Court, on October 17,

28   granted summary judgment in DC's favor on its First and Third Claims.  DN 507.

- 5 -

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 21 of 230

1  The Court's ruling never cites or discusses the Bonesteel or Josephson documents;

2  nor does it address defendants' irrelevant and false claim that DC recently

3  "contrived" its reading of the 1992 Agreement. *Id*. The Court also did not cite the

4  two Peavy letters, except to note the volume of correspondence between DC and

5  the Shusters. *Id*. at 4. In fact, the Court held that the 1992 Agreement was clear on

6  its face, that DC was entitled to judgment based on its plain text, and that the Court

7  need not consider other evidence to bolster that conclusion. *Id*. at 7.

8      5. Defendants' Varied Responses To The Court's Ruling. Defendants

9  responded to the Court's summary judgment ruling by first saying the parties

10  should agree to a Rule 54(b) appeal on DC's First and Third Claims. Defendants

11  then argued the summary judgment motion should be vacated because of DC's

12  alleged discovery misconduct. DC disagreed, and urged defendants not to file

13  either motion, PD Exs. D, E, but if they did file, to make sure the motion to vacate

14  was resolved before they filed a Rule 54(b) motion—which seeks directly

15  inconsistent relief, *id*. ¶ 5. DC has also pointed out why defendants' Rule 54(b)

16  proposal was both premature and improper. *Id*. Ex. E.

17      Defendants pressed ahead and simultaneously filed their motions to vacate

18  and under Rule 54. DN 513, 514. The motion to vacate makes the same arguments

19  about DC's discovery responses that defendants and DC briefed in October—*weeks*

20  *before* this Court's summary judgment order issued. *Cf.* DN 495-2, 498, 499.

21  **III.   DEFENDANTS' MOTION TO VACATE SHOULD BE DENIED.**

22      A. Defendants' Motion Is An Improper Request For Reconsideration.

23      Defendants' motion to vacate improperly repeats the same complaints about

24  DC's discovery responses that they made in their failed summary judgment

25  briefing. A motion for reconsideration may be made "*only* on the grounds of (a) a

26  material difference in fact or law that … *could not have been known to the party*

27  *moving for reconsideration at the time of such decision*; (b) the emergence of new

28  material facts or a change of law occurring *after the time of the decision*; or (c) a

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

SER 16

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 22 of 230

1    manifest showing of a failure to consider material facts presented to the Court

2    before such decision." C.D. L.R. 7-18 (emphasis added). The Rule specifically

3    mandates that "[n]o motion for reconsideration shall in any manner repeat any oral

4    or written argument made in support of or in opposition to the original motion." *Id.*

5        1. Defendants' motion to vacate presents no new facts or law—it simply

6    rehashes the same story defendants told this Court in their summary judgment

7    briefing. When DC submitted the Bonesteel declaration, defendants objected,

8    arguing that the public filing it discusses should have been produced earlier in

9    response to Peary's discovery requests. DN 495-2 at 3-4. When DC submitted the

10   underlying public document and the Josephson letter (at defendants' prompting),

11   defendants filed a brief urging the Court to exclude from its consideration *all four*

12   of the documents that defendants' motion now targets. DN 499. In this October 5

13   filing, defendants claimed the four documents were responsive to Peary's discovery

14   requests and accused DC of "improperly" withholding them. *Id.* at 1, 3 & n.1.

15       Having lost on summary judgment, defendants now repeat the same

16   arguments here, *e.g.*, Mot. 6 ("The Bonesteel Document that DC had withheld was

17   directly responsive to Defendants' initial requests for production."), in direct

18   contravention to the "rigorous" standard for Rule 7-18 motions, *In re Impac Mortg.*

19   *Holdings, Inc. Secs. Litig.*, 2006 WL 6886003, at *1 (C.D. Cal. June 9, 2006).

20   Worse yet, defendants rehash these prior arguments without properly styling their

21   motion as one for reconsideration, or even attempting to cite or meet the demanding

22   Rule 7-18 test. *Cf. Figueroa v. Gates*, 2002 WL 31572968, at *3 (C.D. Cal. Nov.

23   15, 2002) (sanctioning party for such gamesmanship).

24       2. Defendants never mention the Rule 7-18 standard because they cannot

25   meet it. They point to no new fact that emerged "*after the time of the* [Court's

26   summary judgment] *decision*," a prerequisite to their motion. C.D. L.R. 7-18(a)-(b)

27   (emphasis added). Defendants possessed all four documents about which they

28   complain before summary judgment briefing closed; they objected to the evidence

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

SER 17

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 23 of 230

1   and/or relied on it themselves; and they made the tactical choice not to seek any

2   further discovery related to the documents before judgment issued.  Evidence is not

3   *new* if it was "in the possession of the party before the judgment was rendered."

4   *Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208 (9th Cir. 1987); *Optional*

5   *Capital, Inc. v. Kim*, 2008 WL 2986660, at * 3 (C.D. Cal. Aug. 1, 2008) (same).

6          Case after case rejects the very sort of motion defendants have brought.  *E.g.*,

7   *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 2009 WL 7464165, at *1 (C.D. Cal. Feb.

8   18, 2009) (court will not consider on motion for reconsideration "arguments already

9   made by [moving party] in … cross-motions for summary judgment"); *Universal*

10  *Dyeing & Printing, Inc. v. U.S. Textile Printing, Inc.*, 2011 WL 5865567, at *1

11  (C.D. Cal. Nov. 21, 2011) (denying motion for reconsideration where moving party

12  "repeat[ed] its previously made arguments regarding Defendants' alleged

13  misconduct and discovery violations"); *Shah v. Cnty. of Los Angeles*, 2008 WL

14  4200603, at *1 (C.D. Cal. Sept. 4, 2008) (denying motion for reconsideration where

15  moving party "raise[d] no new objections . . . that were not raised in his [previously

16  filed] objections"); *Impac*, 2006 WL 6886003, at *2 (moving party "may not

17  reargue" points already made "by way of a motion for reconsideration").

18         3.  Nor have defendants made a showing that this Court "manifest[ly]" failed

19  to consider material facts and evidence in granting DC summary judgment.  C.D.

20  L.R. 7-18(c).  There is nothing in the Court's 18-page opinion suggesting it failed

21  to consider any issue.  *Cf. Brown v. U.S.*, 2011 WL 333380, at *3 (C.D. Cal. Jan.

22  31, 2011) ("[r]egardless of whether a particular argument was addressed explicitly"

23  in a court's order, "conclusory assertions that these arguments were 'overlooked'"

24  were insufficient to justify reconsideration); *Negrete v. Allianz Life Ins. Co. of N.*

25  *Am.*, 2010 WL 4536779, at *5 (C.D. Cal. Nov. 1, 2010) ("Local Rule 7-18(c) does

26  not require the Court to address in its Order every single piece of evidence [a party]

27  submits, or argument in [a party's] briefs"); *Price v. Household Int'l Grp. Ins. Plan*,

28  2008 WL 4554161, at *3 (C.D. Cal. Oct. 7, 2008) (discussion of evidence in

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 18**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 24 of 230

1    briefing "precludes the argument that the court was unaware of or failed to consider

2    the effects of [it]"). Indeed, the Court ostensibly did what defendants asked it to do:

3    It made no mention of the Bonesteel or Josephson evidence, and it did not quote or

4    place any direct reliance on the two Peavy letters. *Supra* at 1, 4-5.

5       B. Defendants Cannot Satisfy Their Proposed Rule 60(b)(3) Standard.

6       Because defendants' motion is really a motion for reconsideration, there is no

7    need for this Court to apply "standards borrowed from Rule 60(b)(3)." Mot. at 8.

8    But even under that asserted test, *id.*, defendants' motion must be denied.  DC did

9    not commit any "misconduct," and DC did not prevent defendants from "'fully and

10   fairly presenting the case.'" *Id.* (quoting *In re M/V Peacock on Complaint of*

11   *Edwards*, 809 F.2d 1403, 1404-05 (9th Cir. 1987)).

12      *1. No Misconduct.*  DC conducted a good-faith search for non-privileged,

13   responsive documents, and invited defendants to discuss the search methodology

14   and even to propose new searches. *Supra* at 2-3.  The law permits this approach,

15   and tellingly defendants never challenged this protocol—either through a motion to

16   compel, or a Rule 56(d) application. *Id.*[7]  Upon discovering the two Peavy letters,

17   DC produced them and invited defendants to depose Levitz.  Defendants not only

18   declined, they cited and relied on the Peavy letters as evidence supporting their

19   cross-summary judgment motion. *Supra* at 4.  And while defendants objected to

20   the Bonesteel and Josephson materials (and attacked DC concerning the Peavy

21   letters and its discovery responses generally), they never once sought to halt the

22   summary judgment process so as to obtain any additional discovery. *Id.* at 4-6.

23   *They urged the Court to rule*, and only raised the need to take new discovery after

24   the Court granted summary judgment in DC's favor, not theirs. *Id.*

---

25      [7] Defendants' motion to vacate cannot be treated as an untimely Rule 56(d) motion.
26   "[T]he process of evaluating a summary judgment motion would be flouted if requests for
     more time [and] discovery" could be filed after the hearing on the summary judgment.
27   *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir. 1990).  Moreover, defendants'
     motion to vacate is not accompanied by the required Rule 56(d) affidavit. *See Tatum v.*
28   *City & Cty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 19**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 25 of 230

1    Defendants' cited cases are nowhere near on point.  For example, *Anderson*

2    *v. Cryovac*, 862 F.2d 910, 927-29 (1st Cir. 1988), held that defendants engaged in

3    discovery misconduct by knowingly and repeatedly failing to produce a highly

4    relevant geographical report, despite repeated requests from plaintiffs *and a court*

5    *order* rejecting the defendants' challenge to those requests.  *See also MGA Entm't,*

6    *Inc. v. Nat'l Prods., Ltd.*, 2012 WL 182158, at *10 (C.D. Cal. Jan. 23, 2012)

7    (defendants withheld contracts that were clearly germane to plaintiffs' allegations);

8    *In re Staff Inv. Co.*, 146 B.R. 256, 264 (Bankr. E.D. Cal. 1992) (debtor made

9    affirmative misrepresentations in order to obtain a dismissal of the action).  DC did

10   nothing of the sort; when it discovered new and possibly germane documents, it

11   produced them.  Defendants' failure to cite a single case finding "misconduct" on

12   similar facts illustrates their inability to meet the first half of the Rule 60(b)(3) test.

13       *2. Fairness.*  Defendants also fail to show they were prevented from "fully

14   and fairly presenting their case."  *M/V Peacock*, 809 F.2d at 1404-05.  First and

15   foremost, before losing on summary judgment, defendants eschewed multiple

16   opportunities to conduct the very discovery they now seek.  They chose not to file

17   motions to compel, chose not to file a Rule 56(d) application, declined depositions,

18   and even urged the Court to rule on the summary judgment record then before it.

19   *Supra* at 2-6; DN 499 at 3-4 (Defendants' October 5, 2012, filing: "DC's newfound

20   evidence should be excluded, and Defendants' motion granted.").

21       Defendants' failure to seek discovery is fatal to their claim, for it is well-

22   established that "[t]he proper remedy for any perceived violation of discovery is to

23   seek redress under Rule 37(a)(2), not to wait until after summary judgment and file

24   a Rule 60(b)(3) motion."  *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1292

25   (10th Cir. 2005); *see Dukes v. City of Minneapolis*, 339 F. App'x 665, 668 (8th Cir.

26   2009) ("Notably, while Dukes now complains that the officers never produced the

27   office phone records, he was obligated to pursue the release of those records prior

28   to the grant of summary judgment."); *Ross*, 2007 WL 1521605, at *4 .

- 10 -

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 20**

1    Defendants' cited cases do not upset this plain rule.  Some involve *denials* of

2    Rule 60(b)(3) relief.  *E.g.*, *M/V Peacock*, 809 F.2d at 1405 (no Rule 60(b)(3) relief

3    because defendants' misrepresentations did not prevent plaintiff from presenting

4    case); *Bunch v. U.S.*, 680 F.2d 1271 (9th Cir. 1982) (denying Rule 60(b)(3) motion

5    where witnesses allegedly changed story at trial).  Others feature grants of Rule

6    60(b)(3) relief, but involve egregious misconduct.[8]  Still worse, defendants grossly

7    distort *In re Vioxx Prods.*, 489 F. Supp. 2d 587 (E.D. La. 2007).  Defendants say it

8    involved a grant of Rule 60(b)(3) relief based on "discovery misconduct" regarding

9    a "central issue in [the] litigation."  Mot. at 13.  But in *Vioxx*, the court granted

10   relief because a key defense expert misrepresented his qualifications "to the Court

11   and to the jury *during the trial*."  489 F. Supp. 2d at 588 (emphasis added).  The

12   *Vioxx* opinion nowhere even mentions the word "discovery."

13         In short, Rule 60(b)(3) is not a reset button for defendants' failed strategic

14   choices.  "Parties cannot use Rule 60(b) as a mechanism to correct their own

15   mistakes after summary judgment has not gone their way."  *Zurich*, 426 F.3d at

16   1293.  And, in any event, defendants' proposed remedy—vacating the Court's

17   summary judgment order—makes no sense.  In granting DC judgment, the Court

18   did not rely on any of the challenged documents.  Instead, it concluded that it had to

19   look only at the 1992 Agreement to grant DC judgment on its First Claim.  DN 507

20   at 7 ("[T]he Court finds no ambiguity in the parties' agreement .... [T]he 1992

21   Agreement does in fact settle all prior agreements.").  As for DC's Third Claim,

22   defendants offer no reason or basis to reverse that ruling.

---

[8] *See Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990) (defendants suppressed relevant documents through trial); *Anderson*, 862 F.2d at 930-33 (similar); *Square Constr. Co. v. WMATA*, 657 F.2d 68, 72 (4th Cir. 1981) (similar); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1342 (11th Cir. 1978) (defendant claimed it could not find a salient report, and upon finding it, declined to produce it even once the case went to trial).

DC'S OPP. TO DEF.'S MOT. TO
VACATE OCT. 17, 2012 ORDER

**SER 21**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 26 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 27 of 230

**IV.   DC SHOULD BE AWARDED ITS FEES AND COSTS.**

Defendants' motion flatly violates Rules 7-18 and 60(b)(3).  Under Local Rule 83-7, DC is entitled to its fees and costs in having to oppose this motion.  *E.g.*, *Figueroa*, 2002 WL 31572968, at *3 (awarding attorneys' fees under L.R. 83-7 where "self-styled 'renewed' motion [was] clearly a motion for reconsideration" but moving party "failed to recognize this or to articulate the appropriate standard under Local Rule 7-18").  DC and its counsel are wary ever to seek relief of this sort, but defendants' latest motion (one of hundreds of filings they have made in over-litigating this case) so badly crosses the line as to warrant it.

**V.   CONCLUSION**

Defendants' motion should be denied, and DC should be awarded its fees.

Dated:   November 15, 2012            Respectfully submitted,
                                      O'MELVENY & MYERS LLP

                                      By:  /s/ Daniel M. Petrocelli
                                            Daniel M. Petrocelli

OMM_US:71095319

- 12 -

**SER 22**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 28 of 230

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

12              Plaintiff,              **DECLARATION OF DANIEL M.
                                        PETROCELLI IN SUPPORT OF
13          v.                          REQUEST FOR CONTINUANCE
                                        OF SUMMARY JUDGMENT
14  PACIFIC PICTURES                    UNDER FED. R. CIV. P. 56(d),
    CORPORATION, IP WORLDWIDE,          AND IN SUPPORT OF DC'S
15  LLC, IPW, LLC, MARC TOBEROFF,       OPPOSITION TO DEFENDANTS'
    an individual, MARK WARREN          MOTION FOR PARTIAL
16  PEARY, as personal representative of SUMMARY JUDGMENT
    the ESTATE OF JOSEPH SHUSTER,
17  JEAN ADELE PEAVY, an individual,
    LAURA SIEGEL LARSON, an            Hon. Otis D. Wright II
18  individual and as personal
    representative of the ESTATE OF     **Hearing Date:**   Oct. 15, 2012
19  JOANNE SIEGEL, and DOES 1-10,       **Hearing Time:**   1:30 p.m.
    inclusive,                          **Courtroom:**      11
20
                Defendants.
21

22

23

24

25

26

27

28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 29 of 230

# DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state:

1.      I am a partner at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics in this case.  I make this declaration in support of DC Comics' Request For Continuance Of Summary Judgment Under Fed. R. Civ. P. 56(d), and in support of DC's Opposition To Defendants' Motion For Partial Summary Judgment.  I have personal knowledge of the matters set forth in this declaration.

2.      Defendants have moved for summary judgment on DC's First, Second, and Third Claims for Relief.  DC moved for summary judgment on its Third Claim, and three of the five grounds underlying its First Claim.  *See* Docket No. 458.  The Court tentatively granted DC's motion, and heard oral argument on the motion on September 5, 2012.  (A true and correct copy of the Court's tentative opinion is attached hereto as Exhibit 1; a true and correct copy of the transcript of the September 5 oral argument is attached hereto as Exhibit 2.)

3.      As explained in the sections that follow, discovery is ongoing on the additional issues defendants alone challenge in their cross-motion for summary judgment—chief among them, the unclean-hands ground for relief underlying DC's First Claim, and DC's Second Claim.  Hence, DC asks the Court to defer ruling on these particular issues until discovery is complete.

4.      Under Federal Rule of Civil Procedure 56(d), a party may obtain a continuance on a motion for summary judgment if it appears that he "cannot for reasons stated present by affidavit facts essential to justify his opposition."  If a party making a Rule 56(d) request has "diligently pursued its previous discovery opportunities," *Byrd v. Guess*, 137 F.3d 1126, 1135 (9th Cir. 1998), and sets forth in affidavit form (1) the relevant information it seeks to elicit from further discovery, and (2) the basis for believing that the information sought actually exists, then the additional discovery must be granted.  *VISA Int'l Servs. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986) (reversing district court's

- 1 -

PETROCELLI DECL. ISO DC'S RULE 56(D) REQUEST AND DC'S OPP. TO DEFS.' MSJ

SER 24

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 30 of 230

1   denial of Rule 56(f) application where discovery was not complete); *Metabolife*

2   *Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("the Supreme Court has

3   restated the rule as <u>requiring</u>, rather than <u>merely permitting</u>, discovery 'where the

4   non-moving party has not had the opportunity to discover information that is

5   essential to its opposition'") (underlining added); *Burlington N. Santa Fe R.R. Co.*

6   *v. Assiniboine and Sioux Tribes for the Fort Peck Reservation*, 323 F.3d 767, 773

7   (9th Cir. 2003) (noting that where a summary judgment motion is filed "before a

8   party has had any realistic opportunity to pursue discovery … district court should

9   grant any Rule 56(f) motion fairly freely").

10   **I.**   **DC Has Diligently Pursued Discovery**

11        5.    Since DC filed this case in 2010, it has diligently pursued discovery in

12   aid of its claims, including its unclean-hands claim and its Second Claim, which

13   challenges the scope of the Shuster Termination Notice, assuming the Notice is

14   valid.  DC served hundreds of discovery requests, deposed a number of witnesses,

15   and been forced by defendants' misconduct to file well over 20 discovery motions.

16        6.    Despite reasonable diligence on DC's part, discovery has been delayed

17   due to: (1) an almost two-year-long discovery dispute (and stay that was imposed)

18   concerning the Toberoff Timeline documents; and (2) defendants' efforts to evade

19   and obstruct the discovery process (which will be the subject of an omnibus

20   sanctions motion that DC will file shortly).

21        7.    Defendants' discovery misconduct has particularly prejudiced DC's

22   ability to litigate its unclean-hands claim, which, like any claim involving

23   allegations of fraud and bad faith on the part of defendants, relies on evidence that

24   is uniquely within the offending party's possession. *E.g., Harrods Ltd. v. Sixty*

25   *Internet Domain Names*, 302 F.3d 214, 245-46 (4th Cir. 2002) (reversing grant of

26   summary judgment on Rule 56(f) grounds where plaintiff argued such discovery on

27   bad-faith claim was "uniquely in the possession of defendants").

28        8.    For almost two years—until May 2012—discovery in this case was

- 2 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 31 of 230

1   largely stalled while the parties litigated whether defendants waived privilege over

2   the Toberoff Timeline documents by disclosing them to the U.S. Attorney's office

3   in 2010.  The Timeline documents describe Toberoff's rampant business and ethical

4   misconduct.  *In re Pacific Pictures*, 679 F.3d 1121, 1124 (9th Cir. 2012); Docket

5   Nos. 163-12 at 735-40; 427-3-427-11.

6       9.      The discovery magistrate ordered defendants to produce the Timeline

7   documents to DC in May 2011, but stayed his ruling pending appellate review.

8   Docket No. 262 at 4.  While the case was stayed (and defendants' petition for writ

9   review was pending), DC sought to take a number of depositions of defendants and

10  third party witnesses, but defendants and the third parties argued that DC would

11  only have one chance to depose each witness, and even if the Timeline documents

12  were later produced, DC could not examine the witnesses a second time.

13      10.     In April 2012, the Ninth Circuit affirmed the district court's order

14  compelling defendants to produce the Timeline documents.  *Pacific Pictures*, 679

15  F.3d at 1131.  Defendants delayed producing the documents, filing a series of

16  emergency motions, which this Court and the Ninth Circuit rejected.  Docket Nos.

17  424, 429; 9th Cir. Appeal No. 11-71844 Docket No. 39.  The Timeline documents

18  were finally produced in May 2012, and have revealed not only further evidence of

19  defendants' misconduct, but that defendants have been withholding other

20  documents and important evidence, and misled DC and the Courts about what

21  documents they possessed and what documents were privileged or not.[1]

---

[1] Defendants' obstruction of the discovery process, includes, but is not limited to:
• withholding non-privileged communications between defendant Laura Siegel
  Larson and her brother, Michael Siegel, *e.g.*, Docket Nos. 160 at 37-38; 225-4;
  316 at 21-24; 362-2 at 286-90; 394 at 14-17;
• manipulating privilege logs to conceal non-privileged documents, *e.g.*, Docket
  Nos. 316 at 21-24; 362-2 at 286-90; and
• falsely claiming that responsive documents do not exist, *compare* Docket No.
  395-1 at 96-97 (defendants' statement to the Court at the hearing on DC's
  motion to compel Laura's November 2, 2002, letter to Michael: "there's no
  November 2nd letter as described"), *and* Docket No. 162-12 at 589 ("There are
  no documents related to an offer by a 'billionaire investor' to purchase the
  Siegels' Superman rights"), *with* Docket No. 455-2 at 3-4 (November 2, 2002
  letter, from Larson to Michael Siegel produced after DC moved for

- 3 -                PETROCELLI DECL. ISO DC'S RULE 56(D)
                     REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 32 of 230

1    11.    These discovery issues will be fully addressed in the sanctions motion

2    DC intends to file.  Docket No. 477-2 at 120-21.  And these documents and issues

3    bear directly on DC's unclean-hands claim against defendants.  Such documents

4    include previously undisclosed legal memoranda from third-party attorneys to

5    Toberoff documenting the ethical violations presented by his joint-venture business

6    relationship with the Shuster heirs.  Docket No. 427-3 at 335-49.  DC needs to

7    complete all document discovery—and motion practice related to it—before any

8    summary judgment motion challenging its unclean-hands claim can be heard.  It

9    also still needs to depose many witnesses about these documents, including each of

10   the defendants, as well as close to 10 third parties.  While the Court could grant

11   summary judgment in DC's favor on its unclean-hands claim for the reasons

12   discussed in DC's opposition to defendants' motion, defendants cannot possibly

13   obtain summary judgment on these issues, when discovery is still so incomplete.

14   **A.    DC's First Claim for Relief**

15   12.    DC's First Claim alleges that Peary and Toberoff (working along with

16   the Siegels) tried to rewrite history to assert that Joe Shuster was not the co-creator

17   of the character Superboy.  It further alleges that Toberoff induced the Shusters to

18   relinquish their Superboy rights to permit the Siegels to bring an infringement

19   action against DC.  It also alleges that, as a *quid pro quo*, the Siegels promised to

20   share their recovery in the *Siegel* case with the Shusters.  Docket No. 49 ("FAC")

21   ¶¶ 86-91, 131-33.  In DC's concurrently filed opposition to defendants' cross-

22   motion for summary judgment, DC cites and documents the evidence supporting

23   this unclean-hands claim.  Opp. at 17-25.

24   13.    Defendants' cross-motion asserts that it is an "undisputed fact" that

25   "[n]either Mr. Peary nor Ms. Peavy have any interest in [the Siegels'] Superboy

26   reconsideration), *and* Docket Nos. 394 at 14-17; 439 at 1-2 ("We learned that

27   due to the delays and the misinformation Kevin [Marks] had given them that
     there was a deal with DC, the billionaire investor who was offering $15 million
     up front plus participation thought it was a hopeless situation and invested his

28   money elsewhere."). *See* Docket No. 477-2 at 119-36.

- 4 -

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 33 of 230

1    notices of termination." Cross-Mot. at 22; Defs.' Statement of Uncontroverted

2    Facts ("DSUF") 63. This is wrong, as the evidence cited in DC's opposition brief

3    shows. DC is still in the midst of document and deposition discovery to establish

4    defendants' full activities in carrying out the alleged Superboy fraud. This includes

5    the pressing need to obtain the illicit 2008 Consent Agreement between the Siegel

6    and Shuster heirs and Toberoff. Defendants refuse to produce the document or

7    testify concerning its contents fully, but have revealed in depositions that it is

8    signed by the Siegels and Shusters and by Toberoff; it remains in effect to this day;

9    and it prohibits the heirs from entering into an agreement with DC regarding their

10   respective Superman rights without each other's consent. *E.g.,* Docket Nos. 90 at

11   3-4; 160 at 12-13; 305-37 at 1155:21-1156:25, 1158:19-1159:4, 1184:8-1185:11.

12   DC moved to compel the Consent Agreement in February 2011, and Magistrate

13   Judge Zarefsky denied the motion based on Toberoff's representations to Judge

14   Larson in the *Siegel* case. Docket Nos. 160 at 6-44; 209 at 1-10. Since that time,

15   however, new facts have emerged that disprove Toberoff's assertions, and

16   defendants have selectively disclosed information about the agreement that reveal

17   many of its contents. DC will move shortly to compel the production of the

18   Consent Agreement and further testimony concerning its contents.

19          14.    DC deposed both Mark Warren Peary and Laura Siegel Larson in

20   2011. When DC asked them about the contents of the Consent Agreement,

21   Toberoff impeded DC from getting meaningful testimony by only selectively

22   allowing the witnesses to testify when it was (in his view) advantageous to their

23   position, and making untenable privilege assertions where it was not. For instance,

24   in Peary's July 2011 deposition, Toberoff allowed him to testify that the Consent

25   Agreement provides that "any agreement with DC or settlement with DC requires

26   the consent of the Siegels," Docket No. 305-37 at 1184:8-1185:11, and that it is

27   "still in effect," *id.* at 11174:5-7, but shut down all questions concerning:

28   • Why Peary entered into the Consent Agreement, *see id.* at 1168:15-1170:17;

- 5 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 34 of 230

- Why Peary believes the Consent Agreement benefits the Shuster heirs, *see id.* at 1187:14-23;
- Peary's understanding of the purpose of the Consent Agreement, *see id.* at 1168:15-22, 1171:4-13;
- Peary's understanding of the effect of the Consent Agreement, *see id.* at 1171:4-13;
- Why Peary referred to the document as a "Consent Agreement," *see id.* at 1168:2-14;
- Whether the Siegel heirs can enter into an agreement concerning their rights without the Shuster heirs' consent, *see id.* at 1171:16-1172:15;
- Whether the Shuster heirs are free to enter into an agreement concerning their rights without the consent of anyone else, *see id.* at 1172:24-1173:7, 1188:15-1190:7;
- Whether the Consent Agreement entitles the Shuster heirs to share a portion of any settlement proceeds the Siegel heirs receive, *see id.* at 1172:17-22, 1173:9-15;
- Whether the Consent Agreement entitles the Shuster heirs to share a portion of the Siegel heirs' profits from the accounting trial in the *Siegel* cases, *see id.* at 1277:5-13, 1278:7-12; and
- Peary's understanding that the Consent Agreement violates DC's rights, *see id.* at 1143:8-1146:17.

15.     Defendants' selective disclosures concerning the 2008 Consent Agreement strongly suggest a *quid pro quo* arrangement alleged by DC.  For example, Toberoff permitted Peary to testify that the agreement purportedly does not entitle the Shusters to share in any recoveries by the Siegels from their copyright infringement case against DC involving Superboy.  Docket No. 305-37 at 1191:13-19.  Yet, when DC asked Peary whether the Consent Agreement refers to Superboy at all or entitles the Shusters to a portion of the proceeds from the

- 6 -

SER 29

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 35 of 230

1    Siegels' *Superman* case, Case No. CV-04-8400, Toberoff objected, instructed Peary
2    not to answer, and said any answer would reveal "the contents of the Consent
3    Agreement." Docket No. 305-37 at 1172:4-7, 1277:5-1276:12.

4         16.    During Larson's deposition, Toberoff revealed that his approach is to
5    "assert[] privilege to what is in the [consent] agreement," but not assert privilege as
6    to what is not in the agreement, as "what is not in the agreement would not be
7    privileged." Docket No. 305-24 at 817:19-818:1. This statement, combined with
8    Toberoff's selective objections during Peary's deposition, also suggests the Consent
9    Agreement may include an arrangement to trade the proceeds from the Siegel
10   Superman case for the Shusters' forfeiture of their Superboy rights.

11        17.    When DC recently deposed Toberoff, he asserted privilege frequently
12   and broadly, and admitted that he spoke to the Siegels about whether the Shusters
13   had an interest in Superboy, Ex. 3 at 344:17-345:4, and that the agreement requires
14   the "mutual consent" of the heirs to settle and does not require his consent, *id.* at
15   360:10-361:12.

16        18.    In addition to moving to compel the production of the Consent
17   Agreement and full, uninterrupted testimony concerning its contents, DC will be
18   moving to further depose Peary and Larson concerning the Consent Agreement, the
19   Timeline document, and other evidence defendants had suppressed when their prior
20   depositions were taken. DC also needs to conclude Toberoff's deposition—which
21   should require one additional day—depose representatives for his three companies,
22   and depose third-party witnesses like J. Todd Harris (Toberoff's former business
23   partner), and Ari Emanuel (Toberoff's former business partner).

24   **B.    DC's Second Claim for Relief**

25        19.    DC's Second Claim is in the alternative and only needs to be
26   addressed if the Court does not find the Shuster termination notice invalid for the
27   reasons stated in its First Claim. DC alleges that the scope of any rights to be
28   recaptured by the Shusters' termination is limited and does not include, *inter alia*:

- 7 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 36 of 230

1    (a) unpublished Superman works; (b) promotional announcements published before

2    *Action Comics #1*; (c) works for hire; (d) derivative works; or (e) certain elements

3    of the Superman character and storyline that either do not appear in the specified

4    works, or are not listed in the notice.  Docket No. 49, FAC ¶¶ 135-64.

5        20.    In a four-sentence paragraph added to their motion without any prior

6    notice to DC—and in violation of the Court's meet-and-confer rules, C.D. Cal. L.R.

7    7-3; Ex. 4 at 409—defendants contend that DC's claim as to categories (a) and (c)

8    above involves work-for-hire issues and is precluded by the interlocutory

9    judgments in *Siegel*.  Cross-Mot. at 22.

10       21.    Defendants' perfunctory treatment of this claim skims over the

11   differences between Siegel's and Shuster's employment histories with DC and

12   ignores contested factual issues that have yet to be examined in discovery.  Siegel

13   and Shuster performed different types of work for DC, at different times, and had

14   different arrangements for compensation.  For instance, while Siegel largely wrote

15   the Superman scripts himself, letters among Siegel and Shuster and DC indicate

16   that they employed other artists besides Shuster to illustrate the stories, Exs. 5-9,

17   and when Siegel left DC to write for military publications during World War II,

18   Shuster remained in Ohio as a DC employee.  Docket No. 469-1 at 7 ("Since

19   [Siegel] has been in the Army . . . [h]is artist collaborator, Joe Schuster, is keeping

20   the strip going . . . .").  As of 1939, Shuster only illustrated for Superman, while

21   Siegel continued writing for Superman and several other comics, and they were

22   paid differently.  Docket No. 459-1 at 20.

23       22.    In further discovery, DC will focus on factual issues specific to

24   Shuster's work, including:

25   - the work he did for DC, and whether and to what extent he hired other
       illustrators to draw for Superman;

26   - the manner in which Shuster was compensated and supervised by DC;

27   - the extent of his contributions to early Superman works; and

28   - his involvement with the pre-*Action Comics #1* promotional announcements.

- 8 -          PETROCELLI DECL. ISO DC'S RULE 56(D)
               REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 37 of 230

## II.      ADDITIONAL MATERIALS CITED IN DC'S OPPOSITION PAPERS

23.     Attached hereto as Exhibit 4 is a true and correct copy of a letter from me to Marc Toberoff and Richard Kendall, dated August 21, 2012.

24.     Attached hereto as Exhibit 5 is a true and correct copy of a letter from J.S. Leibowitz to Jerome Siegel, dated January 23, 1940.

25.     Attached hereto as Exhibit 6 is a true and correct copy of a letter from Whitney Ellsworth to Mr. Siegel, dated January 22, 1940.

26.     Attached hereto as Exhibit 7 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated January 25, 1940.

27.     Attached hereto as Exhibit 8 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated February 8, 1940.

28.     Attached hereto as Exhibit 9 is a true and correct copy of a letter from Mr. Leibowitz to Mr. Siegel, dated May 2, 1940.

29.     Attached hereto as Exhibit 10 is a true and correct copy of a script entitled "Superboy," written by Mr. Siegel.

30.     Attached hereto as Exhibit 11 is a true and correct copy of a comic book entitled *More Fun #101*.

31.     Attached hereto as Exhibit 12 is a true and correct copy of a comic book entitled *Superman #1*.

32.     Attached hereto as Exhibit 13 is a true and correct copy of a comic strip dated May 31, 1942.

33.     Attached hereto as Exhibit 14 is a true and correct copy of a letter from Jean Peavy to Marty Payson, dated August 21, 1992.

34.     Attached hereto as Exhibit 15 is a true and correct copy of a "Notice of Termination of Transfer Covering Extended Renewal Term for Superboy," dated November 8, 2002.

35.     Attached hereto as Exhibit 16 is a true and correct copy of an excerpt from the "Brief of Appellant" in *Classic Media, Inc. v. Mewborn*, Ninth Circuit

PETROCELLI DECL. ISO DC'S RULE 56(D) REQUEST AND DC'S OPP. TO DEFS.' MSJ

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 38 of 230

1    Appeal No. 06-55385, dated June 30, 2006.

2         36.    Attached hereto as Exhibit 17 is a true and correct copy of an expert

3    report submitted by Jeff Rovin in Case No. CV 04-8400 (the "*Siegel* Action"),

4    dated January 11, 2007.

5         37.    Attached hereto as Exhibit 18 is a true and correct copy of an expert

6    report submitted by Mark Waid in the *Siegel* Action dated February 8, 2007.

7         38.    Attached hereto as Exhibit 19 is a true and correct copy of an article

8    titled "Up, Up And Awa-a-y! The Rise of Superman, Inc." from *The Saturday*

9    *Evening Post*, dated June 21, 1941.

10        39.    Attached hereto as Exhibit 20 is a true and correct copy of an

11   agreement signed by Mr. Siegel, Joseph Shuster, and Jay Emmett on behalf of

12   Warner Communications Inc. dated December 23, 1975.

13        40.    Attached hereto as Exhibit 21 is a true and correct copy of a letter from

14   Mr. Payson to Mr. Shuster, dated August 8, 1988.

15        41.    Attached hereto as Exhibit 22 is a true and correct copy of a letter from

16   Mr. Payson to Joanne Siegel, dated March 5, 1991.

17        42.    Attached hereto as Exhibit 23 is a true and correct copy of a letter from

18   Mr. Payson to Ms. Peavy, dated September 8, 1992.

19        43.    Attached hereto as Exhibit 24 is a true and correct copy of a

20   "Copyright Research Report," dated August 22, 1994.

21        44.    Attached hereto as Exhibit 25 is a true and correct copy of "Copyright

22   Renewal Registrations" for Superman and Superboy, dated 1972.

23        45.    Attached hereto as Exhibit 26 is a true and correct copy of a certificate

24   of renewal registration for Superboy, dated November 15, 1972.

25        46.    Attached hereto as Exhibit 27 is a true and correct copy of "Copyright

26   Renewal Registrations" for Superman and Superboy, dated 1973.

27        47.    Attached hereto as Exhibit 28 is a true and correct copy of the

28   Superman story from the comic book entitled *Action Comics #1*.

PETROCELLI DECL. ISO DC'S RULE 56(D)
                            REQUEST AND DC'S OPP. TO DEFS.' MSJ

**SER 33**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 39 of 230

48.     Attached hereto as Exhibit 29 is a true and correct copy of a letter from Ms. Siegel to Steven Ross, dated February 14, 1982.

49.     Attached hereto as Exhibit 30 is a true and correct copy of the Declaration Of Paul Levitz In Support Of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief, dated July 16, 2012.

50.     Attached hereto as Exhibit 31 is a true and correct copy of excerpts from "Notices of Termination of Transfers," dated April 3, 1997.

51.     Attached hereto as Exhibit 32 is a true and correct copy of excerpts of the call log of Kevin Marks, dated November 2001.

52.     Attached hereto as Exhibit 33 is a true and correct copy of an email from Mr. Toberoff to Michael Siegel, dated November 17, 2001.

53.     Attached hereto as Exhibit 34 is a true and correct copy of an agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Ms. Siegel and Laura Siegel Larson, dated as of October 3, 2002.

