APPELLATE CASE NO. 12-57245

Oral Argument Scheduled for May 23, 2013
(Reinhardt, J.; Thomas, J.; Sedwick, D.J.)

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC;
MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the
Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal
representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

### APPELLANTS' REPLY BRIEF

Appeal From The United States District Court for the Central District of
California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
  *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
  *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:    (310) 246-3101

*Attorneys for Defendants-Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................4

I. THE ORDER IMPROPERLY GRANTED DC'S FIRST CLAIM ...............4

    A. Congress Intended To Protect The Termination Right Against
        Contractual Erosion...............................................................................4

    B. The Cases Turn On The Presence Or Absence Of Termination
        Leverage To Re-Negotiate A Pre-1978 Copyright Grant ....................6

        1. DC's Arguments Are Unpersuasive ........................................10

    C. The 1992 Agreement Is Not A "Revocation" of Joe Shuster's
        Superman Grants Nor A "Re-Grant" Of His Copyrights....................13

        1. DC's New York Law Arguments Fail ......................................17

    D. The Record Belies DC's Claim..........................................................21

    E. The Order Drew Improper Inferences Against Defendants...............25

    F. The Order Contravenes Congress' Intent And Enables Easy
        Circumvention Of The Termination Right.........................................26

II. DC'S REMAINING FIRST CLAIM ARGUMENTS CAN BE
    DISPOSED OF ...................................................................................29

III. DC'S THIRD CLAIM SHOULD BE DENIED...........................................30

CONCLUSION ...............................................................................................30

CERTIFICATE OF COMPLIANCE...............................................................31

CERTIFICATE OF SERVICE ........................................................................32

i

## <u>TABLE OF AUTHORITIES</u>

*Albany Sav. Bank, F.S.B. v. Halpin,*
117 F.3d 669 (2d Cir. 1997)................................................................. 17-18

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
548 U.S. 291 (2006).............................................................................12

*Associated Food Stores, Inc. v. Siegel,*
205 N.Y.S.2d 208 (1960).....................................................................18

*Beck v. Manufacturers Hanover Trust Co.,*
481 N.Y.S.2d 211 (1984)..................................................................... 18

*Blair & Co. v. Otto,*
171 N.Y.S.2d 203 (1958)......................................................................20

*Bourne Co. v. MPL Commc'ns, Inc.,*
675 F. Supp. 859 (S.D.N.Y. 1987) ......................................................30

*California Pro-Life Council, Inc. v. Getman,*
328 F.3d 1088 (9th Cir. 2003) ........................................................ 29-30

*Classic Media, Inc. v. Mewborn,*
532 F.3d 978 (9th Cir. 2008) .........................................................*passim*

*Classic Media, Inc. v. Mewborn,*
2006 U.S. Dist. LEXIS 90957 (C.D. Cal. Feb. 16, 2006) ....................15

*Fair Hous. Council v. Riverside Two,*
249 F.3d 1132 (9th Cir. 2001) .............................................................25

*Fred Fisher Music Co. v. M. Witmark & Sons,*
318 U.S. 643 (1943)..........................................................1, 3-4, 27-28

*Goldbard v. Empire State Mut. Life Ins. Co.,*
171 N.Y.S.2d 194 (1958)......................................................................19

*Goldome Corp. v. Wittig,*
634 N.Y.S.2d 308 (1995)................................................................ 19-20

*Healy v. Healy*,
594 N.Y.S.2d 90 (1993) ................................................................. 3, 18

*Hemlani v. Guerrero*,
902 F.2d 1412 (9th Cir. 1990) ........................................................ 29

*Independent Energy Corp. v. Trigen Energy Corp.*,
944 F. Supp. 1184 (S.D.N.Y. 1996) ................................................ 20

*Larry Spier, Inc. v. Bourne Co.*,
953 F.2d 774 (2d Cir. 1992) ........................................................ 5, 27

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002) ............................................................ 5

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (2005) (9th Cir. 2005) .................................... *passim*

*Music Sales Corp. v. Morris*,
73 F. Supp. 2d 364 (S.D.N.Y. 1999) ................................................ 5

*N.F.L. Ins. by Lines v. B & B Holdings*,
874 F. Supp. 606 (S.D.N.Y. 1995) ................................................. 21

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001) ......................................................................... 5

*National American Corp. v. Federal Republic of Nigeria*,
597 F.2d 314 (2d Cir. 1979) .......................................................... 20

*Palm Desert Art, Inc. v. Mohr*,
2001 U.S. Dist. LEXIS 620 (N.D.N.Y Jan. 26, 2001) .................... 20

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ..................................................... *passim*

*Private One of N.Y., LLC v. JMRL Sales & Serv.*,
471 F. Supp. 2d 216 (E.D.N.Y. 2007) ........................................... 20

iii

*Ray Charles Found. v. Robinson*,
2013 U.S. Dist. LEXIS 21273 (C.D. Cal. Jan. 25, 2013) ............................... 5-6, 27

*Russ v. Morrison*,
695 F. Supp. 2d 33 (S.D.N.Y. 2010) ....................................................................18

*Stewart v. Abend*,
495 U.S. 207 (1990) ........................................................................................1, 5

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
736 F. Supp. 1281 (S.D.N.Y. 1990) ..............................................................18, 20

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (2004) ............................................................................................17

*Wang v. Chen*,
1992 WL 7840 (S.D.N.Y. Jan. 10, 1992) ............................................................18

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir. 1995)...................................................................................21

## Statutes

17 U.S.C. § 203 ...............................................................................................12, 28

17 U.S.C. § 301 .......................................................................................................28

17 U.S.C. § 304(c) ...........................................................................................*passim*

17 U.S.C. § 304(d) ....................................................................................................1

## Other Sources

H.R. Rep. No. 1476, 94th Congress, 2d Sess. (1976)........................................4, 12

H. Comm. On The Judiciary, 88th Cong., Discussion And Comments On The
Report Of The Register Of Copyrights (Comm. Print 1963) .................................26

iv

## **INTRODUCTION**

For two centuries, Congress has provided authors and their families with the right to recover previously-transferred copyrights, to allow them to participate in the real value of their works and to remedy the sharp imbalance between publishers and authors. *Stewart v. Abend*, 495 U.S. 207, 218-21 (1990). Under all copyright acts, the renewal copyright was intended to revert to the author so as "to provide for [his] family … after his death." *Id.* at 217. However, *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943), effectively gutted Congress' plan by allowing renewal rights to be pre-assigned, and publishers to insist on this.

