APPELLATE CASE NO. 12-57245

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

### APPELLANTS' REPLY EXCERPTS OF RECORD (VOL. I OF I)

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@toberoffandassociates.com*
Keith G. Adams (240497)
 *kgadams@toberoffandassociates.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants*

# INDEX TO APPELLANTS' ELECTRONIC REPLY EXCERPTS OF RECORD

| Date | Docket | Title | Vol. | Page |
|------|--------|-------|------|------|
| 8/20/2012 | 479 | Declaration of Keith Adams re: Defendants' Motion for Summary Judgment | | |
| | | (previously attached at Excerpts of Record, Vol. III, p. 541-551) | | |
| | | *Exhibit PP – DC's Second Amended Counterclaims filed in Siegel, dated February 17, 2011* | I | 1 |
| 10/31/2011 | 338 | Excerpts from Defendants' Reply re: Defendants' Consolidated Motion to Dismiss | I | 39 |
| 10/31/2011 | 338-1 | Supplemental Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | I | 45 |
| | | *Exhibit A – April 28, 2005 Letter from Paul Levitz to Jean Peavy and Mark Warren Peary* | I | 51 |
| 10/24/2011 | 334 | Excerpts from DC's Opposition re: Defendants' Consolidated Motion to Dismiss | I | 58 |
| 10/24/2011 | 334-6 | DC's Request for Judicial Notice re: Defendants' Consolidated Motion to Dismiss | I | 63 |
| | | *Exhibit F – May 12, 2005 Letter from Marc Toberoff to Patrick Perkins* | I | 67 |

1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
    cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:  (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
    pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:  (845) 265-2819

11  Attorneys for Defendants and Counterclaimant

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15

16  JOANNE SIEGEL and LAURA          Case No. CV-04-8400 ODW (RZx)
    SIEGEL LARSON,
17                                   SECOND AMENDED
                Plaintiffs           COUNTERCLAIMS
18
                                     The Hon. Otis D. Wright II
19         v.

20  WARNER BROS.
    ENTERTAINMENT INC., DC
21  COMICS, and DOES 1-10,

22              Defendants

23  WARNER BROS
24  ENTERTAINMENT INC, DC
25  COMICS, and DOES 1-10
26         COUNTERCLAIMANT
27         v.
28  JOANNE SIEGEL und LAURA
    SIEGEL LARSON
         COUNTERDEFENDANTS

                                     SECOND AMENDED
                                     COUNTERCLAIMS

COPY

FILED

2011 FEB 17 PM 3:38

CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF
LOS ANGELES

BY

**Exhibit PP**
**445**

**RER-1**

1    On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for

2    Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16.

3    Docket Nos. 637, 643.  For purposes of completeness, defendants hereby reassert

4    the counterclaims contained in the First Amended Counterclaims, Docket No. 42,

5    with changes to reflect only the current date, the updated pleading title, and the

6    Court's dismissal of Time Warner Inc. as a party to this action.  Defendants reserve

7    all rights, including to amend these counterclaims as and when appropriate.

8    Defendant/Counterclaimant DC Comics, for its Second Amended

9    Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura

10   Siegel Larson, alleges:

11                                  **PARTIES**

12   1.    Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a

13   New York General Partnership engaged in the business of, *inter alia*, creating,

14   exploiting, and licensing comic book stories and characters.  DC is the successor in

15   interest to all rights under copyright and other rights, including trademark rights

16   and the good will in and to the first Superman story and all other works and

17   products relating to the Superman character.

18   2.    Upon information and belief, Plaintiff/Counterclaim Defendant Joanne

19   Siegel is an individual and citizen of the State of California, in the County of Los

20   Angeles.  Upon further information and belief, Joanne Siegel is the widow of

21   Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

22   3.    Upon information and belief, Plaintiff/Counterclaim Defendant Laura

23   Siegel Larson is an individual and citizen of the State of California, in the County

24   of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a

25   daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and

26   Laura Siegel Larson are referred to herein as "the Siegels."

27

28

                                     - 1 -                    SECOND AMENDED
                                                             COUNTERCLAIMS

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction of the subject matter hereof under the provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections 1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332, 1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18 U.S.C. § 1367.

5.     Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information and belief, a substantial part of the events giving rise to DC's claims occurred or a substantial part of the properties that are the subject of these counterclaims are situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found in this District.

**FACTS COMMON TO ALL COUNTERCLAIMS**

**Background And History**

6.     Upon information and belief, in or about 1933, Jerome Siegel ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on creating a number of stories, including a story entitled "The Reign of the Superman," which was published in a magazine put out by Siegel and Shuster themselves entitled "Science Fiction." Upon further information and belief, other than the same name, the "Superman" character in this story shared very little, if any, similarity with the character that would later become known as Superman.

7.     Upon information and belief, in early 1933, Siegel and Shuster began collaborating on "comic strips," initially for syndication and eventually for publication in "comic books," a new and growing medium. Among their work together were a number of comic strips featuring a character they named Superman. This Superman character bore virtually no resemblance to the character of the same name that had previously appeared in the "Science Fiction" magazine. Upon

- 2 -

SECOND AMENDED
COUNTERCLAIMS

1    further information and belief, those works, which were never published, included:

2    (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a

3    seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a

4    paragraph previewing Superman exploits; (d) a nine-page synopsis covering an

5    additional two months of daily comic strips; and (e) fifteen daily comic strips

6    (collectively the "Unpublished Superman Works").

7         8.    Upon information and belief, between 1933 and 1937 Siegel and

8    Shuster submitted the Unpublished Superman Works to a number of prospective

9    publishers and newspaper syndicates, but the work was rejected by them all.

10        9.    Meanwhile, between 1935 and 1937, Siegel and Shuster created a

11   number of comics strips that were published, including such titles as "Dr. Occult,"

12   "Henri Duval," and "Spy."

13        10.   On December 4, 1937, Siegel and Shuster entered into an "Agreement

14   of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc.

15   ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster

16   agreed to "give their exclusive services" in producing comic features entitled "Slam

17   Bradley" and "The Spy" for a period of two years.  Under the Agreement, Siegel

18   and Shuster were required to submit any new comics to DCI first, which reserved

19   the right to accept or reject the work for a period of sixty (60) days.

20        11.   Early in 1938, DCI was looking for materials for a new comic book it

21   was intending to publish under the name "Action Comics."  In that connection,

22   upon information and belief, DCI was provided with the twenty four (24) days of

23   Superman comic strips from the Unpublished Superman Works for review.  At the

24   instance and expense of DCI and subject to its right to control, Siegel and Shuster

25   cut and pasted the comic strips, and added certain additional material, to create a

26   thirteen page comic book story which was accepted for publication by DCI.

27        12.   In an agreement with DCI dated March 1, 1938 (the "March 1, 1938

28   Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip

- 3 -                                    SECOND AMENDED
                                         COUNTERCLAIMS

**RER-4**

1 entitled 'Superman' . . . all good will attached thereto and exclusive right to the use

2 of the characters and story, continuity and title of strip . . ." and agreed not to

3 employ Superman and other characters in the strip "by their names contained

4 therein."

5     13. DCI advertised the publication of the new comic story Superman and

6 the new title "Action Comics No. 1" in others of its publications, including but not

7 limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New

8 Adventure Comics No. 26," all of which are cover dated May 1938 and, upon

9 information and belief, were distributed in copies to the public on or before April 1,

10 1938. These advertisements (the "Superman Ads"), which depict the Superman

11 character in his costume, exhibiting super-strength, show almost the entirety of

12 what would become the cover of "Action Comics No. 1."

13     14. Upon information and belief, sometime prior to April 16, 1938, but

14 after the Superman Ads, DCI published the thirteen page Superman comic book

15 comprising the first Superman story in "Action Comics No. 1," bearing the "cover"

16 date June 1938 (hereinafter "Action Comics No. 1"). However, Action Comics No.

17 1 was not comprised entirely of the pre-existing Unpublished Superman Works.

18 Rather, upon information and belief, in response to DCI's instruction that the

19 Unpublished Superman Works be presented as a thirteen page comic book and

20 subject to DCI's right to control, Siegel and Shuster created additional materials to

21 complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

22     15. After the publication of Action Comics No. 1, upon information and

23 belief, Siegel and Shuster supplied further original Superman stories at DCI's

24 instance and expense and subject to its right to control. On September 22, 1938,

25 Siegel and Shuster entered into another employment agreement (the "DCI

26 September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been

27 doing the art work and continuity for said comics [including Superman comics] for

28 us. We wish you to continue to do said work and hereby employ and retain you for

- 4 -

SECOND AMENDED
COUNTERCLAIMS

1   said purposes . . . ."  The DCI September 22, 1938 Agreement also contained an

2   acknowledgement that DCI was the "exclusive" owner of Superman.

3        16.    Also on September 22, 1938, Siegel and Shuster entered into an

4   agreement with DCI and with the McClure Newspaper Syndicate (the "McClure

5   September 22, 1938 Agreement") concerning the use of Superman in newspaper

6   strips.

7        17.    All of Siegel and Shuster's contributions to Superman comic books

8   and comic strips published subsequent to Action Comics No. 1 as well as the

9   Additional Action Comics No. 1 Materials, were made either under the DCI March

10  1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure

11  September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by

12  one or more of these Agreements, or certain subsequent agreements affirming those

13  agreements, as employees of DCI or its successors or at DCI's instance and expense

14  and subject to DCI's right of control, with the result that the copyrights to all

15  Superman materials created by them after preparation of materials included in

16  Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are

17  owned exclusively by DC Comics as works made for hire under the then applicable

18  1909 Copyright Act.

19       18.    On November 30, 1938, Siegel wrote to DCI (the "November 1938

20  Letter") suggesting that it do a comic book named Superboy, "which would relate

21  to the adventures of Superman as a youth."  The November 30, 1938 Letter does

22  not contain any discussion of plot, dialogue, appearance, or any other copyrightable

23  material relating to Superboy.  DCI decided not to publish a "Superboy" comic at

24  that time.

25       19.    In 1939, among the Superman comics prepared by Siegel and Shuster

26  at the instance and expense of DCI and subject to its right of control, was Superman

27  No. 1, with a cover date of Summer 1939.  In Superman No. 1, Clark Kent was

28  depicted as a youth with super powers.

- 5 -                                                SECOND AMENDED
                                                     COUNTERCLAIMS

20.     On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips.  In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21.     Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth.  The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests... America's outstanding boy hero: SUPERBOY!"  The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided not to publish a "Superboy" comic at that time.

22.     Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

- 6 -

SECOND AMENDED
COUNTERCLAIMS

1  resemblance to anything contained in the Unpublished 1940 Superboy Script, and

2  such similarities as may exist are common to earlier Superman related material

3  owned by DCI.