54.     Attached hereto as Exhibit 35 is a true and correct copy of a subpoena to Mark Warren Peary dated April 12, 2006.

55.     Attached hereto as Exhibit 36 is a true and correct copy of a subpoena issued to Ms. Peavy dated April 12, 2006.

56.     Attached hereto as Exhibit 37 is a true and correct copy of a subpoena to Mr. Toberoff dated September 20, 2006.

57.     Attached hereto as Exhibit 38 is a true and correct copy of a subpoena to Mr. Toberoff dated October 19, 2006.

58.     Attached hereto as Exhibit 39 is a true and correct copy of an excerpt from the transcription of the November 11, 2006, deposition of Ms. Peavy.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 21st day of September, 2012, at Los Angeles, California.

/s/ Daniel M. Petrocelli
Daniel M. Petrocelli

- 11 -

PETROCELLI DECL. ISO DC'S RULE 56(D)
REQUEST AND DC'S OPP. TO DEFS.' MSJ

**SER 34**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 40 of 230

## TABLE OF CONTENTS

| Exhibit | Description | Page |
|---|---|---|
| 1. | Tentative "Order Granting Plaintiff's Motion For Partial Summary Judgment," dated August 30, 2012 | 12 |
| 2. | Transcript of September 5, 2012, oral argument | 31 |
| 3. | Transcript of September 18, 2012, deposition of Marc Toberoff | 92 |
| 4. | Letter from Daniel Petrocelli to Marc Toberoff and Richard Kendall, dated August 21, 2012 | 408 |
| 5. | Letter from J.S. Leibowitz to Jerome Siegel, dated January 23, 1940 | 410 |
| 6. | Letter from Whitney Ellsworth to Mr. Siegel, dated January 22, 1940 | 412 |
| 7. | Letter from Mr. Leibowitz to Mr. Siegel, dated January 25, 1940 | 414 |
| 8. | Letter from Mr. Leibowitz to Mr. Siegel, dated February 8, 1940 | 416 |
| 9. | Letter from Mr. Leibowitz to Mr. Siegel, dated May 2, 1940 | 417 |
| 10. | Script entitled "Superboy," written by Mr. Siegel | 419 |
| 11. | Comic book entitled *More Fun #101* | 432 |
| 12. | Comic book entitled *Superman #1* | 438 |
| 13. | Comic strip dated May 31, 1942 | 458 |
| 14. | Letter from Jean Peavy to Marty Payson, dated August 21, 1992 | 459 |
| 15. | "Notice of Termination of Transfer Covering Extended Renewal Term for Superboy," dated November 8, 2002 | 476 |
| 16. | Excerpt from the "Brief of Appellant" in *Classic Media, Inc. v.* | 534 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 41 of 230

| Exhibit | Description | Page |
|---|---|---|
| | *Mewborn*, Ninth Circuit Appeal No. 06-55385, dated June 30, 2006 | |
| 17. | Expert report submitted by Jeff Rovin in Case No. CV 04-8400 (the "*Siegel* Action"), dated January 11, 2007 | 538 |
| 18. | Expert report submitted by Mark Waid in the *Siegel* Action dated February 8, 2007 | 547 |
| 19. | Article titled "Up, Up And Awa-a-y! The Rise of Superman, Inc." from The Saturday Evening Post, dated June 21, 1941 | 554 |
| 20. | Agreement signed by Mr. Siegel, Joseph Shuster, and Jay Emmett on behalf of Warner Communications Inc. dated December 23, 1975 | 560 |
| 21. | Letter from Mr. Payson to Mr. Shuster, dated August 8, 1988 | 595 |
| 22. | Letter from Mr. Payson to Joanne Siegel, dated March 5, 1991 | 596 |
| 23. | Letter from Mr. Payson to Ms. Peavy dated September 8, 1992. | 597 |
| 24. | "Copyright Research Report," dated August 22, 1994 | 598 |
| 25. | "Copyright Renewal Registrations" for Superman and Superboy, dated 1972 | 694 |
| 26. | Certificate of renewal registration for Superboy, dated November 15, 1972. | 695 |
| 27. | "Copyright Renewal Registrations" for Superman and Superboy, dated 1973 | 698 |
| 28. | Comic book entitled *Action Comics #1* | 699 |
| 29. | Letter from Ms. Siegel to Steven Ross, dated February 14, 1982 | 713 |
| 30. | Declaration Of Paul Levitz In Support Of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief (excluding exhibits), dated July 16, 2012 | 717 |
| 31. | Excerpts of "Notice of Termination of Transfer Covering Extended Renewal Term," dated April 3, 1997 | 722 |
| 32. | Excerpts of the call log of Kevin Marks, dated November 2001 | 785 |
| 33. | Email from Mr. Toberoff to Michael Siegel, dated November 17, 2001 | 787 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 42 of 230

| Exhibit | Description | Page |
|---|---|---|
| 34. | Agreement between Mr. Toberoff and Ariel Emanuel, on behalf of IP Worldwide, and Ms. Siegel and Laura Siegel Larson, dated as of October 3, 2002 | 790 |
| 35. | Subpoena to Mark Warren Peary issued by the U.S. District Court for the District of New Mexico, dated April 12, 2006 | 794 |
| 36. | Subpoena issued to Ms. Peavy by the U.S. District Court for the District of New Mexico, dated April 12, 2006 | 800 |
| 37. | Subpoena to Mr. Toberoff, issued by this Court and dated September 20, 2006 | 806 |
| 38. | Subpoena to Mr. Toberoff, issued by this Court and dated October 19, 2006 | 819 |
| 39. | Excerpt from the transcription of the November 11, 2006, deposition of Ms. Peavy | 833 |

**SER 37**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 43 of 230

# EXHIBIT 3

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 44 of 230

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

*TOBEROFF, MARC  - Vol. 1*

*September 18, 2012*

---

**MERRILL CORPORATION**
LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 3**
92

**SER 39**

MARC  TOBEROFF - 9/18/2012

Page 221

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 45 of 230

| | | |
|---|---|---|
| 1 | that they got divorced and, in fact, legally | 15:58:14 |
| 2 | divorced. | 15:58:16 |
| 3 | Q.  I was asking about whether she -- when she | 15:58:18 |
| 4 | died, if she died? | 15:58:21 |
| 5 | A.  Yeah, I have a vague recollection that she | 15:58:23 |
| 6 | did die, but -- but -- | 15:58:25 |
| 7 | Q.  So, circling back to a question I asked you | 15:58:30 |
| 8 | a while ago, I don't think it was answered and if it | 15:58:35 |
| 9 | was, I apologize for asking it again, but given your | 15:58:38 |
| 10 | knowledge that only the estate would have a | 15:58:41 |
| 11 | termination right and that was the only right of | 15:58:43 |
| 12 | which you were aware the Shusters had, why wasn't | 15:58:47 |
| 13 | this agreement prepared so that it was between PPC | 15:58:53 |
| 14 | and the estate of Joe Shuster by its personal | 15:58:58 |
| 15 | representative? | 15:59:02 |
| 16 | A.  Because there was no -- | 15:59:04 |
| 17 | MR. KENDALL:  Argumentative. | 15:59:06 |
| 18 | THE WITNESS:  -- there was no estate. | 15:59:06 |
| 19 | BY MR. PETROCELLI: | 15:59:06 |
| 20 | Q.  Why wasn't it prepared such that it was | 15:59:09 |
| 21 | only between Jean, as executor, named under the will | 15:59:10 |
| 22 | of Joe Shuster and PPC? | 15:59:16 |
| 23 | MR. KENDALL:  Argumentative. | 15:59:19 |
| 24 | THE WITNESS:  Because she was elderly. | 15:59:20 |
| 25 | BY MR. PETROCELLI: | 15:59:20 |

MARC   TOBEROFF - 9/18/2012

Page 222

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 46 of 230

| | | |
|---|---|---|
| 1 | Q.  Meaning what? | 15:59:29 |
| 2 | A.  She was elderly and she declined to act as | 15:59:29 |
| 3 | an executor of an estate. | 15:59:33 |
| 4 | Q.  She didn't decline to act as of the signing | 15:59:35 |
| 5 | of Exhibit 10, though, correct? | 15:59:37 |
| 6 | A.  Yes, she didn't -- anyway, this is | 15:59:40 |
| 7 | revealing privileged information now. | 15:59:45 |
| 8 | Q.  She told you prior to the signing of | 15:59:47 |
| 9 | Exhibit 10 that she would not serve as executrix? | 15:59:49 |
| 10 | MR. KENDALL:  Just a minute.  I'm going to | 15:59:52 |
| 11 | object in light of the witness' last answer that it | 15:59:53 |
| 12 | appears to call for privileged information. | 15:59:56 |
| 13 | THE WITNESS:  Privileged.  I believe those | 15:59:59 |
| 14 | conversations are privileged as to the setting up of | 16:00:02 |
| 15 | the estate, other than what's as part of the estate | 16:00:04 |
| 16 | record. | 16:00:08 |
| 17 | BY MR. PETROCELLI: | 16:00:08 |
| 18 | Q.  So to be clear on this so there's no waste | 16:00:09 |
| 19 | of time here, you do recall discussions with Jean | 16:00:12 |
| 20 | and/or Warren on this subject and decline to answer? | 16:00:17 |
| 21 | MR. KENDALL:  Which subject? | 16:00:26 |
| 22 | MR. PETROCELLI:  The subject of -- of | 16:00:27 |
| 23 | Jean's willingness or unwillingness to serve as an | 16:00:29 |
| 24 | executrix for the purpose of serving a notice of | 16:00:33 |
| 25 | termination. | 16:00:36 |

MARC   TOBEROFF  -  9/18/2012

Page  223

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 47 of 230

```
 1          THE WITNESS:  I don't recall specific          16:00:37
 2     conversations.  I recall the result of              16:00:38
 3     conversations.                                      16:00:44
 4     BY MR. PETROCELLI:                                  16:00:44
 5          Q.  The result being what?  Her unwillingness  16:00:47
 6     to serve?                                           16:00:53
 7          A.  Exactly.                                   16:00:53
 8          Q.  That's all you recall, none of the         16:00:54
 9     thinking, none of the reasons, no particulars, just 16:00:56
10     that?                                               16:00:58
11          A.  Yes.                                       16:00:58
12          Q.  Okay.  When did you come to appreciate that 16:01:01
13     the transfers were void under 304(C)60?            16:01:15
14          MR. KENDALL:  Calls for the witness' work      16:01:21
15     product.                                            16:01:23
16          THE WITNESS:  I can't put a date on it.        16:01:27
17     BY MR. PETROCELLI:                                  16:01:27
18          Q.  Was it before the Shuster lawsuit in May   16:01:29
19     2010?                                               16:01:32
20          A.  Yes.                                       16:01:33
21          Q.  Was it before the attempt to cancel the PPC 16:01:36
22     agreements and substitute a legal retainer agreement 16:01:48
23     in 2004?                                            16:01:51
24          MR. KENDALL:  I'm going to object as           16:01:52
25     apparently calling for work product.               16:01:54
```

MARC   TOBEROFF  -  9/18/2012

Page 224

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 48 of 230

| | |
|---|---|
| 1 | THE WITNESS:  I can't -- I can't put a date | 16:01:58 |
| 2 | on it, but -- I can't put a date on it. | 16:02:00 |
| 3 | BY MR. PETROCELLI: | 16:02:00 |
| 4 | Q.  Can you tell me whether it was before or | 16:02:04 |
| 5 | after the events I just described that took place in | 16:02:06 |
| 6 | 2004? | 16:02:08 |
| 7 | A.  I would say certainly by 2004 I was | 16:02:09 |
| 8 | thinking of the next question, whether it was | 16:02:15 |
| 9 | before, you know, the 2003 agreement or not. | 16:02:18 |
| 10 | Because the 2003 agreement doesn't -- and it's | 16:02:22 |
| 11 | been -- it's been kind of swept into the 2001 | 16:02:26 |
| 12 | agreement, and the briefing, and we pointed out | 16:02:30 |
| 13 | recently that the 2003 agreement doesn't, in fact, | 16:02:33 |
| 14 | assign termination rights to any joint venture. | 16:02:40 |
| 15 | They stay with the executor under the 2003 | 16:02:43 |
| 16 | agreement. | 16:02:44 |
| 17 | Q.  Was that deliberate or are you just saying | 16:02:45 |
| 18 | that's just the way you now read the words? | 16:02:48 |
| 19 | MR. KENDALL:  Objection. | 16:02:51 |
| 20 | THE WITNESS:  No, no, that's -- | 16:02:51 |
| 21 | MR. KENDALL:  Appearing to call for your | 16:02:53 |
| 22 | work product. | 16:02:54 |
| 23 | THE WITNESS:  Yeah, that's -- that's what | 16:02:55 |
| 24 | it says. | 16:02:56 |
| 25 | BY MR. PETROCELLI: | 16:02:56 |

MARC   TOBEROFF - 9/18/2012

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 49 of 230

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  We don't see a date on it. | 17:08:08 |
| 2 | Q.  By the time that you executed Exhibit 20, | 17:08:11 |
| 3 | the September 10, 2004 agreement, had you come to | 17:08:18 |
| 4 | the view that the transfers set forth in the 2001 | 17:08:30 |
| 5 | agreement were void ab initio? | 17:08:35 |
| 6 | A.  I believe by 2- -- I believe by | 17:08:40 |
| 7 | September of 2004, I would have known that. | 17:08:49 |
| 8 | Q.  Is that one of the reasons why the | 17:08:54 |
| 9 | agreement was canceled? | 17:08:58 |
| 10 | A.  I don't -- I think there was -- it could | 17:09:07 |
| 11 | have been.  I don't want to speculate, but I don't | 17:09:11 |
| 12 | have a specific recollection of focusing on that. | 17:09:15 |
| 13 | My specific recollection is that I wasn't | 17:09:23 |
| 14 | comfortable with the form of the agreement to begin | 17:09:29 |
| 15 | with.  That's why I had it reviewed.  And even after | 17:09:32 |
| 16 | I had the new form of agreement, I -- even though | 17:09:37 |
| 17 | that -- and again, without waiver of the | 17:09:43 |
| 18 | attorney-client relationship with the Jackoway firm, | 17:09:46 |
| 19 | I wasn't really comf- -- entirely comfortable with | 17:09:50 |
| 20 | that, either, and then just replaced it by a | 17:09:55 |
| 21 | retainer agreement, which coincided with the fact | 17:10:00 |
| 22 | that learning more about the termination rights, | 17:10:05 |
| 23 | feeling that everything surrounding Superman was in | 17:10:11 |
| 24 | anticipation of litigation, and -- and that it was | 17:10:20 |
| 25 | just a bad fit between how I used to do business | 17:10:26 |

MARC   TOBEROFF - 9/18/2012

Page 265

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 50 of 230

| | | |
|---|---|---|
| 1 | starting with that 2001 form of agreement and even | 17:10:29 |
| 2 | under the 2003 agreement it was just simpler to have | 17:10:33 |
| 3 | a simple retainer. | 17:10:39 |
| 4 | And the idea was to replace -- to cancel | 17:10:40 |
| 5 | and replace that agreement with this retainer | 17:10:42 |
| 6 | agreement.  That's why it was both dated as of the | 17:10:44 |
| 7 | exact same date. | 17:10:47 |
| 8 | Q.  Was it prepared, that is Exhibit 20 and | 17:10:49 |
| 9 | Exhibit 21, at or about the time of commencement of | 17:10:56 |
| 10 | litigation in the Siegel case? | 17:10:58 |
| 11 | A.  I think it was prepared before that. | 17:11:04 |
| 12 | Q.  The Siegel litigation was in October 2004? | 17:11:05 |
| 13 | A.  When we filed the Siegel lawsuit? | 17:11:07 |
| 14 | Q.  Yes. | 17:11:13 |
| 15 | A.  It was either October or November.  I -- I | 17:11:13 |
| 16 | would -- it would be helpful to know the date when I | 17:11:16 |
| 17 | entered into the Siegel litigation retainer | 17:11:20 |
| 18 | agreement.  I didn't know whether that was -- if | 17:11:22 |
| 19 | that was around September 10, 2004. | 17:11:29 |
| 20 | Q.  Take a look at that document which has also | 17:11:37 |
| 21 | been produced to us in redacted form.  It's dated | 17:11:40 |
| 22 | October 3, 2004. | 17:11:43 |
| 23 | THE WITNESS:  October 3, 2004? | 17:11:48 |
| 24 | MR. PETROCELLI:  Yeah.  That will be marked | 17:11:50 |
| 25 | as Exhibit 103. | 17:11:51 |

**EXHIBIT 3**
357                                                    **SER 45**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 51 of 230

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
3  Pablo D. Arredondo (State Bar No. 241142)
     *parredondo@ipwla.com*
4  TOBEROFF & ASSOCIATES, P.C.
   22337 Pacific Coast Highway #348
5  Malibu, California 90265
   Telephone:  (310) 246-3333
6  Fax:        (310) 246-3101

7  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
8  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
9  as personal representative of the Estate of
   Joanne Siegel

10                **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12  DC COMICS,                          | Case No: CV 10-03633 ODW (RZx)

13              Plaintiff,               | Hon. Otis D. Wright II, U.S.D.J.
                                         | Hon. Ralph Zarefsky, U.S.M.J.
14        vs.

15  PACIFIC PICTURES CORPORATION;   | **DECLARATION OF KEITH G.**
    IP WORLDWIDE, LLC; IPW, LLC;    | **ADAMS IN SUPPORT OF**
16                                   | **DEFENDANTS' OPPOSITION**
    MARC TOBEROFF, an individual;   | **TO DC'S MOTION FOR**
17  MARK WARREN PEARY, as personal   | **PARTIAL SUMMARY**
    representative of the ESTATE OF  | **JUDGMENT ON ITS FIRST**
18  JOSEPH SHUSTER; JEAN ADELE       | **AND THIRD CLAIMS FOR**
    PEAVY, an individual; LAURA      | **RELIEF**
19
    SIEGEL LARSON, individually and as  | *Opposition, Statement of Genuine*
20  personal representative of the ESTATE  | *Issues, Evidentiary Objections, and*
    OF JOANNE SIEGEL,                | *[Proposed] Order filed concurrently*
21                                   | *herewith*
    and DOES 1-10, inclusive,
22                                   | Complaint filed:  May 14, 2010
                                     | Trial Date:  None Set
23              Defendants.
                                     | Date:   Aug. 20, 2012*
24                                   | Time:   1:30 p.m
                                     | Place:  Courtroom 11
25

26

27

28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 52 of 230

| Exh. | Title | Page |
|------|-------|------|
| 1 | "Superman's Creators, Nearly Destitute, Invoke His Spirit", New York Times, dated November 22, 1975. | 5 |
| 2 | "Mild-Mannered Cartoonists Go To Aid of Superman's Creators", New York Times, dated December 10, 1975 | 6 |
| 3 | "Man of Steel Splinters and American Dream", New York Times, dated February 25, 1979 | 7-8 |
| 4 | Agreement between DC Comics, Inc. and Swampfilms, Inc., dated October 10, 1980 | 9-32 |
| 5 | "Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78", New York Times, dated August 3, 1992 | 33 |
| 6 | "Jerry Siegel, Superman's Creator, Dies at 81" dated January 31, 1996 | 34 |
| 7 | Thompson & Thompson Copyright Report, dated February 29, 1996 | 35-43 |
| 8 | Agreement between Warner Bros. and Hasbro, Inc. dated December 18, 1998 | 44-75 |
| 9 | Agreement between Marvel Characters, Inc. and Katja Motion Picture Corp., dated August 2, 2001 | 76-130 |
| 10 | Agreement between Pacific Pictures Corporation, Mark Warren Peary and Jean Peavy, dated November 28, 2001 | 131-134 |
| 11 | Agreement between Warner Bros. and Edgar Rice Burroughs, Inc., dated December 2, 2002 | 135-229 |
| 12 | Agreement between Pacific Pictures Corporation, Jean Peavy and Mark Warren Peary (as Executor of Joseph Shuster's Estate), dated October 27, 2003. | 230-233 |
| 13 | Letter from Marc Toberoff to Mark Warren Peary (as | 234 |

1
DECLARATION OF KEITH G. ADAMS

**SER 47**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 53 of 230

|    |    |                                                                                      |         |
|----|----|--------------------------------------------------------------------------------------|---------|
| 1  |    | Executor of the Estate of Joseph Shuster) and Jean                                   |         |
| 2  |    | Peavy, dated September 10, 2004                                                       |         |
| 3  |    |                                                                                      |         |
| 4  | 14 | DC Comics' First Amended Counterclaims, filed in *Siegel*                            | 235-274 |
| 5  | 15 | Letter from Marc Toberoff to Patrick Perkins, dated May 12,                          | 275     |
| 6  |    | 2005                                                                                 |         |
| 7  | 16 | Excerpts from deposition of Laura Siegel Larson, dated                               | 276-280 |
| 8  |    | August 1, 2006                                                                       |         |
| 9  | 17 | Excerpts from deposition of Mark Warren Peary, dated                                 | 281-301 |
| 10 |    | November 11, 2006                                                                    |         |
| 11 | 18 | Letter from Alexander Merino to Adam Hagen, dated                                    | 302     |
| 12 |    | November 15, 2006                                                                    |         |
| 13 | 19 | Excerpts from deposition of Marc Toberoff, dated November                            | 303-323 |
| 14 |    | 17, 2006                                                                             |         |
| 15 | 20 | Declaration of Wayne Smith, dated March 26, 2007                                     | 324-329 |
| 16 | 21 | N.Y. State Division of Corporations Entity Information entry                         | 330-331 |
| 17 |    | for Pacific Pictures Corporation, dated 2010                                         |         |
| 18 | 22 | Excerpts from Joint Stipulation, dated February 8, 2011                              | 332-336 |
| 19 | 23 | Order issued by Magistrate Judge Zarefsky, dated April 11,                           | 337-350 |
| 20 |    | 2011                                                                                 |         |
| 21 | 24 | Excerpts from Defendants' Opposition to DC Comics'                                   | 351-356 |
| 22 |    | Motion for Review, dated May 2, 2011                                                 |         |
| 23 | 25 | Order issued on May 23, 2011                                                          | 347-359 |
| 24 | 26 | Excerpts from deposition of Mark Warren Peary, dated June                            | 360-373 |
| 25 |    | 29, 2011                                                                             |         |
| 26 | 27 | Letter from Marc Toberoff to Mark Warren Peary and Jean                              | 374-375 |
| 27 |    | Peavy dated August 2, 2011                                                            |         |
| 28 | 28 | Mediation Questionnaire, dated November 9, 2011                                       | 376-378 |

**SER 48**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 54 of 230

# DECLARATION OF KEITH G. ADAMS

I, Keith G. Adams, declare as follows:

1.      I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and for plaintiff Laura Siegel Larson in the related case of *Siegel v. Warner Bros. Entertainment Inc., et al.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), and submit this declaration in support of Defendants' Opposition to plaintiff DC Comics' ("DC") Motion for Partial Summary Judgment On Its First and Third Claim for Relief.

2.      Attached hereto as Exhibit "1" is a true and correct copy of an article titled "Superman's Creators, Nearly Destitute, Invoke His Spirit" from *The New York Times*, dated November 22, 1975.

3.      Attached hereto as Exhibit "2" is a true and correct copy of an article titled "Mild-Mannered Cartoonists Go To Aid of Superman's Creators" from *The New York Times*, dated December 10, 1975.

4.      Attached hereto as Exhibit "3" is a true and correct copy of an article titled "Man of Steel Splinters an American Dream" from the *Los Angeles Times*, dated February 25, 1979.

5.      Attached hereto as Exhibit "4" is a true and correct copy of an October 10, 1980 Agreement between DC Comics, Inc. on the one hand and Swampfilms, Inc. on the other hand, produced by DC in the related *Siegel* case and designated as a trial exhibit without a confidentiality designation.

6.      Attached hereto as Exhibit "5" is a true and correct copy of an article titled "Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78" from *The New York Times*, dated August 3, 1992.

7.      Attached hereto as Exhibit "6" is a true and correct copy of an article

**SER 49**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 55 of 230

1  titled "Jerry Siegel, Superman's Creator, Dies at 81" from *The New York Times*,

2  dated January 31, 1996.

3      8.    Attached hereto as Exhibit "7" is a true and correct copy of a February

4  29, 1996 Copyright Research Report generated by Thompson & Thompson, which

5  was produced by plaintiff in the related *Siegel* case.

6      9.    Attached hereto as Exhibit "8" is a true and correct copy of a December

7  18, 1998 Agreement between Warner Bros. on the one hand, and Hasbro, Inc. and

8  Hasbro International, Inc., on the other hand, produced by Warner Bros. in the related

9  *Siegel* case and designated as a trial exhibit without a confidentiality designation.

10      10.    Attached hereto as Exhibit "9" is a true and correct copy of an August

11  2, 2001 Agreement between Marvel Characters, Inc. on the one hand, and Katja

12  Motion Picture Corp., on the other hand, produced by Warner Bros. in the related

13  *Siegel* case and designated as a trial exhibit without a confidentiality designation.

14      11.    Attached hereto as Exhibit "10" is a true and correct copy of a

15  November 28, 2001 Agreement between Pacific Pictures Corporation, on the one

16  hand, and Mark Warren Peary and Jean Peavy, on the other hand.

17      12.    Attached hereto as Exhibit "11" is a true and correct copy of a

18  December 2, 2002 Agreement between Warner Bros., on the one hand, and Edgar

19  Rice Burroughs, Inc., on the other, produced by Warner Bros. in the related *Siegel*

20  case and designated as a trial exhibit without a confidentiality designation.

21      13.    Attached hereto as Exhibit "12" is a true and correct copy of a October

22  27, 2003 Agreement between Pacific Pictures Corporation, on the one hand, and Jean

23  Peavy and Mark Warren Peary (as Executor of Joseph Shuster's Estate), on the other

24  hand.

25      14.    Attached hereto as Exhibit "13" is a true and correct copy of a letter

26  dated September 10, 2004 from Marc Toberoff to Mark Warren Peary (as Executor of

27  the Estate of Joseph Shuster) and Jean Peavy.

28      15.    Attached hereto as Exhibit "14" is a true and correct copy of DC

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 56 of 230

1    Comics' First Amended Counterclaims filed in the related *Siegel* case.

2        16.    Attached hereto as "Exhibit 15" is a true and correct copy of a letter

3    dated May 12, 2005 from Marc Toberoff to Patrick Perkins.

4        17.    Attached hereto as Exhibit "16" is a true and correct copy of excerpts

5    from the transcript of the August 1, 2006 deposition of Laura Siegel Larson in the

6    related *Siegel* case.

7        18.    Attached hereto as Exhibit "17" is a true and correct copy of excerpts

8    from the transcript of the November 11, 2006 deposition of Mark Warren Peary in

9    the related *Siegel* case.

10       19.    Attached hereto as Exhibit "18" is a true and correct copy of a letter

11   dated November 15, 2006 from Alexander Merino, former counsel for plaintiff Laura

12   Siegel Larson in *Siegel*, to Adam Hagen, former counsel for DC/Warner in *Siegel*.

13       20.    Attached hereto as Exhibit "19" is a true and correct copy of excerpts

14   from the transcript of the November 17, 2006 deposition of Marc Toberoff in *Siegel*.

15       21.    Attached hereto as Exhibit "20" is a true and correct copy of a

16   declaration of Wayne Smith dated March 26, 2007 and filed in the related *Siegel*

17   case.

18       22.    Attached hereto as Exhibit "21" is a true and correct copy of a 2010

19   New York State Division of Corporations Entity Information entry for Pacific

20   Pictures Corporation.

21       23.    Attached hereto as Exhibit "22" is a true and correct copy of excerpts

22   from a Joint Stipulation Regarding DC Comics' Motion To Compel filed in this case

23   on February 8, 2011.

24       24.    Attached hereto as Exhibit "23" is a true and correct copy of an order

25   issued by Magistrate Judge Zarefsky on April 11, 2011.

26       25.    Attached hereto as Exhibit "24" is a true and correct copy of excerpts

27   from Defendants' Opposition to DC Comics' Motion for Review of Magistrate

28   Zarefsky's April 11, 2001 Order On Plaintiff's Motion to Compel, filed on May 2,

1  | 2011.

2  |     26.    Attached hereto as Exhibit "25" is a true and correct copy of an order

3  | issued by this Court on May 23, 2011.

4  |     27.    Attached hereto as Exhibit "26" is a true and correct copy of excerpts

5  | from the transcript of the June 29, 2011 deposition of Mark Warren Peary.

6  |     28.    Attached hereto as Exhibit "27" is a true and correct copy of a letter

7  | dated August 2, 2011 from Marc Toberoff to Mark Warren Peary and Jean Peavy.

8  |     29.    Attached hereto as Exhibit "28" is a true and correct copy of a

9  | Mediation Questionnaire filed on November 9, 2011 in *DC Comics v. Pacific*

10 | *Pictures Corp. et al.,* Ninth Circuit Appeal No. 11-56934.

11 |

12 |     I declare under penalty of perjury of the laws of the United States of America

13 | that the foregoing is true and correct.

14 |     Executed on July 30, 2012, at Malibu, California.

15 |

16 |

17 |             Keith G. Adams

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 57 of 230

**SER 52**

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 2, 2011

<u>Via E-Mail</u>

Mark Warren Peary
Jean Adele Peavy
51 Camino Cabo
Santa Fe, New Mexico 87508

Re:   <u>Pacific Pictures Agreements</u>

Mark:

This is to confirm your and our understanding that the retainer agreement between Mark Warren Peary, Jean Adele Peavy and the Law Offices of Marc Toberoff (now Toberoff & Associates, P.C.), dated as of November 23, 2001 (the "Retainer Agreement"), completely replaced and superseded the November 23, 2001 agreement between Pacific Pictures Corporation, Jean Adele Peavy and Mark Warren Peary, as well as the October 27, 2003 agreement between Pacific Pictures Corporation and Mark Warren Peary (the "PPC Agreement(s)"), and that no provisions of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, survived or had any continuing force or effect after the Retainer Agreement was executed.

This also serves to confirm your and our understanding that the September 10, 2004 letter between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy totally cancelled the PPC Agreements, and that no term of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, was intended to survive such cancellation.

Pacific Pictures Corporation has been dissolved, and Marc Toberoff is its successor in interest. For the avoidance of doubt, in the unlikely event that any right, title or interest of Pacific Pictures Corporation under either of the PPC Agreements is deemed to have nonetheless survived your and our mutual cancellation and replacement of the PPC Agreements, Mr. Toberoff hereby quitclaims any such right, title or interest of Pacific Pictures Corporation to the Estate of Joseph Shuster.

This letter, including the above quitclaim, shall have no affect on the parties' rights and obligations under the Retainer Agreement, all of which are expressly preserved.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 58 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 59 of 230

**TOBEROFF & ASSOCIATES, P.C.**

August 2, 2011
Re:    Pacific Pictures Agreements
Page:  2 of 2


Very truly yours,

Marc Toberoff


AGREED:


The Estate of Joseph Shuster

Mark Warren Peary,
as Personal Representative


Mark Warren Peary


Jean Adele Peavy


Marc Toberoff,
as successor to Pacific Pictures Corporation


EXHIBIT D
119

Exhibit-27

375

**SER 54**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 60 of 230

1  DANIEL M. PETROCELLI (S.B. #097802)
    dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11              Plaintiff,              **DECLARATION OF PAUL
                                        LEVITZ IN SUPPORT OF DC**
12        v.                            **COMICS' MOTION FOR
                                        PARTIAL SUMMARY**
13  PACIFIC PICTURES                    **JUDGMENT ON ITS FIRST AND
    CORPORATION, IP WORLDWIDE,          THIRD CLAIMS FOR RELIEF**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          Hon. Otis D. Wright II
15  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,       **Hearing Date:**  Aug. 20, 2012
16  JEAN ADELE PEAVY, an individual,    **Hearing Time:**  1:30 p.m.
    LAURA SIEGEL LARSON, an             **Courtroom:**     11
17  individual and as personal
    representative of the ESTATE OF
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
              Defendants.
20
21
22
23
24
25
26
27
28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 61 of 230

## DECLARATION OF PAUL LEVITZ

1.      I worked at DC Comics ("DC") for 38 years, and continue to serve as Senior Advisor, Consulting Editor, and as a writer for DC. I have personal knowledge of the matters set forth in this declaration or conducted due diligence to gather them, and if called to testify to the facts stated herein, I could and would do so competently.

2.      In 1972, I began working as a freelance writer for DC. In 1973, I became an assistant editor. Throughout the 1970s, I became progressively more involved in management of DC's general business activities, and in 1980, I was promoted to Manager of Business Affairs. By 1985, I had become predominantly responsible for DC's business operations, and I was promoted to Executive Vice President. In 1989, I became Executive Vice President and Publisher. From 2002 to 2010, I served as DC's President and Publisher. Since then, I have served as Senior Advisor, Consulting Editor, and as a writer for DC.

3.      During my many years as a business executive at DC, part of my role was to maintain relationships with writers and artists who had worked for DC in the past, as well as their families. I had many interactions with Joseph Shuster, his brother Frank Shuster, his sister Jean Peavy, and his nephew Mark Warren Peary. Attached hereto as Exhibits 1-78 are true and correct copies of my correspondence with the Shuster family that DC and I could locate.

4.      In a 1975 agreement, DC affiliate Warner Communications Inc. agreed to provide Joe Shuster and Jerome Siegel with lump sum payments, lifetime annual payments, survivor payments to their heirs, insurance coverage, and other benefits. As of 2011, Warner had paid the Shuster and Siegel families $4.3 million under the 1975 agreement, not including medical benefits or special bonuses.

5.      After Joe Shuster passed away in 1992, Frank and Jean wrote letters to me and Martin Payson at Time Warner asking for financial assistance. (Exhibits 3, 6 and 7.) Jean told us she was Joe's sole heir. (Exhibit 3.) I took the lead in

- 1 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 62 of 230

1  negotiations with Frank and Jean. On September 8, 1992, I sent Frank a letter

2  offering that DC would increase the survivor payments due to Frank under the 1975

3  agreement from $5,000 to $25,000 per year. (Exhibit 5.)

4      6.     On September 10, 1992, Frank sent me a letter stating that he was

5  "extremely pleased" with DC's offer, and saying that, after "discuss[ing] this good

6  news with [his] sister Jean," she and Frank wished that payments be made directly

7  to Jean, who would "send [Frank] whatever money [he] wanted as a gift which

8  would not be taxable to [him]." (Exhibit 6.)

9      7.     Frank (who lived in New York) said that Jean would be visiting New

10  York soon, and asked if he and Jean could meet with me in New York to discuss

11  these issues further. (Exhibit 6.) I agreed, and we met in my office at DC in late

12  September or early October 1992. Jean basically spoke for the two of them, as

13  Frank was frail and considerably older. It was clear that by changing the agreement

14  to pay the annual stipend for Jean's lifetime rather than Frank's, DC would both be

15  far exceeding our promise to Joe and committing to a much larger sum. I

16  understood Joe's original wish, as embodied in the 1975 agreement, to be to take

17  care of Frank because of the assistance Frank had rendered on the early Superman

18  strips as a letterer, and because Frank had taken Joe in during the 1960s; I had never

19  known or understood Joe to want to provide for Jean. Nonetheless, on DC's behalf,

20  I conditionally agreed to Jean and Frank's request.

21      8.     Given DC's financial success, former writers and artists, or their

22  families, would from time to time, ask DC for money, much as Frank and Jean had

23  done. Every time DC agreed to grant such a request, I would make clear to the

24  writer, artist, or family member that the payment would represent their last and final

25  deal with DC, and would resolve any past, present, or future claims against DC. I

26  recall having this same discussion with Frank and Jean during our in-person

27  meeting in 1992. Frank and Jean both confirmed that they understood. Following

28  this discussion, DC (through me) and Frank and Jean signed an agreement on

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 57**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 63 of 230

1  October 2, 1992, dated as of August 1, 1992. A true and correct copy of that

2  agreement is attached hereto as Exhibit 8. In key part, and consistent with the

3  above, it states:

> We ask you to confirm by your signatures below that this agreement fully
> settles all claims to any payments or other rights or remedies which you may
> have under any other agreement or otherwise, whether now or hereafter
> existing regarding any copyrights, trademarks, or other property right in any
> and all work created in whole or in part by your brother, Joseph Shuster, or
> any works based thereon. In any event, you now grant to us any such rights
> and release us, our licensees and all others acting with our permission, and
> covenant not to assert any claim of right, by suit or otherwise, with respect to
> the above, now and forever.

9      9.    DC maintained a good relationship with the Shuster family until 2001.

10  In particular, Jean and I exchanged many letters, notes, and holiday cards. In many

11  of Jean's letters, she would request special bonuses in excess of the payments due

12  under the 1992 agreement based on some particular new success DC had achieved,

13  like a television series. When Jean made such a request—including in 1999—DC

14  agreed to honor Joe's memory and provide an additional bonus ranging from

15  $10,000 to $25,000. DC paid Jean bonuses in 1993, 1994, 1995, 1996, 1998, 1999,

16  2000 and 2001. (Exhibits 23, 27, 33, 39, 53, 60, 67, 71.) In total, DC has paid Jean

17  at least over $610,000 under the 1992 agreement, and continues to pay her under

18  the agreement to this day, even though she went back on her word.

19      10.   I also exchanged correspondence over the years with Jean's son, Mark

20  Warren Peary. On May 29, 1996, Mark sent me a screenplay called

21  "DREAMERS," which he described as "an inspiring life story of Joe Shuster and

22  Jerry Siegel." (Exhibit 44.) The screenplay discusses how Joe Shuster made

23  amends with DC late in his life. Mark asked me to pass along the screenplay to

24  Warner Bros., which I did. On November 6, 1999, Mark asked whether I would be

25  willing to submit a revised screenplay to Warner Bros. (which I later did) and asked

26  whether Joanne Siegel's termination claim concerning her husband's rights would

27  "interfere with us selling our screenplay." (Exhibit 62.) Mark Peary never told me

28  that he thought he or his family had any remaining termination claims to assert. To

- 3 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 58**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 64 of 230

1    the contrary, in 1999, Jean told me she planned to honor our 1992 agreement and

2    would assert no termination claim.  (Exhibit 59.)  I was disappointed when I learned

3    that the Shuster family filed their termination claim.