When Congress extended the renewal term in the 1976 Copyright Act, it therefore provided authors and their families with an inalienable right to recover their copyrights for the extended term by terminating old grants. In reaction to *Fred Fisher*'s frustration of its objectives, Congress spoke unequivocally: "Termination of the grant may be effected notwithstanding any agreement to the contrary…." 17 U.S.C. § 304(c)(5). By use of the word "any," Congress mandated that this clause cover as broad a range of agreements as possible.

In 1998 Congress reaffirmed its objectives in the Copyright Term Extension Act ("CTEA"), coupling a further term extension with a second termination right (Section 304(d)); expanding the class of statutory heirs to include an author's estate; and again ensuring that this right could not be anticipatorily waived, settled

1

or otherwise alienated.

In adopting DC's erroneous arguments that a 1992 pension agreement with Shuster's siblings barred the termination right, the district court's order (ER-1-18; "Order") invites all manner of opportunistic behavior to frustrate Congress' goals.

The Order misconstrued and contravened this Court's holdings in *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (2005) (9th Cir. 2005) and *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), along with *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), on which it purported to rely.

In light of Section 304(c)(5) and Congress' clear intent to protect the termination right, those cases narrowly held as follows: Where a statutory heir uses her termination rights as leverage to re-negotiate an author's pre-1978 copyright grant, her express post-1978 revocation and re-grant will not be viewed as an "agreement to the contrary" because it achieves "the very result envisioned by Congress when it enacted the termination provisions." *Milne*, 430 F.3d at 1047; *see also Mewborn*, 532 F.3d at 987-88; *Steinbeck*, 537 F.3d at 202, 204. Where the termination right is not used as bargaining leverage, an heir's purported post-1978 re-grant, though alleged to supersede a pre-1978 grant, does <u>not</u> bar the termination right. *Mewborn*, 532 F.3d at 989.

The 1992 Agreement fails to satisfy this vigilant standard in every way. Prior to CTEA's passage in 1998, *no one* held Shuster termination rights.

2

Shuster's siblings could hardly have "leveraged" a non-existent right.

DC also failed to provide any evidence that the parties even intended a "revocation and regrant." The simple pension agreement purports to do neither, unlike the very explicit agreements in both *Milne* and *Steinbeck*. This is unsurprising – in 1992, there was no plausible reason for DC to revoke Shuster's venerable Superman grants that had been upheld in two Court judgments. ER-113-15 ¶¶13-15.

Nor does New York law salvage DC's frivolous claim, as it naturally requires evidence of a "clear and definite" intent to revoke and replace a prior contract. *Healy v. Healy*, 594 N.Y.S.2d 90, 91 (1993).

The Order's misconstruction of the 1992 Agreement to "impliedly" eliminate the termination right – when all the evidence pointed to a contrary conclusion – flies in the face of Congress' intent to safeguard the right.

Under the Order, all that is needed to eradicate the termination right is some post-1978 quitclaim by non-statutory heirs that references copyrights. That is not the law, and is blatantly inconsistent with the statute, Congress' clear objectives, and binding precedent. If allowed to stand, the Order would make a mess of this Court's carefully-circumscribed decisions in *Milne* and *Mewborn*, turn a vital federal right into a state contract free-for-all, and pave the way for its easy circumvention. *Fred Fisher*, all over again.

3

# ARGUMENT

## I.  THE ORDER IMPROPERLY GRANTED DC'S FIRST CLAIM

### A.  Congress Intended To Protect The Termination Right Against Contractual Erosion

Congress has long recognized that authors, to see their works published, often agree to one-sided copyright transfers that publishers make as expansive as possible for as little compensation as possible.  The termination provisions were designed to "to 'safeguard authors against unremunerative transfers' and improve the[ir] 'bargaining position.'"  *Milne*, 430 F.3d at 1046 (citations omitted).

> A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.

H.R. Rep. No. 1476, 94th Congress, 2d Sess. ("H.R. Rep. 94-1476") at 124 (1976). This concern was "even more persuasive under section 304" as to pre-1978 grants:

> [T]he extended [renewal] term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it.

*Id.* at 140; *see Mewborn*, 532 F.3d at 984 (same), 985 ("This term extension was intended, once again, to benefit authors and their heirs, and not to serve as a windfall for grantees.").

Publishers had long contracted around Congress' efforts to protect authors and their families, facilitated by *Fred Fisher*.  To prevent such contractual erosion

4

and judicial frustration of the termination right, Congress was clear: "Termination of the grant may be effected notwithstanding any agreement to the contrary…." 17 U.S.C. § 304(c)(5). The plain meaning is that termination rights may be exercised despite any contractual device or interpretation that divests them.

This provision, combined with Section 304(c)(6)(D), barring re-grant of recaptured copyrights before termination notices are served, protects the right by preventing the preemptive settlement or sale of the termination interest, no matter how beneficial this might appear. No one – not authors, statutory or testamentary heirs – can alienate termination rights, as "[Section 304(c)] was drafted so as to leave no doubt about the family's power to recapture the [author's] copyright." *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 779 (2d Cir. 1992). *See N.Y. Times v. Tasini*, 533 U.S. 483, 496 n.3 (2001) (noting the "inalienable authorial right to revoke a copyright transfer"); *Stewart,* 495 U.S. at 230 ("inalienable termination right"); *Mewborn*, 532 F.3d at 985, 986 (noting "inalienable" nature of right); *Marvel Characters v. Simon*, 310 F.3d 280, 282 (2d Cir. 2002) (same).