4      23.    In 1947, Siegel and Shuster brought suit against, *inter alia*, DCI's

5  successor in interest, National Comics Publications, Inc. ("National") in the New

6  York Supreme Court in Westchester County (the "Westchester Action"). The

7  Westchester Action was, in part, the culmination of a dispute between Siegel and

8  Shuster and National over what Siegel and Shuster claimed was DCI's

9  unauthorized publication of Superboy. In the Westchester Action, in addition to

10  seeking redress in connection with Superboy, Siegel and Shuster sought to

11  invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938

12  Agreement was obtained by duress, and sought to recapture all rights in Superman.

13      24.    On November 21, 1947, the Court in the Westchester Action issued an

14  opinion (the "Westchester Opinion") after trial in which it found that the March 1,

15  1938 Agreement transferred to DCI all rights in Superman and that the DCI

16  September 22, 1938 Agreement was valid and not obtained under duress. The

17  Court also held that in publishing Superboy, DCI had acted "illegally."

18      25.    At the Court's request, the parties to the Westchester Action submitted

19  proposed fact findings and conclusions of law. On April 12, 1948, the Court

20  adopted fact findings and conclusions of law and issued an interlocutory judgment

21  (collectively the "Westchester Action Interlocutory Judgment"). The defendants in

22  the Westchester Action filed a notice of appeal, and the Westchester Action

23  Interlocutory Judgment was stayed pending appeal.

24      26.    Shortly thereafter, the parties to the Westchester Action entered into

25  two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948

26  Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948

27  Consent Agreement"). Under both documents, *inter alia*, Siegel and Shuster: (a)

28  agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledge

- 7 -

SECOND AMENDED
COUNTERCLAIMS

1    that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in

2    and to Superman, including "the title, names, characters, concept and formula" as

3    set forth in Action Comics No. 1; (c) acknowledged National was sole and

4    exclusive owner of Superman, the conception, idea, continuity, pictorial

5    representation and formula thereof in all media; (d) agreed that they were enjoined

6    from creating, publishing or distributing any Superman work or any imitation

7    thereof, and from using the title Superman or title that contained the word "Super";

8    (e) acknowledged that National was the sole owner of and owned exclusive rights

9    in Superboy; (f) agreed that they were enjoined from creating, publishing or

10    distributing Superboy or any imitation thereof; (g) agreed they were prohibited

11    from representing their past connection with Superman and Superboy in such a way

12    to confuse the public that such connection still existed; and (h) agreed they were

13    prohibited from using any coloring, lettering or printing in referring to Superman or

14    Superboy that was imitative of that used by National.

15          27.    In the 1960s, Siegel and Shuster again brought suit against National,

16    this time in the United States District Court for the Southern District of New York

17    for a declaration that they (and not National) owned the copyright in the renewal

18    copyright term for Action Comics No. 1.  In a decision published in *Siegel v.*

19    *National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the

20    district court held, *inter alia*, that the agreements between Siegel and Shuster on the

21    one hand and DCI (and later National) on the other, intended to assign all rights in

22    Superman to DCI and National, including renewal copyright rights.

23          28.    In a decision published in *Siegel v. National Periodical Publications,*

24    *Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the

25    lower court's ruling relating to National's ownership of all rights in Superman.

26    Siegel and Shuster did not further appeal the ruling.

27          29.    On December 23, 1975, Siegel and Shuster entered into an agreement

28    with Warner Communications, Inc., then National's parent company (the

- 8 -

SECOND AMENDED
COUNTERCLAIMS

1   "December 23, 1975 Agreement").  Under this agreement, Siegel and Shuster again

2   acknowledged that Warner Communications, Inc. was the sole and exclusive owner

3   of "all right, title and interest in and to the 'Superman' concept, idea, continuity,

4   pictorial representation, formula, characters, cartoons and comic strips, title, logo,

5   copyrights and trademarks, including any and all renewals and extensions of such

6   rights, in the United States and throughout the world, in any and all forms of

7   publication, reproduction and presentation, whether now in existence or hereafter

8   devised . . . ."

9        30.     Under the December 23, 1975 Agreement, Siegel and Shuster each

10  were to and did receive throughout their lives annual payments as well as medical

11  insurance coverage. Upon Siegel's death, annual payments were to be made to

12  Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life.  The

13  amount of the annual payment pursuant to the December 23, 1975 Agreement was

14  increased over the years. Since Siegel's passing in 1996, Joanne Siegel has

15  continuously received and accepted annual payments and health insurance under

16  that agreement.

17              **DC Comics' Development And Licensing**

18              **Of Superman Works And Products**

19       31.     The initial graphic representations of the Superman character in 1938,

20  now stylistically dated, presented his adventures with a limited number of

21  characters in settings that had the look and feel of that particular period. From the

22  portrayal of the Superman character in "Action Comics No. 1," we only know that

23  he is an upright hero who was sent as an infant to Earth aboard a space ship from an

24  unnamed distant planet destroyed by old age.  Superman is also depicted as secretly

25  possessed of extraordinary physical abilities, including superhuman strength and

26  the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and run faster than

27  an express train.  In his ordinary life, the character is depicted as a mild-mannered

28  newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego,

- 9 -

SECOND AMENDED
COUNTERCLAIMS

1   Superman is a costumed heroic figure using his extraordinary physical abilities to

2   fight against crime.

3        32.   Since the publication of "Action Comics No. 1," DC Comics has

4   authored, published and distributed several thousand other comic books containing

5   the adventures of Superman throughout the United States and abroad in many

6   millions of copies, adding more than 60 years worth of material to further define,

7   update and improve upon the Superman character and presenting an ongoing new

8   flow of Superman exploits and characters resulting in the creation of an entire

9   fictional Superman "universe."

10       33.   In addition to the publication of new comic books containing the

11   Superman comic strip character, DC Comics has over the last 66 years participated

12   in the creation, development and licensing of numerous Superman live action and

13   animated feature length motion pictures, motion picture serials, radio and television

14   serials and live theatrical presentations. These works have also significantly

15   contributed to the modernizing and evolution of the Superman character from his

16   1938 appearance.

17       34.   Over the years since Action Comics No. 1, the presentations of

18   Superman provided first by DCI and then DC Comics did not present a static

19   depiction but an ever-evolving portrayal of Superman continuously, featuring new

20   super powers, new villains, new components to the Superman universe, new

21   elements in the Superman back story, and changes in the appearance of Superman.

22   Most notably, many of Superman's powers that are among his most famous today

23   did not appear in Action Comics No. 1 but only appeared in later publications.

24   These include: his ability to fly; his super-vision which enables him to see through

25   walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-

26   hearing which enables him to hear conversations at great distances; his

27   invulnerability to injury which is most often shown as bullets bouncing off his chest

28   and/or arms.

- 10 -

SECOND AMENDED<br>COUNTERCLAIMS

**RER-11**

35.     One notable part of the evolution of the appearance of the Superman

character undertaken by DC Comics and its predecessors, has been the

transformation of the emblem on the chest of Superman's costume. In Action

Comics No. 1, the emblem was comprised of a small yellow inverted triangle

bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics

No. 1 Crest").  Thereafter, in changing the appearance of Superman and his

costume, DC Comics and/or its predecessors significantly changed the Action

Comics No. 1 Crest.  Bearing little if any resemblance to the original, it is now a

large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in

the middle, also in the color red (the "S in Shield Device").  The S in Shield

Device, as transformed by DC Comics and its predecessors, has become a strong

symbol, standing alone, of all goods and services relating to Superman and his sole

source, DC Comics and its predecessors.

36.     At all relevant times, DC Comics, its predecessors in interest and

licensees have duly complied with the provisions of the 1976 Copyright Act and its

1909 predecessor statute with respect to securing copyright protection for the

numerous works in which the Superman character has appeared and establishing

DC Comics' copyright ownership thereof, including the original and all works

based upon and derived therefrom, and have received from the Register of

Copyrights, valid and subsisting certificates of copyright registration and renewal

with respect thereto.

37.     DC Comics and its predecessors have, since 1938, continuously held

themselves out as the exclusive owners of all rights under copyright in Superman.

38.     DC Comics has over many decades adopted and made long,

continuous and exclusive use of (a) the name and mark Superman and (b) certain

key symbols and indicia of origin in connection with and to identify all authorized

uses of the Superman character in print and all other media (sometimes hereinafter

the "Superman symbols and indicia of origin").  The Superman name and mark and

- 11 -

SECOND AMENDED
COUNTERCLAIMS

1    Superman symbols and indicia of origin include, *inter alia*, Superman's

2    characteristic outfit, comprised of a full length blue leotard with red cape, a yellow

3    belt, the S in Shield Device, as well as certain key identifying phrases. Most

4    notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a plane!...It's

5    Superman!" first used in the introduction to the 1940 radio program The

6    Adventures of Superman, and thereafter continuously repeated in Superman

7    television programming and various Superman publications. All of these Superman

8    symbols and indicia of origin have been used on and in connection with a wide

9    variety of publications and licensed goods and services, as they have been added to

10    the Superman character and mythology under DC Comics' and/or its predecessors'

11    supervision and direction, but, in any event, for the earliest symbols, since as early

12    as 1938.

13        39.    As a result of the above-described continuous and exclusive use by DC

14    Comics of the Superman name and mark, as well as the Superman symbols and

15    indicia of origin for over sixty years, the names, marks and symbols and the

16    appearance of the Superman character have become famous and the public has

17    come to recognize that all publications, entertainment and products featuring

18    Superman or bearing such marks all come from the same source, namely, DC

19    Comics, and that DC Comics is the exclusive source of the Superman character and

20    all uses of the character on and in connection with any goods and services.

21        40.    DC Comics owns dozens of federal trademark registrations for

22    Superman related indicia across a broad array of goods and services. Those

23    registrations include, but are not limited to the following for the following marks:

24    (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177,

25    1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803,

26    1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b)

27    SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026,

28    1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

- 12 -

SECOND AMENDED
COUNTERCLAIMS

1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the
"S in Shield" Device (either alone or as part of a rendering of Superman) 2,211,378,
2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233, 1,209,743,
1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630, 1,184,881,
1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150, 1,140,418,
1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No. 2,485,624; (e)
MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY Reg. Nos.
394,923 (telescopic lettering), 1,221,719 (block letters); (g) SUPERGIRL (stylized
and in block letters) Reg. Nos. 987,395, 414,623, 1,238,334; (h) SUPERWOMAN
(in telescopic lettering) Reg. No. 394,922; (i) SMALLVILLE Reg. Nos. 2,626,700,
2,809,352, 2,768,213, 2,765,711, 2,882,881; (j) KRYPTONITE Reg. Nos.
2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306; (1) LOOK, UP IN THE SKY,
IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304; (m) LEX LUTHOR Reg. Nos.
2,802,600, 1,634,007; (n) LOIS LANE Reg. No. 1,184,702; (o) PERRY WHITE
Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No. 1,190,637; (q) LOIS AND
CLARK Reg. No. 1,990,231; and (r) ACTION COMICS (stylized) 360,765
(collectively with the SUPERMAN symbols and indicia of origin, the "Superman
Marks").

41.    These registrations alone suffice to show the unusual breadth and
scope of the use of such marks related to Superman by DC Comics or its licensees
on or in connection with a broad range of goods and services, all of which have
come to be seen over six decades by countless consumers as indicating an exclusive
authorization or sponsorship thereof by plaintiff DC Comics, the publisher and
source of all Superman comic books and other Superman productions and products.

### The Superman Notices Of Termination

42.    On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim
Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel,
Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice

- 13 -

1   of Termination of Transfer Covering Extended Renewal. Those documents

2   purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the

3   Siegels' share in the following grants of copyright: (a) the December 4, 1937

4   Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938

5   Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19

6   1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975

7   Agreement (collectively the "Superman Notices"). However, the Siegels served no

8   notice terminating their share of the copyright grant in the May 21, 1948 Consent

9   Agreement.

10       43.    The Superman Notices purport to terminate the Siegels' share of the

11   above grants listed therein in the Unpublished Superman Works, Action Comics

12   No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1

13   Works"). However, in none of the seven Superman Notices, or anywhere else, do

14   the Siegels purport to terminate their share of any copyright grant in the Superman

15   Ads.

16       44.    In the Superman Notices, the Siegels expressly recognize and

17   acknowledge that the character Superboy is a derivative work based on Superman.

18   The Superman Notices expressly identify Superboy as part of the Superman

19   "family" of characters in which the Siegels are purporting to terminate their grants.

20   Indeed, the more than 15,000 works listed in the Superman Notices include

21   hundreds of publications and other works that feature *only* Superboy (as opposed to

22   Superman), and also Superman No. 1 with a cover date of Summer 1939, in which

23   Superman is depicted as a youth.

24       45.    In late November, 1998, DC Comics received from

25   Plaintiffs/Counterclaim Defendants. Joanne Siegel and Laura Siegel Larson,

26   through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four

27   documents entitled Notice of Termination of Transfer Covering Extended Renewal.