4         I declare under penalty of perjury under the laws of the United States that the

5    foregoing is true and correct and that this declaration is executed this 16th day of

6    July 2012 in New York, New York.

7

8                                                    _____
                                                          Paul Levitz
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 59**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 65 of 230

# EXHIBIT 10

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 66 of 230

316 Morton La., NW
Albuquerque, N.M.
87114
Oct. 7, 1992

Paul Levitz, publisher
DC Comics Inc.
1325 Avenue of the Americas
New York, N.Y. 10019

Dear Paul,

Happy for you that your baby is finally here. Sorry we had to miss seeing you when Frank & I went into the office Oct. 2 to sign the papers. We were very disappointed to learn that the $25,00 could not be given as a gift. This means that we would only end up with about half of your intended compensation as the income tax would take about 45% of it.

As the family of Joe Shuster, we know we deserve more. We, as Joe was, are peaceloving people & even though we are aware of the copy-right laws, decided not to stir up trouble & settle for just a crumb off the table. You have all been very kind to us & we appreciate your friendship. We feel that surely time-Warner can figure out a way for us to receive the full $25,000. If it can't be given to us as a gift, can they reimburse us for the amount of money that will be deducted at payroll by making out a separate check for that amount & sending it to us? It is an unusual request to have Time Warner pick up the tab for the income tax but otherwise we will be left with practically nothing after Fran & I divide it.

Please discuss this with Marty Payson. We know you are all trying to be fair. Thanks for your consideration. Looking forward to hearing from you soon. We will be home next week.

Sincerely, Jean Shuster Peavy

DC 00156

**EXHIBIT 10**
33

**SER 61**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 67 of 230

# EXHIBIT 23

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 68 of 230

DC COMICS
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz, Executive Vice President & Publisher

September 7, 1993

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm sorry to have taken a few weeks to reply to your letter of July 10th, but as you may
know, summer is comic convention time as well as vacation time, and our offices are
both deserted and chaotic during this season.

As I hope you recall from our meetings in New York, we've done extensive research
into the copyright act and any potential rights that you and Frank may have as Joe's
siblings and survivors. It is our firm conviction based on that research and expert
counsel, that you don't have any legal rights or claims whatsoever.

Nonetheless, we do recognize the fact that Joe would want you to benefit from his great
creativity and we have acted accordingly. As you know, Joe's agreement with Warner
Communications (and thereby Time Warner and DC) only required us to pay $5,000 a
year to Frank after Joe's death. During the 16 years that agreement was controlling,
Joe did not ask us to increase that amount. After his death, we raised $5,000 to
$25,000 a year without any legal obligation to do so, in deference to Joe's memory and
your role in his life.

When you asked us to raise the amount to gross you up for what seemed to be an
unlikely effect of taxes, I promised that we would review the effect of the taxes on you
after you had experienced the IRS's effect on a year of the income. In the spring, when
you and Frank have filed your taxes, I'll be happy to examine your situation in detail
and we'll discuss the results of our examination with you.

In the meantime, we are not prepared to consider your request that you receive the same
income that Jerry and Joanne Siegel are receiving. Perhaps Joe would have wanted
that, but during his long relationship with us he gave no indication of that desire. And
even if he had, in fairness, there is a vital difference between being the actual co-creator
of Superman and being his surviving family. Jerry and Joe were, in every way, in a
class by themselves.

We are, however, pleased that the launch on September 12th of the new Lois & Clark:
The New Adventures of Superman television series will give a new generation a new
chance to fall in love with Jerry's and Joe's wonderful creation. In celebration of that

Confidential

WB007959

**EXHIBIT 23**
47

**SER 63**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 69 of 230

occasion, we're pleased to enclose a bonus check for $25,000 for you and Frank to enjoy as you watch the premiere.

Best,

Paul Levitz

:lf

cc: Frank Shuster

Confidential

WB007960

EXHIBIT 23
48

SER 64

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 70 of 230



## DC COMICS

1325 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
GENERAL ACCOUNT

No. 015672

PAY

| | DATE | CHECK NO. | NET AMOUNT |
|---|---|---|---|
| | 09/01/93 | 00015672 | ◆◆◆◆◆25,000.00 |

TWENTY FIVE THOUSAND AND 00/100 DOLLARS

TO THE
ORDER
OF

JEAN SHUSTER PEAVY
316 HORTON LN NW
ALBUQUERQUE
NM   87114

AUTHORIZED SIGNAT

CHEMICAL
55 WATER STREET NEW YORK, N.Y 10041

∦835∦

---

### DC COMICS

D C COMICS

PLEASE DETACH BEFORE DEPOSITING
00015672  015672

| VOUCHER NO. | INVOICE NUMBER | PURCHASE ORDER | INVOICE DATE | AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|
| B49958 | | | 08 26 93 | 25,000.00 | .00 | 25,000.00 |
| | | | | | | |
| TOTALS | | | | 25,000.00 | .00 | 25,000.00 |

Confidential

WB007961

**EXHIBIT 23**
49

**SER 65**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 71 of 230

# EXHIBIT 27

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 72 of 230

**DC COMICS**
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz/Executive Vice President & Publisher

July 11, 1994

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Frank Shuster
98-120 Queens Boulevard
Apartment 4K
Rego Park NY 11374

Dear Jean and Frank:

It was nice to have you visit in May, and I'm pleased to see that you're both well. I've finally had an opportunity to discuss your various requests with my colleagues, and would like to share our feelings with you.

While we have a great deal of personal sympathy for your desire to take care of Joe's nephew, niece and her family as you would have hoped (or expected) Joe to respond had he lived, we can't accept that as our corporate responsibility. We have acted in what we believe is a fair and decent, even generous, manner to you beyond our contractual obligations to you both in the spirit of our agreement with Joe. While he may have been willing to go even further, we can't act in his stead. We must, therefore, decline to either raise your annual stipend by the eight or nine thousand dollars you requested or to add an ongoing cost of living formula.

We are willing, however, to share the good fortune that Superman brings us with the family of his creators. We're pleased to acknowledge our pick-up for a second season of LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN (which happened the day you came in) with the enclosed bonus check for $10,000. On behalf of the DC, Warner Bros. and Time Warner team, we want you to feel Joe's genius is remembered and honored.

I hope that other occasions will arise in future years which we will find suitable for material acknowledgement that can assist your family, but we cannot promise to do more than consider them as they may occur.

Wishing you both continued health and happiness,

Best,

Paul Levitz

:lf

Redacted

A division of Warner Bros.–A Time Warner Entertainment Company

**EXHIBIT 27**
**59**

DCC00006420

**SER 67**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 73 of 230



# DC COMICS

1325 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
GENERAL ACCOUNT

No. 010075

PAY

| DATE | CHECK NO. | NET AMOUNT |
| --- | --- | --- |
| 07/11/94 | 00010075 | |

TEN THOUSAND AND 00/100 DOLLARS

**********10,000.00*********

TO THE
ORDER
OF

JEAN SHUSTER PEAVY
316 HORTON LN NW
ALBUQUERQUE
NM       87114

CHEMICAL
55 WATER STREET, NEW YORK, N.Y. 10041

AUTHORIZED SIGNATURE

4835

---

# DC COMICS

1325 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10019

PLEASE DETACH BEFORE DEPOSITING  010075

| VOUCHER NO. | INVOICE NUMBER | PURCHASE ORDER | INVOICE DATE | AMOUNT | DISCOUNT | NET AMOUNT |
| --- | --- | --- | --- | --- | --- | --- |
| 114565 | 114565 | | 07/11/94 | 10,000.00 | 0.00 | 10,000.00 |

Bonus – "Lois and Clark" – 2nd season

DCC00006421

**EXHIBIT 27**
**60**

**SER 68**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 74 of 230

# EXHIBIT 33

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 75 of 230

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz/Executive Vice President & Publisher

June 7, 1995

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque  NM  87114

Dear Jean:

We've recently received official word of the pick up of LOIS & CLARK: THE NEW
ADVENTURES OF SUPERMAN for a third season, and wanted to share our success with
you and Frank.  Enclosed please find a bonus check for $10,000, continued honor of Joe's
wonderful co-creation.

Hope all else is well with you and yours.

Best,

Paul Levitz

:lf

cc: Frank Schuster

A division of Warner Bros.–A Time Warner Entertainment Company

**EXHIBIT 33**
**66**

DCC00006414

**SER 70**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 76 of 230



EXHIBIT 33
67

DCC00006415

**SER 71**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 77 of 230

# EXHIBIT 39

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 78 of 230



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

March 25, 1996

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm please to inform you that we;ve had an early pick-up for LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN for the season beginning this fall. The show's done very well in the ratings, and has made it up to the top 20 shows. In continuing recognition of Joe's contribution to our success, we're enclosing a check for $10,000 for you and Frank.

I hope all else is well with you and your family.

Sincerely,

Paul Levitz

:lf

cc: Frank Shuster

A division of Warner Bros.–A Time Warner Entertainment Company

**EXHIBIT 39**
**74**

DCC00006375

**SER 73**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 79 of 230

CHEMICAL
55 Water Street
New York, N.Y. 10041



DC COMICS
1700 Broadway
New York, NY 10019
General Account

No. 34839

PAY | DATE 03/21/96 | CHECK NO. 00034839 | NET AMOUNT **$**$**$**$10,000.00

TEN THOUSAND AND 00/100 DOLLARS

TO THE ORDER OF
JEAN SHUSTER PEAVY
316 HORTON LN NW
ALBUQUERQUE
NM 87114

AUTHORIZED SIGNATURE

THE BACK OF THIS CHECK MUST CONTAIN AN ARTIFICIAL WATERMARK OR IS VOID

1835

DC COMICS
1700 BROADWAY, NEW YORK, NY 10019          D C COMICS

PLEASE DETACH BEFORE DEPOSITING 34839
00034839

| VOUCHER NO. | INVOICE NUMBER | PURCHASE ORDER | INVOICE DATE | AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|
| T10088 | | | 03 20 96 | 10,000.00 | .00 | 10,000.00 |
| TOTALS | | | | 10,000.00 | .00 | 10,000.00 |

**EXHIBIT 39**
75

DCC00006376

**SER 74**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 80 of 230

# EXHIBIT 41

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 81 of 230

316 Horton Ln. NW
Albuquerque, NM 87114
Fax/Phone: 505-897-7450

March 29, 1996

Paul Levitz, Exec. Vice Pres. & Publisher
Jenette Kahn, President
DC Comics
1700 Broadway
New York, NY 10019

Dear Paul and Jenette:

I'm faxing a Memorial letter to you which I hope can be read at Jerry's Memorial service. Sorry I could not be there in person. I need to be in New York in early June. My brother Frank and I would like to come in and visit with both of you at that time.

. . . to relay   A screenplay is
. . . . . . . . . on warren Peary and Rick Palad . . about the life story of Siegel and Shuster titled "DREAMERS." A couple of Hollywood production companies have shown some interest in it . . . . . . . . company, co-producers of Braveheart, and . . . . . I think that Warner Brothers should take a look at the screenplay and have first choice of producing it if they are interested. I've read the synopsis. It is wonderful. I believe it is a picture that would do very well for Warner. I would be glad to send you the synopsis and you could see if there is interest at Warner Brothers. Please let me know.

We will look forward to seeing you if you will be in town. I will be there from May 29 through June 11.

With very best wishes,

*Jean Shuster Peavy*

Jean Shuster Peavy

**EXHIBIT 41**

77

DCC00006372

**SER 76**

MAR 28 '96 10:18        5085977450        PAGE

## MEMORIAL TO JERRY SIEGEL

My brother Frank and I regret the fact that we could not attend the Memorial Services for our beloved friend, Jerry Siegel. As sister and brother of Joe Shuster, artist creator of SUPERMAN, we had known Jerry almost all of our lives.  I, Jean, was 11 years old when I first met him.  He became a third brother to me as he was over at our apartment every single day working with Joe.  As all children do, we loved the comics.  Frank and I read the early comics that they had created.  When they created SUPERMAN, as we know him today, I became real excited.  Of all their characters, this, I remember saying, was their best.  It grabbed me and I felt that it would effect everyone as it had me.  I'm glad that my childish intuition was correct.

Over the years I had witnessed the life of Jerry and Joe with its ups and downs, their joy of creation and their despair of rejection.  They had small wins in the beginning when they sold some of their early comics, and had great joy when they finally sold their favorite character, SUPERMAN.

We are pleased that the last 18 years of Jerry's life was lived with the recognition he deserved and the security that they had earned, thanks to the younger generations at DC COMICS and WARNER BROS.

The last time I saw Jerry Siegel and his wife, Joanne, was when Joe passed away in 1992.  My brother Frank and I will always love Jerry in our memory.  A great creative genius has been lost to the world but his creations will live on forever.

Jean Shuster Peavy

*Jean Shuster Peavy*

P.01        5085977450        WARREN PEARY

**EXHIBIT 41**
78

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 82 of 230

DCC00006373

SER 77

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 83 of 230

# EXHIBIT 42

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 84 of 230

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

March 30, 1996

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque  NM  87114

Frank Shuster
98-120 Queens Boulevard
Apartment 4K
Rego Park  NY  11374

Dear Jean and Frank:

The memorial service for Jerry in Los Angeles went very beautifully, and I read Jean's message to the audience.  I'm enclosing copies of the program for each of you, and thought you'd like to know that the attendees also included Bob Kane (creator of Batman), Stan Lee (creator of the Marvel Comics characters), and Forrest J. Ackerman (a member of science fiction fandom who knew Jerry and Joe through correspondence since they were kids).

I'll look forward to seeing you in June, and to seeing Warren's screenplay when completed.  The Warner film executives will be happy to read and evaluate it.

Best,

Paul Levitz

:lf

A division of Warner Bros. — A Time Warner Entertainment Company

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 85 of 230



# JERRY SIEGEL
## 1914-1996

Jerry Siegel conceived Superman with his collaborator, Joe Shuster, when they were high school students in Cleveland. After several years of unsuccessfully trying to have the character syndicated as a comic strip, Superman was selected by DC Comics as the lead feature for ACTION COMICS #1 (June, 1938). Siegel & Shuster's Man of Steel was an instant hit, virtually creating the comic book industry by the millions of readers it attracted, and the thousands of other super heroes it inspired.

The classic story of Lois, Clark and Superman, has remained constant since the very first episode. Superman went on to become an extraordinary performer in every entertainment medium, including newspaper strips, radio drama, theatrical cartoons, novels, children's books, movie serials, live-action television, Broadway theater, television cartoons, and motion pictures. Jerry Siegel continued to script the character for eight years, and contributed to Superman's legend into the sixties.

Today Superman is known and beloved by children and adults alike, in nearly every country in the world. He is the star of a new comic every week, while reaching out to a wider audience in the hit TV series *Lois & Clark: The New Adventures of Superman* from Warner Bros. Television, with a new cartoon series debuting this fall on the Kids' WB, and Warner Bros. Theatrical is working on a new blockbuster Superman movie. The tale told by Jerry Siegel is still told and retold, embellished and passed on, and acted out by kids with towels round their neck and fine actors alike.

Jerry Siegel contributed many different stories to our culture, including other characters still published by DC, but it is Superman that touched all of our lives. Whether we first read the story as children or have just had the opportunity to work with Superman at the many divisions of Warner Bros., we celebrate Jerry Siegel's life and creativity. We thank his wife, Joanne, and daughter, Laura, for sharing Superman's father with us.

MARCH 29, 1996
BURBANK, CALIFORNIA

SPEAKERS

JOHN SCHULMAN — *Executive Vice President & General Counsel, Warner Bros.*
JENETTE KAHN — *President & Editor-in-Chief, DC Comics*
PAUL LEVITZ — *Executive Vice President & Publisher, DC Comics*
TONY JONAS — *President, Warner Bros. Television*
JENNIFER PERINI — *Vice President, Warner Bros. Theatrical Production*
PAUL DINI — *Producer, Warner Bros. Television Animation*
LAURA SIEGEL-LARSON
JOANNE SIEGEL

**EXHIBIT 42**
80

DCC00006207

**SER 80**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 86 of 230

# EXHIBIT 44

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 87 of 230

Warren Peary
Rick Palacioz
316 Horton Ln. NW
Albuquerque, NM 87114
Ph./Fax  505-897-7450

May 29, 1996

Paul Levitz,  Exec. V-Pres.
DC COMICS
1700 Broadway
New York, NY 10019

Dear Paul,

We are delighted to enclose the screenplay "DREAMERS™" - an inspiring life story of Joe Shuster and Jerry Siegel.  We've also enclosed supporting graphics created specifically for you and Warner Brothers for a strong visual feel of the story.  A brief synopsis is as follows:

Drawn together by destiny, two poor, Jewish kids growing up in the Depression cling to their dreams and create the world's greatest superhero that becomes a beacon of hope and courage to America and the world in a time of great turmoil.  An enduring lifelong friendship sees them through the ups and downs of fame and fortune.  In the end, they discover the most important thing of all is how their enduring legacy has changed peoples lives forever in ways that have made the world a better place.

We are very excited about DREAMERS™ as it is based on one of the greatest stories ever and came to us as an inspiration in tribute to the lives of these two great people.  Currently, we have two other Hollywood production companies interested in the screenplay, The Ladd Company at Paramount Studios and Tipperary Pictures.  We want to give Warner Brothers "first crack" at this screenplay as it is a magical and moving story that would be perfect for Warner, in addition to fueling even greater interest in Superman.

Since you will be passing DREAMERS™ on to a Warner Brothers development Exec we would like to ask from you a letter acknowledging receipt of the screenplay written by Warren Peary and Rick Palacioz.  If you could send us two letters on your letterhead acknowledging receipt with your (and Jenette Kahn's if possible) "autograph" to frame for our business offices that would be great as we're big fans of DC Comics and Warner Brothers.

Warren Peary is Joe Shuster's nephew and knew his uncle quite well during the last 20 years of his life.  He is also a professional writer and a published author.  Rick Palacioz has studied screen writing under a number of premiere Hollywood screenwriters including Hilary Bader (Lois & Clark, Voyager, Deep Space Nine), Marshall Herskowitz (Legends of the Fall), Graham Yost (Speed, Broken Arrow), and Dan Petrie (Big Easy, Beverly Hills Cop).

Thank you for your sincere interest.  We would appreciate it if the people at Warner Brothers could let us know of their interest within 3 months.  Thanks again.

Sincerely yours,

Warren Peary

Rick Palacioz

P.S.  In your letter to us, could you please let us know the name of a contact person who recieved the script at Warner Brothers.

**EXHIBIT 44**

82

DCC00006235

**SER 82**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 88 of 230

DREAMERS ™

The Story Of Joe Shuster and Jerry Siegel

The Creators of SUPERMAN

by

Warren Peary & Rick Palacioz

316 Horton Ln. NW                    WGA Registered
Albuquerque, NM 87114                No. 09988-00
505-897-7450                             09988-01

Copyright © 1996 by Mark Warren Peary and Rick Palacioz.
All Rights Reserved. "DREAMERS" is a trademark of Warren Peary and Rick Palacioz

**EXHIBIT 44**
94

DCC00006247
**SER 83**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 89 of 230

38.

Jerry and Joe slowly open the door with ACTION COMICS laid over
frosted glass on it, poking their heads in first then walking in.
They're dressed in their "best" old coats and ties.

                    RECEPTIONIST
          May I help you?

                    JERRY
          Yes Ma'am, we're here to see Mr. Lonenfield.
          Jerry Siegel and Joe Shuster.

                    RECEPTIONIST
                 (pushing speaker)
          Mr. Lonenfield, Jerry Siegel and Joe Shuster
          are here to see you. -- You can go on in now
          boys.

INT. LONENFIELD'S OFFICE

where Harry Lonenfield is sitting behind a big wooden desk.  His
managing partner, JACK DIENOWITZ, is standing on the other side
of the room pouring a drink.

                    LONENFIELD
          (standing up and coming around his desk
          to meet them smiling) Mr. Siegel, Mr. Shuster
          (shaking hands) Good to meet you boys.
                 (Beat)
          This is my partner Jack Dienowitz.

                    DIENOWITZ
                 (shaking hands)
          How are you boys doing?

                    JERRY & JOE
          Fine...fine

They all sit except for Dienowitz who stands off to the side.

                    LONENFIELD
          Listen boys, we saw your work and we liked
          it.  We're willing to put Superman as the
          lead in the first issue of our new Action
          Comics.  (Jerry & Joe smile at each other
          fidgeting in their chairs)
          What I'm gonna need you to do is paste up your
          strip so it'll fit into a 13 page comic book
          story.

                    JERRY & JOE
                 (nodding eagerly)
          Yeah we can do that...we can do that.

DCC00006285

**EXHIBIT 44**
**157**

**SER 84**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 90 of 230

39.

                    LONENFIELD
        Good.  We'll pay you $10 a page so that
        comes to $130.  How does that sound?

Jerry and Joe look at each other excitedly talking between
themselves.

                    JERRY
        A lot of people work an entire month to
        make $130.

                    JOE
        Sounds good to me.

                    BOTH
                (to Lonenfield)
        That's fine...yeah sounds good.

                    LONENFIELD
        Good.  There's one more piece of business.
        -- Jack?

                    DIENOWITZ
        Before we can pay you, we're going to need
        you to sign this release form.

                    JERRY
        What...what is this for?

                    DIENOWITZ
                (handing it to Jerry)
        It's customary of all our contributors to
        release all rights to us.  (sitting halfway
        on the desk in front of them) This is the
        businesslike way of doing things.

                    LONENFIELD
                (lighting up a cigar)
        Listen boys if you need time to look over
        the agreement take some time, we'll be here.

                    JERRY
        Ah, we will if you don't mind.  We need to think
        about it before we make our decision together,
        right Joe?

                    JOE
        Sure Jerry ...I mean this is all happening
        so fast , we didn't think it was going to
        be like this ...

DCC00006286

**EXHIBIT 44**
**158**

**SER 85**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 91 of 230

40.

>                    DIENOWITZ
>          Boys why don't you take your time like Harry
>          suggested, here go on out and have a soda.

Dienowitz pulls out a dollar and hands it the two young men.

>                    JOE
>          Thanks Mister Dienowitz, we'll be back in
>          hour, is that okay?

>                    DIENOWITZ
>          Sure sure...(Dienowitz buzzes his speaker)
>          Alma, Mr. Siegal and Mr. Shuster are going
>          to come back in an hour...send them on through.

>                    SECRETARY (VO)
>          Yes sir, Mr. Dienowitz.

Both men walk over to shake hands with Siegal and Shuster
patting them on the back.

>                    LONENFIELD
>          Good luck now boys...see ya in an hour.
>          (buzzing the secretary again) Send in the
>          other two artists...

Joe and Jerry look at each other, their confidence shaken as they
leave the office and watch two equally young artists with looks
of hope filling their faces walk past them.  One of the artists
reaches out to shake hands with Joe.

>                    ARTIST
>          Hi, the names Kane, Bob Kane.  Maybe I'll
>          be seeing ya around?

>                    JOE
>          Yeah, yeah you'll be hear'in about me, the
>          bosses want to sign us up!

>                    KANE
>          So you're the guys with the Superman character
>          huh?  Yeah, the editor, Sullivan has been telling
>          me about you guys.

>                    JOE
>          So you work for Action comics?

>                    KANE
>          Yeah! I do stuff here and there, got this new
>          character I'm working on.

**EXHIBIT 44**
**159**

DCC00006287

**SER 86**

41.

                         JOE
          Oh yeah, what is it?

                        KANE
          Still working on the idea, gonna have something
          to do with a bat man.

                         JOE
          Neat!  Well hey, let's get together later sometime.

                        KANE
          Good luck!

Jerry who's gone ahead comes back looking for Joe.

                        JERRY
          There you are. I thought I'd lost you!

The two make their way out to the now crowded office seeing other
young hopefuls everywhere clutching artwork.

                        JERRY
          (whispering to Joe as they move past them)
          Look at all these kids, they're all here
          to get work with Action Comics!

INT.  SODA POP AND ICE CREAM PARLOR

where Joe and Jerry sit sipping a Coca-Cola looking weary.

                         JOE
          We better think this over Jerry, we need
          the money and we've been trying to sell
          Superman for five years now!  We've come
          a long ways and we're out of money, just
          train fare back.
          (Beat)
          We don't want to go back empty-handed do we?
          Maybe we should take a chance.  This is the
          real thing Jerry, what do you think we should do?

                        JERRY
          Things gotta start sometime... but I don't
          know anything about this legal stuff.  I don't
          know...I guess it's okay.
          (Beat)
          We've worked so long and hard.  Joe, we've just
          about given up on Superman.  (shrugging) Well,
          at least this  way we'll see him in print.
          Y'know I just want to see Superman in print.
          That's what's really important.  And besides,
          $130 is good money.

DCC00006288

**EXHIBIT 44**
**160**

**SER 87**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 93 of 230

42.

                    JOE
                  (nodding)
          Our family could sure use it.

Jerry nods in agreement playing with his straw, fidgiting.

                    JERRY
          Something big is gonna happen out of
          all this.  It's time...time for Superman
          to be born...

INT.   LONENFIELD'S OFFICE

                    JERRY
          (to Lonenfield holding the release)
          What about future stories?

                    LONENFIELD
                  (facing them again)
          Listen, if it does well, they'll be a
          lot more work for you boys.

                    JERRY
          Well..uh...could we make more if...

                    LONENFIELD
                  (interrupting)
          If it does well, you'll make a lot more.
          Don't worry about it.  We'll take care of
          you guys.

Jerry and Joe look over the form while Dienowitz strolls across
the room and Lonenfield turns in his chair looking out the
window.  CU -- Jerry and Joe signing the historic 1938 contract
with Action Comics.

                    DIENOWITZ
          Welcome to Action Comics fellas!

                    Lonenfield
          Here's your check boys, it's time to
          go to work!

INT.   SHUSTER APARTMENT - CLEVELAND - TWO DAYS LATER

Where Joe and Jerry are furiously working to paste up a full 13
pages of Superman.  Joe sits at the drawing board and for the
first time we witness with him a history making event, the
drawing that will become the cover of ACTION COMICS #1

                                        CUT TO:

DCC00006289

**EXHIBIT 44**
**161**

**SER 88**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 94 of 230

43.

PRINTER'S PRESS ROOM - ACTION COMICS - NEW YORK

where dozens of comics are being printed and we see the cover of
Issue No. 1 Action Comics rolling off the presses.  We see
SUPERMAN lifting a car as bad guys run away.

INT.  LONENFIELD'S OFFICE - NEW YORK - DAY

                    LONENFIELD
          So Jack, how are the sales going?

                    DIENOWITZ
          Sales are okay.  We're keeping up with
          the competition.

                    LONENFIELD
          Well good.  Send the boys another $130,
          we'll do a second run.

INT.  SHUSTER APARTMENT - CLEVELAND - DAY

Joe and Jerry sit at the table working.

                    JERRY
          Good news Joe.  Mr. Lonenfield called
          to say they're sending us $130 for a
          2nd run.

                    JOE
          That's great to hear!  So is it selling well?

                    JERRY
          He didn't say.

                    JOE
          I hope this is it Jerry.  This is our
          chance to make it.  If this doesn't work
          out I don't know what we'll do.

                    JERRY
          I don't know either Joe...I don't know
          either.

MONTAGE

of more Action Comics coming off the presses, being dropped at
newstands, and children buying.

Then more Action Comics coming off the presses, being dropped off
at newstands but this time children all around the country lining
up, clamering to buy Action Comics and SOLD OUT signs being put
on the racks everywhere.

DCC00006290

**EXHIBIT 44**
**162**

**SER 89**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 95 of 230

44.

INT.   LONENFIELD'S OFFICE - NEW YORK - DAY

                    LONENFIELD
What's going on out there Jack?  A bunch
of my distributors called to say they ran
out of comic books.

                    DIENOWITZ
I'm not sure Harry.

                    LONENFIELD
I'm hearing the rumbling of distant drums
Jack.  We better have a newsstand survey --
find out what's going on.

                    DIENOWITZ
I'm on it.

INT.   LONENFIELD'S OFFICE - NEW YORK - DAY

LEGEND: 3 DAYS LATER

                    LONENFIELD
What have you got, Jack?

                    DIENOWITZ
Well it seems that sales have tripled
since the last printing.

                    LONENFIELD
So Action Comics is trouncing the
competition.

                    DIENOWITZ
It's not Action Comics the kids are
asking for but that magazine with
Superman on the cover.

                    LONENFIELD
Superman?  See what did I tell you;
these Siegel and Shuster boys are
geniuses.  Have Superman splashed on
the cover of all Action Comics!

EXT.   CITY STREET NEWSSTAND - ANY CITY USA - DAY

where a long line of kids is buying up Action Comics in an
excited frenzy of mild pushing and shoving.  At the back of the
line stands a boy smaller than the others.  He looks around the
bigger kids to see what's in front.  Two bigger kids walk up in
front of him pushing him behind.  Saddened, a tear shows up in
his eye.

DCC00006291

**EXHIBIT 44**
**163**

**SER 90**

45.

The newstand man catches a glimpse of this and pulls a comic from
the back of the rack.  Soon all the comics are gone and a SOLD
OUT sign is put on the rack.  The remaining kids moan in
disappointment as they walk away.  The small boy stands there a
second wiping the tears from his eyes.

                        NEWSSTAND MAN
          Hey kid, come here.

He pulls out from his back pocket the last issue with Superman
emblazened on the cover.  The boy's eyes light up and a big smile
appears on his face.

                        SMALL BOY
          Gee, thanks mister!

He runs off in glee tightly holding his treasure, finds a spot
under a tree to sit and opens the first page.

POV - SMALL BOY

Seeing the very first picture of the planet Krypton starting to
blow apart.

MONTAGE - THE BOY'S IMAGINATION

of live action of the planet KRYPTON blowing apart into a million
firey pieces.  A small glowing SPACESHIP hurdles toward us from
the destroyed planet.  It zooms right above us into the blackness
of space.  We see EARTH from space getting larger and larger.
FROM the planet Earth a bright glowing ball streaks across the
sky.

Suddenly a glowing, blurred image of Superman BURSTS through the
ground straight into the sky with streaks of red, blue and gold
color streaming from behind.  The Superman image SHOOTS across
the sky over farms and cities with people pointing up in awe.  Up
higher into the sky the image flys.

POV - Superman flying directly toward us in a lightning-fast blur
then bursting into a FLASH OF LIGHT.

INT.  LONENFIELD'S OFFICE - NEW YORK - DAY

where Lonenfield is fielding call after call as the phones are
ringing off the hook.

                        LONENFIELD
                     (to his partner)
          It's crazy out there Jack!  Kids are
          going nuts over Superman.  Newstands
          all over the country are selling out.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 96 of 230

DCC00006292

**EXHIBIT 44**
**164**

**SER 91**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 97 of 230

46.

The Ledger Syndicate, the Bell Syndicate, United Feature - they all want Superman in their papers throughout the country. It's becoming a phenomena, this Superman. I've never seen anything like it!

                    DIENOWITZ
You were right Harry.  These Siegel and Shuster boys are geniuses.  Kids all over the country are lined up for Superman, Harry, I've seen it with my own eyes.  It's unbelievable, just unbelievable!

          LONENFIELD
By sheer dumb luck, we've stumbled onto a gold mine!  These boys have revolutionized the industry.  (throwing an open comic on his desk in blazing color)  After all, they've created the world's greatest  Superhero.  It's written all over the sales records.

                    DIENOWITZ
I'm gonna keep the press runs small for a while, y'know make 'em thirst for more!
               (Beat)
Y'know we're gonna be rich beyond our wildest dreams and we owe it all to these two kids.

          LONENFIELD
Dreamers...

                    DIENOWITZ
What's that?

          LONENFIELD
Dreamers.  They are two dreamers.  Jerry told me Superman came to him in a dream and then he got with Joe and they just dreamed some more.  It's like something... magical.  Together they were Superman, you could just see it and feel it in their eyes.

                    DIENOWITZ
You know, I've seen the same look in the eyes of kids throughout the country.  It's like this Superman character has been born in them.

          LONENFIELD
Y'know, I feel a little guilty we didn't give these two a better deal.

**EXHIBIT 44**
**165**

DCC00006293

SER 92

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 98 of 230

47.

>                     DIENOWITZ
>           Look, maybe later we can do better by
>           them, but for now business is business.
>
>                     LONENFIELD
>           Yeah, you're right Jack.  We do got a
>           business to run.  So here's what I think
>           we should do next...

They both nod in agreement as they go over their plans
to carve out a market for the Man Of Steel.

>                                   CUT TO:

MONTAGE

of Joe and Jerry working full time producing page after page of
Superman stories.

EXT.  A CLEVELAND STREET - DAY

LEGEND:  SIX MONTHS LATER

where Joe and Jerry are walking along.

>                     JERRY
>           We got $130 for next month's issue of
>           Superman.
>
>                     JOE
>           I guess Superman is doing okay, huh?
>
>                     JERRY
>           It's sure has been good to get steady pay.
>
>                     JOE
>           You bet it has.  (passing a newstand) Hey,
>           look here's the comics books.  (to newstand
>           man) Hey, Mister, where's Action Comics?
>
>                     NEWSTAND MAN
>                (pointing to SOLD OUT sign)
>           It was here before we sold out.  Gotta get
>           here earlier if you want one.  Kids are buying
>           it out.  Here take a look at this.  (holding up
>           newspaper pointing to article)
>
>                     JOE
>                (reading out loud)
>           "Superman breaks comic book sale's records.
>           100,000 sold out every month.  Kids every-
>           where clamoring for Superman!?"

**EXHIBIT 44**
**166**

DCC00006294

**SER 93**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 99 of 230

48.

Both their jaws drop open as he sets the paper down.

                    JOE
          Goodness gracious, Jerry!  We had no idea!
                    (Beat)
          Uh, shouldn't we be makin a little more?

                    JERRY
          Yeah Joe, we should.  My God, do you know
          what this means?!  Every newspaper syndicate
          editor in the country that turned down
          Superman will be begging to get it now.

                    JOE
          Can't we sell to them besides Action Comics?

                    JERRY
          (who by now looks white as a ghost)
          Uh...you know that form we signed?

                    JOE
          Yeah, what about it?

                    JERRY
          I think we sold all our rights to Action
          Comics.

                    JOE
          Well, can't we get them back?

                    JERRY
          I don't know Joe, we have to try.

INT.  SIEGEL'S SMALL HOUSE  - CLEVELAND - DAY

Jerry is on the phone and Joe stands beside him.

INTERCUT - JERRY/LONENFIELD

                    JERRY
          This is Jerry Siegel in Cleveland.
          May I speak to Mr. Lonenfield?

                    SECRETARY (VO)
          One moment please.

                    JERRY
                    (to Joe)
          They're putting him on.

                    LONENFIELD
          Hello there Jerry.  How ya boys doing?

**EXHIBIT 44**
**167**

DCC00006295

**SER 94**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 100 of 230

49.

> JERRY
> Fine thank you.  Uh...did you get our
> letter?

> LONENFIELD
> Yes I did.

> JERRY
> Well, you know Mr. Lonenfield, when we
> signed that release we had no idea how
> well Superman was going to sell and since
> it's done so well and all...well...we think
> it's fair that we get back the rights.

> LONENFIELD
> We can't do that.
> (Beat)
> But if you'll come to New York I'm sure we
> can work something out.

> JERRY
> Well...all right.  We can be there tomorrow.

> LONENFIELD
> Good, good.  See you then.

END INTERCUT

Jerry slowly hangs up the phone looking up at Joe.

> JOE
> Well?  What did he say?

> JERRY
> He said we can't get the rights back but
> we'll work something out.

INT.  TRAIN TO NEW YORK SEATCAR - NIGHT

Jerry and Joe sit in the train bouncing along trying to sleep in
their clothes for lack of sleeper fare.

> JOE
> (gazing out window)
> It's gonna work out Jerry, just you wait
> and see.

> JERRY
> I hope you're right Joe...I hope you're right.

> JOE
> You know that dream you had six years ago

DCC00006296

**EXHIBIT 44**
168

**SER 95**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 101 of 230

50.

that you told me about when we created
Superman?

                    JERRY
          Yeah, what about it?

                    JOE
          It was an omen, Jerry.  Superman is going
          to change the world.  It's too powerful
          not to.  Just wait and see.

Jerry who's crumpled up on the seat next to Joe, turns his head
and looks straight at him.

EXT.   TRAIN STATION NEXT MORNING - NEW YORK

Jerry and Joe step down from the train, clothes rumpled, hair
tasseled, and yawning.

                    JERRY
          We better get some coffee.

                    JOE
          I think I slept on my foot. (limping)

                    JERRY
               (holding his neck)
          I feel like I've been run over by a train.

They stumble off into the crowd trying to wake up.

INT.   LONENFIELD'S OFFICE - NEW YORK

                    LONENFIELD
               (gesturing)
          Come on in boys.  Would you like some
          coffee?  A soda?

                    JOE
          No thank you, we've had plenty of coffee.

                    LONENFIELD
               (as Dienowitz walks in)
          Jack come on in.  (to Jerry & Joe) I talked
          about your concerns with Mr. Dienowitz.  So
          what do you have in mind?

                    JERRY
          Well..uh...since Superman has been selling
          so well...how about $5 more per page?

**EXHIBIT 44**
**169**

DCC00006297

**SER 96**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 102 of 230

51.

                    DIENOWITZ
          You want a 50% raise?! Well...I don't know.
          What do you think Harry?