"[T]he right cannot be waived in advance or contracted away." H.R. Rep. 94-1976 at 125. *See Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 372 (S.D.N.Y. 1999) ("Neither the author nor the statutory heirs may contract away their termination right…."); *Ray Charles Found. v. Robinson*, 2013 U.S. Dist. LEXIS 21273, at *21-22 (C.D. Cal. Jan. 25, 2013) ("[T]he Copyright Act prevents

5

the Court from interpreting the agreements signed by Defendants as limiting their statutory termination rights."). While otherwise enforceable, contracts used to block statutory termination, directly or indirectly, are prohibited "agreements to the contrary" under Section 304(c)(5), with one narrow exception described below in Section I.B. *Id.* ("[A]greements [] interpreted to waive Defendants' rights to recapture the copyrights at issue … are plainly 'agreements to the contrary' of the Copyright Act's termination provisions and are unenforceable to that extent.").

## B. The Cases Turn On The Presence Or Absence Of Termination Leverage To Re-Negotiate A Pre-1978 Copyright Grant

In examining whether a post-1978 re-negotiation that effectively eliminated the termination right was void as an "agreement to the contrary," *Milne, Mewborn* and *Steinbeck* all focused on whether a statutory heir had leveraged his/her termination right and achieved its legislative purpose. In denial, DC spends nine pages arguing that the decisions do not require a termination right. Dkt. 24-1 ("AB") 35-44. DC's claim falls apart on reading the three cases, which *all* highlight this critical element.

*Milne* spent paragraph after paragraph explaining that Christopher Milne's post-1978 renegotiation, though effectively eliminating the termination right, was not "contrary" to Congress' objectives, because Christopher held and fully leveraged his termination right:

Christopher …. **us[ed] the bargaining power conferred by his termination right** … result[ing], by some estimates, in a net gain of hundreds of millions of dollars....

*Milne*, 430 F.3d at 1040-41 (emphasis added).

The beneficiaries of the Pooh Properties Trust were able to obtain considerably more money **as a result of the bargaining power wielded by the author's son, Christopher, who was believed to own a statutory right to terminate the 1930 grant under section 304(c)**…. **Although Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal**....

*Id.* at 1044-45 (emphasis added).

**Congress sought to foster this purpose [of safeguarding authors/heirs against unremunerative transfers and improving their bargaining position] by permitting an author's heirs to use the increased bargaining power conferred by the imminent threat of statutory termination to enter into new, more advantageous grants. This is exactly what Christopher and the other beneficiaries of the Pooh Properties Trust did in 1983.** After more than 50 years of advancement of the Pooh works in the marketplace, their value was sufficiently demonstrated, and **the 1976 Copyright Act provided Christopher a window for termination. The Pooh Properties Trust recognized the perceived right to terminate as a valuable bargaining chip, and used it to obtain an advantageous agreement that doubled its royalty share relative to SSI's share. Thus, the 1983 agreement exemplifies the increased bargaining power that Congress intended to bestow on authors and their heirs by creating the termination right under the 1976 Copyright Act.  As the 1983 agreement appears to be the type expressly contemplated and endorsed by Congress, we do not consider it to be a prohibited "agreement to the contrary" under section 304(c)(5).**

*Id.* at 1046 (emphases added).  Two more paragraphs were spent explaining how

Christopher's post-1978 re-negotiation achieved "the very result envisioned by

Congress when it enacted the termination provisions" and "the very purposes for which Congress enacted the termination right." *Id.* at 1046-47, 1048.

Consistent with *Milne, Mewborn* focused on the heir's lack of termination leverage in a post-January 1, 1978 re-grant, in contrast to Christopher's "immediately investative" (532 F.3d at 989) termination rights:

> Mewborn's predicament is a far cry from Christopher Milne's. Milne had–and knew that he had–the right to vest copyright in himself at the very time he revoked the prior grants and leveraged his termination rights…. **Mewborn, on the other hand, would not have the right to serve the advance notice that would vest her rights under § 304(c)(6)(B) until at the very earliest six years later. Thus, unlike Milne, Mewborn had nothing in hand with which to bargain.**

*Id.* (emphasis added).

> The district court misrelied upon *Milne*. *Milne* presented quite a distinct factual scenario with very different statutory implications. **Whereas Mewborn in 1978 did not even have the right to serve an advance notice of termination** … for another six years as to the story and eight for the novel, **the heir in Milne had the present right to serve an advance notice of termination, and could exercise it at any moment. Thus when the Milne heir chose to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, it was tantamount to following the statutory formalities, and achieved the exact policy objectives for which § 304(c) was enacted**.

*Id.* at 987 (citations omitted; emphases added).

> Our court in *Milne* did not find waiver or relinquishment of any right. What it did conclude was that the particular negotiated deal before it was not "any agreement to the contrary;" **it was an agreement consistent with, and which fully honored Christopher's right of termination which could vest immediately if he served notice. …. The avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the**

8

**congressional purpose underlying them**.

*Id.* at 988 (emphasis added).

While not binding here, *Steinbeck* engaged in a strikingly similar analysis, noting Elaine Steinbeck's use of her termination right as leverage and how her post-1978 renegotiation comported with Congress' intent:

> [N]o termination right was exercised prior to the 1994 Agreement, but **Elaine Steinbeck did renegotiate and cancel the 1938 Agreement <u>while wielding the threat of termination</u>. Indeed, this kind of renegotiation appears to be exactly what was intended by Congress.**

*Id.* at 202 (emphasis added).