28   Those documents purport to terminate, effective November 27, 2000, the Siegels'

- 14 -

SECOND AMENDED
COUNTERCLAIMS

1   share it the following grants of copyright relating to the character known as "The

2   Spectre": (a) the December 4, 1937 Agreement; (b) a September 22, 1938

3   Agreement; (c) and October 10, 1939 Agreement and (d) a second October 10,

4   1939 Agreement (collectively the "Spectre Notices").

5       46.     The Spectre Notices purport to terminate the Siegels' share of the

6   above grants in: (a) the Spectre character appearing in costume in an ad in issue No.

7   51 of "More Fun Comics" with a cover date of January 1940; (b) the first Spectre

8   comic book story published in issue No. 52 of "More Fun Comics" with a cover

9   date of February 1940; (c) part 2 of the first Spectre comic book story published in

10   issue No. 53 of "More Fun Comics" with a cover date of March 1940, and hundreds

11   of additional works listed the Spectre Notices (collectively the "Spectre Works").

12                    **The Parties' Negotiations**

13                    **And The Agreement Reached**

14       47.     On April 17, 1997, less than ten days after DC Comics received the

15   Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation.

16   The Siegels requested that DC Comics make an initial settlement proposal. But

17   prior to making such proposal, DC Comics requested that the parties enter into a

18   confidentiality agreement. Frustrated by the Siegels' delay in responding to its

19   proposed form confidentiality agreement, on November 5, 1997, DC Comics'

20   counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you

21   in the past, our client has elected, for settlement purposes only, not to respond to the

22   [Superman Notices] served upon them by challenging their validity or scope *at this*

23   *time*." (Emphasis added.)

24       48.     On December 17, 1997, DC Comics and the Siegels finally entered

25   into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded its

26   first substantive proposal with respect to the copyrights at issue, and in connection

27   therewith also raised certain defects in the termination notice, stating "that there is a

28   substantial legal issue as to the effectiveness of your clients' termination of DC's

SECOND AMENDED
COUNTERCLAIMS

1    interest in the Superman Comic." For more than six months despite repeated

2    requests for feedback, DC Comics heard no response to its December 18, 1997

3    proposal. Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC

4    Comics' counsel that did not respond to the proposal but only requested more

5    information.

6        49.    On July 23, 1998, DC Comics provided the Siegels with the answers to

7    the questions posed in their counsel's letter of June 19, 1998. Despite requests for

8    feedback for another several months, DC Comics again received no response to its

9    proposal.

10        50.    Having heard no response from the Siegels, on April 15, 1999, one day

11    before the purported "Effective Date" set forth in the Superman-Notices, DC

12    Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim

13    Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things,

14    the reasons it considered the Superman Notices to be invalid.

15        51.    On April 30, 1999, DC Comics received a letter from the firm of

16    Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented the

17    Siegels in negotiations with DC Comics. Thereafter, the parties engaged in

18    extensive negotiations with their respective lawyers attending meetings in

19    California and New York, and exchanging proposals. During that time period, at

20    the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance

21    Payment") to the Siegels which payment was agreed to be an advance against any

22    future sums provided under an agreement to be entered into between the parties.

23        52.    On October 16, 2001, a legal representative for DC Comics made an

24    offer to the Siegels through Gang, Tyre by telephone. On October 19, 2001, Kevin

25    Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001 offer.

26    That day, Mr. Marks wrote a letter confirming that the Siegels had "accepted D.C.

27    Comics offer of October 16, 2001" and outlined all of the material terms in detail.

28    Those terms included, *inter alia*, that the Siegels transferred or would transfer all of

- 16 -

SECOND AMENDED
COUNTERCLAIMS

**RER-17**

1 their rights in the Superman property (which was defined in the letter as Superman,

2 Superboy and related properties including but not limited to Supergirl, Steel, Lois

3 & Clark, and Smallville) and in "The Spectre." In exchange, the Siegels were to

4 receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and

5 non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d)

6 significant guaranteed minimum payments as advances against royalties; and (e)

7 percentage royalties from DC Comics' exploitations of Superman across all media,

8 worldwide.

9      53. By return letter of October 26, 2001, DC Comics' representative wrote

10 back providing a "more fulsome outline" of the agreed upon points. Neither the

11 Siegels nor any of their representatives in any way disputed the October 26, 2001

12 confirmatory outline from DC Comics. On February 1, 2002, DC Comics

13 forwarded a draft of a more formal written agreement memorializing the terms

14 agreed to in the October 19 and 26, 2001 correspondence.

15      54. After the October 2001 agreement, DC Comics entered into a written

16 Option Purchase Agreement with Warner Bros., A Division of Time Warner

17 Entertainment Company, L.P. (now known as defendant Warner Bros.

18 Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics

19 granted to Warner Bros. the option to license certain exclusive rights in Superman,

20 and Warner Bros. has commenced photography of a feature-length motion picture

21 based on the property.

22      55. On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel

23 wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company

24 acknowledging that the Siegels had accepted DC Comics' proposal of October 16,

25 2002, but purporting to object to unspecified provisions of the formal written draft

26 and repudiating the agreement reached by the parties in October 2001. To this day,

27 the Siegels have not identified a single provision of the February 1, 2002 formal

28

- 17 -

SECOND AMENDED
COUNTERCLAIMS

1    draft that was inconsistent with the provisions in the Siegels' October 19, 2001

2    acceptance of DC Comics' proposal.

3       56.    On September 30, 2002, however, DC Comics received a letter from

4    the Siegels stating they were breaking off all discussions with DC Comics and

5    again repudiating the agreement reached by the parties in October 2001.

6                **The Superboy Termination Notices**

7       57.    Notwithstanding the fact that the Siegels had already purported to

8    terminate grants with respect to the Superboy character effective April 16, 1999, on

9    November 8, 2002, the Siegels mailed to DC Comics another Notice of

10   Termination of Transfer purporting to relate solely to Superboy (the "Superboy

11   Notice"). The Superboy Notice purports to terminate, effective November 17, 2004,

12   only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the

13   December 23, 1975 Agreement, and identifies many of the same works identified in

14   the Superman Notices. As was the case with the Superman Notices, the Siegels

15   served no notice terminating the copyright grant in the May 21, 1948 Consent

16   Agreement.

17       58.    The Superboy Notice purports to terminate the above grants regarding

18   the following works: (a) the unpublished November 30, 1938 Letter; (b) the

19   unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d)

20   approximately 1,600 additional titles. However, the Superboy Notice lists and

21   purports to terminate grants of rights under copyright relating to hundreds of the

22   same works already purportedly terminated by the earlier Superman Notices. The

23   Superboy Notice does not purport to terminate the 1939 depiction of Superman as a

24   youth in Superman No. 1.

25       59.    In the Superboy Notice, the Siegels make the claim that Superboy is a

26   "separate and distinct copyrighted work and character from the copyrighted work

27   and character Superman." This contention is erroneous.

28

- 18 -

SECOND AMENDED<br>COUNTERCLAIMS

**RER-19**

60.    In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy.  This contention is also erroneous.

61.    Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville."  "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62.    On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia*, that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63.    On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64.    On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

**The Siegels' Filing Of Two Related Cases**

65.    On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

- 19 -

SECOND AMENDED
COUNTERCLAIMS

## FIRST COUNTERCLAIM FOR DECLARATION
## THAT THE SUPERMAN NOTICES AND THE
## SUPERBOY NOTICE ARE INEFFECTIVE

66. DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67. DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

**#1 The May 21, 1948 Consent Agreement Has Not Been Terminated**

68. The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69. As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect. Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

**#2 The December 23, 1975 Agreement**

70. Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71. By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

- 20 -

SECOND AMENDED
COUNTERCLAIMS

**Exhibit PP**
**465**

**RER-21**

72.     By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

73.     Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

74.     Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

75.     Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the December 23, 1975 Agreement, and the grant of copyright therein, remains in full force and effect.

- 21 -

SECOND AMENDED
COUNTERCLAIMS

76.   Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

### #3 The Unpublished Superboy Works

77.   In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

78.   Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

79.   Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

80.   Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision.  As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any copyrightable material therefrom and DC Comics remains the sole owner thereof. Therefore, the Superboy Notice is ineffective.

### #4 Siegel Owned No Copyright In Superboy

81.   The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

- 22 -

SECOND AMENDED
COUNTERCLAIMS

1   82.   Upon information and belief, Siegel, in collaboration with Shuster,

2   prepared the Siegel Superboy Proposals without the prior knowledge or consent of

3   DC Comics' predecessors.

4   83.   Upon further information and belief, Siegel developed the contents of

5   the Siegel Superboy Proposals within the scope of his employment contracts with

6   DC Comics' predecessors and/or at their instance and expense and subject to their

7   right to control.

8   84.   As a result of the foregoing, the Siegel Superboy Proposals were

9   derivative works based upon Superman, prepared without the authorization of the

10   copyright owner, and/or were works made for hire, owned ab initio by the copyright

11   owner in Superman.

12   85.   Whether the Siegel Superboy Proposals were derivative works

13   prepared without the prior authorization of the copyright owner, or were works

14   made for hire, Siegel could not and did not own any copyright interest therein that

15   would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus,

16   the Superboy Notice is ineffective.

17   **#5 The Superman Notices Were Not Timely Served**

18   86.   Upon information and belief, DC Comics' predecessor in interest first

19   secured copyright in Action Comics No. 1 by publication with copyright notice

20   prior to April 16, 1938.

21   87.   All grants made by Siegel and Shuster or rights in Action Comics No.

22   1 are still in effect, and all rights under copyright granted therein are still owned

23   exclusively by DC Comics, because the Superman Notices served by the Siegels are

24   ineffective for failure to comply with the legal requirements therefore prescribed by

25   section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304 (c), in that: the

26   "Effective date" of the Superman Notices, namely April 16, 1999, was too late to

27   fall within the required period specified in 17 U.S.C. § 304 (c) (3) and such notices

28

- 23 -

SECOND AMENDED
COUNTERCLAIMS

1  of termination were served less than two years before the allowable effective date in

2  violation of 17 U.S.C. § 304 (c) (4) (A).

3      88.    On information and belief, plaintiffs deny DC Comics' contentions

4  and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above.

5  Accordingly, an actual controversy has arisen and now exists between

6  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

7      89.    A justiciable controversy exists concerning the above issues and a

8  judicial declaration is necessary and appropriate to determine the parties' respective

9  rights with regard thereto.

10  **SECOND ALTERNATIVE COUNTERCLAIM FOR**

11  **DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR**

12  **CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE**

13  **SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS**

14      90.    DC Comics repeats and realleges paragraphs 1 - 89 above as if fully

15  set forth herein.

16      91.    Since as early as 1998, Plaintiffs/Counterclaim Defendants were on

17  notice of DC Comics' position that the Superman Notices contained legal defects.

18  Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim

19  Defendants were on notice that DC Comics rejected the Superman Notices and

20  asserted exclusive ownership of all copyright in Superman.

21      92.    Since April 16, 1999, the purported effective date of the Superman

22  Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of

23  their purported co-ownership of copyright in Action Comics No. 1.

24      93.    In response to DC Comics' above actions and assertion and such

25  deprivation to the Siegels of the benefits of their alleged copyright co-ownership,

26  Plaintiffs/Counterclaim Defendants took no action until filing the instant action on

27  October 8, 2004, more than six years after DC Comics advised

28  Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

- 24 -

SECOND AMENDED
COUNTERCLAIMS

**RER-25**

1    and more than five years after being placed on notice by DC Comics of its claim of

2    exclusive ownership of copyright in Superman and that it rejected and repudiated

3    the Superman Notices and during which time period the Siegels were deprived of

4    benefits to which they claim they are entitled.

5         94.     Because Plaintiffs/Counterclaim Defendants' claim of partial

6    ownership of copyright accrued more than three years prior to

7    Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into

8    consideration any purported agreements to toll the statute of limitations, any claim

9    of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is

10    barred by the three-year statute of limitations of the Copyright Act.

11         95.     On information and belief, plaintiffs deny DC Comics' contentions

12    and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above.