Lonenfield nods his head at Dienowitz.

                    DIENOWITZ
          Well alright.  We'll give you $5 more a page,
          after all...an artist must be happy. -- But
          remember, you'll be required to do all your
          work for us and no one else.

Jerry and Joe nod surrenderingly and sign a new contract.

EXT.  NEW YORK SIDEWALK - 42ND & BROADWAY

where Joe and Jerry are slowly walking along.

                    JOE
          Don't worry Jerry, at least we got
          something.  Besides we'll have all
          the Superman work we can get now.

                    JERRY
          Yeah, I guess you're right.

                    JOE
          (pointing to poster on side of building)
          Hey look Jerry.  The NEW YORK WORLD'S
          FAIR is coming. -- With the extra money
          maybe we can go.  What do you say?

                    JERRY
          Yeah, that sounds like a good idea.

Joe slaps Jerry on the back smiling.  Jerry brightens up and
slaps Joe on the back as they walk down the sidewalk.

MONTAGE

of Lonenfield and Dienowitz fielding phone calls, ordering press
runs, negotiating with syndication editors and the Superman
strips being placed in every newpaper throughout the nation.

                                        CUT TO:

INT.  LONENFIELD'S OFFICE - NEW YORK -  DAY

                    LONENFIELD
          Look at this Jack, (holding up a newspaper)
          every newspaper syndicate editor in the nation
          is calling Superman tops.

**EXHIBIT 44**
**170**

DCC00006298

**SER 97**

52.

                    DIENOWITZ
          Well, they're not lying Harry.  I just
          got the latest sales records. -- You won't
          believe it.

                    LONENFIELD
          -- Go ahead tell me.

                    DIENOWITZ
          The new bimonthly Superman magazine sold
          1.3 million copies.  And the new quarterly...
          it sold out.

                    LONENFIELD
          This thing has exceeded my wildest expectations.
          It's unbelievable!  Jack you are right...we're
          gonna be rich beyond our wildest dreams!

INT.   NEIGHBORHOOD CLOTHING STORE - CLEVELAND - DAY

Joe walks in and Francine is hanging clothes.

                    JOE
          Hi Francine.  How have you been?

                    FRANCINE
          Hi Joe.  Good to see you again.  How's your
          art been going?

                    JOE
          Remember the special character I was telling
          you about?  We got him published!  We got
          Superman published!  And it's doing real good.

                    FRANCINE
          That's wonderful.  (grabbing his hands) I knew
          you were going to do something special when I
          first met you.

                    JOE
          So...would you like to do something sometime,
          get a soda, go to the zoo?

                    FRANCINE
          Sure, I'd love to.  Thanks for asking Joe,
          that's sweet.  Give me a call and we'll go
          do something. -- Well, I better get back
          to this.

                    JOE
          Great, I'll talk with you soon.

**EXHIBIT 44**

**171**

DCC00006299

**SER 98**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 104 of 230

53.

EXT.  NEW YORK - DAY

LEGEND:  NEW YORK WORLD'S FAIR 1939

Where Joe and Jerry look all around in awe at the futuristic
shapes around them.  In front of them is the PERISPHERE, a 200
foot tall globe and the TRYLON a 700 foot tall column.

                    JOE
          Wow!  Look Jerry.

                    JERRY
          It looks like the stuff you've drawn Joe.

                    JOE
          Hey look! (pointing to a banner over a huge
          exhibit hall) The WORLD OF TOMORROW!

Joe and Jerry eagerly run toward the hall.

INT.  EXHIBIT HALL

A new era is ushered in by the sights and sounds of the future.
The air is electrified with excitment.  Streamlined art deco
furniture and appliances, models of modern cities, highways,
trains, cars and planes are all around.

They walk to one exhibit where a group of people has gathered
around.  In the center is industrial designer Raymond Loewy
telling of his new concepts in streamlining.

                    LOEWY
          ...so the aerodynamic shape enables the
          vehicle to attain greater speeds.

                    MAN IN CROWD
          So do you think man will ever travel faster
          than the speed of sound?

                    LOEWY
          Nothing is impossible.  Who knows what sort
          of incredible wonders the future will bring.

Everyone is bristling with optimism about the future.  Another
crowd gathers at a large exhibit.  Joe and Jerry walking to it
see a bold banner "THE MAN OF TOMORROW."

                    JERRY
          Look Joe.  The Man Of Tomorrow.  I wonder
          who that is?

Two young boys run by them toward the exhibit practically running

DCC00006300

**EXHIBIT 44**
**172**

**SER 99**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 105 of 230

54.

into them.  Moving in through the crowd they jostle to get close.
Joe says "Hello" to a pretty well-dressed woman next to him.  She
says "Hello" but then ignores him.

On a stage before them stands a woman in a silver jump suit
holding a metallic staff in front of a silvery curtain.  An M.C.
walks to the center of the stage.

                    M.C.
          Ladies and gentlemen, boys and girls.  You are
          about to witness what NO ONE has seen before.
          The Man Of Tomorrow comes to Earth from a planet
          of super beings, a planet DOOMED for destruction.
          An infant, the last of their kind, is HURDLED
          toward Earth in a space ship.

The curtains open revealing a large Tesla coil shooting bolts of
electricity across the stage.  The model of a planet hung from
the stage blows apart startling everyone.

                    M.C.
          KRYPTON is destroyed!  Now he is among us.

                    JERRY
          Joe, that's SUPERMAN!

                    JOE
          Superman!  (to woman next to him) We're the
          creators of Superman!

                    WOMAN
          Oh really?  And I'm Lois Lane.

                    M.C.
          BEHOLD!  The Man Of Steel - SUPERMAN!

Smoke from dry ice bursts forth from the floor of the stage.
"Superman" appears rising from the stage floor, fists on his
sides.  Electric lightning bolts sizzle behind him.  Everyone
applauds and kids scream in excitement.

                    M.C.
          A molecular structure a million years further
          evolved than our own.  His skin resists bullets.
          And our gravity is so light he can JUMP over
          buildings in a single bound and LEAP 1/8 of a mile.
          Dedicated to helping those in need.  SUPERMAN!
          THE MAN OF TOMORROW!

"Superman" steps down from the stage giving autographs.  Joe and
Jerry are jostled by all the kids trying to get close.  As
"Superman" makes his way through the crowd he comes face to face

DCC00006301

**EXHIBIT 44**
**173**

**SER 100**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 106 of 230

55.

with Jerry and Joe.

> "SUPERMAN"
> How you guys doing?  Would you like an
> autograph?

> BOTH
> Sure...sure, that would be great.

> "SUPERMAN"
> So who do I make it to?

> JERRY
> Jerry Siegel...

> JOE
> and Joe Shuster.

> "SUPERMAN"
> (starting to write then stops)
> Wait a minute...aren't you guys?
> (he looks down at Superman comics) You
> guys are Siegel and Shuster the creators
> of Superman!  What am I doing?  Give me
> YOUR autographs!

"Superman" brings Jerry and Joe on stage and calls over the M.C. whispering in his ear.

> M.C.
> Ladies and gentlemen.  We have a special
> announcement to make.  We have a surprise
> guest appearance by...the creators of
> Superman!  JERRY SIEGEL and JOE SHUSTER!

A spotlight shines on Jerry and Joe on stage giving autographs to "Superman."  Flashes of light blind them as reporters take pictures from all sides.  The well-dressed woman that was next to Joe walks up to him.

> WOMAN
> You really are the creators.  Look, if you're
> ever in New York again, why don't you give me
> a call.  (slipping a card in Joe's pocket)
> I'm a BIG fan.

She smiles sexily and walks off into the crowd.

EXT.  CITY STREET - CLEVELAND - DAY

where Joe and Jerry are walking home from their New York trip through the neighborhood.  They pass a newstand.

DCC00006302

**EXHIBIT 44**
**174**

**SER 101**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 107 of 230

56.

                    NEWSTAND MAN
          Congratulations boys, you're celebrities.

                    JOE & JERRY
               (to each other confused)
          What?  What's he talking about?

As they continue to walk, other people they pass comment:

               "Hey guys, looking good."
               "How's it feel being stars?"
               "Good going guys."

Walking up to the Shuster apartment building Jean and Frank come
running out with a paper in hand.

                    JEAN
          Hey look!  You guys are on the front page!

                    FRANK
          Yeah, you're in the New York Times, you
          guys are celebrities!

POV - JOE AND JERRY

looking at a New York Times headline, article and photo of
themselves giving autographs to "Superman."  Headline reads:

               "SUPERMAN CREATORS MAKE SURPRISE
               APPEARANCE AT WORLD'S FAIR"

BACK TO SCENE

                    JOE
          Jerry, we made the papers!

                    JERRY
          The New York Times!

                    JOE
          We're celebrities Jerry, do you
          realize that?

They both stand there in stunned silence for a few seconds as
they start to grasp their newfound status.

                    JERRY
          We're the creators of Superman, Joe.

                    JOE
          Yeah I know that...

**EXHIBIT 44**
**175**

DCC00006303

**SER 102**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 108 of 230

57.

> JERRY
> No, I mean WE'RE the creators!  Superman
> is the hottest thing around and we've
> hardly seen anything out of it!
>
> JOE
> I know, you're right Jerry but do you think
> We can get a better deal?
>
> JERRY
> We have to Joe, it's the only thing that's
> fair and just.
>
> JOE
> You're right Jerry, they've got to give us a
> better deal.

POV - JOE AND JERRY

looking at the headline and photo once again.

INT.  LONENFIELD'S OFFICE - NEW YORK - DAY

POV - JACK DIENOWITZ

looking at the same newspaper headline and photo of Joe and
Jerry.

> DIENOWITZ
> (throwing paper on Harry Lonenfield's desk)
> Did you see this?
>
> LONENFIELD
> I did.
>
> DIENOWITZ
> Looks like our boys are moving up in the
> world.
>
> LONENFIELD
> Yeah, I guess they are.
>
> DIENOWITZ
> So, you think we'll be hearing from them
> again?
>
> LONENFIELD
> I'm sure we will.  I'm sure we will.

INT.  SHUSTER APARTMENT - CLEVELAND - NIGHT

where 19 year old Jean is sprawled in curlers across a chair

DCC00006304

**EXHIBIT 44**

**176**

**SER 103**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 109 of 230

58.

talking endlessly on the phone.

                    JOE
          Can you hurry?

                    JEAN
             (trying to wave Joe away)
          I've got to go, my brother keeps bothering
          me.  (hanging up) Here's the phone, but I'm
          not through.

As she walks away Joe makes a sarcastic smily face at her.

                    JOE
             (on the phone)
          Francine?  Hi this is Joe.  Did you hear
          the news? -- Yeah me and Jerry, we're in
          the paper.  Isn't that neat? -- Okay,
          great.  I'll see you tomorrow at
          Schroder's Drugstore.  Bye.

INT.  DRUGSTORE - NEXT DAY

Joe and his girlfriend, Francine, sit sipping soda.

                    JOE
          Superman is gonna be big, I can just feel
          it.  I'm sure I'll be making more money
          soon and maybe we'll have more time together.

                    FRANCINE
          That would be nice Joe...real nice.
          (both pausing to sip soda) What do you
          want out of life Joe?

                    JOE
          You mean besides working on Superman.
          Oh...I don't know.  I guess someone to
          be with.  Someone I can trust. -- Yeah,
          that's really important, to have
          someone I can trust.

                    FRANCINE
          What about fame and money?

                    JOE
          It's good if you can get it...but it's not
          like trust.  Fame and money may come and go
          at anytime but trust lives on forever.

                    FRANCINE
          Joe...(looking up at him) you can trust me.

DCC00006305

**EXHIBIT 44**
**177**

**SER 104**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 110 of 230

59.

Joe smiles back at her placing his hand on top of hers.  Their
hands squeeze together as they smile at each other.

INT.   SHUSTER APARTMENT - CLEVELAND - NIGHT

Joe works at his drawing desk when the phone rings.  Joe picks it
up.

INTERCUT - JERRY/JOE

                    JERRY
          Joe, this is Jerry.

                    JOE
          Hi Jerry, what's up?

                    JERRY
          I got a letter back from Mr. Lonenfield.

                    JOE
          And...?

                    JERRY
          And he said we could come in and renegotiate
          our contract.

                    JOE
          Great!  I know we'll get a fair deal Jerry...
          I just know it.

INT.   LONENFIELD'S OFFICE - NEW YORK - DAY

Lonenfield is in a high back leather chair behind a fancy new
desk.  Dienowitz stands against the wall behind Lonenfield.  Joe
and Jerry walk in with The New York Times containing their
pictures.  They sit down.

                    LONENFIELD
          I'm not sure there's a whole lot we can do for you.

                    JERRY
               (dropping paper on desk)
          Mr. Lonenfield, we know how well Superman has
          done for you and we want a better deal.

                    JOE
          Yes sir, that's right -- we do.

The tension builds as Lonenfield and Dienowitz are silent.
Lonenfield moves his lower jaw around, his fingertips touching
one another near his chin.  Cold "poker eyes" dart across the
room scanning the boys and the paper on his desk.  The tension

**EXHIBIT 44**
**178**

DCC00006306

**SER 105**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 111 of 230

60.

rises.  Then he speaks.

                    LONENFIELD
          You boys have helped our comic book company
          grow.  And we want you to know we appreciate
          that.  -- Hell, Action Comics has practically
          become Superman.  No one can deny that.
                    (Beat)
          So here's what we'll do.  We'll give you a
          raise to $20 a page and...(looking over at
          Dienowitz) 5% of all Superman revenue.

Joe and Jerry look at each other without talking.  Joe smiles
slightly nodding his head at Jerry looking for his reaction.
Jerry smiles and nods in agreement at Joe.

                    JERRY
          Well...that sounds like a reasonable offer.

                    JOE & JERRY
          Yep, that's acceptable.

                    LONENFIELD
          Good, good.  (standing and extending his
          hand across the desk to shake) Boys you
          have yourself a deal.

INT.   HALL OUTSIDE LONENFIELD'S OFFICE

Both boys burst out in glee jumping up and down in excitement,
slapping each other on the back.

                    JOE
          We did it!  Jerry, we did it!

INT.   SHUSTER APARTMENT - CLEVELAND - SAME DAY

There is a knock at the door.  Jean answers it.  "Telegram for
the Shusters."

                    JEAN
          Mama!  Mama!  A telegram!

INSERT - MESSAGE IN BOLD LETTERS ON TELEGRAM

          "PROSPERITY HAS COME TO THE SHUSTERS"

BACK TO SCENE:

The whole family jumps up and down passing the telegram around
for each to read.

DCC00006307

**EXHIBIT 44**
**179**

**SER 106**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 112 of 230

61.

INT.   SHUSTER APARTMENT - CLEVELAND - THAT EVENING

Joe and Jerry burst through the front door as the whole family
runs out in an excited frenzy.

> FRANK
> We got your telegram.  What's
> happened?

> MAMA SHUSTER
> What do you mean prosperity has come?  What...

> JOE
> Mama, Mama, we've really made it with
> Superman.  We're going to be rich!

> JERRY
> Yeah, we're getting a percent of revenue!

> JEAN
> Oh wow!  That's so exciting!  I <u>knew</u> you
> guys were gonna make it!  I just <u>knew</u> it!

> MAMA SHUSTER
> (tears streaming)
> Oh boys!  I'm <u>so</u> happy for you, <u>so</u> happy!
> Oh Papa!  Papa!  We've got wonderful news!

Mama Shuster pulls up her apron to wipe the tears from her eyes
and goes into another room to get Papa Shuster.

MONTAGE

of Joe and Jerry renting an office, hiring 5 other artists to
keep up with the load jammed cheek to jowl furiously drawing and
lettering Superman panels, and only Joe drawing Superman's face.

Joe and Jerry going out looking at nice homes in nice
neighborhoods, moving their families out of their crumbling
apartments and into elegant homes.

INT.   NEW SHUSTER HOME - CLEVELAND - DAY

Mama Shuster and the rest of the family walk in through their
elegant new front door with Tiffany-style etched glass on each
side led by Joe.

POV - CEILING OF ENTRY FOYER

Through a crystal chandelier looking down at the whole group
walking in.

DCC00006308

**EXHIBIT 44**
**180**

**SER 107**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 113 of 230

# EXHIBIT 46

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 114 of 230

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



November 18, 1996

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114

Dear Jean:

I'm sorry to have taken so long to get back to you about "DREAMERS," but as your son has no doubt been reading in the trades, Time Warner's movie units have been going through structural issues relating to the Turner merger for the past season. Warner Bros., the least affected unit, isn't interested in pursuing "DREAMERS" at this time, so I had focused my attention on your behalf on the smaller units. It doesn't appear to be of interest to any of them at this time, with so much of their slates in transition. I'll be happy to recirculate the revised draft if you want to send it along, but I can't recommend you wait for our response.

On your title question, "TRUTH JUSTICE AND THE AMERICAN WAY" is a trademark of ours as part of the Superman property, and I expect we'd be unwilling to allow a movie to be made under that title unless we were making it.

The new SUPERMAN cartoon series has indeed debuted, and we're also issuing the pilot on home video, copies of which I'm enclosing for your pleasure. We do hope it will be a success, and as it develops we'll certainly keep you and Frank in mind.

I hope all else is well with you and yours.

Best

Paul Levitz

:lf



**EXHIBIT 46**
**219**

DCC00006224

**SER 109**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 115 of 230

# EXHIBIT 53

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 116 of 230



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485



Paul Levitz/Executive Vice President & Publisher

July 9, 1998

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for the offer of coming out to the San Diego Con.  We're not planning any major events
around Superman at the convention, so we'll decline the offer, but I have reopened the question
of a raise or bonus with my colleagues, and I'm pleased to enclose a check for $10,000 based on
the Superman animated series' success.

If you and Warren decide to come out to San Diego for the fun of it, please let me know and
we'll roll out the hospitality wagon.

Best

Paul Levitz

:lf
enclosure

A division of Warner Bros.—A Time Warner Entertainment Company

DCC00006612

**EXHIBIT 53**
228

**SER 111**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 117 of 230

| | | | DATE | 07/08/1998 | CHECK NUMBER | 1002251 | |

| INVOICE NUMBER | INVOICE DATE | VOUCHER NUMBER | VOUCHER DUE DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|
| 55644 | 07/02/1998 | TD016171 Due: | 07/02/1998 | $ 10,000.00 | | $ 10,000.00 |

| PRINT BATCH NUMBER | VENDOR CODE | PAY TO NAME | | GROSS TOTAL | DISCOUNT TOTAL | NET TOTAL |
|---|---|---|---|---|---|---|
| 191 | PEAVJ | JEAN SHUSTER PEAVY | | $ 10,000.00 | $ 0.00 | $ 10,000.00 |

DOCUMENT HAS A COLORED BACKGROUND. AN ARTIFICIAL WATERMARK IS PRESENT ON THE REVERSE SIDE.

**DC COMICS**
1700 BROADWAY
NY, NY 10019
GENERAL ACCOUNT

Chase Bank
55 Water Street
New York, NY 10041

50-943/213

| DATE | 07/08/1998 | CHECK NUMBER | 1002251 |

PAY    Ten thousand and no/100 Dollars Only*****************************************

TO THE      JEAN SHUSTER PEAVY
ORDER       316 HORTON LN NW
OF          ALBUQUERQUE  NM  87114

| AMOUNT | $ 10,000.00 |

DCC00006613

**EXHIBIT 53**
**229**

**SER 112**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 118 of 230

# EXHIBIT 59

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 119 of 230

505-897-7450                           316 Horton Lane, NW
                                       Albuquerque, N.M. 87114-1053

                                       September 7, 1999


Paul Levitz, Exec. V. P. & Publisher
DC COMICS
1700 Broadway
New York, N.Y.

Dear Paul:

Hope you attended the Comic-Con's 30th Anniversary last month.
Sorry I had to miss it.  Mike Catron recently sent me a video
he made of the 1998 ACTION NO. 1 COMIC BOOK PANEL which I
had participated in.  Did you ever see it?

The second part of the video he had recorded was of the 1996
Memorial Tribute to Jerry Siegel which you M.C.'d.  It was fun
watching.  I'm glad the public appreciates the fact that Siegel
and Shuster were the pioneers of the comic book industry and
the source of prosperity for so many.  I think back of the 30
years in which they suffered in poverty and my brother Frank and
I supporting Joe.  We're all glad that a new generation of true
comic book enthusiasts took over DC COMICS.

As Joe's sister I would like to still share in some of the
benefits from the legendary SUPERMAN.  You had once told Frank
and I that instead of a yearly raise of the pension, you would
prefer to offer a bonus directly from DC itself.  I'm making
that request again for 1999.

I have learned from the Internet that Joanne Siegel has filed
a copyright claim for SUPERMAN.  I want you to know that I
intend to continue to honor our pension agreement.  I would,
however, appreciate a generous bonus for this year as you
had done many times in the past.

Regards to Janette and any of the staff who know me.

Best wishes,

*Jean Shuster Peavy*

Jean Shuster Peavy

DCC00006198

**EXHIBIT 59**
236                                                            **SER 114**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 120 of 230

# EXHIBIT 60

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 121 of 230

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



October 18, 1999

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for your note. I've reviewed your request for a bonus for SUPERMAN for 1999 with my colleagues. We're pleased that you continue to honor our agreement and that your health enables you to enjoy some benefit from Joe's wonderful creativity. In that spirit we're pleased to accept your request. Enclosed you'll find a $10,000 check in appreciation of our several successful SUPERMAN programs this year. Please give Warren my best and perhaps we'll meet up at next year's San Diego show.

Best,

Paul Levitz

:lf

Redacted

A division of Warner Bros.—A Time Warner Entertainment Company

**EXHIBIT 60**
**237**

DCC00006204

**SER 116**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 122 of 230

| | DATE | 10/12/1999 | CHECK NUMBER | 008683 |

| INVOICE NUMBER | INVOICE DATE | VOUCHER NUMBER | VOUCHER DUE DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|
| 83759 | 10/12/1999 | D0055060 Due: SUPERMAN 1999 | 10/11/1999 | $ 10,000.00 | | $ 10,000.00 |

| PRINT BATCH NUMBER | VENDOR CODE | PAY TO NAME | | GROSS TOTAL | DISCOUNT TOTAL | NET TOTAL |
|---|---|---|---|---|---|---|
| 829 | PEAVJ | JEAN SHUSTER PEAVY | | $ 10,000.00 | $ 0.00 | $ 10,000.00 |

**DOCUMENT HAS A COLORED BACKGROUND. AN ARTIFICIAL WATERMARK IS PRESENT ON THE REVERSE SIDE.**

**DC COMICS**
1700 BROADWAY
NY, NY 10019
GENERAL ACCOUNT

Chase Bank
32 Water Street
New York, NY 10041

50-943/213

| | DATE | 10/12/1999 | CHECK NUMBER | 008683 |

PAY     Ten thousand and no/100 Dollars Only******************************************************

TO THE
ORDER
OF

JEAN SHUSTER PEAVY
316 HORTON LN NW
ALBUQUERQUE NM 87114

| AMOUNT | $ 10,000.00 |

EXHIBIT 60
238

DCC00006205

**SER 117**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 123 of 230

# EXHIBIT 62

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 124 of 230

Warren Peary
Joan Shuster Peavy
316 Horton Ln. NW
Albuquerque, NM 87114
Phone/Fax 505-897 7450

November 5, 1999

Paul Levitz
DC COMICS
1700 Broadway
New York, New York  10019

Dear Paul,

We are still trying to sell a screenplay about the lives of
Jerry Siegel and Joe Shuster.  You had written a note saying
you would be willing to resubmit the screenplay to Warner
Brothers in New York after a rewrite.  It has been rewritten
extensively.  Would you be able to submit it?

I have faxed an article from the November issue of DreamWatch
describing Joanne Siegel's claim to 50% of the rights to
Superman.  Does her claim interfere with us selling our
screenplay?  Thank you.

Confidential

WB008506

**EXHIBIT 62**
240

**SER 119**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 125 of 230



# SUPERMAN GROUNDED!

**PLANS FOR A NEW SUPERMAN FEATURE FILM FACE THEIR BIGGEST CHALLENGE YET, AS A MOMENTOUS LEGAL DISPUTE THREATENS TO PERMANENTLY GROUND THE MAN OF STEEL.**

Created by Joe Shuster and Jerry Siegel, the iconic character has remained the property of DC Comics since 1938, when the two men sold their rights to the company for a reported $130. Siegel's widow Joanne and daughter Laura Siegel Larson now claim a 50% share in rights to the character, having issued legal papers revoking the transfer of rights with the US Copyright Office in Washington DC.

Thanks to changes in US law, creators and their heirs now have the chance to terminate the transfer of rights after set periods of time. However, the termination must be preceded by two years of notification, meaning that the Siegels' papers, submitted in 1997, took effect from 19 April this year. As Shuster has no direct heirs, DC retains 50% of the rights.

According to the documents filed, the Siegels' termination of transfer not only applies to Superman himself, but to every work, in every medium, that includes any character, story element, or indicia reasonably associated with the man of tomorrow. The papers list hundreds of productions which fall under these terms, from comics and films to the Spin Doctors' song, Pocket Full of Kryptonite. While DC retains the rights to all productions between 1938 and 1999, any future revenue from them must be split with the Siegels.

From now on, the Siegels will be entitled to half of all revenue generated from a production related to Superman, including any TV series or theatrical feature films. The terms also allow the Siegels to license or produce their own Superman material, although conversely they must share half of their profits with DC. As the arrangement is unlikely to encourage film or TV companies to embark on a production doomed to lose half its revenue, analysts predict that some form of settlement will likely be agreed.

In the years following their sale of the character rights, Siegel and Shuster attempted to claim a share of profits from DC Comics, settling a lawsuit for $120,000 apiece in 1948. With his eyesight failing, Shuster became a message boy, while Siegel continued to produce some work for DC before being dismissed. In 1978 DC granted the men a yearly payment, beginning at $20,000, and rising annually until Shuster's death in 1992 and Siegel's in 1996.

Neither parties in the current dispute has openly discussed the matter, with DC Publisher Paul Levitz stating, "We have a long and happy and complex relationship with the Siegel family."



### Animated Man of Steel Axed

IN A MOVE THAT MAY BE CONNECTED with the Siegels' action, Warner Brothers has pulled the plug on the animated version of Superman, as well as bringing the adventures of the animated Batman to an end.

Confirming the news at the San Diego Comic Convention, producers Bruce Timm and Paul Dini revealed that Warner Brothers is devoting all its attention to BATMAN BEYOND. The last two episodes of SUPERMAN will feature a final showdown between the Man of Steel and Darkseid.

Meanwhile, Bruce Timm is bidding to bring another DC Comics character onto the small screen. Created by comics legend Jack Kirby, Kamandi, the Last Boy on Earth is the sole surviving human in a future world ruled by intelligent animals. Timm has revealed that his initial series pitch was rejected by Warner Brothers. Undeterred, he states, "KAMANDI is not dead. In fact, we are looking at possibly doing a KAMANDI pilot for Cartoon Network."

---

# Liv Crowned

**ARMAGEDDON STAR LIV TYLER HAS SIGNED ON TO PLAY ARWEN, QUEEN OF THE FAIRIES, IN DIRECTOR PETER JACKSON'S LORD OF THE RINGS TRILOGY.**

Tyler overcame scheduling difficulties to take the role. Signed to star in Robert Altman's DR T AND THE WOMEN, Tyler will be granted a three week break from the nine-month New Zealand RINGS schedule to film her part in the Texas based production. Tyler (right, in ARMAGEDDON) will adopt an English accent as Arwen, who serves as the love interest of Aragorn, played by SHOOTING FISH's Stuart Townsend.

Horror legend Christopher Lee looks set to play evil wizard Saruman in the New Line trilogy, and is reportedly in final negotiations for the part of the sorcerer attempting to take control of Middle Earth. Lee previously announced that he was keen to play the part of Gandalf in the production, although this role has now been filled by Sir Ian McKellen.

Long connected with the production, GOLDENEYE's Sean Bean has been confirmed in the role of Boromir, SUDDEN star John Rhys-Davies has been chosen to play the dwarf Gimli, while WIDE's Orlando Bloom will play Legolas. Young British actor Dominic Monaghan has been cast in the role of Merry Monagran, whose previous credits include the BBC drama series HETTY WAINTHROP INVESTIGATES, will star alongside Elijah Wood as Frodo Baggins, Sean Astin as Samwise Gamgee, and Billy Boyd as Pippin.

Rumours that the computer generated Gollum would be based on the voice and characteristics of ARMAGEDDON's Steve Buscemi have been denied by New Line president Michael DeLuca, who states, "Nope, he's

some unknown Brit." Reports suggest that DeLuca may be referring to Peter Woodthorpe, who voiced Gollum in the BBC radio adaptation.

With filming on the first of the trilogy, FELLOWSHIP OF THE RING, due to begin this autumn, the $130 million series is scheduled to debut Christmas 2000.



Confidential

WB008507

**EXHIBIT 62**
**241**

**SER 120**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 126 of 230

# EXHIBIT 67

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 127 of 230



**DC COMICS**
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

November 20, 2000

Jean Shuster Peavy
51 Camino Cabo
Santa Fe, NM 87505

Dear Jean,

Thanks for the update and the kind words. Although this has been a fairly quiet year for
the Man of Steel (no new television episodes or film for only the second year out of the
past twenty-five or so), we're pleased to honor your request for a year 2000 bonus with
the enclosed check for $10,000. All of us at DC join in wishing you and Warren a good
holiday season, and a happy and healthy new year to come.

Best,

Paul Levitz

A division of Warner Bros.—A Time Warner Entertainment Company

DCC00006193

**EXHIBIT 67**
246

**SER 122**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 128 of 230

# EXHIBIT 71

Case: 12-57245, 04/12/2013, ID: 8585288, DktEntry: 24-2, Page 129 of 230

DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail:paul.levitz@dccomics.com

Paul Levitz - Executive Vice President & Publisher



December 11, 2001

Jean Shuster Peavy
51 Camino Cabo
Santa Fe  NM  87508

Dear jean:

As you surmised, this has been a good year for Superman, with the successful launch of SMALLVILLE and the JUSTICE LEAGUE cartoon series.  In the spirit of that success, and of our continuing respect for Joe's great contribution to our culture and our company, enclosed please find a $25,000 bonus check.

Hoping this holiday finds you and Warren well, and that you have a great new year.

Best,

Paul Levitz

:lf

A division of Warner Bros - An AOL Time Warner Company

DCC00006188

**EXHIBIT 71**
**250**

**SER 124**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 130 of 230

| | DATE | 12/12/2001 | CHECK NUMBER | 1018703 | | |
|---|---|---|---|---|---|---|
| INVOICE NUMBER | INVOICE DATE | VOUCHER NUMBER | VOUCHER DUE DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
| 122101 | 12/11/2001 | VO110850 | 12/11/2001 | $25,000.00 | | $25,000.00 |
| | | 2001 BONUS SUPERMAN | | | | |

| PRINT BATCH NUMBER | VENDOR CODE | PAY TO NAME | | GROSS TOTAL | DISCOUNT TOTAL | NET TOTAL |
|---|---|---|---|---|---|---|
| 2013 | PEAVJ | JEAN SHUSTER PEAVY | | | | $25,000.00 |

DOCUMENT HAS A COLORED BACKGROUND. AN ARTIFICIAL WATERMARK IS PRESENT ON THE REVERSE SIDE.

**DC COMICS**
1700 BROADWAY
NY, NY 10019
GENERAL ACCOUNT

Chase Bank
55 Water Street
New York, NY 10041

50-943/213

| DATE | 12/12/2001 | CHECK NUMBER | 018703 |
|---|---|---|---|

PAY Twenty five thousand and no/100 ********************************************

TO THE ORDER OF
JEAN SHUSTER PEAVY
51 CAMINO CABO
SANTA FE NM 87505

AMOUNT $25,000.00

DCC00006189

**EXHIBIT 71**
251

**SER 125**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 131 of 230

1  DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8             UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11          Plaintiff,                  **DECLARATION OF DANIEL M.
                                        PETROCELLI IN SUPPORT OF
12       v.                             DC COMICS' MOTION FOR
                                        PARTIAL SUMMARY
13  PACIFIC PICTURES                    JUDGMENT ON ITS FIRST AND
    CORPORATION, IP WORLDWIDE,          THIRD CLAIMS FOR RELIEF**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN
15  PEARY, as personal representative of   Hon. Otis D. Wright II
    the ESTATE OF JOSEPH SHUSTER,
16  JEAN ADELE PEAVY, an individual,    **Hearing Date:**  Aug. 20, 2012
    LAURA SIEGEL LARSON, an            **Hearing Time:**  1:30 p.m.
17  individual and as personal          **Courtroom:**      11
    representative of the ESTATE OF
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
20          Defendants.
21
22
23
24
25
26
27
28

                                        PETROCELLI DECL. RE: DC'S
                                        MOT. FOR PARTIAL SUMM. J.

**SER 126**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 132 of 230

## DECLARATION OF DANIEL M. PETROCELLI

I, Daniel M. Petrocelli, declare and state:

1.      I am a partner at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics in the above-entitled action.  I make this declaration in support of DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief.  I have personal knowledge of the matters set forth in this declaration, and if called to testify to the facts stated herein, I could and would do so competently.

2.      Attached hereto as Exhibit 1 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated December 4,1937.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC's predecessor in interest, dated March 1, 1938.  (When referring to DC's predecessors, I refer to "DC" throughout this declaration for simplicity.)

4.      Attached hereto as Exhibit 3 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated September 22, 1938.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an agreement signed by DC and the McClure Newspaper Syndicate dated September 22, 1938.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a letter from J.S. Liebowitz to Jerome Siegel, dated September 28, 1938.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an agreement signed by Jerome Siegel, Joseph Shuster and DC, dated December 19, 1939.

8.      Attached hereto as Exhibit 7 is a true and correct copy of an article titled "Up, Up And Awa-a-y!  The Rise of Superman, Inc." from *The Saturday Evening Post*, dated June 21, 1941.

9.      Attached hereto as Exhibit 8 is a true and correct copy of a Certificate of Registration for A Claim to Renewal Copyright for Action Comics No. 1.

10.      Attached hereto as Exhibit 9 is a true and correct copy of the

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 127**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 133 of 230

1    Complaint in *Siegel v. National Comics Pubs., Inc.*, No. 1099-1947 (N.Y. Sup. Ct.)

2    (the "Westchester Action").

3         11.   Attached hereto as Exhibit 10 is a true and correct copy of the referee's

4    Findings of Fact and Conclusions of Law in the Westchester Action, dated April

5    12, 1948.

6         12.   Attached hereto as Exhibit 11 is a true and correct copy of the

7    Stipulation filed in the Westchester Action, dated May 19, 1948.

8         13.   Attached hereto as Exhibit 12 is a true and correct copy of the Final

9    Judgment issued in the Westchester Action, dated May 21, 1948.

10        14.   Attached hereto as Exhibit 13 is a true and correct copy of an affidavit

11   signed by Jerome Siegel in in *Siegel v. National Periodical Publications, Inc.*, 364

12   F. Supp. 1032 (S.D.N.Y. 1973) ("National"), dated March 1, 1973.

13        15.   Attached hereto as Exhibit 14 is a true and correct copy of an affidavit

14   signed by Joseph Shuster in National and dated March 7, 1973.

15        16.   Attached hereto as Exhibit 15 is a true and correct copy of an

16   agreement signed by Jerome Siegel, Joseph Shuster, and Jay Emmett on behalf of

17   Warner Communications Inc. dated December 23, 1975.

18        17.   Attached hereto as Exhibit 16 is a true and correct copy of a letter

19   signed by Joseph Shuster, dated November 12, 1978.

20        18.   Attached hereto as Exhibit 17 is a true and correct copy of a letter from

21   Martin D. Payson to Joseph Shuster, dated August 8, 1988.

22        19.   Attached hereto as Exhibit 18 is a true and correct copy of a letter from

23   Martin D. Payson to Joanne Siegel, dated March 12, 1990.

24        20.   Attached hereto as Exhibit 19 is a true and correct copy of a letter from

25   Martin D. Payson to Joanne Siegel, dated March 5, 1991.

26        21.   Attached hereto as Exhibit 20 is a true and correct copy of a death

27   certificate for Joseph Shuster, dated August 11, 1992.

28

- 2 -

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 128**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 134 of 230

1      22.    Attached hereto as Exhibit 21 is a true and correct copy of the affidavit

2  of Jean Peavy dated August 17, 1992.

3      23.    Attached hereto as Exhibit 22 is a true and correct copy of a letter from

4  Jean Peavy to Marty Payson dated August 21, 1992.

5      24.    Attached hereto as Exhibit 23 is a true and correct copy of a letter from

6  Marty Payson to Jean Peavy dated September 8, 1992.

7      25.    Attached hereto as Exhibit 24 is a true and correct copy of an

8  agreement signed by Frank Shuster, Jean Peavy, and Paul Levitz on behalf of DC

9  Comics dated October 2, 1992.

10     26.    Attached hereto as Exhibit 25 is a true and correct copy of excerpts

11 from a Notice of Termination of Transfer Covering Extended Renewal term for

12 "Superman" dated April 3, 1997, regarding the March 31, 1938, grant.

13     27.    Attached hereto as Exhibit 26 is a true and correct copy of excerpts

14 from a Notice of Termination of Transfer Covering Extended Renewal term for

15 "Superman" dated April 3, 1997, regarding the December 4, 1937, agreement.

16     28.    Attached hereto as Exhibit 27 is a true and correct copy of excerpts

17 from a Notice of Termination of Transfer Covering Extended Renewal term for

18 "Superman" dated April 3, 1997, regarding the September 22, 1938, agreement

19 with DC.

20     29.    Attached hereto as Exhibit 28 is a true and correct copy of excerpts

21 from a Notice of Termination of Transfer Covering Extended Renewal term for

22 "Superman" dated April 3, 1997, regarding the September 22, 1938, agreement

23 with McClure Newspaper Syndicate.