> It should be noted that **under our view, authors or their statutory heirs <u>holding termination rights</u> are still left with an opportunity to threaten (or to make good on a threat) to exercise termination rights and extract more favorable terms** from early grants of an author's copyright. But nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them. **In this case, Elaine Steinbeck had the opportunity in 1994 to renegotiate the terms of the 1938 Agreement to her benefit, <u>for at least some of the works covered by the agreement were eligible, or about to be eligible, for termination</u>**. By taking advantage of **this opportunity**, she exhausted the single opportunity provided by statute to Steinbeck's statutory heirs to revisit the terms of her late husband's original grants of licenses to his copyrights. **It is no violation of the Copyright Act to execute a renegotiated contract where <u>the Act</u> gives the original copyright owner's statutory heirs <u>the opportunity</u> and incentive to do so.**

*Id.* at 204 (emphases added; citation omitted).

In short, both this Court and the Second Circuit based their decisions about whether an alleged post-1978 "revocation and regrant" could effectively eliminate

the termination right, or was prohibited by Section 304(c)(5), on whether it had leveraged the contracting heir's termination right – thereby achieving "the very purposes for which Congress enacted the termination right." *Milne*, 430 F.3d at 1048.

### 1. DC's Arguments Are Unpersuasive

DC's strained attempts to satisfy these binding precedents are to no avail.

(i) To impersonate *Milne*, DC vaguely argues that Jean (without counsel) was aware of "termination." AB-38. DC refers to hearsay in a letter from Frank (ER-1242), and Jean's 1999 letter, saying she would not bring a "claim." SER-114. The Order erroneously implied that this somehow satisfied *Milne*. ER-4, 10-11, 13. Both letters are legally irrelevant. As a matter of law, Jean and Frank had ***no termination rights or leverage*** in 1992 and "nothing in hand with which to bargain." *Mewborn*, 532 F.3d at 589. In 1992, termination rights were still limited under Section 304(c)(2) to an author's surviving spouse, children and grandchildren. Joe Shuster had none. DC knew this and told Jean, in 1992, that "we've done extensive research into the copyright act and any potential rights that you and Frank may have as Joe's siblings and survivors. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever." ER-706. The 1992 Agreement was certainly *not* the "'one opportunity … to use termination rights,'" as the Order incorrectly held. ER-11

10

(quoting *Steinbeck*); ER-13.

(ii)     Unable to satisfy *Milne* and *Mewborn*, DC seeks refuge in *Steinbeck*, falsely claiming that Elaine Steinbeck lacked termination rights.  AB-36-38.  The Second Circuit specifically noted that "Elaine Steinbeck held a one-half interest in the statutory termination rights."  537 F.3d at 198 n.3.  Under Section 304(c)(1), she needed only one of the author's children to terminate, which was easily foreseeable.  Contemporaneously with her 1994 agreement, Elaine entered into a second agreement concerning other works that Steinbeck's children swiftly ratified.  *Id.* at 196 n.1.  Elaine also had a power of attorney that arguably allowed her to exercise the children's termination rights.  *Id.* at 203 n.5.  Thus, when Elaine negotiated the 1994 Agreement, she "wield[ed] the threat of termination."  *Id.* at 202.  At most, DC's mischaracterization of *Steinbeck* does not salvage its claim, but simply conflicts with *Milne* and *Mewborn*, which control.  The Order nonetheless adopted and relied heavily on DC's misleading rendition of *Steinbeck*. ER-8-9, 11-13.

(iii)    DC also repeatedly cites an out-of-context snippet from the voluminous legislative history of the 1976 Act to argue that alleged successors may eliminate the termination right by entering into a new contract "at any time." AB-4, 22, 24-25, 36-37, 43.  This fails for many reasons.

*Milne,* far from endorsing DC's position, simply cited this legislative

11

statement to note that a party with termination rights "may contract, as an alternative to statutory termination, to revoke a prior grant by replacing it with a new one," and then emphasized Christopher's "use [of] the increased bargaining power conferred by the imminent threat of statutory termination to enter into new, more advantageous grants." 430 F.3d at 1045-46.

DC misleadingly truncates the actual legislative history:

Section 203 would not prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one, thereby causing another 35-year period to start running.

H.R. Rep. 94-1476 at 127. The reference to Section 203 is crucial. Section 203 allows termination of an author's post-1978 grants after thirty-five years; a re-grant by an author is not an "agreement to the contrary" because it does not eliminate the termination right, but merely resets the clock. In contrast, a post-1978 "revocation and re-grant" by an author's successor eradicates the Section 304 termination right, evoking Section 304(c)(5).

Finally, even if DC's legislative history argument supported it, this cannot reverse Section 304(c)(5)'s clear text. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006).

(iv)    DC attacks an "adequacy of consideration" straw man. AB-19, 38, 44-45. Courts examine whether the consideration reflects the bargaining leverage of termination. *See Milne*, 430 F.3d at 1047-48; *Steinbeck*, 537 F.3d at 196, 204;

12

*Mewborn*, 532 F.3d at 989.  The amount is not dispositive, particularly here, where there was no termination right.  The 1992 Agreement's modest $25,000/year pension, split two ways, simply underscores the absence of any bargaining leverage regarding the extremely valuable Superman copyright.[1]

## C.    The 1992 Agreement Is Not A "Revocation" of Joe Shuster's Pre-1978 Superman Grants Nor A "Re-Grant" Of His Copyrights

DC's argument that a post-1978 "revocation and re-grant" by an author's beneficiary, with no termination right, can eliminate the termination right of statutory successors is contrary to the Copyright Act, Congress' intent, *Milne*, *Mewborn* and *Steinbeck*.  This Court, however, need not even reach this issue, because there was no revocation of Shuster's pre-1978 Superman grants nor re-grant of his copyrights in the 1992 Agreement, no evidence of any such intent, nor reason to have done so.  Shuster's pre-1978 grants remained fully operative and terminable.