13    Accordingly, an actual controversy has arisen and now exists between

14    Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

15         96.     A justiciable controversy exists concerning the above issues and a

16    judicial declaration is necessary and appropriate to determine the parties' respective

17    rights with regard thereto.

18                 **THIRD ALTERNATIVE COUNTERCLAIM**

19                   **FOR BREACH OF CONTRACT**

20         97.     DC Comics repeats and realleges paragraphs 1 - 96 above as if fully

21    set forth herein.

22         98.     In or about October 2001, Plaintiffs/Counterclaim Defendants entered

23    into a written agreement with DC Comics memorialized by the authorized agent of

24    Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of

25    DC Comics, John Schulman, which subsequently was confirmed and ratified in

26    writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"),

27    pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1)

28    transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

- 25 -

SECOND AMENDED<br>COUNTERCLAIMS

1   transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and

2   interest, including all United States copyrights, which they may have in any and all

3   past, present, and future Superman and Superboy-related properties, works,

4   characters, names, and trademarks (collectively, the "Superman Works"), (2)

5   agreed to accept certain compensation from DC Comics in consideration of any and

6   all rights, title, and interest which they may have in the Superman Works (the

7   "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim

8   related to the Superman Works other than for breach of the Agreement (the

9   "Covenant Not To Sue").

10         99.     DC Comics has performed all of its obligations under the Agreement,

11   except to the extent such performance has been prevented or excused by the acts or

12   omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without

13   limiting the foregoing, DC Comics established a reserve account of the moneys due

14   to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which DC

15   Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the

16   Agreement but for their repudiation and breach of the Agreement as herein alleged.

17   DC Comics always has been and remains ready, willing, and able to perform all of

18   its obligations under the Agreement, and will resume doing so upon either a

19   withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the

20   Agreement or a final adjudication that the Agreement is enforceable and binding on

21   the parties.

22         100.   Plaintiffs/Counterclaim Defendants have repudiated and otherwise

23   breached the Agreement by, among other things:

24         a.     Claiming, including in this action, that they have not transferred

25   and are not contractually obligated to transfer to DC Comics, worldwide and in

26   perpetuity, all of their rights, title, and interest, including all United States

27   copyrights, which they may have in the Superman Works, and refusing to execute a

28   formal written transfer thereof to DC Comics;

- 26 -

SECOND AMENDED
COUNTERCLAIMS

     b.    Repudiating the Financial Terms and claiming, including in this action, that they are entitled to additional compensation for the Superman Works; and

     c.    Initiating this action in violation of the Covenant Not To Sue.

101.   As a direct and foreseeable result of the contractual breaches on the part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been damaged in an amount to be proven at trial.

## FOURTH ALTERNATIVE COUNTERCLAIM FOR
## DECLARATORY RELIEF REGARDING THE AGREEMENT

102.   DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.

103.   An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:

     a.    Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

     b.    If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

     c.    If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to

- 27 -

SECOND AMENDED
COUNTERCLAIMS

**RER-28**

1  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

2  United States copyrights, which they may have in the Superman Works, then

3  Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

4  otherwise exploit the Superman Works in any manner.

5      104.  DC Comics is informed and believes, and on that basis alleges, that

6  Plaintiffs/Counterclaim Defendants dispute these contentions.

7      105.  DC Comics seeks a judicial determination of the parties' respective

8  rights and obligations, which is necessary and appropriate to allow them to properly

9  govern their future conduct.

10  **FIFTH ALTERNATIVE COUNTERCLAIM FOR**

11  **DECLARATION OF LIMITATIONS ON THE SCOPE OF THE**

12  **SUPERMAN NOTICES AND THE SUPERBOY NOTICE**

13      106.  DC Comics repeats and realleges paragraphs 1 - 65 above as if fully

14  set forth herein.

15      107.  In the event the Superman Notices and/or the Superboy Notice are

16  deemed effective and the settlement agreement between the parties is not enforced,

17  DC Comics asserts the following alternative counterclaim for a declaration limiting

18  the scope and reach of the Superman Notices and the Superboy Notice in six

19  separate and independent ways.

20      108.  DC Comics contends that:

21  **#1 The Superman Ads**

22      109.  The regulations governing the contents of notices of termination

23  promulgated by the U.S. Copyright Office under authority of the 1976 Copyright

24  Act require, in relevant part, that a notice of termination served pursuant to section

25  304 (c) of the 1976 Copyright Act name "each work to which the notice of

26  termination applies."

27

28

- 28 -

SECOND AMENDED
COUNTERCLAIMS

**RER-29**

110.   Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

111.   The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

112.   The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

113.   Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

### #2 Use Of Superman And Superboy Derivative Works
### Prepared Prior To The Purported Effective Dates Of The
### Superman Notices And The Superboy Notice

114.   The Superman Notices purport to terminate the Siegels' share in the Copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works").  Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

115.   The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

- 29 -

SECOND AMENDED
COUNTERCLAIMS

116.   The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117.   Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118.   All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119.   The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No 1 but only appeared later in the Post Action Comics No. 1 Works.

120.   Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.  Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

- 30 -

SECOND AMENDED
COUNTERCLAIMS

### #4 Superboy Is A Derivative Work Based On Superman

121.   In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth."  In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests...America's outstanding boy hero: SUPERBOY!"

122.   As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

123.   Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

124.   The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture U.S. Copyrights therein, such recapture could not affect DC Comics' continuing right to create and exploit new derivative works that do not include such new copyrightable subject matter, including but not limited to, the television series "Smallville."

### #5 The Derivative Work Superboy Is A Joint Work Of Authorship

125.   Upon information and belief, the Siegel Superboy Proposals were joint works of authorship as they were prepared jointly with Shuster and because it was intended that their contents would be merged with artwork to create a comic book or comic strip.

126.   As eventually published, the works containing the Superboy character included both artwork and storyline.

- 31 -

SECOND AMENDED
COUNTERCLAIMS

1    127.   The joint author's share in the Siegel Superboy Proposals is owned by

2    DC Comics and cannot be terminated either by the Superman Notices or the

3    Superboy Notice.

4    128.   As a result of the foregoing, DC Comics right to continue to exploit

5    the Siegel Superboy Proposals and any derivative works based thereon cannot be

6    affected by either the Superman Notices or the Superboy Notice.

7    **#6 "Smallville" Is Not Derived From Superboy**

8    129.   Among the derivative works based upon Superman and authorized b

9    DC Comics is the weekly television series, "Smallville."

10    130.   Regardless of whether the Superboy Notice is effective and further

11    regardless of whether Superboy is a derivative work based upon Superman,

12    "Smallville" was derived from and based upon Superman and is not a derivative

13    work based upon the Siegel Superboy Proposals or any succeeding Superboy comic

14    or Superboy work exploited by DC Comics and/or its predecessors prior to May 21,

15    1948.  Beyond sharing the idea of depicting Superman as a youth, Smallville is not

16    substantially similar to the Siegel Superboy Works.

17    131.   Thus, irrespective of any accounting issues relating to the Siegels'

18    purported right to receive compensation with respect to new episodes of

19    "Smallville," DC Comics' right to continue to authorize production, distribution,

20    and airing of "Smallville" television episodes remains unaffected by the Superman

21    Notices and the Superboy Notice.

22    **#7 The Additional Action Comics No. 1 Materials**

23    132.   The Additional Action Comics No. 1 Materials created in 1938 were

24    prepared at the instance and expense of DCI and subject to its right to control.

25    Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials

26    were "works made for hire" and copyright therein was owned by DCI *ab initio*.

27    133.   Because the Additional Action Comics No. 1 Materials were works

28    made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

- 32 -

SECOND AMENDED
COUNTERCLAIMS

1    17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the

2    Additional Action Comics No. 1 Materials.

3        134.   On information and belief, plaintiffs deny DC Comics' contentions

4    and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above.

5    Accordingly, an actual controversy has arisen and now exists between

6    Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

7        135.   A justiciable controversy exists concerning the above issues and a

8    judicial declaration is necessary and appropriate to determine the parties' respective

9    rights with regard thereto.

10              **SIXTH ALTERNATIVE COUNTERCLAIM FOR**

11              **DECLARATION REGARDING THE PRINCIPLES**

12                **TO BE APPLIED IN AN ACCOUNTING**

13       136.   DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135

14   above as if fully set forth herein.

15       137.   DC Comics contends that in the event the Superman Notices and/or the

16   Superboy Notice were deemed valid and effective, any accounting to which the

17   Siegels would be entitled relating to Superman (including its derivative work

18   Superboy, collectively for this Counterclaim "Superman") would be subject to the

19   following limitations and reductions:

20              a.    The Siegels would not be entitled to any revenues derived from

21                    exploitation of Superman outside of the United States because

22                    termination pursuant to 17 U.S.C. § 304 (c) cannot affect any

23                    grant of non-United States copyrights. 17 U.S.C. § 304 (c) (6)

24                    (E).

25              b.    The Siegels would not be entitled to any revenues derived from

26                    exploitation of the Superman Derivative Works and the

27                    Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

28

                                    - 33 -                    SECOND AMENDED
                                                             COUNTERCLAIMS

c.  Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d.  Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present it the Superman works subject to accounting.

e.  Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f.  The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights.  As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

- 34 -

SECOND AMENDED
COUNTERCLAIMS

**RER-35**

g.   Any accounting of profits would be further reduced by
additional factors, including but not limited to, DC Comics'
direct and indirect expenses, taxes, and DC Comics'
independent role as a publisher of Superman.

h.   Subject to all reductions aforesaid and otherwise determined by
the Court to be applicable, the Siegels would be entitled to an
accounting of only one-half of the copyright co-owner's profits.

138.   On information and belief, plaintiffs deny DC Comics' contentions
and/or the legal effect ascribed thereto as set forth above.  Accordingly, an actual
controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants
and DC Comics as to the above issues.

139.   A justiciable controversy exists concerning the above issues and a
judicial declaration is necessary and appropriate to determine the parties' respective
rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1.   Declaring that the Superman Notices and the Superboy Notice are
ineffective for one or more of the reasons set forth in DC Comics' First
Counterclaim;

2.   In the event that the Superman Notices and/or the Superboy Notice are
deemed effective, for damages according to proof at trial on DC Comics' Third
Alternative Counterclaim;

3.   In the event that the Superman Notices and/or the Superboy Notice are
deemed effective, declaring on DC Comics' 'Fourth Alternative Counterclaim that,
pursuant to the Agreement:

a.   Plaintiffs/Counterclaim Defendants have transferred or are
contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any
and all rights, title, and interest, including all United States copyrights, which they
may have in the Superman Works;

- 35 -

SECOND AMENDED
COUNTERCLAIMS

**RER-36**

1    b.  In the event that Plaintiffs/Counterclaim Defendants are

2 adjudged not to have transferred or not to be contractually obligated to transfer to

3 DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

4 United States copyrights, which they may have in the Superman Works, then the

5 remaining terms of the Agreement are valid and enforceable and

6 Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any

7 past, present, or future exploitation of the Superman Works by or upon license from

8 DC Comics other than pursuant to the Financial Terms; and

9    c.  In the event that Plaintiffs/Counterclaim Defendants are

10 adjudged not to have transferred or not to be contractually obligated to transfer to

11 DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

12 United States copyrights, which they may have in the Superman Works, then

13 Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

14 otherwise exploit the Superman Works in any manner;

15   4.  In the event that the Superman Notices and/or the Superboy Notice are

16 deemed effective, and DC Comics is not granted the relief sought on its Fourth

17 Alternative Counterclaim, declaring that the scope and effect of the Superman

18 Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth

19 Alternative Counterclaim;

20   5.  In the event that the Superman Notices and/or the Superboy Notice are

21 deemed effective, and DC Comics is not granted the relief sought on its Fourth

22 Alternative Counterclaim, declaring that any accounting to which

23 Plaintiffs/Counterclaim Defendants may be entitled will be limited by all applicable

24 principles, including but not limited to, those set forth in DC Comics' Sixth

25 Alternative Counterclaim;

26   6.  Awarding DC Comics its costs and reasonably attorneys' fees incurred

27 in connection with DC Comics' defenses and claims herein seeking declarations

28 with respect to copyright ownership; and

- 36 -       SECOND AMENDED
            COUNTERCLAIMS

1        7.    Awarding DC Comics such other and further relief as may be just.