24     30.    Attached hereto as Exhibit 29 is a true and correct copy of excerpts

25 from a Notice of Termination of Transfer Covering Extended Renewal term for

26 "Superman" dated April 3, 1997, regarding the 1948 Stipulation.

27     31.    Attached hereto as Exhibit 30 is a true and correct copy of excerpts

28 from a Notice of Termination of Transfer Covering Extended Renewal term for

- 3 -

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 135 of 230

1    "Superman" dated April 3, 1997, regarding the December 19, 1939, agreement.

2         32.    Attached hereto as Exhibit 31 is a true and correct copy of excerpts

3    from a Notice of Termination of Transfer Covering Extended Renewal term for

4    "Superman" dated April 3, 1997, regarding the December 23, 1975, agreement.

5         33.    Attached hereto as Exhibit 32 is a true and correct copy of a Joint

6    Venture Agreement signed by Mark Peary, Jean Peavy, and Marc Toberoff on

7    behalf of Pacific Pictures Corporation and dated November 23, 2001.

8         34.    Attached hereto as Exhibit 33 is a true and correct copy of the Petition

9    for Probate of Lost Will and for Letters Testamentary ("Petition") filed by Mark

10   Warren Peary on July 23, 2003, in *In re Estate of Joseph Shuster*, Case No. BP-

11   080635, in the Superior Court of the State of California for the County of Los

12   Angeles ("Probate Action").

13        35.    Attached hereto as Exhibit 34 is a true and correct copy of the Order

14   Admitting Will To Probate, Appointing Executor and Authorizing Independent

15   Administration of Estate with Limited Authority filed by Mark Warren Peary on

16   October 7, 2003, in the Probate Action

17        36.    Attached hereto as Exhibit 35 is a true and correct copy of the Duties

18   and Liabilities of Personal Representative filed by Mark Warren Peary on October

19   21, 2003, in the Probate Action.

20        37.    Attached hereto as Exhibit 36 is a true and correct of an agreement

21   signed by Peary on behalf of the Estate of Joseph Shuster, Jean Peavy, and Marc

22   Toberoff on behalf of Pacific Pictures Corporation, dated October 27, 2003.

23        38.    Attached hereto as Exhibit 37 is a true and correct copy of the Notice

24   Of Termination Of Transfer Covering Extended Copyright Renewal Term Of

25   "Superman" served by Mark Warren Peary, as Executor of the Estate of Joseph

26   Shuster, on November 10, 2003.

27        39.    Attached hereto as Exhibit 38 is a true and correct copy of excerpts

28   from the transcript of the November 11, 2006, deposition of Jean Peavy.

- 4 -                    PETROCELLI DECL. RE: DC'S
                         MOT. FOR PARTIAL SUMM. J.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 136 of 230

1      40.     Attached hereto as Exhibit 39 is a true and correct copy of excerpts

2    from the transcript of the November 11, 2006, deposition of Mark Warren Peary.

3      41.     Attached hereto as Exhibit 40 is a true and correct copy of the

4    Declaration of Paul Levitz in Support of Defendants' Motion for Partial Summary

5    Judgment, filed with this Court on April 30, 2007, in the related *Siegel* cases, Case

6    Nos. CV-04-8400 and CV-04-8776.

7      42.     Attached hereto as Exhibit 41 is a true and correct copy of an order

8    issued by this Court on March 26, 2008, in the related *Siegel* case, Case No. CV-

9    04-8400

10      43.     Attached hereto as Exhibit 42 is a true and correct copy of an order

11    issued by this Court on September 26, 2008, in the related *Siegel* case, Case No.

12    CV-04-8400.

13      44.     Attached hereto as Exhibit 43 is a true and correct copy of the

14    "Toberoff Timeline."

15      45.     Attached hereto as Exhibit 44 is a true and correct copy of the

16    Declaration of Adam Ronan, M.D., in Opposition to Plaintiff's Motion to Initiate

17    Discovery of Two Elderly Witnesses filed in this case on September 13, 2010.

18      46.     Attached hereto as Exhibit 45 is a true and correct copy of excerpts

19    from Plaintiff DC Comics' Renewed Opposition To Marc Toberoff, Pacific

20    Pictures Corporation, IP Worldwide, LLC, and IPW, LLC's Renewed Motion To

21    Dismiss Plaintiff's First Amended Complaint Pursuant To Fed. R. Civ. P. 12(b)(6)

22    (Docket No. 147) (RE: Third And Sixth Claims For Relief), filed in this case on

23    March 21, 2011.

24      47.     Attached hereto as Exhibit 46 is a true and correct copy of excerpts

25    from the transcript of the June 29, 2011, deposition of Mark Warren Peary.

26      48.     Attached hereto as Exhibit 47 is a true and correct copy of excerpts

27    from the transcript of the July 22, 2011, deposition of Laura Siegel Larson.

28

- 5 -

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 137 of 230

49.    Attached hereto as Exhibit 48 is a true and correct copy of excerpts from the transcript of the August 3, 2011, deposition of Dawn Peavy.

50.    Attached hereto as Exhibit 49 is a true and correct copy of the Notice Of Termination Of Transfer Covering Extended Copyright Renewal Term for the Superman promotional announcements served by Mark Warren Peary, as Personal Representative of the Estate of Joseph Shuster, on March 6, 2012.

51.    Attached hereto as Exhibit 50 is a true and correct copy of the Notice Of Termination Of Transfer Covering Extended Copyright Renewal Term for the Superman promotional announcements served by Larson on March 6, 2012.

52.    When Marc Toberoff raised issues concerning the scheduling of this motion, my partner Matt Kline proposed a briefing schedule by which DC would file its motion for partial summary judgment on July 16, 2012, defendants would file their opposition and cross-motion on July 30, DC would file its reply and opposition on August 10, and defendants would file their reply on August 17, allowing for a hearing date of September 10 or 17, 2012, if a hearing was needed. Although this would cut DC's time to file its opposition and reply short by three days, we offered it to Mr. Toberoff so that briefing could be complete on the parties' motions before he allegedly was set to leave for vacation. Mr. Toberoff declined Mr. Kline's proposal and proposed a schedule that would push the summary judgment hearing in this matter back by a month and afford him a month, rather than two weeks, to oppose DC's motion. On July 13, 2012, DC declined Mr. Toberoff's proposal and gave him notice that it would file its motion on July 16, 2012, as planned. A true and correct copy of the July 13, 2012, e-mail from Mr. Kline to Toberoff is attached hereto as Exhibit 51. A true and correct copy of DC's letter giving defendants notice of this motion is attached hereto as Exhibit 52.

- 6 -

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**SER 132**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 138 of 230

1    I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct and that this declaration is executed this 16th day of

3    July 2012 at Los Angeles, California.

4

5                                        /s/ Daniel M. Petrocelli
                                         Daniel M. Petrocelli

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETROCELLI DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

SER 133

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 139 of 230

# EXHIBIT 21

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 140 of 230

### AFFIDAVIT OF JEAN PEAVY UNDER
### CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.  The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.  The decedent died on July 30, 1992 in Los Angeles County, California.

3.  At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.  No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.  The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.  The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.  The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Timer Warner Inc. Common Stock
_____
_____

8.  No other person has a right to the interest of the decedent in the described property.

9.  The affiant requests that the described property be paid, delivered or transferred to her.

10.  The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:   August 17       , 1992


_____
JEAN PEAVY

**EXHIBIT 21**
**182**

DCC00073013

**SER 135**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 141 of 230

STATE OF    NEW MEXICO                )
                                       )  ss.
COUNTY OF   BERNALILLO    ___          )


        On ___August 17_____, 1992, before me, a notary
public for the State of _New Mexico_____, personally
appeared JEAN PEAVY (___) known to me or ( X ) proved to me based
on satisfactory evidence to be the person whose name is subscribed
to the above instrument, and she acknowledged to me that she
executed the same.


        IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal on the day and year first above written.


SEAL:



_Barbara Newson_____
Notary Public for the
State of _New Mexico_____

2.

EXHIBIT 21
183

DCC00073014

SER 136

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 142 of 230

# EXHIBIT 39

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 143 of 230

1              UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL,                )                    COPY
    LAURA SIEGEL LARSON           )
5                                 )
                  Plaintiffs,     )
6                                 )
         v.                       ) CASE NO. CV 04-8400
7                                 )           CV 04-8776
    WARNER BROS, et al.           )
8                                 )
                  Defendants.     )
9

10

11

12

13          DEPOSITION OF MARK WARREN PEARY
                 November 11, 2006
14                   8:30 a.m.
                317 Paseo de Peralta
15              Santa Fe, New Mexico

16

17       PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:

18  TAKEN BY:  MR. PATRICK PERKINS
               Attorney for the Defendants
19

20

21

22  REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                  Bean & Associates, Inc.
23                Professional Court Reporting Service
                  500 Marquette, Northwest, Suite 280
24                Albuquerque, New Mexico 87102

25  (3519B) MC

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 39
317

SER 138

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 144 of 230

1  could, if you could turn to the third page of the

2  document?  You have testified on a couple of occasions

3  that one of the things that was going to happen as a

4  result of this joint venture was to establish the Joe

5  Shuster estate; is that correct?

6       MR. TOBEROFF:  Misstates his testimony as to

7  on behalf of the venture.

8    Q.  Well, then -- that's a good point.  At some

9  point you undertook to establish the Joe Shuster

10 estate; is that accurate?

11   A.  Well, I -- it was -- it was between me and

12 Marc Toberoff.  As far as my understanding of it, that

13 that was legally necessary to establish the estate.

14   Q.  Okay.  And if you look at paragraph 10, the

15 last sentence reads, and I quote, "The parties hereby

16 approve Michael Catron," C-A-T-R-O-N, "for appointment

17 as the administrator of Joe Shuster's estate, once it

18 is established."  Who is Michael Catron?

19   A.  He is -- he is a friend.

20   Q.  And is he, in fact, the administrator of Joe

21 Shuster's estate?

22   A.  No.

23   Q.  And why not?

24   A.  We changed, decided to change that,

25 discussion with Marc Toberoff.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 39
318

SER 139

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 145 of 230

1     Q.   Who initially came up with the name Michael

2   Catron as the administrator?

3          MR. TOBEROFF:  Came up with it?  Vague and

4   ambiguous.

5     A.   I'm not sure who first came up with it.  He

6   is a long-time friend.  That's all I can say.

7          MR. PERKINS:  Would you mark this for me?

8          (Exhibit 5 marked.)

9     Q.   (By Mr. Perkins)  I have asked the court

10  reporter to mark as Exhibit 5 a document that is dated

11  October 27, 2003.  It is addressed to Mark Warren

12  Peary, and it is from Pacific Pictures Corporation.

13  If I could invite your attention to the last page,

14  please?

15         Is that your signature?

16    A.   Yes.

17    Q.   And did you read this document before you

18  signed it?

19    A.   Yes.

20    Q.   Mr. Peary, what was the purpose of entering

21  into this agreement?

22    A.   As far as I understand, the purpose of this

23  was after I was appointed executor of the Shuster

24  estate.

25    Q.   And why did you need to enter this



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 39

319

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 146 of 230

1    agreement, having been appointed executor of the

2    Shuster estate?

3         A.   I assume since my legal role changed that

4    this needed to be another agreement.

5         Q.   Did you receive legal counsel from anyone

6    prior to entering into this agreement with respect to

7    this agreement?

8              MR. TOBEROFF:  Are you asking whether he

9    sought an outside attorney?

10        A.   An outside attorney?

11        Q.   Yes.

12        A.   Other than Marc Toberoff?

13        Q.   Yes, other than Marc Toberoff.

14        A.   No, I don't believe so.

15        Q.   And as of October 27, 2003, when you signed

16   this agreement, had there been any -- strike that.

17             As of October 27, 2003, when you signed this

18   agreement, did you have any idea as to the value of

19   the rights that are at issue in this document?

20             MR. TOBEROFF:  Vague and ambiguous.

21        A.   Do I have any I -- did I have any idea as to

22   the value?  It wasn't really discussed between me --

23             MR. TOBEROFF:  Don't talk about discussions

24   with me.

25        A.   Okay.  So, no, I guess -- I guess not.  I



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 39

320

SER 141

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 147 of 230

1   don't really have -- did not really have any idea of

2   the value, no.

3        Q.   As of October 27, 2003, to your knowledge,

4   had any effort been made to place a value on these

5   rights, either by you or by anyone connected to you?

6             MR. TOBEROFF:  Objection, vague and

7   ambiguous.  And by value, do you mean a specific

8   dollar figure?  In other words, you have asked this

9   question several times as to value.  What do you mean?

10       Q.   Well, what -- Mr. Peary, when I use the term

11  value in connection with rights, what do you

12  understand me to mean?

13       A.   I understand you to mean a dollar figure.

14       Q.   Okay.  So, using that as the definition, as

15  of October 27, 2003, to your knowledge, had anyone

16  placed a value on the rights that are at issue in this

17  agreement?

18            MR. TOBEROFF:  Anyone in the world?

19       Q.   Anyone, to your knowledge?

20       A.   No, not to my knowledge.  Not any specific

21  amount, no.

22       Q.   Was there a general amount?

23       A.   No.

24       Q.   Mr. Peary, are you aware of any offers that

25  have been made to you, either directly or through a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
EXHIBIT 39
321

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

SER 142

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 148 of 230

1    DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3    CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4    O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
5    Los Angeles, CA  90067-6035
     Telephone:  (310) 553-6700
6    Facsimile:   (310) 246-6779

7    PATRICK T. PERKINS (admitted *pro hac vice*)
       pperkins@ptplaw.com
8    PERKINS LAW OFFICE, P.C.
     1711 Route 9D
9    Cold Spring, NY 10516
     Telephone:  (845) 265-2820
10   Facsimile:   (845) 265-2819

11   Attorneys for Plaintiff DC Comics

12

13                 UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15   DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

16              Plaintiff,               **DISCOVERY MATTER**

17        v.                            **DECLARATION OF CASSANDRA
                                        SETO IN SUPPORT OF DC
18   PACIFIC PICTURES                   COMICS' MOTION FOR LEAVE TO
     CORPORATION; IP WORLDWIDE,         CONDUCT FURTHER DEPOSITION
19   LLC; IPW, LLC; MARC                OF DAWN PEAVY**
     TOBEROFF, an individual; MARK
20   WARREN PEARY, as personal          **Judge:**         Hon. Otis D. Wright II
     representative of the ESTATE OF    **Magistrate:**    Hon. Ralph Zarefsky
21   JOSEPH SHUSTER; JEAN ADELE
     PEAVY, an individual; LAURA        **Hearing Date:**        Feb. 13, 2012
22   SIEGEL LARSON, individually and    **Hearing Time:**        10:00 a.m.
     as personal representative of the  **Courtroom:**           540
23   ESTATE OF JOANNE SIEGEL, and       **Discovery Cutoff:**    None Set
     DOES 1-10, inclusive,              **Pretrial Conference:** None Set
24
                Defendants.
25

26

27

28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 149 of 230

## DECLARATION OF CASSANDRA SETO

I, Cassandra Seto, declare and state as follows:

1.     I am an attorney licensed to practice in the State of California and admitted to the Central District of California.  I am an associate at O'Melveny & Myers LLP, counsel of record for plaintiff DC Comics ("DC") in the above-entitled action.  I make this declaration in support of DC's Motion For Leave To Conduct Further Deposition Of Dawn Peavy.  I have personal knowledge of the matters set forth in this declaration.

2.     Attached hereto as Exhibit A is a true and correct copy of the transcript of DC's deposition of Dawn Peavy on August 3, 2011.  To avoid any claims that it is selectively excerpting deposition testimony, DC has attached a full and complete transcript of that deposition.

3.     Attached hereto as Exhibit B is a true and correct copy of a letter from my colleague Matthew Kline to counsel for defendants dated August 4, 2011.

4.     Attached hereto as Exhibit C is a true and correct copy of Plaintiff DC Comics' Second Set Of Requests For Production To Defendant Jean Adele Peavy, dated August 4, 2011.

5.     Attached hereto as Exhibit D is a true and correct copy of Plaintiff DC Comics' Second Set Of Requests For Production To Defendant Mark Warren Peary, dated August 4, 2011.

6.     Attached hereto as Exhibit E is a true and correct copy of a letter from Keith Adams, counsel for defendants, to Mr. Kline dated August 10, 2011.

7.     Attached hereto as Exhibit F is a true and correct copy of a letter from Mr. Kline to Mr. Adams dated August 11, 2011.

8.     Attached hereto as Exhibit G is a true and correct copy of an e-mail from Mr. Kline to counsel for defendants dated August 25, 2011.

9.     Attached hereto as Exhibit H is a true and correct copy of a letter from my colleague Jason Tokoro to Mr. Toberoff dated August 30, 2011.

SETO DECL. ISO OF DC'S MOT. FOR
LEAVE TO CONDUCT FURTHER
DEPO. OF D. PEAVY

**SER 144**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 150 of 230

1        10.   Attached hereto as Exhibit I is a true and correct copy of a letter from

2   Mr. Tokoro to Mr. Toberoff dated September 2, 2011.

3        11.   Attached hereto as Exhibit J is a true and correct copy of a letter from

4   Mr. Adams to Mr. Tokoro dated September 6, 2011.

5        12.   Attached hereto as Exhibit K is a true and correct copy of Defendant

6   Jean Adele Peavy's Response And Objections To Plaintiff DC Comics' Second Set

7   Of Requests For Production Of Documents, dated September 6, 2011.

8        13.   Attached hereto as Exhibit L is a true and correct copy of Defendant

9   Mark Warren Peary's Response And Objections To Plaintiff DC Comics' Second

10   Set of Requests For Production Of Documents, dated September 6, 2011.

11        14.   Attached hereto as Exhibit M is a true and correct copy of a letter from

12   Mr. Toberoff to Mr. Kline dated September 8, 2011.

13        15.   Attached hereto as Exhibit N is a true and correct copy of a letter from

14   Mr. Tokoro to counsel for defendants dated September 15, 2011.

15        16.   Attached hereto as Exhibit O is a true and correct copy of a letter from

16   my colleague Daniel M. Petrocelli to Mr. Toberoff dated September 16, 2011.

17        17.   Attached hereto as Exhibit P is a true and correct copy of a letter from

18   Mr. Kline to Mr. Toberoff dated September 21, 2011.

19        18.   Attached hereto as Exhibit Q is a true and correct copy of The Last Will

20   and Testament of Jean Peavy, produced by defendants on September 30, 2011.

21        19.   Attached hereto as Exhibit R is a true and correct copy of a letter from

22   Mr. Petrocelli to Mr. Toberoff dated October 7, 2011.

23        20.   Attached hereto as Exhibit S is a true and correct copy of a letter from

24   Mr. Toberoff to Mr. Petrocelli dated October 14, 2011.

25        21.   Attached hereto as Exhibit T is a true and correct copy of a letter from

26   Mr. Petrocelli to Mr. Toberoff dated October 19, 2011.

27        22.   Attached hereto as Exhibit U is a true and correct copy of a letter from

28   Mr. Petrocelli to Mr. Toberoff dated November 4, 2011.

- 2 -

SETO DECL. ISO OF DC'S MOT. FOR
LEAVE TO CONDUCT FURTHER
DEPO. OF D. PEAVY

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 151 of 230

1        23.   Attached hereto as Exhibit V is a true and correct copy of a letter from

2    Mr. Toberoff to Mr. Petrocelli dated November 9, 2011.

3        24.   Attached hereto as Exhibit W is a true and correct copy of a letter from

4    Mr. Petrocelli to Mr. Toberoff dated November 11, 2011.

5        I declare under penalty of perjury under the laws of the United States that the

6    foregoing is true and correct and that this declaration is executed this 11th day of

7    January, 2012, at Los Angeles, California.

8

9                                            Cassandra Seto

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

SETO DECL. ISO OF DC'S MOT. FOR
LEAVE TO CONDUCT FURTHER
DEPO. OF D. PEAVY

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 152 of 230

# EXHIBIT Q

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 153 of 230

A235-10
R235-04

# LAST WILL AND TESTAMENT

BE IT KNOWN that I,    Jean Adele Peavy                                              , a resident of
Santa Fe                          , County of   Santa Fe                          , in the State of
New Mexico                        , being of sound mind, do make and declare this to be my Last Will and
Testament expressly revoking all my prior Wills and Codicils at any time made

I.      PERSONAL REPRESENTATIVE:

       I appoint   Mark Warren Peary                              of Santa Fe
                        , as Personal Representative of this my Last Will and Testament and pro-
vide if this Personal Representative is unable or unwilling to serve then I appoint
                                                     of
                        , as alternate Personal Representative. My Personal Representative shall be authorized to carry out all pro-
visions of this Will and pay my just debts, obligations and funeral expenses. I further provide my Personal
Representative shall not be required to post surety bond in this or any other jurisdiction, and direct that no expert
appraisal be made of my estate unless required by law

II.     GUARDIAN:        N/A

       In the event I shall die as the sole parent of minor children, then I appoint
                                                     as Guardian of said minor children. If this named Guardian is
unable or unwilling to serve, then I appoint
as alternate Guardian.

III.    BEQUESTS:

       I direct that after payment of all my just debts, my property be bequeathed in the manner following

Upon my death or upon being declared legally missing for one month
Mark Warren Peary of 51 Camino Cabo, Santa Fe, NM  87508 shall be
sole beneficiary of my estate.

If he does not survive me or is declared legally missing for at
least one month, Dawn Laura Peavy of 11405 Lake Nemi, El Paso, TX
79936 shall be the sole beneficiary of my estate.

If she does not survive me or is declared legally missing for at
least one month, my estate shall be split among the following
charities and persons:

A. Santa Fe Habitat for Humanity, 621 Old Santa Fe Trail, PO Box 2844,
   Santa Fe, NM  87504 shall receive the property at 51 Camino Cabo,
   Belicia Estates, Santa Fe, NM  87508 held through PEAVY TRUST
   NO. WSP-1 as Trustee plus all furniture, fixtures and personal
   property unless specifically given elsewhere to sell, auction or
   use to further the cause of affordable housing.

B. My remaining interests in various financial accounts through
   PEAVY-PEARY PARTNERS L.P. or jointly with my son Mark Warren Peary
   shall be split as follows:

                                              _____
                                              Testator's Initials

       Page ____ of ____



Execute and attest before a notary.  Caution: Louisiana residents should
consult an attorney before preparing a will.

CONFIDENTIAL                                                    MWP 00060

                                                                    SER 148

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 154 of 230

1. $2,500 shall go to David L. Cooke, PO Box 32261, Santa Fe NM 87594
to build free energy devices for the benefit of humanity.

2. $5,000 shall go to the National Arbor Day Foundation, 100 Arbor
Ave., Nebraska City, NE 68410 to promote tree planting and forestry.

3. The remaining financial assets shall be split with 45% going
to the American Institute for Cancer Research, 1759 R Street, NW
Washington, DC  20009 to promote research and education on disease
prevention through healthy plant-based diets and 55% going to the
Physicians Committee for Responsible Medicine, 5100 Wisconsin Ave.,
Suite 404, Washington, DC  20016 to promote education and lobbying
efforts for healthy, plant-based diets and humanitarianism.

C. My 7½% interest in the screenplay 'DREAMERS' shall go to
Rick Palacioz of 2908 Espanola, Albuquerque, NM  87110.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of August, 2001
(year), to this my Last Will and Testament.

_Jean Adele Peavy_
Testator Signature

IV      WITNESSED:

The testator has signed this will at the end and on each other separate page, and has declared or signified
to our presence that it is his/her last will and testament, and in the presence of the testator and each other we have
hereunto subscribed our names this 24th   day of August     25 (year).

_____        _____
Witness Signature                Address

_____        _____
Witness Signature                Address

_____        _____
Witness Signature                Address


                        ACKNOWLEDGMENT
State of N.Mex.
County of SANTA FE  }
We, Mark Warren Peary, Susan Varnick
Megan Bland                  and
the testator and the witnesses, respectively, whose names are signed to the attached and foregoing instrument, were
sworn and declared to the undersigned that the testator signed the instrument as his/her Last Will and that each of
the witnesses, in the presence of the testator and each other, signed the will as a witness

Testator Jean Adele Peavy            Witness _____
                                Witness Megan Bland _____
                                Witness _____

On Aug 24- 01 before me, J.A.P. Jean Adele Peavy
appeared
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____
        Signature of Notary

        OFFICIAL SEAL
        Emily Suazo
        NOTARY PUBLIC
        STATE OF NEW MEXICO
        _____

Affiant   _ Known _ Produced ID
Type of ID _____
                        (Seal)

**CONFIDENTIAL**

**MWP 00061**

**EXHIBIT Q**
**236**

**SER 149**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-03633-ODW(RZx) | Date | November 4, 2011 |
|---|---|---|---|
| Title | DC Comics v. Pacific Pictures Corporation et al | | |

| Present: The Honorable | Otis D. Wright II, United States District Judge |
|---|---|

| Sheila English | None present |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None present | None present |

**Proceedings:**      **MINUTE ORDER  (IN CHAMBERS)**

     **AT THE REQUEST OF THE MOVING PARTY,** the MOTION to Dismiss Consolidated Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) **[333]** is hereby VACATED.

|  | : | 00 |
|---|---|---|
| Initials of Preparer | se | |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 155 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 156 of 230

1   TOBEROFF & ASSOCIATES, P.C.
    Marc Toberoff (State Bar No. 188547)
2    *mtoberoff@ipwla.com*
    Keith G. Adams (State Bar No. 240497)
3    *kgadams@ipwla.com*
    2049 Century Park East, Suite 3630
4   Los Angeles, California, 90067
    Telephone:  (310) 246-3333
5   Fax:        (310) 246-3101

6   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
7   Estate of Joseph Shuster, Jean Adele Peavy,
    and Laura Siegel Larson, individually and
8   as personal representative of the Estate of
    Joanne Siegel

9

10                  **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12   DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

13              Plaintiff,               Hon. Otis D. Wright II, U.S.D.J.
                                         Hon. Ralph Zarefsky, U.S.M.J.
        vs.
14                                       **NOTICE OF WITHDRAWAL
     PACIFIC PICTURES CORPORATION;       OF DEFENDANTS'
15   IP WORLDWIDE, LLC; IPW, LLC;        CONSOLIDATED NOTICE OF
     MARC TOBEROFF, an individual;       MOTION AND MOTION TO
16   MARK WARREN PEARY, as personal      DISMISS PURSUANT TO FED.
     representative of the ESTATE OF     R. CIV. P. 12(b)(6) (Docket No.
17   JOSEPH SHUSTER; JEAN ADELE          333)**
     PEAVY, an individual; LAURA
18   SIEGEL LARSON, individually and as  Complaint filed:   May 14, 2010
     personal representative of the ESTATE OF   Discovery Cutoff: None Set
19   OF JOANNE SIEGEL, and DOES 1-10,    Trial Date:        None Set
     inclusive,
20                                       Date:   November 14, 2011
                                         Time:   1:30 p.m.
21                                       Place:  Courtroom 11
                Defendants.
22

23

24

25

26

27

28

NOTICE OF WITHDRAWAL OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

**SER 151**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 157 of 230

1    KENDALL BRILL & KLIEGER LLP
     Richard B. Kendall (State Bar No. 90072)
2     *rkendall@kbkfirm.com*
     Laura W. Brill (State Bar No. 195889)
3     *lbrill@kbkfirm.com*
     Nicholas F. Daum (State Bar No. 236155)
4     *ndaum@kbkfirm.com*
     10100 Santa Monica Blvd., Suite 1725
5    Los Angeles, California  90067
     Telephone:   (310) 556-2700
6    Facsimile:    (310)556-2705

7    Attorneys for Defendants Marc Toberoff,
     Pacific Pictures Corporation, IP
8    Worldwide, LLC, and IPW, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     NOTICE OF WITHDRAWAL OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 158 of 230

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that, pursuant to Local Rule 7-16, defendants Mark

3  Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele

4  Peavy, Laura Siegel Larson, individually and as personal representative of the Estate

5  of Joanne Siegel, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC,

6  and IPW, LLC hereby withdraw without prejudice their Consolidated Notice Of

7  Motion And Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(6) (Docket No.

8  333), originally filed on October 14, 2011, and scheduled for hearing on November

9  14, 2011.   Defendants withdraw their motion because it implicates issues that are

10  now under the jurisdiction of the Ninth Circuit Court of Appeals pursuant to

11  defendants' recently-filed appeal (Docket No. 339; 9th Cir. Case No. 11-56934), and

12  to avoid potentially wasting the District Court's resources and the risk of conflicting

13  rulings.  *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 59 (1982);

14  *City of L.A., Harbor Division v. Santa Monica Baykeeper,* 254 F.3d 882, 886 (9th

15  Cir. 2001).  Defendants will file their answer to DC Comics' First Amended

16  Complaint by no later than November 17, 2011.

17    Dated:  November 3, 2011     RESPECTFULLY SUBMITTED,

18            /s/ Richard Kendall

19            Richard Kendall

20            KENDALL BRILL & KLIEGER LLP
          Attorneys for Defendants Marc Toberoff *et al.*

21

22            /s/ Marc Toberoff
          Marc Toberoff

23            TOBEROFF & ASSOCIATES, P.C.

24            Attorneys for Defendants Mark Warren Peary *et al.*

25

26

27

28

                    1
NOTICE OF WITHDRAWAL OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

Present:   The Honorable Otis D. Wright II, United States District Judge

| Sheila English | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):   Order Denying Defendants' Motion to Strike Pursuant to Anti-SLAPP Statute  [145]**

Defendants move to strike the Fourth, Fifth and Sixth Claims from Plaintiffs' First Amended Complaint ("FAC") pursuant to California's Anti-SLAPP statute, Code Civ. P. § 425.16(e)(2).  [145]   Defendants argue these claims "concern conduct protected by the Anti-SLAPP law because they concern statements made in connection with litigation and filings in the U.S. Copyright Office." (Mot. at 13.)  Plaintiffs disagree.

Having considered the papers filed in support of and in opposition to the instant motion, the Court deems this matter suitable for decision without oral argument.  *See* Fed. R. Civ. P. 78; L.R. 7-15.  As discussed below, Defendants' motion is **DENIED**.

**DISCUSSION**

The anti-SLAPP statute establishes a procedure to expose and dismiss meritless and harassing claims that seek to chill the exercise of a person's Constitutional rights of petition or free speech in connection with a public issue. *Kearny v. Foley & Lardner, LLP*, 590 F.3d 638, 648 (9th Cir. 2009).  Analysis of an anti-SLAPP motion to strike involves a two-step process.  First, the defendant must show that the claim arises from an "act . . . in furtherance of the person's right of petition or free speech under the United States or California Constitution ..." *Id.* (quoting Cal. Code Civ. P. § 425.16(b)(1)).

"If the court determines that the defendant has met this burden, it must then determine

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 159 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 160 of 230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

whether the plaintiff has demonstrated a probability of prevailing on the merits." *Id.*  To
establish a probability of prevailing, the plaintiff must show that "the complaint is both
legally sufficient and supported by a sufficient prima facie showing of facts to sustain a
favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (footnote and
citations omitted).

*Fourth Claim*: Interference With 1992 Shuster Agreement

Defendants argue "[b]ecause DC's Fourth Claim is clearly based upon filing with the
U.S. Copyright Office [ ] of statutory termination notices, under clear Ninth Circuit
precedent it is subject to the protections of the Anti-SLAPP law." (Mot at 14-15.)  Plaintiffs
counter that "DC's Fourth Claim would be viable if all it alleged was that defendants
wrongfully induced the Shusters to sign the Pacific Pictures agreements." (Opp'n at 18)
("Even if the subsequent acts singled out in defendants' motion (filing notices, assisting in
a probate case, or even encouraging litigiousness) might help evidence the overall scheme,
they are not the root of DC's claims and do not trigger SLAPP.").

It is "the principal thrust or gravamen of the plaintiff's cause of action that determines
whether the anti-SLAPP statute applies [citation], and when the allegations referring to
arguably protected activity are only incidental to a cause of action based essentially on
nonprotected activity, collateral allusions to protected activity should not subject the cause
of action to the anti-SLAPP statute." *Freeman v. Schack*, 154 Cal. App. 4th 719, 727 ( 2007)
(quoting *Martinez v. Metabolife Internat., Inc.*, 113 Cal. App. 4th 181, 188 (2003)).

Here, Plaintiffs allege they had an agreement with the Shusters to settle the parties'
rights with respect to the subject copyrights ("1992 Agreement"). (FAC ¶ 175.)  Marc
Toberoff ("Toberoff") then allegedly interfered with this agreement by reaching out to, and
forming a joint venture between the Shusters and Pacific Pictures Corporation (helmed by
Toberoff) to exploit the Shusters' copyrights. (Id. ¶ 177) ("Toberoff's ultimate purpose in
approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and
grant him the rights they had already granted to DC Comics.").  This is the gravamen of
Plaintiffs' claim, a business tort.

Defendants attempt to invoke the Anti-SLAPP statute by bootstrapping protected

SER 155

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 161 of 230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

activity to this claim. (*See* Reply at 4) (mining the operative complaint for arguably protected activity). Defendants also take issue with Plaintiffs' statement that the Fourth Claim "would be viable if all it alleged was that defendants wrongfully induced the Shusters to sign the [Pacific Pictures Agreements]." ("This makes no sense, as all of DC's alleged damages stem from the Shuster estate's exercise of its statutory termination [of DC's] rights by filing a notice with the U.S. Copyright Office, triggering litigation with DC.").

Unlike Defendants, the Court finds logic in Plaintiffs' argument. By inducing the Shusters to sign the Pacific Pictures Agreements, which purport to assign Toberoff the same rights they already assured DC by the 1992 Agreement, Plaintiffs argue that Toberoff interfered with DC's rights under the 1992 Agreement. This makes sense, as the Pacific Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff those rights which were already assigned to DC Comics.

As for the protected activity advanced by Defendants, such activity is not *itself* the act of interference. The interference was Toberoff's inducement of the Shusters to repudiate the 1992 Agreement and otherwise encumber the subject copyrights, all in derogation of DC's own interests in those very copyrights. The protected activities advanced by Defendants, while relevant to be sure, are not the material facts underlying the alleged interference. *See, e.g.*, *Gerbosi v. Gaims, Weil, West & Epstein, LLP*, 193 Cal. App. 4th 435, 443 (2011) ("A cause of action 'arising from protected activity' means that the defendant's acts underpinning the plaintiff's cause of action involved an exercise of the right of petition or free speech. [Citation.] ... The defendant must establish that the plaintiff's cause of action is actually *based on* conduct in the exercise of those rights. [Citation.]") (emphasis in original). And, while such protected activity may *evidence* the alleged interference, it does not shield it. *See, e.g.*, *Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal. App. 4th 1388, 1399 (2002) ("This contention confuses State Farm's allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct.") (emphasis in original).

In short, the Court finds that Defendants have not met their initial burden of demonstrating that Plaintiffs' Fourth Claim arises from protected activity. Accordingly, Plaintiffs need not demonstrate a probability of prevailing on the merits of this claim.

***Fifth Claim***: Interference with Prospective Economic Advantage re: Siegel-DC

SER 156

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

Comics Agreement (Against Toberoff)

Plaintiffs Fifth Claim is for "Interference with Prospective Economic Advantage re:
Siegel-DC Comics Agreement." (*See* FAC.) Specifically, Plaintiffs allege "Toberoff was
well aware of the [settlement] agreement between [DC] and the Siegel Heirs.... when he
approached the Siegel Heirs and their representatives in late 2001 and 2002 to express interest
in purchasing their Superman rights...." (FAC ¶¶ 184-85) ("Toberoff intentionally engaged
in independently wrongful conduct to carry out his interference by ... falsely misrepresenting
to the Siegel Heirs that he had a billionaire investor ready to purchase their Superman rights
if they repudiated their settlement agreement with [DC]; falsely representing to the Siegels
that he would help them produce a competing Superman motion picture; and wrongly
inducing the Siegels to repudiate their agreement and business relationship with [DC].").

Defendants argue "it is [ ] clear that Toberoff's communications with the Siegels
occurred in connection with settlement negotiations and anticipated litigation." (Mot. at 17.)
The Court does not share Defendants' clarity.  Plaintiffs allege "[a]t the time Toberoff
approached the Siegel Heir in 2001, DC Comics and the Siegel Heirs had finally reached an
agreement resolving their claims to the Superman . . . rights." (Compl. ¶ 182.)  Plaintiffs
acknowledge that this Court previously found this agreement deficient, but contend new
evidence (including, but not limited to the contested Toberoff Timeline) warrants further
review. (Compl. at 57 n.6.)

As the Toberoff Timeline is currently the subject of a discovery dispute, and Plaintiffs
sought but Defendants opposed staying this motion pending resolution of discovery, the
Court is inclined to construe the uncertainty against the moving parties, Defendants.  In any
event, Plaintiffs have established a long-lasting economic relationship with the Siegels, and
allege that Toberoff's nonprotected conduct interfered with this relationship. (Compl. ¶¶
180-86.)  Under the facts before the Court, Defendants have simply not met their burden of
demonstrating that this claim arises from protected activity.

The Court finds particularly illustrative Judge Larson's prior observations of the
negotiations between DC Comics and the Siegels, around the time of the alleged

**CIVIL MINUTES - GENERAL**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 162 of 230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

interference, and without knowledge of the present claim:

> From the Court's reading of the parties' [October 19, 2001 and October 26,
> 2001] correspondence, it is clear that the parties went well beyond reaching a
> settlement in principle regarding their respective positions to the Superman
> property. Rather, . . . the parties' correspondence, and the actions taken in
> response thereto, illustrates that they found themselves in the all-too-familiar
> situation in which verbal settlement negotiations result in what the parties
> believe to be an agreement on all the major points of dispute, but which, upon
> further discussion, falls short of the agreement needed to resolve their dispute.
> The devil, as it often is, was in the details.