DC's entire opposition assumes its false "revocation and re-grant" construct.  But the 1992 Agreement, drafted by DC, says nothing of the sort, in contrast to the *explicit* revocations and re-grants, in lieu of termination, approved in *Milne* and *Steinbeck*.

---

[1] DC's "today's dollars" calculations are extremely misleading.  ER-127-28 ¶32.  DC's snide innuendoes about the Shuster executor, while not relevant, were revealed as false and misleading below.  ER-144-74 ¶¶43-48, 74-83.

In *Milne*, the "1983 agreement specifically stated: 'The Trustees hereby assign, grant, and set over unto [SSI] all of the rights in and to [the Pooh works] which were transferred to [Slesinger by virtue of the 1930 grant].'" 430 F.3d at 1040 n.4 (alterations in original). This Court acknowledged that the agreement expressly "provided for the revocation of the 1930 and 1961 agreements in favor of the new agreement, followed by the re-granting (on the same page) of the rights in the Pooh works to SSI." 430 F.3d at 1040, 1044 (emphasizing "undisputed fact[] that the 1930 grant was expressly revoked").

*Steinbeck* was similarly explicit. The author's 1938 agreement gave Penguin "the 'sole and exclusive right' to publish the works in the United States and Canada." 537 F.3d at 196. The 1994 agreement by his widow provided for the continued "publication by Penguin of all works that were covered by the 1938 Agreement," and expressly stated that "'when signed … [it] will cancel and supersede the previous agreements for the [works] covered thereunder.'" *Id.* (alterations in original). Like *Milne*, *Steinbeck* emphasized the "clear expression of intent to terminate all prior grants" and replace them with a new grant: "The language of the 1994 Agreement makes clear that the parties intended that the 1938 Agreement be terminated." *Id.* at 200.

In *Mewborn,* this Court revisited these issues and expressly refused to expand *Milne* beyond "its distinct factual scenario." 532 F.3d at 987. The

14

publisher claimed a 1978 assignment that did <u>not</u> expressly revoke a pre-1978 grant, but purported to re-grant already-assigned rights, barred termination as an implied revocation and re-grant. *Classic Media, Inc. v. Mewborn*, 2006 U.S. Dist. LEXIS 90957, at *9-10 (C.D. Cal. Feb. 16, 2006). Like DC, the publisher argued that although the new grant contained no revocation language, it "supersede[d]" the pre-1978 grant by addressing the same subject matter. *Id.* at *6.

This Court firmly rejected such arguments, emphasizing that the 1978 assignment did not "expressly revoke[] the earlier … assignments," as in *Milne*. *Mewborn*, 532 F.3d at 989. To the extent it purported to grant copyrights already owned by the publisher, it was a "nullity." *Id.* at 986, 988 n.7 ("the pre-1978 grants [in *Milne*] had already been expressly revoked"), 989 ("Examining the language of Milne's 1983 revocation and re-grant of rights in comparison to Mewborn's 1978 Assignment further underscores the different nature of the intended agreements…. Milne's 1983 assignment … expressly revoked the earlier 1930 and 1961 assignments…."). DC's circular attempt to distinguish *Mewborn*, by erroneously assuming that the 1992 Agreement revoked Shuster's pre-1978 grants, is unpersuasive. AB-39-42.

In 1992, DC unequivocally owned Shuster's Superman copyrights pursuant to his pre-1978 grants – fully performed decades earlier and twice held to have transferred *all* his Superman rights to DC. ER-113-15 ¶¶13-15. As in *Mewborn*,

15

nothing in the 1992 Agreement purported to revoke the operative pre-1978 grants, which are now subject to termination.

The 1992 Agreement is even farther afield from *Milne* and *Steinbeck* than the 1978 assignment in *Mewborn,* which purported to re-grant the previously-assigned rights. The 1992 Agreement did not even attempt to re-grant Joe Shuster's copyrights, but merely quitclaimed *Frank and Jean's* rights, if any:

> We ask you to confirm by your signatures below that this agreement **fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise**, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. **In any event, you now grant to us any such rights** ["which you may have under any other agreements or otherwise"]….

ER-704 (emphases added).

This language is clear. It concerns "claims to any payments or other rights or remedies" that Frank and Jean "may have under any other agreement or otherwise." "Such rights" in the second sentence refers to the same thing – Frank and Jean's rights, if any. This is a quitclaim by Frank and Jean, not a re-grant of the author's copyrights, as emphasized by DC when it told Jean that "you don't have any legal rights or claims whatsoever." ER-706.

Even if the 1992 Agreement were misconstrued to grant Joe's already-assigned copyrights, it would be a "nullity" with no effect on termination rights. *Mewborn*, 532 F.3d at 986.

16

This is not a question of "magic words." There is simply no language in the 1992 Agreement to support DC's frivolous arguments.[2]

### 1.    DC's New York Law Arguments Fail

DC tries to dodge *Milne* and *Mewborn* with false argument that, under New York law, a contract with the same "subject matter" as a prior contract impliedly revokes it, "even if the second contract does not say so." AB-27-28. First, as shown above, the 1992 quitclaim of *Jean and Frank's* rights, if any, does not even purport to replicate *Shuster's* pre-1978 copyright transfers. Second, New York law does not permit courts to "imply" terms not in an agreement:

> "[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." Hence, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (citations omitted). If, for no apparent reason, DC intended to replace Shuster's pre-1978 grants, it would and should have included such language. *See Albany*

---

[2] DC's red herring that Jean silently acted on behalf of Shuster's estate is unsupported by its cited cases. Shuster's estate was not probated in 1992 and none of the steps required to transfer his property were taken. *See* Cal. Probate Code §§ 13100-13116. DC's sole "evidence" for this, adopted in the Order (ER-3), is a letter from Jean to Time Warner, where she merely says that "As heir to [Joe's] will, I am responsible for paying off his credit card debts, along with any bills that will be coming in." ER-302.