2

3   Dated:      February 17, 2011       Respectfully Submitted,

4                           O'MELVENY & MYERS LLP

5                           By: _____

6                             Daniel M. Petrocelli

7                             Attorneys for Defendants and
                                 Counterclaimant

8

9   CC1:844136

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



- 37 -

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:           (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy,
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel
9
                **UNITED STATES DISTRICT COURT**
10
          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
11
   DC COMICS,                              | Case No: CV 10-03633 ODW (RZx)
12                Plaintiff,
                                           | Hon. Otis D. Wright II, U.S.D.J.
13         vs.                             | Hon. Ralph Zarefsky, U.S.M.J.

14  PACIFIC PICTURES CORPORATION;          | **DEFENDANTS' REPLY IN**
    IP WORLDWIDE, LLC; IPW, LLC;           | **SUPPORT OF CONSOLIDATED**
15  MARC TOBEROFF, an individual;          | **MOTION TO DISMISS**
    MARK WARREN PEARY, as personal         | Complaint filed:  May 14, 2010
16  representative of the ESTATE OF         | Discovery Cutoff:  None Set
17  JOSEPH SHUSTER; JEAN ADELE             | Trial Date:         None Set
    PEAVY, an individual; LAURA            | *Supplemental Request for Judicial*
18  SIEGEL LARSON, individually and as     | *Notice filed concurrently*
19  personal representative of the ESTATE   | Date:    November 14, 2011
    OF JOANNE SIEGEL, and DOES 1-10,       | Time:    1:30 p.m.
20  inclusive,                             | Place:   Courtroom 11
21
22                Defendants.
23
24
25
26
27
28
              DEFENDANTS' REPLY IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS

**RER-39**

1  KENDALL BRILL & KLIEGER LLP
   Richard B. Kendall (State Bar No. 90072)
2   *rkendall@kbkfirm.com*
   Laura W. Brill (State Bar No. 195889)
3   *lbrill@kbkfirm.com*
   Nicholas F. Daum (State Bar No. 236155)
4   *ndaum@kbkfirm.com*
   10100 Santa Monica Blvd., Suite 1725
5  Los Angeles, California  90067
   Telephone:   (310) 556-2700
6  Facsimile:    (310)556-2705

7  Attorneys for Defendants Marc Toberoff,
   Pacific Pictures Corporation, IP
8  Worldwide, LLC, and IPW, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' REPLY IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS

## INTRODUCTION

DC Comics' ("DC") opposition, which distorts its own complaint and the applicable law, fails under well-established law:

(1)     All of DC's claims are time-barred.  The Fourth, Fifth, and Sixth Claims are all time-barred under the applicable statute of limitations because DC's complaint ("FAC") and the judicially noticeable facts unquestionably demonstrate that DC was on notice of its purported claims in *2006*, when Defendants produced the allegedly offending PPC Agreements and IPWW Agreements and DC reviewed the defamatory "Timeline" attached to DC's complaint.  DC's First and Third Claims are time-barred by the Copyright Act's three-year limitations period.

(2)     DC's First and Fourth Claims fail under copyright law and the plain terms of the 1992 Agreement between DC and Frank Shuster/Jean Peavy.  Frank Shuster and Jean Peavy have never held any termination rights under the Copyright Act, nor did they ever revoke or regrant Siegel and Shuster's prior Superman grants on which DC has long relied.  To give up the Copyright Act's termination right, clear Ninth Circuit law requires <u>both</u> (i) an express revocation and regrant, <u>and</u> (ii) that the contracting party have a then-existing statutory termination right.  As a matter of law, neither of these mandatory elements were present in the 1992 Agreement, which had no effect on the Shuster executor's notice of termination (the "Shuster Termination").

(3)     DC's Third and Sixth Claims fail because 17 U.S.C. § 304(c)(6)(D), on which DC relies, does not provide it with any enforceable right.  There are direct caselaw and treatises on point, and DC can cite no authority to the contrary.

(4)     DC's Fourth, Fifth, and Sixth Claims also fail due to California's litigation privilege.  DC's Second Claim is in part barred by the judgment in *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008) ("*Siegel*") under the doctrine of issue preclusion, and the remainder should be stayed.[1]

---

[1] DC argues about a purported failure to meet-and-confer (Opp. at 2), but Defendants did meet and confer *and* this motion simply consolidates three *fully briefed* Rule 12(b)(6) motions that were the subject of an extensive meet and confer.  Docket No. 334-4, Ex. 3.

1
DEFENDANTS' REPLY IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS

1   "reasonably susceptible" to DC's interpretation.  *Duane Reade, Inc. v. St. Paul Fire*

2   *& Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *see also Seiden Assoc., Inc. v.*

3   *ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("[L]anguage of a contract is

4   not made ambiguous simply because the parties urge different interpretations.").

5       **The 1948 Consent Judgment:**  DC offers no support for its claim that the

6   May 21, 1948 consent judgment bars statutory termination (FAC ¶¶ 125-28), which

7   fails as a matter of law and was rejected in *Siegel*.  542 F. Supp. 2d at 1131-32.

8       **Statute of Limitations:**  DC's First Claim is time-barred by the Copyright

9   Act's three-year limitations period, as DC filed its complaint 6½ years after DC was

10  served with the Shuster Termination that expressly repudiated DC's co-ownership of

11  the original Superman copyrights.  *See* Docket No. 49 ("FAC") ¶ 92; 17 U.S.C. §

12  507(b) (no civil action under this title unless commenced within three years of

13  accrual); *Zuill v. Shanahan*, 80 F.3d 1366, 1369-70 (9th Cir. 1996) (claim accrues

14  upon "plain and express repudiation").  In contrast to DC's new position that the

15  statute cannot accrue until the Shuster Termination date (Mot. at 4-5), DC advocated

16  the exact opposite in *Siegel* – that the statute was triggered by DC's alleged

17  "repudiation [] expressed by a letter submitted to [Siegels'] counsel dated December

18  18, 1997," well ***before*** the April 16, 1999 Siegel Termination date.  542 F. Supp. 2d

19  at 1034-35 (citing *Zuill*).  In *Siegel*, Judge Larson held the statute was tolled by the

20  parties' written tolling agreement.  *Id.* at 1134-36.[3]

21  **II.   THE SECOND CLAIM**

22      DC's Second Claim concerns whether early ***Superman*** works, jointly

23  written/illustrated by Siegel *and* Shuster, respectively, were "works for hire."  FAC

24  ¶¶ 137-49, 158-59.  That issue was fully adjudicated in *Siegel*, which addressed every

25

26  _____
    [3] DC's argument that DC repudiated the Shuster Termination (Mot. at 5) is irrelevant and
    frivolous.  DC does not – because it cannot – attach a single communication from DC that

27  expresses such a repudiation.  DC also misleadingly focuses on a letter from Mr. Toberoff
    referring to DC's rejection of the <u>Siegel</u> Termination, but omits DC's letter to which Mr.

28  Toberoff responded, which plainly did <u>not</u> repudiate the <u>Shuster</u> Termination.  Supp. Req.
    for Judicial Notice ("SRJN"), Ex. A.

1   conduct occurred], not on the date of discovery."  While DC cites to conflicting state-

2   court cases, "[a]bsent a clear indication from the California courts that the Ninth

3   Circuit's interpretation of [the UCL] was incorrect," this court must follow the

4   interpretation set forth in *Karl Storz.  Perez v. Nidek Co. Ltd.*, 657 F. Supp. 2d 1156,

5   1166 (S.D. Cal. 2009).  DC's UCL claim is clearly time-barred.

6        **DC Has No Legal Right to Negotiate:**  As stated above, DC has no "right" to

7   negotiate under § 304(c)(6)(D), and the Sixth Claim thus fails. *See* Section III, *supra*.

8        **Litigation Privilege:**  DC's Sixth Claim, alleging "consent agreements"

9   regarding the *settlement of litigation* (FAC ¶¶ 170, 188), is barred because where

10  alleged conduct regards "settlement … [the] Civil Code section 47 litigation privilege

11  applies as a matter of law." *Seltzer,* 182 Cal. App. 4th at 972.

12       **Preemption:** To avoid preemption, a UCL claim must "include[] an 'extra

13  element' that makes the right asserted qualitatively different from those protected

14  under the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90

15  (9th Cir. 2005).  DC alleges *no* such extra element, as DC's Sixth Claim expressly

16  "concerns copyright interests" (Opp. at 25) and seeks to "establish the parties'

17  respective rights and obligations with respect to the copyright interest in the

18  Superman material." FAC ¶ 189.  The Sixth Claim is "constructed upon the premise"

19  of a Copyright Act violation and therefore preempted. *Del Madera Properties v.*

20  *Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987).

21       **Failure to Plead "Unfair" Conduct:**  DC has no UCL claim for "unfair"

22  conduct because it alleges no conduct that "significantly threatens or harms

23  competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th

24  163, 187 (1999).  In fact, DC seeks to squelch competition, by asserting a fictitious

25  "right" of exclusivity.  FAC ¶ 168.  Even as alleged, the "consent agreements" do not

26  "forbid" the Siegels/Shusters from negotiating with DC.  FAC ¶ 101.

27                              **CONCLUSION**

28       As set forth in defendants' motion, DC's Claims should be dismissed.

1

Dated:  October 31, 2011

RESPECTFULLY SUBMITTED,

2

/s/ Marc Toberoff

/s/ Laura W. Brill

3

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark
Warren Peary *et al.*

KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff
*et al.*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Marc Toberoff (State Bar No. 188547)
    *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
    *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
    2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
    Telephone:   (310) 246-3333
5  Fax:          (310) 246-3101

6  Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy,
    and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
    Joanne Siegel

9

                    **UNITED STATES DISTRICT COURT**

10

           **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

11

DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

12                Plaintiff,
                                     Hon. Otis D. Wright II, U.S.D.J.
13       vs.                         Hon. Ralph Zarefsky, U.S.M.J.

14  PACIFIC PICTURES CORPORATION;    **DEFENDANTS' SUPPLEMENTAL**
                                     **REQUEST FOR JUDICIAL**
15  IP WORLDWIDE, LLC; IPW, LLC;     **NOTICE IN SUPPORT OF**
    MARC TOBEROFF, an individual;    **CONSOLIDATED MOTION TO**
16  MARK WARREN PEARY, as personal   **DISMISS PURSUANT TO FED. R.**
    representative of the ESTATE OF  **CIV. P. 12(b)(6)**
17  JOSEPH SHUSTER; JEAN ADELE
    PEAVY, an individual; LAURA      *Reply Brief filed concurrently*
18  SIEGEL LARSON, individually and as
19  personal representative of the ESTATE  Complaint filed: May 14, 2010
    OF JOANNE SIEGEL, and DOES 1-10,  Trial Date: None Set
20  inclusive,
                                     Date:     November 14, 2011
21                                   Time:     1:30 p.m.
                                     Place:    Courtroom 11
22                Defendants.