*Siegel v. Warner Bros. Entertainment Inc.*, 542 F.Supp.2d 1098, 1137 (C.D. Cal. 2008). The
devil, Plaintiffs argue, was Toberoff's interference and, suffice it to say, Defendants have not
established-through the haze of details-that Toberoff's alleged misconduct is protected.

> ***Sixth Claim***: Declaratory Relief re: Invalidity of Copyright Assignment and
> Consent Agreements

Here, Plaintiffs seek a declaration invalidating Toberoff's various agreements with the
Siegels and Shusters. Defendants contend "DC's challenge to these alleged agreements
under the unfair competition laws [ ] invokes the litigation-protection provisions of the
Anti-SLAPP law." (Mot. at 20.) Like above, however, Defendants' attempt to harness these
claims to protected activities falters.

Defendants contend the "agreements at issue [were] expressly entered into with
respect to Toberoff's legal services regarding the Siegel Termination and Shuster
Termination, respectively." (Mot. at 20) ("For instance, [ ] both the 2001 and 2003 [Pacific
Pictures] Agreements specifically refer to employing Toberoff's legal services (Ex. C ¶ 7,
Ex. D ¶ 2), and this was clearly understood by Toberoff's clients."). Not quite.

To begin, said agreements engage Pacific Pictures "as [the Shusters'] exclusive
advisor for the purpose of retrieving, enforcing and exploiting . . . Joe Shuster's creations."

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 163 of 230

SER 158

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

(Def. Exh. D ¶ 1.)  And, "in furtherance of this exclusive agreement, [Pacific Pictures] (which is not a law firm) shall engage the services of attorney Mark Toberoff [the President of Pacific Pictures]...." (Id. ¶ 2.)  Plainly, this was not an agreement for the provision of legal services, but one concerning the exploitation of Joe Shuster's creations.  Merely referencing an intent to engage a particular attorney in the future does not transform this into an agreement for legal services.

As Plaintiffs offer, moreover, other agreements specifically disclaim any suggestion that they encompass legal services. (*See, e.g.*, Opp'n at 13) ("[T]his Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services..., if requested and desired by [the Siegels], will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and [the Siegels].") (citation omitted).

Finally, the earliest agreement referenced by Defendants is a November 28, 2001 Joint Venture Agreement with the Shusters, a month or so *after* DC Comics and the Shusters had reached "a.settlement in principle," as noted by Judge Larson. (*See* Def. Exh. B.)  Such a timeline-coupled with Plaintiffs' arguments and Defendants' inability to demonstrate that Toberoff's conduct was protected-counsels against striking these claims.  More pointedly, it gives the Court great pause that a business relationship lasting over 60 years (between DC Comics and the Shusters) came undone at around the time of the alleged interference, after those parties had apparently reached a settlement in principle.[1]

Again, Defendants fail to establish that this claim is subject to the Anti-SLAPP statute, and Plaintiffs need not demonstrate a probability of prevailing on the merits.

**CONCLUSION**

---

[1] Defendants' attempt to cloak Toberoff's alleged interference with protected, litigation and settlement related conduct lacks the specificity required to meet their burden.  Such failure affects the Court's disposition of every claim attacked by Defendants' motion.

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 165 of 230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

      Because Defendants have not met their burden of showing that the claims arise from Toberoff's protected activity, Defendants' special motion to strike is **DENIED**.

    **SO ORDERED**

|  | ---- | : | 00 |
|---|---|---|---|
| Initials of Preparer | SE | | |

SER 160

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 166 of 230

1   DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4   O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9   Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC

12  **UNITED STATES DISTRICT COURT**

13  **CENTRAL DISTRICT OF CALIFORNIA**

14  DC COMICS,

15         Plaintiff,

16      v.

17  PACIFIC PICTURES
   CORPORATION, IP WORLDWIDE,
18  LLC, IPW, LLC, MARC TOBEROFF,
   an individual, MARK WARREN
19  PEARY, as personal representative of
   the ESTATE OF JOSEPH SHUSTER,
20  JEAN ADELE PEAVY, an individual,
   LAURA SIEGEL LARSON, an
21  individual and as personal
   representative of the ESTATE OF
22  JOANNE SIEGEL, and DOES 1-10,
   inclusive,
23
       Defendants.
24

Case No. CV 10-3633 ODW (RZx)

**DC COMICS' OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) (DOCKET NO. 333)**

Hon. Otis D. Wright II

**Hearing Date**:  November 14, 2011
**Hearing Time**:  1:30 p.m.
**Place**:       Courtroom 11

Complaint Filed: May 14, 2010
Discovery Cutoff: None Set
Trial Date:     None Set

25
26
27
28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 167 of 230

1    or "novate," *Blair* held it fully substituted for the old agreement. *Id.* at 278-79.

2          Likewise in *WorldCom*, Judge Wood held that a settlement contract between

3    SkyTel and Beepwear superseded their previous marketing agreement. The new

4    contract "release[d] and discharge[d] SkyTel … from any and all actual or potential

5    claims." 2007 WL 2049723, at *2. Despite the absence of words like "revocation,"

6    the court held these broad releases "evince[d] an unambiguous intention to

7    extinguish" the parties' prior agreement. *Id.* The court noted the uniform view in

8    numerous jurisdictions that "a new contract's release of parties' claims under an old

9    contract proves that the parties intended to novate the old contract." *Id.* at *3.

10         The same result obtained in *Wells Fargo Bank v. Bank of Am.*, 32 Cal. App.

11   4th 424, 431-32 (1995), in which a lessee conveyed all of its "right, title and

12   interest" in a lease to the bank, and the lessee was expressly "relieved of all liability

13   accruing under th[e] lease…." This language—which tracks Peavy's grant of all

14   Joe's copyrights to DC and Peavy's broad release—superseded the parties' prior

15   agreement and extinguished all rights under it. *Id.* While defendants suggest they

16   did not "intend" to relinquish any termination rights by signing the 1992 agreement,

17   that is not what they said at the time. In 1992, Frank said Peavy would "not pursue

18   the termination of the Superman copyright," and in 1999, *after* Congress expanded

19   the termination provisions in the Copyright Act, Peavy told DC, "I have learned

20   from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN. I

21   want you to know that I intend to honor our pension agreement." *Id.* ¶¶ 54-56.[1]

22         *3. The 1992 Contract Is Valid.* Recycling the unsuccessful arguments from

23   *Milne* and *Steinbeck*, defendants say the 1992 agreement is a void "agreement to the

24   contrary." Mot. at 19. Defendants cite *Marvel* and *Mewborn* for this proposition.

---

25   [1] Defendants' cases provide them no help and do not create an "express language"
26   requirement for revoking or replacing existing contracts. *Simply Fit*, 579 F. Supp.
     2d at 377, found no revocation because the new contract contained no inconsistent
27   terms; *Flaum*, 508 N.Y.S.2d at 120, found novation *occurred* where a new contract
     consolidated all liability; and *Beck*, 481 N.Y.S.2d at 218, found no novation where
28   a duty was delegated to a new party, but the original party was not discharged.

DC'S OPP. TO DEFS' CONSOLIDATED
                                          MOTION TO DISMISS

**SER 162**

1    Mot. at 19-20. Both *Steinbeck* and *Milne* rejected *Marvel* as inapposite, as should

2    this Court. *Marvel* dealt with an agreement made decades after the fact to re-

3    characterize works as "works made for hire." The agreement did not operate to

4    revoke pre-1978 grants or replace them with new *post*-1978 grants; thus, it has no

5    application here. *Steinbeck*, 537 F.3d at 203; *Milne*, 430 F.3d at 1044.

6         *Mewborn* is equally off point, and defendants' assertion that it "limited"

7    *Milne*, Mot. at 20, is wrong—*Milne*, the earlier-decided opinion, "controls." *U.S. v.*

8    *Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992). In *Mewborn*, Mewborn entered

9    into an agreement with Classic in 1976, granting it copyrights in Lassie. In 1978,

10   after Congress created the termination right, Classic convinced Mewborn to sign a

11   new agreement in exchange for $3,000. 532 F.3d at 980-81. The agreement did not

12   "substitute[] or revoke[]" any pre-1978 copyright grants; rather, it "affirm[ed]" the

13   1976 grant and granted Classic "addition[al]" rights. *Id.* at 986, 989. Mewborn

14   was not aware of her right of termination, and discovery established that in entering

15   into the 1978 agreement she had no intent "to waive or relinquish" rights. *Id.* at

16   989. In 1996, Mewborn sought to terminate the 1976 agreement, and the Ninth

17   Circuit held she could do so because the 1978 agreement did not replace the 1976

18   agreement and because Mewborn was unaware of her termination right in 1978 and

19   thus had "nothing in hand with which to bargain," unlike in *Milne*. *Id.* at 989-90.

20        Here, the Shusters were fully aware of the Copyright Act's termination

21   provisions and invoked them—just as Steinbeck and Milne did. *Compare* FAC ¶¶

22   54-56, *with Milne*, 430 F.3d at 1040 (Milne used "bargaining power conferred" by

23   termination right), *Steinbeck*, 537 F.3d at 196, 203 n.5 (Steinbeck "wield[ed] the

24   threat of termination" even though she lacked present right). Moreover, Peavy and

25   Frank signed extensive releases openly waiving *all rights* in exchange for the

26   lifetime financial security that was of utmost importance to them. *Supra* at 3.

27        *4. Peavy Had Full Authority To Dispose Of Joe Shuster's Copyrights.*

28   Defendants assert the 1992 agreement does not bar the Shuster termination notice

- 9 -

DC'S OPP. TO DEFS' CONSOLIDATED
MOTION TO DISMISS

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 168 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 169 of 230

1    to reproduce, prepare derivative works, distribute, perform, and display a work—is

2    *not* preempted.  17 U.S.C. §§ 106, 301(a); *Del Madera Props. v. Rhodes &*

3    *Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987).  Although copyrights may be the

4    subject of a state-law claim, where the claim's gravamen is a breach or tort the

5    claim is not preempted.  *E.g.*, *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal.

6    App. 3d 1327, 1353 (1990) (fiduciary breach not preempted); *Bekaert Progressive*

7    *Compos. Corp. v. Wave Cyber Ltd.*, 2007 WL 1110736, at *2-3 (S.D. Cal. Apr. 5,

8    2007) (same; misappropriation); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079,

9    1090 (9th Cir. 2005).  Here, DC's UCL claim concerns copyright interests with

10   which defendants interfered—it does not allege infringement or improper use.[6]

11        **D.    DC's Sixth Claims Is Not Time Barred.**

12        Defendants' statute-of-limitation arguments fail for the reasons above.  While

13   defendants argue (citing *Stutz*) the delayed discovery rule does not apply to UCL

14   claims, Mot. at 8 & n.6, they do not disclose that after *Stutz*, the California Supreme

15   Court and Ninth Circuit said this was an open question.  *Grisham v. Philip Morris*

16   *U.S.A., Inc.*, 40 Cal. 4th 623, 635 n.7 (2007); *Betz v. Trainer Wortham & Co.*, 236

17   Fed. Appx. 253, 256 (9th Cir. 2007).  Since then, courts have held that the

18   discovery applies in UCL cases when fraud is alleged—as it plainly is here.  *E.g.*,

19   *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009).[7]

20   **IX.    CONCLUSION**

21        Defendants' motion should be denied.

22   Dated:  October 24, 2011                    Respectfully Submitted,
23                                               By:  /s/ Daniel M. Petrocelli
                                                 Daniel M. Petrocelli
24

25   [6] In contrast, defendants' off-point cases all do.  *Motown*, *supra*, (unauthorized
     use); *Del Madera*, *supra*, (same); *Idema*, 162 F. Supp. 2d at 1190 (same); *Blue Nile*,
26   478 F. Supp. 2d at 1250; (unauthorized copying); *MEECO*, 2007 U.S. Dist. LEXIS
     25986, at *14 (unauthorized reproduction); *Kodadek*, 152 F.3d at 1212 (same).
27
     [7] *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, at *10 n.16 (C.D. Cal. 2009);
28   *Stearns v. Select Comfort Retail Corp.*, 2010 WL 2898284, at *17 (N.D. Cal. 2010).

DC'S OPP. TO DEFS' CONSOLIDATED
                                                 MOTION TO DISMISS

**SER 164**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 170 of 230

1  Marc Toberoff (State Bar No. 188547)
   *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
   *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel
9
                   **UNITED STATES DISTRICT COURT**
10
          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
11

| | |
|---|---|
| 12  DC COMICS,<br><br>13        Plaintiff,<br><br>   vs.<br><br>14  PACIFIC PICTURES CORPORATION;<br>15  IP WORLDWIDE, LLC; IPW, LLC;<br>   MARC TOBEROFF, an individual;<br>16  MARK WARREN PEARY, as personal<br>17  representative of the ESTATE OF<br>   JOSEPH SHUSTER; JEAN ADELE<br>18  PEAVY, an individual; LAURA<br>19  SIEGEL LARSON, individually and as<br>   personal representative of the ESTATE<br>20  OF JOANNE SIEGEL, and DOES 1-10,<br>21  inclusive,<br><br>22        Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS'**<br>**CONSOLIDATED NOTICE OF**<br>**MOTION AND MOTION TO**<br>**DISMISS PURSUANT TO FED.**<br>**R. CIV. P. 12(b)(6)**<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:          None Set<br><br>Date:    November 14, 2011<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |

23
24
25
26
27
28

**SER 165**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 171 of 230

1  transfer the termination right prior to service of a termination notice has no force.

2  Accordingly, even if the 1992 Agreement could somehow be construed as

3  transferring or impeding the Shuster Executor's right of termination in 2003, it would

4  be unenforceable under the plain language of 17 U.S.C. § 304(c)(5) and (6).

5       No "Revocation and Regrant": *Milne*, 430 F.3d at 1040 n.5, 1042-45

6  recognized a very narrow exception to the above rule of inalienability, solely where

7  there is no longer an operative pre-1978 copyright grant to terminate because a party,

8  with a current termination right, ***expressly revoked*** a pre-1978 copyright grant, and

9  replaced it with a non-terminable post-1978 copyright ***re-grant***.

10       The Ninth Circuit thereafter limited *Milne* in *Classic Media, Inc. v. Mewborn*,

11  532 F.3d 978, 986-89 (9th Cir. 2008), where the plaintiff publisher tried, like DC

12  here, to evade statutory termination by mischaracterizing a redundant post-January 1,

13  1978 copyright grant as a "revocation and regrant" to artificially invoke *Milne's*

14  narrow exception.  The Ninth Circuit held that the post-January 1, 1978 grant was a

15  "nullity," because it purported to grant copyright interests that had already been

16  granted to the publisher in 1976, and did not expressly revoke that pre-1978 grant. *Id.*

17       This case clearly falls within *Mewborn*.  Just as in *Mewborn*, the grantee (DC)

18  already long owned all of Joe Shuster's Superman copyrights at the time of the 1992

19  Agreement; the 1992 Agreement contained no language of revocation; the 1992

20  Agreement did not mention termination; and the alleged grantors (Jean Peavy and

21  Frank Shuster) did not have current termination rights. *Id.*; RJN, Ex. A.  DC's claim

22  is even weaker than that rejected in *Mewborn*, because there the grantor had a future

23  termination right, while Jean Peavy and Frank Shuster can never hold such rights.

24       DC attempts to sidestep the utter lack of any language of "revocation and

25  regrant" in the 1992 Agreement by arguing that this raises a purported factual issue as

26  to the parties' intent.  *See* FAC ¶¶ 52-57, 116.  However, under New York law, which

27

28      their termination right by contract."); 3 *Nimmer* § 11.01 (congressional intent of termination
is to provide authors/heirs with relief from one-sided, unremunerative copyright grants).

20
DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

**SER 166**

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 172 of 230

1  governs the 1992 Agreement,[15] the contract's unambiguous terms can be resolved

2  readily on a motion to dismiss as a matter of law: "Whether a contract is ambiguous

3  is a threshold question of law to be determined by the court." *Duane Reade, Inc. v.*

4  *St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) (granting Rule

5  12(b)(6) dismissal of contract claim). *See Seiden Assoc., Inc. v. ANC Holdings, Inc.*,

6  959 F.2d 425, 428 (2d Cir. 1992) ("[L]anguage of a contract is not made ambiguous

7  simply because the parties urge different interpretations. Nor does ambiguity exist

8  where one party's view 'strain[s] the contract language beyond its reasonable and

9  ordinary meaning.'") (citations omitted).

10      Applicable New York law requires express language for a revocation and

11  replacement of prior contracts. *See Simply Fit of N. Am., Inc. v. Poyner*, 579 F. Supp.

12  2d 371, 377 (E.D.N.Y. 2008) (holding prior contract remained in effect where later

13  contract "did not expressly manifest an intention to substitute or replace" it).[16]

14  Yet, there is no language whatsoever in the 1992 Agreement of a revocation or

15  rescission of Joe Shuster's valuable Superman grants to DC and of a re-grant.

16      In sum, the 1992 Agreement by Jean Peavy and Frank Shuster was totally

17  irrelevant to the Shuster Termination as a matter of law. It involved parties legally

18  incapable of exercising the termination right. It could not have waived or

19  encumbered the termination right. It therefore was not breached by the Shuster

20  Executor's exercise of his termination rights. DC's Fourth Claim thus fails.

21  ///

22

23  [15] This Court applies California choice of law principles, which dictate that the laws of the

24  state with a "materially greater interest" control. *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1087 (9th Cir. 2009). The 1992 Agreement was drafted by DC, a New York partnership; was sent from DC's N.Y.C. headquarters, on N.Y.C. stationary; was between two New York

25  parties (DC and Frank Shuster) and a New Mexican party (Peavy); and concerned property owned and managed by DC in New York. RJN, Ex. A.

26  [16] *See, e.g., Flaum v. Birnbaum*, 508 N.Y.S.2d 115, 120 (N.Y. App. 1986) (holding that, to

27  rescind and replace a existing contract, all parties must have "clearly expressed their intention that a subsequent agreement superseded or substituted for an old agreement");

28  *Beck v. Mfrs. Hanover Trust Co.*, 481 N.Y.S.2d 211, 218 (N.Y. Sup. Ct. 1984) (same; rescission and replacement of a contract "'must never be presumed'") (citations omitted).

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 173 of 230

1    privilege, even if "they are, or are alleged to be, fraudulent, perjurious, unethical, or

2    even illegal," so long as they are "'logically related'" to the action).

3        ***Third***, even if Mr. Toberoff was not acting as an attorney – and he expressly

4    was – the California Supreme Court has clearly held that there can be <u>no</u> liability

5    <u>whatsoever</u> for tortious interference with contract based on the inducement of a party

6    to file suit by a non-attorney. *PG&E*, 50 Cal. 3d at 1127 ("This conclusion will bring

7    us face to face with the question … [of] whether it is proper to impose liability for

8    inducing a potentially meritorious lawsuit. We will conclude that it is not."). *PG&E*

9    held that where a non-attorney defendant contacted an agency, convinced them to

10    seek declaratory relief in order to terminate a contract, paid "for legal, engineering

11    and marketing studies," and retained and paid for outside counsel, in exchange for a

12    percentage of any increased revenues, such activities were protected by the litigation

13    privilege and could not, as a matter of law, give rise to a claim for tortious

14    interference. *Id.* at 1123-24, 1136. The Fifth Claim is similarly premised on alleged

15    inducement of the Siegels to reject a settlement offer, and to file a declaratory

16    judgment action. As such, it is plainly barred as a matter of law.

17                            **CONCLUSION**

18        For the foregoing reasons, DC's First, Third, Fourth, Fifth and Sixth Claims

19    should be dismissed, and DC's Second Claim should be dismissed in part and the

20    remainder stayed as set forth above.

21    Dated: October 14, 2011       RESPECTFULLY SUBMITTED,

22                               /s/ Marc Toberoff

23                               Marc Toberoff

24                               TOBEROFF & ASSOCIATES, P.C.
                                Attorneys for Defendants Mark Warren Peary *et al.*

25                               /s/ Richard Kendall

26                               Richard Kendall

27                               KENDALL BRILL & KLIEGER LLP
                              Attorneys for Defendants Marc Toberoff *et al.*

28

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 174 of 230

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:    (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:   (845) 265-2820
10  Facsimile:    (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14

15  DC COMICS,                          |  Case No. CV 10-3633 ODW (RZx)

16          Plaintiff,

17          v.                          |  **DECLARATION OF DANIEL M. PETROCELLI IN SUPPORT OF DC COMICS' UPDATED, INITIAL OPPOSITION TO DEFENDANTS' MOTION TO STRIKE UNDER CALIFORNIA'S ANTI-SLAPP STATUTE**

18  PACIFIC PICTURES
    CORPORATION, IP WORLDWIDE,
19  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN
20  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
21  JEAN ADELE PEAVY, an individual,    |  **Fed. R. Civ. P. 56(d)**
    LAURA SIEGEL LARSON, an
22  individual and as personal          |  Hon. Otis D. Wright II
    representative of the ESTATE OF
23  JOANNE SIEGEL, and DOES 1-10,
    inclusive,                          |  **Courtroom:**             540
24                                      |  **Discovery Cutoff:**      None Set
            Defendants.                 |  **Pretrial Conference:**   None Set
25                                      |  **Trial:**                 None Set

26

27

28

                              PETROCELLI DECL. ISO DC'S UPDATED
                              INITIAL OPP. TO DEFS' MOTION TO STRIKE

1    121.   In the event the court does not deny defendants' motion to strike in its

2    entirety, I believe that the discovery described above is necessary to provide

3    relevant evidence to fully and fairly oppose the motion.

4    122.   DC therefore requests that the Court deny defendants' Motion to Strike

5    in its entirety or, alternatively, issue an order staying any resolution of defendants'

6    Motion to Strike pending the close of discovery.

7    **V.    Deposition Transcripts & Various Exhibits**

8    123.   To avoid any claims that it is selectively excerpting deposition

9    testimony, DC has attached full and complete deposition transcripts.

10   124.   The deposition of Kevin Marks, the Siegels' attorney prior to

11   Mr. Toberoff, was taken in the related *Siegel* cases, Case Nos. CV-04-8400 and

12   CV-04-8776, on October 7, 2006.  A true and correct copy of the entire transcript

13   from the deposition is attached hereto as Exhibit 14.

14   125.   The deposition of defendant Mr. Peary was taken in the related *Siegel*

15   cases on November 11, 2006.  A true and correct copy of the entire transcript from

16   the deposition is attached hereto as Exhibit 51.

17   126.   The deposition of defendant Marc Toberoff was taken in the related

18   *Siegel* cases on November 17, 2006.  A true and correct copy of the entire transcript

19   from the deposition is attached hereto as Exhibit 17.

20   127.   The deposition of defendant Mark Warren Peary was taken in this case

21   on June 29, 2011.  A true and correct copy of the entire transcript from the

22   deposition is attached hereto as Exhibit 37.

23   128.   The deposition of Don Bulson, attorney for Michael Siegel during his

24   lifetime, was taken in this case on July 19, 2011.  A true and correct copy of the

25   entire transcript from the deposition is attached hereto as Exhibit 52.  The transcript

26   is still under review by Mr. Bulson under Federal Rule of Civil Procedure 30(e)(1),

27   and Mr. Bulson and his counsel reserve all rights to (a) make changes under Rule

28

- 40 -    PETROCELLI DECL. ISO DC'S UPDATED INITIAL OPP. TO DEFS' MOTION TO STRIKE

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 176 of 230

1   30(e)(1) or (b) request further protection of Mr. Bulson's testimony pursuant to any

2   future protective order(s) entered by this or any other Court.

3     129. The deposition of defendant Laura Siegel Larson was taken in this case

4   on July 22, 2011.  A true and correct copy of the entire transcript from the

5   deposition is attached hereto as Exhibit 24.

6     130. The deposition of Dawn Peavy, the daughter of defendant Jean Peavy

7   and sister of defendant Mr. Peary, was taken in this case on August 3, 2011.  A true

8   and correct copy of the entire transcript from the deposition is attached hereto as

9   Exhibit 53.

10    131. Attached hereto as Exhibit 57 is a true and correct copy of an order

11  issued by the Ninth Circuit in Appellate Case No. 10-73851, dated January 7, 2011.

12    132. Attached hereto as Exhibit 58 is a true and correct copy of Exhibit 73

13  to the deposition of Dawn Peavy.

14    133. Attached hereto as Exhibit 59 is a true and correct copy of the

15  November 11, 2006 deposition of Jean Peavy in the *Siegel* case.

16    I declare under penalty of perjury under the laws of the United States that the

17  foregoing is true and correct.  Executed this 8th day of August 2011, at Los

18  Angeles, California.

19

20           /s/ Daniel M. Petrocelli
21           Daniel M. Petrocelli

22

23

24

25

26

27

28

             - 41 -  PETROCELLI DECL. ISO DC'S UPDATED
                  INITIAL OPP. TO DEFS' MOTION TO STRIKE

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 177 of 230

# EXHIBIT 37

Case: 12-57245, 04/12/2013, ID: 8585288, DktEntry: 24-2, Page 178 of 230

**CERTIFIED COPY**

# In The Matter Of:

### DC COMICS
### *v.*
### PACIFIC PICTURES CORPORATION

---

## *PEARY, MARK WARREN - Vol. 1*

### *June 29, 2011*

---



**MERRILL CORPORATION**
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

EXHIBIT 37
1102

SER 173

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 179 of 230

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CERTIFIED
COPY

DC COMICS,                          )
                                    )
              Plaintiff,            )  No. CV-10-3633 ODW (RZx)
                                    )
        VS.                         )
                                    )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as            )
personal representative of          )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an               )
individual, JOANNE SIEGEL,         )
an individual, LAURA SIEGEL        )
LARSON, an individual, and         )
DOES 1-10, inclusive,              )
                                    )
              Defendants.           )
                                    )
                                    )
_____)

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

CSR No. 10094

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 180 of 230

| | | |
|---|---|---|
| 1 | not present but we're going to proceed in their | 10:30:54 |
| 2 | absence.  They were given full notice. | 10:30:58 |
| 3 | MR. TOBEROFF:  They're not attending today. | 10:30:59 |
| 4 | MR. PETROCELLI:  Okay. | 10:31:01 |
| 5 | Q.  Let me mention to you, Mr. Peary, that I've | 10:31:04 |
| 6 | reviewed the deposition that you gave in the Siegel | 10:31:10 |
| 7 | case on November 11, 2006 and it was a somewhat | 10:31:13 |
| 8 | brief deposition.  This will be lengthier.  It's not | 10:31:23 |
| 9 | my intention to duplicate what you were already | 10:31:26 |
| 10 | asked, although I will be, from time to time, | 10:31:34 |
| 11 | picking up on things that were touched upon in that | 10:31:36 |
| 12 | deposition and following up. | 10:31:39 |
| 13 | So I do want you to know that I'm mindful | 10:31:41 |
| 14 | of what your prior testimony is and if you want a -- | 10:31:45 |
| 15 | I think you have a copy in front of you, Marc, but | 10:31:48 |
| 16 | if you need to consult a copy I have one. | 10:31:51 |
| 17 | So first let me start by expanding a bit on | 10:32:01 |
| 18 | your background. | 10:32:04 |
| 19 | You were born on January 14, 1962. | 10:32:05 |
| 20 | Is that right? | 10:32:05 |
| 21 | A.  Yes. | 10:32:08 |
| 22 | Q.  And so you're 49 years old right now? | 10:32:08 |
| 23 | A.  Yes. | 10:32:10 |
| 24 | Q.  And you have never been married, correct? | 10:32:12 |
| 25 | A.  Correct. | 10:32:12 |

MARK WARREN PEARY - 6/29/2011

Page 11

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 181 of 230

| | | | |
|---|---|---|---|
| 1 | Q. | And you have no children. | 10:32:15 |
| 2 | | Is that right? | 10:32:15 |
| 3 | A. | Correct. | 10:32:18 |
| 4 | Q. | You live in Albuquerque? | 10:32:18 |
| 5 | A. | Santa Fe. | 10:32:20 |
| 6 | Q. | Santa Fe, New Mexico? | 10:32:21 |
| 7 | | Do you live alone? | 10:32:23 |
| 8 | A. | No. | 10:32:25 |
| 9 | Q. | With whom do you reside? | 10:32:25 |
| 10 | A. | I share a house with my family, other | 10:32:27 |
| 11 | family members. | | 10:32:31 |
| 12 | Q. | Who are they? | 10:32:32 |
| 13 | A. | My mother and sister. | 10:32:33 |
| 14 | Q. | And your mother is Jean Peavy. | 10:32:36 |
| 15 | | Is that right? | 10:32:38 |
| 16 | A. | Yes. | 10:32:38 |
| 17 | Q. | And your sister is Dawn Peavy? | 10:32:39 |
| 18 | A. | Yes. | 10:32:42 |
| 19 | Q. | D-a-w-n, right? | 10:32:44 |
| 20 | A. | Right. | 10:32:45 |
| 21 | Q. | Anyone else reside with you? | 10:32:45 |
| 22 | A. | No. | 10:32:48 |
| 23 | Q. | Okay.  Dawn was born October 1965. | 10:32:51 |
| 24 | | Is that right? | 10:32:51 |
| 25 | A. | Yes. | 10:32:51 |

MARK WARREN PEARY - 6/29/2011

Page 16

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 182 of 230

| | | |
|---|---|---|
| 1 | Q.  Oh, the university? | 10:37:20 |
| 2 | A.  It's a branch of the university. | 10:37:21 |
| 3 | Q.  Okay.  Now, what about your employment? | 10:37:23 |
| 4 | Can you briefly trace it for me? | 10:37:26 |
| 5 | A.  I've been doing investment work. | 10:37:28 |
| 6 | Q.  I saw from your prior -- your deposition in | 10:37:31 |
| 7 | the Siegel case that you have a two-year degree from | 10:37:35 |
| 8 | I think it's Texas El Paso. | 10:37:39 |
| 9 | Is that right? | 10:37:39 |
| 10 | A.  Yes. | 10:37:39 |
| 11 | Q.  And you went there right out of high | 10:37:42 |
| 12 | school? | 10:37:44 |
| 13 | A.  Yes. | 10:37:45 |
| 14 | Q.  And so what have you been doing | 10:37:46 |
| 15 | occupationally from the time you left college, Texas | 10:37:49 |
| 16 | El Paso, to the present? | 10:37:53 |
| 17 | A.  You want everything I've done or just -- | 10:37:55 |
| 18 | Q.  If you can summarize it that would be | 10:37:58 |
| 19 | helpful. | 10:38:00 |
| 20 | A.  Summarize it. | 10:38:00 |
| 21 | I've done a lot of different things.  I | 10:38:03 |
| 22 | built -- | 10:38:05 |
| 23 | Q.  Can you do it in chronological order for | 10:38:05 |
| 24 | me? | 10:38:08 |
| 25 | A.  I can try. | 10:38:08 |

MARK WARREN PEARY - 6/29/2011

Page 17

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 183 of 230

| | | |
|---|---|---|
| 1 | Q.  Sure. | 10:38:09 |
| 2 | A.  I built homes for a time and sold real | 10:38:11 |
| 3 | estate for a time. | 10:38:14 |
| 4 | Q.  While living in -- | 10:38:18 |
| 5 | A.  In El Paso. | 10:38:18 |
| 6 | Q.  -- in El Paso? | 10:38:20 |
| 7 | A.  Yes.  And -- and then I -- I -- I had a | 10:38:27 |
| 8 | stint selling insurance as well and then I -- I got | 10:38:33 |
| 9 | involved in trading and investing at a later time. | 10:38:40 |
| 10 | Q.  Trading and investing in what? | 10:38:47 |
| 11 | A.  Yes.  I started off in trading futures. | 10:38:48 |
| 12 | Q.  Commodities? | 10:38:55 |
| 13 | A.  Yes.  And then later on branched out more | 10:38:56 |
| 14 | into equity investments and that type of thing and | 10:39:04 |
| 15 | that's been my primary activity for quite a few | 10:39:08 |
| 16 | years. | 10:39:11 |
| 17 | Q.  To the present? | 10:39:11 |
| 18 | A.  Yes. | 10:39:12 |
| 19 | Q.  And you've also written some books from | 10:39:14 |
| 20 | time to time? | 10:39:17 |
| 21 | A.  Yes. | 10:39:17 |
| 22 | Q.  How many books have you authored? | 10:39:18 |
| 23 | A.  Two. | 10:39:19 |
| 24 | Q.  And did you co-author a book with your | 10:39:21 |
| 25 | father? | 10:39:25 |

MARK WARREN PEARY - 6/29/2011

Page 18

| | | |
|---|---|---|
| 1 | A.  I did. | 10:39:25 |
| 2 | Q.  Is that in addition to the two books or one | 10:39:25 |
| 3 | of the two? | 10:39:28 |
| 4 | A.  No, that's one of the two. | 10:39:28 |
| 5 | Q.  And what was that book? | 10:39:30 |
| 6 | A.  What was the title of it? | 10:39:31 |
| 7 | Q.  Yeah, the one you did with your dad. | 10:39:33 |
| 8 | A.  It was called Super Nutrition Gardening. | 10:39:34 |
| 9 | Q.  The one you did on your own? | 10:39:37 |
| 10 | A.  It was called The Greatest Health Secrets. | 10:39:38 |
| 11 | Q.  Okay.  You mentioned at the deposition in | 10:39:41 |
| 12 | November of 2006 that you were working on a | 10:39:44 |
| 13 | screenplay of Joe Shuster's life? | 10:39:48 |
| 14 | A.  Yes. | 10:39:52 |
| 15 | Q.  Do you recall that? | 10:39:52 |
| 16 | A.  Yes. | 10:39:52 |
| 17 | Q.  Have you continued to work on that? | 10:39:54 |
| 18 | A.  No. | 10:39:55 |
| 19 | Q.  Have you written any other material | 10:39:58 |
| 20 | regarding either Joe Shuster -- about either Joe | 10:40:05 |
| 21 | Shuster or Jerry Siegel? | 10:40:10 |
| 22 | A.  No. | 10:40:12 |
| 23 | Q.  Have you been on any -- have you | 10:40:13 |
| 24 | participated in any presentations or pitches to | 10:40:19 |
| 25 | third parties about acquiring options for any work. | 10:40:22 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 184 of 230

MARK WARREN PEARY - 6/29/2011

Page 19

| | | |
|---|---|---|
| 1 | that you've done? | 10:40:29 |
| 2 | A.  At one time -- | 10:40:30 |
| 3 | MR. TOBEROFF:  Meaning -- meaning -- | 10:40:34 |
| 4 | THE WITNESS:  On a screenplay? | 10:40:35 |
| 5 | MR. TOBEROFF:  -- authored work? | 10:40:37 |
| 6 | MR. PETROCELLI:  Yeah. | 10:40:37 |
| 7 | Q.  Any work that you've authored or -- yeah. | 10:40:38 |
| 8 | Any work that you authored? | 10:40:40 |
| 9 | A.  On any screenplay or -- I have other | 10:40:41 |
| 10 | screenplays I've also worked on, so -- | 10:40:44 |
| 11 | MR. TOBEROFF:  He's just talking about any | 10:40:46 |
| 12 | literary work. | 10:40:47 |
| 13 | THE WITNESS:  I've been offered options on | 10:40:51 |
| 14 | other screenplays, yes. | 10:40:53 |
| 15 | BY MR. PETROCELLI: | 10:40:53 |
| 16 | Q.  Have any of them been developed? | 10:40:54 |
| 17 | A.  No. | 10:40:57 |
| 18 | Q.  Have any of the screenplays concerned at | 10:40:58 |
| 19 | all the life of Joe Shuster, the one that was an | 10:41:02 |
| 20 | option? | 10:41:09 |
| 21 | A.  There was one that was. | 10:41:09 |
| 22 | Q.  Was optioned? | 10:41:11 |
| 23 | A.  It has expired, so it's no -- it's not | 10:41:13 |
| 24 | active. | 10:41:13 |
| 25 | Q.  Now, was that -- what was the underlying | 10:41:16 |

EXHIBIT 37
1121

SER 180

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 185 of 230

MARK WARREN PEARY - 6/29/2011

Page 20

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 186 of 230

| | | |
|---|---|---|
| 1 | work that was optioned? | 10:41:19 |
| 2 | A. Screenplay. | 10:41:19 |
| 3 | Q. Was that the screenplay to which you | 10:41:19 |
| 4 | adverted in your deposition in 2006? | 10:41:21 |
| 5 | A. Yes, yes. | 10:41:24 |
| 6 | Q. And it was after your deposition that you | 10:41:25 |
| 7 | optioned it? | 10:41:30 |
| 8 | A. I'm not -- I'm not sure of the exact date. | 10:41:33 |
| 9 | I don't -- I really don't recall the exact date on | 10:41:35 |
| 10 | that. | 10:41:40 |
| 11 | Q. Did you option it to Ilya Salkind? | 10:41:41 |
| 12 | A. Yes. | 10:41:44 |
| 13 | Q. Okay.  And the option was renewed? | 10:41:52 |
| 14 | A. No. | 10:41:53 |
| 15 | Q. How much did you receive for the option? | 10:41:59 |
| 16 | A. We weren't paid anything up front. | 10:42:01 |
| 17 | Q. Okay.  Did the -- how long was the option? | 10:42:04 |
| 18 | A. I believe it was a year. | 10:42:08 |
| 19 | Q. Did it expire? | 10:42:10 |
| 20 | A. Yes, it did. | 10:42:11 |
| 21 | Q. And has anything happened to that | 10:42:11 |
| 22 | screenplay since the expiration of the option to | 10:42:14 |
| 23 | Mr. Salkind? | 10:42:17 |
| 24 | A. No.  We have no sales or options. | 10:42:18 |
| 25 | Q. Have you attempted to present or pitch the | 10:42:22 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 187 of 230

| | | |
|---|---|---|
| 1 | screenplay to anyone else? | 10:42:27 |
| 2 | A.   No, I have not. | 10:42:29 |
| 3 | Q.   How many pages is that screenplay? | 10:42:36 |
| 4 | A.   130. | 10:42:37 |
| 5 | Q.   And have you done any further work on it | 10:42:43 |
| 6 | since the time you optioned it? | 10:42:45 |
| 7 | A.   Nothing substantial. | 10:42:51 |
| 8 | Q.   And is the screenplay about the life of Joe | 10:42:54 |
| 9 | Shuster? | 10:42:56 |
| 10 | A.   Yes. | 10:42:57 |
| 11 | Q.   When you wrote the screenplay, did you | 10:43:00 |
| 12 | collect a -- a file on Joe Shuster from which you | 10:43:02 |
| 13 | put together your screenplay? | 10:43:07 |
| 14 | A.   I did historical background research. | 10:43:08 |
| 15 | Q.   What were the years when you wrote the | 10:43:12 |
| 16 | screenplay? | 10:43:14 |
| 17 | A.   1996 I started, up until the early 2000s. | 10:43:15 |
| 18 | Q.   When your uncle died, he died in July of | 10:43:27 |
| 19 | 1992. | 10:43:29 |
| 20 | Is that right? | 10:43:29 |
| 21 | A.   Yes. | 10:43:29 |
| 22 | Q.   And after he passed, you were involved in | 10:43:33 |
| 23 | collecting his belongings? | 10:43:38 |
| 24 | A.   Yes. | 10:43:40 |
| 25 | Q.   You went out to his apartment in | 10:43:43 |