*Sav. Bank, F.S.B. v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) ("New York contract law includes the rule that ambiguities in contract should be construed against the drafter.").

Third, New York law requires that "[c]ancellation or rescission of a contract must be clearly expressed … unqualified and positive, express and absolute." *Associated Food Stores, Inc. v. Siegel*, 205 N.Y.S.2d 208, 210 (1960) (quotations omitted). Under New York law, DC has the burden to provide evidence of "a 'clear and definite' intent to effect a novation," which it entirely failed to do. *Healy,* 594 N.Y.S.2d at 91; *see Beck v. Manufacturers Hanover Trust Co.*, 481 N.Y.S.2d 211, 218 (1984) (same).

"'New York courts have set a stringent standard for novation,'" *Russ v. Morrison*, 695 F. Supp. 2d 33, 53 (S.D.N.Y. 2010) (citation omitted), which "must never be presumed." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1284 (S.D.N.Y. 1990). *See Wang v. Chen*, 1992 WL 7840, at *6 (S.D.N.Y. Jan. 10, 1992) (same; "[a]pplying this high standard … we can see that there has been no novation").

DC nowhere addresses this law nor supports its erroneous theory that touching upon the same "subject matter" causes a novation. Instead, DC misrepresents a variety of cases, involving very different contractual scenarios.

DC first misrepresents *Steinbeck* as holding that a novation occurs whenever

18

"a new contract addresses all of the parties' obligations and remedies on a given

subject." AB-28. *Steinbeck* actually states:

> Under New York law, "parties to an agreement can mutually agree to
> terminate it ***by expressly assenting to its rescission*** while simultaneously
> entering into a new agreement dealing with the same subject matter." Once
> terminated and superseded, the new contract provides all of the parties'
> obligations and remedies for breach. The 1994 Agreement states that "[t]his
> agreement, when signed by Author and Publisher, ***will cancel and supercede***
> the previous agreements…."

537 F.3d at 200 (emphases added; citations omitted).

DC cites *Goldbard v. Empire State Mut. Life Ins. Co.*, 171 N.Y.S.2d 194

(1958), to argue for an "implied" novation. AB-27-28. *Goldbard* simply noted

that, in certain settlements of contract disputes, courts have found a "superseding

agreement discharging the old … in formalized papers with unequivocal

language." 171 N.Y.S.2d at 200. *Goldbard* found no novation under its facts,

consistent with New York's requirement that the evidence clearly show an intent to

effect a novation. *Id.* at 201-02.

DC's other cases are also readily distinguishable. They acknowledge

novations in certain situations when disputed contract performance obligations are

fully resolved in a settlement agreement. These were not novations because they

were "settlements," but because there was either express contract language, or

other evidence demonstrating a "clear and definite intent" to novate. *See Goldome*

*Corp. v. Wittig*, 634 N.Y.S.2d 308, 309 (1995) (settlement of employment dispute

expressly "establishe[d] that it superseded and extinguished the employment agreement"); *National American Corp. v. Federal Republic of Nigeria*, 597 F.2d 314, 320-21 (2d Cir. 1979) (parties to disputed cement shipment contracts signed formal "discharge agreements"); *Blair & Co. v. Otto*, 171 N.Y.S.2d 203, 205 (1958) (second contract stated it was in "'complete satisfaction'" of prior contract and that parties "'no longer have any interest in such agreement'"); *Palm Desert Art, Inc. v. Mohr*, 2001 U.S. Dist. LEXIS 620, at *3 (N.D.N.Y Jan. 26, 2001) (parties to disputed merger agreement expressly "agreed to undo the merger and restore each corporation to its premerger status").[3] Continuing obligations from the original, settled contracts were inconsistent with the settlement agreements. *See Trans-Orient Marine Corp.*, 736 F. Supp. at 1284 (no novation where the "inconsistencies [between agreements] are insufficient to indicate 'clear and definite intention' to novate").

Unlike the cases DC cites, here, there was no real claim or dispute; nor outstanding obligations of the parties; nor any inconsistency between Shuster's pre-1978 copyright grants and the 1992 Agreement. Shuster sold his Superman

---

[3] *See also Independent Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1193-1194 (S.D.N.Y. 1996) (summary judgment improper as to supercission because "viewed in the light most favorable to plaintiff, the [] agreement is ambiguous"); *Private One of N.Y., LLC v. JMRL Sales & Serv.*, 471 F. Supp. 2d 216, 223 (E.D.N.Y. 2007) (option to purchase superseded by exercise of option in "almost identical" purchase contract).

copyrights to DC long ago, and DC was judged to own his property outright. The 1992 Agreement's release and quitclaim from Jean and Frank did nothing to revoke or supersede the original copyright sale, under New York law or otherwise.

### D. The Record Belies DC's Claim

DC had the burden on summary judgment to present credible evidence that the parties intended a "revocation and re-grant" in the 1992 Agreement, but failed to offer *any* evidence of this. *See Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995) ("[T]he usual rule, requiring a party claiming an exception to bear the burden of proof" applies to termination rights.); *N.F.L. Ins. by Lines v. B & B Holdings*, 874 F. Supp. 606, 611 (S.D.N.Y. 1995) (party "has the burden of establishing all essential terms of the alleged contract"). The 1992 Agreement, and everything else, pointed to the opposite conclusion.

Shuster's pre-1978 grants had twice been upheld, in 1947 and 1974. ER-113-15 ¶¶13-15. When DC voluntarily entered into a 1975 pension agreement with Shuster, it expressly re-affirmed DC's ownership of all Superman rights under his prior grants (ER-662 ¶2), and stated that Shuster "do[es] not now have, and will not in the future have, any rights to Superman." ER-670 ¶7.

In 1992, DC was a part of Time Warner, the world's largest media company, with a well-developed business/legal infrastructure, and Superman was a hugely valuable franchise. In drafting the 1992 Agreement, DC neither mentioned

"Superman" nor identified any pre-1978 grants, and was utterly silent as to "revocation" and/or "re-grant." As no one was eligible for Shuster termination rights, there was no credible reason to revoke Shuster's copyright grants.