23

24

25

26

27

28

1   KENDALL BRILL & KLIEGER LLP
    Richard B. Kendall (State Bar No. 90072)
2     rkendall@kbkfirm.com
    Laura W. Brill (State Bar No. 195889)
3     lbrill@kbkfirm.com
    Nicholas F. Daum (State Bar No. 236155)
4     ndaum@kbkfirm.com
    10100 Santa Monica Blvd., Suite 1725
5   Los Angeles, California 90067
    Telephone:   (310) 556-2700
6   Facsimile:    (310)556-2705

7   Attorneys for Defendants Marc Toberoff,
    Pacific Pictures Corporation, IP
8   Worldwide, LLC, and IPW, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**Exhibit**   **Document**                                                      **Page**

          Request for Judicial Notice                                    1

A        April 28, 2005 letter from DC Comics to Mark Warren Peary       4

B        March 27, 2007 Declaration of Wayne Smith                      11

**RER-47**

1    Pursuant to Rule 201 of the Federal Rules of Evidence, defendants Mark

2    Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele

3    Peavy, Laura Siegel Larson, individually and as personal representative of the Estate

4    of Joanne Siegel, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC,

5    and IPW, LLC ("Defendants"), respectfully request that this Court take supplemental

6    judicial notice of the following documents, submitted in support of Defendants'

7    Consolidated Motion to Dismiss Plaintiff DC Comic's Complaint Pursuant to Fed. R.

8    Civ. P. 12(b)(6).  In ruling on a motion to dismiss a complaint pursuant to Fed. R.

9    Civ. P. 12(b)(6), a court may consider matters subject to judicial notice.  *See Neilson*

10   *v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1111-12 (C.D. Cal. 2003)

11   ("In deciding a motion to dismiss…a court may consider…matters that may be

12   judicially noticed pursuant to Federal Rule of Evidence 201.").  "Subsection (d) [of

13   Rule 201] makes the taking of judicial notice mandatory if the Court is so requested

14   and supplied with the necessary information."  *Haye v. United States*, 461 F.Supp.

15   1168, 1174 (C.D. Cal. 1978)

16   1.    Defendants request that the Court take judicial notice of a letter from

17   Paul Levitz, President of DC Comics, to defendants Mark Warren Peary and Jean

18   Adele Peavy, dated April 28, 2005.  A true and correct copy of the April 28, 2005

19   letter is attached hereto as **Exhibit A.**  Rule 201 of the Federal Rules of Evidence

20   permits a court to take judicial notice of a fact that is "not subject to reasonable

21   dispute in that it is … capable of accurate and ready determination by resort to

22   sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

23   *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (court takes

24   judicial notice on a motion to dismiss of conference call transcripts for the fact that

25   statements were made on the dates specified); *Werner v. Werner*, 267 F.3d 288, 295-

26   296 (3d Cir. 2001) (determination on a motion to dismiss of whether defendants

27   produced corporate meeting minutes during discovery in related state court action "is

28   capable of accurate and ready determination by resort to sources whose accuracy

1    cannot reasonably be questioned by [defendants]").

2         2.    Defendants request that the Court take judicial notice of the Declaration

3    of Wayne Smith in Support of Defendants' Motion to Compel Production of Whistle-

4    Blower Documents, which was dated March 26, 2007 and which was filed on March

5    27, 2007 in the related case, *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal.

6    Case No. 04-CV-08400 ODW (RZx), at Docket No. 108.  A true and correct copy of

7    the March 27, 2007 Declaration of Wayne Smith is attached hereto as **Exhibit B**.  It

8    is proper for the Court to take judicial notice of proceedings and determinations of

9    prior related litigation. 1-201 *Weinstein's Federal Evidence* § 201.12[3] ("Courts

10   have the power to judicially recognize their own records of prior litigation closely

11   related to the present case").  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442

12   F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice, as a matter of public record,

13   of briefs, pleadings, memoranda, expert reports from related litigation); *Kourtis v.*

14   *Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005) ("[C]ourt records from related

15   proceedings can be taken into account without converting a motion to dismiss into a

16   summary judgment motion"), *abrogated on other grounds by Taylor v. Sturgell*, 553

17   U.S. 880 (2008); *Ungureanu v. Teichert*, 2011 U.S. Dist. LEXIS 118507, at *5 (E.D.

18   Cal. Oct. 13, 2011) (holding that "the fact that a declarant uttered such facts … in a

19   declaration which was filed could not be reasonably disputed" and would be subject

20   to judicial notice); *Butcher v. Advanced Mineral Techs., Inc.*, 2011 U.S. Dist. LEXIS

21   21493, at *9 (D. Nev. Mar. 2, 2011) (taking judicial notice "of the fact that

22   [defendant] made certain statements under oath in his declaration filed in the [related]

23   state court action"); *Berman v. McManus*, 2011 U.S. Dist. LEXIS 57841, at *83

24   (E.D. Cal. May 31, 2011) (granting "request for judicial notice as to the [d]eclaration

25   because it is part of another court's file that bears directly on the plaintiff's claims in

26   this action"); *Molus v. Swan*, 2009 U.S. Dist. LEXIS 4192, at *10 (S.D. Cal. Jan. 22,

27   2009) (the court took "judicial notice of the existence of these documents [including

28   a declaration] and the specific statements and/or allegations contained within the

1    documents" from a related case).

2           Pursuant to Federal Rules of Evidence 201, and for the reasons set forth above,

3    Defendants respectfully request that this Court take judicial notice of the documents

4    described above.

5    Dated:  October 31, 2011                    RESPECTFULLY SUBMITTED,

6    /s/ Marc Toberoff                           /s/ Laura W. Brill

7    TOBEROFF & ASSOCIATES, P.C.       KENDALL BRILL & KLIEGER LLP
     Attorneys for Defendants Mark      Attorneys for Defendants Marc Toberoff
8    Warren Peary *et al.*               *et al.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail: paul.levitz@dccomics.com

Paul Levitz - President & Publisher

<u>By Federal Express</u>

April 28, 2005

Jean Adele Peavy
 (as sole heir to Joseph Shuster)
Mark Warren Peary
 (as personal representative of the Estate of Joseph Shuster)
51 Camino Cabo
Santa Fe, NM 87505-2277

Dear Jean and Warren:

　　　I write to you today to offer to license from you the interest in Superman which is the subject of your recent notice of termination. Without in any way conceding that the notice of termination is valid, and though the interest you claim in Superman cannot, under any circumstances, become yours until April 2013 – over eight years from now – DC Comics is proposing to enter into an arrangement with you and begin paying you substantial payments starting *now*. For the period covered by your termination notice, DC will only pay a premium to *one* terminating party. Therefore, before proposing the terms of our offer I believe it would be helpful to lay out some of the background and history that brings us to where we are today.

　　　As an initial matter, I want to reiterate to you the great respect that DC Comics and I personally have for Joe Shuster's work, and for Superman's value and contribution to American culture and to DC Comics. As you may know, I have been working in the comic book field for over thirty years, and like Joe, while still in high school started out as a freelancer for DC. It was my pleasure to know Joe for almost the last two decades of his life. As a result of my long association with DC, I can personally attest to DC's heavy investment in and nurturing of the Superman property, which I believe has played a substantial part in creating the lasting value and continued popular interest the character that Joe and Jerry created has enjoyed. DC's efforts have included the distribution of television programming and motion pictures featuring Superman, merchandising of the Superman character, and continually creating new and interesting story lines that have kept Superman alive in the public's imagination. I hope you agree that DC has done its job well in its management and development of Superman.

1



**EXHIBIT A**
4

*Shuster*
> *Ex. 10.*

RER-51

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 2


Given DC's long history of stewardship, commitment and dedication of resources to Superman, I believe that there is no company better positioned than DC to continue Superman's success.

As you are no doubt aware, aside from you and DC Comics, the heirs of Jerry Siegel also claim to have an interest in the Superman character, and as you probably know, in October 2004 those heirs commenced two lawsuits in federal court in Los Angeles against DC Comics and certain of its affiliated companies. In the first lawsuit they seek an accounting for profits derived from DC's exploitation of the Superman character following the Siegel heirs' purported termination of Jerry Siegel's original 1938 grant to DC.   They claim the termination was effective April 16, 1999. In the second lawsuit the Siegel heirs assert that Jerry Siegel – without any contribution from Joe Shuster – was the sole creator and owner of the character Superboy, that the Siegel heirs purported to terminate DC's interest in the Superboy character effective November 18, 2004, and that neither DC, you nor anyone other than the Siegel heirs is entitled to exploit the Superboy property.

The Siegel lawsuits are pending and in their early stages.  Although it is too early to tell how these lawsuits will turn out (and we believe that DC has substantial defenses to the Siegel heirs' claims) I am advised that the Siegel heirs' counsel has communicated to our lawyers that it is their ultimate goal to settle all claims with DC relating to Superman. This would presumably include all claims relating to any interest in the copyright extension period that begins in 2013 – the same period in which you claim rights. Most lawsuits do, in fact, settle, and it continues to be our hope as well to reach some sort of amicable resolution with the Siegel heirs.  In fact, one of the principal defenses we have raised in the Siegel heirs litigations is that DC did, in fact, reach a comprehensive settlement with the Siegel heirs in 2001, which covered all copyright extension periods, and which was confirmed by the Siegel heirs' lawyers in writing.  The Siegel heirs now deny that there was such an agreement.  This is one of the issues that the court will ultimately decide.

I want to be frank in telling you that if we are able to resolve matters with the Siegel heirs (whether by settlement or judgment) *before* we reach an agreement with you, so that we acquire or are adjudged to own rights to the Superman character during the copyright extension term that begins in 2013, there will not be any pressing need to reach an agreement with you in advance of that date. The reason that we are contacting you at this time is that we are interested in removing now any possible issues as to whether DC Comics has sufficient rights to continue to fully exploit the Superman character in new works during the extension term beginning in 2013.  Once we have certainty that we

2

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 3


have those rights from one of the joint holders, we are then assured of our right to continue to exploit those rights to create new works, and the other joint holder at best is entitled to a participation or has a claim for an accounting. Therefore, if you are interested in receiving something *now* in exchange for rights that cannot ripen until 2013, you should be aware that we are more motivated to make such a deal now. The deal that we envision makes a payment to you as soon as it is signed, but the opportunity to enter into such a deal exists only in the absence of a similar arrangement with the Siegel heirs, or a judgment by the court that the Siegel heirs have already settled the matter – as we contend they have.

In considering our proposal – which you should discuss with any advisors to you – please keep in mind that even after 2013, if your termination notice is valid, your interest will be limited to U.S. rights since the termination notice you gave applies to rights under U.S. law only. In addition, you will still have to share the copyright with either or both the Siegel heirs or DC, so at best you will only have non-exclusive rights. Further, your interest will be limited to the 1930s version of the Superman character and the triangular (as opposed to the current 5-sided) "S" shield which have extremely limited marketability by themselves. These limitations are substantial and could make it virtually impossible for you to enter into any sort of significant license deal with another company. So a deal between you and DC really makes by far the most sense; it gives both parties significant benefits.

So, with that background, I would like generally to outline for you our offer in exchange for your exclusive license to DC of all rights arising out of Joe's authorship or contributions to DC Comics, including any Shuster post-April 2013 rights in Superman and all related properties, including Superboy (the "Superman Property"). Although there may be fine points to this offer that our representatives will want to work out, the following is our basic proposal:

1. **Non-Refundable Cash Advance**

Upon signing, you shall be paid:

- A non-refundable advance against royalties (as described below) of two million dollars ($2,000,000.00) (This means that no matter what, you get to keep the money; it is applied against money DC may owe you commencing in 2013; it is not repayable by you)

3

EXHIBIT A
6

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 4

## 2.    Royalty Payments

Beyond the initial advance, you shall share in the success of the
Superman Property in connection with new works created after
April 18, 2013. Commencing with revenues received on account of
such works after April 18, 2013, DC shall pay you royalties, subject
to recoupment of the advance described above, but in no event
less than $100,000.00 per year, as follows:

- On merchandising and media licenses:

  - 6% of DC's receipts from all media and
    merchandising licenses for the domestic (U.S.)
    territory for use of the Superman Property where
    the property is not commingled with any other
    superhero or equivalent property

  - 3% of DC's receipts from all media and
    merchandising licenses for the domestic territory
    for use of the Superman Property where the
    property is commingled with one other superhero
    or equivalent property (e.g., Batman, Flash)

  - An allocable share of DC's receipts from all media
    and merchandising licenses for the domestic
    territory where the Superman Property is
    commingled with multiple other properties,
    provided that the 6% royalty shall not be reduced
    to less than 1%

  - 1% of DC's receipts from all media and
    merchandising licenses for the domestic territory
    for use of the Superman Property where the
    property is used in an extraordinarily mixed license
    with multiple other properties (e.g. Six Flags
    license with DC and Looney Tunes characters),
    except to the extent that receipts can be
    specifically attributed to the Superman property in
    which case the 6% royalty would apply to such
    receipts.