EXHIBIT 37
1123

MARK WARREN PEARY - 6/29/2011

Page 22

| | | |
|---|---|---|
| 1 | Los Angeles with your mom? | 10:43:44 |
| 2 | A.  Yes. | 10:43:46 |
| 3 | Q.  And did you then take possession of some of | 10:43:48 |
| 4 | his papers and library of comic book materials, | 10:43:55 |
| 5 | whatever he had, drawings, things like that? | 10:44:01 |
| 6 | A.  There were -- there were very limited | 10:44:04 |
| 7 | papers and we didn't find any vintage comics, | 10:44:06 |
| 8 | unfortunately, which would have been worth a lot. | 10:44:10 |
| 9 | He didn't have any.  There were some limited papers, | 10:44:13 |
| 10 | but nothing -- nothing significant.  Mostly personal | 10:44:19 |
| 11 | items. | 10:44:22 |
| 12 | Q.  Where did you get the materials that you | 10:44:24 |
| 13 | used for your book? | 10:44:26 |
| 14 | A.  The book? | 10:44:27 |
| 15 | Q.  Excuse me, the screenplay. | 10:44:30 |
| 16 | A.  The materials, it came from historical | 10:44:34 |
| 17 | research. | 10:44:37 |
| 18 | Q.  About Joe? | 10:44:38 |
| 19 | A.  Yes.  I had a lot of -- a lot of vintage | 10:44:39 |
| 20 | articles that came from the -- the era, which is | 10:44:46 |
| 21 | probably unusual to have a lot of material.  That's | 10:44:51 |
| 22 | where most of it came from. | 10:44:55 |
| 23 | Q.  You collected this on your own? | 10:44:57 |
| 24 | A.  Yes. | 10:44:58 |
| 25 | Q.  By doing public record searches? | 10:44:59 |

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merrillcorp.com/law

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 188 of 230

EXHIBIT 37
1124

SER 183

MARK WARREN PEARY - 6/29/2011

Page 23

| | | |
|---|---|---|
| 1 | A.  Yes.  And family files. | 10:45:02 |
| 2 | Q.  Who -- who had possession of the family | 10:45:05 |
| 3 | files? | 10:45:07 |
| 4 | A.  My mother had collected articles throughout | 10:45:07 |
| 5 | the years. | 10:45:11 |
| 6 | Q.  And those articles are in your home where | 10:45:12 |
| 7 | you and your mother now live, right? | 10:45:14 |
| 8 | A.  Oh, I -- I guess so.  It's just old | 10:45:17 |
| 9 | magazine articles. | 10:45:23 |
| 10 | Q.  Did you retrieve any materials from Joe's | 10:45:28 |
| 11 | apartment after his death that you put in your file | 10:45:32 |
| 12 | for use in writing your screenplay? | 10:45:37 |
| 13 | A.  I -- I don't recall getting any papers from | 10:45:39 |
| 14 | his apartment.  He didn't have much. | 10:45:42 |
| 15 | Q.  What about during his lifetime?  Did he | 10:45:46 |
| 16 | ever give you any material, any papers, any | 10:45:50 |
| 17 | writings, any of his drawings, any comic books, | 10:45:53 |
| 18 | things like that, that you've collected and saved? | 10:45:56 |
| 19 | A.  We -- we had a vintage drawing, a few | 10:45:59 |
| 20 | mementos is all. | 10:46:05 |
| 21 | Q.  Were you close to him? | 10:46:06 |
| 22 | A.  Somewhat. | 10:46:08 |
| 23 | Q.  So you were about 30 when he passed, right? | 10:46:11 |
| 24 | You were born in '62, right? | 10:46:14 |
| 25 | A.  Yeah, that sounds correct. | 10:46:15 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 189 of 230

MARK WARREN PEARY - 6/29/2011

Page 24

| | | |
|---|---|---|
| 1 | Q. And you had known him since you were a | 10:46:18 |
| 2 | small boy? | 10:46:21 |
| 3 | A. Yes.  Not real closely, but I did know him. | 10:46:21 |
| 4 | Q. He had no children, right? | 10:46:28 |
| 5 | A. Correct. | 10:46:28 |
| 6 | Q. But he had been married once? | 10:46:30 |
| 7 | A. Briefly. | 10:46:31 |
| 8 | Q. What years was he married? | 10:46:36 |
| 9 | A. 1979, I believe. | 10:46:37 |
| 10 | Q. Did you attend his wedding? | 10:46:43 |
| 11 | A. No. | 10:46:45 |
| 12 | Q. Did he and his wife elope? | 10:46:46 |
| 13 | A. Excuse me? | 10:46:49 |
| 14 | Q. Did they elope, they went off on their own | 10:46:50 |
| 15 | and got married without a cere- -- you know, a | 10:46:53 |
| 16 | ceremony for the family? | 10:46:56 |
| 17 | A. I'm not aware of the circumstances of their | 10:46:57 |
| 18 | marriage. | 10:47:01 |
| 19 | Q. What was his wife's name? | 10:47:01 |
| 20 | A. I'm not sure I can recall.  I never met | 10:47:02 |
| 21 | her. | 10:47:11 |
| 22 | Q. Never spoke with her? | 10:47:11 |
| 23 | A. No. | 10:47:12 |
| 24 | Q. Ever communicate at all with her in | 10:47:13 |
| 25 | writing? | 10:47:16 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 190 of 230

EXHIBIT 37
1126
**SER 185**

MARK WARREN PEARY - 6/29/2011

Page 25

| | | |
|---|---|---|
| 1 | A.  No, I did not.  It's like 1979, '80, last | 10:47:16 |
| 2 | time they were together. | 10:47:20 |
| 3 | Q.  Did you ever see her? | 10:47:22 |
| 4 | A.  I never met her. | 10:47:23 |
| 5 | Q.  Did you ever see a picture of her? | 10:47:24 |
| 6 | A.  Yes. | 10:47:26 |
| 7 | Q.  Where? | 10:47:26 |
| 8 | A.  Somehow we had -- we had a picture that I | 10:47:31 |
| 9 | had -- I had seen from -- I don't know what it was. | 10:47:33 |
| 10 | It was -- maybe it was -- I -- I don't remember. | 10:47:38 |
| 11 | Somewhere I did see a picture of them, but I never | 10:47:40 |
| 12 | met her. | 10:47:42 |
| 13 | Q.  And Joe had how many nieces and nephews? | 10:47:44 |
| 14 | A.  Just myself and my sister. | 10:47:49 |
| 15 | Q.  Now, you -- I've seen his will or at least | 10:47:59 |
| 16 | a copy of the will and it names your mom, Jean, as | 10:48:03 |
| 17 | his sole beneficiary but identifies you as an | 10:48:08 |
| 18 | alternate beneficiary, as well as executor in the | 10:48:10 |
| 19 | event that she is unwilling or unable to serve. | 10:48:17 |
| 20 | You're generally familiar with that? | 10:48:19 |
| 21 | A.  Yes. | 10:48:20 |
| 22 | Q.  And I notice that your sister wasn't in | 10:48:21 |
| 23 | there. | 10:48:24 |
| 24 | Did your sister, to your knowledge, not | 10:48:25 |
| 25 | have a good relationship with -- with your uncle | 10:48:30 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 191 of 230

MARK WARREN PEARY - 6/29/2011

Page 26

| | | |
|---|---|---|
| 1 | Joe? | 10:48:32 |
| 2 | A.   No, it had nothing to do with that. | 10:48:32 |
| 3 | Q.   Do you have any understanding or belief why | 10:48:34 |
| 4 | only you were included, not your sister? | 10:48:37 |
| 5 | MR. TOBEROFF:   Don't speculate. | 10:48:41 |
| 6 | THE WITNESS:   My sister's provided for by | 10:48:44 |
| 7 | us, so there's no problem with the relationship. | 10:48:48 |
| 8 | That's all I could say. | 10:48:53 |
| 9 | BY MR. PETROCELLI: | 10:48:53 |
| 10 | Q.   When you said your sister is provided for | 10:48:56 |
| 11 | by "us," who is the "us"? | 10:48:58 |
| 12 | A.   Yeah, me and my mom. | 10:49:00 |
| 13 | Q.   Have you been supporting your mom | 10:49:02 |
| 14 | financially since your dad passed? | 10:49:07 |
| 15 | A.   I don't know if I am supporting her.  We | 10:49:11 |
| 16 | have a mutual relationship where she needs my help | 10:49:15 |
| 17 | and I give it to her. | 10:49:21 |
| 18 | Q.   Do you provide financial support to your | 10:49:23 |
| 19 | sister, Dawn? | 10:49:25 |
| 20 | A.   Somewhat but she has a job. | 10:49:28 |
| 21 | Q.   What does she do for a living? | 10:49:30 |
| 22 | A.   She works for a food distributor. | 10:49:32 |
| 23 | Q.   In Santa Fe? | 10:49:36 |
| 24 | A.   Yes. | 10:49:36 |
| 25 | Q.   What's the name of the company? | 10:49:37 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 192 of 230

EXHIBIT 37
1128

SER 187

MARK WARREN PEARY - 6/29/2011

Page 27

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 193 of 230

| | | |
|---|---|---|
| 1 | A.  It -- it's called Labatt. | 10:49:41 |
| 2 | Q.  She's unmarried at the current time? | 10:49:43 |
| 3 | A.  Yes. | 10:49:47 |
| 4 | Q.  Are you familiar with a comic book blogger | 10:49:53 |
| 5 | named Dave Sims or Dave Sim, S-i-m? | 10:49:56 |
| 6 | A.  I'm not sure I am. | 10:50:02 |
| 7 | MR. TOBEROFF:  How do you spell that? | 10:50:10 |
| 8 | MR. PETROCELLI:  S-i-m. | 10:50:12 |
| 9 | Q.  Did your mom in the last four or five years | 10:50:13 |
| 10 | do an interview for Canadian Broadcasting Company, | 10:50:19 |
| 11 | CBC? | 10:50:22 |
| 12 | A.  I'm not aware of that. | 10:50:23 |
| 13 | MR. PETROCELLI:  I've taken the time while | 10:50:26 |
| 14 | we were waiting for you folks to arrive to pre-mark | 10:50:28 |
| 15 | the deposition exhibits that I intend to use.  Now, | 10:50:31 |
| 16 | that said, because I tend to move around a bit, | 10:50:35 |
| 17 | they're not exactly in sequential order. | 10:50:39 |
| 18 | Q.  But let me start by showing you just | 10:50:43 |
| 19 | briefly an exhibit which is a copy of a blog by | 10:50:45 |
| 20 | Mr. Sim about your family dated February 19, 2007. | 10:50:50 |
| 21 | It's Exhibit 24. | 10:50:59 |
| 22 | Marc, I started with 1, Exhibit 1, which | 10:51:00 |
| 23 | I'll get to and I've numbered exhibits starting with | 10:51:03 |
| 24 | 1 since this is the first deposition in the case. | 10:51:10 |
| 25 | (The document referred to was | 10:51:13 |

MARK WARREN PEARY - 6/29/2011

Page 28

| | | |
|---|---|---|
| 1 | marked for identification by the | 10:51:13 |
| 2 | C.S.R. as Exhibit 24 and attached | 10:51:13 |
| 3 | to this deposition.) | 10:51:16 |
| 4 | BY MR. PETROCELLI: | 10:51:16 |
| 5 | Q.  Have you ever seen this blog before or | 10:51:17 |
| 6 | this -- | 10:51:19 |
| 7 | A.  No. | 10:51:19 |
| 8 | Q.  Excuse me, this particular edition of | 10:51:20 |
| 9 | Mr. Sim's blog? | 10:51:23 |
| 10 | A.  No.  I'm not familiar with him. | 10:51:25 |
| 11 | Q.  Okay.  If you go to the second page, the | 10:51:28 |
| 12 | middle of the paragraph, the paragraph that starts | 10:51:31 |
| 13 | with: | 10:51:38 |
| 14 | "Oh, here is a great one:  a | 10:51:42 |
| 15 | letter from Jean and Dawn and | 10:51:44 |
| 16 | Warren Shuster (Peavy/Perry)." | 10:51:47 |
| 17 | Do you see that? | 10:51:51 |
| 18 | A.  Yes. | 10:51:51 |
| 19 | Q.  And then it goes on to have some discussion | 10:51:53 |
| 20 | about -- about you and your sister and your mom. | 10:51:56 |
| 21 | Did you provide a letter to Mr. Sim? | 10:52:00 |
| 22 | A.  A letter? | 10:52:06 |
| 23 | Q.  Yeah. | 10:52:06 |
| 24 | A.  I don't recall having any dealings with | 10:52:16 |
| 25 | Sim. | 10:52:19 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 194 of 230

EXHIBIT 37
1130

SER 189

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | Q.  Did you attend the inaugural Joe Shuster | 10:52:19 |
| 2 | Awards at Toronto Con?  It's Toronto and then C-o-n. | 10:52:24 |
| 3 | A.  No. | 10:52:28 |
| 4 | Q.  Do you know that your mother and sister | 10:52:29 |
| 5 | did? | 10:52:31 |
| 6 | A.  Yes. | 10:52:32 |
| 7 | Q.  What year was that? | 10:52:32 |
| 8 | A.  I'm not sure.  I didn't go. | 10:52:40 |
| 9 | Q.  Last -- was it in the last -- | 10:52:41 |
| 10 | A.  Sometime after 2000. | 10:52:45 |
| 11 | Q.  Okay.  Are you aware of any letters that | 10:52:46 |
| 12 | they wrote to Mr. Sim, "they" being your sister or | 10:52:50 |
| 13 | your mother? | 10:52:54 |
| 14 | A.  No, I don't believe I am. | 10:53:02 |
| 15 | Q.  And you'll see in this next paragraph that | 10:53:03 |
| 16 | follows, at the very end there's a reference to some | 10:53:05 |
| 17 | of your screenplays, then there's some photographs, | 10:53:08 |
| 18 | and the photograph on -- on the third page of | 10:53:12 |
| 19 | Exhibit 24 at the very bottom, is that you, your | 10:53:16 |
| 20 | mother, Jean, and your sister, Dawn? | 10:53:19 |
| 21 | A.  Yes. | 10:53:21 |
| 22 | Q.  Okay.  And then there's the fourth page at | 10:53:21 |
| 23 | the top, talks about the option arrangement with | 10:53:25 |
| 24 | Mr. Salkind. | 10:53:28 |
| 25 | Do you see that? | 10:53:29 |

EXHIBIT 37
1131

SER 190

MARK WARREN PEARY - 6/29/2011

Page 30

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:53:29 |
| 2 | Q.   Okay.  And as far as you know, you didn't | 10:53:31 |
| 3 | provide any of this information to -- to Mr. Sim. | 10:53:34 |
| 4 | Is that right? | 10:53:34 |
| 5 | A.   I don't recall having any dealings with -- | 10:53:41 |
| 6 | with Sim, so I don't know where he got it. | 10:53:44 |
| 7 | Q.   And go to the -- the next page at the very | 10:53:46 |
| 8 | end which starts with, "So there you go." | 10:53:49 |
| 9 | A.   Next page at the very end.  Uh-huh. | 10:53:55 |
| 10 | Q.   It says at the end: | 10:53:57 |
| 11 | "Stay tuned as we try to | 10:53:59 |
| 12 | track down Jean Shuster Peavy's CBC | 10:54:01 |
| 13 | interview." | 10:54:05 |
| 14 | Do you know anything about that interview? | 10:54:06 |
| 15 | A.   No, I don't. | 10:54:07 |
| 16 | Q.   Okay.  When did you change your name from | 10:54:08 |
| 17 | Peavy to Peary? | 10:54:17 |
| 18 | A.   Sometime in the early 1980s. | 10:54:18 |
| 19 | Q.   Did you legally change it? | 10:54:24 |
| 20 | A.   Yes. | 10:54:26 |
| 21 | Q.   Why -- why did you do that? | 10:54:26 |
| 22 | A.   It was like -- it was a -- like a kind of a | 10:54:27 |
| 23 | business type of decision.  I was doing some acting | 10:54:34 |
| 24 | at the time.  That was part of it.  I thought it had | 10:54:36 |
| 25 | a better sound, as actors frequently change their | 10:54:40 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 196 of 230

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | names so -- | 10:54:43 |
| 2 | Q.  Did you -- | 10:54:44 |
| 3 | A.  -- it had to do with that. | 10:54:45 |
| 4 | Q.  Did you appear in anything -- | 10:54:46 |
| 5 | A.  I did. | 10:54:50 |
| 6 | Q.  -- that was previous to -- | 10:54:51 |
| 7 | A.  I did local paid productions and did some | 10:54:53 |
| 8 | various auditions for a time, but I didn't pursue | 10:54:59 |
| 9 | it. | 10:55:01 |
| 10 | Q.  Are you also a musician? | 10:55:09 |
| 11 | A.  I have -- yes, I have done music. | 10:55:12 |
| 12 | Q.  Did you perform in a band called the Cotton | 10:55:14 |
| 13 | Pickin' Peavys? | 10:55:19 |
| 14 | A.  Oh, as a child, that was a childhood thing. | 10:55:19 |
| 15 | Q.  Who -- who was in that band? | 10:55:25 |
| 16 | A.  Myself, mother and father, maybe an | 10:55:26 |
| 17 | occasional other musician. | 10:55:30 |
| 18 | Q.  And what did you play, the banjo? | 10:55:32 |
| 19 | A.  Yes. | 10:55:33 |
| 20 | Q.  Okay.  So you have done some music in your | 10:55:35 |
| 21 | background and you've done some acting? | 10:55:40 |
| 22 | A.  Yes. | 10:55:41 |
| 23 | Q.  Have you ever been compensated for acting? | 10:55:42 |
| 24 | A.  Yes. | 10:55:43 |
| 25 | Q.  How long ago? | 10:55:45 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 197 of 230

EXHIBIT 37
1133

SER 192

MARK WARREN PEARY - 6/29/2011

Page 32

| | | |
|---|---|---|
| 1 | A.  Early 1980s. | 10:55:48 |
| 2 | Q.  So I want to go back a bit on your | 10:55:56 |
| 3 | relationship with your uncle, Joe Shuster. | 10:55:58 |
| 4 | Did you ever spend one-on-one time with him | 10:56:05 |
| 5 | growing up? | 10:56:09 |
| 6 | A.  Some. | 10:56:09 |
| 7 | Q.  Did you go stay with him, for example, for | 10:56:09 |
| 8 | a while? | 10:56:12 |
| 9 | A.  There was one occasion I stayed with him | 10:56:12 |
| 10 | for a couple weeks. | 10:56:16 |
| 11 | Q.  When was that? | 10:56:18 |
| 12 | A.  That's when I thought I might become an | 10:56:20 |
| 13 | actor and I came out here and he let me stay in his | 10:56:22 |
| 14 | place for a while. | 10:56:27 |
| 15 | Q.  Late '80s? | 10:56:27 |
| 16 | A.  No.  That was the early '80s when I had all | 10:56:28 |
| 17 | my hair. | 10:56:32 |
| 18 | Q.  And when did you last see him before he | 10:56:33 |
| 19 | died? | 10:56:39 |
| 20 | A.  There -- there might have been an occasion | 10:56:39 |
| 21 | in the late '80s where we visited him, I believe. | 10:56:46 |
| 22 | It wasn't very long, though. | 10:56:52 |
| 23 | Q.  What wasn't very long? | 10:56:57 |
| 24 | A.  The visit was not long. | 10:56:59 |
| 25 | Q.  Did you speak with him by phone? | 10:57:03 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 198 of 230

EXHIBIT 37
1134

SER 193

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 199 of 230

1        A.  Not much.  Mostly it was to his sister,        10:57:07

2    Jean.        10:57:11

3        Q.  Were you -- so your contact with him        10:57:15

4    diminished in -- over the last years of his life?        10:57:18

5        A.  I don't know if it diminished.  There        10:57:27

6    was -- I would say it was pretty steady as it had        10:57:31

7    been.        10:57:34

8        Q.  But you hadn't seen him in three or four        10:57:37

9    years, right?        10:57:39

10        A.  Yeah, I don't recall the last time I'd seen        10:57:40

11    him, if that's what you're asking.  It was -- we had        10:57:42

12    visited him sometime in the late 1980s and he -- he        10:57:44

13    had gotten older and slower and had various health        10:57:50

14    problems, so it wasn't -- it wasn't a whole lot        10:57:55

15    said.  I don't recall speaking with him much at that        10:58:05

16    time.        10:58:08

17        Q.  Did you ever have a conversation with --        10:58:08

18    with Joe Shuster about copyright interests or        10:58:11

19    termination of copyright interests?        10:58:16

20        A.  No.        10:58:18

21            MR. TOBEROFF:  Compound.        10:58:20

22            THE WITNESS:  No.  Never discussed that.        10:58:22

23    BY MR. PETROCELLI:        10:58:22

24        Q.  Did you ever have a conversation with Joe        10:58:26

25    Shuster about any contractual arrangements he had        10:58:28

Page 34

| | | |
|---|---|---|
| 1 | with DC Comics or Time-Warner or Warner | 10:58:34 |
| 2 | Communications or any other affiliated entity? | 10:58:39 |
| 3 | MR. TOBEROFF:  Compound. | 10:58:42 |
| 4 | THE WITNESS:  No. | 10:58:45 |
| 5 | BY MR. PETROCELLI: | 10:58:45 |
| 6 | Q.   Did he ever discuss with you any of his | 10:58:51 |
| 7 | pension arrangements or agreements? | 10:58:55 |
| 8 | A.   No. | 10:58:57 |
| 9 | Q.   Were you aware of them? | 10:59:00 |
| 10 | A.   I knew he was getting a pension. | 10:59:04 |
| 11 | Q.   From whom? | 10:59:06 |
| 12 | A.   Time-Warner, I believe. | 10:59:07 |
| 13 | Q.   Were you at all involved in his financial | 10:59:15 |
| 14 | affairs, helping him out with paying bills or things | 10:59:19 |
| 15 | like that? | 10:59:23 |
| 16 | A.   Not while he was alive. | 10:59:23 |
| 17 | Q.   When he died, though, you -- you did go | 10:59:26 |
| 18 | through and reconstruct all of his payments and | 10:59:29 |
| 19 | checks and tried to get a handle on how much money | 10:59:32 |
| 20 | he had. | 10:59:36 |
| 21 | Is that right? | 10:59:38 |
| 22 | MR. TOBEROFF:  Vague. | 10:59:38 |
| 23 | You can answer. | 10:59:43 |
| 24 | THE WITNESS:  The only thing I recall is I | 10:59:43 |
| 25 | helped my mo- -- mother clear up his affairs. | 10:59:45 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 200 of 230

MARK WARREN PEARY - 6/29/2011

Page 35

| | | |
|---|---|---|
| 1 | That's about the only involvement I had at the -- | 10:59:55 |
| 2 | after he died. | 10:59:56 |
| 3 | BY MR. PETROCELLI: | 10:59:56 |
| 4 | Q.  And after he died, were you assisting your | 11:00:03 |
| 5 | mom in her discussions with either DC Comics or | 11:00:11 |
| 6 | Time-Warner about financial arrangements? | 11:00:17 |
| 7 | MR. TOBEROFF:  Lacks foundation.  Assumes | 11:00:22 |
| 8 | facts. | 11:00:24 |
| 9 | THE WITNESS:  I -- no, I really had nothing | 11:00:30 |
| 10 | to do with what she was saying. | 11:00:32 |
| 11 | BY MR. PETROCELLI: | 11:00:32 |
| 12 | Q.  Okay.  I'll come back to that in a bit. | 11:00:34 |
| 13 | You are aware that DC Comics has filed a | 11:00:39 |
| 14 | lawsuit against you and other defendants, including | 11:00:47 |
| 15 | Mr. Toberoff? | 11:00:55 |
| 16 | A.  Yes. | 11:00:56 |
| 17 | Q.  Let me show you a copy of the complaint | 11:01:02 |
| 18 | which is Exhibit 1. | 11:01:03 |
| 19 | (The document referred to was | 11:01:06 |
| 20 | marked for identification by the | 11:01:06 |
| 21 | C.S.R. as Exhibit 1 and attached to | 11:01:06 |
| 22 | this deposition.) | 11:01:16 |
| 23 | MR. PETROCELLI:  Actually the first amended | 11:01:16 |
| 24 | complaint. | 11:01:19 |
| 25 | MR. TOBEROFF:  Is this -- I thought this -- | 11:01:19 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 201 of 230

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | that substance through questioning my client. | 11:55:27 |
| 2 |       MR. PETROCELLI:  We -- we disagree. | 11:55:28 |
| 3 |       MR. TOBEROFF:  That's fine. | 11:55:33 |
| 4 | BY MR. PETROCELLI: | 11:55:33 |
| 5 |     Q.  Is the consent agreement that you signed in | 11:55:34 |
| 6 | 2008 still in effect? | 11:55:36 |
| 7 |     A.  Yes. | 11:55:39 |
| 8 |     Q.  Have you had any discussions with any | 11:55:48 |
| 9 | member of the Siegel family about it at any time | 11:55:50 |
| 10 | both before or after signing it? | 11:55:55 |
| 11 |     A.  Not directly. | 11:55:59 |
| 12 |     Q.  What does that mean? | 11:56:00 |
| 13 |     A.  All my discussions are through my attorney. | 11:56:01 |
| 14 |     Q.  How do you have a discussion with the | 11:56:04 |
| 15 | Siegels through the attorney? | 11:56:08 |
| 16 |     A.  Then the answer is no. | 11:56:09 |
| 17 |     Q.  What did you mean when you said not | 11:56:11 |
| 18 | directly, through your attorney? | 11:56:13 |
| 19 |     A.  All -- all my communication about the | 11:56:14 |
| 20 | agreement is -- is through my discussions with my | 11:56:15 |
| 21 | attorney and what he has told me the Siegels have | 11:56:19 |
| 22 | communicated.  That's what I mean. | 11:56:26 |
| 23 |     Q.  Have you ever had a -- a discussion with | 11:56:28 |
| 24 | your mom about the consent agreement? | 11:56:43 |
| 25 |     A.  She -- she -- I may have -- she has a -- | 11:56:56 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 202 of 230

MARK WARREN PEARY - 6/29/2011

Page 107

Case 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 203 of 230

| | | |
|---|---|---|
| 1 | Q.   About how many? | 13:29:16 |
| 2 | A.   Boy, before signing the first agreement I | 13:29:22 |
| 3 | would have had to -- I -- I don't know exactly, but | 13:29:28 |
| 4 | it -- it was a number of times.  I don't know to | 13:29:30 |
| 5 | characterize.  I don't -- I don't have a log, but I | 13:29:35 |
| 6 | talked to him quite a bit. | 13:29:38 |
| 7 | Q.   Okay.  The agreement that you did sign | 13:29:41 |
| 8 | which I'll show you in a bit, were there drafts of | 13:29:43 |
| 9 | that that went back and forth or -- as you recall or | 13:29:48 |
| 10 | did you get a document, sign it and return it? | 13:29:51 |
| 11 | A.   There were drafts. | 13:29:54 |
| 12 | Q.   Did you keep copies of the drafts? | 13:29:56 |
| 13 | A.   No. | 13:29:57 |
| 14 | Q.   On your end, who was reviewing the drafts? | 13:30:01 |
| 15 | A.   I was. | 13:30:07 |
| 16 | Q.   Did you feel competent and capable to | 13:30:09 |
| 17 | understand what you were reading and made changes | 13:30:11 |
| 18 | and comments? | 13:30:15 |
| 19 | A.   Yes. | 13:30:16 |
| 20 | Q.   Okay.  Did you consult with anybody? | 13:30:18 |
| 21 | A.   Like another lawyer? | 13:30:26 |
| 22 | Q.   Yes. | 13:30:26 |
| 23 | A.   No. | 13:30:26 |
| 24 | Q.   Did you discuss with your mother in 2001 | 13:30:29 |
| 25 | these -- your talking to Mr. Toberoff, your | 13:30:34 |

EXHIBIT 37
1209

SER 198

MARK WARREN PEARY - 6/29/2011

Page 108

| | | |
|---|---|---|
| 1 | telephone calls with him, receiving the draft | 13:30:40 |
| 2 | agreements, working on them, this whole activity, | 13:30:44 |
| 3 | did you share all of that with your mother? | 13:30:46 |
| 4 | A.  I'm sure I did. | 13:30:52 |
| 5 | Q.  Did she ask you to undertake this effort? | 13:30:54 |
| 6 | A.  No.  I -- I was doing all of this research | 13:30:57 |
| 7 | on my own.  She didn't know anything about it. | 13:30:59 |
| 8 | Q.  At what point did you disclose to her what | 13:31:03 |
| 9 | you were doing? | 13:31:06 |
| 10 | A.  Probably when I decided to work, retain | 13:31:06 |
| 11 | Mr. Toberoff, it's probably when I really discussed | 13:31:15 |
| 12 | it. | 13:31:20 |
| 13 | Q.  Did you have a one-on-one conversation with | 13:31:20 |
| 14 | your mother or was your sister involved? | 13:31:23 |
| 15 | A.  Boy, I -- | 13:31:26 |
| 16 | Q.  Family meeting? | 13:31:28 |
| 17 | A.  I can't actually visualize that in my mind. | 13:31:30 |
| 18 | I know I talked with Jean.  I don't recall talking | 13:31:33 |
| 19 | to Dawn at that time. | 13:31:38 |
| 20 | Q.  You -- why did you decide not to share with | 13:31:43 |
| 21 | your mother your -- your activities until just | 13:31:47 |
| 22 | before you were ready to sign the document? | 13:31:52 |
| 23 | A.  I was doing research on my own and she -- | 13:31:58 |
| 24 | she had no interest or knowledge of any of -- of | 13:32:01 |
| 25 | that, any of the rights or anything.  It was | 13:32:04 |

EXHIBIT 37
1210

SER 199

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 204 of 230

MARK WARREN PEARY - 6/29/2011

Page 109

| | | |
|---|---|---|
| 1 | something I did completely on my own because I | 13:32:09 |
| 2 | wanted to be thorough, so that's the reason. | 13:32:11 |
| 3 | Q.   And did you come to a point when you | 13:32:19 |
| 4 | thought, like, you had sufficient, thorough | 13:32:20 |
| 5 | information that you could then talk with her? | 13:32:23 |
| 6 | A.   Yes. | 13:32:25 |
| 7 | Q.   And -- and when you did talk with her, was | 13:32:26 |
| 8 | it in that conversation that you first identified to | 13:32:30 |
| 9 | her that you had contacted Mr. Toberoff and you were | 13:32:33 |
| 10 | recommending him? | 13:32:36 |
| 11 | A.   I believe so. | 13:32:36 |
| 12 | Q.   Had she ever heard of Mr. Toberoff, to your | 13:32:42 |
| 13 | knowledge? | 13:32:45 |
| 14 | A.   No. | 13:32:45 |
| 15 | Q.   Did you put Mr. Toberoff in touch with the | 13:32:54 |
| 16 | Siegel family? | 13:32:57 |
| 17 | A.   If I recall, after we had signed a legal | 13:33:01 |
| 18 | agreement, at some point we were -- we were happy | 13:33:05 |
| 19 | that my mother had talked with Joanne and mentioned | 13:33:13 |
| 20 | his name. | 13:33:16 |
| 21 | Q.   Were you present when your mother first | 13:33:24 |
| 22 | mentioned Mr. Toberoff to Joanne? | 13:33:28 |
| 23 | A.   No. | 13:33:32 |
| 24 | Q.   It's a telephone call? | 13:33:34 |
| 25 | A.   Yes. | 13:33:35 |

EXHIBIT 37
1211

SER 200

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 205 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 206 of 230

| 1 | A. Did I have that view? | 14:28:58 |
| 2 | Q. Yes. | 14:28:58 |
| 3 | A. Yes. | 14:28:58 |
| 4 | Q. What informed that view? | 14:29:01 |
| 5 | A. What informed the view? | 14:29:08 |
| 6 | Q. Yeah, why did you feel that way? | 14:29:09 |
| 7 | A. The value of Superman from my own ideas of | 14:29:13 |
| 8 | what I know of it. | 14:29:20 |
| 9 | Q. When did you first have that view? | 14:29:27 |
| 10 | A. About how much Superman is worth? | 14:29:30 |
| 11 | Q. That you did not believe your family was | 14:29:32 |
| 12 | being properly compensated? | 14:29:34 |
| 13 | A. When did I first have that view?  Well, | 14:29:40 |
| 14 | maybe later on when I -- when I -- I realized how -- | 14:29:46 |
| 15 | how broke Joe was when he died and I know that | 14:29:56 |
| 16 | Superman had brought in billions in revenues over | 14:30:02 |
| 17 | the years and they had a -- basically just how -- | 14:30:06 |
| 18 | how poor he was in relation to the value of | 14:30:14 |
| 19 | Superman. | 14:30:18 |
| 20 | Q. But you also knew that Joe never felt the | 14:30:20 |
| 21 | need to terminate or try to terminate his copyright | 14:30:22 |
| 22 | grants, right? | 14:30:26 |
| 23 | MR. TOBEROFF: Assumes facts. | 14:30:30 |
| 24 | THE WITNESS: My knowledge of the history | 14:30:31 |
| 25 | is that they did try to get rights back at times. | 14:30:36 |

Page 153

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 14:30:36 |
| 2 | Q. He never tried to get rights back under the | 14:30:40 |
| 3 | termination provisions of the 1976 copyright act, | 14:30:43 |
| 4 | right? | 14:30:43 |
| 5 | A. Not that I -- no, not on that. | 14:30:47 |
| 6 | Q. Did you ever inquire why if he felt -- if | 14:30:49 |
| 7 | he was as broke as -- as you say he was, why he | 14:30:53 |
| 8 | didn't seek to terminate any copyright grants that | 14:30:56 |
| 9 | he had given? | 14:31:00 |
| 10 | A. I -- I didn't ask him about it. | 14:31:02 |
| 11 | Q. Did you ask your mother? | 14:31:04 |
| 12 | A. No. | 14:31:05 |
| 13 | Q. Did you become aware as part of your | 14:31:11 |
| 14 | research that as early as 1984 Joe Shuster had the | 14:31:13 |
| 15 | right to serve a notice of copyright termination | 14:31:17 |
| 16 | under the 1976 act? | 14:31:23 |
| 17 | A. No. | 14:31:24 |
| 18 | Q. And that he lived for eight years without | 14:31:26 |
| 19 | having done so? | 14:31:29 |
| 20 | A. I was not aware. | 14:31:32 |
| 21 | Q. After you saw how broke he was, and I know | 14:31:35 |
| 22 | you were involved in totaling up the -- the checks | 14:31:37 |
| 23 | and the bills that we saw from your mother's letter, | 14:31:39 |
| 24 | did you discuss with your mother the idea that, | 14:31:44 |
| 25 | "Hey, what happened here? You know, why is he so | 14:31:47 |

EXHIBIT 37
1255

SER 202

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 207 of 230

MARK WARREN PEARY - 6/29/2011

Page 154

| | | |
|---|---|---|
| 1 | broke?  Superman has made billions." | 14:31:49 |
| 2 | A.  Yeah, might have -- might have asked her | 14:31:52 |
| 3 | about it. | 14:31:58 |
| 4 | Q.  What did she say? | 14:31:58 |
| 5 | A.  That it's -- just expressed that it was | 14:32:02 |
| 6 | just an injustice and it was just -- it wasn't | 14:32:07 |
| 7 | right, that type of thing. | 14:32:14 |
| 8 | Q.  How did you know as early as 1992 when Joe | 14:32:19 |
| 9 | Shuster died that Superman had, as you put it, | 14:32:23 |
| 10 | generated billions of dollars in revenue? | 14:32:26 |
| 11 | A.  Well, I had seen Superman all my life.  I | 14:32:28 |
| 12 | grew up -- grew up with Superman and the -- the big | 14:32:32 |
| 13 | movie in '79, the big Superman movie, or '78, I was | 14:32:37 |
| 14 | aware that was the first big blockbuster superhero | 14:32:44 |
| 15 | movie that started the whole genre of superhero | 14:32:48 |
| 16 | movies that is just the rage.  So I'm just aware | 14:32:53 |
| 17 | of -- of how widespread it is and popular. | 14:32:55 |
| 18 | Q.  You were aware of this in 1992 when Joe | 14:32:58 |
| 19 | died broke, right? | 14:33:00 |
| 20 | A.  Yeah, just in general of how -- the history | 14:33:02 |
| 21 | of Superman and how big it is. | 14:33:06 |
| 22 | Q.  And when you had this conversation with | 14:33:13 |
| 23 | your mother right after Joe's death, you're telling | 14:33:15 |
| 24 | us that she agreed with you? | 14:33:23 |
| 25 | A.  Well, she expressed to me that she thought | 14:33:24 |