DC's *post hoc* argument that, in 1992, it nonetheless intended to exchange Shuster's venerable Superman grants, upheld in two Court judgments, for this ephemeral pension agreement, is frivolous. It is simply not plausible that DC, for no apparent reason, would revoke its critical chain-of-title to the billion-dollar Superman franchise or that, if this were its intention, it would do so in anything less than a clear instrument.[4]

DC concedes the 1992 Agreement is "less elaborate" than its usual "rights agreements," but argues the straw man that only a short statement is required. AB-33-34. This misses the point. DC/Warner's modern rights agreements have clearly-defined transfers of rights (ER-675-76 ¶1(a), 722-29 ¶¶2-4), usually followed by a short-form assignment for recordation/constructive notice (even if not "required"). ER-750. As DC/Warner routinely do this for far less valuable properties, they certainly would have done this for a key Superman grant.

Tellingly, Paul Levitz, DC's long-time former President, who negotiated and

_____

[4] Warner, which had controlled and exploited Superman film, television and merchandising rights for decades, had nothing to do with the inconsequential 1992 Agreement, but would have participated in any critical copyright grant underlying its franchise.

signed the 1992 Agreement, could not bring himself in his supporting declaration

to testify that the 1992 Agreement was intended to be a revocation, re-grant,

supercission, or novation. Notwithstanding DC's fabrication that "Levitz said

exactly that" (AB-47), Levitz's declaration is tellingly silent on the central issue.

ER-1230-33. Levitz merely testified that *every time* an author's family asked DC

for additional money, DC obtained a general quitclaim and release in exchange,

undercutting DC's arguments. ER-1231 ¶8.

　　　The Shuster estate served and filed its termination notice in 2002; yet DC

did not raise its concocted 1992 Agreement defense until 2010. ER-141-42 ¶41.

Similarly, DC's 2005 letter to the Shusters, referencing defenses to the termination,

did not once mention the irrelevant 1992 pension agreement. ER-895-901.[5]

　　　Long after 1992, DC continued to rely on the same pre-1978 grants it now

claims were intentionally revoked.

　　　Though the Superman franchise involves third party partners and licensees,

which often require articulation of DC's chain-of-title, DC was hard pressed to

come up with any such documents mentioning the 1992 Agreement. At the end of

summary judgment briefing, DC finally produced two obscure documents that

---

[5] DC avers to this as a "confidential settlement offer" (AB-48), but DC put that
document at issue below when it first disclosed the Shusters' confidential response.
RER-42, 61, 67.

reference the 1992 Agreement.  ER-67-83.  However, these 2006-07 filings

continued to rely on Shuster's pre-1978 grants, and swore that "pursuant to the

terms and conditions" of those pre-1978 grants, Warner "***owns*** the motion picture

… and ancillary rights in the Superman concept throughout the world in

perpetuity…."  ER-69-70 ¶5 (emphasis added); ER-82 ¶5 (same).

DC's **2011** counterclaims in *Siegel* also admitted that Shuster's pre-1978

grants remain in effect:

> **All grants made by Siegel and Shuster or rights in Action Comics
> No. 1 are still in effect**, and all rights under copyright granted therein
> are still owned exclusively by DC Comics….

Reply Excerpts of Record ("RER") 24 ¶87.  DC tries to explain away such

admissions, but if Shuster's pre-1978 grants were superseded, it would be

impossible for "all grants made by Siegel and Shuster" to be "still in effect."  DC

made a raft of similar allegations.  *See* Dkt. 12, Ex. 2 (As to Siegel and Shuster's

grants, "DC remains (through Shuster's un-terminated interests) a co-owner of the

copyrights…."); RER-21 ¶69 (As to "the May 21, 1948 Consent Agreement [by

Shuster], the grant contained therein to all copyrights related to Superman remains

in full force and effect."), 30 ¶112 ("The grants made by Siegel and Shuster … are

still in effect….").

### E.     The Order Drew Improper Inferences Against Defendants

Courts consider cross-motions for summary judgment individually, examining the evidence in the light most favorable to the non-moving party. *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136-37 (9th Cir. 2001). On DC's motion, the Order improperly viewed the 1992 Agreement in the light *most favorable to DC*, adopting indefensible factual inferences of an intent to revoke Shuster's pre-1978 copyright grants from Jean and Frank's simple quitclaim and release of *their* rights, if any. ER-6-7.

The Order also drew improper inferences from Jean's empty reference to non-existent termination rights (ER-4, 10, 11, 13), while ignoring that DC knew she had "no rights whatsoever." ER-706.

The Order ignored that DC had presented no evidence to support its *post hoc* rationalizations; disregarded defendants' contrary evidence (Section I.D, *supra*), including the language of the 1992 Agreement itself; and, after improperly shifting the burden of proof, erroneously concluded that defendants had presented "no evidence." ER-11.

In this fashion, the Order effectively rewrote the 1992 Agreement to serve DC's motion and eradicate the Shuster estate's termination right, contrary to well-established standards governing summary judgment.

**F.** **The Order Contravenes Congress' Intent And Enables Easy Circumvention Of The Termination Right**

The Copyright Act provides a vital termination right with respect to every copyright that is not a "work made-for-hire," implicating many valuable works. Innumerable authors and statutory heirs have already exercised such rights, and many more will follow.

Clearly, Congress' "'notwithstanding any agreement to the contrary' language was intended to protect against attempted contractual circumvention of the termination right." *Mewborn*, 532 F.3d at 985-86. The termination provisions seek to remedy publishers' prior frustration of the "reversionary feature of the [] renewal system[,]… the source of more confusion and litigation than any other provision in the copyright law." H. Comm. On The Judiciary, 88th Cong., Discussion And Comments On The Report Of The Register Of Copyrights, at 93 (Comm. Print 1963).