4

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 5

- On merchandise sold directly by DC

  - 6% of an allocable portion of domestically derived revenue from the Superman Property consistent with revenue reporting by third-party licensees, reducible by commingling or bundling as per the media and merchandising licenses above

- On publications sold directly by DC

  - 1% of the cover price of copies sold in the domestic territory of DC's own editions of publications ("Publications") based on the Superman Property where the Superman Property comprises the title of the publication (*e.g.* "Superman") or where the Superman Property comprises the entire subject matter of the publication (*e.g.* "Action Comics")

  - 1/2% of the cover price of Publications which are based on multiple properties which include the Superman Property

  - there shall be no royalties payable hereunder where the Superman Property appears in publications or stories based on other properties where neither the publication or story title contains the Superman Property

The royalties will be paid to you on a calendar year basis beginning in 2014 (for the April – December, 2013 period) and thereafter through 2033. During this period, you will receive a minimum royalty of $100,000.00 per year regardless of whether DC has recouped its advance. To the extent that the minimum royalty exceeds the royalties earned under the above definitions, such excess shall be treated as an advance against royalties to be earned. Aside from the $100,000.00 minimum, all royalties earned shall first be applied to any unrecouped advances. All sums advanced shall bear interest at the prime interest rate – whatever it may be – to the extent unrecouped.

5

**EXHIBIT A**
8

**RER-55**

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 6

**3.**     **Credit**

DC Comics shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" on comic books, television programs (main titles), motion pictures (main titles on screen), all publications and other works where credit to creators is customary. Credit must be consistent with guild and other obligations.

**4.**     **Miscellaneous Terms**

You will make appropriate warranties and representations that you have not transferred or licensed any of the Superman rights and that DC may exploit the Superman Property without interference. You and DC will also mutually release each other and provide certain covenants and indemnities as to future claims. Finally, you will acknowledge DC's right to use and publish Joe's biographical facts, materials and photographs in connection with the Superman Property, including in connection with publicity and exploitation of Superman, which is something we want to do.

As mentioned above, there may be other details that would need to be ironed out before an agreement is signed, but we've tried to set forth herein the essential terms of the deal we are proposing.

We hope you feel there are compelling reasons for you to seriously consider our offer. First, it gives you money now, eight years before you could be entitled to it otherwise. Second, it provides you with an annual advance for each year from 2014 through 2033 – as long as the term of copyright in Action Comics no. 1. Third, it allows you to capitalize on the synergies created by the combination of your rights – which, by themselves are at best extremely narrow and likely unmarketable – with those of DC. This is a situation where the whole is clearly greater than the sum of the parts and both you and DC can benefit from their combination.

Finally, to be fully open and candid, there is an additional point which I feel compelled to mention. I understand that you are represented by counsel in this matter – Marc Toberoff – and so I will ask DC's representatives to send him a copy of this letter. I assume that you know that Mr. Toberoff is also representing the Siegel heirs in their lawsuits against DC. I feel compelled to mention the dual role Mr. Toberoff is playing because the offer in this letter is

6

EXHIBIT A
9

Jean Adele Peavy
Mark Warren Peary
April 28, 2005
Page 7


made only to you, on a confidential basis, in the hopes of making a deal that is
mutually beneficial to your family and to DC. I hope that you will consider your
own best interests and instruct your counsel accordingly; keeping in mind that
what is best for you may well conflict with the interests of Mr. Toberoff's other
client.

I am hopeful that you will find our proposal beneficial and fair. I very much
look forward to your response and would welcome the opportunity to discuss any
question you may have. Please call or write to me at your convenience, but I
urge you to do so soon as given the current situation we can only keep this offer
open for a short time. Thank you.

Sincerely,

Paul Levitz


7

**EXHIBIT A**
**10**

**RER-57**

1  DANIEL M. PETROCELLI (S.B. #097802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:   (845) 265-2819

11 Attorneys for Plaintiff DC

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14 DC COMICS,                        | Case No. CV 10-3633 ODW (RZx)

15          Plaintiff,               | **DC COMICS' OPPOSITION TO
                                     | DEFENDANTS' CONSOLIDATED
16     v.                            | MOTION TO DISMISS
                                     | PURSUANT TO FED. R. CIV. P.
17 PACIFIC PICTURES                  | 12(b)(6) (DOCKET NO. 333)
   CORPORATION, IP WORLDWIDE,
18 LLC, IPW, LLC, MARC TOBEROFF,     | Hon. Otis D. Wright II
   an individual, MARK WARREN
19 PEARY, as personal representative of
   the ESTATE OF JOSEPH SHUSTER,     | **Hearing Date**:   November 14, 2011
20 JEAN ADELE PEAVY, an individual,  | **Hearing Time**:   1:30 p.m.
   LAURA SIEGEL LARSON, an           | **Place**:          Courtroom 11
21 individual and as personal
   representative of the ESTATE OF    | Complaint Filed:  May 14, 2010
22 JOANNE SIEGEL, and DOES 1-10,      | Discovery Cutoff: None Set
   inclusive,                        | Trial Date:       None Set
23
              Defendants.
24

25

26

27

28
                                          DC'S OPP. TO DEFS' CONSOLIDATED
                                                  MOTION TO DISMISS

**RER-58**

## I.   INTRODUCTION

DC Comics filed its complaint in this case to address two separate sets of claims—neither of which is amenable to defendants' Rule 12 motion.

1.  DC's First and Second Claims, brought against the Shuster heirs, contest the Shuster copyright termination notice.  Despite their current rhetoric, Mot. at 1, Judge Larson held and defendants conceded in the related *Siegel* cases that those cases could not resolve whether the Shuster termination notice is valid.  Docket No. 61 at 48-49 (Larson, J.: "It is by no means a foregone conclusion that the Shuster estate will be successful in terminating the grant to the Superman material…."; Defendants:  "[T]he Siegel Litigations do not concern Shuster's copyright[s]").

In its First Claim, DC asserts five reasons why the Shuster termination notice is invalid.  Defendants' motion *fails to address three of them*.  For this reason alone, their motion must be denied.  The only ground defendants seriously contest—that the Shuster termination notice is barred by a 1992 contract between DC and Jean Peavy, Shuster's sole heir—is fully supported by binding case law holding Peavy had full authority to make her 1992 contract and dispose of the Shusters' rights.

2.  DC's Third to Sixth Claims challenge business agreements that defendant Marc Toberoff's entertainment companies made with the Shuster and Siegel heirs that violate DC's rights.  Defendants argue these claims are time barred, but not only does that raise factual questions that cannot be resolved on a Rule 12 motion, it ignores that defendants' offending conduct was first disclosed to DC in *2008*— well within the statutory period—and that defendants' "fraudulent concealments" and ongoing misconduct fully tolled any statutes.

Defendants' assertion that their business agreements were shielded by the litigation privilege misses the mark.  Toberoff admits these companies' operations were separated from his legal work by a "defined firewall," and he does not dispute having signed the contracts at issue as *president* of these entertainment companies, *not* as a lawyer.  Nor does he dispute that the aspects of the contracts DC challenges

- 1 -

1    claim against DC, Peavy wrote to DC and promised to "honor" her 1992 contract:

2       I have learned from the Internet that Joanne Siegel has filed a copyright
claim for SUPERMAN.  I want you to know that I intend to continue to

3       honor our pension agreement.  DC's RJN Ex. E at 49.

4       DC and Peavy enjoyed a good relationship until 2001 when Toberoff, a self-

5    styled "movie producer," induced Peavy and her son, Mark Peary, to form a Joint

6    Venture with Toberoff's movie company, Pacific Pictures.  The agreement defined

7    the Shusters' rights as all "rights, claims, [and] copyrights, in … SUPERMAN,"

8    and required Peavy and Peary to "assign to the Venture" their Superman rights.  In

9    2003, Toberoff induced Peavy, Peary, and the Estate of Joseph Shuster (of which

10    Peavy was the sole beneficiary) to enter into the same agreement.  The Estate then

11    served a copyright termination notice on DC.  FAC ¶¶ 58-65, 86-101, 112-17.

12    **B.    DC's First Claim In This Case And Defendants' Challenge To It**

13       DC's First Claim seeks a declaration that the Shusters' termination notice is

14    invalid on five separate grounds. *Id.* ¶¶ 106-34.  Retreating from their prior motion,

15    *cf.* Docket No. 186, defendants do *not* separately challenge the first, third, or fifth

16    grounds.  Rather, they argue the entire claim is time barred and challenge just the

17    second and fourth grounds.  Defendants' inability to challenge *all* the alleged bases

18    for DC's claim requires denial of their motion.  If DC's First Claim "states a claim

19    under any legal theory," the motion must be rejected. *Haddock v. Bd. of Dental

20    Exam'rs of Cal.*, 777 F.2d 462, 464 (9th Cir. 1985).  While defendants suggest a

21    Rule 12 motion can be used to pick off sub-parts of a claim, Mot. at 6 n.2, the Court

22    need not engage in this needless exercise, nor does doing so make sense here. *E.g.*,

23    *Wang v. Asset Acceptance, LLC*, 681 F. Supp. 2d 1143, 1145 (N.D. Cal. 2010).

24    **C.    DC's First Claim Is Not Time-Barred.**

25       Citing two infringement cases, defendants argue DC had three years from

26    service of the Shuster termination notice in November 2003 to challenge it in court.

27    Mot. at 5.  This is baseless.  The termination notice does not purport to take effect

28    until *2013*, and as Judge Larson held in *Siegel*: "One could quibble with whether

- 4 -

DC'S OPP. TO DEFS' CONSOLIDATED
MOTION TO DISMISS

1   any date other than the termination effective date itself can serve as the accrual date

2   in a case involving the right to termination of a grant," but "[u]nless and until that

3   legal triggering point is passed"—here, October 26, 2013—"there is nothing for the

4   other co-owner to reject or challenge."  *Siegel v. Warner Bros. Entm't Inc*., 542 F.

5   Supp. 2d 1098, 1134 n.7 (C.D. Cal. 2008).  As for their two cited cases—*Zuill* and

6   *Aalmuhammed*—defendants argued in *Siegel* that both case were inapposite in a

7   termination case like this one.  Case No. CV-04-8400, Docket No. 198 at 45-47.

8       Defendants' argument is also self-defeating.  They say a termination-related

9   claim "accrues when there is a 'plain and express repudiation' of co-ownership."

10   Mot. at 5.  But in May 2005—over *six years* ago—the Shusters acknowledged DC

11   "den[ied] [their] termination interests."  DC's RJN Ex. F.  The Shusters *never* filed

12   suit seeking to enforce their notice or to dispute DC's repudiation.  By defendants'

13   own logic, their right to enforce their termination notice ran in May 2008, and DC

14   thereby owns free and clear all interests to which the Shusters claim an entitlement.

15       **D.    Defendants' Challenge To The Merits Of DC's First Claim Fail.**

16       Peavy's 1992 agreement with DC renders the Shuster termination notice

17   invalid.  Defendants sidestep the issue by devoting only a paragraph to it in their

18   briefing on DC's First Claim, Mot. at 6, then confusingly discuss it as part of DC's

19   Fourth Claim, *id*. at 17-22.  This misdirection is unavailing.

20       *1. The Case Law.*  The termination provisions on which the Shusters rely

21   apply only to *pre-1978* copyrights grants.  17 U.S.C. § 304.  Peavy's 1992 contract

22   with DC effectively rescinded and replaced all pre-1978 grants that Joe Shuster

23   ever made, meaning there was nothing left for the Estate to terminate in 2003.