EXHIBIT 37
1256

SER 203

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 208 of 230

MARK WARREN PEARY - 6/29/2011

Page 155

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 209 of 230

| | | |
|---|---|---|
| 1 | it was an injustice.  And did I agree with her?  Is | 14:33:31 |
| 2 | that what you're asking? | 14:33:34 |
| 3 | Q.  Yes. | 14:33:35 |
| 4 | A.  Well, yes. | 14:33:36 |
| 5 | Q.  The injustice that she expressed to you was | 14:33:39 |
| 6 | that Joe had so little money when Superman had | 14:33:41 |
| 7 | generated so much? | 14:33:44 |
| 8 | A.  Yes. | 14:33:45 |
| 9 | Q.  So did it come as a surprise to you then | 14:33:53 |
| 10 | that she entered into an agreement after that | 14:33:55 |
| 11 | conversation with DC and Time-Warner in which she | 14:33:59 |
| 12 | gave up any copyright interest that the family might | 14:34:06 |
| 13 | have? | 14:34:10 |
| 14 | A.  I don't know what her thinking was. | 14:34:10 |
| 15 | MR. TOBEROFF:  Sorry.  Assumes facts. | 14:34:13 |
| 16 | Lacks foundation. | 14:34:16 |
| 17 | BY MR. PETROCELLI: | 14:34:16 |
| 18 | Q.  She didn't consult with you, right? | 14:34:18 |
| 19 | A.  No. | 14:34:18 |
| 20 | Q.  She was certainly of sound mind in 1992, | 14:34:20 |
| 21 | right? | 14:34:20 |
| 22 | A.  Yes. | 14:34:20 |
| 23 | Q.  When she was expressing to you the | 14:34:24 |
| 24 | injustice after Joe's death, you didn't think she -- | 14:34:26 |
| 25 | she was mentally infirm, you thought that she was | 14:34:30 |

Merrill  Corporation  -  Los Angeles
800-826-0277                                  www.merrillcorp.com/law

EXHIBIT 37
1257

**SER 204**

MARK WARREN PEARY - 6/29/2011

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 210 of 230

| | | |
|---|---|---|
| 1 | healthy and sound and knew exactly what she was | 14:34:34 |
| 2 | saying, right? | 14:34:35 |
| 3 | A. Yes. | 14:34:36 |
| 4 | Q. And in -- and she didn't consult with you | 14:34:36 |
| 5 | when she signed that agreement, Exhibit 5, as of | 14:34:41 |
| 6 | August 31, 1992, correct? | 14:34:46 |
| 7 | A. That's correct. | 14:34:48 |
| 8 | Q. And when you saw it, were you surprised | 14:34:50 |
| 9 | that she had signed that agreement given her | 14:34:52 |
| 10 | statements to you that it was an injustice? | 14:34:54 |
| 11 | A. Well, yes. | 14:34:57 |
| 12 | Q. Do you think that she felt like the | 14:34:59 |
| 13 | injustice had been rectified by virtue of her having | 14:35:00 |
| 14 | obtained that agreement from DC? | 14:35:05 |
| 15 | MR. TOBEROFF: Calls for speculation. | 14:35:07 |
| 16 | THE WITNESS: Can I answer? | 14:35:09 |
| 17 | BY MR. PETROCELLI: | 14:35:09 |
| 18 | Q. Did you discuss that with her when you saw | 14:35:17 |
| 19 | the letter? | 14:35:18 |
| 20 | A. Yeah, what was the original question? | 14:35:20 |
| 21 | Q. When you saw the letter, the agreement, | 14:35:21 |
| 22 | Exhibit 5, and I misspoke, I said August 31, it's | 14:35:23 |
| 23 | August 1, 1992, when you found it and you saw it, | 14:35:28 |
| 24 | did you have a discussion with her to the effect | 14:35:36 |
| 25 | that -- about whether she felt better now that the | 14:35:38 |

EXHIBIT 37
1258

MARK WARREN PEARY - 6/29/2011

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 211 of 230

| | | |
|---|---|---|
| 1 | A. Well -- | 15:58:27 |
| 2 | Q. Not in the proceeds, but in the actual | 15:58:27 |
| 3 | rights? | 15:58:29 |
| 4 | A. My -- my understanding is you can't | 15:58:29 |
| 5 | transfer something you have rights in. | 15:58:31 |
| 6 | Q. And that's something that you learned after | 15:58:34 |
| 7 | you signed this agreement, correct? | 15:58:37 |
| 8 | A. Well, I believe I had some awareness of | 15:58:41 |
| 9 | that before I signed it. | 15:58:44 |
| 10 | Q. You learned that after you signed this | 15:58:45 |
| 11 | agreement when you tried to fix the problem by | 15:58:47 |
| 12 | entering into the legal agreement in 2004 which you | 15:58:51 |
| 13 | then backdated back to 2001, correct? | 15:58:55 |
| 14 | MR. TOBEROFF: Also, let me just interject. | 15:59:02 |
| 15 | I don't want you answering questions that are based | 15:59:03 |
| 16 | on any legal understanding that you've received or | 15:59:07 |
| 17 | knowledge or -- he is asking you information that | 15:59:11 |
| 18 | you just know all on your own. I know it's hard to | 15:59:16 |
| 19 | distinguish between the two, but -- but I'm going to | 15:59:17 |
| 20 | ask you to try and do that and not answer questions | 15:59:22 |
| 21 | based on conversations with attorneys. | 15:59:24 |
| 22 | THE WITNESS: Okay. | 15:59:28 |
| 23 | BY MR. PETROCELLI: | 15:59:28 |
| 24 | Q. Can you look at paragraph 2? It says in | 15:59:47 |
| 25 | the middle, "In consideration for PPC's" -- that's | 15:59:54 |

EXHIBIT 37

MARK WARREN PEARY - 6/29/2011

Page 211

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 212 of 230

| | | |
|---|---|---|
| 1 | Pacific Pictures Corporation's -- "contributions to | 15:59:57 |
| 2 | the Venture" -- and you see "venture" is capital V, | 16:00:00 |
| 3 | right? | 16:00:00 |
| 4 | A.  Which line are you on?  Oh, yes, okay. | 16:00:07 |
| 5 | Q.  And that's the venture between Pacific | 16:00:09 |
| 6 | Pictures and you and your mother, correct? | 16:00:12 |
| 7 | A.  Yes. | 16:00:12 |
| 8 | Q.  Okay.  It says: | 16:00:15 |
| 9 | "In consideration for PPC's | 16:00:16 |
| 10 | contributions to the Venture in the | 16:00:18 |
| 11 | mutual covenants contained herein, | 16:00:19 |
| 12 | claimants hereby transfer and | 16:00:22 |
| 13 | assign to the Venture their rights, | 16:00:24 |
| 14 | titles and -- title and interests | 16:00:27 |
| 15 | in the rights." | 16:00:29 |
| 16 | Do you see that? | 16:00:31 |
| 17 | A.  Yes. | 16:00:31 |
| 18 | Q.  So you understood when you signed this that | 16:00:32 |
| 19 | all of the Joe Shuster rights, termination rights, | 16:00:36 |
| 20 | to the extent they existed, were being transferred | 16:00:40 |
| 21 | and assigned to the venture just as it says, | 16:00:43 |
| 22 | correct? | 16:00:43 |
| 23 | A.  Yes. | 16:00:43 |
| 24 | Q.  Now, are you saying you signed this | 16:00:50 |
| 25 | believing it was invalid because you can't make such | 16:00:52 |

MARK WARREN PEARY - 6/29/2011

Page 212

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 213 of 230

| | | |
|---|---|---|
| 1 | an assignment or transfer of the rights?  Are you | 16:00:56 |
| 2 | telling me -- | 16:00:59 |
| 3 | A.  No. | 16:00:59 |
| 4 | Q.  -- now that it's something you learned | 16:01:00 |
| 5 | afterwards? | 16:01:01 |
| 6 | A.  I learned it afterwards. | 16:01:04 |
| 7 | Q.  Okay.  Let's continue.  How did you learn | 16:01:07 |
| 8 | it, by the way? | 16:01:11 |
| 9 | A.  Discussions with my attorney. | 16:01:15 |
| 10 | Q.  Who is that? | 16:01:17 |
| 11 | MR. TOBEROFF:  I'll let you answer without | 16:01:20 |
| 12 | waiver. | 16:01:22 |
| 13 | MR. PETROCELLI:  I just need to know who | 16:01:22 |
| 14 | the attorney is.  I'd rather have you say | 16:01:23 |
| 15 | "Mr. Toberoff." | 16:01:26 |
| 16 | THE WITNESS:  Mr. Toberoff. | 16:01:26 |
| 17 | MR. TOBEROFF:  But I'm saying I'm letting | 16:01:28 |
| 18 | him answer that question -- | 16:01:29 |
| 19 | MR. PETROCELLI:  Oh, okay. | 16:01:29 |
| 20 | MR. TOBEROFF:  -- without waiver of the | 16:01:31 |
| 21 | privilege. | 16:01:31 |
| 22 | BY MR. PETROCELLI: | 16:01:31 |
| 23 | Q.  The reason I ask you that question is | 16:01:32 |
| 24 | because you may be referring to some other attorney | 16:01:34 |
| 25 | and I just have to have the record be clear. | 16:01:35 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 214 of 230

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  Again, I don't think these | 16:13:36 |
| 2 | questions are -- these instructions are proper. | 16:13:39 |
| 3 | Q.   Look at paragraph 4. | 16:13:39 |
| 4 | MR. TOBEROFF:   I'm not going to allow him | 16:13:42 |
| 5 | to answer how he is assessing potential litigation | 16:13:44 |
| 6 | after he has retained me. | 16:13:49 |
| 7 | MR. PETROCELLI:   It's just going to have to | 16:13:49 |
| 8 | get sorted out in court. | 16:13:52 |
| 9 | Q.   Go to paragraph 4.  It says: | 16:13:55 |
| 10 | "The terms of any and all | 16:13:59 |
| 11 | agreements regarding any of the | 16:14:00 |
| 12 | rights in any respect shall be | 16:14:02 |
| 13 | subject to the express written | 16:14:04 |
| 14 | approval of claimants and PPC.  The | 16:14:06 |
| 15 | parties each warrant and represent | 16:14:10 |
| 16 | that after signing this agreement | 16:14:11 |
| 17 | they will not, without the express | 16:14:13 |
| 18 | written consent of all the parties, | 16:14:15 |
| 19 | transfer, limit or encumber the | 16:14:16 |
| 20 | rights in any respect." | 16:14:18 |
| 21 | When you signed this, you understood that | 16:14:20 |
| 22 | you could not enter into any agreement with DC | 16:14:24 |
| 23 | Comics or any affiliate of DC Comics without the | 16:14:30 |
| 24 | express written consent of Pacific Pictures, | 16:14:35 |
| 25 | correct? | 16:14:35 |

MARK WARREN PEARY - 6/29/2011

Page 224

| | | |
|---|---|---|
| 1 | A.   Yes. | 16:14:35 |
| 2 | Q.   And in your mind who is Pacific Pictures? | 16:14:40 |
| 3 | A.   Marc Toberoff. | 16:14:45 |
| 4 | Q.   And so you understood that you -- you and | 16:14:50 |
| 5 | your family could not enter into a contract with DC | 16:14:54 |
| 6 | Comics no matter how badly you wanted, unless Marc | 16:14:58 |
| 7 | Toberoff consented, correct? | 16:15:03 |
| 8 | A.   Yes. | 16:15:03 |
| 9 | Q.   Did you think that that was an appropriate | 16:15:09 |
| 10 | power for a lawyer to have over a client? | 16:15:17 |
| 11 | A.   I thought it was in his best interest to -- | 16:15:24 |
| 12 | Q.   That's not what I asked you. | 16:15:35 |
| 13 | MR. TOBEROFF:  He's trying to answer your | 16:15:36 |
| 14 | question. | 16:15:37 |
| 15 | MR. PETROCELLI:  Yes. | 16:15:37 |
| 16 | Q.   Did you think -- did you think that it was | 16:15:38 |
| 17 | proper for lawyers to impose that --·to have such | 16:15:44 |
| 18 | a -- an agreement with a client that the client | 16:15:52 |
| 19 | can't settle without the lawyer's consent no matter | 16:15:54 |
| 20 | how much the client wants to settle? | 16:15:58 |
| 21 | A.   At the time I didn't consider it | 16:16:04 |
| 22 | unreasonable. | 16:16:05 |
| 23 | Q.   Did you think it was appropriate?  Did you | 16:16:08 |
| 24 | have any knowledge on that subject whether the | 16:16:11 |
| 25 | lawyers are even permitted under the law to have | 16:16:13 |

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 215 of 230

EXHIBIT 37
1326
SER 210

MARK WARREN PEARY - 6/29/2011

Page 225

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 216 of 230

| | | |
|---|---|---|
| 1 | such arrangements? | 16:16:17 |
| 2 | A.  No, I -- I was not aware. | 16:16:21 |
| 3 | Q.  Did you do any research on that subject? | 16:16:22 |
| 4 | A.  Not specifically this, no. | 16:16:27 |
| 5 | Q.  Were you aware that it's not lawful for a | 16:16:30 |
| 6 | lawyer to have such a -- an agreement with a client? | 16:16:33 |
| 7 | A.  Not at the time. | 16:16:39 |
| 8 | Q.  Have you since become aware of that? | 16:16:40 |
| 9 | A.  Yes. | 16:16:42 |
| 10 | Q.  When? | 16:16:46 |
| 11 | A.  Sometime 2003. | 16:16:55 |
| 12 | Q.  How? | 16:16:57 |
| 13 | A.  Discussions with Marc Toberoff. | 16:17:01 |
| 14 | Q.  What led to -- what prompted those | 16:17:11 |
| 15 | discussions? | 16:17:13 |
| 16 | A.  We -- we both realized that this format was | 16:17:13 |
| 17 | not -- not the best approach to take. | 16:17:20 |
| 18 | Q.  Why was it not the best approach? | 16:17:25 |
| 19 | A.  We decided a legal retainer, a standard | 16:17:30 |
| 20 | legal retainer was a preferred association. | 16:17:33 |
| 21 | Q.  You said in 2001 when you signed this, | 16:17:36 |
| 22 | you -- you were not even able to appreciate the | 16:17:42 |
| 23 | difference between a standard legal retainer and a | 16:17:44 |
| 24 | joint venture agreement. | 16:17:46 |
| 25 | Do you recall giving that testimony?  You | 16:17:48 |

MARK WARREN PEARY - 6/29/2011

Page 226

| | | |
|---|---|---|
| 1 | said you were not even in a position to note that | 16:17:53 |
| 2 | there was anything unusual about it.  Do you recall | 16:17:55 |
| 3 | giving me that answer? | 16:17:57 |
| 4 | MR. TOBEROFF:  I believe that misstates his | 16:17:58 |
| 5 | testimony. | 16:17:59 |
| 6 | MR. PETROCELLI:  I don't think so. | 16:17:59 |
| 7 | THE WITNESS:  What -- what did I say? | 16:18:01 |
| 8 | BY MR. PETROCELLI: | 16:18:01 |
| 9 | Q.  So you were aware in 2001 when you signed | 16:18:02 |
| 10 | the agreement that you were agreeing to a -- an | 16:18:04 |
| 11 | arrangement that was different from the standard | 16:18:08 |
| 12 | lawyer-client agreement in setting up a joint | 16:18:11 |
| 13 | venture with Pacific Pictures? | 16:18:15 |
| 14 | MR. TOBEROFF:  Misstates his testimony. | 16:18:16 |
| 15 | BY MR. PETROCELLI: | 16:18:16 |
| 16 | Q.  I'm asking you now. | 16:18:18 |
| 17 | A.  What did I say before? | 16:18:20 |
| 18 | Q.  Let's not get hung up on what you said | 16:18:22 |
| 19 | before.  It's a new question. | 16:18:25 |
| 20 | A.  Okay. | 16:18:26 |
| 21 | Q.  Okay? | 16:18:26 |
| 22 | Can you read it back, please? | 16:18:27 |
| 23 | (The reporter read the record | 16:18:27 |
| 24 | as follows: | 16:18:27 |
| 25 | "QUESTION:  So you were aware | 16:18:02 |

EXHIBIT 37
1328

SER 212

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 217 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 218 of 230

| | | |
|---|---|---|
| 1 | in 2001 when you signed the | 16:18:03 |
| 2 | agreement that you were agreeing to | 16:18:05 |
| 3 | an arrangement that was different | 16:18:08 |
| 4 | from the standard lawyer-client | 16:18:10 |
| 5 | agreement in setting up a joint | 16:18:12 |
| 6 | venture with Pacific Pictures?") | 16:18:15 |
| 7 | THE WITNESS:  Was I aware that it was | 16:18:43 |
| 8 | different than the standard -- standard legal | 16:18:45 |
| 9 | retainer? | 16:18:46 |
| 10 | BY MR. PETROCELLI: | 16:18:47 |
| 11 | Q.  In 2001 when you signed Exhibit 10 -- | 16:18:48 |
| 12 | A.  2001. | 16:18:50 |
| 13 | Q.  -- were -- were -- were you -- | 16:18:51 |
| 14 | A.  I was. | 16:18:53 |
| 15 | Q.  -- aware that you were signing a contract | 16:18:53 |
| 16 | that was different from the standard lawyer-client | 16:18:57 |
| 17 | agreement? | 16:19:01 |
| 18 | A.  I was not keenly aware of that. | 16:19:03 |
| 19 | Q.  But you became keenly aware of it in 2003, | 16:19:06 |
| 20 | correct? | 16:19:06 |
| 21 | A.  Sometime in there. | 16:19:10 |
| 22 | Q.  Okay.  You said that you and Mr. Toberoff | 16:19:12 |
| 23 | decided that this approach was not the best approach | 16:19:14 |
| 24 | and you should revert to a lawyer- -- a standard | 16:19:19 |
| 25 | lawyer-client agreement, right? | 16:19:22 |

```
1        A.   Yes.                                          16:19:24

2        Q.   Okay.   What prompted that?                   16:19:25

3        A.   I -- I don't remember.   We just discussed    16:19:32

4   things over time.                                       16:19:36

5        Q.   You said you learned that the -- it was not   16:19:40

6   lawful for a lawyer to be able to withhold his          16:19:46

7   consent to a client settlement.                         16:19:49

8        A.   I did -- at the time I didn't know that --    16:19:53

9   that was the case.                                      16:19:56

10       Q.   But you knew that in '03, right?              16:19:56

11       A.   Whenever -- whenever we started discussing    16:19:59

12  changing the form, then at some point after that we     16:20:02

13  agreed we needed to change it, I became aware of         16:20:09

14  that.                                                    16:20:11

15       Q.   Was it -- did he just call you up one day     16:20:14

16  and say, "We have to make a change"?   What brought     16:20:16

17  the change about?                                        16:20:19

18       A.   I don't remember.                             16:20:20

19       Q.   Did you get any legal advice from someone     16:20:30

20  other than Mr. Toberoff when he told you that a         16:20:32

21  change was required?                                     16:20:37

22       A.   No.                                           16:20:38

23       Q.   Did it cause you any concern after you        16:20:43

24  learned that you had signed an agreement that had       16:20:45

25  legal problems associated with it?                      16:20:47
```

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 219 of 230

MARK WARREN PEARY - 6/29/2011

Page 362

```
 1                         DECLARATION

 2

 3

 4

 5

 6         I hereby declare I am the deponent in the

 7   within matter; that I have read the foregoing

 8   deposition and know the contents thereof, and I

 9   declare that the same is true of my knowledge except

10   as to the matters which are therein stated upon my

11   information or belief, and as to those matters, I

12   believe it to be true.

13         I declare under the penalties of perjury of

14   the State of California that the foregoing is true

15   and correct.

16         Executed on the _____ day of

17   _____ 2011, at

18   _____,

19   California.

20

21

22

23

24         _____

25                    W I T N E S S
```

Merrill   Corporation  -  Los Angeles
800-826-0277                        www.merrillcorp.com/law

EXHIBIT 37

SER 215

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 220 of 230

MARK WARREN PEARY - 6/29/2011

Page 363

```
1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF LOS ANGELES    )

3

4          I, Shanda Gabriel, Certified Shorthand

5    Reporter, Certificate No. 10094, for the State of

6    California, hereby certify:

7          I am the deposition officer that

8    stenographically recorded the testimony in the

9    foregoing deposition;

10         Prior to being examined the witness was by

11   me first duly sworn;

12         The foregoing transcript is a true record

13   of the testimony given.

14

15   Dated  July 14,2011         .

16

17

18                Shanda Gabriel
                  CSR 10094
19

20

21

22

23

24

25
```

EXHIBIT 37
1465

SER 216

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 221 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 222 of 230

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Nicholas C. Williamson (State Bar No. 231124)
     *nwilliamson@ipwla.com*
3  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
4  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
5  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
6  Fax:          (310) 246-3101

7  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
8  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson

9

                    **UNITED STATES DISTRICT COURT**

10

               **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11

| | |
|---|---|
| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
| Plaintiff, | |
| vs. | Hon. Otis D. Wright II, U.S.D.J. |
| | **DEFENDANTS MARK WARREN PEARY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JOSEPH SHUSTER, AND JEAN ADELE PEAVY'S REPLY IN SUPPORT OF RENEWED MOTION TO DISMISS AND/OR STAY PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; JOANNE SIEGEL, an individual; LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive, | |
| Defendants. | *Re: Motion to Dismiss and/or Stay First and Second Claims* (Docket No. 148), *under submission per the Court's February 14, 2011 Order* (Docket No. 169) |
| | *Supplemental Brief and [Proposed] Order filed concurrently* |
| | Complaint filed:  May 14, 2010 |
| | Trial Date:  None Set |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

DEFENDANTS PEARY AND PEAVY'S REPLY IN SUPPORT OF RENEWED MOTION TO DISMISS
FIRST AMENDED COMPLAINT

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 223 of 230

1  *Abend*, 495 U.S. 207, 212 (1990) of DC's interpretation of "not living," or why "not

2  living" should be interpreted differently as to sub-sections 304(a) (renewal) and

3  304(c) (recapture of the renewal copyright), instead of being interpreted consistently

4  throughout the same statute. *See* Mot. at 4-5.  Nor can DC justify its rejection of

5  *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999), contradicting

6  DC's interpretation of "not living" <u>in the termination context</u>.

7

8  **C.**   <u>**Pacific Pictures Had No Termination Rights and Was Not Required
To Sign the Shuster Termination Notice as a Matter of Law**</u>

9       DC attempts to create confusion as to its claim that Pacific Pictures needed to

10  sign the Shuster Termination (FAC, ¶¶ 118-24) by arguing that the Shusters had

11  "expressly assigned 50% of whatever interests they held to Pacific Pictures," and that

12  this supposedly presents "an open fact question that cannot be resolved on this

13  motion."  Opp. at 20-21.  As shown in Defendants' Motion, and as DC itself insists in

14  its FAC (¶ 167), under § 304(c)(6)(D) "[a] further grant, or agreement to make a

15  further grant, of any right covered by a terminated grant is valid only if it is made

16  after the effective date of the termination."  Thus, as a pure matter of law, the Pacific

17  Picture Agreements could not and did not transfer the Shuster Executor's termination

18  rights or prospective termination interests.  As such transfers were void *ab initio*, they

19  also cannot support DC's "unclean hands" claim.  FAC, ¶ 130.  DC's argument that

20  "Defendants' concession that these agreements were 'void *ab initio*' … *confirms*"

21  unclean hands is unfathomable:  if the transfers were void and Pacific Pictures *was*

22  listed, there would have been a material misstatement in the termination notice.

23  **D.**   <u>**DC Cannot State a Claim for Unclean Hands**</u>

24       **1.**   **Unclean Hands Is Not a Claim for Relief**

25       As set forth by the Ninth Circuit, "[t]he doctrine of unclean hands does not

26  obviously apply where it is [the plaintiff], not the [defendant], who seeks relief."

27  *Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003).  The rationale is that "unclean

28  hands" is a "defensive doctrine," against "plaintiffs seeking equitable relief and is

8

DEFENDANTS PEARY AND PEAVY'S REPLY IN SUPPORT OF MOTION TO DISMISS FAC

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 224 of 230

1   the case" doctrine to dismiss these duplicative claims[20] or stays the claims until a

2   final judgment is entered in *Siegel*, resulting in issue preclusion. DC's hyperbole that

3   "[s]taying any part of this action … would create chaos and other litigation

4   inefficiencies" is unavailing. Opp. at 25. DC offers no reason why its Second Claim

5   should not be stayed when the identical issues are decided or pending in the much

6   more advanced *Siegel* case.

7          DC also fabricates factual issues to cast doubt on the clear application of the

8   *Siegel* rulings to this case: "Shuster continued to work for DCI and/or its successors

9   [after Siegel and Shuster's 1938 employment agreement] even when Siegel did not,

10  and therefore may have had oral or written employment agreements independent of

11  Siegel." FAC, ¶ 146; Opp. at 23:18-21. However, as DC itself asserted, "[t]he court

12  ruled that all material created by Siegel after [that] 1938 employment agreement with

13  DCI" was "work-for-hire." Complaint, ¶ 146 n.5. Thus, whether Shuster continued

14  to work for DC thereafter under different agreements is not pertinent to whether the

15  "work for hire" determinations in *Siegel* binds DC, since all post-1938 works by

16  Siegel and Shuster were found to be "work-for-hire."

17                          **CONCLUSION**

18         Plaintiff's First and Second Claims for Relief should be dismissed or stayed.

19  DATED: March 29, 2010          TOBEROFF & ASSOCIATES, P.C.

20

21                          By_____
                                      Marc Toberoff

22                          Attorneys for Defendants Mark Warren Peary,
                            as personal representative of the Estate of
23                          Joseph Shuster, Jean Adele Peavy and Laura
                            Siegel Larson

24
───────────────────────
[20] Courts apply the "law of the case" doctrine to ***closely related*** cases. *See Casey v. Planned*
25  *Parenthood*, 14 F.3d 848, 856 (3d Cir. 1994) ("[L]aw of the case rules apply to subsequent
    rulings by the same judge in the same case or a closely related one."); *U.S. v. Musick*, 534 F.
26  Supp. 954 (N.D. Cal. 1982) ("[T]he general rule is that a decision in one case is … the law
    of the case in a related action if it involves the same subject matter and if the points of
27  decision and facts are identical."). Contrary to DC's argument, *Farina v. Nokia*, 578 F.
    Supp. 2d 740, 753 (E.D. Pa. 2008) recognized that, notwithstanding the revisions to the
28  Wright treatise, 18 Federal Rules and Practice § 4478 (2002), "law of the case rules apply to
    subsequent rulings by the same judge in the same case or a closely related one."

                                   12
        DEFENDANTS PEARY AND PEAVY'S REPLY IN SUPPORT OF MOTION TO DISMISS FAC

Case: 12-57245, 04/12/2013, ID: 8585288, DktEntry: 24-2, Page 225 of 230

1   Marc Toberoff (State Bar No. 188547)
      *mtoberoff@ipwla.com*
2   Nicholas C. Williamson (State Bar No. 231124)
      *nwilliamson@ipwla.com*
3   Keith G. Adams (State Bar No. 240497)
      *kgadams@ipwla.com*
4   TOBEROFF & ASSOCIATES, P.C.
    2049 Century Park East, Suite 2720
5   Los Angeles, California, 90067
    Telephone:   (310) 246-3333
6   Fax:         (310) 246-3101

7   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
8   Estate of Joseph Shuster, Jean Adele Peavy,
    Joanne Siegel and Laura Siegel Larson

9

10                    **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12   DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

                         Plaintiff,
13                                       Hon. Otis D. Wright II, U.S.D.J.
              vs.
14                                       **MEMORANDUM OF POINTS
                                         AND AUTHORITIES IN
15   PACIFIC PICTURES CORPORATION;       SUPPORT OF DEFENDANTS
     IP WORLDWIDE, LLC; IPW, LLC;        JOANNE SIEGEL AND LAURA
16   MARC TOBEROFF, an individual;       SIEGEL LARSON'S RENEWED
     MARK WARREN PEARY, as personal      MOTION AND MOTION TO
17   representative of the ESTATE OF     DISMISS AND/OR STRIKE
     JOSEPH SHUSTER; JEAN ADELE          PLAINTIFF'S FIRST
18   PEAVY, an individual; JOANNE        AMENDED COMPLAINT
     SIEGEL, an individual; LAURA        PURSUANT TO FED.R.CIV.P.
19   SIEGEL LARSON, an individual,       12(b)(6)**
20   and DOES 1-10, inclusive,
                                         *Originally filed on 9/20/2010 at
21                    Defendants.        Docket No. 78*

22                                       Complaint filed:  May 14, 2010
                                         Trial Date:  None Set
23
                                         Date:    February 14, 2011
24                                       Time:    1:30 p.m.
                                         Place:   Courtroom 11
25

26

27

28

    SIEGEL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
    RENEWED MOTION TO DISMISS AND/OR STRIKE THIRD AND SIXTH CLAIMS FOR RELIEF

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 226 of 230

1

**INTRODUCTION**

2    DC Comics' ("DC") Third and Sixth Claims for Relief distort the Copyright

3 Act and fundamentally misconstrue Defendants' obligations thereunder.  Defendants

4 Joanne Siegel and Laura Siegel Larson (the "Siegels"), the heirs of Jerry Siegel, and

5 defendant Mark Warren Peary, the duly-appointed personal representative (the

6 "Shuster Executor") of the Estate of Joseph Shuster (the "Shuster Estate"), have

7 properly exercised their rights under 17 U.S.C. §§ 304(c) and (d), respectively, to

8 terminate the prior grants to DC's predecessors by Jerome Siegel ("Siegel") and

9 Joseph Shuster ("Shuster") of the copyright to their famed comic book creation

10 Superman (the "Siegel Termination" and "Shuster Termination," respectively).

11    DC's Third and Sixth Claims are both premised on the erroneous legal position

12 that DC has a statutory "right" to a so-called "period of exclusivity" to negotiate the

13 purchase of the Shuster Estate's recaptured *Superman* copyrights under 17 U.S.C. §

14 304(c)(6)(D).  *See* First Amended Complaint ("FAC"), ¶¶ 167-68.  However, it is

15 clear from the plain language of § 304(c)(6)(D) that it does not provide grantees or

16 their successors (like DC) with any "rights," let alone a right to an exclusive period

17 of negotiation.  It simply provides that a "further grant, or agreement to make a

18 further grant, of any right covered by a terminated grant is valid only if it is made

19 after the effective date of the termination," but that an "agreement for such a further

20 grant may be made between the author or [his heirs] and the original grantee or such

21 grantee's successor in title, after the notice of termination has been served."

22    The statute invalidates any conveyance of terminated rights to a party other

23 than the original grantee before the effective date of the termination, but it does not

24 require the grantor to negotiate with the grantee, contrary to DC's incorrect claims:

25    "Nor does the statute provide for an exclusive period of negotiation.  The
     statute neither compels the terminating party to negotiate with the terminated
26    grantee, nor forbids him from negotiating with anyone else."

27 *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987).  As

28 DC's Third and Sixth Claims are both falsely premised on a fictitious "right" of

1

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS FAC

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 227 of 230

1    exclusive negotiation, both fail as a matter of law, and must be dismissed.

2          Furthermore, DC's claims to an exclusive period of negotiation are moot.  DC

3    argues that two sets of agreements violate its supposed "right":  (1) agreements

4    between defendant Pacific Pictures Corporation and the Shuster Executor (FAC, ¶

5    169), which, as DC is aware, were *cancelled six years ago* (*id.*, ¶ 99) and which were

6    void *ab initio* under § 304(c)(6)(D) as elsewhere alleged in DC's FAC (*id.*, ¶ 167);

7    (2) an agreement between IP Worldwide, LLC and the Siegels, relating to the Siegel

8    Termination, not the Shuster Termination, and which was entered into in 2002, after

9    DC's alleged "right" to exclusive negotiations with the Siegels would have *expired*

10   (*id.*, ¶¶ 81-83, 188); and (3) "consent agreements" between certain defendants (*id.*, ¶¶

11   170, 188).  Such "consent agreements," as alleged, are clearly permitted under §

12   304(c)(6)(D), which invalidates only "[a] further grant, or agreement to make a

13   further grant" of copyright, but does not limit the rights of terminating parties in any

14   other way.  DC has not alleged and cannot allege that the alleged "consent

15   agreements" constitute such a "grant or an agreement to make a further grant."

16         Both the Third and Sixth Claims are also barred by the statute of limitations.

17   The three-year statute of limitations for the Third Claim began to accrue by no later

18   than November **2006**, and expired in November 2009.  The four-year statute of

19   limitations for the Sixth Claim began to accrue by no later than October **2003**, and

20   expired in October 2007.  This complaint was untimely filed in May 2010.

21         In addition, such alleged "consent agreements" are understandings between the

22   Siegels and the Shuster Estate regarding settlement strategy, which were disclosed

23   solely in connection with the parties' settlement mediation and pursuant to a JAMS

24   Confidentiality Agreement with DC.  DC and its counsel willfully breached this

25   JAMS Confidentiality Agreement by their references to such "consent agreements" in

26   the FAC.  DC and its counsel have also willfully breached this Court's January 14,

27   2009 order in the related Superman action (Case No. 04-CV-8400) forbidding such

28   disclosure.  DC's improper references to "consent agreements" in its FAC must be

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS FAC

**SER 222**

1   stricken pursuant to F.R.C.P. 12(f), and once such allegations are stricken, the Third
2   and Sixth Claims must be dismissed for failure to state a claim.
3       DC's vaguely-pled Sixth Claim under California's "Unfair Competition Law"
4   (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ("UCL") is also clearly preempted by the
5   Copyright Act, because it is premised on DC's allegations that Defendants' conduct
6   is "unlawful" under the Copyright Act. FAC, ¶¶ 187-89.  To the extent the Sixth
7   Claim alleges that Defendants' conduct is somehow "unfair" because it "impedes"
8   DC's settlement (*i.e.*, purchase) of the recaptured Superman copyrights, it also fails:
9   the Siegels' or Shuster Executor's alleged agreements amongst themselves as to how
10  they wish to negotiate with DC cannot constitute an "unfair" practice because they
11  are free to negotiate in their own best interest.  *See Racine & Laramie, Ltd. v. Dep't*
12  *of Parks & Recreation*, 11 Cal. App. 4th 1026, 1034 (1992).

## ARGUMENT

14  **I.    LEGAL STANDARD**
15      Pursuant to F.R.C.P. 8(a)(2), a complaint must contain "a short and plain
16  statement of the claim showing that the pleader is entitled to relief."  However, to
17  survive a motion to dismiss under F.R.C.P. 12(b)(6), "a complaint must contain
18  sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"
19  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v.*
20  *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the
21  plaintiff pleads factual content that allows the court to draw the reasonable inference
22  that the defendant is liable for the misconduct alleged."  *Ashcroft*, 129 S.Ct. at 1949.
23  However, "labels and conclusions" are meaningless, and a "formulaic recitation of
24  the elements of a [claim] will not do."  *Twombly*, 550 U.S. at 555.  "Factual
25  allegations must be enough to raise a right to relief above the speculative level."  *Id.*
26  "[W]here the well-pleaded facts do not permit the court to infer more than the mere
27  possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that
28  the pleader is entitled to relief'" and, on that basis, must be dismissed.  *Ashcroft,* 129

SIEGEL DEFENDANTS' MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS FAC

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 228 of 230

Case: 12-57245, 04/12/2013, ID: 8588288, DktEntry: 24-2, Page 229 of 230

1

2    **4.    The Third and Sixth Claims Necessarily Fail, Once Such
            Privileged Settlement Information Is Stricken**

3        DC's Third and Sixth Claims are inextricably based on allegations purporting

4    to disclose privileged Confidential Settlement Information in willful violation of the

5    parties' JAMS Confidentiality Agreement, and this Court's January 14, 2009 Order.

6    *See* FAC, ¶¶ 101, 170-73, 188-89, 192-93.  Once such allegations are properly

7    stricken by the Court pursuant to F.R.C.P. 12(f), the Third and Sixth Claims

8    necessarily fail.  *See In re Connetics Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1006

9    (N.D. Cal. 2008) (granting motion to dismiss where "the complaint cannot possibly

10   make sufficient allegations … in the absence of the stricken paragraph"); *Fraker v.*

11   *Bayer*, 2009 U.S. Dist. LEXIS 125633, at *24 (E.D. Cal. Oct. 2, 2009) (where

12   "portion of the [complaint] that alleges a factual basis for Plaintiff's claim … has

13   been order[ed] stricken … [the] claim must fail for failure to state a claim").

14                                    **CONCLUSION**

15       For the foregoing reasons, Plaintiff's Third and Sixth Claims for Relief should

16   be dismissed with prejudice.

17   DATED:  January 14, 2011            TOBEROFF & ASSOCIATES, P.C.

18

19                                       By _____
                                             Marc Toberoff
20
                                         Attorneys for Defendants Mark Warren Peary,
21                                       as personal representative of the Estate of
                                         Joseph Shuster, Jean Adele Peavy, Joanne
22                                       Siegel and Laura Siegel Larson

23

24

25

26

27   prevent disclosure of any such confidential information").  Defendants therefore will
     respectfully request that DC as well as the closely affiliated defendants in the related
28   *Superman* and *Superboy* cases be enjoined from any further use of such privileged
     "Confidential Settlement Information."

| 9th Circuit Case Number(s) | 12-57245 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) April 12, 2013 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    s/ Cassandra L. Seto

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# CERTIFICATE OF SERVICE
## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)