Contrary to *Mewborn*, the Order expands *Milne* beyond recognition and invites opportunistic "contractual circumvention," trampling Congress' unequivocal intent to protect to the termination right. It encourages publishers to redo pre-1978 copyright grants or, as here and in *Mewborn*, to make after-the-fact claims that this was their intention. Publishers would need only enter into or find some post-1978 contract with release language or adjustments regarding pre-1978 grants and, on that

basis, argue it "supersedes." The intended beneficiaries of the termination right – authors and their families – who dare exercise it will face ever-more-protracted courtroom battles, perpetuating the imbalance of power Congress sought to remedy. *Mewborn*, 532 F.3d at 982-86.

The Order also undermines Congress' objective "to protect the property rights of widows and children in copyrights," notwithstanding testamentary intent. *Larry Spier, Inc.*, 953 F.2d at 778; *see also Ray Charles Found.*, 2013 U.S. Dist. LEXIS 21273, at *24 n.9. While anyone can be a devisee, spouses and children are statutorily entitled to valuable termination rights. Under the Order, publishers can readily obtain alleged "re-grants" from self-interested devisees or their successors, and defeat the termination rights of statutory heirs without them ever having any opportunity to benefit from it.

This *reverses* Congress' intent, and provides a "windfall" to publishers and authors' successors at the direct expense of the intended beneficiaries of federally-mandated termination rights. *Mewborn*, 532 F.3d at 985.

DC's policy arguments are irrelevant because they are based on the unsupportable assumption that the 1992 Agreement was a "revocation and regrant." DC touts "freedom of contract" (AB-42-44), as did *Fred Fisher*, 318 U.S. at 657, but Congress enacted Section 304(c)(5) precisely to prevent contractual erosion of the termination right and the inequities caused by that

27

decision.  *Mewborn*, 532 F.3d at 985 (noting Congress' objective "[t]o provide

additional protection … from unremunerative transfers and a repeat of *Fred*

*Fisher*").  To level the playing field, the remedial termination right, itself,

overrides state contract law.

    DC's contract supremacy arguments lose sight of the Copyright Act's

preemption of conflicting state law.  17 U.S.C. § 301.  It is no coincidence that

*Milne* and *Mewborn* focused on Congress' objectives and federal copyright law,

not state contract law.  The Order effectively guts the termination right, by

enabling it to be easily eliminated under state law.  By replacing this Court's

"agreement to the contrary" analysis with loose concepts of "novation" or

"supercission," the Order introduces uncertainty and confusion, subjecting a single

copyright law regime to fifty different state contract law regimes.  Its holding

greatly expands the scope of potential litigation, and will burden authors, their

families and the courts with endless lawsuits.

    DC's policy arguments amount to a critique of the Copyright Act, which

expressly abrogates ordinary freedom of contract principles.  *See* 17 U.S.C. §§

304(c)-(d); 203(a); 304(c)(5)) ("Termination…may be effected notwithstanding

any agreements to the contrary…."); 304(c)(6)(D) (restricting anticipatory sale of

termination interest); 304(c)(6)(C) (requiring majority consent for further grants).

    Congress has set the copyright policy of the United States.  DC may not like

28

termination rights, or may disagree with Congress' policy objectives, but it is bound by the statute and this Court's precedents.

## II.    DC'S REMAINING FIRST CLAIM ARGUMENTS CAN BE DISPOSED OF

The parties fully briefed DC's other erroneous arguments regarding the Shuster termination, notwithstanding DC's suggestions to the contrary. AB-49-50. DC's argument that the Shuster estate lacks termination rights (sub-part (1)) was fully briefed on DC's own motion. Dkt. 11 ("OB") 47-51; ER-1004-07, 1164-65, 1222-24, 1326-1328. "The interpretation of this statute is purely a question of law, the issue has been fully briefed, and [this Court is] in as good a position as the [district] court to decide if the statute means what it says." *Hemlani v. Guerrero*, 902 F.2d 1412, 1415 (9th Cir. 1990). DC lost its "majority interest" argument (sub-part (3)) and does not challenge this on appeal. OB-46-47; AB-49. DC conceded its "listing of grants" argument (sub-part (4)) by failing to oppose summary judgment on it below. OB-52-53; ER-98, 453, 1014-15. DC concedes its "unclean hands" argument (sub-part (5)) was fully briefed on defendants' motion. OB-53-58; AB-49; ER-96-98, 468-76, 1015-18.

Defendants properly addressed these issues on appeal; notwithstanding DC's tactical failure to include them in its opposition, this Court can readily dispose of DC's First Claim based on this well-developed record. *See California Pro-Life*

*Council, Inc. v. Getman*, 328 F.3d 1088, 1096 n.5 (9th Cir. 2003) ("The district court … did not reach this issue. We may, nonetheless, decide the matter.").

## III. DC'S THIRD CLAIM SHOULD BE DENIED

DC's Third Claim is based on the notion that Section 304(c)(6)(D) gives it "negotiation rights," when it plainly does not, as shown in defendants' opening brief. The statute effectively affords terminated grantees a "competitive advantage," not a statutory right or standing, as recognized in *Milne*, 430 F.3d at 1047, *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 866 (S.D.N.Y. 1987), and leading copyright treatises. OB-59-60.

## <u>CONCLUSION</u>

The judgment should be reversed, and the remainder of DC's First Claim denied or remanded.

Dated: April 26, 2013          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Defendants-Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify that Defendants' attached reply brief is proportionately spaced, has a typeface of 14 points or more, and contains 6,975 words, as measured by the Microsoft Word program used to generate the brief.

Dated:  April 26, 2013          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff

Marc Toberoff

Attorneys for Defendants-Appellants

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the reply brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the reply excerpts of the record was deferred.

Dated: April 26, 2013             TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams

Keith G. Adams

32