24       The leading case on point is *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036,

25   1048 (9th Cir. 2005), which held that when an agreement that *post-dates 1978*

26   revokes all prior copyright grants an author made, it bars any termination claim a

27   party might later assert.  In *Milne*, Christopher Milne, an heir of the Winnie the

28   Pooh author, approached SSI in 1983 to re-negotiate royalty arrangements for

- 5 -                    DC'S OPP. TO DEFS' CONSOLIDATED
                             MOTION TO DISMISS

1    to reproduce, prepare derivative works, distribute, perform, and display a work—is

2    *not* preempted.  17 U.S.C. §§ 106, 301(a); *Del Madera Props. v. Rhodes &*

3    *Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987).  Although copyrights may be the

4    subject of a state-law claim, where the claim's gravamen is a breach or tort the

5    claim is not preempted.  *E.g.*, *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal.

6    App. 3d 1327, 1353 (1990) (fiduciary breach not preempted); *Bekaert Progressive*

7    *Compos. Corp. v. Wave Cyber Ltd.*, 2007 WL 1110736, at *2-3 (S.D. Cal. Apr. 5,

8    2007) (same; misappropriation); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079,

9    1090 (9th Cir. 2005).  Here, DC's UCL claim concerns copyright interests with

10   which defendants interfered—it does not allege infringement or improper use.[6]

11        **D.    DC's Sixth Claims Is Not Time Barred.**

12        Defendants' statute-of-limitation arguments fail for the reasons above.  While

13   defendants argue (citing *Stutz*) the delayed discovery rule does not apply to UCL

14   claims, Mot. at 8 & n.6, they do not disclose that after *Stutz*, the California Supreme

15   Court and Ninth Circuit said this was an open question.  *Grisham v. Philip Morris*

16   *U.S.A., Inc.*, 40 Cal. 4th 623, 635 n.7 (2007); *Betz v. Trainer Wortham & Co.*, 236

17   Fed. Appx. 253, 256 (9th Cir. 2007).  Since then, courts have held that the

18   discovery applies in UCL cases when fraud is alleged—as it plainly is here.  *E.g.,*

19   *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009).[7]

20   **IX.    CONCLUSION**

21        Defendants' motion should be denied.

22   Dated:  October 24, 2011                    Respectfully Submitted,

23                                               By: /s/ Daniel M. Petrocelli

24                                               Daniel M. Petrocelli

---

25   [6] In contrast, defendants' off-point cases all do.  *Motown*, *supra*, (unauthorized
     use); *Del Madera*, *supra*, (same); *Idema*, 162 F. Supp. 2d 1190 (same); *Blue Nile*,
26   478 F. Supp. 2d at  1250; (unauthorized copying); *MEECO*, 2007 U.S. Dist. LEXIS
     25986, at *14 (unauthorized reproduction); *Kodadek*, 152 F.3d at 1212 (same).
27
     [7] *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, at *10 n.16 (C.D. Cal. 2009);
28   *Stearns v. Select Comfort Retail Corp.*, 2010 WL 2898284, at *17 (N.D. Cal. 2010).

- 25 -                                     DC'S OPP. TO DEFS' CONSOLIDATED
                                          MOTION TO DISMISS

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:   (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12             **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14 DC COMICS,

15          Plaintiff,                  Case No. CV 10-3633 ODW (RZx)

16       v.                             **DC COMICS' REQUEST FOR**
                                        **JUDICIAL NOTICE IN SUPPORT**
17 PACIFIC PICTURES                     **OF OPPOSITION TO**
   CORPORATION, IP WORLDWIDE,           **DEFENDANTS' CONSOLIDATED**
18 LLC, IPW, LLC, MARC TOBEROFF,        **MOTION TO DISMISS**
   an individual, MARK WARREN           **PURSUANT TO FED. R. CIV. P.**
19 PEARY, as personal representative of **(DOCKET NO. 333)**
   the ESTATE OF JOSEPH SHUSTER,
20 JEAN ADELE PEAVY, an individual,     **Judge**:       Hon. Otis D. Wright II
   LAURA SIEGEL LARSON, an
21 individual and as personal           **Hearing Date**:   October 18, 2010
   representative of the ESTATE OF      **Hearing Time**:   1:30 p.m.
22 JOANNE SIEGEL, and DOES 1-10,
   inclusive,

23
             Defendants.
24

25

26

27

28
                                        DC'S REQUEST FOR JUDICIAL NOTICE
                                        ISO OPP. TO DEFS'' MOT. TO DISMISS

1    Plaintiff DC Comics hereby requests that the Court take judicial notice of the

2    following documents identified below in support of DC's concurrently filed

3    Opposition to Defendants' Consolidated Motion to Dismiss (Docket No. 333). The

4    court may take notice of facts that are capable of accurate and ready determination

5    by resort to sources whose accuracy cannot reasonably be questioned. *See* FED. R.

6    EVID. 201(b); *U.S. v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.1993).

7        1.    DC requests the Court take judicial notice of the Petition for Probate of

8    Lots Will and for Letters Testamentary ("Petition") filed by defendant Mark

9    Warren Peary on July 23, 2003, in *In re Estate of Joseph Shuster*, Case No. BP-

10   080635, Superior Court of the State of California for the County of Los Angeles

11   ("Probate Action"). A true and correct copy of the Petition is attached hereto as

12   Exhibit A.[1] It is proper for the Court to take judicial notice of court records filed by

13   a party. *E.g., Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th

14   Cir. 2007); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988);

15   *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D. Cal. 1978), *aff'd*,

16   645 F.2d 699 (9th Cir.); 21 WRIGHT & MILLER, FEDERAL PRACTICE AND

17   PROCEDURE § 5106 (3d ed. 1998 & Supp. 2003) ("The most frequent use of judicial

18   notice of ascertainable facts is in noticing the content of court records.").

19       2.    For the same reasons and on the same basis, DC requests the Court

20   take judicial notice of the Order Admitting Will To Probate, Appointing Executor

21   and Authorizing Independent Administration of Estate With Limited Authority

22   ("Order Appointing Executor") filed by defendant Mark Warren Peary on October

23   7, 2003, in the Probate Action. A true and correct copy of the Order Appointing

24   Executor is attached hereto as Exhibit B.

25   _____

26   [1] In certain instances, exhibits attached hereto have been slightly reduced in size to
     confirm with the Local Rules regarding format and pagination of exhibits. *See*

27   L.R. 11-5.2, 11-5.3, 11-5.4. This was done solely to prevent pagination indications
     from overlapping with other text and to clearly differentiate the new pagination

28   from prior document stamps. No other changes were made to any document.

- 1 -        DC'S REQUEST FOR JUDICIAL NOTICE
             ISO OPP. TO DEFS'' MOT. TO DISMISS

3.    For the same reasons and on the same basis, DC requests the Court take judicial notice of the Duties and Liabilities of Personal Representative filed by defendant Mark Warren Peary on October 21, 2003, in the Probate Action.  A true and correct copy of the of the Duties and Liabilities of Personal Representative is attached hereto as Exhibit C.

4.    For the same reasons and on the same basis, DC requests the Court take judicial notice of Mark Peary and Jean Peavy's Memorandum in Opposition to Defendants' Motion to Compel Production of Documents Pursuant to Subpoena Duces Tecum For Contempt, and For Attorneys Fees ("Peavy Opposition") filed August 25, 2006 in *In re Subpoenas Duces Tecum*, Case No. MC-06-20 MV, United States District Court for the District of New Mexico.  A true and correct copy of the Peavy Opposition is attached hereto as Exhibit D.

5.    DC requests the Court take judicial notice of a letter from Jean Peavy to Paul Levitz dated September 7, 1999.  A true and correct copy of the September 7, 1999, letter is attached hereto as Exhibit E.  On a motion to dismiss under Rule 12(b)(6), courts are permitted to consider documents incorporated by reference in the complaint.  *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into the complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."); *Von Koenig v. Snapple Beverage Corp.*, 2010 WL 1980208 (E.D. Cal. May 10, 2010); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1997).  The September 7, 1999, letter is referred to in DC's first amended complaint in this action.  Docket No. 49 ¶¶ 56, 116.

6.    DC requests the Court take judicial notice of the fact that defendants stated no later than May 12, 2005 that DC had denied the validity of the Shusters' termination.  Rule 201 of the Federal Rules of Evidence permits a court to take judicial notice of a fact that is "not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy

DC'S REQUEST FOR JUDICIAL NOTICE
ISO OPP. TO DEFS'' MOT. TO DISMISS

1   cannot reasonably be questioned." Rule 201(d) "makes the taking of judicial notice

2   mandatory if the Court is so requested and supplied with the necessary

3   information." *Haye v. U.S.*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978). A letter

4   signed by defendant Marc Toberoff and dated May 12, 2005, a true and correct

5   copy of which is attached hereto as Exhibit F, states that DC sent a prior letter

6   "denying our clients' termination interests…." The letter is on the letterhead of the

7   "Law Offices of Marc Toberoff," is signed by Marc Toberoff, is written "[o]n

8   behalf of" defendants Mark Peary and Jean Peavy, and is both dated and fax-

9   stamped May 12, 2005. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111

10  (N.D. Cal. 2009) (judicial notice of conference call transcripts for the fact that

11  statements were made on the dates specified); *Twinde v. Threshold Pharm., Inc.*,

12  2009 WL 928132, at *5 (N.D. Cal. Apr. 3, 2009) (judicial notice of fact that

13  statements made in press releases were made on the dates specified).

14  Dated:  October 24, 2010                    Respectfully Submitted,

15                                              O'MELVENY & MYERS LLP

16                                              By:  /s/ Daniel M. Petrocelli

17                                                   Daniel M. Petrocelli

18

19

20

21

22

23

24

25

26

27

28

- 3 -                 DC'S REQUEST FOR JUDICIAL NOTICE
                      ISO OPP. TO DEFS'' MOT. TO DISMISS

**RER-66**

May-12-05  07:24pm  From-                                    T-070  P.002/002  F-020

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF·
NICHOLAS C. WILLIAMSON

· ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540

LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY

May 12, 2005

Via Facsimile and US Mail

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

**Re: Superman / Estate of Joseph Shuster / Mark Warren Peary**

Dear Patrick:

On behalf of our clients, Warren Peary, the personal representative of the Estate of
Joseph Shuster ("Estate") and Jean Adele Peavy, this is to respond to the buy-out
proposal dated April 28, 2005 which DC Comics ("DC") sent directly to them.

While our clients certainly do appreciate DC's efforts, they are passing on DC's offer. It
is believed that the offer is extremely low and bears no relation to the net present value of
the Estate's 50% interest in *Superman* profits for the duration of copyright, commencing
2013. Nor does DC's offer reflect the considerable strategic value of the Estate's 50%
copyright interest in tandem with the Siegel's 50% copyright interest in *Superman*.

One need only to look at DC/Warner Bros.' full-blown plans to reinvigorate *Superman* as
a billion dollar film, television and merchandising franchise and to Marvel's $2.2 billion
market capitalization to understand how DC's $2 million proposal bears little or no
relation to the marketplace and the economic realities of this world famous property.

Given your firm's prior letter on DC's behalf denying our clients' termination interests
without legal grounds, my clients have requested that any further communications to
them be made through our law firm and not to them directly.

The foregoing is without prejudice to any of our clients' rights, remedies, claims or
positions at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

Marc Toberoff

cc: Warren Peary and Jean Peavy

DCC00057438

EXHIBIT F
50

RER-67

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1, submission of one original and seven copies of the reply brief was deferred. Pursuant to Circuit Rule 30-1.3, as modified by the Court's recent directives regarding electronic excerpts of record, submission of four paper copies of the reply excerpts of the record was deferred.

Dated: April 26, 2013          TOBEROFF & ASSOCIATES, P.C.

/s/ Keith G. Adams
Keith G. Adams